**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| T.S., a minor by and through his parent and guardian, S.S.; Q.B., a minor by and through his grandparent and guardian, V.P., <br><br> On behalf of themselves and all others similarly situated, <br><br>        Plaintiffs, <br><br>  v. <br><br> TWENTIETH CENTURY FOX TELEVISION, a division of TWENTIETH CENTURY FOX FILM CORPORATION; FOX BROADCASTING COMPANY; TWENTY-FIRST CENTURY FOX, INC.; FOX ENTERTAINMENT GROUP LLC; FOX NETWORKS GROUP, INC.; THE COUNTY OF COOK, ILLINOIS; THE CHIEF JUDGE OF THE CIRCUIT COURT OF COOK COUNTY in his official capacity; LEONARD DIXON; and JOHN DOES 1 through 20, <br><br>        Defendants. | Case No. 1:16-cv-08303 <br><br> Hon. Amy J. St. Eve <br><br> (Complaint—Class Action) <br><br> JURY TRIAL DEMANDED |

**FIRST AMENDED CLASS ACTION COMPLAINT**

**Introduction**

      Three times during the summer of 2015, the Cook County Juvenile Temporary Detention Center (the "JTDC") was placed on lockdown so that it could be used as a film set to shoot scenes for *Empire*, a hit Fox television show. Numerous areas that are essential to the JTDC's

mission of educating and rehabilitating the children housed there—including the JTDC's school, its facilities for family visits, its only outdoor recreation yard, its library, and its chapel—were placed off limits so that Fox's agents and employees could use them to stage and film the show.

The children for whom these facilities were intended, meanwhile, were ordered to remain in their cells, or were confined to the jail-style "pod" areas just outside their cell doors. There they were told to sit, for days on end. Their schooling continued in name only, visits from their families were interrupted, cut back, or effectively eliminated, sick-call requests were ignored, and programs that are intended to help them overcome the problems that landed them at the JTDC in the first place were cancelled or interrupted.

The purpose of these lockdowns was to provide Fox with a realistic prison facility to use as the primary set of two highly profitable *Empire* episodes. The children at JTDC, meanwhile, were placed under restrictions more severe than those governing many adult jails. Putting the children housed at the JTDC on lockdown so that the Defendants could use the facility to film a profitable television show was a breach of fiduciary duty, and it violated the children's rights under the U.S. Constitution and state law. The profits gained from this misconduct were unjustly obtained. In this lawsuit Named Plaintiffs, on behalf of themselves and a class of similarly-situated children who were subject to these lockdowns, seek the disgorgement of the Defendants' unjust gains, punitive damages, and related remedies.

### Nature of the Action[1]

1.      Named Plaintiffs T.S. and Q.B. were housed at the JTDC in the summer of 2015 during the lockdowns imposed to facilitate the filming of *Empire* there. They seek to represent a class of similarly situated children. On behalf of that class, Named Plaintiffs seek disgorgement,

---

[1]  Plaintiffs make the allegations in this complaint based on personal knowledge as to matters in which they have had personal involvement and on information and belief as to all other matters.

nominal damages, punitive damages, an alternative award of actual damages, and an award of attorneys' fees and costs.

## Parties

2.     Plaintiff T.S. is a 17-year-old boy who was housed at the JTDC during the summer of 2015 when it was placed on lockdown to facilitate the filming of *Empire*.  Pursuant to Federal Rule of Civil Procedure 17, T.S. brings this complaint by and through S.S., his parent and legal guardian.  Like all minors identified in this complaint, T.S. is identified by his initials, pursuant to Federal Rule of Civil Procedure 5.2.  S.S. is identified by initials in order to protect T.S.'s identity.  At the time of the filing of the complaint in this action, T.S. was not incarcerated.

3.     Plaintiff Q.B. is a 17-year-old boy who was housed at the JTDC during the summer of 2015 when it was placed on lockdown to facilitate the filming of *Empire*.  Pursuant to Federal Rule of Civil Procedure 17, Q.B. brings this complaint by and through V.P., his grandparent and legal guardian.  V.P. is identified by initials in order to protect Q.B.'s identity. At the time of the filing of the complaint in this action, Q.B. was not incarcerated.

4.     The Defendants identified in the sub-paragraphs of this paragraph are referred to as the "Fox Defendants" or "Fox."

a.     Defendant Twenty-First Century Fox, Inc. is a diversified global media and entertainment conglomerate with operations in cable network programming, television, and filmed entertainment.  It is a publicly-traded company and is the ultimate parent of all the other Fox Defendants.

b.     Defendant Fox Entertainment Group LLC is a wholly-owned subsidiary of Twenty-First Century Fox, Inc.

c.      Defendant Fox Networks Group, Inc. is a wholly-owned subsidiary of Fox Entertainment Group LLC.

d.      Defendant Twentieth Century Fox Television produces television shows that are broadcast on Fox's network, including *Empire*. Twentieth Century Fox Television is given production credit for both of the *Empire* episodes that were filmed in the JTDC. Twentieth Century Fox Television is a division of Twentieth Century Fox Film Corporation. Twentieth Century Fox Television is not a legal entity distinct from Twentieth Century Fox Film Corporation, and therefore Twentieth Century Fox Film Corporation is liable for all acts and omissions made by or on behalf of Twentieth Century Fox Television. Twentieth Century Fox Film Corporation is a wholly-owned subsidiary of Defendant Twenty-First Century Fox, Inc.

e.      Defendant Fox Broadcasting Company operates the television network that broadcasts *Empire*, among other television programming. Fox Broadcasting Company is a wholly-owned subsidiary of Fox Networks Group, Inc.

5.      Defendant Chief Judge of the Circuit Court of Cook County is sued in his official capacity. The Chief Judge of the Circuit Court of Cook County administers the JTDC.

6.      Defendant Leonard Dixon is the superintendent of the JTDC. He oversaw the JTDC's daily operations at all times during the summer of 2015 when the children housed there were placed on lockdown to facilitate the filming of *Empire*.

7.      Defendant The County of Cook, Illinois ("Cook County") is a county in Illinois. The JTDC is operated as a branch of Cook County's government. Cook County established and operates the JTDC, and it supports, funds, and maintains the facility. Cook County is obligated

4

to indemnify judgements entered against the administrators of the JTDC arising from the operation of the JTDC.

8.      Defendants Does 1 through 20 are sued herein by fictitious names for the reason that their true names are unknown to Plaintiffs.  Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of these Defendants when their identities have been ascertained.  Plaintiffs are informed and believe, and based thereon allege, that these fictitiously-named Defendants are responsible in some manner for the misconduct alleged herein.

9.      The Defendants at all times herein were the agents, joint venturers, and/or co-conspirators of each of the other remaining Defendants, and in doing the things alleged in this complaint they were acting in the course of such agency, joint venture, and/or conspiracy.

## Jurisdiction and Venue

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this is an action arising under 42 U.S.C. § 1983.  The Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims providing the basis for federal subject matter jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.      Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district and this is a convenient and reasonable forum for the resolution of this dispute.

## Facts

### A.  Normal Operation of the JTDC

12.      The JTDC is a five-story building near the intersection of Ogden Avenue and Roosevelt Road, a few miles southwest of downtown Chicago.  It is among the largest juvenile

detention facilities in the country, housing between 250 and 400 children from the ages of 10 to 18.  The average stay for a child at the JTDC is around three weeks.

13.     Under normal operation, the JTDC's floors serve distinct functions.  Children detained at the JTDC are housed primarily on the fourth and fifth floors, which contain rows of cells that open onto small "pods."  The pods serve as common areas in the same manner as a pod or "dayroom" in an adult jail cell block.  A portion of the third floor also contains this cell-and-pod arrangement, including an "intake" pod for newly detained children.

14.     The remainder of the third floor, and the first and second floors, are taken up with facilities designed to provide schooling and structured programming to the children housed at JTDC, along with related administrative services.  The third floor houses the JTDC's infirmary, as well as a large open-air courtyard, which serves as the JTDC's primary recreation yard for the children.  This courtyard is the only place where children detained at the JTDC are allowed outdoors during their detention.  There are smaller auxiliary gymnasium facilities in the basement that can be used by limited numbers of children, and are accessed via elevator.

15.     The second floor is dedicated almost entirely to education and programming, and is the floor on which the bulk of the JTDC's schooling and structured programming services are provided.  The second floor contains the facilities of the Nancy B. Jefferson Alternative School, which is operated by Chicago Public Schools.  In addition to the school's numerous classrooms, the second floor contains a library, a computer lab and music room, and an indoor "game" area with resources to help children detained at the JTDC engage in constructive pastimes.  The second floor also contains a chapel for religious services and other programming, as well as visiting facilities where children can spend time with their families.

6

16.     The first floor contains courtrooms, reception, and administrative offices.  Parts of the first floor are directly accessible to the public, but the remainder of the building is secure and restricted, not accessible to the public without an escort.

17.     The numerous facilities on the JTDC's lower floors are reflective of the purpose for which the children are placed in detention at the JTDC.  The JTDC does not operate as an adult prison, or even an adult jail.  None of the children housed at the JTDC have been convicted of adult crimes, and they are not detained at the JTDC in order to be punished.  To the contrary, because they are children, the purpose of their detention at the JTDC is to nurture and rehabilitate them, which is done by providing the children with schooling, care, and structured programming designed to address the problems that landed them at the JTDC in the first place.  As the JTDC's website states, its mission is to "provide[] the children with a safe, secure and caring environment with programs and structure that enhance personal development and improve opportunity for success upon return to the community."

18.     And indeed, the children housed at the JTDC are in pressing need of these services.  For one thing, they are among the most vulnerable children in Chicago:  more than 90 percent of this population has reported one or more traumatic experiences, with an average child reporting six different traumas.  Sixty percent of the children who enter the JTDC are diagnosed with a mental disorder, and around one-quarter of them are prescribed psychotropic medication.  Added to this, the children frequently arrive at the JTDC in a state of crisis, having been separated from their families and placed in confinement, many for the first time.  Other children, meanwhile, are held at the JTDC not because of a delinquency adjudication, but rather because their home lives are in disarray:  a judge has ordered the child's release from whatever underlying matter brought the child to the JTDC, but the Department of Children and Family

7

Services cannot find a foster home in which to place the child, or the child's guardian has not come to pick the child up. As Superintendent Dixon noted in a recent news interview, "[juvenile] detention is like the emergency room of the juvenile justice system." For that reason, Superintendent Dixon has explained, rather than an incarceration-style setting, "[o]ur thing is to have some normalcy when they [detained children] come here." Conventional incarceration, in which inmates are essentially warehoused in cells or pods with nothing to occupy the hours, aggravates the psychological and emotional traumas suffered by this already vulnerable population, and decreases the children's chances of successfully re-entering society.

19. What is more, subjecting juveniles to forced idleness is dangerous for the children themselves. As the U.S. Department of Justice has explained,

> The amount and quality of structured daily programming in juvenile facilities has a significant impact on the rate of violent and antisocial incidents. Simply stated, youth who do not have adequate opportunities to engage in programmed activities become bored, and are more likely to become involved in mischief or assaultive behavior. Generally accepted professional standards mandate that youth in juvenile justice facilities receive a minimum of one hour of large muscle activity per weekday, two hours of large muscle activity per weekend day, educational programming during weekdays, and other structured developmental and rehabilitative activities. Inadequate youth programming . . . contributes to . . . high levels of youth violence, and departs substantially from generally accepted professional standards.

20. To fulfill the JTDC's rehabilitative mission and provide a safe and structured environment, the JTDC's lower floors are dedicated to offering extensive schooling and structured programming to the children housed there.

21. Under normal operation, the children detained at JTDC eat breakfast on their pods in the upper floors, but quickly head down to the second floor for school, typically by 8:00 a.m. The children attend classes at the school during the day, and take lunch there as well. After classes finish, around 3:00 p.m., the children are typically placed in various structured after-

8

school programs on the second floor, and sometimes on the third-floor recreation yard as well (the recreation yard contains a garden, for instance, which some of the children help maintain). The JTDC's numerous rehabilitative programs include yoga, creative writing courses, computer classes, art, music, and singing. These programs are aimed at addressing the problems that brought each child to JTDC, and at preparing the children to lead more constructive and stable lives once they leave the facility.

22. During the day children are also given time for recreation in the third floor open-air courtyard and game time in the JTDC's indoor game area on the second floor, and they receive visits from family in the JTDC's visiting rooms. These activities, though not formally structured, are also critical for the children's wellbeing, both while they are at the JTDC and after they re-enter society.

23. In the early evening the children return to the pods for dinner and bathing. Shortly thereafter they are placed in their cells for the night.

24. As this itinerary indicates, under normal operation the children spend relatively little time on their pods and cells in the JTDC's upper floors. This is so because, in contrast with the extensive programming and activities the children receive on the second and third floors, their time on the pods is spent under restrictions that can be even more confining than those of an adult jail.

25. Each cell-and-pod arrangement has around 15 to 20 children, overseen by guards. Most of the pods are long, narrow rooms—essentially a large, enclosed corridor outside of a row of cells—with jail-style seating arrangements, consisting of tables that are each fused to short stools and fixed to the floor. Pods are also typically equipped with a television (and accompanying seats) at one end, but they otherwise have little in the way of materials for

9

activities, and certainly nothing comparable to the resources and programming available on the second and third floors.

26. To prevent the monotony of the pods from leading to altercations and physical violence, when the children are on the pod they are prohibited from moving freely. Whereas inmates in an adult jail are typically allowed to move around their "day rooms" as they please, children on the pods at the JTDC must all remain sitting in the same spot, at all times. If a child needs to use the restroom or otherwise leave his seat, that child must raise his hand and receive permission from the guards. While that child is out of his seat, no other children may leave their seats. Breaking this rule—that is, if one child stands up without first receiving permission—is punishable as a "major rule violation." Some limited services are offered on the pods themselves—priests and pastors are allowed to visit the children there, for example—but otherwise the pods are devoid of programming.

27. Exigent circumstances—such as staffing shortages or security concerns— sometimes force JTDC administrators to hold children on the pods, where these significant restrictions govern. Otherwise, though, the JTDC attempts to minimize the time children spend in the restrictive conditions of the pod, in favor of the school facilities, recreation, and structured programming offered in the second and third floors of the facility.

28. Notably, providing meaningful schooling and programming opportunities requires a considerable number of personnel, in addition to facilities where these services can be provided. This is so because the children must be escorted by guards every time they leave their pods to travel to schooling or programming elsewhere in the JTDC.

**B. Filming *Empire* at the JTDC**

29.     Sometime in the spring of 2015, Superintendent Dixon, one or more of the Fox

Defendants, and/or one or more of the Defendant Does entered into an agreement that *Empire*'s

film crew would be permitted to film at the JTDC.  This agreement contemplated that the *Empire*

film crew would have access to many of the restricted facilities on the JTDC's second and third

floors that are intended to rehabilitate and educate the children housed at the JTDC—and that

these children would be barred from those same facilities so that the film crew could work

without interruption.  Instead, by necessary implication, the children housed at the JTDC would

be confined to their cells and pods on the facility's upper floors.  In reaching this agreement, the

Defendants knew that filming *Empire* at the JTDC would result in the lockdowns and attendant

restrictions on the children housed there.

30.     The production and filming of *Empire* at the JTDC lasted two weeks in the

summer of 2015, spread over three different shootings:  June 21 through 26, July 13 through 16,

and August 23 through 26.

31.     The film crews that descended on the JTDC to conduct these shootings were

enormous.  *Empire* employed a film crew of approximately 250 in Chicago, and city permits

taken in the name of "Fox Entertainment Group" show that each time *Empire* came to film at the

JTDC, parking was suspended around the facility for as many as seven city blocks.  These

restrictions were needed to accommodate the large number of cargo vans, production trailers,

motor homes, tractor-trailer rigs, crew vehicles, and other support vehicles used in filming.

32.     During each of the three shootings *Empire*'s film crew—including dozens of

production staff, actors, and extras—took over much of the JTDC's second and third floors.  The

Nancy B. Jefferson school's classrooms were largely occupied with film crews and production

equipment.  The JTDC's chapel was converted into an area for eating, and garbage cans were

placed there for *Empire*'s crew to throw away trash.  The library, which was normally used by

children at the JTDC to read, study, and check out books, was made into crew support area.  The

infirmary was used as a film set, as were some of the JTDC's intake facilities.  So was the

JTDC's visiting area, where the children normally meet with their families.  One area of

particular focus for the film crew was the third floor open-air courtyard, which *Empire*'s crew

used to film large, long-format scenes involving numerous actors and extras.

33.     *Empire* took over more than just the many facilities on the JTDC's second and

third floors.  Internal JTDC documents prepared to plan for the *Empire* filming indicate many

staff were expected or directed to leave their normal duties in order to render services to the film

crew instead.  Some were chosen to act as extras in the show.  Others were assigned to clean and

clear out several areas in the building (this included removing children from some pods that the

*Empire* crew wanted to use for filming), man the delivery docks to permit the free flow of film

equipment, escort actors and crew members to and from the film set, keep *Empire*'s production

crew from wandering around the facility, provide security for areas where filming was to occur,

help escort filming equipment into place, and clean up after the crew.  The *Empire* filming, in

short, not only took over many of the facilities that furnished the schooling and structured

programming that the JTDC was intended to provide; it also diverted a number of staff whose

job it was to help fulfill the JTDC's rehabilitative mission.

34.     As a result, the only place for the children housed at the JTDC was their cells and

pods.  That is where they were kept.  To accommodate *Empire*, Superintendent Dixon and/or

Defendant Does deliberately placed the JTDC on lockdown, confining the children to the jail-

style cell-and-pod arrangements in the JTDC's upper floors.  This was not an accidental or

inadvertent result of the filming.  Rather, it was the planned method by which the JTDC was

cleared out to make way for *Empire*'s film crew.  In an internal JTDC document circulated

among staff to organize the facility in preparation for *Empire*'s arrival, for example, the JTDC's

custodial staff were instructed:

> Notify storeroom for additional supplies that the pods may need for
> increase of resident [*sic*] on pods.  There will be a significant increase in
> utilization of custodial supplies.  Toilet paper, C-fold towels, hand soap,
> hand sanitizer, garbage bags etc… [*sic*] will be needed.

35.     When *Empire* arrived at the JTDC to film, the lockdown began with school.

Instead of going down to their second-floor classrooms after breakfast as they normally would,

the children remained on their pods.  Nancy B. Jefferson teachers were ordered up into these

areas, and instructed to go from pod to pod to teach their students.  This was "school" in name

only.  The pods are not set up or even shaped like classrooms; instead, the teacher must stand in

the midst of the seating that is arranged around the pod.  There is no whiteboard or other

teaching equipment for the instructor to use, and what supplies the teachers can bring to the pods

are limited.  What is more, during *Empire* filming many of the children whom the teachers had to

instruct had not been allowed to move all day, and were going stir-crazy in what amounted to

their own jail "day room."  Indeed these obvious obstacles are why the Nancy B. Jefferson

school facilities existed in the first place, and why the hundreds of children at the JTDC are

escorted down to the school's second-floor classrooms on a daily basis.  Up on the pods

instruction was markedly less effective and often chaotic, and during the *Empire* filming teachers

often did not appear in the pods at all.

36.     Recreation was drastically reduced, and for many children it was eliminated.

Because the JTDC's primary recreation facility—the third floor's open-air courtyard—was being

used to film *Empire*, the children were banned from that area.  (The courtyard is divided into

13

three sections, separated by walls, which allows different groups of children to use the yard independently. The *Empire* film crew only filmed in one of the sections, but the children were still banned from the remainder of the yard.) This left the smaller gymnasium facilities in the JTDC's basement. But with limited space there, and the logistical challenge of bringing children down from the JTDC's upper floors during filming, there was a backlog and many children never received any recreation or exercise at all.

37.    Instead, in an evident attempt to comply with the letter of juvenile facility standards, many children were given "rec time" up on the pods themselves. An "instructor" would arrive and ask whether any of the children wanted to partake in "large muscle activity," by which the instructor apparently meant push-ups, sit-ups, and jumping-jacks, to be done among the tables on the pod. In other pods a ball would be introduced and the children would be told to play. Even these pretenses were often abandoned, and there was simply no recreation at all. At no point during the *Empire* filming were the children allowed outdoors, as they would have if they had been allowed to use the third floor courtyard.

38.    For many of the children detained at the JTDC, visits with families were effectively eliminated during *Empire* filming. For others, visits were restricted and severely shortened, with parents, who normally waited just a few minutes to visit with their children for an hour or more, forced to sit in waiting rooms for hours on end, for the opportunity to see their children for markedly shortened visits.

39.    Other appointments were cancelled as well. For example, in order to seek medical attention the children can fill out sick-call slips on their pods. During normal operation, these requests usually receive prompt attention. The *Empire* film crew used the JTDC's

infirmary to shoot scenes for the show, however, and during filming numerous sick call requests were ignored.

40. Structured programming for children was also cancelled. Most of the structured programming normally occurs on the JTDC's second floor, with some limited programming, such as a botany project that is run on the open-air courtyard, occurring on the third floor. Because the second and third floors had largely been taken over by *Empire*'s film crew, many of the JTDC's after-school programs, including music and dance, were cancelled. Instead of attending these programs, children remained on their pods.

**C. Individual Experiences**

41. <u>**T.S.**</u>

    a. During the summer of 2015, T.S. was 16 years old and was housed in a JTDC living unit. Children on T.S.'s pod normally left the pod in the morning to attend class in the Nancy B. Jefferson school facilities on the second floor, which they attended through mid-afternoon. During the day, they had recreation time in the third-floor courtyard. They also took advantage of games and activities on the commissary area on the JTDC's second floor.

    b. When *Empire* arrived to film, these routines were eliminated. T.S. and the rest of the children on his pod were held there. They were not allowed down to the Nancy B. Jefferson school facilities; instead, teachers would sometimes come up to the pods. This was a chaotic teaching environment. The teacher could not teach in front of the children, and had no whiteboard to instruct from. To make matters worse, the children on the pod, who had been prohibited from meaningful

recreation, were going stir-crazy, and the pod was out of control. In this setting, teaching simply did not occur.

c.      During *Empire*'s filming, the children on T.S.'s pod did not leave for recreation. Instead a JTDC staff "instructor" would occasionally come to the pod and ask, "Who wants to do large-muscle?" This meant, apparently, that the children should do push-ups, sit-ups, and jumping-jacks in front of the seats they had been forced to sit in all day. After none of the children took the instructor up on this "recreation" offer, he would leave the pod. Often, no instructor arrived at all. Sick call requests by children on T.S.'s pod were also ignored during filming, whereas during regular operation they were responded to relatively promptly.

d.      T.S.'s visits with his mother were also interrupted and curtailed. During the JTDC's normal operation, T.S.'s mother visited him during the two visiting periods T.S. was allotted each week. To visit T.S., his mother would arrive during T.S.'s designated visiting time slots, which were in the late afternoon or early evening. Once she arrived, it would typically take 20 minutes for JTDC staff to locate T.S. and bring him to the visiting facilities on the second floor. T.S. and his mother would then be able to have a visit that typically lasted at least an hour.

e.      During *Empire*'s filming, T.S.'s mother arrived at the designated time slot for her visit. Instead of bringing T.S. down, however, she, and several other parents who had arrived to visit during the same slot, were forced to sit in the waiting area. After around two hours had passed, she saw a large group of what appeared to be *Empire*'s cast or crew leave the building. Sometime thereafter, she

was escorted to visit with T.S. in a room much smaller than the JTDC's normal visiting rooms. Instead of being allowed to visit for an hour, their visit was shortened significantly.

42. **Q.B.**

a. During the summer of 2015, Q.B. was 16 years old and was housed in a JTDC living unit. Children on Q.B.'s pod normally attended classes at the Nancy B. Jefferson school throughout the day. The children on Q.B.'s pod were provided with two recreation periods, one for gym class as part of their schooling, and another for an after-school recreation hour.

b. The schooling on the second floor, and the recreation hours, were important to Q.B. and the other the children because they provided a meaningful escape from the monotony of confinement on the pod. While on the pod the children were required to sit in one place, and could only move, one at a time, with prior permission. Even to stand up without first obtaining permission was treated as a major rule violation.

c. Q.B. had two visiting hours during the week, on Tuesdays and Saturdays, and during his confinement at the JTDC his father and his grandmother visited him frequently.

d. One day the children on Q.B.'s pod were told they would not be going down to the school, because *Empire* had arrived to film at the JTDC. During the *Empire* filming teachers occasionally came up to the pod to teach, but sometimes they did not. When they did arrive, the teaching environment was chaotic, as the children had been locked on the pod all day without any opportunity for

movement.  Children on Q.B.'s pod never received recreation during *Empire*'s filming, making time on the pod miserable.  In addition to these restrictions, sick call requests put in by children on Q.B.'s pod were ignored.  Normally such requests were responded to relatively promptly.

e.      Q.B.'s grandmother visited him at the JTDC whenever she could.  She works at a supermarket that frequently requires her to work over the weekends, however, making visits during Q.B.'s Saturday visiting slot difficult.  After being unable to get time off to visit one Saturday, Q.B.'s grandmother asked her boss to take off of work Tuesday, so that she could visit her grandson.  *Empire* was filming that day, however, and when she arrived at the JTDC during Q.B.'s visiting slot, she was told that visits in that time had been cancelled.

43.     **N.T.**

a.      N.T. is a 16-year-old boy who was housed at the JTDC.  During normal operation, he and the other children in his unit would leave the pod after breakfast for classes downstairs at the Nancy B. Jefferson school facilities.  They would attend school through the afternoon, with outdoor recreation in the third-floor courtyard during the school day.  The children in N.T.'s unit participated in multiple after-school programs, including a drum circle and a dance class.  During the two visiting periods that N.T. was allotted each week, either N.T.'s mother, his grandmother, or both would visit with him in the JTDC's visiting area.

b.      When Fox arrived to film *Empire*, N.T.'s unit was placed on lockdown.  The children did not leave the pod for school.  Instead, they remained in their pod, where they were told to remain in their seats.  Movement was permitted only to

18

one child at a time, after the child received permission. Some teachers came up to the pod, but there was no whiteboard board for writing, the teachers brought few materials, and teaching in the pod environment was ineffective. After-school programming was cancelled entirely, and N.T. was unable to visit with his mother or grandmother. Children in N.T.'s unit could only escape the monotony of the pod by buying "room time"—30 minutes alone in their cells—using points they earned for good behavior.

c.      During lockdown the children in N.T.'s unit were taken to the gymnasium facilities in the JTDC's basement, but only occasionally, apparently because administrators from different pods were fighting for scarce recreation time slots there. As a substitute the children were given "recreation" in their pods, during which they were allowed to play cards or write letters. Otherwise, the children were confined to their chairs on the pod and not allowed to move.

44.   **G.M.**

a.      G.M. is a 16-year-old boy who was housed in the JTDC's intake unit when *Empire* arrived to film. Children in the intake unit are normally allowed out of their cells the entire day. They take breakfast in their pods, are allowed some activities there, and are given recreation either in the basement gymnasium facility or the third-floor open-air courtyard. There is also an area in the intake unit where the children can watch television.

b.      The intake unit is on the third floor and was thus close to much of the filming that occurred for *Empire*. While *Empire* was filming, G.M. was not allowed out of his cell. He was given meals in his cell and was instructed to be

19

quiet.  He was allowed out of his cell only for dinner, and then returned to the cell for the evening.

45.  **D.G.**

a.      D.G. is a 16-year-old boy who was housed in a JTDC living unit on the JTDC's third floor.  Children in his unit normally left the pod to attend school in the Nancy B. Jefferson classrooms on the JTDC's second floor, and they would participate in structured programming later in the day.

b.      When *Empire* arrived to film at JTDC, the children did not leave the pod for school.  Instead, teachers came to the pod, though the instruction was much less effective than instruction in the Nancy B. Jefferson school facilities. Eventually no teachers came to the pods.

c.      Otherwise there was a television on the pod, turned on at low volume. Some children watched the television, but in all events, the children on D.G.'s pod were told not to speak, even at conversational levels.  At times during the lockdown, the guards attempted to provide the children with "recreation," but this consisted of a red rubber ball that was given to the children in the pod.  During the *Empire* filming the children on D.G.'s pod were not permitted to leave the pod for recreation.

**D.  The Children Housed at JTDC Were Injured by The Lockdown**

46.      As a proximate result of the *Empire* lockdown, the children housed at the JTDC suffered harm.

47.      The lockdown interrupted and degraded the rehabilitation and structured programming that is designed to address the problems, many of them very serious, that brought

20

the children to the JTDC.  This includes the children's education and schooling, which was degraded and often eliminated as a result of the lockdown.

48.     The lockdown was also psychologically damaging to children in and of itself. Placing children for days on end under the forced idleness that governed in the pods is psychologically and emotionally harmful.  This is particularly so for a vulnerable population like the children housed at the JTDC, many of whom come from unstable or broken homes and suffer from psychological trauma and diagnosed psychological impairments.

49.     As a proximate result of the lockdown, the children housed at the JTDC were also subject to an increased the risk of physical violence.  It is well established that depriving children housed in juvenile facilities of meaningful opportunities for recreation and structured programming, and instead forcing them into idleness on their pods, increases the risk of confrontation and violence among the children themselves.  The *Empire* lockdowns created just such a hazard for the children at JTDC, increasing risk from attack or altercation with other children there.

**E.  The Defendants Profited From Locking Down JTDC**

50.     The Defendants profited as a proximate result of the JTDC lockdown.

51.     The Fox Defendants profited from using the JTDC's incarceration facilities as the primary set for two highly profitable *Empire* episodes.  Scenes shot at JTDC were featured prominently in the first two episodes of *Empire*'s second season, accounting for more than a third of the running time in each.  These episodes were immensely profitable.  Advertisers paid $750,000 per 30-second advertising spot in Episode 1, and $600,000 per 30-second spot in Episode 2.  An advertising industry publication called these rates "astonishing."

52. In addition to this revenue, the Fox Defendants realized profits from *Empire* by broadcasting these episodes overseas, as well as licensing the episodes, streaming them over the internet, and selling them for download. In reports to investors covering this period, Defendant Twenty-First Century Fox, Inc. noted that *Empire* was highly profitable and had contributed significantly to the company's revenues.

53. These profits were the result of joint effort by the Fox Defendants. Defendant Twentieth Century Fox Television was the producer of both episodes featured at the JTDC, which were broadcast by Fox Broadcasting Company; the two companies, which share joint CEOs, work closely together to design programming, including *Empire*, that will maximize Fox's revenue. Indeed, one reason for *Empire*'s multiple visits to the JTDC was that Fox Broadcasting Company and Twentieth Century Fox Television demanded that certain scenes set at the JTDC be re-filmed. In particular, one of the characters in the *Empire* episodes filmed at the JTDC, played by comedian Chris Rock, had originally been depicted as a cannibal. After they learned about this depiction, executives of the Fox Broadcasting Company, Twentieth Century Fox Television, and/or one or more of the Defendant Does acting as agents for the Fox Defendants, ordered that certain scenes at the JTDC be re-shot to change this depiction. The JTDC was placed on lockdown at least in part to accommodate these demands.

54. Defendant Fox Entertainment Group LLC was involved in the production of these episodes, having, for example, secured the parking permits for filming at the JTDC. Profits from the episodes flowed through Fox Networks Group, Inc. and Fox Entertainment Group LLC to Defendant Twenty-First Century Fox, Inc.

55. Cook County and/or certain Defendant Does profited from *Empire*'s filming as well, receiving "reimbursement" revenue connected with the use of the JTDC.

22

### F. The Final Decision Maker Regarding JTDC's Operation Knew About and Approved of the Lockdown

56.     From the facts available, Named Plaintiffs allege that the person who exercises final decision-making authority regarding operation of the JTDC, Timothy Evans, who was the Chief Judge of the Circuit Court of Cook County, knew about and approved the filming of *Empire* at the JTDC, and the facility's consequent lockdown.

57.     As described herein, the *Empire* lockdown occurred during a high-profile transition in which the Chief Judge's office took administrative control of the JTDC for the first time.  It is simply not plausible that Superintendent Dixon, who had just started his job, would authorize the *Empire* filming and lockdown without first checking with his new boss.  And indeed, as described herein, Superintendent Dixon implied in correspondence that Chief Judge Evans was aware of the filming, and had approved of it.

58.     In the summer of 2015, the JTDC was starting a new chapter in its administration. Sixteen years earlier, in 1999, a federal civil rights lawsuit was filed against Cook County, alleging systematic mistreatment and neglect of children housed at the JTDC.  *See Doe v. Cook County*, 99-cv-3945 (N.D. Ill.).

59.     The *Doe* parties originally entered into a settlement agreement under which Cook County would improve conditions at the JTDC.  In 2007, though, after concluding that the County was not complying with the agreement's terms, the District Court appointed a federal temporary administrator to operate the JTDC and bring it into compliance.  On January 1, 2008, a few months after the federal temporary administrator took over the JTDC, the Illinois Legislature enacted a reform measure providing that the Chief Judge of the Circuit Court of Cook County, rather than the Cook County Board, would appoint the JTDC's administrator and all other necessary personnel, who would then serve at the Chief Judge's pleasure.

23

Notwithstanding this transfer of authority, the JTDC would remain under control of the federal District Court's temporary administrator for the next several years.

60.     Years later, the District Court finally determined that the JTDC could be returned to local control.  It ordered that control of the JTDC be transferred from the temporary federal administrator back to local control in 2015.

61.     In preparation for the JTDC's transfer from federal control, Chief Judge Evans appointed Leonard Dixon as the JTDC's new superintendent.  This was a high-profile selection.  Chief Judge Evans announced his choice with a lengthy press release, and held a joint press conference with Superintendent Dixon to discuss Dixon's appointment and his impending takeover of the JTDC.  The transfer was the object of intense media scrutiny, and Chief Judge Evans and Superintendent Dixon gave media interviews on the subject.  In these press events and interviews, both men stressed that their priority in reassuming control of the JTDC would be the care for and welfare of the children housed there.  They also stressed the need to provide the children housed at the JTDC with a non-penal environment that featured structured programming, to help the children cope with difficulties in the outside world once they left the facility.

62.     The federal District Court finally transferred administration of the JTDC to local control on May 20, 2015.  *Empire* arrived to film four weeks later, on June 21.

63.     It is exceedingly unlikely that Superintendent Dixon would have allowed *Empire* to film there without Chief Judge Evans' approval.  Dixon, who has held high-profile positions in the juvenile corrections field for decades, had become the JTDC's superintendent just four weeks earlier when it was placed under Chief Judge Evans' control, for the very first time.  And as noted above, Chief Judge Evans had publicly expressed keen interest in this transfer.  Under

24

these circumstances, it would be implausible to suggest that an experienced administrator like Superintendent Dixon would have placed the JTDC on lockdown so that a large television crew could use it as a film set, without first checking with his boss.

64.     And indeed, in contemporaneous correspondence Superintendent Dixon implied that he had just such approval from Chief Judge Evans.  In July 2015, an attorney wrote to Superintendent Dixon to express concern about reports the attorney had received that the JTDC had been placed on lockdown so that Fox could film *Empire* there.  Superintendent Dixon responded by formal letter on July 24, 2015.  He acknowledged that *Empire* had filmed at the JTDC, but he claimed that the experience for the children had been positive, and they hadn't been inconvenienced in any way.  The letter's closing "courtesy copy" notation indicated that Dixon was sending a copy of the letter to Dr. Beverly Butler, whom the letter noted represented the office of the Chief Judge.  Indeed, Dr. Butler was Chief Judge Evans' special assistant for the transition of the JTDC to the Chief Judge's control.  It is reasonable to infer that Superintendent Dixon's purpose in copying Dr. Butler on the letter was to imply that Chief Judge Evans was aware of, and had approved of, the *Empire* filming.  Crediting Superintendent Dixon this implication, and considering the circumstances discussed above, it is reasonable to infer that Chief Judge Evans, the final decision-maker regarding the operation and administration of the JTDC, knew that the JTDC was being used as a film set for *Empire*, and had approved of it.

## Class Allegations

65.     Named Plaintiffs seek to pursue claims for a class of others similarly situated pursuant to Rule 23(b)(1)(B) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.

66.     Named Plaintiffs seek to represent a class consisting of all children housed at the JTDC when the facility was placed on lockdown during the filming of *Empire* in the summer of 2015.

67.     **Numerosity**—The individuals in this class are so numerous that joinder of all members is impractical. There are between 250 and 400 children housed at JTDC during normal operation.

68.     **Commonality**—There are questions of law and fact common to this class. Among those questions are:

- Whether *Empire* was filmed at the JTDC during the summer of 2015.

- Whether the JTDC was placed on lockdown in order to facilitate this filming.

- Whether locking down the children at the JTDC in order to facilitate the filming of a commercial television show is an action reasonably related to a legitimate governmental interest.

- Whether it was a breach of fiduciary duty to place the children housed at the JTDC on lockdown so that *Empire* could be filmed there.

- Whether the Fox Defendants and Defendant Does acted jointly with the JTDC's administrators to place the children housed at the JTDC on lockdown in order to film scenes for *Empire*.

- Whether the Defendants conspired with one another to place the children at the JTDC on lockdown in order to realize a profit from the filming of *Empire*.

- Whether locking down children housed at the JTDC in the manner described in the complaint created an increased risk of physical violence.

- Whether locking down the children housed at the JTDC in order to film *Empire* departed substantially from generally accepted professional standards for the operation of juvenile facilities.

- Whether locking down the children housed at the JTDC in order to film *Empire* violated their Due Process rights under the U.S. Constitution.

- Whether locking down the children housed at the JTDC in order to film *Empire* effected an unreasonable seizure in violation their rights under the U.S. Constitution.

- Whether the profits that the Defendants realized from locking down the JTDC in order to film *Empire* were unjustly obtained.

- Whether the Defendants are subject to disgorgement of the profits they realized by placing the children at the JTDC on lockdown in order to film *Empire* there.

- Whether the Defendants are subject to nominal damages for placing the children housed at the JTDC on lockdown in order to film *Empire* there.

- Whether the Defendants are subject to punitive damages for placing the children housed at the JTDC on lockdown in order to film *Empire* there.

- Whether the Defendants are subject to actual damages for placing the children housed at the JTDC on lockdown in order to film *Empire* there.

69.    ***Typicality***—Named Plaintiffs' claims are typical of the claims of the Class. Named Plaintiffs were housed at the JTDC when the children at the facility were placed on lockdown in order to facilitate filming for *Empire*.  Their treatment in being placed on lockdown is typical of other children housed at JTDC who were placed on lockdown in order to facilitate the filming of *Empire*.  Named Plaintiffs seek to prove that the locking down of the children housed at the JTDC in order to facilitate the filming of *Empire* violated the constitutional and state-law rights of the children subjected to the lockdown, and that the Defendants are subject to nominal damages, actual damages, punitive damages, and disgorgement for the profits resulting from this misconduct.

70.    ***Adequacy***—Named Plaintiffs will fairly and adequately represent the interests of the class.  They are represented by skilled counsel with experience in complex civil litigation, class actions, and litigation concerning constitutional and prisoners' rights.  Attorneys Stephen H. Weil, Pamela Hanebutt, and Susan Razzano have decades of experience in complex civil litigation, including class action litigation.  The attorneys also have substantial experience in litigation under Section 1983, including individual and class-action litigation on behalf of jail and prison inmates.

71.    ***Rule 23(b)(1)(B)***—Named Plaintiffs' claims for disgorgement, among other remedies, are certifiable under this rule because adjudications with respect to individual members of the class will as a practical matter be dispositive of the interests of the other members of the class.

72.    ***Rule 23(b)(3)***— Named Plaintiffs' claims for actual damages, among other remedies, are certifiable under this rule because the questions of law and fact common to the class predominate over any individual issues, and a class action would be superior to other methods for fairly and efficiently adjudicating this controversy.

**COUNT I - 42 U.S.C. § 1983**
**(All Defendants—Due Process)**

73.    Each paragraph of this complaint is incorporated as if fully restated here.

74.    As described more fully herein, each of the Defendants subjected Named Plaintiffs and similarly situated children at the JTDC to lockdown, which impeded these children from accessing meaningful schooling, rehabilitation, structured programming, recreation, and visits from families, and subjected them to restrictions more severe than those that are commonly imposed in many adult jails.  The Defendants did this so that the JTDC's schooling and other facilities on its second and third floors could be used to stage and shoot scenes for the *Empire* television show.  The Defendants did this while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment.

75.    The lockdowns and attendant conditions were not imposed for a legitimate governmental purpose, but rather to facilitate the filming of a commercial television show and to realize the profits therefrom.  The Fox Defendants acted together with and obtained significant aid from Defendants Cook County, the office of the Chief Judge of the Circuit Court of Cook County, Dixon, and Does 1 through 20 in filming *Empire* for commercial purposes at the JTDC.

28

The Defendants knew that filming *Empire* at the JTDC would result in the lockdowns and attendant restrictions on the children housed there.

76.     The Defendants knew that the lockdowns violated the children's rights and imposed harm and a risk of harm on the children, yet they carried out the lockdown and filming anyway.  This misconduct was undertaken knowingly, intentionally, and/or with reckless indifference to the rights of the children housed at the JTDC.

77.     The lockdowns and attendant conditions violated the Due Process rights of the children housed at the JTDC.

78.     As a proximate result of these lockdowns and resulting conditions, the children housed at the JTDC suffered emotional and psychological pain, were deprived of meaningful opportunities for rehabilitation, education, and family visits, and were subject to increased risk of physical violence at the hands of other children at the facility.

79.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described elsewhere in this complaint.

**COUNT II - 42 U.S.C. § 1983**
**(All Defendants—Unlawful Seizure)**

80.     Each paragraph of this complaint is incorporated as if fully restated here.

81.     Under the JTDC's normal operation, children are permitted, among other things, to attend classes at the Nancy B. Jefferson school, participate in structured programming in appropriate facilities on the JTDC's lower floors that is designed to assist in their rehabilitation, participate in recreation, including outdoor recreation in the third floor courtyard, and visit with family members in the JTDC's visiting areas at appropriate times and for extended periods.

82.     As described more fully herein, the Defendants deliberately placed the children housed at the JTDC on lockdown in their cells and pods, physically restraining and limiting their

29

range of movement, and preventing them from leaving the pods and partaking in the numerous educational and rehabilitative activities that they would otherwise be entitled to do. The Defendants did this while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment.

83.     The Fox Defendants acted together with and obtained significant aid from Defendants Cook County, the office of the Chief Judge of the Circuit Court of Cook County, Dixon, and Does 1 through 20 in filming *Empire* for commercial purposes at the JTDC. The Defendants knew that filming *Empire* at the JTDC would result in the lockdowns and attendant restrictions on the children housed there. The Defendants jointly acted to improperly impose these additional restrictions on the children housed at the JTDC in order to facilitate the *Empire* filming. This constituted a new seizure—that is, a seizure different from, and in addition to, the children's existing lawful detainment.

84.     This new seizure was objectively unreasonable. It was not effected pursuant to a legitimate governmental purpose, but rather so that the schooling, rehabilitation, and recreation areas of the JTDC could be used to film scenes for a profitable television show.

85.     As a proximate result of these lockdowns and resulting conditions, the children housed at the JTDC were deprived of their liberty interest to be free from unreasonable restraint. They also suffered emotional and psychological pain, were deprived of meaningful opportunities for rehabilitation, and were subject to increased risk of physical violence at the hands of other children housed at the facility.

86.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described elsewhere in this complaint.

**COUNT III - 42 U.S.C. § 1983**
**(*Monell* liability— Cook County and/or the**
**Chief Judge of the Circuit Court of Cook County)**

87.     Each paragraph of this complaint is incorporated as if fully restated here.

88.     The lockdowns of the JTDC were the result of the official policy and decisions of Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County.

89.     Specifically, Chief Judge Timothy Evans was the person with final policymaking and decision-making authority regarding the administration and operation of the JTDC, on behalf of Defendants Cook County and/or the office of the Chief Judge of the Circuit Court of Cook County.  This included the decision of whether to allow the filming of *Empire* at the JTDC.

90.     As set forth in more detail in this complaint, Chief Judge Evans was informed of, knew about, and approved of the filming of *Empire* at the JTDC, and its consequent lockdown. Because Chief Judge Evans was the final policy- and decision-maker regarding the JTDC's administration and operation, Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County may be said to have caused the injuries and unjust enrichment described in this complaint.

**COUNT IV - 42 U.S.C. § 1983**
**(Fox Defendants—Joint Action Liability)**

91.     Each paragraph of this complaint is incorporated as if fully restated here.

92.     The Fox Defendants and their employees and/or agents willfully induced and participated in the lockdown of the children at the JTDC facility, and their actions were inextricably intertwined with those of the named and unknown defendant administrators of the JTDC, acting under color of law, who placed the facility on lockdown and imposed the conditions described herein.  The Defendants agreed to engage jointly in an enterprise that only

the government could lawfully institute for the mutual benefit of both the public and private Defendants.

93.     The Fox Defendants deliberately encouraged the JTDC's administrators to improperly place the JTDC on lockdown during the filming of *Empire*, for commercial benefit. The Fox Defendants reached an agreement with the JTDC's administrators that the JTDC's administrators would prohibit the children housed at the JTDC from using the various schooling and rehabilitative facilities on the JTDC's second and third floors so that the Fox Defendants could use those facilities to stage and film scenes for *Empire*. The contemplated and obvious result of this agreement was that the children would be confined to their cells and pods on the JTDC's upper floors. It was to accommodate the Fox Defendants' filming needs that the children at JTDC were placed on lockdown at all. Indeed, it was the intention of the Fox Defendants that the children not be allowed to use their designated schooling and rehabilitation facilities so that the Fox Defendants and their agents could film *Empire* without distraction. In reaching this agreement with the JTDC's administrators, the Fox Defendants entered into a conspiracy and undertook joint action, under color of law, to violate the rights of the children housed at the JTDC.

94.     The acts taken in furtherance of this conspiracy and joint action proximately resulted in the injuries and unjust enrichment described elsewhere in this complaint.

## COUNT V – 42 U.S.C. § 1983
### (Fox Defendants—*Respondeat Superior*)

95.     Each paragraph of this complaint is incorporated as if fully restated here.

96.     While committing the misconduct alleged in the preceding paragraphs, one or more of the Defendant Does 1-20 were employees and/or agents of one or more of the Fox Defendants and were acting within the scope of their employment and/or agency. One or more

32

of the Fox Defendants are liable as principal for all torts constitutional violations committed by their employees and/or agents or on their behalf, and the resulting unjust enrichment.

## COUNT VI - 42 U.S.C. § 1983
### (Conspiracy—All Defendants)

97.     Each paragraph of this complaint is incorporated as if fully restated here.

98.     The Defendants reached an agreement among themselves to deprive the children housed at the JTDC of their constitutional rights, as described throughout this complaint.

99.     In furtherance of this conspiracy, each of the co-conspirators committed overt, tortious acts and was an otherwise willful participant in joint activity.

100.     The misconduct described in this count was undertaken intentionally and/or with reckless indifference to the rights of the children housed at the JTDC.

101.     As a direct and proximate result of the illicit prior agreement referenced above, the rights of the children housed at the JTDC were violated, and they suffered emotional and psychological injuries as well as a wrongfully increased risk of physical injury, as described elsewhere in this complaint.

102.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

## COUNT VII – State Law Claim
### (Breach of Fiduciary Duty – Dixon and Defendant Does)

103.     Each paragraph of this complaint is incorporated as if fully restated here.

104.     Defendants Dixon and one or more of Defendant Does 1-20 were guardians of the children housed at the JTDC.

105.     In turn, the children housed at the JTDC were the wards of these Defendants.

106.     As guardians, these defendants had a fiduciary relationship with the children housed at the JTDC.

107.    Among their obligations as guardians, these Defendants were obliged to act in the best interest of the children housed at the JTDC.

108.    As described more fully throughout this complaint, these Defendants breached these fiduciary duties by placing the children housed at JTDC on lockdown for the purposes of facilitating the filming of a profitable television show there.

109.    As a proximate result of this breach of fiduciary duty, the children housed at the JTDC suffered harm and an increased risk of physical injury, as described elsewhere in this complaint.

110.    As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

**Count VIII State Law Claim**
**(Inducement of Breach of Fiduciary Duty – Fox Defendants and Defendant Does)**

111.    Each paragraph of this complaint is incorporated as if fully restated here.

112.    As set forth more fully herein, Defendants Dixon and one or more of Defendant Does 1-20 were fiduciaries of the children housed at the JTDC.

113.    As set forth more fully herein, one or more of the Fox Defendants and/or Defendant Does induced and/or colluded with one or more of these fiduciaries in committing the breaches of fiduciary duty described elsewhere in this complaint.

114.    These Fox Defendants and/or the Defendant Does knowingly induced and knowingly participated in this breach, and they knowingly accepted the benefits resulting from this breach.

115.    As a proximate result of this breach of fiduciary duty, the children housed at the JTDC suffered harm and an increased risk of physical injury, as described elsewhere in this complaint.

116.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

## COUNT IX – State Law Claim
### (All Defendants – Intentional Infliction of Emotional Distress)

117.     Each paragraph of this complaint is incorporated as if fully restated here.

118.     The actions, omissions, and conduct of the Defendants as set forth in this complaint were extreme and outrageous.  These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to the children housed at the JTDC.

119.     As a direct and proximate result of the Defendants' actions, the children housed at the JTDC suffered emotional distress as set forth above.

120.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

## COUNT X – State Law Claim
### (All Defendants – Civil Conspiracy)

121.     Each paragraph of this complaint is incorporated as if fully restated here.

122.     As described more fully in the preceding paragraphs, the Defendants reached an agreement among themselves to place the children housed in the JTDC on lockdown so that the facility could be used to film scenes for a profitable television show, and conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

123.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

124.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in

35

total disregard of the conditions imposed by or the effects of the lockdowns on the children housed at the JTDC.

125.     As a proximate result of the Defendants' misconduct described in this Count, the children housed at the JTDC suffered harm and the increased risk of physical injury, as described elsewhere in this complaint.

126.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

### COUNT XI – State Law Claim
#### (*Respondeat Superior*)

127.     Each paragraph of this complaint is incorporated as if fully restated here.

128.     While committing the misconduct alleged in the preceding paragraphs, Defendants Dixon and one or more of Defendant Does 1-20 were employees and agents of Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County and acting within the scope of their authority or employment.  Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County are liable as principal for all misconduct committed by these employees and agents.

129.     While committing the misconduct alleged in the preceding paragraphs, one or more of the Fox Defendants and one or more of Defendant Does 1-20 were employees or agents of one or more of the Fox Defendants acting within the scope of their employment.  One or more of the Fox Defendants are liable as principal for all torts committed by their employees or agents.

### COUNT XII – State Law Claim
#### (Cook County – Indemnification)

130.     Each paragraph of this complaint is incorporated as if fully restated here.

131.    Illinois law provides that public entities are directed to pay any tort judgments for compensatory damages for which employees are liable within the scope of their employment activities.

132.    Defendants Dixon and one or more of Defendant Does 1-20 were employees and agents of Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County and acting within the scope of their employment in committing the misconduct described herein.

133.    Cook County is obligated by Illinois law to pay any judgment relating to the operation of the JTDC entered against Defendant Chief Judge of the Circuit Court of Cook County, Defendant Dixon, and/or one or more of Defendant Does 1-20.


**WHEREFORE**, Named Plaintiffs demand a jury trial for all issues so appropriate and requests that this Court issue the following relief in their favor against the Defendants:

a.   A judgment ordering disgorgement of enrichment realized by the Defendants resulting from the misconduct described in this complaint.

b.   A judgment ordering the payment of nominal damages against all Defendants.

c.   A judgment ordering the payment of punitive damages against the Defendants.

d.   A judgment ordering the payment of actual damages against all Defendants (in alternative to disgorgement).

e.   An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

f.   Any other relief this Court deems just and proper.

## JURY DEMAND

Named Plaintiffs hereby demand a trial by jury pursuant to Federal Rule of Civil

Procedure 38(b) on all issues so triable.

Dated:   October 5, 2016

By: _____

Stephen H. Weil
sweil@eimerstahl.com

Pamela R. Hanebutt
phanebutt@eimerstahl.com

Susan M. Razzano
srazzano@eimerstahl.com

Eimer Stahl LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Tel:  (312) 660-7600

*Attorneys for Named Plaintiffs T.S. and Q.B.*

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen Weil, an attorney, hereby certify that on October 5, 2016, I caused the

foregoing First Amended Class Action Complaint to be filed using the Court's CM/ECF system,

which effects service on all counsel of record.

/s/ *Stephen H. Weil*

Stephen H. Weil