**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| T. S. *et al.*, | |
| Plaintiffs, | Case No. 1:16-cv-08303 |
| v. | Judge Amy J. St. Eve |
| Twentieth Century Fox Television, a division of Twentieth Century Fox Film Corporation *et al.*, | |
| Defendants. | |

## PLAINTIFFS' CONSOLIDATED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

I.     Introduction .................................................................................................... 1

II.    The Standard Applicable to a Motion to Dismiss ......................................... 2

III.   The Defendants Violated the Rights of the Children Housed at the JTDC ...................... 2

       A.     The Misconduct at Issue ...................................................................... 2

       B.     Fourteenth Amendment Due Process ................................................... 5

              1.     The lockdowns lacked any legitimate governmental purpose ................... 5

              2.     The lockdowns imposed a substantial injury ............................... 7

              3.     The due process standards cited by defendants are inapplicable .............. 11

                     a.     The "shocks-the-conscience" test does not apply ........................ 11

                     b.     The "atypical and significant hardship" test does not apply ......... 12

       C.     Fourth Amendment ............................................................................ 13

       D.     Breach of Fiduciary Duty ................................................................... 14

       E.     Intentional Infliction of Emotional Distress ("IIED") ....................... 16

IV.    Each of the Defendants is Liable for the Violations of Plaintiffs' Rights ....................... 17

       A.     Fox ...................................................................................................... 17

              1.     Fox is liable as a "joint actor" with the government ................................ 17

                     a.     State action is determined by evaluating the "underlying reality" of the conduct alleged in the FAC, not the Location Agreement's attempt to evade state action liability ..................... 17

                     b.     The FAC plausibly alleges that the government locked the children on the pods pursuant to an understanding with Fox ....... 21

                     c.     Fox's remaining "joint action" arguments fail ............................. 22

              2.     Conspiracy Liability ................................................................... 24

              3.     Fox Defendants' Liability Under Section 1983 ....................... 25

              4.     Inducement of Breach of Fiduciary Duty ................................. 27

              5.     Liability of the Various Fox Defendants ................................... 28

       B.     The Chief Judge ................................................................................. 28

              1.     Eleventh Amendment Immunity ................................................ 28

2.      *Monell* Liability ................................................................................. 34

3.      Conspiracy Liability............................................................................ 34

C.      The County Defendants ................................................................................. 35

1.      *Monell* Liability (Cook County) .............................................................. 35

2.      Qualified Immunity (Leonard Dixon)...................................................... 36

3.      Conspiracy Liability (Leonard Dixon and Cook County) ........................ 37

4.      Statute of Limitations as to IIED (Leonard Dixon and Cook County)..... 37

5.      Indemnification (Cook County)............................................................... 38

V.      Conclusion .................................................................................................................. 38

## TABLE OF AUTHORITIES

### Cases

*A.J. v. Kierst,*
  56 F.3d 849 (8th Cir. 1995) ................................................................. 10

*Adickes v. S.H. Kress & Co.,*
  398 U.S. 144 (1970) ................................................................. 25, 26

*Alber v. Illinois Dep't of Mental Health & Developmental Disabilities,*
  786 F. Supp. 1340 (N.D. Ill. 1992) ................................................................. 15

*Anderson v. Gutschenritter,*
  836 F.2d 346 (7th Cir. 1988) ................................................................. 35

*Antonelli v. Sheahan,*
  81 F.3d 1422 (7th Cir. 1996) ................................................................. 8, 12

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................. 2

*Ayeni v. CBS Inc.,*
  848 F. Supp. 362 (E.D.N.Y. 1994) ................................................................. 7, 26

*Barrett v. Outlet Broad., Inc.,*
  22 F. Supp. 2d 726 (S.D. Ohio 1997) ................................................................. 7, 26

*Bell v. Vill. of Streamwood,*
  2011 WL 4435664 (N.D. Ill. Sept. 6, 2011) ................................................................. 17

*Bell v. Wolfish,*
  441 U.S. 520 (1979) ................................................................. *passim*

*Berger v. Hanlon,*
  129 F.3d 505 (9th Cir. 1997) ................................................................. *passim*

*Bergren v. City of Milwaukee,*
  811 F.2d 1139 (7th Cir. 1987) ................................................................. 10

*Brentwood Academy v. Tennessee Secondary School Athletic Association,*
  531 U.S. 288 (2001) ................................................................. 19, 20, 21

*Bristow v. Drake St. Inc.,*
  41 F.3d 345 (7th Cir. 1994) ................................................................. 16, 17

*Brunette v. Humane Soc'y of Ventura Cty.,*
   294 F.3d 1205 (9th Cir. 2002) ................................................................ 22

*Conradt v. NBC Universal, Inc.,*
   536 F. Supp. 2d 380 (S.D.N.Y. 2008) ..............................................*passim*

*Davis v. Wessel,*
   792 F.3d 793 (7th Cir. 2015) .................................................. 8, 10, 11, 37

*DeGenova v. Sheriff of DuPage County,*
   209 F.3d 973 (7th Cir. 2000) ............................................................ 29, 30

*Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.,*
   795 F.2d 1344 (7th Cir. 1986) ................................................................ 25

*Demery v. Arpaio,*
   378 F.3d 1020 (9th Cir. 2004) .................................................... 9, 10, 37

*Dennis v. Sparks,*
   449 U.S. 24 (1980) ................................................................................. 18

*Doe v. Cook Cty.,*
   1999 WL 1069244 (N.D. Ill. Nov. 22, 1999) ................................... 10, 36

*Drury v. County of McLean,*
   433 N.E.2d 666 (Ill. 1982) ........................................................ 31, 32, 33

*Feltmeier v. Feltmeier,*
   798 N.E.2d 75 (Ill. 2003) ....................................................................... 16

*Frederick v. Biography Channel,*
   683 F. Supp. 2d 798 (N.D. Ill. 2010) ...............................................*passim*

*Geinosky v. City of Chicago,*
   675 F.3d 743 (7th Cir. 2012) .................................................................... 2

*Graham v. Commonwealth Edison Co.,*
   742 N.E.2d 858 (Ill. 2000) ..................................................................... 16

*Graham v. Connor,*
   490 U.S. 386 (1989) ............................................................................... 13

*Gramenos v. Jewel Cos., Inc.,*
   797 F.2d 432 (7th Cir. 1986) .................................................................. 18

*Green v. Harrah's Ill. Corp.,*
   2004 WL 1102272 (N.D. Ill. Apr. 30, 2004) ........................................................ 23

*Hampton v. Hanrahan,*
   600 F.2d 600 (7th Cir. 1979) ............................................................................... 23

*Hanania v. Loren-Maltese,*
   212 F.3d 353 (7th Cir. 2000) ............................................................................... 24

*Harris v. Goins,*
   156 F. Supp. 3d 857 (E.D. Ky. 2015) .................................................................. 25

*Honaker v. Smith,*
   256 F.3d 477 (7th Cir. 2001) ............................................................................... 17

*Hughes v. Patrolmen's Benevolent Ass'n of City of N.Y., Inc.,*
   850 F.2d 876 (2d Cir. 1988) ................................................................................. 26

*J.H. v. Mercer Cty. Youth Det. Ctr.,*
   930 A.2d 1223 (N.J. App. Div. 2007) .................................................................. 15

*James v. Vill. of Willowbrook,*
   2012 WL 3017889 (N.D. Ill. July 19, 2012) ....................................................... 24

*Kingsley v. Hendrickson,*
   135 S. Ct. 2466 (2015) ................................................................................... *passim*

*Lauro v. Charles,*
   219 F.3d 202 (2d Cir. 2000) ....................................................................... 6, 7, 36

*Lugar v. Edmondson Oil Co., Inc.,*
   457 U.S. 922 (1982) ............................................................................................. 25

*Maloney v. Bower,*
   498 N.E.2d 1102 (Ill. 1986) ................................................................................. 32

*McClure v. Owens Corning Fiberglas Corp.,*
   720 N.E.2d 242 (Ill. 1999) ................................................................................... 24

*McDonald v. Haskins,*
   966 F.2d 292 (7th Cir. 1992) ............................................................................... 12

*McKinnon v. Thompson,*
   758 N.E.2d 316 (Ill. Ct. App. 2001) .................................................................... 37

*McMillian v. Monroe Cty.*,
520 U.S. 781 (1997) ............................................................................................. 28, 29

*Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*,
361 F.3d 898 (6th Cir. 2004) ..................................................................................... 25

*Monell v. Department of Social Services*,
436 U.S. 658 (1978) ................................................................................... 25, 34, 35

*Moore v. Marketplace Rest., Inc.*,
754 F.2d 1336 (7th Cir. 1995) ................................................................................... 22

*Morfin v. City of E. Chicago*,
349 F.3d 989 (7th Cir. 2003) ..................................................................................... 18

*N.G. v. Connecticut*,
382 F.3d 225 (2d Cir. 2004) ...................................................................................... 15

*Narducci v. Moore*,
572 F.3d 313 (7th Cir. 2009) ..................................................................................... 36

*Nelson v. Heyne*,
491 F.2d 352 (7th Cir. 1974) ............................................................................... 11, 15

*Orenic v. Illinois State Labor Relations Board*,
537 N.E.2d 784 (Ill. 1989) ......................................................................................... 31

*Parks v. Kownacki*,
711 N.E.2d 1208 (Ill. Ct. App. 1999) ........................................................................ 14

*Parks v. Kownacki*,
737 N.E.2d 287 (Ill. 2000) .................................................................................. 14, 15

*People ex rel. Brazen v. Finley*,
497 N.E.2d 1013 (Ill. Ct. App. 1986) ........................................................................ 32

*People v. Apfelbaum*,
95 N.E. 995 (Ill. 1911) ............................................................................................... 32

*Robinson v. Sappington*,
351 F.3d 317 (7th Cir. 2003) ..................................................................................... 33

*Robles v. Prince George's County*,
302 F.3d 262 (4th Cir. 2002) ......................................................................... 9, 10, 37

*Rojas v. Alexander's Dep't Store, Inc.,*
  654 F. Supp. 856 (E.D.N.Y. 1986) ................................................................. 26, 27

*Ross v. United States,*
  910 F.2d 1422 (7th Cir.1990) ................................................................. 35

*Sandin v. Connor,*
  515 U.S. 472 (1995) ................................................................. 12, 13

*Scott v. O'Grady,*
  975 F.2d 366 (7th Cir. 1992) ................................................................. 29

*Serbalik v. Gray,*
  27 F. Supp. 2d 127 (N.D.N.Y. 1998) ................................................................. 23

*Shields v. Illinois Department of Corrections,*
  746 F.3d 782 (7th Cir. 2014) ................................................................. 25

*Smart v. City of Miami,*
  107 F. Supp. 3d 1271 (S.D. Fla. 2015) ................................................................. 7

*Spearman v. Elizondo,*
  2016 WL 1730650 (N.D. Ill. May 2, 2016) ................................................................. 3

*Steigmann v. Democratic Party of Ill.,*
  406 F. Supp. 2d 975 (N.D. Ill. 2005) ................................................................. 19

*Swanson v. Citibank, N.A.,*
  614 F.3d 400 (7th Cir. 2010) ................................................................. 2

*Temple v. Albert,*
  719 F. Supp. 265 (S.D.N.Y. 1989) ................................................................. 26

*Tesch v. County of Green Lake,*
  157 F.3d 465 (7th Cir. 1998) ................................................................. 8, 12

*Thompson v. Cty. of Cook,*
  412 F. Supp. 2d 881 (N.D. Ill. 2005) ................................................................. 7

*Titran v. Ackman,*
  893 F.2d 145 (7th Cir. 1990) ................................................................. 11, 12

*Tiwari v. NBC Universal, Inc.,*
  2011 WL 5079505 (N.D. Cal. Oct. 25, 2011) ...................................................................*passim*

*Virnich v. Vorwald,*
  664 F.3d 206 (7th Cir. 2011) ................................................................................................ 2

*Wagner v. County of Maricopa,*
  706 F.3d 942 (9th Cir.) ......................................................................................... 9, 10, 37

*Wickersham v. City of Columbia,*
  481 F.3d 591 (8th Cir. 2007) .............................................................................................. 20

*Wilkins v. May,*
  872 F.2d 190 (7th Cir. 1989) .............................................................................................. 13

## **Statutes**

42 U.S.C. § 1983 ...................................................................................................*passim*

55 ILCS § 75 ............................................................................................. 30, 31, 32, 33

745 ILCS 10/8-101 ................................................................................................. 37

Ill. Const. 1970, Art. VI ....................................................................... 31, 32, 33, 34

H.B. 236 ................................................................................................................... 30

## **Rules**

Federal Rule of Civil Procedure 12(b)(6) ...................................................... 2, 5, 19, 35

Federal Rule of Civil Procedure 12(d) ................................................................ 19

Federal Rule of Civil Procedure 10(c) ................................................................ 19

## **Other Authorities**

Newberg on Class Actions § 20:39 ........................................................................ 4

5C Wright, Miller et al., Fed. Prac. & Proc. Civ. § 1366 ................................... 19

I.      **Introduction**[1]

In the summer of 2015, Fox needed a realistic prison setting to film scenes for *Empire*, a profitable Fox television show, and it found just such a location at the Cook County Juvenile Temporary Detention Center ("JTDC").  There was just one problem:  the "location" consisted of the educational and rehabilitative programming areas of the JTDC, which were already being used by several hundred juvenile detainees who were housed at the JTDC.  If barred from those facilities, the only place left for these children was the prison-like "pods" on the JTDC's upper floors.  Fox could have found another location.  Instead, it conspired with the JTDC's administrators to have the children removed to the pods so that it could film its show.

There was no legitimate governmental purpose for these lockdowns, and the defendants do not seriously contend otherwise.  Instead, they claim that the children's rights were not violated.  But this requires the defendants to pretend that they merely altered a few of the children's routines, when the FAC alleges that the restrictions they imposed were plenary, essentially forcing hundreds of children to sit frozen in one place on the pods for days at a time.

In the alternative, the defendants each assert that they cannot be held liable for the violations.  These arguments, though, rely on immunities that simply do not apply, or they invoke a clause that the defendants inserted into the *Empire* rental agreement—precisely the kind of self-serving provision that the Supreme Court has instructed lower courts to ignore as an impermissible maneuver to evade liability for illicit private-government misconduct.

---

[1]  This consolidated memorandum ("Mem.") responds the pending motions to dismiss Plaintiffs' First Amended Complaint ("FAC") filed by the Office of the Chief Judge of the Circuit Court of Cook County ("Chief Judge") (Doc. # 44 ("C.J. MTD")), Cook County and Leonard Dixon ("County Defendants") (Doc. # 48 ("Cty. Defs. MTD")), and the various Fox defendants ("Fox") (Motion to Dismiss, Doc. # 50, and Memorandum in Support, Doc. # 51 ("Fox MTD")).

The defendants' arguments, in short, all fail. Plaintiffs have more than sufficiently alleged that the defendants are liable for violating their rights. The Court should allow Plaintiffs to offer evidence to show that their allegations are true.

## II.     The Standard Applicable to a Motion to Dismiss

Motions to dismiss pursuant to Rule 12(b)(6) attack the legal sufficiency of a pleading—they do not challenge its factual allegations. Therefore, a court must "construe all of the plaintiff's factual allegations as true, and must draw all reasonable inferences in the plaintiff's favor." *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). A complaint will survive a motion to dismiss if these allegations state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To state a claim, a plaintiff's allegations need only make out a "plausible account" of his or her entitlement to relief. *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This happens when the complaint alleges facts that "give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (emphasis original).

## III.    The Defendants Violated the Rights of the Children Housed at the JTDC

### A.     The Misconduct at Issue

Plaintiffs have more than satisfied their pleading obligations. In the thirty-eight page FAC, Plaintiffs explain in detail how, to facilitate the filming of a commercial television show, the defendants imposed extraordinary restrictions upon hundreds of children for days on end.

The defendants admit that the children were impacted by the presence of Fox's film crew, but they attempt to minimize the seriousness of their misconduct by recasting what the children

experienced as a series of discrete, minor inconveniences.  The defendants do this by picking out examples of the effects of the lockdowns,[2] and then proceeding as though those examples were the only restrictions that were imposed.  Thus in the defendants' retelling, the lockdowns were merely "changes to detainees' usual routines" and the loss of a classroom white board (Fox MTD at 4, 5); recreation was not effectively eliminated, just moved (Cty. Defs. MTD at 4); the cancellation of all programming boiled down to a missed dance class (Cty. Defs. MTD at 5); and a child missed a single visit with family.  (C.J. MTD at 7).  After recasting the lockdowns in this manner, the defendants argue that none of the deprivations they imposed adds up to a violation.

This effort to denigrate Plaintiffs' clams ignores the FAC's basic allegations.  As such, it is impermissible:  in bringing a motion to dismiss, a defendant must accept all of a complaint's allegations as true, and explain why ***those*** allegations fail to state a claim.  *See Spearman v. Elizondo*, No. 15-cv-7029, 2016 WL 1730650, at *2 (N.D. Ill. May 2, 2016) ("The [defendant] . . . . examines each of the allegations individually and argues that none of them is sufficient . . . . This divide-and-conquer mode of argument is unpersuasive and runs afoul of the firmly established requirement that complaints be read as a whole.").  Here, the misconduct set out in the FAC is far more serious than the trivial inconveniences re-imagined by the defense.

The FAC alleges that it is psychologically harmful, and physically dangerous, for children to be incarcerated under the severely restrictive conditions that are imposed on the JTDC's pods, (*see* FAC ¶¶ 24, 26), and that for this reason, the JTDC's administrators normally try to minimize the time children spend on the pods by providing them with extensive education,

---

[2]  The defendants also object to the term "lockdown," claiming it applies only where inmates are locked in their cells "on a twenty-four hour basis."  (C.J. MTD at 6 n.1; Fox MTD at 2 n.1).  The defendants' reliance on adult prison parlance is not only wrong, it ignores that some of the children were indeed locked in their cells all day.  (*See* FAC ¶ 44(b).).

3

rehabilitation, and other structured programs on the JTDC's second and third floors. (*See* FAC ¶¶ 18, 19, 21-23.)

These programs are not provided casually. Their importance is reflected in the JTDC's physical layout, which dedicates entire floors to providing this structured programming, (*see id.* ¶¶ 13-17), and in the extensive staffing devoted to transporting children to these services. (*Id.* ¶ 28.) These considerable resources amount to an acknowledgement that simply locking the children on their pods harms them and is detrimental to their best interests. The various education and rehabilitation services on the JTDC's second and third floors thus are not some sort of gratuity, as the defendants insinuate, but rather are critical for preventing detention at the JTDC from harming the children housed there, which would occur if they were simply locked on their pods. The gravamen of the FAC is that the JTDC's administrators abandoned these important practices, and instead subjected the children to conditions more severe than those imposed in many adult correctional facilities, all so that Fox could film a television show.

In their effort to downplay the FAC's allegations as involving just a few altered routines, the defendants largely pass over these claims. That is why, for example, the defendants have nothing to say about Plaintiffs' allegations (*see* FAC ¶¶ 19, 49) that forcing hundreds of children into idleness for days on end increased the risk that they would attack each other. In their re-imagined complaint that overlooks the conditions that were actually imposed on the pods, they simply ignore this claim. In the same way, the defendants argue that T.S. and Q.B. haven't made sufficient allegations about cancelled sick call because ***they*** did not have sick call slips that were ignored. This is a premature—and wrong—argument about class certification. *See, e.g.*, Newberg on Class Actions § 20:39 (5th ed.) ("The claims of the class representative must be typical of the class, but they need not be identical to those of the absent class members."). What

4

the allegation illustrates, moreover, is that the defendants massively disrupted the services provided to hundreds of children and confined them to the restrictive conditions on the pods— not once, but on three separate occasions—for Fox's benefit. Those actions, set out over dozens of paragraphs, are the totality of misconduct upon which Plaintiffs' claims are based and against which the defendants' actions must be evaluated. The defendants may disagree with these allegations, but the proper venue to air those differences is at summary judgement or trial, not in their Rule 12(b)(6) motions.

### B. Fourteenth Amendment Due Process (Count I)

#### 1. The lockdowns lacked any legitimate governmental purpose

The due process rights of the children housed at the JTDC are governed by *Bell v. Wolfish*, 441 U.S. 520 (1979), which concerns the treatment of pretrial detainees. *Bell* articulated a rule: a person in pretrial detention has not been convicted of a crime and therefore, under the Due Process Clause, they may not be punished. 441 U.S. at 535. *Bell* also set out a test to determine whether this rule had been violated:

> if a restriction or condition [imposed on a pretrial detainee] is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees . . . .

*Id.* at 539. The Supreme Court recently clarified this test in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), explaining that

> *Bell*'s focus on "punishment" does not mean that proof of intent (or motive) to punish is required for a pretrial detainee to prevail on a claim that his due process rights were violated. Rather, . . . a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.

135 S. Ct. at 2473-74.

The "challenged governmental action" in this case—the multiple lockdowns—was not reasonably related to a legitimate governmental purpose. Of all the defendants, only the Chief Judge's brief offers a rationale, claiming that the children were locked onto their pods "for the purpose of maintaining order and general security during a time when many 'civilians' were in close proximity to the minors." (C.J. MTD at 6.) This argument is circular. The government, for no legitimate governmental purpose, invited Fox's film crew to use the JTDC, and then locked the children onto their pods to keep them away from the film crew that the government had improperly invited in. This half-hearted explanation, which sidesteps mention of the *Empire* filming, cannot withstand scrutiny.

The defendants, indeed, have good reason to avoid connecting their actions to the *Empire* filming. The courts have been emphatic that when the government alters its conduct to serve private ends such as Fox's, it is not acting pursuant to a legitimate governmental interest:

- In *Lauro v. Charles*, 219 F.3d 202 (2d Cir. 2000), the plaintiff had already been arrested and taken to the police station. After learning that a local Fox channel wanted to film the plaintiff in a "perp walk," however, police handcuffed the plaintiff, drove him around the block, and walked him back into the station house, in front of Fox's cameras. *Id.* at 204-05. The court held that because the perp walk was done solely to create footage for Fox, it "lacked any legitimate law enforcement purpose" and was therefore unconstitutional. *Id.* at 213.

- In *Berger v. Hanlon*, 129 F.3d 505 (9th Cir. 1997), *aff'd in relevant part & vacated on other grounds*, 526 U.S. 808, (1999); *reinstated in relevant part*, 188 F.3d 1155 (9th Cir. 1999), federal officials changed their plans for the execution of a search warrant to facilitate filming by CNN, and coordinated with CNN to alter the manner in which they executed the warrant so as to provide CNN with better footage. *Id.* at 508-09. This rendered the officials' conduct unconstitutional, because "[t]his search stands out as one that at all times was intended to serve a major purpose other than law enforcement," having been planned and executed "so that the officials could assist in the media obtaining material for their commercial programming." *Id.* at 510.

- In *Frederick v. Biography Channel*, 683 F. Supp. 2d 798 (N.D. Ill. 2010), a television program and a city agreed that the program could film arrests for a television show. A police officer then "exacerbat[ed]" an arrest in order to provide arrest footage for the television crew. The court held that the plaintiff's

constitutional rights had been violated because the only reason for altering the manner of arrest was to help the television crew obtain footage. *Id.* at 801.

- Other courts have reached the same conclusion. *See, e.g.*, *Conradt v. NBC Universal, Inc.*, 536 F. Supp. 2d 380 (S.D.N.Y. 2008) (where the manner in which officers conducted an arrest was motivated at least in part by the goal of creating footage for a television show, the officers' actions had no legitimate governmental purpose and the plaintiff's rights were therefore violated); *Tiwari v. NBC Universal, Inc.*, No. 08-cv-3988, 2011 WL 5079505 (N.D. Cal. Oct. 25, 2011) (same); *Smart v. City of Miami*, 107 F. Supp. 3d 1271 (S.D. Fla. 2015) (same); *Barrett v. Outlet Broad., Inc.*, 22 F. Supp. 2d 726 (S.D. Ohio 1997) (police violated plaintiff's rights where they altered manner of search to provide footage for media company) and *Ayeni v. CBS Inc.*, 848 F. Supp. 362 (E.D.N.Y. 1994), *aff'd sub nom. Ayeni v. Mottola*, 35 F.3d 680 (2d Cir. 1994) (same; alteration of search to create footage for media company).

If anything, the government's misconduct here is even worse than the conduct in these cases. At least in *Lauro* and the other decisions cited above,[3] law enforcement agents were engaged in otherwise legitimate governmental activity that they altered (usually by dramatizing their conduct) in furtherance of a private party's interests. Here, the alleged misconduct was entirely unrelated to any such legitimate activity. Rather, the JTDC's administrators acted for the ***sole*** purpose of facilitating the filming of a commercial television show. Their conduct was entirely unrelated to any legitimate governmental purpose and violated Plaintiffs' rights under the Due Process Clause.

### 2. The lockdowns imposed a substantial injury

The alleged deprivations also imposed a substantial, cognizable injury. The defendants briefly argue otherwise, but their contentions simply fail to grapple with the relevant law.

---

[3] These decisions assessed the legitimacy of the government's interest in the context of the Fourth Amendment. The analysis is the same for Due Process Clause. *See, e.g.*, *Thompson v. Cty. of Cook*, 412 F. Supp. 2d 881, 892 (N.D. Ill. 2005) ("Assessment of the governmental interest involved and the 'fit' between that interest and the procedure at issue is an aspect of both the Fourth Amendment and due process standards.").

The defendants contend that even if they imposed the lockdowns in violation of *Bell*, any resulting injury was *de minimis*, so there was no due process violation. (C.J. MTD at 7.) The only support the defendants might be said to offer for this argument are two cases cited by the County Defendants, *Tesch v. County of Green Lake*, 157 F.3d 465 (7th Cir. 1998) and *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996). (*See* Cty. Defs. MTD at 9.) If anything, however, those two decisions highlight the unconstitutional nature of the deprivations alleged here.

In *Tesch*, an adult detainee held for two days was not provided with a change of clothes, received beverages only with meals, and had his mattress placed on the floor, instead of a bed. In *Antonelli*, an adult detainee had to sleep on the floor for a night. In both cases, the court rejected the plaintiff's claims as insufficient to state a constitutional violation. In doing so, however, it emphasized that the challenged conditions did not rise to the level of constitutional deprivations because they arose from legitimate administrative limitations. *Tesch* explained that the challenged conditions were simply the result of the jail's inability to satisfy all inmate needs immediately: "Because there are more inmates than jailers at every facility, it is impossible for a prisoner or a pretrial detainee to expect an immediate response from jail officials for every request made." 157 F.3d at 476. Likewise *Antonelli* explained that the plaintiff was not deprived of his rights because his night on the floor was the result of "overcrowded conditions" that were "unintended." 81 F.3d at 1430. *Tesch* and *Antonelli*, in short, hold that when a challenged condition flows from a legitimate governmental imperative, the courts should afford jailers the substantial deference that they are entitled when operating their facilities.

That deference evaporates, however, when the government imposes restrictions for no legitimate governmental purpose. In *Davis v. Wessel*, 792 F.3d 793 (7th Cir. 2015), for example, a detainee alleged that even though they were supposed to do so, two guards refused to remove

his handcuffs when he went the bathroom during a court hearing, causing him humiliation as he struggled to urinate without wetting himself. 792 F.3d at 795. Relying on *Kingsley,* the court held that if the plaintiff could show that the guards left him handcuffed for no legitimate governmental purpose, the plaintiff would state a claim under *Bell* for violation of his due process rights. *Id.* at 800.

In *Robles v. Prince George's County,* 302 F.3d 262 (4th Cir. 2002) (Wilkinson, J.), officers who had arrested the plaintiff tied him to a light pole in an empty parking lot and left him there for 10 minutes. 302 F.3d at 266. Noting that "[t]he police behavior here was not reasonably related—indeed it was entirely unrelated—to any legitimate law enforcement purpose," the court held that "[e]ven a so-called prank that fails to serve any 'legitimate governmental objective' can constitute a due process infraction." *Id.* at 269-70 (quoting *Bell,* 441 U.S. at 539). In light of the officers' misconduct, the court went on, it was enough for the plaintiff to allege that the experience had scared him. *Id.* While "a litany of subjective complaints" might not be enough to state a constitutional violation, the court explained, the plaintiff had sufficiently alleged a due process deprivation because "any reasonable person would have been upset by what happened here." *Id.* at 270.

The Ninth Circuit reached a similar conclusion in two cases arising from the management of Maricopa County's jail in Arizona. *Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) involved the sheriff's placement of webcams in the jail that transmitted a public video feed of the detainees over the internet. The court held that because the webcams served no legitimate governmental purpose, imposing discomfort on inmates in the form of unnecessary public exposure violated due process. 378 F.3d at 1033. And in *Wagner v. County of Maricopa*, 706 F.3d 942 (9th Cir.) *amended and superseded on denial of reh'g on other grounds*, 747 F.3d 1048

(9th Cir. 2013), an inmate challenged the jail's policy of issuing detainees pink underwear on the grounds that, "given the cultural context," the color was chosen "to shame and stigmatize the male prisoners as feminine." 706 F.3d at 948. Relying on *Bell*'s rule that conditions of pretrial detention not related to a legitimate governmental purpose are violative of due process, the court observed that "[u]nexplained and undefended, the dress-out in pink appears to be punishment without legal justification." *Id.*

The misconduct alleged in the FAC is far more serious than that described in these decisions. The conditions that the defendants imposed, as described in Mem. Section III.A, easily exceed any of the deprivations in *Davis*, *Robles*, *Demery*, and *Wagner*, where the challenged conduct violated due process. Moreover, this case involves detained minors. The law recognizes that child detainees are different from and far more vulnerable than adults. As this Court observed, regarding the conditions of confinement at the JTDC, "the 14th amendment due process standard should, as a general matter, be more liberally construed when applied to juvenile pretrial detainees." *Doe v. Cook Cty.*, No. 99-cv-3945, 1999 WL 1069244, at *4 (N.D. Ill. Nov. 22, 1999) (citing *A.J. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995)). As *Kierst* explained in more detail,

> [i]n applying the due process standard to juveniles, we cannot ignore the reality that assessments of juvenile conditions of confinement are necessarily different from those relevant to assessments of adult conditions of confinement . . . . the due process standard applied to juvenile pretrial detainees should be more liberally construed than that applied to adult detainees.

56 F.3d at 854. The Seventh Circuit has been equally emphatic:

> For the juvenile, the experience of incarceration may have a far more long-lasting psychological effect. . . . [M]inority is a time and condition of life when a person may be most susceptible to influence and to psychological damage. The possibility of such serious injury at the hands of the state to a presumptively innocent minor must be taken into consideration when assessing the conditions of confinement.

10

*Bergren v. City of Milwaukee*, 811 F.2d 1139, 1143-44 (7th Cir. 1987).[4] That that the lockdowns were imposed on children exacerbates the already serious nature of these deprivations. Plaintiffs have alleged substantial injuries that are cognizable under the Due Process Clause.

### 3. The due process standards cited by defendants are inapplicable

The defendants propose two alternative standards under which, they argue, Plaintiffs due process claims fail. Neither of these standards applies in this case, however.

### a) The "shocks-the-conscience" test does not apply

The Chief Judge argues there is no due process violation because the FAC's allegations do not "shock the conscience." (C.J. MTD at 7-8.) This argument is wrong; the FAC's allegations are conscience-shocking, and if the test applied here, Plaintiffs would satisfy it.

The test does not apply, however. The cases cited by the Chief Judge involve substantive due process claims generally.[5] This case, by contrast, is governed by *Bell*. As Judge Easterbrook explained in *Titran v. Ackman*, 893 F.2d 145 (7th Cir. 1990), the question in *Bell* is whether a detainee was punished, not whether that punishment shocks the conscience: "*Bell v. Wolfish* held . . . that during pretrial detention the state may not 'punish' the suspect. Did the state punish?—and not more ambulatory inquiries into the consciences of jurors" is "the right question" when detainees claim that their due process rights were violated. *Titran*, 893 F.2d at 147. The court went on, "*Bell v. Wolfish* did not instruct the inferior federal courts to inquire

---

[4] In line with this reasoning, the Court of Appeals has also recognized that under the Due Process Clause, detained "juveniles have a right to rehabilitative treatment." *Nelson v. Heyne*, 491 F.2d 352, 358 (7th Cir. 1974). That rehabilitative goal is undone when juveniles are "not . . . rehabilitated, but warehoused," impacting their ability to "take their proper places in free society." *Id.* at 360.

[5] One of the cited cases, *Davis*, (*see* C.J. MTD at 8), does involve pretrial detention. But *Davis* only mentioned the "shocks the conscience" in a passing quotation of another case as part of its review of the level of intentionality (*i.e.*, negligent vs. intentional) required under Section 1983. 792 F.3d at 801. *Davis* did not reject *Titran*, much less *Bell* or *Kingsley*.

11

into the state of anyone's conscience"; instead, it is enough that the "behavior [of the jailers] was unreasonable." *Id.* at 147-48. *Accord McDonald by McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992) (citing *Titran* to observe that the "shocks the conscience" and "objective reasonableness" standards are separate and distinct tests). *Titran* anticipated *Kingsley*, which explained that under *Bell*, a pretrial detainee sufficiently asserts a violation of due process if the detainee alleges facts indicating that the challenged restriction was objectively unreasonable. *Kingsley*, 135 S. Ct. at 2473-74. The shocks-the-conscience test thus is not relevant here.

> **b)** **The "atypical and significant hardship" test does not apply**

The County Defendants argue that to violate due process, the restrictions must have imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (Cty. Defs. MTD at 4.) This standard is wrong too. As the County Defendants note, the "atypical and significant" standard comes from *Sandin v. Connor*, 515 U.S. 472 (1995). (*See* Cty. Defs. MTD at 4.) *Sandin*, however, is a ***prison*** case, not a jail case. The distinction is critical because prisoners, who have been convicted of crimes, ***may*** be punished. A convicted prisoner's due process rights are only implicated when such punishment goes over and above—is an "atypical and significant hardship"—the harshness that a convicted inmate should expect from prison life. *Id.* at 484. *Sandin* itself made a point to distinguish this rule from the protections that due process affords to pretrial detainees in ***jails***, who have not been convicted of a crime. Those detainees, as *Sandin* explains, are governed by the standard set out in *Bell*, and thus "'may not be punished'" at all. *Sandin*, 515 U.S. at 484 (quoting *Bell*, 441 U.S. at 535).

The children housed at the JTDC are pretrial detainees. Yet in seven pages of briefing, every case cited by the County Defendants, save two,[6] involved prison conditions, not jail

---

[6] The two exceptions are *Tesch* and *Antonelli*, (*see* Cty. Defs. MTD at 9), which Plaintiffs examine

conditions.  (*See* Cty. Defs. MTD at 3-9.)  The County Defendants do not begin to explain how these cases are relevant here, and indeed they are not.  The County Defendants' arguments are without merit and the Court should reject them.

### C.  Fourth Amendment (Count II)

The Chief Judge argues that the Plaintiffs cannot maintain simultaneous Fourth Amendment and due process claims covering the same conduct.[7]  (C.J. MTD at 8-9.)  As the Chief Judge notes, the Seventh Circuit holds that claims of pretrial detainees should be examined under the Due Process Clause.  (*See id* at 9 (citing *Wilkins v. May*, 872 F.2d 190 (7th Cir. 1989).)

The FAC asserts a Fourth Amendment claim as an alternative cause of action because the Supreme Court has not definitively determined whether the Fourth or the Fourteenth Amendment governs the treatment of pretrial detainees.  *See Graham v. Connor*, 490 U.S. 386, 395, n.10 (1989); *Kingsley*, 135 S. Ct. at 2479 (Alito, J., dissenting) (citing *Graham v. Connor* and noting that Supreme Court has not decided whether Due Process Clause or Fourth Amendment govern pretrial detainees).  In either event, especially in light of the Supreme Court's clarification in *Kingsley* that the claims of pretrial detainees are to be judged by an objective standard, the analysis of the misconduct alleged here would be the same under the Fourth and Fourteenth Amendments.  *See Kingsley*, 135 S. Ct. at 2479 (Alito, J., dissenting) ("It is settled that the test for an unreasonable seizure under the Fourth Amendment is objective, so if a pretrial detainee can bring such a claim, it apparently would be indistinguishable from the substantive due process claim that the [*Kingsley* majority] discusses.").

---

in Mem. Section III.B.2.

[7]  The County Defendants also argue that the FAC's Fourth Amendment claims should be dismissed, but again they rely on *Sandin*, which applies exclusively to convicted prisoners.  (*See* Cty. Defs. MTD at 9-11.)  The County Defendants never explain why *Sandin*'s standard should apply to this case.  Plaintiffs respond by referring to their discussion of *Sandin*, in Mem. Section III.B.3.b.

### D.    Breach of Fiduciary Duty (Count VII)

Dixon asserts that Plaintiffs' breach of fiduciary duty claim should be dismissed, but his arguments are utterly without merit.  He claims that, because there are statutes providing for courts to adjudicate children as "wards of the court," and the children at the JTDC have not been so adjudicated, he is not their guardian.  (Cty. Defs. MTD at 13.)  Not only that—because these statutes exist, claims Dixon, the children at the JTDC are in a fiduciary no-man's land:  "none of the residents of the JTDC are wards of Defendant Dixon—or anyone else for that matter."  (*Id*. at 12.)  This argument is entirely unsupported.  And indeed, the law provides the opposite.

Fiduciary relationships may indeed be established by court order, but as Dixon acknowledges, "[a] fiduciary relationship may [also] arise as a matter of law from the existence of a particular relationship . . . ."  (Cty. Defs. MTD at 13 (citation omitted).)  Here, the relevant fiduciary relationship is that of guardian and ward, which, like other fiduciary relationships, may arise as a matter of law, without a court order, from the relationship of the parties.

*Parks v. Kownacki*, 711 N.E.2d 1208 (Ill. Ct. App. 1999), *rev'd on other grounds*, 737 N.E.2d 287 (Ill. 2000), sets out this rule plainly enough.  In *Parks*, the court held that "the guardian/ward relationship [was] created" when the adult defendant was allowed to keep a teenager in his home, send her to school far from her parents and family, and to "exercise all the control over her that a legal guardian would be allowed to exercise.  A fiduciary duty exists between a guardian and a ward."  711 N.E.2d at 1216 (citation omitted).  The Illinois Supreme Court affirmed this holding, noting that by "accept[ing] the responsibility of plaintiff's care and

14

education, [the defendant] took on the role of her guardian, ***even though he was not given that title by a court***."  737 N.E.2d at 290 (emphasis added).[8]

Just the same, a guardian-ward relationship arises as a matter of law when the government takes over care and control of a child through juvenile detention.  As the Seventh Circuit described the juvenile detention setting, when the government "assumes the place of a juvenile's parents, it assumes as well the parental duties, and its treatment of its juveniles should, so far as can be reasonably required, be what proper parental care would provide."  *Nelson*, 491 F.2d at 360.  *Accord N.G. v. Connecticut*, 382 F.3d 225, 232 (2d Cir. 2004) ("Where the state is exercising some legitimate custodial authority over children, its responsibility to act in the place of parents (*in loco parentis*) obliges it to take special care to protect those in its charge"); *J.H. v. Mercer Cty. Youth Det. Ctr.*, 930 A.2d 1223, 1230 (N.J. App. Div. 2007) (concluding that as *loco parentis*, a juvenile detention center "operates in the traditional role of a guardian toward its ward.").  Here, the government forcibly removed children from the care and control of their parents and entrusted them to the care and control of Dixon, as superintendent of the JTDC.  That is the axiomatic guardian-ward relationship.  Dixon acts as a guardian of the children housed at the JTDC, and he operates under the fiduciary duties that come with that role.

In the alternative, Dixon argues that even if he did have fiduciary duties to the Plaintiffs, he did not violate his duties in this case.  (Cty. Defs. MTD at 13-14.)  This argument relies on the impermissible spin of the FAC that reimagines the lockdowns as a mere change in the children's routines.  (*Id.*)  What the FAC actually alleges, of course, is that Plaintiffs were subjected to severe restrictions so that Fox could film a television show.  (*See* Mem. Section III.A.)  Dixon, in

---

[8] By taking advantage of his power over the children to promote Fox's interests at their expense, Illinois law also treats Dixon as a guardian-by-estoppel.  *See Alber v. Illinois Dep't of Mental Health & Developmental Disabilities*, 786 F. Supp. 1340, 1371 (N.D. Ill. 1992).

other words, engaged in conduct detrimental to his wards' welfare, for no legitimate purpose. The FAC plausibly alleges that Dixon breached his fiduciary duty to Plaintiffs.

### E. Intentional Infliction of Emotional Distress ("IIED") (Count IX)

To state an IIED claim, the plaintiff must allege that the defendant's conduct was "extreme and outrageous," that the defendant knew there was a high probability that its conduct would cause severe emotional distress, and that the conduct caused such distress. *See Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003). The facts alleged in the FAC are more than sufficient to support Plaintiffs' IIED claim.

The misconduct that Plaintiffs allege was extreme and outrageous by nearly any measure. In *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858 (Ill. 2000), the Illinois Supreme Court set out factors indicating that conduct is extreme and outrageous, and the list reads as though it was tailor-made for what the defendants did here:

> First, the more power and control that a defendant has over a plaintiff, the more likely defendant's conduct will be deemed outrageous. This factor should be viewed in conjunction with a second factor: whether the defendant reasonably believed that his objective was legitimate. A reasonable belief that his objective was legitimate does not automatically allow the defendant to pursue that objective by outrageous means, but it is a substantial factor in evaluating the outrageousness of the conduct. Another consideration is the defendant's awareness that the plaintiff is particularly susceptible to emotional distress. Behavior that would not normally be considered outrageous may be actionable if the defendant knows that the plaintiff is particularly susceptible.

742 N.E.2d at 866–67 (citations omitted). The defendants' misconduct checks every one of *Graham*'s boxes.

As to the emotional distress suffered by the Plaintiffs, Illinois courts "tend to merge the issue of the outrageousness of the defendant's conduct with the issue of the severity of the plaintiff's emotional distress," *Bristow v. Drake St. Inc.*, 41 F.3d 345, 350 (7th Cir. 1994), such that "'the extreme and outrageous character of the defendant's conduct is in itself important

evidence that the distress has existed.'" *Id.* (quoting Restatement (Second) of Torts § 46 cmt. J). *Accord Bell v. Vill. of Streamwood*, No. 10-cv-3263, 2011 WL 4435664, at *4 (N.D. Ill. Sept. 6, 2011) ("Illinois law takes the outrageousness of a defendant's actions into account when evaluating the sufficiency of a plaintiff's evidence of severe emotional distress."). As a result, "the very nature of the conduct involved may [itself] be evidence of its [emotional] impact on the victim." *Honaker v. Smith*, 256 F.3d 477, 496 (7th Cir. 2001).

As summarized above, the children housed at the JTDC had been removed from the care of their parents and instead entrusted to the defendants, who had been given complete control over them. The defendants knew these children were exceptionally vulnerable, that they needed the programming that they were normally provided, and that locking them down on their pods could harm them psychologically. Yet the defendants locked them on their pods anyway, for the sole purpose of helping an immensely wealthy corporation use the children's educational and rehabilitative facilities to film a profitable television show. The misconduct alleged here, in short, is exceptionally outrageous and extreme. The Plaintiffs have plausibly alleged that they were emotionally damaged by the lockdowns, which one would expect them to be given the FAC's allegations. They should be allowed to offer evidence to prove it.

## IV. Each of the Defendants is Liable for Violating Plaintiffs' Rights

### A. Fox

#### 1. Fox is liable as a "joint actor" with the government

##### a) State action is determined by evaluating the "underlying reality" of the conduct alleged in the FAC, not the Location Agreement's attempt to evade joint action liability

Count IV asserts that the lockdowns were imposed pursuant to an understanding between Fox and the JTDC's administrators, and that therefore Fox is liable as a state actor under Section 1983. "A private citizen may be considered a state actor" for purposes of Section 1983 when it

"has acted together with or has obtained significant aid from state officials" in furtherance of the challenged conduct. *Morfin v. City of E. Chicago*, 349 F.3d 989, 1003 (7th Cir. 2003) (quotation omitted). This occurs when there is "an agreement on a joint course of action in which the private party and the state have a common goal" to achieve the challenged conduct. *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 435 (7th Cir. 1986) (citation omitted). *See also Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980) ("[T]o act 'under color of' state law[,] . . . . [i]t is enough that [the private party] is a willful participant in joint action with the [government] or its agents. Private persons, jointly engaged with [government] officials in the challenged action, are acting [] 'under color' of law for purposes of § 1983 actions.").

Multiple courts, addressing facts strikingly similar to the ones here, have held that private parties, particularly media companies like Fox, act under color of law when they reach an understanding with the government on a course of action that leads to the challenged conduct. (*See* Mem. Section III.B.1.) Fox acknowledges several of these cases, including *Berger*, *Frederick*, and *Conradt* and *Tiwari*. (*See* Fox MTD at 12-14.) And indeed, aside from some editorializing, (*e.g.*, "*Berger* is an outlying case," Fox MTD at 12), Fox summarizes these decisions more or less accurately. As Fox puts it, in these cases, the private party and the government were found to have acted jointly because they reached an "understanding[] . . . that law enforcement personnel would deviate from normal procedures" to achieve a common goal (usually, to obtain dramatized footage of police work), and the government altered its normal conduct to achieve that goal (usually, by engaging in a gratuitous arrest or search). (Fox MTD 12-14.) These cases, even as Fox summarizes them, are on all fours with the misconduct that is alleged here.

Fox nevertheless contends these cases are distinguishable. This argument is based on a single, linchpin claim: appending its "Location Agreement" for renting out the JTDC to its Rule 12(b)(6) motion,[9] Fox contends that this formal contract was "the ***only*** 'agreement' [Fox] reached with government officials" regarding its use of the JTDC. (Fox MTD at 10 (emphasis added).) The Location Agreement, in turn, recites that Fox's filming would not disrupt the JTDC's operations "in any manner whatsoever." (*See* Fox MTD at 4 & Ex. A, Doc. # 51-2 at PageID #:244.) From this, Fox argues that the Plaintiffs cannot be heard to allege that the JTDC's administrators imposed the lockdowns pursuant to an understanding with Fox, because the no-disruption recitation "proves" such allegations "to be false." (Fox MTD at 4.)

This argument fails. The Supreme Court has anticipated that parties engaged in joint private-government action will attempt to avoid state action liability through ploys just like Fox's, and it has instructed courts to look ***beyond*** such evasions by instead examining the actual nature of the challenged conduct. *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001) involved the question of whether a school athletic association was a state actor. The state had once "freely acknowledged" the athletic association's official character, but then changed its regulations to disclaim any association, instead acknowledging

---

[9] Fox apparently seeks to introduce the Location Agreement pursuant to Federal Rule of Civil Procedure 10(c), which creates a narrow exception to the canon that Rule 12(b)(6) motions should be decided based on the facts alleged in a complaint, not on other facts that a defendant might seek to introduce through documents attached a motion to dismiss. *See Steigmann v. Democratic Party of Ill.*, 406 F. Supp. 2d 975, 986 (N.D. Ill. 2005) (St. Eve., J.) (describing Rule 10(c) exception). This exception, however, only applies where a complaint's allegations are dependent upon such documents. *See generally* 5C Wright, Miller et al., Fed. Prac. & Proc. Civ. § 1366 & n.34. Here, the Location Agreement is not integral or central to the FAC's joint action allegations. Fox does not identify any doctrine under which a plaintiff's allegation that there is an illicit understanding to engage in unlawful conduct can be negated if the alleged co-conspirators execute a written agreement reciting that they will not engage in such conduct. And indeed, as explained below, *Brentwood Academy* instructed courts to look beyond such formal attempts to evade state action liability. The Rule 10(c) exception therefore does not apply, and pursuant to Federal Rule of Civil Procedure 12(d) the Court should exclude the Location Agreement.

the association's regulatory function "by winks and nods." 531 U.S. at 301. The Court rejected

this "formal" effort to evade state action:

> if formalism were the *sine qua non* of state action, the doctrine would vanish
> owing to the ease and inevitability of its evasion, and for just that reason
> formalism has never been controlling. For example, a criterion of state action like
> symbiosis . . . looks not to form but to an underlying reality.

531 U.S. at 302 n.4. The lower courts have followed that instruction. In *Wickersham v. City of

Columbia*, 481 F.3d 591, 599 (8th Cir. 2007), for example, a private air show and a city had in

place a written agreement that the city's police would arrest protesters at the show at the

direction of the air show. Plaintiff-protesters sued under Section 1983, and a district court found

that the air show and the city had acted jointly to violate the plaintiffs' free speech rights. The

city and the air show then formally disclaimed any relationship—but they operated in roughly

the same manner. The court looked past the formal disclaimers in the city-air show agreement,

and, citing *Brentwood*, explained that the "underlying reality of private entity's relationship to

the state often trumps legal formalities erected in attempt to thwart a finding of state action."

*Wickersham*, 481 F.3d at 599 (quotation omitted).

Judge Shadur appears to have taken the same approach in *Frederick*. Fox tries to

distinguish *Frederick* from this case on the grounds that "the [*Frederick*] media participants

entered into agreements with law enforcement that specifically contemplated deviations from

normal police procedures in order to promote 'entertainment value.'" (Fox MTD at 14.) The

formal written agreement in that case, however, is available on *Frederick*'s ECF docket, and it

recites (twice) that the "recording shall not interfere with the Police Department's operations and

services." *Frederick*, No. 1:09-cv-06837 Doc. #17-2. (Attached to the Declaration of Stephen

H. Weil as Exhibit A.) Judge Shadur gave the written agreement careful consideration, *see

Frederick*, 683 F. Supp. 2d at 800 & n.5 (discussing details of agreement) and he quite properly

20

considered the reality underlying of the relationship, not the parties' self-serving recitation, to conclude that the media company and the city had acted jointly to violate the plaintiff's rights.

The Court should follow this precedent here. It should look past the defendants' attempt in the Location Agreement to evade state action liability, and instead make that determination by examining the underlying reality of the defendants' conduct.

> **b)** **The FAC plausibly alleges that the government locked the children on the pods pursuant to an understanding with Fox**

Plaintiffs make extensive and detailed allegations about the lockdowns and the "underlying reality" in which they occurred. At the end of the day, their allegations are simple: there were two groups of people who could not occupy the same space at the same time. On the one hand there were hundreds of children who normally used the facilities on the JTDC's second and third floors for educational and rehabilitative programming. On the other was Fox's film crew of hundreds, with masses of equipment, who would need to take over those same facilities in order to film the scenes Fox wanted.

That reality would have been inescapable to Fox and the JTDC's administrators; thus, it is permissible to infer that when they agreed to use the JTDC for filming, Fox and the government contemplated, and had an understanding, that the children who normally used the facilities on the second and third floors would be excluded from them. Even Fox concedes that Plaintiffs have sufficiently pled its knowledge: "At most, Plaintiffs allege knowledge by [Fox] 'that filming *Empire* at the JTDC would result in . . . restrictions on the children housed there.'" (Fox MTD at 9 (ellipses original).) Indeed. Holding the children in their pods was the only way

for Fox to film at the JTDC, and the defendants knew it.[10]  The Location Agreement's formal no-disruption recitation is a sham.  Under *Brentwood Academy*, the Court should ignore it.

The facts alleged in the FAC permit the plausible inference that Fox and the JTDC's administrators reached an understanding that the JTDC would alter its normal operations such that the hundreds of children who normally used the JTDC's education and rehabilitation facilities would instead be held on their pods so that Fox could use them to film *Empire*.  Those allegations are sufficient to hold Fox liable as a joint actor under color of law.

### c)    **Fox's remaining "joint action" arguments fail**

The Location Agreement's no-disruption provision undergirds all of the Fox's arguments regarding its joint actor liability and without it, Fox's remaining claims fall apart.  Properly considered, the FAC's allegations align squarely with Fox's own summary of *Berger*, *Frederick*, *Conradt*, and *Tiwari*, in which, as Fox puts it, the defendant media company was properly treated as a joint actor because it entered into an agreement with the government that contemplated "deviations from normal [government] procedures in order to promote" the media company's interests "at the expense" of the plaintiffs in those cases.  (Fox MTD at 14.)

As Fox itself explains, this is distinguishable from cases where the private party is merely a passive, independent observer of the government's conduct.  *See Brunette v. Humane Soc'y of Ventura Cty.*, 294 F.3d 1205, 1212 (9th Cir. 2002) (*see* Fox MTD at 11) (reporter "acted independently" where government invited her to witness the execution of a search warrant, but "did nothing to facilitate the [reporter's] news gathering mission.").

---

[10]  Location Agreement says as much itself.  A few lines up from its promise that there would be no disruptions, it recites that Fox would be using the JTDC's "visitation room, exercise yard, medical office," and various other areas.  (*See* Fox MTD Ex. A at PageID #244, Section 1(A).)

It is also distinguishable from situations where a private party merely "calls the cops," *i.e.*, where a party calls on the government's assistance, and the government's agents then decide what to do based on their own discretion, rather than an understanding with the party. (Fox MTD at 14.) *See Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336 (7th Cir. 1995) (cited in Fox MTD at 8) (no joint action where restaurant owner gave false information to officer who then arrested plaintiffs, where there was no other evidence the owner and the police had a plan to arrest people at owner's request); *Green v. Harrah's Ill. Corp.*, 2004 WL 1102272 (N.D. Ill. Apr. 30, 2004) (St. Eve, J.) (cited in Fox MTD at 16) (no joint action where defendant told police that plaintiff had been involved in criminal conduct, and police arrested plaintiff because they believed the defendant's accusations); *Serbalik v. Gray*, 27 F. Supp. 2d 127 (N.D.N.Y. 1998) (cited in Fox MTD at 14) (no joint action where plaintiff's neighbors complained about plaintiff's septic system, and officials conducted an investigation that violated plaintiff's rights).

Fox also argues that it cannot be held liable as a joint actor because it wasn't "motivated . . . by the goal of depriving the Plaintiffs of their constitutional rights." (*Id.* at 15.) Rather, its "only goal in filming at the JTDC . . . was to gain access to a realistic prison facility to use as a film set." (Fox MTD at 10 (quotation omitted).) This argument is absurd—Fox is essentially claiming that the ends justify the means. The media companies in *Berger*, *Frederick*, *Conradt*, and *Tiwari* also just wanted good television footage. They were liable as joint actors because they each reached an understanding with the government that it would violate people's rights help the companies get that footage. That is exactly what the Plaintiffs allege here. Fox wanted to use the JTDC's second and third floors as a realistic prison set, and reached an understanding with the JTDC's administrators to violate the rights of hundreds of children so that its filming

goals could be accomplished.  That understanding, which the FAC alleges in detail, is grounds for joint action liability.

### 2.      Conspiracy Liability

Plaintiffs assert that the defendants engaged in conspiracy to violate their federal and state rights.  The state and federal elements of conspiracy are essentially identical.  *See Hampton v. Hanrahan*, 600 F.2d 600, 620–21 (7th Cir. 1979), *judgment rev'd in part on other grounds*, 446 U.S. 754 (1980) ("A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." (quotation omitted)); *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (same essential elements).

Repeating one of its joint action arguments, Fox contends that Plaintiffs have not alleged a conspiracy because Fox's "only goal was to film scenes for a fictional television show in a realistic prison setting."  (Fox MTD at 17.)  Again, this misdirects the reader from the relevant purpose of the alleged conspiracy.  Plaintiffs allege that Fox's goal was to shoot scenes for a television show—and that it conspired with the government to violate the Plaintiffs' rights (by agreeing that the children would be held on the pods while Fox filmed *Empire*) in order to accomplish that goal.  It does not save Fox that its ***ultimate*** goal was to shoot a television show. What matters is that Fox conspired with the government to inflict a wrong on the children at the JTDC as a means to accomplish that ultimate goal.  Every conspirator is "responsible for the foreseeable activities of his co-conspirators to further the goals of the conspiracy," *James v. Vill. of Willowbrook*, No. 11-cv-9126, 2012 WL 3017889, at *12 (N.D. Ill. July 19, 2012) (citing

*Pinkerton v. United States*, 328 U.S. 640 (1946)), which here includes the restrictions placed on the children to facilitate Fox's filming.

Thus the relevant goal of the alleged conspiracy was to violate Plaintiffs' rights. Fox's citation to cases like *Hanania v. Loren-Maltese*, 212 F.3d 353 (7th Cir. 2000), where the alleged co-conspirators did not share the same goal, is thus unavailing. The FAC sufficiently alleges that Fox conspired with the JTDC's administrators to engage in the violations alleged here.

### 3. Fox's Liability Under Section 1983

In Count V, Plaintiffs advance a *respondeat superior* Section 1983 liability claim against Fox in light of the extensive *dicta* in *Shields v. Illinois Department of Corrections*, 746 F.3d 782 (7th Cir. 2014), which reasoned that, as a general matter, corporations should be subject to *respondeat superior* liability under Section 1983. 746 F.3d at 789-96. This is not yet the law in the Seventh Circuit, though, as *Shields* noted, *id.* at 796, and Count V seeks to preserve this alternative basis for liability in the event the *Shields dicta* becomes the law.

Fox takes *Shields* a step further, however, arguing not only that Count V should be dismissed, but that all the other federal counts against it should be dismissed as well. (Fox MTD at 17.) That does not follow. Both before and after it decided *Monell v. Department of Social Services*, 436 U.S. 658 (1978)*, the Supreme Court has held that corporate entities themselves can be liable under Section 1983 for conspiring or acting jointly with government officials. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) (restaurant held liable for conspiracy with police to make unlawful arrest); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982) (private corporation held liable for joint action with state, without *Monell* inquiry). The lower courts, including the Seventh Circuit, have followed suit. *See Del's Big Saver Foods, Inc. v. Carpenter Cook, Inc.*, 795 F.2d 1344, 1345 (7th Cir. 1986) (Posner, J.) (creditor corporation

treated as state actor under *Lugar* joint action principles after receiving state assistance against plaintiff, without *Monell* inquiry); *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 904-06 (6th Cir. 2004) (addressing *Monell* and holding that Section 1983 conspiracy claims may be premised on agreement by a corporate defendant); *Harris v. Goins*, 156 F. Supp. 3d 857, 867 (E.D. Ky. 2015) (citing *City of Memphis* holding that "[corporate] entities can participate in civil conspiracies under § 1983, and that this type of conspiracy claim does not rely on a *respondeat superior* theory"); *Hughes v. Patrolmen's Benevolent Ass'n of City of N.Y., Inc.*, 850 F.2d 876, 880 (2d Cir. 1988) (citing *Adickes* to hold police union liable under joint action theory for conspiring with police department, on grounds that "private party involved in a conspiracy liable under § 1983 if private party a willful participant in joint activity with the State or its agents" (quotation omitted)); *Temple v. Albert*, 719 F. Supp. 265, 268 (S.D.N.Y. 1989); ("This is not to say that a private corporate employer is never liable under § 1983. Where a plaintiff alleges a conspiracy between the private employer and its employees who are acting "under color of state law," a sufficient basis for potential liability exists." (citing *Adickes* and distinguishing conspiracy liability from institutional practice liability)); *Rojas v. Alexander's Dep't Store, Inc.*, 654 F. Supp. 856, 858 (E.D.N.Y. 1986) (corporate defendant liable on the basis of joint action, which "involves a utilization for [the corporate defendant's] benefit of state law enforcement authority").

Indeed such an agreement is the basis for joint action liability for the corporate defendants in *Berger* (CNN), *Frederick* (Biography Channel), *Conradt* (NBC), and *Tiwari* (NBC), as well as *Barrett* (Outlet Broadcasting, Inc.) and *Ayeni* (CBS). Fox entered such an agreement here, and is liable as a joint actor under Section 1983.

### 4. Inducement of Breach of Fiduciary Duty

Plaintiffs assert that Fox induced Leonard Dixon and the JTDC's other administrators to breach their fiduciary duties to the children at the JTDC. (FAC ¶¶ 111-16.) Besides adopting Dixon's arguments that there was no breach of fiduciary duty, Fox argues that the inducement claim should be dismissed, for two reasons. First, Fox argues that the Plaintiffs "do not and cannot allege any 'participation' by Fox in any decisions respecting the treatment of detainees." (Fox MTD at 18-19.) Fox does not explain why this is so, but presumably this argument relies on its contention that the no-disturbance recitation in the Location Agreement somehow negates all of the allegations that Plaintiffs in fact make about the understanding Fox reached with the JTDC's administrators. That argument is a failure, as Plaintiffs have demonstrated. (*See* Mem. Section IV.A.1.) The FAC sufficiently alleges that Fox orchestrated the violation of the children's constitutional rights for its own interests, and induced the JTDC's administrators to abandon their obligations to the children. (*See id.*; FAC ¶¶ 29, 93, 113.)

Second, Fox argues that "Plaintiffs do not and cannot allege any benefit that flowed to any Fox Defendant specifically from the conditions that the government allegedly imposed on the Plaintiffs while TCFTV was present at the JTDC," because Fox benefitted from *accessing* the JTDC, but not from the lockdowns. (Fox MTD at 19.) This argument is hard to take seriously. Keeping the children off the second and third floors, which meant they were locked on their pods, was *the act* that cleared out those facilities for Fox to film the *Empire* scenes, from which it then profited. Fox fails to cite any authorities suggesting that it should not be held liable for the profits it realized as the *proximate* result of inducing a breach of fiduciary duty.

27

### 5. Liability of the Various Fox Defendants

"Fox" refers to the several Fox defendants collectively. In footnotes 2 and 6 of its brief, the Fox states that only one of those Fox entities, Twentieth Century Fox Television, a division of Twentieth Century Fox Film Corporation ("TCFTV") can possibly be held liable. This is so because "none of the [other] Fox Defendants had or are alleged to have had anything to do with filming at the JTDC" (Fox MTD at 3 n.2) and because only TCFTV personnel were at the JTDC for filming (Fox MTD at 8 n.6), whereas Plaintiffs seek to hold the other Fox defendants liable on the grounds that they profited from the filming at the JTDC. (*Id.*)

This is not true. The FAC alleges that defendant Fox Entertainment Group LLC was involved in the filming at JTDC (FAC ¶ 54), and that defendant Fox Broadcasting Company was directly involved in decisions about filming at the JTDC. (*Id.* ¶ 53.) Fox is correct that the FAC alleges that these and the remaining Fox defendants (Twenty-First Century Fox, Inc. and Fox Networks Group, Inc.) were unjustly enriched by the filming at the JTDC, but Fox does not present any argument as to why unjust enrichment cannot be a basis for liability. Indeed, Fox's brief makes no arguments on that score at all, and thus Fox has not presented reasons why the claims against the other Fox defendants should be dismissed. At this early stage of the litigation, therefore, the Court should not dismiss the other Fox defendants.

### B. The Chief Judge

#### 1. Eleventh Amendment Immunity

The FAC names the Chief Judge as a defendant in his official capacity. The Eleventh Amendment generally affords the Chief Judge's office immunity from suit. Here, however, state law make clear that in exercising authority over the JTDC, the Chief Judge acts as a local, rather than a state, official. As such, Eleventh Amendment immunity does not apply.

The Chief Judge argues, without elaboration, that his office is entitled to Eleventh Amendment immunity because "Judges . . . of the circuit courts are state officials." (C.J. MTD at 4.) The Supreme Court has explained, however, that determining whether an official is a state or a local officer is not that simple. Rather,

> the question is not whether [the official] acts for [the state] or [local government] in some categorical, 'all or nothing' manner. Our cases . . . instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue.

*McMillian v. Monroe Cty.*, 520 U.S. 781, 785 (1997). This "inquiry is dependent on an analysis of state law," but state law does not "answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy." *Id.* at 786. Rather, "our understanding of the actual function of a governmental official, in a particular area, will . . . be dependent on the definition of the official's functions under relevant state law." *Id.*

In *Scott v. O'Grady*, 975 F.2d 366 (7th Cir. 1992), the Court of Appeals, anticipating the analysis prescribed by *McMillian*, examined a claim of Eleventh Amendment immunity by an Illinois county sheriff. In *Scott*, tenants who had been evicted by sheriff's deputies acting pursuant to a state court order brought an official capacity suit against the sheriff's office, and the sheriff moved to dismiss on the grounds that his office had Eleventh Amendment immunity. 975 F.3d at 368-69.

The court noted that the Illinois Constitution defined sheriffs as county officials and that they normally functioned as such. *Id.* at 370-71. Thus as a general matter, Illinois sheriffs are county officers and are not entitled to Eleventh Amendment immunity. *Id.* at 371. "But this conclusion does not end our inquiry," the court went on. *Id.* "The fact that [sheriff's deputies] normally act as county officials does not mean that they can never act as an arm of the state." *Id.* Instead, the court examined the particular action that gave rise to the complaint. *Id.* Because the

sheriff had been enforcing a state court order rather than performing his typical duties, the sheriff, although classified as an officer of the county, was acting as a state officer and was therefore entitled to Eleventh Amendment immunity. *Id.*

The Seventh Circuit applies the same methodology to determine the status of officials in the administration of institutions or facilities like the JTDC. In *DeGenova v. Sheriff of DuPage County*, 209 F.3d 973 (7th Cir. 2000), the court analyzed whether an Illinois sheriff acts as a state officer when administering the county jail. While the Illinois Constitution defined sheriffs as county officials, the *DeGenova* court, applying *McMillian* and *Scott*, looked beyond that label to examine the sheriff's particular function at issue. 209 F.3d at 976. The court concluded that because the county "maintains and furnishes the jail" and pays for its operation and the sheriff's expenses in operating the jail, the sheriff acted as a county officer when administering it. *Id.*

In this case, the Chief Judge exercises administrative control over the JTDC pursuant to the County Shelter Care and Detention Home Act (the "Detention Home Act"), 55 ILCS § 75/1 *et seq.*[11] This law, and the Illinois Constitution, both make clear that in administering the JTDC, the Chief Judge exercises authority as a county rather than a state officer.

***First***, the Detention Home Act makes clear that juvenile detention centers like the JTDC are creatures of county, rather than state, government. The JTDC, like other juvenile detention facilities in the state, was created pursuant to the powers granted to counties under the Detention Home Act. And that law provides that the establishment, operation, and administration of these juvenile homes is exclusively a county, rather than a state, function.

---

[11] The Chief Judge was given this authority since 2008, pursuant to an amendment of the Detention Home Act. *See* 2007 Ill. Legis. Serv. 95-194 (H.B. 236) (West).

From the outset, the Detention Home Act specifies that Illinois county boards may create and operate a juvenile detention center—if they choose to do so:

> The board of county commissioners or the county board in any county in this State, may locate, purchase, erect, lease, or otherwise provide and establish, support and maintain a detention home for the care and custody of delinquent minors and a shelter care home for the temporary care of minors who are delinquent, dependent, neglected, addicted, abused or require authoritative intervention.

55 ILCS § 75/1(a). The Detention Home Act provides that a county may levy and collect taxes to pay for the operation of its juvenile detention center, *see* 55 ILCS §§ 75/1, 5, and it provides that, depending on the size of the county, the establishment of a juvenile detention center (and the taxes levied to support it) require approval of the county's voters, not just its board. 55 ILCS §§ 75/1, 6. During the detention center's operation, a county's board determines and provides the funding for the detention center, 55 ILCS § 75/3, can demand any type of report it needs from the center's administrator, 55 ILCS § 75/4, and can even transfer the detainees in its center to other counties that will rent bed space in their detention centers. 55 ILCS § 75/9.

A county can choose to eliminate its juvenile detention center as well. Section 75/1(a) has permissive language providing that a county board "may" choose to maintain an existing juvenile detention center, *supra*, and the law explicitly provides the voters of each county, by referendum, may choose to eliminate their county's juvenile detention center. 55 ILCS § 75/7.

The Detention Home Act, in other words, ***authorizes*** counties to establish and operate juvenile detention centers, but does not ***require*** them to do so. Whether a county establishes, supports, or eliminates a juvenile detention center is a choice that the Detention Home Act leaves entirely to each county. The Chief Judge's authority in administering the JTDC, in other words, flows from a sphere of action that the state law leaves to county, not state, government.

**Second**, when performing the duties set out in the Detention Home Act, the Chief Judge is not exercising the powers that make him a state officer in the first place.

The Chief Judge's brief cites *Orenic v. Illinois State Labor Relations Board*, 537 N.E.2d 784, 795 (Ill. 1989) for the proposition that he is a state officer. (C.J. MTD at 4.) *Orenic*, in turn, relies on *Drury v. County of McLean*, 433 N.E.2d 666 (Ill. 1982). And both *Orenic* and *Drury* determine whether circuit courts judges are state officers by looking to Article VI of the Illinois Constitution. *Orenic*, 537 N.E.2d at 795; *Drury*, 433 N.E.2d at 669.

That is certainly enough for determining a circuit court judge's status as a general matter. But Article VI defines circuit court judges as state officers in their exercise of the state's ***judicial power***. *See* Ill. Const. 1970, art. VI, § 1 ("The judicial power is vested in a Supreme Court, an Appellate Court and Circuit Courts.") "Judicial power" refers to the construction of laws and the adjudication of legal rights. *See People v. Apfelbaum*, 95 N.E. 995 (Ill. 1911). It is nothing resembling the Chief Judge's oversight of the JTDC. Article VI, § 7(c) certainly confers on the Chief Judge administrative authority, but that is administrative authority over the ***circuit court***— not the exercise of other functions that the Legislature might assign to a chief judge. *See*, *e.g.*, *Maloney v. Bower*, 498 N.E.2d 1102, 1104 (Ill. 1986) (a chief judge cannot use the authority granted in Article VI, § 7 (c) "to issue general orders for the administration of courts" to instead enlarge the duties of the office of the public defender); *People ex rel. Brazen v. Finley*, 497 N.E.2d 1013, 1015 (Ill. Ct. App. 1986), *aff'd,* 519 N.E.2d 898 (Ill. 1988) (holding that Article VI, § 7(c) is a "grant of limited administrative authority over the workings of the circuit court," and does not confer on chief judges the power to make ethics rules for the circuit court bar).

Indeed, the Chief Judge's authority to administer the JTDC flows not from Article VI, but rather comes entirely from the Detention Home Act, *see* 55 ILCS § 75/3(b). Were it otherwise,

the Cook County Board would have been exercising Article VI's "judicial power" for decades, up until the Legislature amended the Detention Home Act in 2008 to add provisions regarding the Chief Judge's role. That cannot be.

*Drury* makes this distinction plain enough. In that case, the question was whether clerks of the circuit courts were county or state officials. The court held that clerks were state officials, because to hold otherwise would interfere with the circuit court's exercise of Article VI's "judicial power," since "any county could eliminate the office of the clerk of the circuit court." *Drury*, 433 N.E.2d at 669. This was impermissible, *Drury* explained, because "Article VI . . . does not contemplate nor does it authorize the exercise of any control over or permit the imposition of a burden on the judicial system by any local entity." *Id.* (quotation omitted). Therefore, *Drury* concluded,

> the clerk of the circuit court must be a member of State government, not subject to the control of any local government. We could not permit the administration of justice to hinge on the passage of a county ordinance abolishing the essential position of the clerk of the circuit court.

*Id.* Here, of course, the situation is the opposite. The Chief Judge's authority to administer the JTDC flows entirely from 55 ILCS § 75/3, and as noted above, Cook County is free to eliminate that authority entirely by choosing to eliminate the JTDC itself. Indeed, the Detention Home Act makes clear that the choice to establish or eliminate the Chief Judge's authority over the JTDC, by establishing or choosing to eliminate the JTDC, is entirely the County's prerogative. Rather than flowing from the Chief Judge's state-officer Article VI powers, his authority regarding the particular actions at issue in this case flows entirely from the power conferred on Cook County to establish and operate the JTDC.

In enacting 55 ILCS § 75/3, in essence, the Legislature decided to permit for the Chief Judge to have a role in the administration of county government. That role does not flow from

the provisions Article VI that clothe the Chief Judge with state-officer status in the exercise of the state's judicial power, but rather comes from the power that the Legislature has vested in Cook County. That power, in other words, is a creature of county, not state, government.

**Third**, other respects, the Chief Judge resembles a county officer. Most importantly, Cook County, not the State, is liable for any judgments entered against the Chief Judge. *See Robinson v. Sappington*, 351 F.3d 317, 339 (7th Cir. 2003) ("Under Illinois law, [a county] is responsible for the payment of expenses and judgments emanating from the workings of [the county circuit] court."). This fact, combined with the other features of Illinois law reviewed above, demonstrates that the Chief Judge operates as a county rather than a state official when administering the JTDC. Eleventh Amendment immunity therefore does not apply.

### 2. *Monell* Liability

Plaintiffs assert a *Monell* claim against the Chief Judge in his official capacity, on the grounds that Chief Judge Evans, as final decision-maker for the office of the Chief Judge, was aware of and approved of *Empire*'s filming at the JTDC and its consequent lockdown.

The Chief Judge argues that this claim should be dismissed. (C.J. MTD at 10.) The Chief Judge does not challenge the factual sufficiency of the allegations. Rather, he argues that his office cannot be held liable under *Monell* because the Chief Judge is a state official, not a local one. (*Id.*) As set forth above, however, in exercising administrative control over the JTDC the Chief Judge operates as a county rather than a state official. (*See* Mem. Section IV.B.1.) The Court should deny the Chief Judge's motion to dismiss the *Monell* claim.

### 3. Conspiracy Liability

The Chief Judge argues that the state and federal conspiracy claims against his office should be dismissed because Plaintiffs have not sufficiently alleged a conspiracy to violate their

rights, and because Plaintiffs' rights were not violated in the first place. (C.J. MTD at 10-11.) These arguments are stated in the Chief Judge's brief with no elaboration. Presumably the Chief Judge means to adopt the arguments against conspiracy raised by Fox. But Fox's arguments fail, for the reasons set out in Mem. Section IV.A.2. The defendants' argument that no violations occurred also fail, for the reasons set out in Mem. Section III. The Court should deny the Chief Judge's motion to dismiss Plaintiffs' conspiracy claims.

### C. The County Defendants

#### 1. *Monell* Liability (Cook County)

Cook County argues that the *Monell* claims against it should be dismissed because the Chief Judge is the official with final policymaking and decision-making authority regarding the administration and operation of the JTDC. The County argues that it does not control the actions of the Chief Judge, and that under Section 1983 its liability must be limited to actions for which it "is actually responsible." (Cty. Defs. MTD at 14-15.)

This argument is correct as a matter of law, but *Monell* does not foreclose the County's liability for its own actions, or actions taken in combination with the Chief Judge. *See Ross v. United States*, 910 F.2d 1422, 1430 n.5 (7th Cir. 1990) ("We are mindful of the defendant's warning that the actions of the sheriff cannot be attributed to the county. Reading the complaint in a light most favorable to the plaintiff, however, the county and the sheriff acted together in promulgating the alleged policy. Thus, we use the term 'county' in a loose sense, to denote the actions of both the sheriff and the county"); *Anderson v. Gutschenritter*, 836 F.2d 346 (7th Cir. 1988) (holding that Illinois counties are liable for certain acts of sheriffs who set policy in area of jail management). The County's liability for its own actions is direct, and the foregoing cases demonstrate that it can be liable for constitutional violations that it caused at the JTDC.

It is far too early to declare that the County did not in fact cause any of the challenged violations. Not only does the County fund and operate the JTDC, (*see* Mem. Section IV.B.1), but it ultimately entered an agreement with Fox that led to the lockdowns. Thus, dismissal under Rule 12(b)(6) is improper. Plaintiffs are entitled to move past the pleadings and conduct discovery, and the County is entitled to make its argument at summary judgment if the facts are as it claims.

### 2.      Qualified Immunity (Leonard Dixon)

Dixon argues that he is entitled to qualified immunity. (Cty. Defs. MTD at 11-12.) To determine whether an official is entitled to qualified immunity, the court first determines whether the plaintiff has alleged the violation of a constitutional right, and if so, whether, "in the light of pre-existing law[,] the unlawfulness" of the official's actions would be apparent to a reasonable official. *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009) (quotation omitted). Dixon's alleged misconduct was certainly unorthodox. But "an officer can be on notice that his conduct violates constitutional rights even in novel factual circumstances." *Id.* (quotation omitted). It does not matter "that there is no opinion explicitly finding" that the misconduct at issue was a constitutional violation, so long as "unlawfulness [is] apparent in light of the caselaw." *Id.* at 322 (quotations omitted).

Dixon argues that the Plaintiffs do not have clearly established rights to "education in a classroom," "dance and music" classes, long visits with family, etc. (Cty. Defs. MTD at 12.) But re-writing to the FAC in this way is impermissible. (*See* Mem. Section III.A.) Dixon must accept the FAC's allegations and explain why those allegations, construed in the Plaintiffs' favor, fail to state a claim. And what the FAC alleges is a violation of rights that would have been abundantly clear to a reasonable official in 2015. *Bell* had established that a restriction

imposed on a pretrial detainee for no legitimate governmental purpose violates due process. *Bell*, 441 U.S. at 539. It was also well established that government officers have no legitimate governmental purpose in imposing restrictions on citizens to further the interests of a private party, particularly where the government acts in concert with the private entity to further the private entity's interests. That was set out in *Lauro*, *Berger*, *Frederick*, and the other "media" cases discussed herein. (*See* Mem. Section III.B.1.) And it was well established, particularly in the juvenile detention setting, that warehousing children and forcing them into idleness is injurious to minors and thus is not a *de minimis* imposition. That would have been evident to a reasonable official, and the particular protections that the Due Process Clause affords juveniles was clear from *Doe* and the other juvenile cases discussed herein, as well as from *Davis*, *Robles*, *Demery*, and *Wagner*. (*See* Mem. Section III.B.2.) The FAC has sufficiently alleged that Dixon imposed severely restrictive conditions on detained children, for absolutely no legitimate purpose, in violation of due process rights that a reasonable official should have been aware of. Dixon should not enjoy qualified immunity for his misconduct.

### 3. Conspiracy Liability (Leonard Dixon and Cook County)

The County Defendants adopt Fox's arguments that Plaintiffs have not sufficiently alleged a conspiracy. (Cty. Defs. MTD at 16.) Their motion fails for the same reason Fox's arguments fail. (*See* Mem. Section IV.2.)

### 4. Statute of Limitations as to IIED (Leonard Dixon and Cook County)

The County Defendants argue that under 745 ILCS 10/8-101, the Plaintiffs' IIED claims are barred under Section 8-101's one-year statute of limitations for municipal defendants. (Cty. Defs. MTD at 15-16.) T.S. and Q.B., are minors, however, (*see* FAC ¶¶ 2, 3), and Section 8-101 does not begin to run against them until they turn 18. *See McKinnon v. Thompson*, 758 N.E.2d

316, 319 (Ill. Ct. App. 2001) ("[T]he one-year limitations period of section 8-101 applies, but it does not begin to run until [plaintiff] reaches 18 years of age. Thus, [plaintiff]'s cause of action would not be time-barred as long as it was filed prior to his nineteenth birthday.") The IIED claims are not time-barred.

### 5. Indemnification (Cook County)

Count XII states an indemnification claim against Cook County, asserting that the County is liable for judgments against Leonard Dixon and the Chief Judge. (FAC ¶¶ 130-33.) The County does not argue otherwise, and indeed, the FAC sufficiently alleges that the misconduct here occurred within the defendants' scope of employment. Count XII should survive.

## V. Conclusion

For the foregoing reasons, all of the pending motions to dismiss should be denied.

DATED: January 17, 2017     Respectfully Submitted,

            /s/ Stephen H. Weil
          Stephen H. Weil - sweil@eimerstahl.com
          Pamela R. Hanebutt - phanebutt@eimerstahl.com
          Susan M. Razzano - srazzano@eimerstahl.com

          Eimer Stahl LLP
          224 South Michigan Avenue, Suite 1100
          Chicago, IL 60604
          Tel: (312) 660-7600

          *Attorneys for Named Plaintiffs T. S. and Q. B.*

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that on January 18, 2017, a true and correct copy of the foregoing was filed electronically.  Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

                                  /s/ Stephen H. Weil