**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| T.S., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 16 C 8303 |
| v. | ) | |
| | ) | |
| TWENTIETH CENTURY FOX | ) | |
| TELEVISION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On October 5, 2016, minor Plaintiffs T.S. and Q.B., through their legal guardians,

brought the present twelve-count First Amended Class Action Complaint against Defendants

Twentieth Century Fox Television and other Fox entities ("Fox Defendants"); Cook County,

Illinois; Leonard Dixon, the Superintendent of Cook County Juvenile Temporary Detention

Center ("JTDC"); the Office of the Chief Judge of the Circuit Court of Cook County (Chief

Judge's Office); and Defendant Does alleging violations of their constitutional rights, along with

supplemental state law claims. *See* 28 U.S.C. §§ 1331, 1367(a). Plaintiffs, who seek to

represent a class of similarly situated juveniles, bring the following substantive claims and

claims seeking to establish certain Defendants' liability in their First Amended Complaint: (1) a

Fourteenth Amendment due process claim against all Defendants (Count I); (2) a Fourth

Amendment claim against all Defendants (Count II); (3) a *Monell* liability claim against Cook

County/and or the Chief Judge's Office (Count III); (4) a joint action liability claim against the

Fox Defendants (Count IV); (5) a respondeat superior liability claim against the Fox Defendants

in relation to Plaintiffs' constitutional claims (Count V); (6) a constitutional conspiracy claim

against all Defendants (Count VI); (7) a state law breach of fiduciary duty claim against Superintendent Dixon and Defendant Does (Count VII); (8) an inducement of breach of fiduciary duty claim against the Fox Defendants (Count VIII); (9) an intentional infliction of emotional distress claim against all Defendants (Count IX); (10) a state law civil conspiracy claim against all Defendants (Count X); (11) a state law respondeat superior claim against Cook County, the Chief Judge's Office, and the Fox Defendants (Count XI); and (12) an indemnification claim pursuant to 745 ILCS 10/9-102 against Cook County (Count XII).

Before the Court are three separate motions to dismiss brought by the Fox Defendants, Defendants Dixon and Cook County, and the Chief Judge's Office pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court denies the Cook County Defendants' and Chief Judge's Office' motions to dismiss the following claims – Counts I, III, VII, IX and X, and grants without prejudice these Defendants' motions to dismiss Count VI. As to the Fox Defendants, the Court grants without prejudice Defendants' motions to dismiss Counts I, IV, VI, VIII, IX, and X. The Court grants with prejudice Defendants' motions to dismiss Counts II and V. Furthermore, the Court grants Plaintiffs leave to amend their allegations in Counts IV, VI, VIII, IX, and X in a Second Amended Class Action Complaint – in accordance with this ruling and consistent with counsel's Rule 11 obligations – by no later than May 12, 2017.[1] *See Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,* 786 F.3d 510, 518 (7th Cir. 2015) (there is a "presumption in favor of giving plaintiffs at least one opportunity to amend."). Last, at this stage of the proceedings, Defendants Dixon and the Chief Judge's

---

[1] If Plaintiffs sufficiently allege joint action liability (Count IV) or their constitutional conspiracy claim (Count VI) in the Second Amended Complaint, the Fox Defendants will remain Defendants as to Plaintiffs' constitutional due process violation as alleged in Count I.

Office have not established their affirmative defenses regarding immunity.  *See Hyson USA, Inc. v. Hyson 2U, Ltd.,* 821 F.3d 935, 939 (7th Cir. 2016) ("a plaintiff ordinarily need not anticipate and attempt to plead around affirmative defenses.").

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted."  *Camasta v. Jos. A. Bank Clothiers, Inc.,* 761 F.3d 732, 736 (7th Cir. 2014); *see also Hill v. Serv. Emp. Int'l Union,* 850 F.3d 861, 863 (7th Cir. 2017).  Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Under the federal pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).  When determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor."  *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

## BACKGROUND

### I.      Introduction

In the summer of 2015, officials placed the JTDC on lockdown so that it could be used to film episodes for the Fox television show *Empire*.  (R. 23, First Am. Compl. Intro. ¶ 1.)  More

specifically, the filming of *Empire* at the JTDC occurred over three different time periods in the summer of 2015, namely, June 21 through 26, July 13 through 16, and August 23 through 26. (*Id*. ¶ 30.)  Plaintiffs, who were juvenile detainees during that time, allege that JTDC officials "placed off limits" certain areas that are essential to the JTDC's mission of educating and rehabilitating the hundreds of juveniles housed there, including the JTDC's school, its facilities for family visits, the outdoor recreation yard, the library, the infirmary, and the chapel.  (*Id*. Intro. ¶ 1, ¶¶ 30, 32, 35.)  JTDC officials placed these areas off limits so the Fox Defendants' agents and employees could use these areas to stage and film the television show.  (*Id*. Intro. ¶ 1.)  To that end, JTDC officials ordered that the juvenile detainees either remain in their cells or be placed in jail-style "pod" areas, which significantly limited the juveniles' movement.  (*Id*. Intro. ¶ 2, ¶¶ 34, 36.)  As a result, the juvenile detainees sat for days on end, their schooling existed in name only, visits from their families were effectively eliminated, and sick-call requests were ignored, among other alleged deprivations.  (*Id*. Intro. ¶ 2, ¶¶ 35, 38.)  In short, these lockdowns effectively cancelled or interrupted the JTDC programs intended to help the juvenile detainees.  (*Id*. Intro. ¶ 2, ¶ 40.)  Plaintiffs allege that the purpose of these lockdowns was to provide the Fox Defendants with a realistic prison facility for the *Empire* episodes.  (*Id*. Intro. ¶ 3.)

## II.      Agreement to Film at the JTDC

In the spring of 2015, Superintendent Dixon and/or the Chief Judge's Office, one or more of the Fox Defendants, and/or one or more of the Defendant Does entered into an agreement permitting *Empire*'s crew to film at the JTDC.  (*Id*. ¶¶ 29, 56.)  The parties' agreement contemplated that the *Empire* crew of approximately 250 individuals, including dozens of staff,

actors, and extras, would have access to many of the restricted facilities on the JTDC's second and third floors and that the juveniles would be barred from those facilities so the crews could work without interruption. (*Id.* ¶¶ 29, 31, 32.) Plaintiffs allege that under this agreement, the JTDC would confine the juvenile detainees to their cells and pods on the JTDC's upper floors for extended periods of time. (*Id.* ¶¶ 29, 34.) According to Plaintiffs, in reaching this agreement, all of the Defendants knew that filming *Empire* at the JTDC would result in the lockdowns and attendant restrictions on the juvenile detainees housed there. (*Id.* ¶ 29.) In addition, internal JTDC planning documents prepared for the *Empire* filming indicate that many JTDC staff members were expected or directed to leave their normal duties to provide services to the *Empire* crew, including acting as extras in the show, assisting at the delivery docks to permit the free flow of film equipment, escorting actors and crew members to and from the set, and cleaning up after the crew. (*Id.* ¶ 33.)

## III. Juvenile Pretrial Detainees

To put the disruptions resulting from the filming of *Empire* in context, Plaintiffs allege that many of the juveniles housed at the JTDC have encountered traumatic experiences prior and during their detention, including that sixty percent of the juveniles who enter the JTDC have been diagnosed with a mental disorder and around one-quarter of them are taking prescribed psychotropic medications. (*Id.* ¶ 18.) Added to this, Plaintiffs assert that the juveniles frequently arrive at the JTDC in a state of crisis having been separated from their families and placed in confinement. (*Id.*) Plaintiffs also allege that the 2015 lockdowns were psychologically damaging to many of the juvenile detainees because they were forced to remain idle in their cells and pods. (*Id.* ¶ 48.) According to Plaintiffs, as a proximate result of these lockdowns and the

attendant conditions, the juveniles housed at the JTDC suffered emotional and psychological pain, were deprived of meaningful opportunities for rehabilitation, education, and family visits, and were subjected to increased risk of physical violence at the hands of other juveniles at the facility. (*Id.* ¶ 78.)

## ANALYSIS

## I.      Constitutional Claims

In Counts I through VI of the First Amended Complaint, Plaintiffs bring substantive constitutional claims pursuant to 42 U.S.C. § 1983, as well as claims seeking to establish certain Defendants' liability for the alleged constitutional violations. To succeed on their § 1983 claims, Plaintiffs must show: "(1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under color of state law." *Wilson v. Warren Cnty., Illinois*, 830 F.3d 464, 468 (7th Cir. 2016). As Plaintiffs acknowledge, the Fox Defendants are not state actors, and thus they cannot be liable for any constitutional violations unless Plaintiffs have sufficiently alleged their joint action with state actors and/or that the Fox Defendants conspired with state actors to deprive Plaintiffs of their constitutional rights. *See id.*; *see also L.P. v. Marian Catholic High Sch.*, 852 F.3d 690 (7th Cir. 2017). Before determining whether Plaintiffs have sufficiently alleged that the Fox Defendants acted jointly with the state actor Defendants, the Court first turns to whether Plaintiffs have adequately alleged the substantive constitutional claims under *Iqbal* and *Twombly*.

### A.      Fourteenth Amendment Due Process Claim – Count I

In Count I of the First Amended Complaint, Plaintiffs allege that as juvenile detainees, the Fourteenth Amendment due process clause provides them certain protections in relation to

the conditions of their confinement and that all of the Defendants violated these protections. *See Schall v. Martin,* 467 U.S. 253, 269, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) ("[d]ue process requires that a pretrial detainee not be punished") (quoting *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)); *see also Bergren v. City of Milwaukee*, 811 F.2d 1139, 1142-43 (7th Cir. 1987). As the Seventh Circuit instructs, "there is little practical difference, if any, between the standards applicable to pretrial detainees and convicted inmates when it comes to conditions of confinement claims, and that such claims brought under the Fourteenth Amendment are appropriately analyzed under the Eighth Amendment test." *Smith v. Dart*, 803 F.3d 304, 310 (7th Cir. 2015). That being said, under the seminal Supreme Court decision relating to pretrial detainees' due process rights, namely, *Bell v. Wolfish*, the Supreme Court held that "court[s] must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538. More specifically, "[i]n the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2473 (2015) (quoting *Bell*, 441 U.S. at 561). Also, "[i]n assessing whether the treatment of the detained juvenile satisfies the requirements of due process, it is quite appropriate – indeed necessary – to consider that in such an environment juveniles may indeed have different needs and more importantly, different capacities than adults." *Bergren,* 811 F.2d at 1143.

Here, the challenged governmental action consists of the three lockdowns at the JTDC that occurred in June, July, and August 2015. Plaintiffs argue that these lockdowns, which

resulted in the denial of their due process rights, were not rationally related to a legitimate nonpunitive purpose, but rather, the purpose of these lockdowns was to provide the Fox Defendants with a realistic prison facility to film two *Empire* episodes. In response, Defendants Dixon and Cook County argue that Plaintiffs have failed to allege a sufficient deprivation of their liberty interests in the context of substantive due process protections pursuant to *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 415 (1995), and its progeny – which is not Plaintiffs' theory of liability concerning the conditions of their confinement because Plaintiffs are not incarcerated adult prisoners challenging disciplinary segregation. *See id.* at 485 ("The punishment of incarcerated prisoners, on the other hand, serves different aims than those found invalid in *Bell*."); *see also Wilkinson v. Austin,* 545 U.S. 209, 223, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) ("The *Sandin* standard requires us to determine if assignment to [a Supermax prison] 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'") (citation omitted). Instead, Plaintiffs' theory of the case is that all of the Defendants violated Plaintiffs' due process rights in relation to the conditions of their confinement as juvenile pretrial detainees in contradiction of *Bell v. Wolfish*. As such, Defendants' arguments relying on *Sandin* and *Wilkinson* are unavailing. Similarly, the Chief Judge's Office's "shock the conscience" argument is without merit because *Bell* did not instruct "federal courts to inquire into the state of anyone's conscience." *Titran v. Ackman,* 893 F.2d 145, 147 (7th Cir. 1990) ("*Bell v. Wolfish* did not instruct the inferior federal courts to inquire into the state of anyone's conscience, and to the extent 'substantive due process' applies, it is 'at best redundant of [sic] that provided by the Eighth Amendment.'") (citation omitted).

Next, all of the Defendants attempt to pick apart each alleged constitutional deprivation in isolation despite well-settled Seventh Circuit authority "that some conditions which taken singly do not constitute cruel or unusual punishment, may in cumulative effect violate the Eighth Amendment." *Dixon v. Godinez,* 114 F.3d 640, 643 (7th Cir. 1997); *see also Gray v. Hardy,* 826 F.3d 1000, 1005 (7th Cir. 2016) ("[s]ome conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so.") (citation omitted). Viewing the allegations and all reasonable inferences in Plaintiffs' favor – and the alleged deprivations as a whole – Plaintiffs have plausibly stated the denial of their due process rights by alleging that the filming of the *Empire* episodes and Defendants' attendant conduct resulted in depriving the juvenile detainees access to the infirmary and the denial of sick-call requests, along with the elimination of schooling, family visits, and restricting the juveniles' movement and outdoor activities. *See Smith,* 803 F.3d at 313 ("We have recognized that lack of exercise can rise to a constitutional violation"); *Ortiz v. City of Chicago,* 656 F.3d 523, 531 (7th Cir. 2011) ("Each state actor who encounters a detainee must reasonably respond to medical complaints."); *Swansey v. Elrod,* 386 F. Supp. 1138, 1143 (N.D. Ill. 1975) ("children who remain unconvicted of any crime may not be subjected to devastating psychological and reprehensible physical conditions"). In fact, Plaintiffs' allegations regarding the denial of access to the infirmary and the rejected sick-call requests – alone – state an actionable claim. *See, e.g., Dobbey v. Mitchell-Lawshea,* 806 F.3d 938, 940 (7th Cir. 2015); *Gallagher v. City of Winlock, Wash.,* 287 Fed. Appx. 568, 576 (9th Cir. 2008).

Nevertheless, all of the Defendants argue that the deprivations were short-term inconveniences – taking issue with Plaintiffs' characterization of the alleged constitutional

deprivations. At this procedural posture, however, the Court must view the facts and all reasonable inferences in Plaintiffs' favor, not in Defendants' favor. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2196, 167 L.Ed.2d 1081 (2007); *Smith,* 803 F.3d at 309. Additionally, Plaintiffs have adequately alleged that there was no legitimate governmental purpose for the lockdowns, but rather the lockdowns provided the Fox Defendants with a realistic prison facility to use as a set for two *Empire* episodes – allegations that allow the Court to reasonably infer the purpose of the governmental action was punishment. *See Bell*, 441 U.S. at 538-39 ("if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees."); *Mulvania v. Sheriff of Rock Island Cnty.,* 850 F.3d 849 (7th Cir. 2017) ("A pretrial condition can amount to punishment in two ways: first, if it is 'imposed for the purpose of punishment,' or second, if the condition 'is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the government action is punishment.'") (quoting *Bell*, 441 U.S. at 538-39). As such, Plaintiffs' allegations are sufficient at this stage of the proceedings. Thus, the Court denies Defendants' motion to dismiss Count I of the First Amended Complaint.[2]

---

[2] In their opening brief, the Fox Defendants make a cursory argument that Plaintiffs' constitutional claims fail because "named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" *Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted). Not only is this argument undeveloped, but as the direct quotation implicates, it is best left for Plaintiffs' class certification motion. *See United States v. Cisneros,* 846 F.3d 972, 978 (7th Cir. 2017) (perfunctory and undeveloped arguments are waived). In addition, the Fox Defendants did not make any cogent standing arguments based on *Spokeo* until their reply brief. *See Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 897(7th Cir. 2017) (arguments made first time in reply brief are waived).

**B.    Fourth Amendment Claim – Count II**

In the alternative to their Fourteenth Amendment due process claim, in Count II, Plaintiffs bring a Fourth Amendment claim against all of the Defendants arguing that the Supreme Court has not definitely determined whether the Fourth Amendment continues to provide protection against the use of excessive force beyond arrest.  *See Graham v. Connor,* 490 U.S. 386, 395 n.10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Kingsley,* 135 S.Ct. at 2479 (Alito, J., dissenting) ("we should decide whether a pretrial detainee can bring a Fourth Amendment claim based on the use of excessive force by a detention facility employee," because "[w]e have not yet decided that question.").  Plaintiffs' argument is misplaced because the Supreme Court has repeatedly recognized that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."  *See Graham v. Connor,* 490 U.S. 386, 395 n.10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see also Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 127, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) ("the Due Process Clause of its own force requires that conditions of confinement satisfy certain minimal standards for pretrial detainees").  As such, an alternative claim based on the Fourth Amendment is unwarranted.  The Court grants, with prejudice, Defendants' motions to dismiss Plaintiffs' Fourth Amendment claim as alleged in Count II.

**II.    Claims Pertaining to Liability**

**A.    Joint Action Liability – Count IV**

As mentioned above, Plaintiffs seek to establish that the Fox Defendants – despite being private actors – acted under color of state law as required by § 1983, and thus are liable for the purported constitutional violations.  "The Supreme Court has set forth various tests to use when

deciding whether someone is a governmental actor, including the 'symbiotic relationship test, the state command and encouragement test, the joint participation doctrine, and the public function test.'" *Listecki v. Official Comm. of Unsecured Creditors,* 780 F.3d 731, 738 (7th Cir. 2015) (citation omitted). Plaintiffs seek to establish that the Fox Defendants are liable for the alleged constitutional deprivations under the "joint action" or "joint participation" doctrine in relation to their Fourteenth Amendment due process claim alleged in Count I. "To act 'under color' of law does not require that the accused be an officer of the State," it "is enough that he is a willful participant in joint activity with the State or its agents." *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (citation omitted). As the Seventh Circuit recently explained, a "private person acts under color of state law when she is a 'willful participant in joint action with the State or its agents,'" which requires "'evidence of a concerted effort between a state actor and that individual.'" *L.P.,* 852 F.3d 690 (citation omitted). More specifically, for "a private actor to act under color of state law he must have 'had a 'meeting of the minds' and thus reached an understanding' with a state actor to deny plaintiffs a constitutional right." *Wilson,* 830 F.3d at 468 (citation omitted); *see also L.P.*, 852 F.3d 690 ("The plaintiff must identify a sufficient nexus between the state and the private actor to support a finding that the deprivation committed by the private actor is 'fairly attributable to the state.'") (citation omitted). Under this standard, Plaintiff must allege facts supporting a reasonable inference that there was "a meeting of the minds" between the private and public defendants and that they shared a common goal in relation to the deprivation of Plaintiffs' constitutional rights. *See Wilson,* 830 F.3d at 468.

In their First Amended Complaint, Plaintiffs allege that Defendant Superintendent Dixon or the Chief Judge, one or more of the Fox Defendants, and/or one or more of the Defendant Does willfully entered into an agreement that would permit *Empire*'s crew to film at the JTDC, and that as a result of implementing this agreement, Defendants deprived the juvenile detainees of their Fourteenth Amendment due process rights.  Plaintiffs further contend that the Fox Defendants acted together with – and obtained significant assistance from – the Cook County Defendants in filming *Empire* for commercial purposes, and that Defendants knew that filming *Empire* at the JTDC would result in lockdowns that placed unconstitutional restrictions on the juveniles housed there.  (First Am. Compl. ¶ 83.)  According to Plaintiffs, the Fox Defendants deliberately encouraged the JTDC's administrators to improperly place the JTDC on lockdown during the filming of *Empire*, and the contemplated and obvious result of this agreement was restricting the juvenile detainees' movement.  (*Id.* ¶ 93.)

Construing Plaintiffs' allegations as true and drawing all reasonable inferences in Plaintiffs' favor, they have failed to sufficiently allege that the Fox Defendants and any of the state actor/government Defendants reached an understanding to deny the juvenile detainees' constitutional rights.  *See Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").  Although Plaintiffs' allegations suggest an agreement between the private and state actors that resulted in restricting the juvenile detainees' movement and access to facilities, Plaintiffs have failed to allege sufficient facts raising a reasonable inference that the state and private actors had a "meeting of minds" in relation to a shared unconstitutional goal.  *See Adickes,* 398 U.S. at 158; *Wilson,* 830 F.3d at 468-69.

In support of their joint action allegations, Plaintiffs rely on cases in which federal courts have concluded that media defendants acted under color of state law because they and the public defendants had either collaborated in an arrest or agreed to film actual criminal activity. *See, e.g., Smart v. City of Miami,* 107 F. Supp. 3d 1271, 1287 (S.D. Fla. 2015) (media defendant's filming murder scene and arrest violated Fourth Amendment); *Conradt v. NBC Universal, Inc.,* 536 F. Supp.2d 380, 392 (S.D.N.Y. 2008) ("for the sake of a more exciting television show," media defendant "instigated and then placed itself squarely in the middle of a police operation."); *cf. Lauro v. Charles*, 219 F.3d 202 (2d Cir. 2000) (staged "perp walk" constitutes Fourth Amendment violation); *Frederick v. Biography Channel,* 683 F. Supp. 2d 798, 800 (N.D. Ill. 2010) ("a symbiotic relationship between a governmental body and a private party can place the private party squarely in the crosshairs of the Fourteenth Amendment."). These cases are not persuasive because Plaintiffs allege that the Fox Defendants filmed scripted episodes of *Empire* with actors – not that the parties agreed to recreate or film actual criminal activity. As such, the Court grants this aspect of the Fox Defendants' motion without prejudice. The Court grants Plaintiffs leave to amend their joint action allegations keeping in mind counsel's Rule 11 obligations.

Last, the Fox Defendants' argument that the parties' "Location Agreement" is the only relevant contract at issue and that the Location Agreement (and presumably its subsequent addenda) does not contemplate denying Plaintiffs' civil rights is an overly formalistic argument ignoring the alleged relationship and agreement between the Fox Defendants and the government officials in this matter. *See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 302 n.4, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) ("[I]f formalism were the sine qua non

of state action, the doctrine would vanish owing to the ease and inevitability of its evasion, and for just that reason formalism has never been controlling.").[3]  Nonetheless, Plaintiffs have still failed to sufficiently allege joint action under the federal pleading standards.

**B.      Federal Conspiracy Claim – Count IV**

In Count IV, Plaintiffs seek to establish the Fox Defendants' liability, in tandem with the other Defendants' liability, for the alleged due process deprivations via a § 1983 conspiracy claim.  First, despite Defendants' arguments to the contrary, Plaintiffs have adequately alleged constitutional deprivations underlying their conspiracy claim.  *See Katz-Crank v. Haskett,* 843 F.3d 641, 650 (7th Cir. 2016) ("there is no independent cause of action for § 1983 conspiracy").  Second, Defendants argue that Plaintiffs have failed to sufficiently allege that the state and private Defendants acted in conspiracy to deny the juvenile detainees' constitutional rights.  The Court agrees.

The elements of a § 1983 conspiracy claim include that (1) the individuals reached an agreement to deprive a plaintiff of his constitutional rights; and (2) overt acts in furtherance of the agreement actually deprived the plaintiff of those constitutional rights.  *See Beaman v. Freesmeyer,* 776 F.3d 500, 510 (7th Cir. 2015); *see also Cooney v. Casady,* 735 F.3d 514, 518 (7th Cir. 2013) ("The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or

_____

[3]  The Fox Defendants' attempt to rebut Plaintiffs' well-pleaded allegations with their own contract interpretation of the Location Agreement is misplaced at this stage of the case, especially because Plaintiffs do not refer to this contract in their First Amended Complaint nor did Plaintiffs attach this contract to their First Amended Complaint.  *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.").

possess the same motives for desiring the intended conspiratorial result.") (citation omitted). In their First Amended Complaint, Plaintiffs allege that the Fox Defendants conspired with the government Defendants to inflict a wrong on the juvenile detainees that ultimately violated their due process rights. Although Plaintiffs have adequately alleged violations of their due process rights as juvenile detainees and that Defendants had an agreement, Plaintiffs have not sufficiently alleged facts raising a reasonable inference that Defendants' agreement concerned depriving the juvenile detainees' constitutional rights. *See Tom Beu Xiong v. Fischer,* 787 F.3d 389, 398 (7th Cir. 2015) ("bare allegation of a conspiracy between private and state entities is insufficient to bring the private entity within the scope of § 1983.") (citation omitted). The Court thus grants Defendants' motions to dismiss Plaintiffs' § 1983 conspiracy claim without prejudice and grants Plaintiffs leave to amend these allegations in their Second Amended Class Action Complaint.

### C. Respondeat Superior – Count V

In Count V, Plaintiffs allege that the Fox Defendants are liable for their employees' and agents' conduct in relation to Plaintiffs' § 1983 due process claim under the theory of respondeat superior. Plaintiffs base this claim on dicta in the Seventh Circuit's decision *Shields v. Illinois Dept. of Corr.,* 746 F.3d 782, 789 (7th Cir. 2014), to preserve their argument as an alternative basis for liability in case this dicta becomes law. To clarify, in *Shields*, the Seventh Circuit recognized that under § 1983 a private corporation cannot be held liable based on the employee-employer relationship, namely, respondeat superior, but that this issue deserved "fresh consideration" in the future. *See id.* at 789 (citing *Iskander v. Village of Forest Park,* 690 F.2d 126, 128 (7th Cir. 1982)). The Court thus grants the Fox Defendants' motion with prejudice.

**D.** **Immunity Affirmative Defenses**

Before addressing Plaintiffs' allegations under *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) – which concern Superintendent Dixon and the Chief Judge's Office – the Court turns to these Defendants' immunity arguments to determine whether they remain named Defendants to this lawsuit.

**1.** **Eleventh Amendment Immunity – The Chief Judge's Office**

The Chief Judge's Office brings the affirmative defense of Eleventh Amendment immunity. *See Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 39, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) ("The Eleventh Amendment largely shields States from suit in federal court without their consent."). In particular, the Chief Judge's Office argues that because the Eleventh Amendment bars lawsuits against state officers acting in their official capacities, the Court must dismiss Chief Judge Evans from this lawsuit because Illinois Circuit Court judges are state officials. *See Orenic v. Illinois State Labor Relations Bd.,* 127 Ill. 2d 453, 475, 130 Ill. Dec. 455, 537 N.E.2d 784 (Ill. 1989) ("members of the judicial branch of State government ... are not county officers"). Indeed, Plaintiffs agree that the Eleventh Amendment generally affords Chief Judge Evans immunity from suit. Nevertheless, Plaintiffs seek to establish that the Chief Judge's Office is liable because operation of the JTDC is a county function – as opposed to the Chief Judge's actions taken pursuant to his state-officer judicial powers. In support of their argument, Plaintiffs point to the Illinois County Shelter Care and Detention Home Act ("Detention Home Act"), which allows counties in Illinois to create and operate juvenile detention centers. *See* 55 ILCS 75/1; *see also Acme Markets, Inc. v. Callanan,* 236 Ill. 2d 29, 31, 337 Ill.Dec. 867, 923 N.E.2d 718 (Ill. 2009) (taxes for the funding county's detention home as provided by the

Detention Home Act are levied by each Illinois county).

In response, the Chief Judge's Office maintains that Chief Judge Evans' actual function under the Detention Home Act is limited because the Act merely gives the Chief Judge power to "appoint an administrator to serve as Superintendent," as well as other "necessary personnel" to administer the JTDC, along with direct control of the JTDC's budget. *See* 55 ILCS 75/3(b), (c); *see also McMillian v. Monroe Cnty., Ala.,* 520 U.S. 781, 786, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) (the court's "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law."). Accordingly, the Chief Judge's Office argues that – even if administration under the Detention Home Act is a county function – Defendant Superintendent Dixon is the individual with administrative authority over the JTDC pursuant to the Act. *See* 55 ILCS 75/3(b). At this stage of the proceedings – and in light of the transition of administrators during the relevant time period – whether Superintendent Dixon had administrative authority over the JTDC during the relevant time period and was the governmental official who gave the Fox Defendants permission to film *Empire* at the JTDC is not as clear-cut as the Chief Judge's Office suggests. *See McMillian,* 520 U.S. at 785 ("the question is not whether [the official] acts for [the state] or [c]ounty in some categorical, 'all or nothing' manner.... Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue.").

To give context, in 2007, the State of Illinois enacted legislation that transferred the administration of the JTDC from Cook County's executive branch (Board of Commissioners) to the Chief Judge's Office allowing the Chief Judge to appoint and remove administrators to run

the JTDC. *See Doe v. Cook Cnty., Illinois,* 798 F.3d 558, 560 (7th Cir. 2015). The Chief Judge appointed Superintendent Dixon as JTDC Superintendent in May 2015 – one month before the filming of *Empire* began. *See id.* Prior to May 2015, Transitional Administrator Earl Dunlap was tasked with running the JTDC.[4] Also, in the First Amended Complaint, Plaintiffs allege that the Chief Judge Timothy Evans knew about and approved the filming of *Empire* at the JTDC, as well as the facility's consequent lockdown, and that the lockdown occurred during the high-profile transition in which the Chief Judge's Office took administrative control of the JTDC. (First Am. Compl. ¶¶ 56, 57.) Plaintiffs further assert that despite Superintendent Dixon's experience in the field of juvenile corrections, he had just become the JTDC's Superintendent prior to the *Empire* filming raising a reasonable inference that the filming was done with Chief Judge Evans' approval. (*Id.* ¶¶ 63, 64.) Under these circumstances and allegations, whether someone in the Chief Judge's Office, the Chief Judge, Superintendent Dixon, and/or Transitional Administrator Dunlap was the relevant administrator and/or decision-maker regarding the Fox Defendants filming *Empire* at the JTDC remains unclear. In short, the parties' legal arguments concerning immunity are muddied by this change in administration, as well as Plaintiffs' allegations that the Chief Judge's Office was exercising county administrative authority – not judicial authority. Until the parties take discovery to determine which final policy decision-

---

[4] In relation to the 2002 settlement agreement between detainees and the JTDC, the "district court retained jurisdiction over implementation of the settlement," and in 2007 the district court "appointed Dunlap as the Transitional Administrator of the Center." *Coleman v. Dunlap,* 695 F.3d 650, 651 (7th Cir. 2012). "The 2007 order gave Dunlap plenary authority to 'oversee, supervise, and direct all management, administrative, financial, contractual, personnel, security, housing, custodial, purchasing, maintenance, technology, health services, mental health services, food and laundry service, recreational, educational, and programmatic functions relating to the operation of the [Center] consistent with the authority vested in the position of Superintendent of the [Center].'" *Id.* at 651-52.

maker allowed the Fox Defendants to film *Empire* at the JTDC, the Chief Judge's Office remains a Defendant to this lawsuit.

### 2. Qualified Immunity – Superintendent Dixon

Similarly, Superintendent Dixon argues that he is protected by qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes,* 135 S.Ct. 2042, 2044 (2015) (internal quotation marks omitted). When evaluating qualified immunity, courts consider: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gill v. City of Milwaukee,* 850 F.3d 335, 340 (7th Cir. 2017) (citation omitted). "A plaintiff can show that a right is 'clearly established' by statute or constitution in at least two ways: (1) he can point to a clearly analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was 'so egregious that no reasonable person could have believed that it would not violate established rights.'" *Beaman,* 776 F.3d at 508 (citation omitted).

Defendant Superintendent Dixon's first argument is that Plaintiffs' constitutional deprivation allegations amount to mere inconveniences, and thus Plaintiffs have not established the first prong of the qualified immunity test. Defendant Dixon relies on his version of the facts and not the facts taken in a light most favorable to Plaintiffs, therefore, this argument is without merit. *See Gill,* 850 F.3d at 340. The Court thus turns to the second prong of Defendant Dixon's qualified immunity defense, namely, whether the juvenile detainees' right to be free from the alleged unconstitutional conduct at issue was clearly established in the summer of 2015.

Plaintiffs' allegations fall squarely within the protections provided by the seminal case *Bell v. Wolfish* (as further articulated by the *Schall* Court in the context of juvenile detainees) because Plaintiffs have alleged that the conditions of their confinement – including the denial of health care – amounted to punishment and that Defendants had no legitimate governmental reason for the lockdowns that took place in June, July, and August 2015.  *See Kingsley,* 135 S. Ct. at 2473; *see also Paine v. Cason,* 678 F.3d 500, 510 (7th Cir. 2012) ("It is clearly established that state actors who, without justification, increase a person's risk of harm violate the Constitution.").  In sum, Defendant Dixon has not established the affirmative defense of qualified immunity at this early stage of the litigation.

### E.      Monell Liability – Count III

Because the Chief Judge's Office and Superintendent Dixon have not established their affirmative defenses of Eleventh Amendment and qualified immunity, the Court turns to Plaintiffs' arguments under *Monell*.  Specifically, in Count III, Plaintiffs allege that Cook County and/or the Chief Judge's Office are liable for the alleged due process deprivations pursuant to *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Cook County, Superintendent Dixon, and the Chief Judge's Office move to dismiss this claim. To recover under *Monell*, Plaintiffs must establish that (1) they suffered a deprivation of a constitutional right; (2) as a result of an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority, that was (3) the cause of his constitutional injury.  *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017); *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016).

Plaintiffs seek to establish *Monell* liability pursuant to the deliberate act of the individual with the "final policy-making authority" in relation to the administration of the JTDC and the decision to allow the Fox Defendants to film *Empire* there.  *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).  To do so, they allege that Superintendent Dixon, Chief Judge Evans, and/or someone in the Chief Judge's Office knew about and approved the filming of *Empire* at the JTDC, and the facility's consequent lockdowns.  (First Am. Compl. ¶¶ 29, 56, 63-65.)  Although it is undisputed that the Detention Home Act gives the Chief Judge the power to "appoint an administrator to serve as Superintendent" and that the Chief Judge appointed Superintendent Dixon in May 2015, as discussed above, it is unclear who made the decision to allow the Fox Defendants to film episodes of *Empire* at the JTDC.  As such, viewing Plaintiffs' allegations as true and all reasonable inferences in their favor, they have sufficiently stated a claim for *Monell* liability under *Iqbal* and *Twombly* based on a final policy-maker's decision.  *See Presser v. Acacia Mental Health Clinic,* LLC, 836 F.3d 770, 776 (7th Cir. 2016) ("Under Rule 8, a plaintiff only needs to 'give enough details about the subject-matter of the case to present a story that holds together.'") (citation omitted).  Once the parties conduct discovery and uncover who made the final policy decision to allow the Fox Defendants to film *Empire* at the JTDC, Plaintiffs can narrow their claims.

Moreover, although Cook County argues that Plaintiffs have pleaded themselves out of court because they allege that Chief Judge Evans was the decision-maker with final policy-making authority, Plaintiffs have also set forth sufficient allegations that Superintendent Dixon may have also been a final policy decision-maker, and, at this procedural posture, the Court is

required to view the allegations and all reasonable inferences in Plaintiffs' favor. *See Domanus v. Locke Lord LLP,* 847 F.3d 469, 478 (7th Cir. 2017). These allegations include Superintendent Dixon's significant background and experience in the field of juvenile corrections, that he allegedly entered into the agreement with the other Defendants to permit the crews to film *Empire* at the JTDC, and that he aided the Fox Defendants in filming *Empire* while acting in the scope of his employment. (First Am. Compl. ¶¶ 29, 63, 83.) The Court therefore denies Defendants Cook County's, Superintendent Dixon's and Chief Judge's Office's motions to dismiss Plaintiffs' *Monell* liability claim.

## III. State Law Claims

### A. Breach of Fiduciary Duty – Count VII

In Count VII of the First Amended Complaint, Plaintiffs allege that Superintendent Dixon and Defendant Cook County Does breached their fiduciary duty based Superintendent Dixon's role as a guardian or warden of the juvenile detainees. *See In re Estate of Gustafson*, 268 Ill. App. 3d 404, 407, 206 Ill.Dec. 45, 644 N.E.2d 813 (2d Dist. 1994) ("A 'fiduciary' is a person, having a duty, created by his undertaking, to act primarily for another's benefit in matters connected with such an undertaking, and it includes relationships such as a guardian."). On the other hand, Defendant Dixon argues:

> Plaintiffs are mistaken because none of the residents of the JTDC are wards of Defendant Dixon – or anyone else for that matter. The residents of the JTDC are individuals who are awaiting an adjudication proceeding where the court may adjudicate them as wards of the court and commit them to the Illinois Department of Juvenile Justice. Until that adjudication takes place, the parents or guardians maintain their status related to the residents of the JTDC. Accordingly, there is no fiduciary relationship between Defendant Dixon and Plaintiffs' claim must be dismissed with prejudice.

(R. 48, Mot. Dismiss, at 12.)

In essence, Defendant Dixon is arguing that no state actor has the duty to protect the juvenile detainees from harm while they were housed at the JTDC – an argument in direct contradiction of well-established law. *See DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 2008, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ("when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."); *Murphy v. Morgan,* 914 F.2d 846, 849 (7th Cir. 1990) ("[o]nce the state assumes custody of a person, it owes him a rudimentary duty of safekeeping"); *cf. Nelson v. Heyne*, 491 F.2d 352, 360 (7th Cir. 1974) ("When a state assumes the place of a juvenile's parents, it assumes as well the parental duties, and its treatment of its juveniles should, so far as can be reasonably required, be what proper parental care would provide.").

In the tort context and pursuant to the duty of assuming some responsibility for the juvenile detainees' safety and well-being, Plaintiffs argue that Defendant Superintendent Dixon and Defendant Does owed them a fiduciary duty similar to that of guardian's fiduciary duty to its wards – even though Plaintiffs had not been officially adjudicated as "wards" of the court under Illinois' Juvenile Court Act during the relevant time period. *See Parks v. Kownacki,* 193 Ill. 2d 164, 169, 249 Ill.Dec. 897, 737 N.E.2d 287 (Ill. 2000) (once individual "accepted the responsibility of plaintiff's care and education, he took on the role of her guardian, even though he was not given that title by a court"); *Clayton v. Millers First Ins. Co.,* 384 Ill. App. 3d 429, 435, 322 Ill.Dec. 976, 892 N.E.2d 613 (5th Dist. 2008) ("In *Parks,* Illinois recognized that the term 'ward' could be used to describe a person despite no prior adjudication of that status."); *Parks v. Kownacki,* 305 Ill. App. 3d 449, 461, 238 Ill.Dec. 547, 711 N.E.2d 1208 (5th Dist.

1999), *rev'd on other grounds,* 193 Ill. 2d 164 (Ill. 2000) ("The duty to protect from harm certainly encompasses a duty to refrain from harming and to restrain others within one's control from harming."). Based on this Illinois case law, the Court agrees.

In their First Amended Complaint, Plaintiffs allege that Superintendent Dixon and Defendant Does had a fiduciary duty in relation to the juveniles' safety and well-being and Superintendent Dixon and the Cook County Doe Defendants breached their duty by subjecting the juveniles to numerous restrictions that were detrimental to their health and safety so that the Fox Defendants could film a television show. Under these allegations, Plaintiffs have stated sufficient factual detail raising a reasonable inference that Superintendent Dixon and the Doe Defendants are liable for breaching their fiduciary duty. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Therefore, the Court denies Defendants Dixon's and Cook County's motion to dismiss Count VII.

**B.      Inducement to Breach Fiduciary Duty – Count VIII**

Plaintiffs further allege that the Fox Defendants tortiously induced Defendant Dixon and the Doe Defendants to breach their fiduciary duty. The elements for the inducement of a breach of fiduciary duty include that the third party: (1) colluded with the fiduciary in committing a breach of fiduciary duty; (2) knowingly induced or participated in such breach; and (3) obtained the benefits resulting from the breach of duty. *See Village of Wheeling v. Stavros,* 89 Ill. App. 3d 450, 454-55, 44 Ill.Dec. 701, 411 N.E.2d 1067 (1st Dist. 1980). In their motion to dismiss, the Fox Defendants maintain that Plaintiffs have failed to adequately allege that they knowingly participated with Defendant Dixon and the Doe Defendants in breaching any fiduciary duty. The

Fox Defendants also argue Plaintiffs have not alleged that the Fox Defendants received any benefit from the JTDC administration's impositions on the juvenile detainees.

As discussed above, Plaintiffs allege that the Fox Defendants acted together with – and obtained significant assistance from – the Cook County Defendants in filming *Empire* for commercial purposes, and that Defendants knew that filming *Empire* at the JTDC would result in the lockdowns, which placed significant restrictions on the juveniles' movement within the facility. According to Plaintiffs, the Fox Defendants deliberately encouraged the JTDC's administrators and officials to improperly place the JTDC on lockdown during the filming of *Empire* for economic and commercial benefits. In doing so, JTDC administrators accommodated the Fox Defendants' filming needs over the juveniles' health and well-being. Missing from these allegations, however, is that the Fox Defendants "knowingly participated in a breach of duty." *Village of Wheeling,* 89 Ill. App. 3d at 454. Hence, Plaintiffs' allegations do not plausibly suggest that they have a right to relief above a speculative level as to the Fox Defendants' tortious inducement. The Court therefore grants – without prejudice – the Fox Defendants' motion to dismiss Count VIII. Plaintiffs may re-allege Count VIII in their Second Amended Complaint.

### C. Intentional Infliction of Emotional Distress – Count IX

Next, Plaintiffs bring a common law intentional infliction of emotional ("IIED") claim against all of the Defendants. "To recover on a claim for IIED, Illinois law requires a plaintiff to prove: (1) that the conduct was extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and, (3) that the conduct in fact caused severe emotional

distress." *Bailey v. City of Chicago,* 779 F.3d 689, 696 (7th Cir. 2015). The tort of IIED does

not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other

trivialities." *Boston v. U.S. Steel Corp.,* 816 F.3d 455, 467 (7th Cir. 2016) (citation omitted).

The "extreme and outrageous character of a defendant's conduct may arise, not so much from

what he says or does, but from the defendant's improper use of a position of power which gives

him the ability to adversely affect the plaintiff's interests." *Fox v. Hayes,* 600 F.3d 819, 842 (7th

Cir. 2010) (citation omitted). Also, Illinois "courts consider whether the defendant knew the

plaintiff was particularly susceptible to emotional distress and acted inappropriately despite that

knowledge." *Cairel v. Alderden*, 821 F.3d 823, 836 (7th Cir. 2016). "In determining whether

conduct is extreme and outrageous, courts use an objective standard based on all the facts and

circumstances of the case." *Bianchi v. McQueen,* 58 N.E.3d 680, 700, 405 Ill.Dec. 419 (2d Dist.

2016).

Key to Plaintiffs' IIED claim is Defendant Dixon's and the Doe Defendants' position of

power over them because they were juvenile detainees who were susceptible to emotion distress

due to their known mental health issues and other circumstances of their confinement. *See*

*Cairel*, 821 F.3d at 836; *Fox,* 600 F.3d at 842. In this context, Plaintiffs have sufficiently alleged

that the juveniles detainees were psychologically vulnerable and that by being placed in their

cells or jail-like pods, they suffered additional emotional trauma and a resultant lack of access to

medical and other JTDC facilities. To state a claim for IIED, however, Plaintiffs must also

allege that Defendants' conduct went beyond all possible bounds of decency and is regarded as

intolerable in a civilized community. *See Cairel*, 821 F.3d at 835; *Bianchi,* 58 N.E.3d at 700. In

*Bianchi*, for example, the Illinois Appellate Court concluded that the defendant special

prosecutors' abuse of power was extreme and outrageous where "plaintiffs alleged that defendants fabricated and manufactured evidence and concealed exculpatory evidence for the purpose of falsely and maliciously detaining, arresting, and charging plaintiffs, knowing that such charges lacked probable cause." *Id.* at 700; *see also Alexander v. United States,* 721 F.3d 418, 425 (7th Cir. 2013) (plaintiff prosecuted without probable cause due to fabricated evidence sufficiently stated extreme and outrageous conduct under Rule 12(b)(6)); *Thomas v. City of Blue Island,* 178 F. Supp. 3d 646, 656 (N.D. Ill. 2016) (plaintiff adequately alleged extreme and outrageous conduct based on allegations that "police purposely failed to investigate a crime against a child resulting in the child's death in order to protect a political or personal connection or friend"); *Chatman v. City of Chicago,* No. 14 C 2945, 2016 WL 4734361, at *5 (N.D. Ill. Sept. 12, 2016) (defendants' conduct in "knowingly withholding exculpatory information, even though they were aware that there was a high likelihood that disclosure of the information would impact [plaintiff's] trial and appeal" amounted to extreme and outrageous conduct.)

In light of these cases and viewing the allegations in Plaintiffs' favor, they have alleged sufficient details that the Defendant Dixon and the Cook County Defendants had a position of power over them and abused this power by depriving them freedom of movement and access to vital services, such as health care, amounting to extreme and outrageous conduct. Plaintiffs also allege that Defendant Dixon and the Doe Defendants were aware of the detainees' emotional and psychological problems in abusing this power. "Mindful of the relatively low bar [Plaintiffs are] required to clear at this preliminary stage of his case," Plaintiffs' IIED claim against Defendant Dixon and the Doe Defendants sufficiently passes muster under Rule 12(b)(6). *See Alexander,* 721 F.3d at 425. The Court views Plaintiffs' allegations as to the Fox Defendants' conduct

differently because the First Amended Complaint does not allege sufficient facts to establish that the Fox Defendants were in a position of power over Plaintiffs and it is not reasonable to infer from the facts as alleged that the Fox Defendants knew of Plaintiffs' mental health care issues and the circumstances of their confinement.  Thus, Plaintiffs have not adequately alleged that the Fox Defendants knew that there was a high probability that their conduct would cause severe emotional distress.  *See McGreal v. Village of Orland Park*, 850 F.3d 308, 314 (7th Cir. 2017); *Bailey*, 779 F.3d at 696.  The Court therefore grants in part and denies in part Defendants' motions to dismiss Plaintiffs' IIED claim.  The Court grants Plaintiffs leave to re-allege their IIED claim against the Fox Defendants keeping in mind counsel's Rule 11 obligations.

In addition, the Chief Judge's Office did not respond to Plaintiffs' IIED allegations in its legal memoranda, and thus the Chief Judge's Office, its agents, and employees remain Defendants to Plaintiffs' IIED claim.  *See Steen v. Myers,* 486 F.3d 1017, 1020-21 (7th Cir. 2007) (absence of discussion in brief amounts to abandonment of argument).

Last, Defendant Dixon and Cook County argue that the one-year limitations period pursuant to 745 ILCS 10/8-101 of the Illinois Tort Immunity Act bars Plaintiffs' IIED claim (and presumably Plaintiffs' other state law claims).  Because this one-year limitations period does not begin to run until Plaintiffs reach 18 years of age, and Plaintiffs brought this lawsuit when they were under the age of 18, Defendants' statute of limitations argument is misplaced.  *See Lee v. Naperville Cmty. Unit Sch. Dist. 203,* 53 N.E.3d 55, 61, 403 Ill.Dec. 1 (2d Dist. 2015) ("although section 13–211 tolls the limitations period until the plaintiff attains the age of 18, section 8–101 requires the action to be commenced within one year thereafter.").

**D.     State Law Conspiracy Claim – Count X**

The Court next considers whether Plaintiffs have sufficiently alleged their state law civil conspiracy claim – which sounds in tort – against all of the Defendants under the dictates of *Iqbal* and *Twombly*. "In Illinois, civil conspiracy is defined as 'a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means.'" *Independent Trust Corp. v. Stewart Info. Servs. Corp.,* 665 F.3d 930, 938 (7th Cir. 2012) (citation omitted). Under Illinois law, "to state a claim for civil conspiracy, a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement." *McClure v. Owens Corning Fiberglas Corp.,* 188 Ill.2d 102, 133, 720 N.E.2d 242, 241 Ill.Dec. 787 (Ill. 1999); *see also Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 63, 206 Ill.Dec. 636, 645 N.E.2d 888 (Ill. 1994) ("A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort.").

Although Plaintiffs have sufficiently alleged their breach of fiduciary duty and IIED claims, they have failed to adequately allege that the Fox Defendants had an agreement with Defendant Dixon and other Doe Defendants and committed tortious acts in furtherance of that agreement. To do so, Plaintiffs would need to plausibly allege that the Fox Defendants planned, assisted, and encouraged the tortious conduct at issue. *See McClure,* 188 Ill. 2d at 133 ("The civil conspiracy theory has the effect of extending liability for a tortious act beyond the active tortfeasor to individuals who have not acted but have only planned, assisted, or encouraged the act."). On the other hand, because the Chief Judges' Office did not respond to Plaintiffs' IIED and state law civil conspiracy allegations, the Chief Judge's Office remains a Defendant to these

claims. *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016) (failing to respond to arguments amounts to waiver). The Court therefore grants in part without prejudice and denies in part Defendants' motions to dismiss Plaintiffs' civil conspiracy claim as alleged in Count X.

## IV. Respondeat Superior and Indemnification Claims – Counts XI and XII

Plaintiffs bring a respondeat superior claim against the Chief Judge's Office, Cook County, and the Fox Defendants in Count XI based on the liability of their employees and agents acting within the scope of their authority or employment. Because certain state law claims survive Defendants' motion to dismiss as to Cook County and the Chief Judge's Office, this respondeat superior claim remains in this lawsuit. *See Coghlan v. Beck,* 984 N.E.2d 132, 153, 368 Ill.Dec. 407 (1st Dist. 2013) ("Under the theory of respondeat superior, an employer can be liable for the torts of an employee, but only for those torts that are committed within the scope of the employment, including negligent, willful, malicious, or even criminal acts.").[5] Finally, because Cook County is a necessary party to this lawsuit for indemnification purposes under 745 ILCS 10/9-102, Count XII is properly alleged.

## V. Named Fox Defendants

As to the argument that not all of the Fox entities can be held liable in this lawsuit, the Fox Defendants made this argument in two perfunctory footnotes (and again in a cursory fashion it the reply brief) that merely contradict Plaintiffs' well-pleaded allegations. The Fox

---

[5] Although the Fox Defendants seek to dismiss Count XI as redundant, it is not uncommon for litigants in this district to allege state law respondeat superior and indemnification claims as separate counts. Therefore, the Court denies the Fox Defendants' request.

Defendants have therefore waived this argument at this procedural posture. *See Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.,* 848 F.3d 822, 829 (7th Cir. 2017) ("A party may waive an argument by presenting it only in an undeveloped footnote."). Nonetheless, the Court encourages Plaintiffs to attempt to narrow the Fox Defendants in their Second Amended Class Action Complaint.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendants' motions to dismiss brought pursuant to Rule 12(b)(6).

**Dated:** April 20, 2017

ENTERED

**AMY J. ST. EVE**
**United States District Court Judge**