# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| T.S., and Q.B., a minor by and through his grandparent and guardian, V.P., | ) | |
| | ) | |
| On behalf of themselves and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | 16 C 8303 |
| | ) | |
| vs. | ) | Honorable Judge |
| | ) | Amy J. St. Eve |
| TWENTIETH CENTURY FOX, TELEVISION, INC., a division of TWENTIETH CENTURY FOX FILM CORPORATION; FOX BROADCASTING COMPANY; TWENTY-FIRST CENTURY FOX, INC., THE COUNTY OF COOK, ILLINOIS; THE CHIEF JUDGE OF THE CIRCUIT COURT OF COOK COUNTY in his official capacity; LEONARD DIXON; and JOHN DOES 1 through 20, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS COOK COUNTY AND DIXON'S ANSWER TO PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT

NOW COME, Defendants, Leonard Dixon and Cook County, by their attorney Kimberly M. Foxx, State's Attorney of Cook County, through her assistants, Anthony E. Zecchin and Allyson L. West, make the following answer to Plaintiff's Second Amended Class Action Complaint.

## Introduction

Three times during the summer of 2015, the Cook County Juvenile Temporary Detention Center (the "JTDC") was placed on lockdown so that it could be used as a film set to shoot scenes for *Empire*, a hit Fox television show. Numerous areas of the JTDC that are designed for

and essential to its mission of educating and rehabilitating the children housed there—including the JTDC's school, its facilities for family visits, its only outdoor recreation yard, its library, and its chapel—were placed off limits so that Fox's agents and employees could use them to stage and film the show.

**Answer**: Defendants admit that in the summer of 2015 the show Empire shot scenes for its television show at the JTDC. Defendants deny the remaining allegations contained in this introduction paragraph.

The children for whom these facilities were intended, meanwhile, were ordered to remain in their cells, or were confined to the jail-style "pod" areas just outside their cell doors. There they were told to sit, for days on end. Their schooling continued in name only, visits from their families were interrupted, cut back, or effectively eliminated, sick-call requests were ignored, and programs that are intended to help them overcome the problems that landed them at the JTDC in the first place were cancelled or interrupted.

**Answer**: Defendants deny the allegations contained in this introduction paragraph.

The purpose of these lockdowns was to provide Fox with a realistic prison facility to use as the primary set of two highly profitable *Empire* episodes. The children at the JTDC, meanwhile, were placed under restrictions more severe than those governing many adult jails. Putting the children housed at the JTDC on lockdown so that the Fox Defendants could use the facility to film a profitable television show was a breach of fiduciary duty, and it violated the children's rights under the U.S. Constitution and state law. The profits gained from this misconduct were unjustly obtained. In this lawsuit Named Plaintiffs, on behalf of themselves and a class of similarly-situated children who were subject to these lockdowns, seek an accounting and disgorgement of the Defendants' unjust gains, punitive damages, and related

2

remedies.

**Answer**: Defendants deny the allegations contained in this introduction paragraph.

## Nature of the Action[1]

1.      Named Plaintiffs T.S. and Q.B. were housed at the JTDC in the summer of 2015 during the lockdowns imposed to facilitate the filming of *Empire* there. They seek to represent a class of similarly situated children. On behalf of that class, Named Plaintiffs seek an accounting, disgorgement, nominal damages, punitive damages, an alternative award of actual damages, and an award of attorneys' fees and costs.

**Answer**: Defendants deny the allegations contained in Paragraph 1.

## Parties

2.      Plaintiff T.S. is 18 years old. He was housed at the JTDC during the summer of 2015 when it was placed on lockdown to facilitate the filming of *Empire*. At the time of the filing of the complaint in this action, T.S. was not incarcerated. T.S. is identified by initials in order to protect his identity.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 2. Therefore, Defendants deny the same and demand strict proof thereof.

3.      Plaintiff Q.B. is 17 years old. He was housed at the JTDC during the summer of 2015 when it was placed on lockdown to facilitate the filming of *Empire*. Pursuant to Federal Rule of Civil Procedure 17, Q.B. brings this complaint by and through V.P., his grandparent and legal guardian. V.P. is identified by initials in order to protect Q.B.'s identity. At the time of the

---

[1] Plaintiffs make the allegations in this complaint based on personal knowledge as to matters in which they have had personal involvement and on information and belief as to all other matters.

3

filing of the complaint in this action, Q.B. was not incarcerated.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 3. Therefore, Defendants deny the same and demand strict proof thereof.

4. The Defendants identified in the sub-paragraphs of this paragraph are referred to as the "Fox Defendants" or "Fox."

a. Defendant Twenty-First Century Fox, Inc. is a diversified global media and entertainment conglomerate with operations in cable network programming, television, and filmed entertainment. It is a publicly-traded company and is the ultimate parent of the other Fox Defendants.

b. Defendant Twentieth Century Fox Television produces television shows that are broadcast on Fox's television network, including *Empire*. Twentieth Century Fox Television is given production credit for both of the *Empire* episodes that were filmed in the JTDC. Twentieth Century Fox Television is a division of Twentieth Century Fox Film Corporation. Twentieth Century Fox Television is not a legal entity distinct from Twentieth Century Fox Film Corporation, and therefore Twentieth Century Fox Film Corporation is liable for all acts and omissions made by or on behalf of Twentieth Century Fox Television. Twentieth Century Fox Film Corporation is a wholly-owned subsidiary of Defendant Twenty-First Century Fox, Inc.

c. Defendant Fox Broadcasting Company operates the television network that broadcasts *Empire*, among other programming. Fox Broadcasting Company is a wholly-owned subsidiary of Defendant Twenty-First Century Fox, Inc.

4

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 4, subparagraph a) through c). Therefore, Defendants deny the same and demand strict proof thereof.

5.     Defendant Chief Judge of the Circuit Court of Cook County is sued in his official capacity. The Chief Judge of the Circuit Court of Cook County administers the JTDC.

**Answer**: Defendants admit that the Plaintiff is suing Defendant Chief Judge in his official capacity.  Defendants deny the remaining allegations contained in Paragraph 5.

6.     Defendant Leonard Dixon is the superintendent of the JTDC. He oversaw the JTDC's daily operations at all times during the summer of 2015 when the children housed there were placed on lockdown to facilitate the filming of *Empire*.

**Answer**: Defendants admit that Leonard Dixon is the superintendent of the JTDC and that he oversaw the JTDC's daily operations during the summer of 2015.  Defendants deny the remaining allegations contained in Paragraph 6.

7.     Defendant The County of Cook, Illinois ("Cook County") is a county in Illinois. The JTDC is operated as a branch of Cook County's government. Cook County established and operates the JTDC, and it supports, funds, and maintains the facility. Cook County is obligated to indemnify judgments entered against the administrators of the JTDC arising from the operation of the JTDC.

**Answer**: Defendants admit the allegations contained in Paragraph 7.

8.     Defendants Does 1 through 20 are sued herein by fictitious names for the reason that their true names are unknown to Plaintiffs. Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of these Defendants when their identities have been ascertained. Plaintiffs are informed and believe, and based thereon allege, that these

5

fictitiously-named Defendants are responsible in some manner for the misconduct alleged herein.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 8. Therefore, Defendants deny the same and demand strict proof thereof.

9.      The Defendants at all times herein were the agents, joint venturers, and/or coconspirators of each of the other remaining Defendants, and in doing the things alleged in this complaint they were acting in the course of such agency, joint venture, and/or conspiracy.

**Answer**: Defendants deny the allegations contained in Paragraph 9.

## Jurisdiction and Venue

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this is an action arising under 42 U.S.C. § 1983. The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims providing the basis for federal subject matter jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

**Answer**: Defendants admit the allegations contained in Paragraph 10.

11.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district and this is a convenient and reasonable forum for the resolution of this dispute.

**Answer**: Defendants admit the allegations contained in Paragraph 11.

## Facts

**A. Normal Operation of the JTDC**

12.     The JTDC is a five-story building near the intersection of Ogden Avenue and Roosevelt Road, a few miles southwest of downtown Chicago. It is among the largest juvenile

6

detention facilities in the country, housing between 250 and 400 children from the ages of 10 to 18. The average stay for a child at the JTDC is around three weeks.

**Answer**: Defendants admit that the JTDC is a five-story building near the intersection of Ogden Avenue and Roosevelt Road. Defendants deny the remaining allegations contained in Paragraph 12.

13. Under normal operation, the JTDC's floors serve distinct functions. Children detained at the JTDC are housed primarily on the fourth and fifth floors, which contain rows of cells that open onto small "pods." Each pod serves as a common area in the same manner as a pod or "dayroom" in an adult jail cell block. A portion of the third floor also contains this cell and- pod arrangement, including an "intake" pod for newly detained children.

**Answer**: Defendants deny that the housing units for general population, intake and release are like "adult jail call." Defendants admit the remaining allegations contained in Paragraph 13.

14. The remainder of the third floor, and the first and second floors, are taken up with facilities designed to provide schooling and structured rehabilitative programming to the children housed at JTDC, along with related administrative services. The third floor houses the JTDC's infirmary, as well as a large open-air courtyard, which serves as the JTDC's primary recreation yard for the children. This courtyard is the only place where children detained at the JTDC are allowed outdoors during their detention. There are smaller auxiliary gymnasium facilities in the basement that can be used by limited numbers of children, and are accessed via elevator.

**Answer**: Defendants deny the allegations contained in Paragraph 14.

15. The second floor is dedicated almost entirely to education and programming, and is the floor on which the bulk of the JTDC's schooling and structured rehabilitative programming

7

services are provided. The second floor contains the facilities of the Nancy B. Jefferson Alternative School, which is operated by Chicago Public Schools. In addition to the school's numerous classrooms, the second floor contains a library, a computer lab and music room, and an indoor "game" area with resources to help children detained at the JTDC engage in constructive pastimes. The second floor also contains a chapel for religious services and other programming, as well as visiting facilities where children can spend time with their families.

**Answer**: Defendants deny that "the bulk" of the structured rehabilitative programming occurs on the second floor. The Defendants admit the remaining allegations contained in Paragraph 15.

16. The first floor contains courtrooms, reception, and administrative offices. Parts of the first floor are accessible to the public, but the remainder of the building is secure and restricted, not accessible to the public without an escort.

**Answer**: Defendants admit the allegations contained in Paragraph 16.

17. The numerous facilities on the JTDC's lower floors are reflective of the purpose for which the children are placed in detention at the JTDC. The JTDC does not operate as an adult prison, or even an adult jail. None of the children housed at the JTDC have been convicted of adult crimes, and they are not detained at the JTDC in order to be punished. To the contrary, because they are children, the purpose of their detention at the JTDC is to nurture and rehabilitate them, which is done by providing the children with schooling, care, and structured programming designed to address the problems that landed them at the JTDC in the first place. As the JTDC's website states, its mission is to "provide[] the children with a safe, secure and caring environment with programs and structure that enhance personal development and improve opportunity for success upon return to the community."

8

**Answer**: Defendants admit the allegations contained in Paragraph 17.

18.     And indeed, the children housed at the JTDC are in pressing need of these

services. For one thing, they are among the most vulnerable children in Chicago: more than 90

percent of this population has reported one or more traumatic experiences, with an average child

reporting six different traumas.[2] Sixty percent of the children who enter the JTDC are diagnosed

with a mental disorder, and around one-quarter of them are prescribed psychotropic medication.[3]

Added to this, the children frequently arrive at the JTDC in a state of crisis, having been

separated from their families and placed in confinement, many for the first time. Other children,

meanwhile, are held at the JTDC not because of a delinquency adjudication, but rather because

their home lives are in disarray: a judge has ordered the child's release from whatever

underlying matter brought the child to the JTDC, but the Department of Children and Family

Services cannot find a foster home in which to place the child, or the child's guardian has not

come to pick the child up. As Superintendent Dixon noted in a recent news interview,

"[juvenile] detention is like the emergency room of the juvenile justice system." For that reason,

Superintendent Dixon has explained, rather than house the children in an incarceration-style

setting, "[o]ur thing is to have some normalcy when they [detained children] come here."

---

[2] See National Child Traumatic Stress Network ("NCTSN"), Victimization and Juvenile
Offending, 2016,
http://www.nctsn.org/sites/default/files/assets/pdfs/victimization_juvenile_offending.pdf. See
also NCTSN, *Assessing Exposure to Trauma and Posttraumatic Stress Symptoms in the Juvenile
Justice Population*, 2014,
http://www.nctsn.org/sites/default/files/assets/pdfs/assessing_trauma_in_jj_2014.pdf
("The majority of youth in the juvenile justice system report experiencing multiple types of
trauma, termed polyvictimization." (citations omitted).)

[3] The National Council on Crime and Delinquency, *Juvenile Detention in Cook County: Future
Directions*, Feb. 2012 at 27, http://www.nccdglobal.org/sites/default/files/publication_pdf/cook-
countyreport.
pdf (prepared for office of the Chief Judge of the Circuit Court of Cook County).

Conventional incarceration, in which inmates are essentially warehoused in cells or pods with nothing to occupy the hours, aggravates the psychological and emotional traumas suffered by this already vulnerable population, and decreases the children's chances of successfully reentering society.

**Answer**: Defendants admit the statements made by Dixon.  However, Defendants, lack knowledge or information in which to admit or deny the remaining allegations contained in Paragraph 18. Therefore, Defendants deny the same and demand strict proof thereof.


19.     What is more, subjecting juveniles to forced idleness is dangerous for the children themselves. As the U.S. Department of Justice has explained,

> The amount and quality of structured daily programming in juvenile facilities has a significant impact on the rate of violent and antisocial incidents. Simply stated, youth who do not have adequate opportunities to engage in programmed activities become bored, and are more likely to become involved in mischief or assaultive behavior. Generally accepted professional standards mandate that youth in juvenile justice facilities receive a minimum of one hour of large muscle activity per weekday, two hours of large muscle activity per weekend day, educational programming during weekdays, and other structured developmental and rehabilitative activities. Inadequate youth programming . . . contributes to . . . high levels of youth violence, and departs substantially from generally accepted professional standards.

**Answer**: Defendants make no answer to Paragraph 19, as it contained no factual allegations against these Defendants in which to admit or deny.  If the contents of Paragraph 19 can be construed against these Defendants, Defendants deny same and demand strict proof thereof.

20.     To fulfill the JTDC's rehabilitative mission and provide a safe and structured environment, the JTDC's lower floors are dedicated to offering extensive schooling and structured programming to the children housed there.

**Answer**: Defendants deny the allegations contained in Paragraph 20.

21.    Under normal operation, the children detained at JTDC eat breakfast on their pods in the upper floors, but quickly head down to the second floor for school, typically by 8:00 a.m. The children attend classes at the school during the day, and take lunch there as well. After classes finish, around 3:00 p.m., the children are typically placed in various structured after-school programs on the second floor, and sometimes on the third-floor recreation yard as well (the recreation yard contains a garden, for instance, which some of the children help maintain). The JTDC's numerous rehabilitative programs include yoga, creative writing courses, computer classes, art, music, and singing. These programs are aimed at addressing the problems that brought each child to JTDC, and at rehabilitating the children so that they can lead more constructive and stable lives once they leave the facility.

**Answer**: Defendants deny the allegations contained in Paragraph 21.

22.    During the day children are also given time for recreation in the third-floor open air courtyard and game time in the JTDC's indoor game area on the second floor, and they receive visits from family in the JTDC's visiting rooms. These activities, though not formally structured, are also critical for the children's wellbeing, both while they are at the JTDC and after they re-enter society.

**Answer**: Defendants admit the allegations contained in Paragraph 22.

23.    In the early evening the children return to the pods for dinner and bathing. Shortly thereafter they are placed in their cells for the night.

**Answer**: Defendants admit the allegations contained in Paragraph 23.

24.    As this itinerary indicates, under normal operation the children spend relatively little time on their pods and cells in the JTDC's upper floors. This is so because, in contrast with

the extensive programming and activities the children receive on the second and third floors,

their time on the pods is spent under restrictions that can be even more confining than those of an

adult jail.

    **Answer**: Defendants admit that the children participate in programming and activities.

Defendants deny the remaining allegations contained in Paragraph 24.

    25.    Each cell-and-pod arrangement has around 15 to 20 children, overseen by guards.

Most of the pods are long, narrow rooms—essentially a large, enclosed corridor outside of a row

of cells—with jail-style seating arrangements, consisting of tables that are each fused to short

stools and fixed to the floor. Pods are also typically equipped with a television (and

accompanying seats) at one end, but they otherwise have little in the way of materials for

activities, and certainly nothing comparable to the resources and programming available on the

second and third floors.

    **Answer**: Defendants admit that each cell-and-pad arrangement has around 15 to 20

children, overseen by guards.  Defendants deny the remaining allegations contained in Paragraph

25.

    26.    To prevent the monotony of the pods from leading to altercations and physical

violence, when the children are on the pod they are prohibited from moving freely. Whereas

inmates in an adult jail are typically allowed to move around their "day rooms" as they please,

children on the pods at the JTDC must all remain sitting in the same spot, at all times. If a child

needs to use the restroom or otherwise leave his seat, that child must raise his hand and receive

permission from the guards. While that child is out of his seat, no other children may leave their

seats. Breaking this rule—that is, if one child stands up without first receiving permission—is

punishable as a "major rule violation." Some limited services are offered on the pods

themselves—priests and pastors are allowed to visit the children there, for example—but otherwise the pods are devoid of programming.

**Answer**: Defendants deny the allegations contained in Paragraph 26.

27.     Exigent circumstances—such as staffing shortages or security concerns—sometimes force JTDC administrators to hold children on the pods, where these significant restrictions govern. Otherwise, though, the JTDC attempts to minimize the time children spend in the restrictive conditions of the pod, in favor of the school facilities, recreation, and structured rehabilitative programming offered in the second and third floors of the facility.

**Answer**: Defendants admit that sometimes exigent circumstances exist where the children are held on the pods.  Defendants deny the remaining allegations contained in Paragraph 27 as argumentative.

28.     Notably, providing meaningful schooling and programming opportunities requires a considerable number of personnel, in addition to facilities where these services can be provided. This is so because the children must be escorted by guards and otherwise have their movements controlled every time they leave their pods to travel to schooling or programming elsewhere in the JTDC.

**Answer**: Defendants admit the allegations contained in Paragraph 28.

**B. Filming *Empire* at the JTDC**

29.     Sometime in the spring of 2015, the Fox Defendants scouted the JTDC, and decided that they wanted to use the facilities on the JTDC's second and third floors to stage and shoot scenes for *Empire*. The Fox Defendants were confronted with the fact, however, that the facilities they wanted were the facilities that enabled JTDC administrators to let the children housed there off their pods, and were the facilities that provided a venue for the children housed

at the JTDC to receive education and rehabilitation services. Further, the Fox Defendants were confronted with the fact that indeed, hundreds of children relied on the facilities on the second and third floors to provide space from which they could leave their pods and receive education and rehabilitation. Further, the Fox Defendants were confronted with the fact that the only way *Empire's* crew could use the facilities on the JTDC's second and third floors was for the children to be prevented from using them, which meant confining hundreds of children to their pods during filming—both because that was the only place at the JTDC left for the children to go, and because the presence of a large film crew would be massively disruptive to the JTDC's normal operations.

**Answer**: Defendants admit the Fox Defendants decided to use the facilities on the JTDC to shoot scenes for Empire. Defendants deny the remaining allegations contained in Paragraph 29.

30.     The Fox Defendants were thus confronted with the problem that the facilities they desired were also required for the education and rehabilitation of hundreds of children (and indeed provided the space needed for the children to be able to leave their pods), yet would be worthless to the Fox Defendants for filming unless the JTDC's administrators excluded those same children from the facilities, which would be accomplished by confining them to their pods.

**Answer**: Defendants deny the allegations contained in Paragraph 30.

31.     When confronted with this problem, the Fox Defendants could have found another facility or built a set for the incarceration scenes they wanted to shoot. They did neither. Instead, they sought to enter an agreement with the JTDC's administrators that they knew or were substantially certain would induce the administrators to exclude the children from the JTDC's second and third floors so that *Empire's* film crew could use those areas for staging and

14

filming.

**Answer**: Defendants deny the allegations contained in Paragraph 31, as argumentative.

32.     To induce the JTDC's administrators to let *Empire's* crew use the education and rehabilitation facilities that were normally used by the children at the JTDC, the Fox Defendants offered to pay a rental fee for the use of the JTDC. The Fox Defendants also offered to pay wages and overtime for JTDC staff to leave their duties facilitating the normal operation of the JTDC—duties occupied in substantial part with enabling the children's use of the education and rehabilitation facilities—and instead facilitate the *Empire* crew's use of those same facilities for filming. These offers were made on the condition that the JTDC's administrators would change the facility's normal operations to make the second and third floors available to Empire's crew, which all the Defendants knew or were substantially certain could only be accomplished by excluding from those areas the hundreds of children who normally used them, and which, in turn, the Defendants knew or were substantially certain could only be accomplished by confining the children to their pods.

**Answer**: Defendants deny the allegations contained in Paragraph 32.

33.     The JTDC's administrators accepted the inducements offered by the Fox Defendants, and the Fox Defendants reached an agreement with Superintendent Dixon and/or one or more of the Defendant Does for *Empire's* film crew to film at the JTDC. This agreement contemplated that the Empire film crew would have access to many of the restricted facilities on the JTDC's second and third floors that are intended to rehabilitate and educate the children housed at the JTDC—and that the children who normally used those facilities would be barred from them, so that the film crew could work without interruption. Instead, by necessary implication, the children housed at the JTDC would be confined to their cells and pods on the

facility's upper floors. In reaching this agreement, the Defendants knew or were substantially certain that filming *Empire* at the JTDC would result in the lockdowns and attendant restrictions on the children housed there.

**Answer**: Defendants deny the allegations contained in Paragraph 33.

34.      The production and filming of *Empire* at the JTDC lasted two weeks in the summer of 2015, spread over three different shootings: June 21 through 26, July 13 through 16, and August 23 through 26.

**Answer**: Defendants admit the allegations contained in Paragraph 34.

35.      The film crews that descended on the JTDC to conduct these shootings were enormous. *Empire* employed a film crew of approximately 250 in Chicago, and city permits taken in the name of "Fox Entertainment Group" show that each time Empire came to film at the JTDC, parking was suspended around the facility for as many as seven city blocks. These restrictions were needed to accommodate the large number of cargo vans, production trailers, motor homes, tractor-trailer rigs, crew vehicles, and other support vehicles used in filming.

**Answer**: Defendants lack knowledge and information in which to admit or deny the allegations contained in Paragraph 35.  Therefore, Defendants deny same and demand strict proof thereof.

36.      During each of the three shootings *Empire's* film crew—including dozens of production staff, actors, and extras—took over much of the JTDC's second and third floors. The Nancy B. Jefferson school's classrooms were largely occupied with film crews and production equipment. The JTDC's chapel was converted into an area for eating, and garbage cans were placed there for Empire's crew to throw away trash. The library, which was normally used by children at the JTDC to read, study, and check out books, was made into crew support area. The

infirmary was used as a film set, as were some of the JTDC's intake facilities. So was the JTDC's visiting area, where the children normally meet with their families. One area of particular focus for the film crew was the third-floor open-air courtyard, which Empire's film crew used to shoot large, long-format scenes involving numerous actors and extras.

**Answer**: Defendants admit that the JTDC chapel was used as an eating area, and garbage cans were placed there for trash. Additionally, Defendants admit that the library was used as the crew support area. Defendants deny the remaining allegations contained in Paragraph 36.

37.     *Empire* took over more than just the many facilities on the JTDC's second and third floors. Internal JTDC documents prepared to plan for the *Empire* filming indicate many staff were expected or directed to leave their normal duties in order to render services to the film crew instead. Some were chosen to act as extras in the show. Others were assigned to clean and clear out different areas in the building (this included removing children from some pods that the *Empire* crew wanted to use for filming), man the delivery docks to permit the free flow of film equipment, escort actors and crew members to and from the film set, keep *Empire's* production crew from wandering around the facility, provide security for areas where filming was to occur, help escort filming equipment into place, and clean up after the crew. The *Empire* filming, in short, not only took over many of the facilities that furnished the schooling and structured programming that the JTDC was intended to provide; it also diverted a number of staff whose job it was to help fulfill the JTDC's rehabilitative mission. And indeed, the Fox Defendants paid for these JTDC staff members to serve the Fox Defendants' needs during the filming.

**Answer**: Defendants deny the allegations contained in Paragraph 37.

38.     As a result, the only place left for the children housed at the JTDC was their cells and pods. That is where they were kept. To accommodate *Empire*, Superintendent Dixon and/or

Defendant Does deliberately placed the JTDC on lockdown, confining the children to the jailstyle cell-and-pod arrangements in the JTDC's upper floors. This was not an accidental or inadvertent result of the filming. Rather, it was the planned method by which the JTDC was cleared out to make way for *Empire's* film crew. In an internal JTDC document circulated among staff to organize the facility in preparation for *Empire's* arrival, for example, the JTDC's custodial staff were instructed:

> Notify storeroom for additional supplies that the pods may need for increase of resident [sic] on pods. There will be a significant increase in utilization of custodial supplies. Toilet paper, C-fold towels, hand soap, hand sanitizer, garbage bags etc… [sic] will be needed.

**Answer**: Defendants deny the allegations contained in Paragraph 38.

39.     When Empire arrived at the JTDC to film, the lockdown began with school. Instead of going down to their second-floor classrooms after breakfast as they normally would, the children remained on their pods. Nancy B. Jefferson teachers were ordered up into these areas, and instructed to go from pod to pod to teach their students. This was "school" in name only. The pods are not set up or even shaped like classrooms; instead, the teacher must stand in the midst of the seating that is arranged around the pod. There is no whiteboard or other teaching equipment for the instructor to use, and what supplies the teachers can bring to the pods are limited. What is more, during *Empire* filming many of the children whom the teachers had to instruct had not been allowed to move all day, and were going stir-crazy in what amounted to their own jail "day room." Indeed these obvious obstacles are why the Nancy B. Jefferson school facilities existed in the first place, and why the hundreds of children at the JTDC are escorted down to the school's second-floor classrooms on a daily basis. Up on the pods instruction was markedly less effective and often chaotic, and during the *Empire* filming teachers

18

often did not appear in the pods at all.

**Answer**: Defendants admit that the days in which schooling was in fact in session the teachers instructed the students from their pods. Defendants deny the remaining allegations contained in Paragraph 39.

40.     Recreation was drastically reduced, and for many children it was eliminated. Because the JTDC's primary recreation facility—the third floor's open-air courtyard—was being used to film Empire, the children were banned from that area. (The courtyard is divided into three sections, separated by walls, which allows different groups of children to use the yard independently. The Empire film crew only filmed in one of the sections, but the children were still banned from the remainder of the yard.) This left the smaller gymnasium facilities in the JTDC's basement. But with limited space there, and the logistical challenge of bringing children down from the JTDC's upper floors during filming, there was a backlog and many children never received any recreation or exercise at all.

**Answer**: Defendants admit that the children were not allowed to use the third floor open-air courtyard while Empire was being filmed. Defendants further admit that the children were allowed to use the gymnasium. Defendants deny the remaining allegations contained in Paragraph 40.

41.     Instead, in an evident attempt to comply with the letter of juvenile facility standards, many children were given "rec time" up on the pods themselves. An "instructor" would arrive and ask whether any of the children wanted to partake in "large muscle" activity, by which the instructor apparently meant push-ups, sit-ups, and jumping-jacks, to be done among the tables on the pod. In other pods a ball would be introduced and the children would be told to play. Even these pretenses were often abandoned, and there was simply no recreation at all. At

no point during the *Empire* filming were the children allowed outdoors, as they would have if they had been allowed to use the third-floor courtyard.

**Answer**: Defendants admit that the children were not allowed outdoors to the third-floor courtyard during the Empire filming. Defendants deny the remaining allegations contained in Paragraph 41.

42. For many of the children detained at the JTDC, visits with families were effectively eliminated during *Empire* filming. For others, visits were restricted and severely shortened, with parents, who normally waited just a few minutes to visit with their children for an hour or more, forced to sit in waiting rooms for hours on end, for the opportunity to see their children for markedly shortened visits.

**Answer**: Defendants deny the allegations contained in Paragraph 42.

43. Other appointments were cancelled as well. For example, in order to seek medical attention the children can fill out sick-call slips on their pods. During normal operation, these requests usually receive prompt attention. The *Empire* film crew used the JTDC's infirmary to shoot scenes for the show, however, and during filming numerous sick call requests were ignored.

**Answer**: Defendants deny the allegations contained in Paragraph 43.

44. Structured programming for children was also cancelled. Most of the structured programming normally occurs on the JTDC's second floor, with some limited programming, such as a botany project that is run on the open-air courtyard, occurring on the third floor. Because the second and third floors had largely been taken over by *Empire's* film crew, many of the JTDC's after-school programs, including music and dance, were cancelled. Instead of attending these programs, children remained on their pods.

20

**Answer**: Defendants deny the allegations contained in Paragraph 44.

45.     That the children at the JTDC had been placed on lockdown was made obvious to the Fox Defendants from the first day they arrived at the JTDC for filming. Despite this, the Fox Defendants continued to use the facilities at the JTDC for filming. The Fox Defendants continued to pay the JTDC's administrators to make the JTDC's second and third floors available to *Empire*'s crew even though the Fox Defendants knew or were substantially certain that this was accomplished by keeping the children housed at the JTDC on lockdown, and they continued knowingly to benefit from the lockdowns at the expense of the children housed there, by using the spaces freed up by the lockdowns to record footage for *Empire*.

**Answer**: Defendants deny the allegations contained in Paragraph 45.

46.     During the course of filming, the Fox Defendants also rewarded the JTDC's administrators, including Superintendent Dixon, for making the second and third floors available to the Fox Defendants for filming. The Fox Defendants did this by allowing the JTDC's administrators to rub shoulders and take photographs with *Empire*'s star actors, including Chris Rock and Terrence Howard. Indeed, in the months after *Empire'*s filming at the JTDC ended, Superintendent Dixon had lined the walls of his JTDC office with framed photographs of himself posing with *Empire*'s stars.

**Answer**: Defendants admit that Dixon took photographs with Empire's star actors and admits that photographs were hung including photographs of the residents with Chris Rock.

## C. Individual Experiences

47.     **T.S.**

a.     During the summer of 2015, T.S. was 16 years old and was housed in a JTDC living unit. Children on T.S.'s pod normally left the pod in the morning to

21

attend class in the Nancy B. Jefferson school facilities on the second floor, which

they attended through mid-afternoon. During the day, they had recreation time in

the third-floor courtyard. They also took advantage of games and activities on the

commissary area on the JTDC's second floor.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny

the allegations contained in Paragraph 47, subparagraph a. Therefore, Defendants deny the same

and demand strict proof thereof.

b.      When Empire arrived to film, these routines were eliminated. T.S. and the

rest of the children on his pod were held there. They were not allowed down to

the Nancy B. Jefferson school facilities; instead, teachers would sometimes come

up to the pods. This was a chaotic teaching environment. The teacher could not

teach in front of the children, and had no whiteboard to instruct from. To make

matters worse, the children on the pod, who had been prohibited from meaningful

recreation, were going stir-crazy, and the pod was out of control. In this setting,

teaching simply did not occur.

**Answer**: : Defendants lack sufficient knowledge or information in which to admit or

deny the allegations contained in Paragraph 47, subparagraph b. Therefore, Defendants deny the

same and demand strict proof thereof.

c.      During *Empire'*s filming, the children on T.S.'s pod did not leave for

recreation. Instead a JTDC staff "instructor" would occasionally come to the pod

and ask, "Who wants to do large-muscle?" This meant, apparently, that the

children should do push-ups, sit-ups, and jumping-jacks in front of the seats they

had been forced to sit in all day. After none of the children took the instructor up

on this "recreation" offer, he would leave the pod. Often, no instructor arrived at

all. Sick call requests by children on T.S.'s pod were also ignored during filming,

whereas during regular operation they were responded to relatively promptly.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny

the allegations contained in Paragraph 47, subparagraph c. Therefore, Defendants deny the same

and demand strict proof thereof.

d.      T.S.'s visits with his mother were also interrupted and curtailed. During

the JTDC's normal operation, T.S.'s mother visited him during the two visiting

periods T.S. was allotted each week. To visit T.S., his mother would arrive

during T.S.'s designated visiting time slots, which were in the late afternoon or

early evening. Once she arrived, it would typically take 20 minutes for JTDC

staff to locate T.S. and bring him to the visiting facilities on the second floor.

T.S. and his mother would then be able to have a visit that typically lasted at least

an hour.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny

the allegations contained in Paragraph 47, subparagraph d. Therefore, Defendants deny the same

and demand strict proof thereof.

e.      During Empire's filming, T.S.'s mother arrived at the designated time slot

for her visit. Instead of bringing T.S. down, however, she, and several other

parents who had arrived to visit during the same slot, were forced to sit in the

waiting area. After around two hours had passed, she saw a large group of what

appeared to be *Empire*'s cast or crew leave the building. Sometime thereafter, she

was escorted to visit with T.S. in a room much smaller than the JTDC's normal

visiting rooms. Instead of being allowed to visit for an hour, their visit was shortened significantly.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 47, subparagraph e. Therefore, Defendants deny the same and demand strict proof thereof.

48.   **Q.B.**

a.      During the summer of 2015, Q.B. was 16 years old and was housed in a JTDC living unit. Children on Q.B.'s pod normally attended classes at the Nancy B. Jefferson school throughout the day. The children on Q.B.'s pod were provided with two recreation periods, one for gym class as part of their schooling, and another for an after-school recreation hour.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 48, subparagraph a. Therefore, Defendants deny the same and demand strict proof thereof.

b.      The schooling on the second floor, and the recreation hours, were important to Q.B. and the other the children because they provided a meaningful escape from the monotony of confinement on the pod. While on the pod the children were required to sit in one place, and could only move, one at a time, with prior permission. Even to stand up without first obtaining permission was treated as a major rule violation.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 4, subparagraph b. Therefore, Defendants deny the same and demand strict proof thereof.

24

    c.     Q.B. had two visiting hours during the week, on Tuesdays and Saturdays, and during his confinement at the JTDC his father and his grandmother visited him frequently.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 48, subparagraph c. Therefore, Defendants deny the same and demand strict proof thereof.

    d.     One day the children on Q.B.'s pod were told they would not be going down to the school, because *Empire* had arrived to film at the JTDC. During the *Empire* filming teachers occasionally came up to the pod to teach, but sometimes they did not. When they did arrive, the teaching environment was chaotic, as the children had been locked on the pod all day without any opportunity for movement. Children on Q.B.'s pod never received recreation during Empire's filming, making time on the pod miserable. In addition to these restrictions, sick call requests put in by children on Q.B.'s pod were ignored. Normally such requests were responded to relatively promptly.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 48, subparagraph d. Therefore, Defendants deny the same and demand strict proof thereof.

    e.     Q.B.'s grandmother visited him at the JTDC whenever she could. She works at a supermarket that frequently requires her to work over the weekends, however, making visits during Q.B.'s Saturday visiting slot difficult. After being unable to get time off to visit one Saturday, Q.B.'s grandmother asked her boss to

25

take off of work Tuesday, so that she could visit her grandson. *Empire* was

filming that day, however, and when she arrived at the JTDC during Q.B.'s

visiting slot, she was told that visits in that time had been cancelled.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny

the allegations contained in Paragraph 48, subparagraph e. Therefore, Defendants deny the same

and demand strict proof thereof.

49. **N.T.**

a.      N.T. is a 16-year-old boy who was housed at the JTDC. During normal

operation, he and the other children in his unit would leave the pod after breakfast

for classes downstairs at the Nancy B. Jefferson school facilities. They would

attend school through the afternoon, with outdoor recreation in the third-floor

courtyard during the school day. The children in N.T.'s unit participated in

multiple after-school programs, including a drum circle and a dance class. During

the two visiting periods that N.T. was allotted each week, either N.T.'s mother,

his grandmother, or both would visit with him in the JTDC's visiting area.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny

the allegations contained in Paragraph 49, subparagraph a. Therefore, Defendants deny the same

and demand strict proof thereof.

b.      When Fox arrived to film *Empire*, N.T.'s unit was placed on lockdown.

The children did not leave the pod for school. Instead, they remained in their pod,

where they were told to remain in their seats. Movement was permitted only to

one child at a time, after the child received permission. Some teachers came up to

the pod, but there was no whiteboard for writing, the teachers brought few

materials, and teaching in the pod environment was ineffective. After-school programming was cancelled entirely, and N.T. was unable to visit with his mother or grandmother. Children in N.T.'s unit could only escape the monotony of the pod by buying "room time"—30 minutes alone in their cells—using points they earned for good behavior.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 49, subparagraph b. Therefore, Defendants deny the same and demand strict proof thereof.

c.     During lockdown the children in N.T.'s unit were taken to the gymnasium facilities in the JTDC's basement, but only occasionally, apparently because administrators from different pods were fighting for scarce recreation time slots there. As a substitute the children were given "recreation" in their pods, during which they were allowed to play cards or write letters. Otherwise, the children were confined to their chairs on the pod and not allowed to move.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 49, subparagraph c. Therefore, Defendants deny the same and demand strict proof thereof.

50.     **G.M.**

a.     G.M. is a 16-year-old boy who was housed in the JTDC's intake unit when *Empire* arrived to film. Children in the intake unit are normally allowed out of their cells the entire day. They take breakfast in their pods, are allowed some activities there, and are given recreation either in the basement gymnasium facility or the third-floor open-air courtyard. There is also an area in the intake

unit where the children can watch television.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 50, subparagraph a. Therefore, Defendants deny the same and demand strict proof thereof.

    b.    The intake unit is on the third floor and was thus close to much of the filming that occurred for *Empire*. While *Empire* was filming, G.M. was not allowed out of his cell. He was given meals in his cell and was instructed to be quiet. He was allowed out of his cell only for dinner, and then returned to the cell for the evening.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 50, subparagraph b. Therefore, Defendants deny the same and demand strict proof thereof.

51.    **D.G.**

    a.    D.G. is a 16-year-old boy who was housed in a JTDC living unit on the JTDC's third floor. Children in his unit normally left the pod to attend school in the Nancy B. Jefferson classrooms on the JTDC's second floor, and they would participate in structured programming later in the day.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 51, subparagraph a. Therefore, Defendants deny the same and demand strict proof thereof.

    b.    When *Empire* arrived to film at JTDC, the children did not leave the pod for school. Instead, teachers came to the pod, though the instruction was much less effective than instruction in the Nancy B. Jefferson school facilities.

28

Eventually, no teachers came to the pods.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 51, subparagraph b. Therefore, Defendants deny the same and demand strict proof thereof.

      c.     Otherwise there was a television on the pod, turned on at low volume. Some children watched the television, but in all events, the children on D.G.'s pod were told not to speak, even at conversational levels. At times during the lockdown, the guards attempted to provide the children with "recreation," but this consisted of a red rubber ball that was given to the children in the pod. During the *Empire* filming the children on D.G.'s pod were not permitted to leave the pod for recreation.

**Answer**: Defendants lack sufficient knowledge or information in which to admit or deny the allegations contained in Paragraph 51, subparagraph c. Therefore, Defendants deny the same and demand strict proof thereof.

## D. The Children Housed at JTDC Were Injured and Humiliated by The Lockdowns

52.     As a proximate result of the Empire lockdown, the children housed at the JTDC suffered harm.

**Answer**: Defendants deny the allegations contained in Paragraph 52.

53.     The lockdown interrupted and degraded the rehabilitation and structured programming that is designed to address the problems, many of them very serious, that brought the children to the JTDC. This includes the children's education and schooling, which was degraded and often eliminated as a result of the lockdown.

**Answer**: Defendants deny the allegations contained in Paragraph 53.

54.     Being placed on lockdown was also humiliating, and it was psychologically damaging to the children in and of itself. Placing children for days on end under the forced idleness that governed in the pods is psychologically and emotionally harmful. This is particularly so for a vulnerable population like the children housed at the JTDC, many of whom come from unstable or broken homes and suffer from psychological trauma and diagnosed psychological impairments.

**Answer**: Defendants deny the allegations contained in Paragraph 54.

55.     As a proximate result of the lockdown, the children housed at the JTDC were also subject to an increased the risk of physical violence. It is well established that depriving children housed in juvenile facilities of meaningful opportunities for recreation and structured programming, and instead forcing them into idleness on their pods, increases the risk of confrontation and violence among the children themselves. The Empire lockdowns created just such a hazard for the children at JTDC, increasing risk from attack or altercation with other children there.

**Answer**: Defendants deny the allegations contained in Paragraph 55.

**E. The Defendants Profited from Locking Down JTDC**

56.     The Defendants profited as a proximate result of the JTDC lockdown.

**Answer**: Defendants deny the allegations contained in Paragraph 56.

57.     The Fox Defendants profited from using the JTDC's incarceration facilities as the primary set for two highly profitable *Empire* episodes. Scenes shot at JTDC were featured prominently in the first two episodes of *Empire'*s second season, accounting for more than a third of the running time in each. These episodes were immensely profitable. Advertisers paid $750,000 per 30-second advertising spot in Episode 1, and $600,000 per 30-second spot in

Episode 2. An advertising industry publication called these rates "astonishing."

> **Answer**: Defendants lack knowledge or information in which to admit or deny the allegations contained in Paragraph 57. Therefore, Defendants deny same and demand strict proof thereof.

58.     In addition to this revenue, the Fox Defendants realized profits from *Empire* by broadcasting these episodes overseas, as well as licensing the episodes, streaming them over the internet, and selling them for download. In reports to investors covering this period, Defendant Twenty-First Century Fox, Inc. noted that *Empire* was highly profitable and had contributed significantly to the company's revenues.

> **Answer**: Defendants lack knowledge or information in which to admit or deny the allegations contained in Paragraph 58. Therefore, Defendants deny same and demand strict proof thereof.

59.     These profits were the result of joint effort by the Fox Defendants. Defendant Twentieth Century Fox Television was the producer of both episodes featured at the JTDC, which were broadcast by Fox Broadcasting Company; the two companies, which share joint CEOs, work closely together to design programming, including *Empire*, that will maximize Fox's revenue. Indeed, one reason for Empire's multiple visits to the JTDC was that Fox Broadcasting Company and Twentieth Century Fox Television demanded that certain scenes set at the JTDC be re-filmed. In particular, one of the characters in the Empire episodes filmed at the JTDC, played by comedian Chris Rock, had originally been depicted as a cannibal. After they learned about this depiction, executives of the Fox Broadcasting Company, Twentieth Century Fox Television, and/or one or more of the Defendant Does acting as agents for the Fox Defendants, ordered that certain scenes at the JTDC be re-shot to change this depiction. The

31

JTDC was placed on lockdown at least in part to accommodate these demands. Profits from the episodes filmed at the JTDC flowed to Defendant Twenty-First Century Fox, Inc.

**Answer**: Defendants lack knowledge or information in which to admit or deny the allegations contained in Paragraph 59. Therefore, Defendants deny same and demand strict proof thereof.

60.     Cook County and/or certain Defendant Does profited from *Empire*'s filming as well, receiving rental fees and "reimbursement" revenue connected with the use of the JTDC.

**Answer**: Defendants deny the allegations contained in Paragraph 60.

**F. The Final Decision Maker Regarding JTDC's Operation Knew About and Approved of the Lockdown**

61.     From the facts available, Named Plaintiffs allege that the person who exercises final decision-making authority regarding operation of the JTDC, Timothy Evans, who was the Chief Judge of the Circuit Court of Cook County, knew about and approved the filming of Empire at the JTDC, and the facility's consequent lockdown.

**Answer**: Defendants deny the allegations contained in Paragraph 61.

62.     As described herein, the *Empire* lockdown occurred during a high-profile transition in which the Chief Judge's office took administrative control of the JTDC for the first time. It is simply not plausible that Superintendent Dixon, who had just started his job, would authorize the Empire filming and lockdown without first checking with his new boss. And indeed, as described herein, Superintendent Dixon implied in correspondence that Chief Judge Evans was aware of the filming, and had approved of it.

**Answer**: Defendants deny the allegations contained in Paragraph 62.

63.     In the summer of 2015, the JTDC was starting a new chapter in its administration. Sixteen years earlier, in 1999, a federal civil rights lawsuit was filed against Cook County,

alleging systematic mistreatment and neglect of children housed at the JTDC. *See Doe v. Cook County*, 99-cv-3945 (N.D. Ill.).

> **Answer**: Defendants admit the allegations contained in Paragraph 63.

64.     The *Doe* parties originally entered into a settlement agreement under which Cook County would improve conditions at the JTDC. In 2007, though, after concluding that the County was not complying with the agreement's terms, the District Court appointed a federal temporary administrator to operate the JTDC and bring it into compliance. On January 1, 2008, a few months after the federal temporary administrator took over the JTDC, the Illinois Legislature enacted a reform measure providing that the Chief Judge of the Circuit Court of Cook County, rather than the Cook County Board, would appoint the JTDC's administrator and all other necessary personnel, who would then serve at the Chief Judge's pleasure. Notwithstanding this transfer of authority, the JTDC would remain under control of the federal District Court's temporary administrator for the next several years.

> **Answer**: Defendants admit the allegations contained in Paragraph 64.

65.     Years later, the District Court finally determined that the JTDC could be returned to local control. It ordered that control of the JTDC be transferred from the temporary federal administrator back to local control in 2015.

> **Answer**: Defendants admit the allegations contained in Paragraph 65.

66.     In preparation for the JTDC's transfer from federal control, Chief Judge Evans appointed Leonard Dixon as the JTDC's new superintendent. This was a high-profile selection. Chief Judge Evans announced his choice with a lengthy press release, and held a joint press conference with Superintendent Dixon to discuss Dixon's appointment and his impending takeover of the JTDC. The transfer was the object of intense media scrutiny, and Chief Judge

Evans and Superintendent Dixon gave media interviews on the subject. In these press events and interviews, both men stressed that their priority in reassuming control of the JTDC would be the care for and welfare of the children housed there. They also stressed the need to provide the children housed at the JTDC with a non-penal environment that featured structured programming, to help the children cope with difficulties in the outside world once they left the facility.

**Answer**: Defendants admits that Leonard Dixon was appointed as the JTDC's new superintendent and that news conferences were held regarding the appointment and the administration of the JTDC.

67.  The federal District Court finally transferred administration of the JTDC to local control on May 20, 2015. *Empire* arrived to film four weeks later, on June 21.

**Answer**:  Defendants admit the allegations contained in Paragraph 67.

68.  It is exceedingly unlikely that Superintendent Dixon would have allowed *Empire* to film there without Chief Judge Evans' approval. Dixon, who has held high-profile positions in the juvenile corrections field for decades, had become the JTDC's superintendent just four weeks earlier when it was placed under Chief Judge Evans' control, for the very first time. And as noted above, Chief Judge Evans had publicly expressed keen interest in this transfer. Under these circumstances, it would be implausible to suggest that an experienced administrator like Superintendent Dixon would have placed the JTDC on lockdown so that a large television crew could use it as a film set, without first checking with his boss.

**Answer**: Defendants neither admit nor deny as the paragraph is argumentative and does not contain factual allegations. To the extent an answer is warranted, Defendants deny the allegations contained in Paragraph 68.

34

69.     And indeed, in contemporaneous correspondence Superintendent Dixon implied that he had just such approval from Chief Judge Evans. As part of the *Doe* litigation the District Court appointed Thomas F. Geraghty, a professor at Northwestern University School of Law, as "next friend" of the Doe child class members at the JTDC. (*Doe,* 99-cv-3945, Doc. # 8 (Aug. 4, 1999).) In July 2015, while the JTDC transition was still being monitored by the District Court, (see id., Doc. # 786 (May 15, 2015)), Professor Geraghty wrote to Superintendent Dixon to express concern about reports he had received that the JTDC had been placed on lockdown so that Fox could film *Empire* there. Superintendent Dixon responded by formal letter on July 24, 2015. He acknowledged that Empire had filmed at the JTDC, but he claimed that the experience for the children had been positive and that they hadn't been inconvenienced in any way. The letter's closing "courtesy copy" notation indicated that Dixon was sending a copy of the letter to Dr. Beverly Butler, whom the letter noted represented the office of the Chief Judge. Indeed, Dr. Butler was Chief Judge Evans' special assistant for the transition of the JTDC to the Chief Judge's control. It is reasonable to infer that Superintendent Dixon's purpose in copying Dr. Butler on the letter was to imply that Chief Judge Evans was aware of, and had approved of, the Empire filming. Crediting Superintendent Dixon this implication, and considering the circumstances discussed above, it is reasonable to infer that Chief Judge Evans, the final decision-maker regarding the operation and administration of the JTDC, knew that the JTDC was being used as a film set for Empire, and had approved of it.

**Answer**: Defendants neither admit nor deny as the paragraph is argumentative and does not contain factual allegations. To the extent an answer is warranted, Defendants deny the allegations contained in Paragraph 69.

70.     Alternatively, if Superintendent Dixon was the person who exercised final

decision-making authority regarding operation of the JTDC, he knew of and approved of *Empire's* filming at the JTDC and the facility's the consequent lockdown, as described elsewhere in this complaint.

**Answer**: Defendants deny the approval of any lockdown.

**Class Allegations**

71.     Named Plaintiffs seek to pursue claims for a class of others similarly situated pursuant to Rule 23(b)(1)(B) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.

**Answer**: Defendants admit that the Plaintiff seeks to pursue claims under Rule 23(b)(1)(B) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.

72.     Named Plaintiffs seek to represent a class consisting of all children housed at the JTDC when the facility was placed on lockdown during the filming of Empire in the summer of 2015.

**Answer**: Defendants admit that the Plaintiffs are seeking representation of a class. Defendants deny any wrongdoing.

73.     ***Numerosity***—The individuals in this class are so numerous that joinder of all members is impractical. There are between 250 and 400 children housed at JTDC during normal operation.

**Answer**: Defendants deny the allegations contained in Paragraph 73.

74.     ***Commonality***—There are questions of law and fact common to this class. Among those questions are:


- Whether Empire was filmed at the JTDC during the summer of 2015.

- Whether the JTDC was placed on lockdown in order to facilitate this filming.

36

- Whether locking down the children at the JTDC in order to facilitate the
- filming of a commercial television show is an action reasonably related to a
- legitimate governmental interest.
- Whether it was a breach of fiduciary duty to place the children housed at the
- JTDC on lockdown so that Empire could be filmed there.
- Whether the Fox Defendants and Defendant Does acted jointly with the
- JTDC's administrators to place the children housed at the JTDC on lockdown
- in order to film scenes for Empire.
- Whether the Defendants conspired with one another to place the children at
- the JTDC on lockdown in order to realize a profit from the filming of Empire.
- Whether locking down children housed at the JTDC in the manner described
- in the complaint created an increased risk of physical violence.
- Whether locking down the children housed at the JTDC in order to film
- Empire departed substantially from generally accepted professional standards
- for the operation of juvenile facilities.
- Whether locking down the children housed at the JTDC in order to film
- Empire violated their Due Process rights under the U.S. Constitution.
- Whether locking down the children housed at the JTDC in order to film
- Empire effected an unreasonable seizure in violation their rights under the
- U.S. Constitution.
- Whether the profits that the Defendants realized from locking down the JTDC
- in order to film Empire were unjustly obtained.
- Whether the Defendants are subject to disgorgement of the profits they

- realized by placing the children at the JTDC on lockdown in order to film
- Empire there.
- Whether the Defendants are subject to nominal damages for placing the
- children housed at the JTDC on lockdown in order to film Empire there.
- Whether the Defendants are subject to punitive damages for placing the
- children housed at the JTDC on lockdown in order to film Empire there.
- Whether the Defendants are subject to actual damages for placing the children
- housed at the JTDC on lockdown in order to film Empire there.

**Answer**: Defendants deny the allegations contained in Paragraph 74.

75. *Typicality*—Named Plaintiffs' claims are typical of the claims of the Class. Named Plaintiffs were housed at the JTDC when the children at the facility were placed on lockdown in order to facilitate filming for Empire. Their treatment in being placed on lockdown is typical of other children housed at JTDC who were placed on lockdown in order to facilitate the filming of *Empire*. Named Plaintiffs seek to prove that the locking down of the children housed at the JTDC in order to facilitate the filming of *Empire* violated the constitutional and state-law rights of the children subjected to the lockdown, and that the Defendants are subject to nominal damages, actual damages, punitive damages, and disgorgement for the profits resulting from this misconduct.

**Answer**: Defendants deny the allegations contained in Paragraph 75.

76. *Adequacy*—Named Plaintiffs will fairly and adequately represent the interests of the class. They are represented by skilled counsel with experience in complex civil litigation, class actions, and litigation concerning constitutional and prisoners' rights.

**Answer**: Defendants deny the allegations contained in Paragraph 76.

38

77. ***Rule 23(b)(1)(B)***—Named Plaintiffs' claims for accounting and disgorgement, among other remedies, are certifiable under this rule because adjudications with respect to individual members of the class will as a practical matter be dispositive of the interests of the other members of the class.

**Answer**: Defendants deny the allegations contained in Paragraph 77.

78. ***Rule 23(b)(3)***— Named Plaintiffs' alternative claims for actual damages, among other remedies, are certifiable under this rule because the questions of law and fact common to the class predominate over any individual issues, and a class action would be superior to other methods for fairly and efficiently adjudicating this controversy.

**Answer**: Defendants deny the allegations contained in Paragraph 78.

### COUNT I – 42 U.S.C. § 1983
### (All Defendants – Due Process)

79. Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants reassert and incorporate their answers to each paragraph of this complaint herein.

80. As described more fully herein, each of the Defendants subjected Named Plaintiffs and similarly situated children at the JTDC to lockdown, which impeded these children from accessing meaningful schooling, rehabilitation, structured programming, recreation, and visits from families, and subjected them to restrictions more severe than those that are commonly imposed in many adult jails. The Defendants did this so that the JTDC's schooling and other facilities on its second and third floors could be used to stage and shoot scenes for the *Empire* television show. The Defendants did this while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment.

**Answer**: Defendants deny the allegations contained in Paragraph 80.

39

81.     The lockdowns and attendant conditions were not imposed for a legitimate governmental purpose, but rather to facilitate the filming of a commercial television show and to realize the profits therefrom. The Fox Defendants acted together with and obtained significant aid from Defendants Cook County, the office of the Chief Judge of the Circuit Court of Cook County, Dixon, and Does 1 through 20 in filming *Empire* for commercial purposes at the JTDC. The Defendants knew that filming Empire at the JTDC would result in the lockdowns and attendant restrictions on the children housed there.

**Answer**: Defendants deny the allegations contained in Paragraph 81.

82.     The Defendants knew that the lockdowns violated the children's rights and imposed harm and a risk of harm on the children, yet they carried out the lockdown and filming anyway. This misconduct was undertaken knowingly, intentionally, and/or with reckless indifference to the rights of the children housed at the JTDC.

**Answer**: Defendants deny the allegations contained in Paragraph 82.

83.     The lockdowns and attendant conditions violated the Due Process rights of the children housed at the JTDC.

**Answer**: Defendants deny the allegations contained in Paragraph 83.

84.     As a proximate result of these lockdowns and resulting conditions, the children housed at the JTDC suffered emotional and psychological pain, were deprived of meaningful opportunities for rehabilitation, education, and family visits, and were subject to increased risk of physical violence at the hands of other children at the facility.

**Answer**: Defendants deny the allegations contained in Paragraph 84.

85.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described elsewhere in this complaint.

40

**Answer**: Defendants deny the allegations contained in Paragraph 85.

## COUNT II – 42 U.S.C. § 1983[4]
### (All Defendants – Unlawful Seizure)

86.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants make no answer to Count II as the Court has dismissed this Count

WITH prejudice.

## COUNT III – 42 U.S.C. § 1983
### (*Monell* liability – Cook County and/or the
### Chief Judge of the Circuit Court of Cook County)

93.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants reassert and incorporate their answers to each paragraph of

this complaint herein.

94.     The lockdowns of the JTDC were the result of the official policy and decisions of

Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County.

**Answer**: Defendants deny the allegations contained in Paragraph 94.

95.     Specifically, Chief Judge Timothy Evans was the person with final policymaking

and decision-making authority regarding the administration and operation of the JTDC, on behalf

of Defendants Cook County and/or the office of the Chief Judge of the Circuit Court of Cook

County. This included the decision of whether to allow the filming of *Empire* at the JTDC.

**Answer**: Defendants deny the allegations contained in Paragraph 95.

96.     As set forth in more detail in this complaint, Chief Judge Evans was informed of,

knew about, and approved of the filming of *Empire* at the JTDC, and its consequent lockdown.

Because Chief Judge Evans was the final policy- and decision-maker regarding the JTDC's

---

[4] The Court has dismissed this count with prejudice. Plaintiffs re-assert it here for purposes of
preservation.

administration and operation, Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County may be said to have caused the injuries and unjust enrichment described in this complaint.

**Answer**: Defendants deny the allegations contained in Paragraph 96.

### COUNT IV – 42 U.S.C. § 1983
#### (Fox Defendants – Action Under Color of Law)

97.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants make no answer to Count IV of Plaintiff Second Amended Complaint as this Count is not directed toward these Defendants.  If Count IV can be construed against these Defendants, Defendants deny each and every allegation contained in Count IV.

### COUNT V – 42 U.S.C. § 1983[5]
#### (Fox Defendants – Respondeat Superior)

101.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants make no answer to Count V of Plaintiff Second Amended Complaint as this Count is not directed toward these Defendants.  If Count V can be construed against these Defendants, Defendants deny each and every allegation contained in Count V.

### COUNT VI – 42 U.S.C. § 1983
#### (Conspiracy – All Defendants)

103.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants reassert and incorporate their answer to each paragraph of this complaint herein.

104.     The Defendants reached an agreement among themselves to deprive the children housed at the JTDC of their constitutional rights, as described throughout this complaint.

---

[5] The Court has dismissed this count with prejudice. Plaintiffs re-assert it here for purposes of preservation.

**Answer**: Defendants deny the allegations contained in Paragraph 104.

105.     In furtherance of this conspiracy, each of the co-conspirators committed overt, tortious acts and was an otherwise willful participant in joint activity.

**Answer**: Defendants deny the allegations contained in Paragraph 105.

106.     The misconduct described in this count was undertaken intentionally and/or with reckless indifference to the rights of the children housed at the JTDC.

**Answer**: Defendants deny the allegations contained in Paragraph 106.

107.     As a direct and proximate result of the illicit prior agreement referenced above, the rights of the children housed at the JTDC were violated, and they suffered emotional and psychological injuries as well as a wrongfully increased risk of physical injury, as described elsewhere in this complaint.

**Answer**: Defendants deny the allegations contained in Paragraph 107.

108.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

**Answer**: Defendants deny the allegations contained in Paragraph 108.

**COUNT VII – State Law Claim**
**(Breach of Fiduciary Duty – Dixon and Defendant Does)**

109.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants reassert and incorporate their answer to each paragraph of this complaint herein.

110.     Defendants Dixon and one or more of Defendant Does 1-20 were guardians of the children housed at the JTDC.

**Answer**:  Defendants deny the allegations contained in Paragraph 110.

111.     In turn, the children housed at the JTDC were the wards of these Defendants.

**Answer**: Defendants deny the allegations contained in Paragraph 111.

112.     As guardians, these defendants had a fiduciary relationship with the children housed at the JTDC.

**Answer**: Defendants deny the allegations contained in Paragraph 112.

113.     Among their obligations as guardians, these Defendants were obliged to act in the best interest of the children housed at the JTDC.

**Answer**: Defendants deny the allegations contained in Paragraph 113.

114.     As described more fully throughout this complaint, these Defendants breached these fiduciary duties by placing the children housed at JTDC on lockdown for the purposes of facilitating the filming of a profitable television show there.

**Answer**: Defendants deny the allegations contained in Paragraph 114.

115.     As a proximate result of this breach of fiduciary duty, the children housed at the JTDC suffered harm and an increased risk of physical injury, as described elsewhere in this complaint.

**Answer**: Defendants deny the allegations contained in Paragraph 115.

116.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

**Answer**: Defendants deny the allegations contained in Paragraph 116.

### Count VIII – State Law Claim
**(Inducement of Breach of Fiduciary Duty – Fox Defendants and Defendant Does)**

117.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants make no answer to Count VIII of Plaintiff Second Amended Complaint as this Count is not directed toward these Defendants.  If Count VIII can be construed against these Defendants, Defendants deny each and every allegation contained in Count VIII.

44

### COUNT IX – State Law Claim
**(All Defendants – Intentional Infliction of Emotional Distress)**

124.    Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants reassert and incorporate their answers to each paragraph in this complaint herein.

125.    The actions, omissions, and conduct of the Defendants as set forth in this complaint were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to the children housed at the JTDC.

**Answer**: Defendants deny the allegations contained in Paragraph 125.

126.    Among other things, there is substantial evidence to permit the inference that the Fox Defendants acted in reckless disregard of the probability that the lockdowns would cause severe emotional distress. *Empire*'s filming at the JTDC took place amid rising awareness of mass incarceration and its effects on poor and vulnerable populations, including the psychological damage of incarceration on young people. In the weeks before the filming at the JTDC, this included extensive media coverage of the suicide of a young man who had been jailed as a juvenile in New York.[6] In light of the prominence of the subject, the Fox Defendants

---

[6] See, e.g., Jennifer Gonnerman, Kalief Browder, 1993–2015, The New Yorker, June 7, 2015 http://www.newyorker.com/news/news-desk/kalief-browder-1993-2015; Iyana Robertson, 22-Year-Old Man Held on Rikers Island Without Trial Commits Suicide, Vibe, June 8, 2015 http://www.vibe.com/2015/06/kalief-browder-commits-suicide-at-22; Jim Dwyer, A Life That Frayed as Bail Reform Withered, N.Y. Times, June 9, 2015, https://www.nytimes.com/2015/06/10/nyregion/after-ashocking- death-a-renewed-plea-for-bail-reform-in-new-york-state.html; Matt Ford, Justice Kennedy Denounces Solitary Confinement, The Atlantic, June 18, 2015 https://www.theatlantic.com/politics/archive/2015/06/kalief-browder-justice-kennedy-solitaryconfinement/ 396320.

sought to include themes of mass incarceration in the plot of the two *Empire* episodes filmed at the JTDC.[7] It is reasonable to infer that in developing these *Empire* episodes the Fox Defendants familiarized themselves with the effects of mass incarceration, including the demographics who gets incarcerated and the psychological vulnerability of people subject to such incarceration. These are established areas of study with ample literature discussing the psychological vulnerability of the population in detention, including studies supporting the statistics Plaintiffs have cited elsewhere in this complaint. Thus, it is further reasonable to infer that the Fox Defendants acted in reckless disregard of the effects of causing the children housed at the JTDC to be placed on lockdown.

**Answer**: Defendants deny the allegations contained in Paragraph 126.

127.    As a direct and proximate result of the Defendants' actions, the children housed at the JTDC suffered emotional distress as set forth above.

**Answer**: Defendants deny the allegations contained in Paragraph 127.

128.    As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

**Answer**: Defendants deny the allegations contained in Paragraph 128.

## COUNT X – State Law Claim
### (All Defendants – Civil Conspiracy)

129.    Each paragraph of this complaint is incorporated as if fully restated here.

---

[7] See, e.g., Spencer Kornhaber, Empire's Ambiguous Take on the Social-Justice Movement, The Atlantic, Sept. 23, 2015, https://www.theatlantic.com/entertainment/archive/2015/09/empire-season-2- premiere-mass-incarceration/406921; Gene Demby, 'Empire' Nods to a Very Different Take on Policing Than We Usually See in Prime Time, NPR – Code Switch, Oct. 2, 2015, http://www.npr.org/sections/codeswitch/2015/10/02/445045620/empire-nods-to-a-very-different-take-onpolicing- than-we-usually-see-in-primetim; Jada Uan, Empire's Soapy Take on Social Justice is Also Very Nuanced, Vulture, Sept. 24, 2015, http://www.vulture.com/2015/09/empire-black-lives-matter-nuancedopening.html.

**Answer**: Defendants reassert and incorporate their answers to each paragraph in this complaint herein.

130.     As described more fully in the preceding paragraphs, the Defendants reached an agreement among themselves to place the children housed in the JTDC on lockdown so that the facility could be used to film scenes for a profitable television show, and conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

**Answer**: Defendants deny the allegations contained in Paragraph 130.

131.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

**Answer**: Defendants deny the allegations contained in Paragraph 131.

132.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the conditions imposed by or the effects of the lockdowns on the children housed at the JTDC.

**Answer**: Defendants deny the allegations contained in Paragraph 132.

133.     As a proximate result of the Defendants' misconduct described in this Count, the children housed at the JTDC suffered harm and the increased risk of physical injury, as described elsewhere in this complaint.

**Answer**: Defendants deny the allegations contained in Paragraph 133.

134.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

**Answer**: Defendants deny the allegations contained in Paragraph 134.

## COUNT XI – State Law Claim
### (Respondeat Superior)

135.    Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants reassert and incorporate their answers to each paragraph in this complaint herein.

136.    While committing the misconduct alleged in the preceding paragraphs, Defendants Dixon and one or more of Defendant Does 1-20 were employees and agents of Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County and acting within the scope of their authority or employment. Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County are liable as principal for all misconduct committed by these employees and agents.

**Answer**: Defendants deny the allegations contained in Paragraph 136.

137.    While committing the misconduct alleged in the preceding paragraphs, one or more of the Fox Defendants and one or more of Defendant Does 1-20 were employees or agents of one or more of the Fox Defendants acting within the scope of their employment. One or more of the Fox Defendants are liable as principal for all torts committed by their employees or agents.

**Answer**: Defendants deny the allegations contained in Paragraph 137.

## COUNT XII – State Law Claim
### (Cook County – Indemnification)

138.    Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants reassert and incorporate their answers to each paragraph in this complaint herein.

139.    Illinois law provides that public entities are directed to pay any tort judgments for compensatory damages for which employees are liable within the scope of their employment

activities.

**Answer**: Defendants admit the allegations contained in Paragraph 139.

140.    Defendants Dixon and one or more of Defendant Does 1-20 were employees and agents of Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County and acting within the scope of their employment in committing the misconduct described herein.

**Answer**: Defendants deny the allegations contained in Paragraph 140.

141.    Cook County is obligated by Illinois law to pay any judgment relating to the operation of the JTDC entered against Defendant Chief Judge of the Circuit Court of Cook County, Defendant Dixon, and/or one or more of Defendant Does 1-20.

**Answer**: Defendants admit that Cook County is obligated for indemnification purposes, however, Defendants deny the remaining allegations contained in Paragraph 141.

### COUNT XIII
**(Fox Defendants – Unjust Enrichment and/or Accounting)**

142.    Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: Defendants make no answer to Count XIII of Plaintiff Second Amended Complaint as this Count is not directed toward these Defendants.  If Count XIII can be construed against these Defendants, Defendants deny each and every allegation contained in Count XIII.

WHEREFORE, Named Plaintiffs demand a jury trial for all issues so appropriate and requests that this Court issue the following relief in their favor against the Defendants:

a.    A judgment ordering an accounting and disgorgement of all profits and benefits realized by the Fox Defendants resulting from the filming at the JTDC, with interest.

49

b.     A judgment ordering an accounting and disgorgement of enrichment realized by the remaining Defendants resulting from the misconduct described in this complaint, with interest.

c.     A judgment ordering the payment of nominal damages against all Defendants.

d.     A judgment ordering the payment of punitive damages against all Defendants except the office of the Chief Judge and Cook County.

e.     A judgment ordering the payment of actual damages against all Defendants (in alternative to nominal damages, accounting, and disgorgement).

f.     An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law.

g.     Any other relief this Court deems just and proper.

**Answer**: Defendants deny that the Plaintiff is entitled to the damages sought and further deny any wrongdoing.

## AFFIRMATIVE DEFENSES

NOW COME Defendants, Dixon and Cook County, by their attorney, Kimberly M. Foxx Cook County State's Attorney, through her assistants, Anthony E. Zecchin and Allyson L. West, and the state the following Affirmative Defenses

1.     The Defendants' conduct was at all times objectively reasonable and did not violate any of Plaintiffs' clearly established Constitutional rights.  Accordingly, the Defendants are entitled to the defense of Qualified Immunity.

2.     Defendant Cook County is immune from any claim for punitive damages under 745 ILCS 10/2-102 of the Illinois Tort Immunity Act which provides as follows:  "A local public

entity is not liable to pay punitive or exemplary damages in any action brought directly or indirectly against it by the injured party or a third party."

3.      Defendants cannot be held liable for an injury resulting from an act or omission of its employee where the employee is not liable.  745 ILCS 10/2-109.

4.      As to Plaintiff's state law claims, Defendants is not liable to pay attorney's fees as "the law in Illinois clearly is that absent a statute or contractual agreement 'attorney fees and the ordinary expenses and burdens of litigation are not allowable to the successful party.'" *See Kerns v. Engelke*, 76 Ill. 2d 154, 166 (1979).


WHEREFORE, Defendants, Dixon and Cook County, prays that this Honorable Court enter a finding that Plaintiffs are not entitled to the relief requested in the Complaint and that Plaintiffs' Complaint be dismissed with prejudice and that this Court grant any other such relief to Defendants as it deems proper and just.


## JURY DEMAND

Defendants demand trial by jury.


Respectfully Submitted,

Kimberly M. Foxx
State's Attorney of Cook County


By:      /s/ *Anthony E. Zecchin*
Anthony E. Zecchin
Assistant State's Attorney
Richard J. Daley Center
50 West Washington, Suite 500
Chicago, Illinois 60602

(312) 603-3373


By: /s/ *Allyson L. West*
   Allyson L. West
   Assistant State's Attorney
   Richard J. Daley Center
   50 West Washington, Suite 500