**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

T.S. *et al.,*

        Plaintiffs,

  v.

Twentieth Century Fox Television *et al.,*

        Defendants.

Case No. 1:16-cv-08303

Hon. Amy J. St. Eve

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FOX'S
<u>MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT</u>**

The Court gave Plaintiffs leave to file a Second Amended Complaint ("SAC") asserting

Counts IV, VI, VIII, IX, X, and XIII against the various Fox defendants (collectively, "Fox").

Fox has moved to dismiss those claims (*see* Doc. # 91, "Fox Mem."), but its arguments are

wrong.  Plaintiffs are voluntarily withdrawing their amendment of Count IX.  Otherwise, the

Court should deny Fox's motion and allow Plaintiffs to prove that the facts they allege are true.[1]

## ARGUMENT

The federal rules "require[] only a 'short and plain statement of the claim showing that

pleader is entitled to relief.'"  *United States ex rel. Hanna v. City of Chi.*, 834 F.3d 775, 779 (7th

Cir. 2016) (quoting Fed. R. Civ. P. 8).  A plaintiff thus "is not required to include detailed factual

allegations," *Alexander v. United States*, 721 F.3d 418, 422 (7th Cir. 2013) (quotation omitted),

and to counter a motion to dismiss the plaintiff need only "point to facts in a brief or affidavit in

order to show that there is a state of facts within the scope of the complaint that if proved (a

matter for trial) would entitle him to judgment."  *Hanna*, 834 F.3d at 779 (quotation omitted).

The court, in turn, "construe[s] all of the plaintiff's factual allegations as true, and must draw all

reasonable inferences in the plaintiff's favor."  *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir.

2011).  The plaintiff's claims "need not be probable, only plausible," *Indep. Trust Corp. v.*

---

[1]  At various points in its Motion to Dismiss, Fox reargues parts of the Court's April 20 ruling that Fox argued in its original motion, and lost.  These include the Court's rejection of Fox's attempt to have its Location Agreement govern Plaintiffs' allegations (*see* Fox. Mem. at 3 & 3 n.1), its rejection of Fox's efforts to strike Plaintiffs' allegations regarding sick call (*see id.* at 4 n.2, 9 n.4), its rejection of the defendants' divide-and-conquer reading of the Plaintiffs' allegations, (*see id.* at 9 n.4), and its ruling that Plaintiffs had sufficiently alleged an IIED claim (aside from Fox's liability for it), (*see id.* at 14).

The SAC did not change any of the FAC's allegations on these matters, and none of them are at issue in the claims that the Court has allowed Plaintiffs to re-assert against Fox.  What Fox really seeks, therefore, is for the Court to reconsider its settled rulings.  To do that Fox should have filed a motion for reconsideration, which is controlled by established standards. *See, e.g., Muczynski v. Lieblick*, No. 10-cv-0081, 2013 WL 1080613, at **1-2 (N.D. Ill. Mar. 14, 2013) (describing standards governing motions to reconsider).  Fox does not acknowledge or attempt to satisfy these standards, and indeed its requests fall well short of them.  They should be rejected.  If the Court does decide to entertain these requests, however, Plaintiffs would ask for a stand-alone briefing schedule, instead of litigating these issues in the briefing that the Court provided for analysis of the claims that it allowed Plaintiffs to re-assert in the SAC.

*Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012), such that the court should "ask itself ***could*** these things have happened, not ***did*** they happen." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (emphasis original). The SAC's allegations satisfy this standard.

## I. SAC Count IV sufficiently alleges a joint action claim against Fox.

In its April 20 ruling the Court held that to state a joint action claim, a complaint must allege facts permitting the inference that the private and public defendants had a "meeting of the minds" about a "common goal" to deprive the plaintiffs of their constitutional rights. (Mem. Op., Doc. # 73 at 13 (citations omitted).) The Court noted that the First Amended Complaint ("FAC") had alleged that "all the Defendants knew that filming *Empire* at the JTDC would ***result*** in the lockdowns and attendant restrictions on the juveniles housed there," (Mem. Op. at 5 (emphasis added)), but it concluded that Plaintiffs had not sufficiently alleged that this was a ***goal*** of the agreement. (*Id.* at 13-14.) The Court reviewed the various "media" joint-action decisions (*id.* at 14), and distinguished them on the grounds that in those cases the private parties filmed the violative conduct itself, whereas Fox filmed a scripted show with actors. (*Id.*)

In the "media" cases, none of the private parties were found to have a goal of violating the plaintiff's rights as an end in itself. Instead, the violation was instrumental: the private parties had a meeting of the minds with the government that it would do an act, which violated the plaintiffs' rights, so that the private party could accomplish some other goal—in those cases, to capture entertaining law enforcement footage. *See Smart v. City of Miami*, 107 F. Supp. 3d 1271, 1278-79 (S.D. Fla. 2015); *Conradt v. NBC Universal, Inc.*, 536 F. Supp. 2d 380, 383 (S.D.N.Y. 2008); *Frederick v. Biography Channel*, 683 F. Supp. 2d 798, 800-01 (N.D. Ill. 2010). The violation grew directly out of these agreements, in that the government imposed itself on the plaintiff to further the private party's goals rather than for a legitimate governmental purpose.

Plaintiffs thus read the Court's distinction between the FAC and the "media" decisions to turn not on the location of cameras or what was filmed *per se*, but rather on whether it is reasonable to infer from the alleged circumstances that the government and the private party had a mutual understanding that the government would impinge on others in order to serve the private party's ends. In the SAC, Plaintiffs have therefore added detail to their allegations about the circumstances of the agreement to film *Empire* at the JTDC. From the facts alleged, it is plausible that the defendants had a meeting of the minds that the government would do acts, which violated the rights of the children housed at the JTDC, in order to serve Fox's interests:

SAC ¶ 29: Before filming, Fox scouted the JTDC. Given that Fox eventually took over half of the JTDC's secure floors (*see* SAC ¶¶ 35-37), it is reasonable to infer that Fox developed a basic understanding that these floors—and the specific places Fox wanted to use—comprised the JTDC's school, recreation yard, visiting areas, and similar facilities, which were normally used by the JTDC's population of hundreds of children for education and recreation.

SAC ¶ 30: Fox was thus confronted with the problem that its massive film crew (and its attendant disruption) (*see* SAC ¶¶ 35-37) would be unable to use the JTDC, and the facility would thus be useless for filming, unless the JTDC's administrators altered the facility's normal operations by excluding the children from the second and third floors that they normally used, which the administrators could only accomplish by confining the children to the other half of the JTDC—the pods where the children were otherwise housed.

SAC ¶¶ 31-32: Still wanting to use JTDC's second and third floors, Fox offered to pay the JTDC administrators, and to pay JTDC staff for their assistance with the filming. Because Fox knew that hundreds of children normally used those floors, however, a condition of this offer was that the JTDC's administrators would alter their normal operations to exclude the children from those areas. Both sides understood that this would be accomplished by confining the children to the pods.

SAC ¶ 33: The JTDC's administrators accepted Fox's offers, and the two sides reached an agreement that Fox would pay the JTDC's administrators to use the second and third floors, and in exchange the administrators would alter the JTDC's normal operations by locking the children on their pods instead of allowing them to use the second and third floors.

The nature of an illicit agreement must almost always be inferred from the surrounding circumstances. *See Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979). Here, Fox **had** to

3

receive assurances from the JTDC's administrators that they would change the JTDC's normal operations to exclude the children from the second and third floors. Without that, why would Fox pay to use the JTDC, or send its large film crew to a place that would normally be filled with hundreds of children and thus useless for filming? Fundamentally, both sides had to have agreed that the JTDC's administrators would alter their normal operations to place significant additional restrictions on the children at the JTDC (*i.e.*, confining the children to the pods), not for a legitimate governmental purpose, but to facilitate Fox's filming on the second and third floors. It is plausible, in other words, that two sides reached a meeting of the minds that the government would do acts forming the core violation identified in both the "media" joint-action cases and *Bell v. Wolfish*, 441 U.S. 520 (1979). SAC Count IV thus states a joint action claim against Fox.

## II.    SAC Counts VI and X sufficiently allege conspiracy.

Plaintiffs' conspiracy counts should survive for the same reasons as their joint action claim. The Court dismissed the FAC's conspiracy counts because "Plaintiffs have not sufficiently alleged a reasonable inference that Defendants' agreement concerned depriving juvenile detainees' constitutional rights." (Mem. Op. at 16.) As Plaintiffs explain in Section I above, however, the SAC's factual allegations do support such an inference. The Court should therefore deny the motion to dismiss the SAC Counts VI and X.

## III.    SAC Count VIII states a claim against Fox for inducing the JTDC's administrators to breach their fiduciary duties.

The Court noted that the FAC alleged that Fox had "encouraged" the JTDC's administrators to breach their fiduciary duties, but it dismissed FAC Count VIII on the grounds that, because the FAC had not sufficiently alleged a "meeting of the minds," it had not alleged Fox's "participation" in the administrators' breach. (Mem. Op. at 26.) Fox moves to dismiss

Count VIII from the SAC on these same grounds, arguing that it fails because the SAC has not alleged Fox's "collu[sion]" or "participat[ion]" in the administrators' breach. (Fox Mem. at 10.)

Plaintiffs have two responses. First, the SAC does sufficiently allege a "meeting of the minds," (*see* Section I), and thus alleges Fox's "participation." Second, in Illinois a plaintiff can state an inducement-of-breach claim by alleging either that the defendant "participated" in a fiduciary's breach *or* that it "induced" the breach, and the SAC does both.

Plaintiffs have amended the SAC to allege knowing inducement (SAC ¶¶ 32-37), and they have amended Count VIII to allege both that Fox participated in the breach of fiduciary duty (*id.* ¶ 120), and separately that it knowingly induced the breach. (*Id.* ¶ 121.) The SAC thus states a claim for inducement-of-breach under both "participation" and "inducement" theories. That is consistent with the law in Illinois, which provides that either a defendant's participation in, or its inducement of, a fiduciary's breach can be the basis for an inducement-of-breach claim:

> A third party's inducement of, or knowing participation in[,] a breach of duty by an agent is a wrong against the principal which may subject the third party to liability. . . . A third party who induces a breach of a trustee's duty of loyalty, or participates in such a breach, or knowingly accepts any benefit from such a breach, becomes directly liable to the aggrieved party.

*Vill. of Wheeling v. Stavros*, 411 N.E.2d 1067, 1070 (Ill. Ct. App. 1980). *Stavros* makes clear that the disjunctive articulation of this rule was not grammatical happenstance, but rather reflects a considered judgment. For the rule, *Stavros* relied on *Lawrence Warehouse Co. v. Twohig*, 224 F.2d 493 (8th Cir. 1955) and *Hammonds v. Aetna Casualty & Surety Co.*, 237 F. Supp. 96 (N.D. Ohio 1963). *See Stavros*, 411 N.E.2d at 1070. *Lawrence Warehouse* involved collusion between a third party and the plaintiff's fiduciary. 224 F.2d at 498. *Hammonds*, on the other hand, held that the plaintiff had stated an inducement-of-breach claim by alleging that the defendant had tricked and intimidated, and thereby induced, the plaintiff's fiduciary to abandon him. 237 F. Supp. at 98, 101. Such inducement is inarguably distinct from any sort of "collusion" or

5

"participation" between the third party and the fiduciary.  Thus a defendant who induces a fiduciary to breach a duty—regardless of whether the defendant also colludes or participates in the breach—is subject to an inducement-of-breach claim.

Courts applying *Stavros* have understood that inducement alone supports an inducement-of-breach claim.  *In re Salem Mills, Inc.*, 881 F. Supp. 1109 (N.D. Ill. 1995), for example, involved a defendant-vendor who admitted to paying an employee of the plaintiff-customer to "avoid getting kicked out" by the employee as a seller to the plaintiff-customer.  881 F. Supp. at 1111-12.  No collusion or participation in the employee's breach of fiduciary duty was alleged.  The court held that the vendor was liable for the employee's breach of fiduciary duty "because his admission indicates that he knowingly induced this breach for the purpose of maintaining a business relationship with [the plaintiff-customer]."  *Id.* at 1117.  *Cf. People ex rel. Daley v. Warren Motors, Inc.*, 500 N.E.2d 22, 27 (1986) (collecting cases, including *Stavros*, to note that courts impose "constructive trusts on benefits obtained by third persons through their knowledge of ***or*** involvement in a public official's breach of fiduciary duty." (emphasis added)).  An allegation of inducement alone thus supports an inducement-of-breach claim.[2]

Fox nevertheless argues, relying on *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502 (7th Cir. 2007), that an inducement-of-breach claim "requires the third party to have ***colluded*** with a fiduciary in committing a breach of fiduciary duty."  (Fox. Mem. at 10 (emphasis added).)  That reading is mistaken.  *Borsellino* relied exclusively on *Regnery v.*

---

[2]  The same rule applies in other jurisdictions.  Fox cites *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531 (7th Cir. 1991), for example.  (Fox. Mem. at 10.)  *Pappas* involves the law of ERISA rather than that of Illinois, but it too treats participation and inducement as distinct grounds for liability.  *See* 923 F.2d at 542 (holding that plaintiff had not pled that defendant "participated" in the fiduciary's breach, and separately that he had not pled the defendant's "inducement, either").  New York recognizes the same distinction.  *See In re Sharp Int'l Corp.*, 403 F.3d 43, 51 (2d Cir. 2005) ("[Plaintiff's] allegation cannot be characterized as either participation or substantial assistance [by the third-party defendant in a fiduciary's breach of duty].  Therefore, this allegation assists [plaintiff] only if it qualifies as an inducement.").

6

*Meyers*, 679 N.E.2d 74 (Ill. Ct. App. 1997), *see Borsellino*, 477 F.3d at 508-09, and *Regnery* in

turn relied exclusively on *Stavros*. *See Regnery*, 679 N.E.2d at 809. Neither decision altered

*Stavros*'s disjunctive rule. In *Regnery* the third party colluded in and induced a fiduciary's

breach, while in *Borsellino* the third party did not collude in or induce the breach. *See Regnery*,

679 N.E.2d at 809; *Borsellino*, 477 F.3d at 508-09. Obviously a third party who both colludes in

and induces a breach is liable under a disjunctive rule, while one who does neither is not.

*Regnery* and *Borsellino* thus never reached the question of whether a disjunctive or a conjunctive

rule should apply, and neither case should be read to disturb *Stavros*'s well-considered holding

that either collusion or inducement can form the basis of an "inducement" claim.[3]

Plaintiffs have alleged both that Fox participated in the JTDC administrators' breach of

fiduciary duty, and that it knowingly induced that breach. Under Illinois law, either allegation

states an inducement-of-breach claim. Count VIII thus should not be dismissed.

## IV.    SAC Count XIII states a claim for an accounting and/or unjust enrichment.

### A.    Count XIII asserts a valid unjust enrichment claim under Illinois law.

Count XIII charges that Fox was unjustly enriched because it knew or should have known

that the JTDC's administrators were violating the rights of the children at the JTDC, yet it took

advantage of those violations to film the *Empire* footage, and profited from doing so.

As Plaintiffs summarized in their Rule 15(a)(2) motion (*see* Doc. # 80 ¶ 8), the cause of

action stated in Count XIII is well-grounded in the law. "A person who obtains a benefit . . . in

consequence of another's breach of [a fiduciary] duty . . . is liable in restitution to the person to

---

[3] There is no reason to think that either case sought to do so, either. The straightforward reading of *Regnery*, rather, is that it was describing the facts before it, which involved collusion and inducement. *Borsellino*, meanwhile, simply repeated *Regnery*'s phrasing. And since *Borsellino*'s holding did not turn on the conjunctive vs. disjunctive nature of an inducement-of-breach claim, its phrasing on that issue amounts to *dictum*. *See United States v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (noting that *dictum* are statements of law "not essential to the decision," and are not controlling for the lower courts).

whom the duty is owed." Restatement (Third) Restitution and Unjust Enrichment § 43(c) (Am. Law Inst. 2011). Specifically, "[b]enefits derived from a fiduciary's breach of duty may . . . be recovered from third parties, not themselves under any special duty to the claimant, who acquire such benefits with notice of the breach." *Id.* § 43 cmt. g. The same rule applies to third parties who benefit from wrongs other than breaches of fiduciary duty. That principle is set out in the Restatement (Third) of Restitution and Unjust Enrichment § 44(1), which tracks the language of Section 43(c) in providing that "[a] person who obtains a benefit by conscious interference with a claimant's legally protected interests (*or in consequence of such interference by another*) is liable in restitution as necessary to prevent unjust enrichment." *Id.* (emphasis added).

The rule in Section 43 is consistent with Illinois law—indeed it draws from it.[4] *See* Restatement (Third) Restitution and Unjust Enrichment § 43 cmt. g, illus. 32 (describing *Conant v. Karris*, 520 N.E.2d 757 (Ill. Ct. App. 1987)). In *Conant* the plaintiff-investor, Conant, created a proprietary business plan for buying a property and hired a broker, Ernest, to represent him in the transaction. Ernest communicated the plan to his brother, Nicholas, who knew that Ernest was acting as Conant's agent. After Nicholas used the information from Ernest to underbid Conant for the property, Conant sued Nicholas for an accounting. 520 N.E.2d at 786. The court held that even though Nicholas was a third party, he was liable in unjust enrichment:

> [I]t is not necessary to have a fiduciary relationship between plaintiff and the buyer. . . . A third party who . . . knowingly accepts any benefit from [] a breach [of fiduciary duty] becomes directly liable to the aggrieved party.

---

[4] Section 44(1) is consistent with Illinois law as well. *See Wms. Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) (restitution is available for misconduct "whether or not the tort involved a breach of fiduciary duty"); *TCF Mortg. Corp. v. Gelber Holding Co.*, No. 91-cv-2125, 1991 WL 127587, at *3 (N.D. Ill. July 3, 1991) (plaintiff stated an unjust enrichment claim against second defendant for profiting from first defendant's misconduct, even though first defendant was not a fiduciary of plaintiff).

*Id.* at 790-91. Indeed this rule applies both when third party knows it is benefitting from the misconduct, and when it should have known it was doing so as well. In *Warren Motors*, persons involved in a tax-kickback scheme at the county assessor's office told an auto dealer that they could reduce his taxes in exchange for a portion of the savings. The dealer agreed and the persons secured the tax reductions. 500 N.E.2d at 23-25. When the state sued the dealer on a theory of unjust enrichment to recover the resulting tax benefits, he argued that he was not liable because his only "wrong" was "a failure to inquire into the circumstances of the tax-assessment reductions," which "is insufficient evidence for the imposition of a constructive trust." *Id.* at 28. The court disagreed. Quoting the Restatement of Restitution, it explained:

> A person has notice of facts giving rise to a constructive trust not only when he knows them, but also when he should know them; that is when he knows facts which would lead a reasonably intelligent and diligent person to inquire whether there are circumstances which would give rise to a constructive trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know of such circumstances.

*Id.* (quoting Restatement of Restitution § 174, cmt. a (Am. Law Inst. 1937)). Applying this standard, the court held that the dealer was liable in unjust enrichment because he "knew or should have known" that the tax reductions were improper, since the circumstances should have alerted him that the reductions were not being accomplished by legitimate means. *Id.* at 28, 29.

Count XIII claims that Fox knew, or should have known, that the JTDC's administrators were placing the children at the JTDC on lockdown to facilitate Fox's filming and thus violating their rights, and yet Fox accepted benefits from that misconduct to enrich itself anyway. (*See* SAC ¶¶ 143-150.) Under the authorities discussed above, Count XIII states a viable claim for an accounting and/or unjust enrichment.

Fox argues that Count XIII does not state a valid unjust enrichment claim because it is "untethered" from a substantive violation. (Fox Mem. at 11-12.) The decisions Fox relies on do

9

not help it, however. In two of the cases, the plaintiffs alleged that the defendant had violated

their substantive rights, and that it had been unjustly enriched by those violations. *See Sheridan*

*v. iHeartMedia, Inc.*, No. 15-cv-09229, 2017 WL 2424217 (N.D. Ill. June 5, 2017); *Soto v. Sky*

*Union, LLC*, 159 F. Supp. 3d 871 (N.D. Ill. 2016). The courts dismissed the plaintiffs'

substantive claims, however, leaving the unjust enrichment claims unconnected to any

substantive violation. *See Sheridan*, 2017 WL 2424217, at *11; *Soto*, 159 F. Supp. 3d at 884. In

two other cases, the plaintiffs alleged unjust enrichment without claiming a substantive violation

at all, *see Cleary v. Philip Morris Inc.*, 656 F.3d 511, 514 (7th Cir. 2011), or alleged substantive

violations and unjust enrichment claims for different conduct, *see Charles Hester Enters., Inc. v.*

*Ill. Founders Ins. Co.*, 484 N.E.2d 349, 354 (Ill. Ct. App. 1985).[5] After *Sheridan* and *Soto*

dismissed the underlying substantive claims, and after *Cleary* and *Charles Hester* noted that the

unjust enrichment count was not connected to a substantive claim in the first place, each of the

four courts dismissed the unjust enrichment claim because, in *Cleary*'s wording, it was

"untethered" from any violation of the plaintiff's substantive rights. 656 F.3d at 514.

From these decisions Fox argues that if the Court dismisses all the SAC's other counts

against it, the unjust enrichment claim in Count XIII will be "untethered" from any substantive

violation, and under Illinois law it must be dismissed as well. (Fox Mem. at 11-12.) The

problem with this argument is that Illinois law ***also*** provides that when one party (here, the

JTDC's administrators) violates a victim's substantive rights, and a second party (here, Fox) has

notice of that violation and yet proceeds to profit from it, the victim can assert an unjust

---

[5] Fox cites yet two more decisions, *Tsitiridis v. Mahmoud*, 2015 WL 9273251 (Ill. Ct. App. Dec. 18, 2015) and *Gagnon v. Schickel*, 983 N.E.2d 1044 (Ill. Ct. App. 2012), (*see* Fox Mem. at 11), but it apparently does so only for the quote, "Unjust enrichment is not an independent cause of action." The cases otherwise hold that unjust enrichment cannot be asserted if the challenged conduct is covered by the parties' express contract, a well-established rule that is irrelevant in this case.

enrichment claim against the second party. That is the basis for Count XIII's claim against Fox. The count's text makes that plain, and Plaintiffs' Rule 15(a)(2) motion identified the line of authority on which the count is based, quoting *Conant* and Restatement (Third) sections 43 and 44. Fox, however, studiously avoids all this—nowhere does it acknowledge any of the authorities supporting the claim. Count XIII states a valid claim for unjust enrichment.

### B. The SAC's factual allegations satisfy the elements of Count XIII.

Plaintiffs reviewed the SAC's allegations in Section I above. In summary, the SAC alleges that the JTDC's secure areas are divided between its upper floors, which contain jail-like pods, and its second and third floors, which contain the JTDC's education and rehabilitation facilities. Children housed at the JTDC are transported down from the pods for education and rehabilitation on a daily basis. (*See* SAC ¶¶ 12-28.) Indeed, the SAC makes clear that this daily movement of hundreds of children is the central and most significant undertaking at the JTDC.

The SAC alleges that Fox scouted the JTDC and decided that it wanted to use its second and third floors for filming, but that in so doing Fox was confronted with the fact that having its large crew take over the second and third floors would prevent the children from using those same facilities, and require them to be kept on their pods. (*Id.* ¶¶ 29-32.) Fox decided to film at the JTDC anyway; during filming it was again obvious that the JTDC's administrators had confined the children to their pods and otherwise shut down the JTDC's normal operations in order to make Fox's filming possible. Yet Fox proceeded to film, and then used the footage to realized profits. (*Id.* ¶¶ 45, 57-59.)

Even Fox has admitted that Plaintiffs have sufficiently alleged it knew that the JTDC's administrators were placing restrictions on the children so that Fox could film. In its motion to dismiss the FAC, Fox argued vigorously that Plaintiffs had not sufficiently alleged that it had

"reached an understanding" with JTDC officials to violate the children's rights (*see* Doc. # 50 at 9-10), but in the same breath it acknowledged that "[a]t most, Plaintiffs allege knowledge by [Fox] that filming *Empire* at the JTDC would result in restrictions on the children housed there." (*Id.* at 9 (quoting FAC ¶ 83, ellipses omitted).)

In its current motion, Fox never says whether the SAC's allegations satisfy the "knew or should have known" element of Count XIII. Fox nonetheless appears eager to walk back its admission that Plaintiffs sufficiently alleged it knew about the restrictions. Over and again, it now calls those allegations "speculative" and "conclusory." (*See* Fox Mem. at 2, 5, 6, 7.) A plain reading of the SAC, however, shows those objections are empty. Consider a few examples:

- The SAC alleges that Fox scouted the JTDC with plans that its film crew would take over half of the building's secure floors, which were comprised of facilities for educating and rehabilitating the children housed at the JTDC. It is plausible that Fox knew or should have known that the JTDC's administrators would make those floors available to Fox by barring the JTDC's children from them.

- The other half of the JTDC was the pods on the facility's upper floors, which ringed the third-floor courtyard. It is plausible that Fox knew or should have known that the only way for it to use the second and third floors was for the administrators to confine the children to this other half of the facility.

- The SAC alleges that Fox took over the JTDC's visiting area for filming. It is plausible that Fox knew or should have known that the JTDC's administrators facilitated this by disrupting family visits.

- The SAC alleges that Fox's crew use many of the JTDC school's classrooms for staging. It is plausible that Fox knew or should have known the administrators facilitated this by preventing the children from being schooled there.

- The SAC alleges that Fox took over the entire third floor outdoor courtyard. It is plausible that Fox knew or should have known that the administrators made that courtyard available by barring the children from that same area.

Of course, these inferences are more than plausible. In a facility that basically had two areas—half pods and cells for housing the detainees, and half floors for rehabilitating and educating them—the JTDC's administrators offered the second area to Fox for filming, and simultaneously barred the children from using it. To paraphrase *Warren Motors*, 500 N.E.2d at 28, Fox "would

12

have to have been invincibly innocent not to know" that the JTDC's administrators did this by confining the children to their pods in the upper half of the building. Yet Fox took advantage of that misconduct to capture television footage, which it then used to obtain profits. That is a plausible—indeed, an inescapable—inference to draw from the SAC's allegations. Fox's conduct, as alleged in the SAC, subjects it to the unjust enrichment set out in Count XIII.

### C. Fox's argument that its unjust enrichment is "attenuated" fails.

Fox argues that even if it was unjustly enriched, its enrichment was too attenuated to support Plaintiffs' unjust enrichment claim because the misconduct against the children is insufficiently connected to *Empire*'s filming, and because Fox's use of the JTDC footage in the *Empire* episodes is insufficiently connected to Fox's profits. (Fox Mem. at 12.)

This argument is so cursory that it should be dismissed out of hand. Fox's brief does not explain what criteria govern the question of attenuation, nor does it specify how the SAC's allegations fit that doctrine. In any event, though, Fox is simply wrong. Plaintiffs allege that the government placed the children at the JTDC on lockdown, causing the massive disruptions described throughout the SAC, to make it possible for Fox to shoot footage there; and that Fox used this footage as a prominent component of two *Empire* episodes, from which it profited. (*See, e.g.*, SAC ¶¶ 29-31, 36-55, 57, 143-49.) Fox has had ample opportunity to specify what is missing from this straightforward chain of events, but it has not done so. Indeed if the Court reaches this question, it will have already decided that Plaintiffs have plausibly alleged that Fox knew or should have known that the children were being placed on lockdown in order to facilitate *Empire*'s filming, yet it went ahead with the filming anyway. Fox does not explain why the footage it obtained as a result of that filming is insufficiently connected to the lockdowns that were imposed to make it possible.

13

Fox's claim that Plaintiffs have not explained how the JTDC footage contributed to its profits, meanwhile, simply fails to appreciate the nature of Fox's liability. Fox is being sued as a wrongdoer, not an innocent beneficiary. This makes it liable for consequential gains, including those gains realized by putting the footage "to an especially profitable use—beyond the ordinary or use value that the same assets would have in another's hands." Restatement (Third) Restitution and Unjust Enrichment § 53 cmt. d (Am. Law Inst. 2011). That Fox combined the JTDC footage with other material in creating the *Empire* episodes does not change this, because it is the ***defendant*** who "'carries the burden of disentangling the contributions of the several factors which he has confused. The law requires him to resolve any doubts arising from his wrong.'" *Leigh v. Engle*, 727 F.2d 113, 139 n.38 (7th Cir. 1984) (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 48 (2d Cir. 1939) (Hand, J.)).

Fox also states that Plaintiffs have failed to allege that they have "a better claim" or an "entitle[ment]" to the profits from broadcasting the two *Empire* episodes in which the wrongfully-obtained footage was used. (Fox Mem at 12-13.) This is not an argument so much as a proclamation, consisting of unexplained case citations and a declaration that Plaintiffs have failed to meet whatever standards that those cases purportedly stand for. Since Fox does not support this this claim with any actual argument, Plaintiffs cannot tell why Fox contends that the SAC fails to meet the rules Fox has invoked.

It is no mystery why Fox never develops these arguments: it has none. Count XIII charges that Fox has retained the benefits from the *Empire* footage to the detriment of the children at the JTDC, who had their rights violated, with Fox's knowledge, so that it could create television footage that it would then put to profitable use; and that it would violate the principles of equity and good conscience for Fox to retain the profits it derived from that footage. (SAC ¶¶

14

149-50.)  That states a straightforward claim for unjust enrichment, *see Devco v. T10 Meltel, LLC*, No. 15-cv 3558, 2017 WL 750603, at *2 (N.D. Ill. Feb. 27, 2017) ("Under Illinois law, in order to sustain a claim of unjust enrichment, the complaining party has to show that the other party has unjustly retained a benefit to its detriment, and that the retention of the benefit violates the fundamental principles of justice, equity, and good conscience." (quotation, brackets, ellipses omitted)), and it is amply supported by the factual allegations in the SAC.  Fox's argument fails.

## V.     SAC Count IX—Intentional Infliction of Emotional Distress ("IIED").

The SAC amended Count IX by adding SAC ¶ 126 to make specific IIED allegations against Fox.  This was the only amendment to Count IX.  Upon further consideration Plaintiffs believe it is appropriate to withdraw SAC ¶ 126 and to have the Court's dismissal of Count IX against Fox to be converted to a dismissal with prejudice.  Plaintiffs so move the Court.

## CONCLUSION

The SAC states valid claims against Fox that are supported by well-pleaded allegations of fact.  The Court should reject Fox's motion to dismiss SAC Counts IV, VI, VIII, X, and XIII, and allow Plaintiffs to prove that the facts that form the basis of those claims are true.

July 14, 2017                                    Respectfully Submitted,

                                                 /s/ Stephen H. Weil

                                                 Stephen H. Weil – steve@weilchardon.com
                                                 Alexis G. Chardon – ali@weilchardon.com
                                                 Weil & Chardon LLC
                                                 333 S. Wabash Avenue, Suite 2700
                                                 Chicago, IL 60604
                                                 (312) 585-7404

                                                 *Attorneys for Named Plaintiffs T.S. and Q.B.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2017, a true and correct copy of the foregoing was filed electronically.  Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

<u>/s/ Stephen H. Weil</u>

16