**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| T.S. *et al.*,<br><br>　　　　　　　Plaintiffs.<br><br>　　　v.<br><br>Twentieth Century Fox Television, a division of Twentieth Century Fox Film Corporation *et al.*,<br><br>　　　　　　　Defendants. | Case No. 1:16-cv-08303<br><br>Honorable Judge Amy J. St. Eve |

**FOX DEFENDANTS' ANSWER TO SECOND AMENDED COMPLAINT**

Defendants Twentieth Century Fox Television, a division of Twentieth Century Fox Film Corporation, Fox Broadcasting Company, and Twenty-First Century Fox, Inc. (collectively the "Fox Defendants"), by and through their undersigned attorneys, hereby answer Plaintiffs' Second Amended Class Action Complaint ("Complaint"). To the extent the Complaint attempts to characterize certain alleged facts (i.e., by describing situation at the JTDC as a "lockdown" or that certain alleged facts were "obvious"), the Fox Defendants respond generally that such allegations constitute mere pejoratives or conclusions of law and do not constitute allegations of fact requiring a response; but to the extent such allegations may be construed as allegations of fact, the Fox Defendants object to and deny each and every such allegation, and incorporate by reference this response in each paragraph below as if fully set forth therein. The Fox Defendants further respond that the headings in the Complaint do not constitute allegations of fact requiring a response; but to the extent the headings may be construed as allegations of fact, the Fox Defendants respond that they are without sufficient knowledge or information to form a belief as to the truth of the allegations and on that basis deny each and every such allegation. Except as may be expressly and

1

specifically admitted herein, the Fox Defendants deny each and every allegation alleged in the Complaint and further deny that Plaintiffs have suffered any damages by reason of any act, omission, or conduct on the part of the Fox Defendants and further deny that Plaintiffs are entitled to the relief sought in the Complaint, or to any relief at all, from the Fox Defendants. With respect to the specific paragraphs of the Complaint, the Fox Defendants respond as follows:

In response to the unnumbered paragraphs, styled as an "Introduction," the Fox Defendants admit that Plaintiffs have brought a purported class action that they allege is "on behalf of themselves and a class of similarly situated children" against the defendants, including the Fox Defendants. The Fox Defendants further admit that Plaintiffs seek various categories of damages, but deny that Plaintiffs are entitled to any damages. The Fox Defendants are otherwise without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of the first unnumbered paragraph and on that basis deny each and every such allegation.

### Nature of the Action

1.      Named Plaintiffs T.S. and Q.B. were housed at the JTDC in the summer of 2015 during the lockdowns imposed to facilitate the filming of *Empire* there. They seek to represent a class of similarly situated children. On behalf of that class, Named Plaintiffs seek an accounting, disgorgement, nominal damages, punitive damages, an alternative award of actual damages, and an award of attorneys' fees and costs.

**Answer**:  In response to Paragraph 1, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of Paragraph 1 and on that basis deny each and every such allegation.  In response to the second sentence of Paragraph 1, the Fox Defendants admit that Plaintiffs have brought a purported class action and that they "seek to represent a class of similarly

situated children," but deny the relief purportedly sought in connection therewith. To the extent not expressly admitted, the Fox Defendants deny the allegations of Paragraph 1.

## Parties

2.      Plaintiff T.S. is 18 years old. He was housed at the JTDC during the summer of 2015 when it was placed on lockdown to facilitate the filming of *Empire*. At the time of the filing of the complaint in this action, T.S. was not incarcerated. T.S. is identified by initials in order to protect his identity.

**Answer**:  In response to Paragraph 2, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

3.      Plaintiff Q.B. is 17 years old. He was housed at the JTDC during the summer of 2015 when it was placed on lockdown to facilitate the filming of *Empire*. Pursuant to Federal Rule of Civil Procedure 17, Q.B. brings this complaint by and through V.P., his grandparent and legal guardian. V.P. is identified by initials in order to protect Q.B.'s identity. At the time of the filing of the complaint in this action, Q.B. was not incarcerated.

**Answer**:  In response to Paragraph 3, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

4.      The Defendants identified in the sub-paragraphs of this paragraph are referred to as the "Fox Defendants" or "Fox."

      a.      Defendant Twenty-First Century Fox, Inc. is a diversified global media and entertainment conglomerate with operations in cable network programming,

3

television, and filmed entertainment. It is a publicly-traded company and is the ultimate parent of the other Fox Defendants.

**Answer**:  In response to the first sentence of Paragraph 4(a), the Fox Defendants admit that Twenty-First Century Fox, Inc. has "operations in cable network programming, television, and filmed entertainment" in various countries.  In response to the second sentence of Paragraph 4(a), the Fox Defendants admit that Twenty-First Century Fox, Inc. is publicly traded.  To the extent not expressly admitted, the Fox Defendants deny the allegations of Paragraph 4(a).

b.  Defendant Twentieth Century Fox Television produces television shows that are broadcast on Fox's television network, including *Empire*. Twentieth Century Fox Television is given production credit for both of the *Empire* episodes that were filmed in the JTDC. Twentieth Century Fox Television is a division of Twentieth Century Fox Film Corporation. Twentieth Century Fox Television is not a legal entity distinct from Twentieth Century Fox Film Corporation, and therefore Twentieth Century Fox Film Corporation is liable for all acts and omissions made by or on behalf of Twentieth Century Fox Television. Twentieth Century Fox Film Corporation is a wholly-owned subsidiary of Defendant Twenty-First Century Fox, Inc.

**Answer:**  In response to the first sentence of Paragraph 4(b), the Fox Defendants admit that Twentieth Century Fox Television produces the *Empire* television show and that *Empire* is broadcast by Fox Broadcasting Company.  In response to the second sentence of Paragraph 4(b), the Fox Defendants admit that Twentieth Century Fox Television is listed at the producer of the *Empire* episodes at issue in this matter.  In response to the third

4

sentence of Paragraph 4(b), the Fox Defendants admit that Twentieth Century Fox Television is a division of Twentieth Century Fox Film Corporation. In response to the fourth sentence of Paragraph 4(b), the Fox Defendants deny the allegations contained therein. In response to the fifth sentence of Paragraph 4(b), the Fox Defendants admit that Twentieth Century Fox Film Corporation operates as a subsidiary of Twenty-First Century Fox, Inc. To the extent not expressly admitted, the Fox Defendants deny the allegations of Paragraph 4(b).

> c. Defendant Fox Broadcasting Company operates the television network that broadcasts *Empire*, among other programming. Fox Broadcasting Company is a wholly-owned subsidiary of Defendant Twenty-First Century Fox, Inc.

**Answer**: In response to the first sentence of Paragraph 4(c), the Fox Defendants admit the allegations contained therein. The Fox Defendants deny the allegations of the second sentence of Paragraph 4(c).

5. Defendant Chief Judge of the Circuit Court of Cook County is sued in his official capacity. The Chief Judge of the Circuit Court of Cook County administers the JTDC.

**Answer**: In response to the first sentence of Paragraph 5, the Fox Defendants admit that Plaintiffs have purported to sue the Chief Judge of the Circuit Court of Cook County "in his official capacity." In response to the second sentence of Paragraph 5, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

6.     Defendant Leonard Dixon is the superintendent of the JTDC. He oversaw the JTDC's daily operations at all times during the summer of 2015 when the children housed there were placed on lockdown to facilitate the filming of *Empire*.

**Answer**:  In response to Paragraph 6, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

7.     Defendant The County of Cook, Illinois ("Cook County") is a county in Illinois. The JTDC is operated as a branch of Cook County's government. Cook County established and operates the JTDC, and it supports, funds, and maintains the facility. Cook County is obligated to indemnify judgments entered against the administrators of the JTDC arising from the operation of the JTDC.

**Answer**:  In response to the first sentence of Paragraph 7, the Fox Defendants admit that The County of Cook is a county in Illinois.  In response to the remaining sentences of Paragraph 7, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

8.     Defendants Does 1 through 20 are sued herein by fictitious names for the reason that their true names are unknown to Plaintiffs. Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of these Defendants when their identities have been ascertained. Plaintiffs are informed and believe, and based thereon allege, that these fictitiously-named Defendants are responsible in some manner for the misconduct alleged herein.

**Answer**:  In response to the first sentence of Paragraph 8, the Fox Defendants admit that Plaintiffs have sued Does 1 through 20 "by fictitious names."  In response to the remaining

sentences of Paragraph 8, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation. The Fox Defendants further deny that any person or entity related to the Fox Defendants is liable for any misconduct alleged in the Complaint.

9.      The Defendants at all times herein were the agents, joint venturers, and/or co-conspirators of each of the other remaining Defendants, and in doing the things alleged in this complaint they were acting in the course of such agency, joint venture, and/or conspiracy.

**Answer**:  The Fox Defendants deny the allegations of Paragraph 9.

## Jurisdiction and Venue

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this is an action arising under 42 U.S.C. § 1983. The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims providing the basis for federal subject matter jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

**Answer**:  The Fox Defendants admit that the Court has jurisdiction over this matter.

11.      Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district and this is a convenient and reasonable forum for the resolution of this dispute.

**Answer**:  The Fox Defendants admit that that venue exists with the Court for this matter and deny any liability for any events or omissions allegedly "giving rise to the action."

<u>Facts</u>

**A.    Normal Operation of the JTDC**

12.    The JTDC is a five-story building near the intersection of Ogden Avenue and Roosevelt Road, a few miles southwest of downtown Chicago. It is among the largest juvenile detention facilities in the country, housing between 250 and 400 children from the ages of 10 to 18. The average stay for a child at the JTDC is around three weeks.

    **Answer**:  The Fox Defendants admit that the JTDC is "near the intersection of Ogden Avenue and Roosevelt Road."  In response to the remaining allegations of Paragraph 12, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

13.    Under normal operation, the JTDC's floors serve distinct functions. Children detained at the JTDC are housed primarily on the fourth and fifth floors, which contain rows of cells that open onto small "pods." Each pod serves as a common area in the same manner as a pod or "dayroom" in an adult jail cell block. A portion of the third floor also contains this cell-and-pod arrangement, including an "intake" pod for newly detained children.

    **Answer**:  In response to Paragraph 13, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

14.    The remainder of the third floor, and the first and second floors, are taken up with facilities designed to provide schooling and structured rehabilitative programming to the children housed at JTDC, along with related administrative services. The third floor houses the JTDC's infirmary, as well as a large open-air courtyard, which serves as the JTDC's primary recreation yard for the children. This courtyard is the only place where children detained at the JTDC are

allowed outdoors during their detention. There are smaller auxiliary gymnasium facilities in the basement that can be used by limited numbers of children, and are accessed via elevator.

> **Answer**: In response to Paragraph 14, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

15.     The second floor is dedicated almost entirely to education and programming, and is the floor on which the bulk of the JTDC's schooling and structured rehabilitative programming services are provided. The second floor contains the facilities of the Nancy B. Jefferson Alternative School, which is operated by Chicago Public Schools. In addition to the school's numerous classrooms, the second floor contains a library, a computer lab and music room, and an indoor "game" area with resources to help children detained at the JTDC engage in constructive pastimes. The second floor also contains a chapel for religious services and other programming, as well as visiting facilities where children can spend time with their families.

> **Answer**: In response to Paragraph 15, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

16.     The first floor contains courtrooms, reception, and administrative offices. Parts of the first floor are accessible to the public, but the remainder of the building is secure and restricted, not accessible to the public without an escort.

> **Answer**: In response to Paragraph 16, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

17.     The numerous facilities on the JTDC's lower floors are reflective of the purpose for which the children are placed in detention at the JTDC. The JTDC does not operate as an adult prison, or even an adult jail. None of the children housed at the JTDC have been convicted of adult crimes, and they are not detained at the JTDC in order to be punished. To the contrary, because they are children, the purpose of their detention at the JTDC is to nurture and rehabilitate them, which is done by providing the children with schooling, care, and structured programming designed to address the problems that landed them at the JTDC in the first place. As the JTDC's website states, its mission is to "provide[] the children with a safe, secure and caring environment with programs and structure that enhance personal development and improve opportunity for success upon return to the community."

**Answer**:  In response to Paragraph 17, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

18.     And indeed, the children housed at the JTDC are in pressing need of these services. For one thing, they are among the most vulnerable children in Chicago: more than 90 percent of this population has reported one or more traumatic experiences, with an average child reporting six different traumas.[1] Sixty percent of the children who enter the JTDC are diagnosed with a mental disorder, and around one-quarter of them are prescribed psychotropic medication.[2] Added

---

[1]  *See* National Child Traumatic Stress Network ("NCTSN"), *Victimization and Juvenile Offending*, 2016, http://www.nctsn.org/sites/default/files/assets/pdfs/victimization_juvenile_offending.pdf. *See also* NCTSN, *Assessing Exposure to Trauma and Posttraumatic Stress Symptoms in the Juvenile Justice Population*, 2014, http://www.nctsn.org/sites/default/files/assets/pdfs/assessing_trauma_in_jj_2014.pdf ("The majority of youth in the juvenile justice system report experiencing multiple types of trauma, termed polyvictimization." (citations omitted).)

[2] The National Council on Crime and Delinquency, Juvenile Detention in Cook County: Future Directions, Feb. 2012 at 27, http://www.nccdglobal.org/sites/default/files/publication_pdf/cook-county-report.pdf (prepared for office of the Chief Judge of the Circuit Court of Cook County).

to this, the children frequently arrive at the JTDC in a state of crisis, having been separated from their families and placed in confinement, many for the first time. Other children, meanwhile, are held at the JTDC not because of a delinquency adjudication, but rather because their home lives are in disarray: a judge has ordered the child's release from whatever underlying matter brought the child to the JTDC, but the Department of Children and Family Services cannot find a foster home in which to place the child, or the child's guardian has not come to pick the child up. As Superintendent Dixon noted in a recent news interview, "[juvenile] detention is like the emergency room of the juvenile justice system." For that reason, Superintendent Dixon has explained, rather than house the children in an incarceration-style setting, "[o]ur thing is to have some normalcy when they [detained children] come here." Conventional incarceration, in which inmates are essentially warehoused in cells or pods with nothing to occupy the hours, aggravates the psychological and emotional traumas suffered by this already vulnerable population, and decreases the children's chances of successfully reentering society.

**Answer**:  In response to Paragraph 18, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

19.  What is more, subjecting juveniles to forced idleness is dangerous for the children themselves. As the U.S. Department of Justice has explained,

> The amount and quality of structured daily programming in juvenile facilities has a significant impact on the rate of violent and antisocial incidents. Simply stated, youth who do not have adequate opportunities to engage in programmed activities become bored, and are more likely to become involved in mischief or assaultive behavior. Generally accepted professional standards mandate that youth in juvenile justice facilities receive a minimum of one hour of large muscle activity per weekday, two hours of large muscle activity per weekend day, educational programming during weekdays, and other structured developmental and rehabilitative

> activities. Inadequate youth programming . . . contributes to . . . high levels of youth violence, and departs substantially from generally accepted professional standards.

**Answer**:  In response to Paragraph 19, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

20.     To fulfill the JTDC's rehabilitative mission and provide a safe and structured environment, the JTDC's lower floors are dedicated to offering extensive schooling and structured programming to the children housed there.

**Answer**:  In response to Paragraph 20, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

21.     Under normal operation, the children detained at JTDC eat breakfast on their pods in the upper floors, but quickly head down to the second floor for school, typically by 8:00 a.m. The children attend classes at the school during the day, and take lunch there as well. After classes finish, around 3:00 p.m., the children are typically placed in various structured after- school programs on the second floor, and sometimes on the third-floor recreation yard as well (the recreation yard contains a garden, for instance, which some of the children help maintain). The JTDC's numerous rehabilitative programs include yoga, creative writing courses, computer classes, art, music, and singing. These programs are aimed at addressing the problems that brought each child to JTDC, and at rehabilitating the children so that they can lead more constructive and stable lives once they leave the facility.

**Answer**:  In response to Paragraph 21, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

22. During the day children are also given time for recreation in the third-floor open-air courtyard and game time in the JTDC's indoor game area on the second floor, and they receive visits from family in the JTDC's visiting rooms. These activities, though not formally structured, are also critical for the children's wellbeing, both while they are at the JTDC and after they re-enter society.

**Answer**: In response to Paragraph 22, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

23. In the early evening the children return to the pods for dinner and bathing. Shortly thereafter they are placed in their cells for the night.

**Answer**: In response to Paragraph 23, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

24. As this itinerary indicates, under normal operation the children spend relatively little time on their pods and cells in the JTDC's upper floors. This is so because, in contrast with the extensive programming and activities the children receive on the second and third floors, their time on the pods is spent under restrictions that can be even more confining than those of an adult jail.

**Answer**: In response to Paragraph 24, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

25. Each cell-and-pod arrangement has around 15 to 20 children, overseen by guards. Most of the pods are long, narrow rooms—essentially a large, enclosed corridor outside of a row

of cells—with jail-style seating arrangements, consisting of tables that are each fused to short stools and fixed to the floor. Pods are also typically equipped with a television (and accompanying seats) at one end, but they otherwise have little in the way of materials for activities, and certainly nothing comparable to the resources and programming available on the second and third floors.

> **Answer**: In response to Paragraph 25, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

26.     To prevent the monotony of the pods from leading to altercations and physical violence, when the children are on the pod they are prohibited from moving freely. Whereas inmates in an adult jail are typically allowed to move around their "day rooms" as they please, children on the pods at the JTDC must all remain sitting in the same spot, at all times. If a child needs to use the restroom or otherwise leave his seat, that child must raise his hand and receive permission from the guards. While that child is out of his seat, no other children may leave their seats. Breaking this rule—that is, if one child stands up without first receiving permission—is punishable as a "major rule violation." Some limited services are offered on the pods themselves— priests and pastors are allowed to visit the children there, for example—but otherwise the pods are devoid of programming.

> **Answer**: In response to Paragraph 26, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

27.     Exigent circumstances—such as staffing shortages or security concerns— sometimes force JTDC administrators to hold children on the pods, where these significant restrictions govern. Otherwise, though, the JTDC attempts to minimize the time children spend in

the restrictive conditions of the pod, in favor of the school facilities, recreation, and structured rehabilitative programming offered in the second and third floors of the facility.

**Answer**: In response to Paragraph 27, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

28. Notably, providing meaningful schooling and programming opportunities requires a considerable number of personnel, in addition to facilities where these services can be provided. This is so because the children must be escorted by guards and otherwise have their movements controlled every time they leave their pods to travel to schooling or programming elsewhere in the JTDC.

**Answer**: In response to Paragraph 28, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

**B.  Filming *Empire* at the JTDC**

29. Sometime in the spring of 2015, the Fox Defendants scouted the JTDC, and decided that they wanted to use the facilities on the JTDC's second and third floors to stage and shoot scenes for *Empire*. The Fox Defendants were confronted with the fact, however, that the facilities they wanted were *the* facilities that enabled JTDC administrators to let the children housed there off their pods, and were the facilities that provided a venue for the children housed at the JTDC to receive education and rehabilitation services. Further, the Fox Defendants were confronted with the fact that indeed, hundreds of children relied on the facilities on the second and third floors to provide space from which they could leave their pods and receive education and rehabilitation. Further, the Fox Defendants were confronted with the fact that the only way *Empire*'s crew could use the facilities on the JTDC's second and third floors was for the children to be prevented from

15

using them, which meant confining hundreds of children to their pods during filming—both because that was the only place at the JTDC left for the children to go, and because the presence of a large film crew would be massively disruptive to the JTDC's normal operations.

> **Answer**: In response to the first sentence of Paragraph 29, Twentieth Century Fox Television admits that it considered the JTDC as a possible filming location in the spring of 2015 but denies that it wanted to use the JTDC's entire second and third floors to stage and shoot scenes for *Empire*. In response to the first sentence of Paragraph 29, Fox Broadcasting Company and Twenty-First Century Fox, Inc. state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation. The Fox Defendants deny the remaining allegations of Paragraph 29.

30.     The Fox Defendants were thus confronted with the problem that the facilities they desired were also required for the education and rehabilitation of hundreds of children (and indeed provided the space needed for the children to be able to leave their pods), yet would be worthless to the Fox Defendants for filming unless the JTDC's administrators excluded those same children from the facilities, which would be accomplished by confining them to their pods.

> **Answer**: The Fox Defendants deny the allegations of Paragraph 30.

31.     When confronted with this problem, the Fox Defendants could have found another facility or built a set for the incarceration scenes they wanted to shoot. They did neither. Instead, they sought to enter an agreement with the JTDC's administrators that they knew or were substantially certain would induce the administrators to exclude the children from the JTDC's second and third floors so that *Empire*'s film crew could use those areas for staging and filming.

> **Answer**: The Fox Defendants deny the allegations of Paragraph 31.

32.     To induce the JTDC's administrators to let *Empire*'s crew use the education and rehabilitation facilities that were normally used by the children at the JTDC, the Fox Defendants offered to pay a rental fee for the use of the JTDC. The Fox Defendants also offered to pay wages and overtime for JTDC staff to leave their duties facilitating the normal operation of the JTDC—duties occupied in substantial part with enabling the children's use of the education and rehabilitation facilities—and instead facilitate the *Empire* crew's use of those same facilities for filming. These offers were made on the condition that the JTDC's administrators would change the facility's normal operations to make the second and third floors available to *Empire*'s crew, which all the Defendants knew or were substantially certain could only be accomplished by excluding from those areas the hundreds of children who normally used them, and which, in turn, the Defendants knew or were substantially certain could only be accomplished by confining the children to their pods.

**Answer**:  The Fox Defendants deny the allegations of Paragraph 32.

33.     The JTDC's administrators accepted the inducements offered by the Fox Defendants, and the Fox Defendants reached an agreement with Superintendent Dixon and/or one or more of the Defendant Does for *Empire*'s film crew to film at the JTDC. This agreement contemplated that the *Empire* film crew would have access to many of the restricted facilities on the JTDC's second and third floors that are intended to rehabilitate and educate the children housed at the JTDC—and that the children who normally used those facilities would be barred from them, so that the film crew could work without interruption. Instead, by necessary implication, the children housed at the JTDC would be confined to their cells and pods on the facility's upper floors. In reaching this agreement, the Defendants knew or were substantially certain that filming

17

*Empire* at the JTDC would result in the lockdowns and attendant restrictions on the children housed there.

> **Answer**:  The Fox Defendants deny the allegations of Paragraph 33.

34.    The production and filming of *Empire* at the JTDC lasted two weeks in the summer of 2015, spread over three different shootings: June 21 through 26, July 13 through 16, and August 23 through 26.

> **Answer**:  Twentieth Century Fox Television admits the facts alleged in Paragraph 34.  In response to Paragraph 34, Fox Broadcasting Company and Twenty-First Century Fox, Inc. state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

35.    The film crews that descended on the JTDC to conduct these shootings were enormous. *Empire* employed a film crew of approximately 250 in Chicago, and city permits taken in the name of "Fox Entertainment Group" show that each time *Empire* came to film at the JTDC, parking was suspended around the facility for as many as seven city blocks. These restrictions were needed to accommodate the large number of cargo vans, production trailers, motor homes, tractor-trailer rigs, crew vehicles, and other support vehicles used in filming.

> **Answer**:  The Fox Defendants deny the allegations of the first sentence of Paragraph 35. In response to the remaining allegations of Paragraph 35, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

36.    During each of the three shootings *Empire*'s film crew—including dozens of production staff, actors, and extras—took over much of the JTDC's second and third floors. The

Nancy B. Jefferson school's classrooms were largely occupied with film crews and production equipment. The JTDC's chapel was converted into an area for eating, and garbage cans were placed there for *Empire*'s crew to throw away trash. The library, which was normally used by children at the JTDC to read, study, and check out books, was made into crew support area. The infirmary was used as a film set, as were some of the JTDC's intake facilities. So was the JTDC's visiting area, where the children normally meet with their families. One area of particular focus for the film crew was the third-floor open-air courtyard, which *Empire*'s film crew used to shoot large, long-format scenes involving numerous actors and extras.

> **Answer**: In response to the first, second, third, fourth and sixth sentences of Paragraph 36, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation. The Fox Defendants deny the allegations of the fifth and seventh sentences of Paragraph 36.

37. *Empire* took over more than just the many facilities on the JTDC's second and third floors. Internal JTDC documents prepared to plan for the *Empire* filming indicate many staff were expected or directed to leave their normal duties in order to render services to the film crew instead. Some were chosen to act as extras in the show. Others were assigned to clean and clear out different areas in the building (this included removing children from some pods that the *Empire* crew wanted to use for filming), man the delivery docks to permit the free flow of film equipment, escort actors and crew members to and from the film set, keep *Empire*'s production crew from wandering around the facility, provide security for areas where filming was to occur, help escort filming equipment into place, and clean up after the crew. The *Empire* filming, in short, not only took over many of the facilities that furnished the schooling and structured programming that the JTDC was

intended to provide; it also diverted a number of staff whose job it was to help fulfill the JTDC's rehabilitative mission. And indeed, the Fox Defendants paid for these JTDC staff members to serve the Fox Defendants' needs during the filming.

> **Answer**: In response to the first five sentences of Paragraph 37, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation. The Fox Defendants deny the allegations of the sixth sentence of Paragraph 37.

38. As a result, the only place left for the children housed at the JTDC was their cells and pods. That is where they were kept. To accommodate *Empire*, Superintendent Dixon and/or Defendant Does deliberately placed the JTDC on lockdown, confining the children to the jail-style cell-and-pod arrangements in the JTDC's upper floors. This was not an accidental or inadvertent result of the filming. Rather, it was the planned method by which the JTDC was cleared out to make way for *Empire*'s film crew. In an internal JTDC document circulated among staff to organize the facility in preparation for *Empire*'s arrival, for example, the JTDC's custodial staff were instructed:

> > Notify storeroom for additional supplies that the pods may need for increase of resident [*sic*] on pods. There will be a significant increase in utilization of custodial supplies. Toilet paper, C-fold towels, hand soap, hand sanitizer, garbage bags etc... [*sic*] will be needed.

> **Answer**: In response to Paragraph 38, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

39. When *Empire* arrived at the JTDC to film, the lockdown began with school. Instead of going down to their second-floor classrooms after breakfast as they normally would, the children remained on their pods. Nancy B. Jefferson teachers were ordered up into these areas, and

instructed to go from pod to pod to teach their students. This was "school" in name only. The pods are not set up or even shaped like classrooms; instead, the teacher must stand in the midst of the seating that is arranged around the pod. There is no whiteboard or other teaching equipment for the instructor to use, and what supplies the teachers can bring to the pods are limited. What is more, during *Empire* filming many of the children whom the teachers had to instruct had not been allowed to move all day, and were going stir-crazy in what amounted to their own jail "day room." Indeed these obvious obstacles are why the Nancy B. Jefferson school facilities existed in the first place, and why the hundreds of children at the JTDC are escorted down to the school's second-floor classrooms on a daily basis. Up on the pods instruction was markedly less effective and often chaotic, and during the *Empire* filming teachers often did not appear in the pods at all.

> **Answer**: In response to Paragraph 39, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

40.     Recreation was drastically reduced, and for many children it was eliminated. Because the JTDC's primary recreation facility—the third floor's open-air courtyard—was being used to film *Empire*, the children were banned from that area. (The courtyard is divided into three sections, separated by walls, which allows different groups of children to use the yard independently. The *Empire* film crew only filmed in one of the sections, but the children were still banned from the remainder of the yard.) This left the smaller gymnasium facilities in the JTDC's basement. But with limited space there, and the logistical challenge of bringing children down from the JTDC's upper floors during filming, there was a backlog and many children never received any recreation or exercise at all.

**Answer**:  In response to Paragraph 40, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

41.     Instead, in an evident attempt to comply with the letter of juvenile facility standards, many children were given "rec time" up on the pods themselves. An "instructor" would arrive and ask whether any of the children wanted to partake in "large muscle" activity, by which the instructor apparently meant push-ups, sit-ups, and jumping-jacks, to be done among the tables on the pod. In other pods a ball would be introduced and the children would be told to play. Even these pretenses were often abandoned, and there was simply no recreation at all. At no point during the *Empire* filming were the children allowed outdoors, as they would have if they had been allowed to use the third-floor courtyard.

**Answer**:  In response to Paragraph 41, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

42.     For many of the children detained at the JTDC, visits with families were effectively eliminated during *Empire* filming. For others, visits were restricted and severely shortened, with parents, who normally waited just a few minutes to visit with their children for an hour or more, forced to sit in waiting rooms for hours on end, for the opportunity to see their children for markedly shortened visits.

**Answer**:  In response to Paragraph 42, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

43.     Other appointments were cancelled as well. For example, in order to seek medical attention the children can fill out sick-call slips on their pods. During normal operation, these requests usually receive prompt attention. The *Empire* film crew used the JTDC's infirmary to shoot scenes for the show, however, and during filming numerous sick call requests were ignored.

> **Answer**:  In response to the first, second and third sentences of Paragraph 43, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.  In response to the fourth sentence of Paragraph 43, Twentieth Century Fox Television denies that "[t]he *Empire* film crew used the JTDC's infirmary to shoot scenes for the show" and further states that it is without sufficient knowledge or information to form a belief as to the truth of the allegation that "during filming numerous sick call requests were ignored" and on that basis denies this allegation.  In response to the fourth sentence of Paragraph 43, Fox Broadcasting Company and Twenty-First Century Fox, Inc. state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

44.     Structured programming for children was also cancelled. Most of the structured programming normally occurs on the JTDC's second floor, with some limited programming, such as a botany project that is run on the open-air courtyard, occurring on the third floor. Because the second and third floors had largely been taken over by *Empire*'s film crew, many of the JTDC's after-school programs, including music and dance, were cancelled. Instead of attending these programs, children remained on their pods.

**<u>Answer</u>**:  In response to Paragraph 44, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

45.     That the children at the JTDC had been placed on lockdown was made obvious to the Fox Defendants from the first day they arrived at the JTDC for filming. Despite this, the Fox Defendants continued to use the facilities at the JTDC for filming. The Fox Defendants continued to pay the JTDC's administrators to make the JTDC's second and third floors available to *Empire*'s crew even though the Fox Defendants knew or were substantially certain that this was accomplished by keeping the children housed at the JTDC on lockdown, and they continued knowingly to benefit from the lockdowns at the expense of the children housed there, by using the spaces freed up by the lockdowns to record footage for *Empire*.

**<u>Answer</u>**:  The Fox Defendants deny the allegations of Paragraph 45.

46.     During the course of filming, the Fox Defendants also rewarded the JTDC's administrators, including Superintendent Dixon, for making the second and third floors available to the Fox Defendants for filming. The Fox Defendants did this by allowing the JTDC's administrators to rub shoulders and take photographs with *Empire*'s star actors, including Chris Rock and Terrence Howard. Indeed, in the months after *Empire*'s filming at the JTDC ended, Superintendent Dixon had lined the walls of his JTDC office with framed photographs of himself posing with *Empire*'s stars.

**<u>Answer</u>**:  The Fox Defendants deny the allegations of the first and second sentences of Paragraph 46.  In response to the third sentence of Paragraph 46, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

C. **Individual Experiences**

47. **T.S.**

a.    During the summer of 2015, T.S. was 16 years old and was housed in a JTDC living unit. Children on T.S.'s pod normally left the pod in the morning to attend class in the Nancy B. Jefferson school facilities on the second floor, which they attended through mid-afternoon. During the day, they had recreation time in the third-floor courtyard. They also took advantage of games and activities on the commissary area on the JTDC's second floor.

**Answer**:  In response to Paragraph 47(a), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

b.    When *Empire* arrived to film, these routines were eliminated. T.S. and the rest of the children on his pod were held there. They were not allowed down to the Nancy B. Jefferson school facilities; instead, teachers would sometimes come up to the pods. This was a chaotic teaching environment. The teacher could not teach in front of the children, and had no whiteboard to instruct from. To make matters worse, the children on the pod, who had been prohibited from meaningful recreation, were going stir-crazy, and the pod was out of control. In this setting, teaching simply did not occur.

**Answer**:  In response to Paragraph 47(b), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

c.    During *Empire*'s filming, the children on T.S.'s pod did not leave for recreation. Instead a JTDC staff "instructor" would occasionally come to the pod

and ask, "Who wants to do large-muscle?" This meant, apparently, that the children should do push-ups, sit-ups, and jumping-jacks in front of the seats they had been forced to sit in all day. After none of the children took the instructor up on this "recreation" offer, he would leave the pod. Often, no instructor arrived at all. Sick call requests by children on T.S.'s pod were also ignored during filming, whereas during regular operation they were responded to relatively promptly.

**Answer**: In response to Paragraph 47(c), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

d.     T.S.'s visits with his mother were also interrupted and curtailed. During the JTDC's normal operation, T.S.'s mother visited him during the two visiting periods T.S. was allotted each week. To visit T.S., his mother would arrive during T.S.'s designated visiting time slots, which were in the late afternoon or early evening. Once she arrived, it would typically take 20 minutes for JTDC staff to locate T.S. and bring him to the visiting facilities on the second floor.  T.S. and his mother would then be able to have a visit that typically lasted at least an hour.

**Answer**: In response to Paragraph 47(d), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

e.     During *Empire*'s filming, T.S.'s mother arrived at the designated time slot for her visit. Instead of bringing T.S. down, however, she, and several other parents who had arrived to visit during the same slot, were forced to sit in the waiting area. After around two hours had passed, she saw a large group of what appeared to be

*Empire*'s cast or crew leave the building. Sometime thereafter, she was escorted to visit with T.S. in a room much smaller than the JTDC's normal visiting rooms. Instead of being allowed to visit for an hour, their visit was shortened significantly.

**Answer**: In response to Paragraph 47(e), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

48. **Q.B.**

a. During the summer of 2015, Q.B. was 16 years old and was housed in a JTDC living unit. Children on Q.B.'s pod normally attended classes at the Nancy B. Jefferson school throughout the day. The children on Q.B.'s pod were provided with two recreation periods, one for gym class as part of their schooling, and another for an after-school recreation hour.

**Answer**: In response to Paragraph 48(a), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

b. The schooling on the second floor, and the recreation hours, were important to Q.B. and the other the children because they provided a meaningful escape from the monotony of confinement on the pod. While on the pod the children were required to sit in one place, and could only move, one at a time, with prior permission. Even to stand up without first obtaining permission was treated as a major rule violation.

**Answer**: In response to Paragraph 48(b), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

      c.     Q.B. had two visiting hours during the week, on Tuesdays and Saturdays, and during his confinement at the JTDC his father and his grandmother visited him frequently.

**Answer**: In response to Paragraph 48(c), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

      d.     One day the children on Q.B.'s pod were told they would not be going down to the school, because *Empire* had arrived to film at the JTDC. During the *Empire* filming teachers occasionally came up to the pod to teach, but sometimes they did not. When they did arrive, the teaching environment was chaotic, as the children had been locked on the pod all day without any opportunity for movement. Children on Q.B.'s pod never received recreation during *Empire*'s filming, making time on the pod miserable. In addition to these restrictions, sick call requests put in by children on Q.B.'s pod were ignored. Normally such requests were responded to relatively promptly.

**Answer**: In response to Paragraph 48(d), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

      e.     Q.B.'s grandmother visited him at the JTDC whenever she could. She works at a supermarket that frequently requires her to work over the weekends, however,

making visits during Q.B.'s Saturday visiting slot difficult. After being unable to get time off to visit one Saturday, Q.B.'s grandmother asked her boss to take off of work Tuesday, so that she could visit her grandson. *Empire* was filming that day, however, and when she arrived at the JTDC during Q.B.'s visiting slot, she was told that visits in that time had been cancelled.

**Answer**: In response to Paragraph 48(e), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

49. **N.T.**

a. N.T. is a 16-year-old boy who was housed at the JTDC. During normal operation, he and the other children in his unit would leave the pod after breakfast for classes downstairs at the Nancy B. Jefferson school facilities. They would attend school through the afternoon, with outdoor recreation in the third-floor courtyard during the school day. The children in N.T.'s unit participated in multiple after-school programs, including a drum circle and a dance class. During the two visiting periods that N.T. was allotted each week, either N.T.'s mother, his grandmother, or both would visit with him in the JTDC's visiting area.

**Answer**: In response to Paragraph 49(a), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

b. When Fox arrived to film *Empire*, N.T.'s unit was placed on lockdown. The children did not leave the pod for school. Instead, they remained in their pod, where they were told to remain in their seats. Movement was permitted only to one child

at a time, after the child received permission. Some teachers came up to the pod, but there was no whiteboard for writing, the teachers brought few materials, and teaching in the pod environment was ineffective. After-school programming was cancelled entirely, and N.T. was unable to visit with his mother or grandmother. Children in N.T.'s unit could only escape the monotony of the pod by buying "room time"—30 minutes alone in their cells—using points they earned for good behavior.

**Answer**:  In response to Paragraph 49(b), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

c.    During lockdown the children in N.T.'s unit were taken to the gymnasium facilities in the JTDC's basement, but only occasionally, apparently because administrators from different pods were fighting for scarce recreation time slots there. As a substitute the children were given "recreation" in their pods, during which they were allowed play cards or write letters. Otherwise, the children were confined to their chairs on the pod and not allowed to move.

**Answer**:  In response to Paragraph 49(c), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

50.    **G.M.**

a.    G.M. is a 16-year-old boy who was housed in the JTDC's intake unit when *Empire* arrived to film. Children in the intake unit are normally allowed out of their cells the entire day. They take breakfast in their pods, are allowed some activities there, and are given recreation either in the basement gymnasium facility or the

third-floor open-air courtyard. There is also an area in the intake unit where the children can watch television.

**Answer**: In response to Paragraph 50(a), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

    b.    The intake unit is on the third floor and was thus close to much of the filming that occurred for *Empire*. While *Empire* was filming, G.M. was not allowed out of his cell. He was given meals in his cell and was instructed to be quiet. He was allowed out of his cell only for dinner, and then returned to the cell for the evening.

**Answer**: In response to Paragraph 50(b), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

51.    **D.G.**

    a.    D.G. is a 16-year-old boy who was housed in a JTDC living unit on the JTDC's third floor. Children in his unit normally left the pod to attend school in the Nancy B. Jefferson classrooms on the JTDC's second floor, and they would participate in structured programming later in the day.

**Answer**: In response to Paragraph 51(a), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

    b.    When *Empire* arrived to film at JTDC, the children did not leave the pod for school. Instead, teachers came to the pod, though the instruction was much less

effective than instruction in the Nancy B. Jefferson school facilities. Eventually, no teachers came to the pods.

**Answer**: In response to Paragraph 51(b), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

      c.     Otherwise there was a television on the pod, turned on at low volume. Some children watched the television, but in all events, the children on D.G.'s pod were told not to speak, even at conversational levels. At times during the lockdown, the guards attempted to provide the children with "recreation," but this consisted of a red rubber ball that was given to the children in the pod. During the *Empire* filming the children on D.G.'s pod were not permitted to leave the pod for recreation.

**Answer**: In response to Paragraph 51(c), the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

**D.    The Children Housed at JTDC Were Injured and Humiliated by The Lockdowns**

52.    As a proximate result of the *Empire* lockdown, the children housed at the JTDC suffered harm.

**Answer**: The Fox Defendants deny the allegations of Paragraph 52.

53.    The lockdown interrupted and degraded the rehabilitation and structured programming that is designed to address the problems, many of them very serious, that brought the children to the JTDC. This includes the children's education and schooling, which was degraded and often eliminated as a result of the lockdown.

**Answer**: The Fox Defendants deny the allegations of Paragraph 53.

54.     Being placed on lockdown was also humiliating, and it was psychologically damaging to the children in and of itself. Placing children for days on end under the forced idleness that governed in the pods is psychologically and emotionally harmful. This is particularly so for a vulnerable population like the children housed at the JTDC, many of whom come from unstable or broken homes and suffer from psychological trauma and diagnosed psychological impairments.

**Answer**:  The Fox Defendants deny the allegations of Paragraph 54.

55.     As a proximate result of the lockdown, the children housed at the JTDC were also subject to an increased the risk of physical violence. It is well established that depriving children housed in juvenile facilities of meaningful opportunities for recreation and structured programming, and instead forcing them into idleness on their pods, increases the risk of confrontation and violence among the children themselves. The *Empire* lockdowns created just such a hazard for the children at JTDC, increasing risk from attack or altercation with other children there.

**Answer**:  The Fox Defendants deny the allegations of Paragraph 55.

**E.     The Defendants Profited from Locking Down JTDC**

56.     The Defendants profited as a proximate result of the JTDC lockdown.

**Answer**:  The Fox Defendants deny the allegations of Paragraph 56.

57.     The Fox Defendants profited from using the JTDC's incarceration facilities as the primary set for two highly profitable *Empire* episodes. Scenes shot at JTDC were featured prominently in the first two episodes of *Empire*'s second season, accounting for more than a third of the running time in each. These episodes were immensely profitable. Advertisers paid $750,000 per 30-second advertising spot in Episode 1, and $600,000 per 30-second spot in Episode 2. An advertising industry publication called these rates "astonishing."

**Answer**:  The Fox Defendants deny the allegations of the first, second and third sentences of Paragraph 57.  In response to the fourth sentence of Paragraph 57, Fox Broadcasting Company admits that it sold advertising spots related to *Empire*.  In response to the fourth sentence of Paragraph 57, Twentieth Century Fox Television and Twenty-First Century Fox, Inc. state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.  In response to the fifth sentence of Paragraph 57, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

58.     In addition to this revenue, the Fox Defendants realized profits from *Empire* by broadcasting these episodes overseas, as well as licensing the episodes, streaming them over the internet, and selling them for download. In reports to investors covering this period, Defendant Twenty-First Century Fox, Inc. noted that *Empire* was highly profitable and had contributed significantly to the company's revenues.

**Answer**:  The Fox Defendants admit that *Empire* is a popular television show and is available in multiple mediums and markets, including via streaming over the Internet.  The Fox Defendants further admit that advertising sales related to *Empire* have been accretive to Twenty-First Century Fox, Inc.'s earnings.  To the extent not expressly admitted, the Fox Defendants deny the allegations of Paragraph 58.

59.     These profits were the result of joint effort by the Fox Defendants. Defendant Twentieth Century Fox Television was the producer of both episodes featured at the JTDC, which were broadcast by Fox Broadcasting Company; the two companies, which share joint CEOs, work closely together to design programming, including *Empire*, that will maximize Fox's revenue.

Indeed, one reason for *Empire*'s multiple visits to the JTDC was that Fox Broadcasting Company and Twentieth Century Fox Television demanded that certain scenes set at the JTDC be re-filmed. In particular, one of the characters in the *Empire* episodes filmed at the JTDC, played by comedian Chris Rock, had originally been depicted as a cannibal. After they learned about this depiction, executives of the Fox Broadcasting Company, Twentieth Century Fox Television, and/or one or more of the Defendant Does acting as agents for the Fox Defendants, ordered that certain scenes at the JTDC be re-shot to change this depiction. The JTDC was placed on lockdown at least in part to accommodate these demands. Profits from the episodes filmed at the JTDC flowed to Defendant Twenty-First Century Fox, Inc.

> **Answer**: The Fox Defendants deny the allegations of the first, second, third, fourth, fifth and sixth sentences of Paragraph 59. In response to the seventh sentence of Paragraph 59, the Fox Defendants admit that profits from *Empire* have been accretive to Twenty-First Century Fox, Inc.'s earnings, but denies that profits from episodes at the JTDC "flowed."

60.　　Cook County and/or certain Defendant Does profited from *Empire*'s filming as well, receiving rental fees and "reimbursement" revenue connected with the use of the JTDC.

> **Answer**: In response to Paragraph 60, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

## F.　The Final Decision Maker Regarding JTDC's Operation Knew About and Approved of the Lockdown

61.　　From the facts available, Named Plaintiffs allege that the person who exercises final decision-making authority regarding operation of the JTDC, Timothy Evans, who was the Chief Judge of the Circuit Court of Cook County, knew about and approved the filming of *Empire* at the JTDC, and the facility's consequent lockdown.

**Answer**: In response to Paragraph 61, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

62. As described herein, the *Empire* lockdown occurred during a high-profile transition in which the Chief Judge's office took administrative control of the JTDC for the first time. It is simply not plausible that Superintendent Dixon, who had just started his job, would authorize the *Empire* filming and lockdown without first checking with his new boss. And indeed, as described herein, Superintendent Dixon implied in correspondence that Chief Judge Evans was aware of the filming, and had approved of it.

**Answer**: In response to Paragraph 62, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

63. In the summer of 2015, the JTDC was starting a new chapter in its administration. Sixteen years earlier, in 1999, a federal civil rights lawsuit was filed against Cook County, alleging systematic mistreatment and neglect of children housed at the JTDC. *See Doe v. Cook County*, 99-cv-3945 (N.D. Ill.).

**Answer**: In response to Paragraph 63, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

64. The *Doe* parties originally entered into a settlement agreement under which Cook County would improve conditions at the JTDC. In 2007, though, after concluding that the County was not complying with the agreement's terms, the District Court appointed a federal temporary administrator to operate the JTDC and bring it into compliance. On January 1, 2008, a few months

after the federal temporary administrator took over the JTDC, the Illinois Legislature enacted a reform measure providing that the Chief Judge of the Circuit Court of Cook County, rather than the Cook County Board, would appoint the JTDC's administrator and all other necessary personnel, who would then serve at the Chief Judge's pleasure. Notwithstanding this transfer of authority, the JTDC would remain under control of the federal District Court's temporary administrator for the next several years.

> **Answer**:  In response to Paragraph 64, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

65.     Years later, the District Court finally determined that the JTDC could be returned to local control. It ordered that control of the JTDC be transferred from the temporary federal administrator back to local control in 2015.

> **Answer**:  In response to Paragraph 65, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

66.     In preparation for the JTDC's transfer from federal control, Chief Judge Evans appointed Leonard Dixon as the JTDC's new superintendent. This was a high-profile selection. Chief Judge Evans announced his choice with a lengthy press release, and held a joint press conference with Superintendent Dixon to discuss Dixon's appointment and his impending takeover of the JTDC. The transfer was the object of intense media scrutiny, and Chief Judge Evans and Superintendent Dixon gave media interviews on the subject. In these press events and interviews, both men stressed that their priority in reassuming control of the JTDC would be the care for and welfare of the children housed there. They also stressed the need to provide the children housed at

the JTDC with a non-penal environment that featured structured programming, to help the children cope with difficulties in the outside world once they left the facility.

**Answer**: In response to Paragraph 66, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

67. The federal District Court finally transferred administration of the JTDC to local control on May 20, 2015. *Empire* arrived to film four weeks later, on June 21.

**Answer**: In response to Paragraph 67, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

68. It is exceedingly unlikely that Superintendent Dixon would have allowed *Empire* to film there without Chief Judge Evans' approval. Dixon, who has held high-profile positions in the juvenile corrections field for decades, had become the JTDC's superintendent just four weeks earlier when it was placed under Chief Judge Evans' control, for the very first time. And as noted above, Chief Judge Evans had publicly expressed keen interest in this transfer. Under these circumstances, it would be implausible to suggest that an experienced administrator like Superintendent Dixon would have placed the JTDC on lockdown so that a large television crew could use it as a film set, without first checking with his boss.

**Answer**: In response to Paragraph 68, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

69. And indeed, in contemporaneous correspondence Superintendent Dixon implied that he had just such approval from Chief Judge Evans. As part of the *Doe* litigation the District

Court appointed Thomas F. Geraghty, a professor at Northwestern University School of Law, as "next friend" of the *Doe* child class members at the JTDC. (*Doe*, 99-cv-3945, Doc. # 8 (Aug. 4, 1999).) In July 2015, while the JTDC transition was still being monitored by the District Court, (*see id.*, Doc. # 786 (May 15, 2015)), Professor Geraghty wrote to Superintendent Dixon to express concern about reports he had received that the JTDC had been placed on lockdown so that Fox could film *Empire* there. Superintendent Dixon responded by formal letter on July 24, 2015. He acknowledged that *Empire* had filmed at the JTDC, but he claimed that the experience for the children had been positive and that they hadn't been inconvenienced in any way. The letter's closing "courtesy copy" notation indicated that Dixon was sending a copy of the letter to Dr. Beverly Butler, whom the letter noted represented the office of the Chief Judge. Indeed, Dr. Butler was Chief Judge Evans' special assistant for the transition of the JTDC to the Chief Judge's control. It is reasonable to infer that Superintendent Dixon's purpose in copying Dr. Butler on the letter was to imply that Chief Judge Evans was aware of, and had approved of, the *Empire* filming. Crediting Superintendent Dixon this implication, and considering the circumstances discussed above, it is reasonable to infer that Chief Judge Evans, the final decision-maker regarding the operation and administration of the JTDC, knew that the JTDC was being used as a film set for *Empire*, and had approved of it.

> **Answer**:  In response to Paragraph 69, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

70.     Alternatively, if Superintendent Dixon was the person who exercised final decision-making authority regarding operation of the JTDC, he knew of and approved of *Empire*'s

filming at the JTDC and the facility's the consequent lockdown, as described elsewhere in this complaint.

**Answer**:  In response to Paragraph 70, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

## Class Allegations

71.     Named Plaintiffs seek to pursue claims for a class of others similarly situated pursuant to Rule 23(b)(1)(B) and/or Rule 23(b)(3) of the Federal Rules of Civil Procedure.

**Answer**:  In response to Paragraph 71, the Fox Defendants admit that Plaintiffs "seek to pursue claims for a class of others similarly situated," but deny that such claims may proceed on a class basis.

72.     Named Plaintiffs seek to represent a class consisting of all children housed at the JTDC when the facility was placed on lockdown during the filming of *Empire* in the summer of 2015.

**Answer**:  In response to Paragraph 72, the Fox Defendants admit that Plaintiffs "seek to represent a class consisting of all children housed at the JTDC when the facility was placed on lockdown during the filming of *Empire*," but deny that such claims may proceed on a class basis.

73.     ***Numerosity***—The individuals in this class are so numerous that joinder of all members is impractical. There are between 250 and 400 children housed at JTDC during normal operation.

**Answer**:  The Fox Defendants deny the allegations of Paragraph 73.

74. *Commonality*—There are questions of law and fact common to this class. Among those questions are:

- Whether *Empire* was filmed at the JTDC during the summer of 2015.

- Whether the JTDC was placed on lockdown in order to facilitate this filming.

- Whether locking down the children at the JTDC in order to facilitate the filming of a commercial television show is an action reasonably related to a legitimate governmental interest.

- Whether it was a breach of fiduciary duty to place the children housed at the JTDC on lockdown so that *Empire* could be filmed there.

- Whether the Fox Defendants and Defendant Does acted jointly with the JTDC's administrators to place the children housed at the JTDC on lockdown in order to film scenes for *Empire*.

- Whether the Defendants conspired with one another to place the children at the JTDC on lockdown in order to realize a profit from the filming of *Empire*.

- Whether locking down children housed at the JTDC in the manner described in the complaint created an increased risk of physical violence.

- Whether locking down the children housed at the JTDC in order to film *Empire* departed substantially from generally accepted professional standards for the operation of juvenile facilities.

- Whether locking down the children housed at the JTDC in order to film *Empire* violated their Due Process rights under the U.S. Constitution.

- Whether locking down the children housed at the JTDC in order to film *Empire* effected an unreasonable seizure in violation their rights under the U.S. Constitution.

- Whether the profits that the Defendants realized from locking down the JTDC in order to film *Empire* were unjustly obtained.

- Whether the Defendants are subject to disgorgement of the profits they realized by placing the children at the JTDC on lockdown in order to film *Empire* there.

- Whether the Defendants are subject to nominal damages for placing the children housed at the JTDC on lockdown in order to film *Empire* there.

- Whether the Defendants are subject to punitive damages for placing the children housed at the JTDC on lockdown in order to film *Empire* there.

- Whether the Defendants are subject to actual damages for placing the children housed at the JTDC on lockdown in order to film *Empire* there.

**Answer**: The Fox Defendants deny the allegations of Paragraph 74.

75. **Typicality**—Named Plaintiffs' claims are typical of the claims of the Class. Named Plaintiffs were housed at the JTDC when the children at the facility were placed on lockdown in order to facilitate filming for *Empire*. Their treatment in being placed on lockdown is typical of other children housed at JTDC who were placed on lockdown in order to facilitate the filming of *Empire*. Named Plaintiffs seek to prove that the locking down of the children housed at the JTDC in order to facilitate the filming of *Empire* violated the constitutional and state-law rights of the children subjected to the lockdown, and that the Defendants are subject to nominal damages, actual damages, punitive damages, and disgorgement for the profits resulting from this misconduct.

**Answer**: The Fox Defendants deny the allegations of Paragraph 75.

76. **Adequacy**—Named Plaintiffs will fairly and adequately represent the interests of the class. They are represented by skilled counsel with experience in complex civil litigation, class actions, and litigation concerning constitutional and prisoners' rights.

**Answer**: The Fox Defendants deny the allegations of Paragraph 76.

77. **Rule 23(b)(1)(B)**—Named Plaintiffs' claims for accounting and disgorgement, among other remedies, are certifiable under this rule because adjudications with respect to individual members of the class will as a practical matter be dispositive of the interests of the other members of the class.

**Answer**: The Fox Defendants deny the allegations of Paragraph 77.

78. **Rule 23(b)(3)**— Named Plaintiffs' alternative claims for actual damages, among other remedies, are certifiable under this rule because the questions of law and fact common to the

class predominate over any individual issues, and a class action would be superior to other methods for fairly and efficiently adjudicating this controversy.

**Answer**:  The Fox Defendants deny the allegations of Paragraph 78.

### COUNT I – 42 U.S.C. § 1983
**(All Defendants – Due Process)**

79.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**:  In response to Count I, Paragraph 79, the Fox Defendants state that the all claims against the Fox Defendants contained in this count were dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

80.     As described more fully herein, each of the Defendants subjected Named Plaintiffs and similarly situated children at the JTDC to lockdown, which impeded these children from accessing meaningful schooling, rehabilitation, structured programming, recreation, and visits from families, and subjected them to restrictions more severe than those that are commonly imposed in many adult jails. The Defendants did this so that the JTDC's schooling and other facilities on its second and third floors could be used to stage and shoot scenes for the *Empire* television show. The Defendants did this while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment.

**Answer**:  In response to Count I, Paragraph 80, the Fox Defendants state that the all claims against the Fox Defendants contained in this count were dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 80.

81.     The lockdowns and attendant conditions were not imposed for a legitimate governmental purpose, but rather to facilitate the filming of a commercial television show and to realize the profits therefrom. The Fox Defendants acted together with and obtained significant aid from Defendants Cook County, the office of the Chief Judge of the Circuit Court of Cook County, Dixon, and Does 1 through 20 in filming *Empire* for commercial purposes at the JTDC. The Defendants knew that filming *Empire* at the JTDC would result in the lockdowns and attendant restrictions on the children housed there.

> **Answer**:  In response to Count I, Paragraph 81, the Fox Defendants state that the all claims against the Fox Defendants contained in this count were dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 81.

82.     The Defendants knew that the lockdowns violated the children's rights and imposed harm and a risk of harm on the children, yet they carried out the lockdown and filming anyway. This misconduct was undertaken knowingly, intentionally, and/or with reckless indifference to the rights of the children housed at the JTDC.

> **Answer**:  In response to Count I, Paragraph 82, the Fox Defendants state that the all claims against the Fox Defendants contained in this count were dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 82.

83.     The lockdowns and attendant conditions violated the Due Process rights of the children housed at the JTDC.

> **Answer**:  In response to Count I, Paragraph 83, the Fox Defendants state that the all claims against the Fox Defendants contained in this count were dismissed by the Court with

prejudice on October 16, 2017 [Docket No. 110]. To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 83.

84.    As a proximate result of these lockdowns and resulting conditions, the children housed at the JTDC suffered emotional and psychological pain, were deprived of meaningful opportunities for rehabilitation, education, and family visits, and were subject to increased risk of physical violence at the hands of other children at the facility.

**Answer**: In response to Count I, Paragraph 84, the Fox Defendants state that the all claims against the Fox Defendants contained in this count were dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110]. To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 84.

85.    As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described elsewhere in this complaint.

**Answer**: In response to Count I, Paragraph 85, the Fox Defendants state that the all claims against the Fox Defendants contained in this count were dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110]. To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 85.

**COUNT II – 42 U.S.C. § 1983**[3]
**(All Defendants – Unlawful Seizure)**

86.    Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: In response to Count II, Paragraph 86, the Fox Defendants state that this count was dismissed by the Court with prejudice on April 20, 2017 [Docket No. 73]. To the

---

[3] The Court has dismissed this count with prejudice. Plaintiffs re-assert it here for purposes of preservation.

extent that an answer is required, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

87.     Under the JTDC's normal operation, children are permitted, among other things, to attend classes at the Nancy B. Jefferson school, participate in structured programming in appropriate facilities on the JTDC's lower floors that is designed to assist in their rehabilitation, participate in recreation, including outdoor recreation in the third-floor courtyard, and visit with family members in the JTDC's visiting areas at appropriate times and for extended periods.

**Answer**:  In response to Count II, Paragraph 87, the Fox Defendants state that this count was dismissed by the Court with prejudice on April 20, 2017 [Docket No. 73].  To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

88.     As described more fully herein, the Defendants deliberately placed the children housed at the JTDC on lockdown in their cells and pods, physically restraining and limiting their range of movement, and preventing them from leaving the pods and partaking in the numerous educational and rehabilitative activities that they would otherwise be entitled to do. The Defendants did this while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment.

**Answer**:  In response to Count II, Paragraph 88, the Fox Defendants state that this count was dismissed by the Court with prejudice on April 20, 2017 [Docket No. 73].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 88.

89.     The Fox Defendants acted together with and obtained significant aid from Defendants Cook County, the office of the Chief Judge of the Circuit Court of Cook County,

Dixon, and Does 1 through 20 in filming *Empire* for commercial purposes at the JTDC. The Defendants knew that filming *Empire* at the JTDC would result in the lockdowns and attendant restrictions on the children housed there. The Defendants jointly acted to improperly impose these additional restrictions on the children housed at the JTDC in order to facilitate the *Empire* filming. This constituted a new seizure—that is, a seizure different from, and in addition to, the children's existing lawful detainment.

> **Answer**:  In response to Count II, Paragraph 89, the Fox Defendants state that this count was dismissed by the Court with prejudice on April 20, 2017 [Docket No. 73].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 89.

90.     This new seizure was objectively unreasonable. It was not effected pursuant to a legitimate governmental purpose, but rather so that the schooling, rehabilitation, and recreation areas of the JTDC could be used to film scenes for a profitable television show.

> **Answer**:  In response to Count II, Paragraph 90, the Fox Defendants state that this count was dismissed by the Court with prejudice on April 20, 2017 [Docket No. 73].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 90.

91.     As a proximate result of these lockdowns and resulting conditions, the children housed at the JTDC were deprived of their liberty interest to be free from unreasonable restraint. They also suffered emotional and psychological pain, were deprived of meaningful opportunities for rehabilitation, and were subject to increased risk of physical violence at the hands of other children housed at the facility.

> **Answer**:  In response to Count II, Paragraph 91, the Fox Defendants state that this count was dismissed by the Court with prejudice on April 20, 2017 [Docket No. 73].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 91.

92.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described elsewhere in this complaint.

**Answer**:  In response to Count II, Paragraph 92, the Fox Defendants state that this count was dismissed by the Court with prejudice on April 20, 2017 [Docket No. 73].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 92.

**COUNT III – 42 U.S.C. § 1983**
(***Monell* liability – Cook County and/or the
Chief Judge of the Circuit Court of Cook County)**

93.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**:  In response to Count III, Paragraph 93, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

94.     The lockdowns of the JTDC were the result of the official policy and decisions of Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County.

**Answer**:  In response to Count III, Paragraph 94, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

95.     Specifically, Chief Judge Timothy Evans was the person with final policymaking and decision-making authority regarding the administration and operation of the JTDC, on behalf of Defendants Cook County and/or the office of the Chief Judge of the Circuit Court of Cook County. This included the decision of whether to allow the filming of *Empire* at the JTDC.

**Answer**: In response to Count III, Paragraph 95, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required. To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

96.     As set forth in more detail in this complaint, Chief Judge Evans was informed of, knew about, and approved of the filming of *Empire* at the JTDC, and its consequent lockdown. Because Chief Judge Evans was the final policy- and decision-maker regarding the JTDC's administration and operation, Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County may be said to have caused the injuries and unjust enrichment described in this complaint.

**Answer**: In response to Count III, Paragraph 96, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required. To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

### COUNT IV – 42 U.S.C. § 1983
#### (Fox Defendants – Action Under Color of Law)

97.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: In response to Count IV, Paragraph 97, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110]. To the extent that an answer is required, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

98.     The Fox Defendants and their employees and/or agents willfully induced and participated in the lockdown of the children at the JTDC facility, and their actions were inextricably intertwined with those of the named and unknown defendant administrators of the JTDC, acting under color of law, who placed the facility on lockdown and imposed the conditions described herein. The Defendants agreed to engage jointly in an enterprise that only the government could lawfully institute for the mutual benefit of both the public and private Defendants. The JTDC's administrators placed the JTDC on lockdown pursuant to an understanding with (and pursuant to payment by) the Fox Defendants, in order to achieve the Fox Defendants' goals.

> **Answer**:  In response to Count IV, Paragraph 98, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 98.

99.     The Fox Defendants deliberately encouraged the JTDC's administrators to improperly place the JTDC on lockdown during the filming of *Empire*, for commercial benefit. The Fox Defendants reached an agreement with the JTDC's administrators that the JTDC's administrators would prohibit the children housed at the JTDC from using the various schooling and rehabilitative facilities on the JTDC's second and third floors so that the Fox Defendants could use those facilities to stage and film scenes for *Empire*. The contemplated, obvious, and substantially certain result of this agreement was that the children would be confined to their cells and pods on the JTDC's upper floors. It was to accommodate the Fox Defendants' filming needs that the children at JTDC were placed on lockdown at all. Indeed, it was the intention of the Fox Defendants that the children not be allowed to use their designated schooling and rehabilitation facilities so that the Fox Defendants could use those same facilities to film *Empire* instead. In

reaching this agreement with the JTDC's administrators, the Fox Defendants undertook joint action, under color of law, to violate the rights of the children housed at the JTDC. The actions of the Fox Defendants and the JTDC's administrators were also inextricably intertwined in bringing about the violations alleged in this complaint.

**Answer**: In response to Count IV, Paragraph 99, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110]. To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 99.

100. The acts taken in furtherance of the agreement between the Fox Defendants and the JTDC's administrators proximately resulted in the injuries and unjust enrichment described elsewhere in this complaint.

**Answer**: In response to Count IV, Paragraph 100, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110]. To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 100.

## COUNT V – 42 U.S.C. § 1983[4]
### (Fox Defendants – *Respondeat Superior*)

101. Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: In response to Count V, Paragraph 101, the Fox Defendants state that this count was dismissed by the Court with prejudice on April 20, 2017 [Docket No. 73]. To the extent that an answer is required, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

---

[4] The Court has dismissed this count with prejudice. Plaintiffs re-assert it here for purposes of preservation.

102.    While committing the misconduct alleged in the preceding paragraphs, one or more of the Defendant Does 1-20 were employees and/or agents of one or more of the Fox Defendants and were acting within the scope of their employment and/or agency. One or more of the Fox Defendants are liable as principal for all torts constitutional violations committed by their employees and/or agents or on their behalf, and the resulting unjust enrichment.

**Answer**: In response to Count II, Paragraph 102, the Fox Defendants state that this count was dismissed by the Court with prejudice on April 20, 2017 [Docket No. 73]. To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 102.

### COUNT VI – 42 U.S.C. § 1983
### (Conspiracy – All Defendants)

103.    Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: In response to Count VI, Paragraph 103, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110]. To the extent that an answer is required, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

104.    The Defendants reached an agreement among themselves to deprive the children housed at the JTDC of their constitutional rights, as described throughout this complaint.

**Answer**: In response to Count VI, Paragraph 104, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110]. To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 104.

105.    In furtherance of this conspiracy, each of the co-conspirators committed overt, tortious acts and was an otherwise willful participant in joint activity.

**Answer**:  In response to Count VI, Paragraph 105, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 105.

106.    The misconduct described in this count was undertaken intentionally and/or with reckless indifference to the rights of the children housed at the JTDC.

**Answer**:  In response to Count VI, Paragraph 106, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 106.

107.    As a direct and proximate result of the illicit prior agreement referenced above, the rights of the children housed at the JTDC were violated, and they suffered emotional and psychological injuries as well as a wrongfully increased risk of physical injury, as described elsewhere in this complaint.

**Answer**:  In response to Count VI, Paragraph 107, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 107.

108.    As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

**Answer**:  In response to Count VI, Paragraph 108, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the

extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 108.

**COUNT VII – State Law Claim**
**(Breach of Fiduciary Duty – Dixon and Defendant Does)**

109.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**:  In response to Count VII, Paragraph 109, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

110.     Defendants Dixon and one or more of Defendant Does 1-20 were guardians of the children housed at the JTDC.

**Answer**:  In response to Count VII, Paragraph 110, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

111.     In turn, the children housed at the JTDC were the wards of these Defendants.

**Answer**:  In response to Count VII, Paragraph 111, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

112.     As guardians, these defendants had a fiduciary relationship with the children housed at the JTDC.

**Answer**: In response to Count VII, Paragraph 112, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required. To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

113. Among their obligations as guardians, these Defendants were obliged to act in the best interest of the children housed at the JTDC.

**Answer**: In response to Count VII, Paragraph 113, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required. To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

114. As described more fully throughout this complaint, these Defendants breached these fiduciary duties by placing the children housed at JTDC on lockdown for the purposes of facilitating the filming of a profitable television show there.

**Answer**: In response to Count VII, Paragraph 114, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required. To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

115. As a proximate result of this breach of fiduciary duty, the children housed at the JTDC suffered harm and an increased risk of physical injury, as described elsewhere in this complaint.

**Answer**:  In response to Count VII, Paragraph 115, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

116.    As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

**Answer**:  In response to Count VII, Paragraph 116, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

### Count VIII – State Law Claim
**(Inducement of Breach of Fiduciary Duty – Fox Defendants and Defendant Does)**

117.    Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**:   In response to Count VIII, Paragraph 117, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

118.    As set forth more fully herein, Defendants Dixon and one or more of Defendant Does 1-20 were fiduciaries of the children housed at the JTDC.

**Answer**:  In response to Count VIII, Paragraph 118, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.  To the extent that it is alleged that any entity or person related to the Fox Defendants were "fiduciaries of the children housed at the JTDC," those allegations are denied.

119.    As set forth more fully herein, one or more of the Fox Defendants and/or Defendant Does colluded with and/or induced one or more of these fiduciaries to commit the breaches of fiduciary duty described elsewhere in this complaint.

**Answer**:  The Fox Defendants deny the allegations of Count VIII, Paragraph 119.

120.    These Fox Defendants and/or the Defendant Does knowingly participated in this breach, and they knowingly accepted the benefits resulting from this breach.

**Answer**:  The Fox Defendants deny the allegations of Count VIII, Paragraph 120.

121.    Alternatively, the Fox Defendants and/or the Defendant Does knowingly induced this breach, and they knowingly accepted the benefits resulting from this breach.

**Answer**:  The Fox Defendants deny the allegations of Count VIII, Paragraph 121.

122.    As a proximate result of this breach of fiduciary duty, the children housed at the JTDC suffered harm and an increased risk of physical injury, as described elsewhere in this complaint.

**Answer**:  The Fox Defendants deny the allegations of Count VIII, Paragraph 122.

123.    As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

**Answer**:  The Fox Defendants deny the allegations of Count VIII, Paragraph 123.

**COUNT IX – State Law Claim**
**(All Defendants – Intentional Infliction of Emotional Distress)**

124.    Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**:  In response to Count IX, Paragraph 124, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

125.     The actions, omissions, and conduct of the Defendants as set forth in this complaint were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to the children housed at the JTDC.

**Answer**:  In response to Count IX, Paragraph 125, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 125.

126.     Among other things, there is substantial evidence to permit the inference that the Fox Defendants acted in reckless disregard of the probability that the lockdowns would cause severe emotional distress. *Empire*'s filming at the JTDC took place amid rising awareness of mass incarceration and its effects on poor and vulnerable populations, including the psychological damage of incarceration on young people. In the weeks before the filming at the JTDC, this included extensive media coverage of the suicide of a young man who had been jailed as a juvenile in New York.[5]  In light of the prominence of the subject, the Fox Defendants sought to include themes of mass incarceration in the plot of the two *Empire* episodes filmed at the JTDC.[6] It is

---

[5]     *See, e.g.*, Jennifer Gonnerman, Kalief Browder, 1993–2015, The New Yorker, June 7, 2015 http://www.newyorker.com/news/news-desk/kalief-browder-1993-2015; Iyana Robertson, 22-Year-Old Man Held on Rikers Island Without Trial Commits Suicide, Vibe, June 8, 2015 http://www.vibe.com/2015/06/kalief-browder-commits-suicide-at-22; Jim Dwyer, A Life That Frayed as Bail Reform Withered, N.Y. Times, June 9, 2015, https://www.nytimes.com/2015/06/10/nyregion/after-a-shocking-death-a-renewed-plea-for-bail-reform-in-new-york-state.html; Matt Ford, Justice Kennedy Denounces Solitary Confinement, The Atlantic, June 18, 2015 https://www.theatlantic.com/politics/archive/2015/06/kalief-browder-justice-kennedy-solitary-confinement/396320.

[6]     *See, e.g.*, Spencer Kornhaber, Empire's Ambiguous Take on the Social-Justice Movement, The Atlantic, Sept. 23, 2015, https://www.theatlantic.com/entertainment/archive/2015/09/empire-season-2-premiere-mass-incarceration/406921;  Gene Demby, 'Empire' Nods to a Very Different Take on Policing Than We Usually See in Prime Time, NPR – Code Switch, Oct. 2, 2015, http://www.npr.org/sections/codeswitch/2015/10/02/445045620/empire-nods-to-a-very-different-take-on-policing-than-we-usually-see-in-primetim; Jada Uan, Empire's Soapy Take on Social Justice is Also Very

reasonable to infer that in developing these *Empire* episodes the Fox Defendants familiarized themselves with the effects of mass incarceration, including the demographics who gets incarcerated and the psychological vulnerability of people subject to such incarceration. These are established areas of study with ample literature discussing the psychological vulnerability of the population in detention, including studies supporting the statistics Plaintiffs have cited elsewhere in this complaint. Thus, it is further reasonable to infer that the Fox Defendants acted in reckless disregard of the effects of causing the children housed at the JTDC to be placed on lockdown.

> **Answer**:  In response to Count IX, Paragraph 126, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 126.

127.     As a direct and proximate result of the Defendants' actions, the children housed at the JTDC suffered emotional distress as set forth above.

> **Answer**:  In response to Count IX, Paragraph 127, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 127.

128.     As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

> **Answer**:  In response to Count IX, Paragraph 128, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the

---

Nuanced, Vulture, Sept. 24, 2015, http://www.vulture.com/2015/09/empire-black-lives-matter-nuanced-opening.html.

extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 128.

### COUNT X – State Law Claim
### (All Defendants – Civil Conspiracy)

129.    Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: In response to Count X, Paragraph 129, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110]. To the extent that an answer is required, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

130.    As described more fully in the preceding paragraphs, the Defendants reached an agreement among themselves to place the children housed in the JTDC on lockdown so that the facility could be used to film scenes for a profitable television show, and conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

**Answer**: In response to Count X, Paragraph 130, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110]. To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 130.

131.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

**Answer**: In response to Count X, Paragraph 131, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110]. To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 131.

132.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the conditions imposed by or the effects of the lockdowns on the children housed at the JTDC.

**Answer**:  In response to Count X, Paragraph 132, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 132.

133.    As a proximate result of the Defendants' misconduct described in this Count, the children housed at the JTDC suffered harm and the increased risk of physical injury, as described elsewhere in this complaint.

**Answer**:  In response to Count X, Paragraph 133, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 133.

134.    As a further proximate result of this misconduct, the Defendants profited and were unjustly enriched, as described in this complaint.

**Answer**:  In response to Count X, Paragraph 134, the Fox Defendants state that this count was dismissed by the Court with prejudice on October 16, 2017 [Docket No. 110].  To the extent that an answer is required, the Fox Defendants deny the allegations of Paragraph 134.

### COUNT XI – State Law Claim
### (*Respondeat Superior*)

135.    Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**:  In response to Count XI, Paragraph 135, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

136.     While committing the misconduct alleged in the preceding paragraphs, Defendants Dixon and one or more of Defendant Does 1-20 were employees and agents of Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County and acting within the scope of their authority or employment. Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County are liable as principal for all misconduct committed by these employees and agents.

**Answer**:  In response to Count XI, Paragraph 136, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

137.     While committing the misconduct alleged in the preceding paragraphs, one or more of the Fox Defendants and one or more of Defendant Does 1-20 were employees or agents of one or more of the Fox Defendants acting within the scope of their employment. One or more of the Fox Defendants are liable as principal for all torts committed by their employees or agents.

**Answer**:  In response to Count XI, Paragraph 137, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants state that they are without sufficient

knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

**COUNT XII – State Law Claim**
**(Cook County – Indemnification)**

138.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**:  In response to Count XII, Paragraph 138, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

139.     Illinois law provides that public entities are directed to pay any tort judgments for compensatory damages for which employees are liable within the scope of their employment activities.

**Answer**:  In response to Count XII, Paragraph 139, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

140.     Defendants Dixon and one or more of Defendant Does 1-20 were employees and agents of Defendants Cook County and/or the Chief Judge of the Circuit Court of Cook County and acting within the scope of their employment in committing the misconduct described herein.

**Answer**:  In response to Count XII, Paragraph 140, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required.  To the extent that an answer is required, the Fox Defendants state that they are without sufficient

knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

141.     Cook County is obligated by Illinois law to pay any judgment relating to the operation of the JTDC entered against Defendant Chief Judge of the Circuit Court of Cook County, Defendant Dixon, and/or one or more of Defendant Does 1-20.

**Answer**: In response to Count XII, Paragraph 141, the Fox Defendants state that this count is not directed against the Fox Defendants and, therefore, no answer is required. To the extent that an answer is required, the Fox Defendants state that they are without sufficient knowledge or information to form a belief as to the truth of the allegations contain therein and on that basis deny each and every such allegation.

## COUNT XIII
### (Fox Defendants – Unjust Enrichment and/or Accounting)

142.     Each paragraph of this complaint is incorporated as if fully restated here.

**Answer**: In response to Count XIII, Paragraph 142, the Fox Defendants repeat and incorporate their responses to each of the paragraphs of this Complaint.

143.     The administrators of the JTDC placed the children housed at the facility on lockdown, and subjected them to conditions described elsewhere in this complaint, for the purpose of allowing the Fox Defendants to use the children's educational and rehabilitative facilities to record television footage.

**Answer**: The Fox Defendants deny the allegations of Count XIII, Paragraph 143.

144.     In so doing, the JTDC's administrators violated the children's rights, including by (a) breaching their fiduciary duties to the children, (b) subjecting them to punishment in violation of due process, and (c) subjecting them to emotional distress.

**Answer**: The Fox Defendants deny the allegations of Count XIII, Paragraph 144.

145.     The Fox Defendants knew or should have known that the JTDC's administrators were fiduciaries of the children housed at the JTDC.

**Answer**:  The Fox Defendants deny the allegations of Count XIII, Paragraph 145.

146.     The Fox Defendants knew or should have known that the JTDC's administrators were placing the children housed at the JTDC on lockdown and violating their rights, and that the JTDC's administrators did so for the purpose of allowing the Fox Defendants to use the facility to record television footage.

**Answer**:  The Fox Defendants deny the allegations of Count XIII, Paragraph 146.

147.     Despite what the Fox Defendants knew or should have known, the Fox Defendants used the lockdowns to record television footage from for the purpose of realizing profits and benefits for themselves.

**Answer**:  The Fox Defendants deny the allegations of Count XIII, Paragraph 147.

148.     The Fox Defendants used the footage that they were able to record at the JTDC by virtue of the lockdowns to realize profits and benefits in an amount unknown to Plaintiffs, by broadcasting and otherwise monetizing the two *Empire* episodes filmed at the JTDC.

**Answer**:  The Fox Defendants deny the allegations of Count XIII, Paragraph 148.

149.     The Fox Defendants have retained these profits and benefits to the detriment of the children housed at the JTDC, who were placed on lockdown and had their rights violated so that the Fox Defendants could record the filming from which the Fox Defendants' profits and benefits were realized.

**Answer**:  The Fox Defendants deny the allegations of Count XIII, Paragraph 149.

150.    The Fox Defendants' retention of the profits and benefits, realized at the expense of the children who were placed on lockdown at the JTDC, violates fundamental principles of justice, equity, and good conscience.

**Answer**:  The Fox Defendants deny the allegations of Count XIII, Paragraph 150.

151.    Plaintiffs seek an accounting to recover and disgorge the profits and benefits realized by the Fox Defendants from the filming at the JTDC.

**Answer**:  In response to Count XIII, Paragraph 151, the Fox Defendants state that the allegations of this paragraph constitute legal conclusions to which no response is necessary. To the extent a response is necessary, the Fox Defendants deny that Plaintiffs are entitled to the relief they seek in Paragraph 151.

## ANSWER TO PLAINTIFFS' REQUEST FOR RELIEF

Although Plaintiffs' Request for Relief contains no allegations of fact, and as such, does not require an admission or denial, the Fox Defendants deny that Plaintiffs are entitled to any relief, either as requested in their Request for Relief or otherwise.

## JURY DEMAND

Plaintiffs' Jury Demand contains no allegations of fact, and as such, does not require an admission or denial.

## AFFIRMATIVE DEFENSES

The Fox Defendants alleges the following affirmative defenses with respect to the claims alleged in the Complaint, without assuming the burden of proof where the burden of proof rests on Plaintiffs.  The Fox Defendants also hereby give notice that they intend to rely upon such other

and further defenses as may become available or apparent during pretrial proceedings in this action and hereby reserves their right to amend this Answer and assert all such defenses.

## FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred because Plaintiff has failed to state facts sufficient to constitute a claim against the Fox Defendants.

## SECOND AFFIRMATIVE DEFENSE

The injury or damage suffered by Plaintiffs, in any there be, would be adequately compensated in an action at law for damages. Accordingly, Plaintiffs have a complete and adequate remedy at law and are not entitled to seek equitable relief.

## THIRD AFFIRMATIVE DEFENSE

The Fox Defendants are not liable to pay attorney's fees as "the law in Illinois clearly is that absent a statute or contractual agreement 'attorney fees and ordinary expenses and burdens of litigation are not allowable to the successful party.'" *See Kerns v. Engelke*, 76 Ill. 154, 166 (1979).

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs have not suffered any damages or harm whatsoever by reason of the conduct alleged, and that by reason of the foregoing, Plaintiffs lack standing and is otherwise barred from any recovery against the Fox Defendants.

## FIFTH AFFIRMATIVE DEFENSE

The purported claims made by Plaintiffs and members of the purported class on whose behalf they purport to sue are precluded because the alleged conduct would have affected, if anyone, only an insubstantial number of putative class members.

## SIXTH AFFIRMATIVE DEFENSE

The purported class cannot be certified under Federal Rule of Civil Procedure 23 because, *inter alia*, the purported class, class representatives and/or class counsel fail to meet the typicality, commonality, adequacy, superiority, and predominance requirements for class actions.

## SEVENTH AFFIRMATIVE DEFENSE

The purported claims made by Plaintiffs and members of the purported class on whose behalf they purport to sue are precluded or limited because Plaintiffs and members of the purported class on whose behalf they purport to sue failed to exhaust all other available remedies.

## REQUEST FOR RELIEF

WHEREFORE, having fully answered the Complaint, the Fox Defendants respectfully request this Court grant them the following relief:

1. That Plaintiffs take nothing by way of their Complaint;

2. That judgment be entered in favor of the Fox Defendants and against Plaintiff on the Complaint as a whole;

3. That the Fox Defendants be awarded attorneys' fees and costs of suit as may be appropriate under applicable statutes; and

4. That the Court award the Fox Defendants such other relief as the Court may deem appropriate.

Dated: November 13, 2017

Respectfully Submitted,

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing **Fox Defendant's Answer to Second Amended Complaint** was served on all counsel of record pursuant to the Court's ECF system on this 13th day of November, 2017.


<u>/s/ Jeffrey S. Jacobson</u>
Jeffrey S. Jacobson