## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| T.S. *et al.,* <br><br> Plaintiffs. <br><br> v. <br><br> Twentieth Century Fox Television, a division of Twentieth Century Fox Film Corporation et al., <br><br> Defendants. | Case No. 1:16-cv-08303 <br><br> Honorable Judge Amy J. St. Eve |

### FOX DEFENDANTS' MEMORANDUM IN OPPOSITION
### TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY

The Fox Defendants have produced to Plaintiffs all their correspondence with the Cook County Juvenile Temporary Detention Center ("JTDC"); all of their internal correspondence (although there is little of it) related to the filming of scenes from two episodes of *Empire* at the JTDC; their contract documents with Cook County; all documents pertaining to payments to Cook County; and "call sheets" and other documents showing where Twentieth Century Fox Television ("TCFTV") filmed within the JTDC and when, and who was present at the JTDC for filming. Plaintiffs have not complained and cannot complain about these critical and dispositive elements of the Fox Defendants' production.

With nothing substantive about which to challenge the Fox Defendants, Plaintiffs—at four minutes to midnight just two business days before a status hearing—filed a Motion to Compel seeking three forms of unwarranted and extraneous discovery. First, Plaintiffs seek to compel "discovery about discovery," despite already having had the information they seek about the nature of the Fox Defendants' discovery efforts explained to them in detail. Second, Plaintiffs seek "all sources of revenue and the amounts of each such source; and all costs and the amounts of each

source of cost" for two full seasons of *Empire*. As shown below, this is an improper request for multiple reasons. Finally, Plaintiffs seek to compel Twenty-First Century Fox ("21CF"), the ultimate parent company of the subsidiary ("TCFTV") that actually oversaw the filming of *Empire* at the JTDC, to answer a compound, multi-part, and irrelevant interrogatory seeking the identity of "each employee or agent of 21CF or any of its subsidiaries who were assigned to or worked in or as part of the business unit 'Fox Television Group' during the Relevant Period." The subparts purport to require 21CF to identify communications by "subsidiaries" including the two other Fox Defendants, TCFTV and Fox Broadcasting Company ("FBC"), despite the fact that these entities separately have answered and verified similar interrogatories and produced documents.

The Fox Defendants believe their objections to all of these requests are well-founded and asks the Court to sustain their objections. The Fox Defendants also protest the manner in which Plaintiffs have presented these issues for decision. Plaintiffs have known the Fox Defendants' position on these "disputed" discovery issues since January 24, 2018, when the parties held an in-person meet-and-confer session in the courthouse immediately after the last status hearing. Plaintiffs, however, sandbagged the Fox Defendants by waiting until literally the last possible minute on March 2, 2018, to file their motion.

Plaintiffs' tactics are sharp but not unexpected. It was because Plaintiffs telegraphed their desire to seek unbounded discovery that the Fox Defendants sought and received clarification from this Court on October 30, 2017, regarding the elements that Plaintiffs must prove against them. As stated by the Court, Plaintiffs must show that the Fox Defendants "either knowingly participated in or knowingly induced the JTDC officials to breach their fiduciary duty." October 30, 2017 Order, (Docket No. 117). So defined, Plaintiffs' claim can be stated only against TCFTV because no other Fox Defendant had any involvement in the filming of *Empire* scenes at the JTDC.

Further, given the division of management responsibilities within TCFTV, only a small number of people, for a short period of time, had any role in these matters. Plaintiffs' sweeping requests, however, go far beyond this limited group. The Fox Defendants believe that the discovery at issue in Plaintiffs' motion is not proportional to the needs to this case, especially considering the facts uncovered to date which draws the issues at stake into focus.

Defendants collectively have produced tens of thousands of pages of documents to Plaintiffs, *all* of which confirm that Plaintiffs' claims in this case entirely lack merit: No fiduciary breach occurred at the JTDC, and the Fox Defendants had absolutely no control over the conditions of Plaintiffs' detention. The facts presented below bear on the proportionality standard embodied in Rule 26(b)(2)(C) in that they frame the "issue at stake" in comparison to the expense and burden that Plaintiffs are permitted to impose on the Fox Defendants. Notably, although Defendants made clear to Plaintiffs in January that they would bring the state of the discovery record to the Court's attention in opposition to any motion to compel (*see* Dkt. No. 138-1 at 47-49), the best Plaintiffs could do in their motion (at 7) was to state in the most general terms that their "investigation to date has confirmed the bulk of [their] allegations." Not even to bolster their requests for unnecessarily broad and burdensome discovery against the Fox Defendants could Plaintiffs muster a single page from the tens of thousands of documents in the record that supports their claims.

- **Medical Treatment.** It is undisputed now that no filming of *Empire* scenes ever occurred in the JTDC's infirmary. The infirmary always remained open through multiple access points on all filming days, and medical treatment occurred normally. Plaintiffs confirmed in interrogatory responses that neither of the two named plaintiffs had a medical need unmet during filming, and Plaintiffs were unable to name *any* specific detainee whose medical needs allegedly were unmet.

3

- **Visitation.** Visitation occurred on all filming days, generally from 8 AM to 8 PM. When *Empire* scenes were filmed in the JTDC's primary visitation area, the JTDC had an alternative, larger visitation room available on the same floor with equivalent seating capacity. Specifically, the documents show that Plaintiff T.S. received multiple visitors on filming days and Plaintiff Q.B. similarly received a visitor on one of the filming days. The visitor logs, coupled with the JTDC's internal detainee travel records, show no substantial delay occurred in effecting these or other visits.

- **Education.** *Empire* filming occurred over the summer, not during the school year. Plaintiffs admitted in their interrogatory responses that the Nancy B. Jefferson Alternative School at the JTDC was *not* in session on any of the June or August 2015 dates when *Empire* scenes were filmed. Plaintiffs contend that summer school activities occurred on at least one filming date in July 2015, and that lessons were taught in residential pods rather than classrooms. However, (1) the JTDC had far fewer than its maximum number of detainees at that time; (2) the common area of a residential pod is no smaller than a classroom; and (3) detainees have no greater freedom of movement in a classroom than they do in a residential pod and must seek permission to stand or move around regardless of where instruction occurs.

- **Recreation.** On days when *Empire* scenes were filmed in the JTDC's outdoor, concrete-surface recreation area, it is the Fox Defendants' understanding that both of the JTDC's two massive indoor gymnasiums were available to detainees, along with other recreation options.

- **"Chapel."** The room Plaintiffs call the JTDC's "Chapel," which the Fox Defendants used during filming days, is, in fact, a large multi-purpose meeting room. Although it

is the site for religious services on Sundays and religious holidays, the room is not available for religious use on other days.

Defendants have offered Plaintiffs' counsel a tour of the JTDC so they can understand the implausibility of their allegations. Plaintiffs' counsel have not accepted this offer.

In denying Defendants' motions to dismiss, the Court obviously was troubled by Plaintiffs' claims respecting medical treatment. Those claims, however, already have been so conclusively disproved in discovery that Plaintiffs likely cannot even mention them again to this Court without violating Rule 11. Discovery has disproved Plaintiffs' other allegations, too, but none of those allegations (of single curtailed family visits, etc.) rose to the level of civil rights violations even had they occurred, which they did not. And, critically, the documents produced to Plaintiffs all showed that JTDC officials told TCFTV where it could film and when. This record demonstrates that the Fox Defendants had no say whatsoever in the condition of Plaintiffs' detention.

Plaintiffs' motion to compel discovery from the Fox Defendants—and, in particular, the burden of any discovery step requested by Plaintiffs—must be viewed through this prism: Literally *nothing* in a year-long discovery record suggests that a breach of duty occurred or that any Fox Defendant knowingly induced or participated in such a violation. Plaintiffs' burdensome demands for documents that have nothing to do with the conditions of their detention or Fox's involvement in those conditions should fail.

1.      Plaintiffs' Requests For "Discovery About Discovery."

Sixteen months ago, on November 7, 2016, the Court ordered the Fox Defendants to identify all employees or contractors of theirs who (a) scouted the JTDC as a location; (b) made decisions about whether *Empire* should be filmed at the JTDC instead of somewhere else; (c) worked out with the government defendants what parts of the facility Fox could use; (d) negotiated

the Location Agreement between Cook County and the Fox Defendants; or (e) coordinated production and filming within the JTDC. The Fox Defendants identified 11 such people and Plaintiffs served preservation subpoenas on them. These subpoenas were not even necessary; the Fox Defendants represented to the Court that they had taken appropriate preservation steps immediately after they waived service of the original complaint on August 31, 2016.

The Fox Defendants have gathered and produced to Plaintiffs all relevant documents that, at the time of preservation, were in the possession, custody, or control of all current employees and contractors of TCFTV—the entity that filmed *Empire* scenes at the JTDC—who had received preservation subpoenas. The process of gathering documents from two *former* contractors has taken slightly longer, but will be completed shortly, and the Fox Defendants expect that any documents from these former contractors would duplicate, and not supplement, the Fox Defendants' prior production. The Fox Defendants have confirmed to Plaintiffs that, of the Fox Defendants, only TCFTV had any involvement in the decision to film at the JTDC, communications with Cook County, or the logistics of filming.

Plaintiffs' assertion in their motion that the Fox Defendants "refused to answer" their questions about discovery is simply false. The Fox Defendants explained to Plaintiffs during their in-person meet-and-confer on January 24 that none of the people in question were Fox employees or had email accounts to which the Fox Defendants have access. *See, e.g.,* Dkt. No. 138-1 at 58-60 (post-conferral email from Fox Defendants' counsel). The Fox Defendants further explained that with the aid of and pursuant to instructions from counsel, these individuals searched their personal email accounts for potentially relevant documents. Because the subject (filming at the JTDC) and the relevant time period (spring and summer of 2015) are narrow, search terms were neither used nor required during this process.

Plaintiffs complain about a dearth of internal correspondence, but this is readily explained. The relevant contractors did not principally communicate in writing with each other regarding the decision to film at the JTDC. TCFTV contractors chose the JTDC because they needed a prison-like location in the Chicago area; the JTDC clearly was the better of two available options, and the appropriate contractors scouted it in person. TCFTV accepted a take-it-or-leave-it contract presented by Cook County, JTDC officials told TCFTV when and where it could film, and TCFTV followed those instructions. The Fox Defendants have produced to Plaintiffs daily "call sheets" showing who was present at the JTDC and exactly where and with whom each scene was filmed, along with all communications with the JTDC and all internal emails regarding filming. As further explained to Plaintiffs' counsel on January 24, the filming of a television show involves many oral discussions and the use of contractors who are not subject to blanket document retention policies and have no reason to keep materials related to specific episodes after filming is complete. That said, and as detailed above, at the outset of this case the Fox Defendants preserved and subsequently produced the relevant documents. Other than confirming that two former contractors have no documents beyond what the Fox Defendants already have produced, the Fox Defendants' production of these documents is complete.

No further "discovery about discovery" should be required. Indeed, the Seventh Circuit's guidelines make clear that this entire subject should not be approached unadvisedly. *See*, Seventh Cir. Elec. Discovery Comm., Proposed Standing Order Relating to the Discovery of ESI, Principle 2.04(b). To the extent Plaintiffs have questions about documents, the best way for them to explore those issues is at depositions of Fox personnel, if Plaintiffs choose to take those depositions. The Fox Defendants have suggested to Plaintiffs that they should depose government employees first because, logically, questions regarding whether a breach of fiduciary duty actually occurred should

precede questions regarding an alleged inducement of that breach. Yet, nearly a year after the Court partially denied the governmental defendants' motion to dismiss, Plaintiffs have yet to depose or even notice the deposition of a single government employee.

### 2. Discovery Related to Advertising Revenue.

The Fox Defendants have not attempted to shield from discovery *any* matter pertaining to their activities at the JTDC. As the Court knows, the Fox Defendants' purpose at the JTDC was to film a few scenes aired in the first two episodes of *Empire*'s second season. Plaintiffs, however, contend that because they have pleaded a claim for "unjust enrichment," they may demand "all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost" for the 30 episodes constituting the entire first two seasons of *Empire*. Plaintiffs' motion did not cite a single case to support their unbridled claim for this information.

This Court should restrain these discovery requests in a manner consistent with the applicable case law and discovery needs at this stage in the proceedings. Very recently, the Seventh Circuit confirmed the circumstances in which monies can be claimed through an "unjust enrichment" theory:

> In situations like this case, where a plaintiff seeks a benefit that was transferred to a defendant by a third party, a defendant's retention of the benefit is unjust when "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant.

*Banco Panamericano, Inc. v. City of Peoria, Illinois*, 880 F.3d 329, 333 (7th Cir. 2018), *quoting HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). Plaintiffs here have not contended and cannot contend that advertising revenues related to *Empire* "should have been [paid]" to them rather than to the Fox Defendants or that they possess "a better claim"

than the Fox Defendants to these revenues. Plaintiffs appear only to be claiming unjust enrichment pursuant to the "wrongful conduct" prong of the test. Case law, however, does not permit them to seek the Fox Defendants' advertising revenues as a measure of those damages.

In *Sotelo v. DirectRevenue, LLC*, 384 F. Supp.2d 1219 (N.D. Ill. 2005), a class action plaintiff alleged that the defendant, an internet marketing company, caused "spyware" to be downloaded onto his personal computer, and sued on several theories, including unjust enrichment. *Id.* at 1222. With respect to unjust enrichment, the plaintiff claimed that the defendant had "turned his computer into an 'advertising machine'" and thereby earned advertising revenue "that it was not entitled to receive." *Id.* at 1234. On the defendants' motion to dismiss, the court allowed several of the plaintiff's claims to proceed, but dismissed his unjust enrichment claim because— allegations of "wrongful conduct" notwithstanding—the plaintiff himself had no 'claim' or 'entitlement' to the [advertising] monies." *Id.*, quoting *Association Benefit Serv., Inc. v. Advanceps Holding Corp.*, No. 04 C 3271, 2004 WL 2101928, at *3 (N.D. Ill. Sept. 21, 2004) (similarly dismissing unjust enrichment claims where plaintiff had no alleged entitlement to the specific monies it claimed as damages).

*Sotelo* is far from the only case so holding. Where a plaintiff pursues an unjust enrichment claim on a theory of "wrongful conduct" by the defendant, the law is clear that plaintiff "must show some entitlement to the benefit at issue allegedly enjoyed by the defendant." *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, 194 F. Supp.3d 706, 726 (N.D. Ill. 2016). "There is no authority for applying '*HPI*'s wrongful conduct exception where a plaintiff is attempting to recover money to which it is not entitled.'" *Cement-Lock v. Gas Technology Inst.*, 523 F. Supp.2d 827, 863 (N.D. Ill. 2007), quoting *Asch v. Teller, Levit & Silvertrust, P.C.*, No. 00 C 3290, 2003 WL 22232801, at *7 (N.D. Ill. Sept. 26, 2003).

In *Alarm Detection Sys.*, the plaintiff, a fire alarm monitoring company, claimed that government-run "fire protection districts" colluded with certain other alarm monitoring companies to charge unauthorized monitoring fees and control the market to the plaintiff's detriment. On cross-motions for summary judgment, the court—as this Court did—kept alive the plaintiff's unjust enrichment claim to the extent it "rest[ed] on the same improper conduct alleged in" the plaintiff's surviving antitrust and Constitutional claims. The court, however, judged in the *defendants'* favor "[t]o the extent that Alarm Detection seeks to recoup the fees Defendants have collected." *Alarm Detection Sys.*, 194 F. Supp.3d at 726. The plaintiff contended that even if the allegedly unauthorized fees the defendants charged enriched them "wrongly," those fees were not an appropriate measure of the plaintiffs' alleged damages because the plaintiff itself had no "entitlement" to the fees in question. *Id.*

Essentially the same occurred in *Asch.* There, a government agency contracted with a law firm to collect delinquent student loans and compensated that firm with 18% of the money it collected. For five years, the law firm allegedly did not "apply every payment it received from debtors to a particular debtor's account on the actual date of receipt," meaning that debtors accrued interest on debt they no longer owed. *Asch*, 2003 WL 22232801, at *1. Among the claims the plaintiff debtor brought against the law firm was one for unjust enrichment, claiming that the law firm should disgorge to him and other debtors the 18% fees it earned due to the firm's allegedly "wrongful conduct." *Id.* at *7. The court ruled in the defendant's favor because the plaintiffs were not persons to whom the fees might have been paid instead. *See id.*

Finally, *Cement-Lock* was a derivative action brought by inventors of a technology against a licensee company they alleged devalued that property. The court allowed several of the plaintiffs' claims to proceed, but *not* their unjust enrichment claim, which was premised upon

10

"increased salaries and bonuses" the defendants received "as a cut of the profits generated" by the alleged fraud. *Cement-Lock*, 523 F. Supp.2d at 863. "[O]nly a party with entitlement" to monies in question "would be entitled to recover them under an unjust enrichment theory," and the plaintiffs would not have received those salaries and bonuses if the defendants had not. *Id.*

Although *Alarm Detection Sys.*, *Asch*, and *Cement-Lock*—but not *Sotelo* or *Association Benefit Serv.*—were decided in the context of summary judgment, all five cases demonstrate that because Plaintiffs here have no possible entitlement to advertising revenues, they cannot recover those revenues as a measure of damages in a claim for unjust enrichment. The amount of money the Fox Defendants were paid for advertising on *Empire* therefore has no relevance to this case, and Plaintiffs therefore have no legal basis on which to seek discovery on those matters.

Plaintiffs' requests for advertising revenue information are improper for other reasons, too.

*First*, even if advertising revenues constituted an appropriate measure of damages—and they do not—this information still would pertain *only* to damages, not to the merits. Plaintiffs' request therefore is premature. Discovery related to damages only should be deferred until such time as Plaintiffs have advanced their case on its non-existent merits.

*Second*, the only Fox Defendant that had any involvement in the decision to film *Empire* scenes at the JTDC or the logistics of filming was TCFTV, and TCFTV did not sell advertising or receive advertising revenues on the relevant *Empire* episodes. Even if Plaintiffs ultimately establish TCFTV's liability to them, which they cannot and will not, advertising revenues will not be implicated by that finding.

*Third*, Plaintiffs' requests are wildly overbroad and unduly burdensome. TCFTV filmed at the JTDC just a few scenes of two episodes from *Empire*'s second season. But Plaintiffs are seeking *all* documents pertaining to advertising on *Empire* for all episodes from both of the show's

first two seasons.  Plaintiffs have made no attempt to establish that the Fox Defendants earned a single penny more in advertising revenues for any episode *because* these scenes were filmed at the JTDC as opposed to on a soundstage or some other location.  Moreover, responding to Plaintiffs' discovery requests is not just a matter of producing some existing "binder."  Gathering the information Plaintiffs have requested will require significant effort by Fox entities other than TCFTV, against which Plaintiffs have no possible claim.

The Fox Defendants have produced to Plaintiffs all documents in their possession regarding the monies they paid to film at the JTDC.  This includes the lease fees and all wage and cost reimbursements required by the parties' Location Agreement.  Nothing else should be required at this stage of the litigation.

### 3.     Information About Irrelevant Fox Entities.

The Fox Defendants repeatedly have affirmed to Plaintiffs orally, through verified interrogatory answers, and in their production of documents, that TCFTV was the only entity that had any involvement with filming *Empire* scenes at the JTDC.  The Fox Defendants have confirmed specifically that 21CF and FBC had no such involvement.  Despite these assurances, Plaintiffs are demanding information from 21CF, FBC, and TCFTV  about "each employee or agent" of theirs who "were assigned to or worked in or as part of the business unit 'Fox Television Group.'"  Plaintiffs contend they need this information "to understand the collaboration between [Fox Broadcasting Company] and TCFTV through Fox Television Group, as that collaboration relates to the liability of FBC for the filming of *Empire* at the JTDC."  Mot. at 12.  But whether these entities shared *unrelated* employees is irrelevant; what is important is that none of the people who were involved with filming at the JTDC worked for any entity other than TCFTV.

21CF is unable to provide and verify discovery responses regarding communications by or between other corporate defendants. As demonstrated by the documents and the Fox Defendants' discovery responses, TCFTV was the entity solely responsible for the filming to the two *Empire* episodes at the JTDC. In addition, the interrogatories request for communications related to FBC and TCFTV is redundant of interrogatories already answered by those entities and the relevant documents produced.

<u>CONCLUSION</u>

For the reasons stated above, the Fox Defendants request that the Court deny the relief sought in Plaintiffs' Motion to Compel.

Date: March 5, 2018                    Respectfully Submitted,

                                       /s/Jeffrey S. Jacobson

                                       Jeffrey S. Jacobson
                                       Kelley Drye & Warren LLP
                                       101 Park Ave
                                       New York, NY 10178
                                       212-808-5145
                                       jjacobson@kelleydrye.com

                                       Matthew C. Luzadder
                                       Catherine E. James
                                       Kelley Drye & Warren LLP
                                       333 West Wacker Drive
                                       Suite 2600
                                       Chicago, IL 60606
                                       (312) 857-7070
                                       mluzadder@kelleydrye.com
                                       cjames@kelleydrye.com

                                       *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing Defendant Twentieth Century

Fox Television's **MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

**DISCOVERY FROM FOX DEFENDANTS** were served on all counsel of record pursuant to the

Court's ECF system on this 5th day of March, 2018.

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for Defendants*