# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| T.S. *et al.,* | |
| Plaintiffs, | Case No. 1:16-cv-08303 |
| v. | Hon. Amy J. St. Eve |
| Twentieth Century Fox Television *et al.,* | |
| Defendants. | |

**PLAINTIFFS' FIRST SET OF INTERROGATORIES TO**
**TWENTIETH CENTURY FOX TELEVISION**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs request

that Defendant Twentieth Century Fox Television, a division of Twentieth Century Fox Film

Corporation ("TCFTV") answer the following interrogatories:

**DEFINITIONS AND INSTRUCTIONS**

1. "You" means TCFTV and its officers, employees, and agents.

2. "FBC" means Fox Broadcasting Company.

3. "21CF" means Twenty-First Century Fox, Inc.

4. "JTDC" means the Cook County Juvenile Temporary Detention Center.

5. The term "document" is defined to have the same meaning and to be equal in scope to the terms "documents" and "electronically stored information" as used in Federal Rule of Civil Procedure 34(a). Documents include communications.

6. "Communication" and "communications" means any and all inquiries, discussions, conferences, conversations, negotiations, agreements, meetings, interviews, telephone conversations, letters correspondence, notes, telegrams, facsimiles, electronic mail (email), ESI, memoranda, documents, writings, or other forms of communications, including but not limited to oral, written, and telephonic communications.

7. The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" shall mean "including without limitation."

1

8. "Date" shall mean the exact date, month and year, if ascertainable or, if not, the best approximation of the date (based upon relationship with other events).

9. "Agent" shall mean any agent, employee, officer, director, attorney, independent contractor or any other person acting at the direction of or on behalf of another.

10. "Person" shall mean any individual, corporation, proprietorship, partnership, trust, association or any other entity.

11. The word "identify," when used in reference to a document (including electronically stored information), means and includes the name and address of the custodian of the document, the location of the document, and a general description of the document, including (1) the type of document (e.g., letter or memorandum) and, if electronically stored information, the software application used to create it (e.g., MS Word or MS Excel Spreadsheet); (2) the general subject matter of the document or electronically stored information; (3) the date of the document or electronically stored information; (4) the author of the document or electronically stored information; (5) the addressee of the document or electronically stored information; and (6) the relationship of the author and addressee to each other.

12. The word "identify," when used in reference to a natural person, means and includes the person's full name, position and/or title, and present contact information. Stating that a person can be contacted through counsel is not sufficient.

13. These interrogatories are continuing in nature and refer to all discovery, including discovery yet to be served. You are reminded to supplement your responses to these requests and your documents produced in response to these requests in accordance with Rule 26 of the Federal Rules of Civil Procedure.

## INTERROGATORIES

1. State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.

2. State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses. Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

3. List the documents, ESI, tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes

listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control.

4.      Describe in detail the nature of the search you have performed to discover and/or produce documents in this case.  Include in your answer a description of all locations, whether electronic or physical, that have been searched, and all custodians whose documents have been searched.  If you have used search terms or other parameters to search ESI, provide those terms and parameters.

5.      Identify each employee or agent of TCFTV, FBC, or 21CF who entered the JTDC for any purpose relating to the filming of *Empire* there.  For each such person, identify:

   a.      The person's name;

   b.      The person's last known contact information, including address and phone number;

   c.      The person's employer;

   d.      Each person or entity on whose behalf or at whose direction the person entered the JTDC;

   e.      The person's job title;

   f.      Each date and time that the person entered the JTDC;

   g.      Each place within the JTDC that the person travelled; and

   h.      The nature of the work or tasks the person performed within the JTDC.


6.      Identify each person who provided services to TCFTV, FBC, or 21CF, directly or indirectly, relating to the filming of *Empire* at the JTDC.  For each such person, identify:

   a.      The person's name;

   b.      The person's last known contact information, including address and phone number;

   c.      The person's employer;

   d.      Each person or entity on whose behalf or at whose direction the person provided the service;

   e.      The person's job title;

   f.      Each date and time that the person entered the JTDC if any;

   g.      Each place within the JTDC, if any, that the person travelled; and

   h.      The nature of the services that the person provided.

3

7.     Identify all communications to or from any employee or agent of TCFTV, FBC, or 21CF relating to the filming of *Empire* at the JTDC, including but not limited to the effect of the filming on the JTDC's operations and the detainees housed there.  For each such communication, identify:

    a.     Each person who participated in the communication;

    b.     The employer of each such person or the entity for whom each such person acted as an agent;

    c.     The time and date of the communication;

    d.     Any documents generated by or relating to the communication; and

    e.     A fair description of the nature and substance of the communication.

8.     With respect to Section 1(D) of your Location Agreement with Cook County (ECF No. 51-2), identify:

    a.     All information, including but not limited to documents, relied upon or pursuant to which TCFTV's "acknowledge[d] that the [JTDC] is a functioning Municipal Building, operating as a residential facility for juveniles.";

    b.     Every act that TCFTV and its employees or agents took (or refrained from taking) in performance of Section 1(D); and

    c.     All your communications with any person regarding the inclusion of Section 1(D) in the Location Agreement.

9.     With respect to income realized by TCFTV in relation to *Empire*, identify with specificity:

    a.     The gross revenues, net revenues, and profits you have received from Season 1 of *Empire*;

    b.     The gross revenues, net revenues, and profits you have received from Season 2 of *Empire*;

    c.     For *Empire* Season 2, Episode 1, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost; and

    d.     For *Empire* Season 2 Episode 2, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost

10.     For each of your defenses, state the facts relevant to it and the legal theories upon which it is based.

4

November 3, 2017                              /s/ Stephen H. Weil

                                             Stephen H. Weil – steve@weilchardon.com
                                             Alexis G. Chardon – ali@weilchardon.com
                                             Weil & Chardon LLC
                                             333 S. Wabash Ave., Suite 2700
                                             (312) 585-7404

                                             *Attorneys for Named Plaintiffs T.S. and Q.B.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2017, a true and correct copy of the foregoing was served to the following via email:

Allyson West, allyson.west@cookcountyil.gov

Anthony Zecchin, anthony.zecchin@cookcountyil.gov

T. Andrew Horvat, THorvat@atg.state.il.us

Jeffrey Jacobsen, jjacobson@kelleydrye.com

Matthew C. Luzadder, mluzadder@kelleydrye.com

Catherine James, cjames@kelleydrye.com

Janine N. Fletcher, jfletcher@kelleydrye.com

/s/ Stephen H. Weil

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

T.S. *et al.,*

        Plaintiffs,

  v.

Twentieth Century Fox Television *et al.,*

        Defendants.

Case No. 1:16-cv-08303

Hon. Amy J. St. Eve

## PLAINTIFFS' FIRST SET OF INTERROGATORIES TO FOX BROADCASTING COMPANY

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs request

that Defendant Fox Broadcasting Company ("FBC") answer the following interrogatories:

### DEFINITIONS AND INSTRUCTIONS

1.     "You" means FBC and its officers, employees, and agents.

2.     "TCFTV" means Twentieth Century Fox Television, a division of Twentieth Century Fox Film Corporation.

3.     "21st Fox" means Twenty-First Century Fox, Inc.

4.     "JTDC" means the Cook County Juvenile Temporary Detention Center.

5.     The term "document" is defined to have the same meaning and to be equal in scope to the terms "documents" and "electronically stored information" as used in Federal Rule of Civil Procedure 34(a). Documents include communications.

6.     "Communication" and "communications" means any and all inquiries, discussions, conferences, conversations, negotiations, agreements, meetings, interviews, telephone conversations, letters correspondence, notes, telegrams, facsimiles, electronic mail (email), ESI, memoranda, documents, writings, or other forms of communications, including but not limited to oral, written, and telephonic communications.

7.     The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" shall mean "including without limitation."

1

8.      "Date" shall mean the exact date, month and year, if ascertainable or, if not, the best approximation of the date (based upon relationship with other events).

9.      "Agent" shall mean any agent, employee, officer, director, attorney, independent contractor or any other person acting at the direction of or on behalf of another.

10.     "Person" shall mean any individual, corporation, proprietorship, partnership, trust, association or any other entity.

11.     The word "identify," when used in reference to a document (including electronically stored information), means and includes the name and address of the custodian of the document, the location of the document, and a general description of the document, including (1) the type of document (e.g., letter or memorandum) and, if electronically stored information, the software application used to create it (e.g., MS Word or MS Excel Spreadsheet); (2) the general subject matter of the document or electronically stored information; (3) the date of the document or electronically stored information; (4) the author of the document or electronically stored information; (5) the addressee of the document or electronically stored information; and (6) the relationship of the author and addressee to each other.

12.     The word "identify," when used in reference to a natural person, means and includes the person's full name, position and/or title, and present contact information. Stating that a person can be contacted through counsel is not sufficient.

13.     These interrogatories are continuing in nature and refer to all discovery, including discovery yet to be served.  You are reminded to supplement your responses to these requests and your documents produced in response to these requests in accordance with Rule 26 of the Federal Rules of Civil Procedure.

## <u>INTERROGATORIES</u>

1.      State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.

2.      State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses.  Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

3.      List the documents, ESI, tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes

listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control.

4.      Describe in detail the nature of the search you have performed to discover and/or produce documents in this case.  Include in your answer a description of all locations, whether electronic or physical, that have been searched, and all custodians whose documents have been searched.  If you have used search terms or other parameters to search ESI, provide those terms and parameters.

5.      Identify each employee or agent of TCFTV, FBC, or 21st Fox who entered the JTDC for any purpose relating to the filming of *Empire* there.  For each such person, identify:

    a.      The person's name;

    b.      The person's last known contact information, including address and phone number;

    c.      The person's employer;

    d.      Each person or entity on whose behalf or at whose direction the person entered the JTDC;

    e.      The person's job title;

    f.      Each date and time that the person entered the JTDC;

    g.      Each place within the JTDC that the person travelled; and

    h.      The nature of the work or tasks the person performed within the JTDC.

6.      Identify each person who provided services to TCFTV, FBC, or 21st Fox, directly or indirectly, relating to the filming of *Empire* at the JTDC.  For each such person, identify:

    a.      The person's name;

    b.      The person's last known contact information, including address and phone number;

    c.      The person's employer;

    d.      Each person or entity on whose behalf or at whose direction the person provided the service;

    e.      The person's job title;

    f.      Each date and time that the person entered the JTDC if any;

    g.      Each place within the JTDC, if any, that the person travelled; and

    h.      The nature of the services that the person provided.

7.   Identify all communications to or from any employee or agent of TCFTV, FBC, or 21st Fox relating to the filming of *Empire* at the JTDC, including but not limited to the effect of the filming on the JTDC's operations and the detainees housed there.  For each such communication, identify:

   a.   Each person who participated in the communication;

   b.   The time and date of the communication;

   c.   Any documents generated by or relating to the communication; and

   d.   A fair description of the nature and substance of the communication.

8.   With respect to income realized by FBC in relation to *Empire*, identify with specificity:

   a.   The gross revenues, net revenues, and profits you have received from Season 1 of *Empire*;

   b.   The gross revenues, net revenues, and profits you have received from Season 2 of *Empire*;

   c.   For *Empire* Season 2, Episode 1, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost; and

   d.   For *Empire* Season 2 Episode 2, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost

9.   For each of your defenses, state the facts relevant to it and the legal theories upon which it is based.


November 3, 2017                          /s/ Stephen H. Weil

                                          Stephen H. Weil – steve@weilchardon.com
                                          Alexis G. Chardon – ali@weilchardon.com
                                          Weil & Chardon LLC
                                          333 S. Wabash Ave., Suite 2700
                                          (312) 585-7404

                                          *Attorneys for Named Plaintiffs T.S. and Q.B.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2017, a true and correct copy of the foregoing was served to the following via email:

Allyson West, allyson.west@cookcountyil.gov

Anthony Zecchin, anthony.zecchin@cookcountyil.gov

T. Andrew Horvat, THorvat@atg.state.il.us

Jeffrey Jacobsen, jjacobson@kelleydrye.com

Matthew C. Luzadder, mluzadder@kelleydrye.com

Catherine James, cjames@kelleydrye.com

Janine N. Fletcher, jfletcher@kelleydrye.com

/s/ Stephen H. Weil

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

T.S. *et al.,*

       Plaintiffs,

  v.

Twentieth Century Fox Television *et al.,*

       Defendants.

Case No. 1:16-cv-08303

Hon. Amy J. St. Eve

## PLAINTIFFS' FIRST SET OF INTERROGATORIES TO TWENTY-FIRST CENTURY FOX, INC.

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs request that Defendant Twenty-First Century Fox, Inc. ("21CF") answer the following interrogatories:

### DEFINITIONS AND INSTRUCTIONS

1.    "You" means 21CF and its officers, employees, agents, and subsidiaries.

2.    "FBC" means Fox Broadcasting Company.

3.    "TCFTV" means Twentieth Century Fox Television, a division of Twentieth Century Fox Film Corporation.

4.    "JTDC" means the Cook County Juvenile Temporary Detention Center.

5.    The term "document" is defined to have the same meaning and to be equal in scope to the terms "documents" and "electronically stored information" as used in Federal Rule of Civil Procedure 34(a).  Documents include communications.

6.    "Communication" and "communications" means any and all inquiries, discussions, conferences, conversations, negotiations, agreements, meetings, interviews, telephone conversations, letters correspondence, notes, telegrams, facsimiles, electronic mail (email), ESI, memoranda, documents, writings, or other forms of communications, including but not limited to oral, written, and telephonic communications.

7.    "Relevant Period" means May 22, 2015 to September 26, 2015.

1

8.      The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" shall mean "including without limitation."

9.      "Date" shall mean the exact date, month and year, if ascertainable or, if not, the best approximation of the date (based upon relationship with other events).

10.     "Agent" shall mean any agent, employee, officer, director, attorney, independent contractor or any other person acting at the direction of or on behalf of another.

11.     "Person" shall mean any individual, corporation, proprietorship, partnership, trust, association or any other entity.

12.     The word "identify," when used in reference to a document (including electronically stored information), means and includes the name and address of the custodian of the document, the location of the document, and a general description of the document, including (1) the type of document (e.g., letter or memorandum) and, if electronically stored information, the software application used to create it (e.g., MS Word or MS Excel Spreadsheet); (2) the general subject matter of the document or electronically stored information; (3) the date of the document or electronically stored information; (4) the author of the document or electronically stored information; (5) the addressee of the document or electronically stored information; and (6) the relationship of the author and addressee to each other.

13.     The word "identify," when used in reference to a natural person, means and includes the person's full name, position and/or title, and present contact information. Stating that a person can be contacted through counsel is not sufficient.

14.     These interrogatories are continuing in nature and refer to all discovery, including discovery yet to be served.  You are reminded to supplement your responses to these requests and your documents produced in response to these requests in accordance with Rule 26 of the Federal Rules of Civil Procedure.

## **INTERROGATORIES**

1.      State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.

2.      State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses.  Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

3.      List the documents, ESI, tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control.

4.      Describe in detail the nature of the search you have performed to discover and/or produce documents in this case. Include in your answer a description of all locations, whether electronic or physical, that have been searched, and all custodians whose documents have been searched. If you have used search terms or other parameters to search ESI, provide those terms and parameters.

5.      Identify each employee or agent of TCFTV, FBC, or 21CF who entered the JTDC for any purpose relating to the filming of *Empire* there. For each such person, identify:

    a.      The person's name;

    b.      The person's last known contact information, including address and phone number;

    c.      The person's employer;

    d.      Each person or entity on whose behalf or at whose direction the person entered the JTDC;

    e.      The person's job title;

    f.      Each date and time that the person entered the JTDC;

    g.      Each place within the JTDC that the person travelled; and

    h.      The nature of the work or tasks the person performed within the JTDC.

6.      Identify each person who provided services to TCFTV, FBC, or 21CF, directly or indirectly, relating to the filming of *Empire* at the JTDC. For each such person, identify:

    a.      The person's name;

    b.      The person's last known contact information, including address and phone number;

    c.      The person's employer;

    d.      Each person or entity on whose behalf or at whose direction the person provided the service;

    e.      The person's job title;

    f.      Each date and time that the person entered the JTDC if any;

    g.      Each place within the JTDC, if any, that the person travelled; and

3

       h.     The nature of the services that the person provided.

7.     Identify all communications to or from any employee or agent of TCFTV, FBC, or 21CF relating to the filming of *Empire* at the JTDC, including but not limited to the effect of the filming on the JTDC's operations and the detainees housed there. For each such communication, identify:

       a.     Each person who participated in the communication;

       b.     The employer of each such person or the entity for whom each such person acted as an agent;

       c.     The time and date of the communication;

       d.     Any documents generated by or relating to the communication; and

       e.     A fair description of the nature and substance of the communication.

8.     With respect to income realized by 21CF or any of its subsidiaries in relation to *Empire*, identify with specificity for each such entity:

       a.     The gross revenues, net revenues, and profits that received from Season 1 of *Empire*;

       b.     The gross revenues, net revenues, and profits received from Season 2 of *Empire*;

       c.     For *Empire* Season 2, Episode 1, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost; and

       d.     For *Empire* Season 2 Episode 2, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost

9.     Identify each employee or agent of 21CF or any of its subsidiaries who were assigned to or worked in or as part of the business unit "Fox Television Group" during the Relevant Period. For each such person, identify:

       a.     The legal entity (e.g., 21CF, FBC, TCFTV, or other) that employed the person;

       b.     The title or role of the person within Fox Television Group;

       c.     Any and all communications that the person had regarding the filming of *Empire* at the JTDC; and

       d.     Any and all documents in the person's possession regarding the filming of *Empire* at the JTDC.

10.    For each of your defenses, state the facts relevant to it and the legal theories upon which it is based.

November 3, 2017                                /s/ Stephen H. Weil

 

Stephen H. Weil – steve@weilchardon.com
Alexis G. Chardon – ali@weilchardon.com
Weil & Chardon LLC
333 S. Wabash Ave., Suite 2700
(312) 585-7404

*Attorneys for Named Plaintiffs T.S. and Q.B.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2017, a true and correct copy of the foregoing was served to the following via email:

Allyson West, allyson.west@cookcountyil.gov

Anthony Zecchin, anthony.zecchin@cookcountyil.gov

T. Andrew Horvat, THorvat@atg.state.il.us

Jeffrey Jacobsen, jjacobson@kelleydrye.com

Matthew C. Luzadder, mluzadder@kelleydrye.com

Catherine James, cjames@kelleydrye.com

Janine N. Fletcher, jfletcher@kelleydrye.com

_/s/ Stephen H. Weil_

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

T.S. *et al.,*

        Plaintiffs,

   v.

Twentieth Century Fox Television *et al.,*

        Defendants.

Case No. 1:16-cv-08303

Hon. Amy J. St. Eve

**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO
TWENTY-FIRST CENTURY FOX, INC., FOX BROADCASTING COMPANY, AND
TWENTIETH CENTURY FOX TELEVISION**

     Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiffs request

that defendants Twentieth Century Fox Television, a division of Twentieth Century Fox Film

Corporation ("TCFTV"); Fox Broadcasting Company ("FBC"); and Twenty-First Century Fox,

Inc. ("21CF") (collectively and/or individually, "Fox") to produce the following:

**DEFINITIONS**

1.    "Filming Periods" means June 21-26, 2015, July 13-16, 2015, and August 23-26, 2015, inclusive, as well as any other time that persons associated with *Empire* (*i.e.*, employees or agents of Fox associated in any way with *Empire*) were present at the JTDC.

2.    "Relevant Period" means May 22, 2015 to September 26, 2015. The Relevant Period includes the Filming Periods.

3.    "You" means Fox and its officers, employees, and agents.

4.    "JTDC" means the Cook County Juvenile Temporary Detention Center.

5.    The term "documents" is defined to have the same meaning and to be equal in scope to the terms "documents" and "electronically stored information" as used in Federal Rule of Civil Procedure 34(a). Documents include communications.

6.    "Communication" and "communications" means any and all inquiries, discussions, conferences, conversations, negotiations, agreements, meetings, interviews, telephone conversations, letters correspondence, notes, telegrams, facsimiles, electronic mail

1

(email), ESI, memoranda, documents, writings, or other forms of communications, including but not limited to both oral and written communications.

7.  The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" shall mean "including without limitation."

8.  "Date" shall mean the exact date, month and year, if ascertainable or, if not, the best approximation of the date (based upon relationship with other events).

9.  "Agent" shall mean any agent, employee, officer, director, attorney, independent contractor or any other person acting at the direction of or on behalf of another.

10. "Person" shall mean any individual, corporation, proprietorship, partnership, trust, association or any other entity.

11. You are reminded to supplement your responses to these requests and your documents produced in response to these requests in accordance with Rule 26 of the Federal Rules of Civil Procedure.

## INSTRUCTIONS

1.  Pursuant to Rule 34(b)(1)(C), ESI is to be produced in the following forms:

    a.  Except as stated below, ESI may be produced in PDF form. However, ESI should not be scanned to PDF (*i.e.*, printed out on paper and then scanned). Rather, the PDF should be generated directly from the underlying electronic file.

    b.  Plaintiffs anticipate that for most ESI the production of metadata will not be necessary. Thus, unless otherwise identified in a request, ESI converted to PDF need not be accompanied by the underlying metadata of the native ESI. However, if Plaintiffs later determine that the production of metadata may be relevant for certain documents, Plaintiffs will request metadata for such documents, and Defendants shall produce responsive metadata within 14 days of such a follow-up request.

    c.  Notwithstanding the foregoing instructions, to the extent that ESI responsive to a document request (1) is or is stored in a spreadsheet, database, or similar form of ESI, or (2) constitutes photographs, images, audio, or video; responsive ESI should be produced as provided in Rule 34(b)(2)(E)(ii), *i.e.*, "in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms."

2.  To the extent that documents responsive to a request contain colors (*i.e.*, colors in addition to black and white), production of such documents should be in color.

## REQUESTS FOR PRODUCTION

1.  All documents identified in your Initial Disclosures.

2

2.      All documents that you identified or referred to in response to Plaintiffs' interrogatories.

3.      All documents concerning (in whole or in part) the filming of *Empire* at the JTDC. This includes, but is not limited to, communications with and among the following persons and entities, as well as officers, employees, or agents of same:

    a.   Any defendant in this case, including any Fox entity;

    b.   Any member of the cast or crew of *Empire*;

    c.   Any person or entity contracted or otherwise hired or retained to provide services relating in whole or in part to the filming of *Empire* at the JTDC;

    d.   Vendors or service providers at the JTDC, including defense attorneys, court staff, states attorneys, sheriff, police, program providers, volunteers, and contractors;

    e.   Non-profit organizations affiliated with the JTDC, including the JTDC Foundation;

    f.   JTDC personnel;

    g.   Chicago Public Schools;

    h.   The City of Chicago;

    i.   The State of Illinois; and

    j.   The Chicago Film Office, the Illinois Film Office, and/or the City of Chicago Department of Cultural Affairs and Special Events.

4.      All documents concerning (in whole or in part) the script or similar document calling for the scenes that were eventually filmed at the JTDC.

5.      All documents concerning (in whole or in part) the scouting, consideration, and selection of the JTDC as a location for the filming of *Empire*.

6.      All documents concerning (in whole or in part) the scouting and consideration of other locations, settings, or methods for the filming of the *Empire* scenes that were filmed at the JTDC, and any negotiations or agreements regarding same.

7.      All documents concerning (in whole or in part) any agreements or contracts relating to the filming of *Empire* at the JTDC, including all documents relating to the negotiation of the agreements, and all versions and drafts of the agreements.

8.      All documents concerning (in whole or in part) the JTDC's layout, floorplans, and operations.

9.      All documents concerning (in whole or in part) any "prep" for filming at the JTDC, including preparations made by Fox employees or agents at the JTDC in advance of filming there.

10. All documents concerning (in whole or in part) the terms (or substantially similar terms) of Section 1(D) of the Location Agreement (ECF No. 51-2), including but not limited to any communications relating to the inclusion of such terms.

11. In Section 1(D) of the Location Agreement (and all subsequent Location Agreements, *see* ECF Nos. 51-2), TCFTV "acknowledges that the [JTDC] is a functioning Municipal Building, operating as a residential facility for juveniles." Produce all documents TCFTV referred to or relied upon in making this acknowledgement, and all documents upon which this acknowledgement was based.

12. All documents concerning (in whole or in part) your performance of Section 1(D) of the Location Agreement (and all subsequent Location Agreements, *see* ECF Nos. 51-2) regarding TFTV's use of the JTDC, *i.e.*, "TCFTV will cooperate with the County, JTDC Administration, and Security, the Department of Facilities Management and Staff and the Sheriff so that normal operations of the Building and its occupants, and access by the public, are not disrupted in any manner whatsoever."

13. All documents concerning (in whole or in part) any consideration or discussion by you or any other person of the effect that filming *Empire* at the JTDC would have on the JTDC's normal operations, on the children housed there, and/or on the provision of services to the children housed there.

14. All documents concerning (in whole or in part) the areas of the JTDC made available for *Empire*'s crew for filming and/or for support services (*e.g.*, areas for crew, equipment, changing, catering, delivery, lighting, production, etc.), as well as travel between such areas.

15. All documents concerning (in whole or in part) schedules or plans for filming, including crew schedules, filming schedules, schedules for access to the JTDC, times for filming or access to the JTDC or areas within the JTDC, and logistics relating to filming at the JTDC.

16. All documents concerning (in whole or in part) any alterations to the JTDC physical space made for filming and support services, including but not limited to any painting of the facility.

17. All documents concerning (in whole or in part) any equipment to be brought into the JTDC, including locations of same and schedules for entry and exit of same.

18. All documents concerning (in whole or in part) any acts to be done (or omitted) by JTDC staff in relation to the filming of *Empire* at the JTDC.

19. All documents concerning (in whole or in part) any alterations or changes to the JTDC's normal operations in connection with to the filming of *Empire* at the JTDC. This includes, but is not limited to, JTDC staff locations, staff duties, resident movement, school, medical, visitation, programming, recreation, court hearings, resident transfers, consolidation of pods, and provision of commissary.

4

20. All documents concerning the locations of actors, film crews, any Fox employees or agents, JTDC staff, and/or JTDC residents during the Filming Periods.

21. All documents related to any compensation paid or given by Fox to Cook County or any other party in exchange for or in relation to use of the JTDC as a set for filming of *Empire*.

22. All photographs or video of the crew or cast of *Empire* at the JTDC during the Relevant Period, including any metadata.

23. All documents created as posted signs (*e.g.*, a document created to be taped on a wall as a posted sign) relating in any way to the *Empire* filming, as well as any electronic files used to generate such documents, including any metadata.

24. All budget binders concerning (in whole or in part) *Empire* Season 2, Episode 1 and Episode 2.

25. All production schedules concerning (in whole or in part) the scenes for *Empire* that were filmed at the JTDC.

26. Documents sufficient to identify each Fox employee or agent who entered the JTDC in connection with the filming of *Empire* there (including before and after the dates identified in the Filming Periods), the time(s) each such person entered the JTDC, and the time(s) each such person exited the JTDC.

27. All expense reports concerning (in whole or in part) the scenes for *Empire* that were filmed at the JTDC.

28. All profit and loss statements of TCFTV concerning (in whole or in part) all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2.

29. All profit and loss statements of FBC concerning (in whole or in part) all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2.

30. All profit and loss statements of 21CF concerning (in whole or in part) all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2.

31. Documents sufficient to show the rental cost per day of each other facility rented as a set for purposes of filming for Season 2 of *Empire*.

November 3, 2017                                    /s/ Stephen H. Weil

                                                   Stephen H. Weil – steve@weilchardon.com
                                                   Alexis G. Chardon – ali@weilchardon.com
                                                   Weil & Chardon LLC
                                                   333 S. Wabash Ave., Suite 2700

(312) 585-7404

*Attorneys for Named Plaintiffs T.S. and Q.B.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2017, a true and correct copy of the foregoing was served to the following via email:

Allyson West, allyson.west@cookcountyil.gov

Anthony Zecchin, anthony.zecchin@cookcountyil.gov

T. Andrew Horvat, THorvat@atg.state.il.us

Jeffrey Jacobsen, jjacobson@kelleydrye.com

Matthew C. Luzadder, mluzadder@kelleydrye.com

Catherine James, cjames@kelleydrye.com

Janine N. Fletcher, jfletcher@kelleydrye.com


/s/ Alexis G. Chardon

# EXHIBIT 5

Alexis Chardon, Esq.
Weil & Chardon LLC
333 S. Wabash, Suite 2700
Chicago, IL 60604
ali@weilchardon.com
312-585-7404

January 12, 2018

**Via Email**

Jeff Jacobson
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178
jjacobson@kelleydrye.com

Re: *T.S., et. al v. Twentieth Century Fox Television, et. al* (No. 16-c-8303):
Demand for Local Rule 37.2 Conference

Dear Jeff,

Pursuant to Local Rule 37.2, I write to you regarding the December 15, 2017 responses of your clients (Twenty-First Century Fox, Inc. ("21CF"), Twentieth Century Fox Television ("TCFTV"), and Fox Broadcasting Company ("FBC") (collectively "Fox")) to Plaintiffs' first set of Requests for Production and Plaintiffs' First Set of Interrogatories. Your clients' responses are not in compliance with their discovery obligations, as we describe in this letter.

We are requesting a Rule 37.2 conference regarding your clients' discovery responses next week. At this point, I am generally available on the mornings or afternoons January 15, 16, 18, and 19. Please contact me to arrange the conference.

The specific problems with Fox's discovery responses are detailed below.

- **Interrogatory Nos. 1-4 (FBC, TCFTV, 21CF)**

The first four interrogatories served on each of your three clients were identical. For each, you objected that the interrogatory is "overbroad, unduly burdensome, and not proportional to the needs of the case." These are boilerplate objections. Because you provide no basis for any of them, under case law in this District they are considered tantamount to no objection at all. The objections are invalid in any event. Interrogatories 1-4 track the Northern District of Illinois's Mandatory Initial Discovery Pilot Program

1

("MIDP").[1]  We do not understand how you can assert these objections to discovery that has specifically been treated as appropriate by this District Court.  Please let us know whether you have withheld information on the basis of these objections.

In addition to the foregoing, we also have more specific concerns with the substantive responses that you did provide in response to Interrogatory Nos. 1 and 4.

- **Interrogatory No. 1 (FBC, TCFTV, 21CF)**

Your answer to Interrogatory Number 1, which seeks the names and contact information of people with knowledge of the case, is incomplete.  As far as Fox representatives, you list only Brady Breen, Richard Lederer, Loucas George, Bruce Terris, and Jess Gisin as being likely to have relevant, discoverable information.  It is plain from the limited number of documents that you have produced thus far, however, that this list is incomplete.  From the documents we have reviewed, several other Fox employees, agents, or representatives, including Jonathan Klemke and Megan Grogan, plainly engaged in responsive communications (*see, e.g.*, TCFTV00575-76), while others, such as Lee Daniels, or toured the facility in advance of filming and/or had relevant input into filming locations, etc. (*see, e.g.*, CCSAO 7765; TCFTV00090-91).  These individuals, to name a few, plainly have information responsive to this interrogatory, but you have not identified them.  Indeed, even at the outset of this litigation (in your November 11, 2016 letter to Steve Weil), you provided us with a much longer list of people who performed functions relating to the allegations in the complaint.

Your inadequate response to Interrogatory No. 1 raises two possibilities:  either you have not taken the step of reviewing the few documents you have produced to make sure you can list relevant witnesses; or more likely, you have adopted a cramped (and undisclosed) interpretation of one or more of the terms in the interrogatory itself— perhaps "discoverable," "relevant," or "claims."  That is forbidden.  Parties responding to discovery are required to give terms in discovery requests their ordinary meaning, and on the production thus far it is clear that Klemke, Grogan, and Daniels fall within Interrogatory No. 1 under any reasonable construction of interrogatory.

Alternatively, if you have made a cursory search on the contention that our request is out of proportion to the needs of the case, your response is indefensible.  Your clients evidently dispute our claims against them in this case, but the like it or not the claims in this case implicate millions of dollars in liability.  It is simply a nonstarter to limit a search to a single custodian's emails on grounds of proportionality.

---

[1]  The MIDP is described at the following link, and you can see the relevant mandatory disclosures at pages 4-5 of the document:
https://www.fjc.gov/sites/default/files/2017/MIDPP%20Illinois%20Northern%20Standing%20Order.pdf.

2

Please provide a list in response to this Interrogatory that meets your obligations under Rule 33.  If you do not amend your responses substantially we will conclude that your clients have violated their discovery obligations as described above, and move to compel an appropriate response.

- **Interrogatory No. 4  (FBC, TCFTV, 21CF) and every Request For Production**

The following discussion applies to each of your responses to the Requests for Production, in addition to your response to Interrogatory No. 4.

Interrogatory No. 4 asks you to describe the nature of the search you have performed to discover and produce documents in this case.  You make a series of boilerplate burden/overbreadth/vagueness objections that are invalid in this District — particularly because this interrogatory tracks a disclosure endorsed by the Court under the MIDP.

You also object that Interrogatory No. 4 violates the spirit of the Seventh Circuit Electronic Discovery Committee's Proposed Standing Order Relating to the Discovery of ESI, Principle 2.04(b).  That is wrong too.  Principle 2.04(b) only cautions against using such discovery "unadvisedly."  Interrogatory No. 4 is not an ill-advised request.  As an MIDP mandatory disclosure, it has specifically been endorsed the District Court as a useful and appropriate discovery device.  Furthermore, this case involves a discrete set of events that occurred at specific times, and our requests primarily ask for communications.  As such, the bulk of our requests can be satisfied by a straightforward search of custodians' emails and similar communication mediums.  Under the circumstances there is simply no reason (and indeed your objections point to none) to believe that this interrogatory will result in a meta-discovery litigation side-show.  Your invocation of Principle 2.04(b) is thus invalid.

It is clear that Interrogatory No. 4 serves an important role in this case.  Among other things, you appear to have only produced emails from a *single* document custodian (Brady Breen), and only have produced Mr. Breen's *inbox* at that.  If true, this means that you have not even produced communications from the short list of Fox representatives named in your initial disclosures and in response to Interrogatory No. 1.  In addition, your response to Interrogatory No. 4 indicates that you have limited your search for responsive to communications between Fox (and its agents) and the JTDC's administrators—*and thus have made no effort to identify internal communications among Fox employees and agents*, which are specifically called for in multiple discovery requests.

Of course, pursuant the Court's orders, we are in the unusual position of having begun written discovery without a Rule 26(f) conference.  Nevertheless we believe that you can make a commonsense response to Interrogatory No. 4 now.  To that end we propose

that pending our Rule 26(f) conference you provide the following, minimal answers in response to Interrogatory No. 4:

- Which custodians were searched?
- What electronic and physical locations were searched?
- Did your search include keywords or similar e-discovery tools? If so, which terms, and which tools?
- Did you limit your search based on the sender or recipient of the communication?

- **Interrogatory Nos. 5, 6 (FBC, TCFTV, 21CF)**

These interrogatories seek information pertaining to employees and agents who entered the JTDC for filming of *Empire* and to persons who provided services in relation to the filming. We recognize that you have produced Call Sheets listing the names of many people involved with the filming. We are reviewing this production, and reserve our right to object to your response to this Interrogatory in the future.

- **Interrogatory No. 7 (FBC, TCFTV, 21CF)**

This Interrogatory seeks information about and descriptions of communications from any employee or agent of the defendants relating to the filming of *Empire* at the JTDC. You have objected on the grounds that this request is overbroad. That boilerplate objection is undeveloped and therefore effectively waived, and it is meritless in any event—this case concerns a set of discrete events and a request for all communications about those events is reasonably calculated to lead to the discovery of admissible evidence.

You also refer to your production. But if we understand your response to Interrogatory No. 4 correctly, you have excluded from your discovery responses internal communications among Fox and its agents, instead confining your responses to communications between Fox (or its agents) and the JTDC's administrators – and only as reflected in Brady Breen's inbox. If that is correct, you have effectively failed to respond to this interrogatory. You must amend your response.

- **Interrogatory No. 8 (TCFTV)**

This interrogatory, served on TCFTV only, seeks information relating to Section 1(D) of the Location Agreement and how your clients performed their obligations under it. In response you have referred to the December 15, 2017 production provided in response to our Requests For Production.

It is well established that Rule 33(d) does not permit a responding party to refer generally to their document production in response to specific questions about discrete

issues. *See, e.g., Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 428 F. Supp. 2d 761, 770 (N.D. Ill. 2005) (rejecting responding party's reference to entire document production). We don't know what, if anything, Fox did to comply with its obligations under Section 1(D)—but you do. A general reference to your production is therefore insufficient.

Furthermore, regardless of how interpreted, we don't see any documents in the production that could be construed as responsive to section (c) of this interrogatory, that being communications about the inclusion of Section 1(D) in the first place. You must amend your client's response to this interrogatory.

- **Interrogatory No. 8 (FBC, 21CF); Interrogatory No. 9 (TCFTV); Requests For Production Nos. 28, 29, 30**

These discovery requests seek information relating to your income and profits realized as a result of the allegations in the complaint. Such information is relevant both to liability (as it relates to motives, mental state, knowledge, and background). And, of course, it is foundational to our claim for unjust enrichment. Yet you have refused to provide any information responsive to these requests.

The money realized from Season 1 is relevant to the revenue the pricing of Season 2, including the episodes shot at the JTDC. Our inquiry in Interrogatory 8(a) to FBC and 21CF and Interrogatory 9(a) to TCFTV is therefore reasonably calculated to lead to the discovery of admissible evidence about the revenues that were realized in the first two episodes of Season 2. And overall revenue from Season 2 as requested in subjection (b) of those same interrogatories of is likewise relevant to the pricing, budget, and profit of Episodes 1 and 2, since costs and revenue for Episodes 1 and 2 may have been allocated across the entire season.

In subsection (c) and (d) to the interrogatories, we also request revenue from Episodes 1 and 2 specifically. But you object to that too—apparently on the ground that we should be confined to costs and revenue "related to TCFTV's filming at the JTDC." There will doubtless be disagreement in this case about what revenue and what costs are "related to TCFTV's filming at the JTDC." There is a time and place for that disagreement. At the discovery stage, though, we are entitled to seek information that sheds light on the issue— and such information indisputably includes costs and revenues for the episodes. These requests are thus reasonably calculated to lead to the discovery of admissible evidence, and must be answered.

Finally, you object that this discovery is premature because liability has not been "established" and class certification has not occurred. While this contention is undeveloped, it appears to be a re-hash of arguments you already made to the Court and lost at the dismissal stage. As a result, the Rules allow us to take discovery on "any matter

that is relevant to any party's claim," Fed. R. Civ. P. 26(b)(1), which plainly includes the information we have sought in this revenue discovery. We are entitled to this discovery now.

- **Interrogatory No. 9 (21CF)**

    This Interrogatory requests information regarding employees of Fox Television Group and their communications pertaining to the filming of Empire at JTDC. You have objected that the request is overly broad and unduly burdensome, and that it seeks the identity of employees or agents who "had nothing to do with the filming at the JTDC."

    This interrogatory is reasonably calculated to lead to the discovery of admissible evidence. We allege that FBC and TCFTV worked closely together on programming including Empire, and that FBC was involved in the filming of scenes at the JTDC. (*See* ECF No. 88 ¶ 59.) According to statements by 21CF, this collaboration is realized by uniting FBC and TCFTV through the Fox Television Group business unit.[2] The makeup of Fox Television Group is therefore relevant to our claims in this case, and your objections that subsections (a) and (b) of this interrogatory do not seek relevant information is incorrect. Furthermore, responsive information should be readily available to a sophisticated and well-organized corporation like 21CF, and would not be burdensome to provide.

    You have also refused to answer subsections (c) and (d) of this interrogatory, which concern information and evidence relating directly to the filming of *Empire* at the JTDC. Such information of course is relevant to our claims in this case. You have not articulated any specific objection to subsection (d) at all, but regarding subsection (c) you object that we seek "*all*" communications "*regarding*" the filming of Empire, and state that this is too broad and burdensome because "most of the documents sought are not relevant to any party's claims or defenses." Once again, you've raised a boilerplate objection and have made no effort to articulate the grounds of your claims of irrelevance and burden. This is insufficient.

    Pursuant to your duties under Rule 33, please fully and promptly respond to this interrogatory.

---

[2] *See* Business Wire, "21st Century Fox Unites Fox Broadcasting Company and 20th Century Fox Television under the Leadership of Gary Newman and Dana Walden in New Business Unit, Fox Television Group," (July 14, 2014), https://www.businesswire.com/news/home/ 20140714005854/en/21st-Century-Fox-Unites-Fox-Broadcasting-Company.

- **Interrogatory No. 10 (to 21CF) and Interrogatory No. 9 (to TCFTV and FBC)**

You have objected that this Interrogatory is a "contention interrogatory" and is therefore premature. We believe that the parties should negotiate a time to respond to this interrogatory as part of a discovery management conference.

- **Request for Production No. 11 (to all defendants)**

This RFP pertains to Section 1(D) of the Location Agreement. You object to the Request "to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines," but also state that you will produce documents subject to that objection. If you are withholding documents based on this objection, please identify them in a privilege log, pursuant to Rule 26(b)(5)(A).

- **Request for Production No. 22 (to all defendants)**

This Request seeks photographs and videos of the cast and crew at the JTDC during the Relevant Period. You have objected that the Request is too broad and burdensome. For the sake of compromise, we will table this request right now until we can receive and review the other documents we are seeking. Once that is done, we will revisit whether this request is still necessary. If it is, we will seek to narrow it with more guidance from you regarding the burden of a response.

- **Request for Production No. 23 (to all defendants)**

This request seeks "All documents created as posted signs . . . relating in any way to the Empire filming." You have objected to the request as overly broad, unduly burdensome, and not proportional to the needs of the case. You also object that it is irrelevant. You have offered no explanation for these boilerplate objections, such as why the documents are not relevant or why the request is not proportional to our needs. For that reason alone, your objections are meritless. Request No. 23 seeks information which is clearly related to the manner in which the filming of Empire at the JTDC affected the normal operation of the facility, which is one of the main issues in this case. The persons responsible for creating and posting such documents should not be hard to identify, and thus this request is not unduly burdensome. Rule 34 requires your clients to produce responsive documents.

- **Request for Production No. 24**

This request seeks "budget binders" for the two *Empire* episodes that were filmed at the JTDC. You have objected that the budget binders could "conceivably" encompass a large number of documents unrelated to any party's claim or defense, and state that you will instead only produce documents sufficient to show the amounts paid by the Fox Defendants for use of the JTDC. This response is insufficient.

7

Your objection to this request shows that, once again, you intend to define unilaterally what costs and revenues are relevant to our claims, and then reveal to us only the information you want. And indeed, your offer to produce only information about the rents and other payments you made for using the JTDC shows just how narrowly you would prefer the scope of relevant information to be drawn.

That is not how discovery works. Your clients will have plenty of time and space to argue about what costs and revenues are relevant to our claims. At the discovery stage, however, we are entitled to sufficient information to test those arguments. The documents requested here are precisely the type of information we will need to be able to develop a picture of the costs and revenues associated with this case, and these requests are therefore reasonably calculated to lead to the discovery of admissible evidence.

These documents should already be organized and easy to gather and produce, and you enjoy a protective order in this case to guard such information against improper dissemination. There no justification, in other words, for your refusal to produce these documents. Under Rule 34, your clients are required to produce them.

- **Request for Production No. 31 (to all defendants)**

This request seeks documents sufficient to show rental cost per day of other facilities used for filming Season 2 of *Empire*. You object that this request is not related to our claims or defenses. That is plainly untrue. We allege that your clients were willing to have the children at the JTDC placed on lockdown because they found the JTDC to be a desirable place to film. It appears that Fox may have gotten a far below-market value for the JTDC facility and have paid far less for JTDC than it did for other facilities, even where filming at other facilities did not disrupt governmental functions or impede on the civil rights of children. If true, this sheds light on Fox's motives in disrupting the facility three times in 2015, and of course is also relevant to Plaintiffs' unjust enrichment damages. Accordingly, you should produce this information. The expenses at other facilities you used for filming are a relevant and probative comparator to whether Fox was getting a bargain at the JTDC.

## Other Issues

There are four other issues we will need to discuss on our discovery conference. They are:

1) **"Empty" or unreadable native files.** As you know, we contacted you on December 21, 2017 to inquire as to why 139 of the 150 native files produced by you were empty or unreadable. We appreciate Catie James's response to our question on December 22, 2017. We understand from Catie's e-mail that, after conferring with

8

your Discovery Services team, she learned that each of the native files produced as empty (0KB) files were actually originally empty embedded image files attached to emails. For Bates Range TCFTV00750-875 (approximately 40 files which were of small volume), you have produced duplicate versions of these call sheets as PDFs. Although these files are unreadable, we understand you to be saying that you did not originally intend to produce them as "Native" in the first place, but these files were simply automatically created when you exported the files from Mac. On January 5, 2018 you issued a re-production of all the files to help clarify the production, but while we have been able to download the new production we have not yet been able to open or review any of the new files.[3] At this point we have no reason to doubt your explanations for the empty/unreadable native files, but we want to receive some additional assurance that an attorney has investigated this and can confirm that we are not missing any files you intended to produce. At bottom, we are just confused about why the approximately 140 empty or unreadable files were produced in the first place, and why slip sheets were included in the PDF production for them. To be clear, we are not seeking production of empty or "junk" files, such as the type of .img or .png files with no substantive content which sometimes are automatically appended to emails, if that is really all these are. In addition to conferencing with you, it may also make sense for us to conference directly with your discovery services team about our technical issues with reviewing the January 5 re-production.

2) **Scanned PDF files**. Our instructions specifically requested that ESI produced as PDF should not be scanned to PDF, but rather generated directly from the underlying electronic file. We believe your PDF production may not have conformed with this instruction, as it was not OCR-searchable. Please confirm that, going forward, you will generate PDFs directly from the underlying files. Scanning to PDF renders the documents un-searchable, making review of produced documents much more burdensome and expensive.[4]

---

[3] We get an error message that Windows "cannot complete the extraction," and we do not receive a prompt for the password you sent. We can, however, see that the formerly 0Kb files are now 1 or 2 KB files.

[4] Judge St. Eve's standing instructions recognize this same problem, and contain an instruction that is essentially identical to Instruction 1(a). *See* Chambers Page of Judge Amy St. Eve http://www.ilnd.uscourts.gov/judge-info.aspx?2qetMz8rZTQ= ("All electronic filings (with the exception of exhibits) in Judge St. Eve's cases must be generated by printing to PDF from the original word processing file so that the text of the digital document is searchable. PDF images created by scanning paper documents are not searchable and may be used only for appendix or reference materials not available in PDF format.")

3) **Third party subpoena responses**.  You have accepted service and responded in writing to several third party subpoenas to third persons who were Fox's agents during the filming.  Your written responses indicate that searches will be performed and documents produced.  We cannot, of course respond to the objections raised in your responses until we see the production.  We inquired via email on December 21 and January 3 as to the status of a production, and on January 5 you told us that the accompanying production, "if any," should arrive within the next couple of weeks.  The "if any" is concerning.  The third party subpoenas seek information vital to our case – documents controlled by preservation orders that are now over a year old – and we will expect full conformance with them.  Unless you are planning a fulsome search and production in response to each subpoena, and unless that production will come soon, we need to conference about the scope of your response.  Importantly, we need to confirm that you have not also imposed the same inadequate scope to the search and production as you have done for your own production responses, as detailed in this letter.

4) **Interrogatory Verifications from your clients**.  Rule 33 requires that interrogatories be answered "under oath" by the answering party.  Your interrogatory responses are signed only by counsel.  Please be aware that we will adamantly stand on the requirement that you provide signatures from your clients, which will assure us that the interrogatory answers are truthful and complete.  Because we are seeking amended responses to your recent answers as detailed in this letter, we are not pressing for these verifications now.

I hope that our conference will allow us to amicably resolve these issues.

Regards,

/s/ Ali Chardon

Alexis G. Chardon, Esq.

Copies via email:

cjames@kelleydrye.com
mluzadder@kelleydrye.com
jfletcher@kelleydrye.com
allyson.west@cookcountyil.gov
anthony.zecchin@cookcountyil.gov
thorvat@atg.state.il.us

10

# EXHIBIT 6

2/28/2018
Case: 1:16-cv-08303 Document #: 141-4 Filed: 03/06/18 Page 41 of 170 PageID #:1012
Case: 1:16-cv-08303 Document #: 155-1 Filed: 03/02/18 Page 41 of 170 PageID #:1062



**Stephen Weil <steve@weilchardon.com>**

---

## RE: T.S. v. Fox: Need for Rule 37 Discovery Conference
1 message

---

**Jacobson, Jeffrey** <JJacobson@kelleydrye.com>                    Tue, Jan 23, 2018 at 2:38 PM
To: Alexis Chardon <ali@weilchardon.com>
Cc: "James, Catherine " <CJames@kelleydrye.com>, "Luzadder, Matt" <MLuzadder@kelleydrye.com>, "Allyson West (States Attorney)" <Allyson.West@cookcountyil.gov>, "ANTHONY ZECCHIN (States Attorney)" <anthony.zecchin@cookcountyil.gov>, "Horvat, Timothy" <thorvat@atg.state.il.us>, Stephen Weil <steve@weilchardon.com>


This discussion jumped the shark at least two iterations ago. I have not told you to scrap any positions. I have suggested you come to a meet-and-confer ready to tell me what you want, and we will come ready to consider your requests and to reach appropriate compromises.


See you tomorrow.


**JEFFREY JACOBSON**

Partner

Co-Chair, Class Actions Practice

**Kelley Drye & Warren LLP**
Tel: (212) 808-5145
jjacobson@kelleydrye.com


**From:** Alexis Chardon [mailto:ali@weilchardon.com]
**Sent:** Tuesday, January 23, 2018 2:34 PM
**To:** Jacobson, Jeffrey <JJacobson@KelleyDrye.com>
**Cc:** James, Catherine <CJames@KelleyDrye.com>; Luzadder, Matt <MLuzadder@KelleyDrye.com>; Allyson West (States Attorney) <Allyson.West@cookcountyil.gov>; ANTHONY ZECCHIN (States Attorney) <anthony.zecchin@cookcountyil.gov>; Horvat, Timothy <thorvat@atg.state.il.us>; Stephen Weil <steve@weilchardon.com>
**Subject:** Re: T.S. v. Fox: Need for Rule 37 Discovery Conference


Jeff,


We've asked for a written response because it helps focus the disputes and makes live conferences more productive. It sounds as though you are nevertheless refusing at any point to provide any written response to our January 12 letter. That's surprising, but if you had told us so before we could have avoided a lot of this back-and-forth.


Your email from 6:08 this morning goes further, however, essentially claiming that the January 12 letter isn't a legitimate effort to meet and confer. ("Because your 12-page letter was long on rhetoric and legal arguments with which you know we disagree, but short on statements of what you actually want, the first move tomorrow presumably has to be yours.") We read

2/28/2018
Case: 1:16-cv-08303 Document #: 141-1 Filed: 03/06/18 Page 42 of 170 PageID #:1013
Case: 1:16-cv-08303 Document #: 133-1 Filed: 03/02/18 Page 42 of 170 PageID #:1063

your 6:08 email as instead saying that you do not intend to respond to the positions we articulate in our letter, and that we should come to the discovery conference with new positions even though you haven't responded to the first round.

As I said in my 12:06 pm email today, we are not going to do that.  The positions in our January 12 letter are the positions we will take at any discovery conference tomorrow.  If you want to respond to those positions that's fine, and we will obviously consider your responses.  But if you are claiming those positions are illegitimate or nonstarters and we need to come up with new ones, then we can havue our discovery conference, but we will be at issue.

We can use one of the attorney/witness rooms across the hall from the courtroom to meet tomorrow.

Ali

Alexis G. Chardon, Esq.

Weil & Chardon LLC

333 S. Wabash Avenue, Suite 2700

Chicago, IL 60604

ali@weilchardon.com

312-585-7404 (office)

312-752-6046 (cell)

312-995-7102 (fax)

The information contained in this email any any attachments is intended only for the personal and confidential use of the designated recipient named above. This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution, or copying of the message and any attachments is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and/or reply email.

On Tue, Jan 23, 2018 at 12:42 PM, Jacobson, Jeffrey <JJacobson@kelleydrye.com> wrote:

> Your prior writings at least had the veneer of seriousness.  This one does not.  I am unaware of any requirement that meet-and-confer sessions be preceded by written exchanges satisfactory to the complaining party.  If you want to cite me to such a requirement, I would be happy to consider it. Otherwise, I would expect you to meet and confer in good faith, as I am willing to do, when we all are together tomorrow.
>
> **JEFFREY JACOBSON**
>
> Partner
>
> Co-Chair, Class Actions Practice

2/28/2018

Case: 1:16-cv-08303 Document #: 441-1 Filed: 03/06/18 Page 43 of 170 PageID #:1012
Case: 1:16-cv-08303 Document #: 159-1 Filed: 03/02/18 Page 43 of 170 PageID #:1064

**Kelley Drye & Warren LLP**

Tel: (212) 808-5145

jjacobson@kelleydrye.com

**From:** Alexis Chardon [mailto:ali@weilchardon.com]

**Sent:** Tuesday, January 23, 2018 12:06 PM

**To:** Jacobson, Jeffrey <JJacobson@KelleyDrye.com>

**Cc:** James, Catherine <CJames@KelleyDrye.com>; Luzadder, Matt <MLuzadder@KelleyDrye.com>; Allyson West (States Attorney) <Allyson.West@cookcountygov.gov>; ANTHONY ZECCHIN (States Attorney) <anthony.zecchin@cookcountyil.gov>; Horvat, Timothy <thorvat@atg.state.il.us>; Stephen Weil <steve@weilchardon.com>

**Subject:** Re: T.S. v. Fox: Need for Rule 37 Discovery Conference

Jeff,

From your email I take it that we can expect responsive production (if any) within two weeks in response to RFPs and Interrogatories from our November 3 discovery as well as the November 27 third party subpoenas. Please confirm that that is correct.

As to the various problems we raised with respect to the November 3 discovery, I read your email from this morning as refusing to respond to our January 12 enforcement letter on the grounds that it is long and rhetorical, and instead demanding that we re-formulate the positions we take in our letter at an in-person meeting tomorrow. We will not do that. The positions in the January 12 letter are grounded in the rules of discovery. The letter is "rhetorical" in that it explains why your clients' responses to not comply with those rules. The letter is 10 pages long because it goes point by point through the problems we have identified with your discovery objections and responses. These are the positions we would take if we had a meeting tomorrow. If you are refusing to respond to the issues we raise in the letter, then Plaintiffs have fulfilled their obligation to attempt to meet and confer, and we are at issue regarding that discovery.

We do not want that outcome because we want to avoid needless motion practice. Therefore I invite you to respond to the January 12 letter. Given that you have not responded so far, though, at this point we don't think an in-person conference after tomorrow's hearing makes much sense. We would therefore propose a telephonic conference after you have responded to the letter. But again, if you are standing on your position and are refusing to respond, then we are unfortunately at issue.

Ali

Alexis G. Chardon, Esq.

Weil & Chardon LLC

333 S. Wabash Avenue, Suite 2700

Chicago, IL 60604

ali@weilchardon.com

312-585-7404 (office)

312-752-6046 (cell)

312-995-7102 (fax)

The information contained in this email any any attachments is intended only for the personal and confidential use of the designated recipient named above. This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution, or copying of the message and any attachments is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and/or reply email.

On Tue, Jan 23, 2018 at 6:08 AM, Jacobson, Jeffrey <JJacobson@kelleydrye.com> wrote:

> Ali,
>
> I did not, or at least did not intend, to <u>promise</u> a supplemental production.  Back when you sought to issue preservation subpoenas to the persons we identified as potentially knowledgeable, I told you and the Court that we already had collected their relevant documents.  We are in the process now of confirming that we have examined all potential sources of email—as you have seen, the people who decided to film at the JTDC, managed the logistics of filming, and corresponded with the JTDC, were not Fox employees and did not have Fox email—and that we have produced to you everything we previously collected.  If there is to be a supplemental production, we will make it within about two weeks.  If our production of these categories of documents is complete, I will tell you within the same time frame.  To be clear, our collection process always has encompassed the non-employees we designed as potentially knowledgeable.  For that reason, you should not anticipate a separate production in response to your third-party subpoenas.
>
> Subject only to the caveat above that we are confirming having searched all sources, we believe we have produced all documents relevant to the non-existent "merits" of your claim.  We have not intentionally withheld any correspondence with the JTDC or any internal correspondence regarding the decision to film at the JTDC or the logistics of filming.  There was no "negotiation" over the access agreement; we signed the documents presented to us by Cook County.  You also have all of the documents in our possession regarding where we filmed within the JTDC and who was present for filming.
>
> We do not believe more is legitimately required of the Fox defendants for reasons we have stated over and over again.  Nevertheless, as I also have said repeatedly, we will meet and confer with you in good faith tomorrow and attempt to reach agreements that would obviate unnecessary motion practice.  Because your 12-page letter was long on rhetoric and legal arguments with which you know we disagree, but short on statements of what you actually want, the first move tomorrow presumably has to be yours.
>
> Thanks, and best regards,
>
> Jeff
>
> **JEFFREY JACOBSON**
>
> Partner

2/28/2018

Case: 1:16-cv-08303 Document #: 141-1 Filed: 03/06/18 Page 45 of 170 PageID #:1012
Case: 1:16-cv-08303 Document #: 138-1 Filed: 03/02/18 Page 45 of 170 PageID #:1066

Co-Chair, Class Actions Practice

**Kelley Drye & Warren LLP**
Tel: (212) 808-5145
jjacobson@kelleydrye.com


**From:** Alexis Chardon [mailto:ali@weilchardon.com]
**Sent:** Monday, January 22, 2018 1:54 PM


**To:** Jacobson, Jeffrey <JJacobson@KelleyDrye.com>
**Cc:** James, Catherine <CJames@KelleyDrye.com>; Luzadder, Matt <MLuzadder@KelleyDrye.com>; Allyson West (States Attorney) <Allyson.West@cookcountyil.gov>; ANTHONY ZECCHIN (States Attorney) <anthony.zecchin@cookcountyil.gov>; Horvat, Timothy <thorvat@atg.state.il.us>; Stephen Weil <steve@weilchardon.com>
**Subject:** Re: T.S. v. Fox: Need for Rule 37 Discovery Conference


Jeff, if you would like to conduct discovery negotiations after the conference this Wednesday we reiterate our request for a written response beforehand, so that we have time to consider whatever positions you are taking in response to the issues raised in our Rule 37.2 letter.


In addition, please tell us (1) when we can anticipate the supplemental production you mentioned in your Jan. 18 email, and (2) when we will get the production responding to the third party subpoenas that you accepted.


Regards,

Ali


Alexis G. Chardon, Esq.

Weil & Chardon LLC

333 S. Wabash Avenue, Suite 2700

Chicago, IL 60604

ali@weilchardon.com

312-585-7404 (office)

312-752-6046 (cell)

312-995-7102 (fax)


The information contained in this email any any attachments is intended only for the personal and confidential use of the designated recipient named above. This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution, or copying of the message and any attachments is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and/or reply email.


On Fri, Jan 19, 2018 at 5:54 PM, Jacobson, Jeffrey <JJacobson@kelleydrye.com> wrote:

2/28/2018

Case: 1:16-cv-08303 Document #: 141-1 Filed: 03/06/18 Page 46 of 170 PageID #:1012
Case: 1:16-cv-08303 Document #: 133-1 Filed: 03/02/18 Page 46 of 170 PageID #:1067

Ali,

My email yesterday should have been self-explanatory.  I was not proposing a briefing schedule or even suggesting that a dispute is inevitable.  I said we will see you after the hearing.  I also suggested that we provide Judge St. Eve with a simple, joint message that discovery is ongoing, that we are working through issues and may have disputes in the near future, but nothing ripe for the Court's consideration at the moment.  The hearing should last 90 seconds, and then we can go confer.

The rest of my message should have been equally self-explanatory.  Repeatedly, Steve has said that he is open to the idea that your case has no merit.  The documents you have are conclusive, and to the extent you think they are not, ask for a tour of the JTDC.  It will be as convincing to you as it was to me.

Have a nice weekend.

Jeff


**JEFFREY JACOBSON**

Partner

Co-Chair, Class Actions Practice

**Kelley Drye & Warren LLP**
Tel: (212) 808-5145
jjacobson@kelleydrye.com


**From:** Alexis Chardon [mailto:ali@weilchardon.com]
**Sent:** Friday, January 19, 2018 6:41 PM
**To:** Jacobson, Jeffrey <JJacobson@KelleyDrye.com>
**Cc:** James, Catherine <CJames@KelleyDrye.com>; Luzadder, Matt <MLuzadder@KelleyDrye.com>; Allyson West (States Attorney) <Allyson.West@cookcountyil.gov>; ANTHONY ZECCHIN (States Attorney) <anthony.zecchin@cookcountyil.gov>; Horvat, Timothy <thorvat@atg.state.il.us>; Stephen Weil <steve@weilchardon.com>

**Subject:** Re: T.S. v. Fox: Need for Rule 37 Discovery Conference


Jeff,


I take it from the last part of your email yesterday that you are producing some of the documents that my Jan. 12 letter identified as lacking from your production.  If that's the case then it should avoid dispute over some of the issues the letter raised.

As I said in my email from Wednesday, we think a live conference would be useful, but we request a written response to the Jan. 12 letter first, so that we have time to consider your positions in advance. Our positions in the January 12 letter are straightforward so I'm surprised that you're treating that request as some sort of squeeze maneuver, but in all events we didn't expect to have exhausted our meet-and-confer process by the time of the status conference. If you to not want to have the conference beforehand, then we can have it sometime after the status.

It appears that you are proposing to set a motion schedule for discovery and to proceed before a magistrate. Without knowing the scope (if any) of our discovery dispute we don't believe a pre-set motion schedule makes sense. And given the complex nature of this case and Judge St. Eve's familiarity with it, we don't believe that proceeding before a magistrate would be productive. Your email from yesterday also discusses your position on the merits in the case at length. We aren't sure what to make of this, except to respond that discussion is out of place at this stage, since the case is in discovery.

Best regards,

Ali

Alexis G. Chardon, Esq.

Weil & Chardon LLC

333 S. Wabash Avenue, Suite 2700

Chicago, IL 60604

ali@weilchardon.com

312-585-7404 (office)

312-752-6046 (cell)

312-995-7102 (fax)

The information contained in this email any any attachments is intended only for the personal and confidential use of the designated recipient named above. This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution, or copying of the message and any attachments is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and/or reply email.

On Thu, Jan 18, 2018 at 5:39 PM, Jacobson, Jeffrey <JJacobson@kelleydrye.com> wrote:

Ali,

Thanks for your prompt response. When I saw your letter on Friday, which you sent a month after we served our responses and barely a week before a long-scheduled status conference, my cynical mind thought that perhaps you were focused more on generating a dispute to discuss at the conference rather than actually trying to reach acceptable compromises. My practical side

won out over my cynicism, and I suggested we discuss these not-particularly-urgent issues after the hearing rather than before. My thought was we could jointly tell the Court that discovery is proceeding apace, that we might have disputes requiring adjudication in the near future, but we are trying to work through them. We might ask Judge St. Eve if she wants to hear discovery disputes or wants them presented to the Magistrate Judge, and if she wants to hear them herself, we could suggest that she put something like an early March date on the calendar for the next status conference, which we can advise her we don't need if we work through our disagreements cooperatively.

From my perspective, if that suggestion does not work for you and you want to get into an elongated discussion about what the parties have been doing since the last conference, I might offer the following highlights from a tour of the JTDC—which, I note, you have not requested—and from our extensive review of the documents produced by all defendants:

**Infirmary/Medical Treatment:** You now know conclusively that Fox never filmed in the infirmary. The infirmary is, and on all filming days was, open, operating, and accessible through multiple doors. You have seen records confirming that medical rounds and treatments occurred without interruption on filming days. Through your own discovery responses, you have demonstrated that the Second Amended Complaint's false allegations to the contrary are based on nothing more than double-hearsay. The record on this issue is so clear that I do not think you can even make reference to your medical treatment allegations in future briefing to the Court.

**School Activities:** As you have admitted, school was out for the summer on the days that Fox filmed. Filming therefore disrupted no regular schooling and no schooling at all during at least two of the three filming periods. To the extent summer school activities may have occurred over the four relevant days in July, and if some of those activities went forward in residential pods rather than classrooms, you should understand that the common seating areas in the pods are equivalently sized with classrooms and that detainees are subject to exactly the same restrictions (*i.e.*, need to ask permission to stand, etc.) regardless of where those activities occurred.

**Recreational Options:** The outdoor recreation area has a concrete surface; there is no grass. The JTDC also has two massive gymnasiums as well as other recreational options, all of which were available on filming days. You have seen records of all the recreational activities that occurred on filming days. You also should be aware by now that detainees do not have access to the outdoor area on any day where the temperature is above or below set limits or the weather is otherwise inclement. It is, as I said, only one of many recreational options at the JTDC, the rest of which are not weather-dependent. Further, the beautiful wall-length mural that you contended Fox painted over during filming is still there, fully intact. It was merely covered during filming.

**Visitation:** You have seen the visitation logs showing that visitations occurred on schedule during all filming days. The room used for family visitation on the days when *Empire* filmed in the regular visitation room is larger than the regular room and has exactly the same seating capacity. The presence of the *Empire* cast and crew did not necessitate any cancellations of family visits, and the separate facility where detainees can have private meetings with counsel was never impacted in any way.

**"Chapel":** The room your complaint describes as the Chapel, which indeed hosts religious services on holidays, is just a large room with no religious indicia at all. When I toured the JTDC, that room was in use by facility personnel conducting physical training.

Put bluntly, the record already is clear—or is coming very close to being clear—that no breach of fiduciary duty occurred. Your burden to maintain a claim against Fox is to demonstrate that we "knowingly induced" or "knowingly participated in" a breach of fiduciary duty. To satisfy our discovery obligations, Fox already has produced to you, among other things, most of the emails between our personnel and the JTDC and internal emails regarding filming. We will supplement our production shortly, at which point you will have all such documents. You already have all records in our possession regarding who was present at the JTDC for Fox and where we filmed. The JTDC forbade the taking of unauthorized photographs by Fox personnel and we have no reason to believe that anyone violated that directive. We have looked for signs created and posted in the JTDC during filming and found none; they all appear to have been discarded when filming ended. We believe you already have records of all monies Fox paid to the JTDC—the rental fees and the other items (reimbursement of overtime, etc.) that the contract obligated us to pay, although we would be happy to discuss with you any perceived missing items.

To be clear, I do not think that the Court expects this kind of detail from either side at a status conference. It is better, I think, simply to advise the Court that we are moving forward and have no ripe disputes at this time. If it your intention to tee up unripe disputes, however, I think the Court will want to understand the full landscape.

Please let me know how you would like to proceed.

Thanks, and best regards,

Jeff

**JEFFREY JACOBSON**

Partner

Co-Chair, Class Actions Practice

**Kelley Drye & Warren LLP**
Tel: (212) 808-5145
jjacobson@kelleydrye.com

**From:** Alexis Chardon [mailto:ali@weilchardon.com]
**Sent:** Wednesday, January 17, 2018 5:10 PM
**To:** Jacobson, Jeffrey <JJacobson@KelleyDrye.com>
**Cc:** James, Catherine <CJames@KelleyDrye.com>; Luzadder, Matt <MLuzadder@KelleyDrye.com>; Allyson West (States Attorney) <Allyson.West@cookcountyil.gov>; ANTHONY ZECCHIN (States Attorney) <anthony.zecchin@cookcountyil.gov>; Horvat, Timothy <thorvat@atg.state.il.us>; Stephen Weil <steve@weilchardon.com>; Fletcher, Janine <JFletcher@KelleyDrye.com>
**Subject:** Re: T.S. v. Fox: Need for Rule 37 Discovery Conference

Dear Jeff:

Thanks for your note. We are amenable to a live conference. We would like a written response to our discovery letter beforehand. A live discovery conference will be far more productive if we've had a chance to consider the

positions you are formulating in advance. As to timing, we would prefer that we at least have an initial conference before the status hearing. At the hearings thus far Judge St. Eve has repeatedly asked where the parties stand on discovery, and we believe she will want to know whether Plaintiffs and Fox anticipate discovery problems going forward.

Regarding the MIDP, of course we don't contend that our claims against the Fox Defendants fall under the program. I referred to the MIDP in my enforcement letter because your clients repeatedly claimed that our interrogatories were vague and overbroad, when the precise same terms had been endorsed by the Court through the MIDP. Presumably you are not objecting to the interrogatories on the grounds that they are phrased in the same way as the MIDP disclosure requirements.

Best,

Ali

Alexis G. Chardon, Esq.

Weil & Chardon LLC

333 S. Wabash Avenue, Suite 2700

Chicago, IL 60604

ali@weilchardon.com

312-585-7404 (office)

312-752-6046 (cell)

312-995-7102 (fax)

The information contained in this email any any attachments is intended only for the personal and confidential use of the designated recipient named above. This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution, or copying of the message and any attachments is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and/or reply email.

On Wed, Jan 17, 2018 at 2:21 PM, Jacobson, Jeffrey <JJacobson@kelleydrye.com> wrote:

Ali,

Acknowledging receipt of your letter. We all will be together in just a few days, and I think it would be most productive for us to speak in person immediately after the status conference. Please let me know if that works.

I don't think you are asking for a point-by-point written response in advance of our conversation. I suspect it suffices at this juncture for me to say that I disagree with many (if not most) of the assertions in your letter, but that my colleagues and I would come to an oral discussion with open minds and a desire to avoid unnecessary motion practice. I do think it would be helpful, however, to know in advance of our discussion

why you believe that this case falls within the N.D. Ill.'s Mandatory Initial Discovery Pilot Program.  Our understanding is that the MIDP applies only to cases commenced after June 1, 2017.  Even if this were an MIDP case, we seem to have quite different views as to what the MIDP requires, but those differences may be moot if we agree that the MIDP does not apply to this August 2016-commenced action.  I also should say in advance of our discussion that we do not favor "tabling" any issues.  Instead, if any issues will require intervention by the Court, we would prefer—and expect the Court will prefer—to air them together.


Thanks, and best regards,


Jeff


**JEFFREY S. JACOBSON**

Partner
Co-Chair, Class Actions Practice Group

**Kelley Drye & Warren LLP**
(212) 808-5145
jjacobson@kelleydrye.com


On Jan 12, 2018, at 3:43 PM, Alexis Chardon <ali@weilchardon.com> wrote:

> Dear Jeff,
>
>
> Please review the attached letter regarding your clients' discovery responses, and contact me to schedule a conference for next week regarding the issues raised in the letter.
>
>
> Regards,
>
> Ali
>
>
> Alexis G. Chardon, Esq.
>
> Weil & Chardon LLC
>
> 333 S. Wabash Avenue, Suite 2700
>
> Chicago, IL 60604
>
> ali@weilchardon.com
>
> 312-585-7404 (office)
>
> 312-752-6046 (cell)
>
> 312-995-7102 (fax)
>
>
>
> The information contained in this email any any attachments is intended only for the personal and confidential use of the designated recipient named above. This message may

be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution, or copying of the message and any attachments is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and/or reply email.

<2018.01.12 Rule 37.2 Letter to Fox.pdf>

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

# EXHIBIT 7



Alexis Chardon <ali@weilchardon.com>

---

## Meet and Confer Recap

**Alexis Chardon** <ali@weilchardon.com>                    Wed, Jan 24, 2018 at 5:07 PM
To: "Jacobson, Jeffrey" <jjacobson@kelleydrye.com>, "Luzadder, Matt" <mluzadder@kelleydrye.com>, "James, Catherine"
<cjames@kelleydrye.com>
Cc: Stephen Weil <steve@weilchardon.com>

Jeff, Matt, and Catie:

Thanks for conferring with us today regarding your positions in response to our January 12, 2018 letter. For purposes of making sure we're on the same page in terms of at-issue requests and next steps, here is our recap of our discussion today.

Interrogatory 1: You stand by your original response to this interrogatory. We told you that we believed the list of persons you had identified was incomplete, and pointed to the example of Jonathan Klemke, who scouted the JTDC before filming. You responded that you were standing on your response on the grounds that you believe that you have identified all persons with discoverable information. We don't believe it was clear from the meeting, but it would appear we are at issue as to this interrogatory.

Interrogatory 4: Your answer is that your clients have "searched for any written communications between FBC and the County of Cook, Illinois and the Chief Judge of the Circuit Court of Cook County and any other documents discussing or referencing filming of Empire at the JTDC." You refuse to describe the nature of the search or any of the specifics queries set out in Interrogatory No. 4 on the grounds set forth in your written objections to the interrogatory. You represented to us orally at the meeting that the custodians you searched were those listed in Jeff's November 11, 2016 letter to Steve, and that you looked for "all relevant documents," but at the meeting you declined to answer the specific queries set out in Interrogatory No. 4 on the grounds that or provide further information. We are at issue as to Interrogatory No. 4.

Interrogatory No. 8 to TCFTV: You agreed to amend your answer to this interrogatory along the lines we discussed – generally (according to my understanding) that your client is not aware of any communications relating to the negotiation or performance of Section 1(D) other than what has been produced by you.

Interrogatories and RFPs relating in any way to Fox's profits: you will produce no discovery on this issue because 1) our case is not meritorious, and 2) we are not entitled to profits from advertising revenue. We are at issue as to these requests.

Interrogatory No. 9 to 21CF: You will amend your answer to the interrogatory by answering some portion and objecting to the rest.

RFP 11: You will provide a privilege log, which will encompass the entire scope of your production.

RFP 23: You will amend to answer the interrogatory (you've indicated that your client possesses nothing)

Other items:

- Catie explained the production and provided a flash drive with the additional documents. Thanks. Catie's explanation about the production was satisfactory and we are not at issue regarding the "empty"/unreadable native files.

- We will each exchange interrogatory verifications from our clients in two weeks. Please provide yours after you amend, of course. You did not identify who would sign on behalf of your clients; again, I will note that we will require the parties themselves to sign per the rules.

- You want dates for the depositions of plaintiffs, their guardians, and non-named classmembers under our control (six people). We'll work to connect with them and get back to you.

- You will object to any depositions of Fox agents or employees until all County employees have been deposed.

- The responses to the third party subpoenas, to the extent there are any, are included with the production you've already given us and any supplemental production you are planning to provide. You have not committed to any more production but have stated that there may be more. Because you are unwilling to identify who was the custodian of each document, we also understand that you are unwilling to identify which documents respond to which subpoena.

Regards,
Ali

Alexis G. Chardon, Esq.
Weil & Chardon LLC
333 S. Wabash Avenue, Suite 2700
Chicago, IL 60604
ali@weilchardon.com
312-585-7404 (office)
312-752-6046 (cell)
312-995-7102 (fax)

The information contained in this email any any attachments is intended only for the personal and confidential use of the designated recipient named above. This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution, or copying of the message and any attachments is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and/or reply email.

# EXHIBIT 8



Alexis Chardon <ali@weilchardon.com>

---

## Meet and Confer Recap

**Jacobson, Jeffrey** <JJacobson@kelleydrye.com>            Thu, Jan 25, 2018 at 1:12 PM
To: Alexis Chardon <ali@weilchardon.com>, "Luzadder, Matt" <MLuzadder@kelleydrye.com>, "James, Catherine"
<CJames@kelleydrye.com>
Cc: Stephen Weil <steve@weilchardon.com>

**Ali,**

**We disagree with your self-serving "recap" pretty much from top to bottom. This will sound more harsh than I intend it, but I wish you would spend as much time actually reviewing the documents produced to you as you seem to spend writing these unnecessary and counterproductive emails. The documentary record, once you review it, cannot help but cause you to rethink your prosecution of this case.**

Interrogatory 1: You stand by your original response to this interrogatory. We told you that we believed the list of persons you had identified was incomplete, and pointed to the example of Jonathan Klemke, who scouted the JTDC before filming. You responded that you were standing on your response on the grounds that you believe that you have identified all persons with discoverable information. We don't believe it was clear from the meeting, but it would appear we are at issue as to this interrogatory.

**Your interrogatory asked for identification of people "[we] believe" are likely to have discoverable information. We responded appropriately to that interrogatory. Your summary above, like your discussion yesterday, failed to quote your interrogatory accurately. If you want to have a debate about our "belie[f]," then I suppose we are indeed at issue. What point that would serve is a mystery to me.**

Interrogatory 4: Your answer is that your clients have "searched for any written communications between FBC and the County of Cook, Illinois and the Chief Judge of the Circuit Court of Cook County and any other documents discussing or referencing filming of Empire at the JTDC." You refuse to describe the nature of the search or any of the specifics queries set out in Interrogatory No. 4 on the grounds set forth in your written objections to the interrogatory. You represented to us orally at the meeting that the custodians you searched were those listed in Jeff's November 11, 2016 letter to Steve, and that you looked for "all relevant documents," but at the meeting you declined to answer the specific queries set out in Interrogatory No. 4 on the grounds that or provide further information. We are at issue as to Interrogatory No. 4.

**When a party uses search terms or other automated criteria to exclude documents from production, it often is appropriate for both sides to confer about those criteria and agree on them. Here, your lawsuit concerns a small number of people, a short period of time, and a discrete issue. Locating relevant documents is not particularly difficult in these circumstances and we have conferred with our clients appropriately regarding their preservation and production obligations. If you are trying to find an issue to distract from the absence of facts in your favor, this is not it. Please note, too, that your January 12 letter premised your entire argument on the MIDP, which you quickly and correctly admitted does not apply to this case. As we have pointed out, your interrogatory is inconsistent with the Seventh Circuit's approach to "discovery on discovery" and, to reiterate, our search for documents did not require the use of electronic search terms or sophisticated discovery processes used in the large commercial litigation matters you may have worked on previously.**

Interrogatory No. 8 to TCFTV: You agreed to amend your answer to this interrogatory along the lines we discussed – generally (according to my understanding) that your client is not aware of any communications relating to the negotiation or performance of Section 1(D) other than what has been produced by you.

**At yesterday's meeting, you and Steve could not agree on what you want from us in response to this perhaps poorly drafted interrogatory. It is our position that our clients' correspondence with the JTDC speaks for itself: We obeyed all restrictions that JTDC officials imposed on us, did not push back on them, and thus acted consistently with our obligation not to interfere with the JTDC's operations. I cannot imagine how it advances your case or narrows the issues in dispute for us to say in an interrogatory response, as we have said repeatedly in discussions with you, that we had no discussions with JTDC personnel inconsistent with what is**

memorialized in emails. **Nevertheless, if you amend your interrogatory to ask a question along those lines, we will answer it. I do not propose to attempt ourselves to hit a target that you and Steve kept moving.**

Interrogatories and RFPs relating in any way to Fox's profits: you will produce no discovery on this issue because 1) our case is not meritorious, and 2) we are not entitled to profits from advertising revenue. We are at issue as to these requests.

**This is not an accurate summary of the position we conveyed to you yesterday. Your requests for this kind of information are overbroad and unduly burdensome and, although you said you were willing yesterday to narrow your requests, you proposed no such narrowing. Your requests for expenses related to filming at other locations is wholly irrelevant; _Empire_ filmed at no other detention facilities. Your requests for advertising-related information also are irrelevant. We are aware that Judge St. Eve left your unjust enrichment claim intact, for now, but Judge St. Eve in no way ruled that advertising revenues paid to corporate entities above TCFTV in the corporate chain are an appropriate measure of those damages. Your clients were not alternative recipients of those revenues, as would be required for your clients to claim entitlement to them on an unjust enrichment theory. I look forward to reading a brief in which you make an argument to the contrary.**

**To be clear, I did indeed say that the merits of this case are relevant to your requests for this kind of discovery. As we have made clear in prior correspondence following your January 12 letter, the "merits" of this case now are clear: Medical treatments were not curtailed during filming; school was out of session; visitations occurred normally on filming days; and recreational opportunities abounded. I note that your "recap" of yesterday's meeting did not recount how defensive you and Steve became when I asked you what scrap of evidence you had that any detainee missed a medical treatment. You alluded to some secret evidence that you somehow managed not to include in your interrogatory responses on that issue, before later confessing that you cannot even reach some of the former detainees whose alleged experiences at the JTDC are central to the Second Amended Complaint. If you want to have an argument over whether your case is sufficiently advanced to warrant discovery related solely to the issue of damages, that is a debate I would welcome.**

Interrogatory No. 9 to 21CF: You will amend your answer to the interrogatory by answering some portion and objecting to the rest.

**I believe what we discussed yesterday is amending the response to state that no 21CF employee had communications regarding the filming of _Empire_ at the JTDC. It is entirely possible that 21CF employees possess documents "regarding the filming"—a budgetary line item, for example, could cause a document to fall into that category—but no one in the Fox group of companies, other than agents of TCFTV, had involvement in the decision to film at the JTDC or in the logistics of filming.**

RFP 11: You will provide a privilege log, which will encompass the entire scope of your production.

**That was never in dispute.**

RFP 23: You will amend to answer the interrogatory (you've indicated that your client possesses nothing)

**Yes. As I advised you previously and as we reiterated yesterday, we do not have any such signage.**

Other items:

•    Catie explained the production and provided a flash drive with the additional documents. Thanks. Catie's explanation about the production was satisfactory and we are not at issue regarding the "empty"/unreadable native files.

**Thank you.**

•    We will each exchange interrogatory verifications from our clients in two weeks. Please provide yours after you amend, of course. You did not identify who would sign on behalf of your clients; again, I will note that we will require the parties themselves to sign per the rules.

**No response required.**

•    You want dates for the depositions of plaintiffs, their guardians, and non-named classmembers under our control (six people). We'll work to connect with them and get back to you.

**Your statement that you will "work to connect with them," on top of your admission yesterday that you have been unable to reach them, is a matter of concern. We intend to complete all of these depositions on mutually agreeable dates in February and we will notice them unilaterally if we do not hear back from you very shortly. It goes without saying that you cannot maintain this case**

without cooperative clients, nor can they serve as class representatives if they are not meaningfully supervising your work in this case.

- You will object to any depositions of Fox agents or employees until all County employees have been deposed.

I did not say "all," but we do intend to object to the depositions of Fox employees and agents until after you have deposed at least the main County witnesses. Your burden with respect to the Fox defendants is to demonstrate that we "knowingly induced" or "knowingly participated in" a breach of fiduciary duty by the County defendants. By definition, therefore, depositions of Fox personnel cannot possibly be productive until the contours of any alleged "breach" are fully on the table. Because you face a March 16 cutoff of discovery with respect to the County defendants, with the cutoff for Fox-related discovery to be set for some date thereafter, no prejudice whatsoever will result from deferring depositions of Fox personnel until after March 16.

- The responses to the third party subpoenas, to the extent there are any, are included with the production you've already given us and any supplemental production you are planning to provide. You have not committed to any more production but have stated that there may be more. Because you are unwilling to identify who was the custodian of each document, we also understand that you are unwilling to identify which documents respond to which subpoena.

I agree with your first sentence but not the remainder, which addresses topics we did not discuss at all yesterday. Emails speak for themselves as to the sender and recipients. If you have questions regarding the provenance of any other documents we have produced or will produce, we will be happy to answer them to the extent required by the discovery rules.

Thanks, and best regards,

Jeff

**JEFFREY S. JACOBSON**

Partner
Co-Chair, Class Action Practice

**Kelley Drye & Warren LLP**
101 Park Avenue
New York, NY 10178
Tel: (212) 808-5145

WWW.KELLEYDRYE.COM

jjacobson@kelleydrye.com

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

# EXHIBIT 9



Alexis Chardon <ali@weilchardon.com>

---

## Meet and Confer Recap

**Alexis Chardon** <ali@weilchardon.com>                                Tue, Jan 30, 2018 at 12:39 PM
To: "Jacobson, Jeffrey" <JJacobson@kelleydrye.com>
Cc: "Luzadder, Matt" <MLuzadder@kelleydrye.com>, "James, Catherine" <CJames@kelleydrye.com>, Stephen Weil <steve@weilchardon.com>

Hello Jeff,

Responses to select items in your Jan. 25 email.

**Interrogatory No. 8 to TCFTV**.  You orally represented to us that the document production you have provided provides a complete response to the questions posed in this interrogatory - in other words, nothing else was said or done with respect to Section 1(D). We accepted your proposal to amend the interrogatory to provide that substantive answer to our question; otherwise, there is still none.

**Interrogatories and RFPs relating in any way to Fox's profits**.  In my 1/24 email I recited our understanding that we were at issue with this line of discovery.  You raise several issues.

- Meet and confer regarding burden and overbreadth.  You are correct that we did not discuss your burden/overbreadth objections at our 1/24 meet-and-confer. That is because you refused, both in emails and at our meet and confer, to respond to this discovery based on your threshold objections that our case is meritless and that Plaintiffs are not entitled to advertising revenue. If you would like to move beyond these objections and discuss burden or overbreadth, as your 1/25 email seems to indicate, we'd be happy to do so. The starting point is page 5-6 of our January 12 letter, where we address your objections and explain why this discovery is reasonably calculated to lead to the discovery of admissible evidence.  For the reasons set out in the letter, we do not believe this discovery is unduly burdensome or overbroad.  If you think otherwise and would like to meet and confer regarding this issue, please respond to the points we raise in the January 12 letter by the end of the week.

- Merits.  You've argued vigorously in earlier correspondence, at the 1/24 meeting, and now in your 1/25 email that we aren't entitled to any revenue discovery against the Fox defendants because our underlying case has no merit.  To the extent you are refusing to respond to the revenue discovery on these grounds, then we remain at issue.  You seem to think that we were uncomfortable about this discussion at the meeting.  We aren't; our position at the 1/24 meeting, and our position now, is simply that your opinions about the underlying merits don't have a place in the meet-and-confer process, which concerns whether our requests, and your objections, are appropriate under the federal discovery rules.  You evidently disagree, and again, our understanding is that we are at issue regarding this objection.

- Your 1/25 email talks about our responses to your interrogatory about medical treatment. The interrogatory response we "alluded" to is the response to your Interrogatory No. 3.

**Interrogatory No. 9 to 21CF**.  You write, "I believe what we discussed yesterday is amending the response to state that no 21CF employee had communications regarding the filming of Empire at the JTDC."  That is correct, except that in addition to 21CF you also agreed to make representations about FBC.  As we discussed at the meeting, however, we will nonetheless be at issue with respect to this interrogatory, which concerns the business unit Fox Television Group.

**Depositions for named plaintiffs / guardians / non-named class members**.  What we told you at the meeting is that we would be able to produce the named plaintiffs and their guardians for deposition.  The people we are having trouble contacting are non-named class members.  You say you plan to take these depositions in February.  Under Rule 26(d)(3)(A) that is your prerogative.  Please note, however, that we anticipate receiving more discovery from the government defendants. If you depose these people now we will object to you re-deposing them later on.

**Depositions of Fox witnesses**.  As we discussed at the 1/24 meeting, we are at issue.

Ali

Alexis G. Chardon, Esq.
Weil & Chardon LLC
333 S. Wabash Avenue, Suite 2700
Chicago, IL 60604
ali@weilchardon.com
312-585-7404 (office)
312-752-6046 (cell)
312-995-7102 (fax)

The information contained in this email any any attachments is intended only for the personal and confidential use of the designated recipient named above. This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution, or copying of the message and any attachments is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and/or reply email.

[Quoted text hidden]

# EXHIBIT 10



Alexis Chardon <ali@weilchardon.com>

---

## Meet and Confer Recap

Jacobson, Jeffrey <JJacobson@kelleydrye.com>                    Wed, Jan 31, 2018 at 10:34 AM
To: Alexis Chardon <ali@weilchardon.com>
Cc: "Luzadder, Matt" <MLuzadder@kelleydrye.com>, "James, Catherine" <CJames@kelleydrye.com>, Stephen Weil
<steve@weilchardon.com>

Ali,

I am not sure what you are trying to accomplish with all of this needless back-and-forth.  None of it should be relevant to
any eventual motion practice.  Nevertheless, since you insist upon prolonging this exchange, responses below.

* * *

**Interrogatory No. 8 to TCFTV**.  You orally represented to us that the document
production you have provided provides a complete response to the questions posed in
this interrogatory - in other words, nothing else was said or done with respect to Section
1(D). We accepted your proposal to amend the interrogatory to provide that substantive
answer to our question; otherwise, there is still none.

**Response:  You are incorrect in stating that "nothing else was said or done with respect to Section 1(D)."  The
location agreement states that "TCFTV acknowledges that the Premises is a functioning Municipal Building,
operating as a residential facility for juveniles.  TCFTV will cooperate with the County, JTDC Administration, and
Security, the Department of Facilities Management and the Sheriff so that normal operations of the Building and
its occupants, and access by the public, are not disrupted in any manner whatsoever."  TCFTV followed all
instructions provided to it by JTDC administrators.  As you now seem to be rephrasing Interrogatory No. 8, you
apparently want TCFTV to identify every instruction provided to it.  Not only would such a request be overbroad,
but TCFTV is without knowledge as to whether a JTDC administrator was issuing an instruction pursuant to
Section 1(D) or for some other reason.  The short answer is that we were told where we could go and went where
we were told.  I continue not to know what more you want us to say.**

**Interrogatories and RFPs relating in any way to Fox's profits**.  In my 1/24 email I
recited our understanding that we were at issue with this line of discovery.  You raise
several issues.

- Meet and confer regarding burden and overbreadth.  You are correct that we
  did not discuss your burden/overbreadth objections at our 1/24 meet-and-
  confer. That is because you refused, both in emails and at our meet and confer,
  to respond to this discovery based on your threshold objections that our case is
  meritless and that Plaintiffs are not entitled to advertising revenue. If you would
  like to move beyond these objections and discuss burden or overbreadth, as
  your 1/25 email seems to indicate, we'd be happy to do so.  The starting point is
  page 5-6 of our January 12 letter, where we address your objections and
  explain why this discovery is reasonably calculated to lead to the discovery of
  admissible evidence.  For the reasons set out in the letter, we do not believe
  this discovery is unduly burdensome or overbroad.  If you think otherwise and
  would like to meet and confer regarding this issue, please respond to the points
  we raise in the January 12 letter by the end of the week.

- Merits.  You've argued vigorously in earlier correspondence, at the 1/24
  meeting, and now in your 1/25 email that we aren't entitled to any revenue
  discovery against the Fox defendants because our underlying case has no
  merit.  To the extent you are refusing to respond to the revenue discovery on

these grounds, then we remain at issue.  You seem to think that we were
uncomfortable about this discussion at the meeting.  We aren't; our position at
the 1/24 meeting, and our position now, is simply that your opinions about the
underlying merits don't have a place in the meet-and-confer process, which
concerns whether our requests, and your objections, are appropriate under the
federal discovery rules.  You evidently disagree, and again, our understanding
is that we are at issue regarding this objection.

**Response:  We are not withholding any documents concerning monies that the Fox Defendants paid to
Cook County related to filming at the JTDC.  And, for the umpteenth time, although the demonstrable
meritlessness of your liability case certainly is relevant to our arguments about undue burden, that is
not the sole reason we are declining to provide information about advertising revenues
for *Empire* received by corporate entities above TCFTV.  We have many other objections, including that
(1) the limited claims that Judge St. Eve allowed you to pursue do not and cannot implicate any
corporate entity other than TCFTV, which was the only entity present at or involved with filming at the
JTDC; (2) advertising revenues are not a viable measure of damages in an "unjust enrichment" claim
because Plaintiffs were not alternative recipients of those revenues; and (3) even if advertising
revenues are relevant, which they are not, your demands for revenues related to two entire seasons
of *Empire* are vastly overbroad and unduly burdensome.  It is clear we will not reach agreement on this
issue and, although I think any motion practice on it would be premature and wasteful of the parties'
and the Court's time, I do not think any further written exchanges between us on this issue would be
productive, either.**

- Your 1/25 email talks about our responses to your interrogatory about medical
  treatment.  The interrogatory response we "alluded" to is the response to your
  Interrogatory No. 3.

**Response:  It remains my conviction that you would be violating your duty of candor to the Court if you continue
to assert in this case that TCFTV filmed in the infirmary, which we have demonstrated we did not, or that TCFTV's
presence curtailed infirmary operations, which Cook County has demonstrated did not happen.  Your
interrogatory responses say only that "▆▆▆▆ recalls that he put in sick call requests both during the normal
operation and during Empire filming," but he does not say that his requests were handled any differently during
filming.  ▆▆▆▆ responses admit that he did not make sick call requests at all during filming.  As far as I am
concerned, this issue is off the table unless and until you identify—which you will not be able to do—a live
human being who alleges that his sick call requests went unheeded or were delayed during and because of
filming.**

**Interrogatory No. 9 to 21CF**.  You write, "I believe what we discussed yesterday is
amending the response to state that no 21CF employee had communications regarding
the filming of Empire at the JTDC."  That is correct, except that in addition to 21CF you
also agreed to make representations about FBC.  As we discussed at the meeting,
however, we will nonetheless be at issue with respect to this interrogatory, which
concerns the business unit Fox Television Group.

**Response:  I do not understand what is purportedly "at issue."  The surviving claim in this case is that Fox
employees or agents "knowingly induced" or "knowingly participated in" a breach of duty by JTDC officials.  Of
the Fox entities you have sued, only TCFTV was present at the JTDC.**

Thanks, and best regards,

Jeff

**JEFFREY S. JACOBSON**
Partner
Co-Chair, Class Action Practice
**Kelley Drye & Warren LLP**
101 Park Avenue
New York, NY 10178
Tel: (212) 808-5145

WWW.KELLEYDRYE.COM
jjacobson@kelleydrye.com

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

# EXHIBIT 11

Case: 1:16-cv-08303 Document #: 138-1 Filed: 03/02/18 Page 69 of 170 PageID #:1090



**Alexis Chardon <ali@weilchardon.com>**

---

## Meet and Confer Recap

**Alexis Chardon** <ali@weilchardon.com>                    Wed, Jan 31, 2018 at 3:59 PM
To: "Jacobson, Jeffrey" <JJacobson@kelleydrye.com>
Cc: "Luzadder, Matt" <MLuzadder@kelleydrye.com>, "James, Catherine" <CJames@kelleydrye.com>, Stephen Weil <steve@weilchardon.com>

Thanks for your response, Jeff.

The point of the emails has been to clarify where we are for the purposes of our motion to compel, so we don't move to compel something that is not at issue.  To that end - we were under the impression after our meet and confer that you were submitting amended answers to interrogatories to TCTV Rog 8 and 21CF Rog 9. But from your last emails that does not look to be the case. Can you just clarify which interrogatories, if any, you are planning to amend, or confirm that you are standing on your earlier answers?


Alexis G. Chardon, Esq.
Weil & Chardon LLC
333 S. Wabash Avenue, Suite 2700
Chicago, IL 60604
ali@weilchardon.com
312-585-7404 (office)
312-752-6046 (cell)
312-995-7102 (fax)

The information contained in this email any any attachments is intended only for the personal and confidential use of the designated recipient named above. This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution, or copying of the message and any attachments is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and/or reply email.

[Quoted text hidden]

# EXHIBIT 12



**Alexis Chardon <ali@weilchardon.com>**

---

## Meet and Confer Recap

Luzadder, Matt <MLuzadder@kelleydrye.com>                                    Fri, Feb 2, 2018 at 10:55 AM
To: Alexis Chardon <ali@weilchardon.com>, "Jacobson, Jeffrey" <JJacobson@kelleydrye.com>
Cc: "James, Catherine" <CJames@kelleydrye.com>, Stephen Weil <steve@weilchardon.com>

Alexis,

To clarify, we will be amending our answers to interrogatories shortly per our understanding of the meet and confer.

Have a great weekend,

Matt

**MATT LUZADDER**
Partner

**Kelley Drye & Warren LLP**
(312) 857-2623
mluzadder@kelleydrye.com

**From:** Alexis Chardon [mailto:ali@weilchardon.com]
**Sent:** Wednesday, January 31, 2018 4:00 PM
**To:** Jacobson, Jeffrey <JJacobson@KelleyDrye.com>
**Cc:** Luzadder, Matt <MLuzadder@KelleyDrye.com>; James, Catherine <CJames@kelleydrye.com>; Stephen Weil <steve@weilchardon.com>
**Subject:** Re: Meet and Confer Recap

Thanks for your response, Jeff.

The point of the emails has been to clarify where we are for the purposes of our motion to compel, so we don't move to compel something that is not at issue. To that end - we were under the impression after our meet and confer that you were submitting amended answers to interrogatories to TCTV Rog 8 and 21CF Rog 9. But from your last emails that does not look to be the case. Can you just clarify which interrogatories, if any, you are planning to amend, or confirm that you are standing on your earlier answers?

Alexis G. Chardon, Esq.

2/27/2018                                                                                                                                                Weil & Chardon Mail - International Union...

Case: 1:16-cv-08303 Document #: 141-1 Filed: 03/06/18 Page 72 of 170 PageID #:1012
Case: 1:16-cv-08303 Document #: 138-1 Filed: 03/02/18 Page 72 of 170 PageID #:1093

Weil & Chardon LLC

333 S. Wabash Avenue, Suite 2700

Chicago, IL 60604

ali@weilchardon.com

312-585-7404 (office)

312-752-6046 (cell)

312-995-7102 (fax)

The information contained in this email any any attachments is intended only for the personal and confidential use of the designated recipient named above. This message may be an attorney-client communication, and as such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, distribution, or copying of the message and any attachments is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and/or reply email.

On Wed, Jan 31, 2018 at 10:34 AM, Jacobson, Jeffrey <JJacobson@kelleydrye.com> wrote:

Ali,

I am not sure what you are trying to accomplish with all of this needless back-and-forth.  None of it should be relevant to any eventual motion practice.  Nevertheless, since you insist upon prolonging this exchange, responses below.

* * *

**Interrogatory No. 8 to TCFTV**.  You orally represented to us that the document production you have provided provides a complete response to the questions posed in this interrogatory - in other words, nothing else was said or done with respect to Section 1(D). We accepted your proposal to amend the interrogatory to provide that substantive answer to our question; otherwise, there is still none.

**Response:  You are incorrect in stating that "nothing else was said or done with respect to Section 1(D)."  The location agreement states that "TCFTV acknowledges that the Premises is a functioning Municipal Building, operating as a residential facility for juveniles.  TCFTV will cooperate with the County, JTDC Administration, and Security, the Department of Facilities Management and the Sheriff so that normal operations of the Building and its occupants, and access by the public, are not disrupted in any manner whatsoever."  TCFTV followed all instructions provided to it by JTDC administrators.  As you now seem to be rephrasing Interrogatory No. 8, you apparently want TCFTV to identify every instruction provided to it.  Not only would such a request be overbroad, but TCFTV is without knowledge as to whether a JTDC administrator was issuing an instruction pursuant to Section 1(D) or for some other reason.  The short answer is that we were told where we could go and went where we were told.  I continue not to know what more you want us to say.**

**Interrogatories and RFPs relating in any way to Fox's profits**.  In my 1/24 email I recited our understanding that we were at issue with this line of discovery.  You raise several issues.

    •    Meet and confer regarding burden and overbreadth.  You are correct that we did not discuss your burden/overbreadth objections at our 1/24 meet-and-confer. That is because you refused, both in emails and at our meet and confer, to respond to this discovery based on your threshold objections that our case is meritless and that Plaintiffs are not entitled to advertising revenue. If you would like to move beyond these objections and discuss burden or

overbreadth, as your 1/25 email seems to indicate, we'd be happy to do so. The starting point is page 5-6 of our January 12 letter, where we address your objections and explain why this discovery is reasonably calculated to lead to the discovery of admissible evidence. For the reasons set out in the letter, we do not believe this discovery is unduly burdensome or overbroad. If you think otherwise and would like to meet and confer regarding this issue, please respond to the points we raise in the January 12 letter by the end of the week.

• Merits. You've argued vigorously in earlier correspondence, at the 1/24 meeting, and now in your 1/25 email that we aren't entitled to any revenue discovery against the Fox defendants because our underlying case has no merit. To the extent you are refusing to respond to the revenue discovery on these grounds, then we remain at issue. You seem to think that we were uncomfortable about this discussion at the meeting. We aren't; our position at the 1/24 meeting, and our position now, is simply that your opinions about the underlying merits don't have a place in the meet-and-confer process, which concerns whether our requests, and your objections, are appropriate under the federal discovery rules. You evidently disagree, and again, our understanding is that we are at issue regarding this objection.

**Response: We are not withholding any documents concerning monies that the Fox Defendants paid to Cook County related to filming at the JTDC. And, for the umpteenth time, although the demonstrable meritlessness of your liability case certainly is relevant to our arguments about undue burden, that is not the sole reason we are declining to provide information about advertising revenues for *Empire* received by corporate entities above TCFTV. We have many other objections, including that (1) the limited claims that Judge St. Eve allowed you to pursue do not and cannot implicate any corporate entity other than TCFTV, which was the only entity present at or involved with filming at the JTDC; (2) advertising revenues are not a viable measure of damages in an "unjust enrichment" claim because Plaintiffs were not alternative recipients of those revenues; and (3) even if advertising revenues are relevant, which they are not, your demands for revenues related to two entire seasons of *Empire* are vastly overbroad and unduly burdensome. It is clear we will not reach agreement on this issue and, although I think any motion practice on it would be premature and wasteful of the parties' and the Court's time, I do not think any further written exchanges between us on this issue would be productive, either.**

• Your 1/25 email talks about our responses to your interrogatory about medical treatment. The interrogatory response we "alluded" to is the response to your Interrogatory No. 3.

**Response: It remains my conviction that you would be violating your duty of candor to the Court if you continue to assert in this case that TCFTV filmed in the infirmary, which we have demonstrated we did not, or that TCFTV's presence curtailed infirmary operations, which Cook County has demonstrated did not happen. Your interrogatory responses say only that "[redacted] recalls that he put in sick call requests both during the normal operation and during *Empire* filming," but he does not say that his requests were handled any differently during filming. [redacted] responses admit that he did not make sick call requests at all during filming. As far as I am concerned, this issue is off the table unless and until you identify—which you will not be able to do—a live human being who alleges that his sick call requests went unheeded or were delayed during and because of filming.**

**Interrogatory No. 9 to 21CF**. You write, "I believe what we discussed yesterday is amending the response to state that no 21CF employee had communications regarding the filming of Empire at the JTDC." That is correct, except that in addition to 21CF you also agreed to make representations about FBC. As we discussed at the meeting, however, we will nonetheless be at issue with respect to this interrogatory, which concerns the business unit Fox Television Group.

**Response: I do not understand what is purportedly "at issue." The surviving claim in this case is that Fox employees or agents "knowingly induced" or "knowingly participated in" a breach of duty by JTDC officials. Of the Fox entities you have sued, only TCFTV was present at the JTDC.**

Thanks, and best regards,

Jeff

**JEFFREY S. JACOBSON**

Partner

Co-Chair, Class Action Practice

**Kelley Drye & Warren LLP**

101 Park Avenue

New York, NY 10178

Tel: (212) 808-5145

WWW.KELLEYDRYE.COM

jjacobson@kelleydrye.com

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

The information contained in this E-mail message is privileged, confidential, and may be protected from disclosure; please be aware that any other use, printing, copying, disclosure or dissemination of this communication may be subject to legal restriction or sanction. If you think that you have received this E-mail message in error, please reply to the sender.

This E-mail message and any attachments have been scanned for viruses and are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened. However, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Kelley Drye & Warren LLP for any loss or damage arising in any way from its use.

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| T.S. *et al.*,<br><br>                    Plaintiffs,<br><br>          v.<br><br>Twentieth Century Fox Television *et al.*,<br><br>                    Defendants. | Case No. 1:16-cv-08303<br><br>Hon. Amy J. St. Eve |

## TWENTIETH CENTURY FOX TELEVISION'S AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, by and through its attorneys, Twentieth Century Fox Television ("TCFTV") hereby objects and responds to Plaintiff's First Set of Interrogatories ("Responses"):

## PRELIMINARY STATEMENT

All Responses that follow are made subject to this preliminary statement.

1.      The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Interrogatories or Responses; (3) the right to object to the use of information produced in response to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2.      The information and responses supplied herein are for use in this action only, and for no other purpose.

3.      Any statement by TCFTV that it is producing or will produce information responsive to any Interrogatory does not mean that it possesses responsive information.  A statement that TCFTV is producing or will produce information responsive to any Interrogatory means only that TCFTV is conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information at the conclusion of its investigation.  No response or objection made herein, or lack thereof, is an admission by TCFTV as to the existence or non-existence of any information.

4.      TCFTV expressly preserves its objections to these Interrogatories to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery. Inadvertent production of information that TCFTV later claims was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege.  Instead, TCFTV may request the return of any inadvertently produced information stating the basis for withholding such material.

5.      TCFTV reserves the right to assert additional objections to these Interrogatories as appropriate, and to amend or supplement these objections and responses based on the results of its continuing investigation.

## OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1**: State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 1 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 1 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to TCFTV, if at all, but is available to Plaintiffs and other parties to this action. Subject to and without waiving the foregoing objections, TCFTV states:

1. Named Plaintiffs and persons who, when the Named Plaintiffs were minors, acted as their legal guardians
   Represented by counsel
   Knowledge of facts and circumstances alleged in the complaint.

2. Anna Ashcraft
   Director of Real Estate Management
   County of Cook, Real Estate Management Division
   Represented by counsel
   Knowledge of facts and circumstances alleged in their complaint.

3. Brady Breen
   Location Manager
   To be contacted through undersigned counsel
   Mr. Breen is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, TCFTV's presence at and activities within the JTDC in the summer of 2015, and contacts between TCFTV and JTDC officials before and during filming.

4. Richard Lederer
   Production Manager and Co-Producer
   To be contacted through undersigned counsel
   Mr. Lederer is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, and any payments made to the County pursuant to the Location Agreement or otherwise relating to TCFTV's presence at the JTDC in the summer of 2015.

3

5.     Loucas George
   Co-Executive Producer/Line Producer
   To be contacted through undersigned counsel.
   Mr. George is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, TCFTV's presence at and activities within the JTDC in the summer of 2015, and contacts between TCFTV and JTDC officials before and during filming.

6.     Bruce Terris
   First Assistant Director
   To be contacted through undersigned counsel.
   Mr. Terris is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, TCFTV's presence at and activities within the JTDC in the summer of 2015.

7.     Jess Gisin
   Extras Coordinator
   To be contacted through undersigned counsel
   Ms. Gisin is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the hiring of extras during filming at the JTDC.

**INTERROGATORY NO. 2**: State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses. Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 2 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 2 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to TCFTV, if at all, but is available to Plaintiffs and other parties to this action. Subject to and without waiving the foregoing objections, TCFTV states: None.

4

**INTERROGATORY NO. 3**: List the documents, ESI, tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 3 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 3 is

overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests

information regarding "any party's claims or defenses" and such information is not readily

available to TCFTV, if at all, but is available to Plaintiffs and other parties to this action. Subject

to and without waiving the foregoing objections, TCFTV refers Plaintiffs to the documents it is

producing in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century

Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television.


**INTERROGATORY NO. 4**: Describe in detail the nature of the search you have performed to discover and/or produce documents in this case. Include in your answer a description of all locations, whether electronic or physical, that have been searched, and all custodians whose documents have been searched. If you have used search terms or other parameters to search ESI, provide those terms and parameters.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 4 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case. Specifically, the information sought in

Interrogatory No. 4 is not relevant to any party's claim or defense and improperly requests TCFTV

to undertake a wholly unnecessary task that is inconsistent with the U.S. Court of Appeals for the

Seventh Circuit's approach to "discovery on discovery." *See, e.g.*, Seventh Cir. Elec. Discovery

Comm., Proposed Standing Order Relating to the Discovery of ESI, Principle 2.04(b). Subject to

and without waiving the foregoing objections, TCFTV states that it is producing all written

5

communication between TCFTV and the County of Cook, Illinois and the Chief Judge of the Circuit Court of Cook County and all written agreements, including any amendments or addenda, between TCFTV and the County of Cook, Illinois and the Chief Judge of the Circuit Court of Cook County.

**INTERROGATORY NO. 5**: Identify each employee or agent of TCFTV, FBC, or 21CF who entered the JTDC for any purpose relating to the filming of *Empire* there. For each such person, identify:

    a.      The person's name;

    b.      The person's last known contact information, including address and phone number;

    c.      The person's employer;

    d.      Each person or entity on whose behalf or at whose direction the person entered the JTDC;

    e.      The person's job title;

    f.      Each date and time that the person entered the JTDC;

    g.      Each place within the JTDC that the person travelled; and

    h.      The nature of the work or tasks the person performed within the JTDC.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 5 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 5 related to *each* employee who entered the JDTC *any* purpose is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 5 that are not relevant to any party's claim or defense. Moreover, Interrogatory No. 5 is directed at TCFTV, but requests information related to FBC and 21CF. Requests for such information are more properly directed at FBC and 21CF. Subject to and without waiving the foregoing objections, TCFTV refers

Plaintiffs to the Call Sheets and Production Reports that TCFTV is producing in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television, Bates numbers TCFTV000654 to TCFTV000986.

**INTERROGATORY NO. 6**: Identify each person who provided services to TCFTV, FBC, or 21CF, directly or indirectly, relating to the filming of *Empire* at the JTDC. For each such person, identify:

    a.     The person's name;

    b.     The person's last known contact information, including address and phone number;

    c.     The person's employer;

    d.     Each person or entity on whose behalf or at whose direction the person provided the service;

    e.     The person's job title;

    f.     Each date and time that the person entered the JTDC if any;

    g.     Each place within the JTDC, if any, that the person travelled; and

    h.     The nature of the services that the person provided.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 6 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 6 related to *each* person who provided services to TCFTV, FBC, or 21CF, *directly or indirectly*, *relating to* the filming of *Empire* at the JTDC is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 6 that are not relevant to any party's claim or defense. Moreover, Interrogatory No. 6 is directed at TCFTV, but requests information related to FBC and 21CF. Requests for such information are more properly directed at FBC and

21CF.  Subject to and without waiving the foregoing objections, TCFTV refers Plaintiffs to the

Call Sheets and Production Reports that TCFTV is producing in response to Plaintiffs' First Set of

Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and

Twentieth Century Fox Television, Bates numbers TCFTV000654 to TCFTV000986.

**INTERROGATORY NO. 7**: Identify all communications to or from any employee or agent of
TCFTV, FBC, or 21CF relating to the filming of *Empire* at the JTDC, including but not limited
to the effect of the filming on the JTDC's operations and the detainees housed there. For each
such communication, identify:

     a.      Each person who participated in the communication;

     b.      The employer of each such person or the entity for whom each such person acted
             as an agent;

     c.      The time and date of the communication;

     d.      Any documents generated by or relating to the communication; and

     e.      A fair description of the nature and substance of the communication.

**RESPONSE:** Objection.  TCFTV objects to Interrogatory No. 7 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case.  Specifically, the information sought in

Interrogatory No. 7 related to *all* communications *relating to* the filming of *Empire* at the JTDC is

overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast

amounts of detailed, narrative information in the subsections of Interrogatory No. 7 that are not

relevant to any party's claim or defense.  Moreover, Interrogatory No. 7 is directed at TCFTV, but

requests information related to FBC and 21CF.  Requests for such information are more properly

directed at FBC and 21CF.  Subject to and without waiving the foregoing objections, TCFTV

refers Plaintiffs to the documents produced in response to Plaintiffs' First Set of Requests for

Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century

Fox Television.

**INTERROGATORY NO. 8**: With respect to Section 1(D) of your Location Agreement with Cook County (ECF No. 51-2), identify:

    a.      All information, including but not limited to documents, relied upon or pursuant to which TCFTV's "acknowledge[d] that the [JTDC] is a functioning Municipal Building, operating as a residential facility for juveniles.";

    b.      Every act that TCFTV and its employees or agents took (or refrained from taking) in performance of Section 1(D); and

    c.      All your communications with any person regarding the inclusion of Section 1(D) in the Location Agreement.

**RESPONSE:** TCFTV refers Plaintiffs the documents produced in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television. TCFTV further states that all of its non-privileged communications with any person regarding the inclusion of Section 1(D) in the Location Agreement have been produced to Plaintiffs, and objects to this interrogatory on the grounds that Plaintiffs are equally capable of locating and identifying these documents within TCFTV's production. Subject to and without waiving the foregoing, TCFTV refers Plaintiffs to the following communications regarding the inclusion of Section 1(D) in the Location Agreement produced in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television, Bates numbers TCFTV000316-327.

**INTERROGATORY NO. 9**: With respect to income realized by TCFTV in relation to *Empire*, identify with specificity:

    a.      The gross revenues, net revenues, and profits you have received from Season 1 of *Empire*;

    b.      The gross revenues, net revenues, and profits you have received from Season 2 of *Empire*;

    c.      For *Empire* Season 2, Episode 1, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost; and

    d.      For *Empire* Season 2[,] Episode 2, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 9 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 9 (a) and (b) request revenue and profit information for two complete seasons of *Empire*, including revenue and profit information for Season 1, the filming of which concluded before the events giving rise to the current action. This information is not relevant to any party's claim or defense. In addition, Interrogatory No. 9 (c) and (d) request an accounting of all costs and revenue for the first two episodes of *Empire* Season 2, regardless of if the costs or revenue are related to TCFTV's filming at the JTDC. Finally, at this stage in the pleadings, the information sought in Interrogatory No. 9 is not relevant because TCFTV's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of Civil Procedure 23. Therefore discovery of actual damages issues prior to class certification is premature. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

**INTERROGATORY NO. 10**: For each of your defenses, state the facts relevant to it and the legal theories upon which it is based.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 10 because it is unduly burdensome. Specifically, Interrogatory No. 10 is a contention interrogatory that is premature at this stage in the proceeding and places an undue burden on TCFTV in purporting to require TCFTV to answer this contention interrogatory before discovery is complete in this matter. "The general

policy is to defer contention interrogatories until discovery is near an end, in order to promote efficiency and fairness." *Ziemack v. Centel Corp.*, 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995).

Date: February 16, 2018                     Respectfully Submitted,

                                            /s/ Jeffrey S. Jacobson

                                            Jeffrey S. Jacobson
                                            Kelley Drye & Warren LLP
                                            101 Park Ave
                                            New York, NY 10178
                                            212-808-5145
                                            jjacobson@kelleydrye.com

                                            Matthew C. Luzadder
                                            Catherine E. James
                                            Kelley Drye & Warren LLP
                                            333 West Wacker Drive
                                            Suite 2600
                                            Chicago, IL 60606
                                            (312) 857-7070
                                            mluzadder@kelleydrye.com
                                            cjames@kelleydrye.com

                                            *Attorneys for the Fox Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2018, a true and correct copy of the foregoing was served to all counsel of record via email.


/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

## TWENTIETH CENTURY FOX TELEVISION
## INTERROGATORY VERIFICATION

### *T.S. et al., v. Twentieth Century Fox Television et al.*

The undersigned, an agent of Twentieth Century Fox Television, a unit of Twentieth Century Fox Film Corporation ("TCFTV") who is authorized to sign this verification, hereby certifies under penalty of perjury, pursuant to 28 U.S.C. § 1746, that he has reviewed the responses to Plaintiffs' First Set of Interrogatories (Nos. 1-10), that the facts stated in the responses have been assembled by employees, agents, and/or legal representatives of TCFTV with knowledge of these matters, and that, to the best of his knowledge, information, and belief, the facts stated in such responses are correct.

Dated:  February 14, 2018

TWENTIETH CENTURY FOX TELEVISION, a unit
of Twentieth Century Fox Film Corporation

By: _____

Jonathan Harris
Senior Vice President, Legal Affairs

# EXHIBIT 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| T.S. *et al.*,<br><br>                    Plaintiffs,<br><br>        v.<br><br>Twentieth Century Fox Television *et al.*,<br><br>                    Defendants. | Case No. 1:16-cv-08303<br><br>Hon. Amy J. St. Eve |

## FOX BROADCASTING COMPANY'S AMENDED OBJECTIONS AND RESPONSES TO<br>PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, by and through its attorneys, Fox Broadcasting Company ("FBC") hereby objects and responds to Plaintiff's First Set of Interrogatories ("Responses"):

### PRELIMINARY STATEMENT

All Responses that follow are made subject to this preliminary statement.

1.      The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Interrogatories or Responses; (3) the right to object to the use of information produced in response to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2.      The information and responses supplied herein are for use in this action only, and for no other purpose.

3.      Any statement by FBC that it is producing or will produce information responsive to any Interrogatory does not mean that it possesses responsive information.  A statement that FBC is producing or will produce information responsive to any Interrogatory means only that FBC is conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information at the conclusion of its investigation.  No response or objection made herein, or lack thereof, is an admission by FBC as to the existence or non-existence of any information.

4.      FBC expressly preserves its objections to these Interrogatories to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery.  Inadvertent production of information that FBC later claims was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege.  Instead, FBC may request the return of any inadvertently produced information stating the basis for withholding such material.

5.      FBC reserves the right to assert additional objections to these Interrogatories as appropriate, and to amend or supplement these objections and responses based on the results of its continuing investigation.

## OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1**: State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 1 because it is overly broad and unduly burdensome. Specifically, Interrogatory No. 1 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to FBC, if at all, but is available to Plaintiffs and other parties to this action. Subject to and without waiving the foregoing objections, FBC states:

1. Named Plaintiffs and persons who, when the Named Plaintiffs were minors, acted as their legal guardians
   Represented by counsel
   Knowledge of facts and circumstances alleged in the complaint.

2. Anna Ashcraft
   Director of Real Estate Management
   County of Cook, Real Estate Management Division
   Represented by counsel
   Knowledge of facts and circumstances alleged in their complaint.

3. Brady Breen
   Location Manager
   To be contacted through undersigned counsel
   Mr. Breen is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, TCFTV's presence at and activities within the JTDC in the summer of 2015, and contacts between TCFTV and JTDC officials before and during filming.

4. Richard Lederer
   Production Manager and Co-Producer
   To be contacted through undersigned counsel
   Mr. Lederer is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, and any payments made to the County pursuant to the Location Agreement or otherwise relating to TCFTV's presence at the JTDC in the summer of 2015.

5.      Loucas George
        Co-Executive Producer/Line Producer
        To be contacted through undersigned counsel.
        Mr. George is likely to have knowledge regarding the facts and circumstances
        surrounding the events described in the Complaint, including, but not limited to,
        TCFTV's presence at and activities within the JTDC in the summer of 2015, and
        contacts between TCFTV and JTDC officials before and during filming.

6.      Bruce Terris
        First Assistant Director
        To be contacted through undersigned counsel.
        Mr. Terris is likely to have knowledge regarding the facts and circumstances
        surrounding the events described in the Complaint, TCFTV's presence at and
        activities within the JTDC in the summer of 2015.

7.      Jess Gisin
        Extras Coordinator
        To be contacted through undersigned counsel
        Ms. Gisin is likely to have knowledge regarding the facts and circumstances
        surrounding the events described in the Complaint, including, but not limited to,
        the hiring of extras during filming at the JTDC.


**INTERROGATORY NO. 2**: State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses. Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 2 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 2 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to FBC, if at all, but is available to Plaintiffs and other parties to this action. Subject to and without waiving the foregoing objections, FBC states: None.

4

**INTERROGATORY NO. 3**: List the documents, ESI, tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 3 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 3 is

overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests

information regarding "any party's claims or defenses" and such information is not readily

available to FBC, if at all, but is available to Plaintiffs and other parties to this action. Subject to

and without waiving the foregoing objections, FBC states that it has no "documents, ESI, tangible

things, land, or other property" that discuss filming at the JTDC. FBC further refers Plaintiffs to

the documents TCFTV is producing in response to Plaintiffs' First Set of Requests for Production

to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox

Television.

**INTERROGATORY NO. 4**: Describe in detail the nature of the search you have performed to discover and/or produce documents in this case. Include in your answer a description of all locations, whether electronic or physical, that have been searched, and all custodians whose documents have been searched. If you have used search terms or other parameters to search ESI, provide those terms and parameters.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 4 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case. Specifically, the information sought in

Interrogatory No. 4 is not relevant to any party's claim or defense and improperly requests FBC to

undertake a wholly unnecessary task that is inconsistent with the U.S. Court of Appeals for the

Seventh Circuit's approach to "discovery on discovery." *See, e.g.*, Seventh Cir. Elec. Discovery Comm., Proposed Standing Order Relating to the Discovery of ESI, Principle 2.04(b). Subject to and without waiving the foregoing objections, FBC states that it has searched for any written communication between FBC and the County of Cook, Illinois and the Chief Judge of the Circuit Court of Cook County and any other documents discussing or referencing filming of *Empire* at the JTDC and has no such documents.

**INTERROGATORY NO. 5**: Identify each employee or agent of TCFTV, FBC, or 21st Fox who entered the JTDC for any purpose relating to the filming of *Empire* there. For each such person, identify:

     a.       The person's name;

     b.       The person's last known contact information, including address and phone number;

     c.       The person's employer;

     d.       Each person or entity on whose behalf or at whose direction the person entered the JTDC;

     e.       The person's job title;

     f.       Each date and time that the person entered the JTDC;

     g.       Each place within the JTDC that the person travelled; and

     h.       The nature of the work or tasks the person performed within the JTDC.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 5 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 5 related to each employee who entered the JDTC for any purpose is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 5 that are not

relevant to any party's claim or defense. Moreover, Interrogatory No. 5 is directed at FBC, but requests information related to TCFTV and 21CF. Requests for such information are more properly directed at TCFTV and 21CF. Subject to and without waiving the foregoing objections, FBC states that no FBC employees or agents were involved in the decision to film or logistics of the filming of *Empire* at the JTDC. FBC further refers Plaintiffs to the Call Sheets and Production Reports that TCFTV is producing in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television, Bates numbers TCFTV000654 to TCFTV000986.

**INTERROGATORY NO. 6**: Identify each person who provided services to TCFTV, FBC, or 21st Fox, directly or indirectly, relating to the filming of *Empire* at the JTDC. For each such person, identify:

a.      The person's name;

b.      The person's last known contact information, including address and phone number;

c.      The person's employer;

d.      Each person or entity on whose behalf or at whose direction the person provided the service;

e.      The person's job title;

f.      Each date and time that the person entered the JTDC if any;

g.      Each place within the JTDC, if any, that the person travelled; and

h.      The nature of the services that the person provided.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 6 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 6 related to *each* person who provided services to TCFTV, FBC, or 21CF, *directly or indirectly*, *relating to* the filming of *Empire* at the JTDC is overly broad, unduly

7

burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 6 that are not relevant to any party's claim or defense. Moreover, Interrogatory No. 6 is directed at FBC, but requests information related to TCFTV and 21CF. Requests for such information are more properly directed at TCFTV and 21CF. Subject to and without waiving the foregoing objections, FBC refers Plaintiffs to the Call Sheets and Production Reports that TCFTV is producing in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television, Bates numbers TCFTV000654 to TCFTV000986.

**INTERROGATORY NO. 7**: Identify all communications to or from any employee or agent of TCFTV, FBC, or 21st Fox relating to the filming of *Empire* at the JTDC, including but not limited to the effect of the filming on the JTDC's operations and the detainees housed there. For each such communication, identify:

     a.     Each person who participated in the communication;

     b.     The time and date of the communication;

     c.     Any documents generated by or relating to the communication; and

     d.     A fair description of the nature and substance of the communication.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 7 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 7 related to *all* communications *relating to* the filming of *Empire* at the JTDC is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 7 that are not relevant to any party's claim or defense. Moreover, Interrogatory No. 7 is directed at FBC, but requests information related to TCFTV and 21CF. Requests for such information are more properly directed at TCFTV and 21CF. Subject to and without waiving the foregoing objections,

FBC states that no FBC employees or agents were involved in the decision to film or logistics of the filming of *Empire* at the JTDC. FBC further refers Plaintiffs to the documents produced in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television.

**INTERROGATORY NO. 8**: With respect to income realized by FBC in relation to *Empire*, identify with specificity:

    e.    The gross revenues, net revenues, and profits you have received from Season 1 of *Empire*;

    f.    The gross revenues, net revenues, and profits you have received from Season 2 of *Empire*;

    g.    For *Empire* Season 2, Episode 1, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost; and

    h.    For *Empire* Season 2 Episode 2, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost

**RESPONSE:** Objection. FBC objects to Interrogatory No. 8 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 8 (a) and (b) request revenue and profit information for two complete seasons of *Empire*, including revenue and profit information for Season 1, the filming of which concluded before the events giving rise to the current action. This information is not relevant to any party's claim or defense. In addition, Interrogatory No. 8 (c) and (d) request an accounting of all costs and revenue for the first two episodes of *Empire* Season 2, regardless of if the costs or revenue are related to FBC's alleged involvement in the filming at the JTDC. Finally, at this stage in the pleadings, the information sought in Interrogatory No. 8 is not relevant because FBC's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of

Civil Procedure 23. Therefore discovery of actual damages issues prior to class certification is premature. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

**INTERROGATORY NO. 9**: For each of your defenses, state the facts relevant to it and the legal theories upon which it is based.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 9 because it is unduly burdensome. Specifically, Interrogatory No. 9 is a contention interrogatory that is premature at this stage in the proceeding and places an undue burden on FBC in purporting to require FBC to answer this contention interrogatory before discovery is complete in this matter. "The general policy is to defer contention interrogatories until discovery is near an end, in order to promote efficiency and fairness." *Ziemack v. Centel Corp.*, 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995).

Date: February 16, 2018                                    Respectfully Submitted,

                                                           /s/ Jeffrey S. Jacobson

                                                           Jeffrey S. Jacobson
                                                           Kelley Drye & Warren LLP
                                                           101 Park Ave
                                                           New York, NY 10178
                                                           212-808-5145
                                                           jjacobson@kelleydrye.com

                                                           Matthew C. Luzadder
                                                           Catherine E. James
                                                           Kelley Drye & Warren LLP
                                                           333 West Wacker Drive
                                                           Suite 2600
                                                           Chicago, IL 60606
                                                           (312) 857-7070
                                                           mluzadder@kelleydrye.com
                                                           cjames@kelleydrye.com

                                                           *Attorneys for the Fox Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 16, 2018, a true and correct copy of the foregoing was served to all counsel of record via email.


/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

## FOX BROADCASTING COMPANY
## INTERROGATORY VERIFICATION

### *T.S. et al., v. Twentieth Century Fox Television et al.*

The undersigned, an agent of Fox Broadcasting Company ("FBC") who is authorized to sign this verification, hereby certifies under penalty of perjury, pursuant to 28 U.S.C. § 1746, that she has reviewed the amended responses to Plaintiffs' First Set of Interrogatories (Nos. 1-9), that the facts stated in the responses have been assembled by employees, agents, and/or legal representatives of FBC with knowledge of these matters, and that, to the best of her knowledge, information, and belief, the facts stated in such responses are correct.

Dated: February 14, 2018

FOX BROADCASTING COMPANY

By:_____

Janene Bassett
Assistant Secretary
Fox Broadcasting Company

# EXHIBIT 15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| T.S. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Twentieth Century Fox Television *et al.*,<br><br>Defendants. | Case No. 1:16-cv-08303<br><br>Hon. Amy J. St. Eve |

**TWENTY-FIRST CENTURY FOX, INC.'S AMENDED OBJECTIONS AND**
**RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, by and through its attorneys, Twenty-First Century Fox ("21CF") hereby objects and responds to Plaintiffs' First Set of Interrogatories ("Responses"):

**PRELIMINARY STATEMENT**

All Responses that follow are made subject to this preliminary statement.

1.      The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Interrogatories or Responses; (3) the right to object to the use of information produced in response to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2.      The information and responses supplied herein are for use in this action only, and for no other purpose.

3.      Any statement by 21CF that it is producing or will produce information responsive to any Interrogatory does not mean that it possesses responsive information.  A statement that 21CF is producing or will produce information responsive to any Interrogatory means only that 21CF is conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information at the conclusion of its investigation.  No response or objection made herein, or lack thereof, is an admission by 21CF as to the existence or non-existence of any information.

4.      21CF expressly preserves its objections to these Interrogatories to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery. Inadvertent production of information that 21CF later claims was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege.  Instead, 21CF may request the return of any inadvertently produced information stating the basis for withholding such material.

5.      FBC reserves the right to assert additional objections to these Interrogatories as appropriate, and to amend or supplement these objections and responses based on the results of its continuing investigation.

## OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1:** State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 1 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 1 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to 21CF, if at all, but is available to Plaintiffs and other parties to this action. Subject to and without waiving the foregoing objections, 21CF states:

1. Named Plaintiffs and persons who, when the Named Plaintiffs were minors, acted as their legal guardians
   Represented by counsel
   Knowledge of facts and circumstances alleged in the complaint.

2. Anna Ashcraft
   Director of Real Estate Management
   County of Cook, Real Estate Management Division
   Represented by counsel
   Knowledge of facts and circumstances alleged in their complaint.

3. Brady Breen
   Location Manager
   To be contacted through undersigned counsel
   Mr. Breen is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, TCFTV's presence at and activities within the JTDC in the summer of 2015, and contacts between TCFTV and JTDC officials before and during filming.

4. Richard Lederer
   Production Manager and Co-Producer
   To be contacted through undersigned counsel
   Mr. Lederer is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, and any payments

3

made to the County pursuant to the Location Agreement or otherwise relating to TCFTV's presence at the JTDC in the summer of 2015.

5.    Loucas George
Co-Executive Producer/Line Producer
To be contacted through undersigned counsel.
Mr. George is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, TCFTV's presence at and activities within the JTDC in the summer of 2015, and contacts between TCFTV and JTDC officials before and during filming.

6.    Bruce Terris
First Assistant Director
To be contacted through undersigned counsel.
Mr. Terris is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, TCFTV's presence at and activities within the JTDC in the summer of 2015.

7.    Jess Gisin
Extras Coordinator
To be contacted through undersigned counsel
Ms. Gisin is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the hiring of extras during filming at the JTDC.

**INTERROGATORY NO. 2:** State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses. Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

**RESPONSE**: Objection.  21CF objects to Interrogatory No. 2 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case.  Specifically, Interrogatory No. 2 is

overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests

information regarding "any party's claims or defenses" and such information is not readily

available to 21CF, if at all, but is available to Plaintiffs and other parties to this action.  Subject to

and without waiving the foregoing objections, 21CF states:  None.

**INTERROGATORY NO. 3:** List the documents, ESI, tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 3 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 3 is

overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests

information regarding "any party's claims or defenses" and such information is not readily

available to 21CF, if at all, but is available to Plaintiffs and other parties to this action. Subject to

and without waiving the foregoing objections, 21CF states that it has no "documents, ESI, tangible

things, land, or other property" that discuss filming at the JTDC. 21CF further refers Plaintiffs to

the documents TCFTV is producing in response to Plaintiffs' First Set of Requests for Production

to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox

Television.


**INTERROGATORY NO. 4** Describe in detail the nature of the search you have performed to discover and/or produce documents in this case. Include in your answer a description of all locations, whether electronic or physical, that have been searched, and all custodians whose documents have been searched. If you have used search terms or other parameters to search ESI, provide those terms and parameters.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 4 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case. Specifically, the information sought in

Interrogatory No. 4 is not relevant to any party's claim or defense and improperly requests 21CF

to undertake a wholly unnecessary task that is inconsistent with the U.S. Court of Appeals for the

Seventh Circuit's approach to "discovery on discovery." *See, e.g.*, Seventh Cir. Elec. Discovery

5

Comm., Proposed Standing Order Relating to the Discovery of ESI, Principle 2.04(b). Subject to and without waiving the foregoing objections, 21CF states that it has searched for any written communication between 21CF and the County of Cook, Illinois and the Chief Judge of the Circuit Court of Cook County and any other documents discussing or referencing filming of *Empire* at the JTDC and has no such documents.

**INTERROGATORY NO. 5:** Identify each employee or agent of TCFTV, FBC, or 21CF who entered the JTDC for any purpose relating to the filming of *Empire* there. For each such person, identify:

      a.      The person's name;

      b.      The person's last known contact information, including address and phone number;

      c.      The person's employer;

      d.      Each person or entity on whose behalf or at whose direction the person entered the JTDC;

      e.      The person's job title;

      f.      Each date and time that the person entered the JTDC;

      g.      Each place within the JTDC that the person travelled; and

      h.      The nature of the work or tasks the person performed within the JTDC.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 5 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 5 related to each employee who entered the JDTC for any purpose is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 5 that are not relevant to any party's claim or defense. Moreover, Interrogatory No. 5 is directed at 21CF, but

requests information related to TCFTV and FBC. Requests for such information are more properly

directed at TCFTV and FBC. Subject to and without waiving the foregoing objections, 21CF states

that no 21CF employees or agents were involved in the decision to film or logistics of the filming

of *Empire* at the JTDC. 21CF further refers Plaintiffs to the Call Sheets and Production Reports

that TCFTV is producing in response to Plaintiffs' First Set of Requests for Production to Twenty-

First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television, Bates

numbers TCFTV000654 to TCFTV000986.


**INTERROGATORY NO. 6:** Identify each person who provided services to TCFTV, FBC, or
21CF, directly or indirectly, relating to the filming of *Empire* at the JTDC. For each such person,
identify:

      a.      The person's name;

      b.      The person's last known contact information, including address and phone
              number;

      c.      The person's employer;

      d.      Each person or entity on whose behalf or at whose direction the person provided
              the service;

      e.      The person's job title;

      f.      Each date and time that the person entered the JTDC if any;

      g.      Each place within the JTDC, if any, that the person travelled; and

      h.      The nature of the services that the person provided.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 6 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case. Specifically, the information sought in

Interrogatory No. 6 related to *each* person who provided services to TCFTV, FBC, or 21CF,

*directly or indirectly*, *relating to* the filming of *Empire* at the JTDC is overly broad, unduly

burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed,

7

narrative information in the subsections of Interrogatory No. 6 that are not relevant to any party's

claim or defense.  Moreover, Interrogatory No. 6 is directed at 21CF, but requests information

related to TCFTV and FBC.  Requests for such information are more properly directed at TCFTV

and FBC.  Subject to and without waiving the foregoing objections, 21CF refers Plaintiffs to the

Call Sheets and Production Reports that TCFTV is producing in response to Plaintiffs' First Set of

Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and

Twentieth Century Fox Television, Bates numbers TCFTV000654 to TCFTV000986.


**INTERROGATORY NO. 7:** Identify all communications to or from any employee or agent of
TCFTV, FBC, or 21CF relating to the filming of *Empire* at the JTDC, including but not limited
to the effect of the filming on the JTDC's operations and the detainees housed there. For each
such communication, identify:

      a.      Each person who participated in the communication;

      b.      The employer of each such person or the entity for whom each such person acted
             as an agent;

      c.      The time and date of the communication;

      d.      Any documents generated by or relating to the communication; and

      e.      A fair description of the nature and substance of the communication.

**RESPONSE**:  Objection.  21CF objects to Interrogatory No. 7 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case.  Specifically, the information sought in

Interrogatory No. 7 related to *all* communications *relating to* the filming of *Empire* at the JTDC is

overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast

amounts of detailed, narrative information in the subsections of Interrogatory No. 7 that are not

relevant to any party's claim or defense.  Moreover, Interrogatory No. 7 is directed at 21CF, but

requests information related to TCFTV and FBC.  Requests for such information are more properly

directed at TCFTV and FBC.  Subject to and without waiving the foregoing objections, 21CF states

that no 21CF employees or agents were involved in the decision to film or logistics of the filming of *Empire* at the JTDC. 21CF further refers Plaintiffs to the documents produced in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television.

**INTERROGATORY NO. 8:** With respect to income realized by 21CF or any of its subsidiaries in relation to *Empire*, identify with specificity for each such entity:

    a.    The gross revenues, net revenues, and profits that received from Season 1 of *Empire*;

    b.    The gross revenues, net revenues, and profits received from Season 2 of *Empire*;

    c.    For *Empire* Season 2, Episode 1, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost; and

    d.    For *Empire* Season 2 Episode 2, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 8 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 8 (a) and (b) request revenue and profit information for two complete seasons of *Empire*, including revenue and profit information for Season 1, the filming of which concluded before the events giving rise to the current action. This information is not relevant to any party's claim or defense. In addition, Interrogatory No. 8 (c) and (d) request an accounting of all costs and revenue for the first two episodes of *Empire* Season 2, regardless of if the costs or revenue are related to 21CF's alleged involvement in the filming at the JTDC. Finally, at this stage in the pleadings, the information sought in Interrogatory No. 8 is not relevant because 21CF's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of Civil Procedure 23. Therefore discovery of actual damages issues prior to class certification is premature. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

**INTERROGATORY NO. 9:** Identify each employee or agent of 21CF or any of its subsidiaries who were assigned to or worked in or as part of the business unit "Fox Television Group" during the Relevant Period. For each such person, identify:

    a.      The legal entity (e.g., 21CF, FBC, TCFTV, or other) that employed the person;

    b.      The title or role of the person within Fox Television Group;

    c.      Any and all communications that the person had regarding the filming of *Empire* at the JTDC; and

    d.      Any and all documents in the person's possession regarding the filming of *Empire* at the JTDC.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 9 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 9 seeks information that is not relevant to any party's claim or defense, including that identity of alleged employees or agents that had nothing to do with the filming at the JTDC. Moreover, the information sought in Interrogatory No. 9(c) related to *all* communications *regarding* the filming of *Empire* at the JTDC is overly broad and unduly burdensome in that most of the communications and documents sought are not relevant to any party's claims or defense. Subject to and without waiving the foregoing, 21CF states that no 21CF employees or agents were involved in the decision to film or logistics of the filming of *Empire* at the JTDC.

**INTERROGATORY NO. 10**: For each of your defenses, state the facts relevant to it and the legal theories upon which it is based.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 10 because it is unduly burdensome. Specifically, Interrogatory No. 10 is a contention interrogatory that is premature at this stage in

the proceeding and places an undue burden on 21CF in purporting to require 21CF to answer this contention interrogatory before discovery is complete in this matter. "The general policy is to defer contention interrogatories until discovery is near an end, in order to promote efficiency and fairness." *Ziemack v. Centel Corp.*, 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995).

Date: February 16, 2018                    Respectfully Submitted,

                                           /s/ Jeffrey S. Jacobson

                                           Jeffrey S. Jacobson
                                           Kelley Drye & Warren LLP
                                           101 Park Ave
                                           New York, NY 10178
                                           212-808-5145
                                           jjacobson@kelleydrye.com

                                           Matthew C. Luzadder
                                           Catherine E. James
                                           Kelley Drye & Warren LLP
                                           333 West Wacker Drive
                                           Suite 2600
                                           Chicago, IL 60606
                                           (312) 857-7070
                                           mluzadder@kelleydrye.com
                                           cjames@kelleydrye.com

                                           *Attorneys for the Fox Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2018, a true and correct copy of the foregoing was served to all counsel of record via email.

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

## TWENTY-FIRST CENTURY FOX, INC.
## INTERROGATORY VERIFICATION

### *T.S. et al., v. Twentieth Century Fox Television et al.*

The undersigned, an agent of Twenty-First Century Fox, Inc. ("21CF") who is authorized to sign this verification, hereby certifies under penalty of perjury, pursuant to 28 U.S.C. § 1746, that she has reviewed the amended responses to Plaintiffs' First Set of Interrogatories (Nos. 1-10), that the facts stated in the responses have been assembled by employees, agents, and/or legal representatives of 21CF with knowledge of these matters, and that, to the best of her knowledge, information, and belief, the facts stated in such responses are correct.

Dated: February 14, 2018

TWENTY-FIRST CENTURY FOX, INC.

By: _____

Janene Bassett
Assistant Secretary
Twenty-First Century Fox, Inc.

# EXHIBIT 16

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| T.S. *et al.*, | Case No. 1:16-cv-08303 |
| Plaintiffs, | Hon. Amy J. St. Eve |
| v. | |
| Twentieth Century Fox Television *et al.*, | |
| Defendants. | |

## TWENTY-FIRST CENTURY FOX, INC., FOX BROADCASTING COMPANY, AND TWENTIETH CENTURY FOX TELEVISION OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, by and through their attorneys, Twentieth Century Fox Film Corporation ("TCFTV"); Fox Broadcasting Company ("FBC"); and Twenty-First Century Fox, Inc. ("21CF") (collectively the "Fox Defendants"), hereby object and respond ("Responses") to Plaintiffs' First Set of Requests for Production ("Requests"):

### PRELIMINARY STATEMENT

All Responses that follow are made subject to this preliminary statement.

1.      The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Requests or Responses; (3) the right to object to the use of information produced in response to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2.     The information and responses supplied herein are for use in this action only, and for no other purpose.

3.     Any statement by the Fox Defendants that they are producing or will produce information or documents responsive to any Request does not mean that any of the Fox Defendants, either individually or collectively, possesses responsive information. A statement that the Fox Defendants are producing or will produce information or documents responsive to any Request means only that the Fox Defendants are conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information or documents at the conclusion of its investigation within their respective possession, custody, or control. No response or objection made herein, or lack thereof, is an admission by any of the Fox Defendants as to the existence or non-existence of any information or documents.

4.     The Fox Defendants expressly preserve their objections to these Requests to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery. Inadvertent production of information that the Fox Defendants later claim was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege. Instead, the Fox Defendants may request the return of any inadvertently produced information stating the basis for withholding such material.

5.      The Fox Defendants reserve the right to assert additional objections to these Requests as appropriate, and to amend or supplement these objections and responses based on the results of their continuing investigation.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1**: All documents identified in your Initial Disclosures.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of the Fox Defendants 26(a)(1) Initial Disclosures. Subject to and without waiving the foregoing objections, the Fox Defendants will produce the responsive non-privileged documents identified in their Initial Disclosures in their possession, custody, or control.

**REQUEST NO. 2**: All documents that you identified or referred to in response to Plaintiffs' interrogatories.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure but the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce those documents referred to in their respective Responses to Plaintiffs' Interrogatories, if any.

**REQUEST NO. 3**: All documents concerning (in whole or in part) the filming of *Empire* at the JTDC. This includes, but is not limited to, communications with and among the following persons and entities, as well as officers, employees, or agents of same:

      a.      Any defendant in this case, including any Fox entity;

      b.      Any member of the cast or crew of *Empire*;

      c.      Any person or entity contracted or otherwise hired or retained to provide services relating in whole or in part to the filming of *Empire* at the JTDC;

      d.      Vendors or service providers at the JTDC, including defense attorneys, court staff, states attorneys, sheriff, police, program providers, volunteers, and contractors;

    e.       Non-profit organizations affiliated with the JTDC, including the JTDC Foundation;

    f.       JTDC personnel;

    g.       Chicago Public Schools;

    h.       The City of Chicago;

    i.       The State of Illinois; and

    j.       The Chicago Film Office, the Illinois Film Office, and/or the City of Chicago Department of Cultural Affairs and Special Events.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" the filming of *Empire* at the JTDC could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. For example, this Request encompasses communications with individuals and third-parties provided services "relating" to the filming of *Empire* at the JTDC that did not have contact with any defendant other than TCFTV or were not present at the JTDC, such as film editors and caterers. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce communications and documents between and among the Fox Defendants, the County, Chief Judge of the Circuit Court of Cook County, Leonard Dixon and JTDC personnel, sufficient to show the cast and crew members present at the JTDC as well as the locations within the JTDC used by TCFTV. The Fox Defendants also will produce the Location Agreement and addenda between TCFTV and the County. No other agreements exist.

**REQUEST NO. 4**: All documents concerning (in whole or in part) the script or similar document calling for the scenes that were eventually filmed at the JTDC.

**RESPONSE**: The Fox Defendants object to this request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" the script or similar document calling for the scenes that were eventually filmed at the JTDC seeks a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, this Request calls for script drafts and the communications related to those edits. Subject to and without waiving the foregoing objections, the Fox Defendants will produce the script(s) used for the scenes filmed at the JTDC and communications, if any, pertaining to edits necessitated by use of the JTDC as a filming location.

**REQUEST NO. 5**: All documents concerning (in whole or in part) the scouting, consideration, and selection of the JTDC as a location for the filming of *Empire*.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, this Request encompasses receipts and other travel documents and communications that are not relevant to the selection of the JTDC as a filming location. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents related to the scouting, consideration, and selection of the JTDC as a location for the filming of *Empire,* and the Location Agreement and addenda between TCFTV and the County for filming within the JTDC.

**REQUEST NO. 6**: All documents concerning (in whole or in part) the scouting and consideration of other locations, settings, or methods for the filming of the *Empire* scenes that were filmed at the JTDC, and any negotiations or agreements regarding same.

5

**RESPONSE**: The Fox Defendants object to this request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, and as with Request No. 5, this Request encompasses receipts and other travel documents and communications that are not relevant to the selection of the JTDC as a filming location. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure but the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, Fox Defendants will produce documents related to the scouting, and consideration of other locations for filming the scenes that were filmed at the JTDC.

**REQUEST NO. 7**: All documents concerning (in whole or in part) any agreements or contracts relating to the filming of *Empire* at the JTDC, including all documents relating to the negotiation of the agreements, and all versions and drafts of the agreements.

**RESPONSE**:  The Fox Defendants object to this request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part) any agreements or contracts relating to the filming" could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, this Request encompasses agreements, contracts, and related communications with individuals and entities that had no part in the selection of the JTDC as a filming location or were not involved in the filming of *Empire* at the JTDC, such as caterers and other service providers. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents related to the

negotiation and execution of the Location Agreement and addenda between TCFTV and the County for filming within the JTDC.

**REQUEST NO. 8**: All documents concerning (in whole or in part) the JTDC's layout, floorplans, and operations.

**RESPONSE**: The Fox Defendants will produce the documents in its possession, if any, that describe the JTDC's layout, floorplans, and operations.

**REQUEST NO. 9**: All documents concerning (in whole or in part) any "prep" for filming at the JTDC, including preparations made by Fox employees or agents at the JTDC in advance of filming there.

**RESPONSE:** The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" any "prep" for filming at the JTDC encompasses a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, this Request encompasses documents related to travel and other logistical considerations for activities that occurred outside of the JTDC. In addition, the Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. Subject to and without waiving the foregoing objections, the Fox Defendants will produce communications and documents between and among the Fox Defendants, the County, Chief Judge of the Circuit Court of Cook County, Leonard Dixon and JTDC personnel, related to the preparation that was done prior to filming at the JTDC.

**REQUEST NO. 10**: All documents concerning (in whole or in part) the terms (or substantially similar terms) of Section 1(D) of the Location Agreement (ECF No. 51-2), including but not limited to any communications relating to the inclusion of such terms.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to

and without waiving the foregoing objections, the Fox Defendants will produce documents and communications between and among the Fox Defendants, the County, Chief Judge of the Circuit Court of Cook County, Leonard Dixon and JTDC personnel, if any, related to Section 1(D) of the Location Agreement.

**REQUEST NO. 11**: In Section 1(D) of the Location Agreement (and all subsequent Location Agreements, *see* ECF Nos. 51-2), TCFTV "acknowledges that the [JTDC] is a functioning Municipal Building, operating as a residential facility for juveniles." Produce all documents TCFTV referred to or relied upon in making this acknowledgement, and all documents upon which this acknowledgement was based.

**RESPONSE:** The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents, if any, related to Section 1(D) of the Location Agreement.

**REQUEST NO. 12**: All documents concerning (in whole or in part) your performance of Section 1(D) of the Location Agreement (and all subsequent Location Agreements, *see* ECF Nos. 51-2) regarding TFTV's use of the JTDC, *i.e.*, "TCFTV will cooperate with the County, JTDC Administration, and Security, the Department of Facilities Management and Staff and the Sheriff so that normal operations of the Building and its occupants, and access by the public, are not disrupted in any manner whatsoever."

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents, if any, related to Section 1(D) of the Location Agreement.

**REQUEST NO. 13**: All documents concerning (in whole or in part) any consideration or discussion by you or any other person of the effect that filming *Empire* at the JTDC would have on the JTDC's normal operations, on the children housed there, and/or on the provision of services to the children housed there.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents and communications between and among the Fox Defendants, the County, Chief Judge of the Circuit Court of Cook County, Leonard Dixon and JTDC personnel, if any, related to the effect that filming *Empire* "would have on the JTDC's normal operations, on the children housed there, and/or on the provision of services to the children housed there."

**REQUEST NO. 14**: All documents concerning (in whole or in part) the areas of the JTDC made available for *Empire*'s crew for filming and/or for support services (*e.g.*, areas for crew, equipment, changing, catering, delivery, lighting, production, etc.), as well as travel between such areas.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents sufficient to show the locations within the JTDC used by TCFTV and any documents that may exists that concern" travel between such areas."

**REQUEST NO. 15**: All documents concerning (in whole or in part) schedules or plans for filming, including crew schedules, filming schedules, schedules for access to the JTDC, times for filming or access to the JTDC or areas within the JTDC, and logistics relating to filming at the JTDC.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, "schedules or plans for filming" encompasses activities that occurred outside of the JTDC. The Fox Defendants further object to this Request to the extent it is duplicative of Plaintiffs' other Requests. Subject to and without waiving the

foregoing objections, the Fox Defendants will produce documents related to schedules or plans for filming at the JTDC.

**REQUEST NO. 16**: All documents concerning (in whole or in part) any alterations to the JTDC physical space made for filming and support services, including but not limited to any painting of the facility.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents, if any, related to any alterations to the JTDC.

**REQUEST NO. 17**: All documents concerning (in whole or in part) any equipment to be brought into the JTDC, including locations of same and schedules for entry and exit of same.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, this Request encompasses contracts for the rental of equipment that is unrelated to the claims in this matter. Subject to and without waiving the foregoing objections, the Fox Defendants will produce correspondence, if any, relating to the entry, exit, and storage of equipment at the JTDC.

**REQUEST NO. 18**: All documents concerning (in whole or in part) any acts to be done (or omitted) by JTDC staff in relation to the filming of *Empire* at the JTDC.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request as unduly burdensome in so far as information regarding the JTDC's operations are within the possession, custody, or control of Cook County. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce communications between the Fox Defendants and JTDC personnel relating to the use of the JTDC.

**REQUEST NO. 19**: All documents concerning (in whole or in part) any alterations or changes to the JTDC's normal operations in connection with to the filming of *Empire* at the JTDC. This includes, but is not limited to, JTDC staff locations, staff duties, resident movement, school, medical, visitation, programming, recreation, court hearings, resident transfers, consolidation of pods, and provision of commissary.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request as unduly burdensome in so far as information regarding the JTDC's operations are within the possession, custody, or control of Cook County. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce communications between the Fox Defendants and JTDC personnel relating to the use of the JTDC and documents sufficient to show the locations within the JTDC used by TCFTV.

**REQUEST NO. 20**: All documents concerning the locations of actors, film crews, any Fox employees or agents, JTDC staff, and/or JTDC residents during the Filming Periods.

**RESPONSE**:  The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request as unduly burdensome in so far as information regarding the JTDC's operations are within the possession, custody, or control of Cook County. Subject to and without waiving the foregoing objections, the Fox Defendants will produce communications between the Fox Defendants and JTDC personnel relating to the use of the JTDC and documents sufficient to show the cast and crew members present at the JTDC as well as the locations within the JTDC used by TCFTV.

**REQUEST NO. 21**: All documents related to any compensation paid or given by Fox to Cook County or any other party in exchange for or in relation to use of the JTDC as a set for filming of *Empire*.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests.  The Fox Defendants further object to this Request to the extent it seeks

information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents sufficient to show all amounts paid by the Fox Defendants for the use of the JTDC as a set for filming of *Empire*.

**REQUEST NO. 22**: All photographs or video of the crew or cast of *Empire* at the JTDC during the Relevant Period, including any metadata.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all photographs or video" of the crew or cast of *Empire* at the JTDC during which the JTDC was used for filming encompasses a large number of documents and information unrelated to any party's claim or defense, and is not proportional to the needs of the case.

**REQUEST NO. 23**: All documents created as posted signs (*e.g.*, a document created to be taped on a wall as a posted sign) relating in any way to the *Empire* filming, as well as any electronic files used to generate such documents, including any metadata.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents" created as posted signs seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case.

**REQUEST NO. 24**: All budget binders concerning (in whole or in part) *Empire* Season 2, Episode 1 and Episode 2.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all budget binders concerning (in whole or in part)" *Empire* Season 2, Episode 1 and Episode 2 could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. The Fox Defendants further object to this Request as vague in so far as the term "budget binders" is vague and undefined. Subject to and without waiving the foregoing objections, the Fox Defendants will

produce documents sufficient to show all amounts paid by the Fox Defendants for the use of the

JTDC as a set for filming of *Empire.*

**REQUEST NO. 25**: All production schedules concerning (in whole or in part) the scenes for
*Empire* that were filmed at the JTDC.

**RESPONSE**:  The Fox Defendants object to this Request as overly broad and unduly burdensome.

The Fox Defendants further object to this Request as vague in so far as the term "production

schedules" is vague and undefined. Subject to and without waiving the foregoing objections, the

Fox Defendants will produce call sheets and production reports for filming at the JTDC.

**REQUEST NO. 26**: Documents sufficient to identify each Fox employee or agent who entered
the JTDC in connection with the filming of *Empire* there (including before and after the dates
identified in the Filming Periods), the time(s) each such person entered the JTDC, and the
time(s) each such person exited the JTDC.

**RESPONSE:** The Fox Defendants object to this Request as overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, the Fox Defendants will produce

communications between the Fox Defendants and JTDC personnel, documents sufficient to show

the cast and crew members present at the JTDC as well as the locations within the JTDC used by

TCFTV.


**REQUEST NO. 27**: All expense reports concerning (in whole or in part) the scenes for *Empire*
that were filmed at the JTDC.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome.

Plaintiffs' request for "all expense reports concerning (in whole or in part)" the scenes for *Empire*

that were filmed at the JTDC encompasses a large number of documents unrelated to any party's

claim or defense, and is also not proportional to the needs of the case. The Fox Defendants further

object to this Request as vague in so far as the term "expense reports" is vague and undefined.

Subject to and without waiving the foregoing objections, the Fox Defendants will produce

documents sufficient to show all amounts paid by the Fox Defendants for the use of the JTDC as a set for filming of *Empire*.

**REQUEST NO. 28**: All profit and loss statements of TCFTV concerning (in whole or in part) all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all profit and loss statements of TCFTV concerning (in whole or in part)" all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2 encompasses a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, Plaintiffs have not disclosed any calculation of their alleged damages which necessitate or relate to any information contained in any portion of any TCFTV profit and loss statement, to the extent such documents exist. Finally, at this stage in the pleadings, the documents sought in this Request are not relevant because TCFTV's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of Civil Procedure 23. Therefore discovery of actual damages issues prior to class certification is premature. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents sufficient to show all amounts paid by the Fox Defendants for the use of the JTDC as a set for filming of *Empire*.

**REQUEST NO. 29**: All profit and loss statements of FBC concerning (in whole or in part) all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all profit and loss statements of FBC concerning (in whole or in part)" all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2 encompasses a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, Plaintiffs' claims do not allege any FBC action or inaction relating

to, or knowledge of, the conditions within the JTDC during the filming of *Empire*, nor could they. Finally, at this stage in the pleadings, the documents sought in this Request are not relevant because FBC's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of Civil Procedure 23. Therefore discovery of actual damages issues prior to class certification is premature. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents sufficient to show all amounts paid by the Fox Defendants for the use of the JTDC as a set for filming of *Empire*.

**REQUEST NO. 30**: All profit and loss statements of 21CF concerning (in whole or in part) all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all profit and loss statements of 21CF concerning (in whole or in part)" all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2 encompasses a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, Plaintiffs' claims do not allege any 21CF action or inaction relating to, or knowledge of, the conditions within the JTDC during the filming of *Empire*, nor could they. Finally, at this stage in the pleadings, the information sought in this Request are not relevant because 21CF's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of Civil Procedure 23. Therefore discovery of actual damages issues prior to class certification is premature. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents sufficient to show all amounts paid by the Fox Defendants for the use of the JTDC as a set for filming of *Empire*.

**REQUEST NO. 31**: Documents sufficient to show the rental cost per day of each other facility rented as a set for purposes of filming for Season 2 of *Empire*.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, Plaintiffs have not disclosed any calculation of their alleged damages which necessitate or relate to the rental cost per day of any other facility rented as a set for purposes of filming for Season 2 of *Empire*.

Date: December 15, 2017

Respectfully Submitted,

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 15, 2017, a true and correct copy of the foregoing was served to all counsel of record via email.

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

# EXHIBIT 17

1  **KASOWITZ BENSON TORRES & FRIEDMAN LLP**
   JOHN V. BERLINSKI (SBN # 208537)
2  jberlinski@kasowitz.com
   MANSI K. SHAH (SBN # 234984)
3  mshah@kasowitz.com
   CANDACE FRAZIER (SBN # 282358)
4  cfrazier@kasowitz.com
   2029 Century Park East, Suite 750
5  Los Angeles, CA 90067
   Telephone: (424) 288-7900
6  Facsimile: (424) 288-7901

7  Attorneys for Plaintiffs

**CONFORMED COPY**
**ORIGINAL FILED**
Superior Court of California
County of Los Angeles

**NOV 30 2015**

Sherri R. Carter, Executive Office/Clerk

By: _____, Deputy
Ishayla Chambers

8

9            SUPERIOR COURT FOR THE STATE OF CALIFORNIA

10                    COUNTY OF LOS ANGELES

11

12  TEMPERANCE BRENNAN, L.P. f/s/o        Case No.    BC 602548
    KATHLEEN REICHS; SNOOKER
13  DOODLE PRODUCTIONS, INC. f/s/o
    EMILY DESCHANEL; and BERTHA
14  BLUE, INC. f/s/o DAVID BOREANAZ,

15                                        **COMPLAINT FOR:**

16              Plaintiffs,              **(1) BREACH OF CONTRACT;**
                                         **(2) BREACH OF THE IMPLIED**
17         v.                                **COVENANT OF GOOD FAITH AND**
                                             **FAIR DEALING;**
18  TWENTY-FIRST CENTURY FOX, INC.,      **(3) FRAUDULENT INDUCEMENT;**
    a Delaware corporation; FOX          **(4) FRAUDULENT CONCEALMENT;**
19  ENTERTAINMENT GROUP, INC., a         **(5) INDUCING BREACH OF CONTRACT;**
    Delaware corporation; TWENTIETH      **(6) INTENTIONAL INTERFERENCE**
20  CENTURY FOX FILM CORPORATION,            **WITH CONTRACT;**
    a Delaware corporation; FOX          **(7) ACCOUNTING; AND**
21  BROADCASTING COMPANY, a              **(8) DECLARATORY RELIEF**
    Delaware corporation, and DOES 1-20,
22  inclusive,

23              Defendants.             **DEMAND FOR TRIAL BY JURY**

24                                       Trial Date: None

25

26

27

28

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

Plaintiffs Temperance Brennan, L.P. f/s/o Kathleen Reichs ("Reichs"), Snooker Doodle Productions, Inc. f/s/o Emily Deschanel ("Deschanel"), and Bertha Blue, Inc. f/s/o David Boreanaz ("Boreanaz") (collectively, "Plaintiffs"), for their demand against Defendants Twenty-First Century Fox, Inc. ("21st Fox"), Fox Entertainment Group, Inc. ("FEG"), Twentieth Century Fox Television, a unit of Twentieth Century Fox Film Corporation ("20th TV"), and Fox Broadcasting Company ("FBC") (21st Fox, FEG, 20th TV, and FBC collectively "Fox" or "Defendants"), allege as follows:

## I.   **INTRODUCTION**

1.      Fox and its predecessors have played a leading role in the well-documented history of Hollywood accounting scandals. In 1979, for example, Fox produced the movie *Alien* that, on information and belief, cost it between $9 and $11 million to make and by spring of 1980 had generated more than $100 million at the box office alone. Yet, when it came time to pay the film's profit participant—the small, independent producer who had contracted for a share of Fox's profits—Fox claimed that the film had somehow *lost* money and that no profits were due. That independent producer sued, and, on information and belief, obtained a favorable settlement. In the years since, Fox has engaged in similar conduct with respect to many of its television series, including mega-hits such as *M\*A\*S\*H*, *The X-Files*, *N.Y.P.D. Blue*, and *Cops*, all of which on information and belief have spawned meritorious lawsuits.

2.      The Fox conglomerate's latest episode in this grim series concerns *Bones*, the longest running primetime drama in the history of FBC. *Bones* (the "Series") is a one-hour scripted television series based on the best-selling "Temperance Brennan" fiction novels by plaintiff Kathy Reichs. The Series centers around a forensic anthropologist named Dr. Temperance Brennan, who is played by plaintiff Emily Deschanel, and a Special Agent with the FBI named Seeley Booth, who is played by plaintiff David Boreanaz. Together, these characters solve the most baffling murders by combining Dr. Brennan's expertise in cutting edge forensic science with Agent Booth's classically intuitive detective work. *Bones* premiered on FBC in 2005 and was heralded by media outlets as "the best drama of the new network season." Since then the Series has been a constant fixture on FBC's primetime schedule. During Season 10 in 2014,

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
ATTORNEYS AT LAW

COMPLAINT

1  *Bones* celebrated its 200th broadcast episode. Very few dramas on any television network, and

2  only two others in the history of FBC, have ever achieved this honor. Showing no signs of

3  stopping its epic run, *Bones* is currently in its 11th season and is heading toward Season 12.

4      3.    *Bones'* longevity has made it a cash cow for Fox. For example, on information and

5  belief, FBC has earned many hundreds of millions of dollars selling commercial airtime in

6  connection with the Series. The price that advertisers pay for such airtime depends in part on

7  Nielsen audience ratings. In the United States alone, *Bones* averaged 9 million weekly viewers in

8  its most recent season, which made it FBC's second most watched primetime television series.

9  Separate and apart from these advertising revenues, 20th TV—Fox's production and distribution

10  arm—has received hundreds of millions of dollars from the exploitation of the Series in over 150

11  territories throughout the world. According to Gary Newman, Fox Television Group chairman

12  and Chief Executive Officer, the Series has been "incredibly successful internationally, in

13  syndication, on SVOD [subscription video-on-demand] and Netflix." Media outlets have echoed

14  this sentiment, referring to *Bones* as Fox's "golden child."

15      4.    The success of *Bones* has been all the more impressive considering its frequent

16  migration on FBC's primetime schedule. On information and belief, television series achieve

17  better Nielsen audience ratings when they are broadcast on the same day and time each week so

18  that viewers can establish a habit of tuning in for "appointment viewing." Yet in an effort to

19  provide ratings "Band-Aids" for FBC, which in recent history has had fewer than a handful of

20  dramas continue beyond three seasons, FBC has broadcast original *Bones* episodes in seven

21  different time periods spanning five different nights. According to Mr. Newman: "To have a

22  show that resilient is an incredible luxury." Indeed, the value of *Bones* to Fox goes well beyond

23  the revenues that FBC and 20th TV have generated through advertising and licensing the Series.

24      5.    Plaintiff Reichs, a forensic anthropologist, is the inspiration for Temperance

25  Brennan's television persona. In return for her life story rights, the television rights to her novels,

26  and her agreement to render producing services for the Series, 20th TV promised her a 5% share

27  of the Series profits. Plaintiffs Deschanel and Boreanaz, for their leading roles in the Series, are

28

1    each contractually entitled to a 3% share of Series profits. All three Plaintiffs are entitled to

2    periodic accounting statements showing how 20th TV calculates their profits.

3        6.      As the Series became more profitable for Fox over the years, these accounting

4    statements issued by 20th TV counter-intuitively showed Plaintiffs falling farther and farther away

5    from achieving profits. In 2010, for example, not long after FBC aired the finale of the Series'

6    successful fifth broadcast season, plaintiff Reichs received a statement showing that she was

7    nearly $90 million away from receiving profits payments, and plaintiffs' Boreanaz and Deschanel

8    received statements showing they were nearly $100 million away from profits. Knowing of Fox's

9    checkered history in profit participation matters, Plaintiffs noticed an audit of 20th TV's books

10   and records thereafter. During the following years, Plaintiffs' independent auditor set out to

11   uncover the truth but was stymied by 20th TV's refusal to disclose many of the basic documents

12   related to Plaintiffs' profit statements.

13       7.      The documents that 20th TV did provide confirmed Plaintiffs' suspicions and

14   showed that they were being cheated out of more than $100 million in gross revenues and being

15   overcharged many additional millions of dollars in alleged expenses. One of the primary culprits

16   was 20th TV's practice of licensing the Series to Fox affiliates. When "self-dealing" such as this

17   occurs, a temptation exists for the distributor to charge below market rates so that fewer dollars

18   are directed into the "pool" of funds from which profit participants like Plaintiffs share. Many

19   television studios are transparent about this temptation and offer profit participants a "seat at the

20   table" to arrive at what is commonly referred to as an "imputed license fee." 20th TV, however,

21   set its initial network license fees for *Bones* without ever consulting Plaintiffs. And when 20th TV

22   finally did engage with Plaintiffs in the fifth and sixth seasons of the Series, it did so under the

23   threat of cancelling the Series unless Plaintiffs accepted its non-negotiable license fee figure, and

24   then concealed material information about the true value of that figure.

25       8.      Plaintiffs' auditor also uncovered a practice whereby 20th TV "packages" films

26   and television series together in a single license agreement, leveraging the most successful series

27   to force licensing of the entire package. But contrary to logic and well-established California law,

28   when 20th TV accounts to profit participants such as Plaintiffs, it allocates a disproportionately

1    greater share of the total fees it receives to the less valuable shows. The result is that Fox

2    understates the revenues on its most successful television series—which are necessarily the ones

3    most likely to result in profit participation payments.

4         9.    In addition to uncovering improper self-dealing and misallocation claims, the

5    auditor's review, albeit truncated by 20th TV's withholding of many key documents, unearthed

6    more than a dozen accounting errors, tricks, and deceitful acts that 20th TV has used to deprive

7    Plaintiffs of their entitlement to profits. In short, the audit revealed that, consistent with past Fox

8    practices, 20th TV has engaged in a systematic and pervasive effort to cheat Plaintiffs out of their

9    entitlement to profits from the longest running drama series ever broadcast on FBC. Plaintiffs

10    bring this action to enforce their rights to these payments that they are rightfully owed, which

11    they estimate to collectively exceed tens of millions of dollars.

12         **II.    JURISDICTION AND VENUE**

13         10.    The Court has personal jurisdiction over Defendants pursuant to California Code

14    of Civil Procedure 410.10 because the Defendants are domiciled in and/or are doing business in

15    the State of California and some or all of the agreements that are the subject of this dispute were

16    made, entered into, performed, and breached within the State of California. The amount in

17    controversy exceeds the jurisdictional minimum of this Court.

18         11.    Venue is proper in this County pursuant to California Code of Civil Procedure

19    § 395(a) and § 395.5 because the Defendants, or some of them, have their principal place of

20    business in the County of Los Angeles and because some or all of the agreements that are the

21    subject of this dispute were made, entered into, performed, and/or breached in this County.

22         12.    Venue is also proper under the parties' agreements. Plaintiff Reichs' agreement,

23    attached hereto as Exhibit A, provides that her entitlement to profits "shall be defined, computed,

24    accounted for and paid according to the [profits definition] customarily used by Fox, and shall be

25    incorporated herein, subject to good faith negotiations within the customary parameters for

26    persons of [her] stature in the television industry . . .." Ex. A, 2004 Reichs Agreement, Purchase

27    Agreement, ¶ 10(c). The profits definition being used by Fox is attached hereto as Exhibit B. It

28    provides that the parties' rights to "maintain or institute *any* action or proceeding shall be *only* as

1   provided in [the profits definition]," and then defines such an action as "an action at law for

2   recovery of any such monies claimed." Ex B, 2007 Profits Definition, ¶ VII.F. On information

3   and belief, 20th TV is using a similar profits definition with an identical dispute resolution

4   provision for Deschanel and Boreanaz.

5                              **III.**    **PARTIES**

6          13.     Plaintiff Temperance Brennan, L.P. is a partnership organized under the laws of

7   the State of Delaware whose principal place of business is located in the County of Los Angeles.

8   At all relevant times, Temperance Brennan, L.P. was and is the loan-out company through which

9   Kathleen Reichs provides her producing services for the Series.

10         14.     Plaintiff Snooker Doodle Productions, Inc. is a corporation organized under the

11   laws of the State of California, with its principal place of business located in the County of Los

12   Angeles. At all relevant times, Snooker Doodle Productions, Inc. was and is the loan-out

13   company through which Emily Deschanel provides her acting and producing services for the

14   Series.

15         15.     Plaintiff Bertha Blue, Inc. is a corporation organized under the laws of the State of

16   California, with its principal place of business located in the County of Los Angeles. At all

17   relevant times, Bertha Blue, Inc. was and is the loan-out company through which David Boreanaz

18   provides his acting, directing, and producing services for the Series.

19         16.     Defendant Twenty-First Century Fox, Inc., on information and belief, is, and at all

20   relevant times was, a corporation organized and existing under the laws of the State of Delaware

21   doing business throughout the United States, including at its offices in the State of California,

22   County of Los Angeles.

23         17.     Defendant Fox Entertainment Group, Inc., on information and belief, is, and at all

24   relevant times was, a corporation organized and existing under the laws of the State of Delaware

25   doing business throughout the United States, including at its principal place of business in the

26   State of California, County of Los Angeles. Fox Entertainment Group, Inc. is, on information and

27   belief, a wholly-owned subsidiary of Twenty-First Century Fox, Inc.

28

18.     Defendant Twentieth Century Fox Television, on information and belief, is a unit of Twentieth Century Fox Film Corporation, which, on information and belief, is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware doing business throughout the United States, including at its principal place of business in the State of California, County of Los Angeles. Twentieth Century Fox Television, on information and belief, is not a legal entity distinct from Twentieth Century Fox Film Corporation, so Twentieth Century Fox Film Corporation is therefore liable for all acts and omissions made by or on behalf of Twentieth Century Fox Television. Twentieth Century Fox Film Corporation is, on information and belief, a wholly-owned subsidiary of Fox Entertainment Group, Inc. and/or Twenty-First Century Fox, Inc.

19.     Defendant Fox Broadcasting Company, on information and belief, is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware doing business throughout the United States, including at its principal place of business in the State of California, County of Los Angeles. Fox Broadcasting Company is, on information and belief, a wholly-owned subsidiary of Fox Entertainment Group, Inc. and/or Twenty-First Century Fox, Inc.

20.     Defendants, Does 1 through 20, are sued herein by fictitious names for the reason that their true names are unknown to Plaintiff. Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of these Defendants when their identities have been ascertained. Plaintiff is informed and believes and based thereon alleges that these fictitiously named Defendants are responsible in some manner for the actions and damages alleged herein.

21.     Plaintiff is further informed and believes and based thereon alleges that Defendants at all times herein alleged were the agents, employees, servants, joint venturers, and/or co-conspirators of each of the other remaining Defendants, and that in doing the things herein alleged were acting in the course and scope of such agency, employment, joint venture, and/or conspiracy.

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 7 -

COMPLAINT

## IV. FACTUAL BACKGROUND

**A. Plaintiffs are the Inspiration for and the Faces of *Bones***

22.      *Bones* was inspired by a series of crime novels authored by Reichs, and commonly referred to as the "Temperance Brennan Novels." The first of these novels was released in 1997 and there have been 18 in this series to date. All of the novels feature a protagonist named Dr. Temperance Brennan, a forensic anthropologist whose fictional persona is based on Reichs' real-life experiences, which continue to generate creative material for her novels and the Series.

23.      In *Bones*, Dr. Brennan is played by plaintiff Deschanel, and Special Agent Booth is played by plaintiff Boreanaz. The duo are the backbone of the Series, ensuring that millions of viewers tune in each week not only to see the next murder mystery that their characters are able to solve, but also to see the evolution of their relationship. While Dr. Brennan is ruled by her head, Agent Booth is ruled by his heart. These differing perspectives initially give rise to tension between the characters, but ultimately, as is often the case in classic love stories, opposites attract. Through their skillful acting and long-standing dedication to their characters, plaintiffs Deschanel and Boreanaz continue to make palpable for dedicated viewers the powerful chemistry between Dr. Brennan and Agent Booth.

**B. The Outsized Success of *Bones***

24.      Premiering September 13, 2005 on FBC, *Bones* immediately garnered positive reviews for its infusion of dark humor and character development into an otherwise saturated primetime schedule of crime procedurals. The Series' premiere obtained nearly 11 million viewers and was FBC's highest-rated primetime Tuesday-night drama since the premiere of the hit series *24* four years earlier. Media outlets soon began describing the show as "the best drama of the new network season." FBC, knowing it had a hit on its hands, on information and belief, ordered a full season of *Bones* after a mere three episodes had aired.

25.      FBC's instincts proved keen, and the Series continued to generate favorable Nielsen ratings for a freshman drama, finishing the year averaging around 9 million weekly viewers. Remarkably, *Bones* continues to maintain these ratings ten years later in an era when overall audiences have declined in part because, according to FX Networks' CEO John Landgraf:

1    "There is simply too much television." It is due to *Bones*' loyal viewership and its ability to

2    perform regardless of when it airs that FBC has had the luxury of scheduling the Series such that

3    at some point in its run, *Bones* has held a timeslot on every weeknight. It is rare for a series to be

4    moved around the primetime schedule as often as FBC has done with *Bones*, and even rarer still

5    for this type of movement to not negatively affect the overall viewership numbers. It is clear that

6    *Bones* is in a class of its own.

7         26.    This durability of the Series often has been touted by Fox. When FBC announced

8    that *Bones* would be renewed for Season 7 in May 2011, its President of Entertainment Kevin

9    Reilly said, "*Bones* is creatively fresh, it's a rock-solid player every time it airs and this season it

10   has helped us win on Thursday nights for the first time in our history." Fox has even used the

11   Series as a lead-in to help improve the viewership of other series aspiring to cultivate the faithful

12   fan base of *Bones*. For example, last month FBC broadcast a cross-over event with *Bones* and

13   *Sleepy Hollow*, beginning a storyline with *Bones* at 8 p.m. and concluding that storyline with

14   *Sleepy Hollow* at 9 p.m. While *Bones* out-performed *Sleepy Hollow*, Fox was able to use the

15   *Bones* viewership to boost *Sleepy Hollow*'s audience by an additional 38% compared to the prior

16   week. It is this type of consistent performance that has allowed *Bones* to earn its accolades as a

17   "golden child" and the longest running drama ever produced and broadcast by Fox.

18        27.    Of course, *Bones* would not have achieved this distinction without the ability to

19   generate consistent profits for Fox. According to 20th TV, the Series has earned over 1.1 ***billion***

20   dollars in revenues on the 20th TV side alone. This revenue is mostly comprised of fees from

21   domestic broadcast licenses and revenues from syndication, from subscription video-on-demand

22   platforms such as Netflix, and from multiple networks and platforms abroad. Separate and apart

23   from these revenues, on information and belief Fox has generated hundreds of millions of

24   additional dollars in advertising revenues in connection with the 220 *Bones* episodes and counting

25   that have aired to date in original runs and in syndication on Fox's owned and operated network

26   of television channels throughout the United States and abroad.

27        28.    *Bones* has also received significant critical acclaim, and the Series and its cast

28   have been recognized by various entertainment industry award nominations. In fact, its cast and

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 9 -

COMPLAINT

1    crew have been nominated for over 10 different industry awards including the Primetime Emmys
2    and People's Choice Awards.

3    **C.  The Agreements Entitling Reichs to Series Profits**

4          29.    In or about April 2005, Reichs and 20th TV entered into their initial agreements
5    regarding the Series dated as of September 1, 2004. Attached hereto as Exhibit A are true and
6    correct copies of a redacted Purchase Agreement for Purchase of Literary Material and Life Story
7    Rights and a redacted Option Agreement for Purchase of Literary Material and Life Story Rights,
8    along with supporting exhibits, executed by Reichs and 20th TV (the "2004 Reichs Agreement").

9          30.    The 2004 Reichs Agreement entitled Reichs to fixed and contingent compensation
10   in connection with her work on the Series. With respect to the latter, Reichs is entitled to a 5%
11   share of the Series "Modified Adjusted Gross Receipts" ("MAGR"), pursuant to a profits
12   definition that 20th TV promised to supply at a later time. The 2004 Reichs Agreement further
13   provided that after Reichs received the profits definition it would be "subject to good faith
14   negotiations within the customary parameters for persons of [Reichs'] stature in the television
15   industry." Ex. A, 2004 Reichs Agreement, Purchase Agreement, ¶ 10(c).

16         31.    It was not until approximately three years later, in November 2007, that 20th TV
17   provided Reichs with its "standard" MAGR definition (the "2007 Profits Definition"). Attached
18   hereto as Exhibit B is a true and correct copy of the correspondence from 20th TV providing
19   Reichs with this 2007 Profits Definition. Notwithstanding 20th TV's promise to subsequently
20   negotiate this 2007 Profits Definition in "good faith," 20th TV never even commenced such
21   negotiations.

22   **D.  The Agreements Entitling Deschanel and Boreanaz to Series Profits**

23         32.    Plaintiffs Deschanel and Boreanaz became entitled to Series profits when they
24   signed their initial agreements with 20th TV in 2005. Their most recent agreements entitling them
25   to profits, true and correct copies of which are attached hereto with redactions as Exhibits C and
26   D, are dated as of December 24, 2012, and provide for each of them to receive a 3% share of
27   MAGR (the "2012 Actor Agreements"). Similar to the 2004 Reichs Agreement, the 2012 Actor
28   Agreements provide that after Deschanel and Boreanaz receive their MAGR profits definitions,

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

COMPLAINT

1  those definitions would be subject to "good faith negotiation within Fox's customary parameters

2  for persons of [Actor's] stature." Exs. C-D, 2012 Actor Agreements, Rider. Unlike with Reichs,

3  however, 20th TV never even sent plaintiffs Deschanel or Boreanaz the profits definition.  On

4  information and belief, the profits definition that 20th TV is using to calculate Deschanel and

5  Boreanaz's profit share is substantially similar to the 2007 Profits Definition and identical with

6  respect to the dispute resolution provisions.

7  **E.  Plaintiffs Receive No Profits Payments For 10 Years**

8  33.    In March 2008, during Season 3 of the Series, 20th TV issued Plaintiffs their first

9  profits accounting statements, which reflected deficits of around $70 million that each of them

10  would need to recoup before they would receive any payments. In January 2009, during the

11  Series' fourth season, 20th TV issued its second set of statements to Plaintiffs, showing that their

12  deficit had been *increased* to over $80 million. By the next accounting period the deficit had

13  grown even further, and at one point the deficit approached or exceeded $100 million depending

14  on the Plaintiff.

15  **F.  The Audit**

16  34.    Unable to reconcile the growing deficit reported on 20th TV's statements with the

17  fact that *Bones* was in the middle of its sixth successful broadcast season, Plaintiffs exercised

18  their contractual audit rights. Toward that end, their representatives engaged Sills & Gentille

19  (now known as Green Hasson & Janks LLP), an independent third party auditing firm

20  specializing in entertainment industry accounting and transactions, to conduct a review of 20th

21  TV's books and records (the "Audit").

22  35.    As explained below, 20th TV withheld from the auditors much of the

23  documentation necessary to conduct this audit and determine the full extent of the underpayments

24  to Plaintiffs. Based on the limited information that 20th TV did provide, however, the auditors

25  uncovered more than twenty accounting violations that they estimated to total well over $100

26  million in underreported receipts and millions of additional dollars in overcharged expenses.

27  Plaintiffs submitted these findings to 20th TV on or around May 14, 2014 (the "Audit Reports").

28  36.    The audit also uncovered the falsity of representations made by 20th TV to

1   Plaintiffs and the concealment of material facts by 20th TV, in connection with discussions

2   between the parties about a potential "release" of claims regarding the license fees that FBC had

3   agreed to pay 20th TV for broadcasting seasons 5 and 6 of the Series (the "2009 Release").

4   **G.   The Tolling Agreements**

5          37.    On or about April 25, 2014, 20th TV and Plaintiffs entered into an agreement

6   extending until May 30, 2015 the deadlines under which Plaintiffs could bring the claims set forth

7   in this lawsuit. Attached hereto as Exhibit E is a true and correct copy of this agreement dated

8   April 25, 2014. On May 6, 2015, 20th TV and Plaintiffs agreed to further extend this deadline

9   until November 30, 2015. Attached hereto as Exhibit F is a true and correct copy of this

10  agreement dated May 6, 2015. On November 20, 2015, 20th TV and Plaintiffs agreed to further

11  extend this deadline until May 31, 2016.

12          **V.    DEFENDANTS' BREACHES OF THE AGREEMENTS**

13  **A.   Failure to Permit a Full and Complete Audit**

14          38.    The 2007 Profits Definition provides Plaintiffs with the right to audit 20th TV's

15  "books of account which relate to the [Series], in order to verify the accuracy of the transactions

16  or items of information as first reflected in any Negative Cost Summary or any Participation

17  Statement . . ." Ex. B, 2007 Profits Definition, ¶ VI.G. However, when it came time to provide

18  the auditors with the documents necessary to verify the accuracy of these transactions and items,

19  20th TV's responses ranged from no substantive response, to outright denial, to false

20  representations that it had disclosed all relevant documents.

21          39.    One of the most significant revenue streams that television studios like 20th TV

22  typically receive are the fees associated with licensing the rights to broadcast initial runs of a

23  television series on a U.S. network. To arrive at these fees here, on information and belief, 20th

24  TV and FBC negotiated a network license agreement. Notwithstanding repeated requests,

25  however, the auditor was never provided with a complete copy of this network license agreement.

26          40.    Nor did 20th TV provide the auditor with any of the scores of license agreements

27  that it entered into with other affiliated companies concerning *Bones*. These included, but were

28  not limited to, agreements with Fox's home video distribution arm, agreements with the Fox

owned and operated stations that broadcast *Bones* in syndication, and agreements with the many

Fox International Channels that broadcast the Series in Europe, Latin America, Africa, and Asia.

41.     In addition to the above, 20th TV failed to provide the auditor with a host of other critical documents including but not limited to:

- Documents enabling the auditor to calculate the Nielsen rankings of the Series to test 20th TV's calculation of cumulative series deficit reimbursement payments;
- Documents reflecting the amount of production costs charged in excess of the budgeted amounts for the Series, and documents reflecting how much, if any, of those excess production costs were reimbursed by FBC and credited to Plaintiffs;
- Documents reflecting the agreements reached, and the revenues received, from licensing the Series on new media platforms such as fox.com and Netflix;
- The agreement with Shaw Television Limited Partnership in connection with the network broadcast of *Bones* in Canada;
- Documents related to determining whether Plaintiffs were credited all revenues 20th TV received from Turner Entertainment Network ("TEN") in connection with TEN's basic cable television license agreement; and
- The detail ledger for foreign home video sales.

42.     Without these and other documents, the auditors could not complete their review or determine the full value of Plaintiffs' claims, though as set forth below, the auditors' findings based on what limited information 20th TV did provide were still significant.

**B.  Improper Self-Dealing**

43.     20th TV has engaged in numerous improper self-dealing license agreements with its affiliated networks and other licensees. Some of the more egregious examples of this misconduct are highlighted below.

**1.  20th TV's "Sweetheart" Network License Agreement with FBC**

44.     The fees received by a distributor for licensing the right to broadcast original runs of a television series to a network are among the most significant revenues included in calculating profits. Recognizing this, and the potential conflict of interest when two arms of the same entity

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

negotiate with one another, many studios who produce for their sister networks have adopted an "imputed license fee" model. In essence, this model prevents conflicts by directly inserting the profit participant into licensing negotiations. The studio discloses the amounts that it intends to credit to the profit participant in connection with the network license up front, and the profit participant negotiates the figure and ultimately signs off on it. This imputed license fee model has the benefit of transparency and strives to minimize self-dealing claims such as those in this case.

45.     Here, however, Plaintiffs were never given a seat at the table when 20th TV "negotiated" the Series initial network license agreement with its sister network FBC. Not surprisingly, the product of that "negotiation" was a schedule of artificially low license fees that benefitted FBC and its parent, 21st Fox, at the expense of Plaintiffs. Then, beginning in Season 5, FBC and 20th TV added insult to injury by conspiring to amend their network license agreement such that FBC would pay even less to 20th TV—and in turn the Plaintiffs—than what it had initially agreed to pay. Through Season 6 these fees were so low that they resulted in a production deficit—the delta between production costs and network license fees—of around $50 million.

46.     The "sweetheart" deals that created this deficit do not even come close to satisfying 20th TV's contractual obligations to enter into license agreements with its affiliates on terms comparable to the terms on which those affiliates enter into similar agreements with unrelated third parties.[1] For example, media outlets have reported that FBC was willing to pay significantly more to license the television series *House* from unrelated distributor Universal Media Studios than FBC paid to license *Bones* from affiliate 20th TV.

47.     As stated above, 20th TV and FBC also routinely amended the terms of their network license agreement to reduce payment obligations to 20th TV at the expense of Plaintiffs. In addition to the Season 5 example set forth above, the initial 20th TV/FBC network license agreement contained a provision that promised to pay 20th TV "rankings bonuses" depending on how *Bones* compared to certain other primetime television series in terms of Nielsen viewership. Shortly before these bonuses were due, however, FBC and 20th TV conspired to amend this

---

[1] In this lawsuit, plaintiffs' Boreanaz and Deschanel do not contest the license fees that were credited to them in connection with Season 11 of the Series.

- 14 -

provision and create a pure "ratings" bonus structure. The result, as these Fox affiliates knew but concealed from Plaintiffs, was a reduction of at least $2.62 million in bonus payments through the Audit Period. Similarly, 20th TV agreed to forego at least $10,375,000 in "deficit recoupment" payments from FBC without any consideration in return. Had FBC licensed the Series from a third party television studio instead of affiliate 20th TV, on information and belief that third party studio would never have agreed to such financially disadvantageous amendments.

### 2. 20th TV's "Sweetheart" Deals with Affiliated Foreign Networks

48. *Bones* has performed well not only in the United States but in many of the more than 70 foreign territories in which 20th TV has licensed it. In certain of these territories, 20th TV licensed runs of the Series in non-exclusive arrangements to both its affiliated networks and to unrelated third party networks. The stark differences between the monetary terms of these deals demonstrate how 20th TV has dramatically underpaid Plaintiffs when licensing to its foreign affiliates. By way of example only, 20th TV licensed Season 1 of the Series in Italy to third party network, RTI SPA, for $3,077 per run while simultaneously licensing Season 1 to its Italian sister network for $200 per run. The value of the Series was therefore more than 15 times what 20th TV, and consequently Plaintiffs, received from this self-dealing transaction. Likewise, 20th TV licensed Season 1 of the Series in Spain to third party Gestora de Inversiones Audiovisuales La Sexta S.A. for $24,667 per run, but when dealing with its Spanish sister network, licensed that season for $300 per run for the same term. In the same territory, 20th TV therefore obtained 82 times more fees when licensing the Series to a third party than to its affiliate. Fox has engaged in similar improper self-dealing transactions with numerous other foreign affiliates.

### 3. Fox's Self-Dealing In New Media Licenses

49. In recent years, the exhibition of television series has evolved beyond traditional linear broadcasts on television screens in the home. These "new media" exhibitions permit viewing of full or partial episodes of television series on platforms including computers, smart phones, and tablets, and allow for downloading and streaming at the convenience of the user. With the emergence of digital subscription video-on-demand options like Hulu and Netflix,

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

COMPLAINT

1   television studios and distributors are now collectively receiving billions of dollars in exchange

2   for licensing their series and related content to these new media outlets.

3        50.    20th TV's licensing of Bones to new media outlets owned in whole or in part by

4   Fox was handled consistent with Fox's overall approach of licensing to related parties at below

5   market rates. One example concerns Hulu, LLC ("Hulu") an entity in which Fox possesses an

6   approximate 33% equity interest according to its SEC 10-K filings. On information and belief,

7   Hulu is available free of charge to viewers and additional premium programming is available at

8   Hulu.com on a monthly subscription basis for $7.99 per month or a commercial free option for

9   $11.99 per month. Press releases in or around March 2008, the date of Hulu's public launch,

10  touted Bones as among the available Hulu programming.

11       51.    On information and belief, the license agreements that 20th TV entered into with

12  related party Hulu for Bones differ markedly from the agreements that Hulu enters into with third

13  party distributors for similar television programming. For one, on information and belief, many

14  third party distributors require fixed cash guarantees to license their series to Hulu, but on

15  information and belief 20th TV is licensing Bones for a speculative percentage of the ad sales and

16  monthly subscriber fees that Hulu pays to 20th TV. This arrangement shifts the risk onto the Profit

17  Participant and can also result in delayed receipt of license fees. Moreover, it means that 20th TV

18  should be allocating an appropriate percentage of the monthly subscriber fees it receives from

19  Hulu to each individual title it has licensed, including Bones. On information and belief, 20th TV

20  has failed to do so, resulting in significant underpayments to Plaintiffs.

21       52.    20th TV has also breached the parties' agreements by licensing the subscription

22  video on demand ("SVOD") rights to current season episodes of Bones to Hulu for below market

23  rates. "Current season" refers to the episodes of a television series that make up the season

24  presently being broadcast in original runs on network television, as opposed to episodes that were

25  broadcast in prior seasons. On information and belief, Fox's financial interest in Hulu has resulted

26  in 20th TV licensing current season episodes of Bones for less than what Hulu would have paid a

27  third party distributor—sometimes even giving away access to clips and series premieres for free.

28  Moreover, this practice of "stacking" current season episodes on multiple platforms such as FBC

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

COMPLAINT

1    and Hulu has, on information and belief, resulted in third party SVOD licensees such as Netflix

2    paying less for those episodes—which have been viewed more often and therefore have lost

3    value—than they would otherwise have paid if the current season episodes were kept off of Hulu.

4          **4.    <u>Fox's "Sweetheart" Domestic Syndication Deal</u>**

5          53.     On information and belief, 20th TV licensed certain "re-runs" of the Series in

6    syndication to Fox's owned and operated group of domestic television stations. Where television

7    series are as successful as *Bones*, such syndication agreements typically contain both a fixed cash

8    license fee and a barter component. The barter component gives distributors such as 20th TV the

9    right to sell commercial airtime during the broadcasts of these "re-run" episodes. Here, when

10   dealing with its affiliated stations group, 20th TV obtained no cash license fees, but rather traded

11   *Bones'* valuable syndication rights for only commercial airtime plus 30 additional seconds of

12   billboard announcements. As an initial matter, 20th TV's licensing of these valuable rights

13   without including a cash component breached its contractual obligation to deal with affiliates on

14   monetary terms comparable to the terms on which those affiliates enter into similar agreements

15   with third party distributors. Moreover, 20th TV's failure to credit Plaintiffs with any revenues

16   from the sale of the 30-second billboard announcements it received as consideration constitutes a

17   further breach of its obligations under the parties' agreements.

18          54.     Moreover, 20th TV has rejected lucrative third-party syndication deals opting to

19   instead license basic cable rights to the Series to its affiliates for less than fair market value. In

20   one such example of this self-dealing, on information and belief, 20th TV licensed the Spanish-

21   language rights to the Series to its then sister network MundoFox (now known as MundoMax) for

22   a mere $13,000 per episode. Knowing that this license fee was well below market value of these

23   rights, 20th TV tried to get Plaintiffs to consent to this transaction by representing that it had

24   contacted all potential Spanish-language buyers and they had passed. But when Plaintiffs'

25   representatives sought to verify that claim, they learned that the other major buyers had never

26   been contacted and knew nothing about this potential opportunity. Moreover, Plaintiffs'

27   representatives were told that these buyers would have paid substantially more than the $13,000

28

per run that MundoFox offered. Notwithstanding Plaintiffs' objection to this transaction, 20th TV went ahead and licensed the Series to MundoFox.

**C. Additional Accounting Claims**

55. As detailed in the Audit Report, 20th TV has committed well over a dozen breaches of the parties' agreements in addition to the claims mentioned above. A sampling of these additional accounting claims is set forth below.

**1. Improper Allocations**

56. When distributing the Series domestically and internationally, 20th TV frequently "packaged" *Bones* with other Fox-owned television series and films and licensed these collective titles as a group. Large distributors such as 20th TV often engage in this practice of "packaging" in an effort to sell as much of their owned content as possible, using the more popular television series and films as "drivers" in these deals, and refusing to sell those "drivers" a la carte. While this strategy is effective in bringing in more revenue for the corporate entity as a whole—because 20th TV can force its less popular content on licensees—it often harms profit participants on successful series like *Bones* whose statement are credited at less than market value.

57. Where a distributor like 20th TV "packages" content together, it has a duty to allocate the total license fees it receives in good faith relative to the actual value of each title in the package. Here, 20th TV blatantly failed to do so. On information and belief, it often employed what is referred to as a "straight-line" allocation methodology and credited all titles in a particular "package" agreement with the same episodic license fees, notwithstanding their different values to the licensee. In other instances, Fox drastically undervalued *Bones* compared to other less successful Fox titles. For example, in one such agreement, Fox allocated only $6,000 per episode to *Bones* but then allocated *seven times as much,* $44,000 per episode, to *Boston Public*—a television series that was cancelled after four seasons. 20th TV's misallocation in favor of *Boston Public*—a series that, on information and belief, likely will never generate profit participation payments—ensures that its corporate parent 21st Fox will retain more money by having to pay out fewer dollars to Plaintiffs on *Bones.* On information and belief, 20th TV has failed to properly allocate license fees on many other "package agreements," including those with Netflix and Hulu.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
ATTORNEYS AT LAW

COMPLAINT

**2.** **Improperly Charging Production Costs Associated with a Spinoff Pilot**

58.     The 2007 Profits Definition obligated 20th TV to calculate Plaintiffs profits by deducting only those production costs incurred "in connection with the preparation, production, completion and delivery of the completed ***Program***," which the 2007 Profits Definition defined as *Bones*. Notwithstanding this clear language, 20th TV breached the parties' agreements by deducting $3.5 million in production costs incurred in connection with a proposed spinoff series called *The Finder* when calculating Plaintiffs' profits.

**3.** **Improperly Charging Distribution Fees on EST and VOD Receipts**

59.     With respect to electronic sell-through ("EST") license agreements, 20th TV accounts to Plaintiffs on a 20% royalty basis, meaning that of the nearly $8 million in cash that 20th TV admits it received in connection with digital downloads of the Series (e.g., iTunes downloads), 20th TV credited to Plaintiffs' profits definition just $1.6 million. 20th TV applies the same accounting treatment to video-on-demand ("VOD"), which is when a distributor makes episodes available to consumers on its website or via a set-top box. But 20th TV does not stop there. On top of the 80% of revenues it keeps, 20th TV deducts an additional 30% or 45% distribution fee, thereby effectively reducing the amounts that are used to calculate Plaintiffs' profits to 14% for domestic EST and VOD and 11% for foreign EST and VOD. 20th TV's purported justification for doing so is that EST and VOD are similar to the hard goods manufactured for DVD sales and this type of accounting treatment is fair with respect to such hard goods. But the expenses associated with DVD sales far outweigh the negligible costs associated with EST and VOD. Using this improper accounting treatment has given 20th TV a windfall and caused Plaintiffs to suffer a detriment of at least $4.2 million in Gross Receipts.

**4.** **Improper Distribution Charges**

60.     In addition to crediting Plaintiffs with less than 20% of certain revenue streams using a royalty-based accounting methodology, 20th TV has also improperly charged certain expenses against its royalty-based accounting. As stated above, when 20th TV accounts to profit participants using a royalty formula it is already excluding 80% of the revenues received.  It is not therefore permitted to also deduct actual expenses associated with that distribution because the

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

1   80% it is holding back is designed to account for those expenses. 20th TV, however, has done

2   exactly that with respect to certain home video distribution expenses and music clearance fees

3   that should be part of the home video expenses. This improper accounting has resulted in a

4   detriment to Plaintiffs of over $1.5 million in Gross Receipts.

5   **5.    Improper Overhead and Corporate Charges**

6   61.    In addition to distribution expenses, 20th TV deducts distribution fees from all

7   revenues that it receives in connection with the distribution of the Series. These distribution fees

8   can be as high as 50% of the total revenues received and are designed to compensate 20th TV for

9   internal costs such as corporate overhead. Yet in addition to deducting these significant

10  distribution fees, 20th TV has also deducted general corporate costs including but not limited to

11  those associated with sales conventions, Fox's TV library and digital services, consumer and

12  market research, and Fox's information technology support services. By taking these additional

13  expenses on top of the direct distribution expenses and distribution fees that are already deducted,

14  Plaintiffs' have suffered a detriment of over $1.1 million in Gross Receipts.

15  62.    Moreover, with respect to production costs, 20th TV charges a 15% overhead fee

16  on all of the more than $400 million in production costs that it has incurred to date. These

17  overhead fees are designed to provide 20th TV with compensation for its internal resources that

18  are used in connection with the production of the Series. Notwithstanding that 20th TV has

19  already collected over $60 million in overhead related to the production of the Series, however,

20  20th TV has added to the Series Production Charges certain indirect and overhead costs not

21  directly attributable to the Series including but not limited to computer support, transporentals,

22  restocking fees, and refreshments. It has then charged a 15% overhead fee on the indirect

23  expenses that should have been subsumed in the overhead fee 20th TV was already taking on the

24  direct production charges for the Series. This practice of double-dipping has resulted in a

25  detriment to Plaintiffs of more than $3.1 million in Gross Receipts.

26  **6.    Insufficiently Supported Expenses**

27  63.    20th TV has a legal duty to justify all of the expenses that it deducts when

28  calculating Plaintiffs' profit participation. With respect to over $100,000 in dubbing expenses,

however, it indicated during the Audit that it is unable to provide any support or justification. In the absence of any support justifying that these expenses were in fact incurred in connection with the distribution of the Series, Plaintiffs should not have these expenses deducted from Gross Receipts when calculating their profit participation.

**7.    Improperly Deducting Foreign Taxes**

64.    Through the Audit Period, 20th TV had deducted approximately $1.4 million from Defined Gross Receipts as distribution expenses attributable to foreign taxes. Because Fox is able to take a credit for these taxes on its United State income tax return, these are not moneys that 20th TV is ultimately out-of-pocket in connection with the Series, and therefore it should not deduct them when calculating Plaintiffs' profit participation.

**8.    Failure to Report Rebates from Media Buys**

65.    20th TV charged the Series with nearly $900,000 in advertising, expenses and accruals related to media buys in markets such as cable, interactive and radio but did not report any credits in connection with these media buys. On information and belief, it is customary to receive discounts, rebates and other credits based on volume purchases related to media buys. In fact, 20th TV has reported rebates from vendors related to production costs, so it is even more questionable that none were reported in connection with these large media buys.

**9.    Improperly Charging Overhead on Distribution Expenses**

66.    20th TV has improperly classified certain distribution expenses as production charges, thereby subjecting them to a 15% overhead fee that would not have been deducted from Plaintiffs' Gross Receipts if these expenses had been properly accounted. For example, 20th TV charged a 15% overhead fee on the $172,205 of AMPTP dues that it paid. The 2007 Profits Definition is clear that AMPTP dues are a distribution expense rather than a production cost, and therefore should not be subject to an overhead fee. Through the Audit Period, Plaintiffs were damaged by at least $25,830 in overcharged expenses as a result of this accounting treatment.

**10.    Improperly Accounting for Breakage**

67.    20th TV incurred tens of millions of dollars in additional production charges over and above what had been budgeted for each season. During the Audit Period, FBC reimbursed

1  20th TV for some of those production overages, known as "breakage." However, instead of

2  offsetting Production Charges with these reimbursements, 20th TV accounted for these amounts in

3  the manner most favorable to itself and detrimental to Plaintiffs. Specifically, 20th TV included

4  these breakage reimbursements in Production Charges and then charged a 15% overhead fee on

5  them even though 20th TV was not truly out-of-pocket on these expenses. This overhead resulted

6  in a detriment to Plaintiffs to be proven at trial but that Plaintiffs expect to exceed $8 million.

7        **11.**   **Improperly Accounting for Product Placement & Integration Revenues**

8        68.   20th TV accounts for product placement and integration revenues as if they are

9  merchandising receipts so that it can apply a 40% distribution fee to those revenues when

10  calculating Plaintiffs' profits. There is nothing in the 2007 Profits Definition permitting this

11  accounting treatment. Moreover, 20th TV failed to follow through on its promise that it would

12  account for certain product integration revenues it received as an offset to Production Charges,

13  thereby reducing the amount of Production Charges for which the 15% overhead was applied.

14  Fox's improper deduction of a 40% distribution fee coupled with its failure to offset Production

15  Charges as promised resulted in a detriment to Plaintiffs of over $1.8 million in Gross Receipts.

16        **12.**   **Underreported License Fees Due to Misclassification of Episodes**

17        69.   20th TV produced certain episodes during one season but then broadcast those

18  episodes as part of a subsequent season. Although the FBC/20th TV network license agreement

19  provided that episodic license fees must increase for successive seasons of the Series, when 20th

20  TV engaged in this practice of holding episodes until later seasons, it only credited Plaintiffs with

21  the license fees for the season in which the episode was produced. This is despite the fact that

22  when Fox licensed those episodes to third parties, 20th TV demanded from a third party the higher

23  license fee associated with the season in which a particular episode aired. This practice resulted in

24  a detriment to Plaintiffs in an amount to be proven at trial.

25        **13.**   **20th TV's Failure to Negotiate the Profits Definitions in Good Faith**

26        70.   Plaintiffs' agreements entitle each of them to a good faith negotiation of their

27  profits definitions within 20th TV's customary parameters for persons of Plaintiffs' stature. With

28  respect to Reichs, 20th TV did not send its standard Profits Definition until 2007, three years after

1    her initial deal had been executed. Upon sending the 2007 Profits Definition, 20th TV did not

2    engage in any negotiation with Reichs whatsoever, let alone a good faith negotiation. With

3    respect to Deschanel and Boreanaz, 20th TV has never even sent them a copy of its standard

4    Profits Definition, and has therefore not negotiated any of its terms at all. Plaintiffs are informed

5    and believe that if 20th TV had engaged in the contractually required good faith negotiation with

6    each Plaintiff, he or she would have received significant improvements to that definition such that

7    his or her eventual profit participation payments would have been dramatically increased.

8              **14.    Improperly Charged Overhead on Unrecouped Guarantees**

9              71.    When calculating Reichs' profit participation payments, 20th TV charged a 15%

10   overhead fee on more than $3 million of unrecouped guarantees and overhead because these

11   expenses were included as Production Charges. As stated above, Reichs' 2004 Agreement entitles

12   her to a Profits Definition that is negotiated in good faith. The fact that Plaintiffs Deschanel and

13   Boreanaz, both of whom are also producers on the Series as is Reichs, were not accounted to in

14   this manner is evidence that Reichs was not treated consistent with the terms of her agreements

15   and should not be subject to the 15% overhead fee applied to these $3 million in expenses.

16             **15.    Failure to Consult Regarding Distribution**

17             72.    The 2012 Agreements provide that "[20th TV] shall accord good faith (meaningful)

18   consultation to [Deschanel and Boreanaz] with respect to the initial domestic off-network sales

19   plan, subject to the reasonable availability and reasonable response time of [Deschanel and

20   Boreanaz]." 20th TV nevertheless failed to consult with Deschanel and Boreanaz about the initial

21   domestic off-network sales plan, and if it had done so, Deschanel and Boreanaz are informed and

22   believe that the consultation would have resulted in higher license fees to 20th TV, which would

23   have resulted in higher profit participation payments to Deschanel and Boreanaz.

24             **VI.    DEFENDANTS' FRAUDULENT CONDUCT**

25             73.    In or around May 2009, 20th TV and FBC approached Plaintiffs and the other

26   profit participants on *Bones* and informed them that unless each and every one of them agreed

27   that FBC could pay 20th TV reduced episodic license fees for Seasons 5 and 6 of *Bones* relative to

28   the amounts that FBC had previously agreed to pay, FBC would not pick up its option on the

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 23 -

1   Series, thereby preventing them from receiving the additional fixed and contingent compensation

2   that they would earn only if the Series continued. 20th TV then prepared an "Agreement and

3   Release" memorializing this, which contained signature lines for each and every profit participant

4   on the Series. Believing 20th TV's representations to be true at the time they were made, and

5   fearful that Season 5 would not be picked up unless she and all the other profit participants signed

6   this 2009 Release, Reichs executed it. It was not until years later during the Plaintiffs' joint

7   attempts to resolve the Audit Claims with 20th TV that Reichs learned that Deschanel and

8   Boreanaz had in fact not signed the 2009 Release and that 20th TV had falsely represented to

9   Reichs that producing Seasons 5 and 6 of *Bones* had been contingent upon *all Bones* profit

10  participants agreeing to the reduced license fees in the 2009 Release. Moreover, Deschanel and

11  Boreanaz learned during the Audit that even though they had refused to sign the 2009 Release

12  because the license fees Fox had proposed for Season 5 and 6 were well below fair market value,

13  20th TV still credited them with those same below-market license fees.

14      74.    In addition to these affirmative misrepresentations in connection with the 2009

15  Release, 20th TV took its bad acts one step further and simultaneously concealed additional

16  material information that, if known by Reichs, would have ensured she did not sign the 2009

17  Release. In particular, Fox suppressed the fact that immediately after obtaining Reichs' signature

18  on the 2009 Release, 20th TV intended to *further* harm her by amending other terms of the

19  existing FBC/20th TV network license agreement to her detriment.

20      75.    Indeed, as Plaintiffs learned during the Audit, the very same day that 20th TV

21  obtained Reichs' signature on the 2009 Release, it entered into a "sweetheart" deal with FBC to

22  amend the Nielsen ratings bonus provision in their network license agreement for *Bones*. The

23  original formula was based on how Nielsen *ranked* the Series relative to other primetime shows

24  and provided for a minimum of $100,000 per episode for each eligible episode, but the

25  amendment replaced this with a less favorable bonus structure tied purely to the Series' Nielsen

26  *ratings*. The new ratings bonus structure considered only the total number of viewers and did not

27  make any adjustments based on how well *Bones* performed relative to its competition. Under this

28  new structure, instead of owing 20th TV a minimum of $100,000 per eligible episode, FBC did

1    not have to pay any money in connection with the majority of the episodes, and in fact paid only a

2    fraction of what would have been due under the original agreement. Yet even though FBC and

3    20th TV were aware that they were devaluing the network license agreement to the detriment of

4    plaintiff Reichs and the other profit participants on the very same day that they were asking them

5    to accept reduced network license fees, Fox concealed this material fact from Plaintiffs.

6          76.     Moreover, FBC ensured it would be exceedingly difficult for 20th TV and

7    therefore the Plaintiffs to obtain these bonuses under the new structure by subjecting *Bones* to the

8    fate of perpetual migration throughout its primetime schedule. Notably, *Bones* is the only drama

9    in the history of FBC that has migrated to so many different timeslots that it has aired on each

10    weeknight during its 11-year run. Just as the day of the week kept migrating, so did its broadcast

11    time, with FBC sometimes airing it at 8 p.m. and at other times airing it at 9 p.m. In some

12    instances, such as Season 7, the weekly day and time for *Bones* were changed three times during

13    the course of a single broadcast season. This decision by FBC to constantly migrate the Series

14    likely led to it having lower viewership, which ultimately impacted the Nielsen bonuses the show

15    would earn under the new *ratings* bonus structure that FBC and 20th TV conspired to employ and

16    in fact did employ.

17          77.     Then in October 2009, at the start of Season 5 when certain "deficit

18    reimbursement" payments that were part of the original network license agreement between 20th

19    TV and FBC were due to be paid to 20th TV, the sister companies once again amended their

20    agreement, this time by eliminating entirely 20th TV's entitlement to these payments that ranged

21    from $250,000-500,000 per episode for the 84 episodes in Seasons 1 through 4 of the Series.

22    Inexplicably, as the show continued and grew more and more successful, 20th TV negotiated with

23    FBC to *forego* payments to which it was already entitled. And it did so without receiving any

24    consideration in return, resulting in a detriment to Plaintiffs of at least $10.375 million in Gross

25    Receipts, and possibly much more.

26

27

28

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 25 -

COMPLAINT

**FIRST CAUSE OF ACTION**

**Breach of Contract**

**(By All Plaintiffs Against Defendant 20th TV)**

78.     Plaintiffs incorporate by reference and reallege each and every allegation in paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

79.     Plaintiffs have performed all conditions, covenants, and promises required to be performed by them in accordance with the terms of their respective agreements and the 2007 Profits Definition provided by 20th TV to Reichs.

80.     All conditions required for Defendants' performance of the conditions, covenants, and promises required to be performed by them in accordance with the terms of the agreements and the 2007 Profits Definition have occurred.

81.     As detailed above, Defendants have breached the agreements and the 2007 Profits Definition by, among other things, failing to pay monies due to Plaintiffs pursuant to Fox's Television Definition of Defined Modified Adjusted Gross Receipts.

82.     Defendants have further breached the agreements and the 2007 Profits Definition by failing to provide Plaintiffs' auditor with documents necessary to allow the auditor to perform its audit of 20th TV accounts as required by the agreements.

83.     As a direct and proximate result of Defendants' breaches of the agreements and the 2007 Profits Definition, Plaintiffs have suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(By All Plaintiffs Against 20th TV)**

84.     Plaintiffs incorporate by reference and reallege each and every allegation in paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

85.     Plaintiffs have performed all conditions, covenants, and promises required to be performed by them in accordance with the terms of their respective agreements and the 2007 Profits Definition.

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

COMPLAINT

86.     All conditions required for Defendants' performance of the conditions, covenants, and promises required to be performed by them in accordance with the terms of the agreements and the 2007 Profits Definition have occurred.

87.     Defendants breached the implied covenant of good faith and fair dealing by unfairly interfering with Plaintiffs' right to receive the benefits of the their respective agreements and the 2007 Profits Definition by, among other things:

- Failing to properly allocate revenues earned from agreements in which *Bones* was licensed in packages with other Fox television series and films;

- Failing to properly allocate to *Bones* revenues earned from new media, including but not limited to those earned from Netflix and Hulu;

- Misclassifying certain revenues and expenses to the detriment of Plaintiffs; and

- Improperly accounting for home video and electronic sell-through receipts to the detriment of Plaintiffs.

88.     As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered monetary damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### Fraudulent Inducement per Cal. Civ. Code § 1572

### (By Plaintiff Reichs Against All Defendants)

89.     Plaintiffs incorporate by reference and reallege each and every allegation in paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

90.     As set forth above, in May 2009, 20th TV and FBC approached Plaintiffs and the other profit participants on *Bones* and informed them that unless each and every one of them agreed that FBC could pay 20th TV significantly reduced episodic license fees for Seasons 5 and 6 of *Bones* relative to the amounts stated in the FBC/20[th] TV network license agreement, FBC would not pick up its option on the Series, thereby preventing them from receiving the additional fixed and contingent compensation that they would earn only if the Series continued. 20th TV then prepared an "Agreement and Release" memorializing this, which contained signature lines for

1   each and every profit participant on the Series. Believing 20th TV's representations to be true at

2   the time they were made, and fearful that Season 5 would not be picked up unless she and all the

3   other profit participants signed this 2009 Release, Reichs executed it. It was not until years later

4   during the Plaintiffs' joint attempts to resolve the Audit Claims with 20th TV that Reichs learned

5   that Deschanel and Boreanaz had in fact not entered into the 2009 Release and 20th TV had

6   falsely represented to Reichs that producing Seasons 5 and 6 of *Bones* had been contingent upon

7   *all Bones* profit participants agreeing to the reduced license fees in the 2009 Release.

8          91.    Defendants knew their representations to Reichs were false at the time they were

9   made, *i.e.* that Defendants would produce and broadcast Season 5 of *Bones* regardless of whether

10  all profit participants signed the 2009 Release, which is in fact what occurred. Defendants

11  intentionally made these false representations to Reichs to induce her to enter into the 2009

12  Release.

13         92.    Plaintiff Reichs actually and justifiably relied on Defendants' false material

14  misrepresentations and, consequently, agreed to enter into the 2009 Release because Fox

15  threatened to cancel *Bones* if she did not acquiesce, thereby stripping her of other fixed and

16  contingent compensation that she would have otherwise been due under the 2004 Reichs

17  Agreement and the 2007 Profits Definition.

18                      **FOURTH CAUSE OF ACTION**

19              **Fraudulent Concealment per Cal. Civ. Code § 1572**

20               **(By Plaintiff Reichs Against All Defendants)**

21         93.    Plaintiffs incorporate by reference and reallege each and every allegation in

22  paragraph 1 through 77 and paragraph 90 of this Complaint, inclusive, as though fully set forth

23  herein.

24         94.    At the time Fox entered into the 2009 Release, FBC and 20th TV concealed their

25  intent to further amend the network license agreement between 20th TV and sister-company FBC

26  to the detriment of Plaintiffs. The very same day that 20th TV induced Reichs to enter into the

27  2009 Release, FBC and 20th TV amended their network license agreement to change the Nielsen

28  bonus structure from a rankings structure that was more favorable to profit participants such as

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

1  Reichs to a ratings structure that was less favorable to Reichs. In addition, Fox concealed the

2  material fact that it would be exceedingly difficult to obtain these Nielsen ratings bonuses under

3  the new structure because it intended to broadcast *Bones* at different time periods on all five

4  weekdays thus making it more difficult for viewers to locate the show and thus to achieve

5  sufficient Nielsen ratings to achieve bonuses.

6    95.    The facts concealed by Defendants were material and Fox concealed such facts

7  with the intent to induce Reichs to enter into the 2009 Release.

8    96.    At the time Fox concealed these material facts, and at the time Reichs took the

9  actions herein alleged, Reichs was ignorant of the facts concealed, and in reasonable reliance on

10  these representations, Reichs was induced to and did enter into the 2009 Release. Had Reichs

11  know the actual facts, and had Defendants not concealed material facts, she would not have taken

12  such actions. Reichs' reliance on Fox's concealment was justified because Reichs could not, in

13  the exercise of reasonable diligence, have discovered the actual facts.

14    97.    As a direct and proximate result of the fraudulent concealment by Fox, Reichs has

15  been damaged in an amount to be proven at trial. When Reichs has ascertained the full value of

16  her damages, she will seek leave of the Court to amend this Complaint accordingly.

17    98.    Reichs is informed and believes and thereon alleges that Defendants, in doing the

18  things alleged herein, acted willfully, maliciously, oppressively and with full knowledge of the

19  adverse effects of their actions on Reichs, and with willful and deliberate disregard to the

20  consequences to Reichs, such as to constitute oppression, fraud, and/or malice. As a direct result

21  of their fraudulent, willful and malicious conduct, Reichs is entitled to exemplary and punitive

22  damages pursuant to Civil Code § 3294 in an amount to be determined by the Court at trial.

23                      **FIFTH CAUSE OF ACTION**

24                      **Inducing Breach of Contract**

25            **(By All Plaintiffs Against 21st Fox, FEG, FBC, and Does 1-20)**

26    99.    Plaintiffs incorporate by reference and reallege each and every allegation in

27  paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

28

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 29 -

COMPLAINT

100.     20th TV and one or more Plaintiffs were parties to the 2004 Reichs Agreement and 2012 Actor Agreements, which are valid and binding contracts.

101.     20th TV and one or more Plaintiffs were parties to the 2007 Profits Definition, portions of which are valid and binding contracts.

102.     At all relevant times, defendants 21st Fox, FEG, FBC, and Does 1-20 were aware of the 2004 Reichs Agreement, the 2007 Profits definition, and the 2012 Actor Agreements and their terms.

103.     As set forth above, 20th TV breached the 2004 Reichs Agreement, the 2012 Actor Agreements, and the binding portions of the 2007 Profits Definition, including their implied covenants of good faith and fair dealing, in various ways.

104.     Defendants 21st Fox, FEG, FBC, and Does 1-20 intended to influence, direct, or cause 20th TV to commit the above-described breaches because these defendants knew they would benefit from such breaches. Among other benefits, Defendants 21st Fox, FEG, FBC, and Does 1-20 benefited by paying lower license fees for the rights to broadcast the Series, thus decreasing costs and increasing profits for FBC and ultimately for 21st Fox as a result of denying Plaintiffs their proper share of revenues from the Series.

105.     Through the conduct described above, Defendants 21st Fox, FEG, FBC, and Does 1-20 caused 20th TV to breach the 2004 Reichs Agreement, the 2012 Actor Agreements, and the binding portions of the 2007 Profits Definition as set forth above. But for the influence or direction of these defendants, 20th TV would have had no incentive, basis, and/or ability to collude with these defendants; rather, absent such collusion, the primary goal of 20th TV would have been to maximize its revenues and profits from the Series and obtain the highest-possible license fees for the Series.

106.     Through their conduct, Defendants 21st Fox, FEG, FBC, and Does 1-20 caused damage to Plaintiffs by inducing acts that reduced 20th TV's Gross Receipts and ultimately Plaintiffs' profit participation in connection with the Series, in an amount to be proven at trial.

107.     The conduct of Defendants 21st Fox, FEG, FBC, and Does 1-20 was a substantial factor in causing Plaintiffs' harm.

108.    In engaging in the misconduct alleged herein, Defendants 21st Fox, FEG, FBC, and Does 1-20 have acted with malice, oppression, or fraud, and in willful disregard of Plaintiffs' rights and interests, thus entitling Plaintiffs to an award of punitive damages in an amount appropriate to punish or make an example of Defendants 21st Fox, FEG, FBC, and Does 1-20, pursuant to Civil Code § 3294.

## SIXTH CAUSE OF ACTION

### Intentional Interference with Contract

**(By All Plaintiffs Against 21st Fox, FEG, FBC, and Does 1-20)**

109.    Plaintiffs incorporate by reference and reallege each and every allegation in paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

110.    20th TV and one or more Plaintiffs were parties to the 2004 Reichs Agreement and 2012 Actor Agreements, which are valid and binding contracts.

111.    20th TV and one or more Plaintiffs were parties to the 2007 Profits Definition, portions of which are valid and binding contracts.

112.    At all relevant times, defendants 21st Fox, FEG, FBC, and Does 1-20 were aware of the 2004 Reichs Agreement, the 2007 Profits Definition, and the 2012 Actor Agreements and their terms.

113.    Defendants 21st Fox, FEG, FBC, and Does 1-20 collaborated and/or participated with 20th TV in the misconduct described above because these defendants knew they would benefit from such misconduct. Among other benefits, Defendants 21st Fox and FBC benefited by paying lower license fees for the rights to broadcast the Series, thus decreasing costs and increasing profits for FBC and ultimately for 21st Fox as a result of denying Plaintiffs their proper share of revenues from the Series.

114.    Through the conduct described above, Defendants 21st Fox, FEG, FBC, and Does 1-20 intended to disrupt or prevent the performance by 20th TV of the 2004 Reichs Agreement, the 2012 Actor Agreements, and the binding portions of the 2007 Profits Definition as set forth above, and did disrupt or prevent that performance.

115.     Through their conduct, Defendants 21st Fox, FEG, FBC, and Does 1-20 caused damaged to Plaintiffs by collaborating and/or participating in acts that reduced 20th TV's Gross Receipts and ultimately Plaintiffs' profit participation in connection with the Series, in an amount to be proven at trial.

116.     The conduct of Defendants 21st Fox, FEG, FBC, and Does 1-20 was a substantial factor in causing Plaintiffs' harm.

117.     In engaging in the misconduct alleged herein, Defendants 21st Fox, FEG, FBC, and Does 1-20 have acted with malice, oppression, or fraud, and in willful disregard of Plaintiffs' rights and interests, thus entitling Plaintiffs to an award of punitive damages in an amount appropriate to punish or make an example of Defendants 21st Fox, FEG, FBC, and Does 1-20, pursuant to Civil Code § 3294.

## SEVENTH CAUSE OF ACTION

### Accounting

### (By All Plaintiffs Against All Defendants)

118.     Plaintiffs incorporate by reference and reallege each and every allegation in paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

119.     A relationship exists between Plaintiffs on the one hand and Defendants on the other hand for which an accounting of Defendants' books and records is appropriate.

120.     Plaintiffs are informed and believe and thereon allege that Fox has derived and received significant income, profit and other benefits from the aforementioned improper and fraudulent accounting practices. Plaintiffs are entitled to a full and accurate accounting of all proceeds generated from, by or in connection with the distribution, licensing and/or other exploitation of the Series and its components as well as the fees and expenses incurred by 20th TV in connection with the production, distribution and exploitation of the Series and its components.

121.     The amount of money due to Plaintiffs is unknown and cannot be reasonably ascertained without a full and complete accounting of Defendants' books and records. Defendants have failed and refused to supply the information and documents necessary to complete that audit. Due to Plaintiffs' exclusion from exercising any control or management over the distribution,

- 32 -

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
ATTORNEYS AT LAW

1  licensing and other exploitation of the Series and the collection, reporting and accounting of

2  revenues generated from such exploitation and the complex nature of the accounts of such

3  exploitation, it is impractical to ascertain a fixed sum that is currently owed to Plaintiffs.

4  Accordingly, the full amount due and owing to Plaintiffs can only be determined pursuant to a

5  full and accurate accounting of all proceeds and expenses generated in connection with the

6  production, distribution, licensing and other exploitation of the Series that Plaintiffs seek herein.

7      122.    Plaintiffs also pray for the Court to impose a constructive trust on all moneys

8  wrongfully withheld by Defendants, in accordance with common law and California Civil Code

9  §§ 2223-2224, for the benefit of Plaintiffs and Plaintiffs' interests.

10  **EIGHTH CAUSE OF ACTION**

11  **Declaratory Relief**

12  **(By All Plaintiffs Against 20th TV)**

13      123.    Plaintiffs incorporate by reference and reallege each and every allegation in

14  paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

15      124.    An actual controversy has arisen and now exists between Reichs and 20th TV

16  regarding the enforceability of the 2009 Release. Reichs is informed and believes that 20th TV

17  contends that Reichs is bound by the terms of the 2009 Release, and that Reichs is not entitled to

18  raise claims associated with the improperly reduced network license fees reported to her in

19  connection with Season 5 and 6 of the Series. Reichs, on the other hand, contends that she was

20  fraudulently induced to enter into the 2009 Release, therefore rendering it null, void, and

21  unenforceable. These issues have been raised with 20th TV who disagrees and thus the parties

22  have a dispute concerning their respective rights and obligations, if any, under the 2009 Release.

23      125.    Plaintiffs are further informed and believe that an actual controversy has arisen

24  and now exists between Plaintiffs and 20th TV regarding the allocation of certain license fees that

25  are used to determine Plaintiffs' profit participation under the agreements. Plaintiffs are informed

26  and believe that 20th TV is misallocating and/or underreporting the revenues for the Series in

27  many of self-dealing domestic and international agreements governing the distribution, licensing,

28  or other exploitation of *Bones*. Plaintiffs, on the other hand, contend that pursuant to their

- 33 -

COMPLAINT

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP ATTORNEYS AT LAW

1  agreements, 20th TV must allocate and report revenues consistent with the monetary terms of the

2  licenses 20th TV enters into with third parties for comparable programs.

3        126.    Plaintiffs are further informed and believe that an actual controversy has arisen

4  and exists between Plaintiffs and 20th TV regarding their respective rights and obligations under

5  the parties' agreements with respect to the interpretation of provisions of the parties' agreement

6  related to the calculation, reporting, and payment of Plaintiffs profit interests in the Series.

7  Plaintiffs are informed and believe that 20th TV contends otherwise.

8        127.    Therefore, Plaintiffs request that this Court make and enter its binding judicial

9  declarations in accordance with Plaintiffs' contentions set forth above. These declarations are

10  both necessary and proper at this time under the circumstances in that, among other things, the

11  interests of judicial economy and substantial justice will be served thereby.

12

13

14               [Remainder of page intentionally left blank]

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against the Defendants and each of them as follows:

1. For monetary damages in an amount to be proven at trial;

2. For a judicial declaration of the parties' contractual rights and duties in connection with *Bones*, their agreements concerning *Bones*, the 2007 Profits Definition, and the 2009 Release alleged herein;

3. For an accounting under Court supervision of the profits of the Series and the amounts due and payable to Plaintiffs in accordance with the agreements alleged herein;

4. For the Court to impose a constructive trust on the moneys wrongfully withheld;

5. For rescission of the 2009 Release;

6. For an award of punitive damages in an amount to be proven at trial;

7. That Plaintiffs be awarded all pre-judgment interest allowable by law;

8. That Plaintiffs be awarded their outside attorneys' fees and costs; and

9. For such further relief as the Court may deem just and proper.


Los Angeles, California

Dated: November 30, 2015   **KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP**

By: _____

John V. Berlinski, Esq.
Mansi K. Shah, Esq.
Candace Frazier, Esq.
2029 Century Park East, Suite 750
Los Angeles, California 90068
Telephone: (424) 288-7900

*Attorneys for Plaintiffs*

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 35 -

COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs Temperance Brennan, L.P. f/s/o Kathleen Reichs, Snooker Doodle Productions, Inc. f/s/o Emily Deschanel, and Bertha Blue, Inc. f/s/o David Boreanaz hereby demand a trial by jury in this matter.

Los Angeles, California

Dated: November 30, 2015

                                        **KASOWITZ, BENSON, TORRES &**
                                        **FRIEDMAN, LLP**

                                        By: _____

                                        John V. Berlinski, Esq.
                                        Mansi K. Shah, Esq.
                                        Candace Frazier, Esq.
                                        2029 Century Park East, Suite 750
                                        Los Angeles, California 90068
                                        Telephone: (424) 288-7900

                                        *Attorneys for Plaintiffs*

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

COMPLAINT