**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

T.S. *et al.*,

        Plaintiffs,

v.

Twentieth Century Fox Television *et al.*,

        Defendants.

Case No. 1:16-cv-08303

Hon. Amy J. St. Eve

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO
COMPEL DISCOVERY FROM FOX DEFENDANTS**

The arguments set out in Fox's Opposition to Plaintiff's Motion to Compel Discovery
(ECF No. 140) are without merit. The Court should grant Plaintiffs' Motion to Compel.

**1. "Meritless case" objection**

Fox objects to discovery on the grounds that the case is meritless in the middle of
discovery on the case's merits. That is flatly inappropriate, but it compels a response. In reality,
discovery to date has confirmed the bulk of Plaintiffs' allegations, and it has revealed new,
troubling facts about the *Empire* lockdowns. For example:

- ***Medical care***. Fox's first and primary argument is that it did not film in the
JTDC's infirmary. (ECF No. 140 at 3.) This appears to be correct. (The produced
communications show that Fox lobbied vigorously for the JTDC's administrators to change their
minds, but ultimately had to film elsewhere.) If discovery confirms this, a future amended
complaint will eliminate the allegation.

Fox seems to think this means that medical care was not interrupted, either. But Fox
seeks to draw a connection that does not exist. Whatever was going on in the infirmary, the

1

specific deprivation that Plaintiffs allege is that responses to their sick call requests were delayed. (*See* ECF No. 88 ¶¶ 43, 47(c), 48(d).) Fox whistles past this distinction, contending that "Plaintiffs confirmed in interrogatory responses that neither of the two named plaintiffs had a medical need unmet during filming . . . ." (ECF No. 140 at 3.) Here is what Plaintiffs' interrogatory[1] response actually said:

> [T.S.] recalls that under normal operation, when he or other children on his pod put in sick call requests, they were usually attended to by the next day. [T.S.] recalls that during the *Empire* filming periods, however, sick call requests were not attended to until the next week. He recalls that he put in sick call requests both during normal operation and during *Empire* filming. [Q.B.] recalls that under normal operation, when he or other children on his pod put in sick call requests, they were usually attended to by the next day, usually by being taken to the infirmary. [Q.B.] recalls that during the *Empire* filming periods, however, many sick call requests were not attended to until the next week; and that children were not brought down to the infirmary for sick calls, as they normally would be. [Q.B.] recalls making sick call requests during the JTDC's normal operation. [Q.B.] does not recall making sick call requests during Empire filming.

In short, the responses explain that T.S. put in a sick call request that was delayed, while Q.B. did not; and both T.S. and Q.B. remember that responses to sick call slips on their pods were delayed during filming. Fox's gloss on this interrogatory response is simply hard to understand.

Plaintiffs' investigation has also revealed that *Empire* disrupted medical care at the JTDC in other ways as well. Plaintiffs' counsel recently interviewed another detainee, L.F.[2] L.F. suffers from ADHD, for which he was prescribed medication. During normal operation, medical staff would deliver the medication to L.F.'s pod during the morning, which allowed him to

---

[1]  In relevant part interrogatory read, "State the dates, times, and nature of all medical treatment requested by the Named Plaintiffs . . . at any time they were detained at the JTDC and state if the requested medical treatment was provided, and if so, the dates, times, and nature of the treatment."

[2]  Plaintiffs' counsel interviewed L.F. on Friday, March 2, 2018. Plaintiffs will update their discovery disclosures regarding this individual.

benefit from the medication during the day. L.F. reported, however, that during the *Empire* filming, staff often did not deliver the medication on time: sometimes it was delivered later in the day, sometimes it was delivered night, and sometimes, he recalls, it was entirely skipped until the next day's dose.

- ***Recreation***. Discovery has confirmed exactly what Plaintiffs alleged: all of the children at the JTDC were barred from going outdoors during the entire time Fox was filming there. Instead, some children were sent to lower indoor gymnasiums, but apparently because there was not enough space there, many of them were given "recreation" on their pods instead. (*See* ECF No. 88 ¶ 40.) The JTDC's written policies required "regular access to outdoor recreation," which was provided on a daily basis during normal operation. As one email euphemistically put it, however, during *Empire* filming JTDC staff had to "coordinate pod activities instead of yard."

- ***Structured Programming***. Plaintiffs have alleged that to accommodate *Empire*'s filming, structured programming was eliminated. (*See, e.g.*, ECF No. 88 ¶ 44.) Fox makes no mention of this allegation, and for good reason. The JTDC's internal policies required it to "develop[] and consistently implement[] a comprehensive and varied system of structured program activities designed to develop pro-social thinking and behavior patterns, and indeed the JTDC normally provided such programming. One program provider was Caleb Probst, of the Chicago Alliance Against Sexual Exploitation. His organization had been preparing a week-long program at the JTDC to start on June 22, 2015, but that same day he was told by Anna Buckingham, the JTDC's structured programming coordinator, that it would be cancelled:

> Probst: "Are we cancelling the whole thing, or just today?"
> Buckingham: "All week. They are filming the show Empire and all programming has been cut."

3

Buckingham had to repeat this news to other program providers in July, explaining that programming was being cancelled because "[t]hey are filming the show Empire here, so everything is pretty much on lock-down."

- **School**. Discovery has revealed that school was in session during the July filming, and was out of session during the filming in June and August. This made matters worse, not better. Without school in session the children at the JTDC would be left to confinement on their pods, which is why JTDC policies require the development of "[s]tructured activities during school holidays and on weekends." As noted above, however, during filming such programming was cancelled. Indeed when JTDC brass sought staff feedback after the first filming in June, one employee had the courage to note that the *Empire* filming had made such activities impossible:

> This was the first week our residents were on summer break. It is during this time that the use of the school area and yards is helpful in allowing them to burn off some of their energy.

With the *Empire* lockdown, though, the children were confined to their pods.

As for schooling, Fox rationalizes that because the children at the JTDC are under restrictions wherever they go, it does not matter that they had school on their pods. (ECF No. 140 at 4.) Were that the case, the JTDC would be a much easier place to run. Yet as Plaintiffs explained in their complaint, during normal operation the JTDC goes to great lengths to ensure that children housed there do not receive schooling on their pods, but rather are able to use the school facilities on the second floor. (ECF No. 88 ¶¶ 21-28.) That was undone when Fox paid to use the JTDC's second floor.

- **Visitation**. Plaintiffs alleged that some visits were cancelled, while others were disrupted. (*See* ECF No. 88 ¶¶ 42, 47.) Discovery has confirmed that. In the leadup to the June filming, an internal JTDC email was circulated advising staff to "[n]otify parents that visitation

4

will be closed on 6/23 . . . ." That is consistent with Q.B.'s allegation that his grandmother was prevented from visiting during the first week of filming. (*Id.* ¶ 48.)

Eventually visits were transferred to an alternate room. Discovery has shown that the new room only had slots for eight visits at a time, instead of the usual twelve. Undoubtedly this stressed the visiting room capacity, and it corroborates the experience of S.S. and T.S. that visiting was shortened and chaotic (*id.* ¶ 47(e)). Discovery also indicates that the tables in the substitute visiting room were much closer together, giving detainees less privacy and thus undermining the therapeutic purpose of family visits, which includes the rare opportunity for detainees to express their vulnerabilities and fears to their parents or guardians.

•       ***Pod transfers***.  Discovery to date has also revealed that in order to accommodate Fox's desire to use some of the residential pods for the filming, JTDC administrators put children at direct risk. Among the most sensitive tasks at the JTDC is pod assignment. Many detainees are in (or are perceived to be in) rival gangs; these rivalries can be deadly. As a result, JTDC policies require careful planning and inter-staff meetings to decide which children should be placed on which pod. And even with this care, every transfer risks that an unknown conflict between residents could lead to violence.

To accommodate *Empire*, however, JTDC staff moved residents wholesale. One staff member wrote:

> Here are my thoughts on how the moves can be done for the Empire taping. . . . We need to transfer *at least* 14 residents (allowing us to close 3A) throughout the facility . . . .

(emphasis original). That email also discussed other, additional pod transfers needed to accommodate *Empire*. The danger posed by these transfers was acute: a single divisional shift report from the first day of filming in June records attacks against two residents who had just

been transferred from other pods. And during the July filming, one staff member expressed concern about transferring a detainee who "is 6'0, 142 lbs., and claims the Black Disciple Gang," explaining that she did not yet have enough information to ensure that the transfer would be safe. In response her colleague wrote, "Empire will be gone by Friday and we can go back to normal."

*     *     *

Fox had one of the largest juvenile detention centers in the country repurposed for two weeks in order to suit its own commercial needs. The impact of this act on such a large facility and the hundreds of children housed there is bound to take some effort to understand, which is the purpose of the discovery process that is currently underway. Fox's claim that there is nothing to see here, however, is wishful thinking. This is a real case, which appropriately includes discovery against Fox. Fox cannot evade that discovery by claiming otherwise.

## 2. Interrogatory No. 4

Fox appears to concede that it should have responded to this interrogatory, essentially treating the statements in its opposition brief as an ersatz response, and then claiming that "[n]o further" discovery on this topic should be required. (ECF No. 140 at 7.) Fox says Plaintiffs should instead seek the information that the interrogatory requests through a deposition. (*Id*.)

Plaintiffs would prefer an actual answer to their interrogatory, so they can get down on paper and in plain English what exactly Fox did to respond to locate responsive documents. Fox's own opposition brief shows why this is needed. Fox says that (1) on November 7, 2016, "the Court ordered the Fox Defendants to identify all employees or contractors of theirs who" had certain responsive information; (2) Fox "identified 11 such people and Plaintiffs served preservation subpoenas on them"; and (3) Fox has produced all documents in the possession of the people "who had received the preservation subpoenas." (*Id.* at 5-6.)

But the Court's November 7, 2016 order did not instruct the Fox defendants to identify their *own* employees—it specifically instructed Fox to identify "*non−Fox* employees and third parties" for purposes of serving subpoenas (ECF No. 43 (emphasis added)), and Plaintiffs' preservation subpoenas were served only on those non-Fox employees. Thus if Fox has indeed searched for and produced documents only from the persons who received the document preservation subpoenas, which is what its brief appears to say, that means Fox has made no effort to search for responsive documents in the possession of Fox employees. Plaintiffs are entitled to have this cleared up. That is what a response to Interrogatory No. 4 would do. For this reason alone, the Court should order the Fox defendants to answer Interrogatory No. 4.

### 3. Discovery regarding Fox's revenues

Fox's objections to Plaintiffs' revenue discovery are meritless. **First**, the main thrust of Fox's objections, running for more than three pages (*see* ECF No. 140 at 8-11), is really a motion for the Court to reconsider and reverse its October 2017 dismissal opinion. Fox argues that Plaintiffs' unjust enrichment claims must fail because they have no "entitlement" or "better claim" to Fox's advertising revenues. (ECF No. 140 at 8-12.) But Fox made these precise arguments in support of its motion to dismiss, contending that Plaintiffs had shown no "entitlement" or "better claim" to Fox's "advertising revenues" and "advertising dollars," (ECF No. 91 at 12-13), and it elaborated and expanded on these arguments in its dismissal reply. (*See* ECF No. 103 at 8-10.) After considering those arguments, however, the Court rejected them. Instead, it held that "Plaintiffs have adequately alleged that the Fox Defendants economically benefitted from their improper conduct in connection to the filming of *Empire* at the JTDC," and it denied Fox's motion to dismiss Plaintiffs' unjust enrichment claim. (ECF No. 110 at 13.)

Fox's objection to Plaintiffs' revenue discovery rests on arguments that would require the Court to reconsider, and reverse, its ruling on Fox's motion to dismiss. The Court, however, has been emphatic that

> motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence. A motion for reconsideration is appropriate only if the court has patently misunderstood a party or made an error not of reasoning but of apprehension. These grounds represent extraordinary circumstances, and a motion to reconsider is to be granted only in such extraordinary circumstances. Motions to reconsider are not at the disposal of parties who want to rehash old arguments. Thus, it is clear that motions to reconsider are not appropriate vehicles to advance arguments already rejected by the Court or new legal theories not argued before the ruling.

*LG Elecs. v. Whirlpool Corp.*, No. 08-cv242, 2009 WL 5579006, at *1 (N.D. Ill. Nov. 23, 2009) (St. Eve, J.) (brackets, ellipses, citations, and quotations omitted).

Fox is trying to evade these criteria by packaging its request for reconsideration in this discovery setting. Fox must do this because it cannot meet the Court's criteria. Its opposition does not even acknowledge the Court's dismissal opinion, or explain why that opinion is wrong, or identify any extraordinary circumstance that would justify another chance to make its "entitlement" and "better claim" arguments anew.[3] Fox's rehashed arguments are wrong on the merits too, and if the Court decides to entertain them, Plaintiffs request a briefing schedule in which to respond. But Plaintiffs respectfully suggest that the proper course is for the Court to reject Fox's reconsideration arguments now.

---

[3] Perhaps to suggest there is new law, Fox highlights *Banco Panamericano, Inc. v. City of Peoria*, 888 F.3d 329, 333 (7th Cir. 2018). (*See* ECF No. 140 at 8.) But the *Banco Panamericano* passage that Fox cites is a block-quote of *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672, 679 (Ill. 1989), the Illinois unjust enrichment case that Fox relied on in its motion to dismiss. (*See* ECF No. 91 at 12-13 (citing *HPI*); ECF No. 103 at 8 (same).) All the other decisions Fox cites, meanwhile, were either cited in or well predated its motion to dismiss briefing.

***Second***, Fox's opposition leans heavily on the argument that Plaintiffs' revenue discovery is overly broad and unduly burdensome.  (*See* ECF No. 140 at 8, 11-12.)  But Fox's counsel pointedly refused to discuss these issues during the meet-and-confer process.  In its original responses Fox made boilerplate objections to the burden and overbreadth of the "revenue" requests, but left things at that.  During meet-and-confer correspondence Plaintiffs noted that the parties had not discussed these objections because Fox had rested on its threshold objections to the revenue discovery, but nevertheless told Fox: "[i]f you would like to move beyond these objections and discuss burden or overbreadth . . . , we'd be happy to do so."  (ECF No. 138 Ex. 9 at 1.)  Fox's counsel specifically declined this invitation:

> your demands for revenues related to two entire seasons of Empire
> are vastly overbroad and unduly burdensome. It is clear we will not
> reach agreement on this issue and, although I think any motion
> practice on it would be premature and wasteful of the parties' and
> the Court's time, I do not think any further written exchanges
> between us on this issue would be productive, either.

(ECF No. 138 Ex. 10 at 2.)  Now, however, Fox makes full-throated burden and overbreadth objection regarding the requests that it specifically declined to negotiate.  Plaintiffs remain willing to confer with Fox to ensure that their responses are not overly broad or unduly burdensome, but having refused to discuss the issue at all, Fox cannot be heard to raise it as grounds for denying Plaintiffs' discovery.

***Third***, Fox argues that if claims ultimately proceed only against TCFTV, advertising revenues will be irrelevant.  (ECF No. 140 at 11.)  Plaintiffs explained in their motion to compel why they also have a case against FBC, which directly implicates advertising revenue (ECF No. 138 at 10.)  But Plaintiffs also explained that advertising revenue is relevant as to TCFTV standing alone, since it helps identify the market "price" at which TCFTV would have "sold" the *Empire* episodes to FBC.  (*Id.* at 10-11.)  Fox's opposition makes no response to this argument.

9

***Fourth*** and finally, Fox argues that it should not have to endure discovery of its revenues until Plaintiffs have made some sort of proof as to the merits of their case. (ECF No. 140 at 11.) This request for a special protection from discovery is founded on Fox's improper, and demonstrably incorrect, claim that discovery should be cut off because Plaintiffs' case lacks merit. The Court should reject it.

### 4. **Interrogatory No. 9 to 21CF** (Discovery Regarding Fox Television Group)

Plaintiffs have alleged that the defendants in this case were joint venturers with one another, (ECF NO. 88 ¶ 9), and that FBC and TCFTV engaged in a "joint effort" specifically with respect to the creation of *Empire* through the Fox Television Group. (*Id.* ¶ 59.) Plaintiffs are entitled to prove this allegation, which would make FBC jointly and severally liable for the torts of its joint venturer with respect to that project. *See, e.g.*, *Clarendon Am. Ins. Co. v. B.G.K. Sec. Servs., Inc.*, 900 N.E.2d 385, 393 (Ill. 2008) ("A joint venture, like a partnership, is liable to third persons for wrongful acts of its venturers done in the course of the joint venture agreement."). This discovery is calculated to advance that proof. Plaintiffs have also alleged that FBC was directly involved in the decision to change the depiction of Chris Rock's character, which required additional filming at the JTDC.[4] (ECF No. 88 ¶ 59.)

Fox is also wrong that 21CF is "unable to provide and verify discovery responses regarding communications by or between other corporate defendants." (ECF No. 140 at 13.) 21CF is the corporate parent of wholly-owned subsidiaries FBC and TCFTV. As the controlling corporate parent, it is required to answer discovery requests pertaining to the knowledge of its subsidiaries, to produce documents in their possession, and even to provide a Rule 30(b)(6)

---

[4] Fox denies that there was any communication by FBC, but as discussed above it does not appear that Fox ever searched for internal communications among Fox employees that might shed light on the issue.

witness to testify about matters within the knowledge of each subsidiary. *See, e.g., Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, No. 01-cv-3016, 2002 WL 1835439, at *2 (S.D.N.Y. Aug. 8, 2002) (finding in favor of Fox plaintiff that "an entity receiving a notice of deposition pursuant to Rule 30(b)(6) is obligated to produce a witness prepared with the knowledge of both the entity that received the subpoena and its subsidiaries or affiliates. . . . [i]f the subsidiaries and affiliates are within its control."); *S.C. Johnson & Son, Inc. v. Dial Corp*., No. 08-cv-4696, 2008 WL 4223659, at *2 (N.D. Ill. Sept. 10, 2008) (similar; citing favorably *Twentieth Century Fox Film Corp*.); *United States v. Int'l Union of Petroleum and Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989) ("A corporation must produce documents possessed by a subsidiary that the parent corporation owns or wholly controls.").

March 6, 2018                                                    Respectfully Submitted,

/s/ Stephen H. Weil

Stephen H. Weil – steve@weilchardon.com
Alexis G. Chardon – ali@weilchardon.com
Weil & Chardon LLC
333 S. Wabash Avenue, Suite 2700
Chicago, IL 60604
(312) 585-7404

*Attorneys for Named Plaintiffs T.S. and Q.B.*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on March 6, 2018, a true and correct copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

                    <u>/s/ Stephen H. Weil</u>