**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

T.S. *et al.*,

    Plaintiffs,

 v.

Twentieth Century Fox Television *et al.*,

    Defendants.

Case No. 1:16-cv-08303

Hon. Amy J. St. Eve

**PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM THE
OFFICE OF THE CHIEF JUDGE OF THE CIRCUIT COURT OF COOK COUNTY**

Pursuant to Federal Rule of Civil Procedure 37(a)(1), Plaintiffs move the Court for an order compelling discovery from defendant Office of the Chief Judge of the Circuit Court of Cook County ("OCJ") to provide an adequate response to five requests for production (RFPs 26-31) that seek communications among employees of the Cook County Juvenile Temporary Detention Center ("JTDC") regarding the filming of *Empire* at that facility.[1]

In support of this motion Plaintiffs state as follows:

**BACKGROUND**

This case is a putative class action brought by former detainees at the JTDC. Plaintiffs allege that in the summer of 2015, the JTDC was used as a set for the filming of scenes for the

---

[1]  ***Local Rule 37.2 Statement***. Pursuant to Local Rule 37.2, Counsel for the parties attempted to resolve this discovery dispute through an informal meet-and-confer process. This included the discovery enforcement correspondence attached hereto as Exhibits 7-10, an-person meeting in March 2018, and multiple phone calls between Stephen Weil (Plaintiffs' counsel) and Andrew Horvat (OCJ's counsel) throughout the month of May 2018, and the first week of June 2018. These efforts were unsuccessful in resolving the discovery dispute.

Fox television show *Empire*, which sent the facility's operations into disarray and caused hundreds of children there to be placed on lockdown. (*See* Second Amended Complaint ("SAC") (ECF No. 88) at 1-2 & *passim*.)

The JTDC's governmental status has changed in recent years. Until 2008 it was operated by the Cook County Board. The Illinois legislature then shifted some administrative control from Cook County to the OCJ. (*See* ECF No. 58 at 28-34, 35-36 (discussing roles of OCJ and County regarding JTDC).) Plaintiffs sued both the OCJ and the County. Both defendants moved to dismiss, both defendants lost those motions, (*see* Mem. Op. (ECF No. 73)), and in August 2017 the case proceeded to discovery.

### 1. First round of discovery, against Cook County.

Based largely on the positions that the County and OCJ had taken in their dismissal briefing,[2] Plaintiffs targeted the County as the "corporate" entity for discovery about the JTDC, while they targeted the OCJ as custodian of information in the Chief Judge's administrative office. As such, in August 2017 Plaintiffs served a set of Requests for Production ("RFPs") on the County asking for production of a variety of JTDC operational documents, while they served much narrower RFPs on the OCJ.[3]

The County RFPs included RFPs 26-31 (*see* Ex. 1 at 4-5), which sought communications among JTDC employees about the *Empire* filming and its impact on JTDC operations—particularly on the children housed there. Plaintiffs and counsel for the County, which was represented by the Cook County State's Attorney's Office ("CCSAO") agreed that the County would search for documents responsive to RFPs 26-31 in JTDC employee email accounts.

---

[2] (*See* Joint Status Report Regarding Discovery (ECF No. 132) at 1-2 (summarizing positions taken by OCJ and Count County at the dismissal stage).)

[3] RFPs to the County are attached as **Ex. 1**. Original RFPs to OCJ are attached as **Ex. 2**.

In November 2017, the County produced approximately 3,000 pages of communications purportedly responsive to RFPs 26-31. During their review of these documents, however, Plaintiffs discovered that the County's document gathering process had been haphazard and had large gaps. The JTDC's email system operates on Microsoft Outlook, which allows centralized searching at the email server level, through Microsoft Exchange.[4] The County, however, did not conduct a centralized search. Instead, a JTDC in-house lawyer sent out a blast email to JTDC employees telling them to conduct a search for responsive emails, print the resulting documents to paper, scan them, and send them to her. Beyond this blast email, it does not appear that any effort was made to oversee the employees' document collection, and thus no way to ensure that employees gathered responsive documents. This created multiple problems:

- Many employees appear to have ignored the "blast" email
- Employees might not have been technically proficient enough to conduct adequate searches
- Employees might have omitted documents from the search that cast them in a negative light
- Some employees were likely gone from the JTDC—either because they had left their jobs since the filming or were absent for other reasons—and thus never searched their emails

On December 29, 2017, Plaintiffs' counsel wrote CCSAO a letter outlining the problems with the collection. (Dec. 29, 2017 Letter from S. Weil to A. West and A. Zecchin, attached as **Ex. 3**.) Plaintiffs identified, among other things, numerous employees for whom no collection was done, including "Supervisor-in-Charge" Gene Robinson, whom a JTDC in-house newsletter had credited with coordinating logistics for the *Empire* filming. The County's collection and production of responsive materials, in short, was plainly flawed and inadequate.

---

[4] Microsoft Exchange is the server management software that hosts Microsoft Outlook email systems.

As a remedy, Plaintiffs' December 29 letter proposed that the County re-run its search for documents responsive to RFPs 26-31, this time using a keyword search on the Microsoft Exchange server that hosted the JTDC's email accounts. The "keyword" terms were:

| | |
|---|---|
| empire | grogan.megan@gmail.com |
| fox | klemke |
| "lee daniels" | scout! |
| breen | film! |
| bradybreen@aol.com | hollywood |
| grogan | movie |

The County agreed to conduct the search, and did so.[5] The County collected responsive documents and saved them to a disc. As explained below, these documents—which are the subject of this motion—have not been given to Plaintiffs and remain on a disc that is now in the possession of the OCJ, which refuses to produce them.

### 2. Discovery switch from Cook County to OCJ.

At about this time, two things happened. On January 24, the OCJ, after being ordered to do so (*see* Min. Order, (ECF No. 129)), produced documents in response to Plaintiffs' August RFP to OCJ. This production, which was composed of emails among staff in the Chief Judge's administrative office and some front-office personnel at JTDC, is bates-stamped OAG 1-1548.

Then, shortly after the OCJ produced OAG 1-1548, the County took a new position in the litigation: it asserted that it was not the entity operating the JTDC—rather the OCJ was. (*See* ECF No. 132 (Joint Status Report) and ECF No. 132-4 (Feb. 2, 2018 Letter from A. West to S. Weil).) As such, the County concluded that it did not have custody or control over JTDC employees' emails responsive to RFPs 26-31. Instead of producing the documents gathered in the keyword search, in early February the County handed the disc containing responsive

---

[5] These terms were not included in Plaintiffs' December 29 letter; they were identified by Plaintiffs and the County during discovery enforcement negotiations.

documents over to the OCJ. The disc remains in the possession of counsel for OCJ, Andrew
Horvat of the Illinois Attorney General's Office.

The County's change occurred in the middle of Plaintiffs' discovery enforcement efforts,
including enforcement of RFPs 26-31. To address the complication this presented, Plaintiffs
determined that the best course of action was to serve OCJ with requests essentially identical to
the discovery that had been served on the County, including RFPs 26-31. (**Ex. 4**.) Along with
this discovery, Plaintiffs' counsel provided Mr. Horvat with the discovery enforcement
correspondence between Plaintiffs and CCSAO, including the December 29 letter.

In early March 2018, counsel for the Plaintiffs and the government defendants held an in-
person meeting to discuss the discovery change. OCJ had received Plaintiffs' discovery, and the
parties agreed at the meeting that Mr. Horvat would compare these requests against:

- the County's existing production;
- the OCJ's January 24th production, *i.e.*, OAG 1-1548; and
- the disc containing the County's "keyword" search on the email server
  hosting the JTDC emails.

It was understood that after conducting this review, Mr. Horvat would decide what additional
documents, if any, OCJ would agree to produce in response to Plaintiffs' discovery requests.
Mr. Horvat asked for extra time to review the requests and the production, and Plaintiffs agreed.

### 3. Discovery dispute regarding RFPs 26-31.

On April 25, Mr. Horvat emailed Plaintiffs, told them that he had concluded his review,
and informed them that he believed the existing production was a complete response to
Plaintiffs' discovery. (*See* Email from T. Horvat to S. Weil (**Ex. 5**) and RFP Responses, **Ex. 6**.[6])

---

[6] Some of the OCJ's responses to RFPs 26-31 refer to a "compact disc entitled
'Electronic Production' previously tendered by Cook County and Leonard Dixon." This does

In subsequent correspondence, it became clear that Mr. Horvat had only reviewed existing production, *i.e.*, the County's production and OAG 1-1548. (**Ex. 7**.) He had not reviewed the documents on disc containing the "keyword" search results. (*Id.*) Mr. Horvat explained he had been unable to open the disc, but he asserted that it contained 4.5 GB of information, which would be too burdensome to review, regardless of what it contained. (*Id.*)[7]

The ensuing discovery enforcement efforts were lengthy, but not productive. After multiple phone calls and back-and-forth correspondence, Mr. Horvat ultimately offered to search the emails of approximately 20 chain-of-command employees who, he said, were involved in either giving or carrying out orders to alter the JTDC's operations to facilitate the *Empire* filming. Plaintiffs pointed out that RFPs 26-31 were broader than this, and sought communications that discussed the *impact* of the changes on the detainees, including such discussions among lower-level employees. The parties' efforts culminated in correspondence on June 7 and 11 (*see* **Exs. 8**, **9**, and **10**), after which the parties determined they were at issue.

## <u>ARUGMENT</u>

Plaintiffs seek a full response to RFPs 26-31, to be conducted through a "keyword" search on the server hosting the JTDC's email accounts, using the keywords identified above. Indeed, the search and collection of documents already has occurred. But the OCJ has never reviewed the results of this search and, in addition, it asserts that 4.5 GB indicates a volume of information that would be unduly burdensome to review even were it willing and able to do so.

---

not refer to the disc at issue in this motion, but rather to part of the County's original production from the fall of 2017.

[7] The actual size of the data on the disc has been uncertain from Mr. Horvat's statements—4.5 GB is Plaintiffs' best understanding of what he has told them.

The OCJ's position is unsupported, and in reality reflects a refusal to take even minimal steps to comply with its Rule 26 obligations. As described below, Plaintiffs' need for this information is substantial, and would not be satisfied by OCJ's offer to conduct a search only of 20 chain-of-command employees who executed the lockdowns for the filming.

**1. OCJ's ability to conduct a "keyword" search.**

Counsel for the OCJ, Mr. Horvat, has repeatedly made what amounts to a threshold objection: he doesn't have the documents. Mr. Horvat has repeatedly claimed that he cannot review the documents gathered through the "keyword" search because (1) OCJ cannot open the "keyword" disc that the County provided, and (2) the County, not OCJ, controls the email server that hosts the email accounts of JTDC employees. These excuses are entirely unsupported.

First, Mr. Horvat has not explained why he cannot access the "keyword" disc or what measures he has taken to address this technical obstacle. Second, Mr. Horvat has repeatedly ignored Plaintiffs' suggestion that OCJ simply ask the County to re-run the search. And indeed, while the County controls the JTDC's email server, the County has already made clear that it is willing to conduct searches of that server at the OCJ's behest. On February 2, once the JTDC discovery switched from the County to OCJ, CCSAO attorney Allyson West explained that the County had conducted the "keyword" search of the JTDC's email server—which led to the creation of the disc—with OCJ's permission:

> As of January 30, 2018, the Office of the Chief Judge gave clearance to the Cook
> County Bureau of Technology (BOT) to conduct a search of all JTDC employee
> email accounts, pursuant to the new search terms you requested. As of yesterday,
> the BOT informed me that they anticipate having that production to us by the end
> of the week.

(ECF No. 132-4 (Feb. 2, 2018 Letter from A. West to S. Weil).) There is simply no reason to believe that the County would not simply re-run the search if OCJ asked. Plaintiffs have repeatedly pressed Mr. Horvat on these topics. He has never responded, and instead has simply

refused to produce the materials in question. Indeed once OCJ and the Plaintiffs determined that they were at issue, Plaintiffs' counsel put the question to Mr. Horvat again, explaining that Plaintiffs were trying to determine whether the County should be made a party to this Motion. (*See* Ex. 10 at 2, ¶2.) As of this filing Mr. Horvat has not responded.

There is every reason to believe that the targeted keyword search resulted in responsive and discoverable materials that are central to this litigation. The OCJ's protests that it cannot access these materials is a rather transparent excuse for doing nothing. The OCJ has not met its burden of establishing that these materials should not be produced.

### 2. The proposed "keyword" search is not unduly burdensome.

***OCJ has not identified the number of documents that a "keyword" search would generate.*** OCJ asserts that the size of the data on the County disc means that reviewing the "keyword" search is too burdensome. There are multiple problems with this argument. For one thing, the disc size measures *file size*, but it is the number of documents that matters for assessing the burden of review. A few emails with large attachments could inflate the apparent size of the keyword search pull. For another, the County may have collected the documents improperly or inefficiently, resulting in an artificially large file size. For example, the County may have failed to de-duplicate the results for its searches of the multiple keyword, which would have inflated the number of responsive documents. Thus the actual number of documents to be reviewed cannot be guessed from the file size of a disc that has never been opened.

***OCJ has ignored Plaintiffs' offers to reduce any burdens by adjusting the "keyword" parameters.*** From the outset of propounding RFPs 26-31 on OCJ, Plaintiffs' counsel has offered repeatedly, in correspondence, conferences, and on the phone, to adjust the keyword search

parameters to reduce any undue burdens the search might impose. OCJ has never responded to this offer, yet still maintains that the existing "keyword" search yield is unduly burdensome.

**Duplicate and "broadcast" emails can easily be culled.** One of the main concerns Mr. Horvat expressed during the meet-and-confer process is that numerous "broadcast" emails about the *Empire* filming were sent out to all 700-odd JTDC employees, which would require OCJ to review the same documents over and over. But such emails can easily be identified when they are gathered at the server level: after the keyword search and at the .PST creation stage, Microsoft Exchange features a "remove duplicates" option that can remove broadcast duplicates from the .PST file. Additionally, Microsoft Exchange allows sorting of emails by date, subject line, and sender, making "broadcast" emails easy to identify.

These are standard features of Microsoft Exchange, and do not require the purchase of specialized software. In an effort to address OCJ's burden concerns Plaintiffs' counsel pointed them out to Mr. Horvat. (*See* Ex. 8.) Mr. Horvat never addressed these observations or claimed that that such tools were unavailable—yet he still maintained that the "keyword" disc's overall size meant that Plaintiffs' request is unduly burdensome. This unsupported assertion is not sufficient to carry the OCJ's burden of establishing that review of the documents would actually impose an undue burden.

**The "keyword" terms are not overinclusive.** Keyword searches can create undue burden concerns where they are overinclusive, because the responding party must sift through a large number of unresponsive documents to find the responsive ones. *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-02420, 2015 WL 833681, at *3 (N.D. Cal. Feb. 24, 2015) (noting that keyword searches can present an over-inclusiveness problem when "they find responsive documents but also large numbers of irrelevant documents." (quotation omitted)).

That is not likely to be a problem here. The JTDC is normally concerned with juvenile detention. The proposed "keyword" terms, on the other hand, are concerned with an entirely different subject: filming. They consist of the unique names of a handful of persons affiliated with Fox, along with terms specifically associated with filming, such as "*Empire*." Thus the "keyword" terms are likely to return *only* responsive documents; it is exceedingly unlikely that OCJ will come across more than a handful of documents that contain these terms yet are not responsive to Plaintiffs' requests. Courts endorse keyword searches that are not likely to be overinclusive. *See, e.g.*, *In re Loestrin 24 Fe Antitrust Litig.*, No. 1:13-md-2472, 2017 WL 1491911, at *7 (D.R.I. Mar. 15, 2017) (indicating approval of search terms that are likely to return responsive documents while "avoid[ing] the burden of screening the overinclusive set that would be derived from use of" a more generic set of proposed terms).

**OCJ has not substantiated its early suggestion that there would be a meaningful "privilege" review burden.** During the March meeting between lawyers for the Plaintiffs and the government defendants, Mr. Horvat suggested that privilege issues might burden OCJ's document review. Counsel for Plaintiffs responded by asking that any such "privileges" be identified early, since these would be threshold legal issues that the parties could deal with or bring before the Court. To date, however, OCJ has not identified burdens that would arise in producing the results of the keyword search—though Mr. Horvat continues to insist that they exist (*see* Ex. 9 at 1-2, ¶ 5).

The claim is unsubstantiated. To the extent Mr. Horvat refers to attorney-client communications, these should be few and easy to find, since the OCJ knows who its attorneys are. To the extent the "privilege" involves statutory protections of information pertaining to juveniles, OCJ has yet to identify any such protections in its objections. In all events any such

protection should be addressable with protective orders—including the confidentiality order that has already been entered in this case, which allows the parties to designate as confidential information otherwise prohibited from disclosure by statute. (*See* Am. Agreed Confidentiality Order (ECF No. 125) ¶ 2(a).) Again, however, while the OCJ insists that there are privileges out there that would require a burdensome privilege review, it has never identified any such privileges or explained why review for the privileges would create a problem. OCJ bears the burden of establishing its claims of privilege and its declaration that some unspecified privilege might create an undue burden is not sufficient deprive Plaintiffs of relevant discovery materials.

*     *     *

In sum, OCJ opposes conducting the "keyword" search on grounds of burden, but (1) its burden claim is speculative and unsupported, and (2) it has been unwilling even to consider steps that would alleviate the only burden—the size of the disc—it has identified. In promulgating the 2015 amendments to Rule 26(b)(1), the committee noted that:

> Computer-based methods of searching [ESI] continue to develop, . . . . and parties should be willing to consider the opportunities for reducing the burden or expense of discovery as reliable means of searching electronically stored information become available.

Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendment. What Plaintiffs propose is considerably more modest: established, free, off-the-shelf search procedures that can substantially eliminate the bulk of the burden that the OCJ has identified. It is simply not appropriate for the OCJ to ignore these proposals and base its burden objections on an insistence that it will follow a brute-force, by-hand search protocol that is demonstrably unnecessary.

### 3. Plaintiffs' need for the discovery is substantial.

Plaintiffs have a substantial need for the documents captured by the "keyword" search, and that need cannot be satisfied by the 20 chain-of-command custodians OCJ has proposed.

11

*First*, the County's initial search cannot be considered an adequate response to RFPs 26-31. At no point has either the County or the OCJ defended the County's initial search in light of the problems identified in the December 29 letter, and for good reason. As that letter explained, the County's document gathering process was entirely unsupervised and haphazard. Plaintiffs were able to determine that numerous employees simply did not respond to the call for responsive documents. And as to the custodians who did respond, it is impossible to know how their collections were made or what documents were omitted.

In *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456 (S.D.N.Y. 2010), Judge Scheindlin sanctioned a party that had assigned search responsibilities to an employee who had no experience conducting searches, received no instruction on how to do so, had no supervision during collection, and had no contact with counsel during the search. *See* 685 F. Supp. 2d at 484-85. The County's original search "methodology" multiplied these problems by hundreds of employees. Plaintiffs cannot be obliged to make do with such a demonstrably unreliable document collection.

*Second*, OCJ's offer, which would limit collection to approximately 20 JTDC managers and their chain-of-command reports charged with executing changes to the JTDC's operations, simply does not come close to responding to RFPs 26-31. To the contrary, Plaintiffs have a substantial need for emails of employees who are specifically *outside* this chain-of-command.

The JTDC has hundreds of employees. Many of these employees have daily contact with the JTDC's juvenile detainees and are thus in a position to make first-hand observations about how the JTDC's *Empire* changes impacted them. RFPs 26-31 specifically targeted communications about this subject, asking for communications not just about the changes in the JTDC's operations, but their *impact* on the detainees.

12

Moreover, there is good reason to believe that production limited to the chain-of-command custodians will not reveal a true picture of what was going on. As one court observed in rejecting a similar custodian limitation, "lower-level officers in any organization may be more candid about dubious practices" than the organization's managers. *Stinson v. City of New York*, No. 10-cv-4228, 2015 WL 4610422, at *6 (S.D.N.Y. July 23, 2015). *Accord Capitol Records, Inc. v. MP3tunes, LLC*, 261 F.R.D. 44, 51 (S.D.N.Y.2009) (noting that "employees at [the managerial] level took care not to say anything incriminating and that lower-level employees were less guarded in their email communications."); *Family Wireless #1, LLC v. Auto. Techs., Inc.*, No. 3:15-cv-1310, 2016 WL 2930887, at *3 (D. Conn. May 19, 2016) ("[L]ower-level employees may discuss execution of policies amongst themselves and with third parties other than their superiors. These communications may be particularly revealing.")

There are specific reasons to believe that such a dynamic was operating here. As the SAC describes, when *Empire* came to film, the JTDC was still under federal oversight. (*See* SAC ¶ 69.) In July 2015 Prof. Thomas Geraghty, whom the District Court had appointed as the detainees' "next friend," wrote Dixon to inquire about reports he had received of restrictions on the detainees to accommodate the filming. (*Id.*) Dixon responded that no such restrictions were in place. (*Id.*) Apparently as part of his response to Geraghty, Dixon commissioned a July 28 report from JTDC managers (Deputy Executive Directors, or "DEDs") on "the impact of *Empire* on the JTDC programming during filming days." The report was glowing and entirely positive, and concluded, "Programs were not curtailed as a result of the filming."

The discovery to date indicates that this was a whitewash. Emails from a single JTDC employee, Anna Buckingham, show her contacting multiple program providers to inform them that *all* of the JTDC's programs were being cancelled because of *Empire*. Below is a sampling:

13

- June 22, 2015 email to Caleb Probst, of the Chicago Alliance Against Sexual Exploitation, informing him that his educational program was being cancelled: "They are filming the show Empire and all the programming has been cut ☹"

- July 8, 2015 to multiple program providers: "FYI that all programming has been cancelled for Tues-Thursday of next week. . . . They are filming the show Empire here, so everything is pretty much on lock-down ☹"

- July 10, 2015 email rejecting a program provider's request to start a program during *Empire* filming dates: "The building is shut down (again) due to Empire filming their show here."

- July 13, 2015 email to Free Write, a regular JTDC program provider: "And just a reminder that there is no Free Write this week, due to Empire."

There is every reason, in short, to believe that the concerns expressed in *Stinson*, *Family Wireless #1*, and *Capital Records* are at play in this case. The JTDC's "DED" managers appear to have been guarding their words when describing *Empire*'s impact on the JTDC. Yet OCJ's list of proposed custodians is confined to these DED managers, plus a handful of employees who reported to the DEDs in executing the *Empire* lockdowns.

Gathering documents from only these custodians is simply not enough. Discovery from the DED managers and their chain-of-command reports will doubtless produce relevant information, but documents gathered from employees *outside* of that chain-of-command are likely to be "particularly revealing," as *Family Wireless #1* observed. 2016 WL 2930887, at *3. Plaintiffs have a substantial need for this information, particularly as they go into depositions that will attempt to uncover what actually happened at the JTDC during the *Empire* filming.

## CONCLUSION

This case involves allegations of a serious abuse of authority—the placement of more than 300 detained children on lockdown so that the JTDC could be used by an entertainment company to film scenes for a commercial television program. The discovery Plaintiffs seek is calculated to identify highly relevant information about the true impact of the *Empire* restrictions

14

on the children housed at the JTDC, which is at the very core of Plaintiffs' case. The OCJ claims that gathering responsive documents would be unduly burdensome, but it has steadfastly refused to substantiate that claim, or even to entertain the numerous methods that Plaintiffs have identified to eliminate any undue burden that the discovery would impose. Plaintiffs are mindful that the OCJ is a government agency and have been forbearing with OCJ counsel in negotiating discovery of these documents. The discovery is nevertheless appropriate and necessary for this case, and the OCJ's refusal to provide it is unwarranted.

WHEREFORE, Plaintiffs respectfully request that the Court grant the relief sought in this motion to compel, and order the OCJ to gather and produce responsive documents as Plaintiffs have requested.

June 27, 2018

Respectfully Submitted,

/s/ Stephen H. Weil

Stephen H. Weil – steve@weilchardon.com
Alexis G. Chardon – ali@weilchardon.com
Weil & Chardon LLC
333 S. Wabash Avenue, Suite 2700
Chicago, IL 60604
(312) 585-7404

Adam J. Pessin – apessin@finekaplan.com
Fine, Kaplan and Black, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, PA 19107
(215) 567-6565

*Attorneys for Named Plaintiffs T.S. and Q.B.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 27, 2018, a true and correct copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.


<u>/s/ Stephen H. Weil</u>