# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

T.S. *et al.*,

        Plaintiffs,

    v.

Twentieth Century Fox Television *et al.*,

        Defendants.

Case No. 1:16-cv-08303

Hon. Rebecca R. Pallmeyer

**NAMED PLAINTIFFS'**
**(1) CROSS-MOTION TO COMPEL AND TO RECONSIDER IN PART, AND**
**(2) OPPOSITION TO THE FOX DEFENDANTS' MOTION FOR PROTECTIVE ORDER**

# TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................ 1

II.     SUMMARY OF DISCOVERY DISPUTE ........................................................ 4

III.    FOX'S MERITS ARGUMENTS ....................................................................... 6

IV.     THE DISCOVERY AT ISSUE ......................................................................... 7

V.      ARGUMENT .................................................................................................... 8

VI.     CONCLUSION ............................................................................................... 16

# DOCKET REFERENCE LIST

| | | |
|---|---|---|
| **ECF 40** | – | Fox Response to Plaintiffs' Motion to Permit Serving of Document Preservation Subpoenas (Nov. 4, 2016) |
| **ECF 110** | – | Memorandum & Order on Fox's Motion to Dismiss (Oct. 16, 2017) |
| **ECF 138** | – | Plaintiff Motion to Compel (Mar. 2, 2018) |
| **ECF 140** | – | Fox Opposition to Motion to Compel (Mar. 5, 2018) |
| **ECF 142** | – | Plaintiff Reply in Support of Motion to Compel (Mar. 6, 2018) |
| **ECF 143** | – | Order on Motion to Compel (Mar. 7, 2018) |
| **ECF 150** | – | Fox Averment and Affidavit of Completeness (April 6, 2018) |
| **ECF 180** | – | Fox Motion for Protective Order (Aug. 21, 2018) |
| **ECF 180-1** | – | Declaration of Peggy Woon in support of Fox motion for protective order (August 20, 2018) |
| **ECF 180**-2 | – | Declaration of Veera Tirumalai in support of motion for protective order (August 21, 2018) |

## EXHIBIT REFERENCE LIST

**SEALED EXHIBITS**

    **Sealed Ex. 1.**    TCFTV 1856-57

    **Sealed Ex. 2.**    TCFTV 1881-82

**UNSEALED EXHIBITS**

    **Ex. 1.**    Complaint, *Temperence Brennan, L.P. v. Twenty-First Century Fox, Inc.* (*"Bones"*), No. BC-602548 (Cal. Super. Ct. Nov. 30, 2015)

    **Ex. 2.**    Silberfeld et al., *The Red and the Black: Studios Have Suffered Recent Court Setbacks in Their Efforts to Defend Hollywood Accounting*, Los Angeles Lawyer, May 2011.

    **Ex. 3.**    *Hollywood Reporter*, Sept. 16, 2015.

    **Ex. 4.**    *Ad Age*, Sept. 24, 2015.

    **Ex. 5.**    *Variety*, Sept. 29, 2015.

    **Ex. 6.**    *Adweek*, Oct. 17, 2016.

    **Ex. 7.**    *TV Week*, May 13, 2014.

    **Ex. 8.**    Plaintiffs' first round of discovery (group exhibit).

    **Ex. 9.**    Plaintiffs' second round of discovery (group exhibit).

    **Ex. 10.**    Parties' discovery enforcement correspondence (group exhibit).

Pursuant to Federal Rules of Civil Procedure 37(a)(1) and 60(b), Plaintiffs cross-move the Court to compel discovery responses from defendants Twenty-First Century Fox, Inc. ("21CF"), Twentieth Century Fox Television ("TCFTV"), and Fox Broadcasting Company ("FBC") (collectively "Fox Defendants" or "Fox"),[1] and to reconsider part of a prior discovery order concerning these same defendants. Plaintiffs also submit this memorandum in opposition to Fox's motion for protective order. (ECF 180.) In support of the foregoing, Plaintiffs state:

## I.     BACKGROUND

This cross-motion and opposition concern two rounds of discovery in which Plaintiffs have tried to ascertain the profits Fox derived from filming scenes for the Fox TV show *Empire* at the Cook County Temporary Juvenile Detention Center ("JTDC").

Plaintiffs represent a putative class of minors detained at the JTDC in 2015. They allege that the JTDC was placed on lockdown three times that summer to accommodate Fox's filming needs. Plaintiffs charge that Fox was unjustly enriched by the lockdowns. As a remedy, they seek disgorgement of the profits Fox realized from filming at the JTDC.

Proving up such profitability is not for the faint of heart. As several actors seeking to discover how much Fox actually made from the show *Bones* put it, "Fox and its predecessors have played a leading role in the well-documented history of Hollywood accounting scandals." Compl. ¶ 1, *Temperence Brennan, L.P. v. Twenty-First Century Fox, Inc.* (*"Bones"*), No. BC-602548 (Cal. Super. Ct. Nov. 30, 2015) (**Ex. 1**). Large media studios—Fox among them—are notorious practitioners of "Hollywood accounting," in which obviously lucrative movies and

---

[1] ***Local Rule 37.2 Statement***.  Pursuant to Local Rule 37.2, Counsel attempted to resolve this discovery dispute through an informal meet-and-confer process in which they exchange of correspondence on July 10, July 23, August 16, and August 20, and held a telephone conference on August 20 between Stephen Weil, Matthew Luzadder and Jeffrey Jacobson.

television shows are made to seem much less profitable than they actually are. Roman M. Silberfeld et al., *The Red and the Black: Studios Have Suffered Recent Court Setbacks in Their Efforts to Defend Hollywood Accounting*, Los Angeles Lawyer, May 2011, at 36 (**Ex. 2**).

"Hollywood accounting" describes accounting practices that make it appear as though "popular, highly successful films and long-running television series produce financial returns for their owners that would be considered ruinous" in real life. *Id.* at 36. These practices are compounded when the studio—like Fox—is vertically integrated, which allows "revenues [to] be manipulated" among different corporate subsidiaries "to ensure the [media] property never generates profits" for which a studio might be liable. *Id.* at 38. *See also Bones* Compl. ¶¶ 7-9 (alleging self-dealing between TCFTV and FBC to hide revenue generated by *Bones*).

Importantly, these accounting gimmicks often collapse when they are challenged in court. *See* Silberfeld, *supra*, *passim* (describing multiple recent successful challenges to Hollywood accounting against various studios, including Fox); *Bones* Compl. ¶ 1 (identifying successful cases against Fox). Because of resistance by studios, however, these challenges can only be made by plaintiffs "who have the means and clout to do so." Silberfeld, *supra*, at 38.

In this case, Plaintiffs have encountered unwavering resistance to discovering the profits attributable to the two *Empire* episodes. Since being compelled to respond to Plaintiffs' initial revenue discovery, Fox has generated a total of four pages of summary-level information, created for this litigation, and has claimed that these pages state all its revenues from the two episodes. (**Seal. Exs. 1, 2**.) The figures, however, raise many more questions than they answer.

Perhaps most glaringly, the figures Fox has put forward appear to be a fraction of the advertising rates that were reported in the entertainment and advertising industry press. Industry publications reported that Fox charged between $497,000 and $750,000 for every 30 seconds of

advertising aired in the two *Empire* episodes.[2]  There appear to have been between 13 and 14

minutes of advertising for the two episodes,[3] suggesting that, in the first-run broadcasts alone,

Fox realized advertising revenues of between $13.9 and $21 million from Episode 201 and

between $12.9 and $15.6 million from Episode 202. 

**(Seal. Ex. 1**.)  Given the number of minutes available

for airing advertisements during the two episodes, that implies rates of approximately

These discrepancies are enormous.  They imply vastly different recoveries for the

Plaintiffs if their unjust enrichment claims are successful.  And indeed, in response to a single

interrogatory about a single line of FBC's revenue figures, Fox has already been forced to

concede that the "summary" it generated omits an entire category of revenue, understating FBC's

profits by more than $1.1 million.  Plaintiffs can only guess what other inaccuracies lie behind

the numbers Fox has generated because Fox has stonewalled Plaintiffs' efforts to get meaningful

discovery on this issue.

---

[2]  Prices reported for 30 seconds of advertising time:
- *Hollywood Reporter*, Sept. 16, 2015 ($750,000 Ep. 201 & $600,000 Ep. 202) (**Ex. 3**).
- *Ad Age*, Sept. 24, 2015 ($497,364 *Empire* "2015" price) (**Ex. 4**).
- *Variety*, Sept. 29, 2015 ($521,794 *Empire* Season 2 average) (**Ex. 5**).
- *Adweek*, Oct. 17, 2016 ($508,115 *Empire* Season 2 average) (**Ex. 6**).

[3]  It appears that Episode 201 ran for 46 minutes (leaving 14 minutes for advertising) and that Episode 202 ran for 47 minutes (leaving 13 minutes for advertising).  *See* https://www.imdb.com/title/tt4365972/ (Ep. 201) and https://www.imdb.com/title/tt4522990/ (Ep. 202).  This is consistent with industry averages for advertising minutes in an hourlong program.  *See TV Week*, How Many Minutes of Commercials Are Shown in an Average TV Hour? The Number Has Been Steadily Climbing, (May 13, 2014) (citing Nielsen report that average hour-long broadcast had 14 minutes, 15 seconds of advertising) (**Ex. 7**).

Determining Fox's actual enrichment is thus a central, and open, question in this litigation. The numbers Fox generated also call into question whether TCFTV "sold" *Empire* to at an arms-length price FBC. TCFTV 1857, for example, indicates that even though Episode 201 was the most watched television program in the United States (eclipsed in viewership only by Sunday Night Football), it netted TCFTV, its creator, █████████

In light of the dubious accounting practices that are common within the industry, the wide gap between representations made by Fox and the rates reported in the industry press, and a complete absence of business records that support Fox's representations, Plaintiffs are seeking discovery to determine how much Fox actually profited from the two episodes. At every turn, though, Fox has refused to disclose the basis for its numbers—refusing to answer interrogatories asking how it calculated them, and refusing to substantiate them with the production of business records. And now, it seeks a protective order to close off any further discovery into the matter.

Plaintiffs ask the Court to (1) issue an order compelling Fox to respond to Plaintiffs' outstanding discovery, as described herein; (2) reconsider a portion of the Court's March 7 order on revenue discovery, which was informed by what appear to be factually inaccurate statements by Fox; and (3) deny Fox's motion for protective order.

## II.    SUMMARY OF DISCOVERY DISPUTE

This is Plaintiff's second motion to compel revenue discovery from Fox. Much of the current dispute has to do with the litigation and outcome of Plaintiffs' first motion to compel, which was decided by the Court on March 7, 2018. In summary, these are the issues in dispute:

***First***, Fox has re-interpreted the Court's March 7 order *granting* much of Plaintiffs' revenue discovery as instead *limiting* all revenue discovery to Fox's four generated pages. In

4

fact, the Court expressly recognized the need for revenue discovery from Fox, and, as described below, and under the terms of that order Fox's disclosures to date are inadequate.

**Second**, part of the Court's March 7 opinion, regarding the proportionality of two revenue interrogatories seeking information about season-wide revenues (as opposed to revenues for the two episodes filmed at the JTDC), was informed by a burden representation made by Fox that appears to be factually incorrect. When Plaintiffs raised this issue, Fox did not dispute that its representations to the Court had been inaccurate. Instead, it claimed they did not matter. Now, Fox has bootstrapped this portion of the Court's March 7 order to refuse *any* discovery implicating information outside the two episodes.

**Third**, 21CF has defied the Court's order to respond to Interrogatory No. 9, which concerns a unit called Fox Television Group. This discovery supports Plaintiffs' claim that *Empire* was a joint venture between FBC and TCFTV, making FBC liable for TCFTV's misconduct at the JTDC.

**Fourth**, Fox has refused to respond to other discovery based on a variety of miscellaneous, inappropriate objections, which are described herein. Perhaps most glaringly, Fox has refused to respond to Plaintiffs' discovery asking it to explain the basis for the four summary pages that it represents as its revenues from the two episodes.

*      *      *

The upshot of these objections is that Plaintiffs have only four pages of what purports to be summary revenue information—only one of which shows advertising revenues—and nothing more. Plaintiffs do not know why Fox has gone to these lengths to resist their discovery. Like any defendant, Fox is entitled to dispute Plaintiffs' claims. But "[a]s the Fox Defendants are no doubt aware, Plaintiffs' unjust enrichment claim survived their Rule 12(b)(6) motion to dismiss" (Order, ECF 143 at 3), and Plaintiffs are now entitled to take discovery that proves their claim.

Plaintiffs thus stand in a position no different than a litigant seeking to disgorge ill-gotten gains from a defendant under any number of familiar circumstances, such as theft of intellectual property. *See, e.g.*, *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 49 (2d Cir.1939) (L. Hand, J.) (owner of movie script may disgorge studio's profits attributable to studio's theft of the script). In such scenarios it would be risible for a disgorgement defendant to insist that the plaintiff make do with four pages of summary revenue figures that the defendant itself had generated for the purposes of the litigation. Yet that is exactly the position Fox has taken here. At bottom, Plaintiffs are simply asking to be treated like any other litigant. Plaintiffs' disgorgement claims have survived Fox's motion to dismiss, and this discovery is their only chance to prove those claims. Plaintiffs are entitled to discover facts to support their allegations.

### III.    FOX'S MERITS ARGUMENTS

Before turning to the discovery dispute between the parties, Plaintiffs address two extraneous matters raised in Fox's protective order memorandum.

*First*, Fox begins the memo arguing that Plaintiffs' claims are meritless, since one of the named plaintiffs stated at his deposition that one of several sick call slips he submitted was a joke. (ECF 180 at 3-4.) This is a familiar gambit. Twice now Fox has tried to cut off discovery on the grounds that Plaintiffs' claims cannot possibly have merit. (*See* ECF 40 & 140.) Both times the Court rejected those attempts out of hand. Fox neglects to mention that ***its*** depositions confirmed that Fox was told that all of the hundreds of children at the JTDC would be deprived of outdoor recreation in order for Fox to film, and that in light of such "impact on the facility" Fox offered to pay the JTDC's administrators—precisely the inducement that Plaintiffs allege.

*Second*, Fox argues this revenue discovery should be cut off because Plaintiffs have no "entitlement" to its profits. (ECF 180 at 15-18.) This is a lightly edited version of the argument

6

Fox made opposing Plaintiffs' first motion to compel (*compare with* ECF 140 at 8-12), which Judge St. Eve specifically rejected as an inappropriate objection to Plaintiffs' revenue discovery. (ECF 143 at 3.) In all events, the argument is wrong.

Fox cites cases that involve enrichment to a wrongdoer, but which does not flow from an injury to the plaintiff. For example, in *Asch v. Teller, Levit & Silvertrust, P.C.*, No. 00-cv-3290, 2003 WL 22232801, at *7 (N.D. Ill. Sept. 26, 2003), plaintiffs sued a debt collector that improperly inflated the interest owed on the plaintiffs' student loans. Incidentally, the inflated interest on the plaintiffs' loans allowed the debt collector to charge its client, the creditor, higher fees for debt collection service. The court concluded that the creditor that paid the inflated fees to the debt collector—and not the plaintiffs—was "the proper party to recover" those fees. *Id.* Here, in contrast, as Judge St. Eve recognized in her decision denying Fox's motion to dismiss, Fox profited directly from the injuries that were inflicted on Plaintiffs for its benefit. (*See* ECF 110 at 13-14.) The advertisers that paid Fox—in contrast to the creditor in *Asch* that paid inflated fees—got exactly what they bargained for. But what Fox sold to those advertisers came at great cost to Plaintiffs, which is why Plaintiffs are the proper party to disgorge Fox's profits.

## IV.    THE DISCOVERY AT ISSUE

Briefly, in their two rounds of discovery Plaintiffs sought the following:

**1. First round of discovery**.

On November 3, 2017, Plaintiffs served their first round of revenue discovery (**Ex. 8**.):

- ***"Episode" interrogatories***. Plaintiffs served "episode" interrogatories asking Fox to identify "all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost" for Episodes 201 and 202. (Interrog. 8 & 9.)

- ***RFPs for profit and loss statements***. Plaintiffs served an RFP (RFPs 28, 29, and 30) asking each of the Fox Defendants to produce profit and loss statements that related in whole or in part to Episodes 201 & 202. (Interrog. 8 & 9.)

- ***"Season" interrogatories***. Plaintiffs served interrogatories asking Fox to identify

7

gross revenue, net revenue, and profits for the first two seasons.  (Interrog. 8 & 9.)

- ***21CF Interrogatory 9***. Plaintiffs served an interrogatory on 21CF asking it to identify information about Fox Television Group, a business unit under which 21CF had "combine[d]" FBC and TCFTV to collaborate on the creation of in-house Fox television shows, like *Empire*.  (21CF Interrog. 9.)

Fox's entire response this discovery—after extensive discovery enforcement and a successful motion to compel—was to "produce" two summary pages of revenue numbers, TCFTV 1856-57 (**Seal. Ex. 1**), which Fox had generated for the purpose of this litigation.

### 2.  Second round of discovery.

After receiving Fox's response, Plaintiffs served a second round of discovery (**Ex. 9**):

- ***Factual basis for summary revenues***.  Plaintiffs served several RFPs and interrogatories asking Fox to identify the "principal and material basis" for the revenue and cost figures put forward in TCFTV 1856-57.
- ***Costs***. Plaintiffs asked Fox to produce documents showing costs of the two episodes.
- ***License agreements***.  Plaintiffs asked TCFTV and FBC to identify and produce the *Empire* license agreements between them (as well as other Fox entities, if there were more agreements).
- ***Additional revenue discovery***.  Besides seeking to understand the basis for TCFTV 1856-57, Plaintiffs propounded their own affirmative revenue discovery, seeking specific categories of information.

In response to this discovery, Fox "produced" an additional two-page revenue summary TCFTV 1881-82 (**Seal Ex. 2**), which purports to show summary revenue information for TCFTV.  Fox also produced hundreds of pages of business records about its costs—but none about its revenues.  And Fox conceded, in response to an interrogatory, that it had omitted an entire category of revenue from TCFTV 1856-57, which understated FBC's advertising revenues by $1.17 million.  Otherwise Fox refused to respond.  This enforcement motion follows.

## V.  ARGUMENT

The question in this dispute is whether Fox, or the Federal Rules, dictate what revenue discovery Plaintiffs are entitled to.  Fox has produced four pages of summary revenue

information that it generated for the purpose of this litigation, and now claims that any other discovery regarding its revenues—either to understand the factual basis of the numbers on those pages or to seek other materials already in Fox's hands—is off limits. Fox's objections are founded on elaborate and often inappropriate arguments about burden, but the upshot is that Fox has not produced a single business record showing what its revenues actually were.

On the other hand, when Plaintiffs requested information to show the basis for Fox's *costs*, Fox had no trouble producing hundreds of pages of information. Costs, of course, support Fox's position because they reduce the net profits available to Plaintiffs through disgorgement. Thus Fox has elected to produce business records that are helpful to Fox with no objection, but refuses to produce business records—or any other information—that would enable Plaintiffs to carry their burden. Fox's picking and choosing of documents to produce and information to provide in order to tilt the scales in its own favor runs counter to the entire purpose of civil discovery under the Federal Rules.

### 1. Fox must explain the factual basis for its revenue representations.

In their second round of discovery, Plaintiffs served several interrogatories asking Fox to explain the "principal and material basis" for the different lines in its "summary" pages. FBC Interrogatory No. 2, for example, asked:

> Describe the principal and material bases for the calculation of Linear Ad Sales totals listed on TCFTV001856, including a detailed breakdown of the principal and material components used in the calculation, and a description of how many minutes of advertising the sales numbers represent.

(**Ex. 9**, FBC Interrog. ¶ 2.) Fox has refused to respond to this discovery, on the grounds that doing so would be unduly burdensome.

That is an untenable position. This and similar discovery simply ask Fox to describe the basis of the revenue representations that it has made. Plaintiffs limited this discovery to ask for

9

the "principal and material" basis of Fox's representation specifically to address any burden concerns—something courts do to **remedy** burden objections to such discovery. *See, e.g.*, *Stevens v. DeWitt Cty., Ill.*, No. 11-cv-3162, 2013 WL 819372, at *4 (C.D. Ill. Mar. 6, 2013) (based on burden objection, limiting interrogatory seeking "all facts" relating to a subject to the "principal or material facts" regarding the subject); *Am. Needle, Inc. v. New Orleans*, No. 04-cv-7806, 2012 WL 4327395, at *2 (N.D. Ill. Aug. 17, 2012) (same). Surely Fox knows how it performed the calculations in its revenue summaries, and it is hard to imagine any good reason for keeping this information secreted from Plaintiffs. Fox cannot use empty burden objections to refuse to explain the basis of its own contentions regarding a core issue in this case.

**2. The Court should (again) order Fox to answer Plaintiffs' first round of RFPs**.

To determine what revenue Fox realized from Episodes 201 and 202, in their first round of discovery, Plaintiffs served RFPs 28, 29, and 30, which asked Fox to produce "profit and loss statements" relating "in whole or in part" to the two episodes. Fox objected to this discovery, but the Court granted Plaintiffs' motion to compel, ordering that "the Fox Defendants must produce the revenues and profit information for the first two episodes of *Empire*'s second season . . . ." (ECF 143 at 3.) ***Despite the Court's order, Fox has not produced any "profit or loss statements," as requested in RFPs 28, 29, and 30.***

Fox now argues that Judge St. Eve never actually ordered it to produce the documents that RFPs 28, 29, & 30 requested. Rather, Fox claims, "the Order . . . expressly limited the Fox Defendants' obligation to producing 'revenues and profit *information*' for the two episodes" (emphasis Fox's), and *denied* Plaintiffs' requests for to produce the documents that the three RFPs actually sought. (ECF 180 at 2-3.)

That is an impossible gloss. If Judge St. Eve had "expressly" limited Plaintiffs to "information," she would have said so, since that would have been a denial of the RFPs. But the

10

March 7 order contains no such language. Rather, it simply grants Plaintiffs' motion to compel production of the documents called for in the RFPs. Fox must respond to the RFPs. They ask Fox to produce contemporaneous business records describing revenues relating to the two episodes, something that Fox has evaded doing now for two rounds of discovery.

### 3. Discovery about revenue outside the two episodes is appropriate, because that is how Fox records its revenues.

Fox does not maintain its revenue books on a per-episode basis, but rather across the season. Fox has manipulated this fact to whip-saw Plaintiffs' requests and stymy their discovery. When Plaintiffs first asked for season revenue information, Fox argued that the requests were overly broad, since they would capture information about episodes beyond the two at issue. Then, Fox objected to discovery about the revenue *from* those two episodes, because it doesn't record revenue information on a "per-episode basis," and attributing revenue to any particular episode requires a "complex accounting exercise." (**Ex. 10**, July 23 Luzadder letter at 6.)

That was precisely why Plaintiffs sought season-wide revenue information in the first place. (*See* ECF 143 at 3.) Fox's argument that such discovery is "out of bounds" is really an attempt to prevent Plaintiffs from discovering the information in Fox's books that shows what it made from the relevant episodes.

### 4. The Court should reconsider its March 7 order regarding the proportionality of Plaintiffs' "season" interrogatories.

Fox bases its season-vs-episode revenue accounting game on the Court's March 7 order denying Plaintiffs "season" interrogatories. In opposing those interrogatories, Fox told the Court that answering these would require it to gather "*all* documents pertaining to advertising on *Empire* for all episodes from both of the show's first two seasons." (ECF 142 at 11-12.) Now, though, Fox does not dispute that the "all documents" representation was inaccurate. (*Compare* Ex. 10, July 10 Weil letter at 1-2 (inquiring about accuracy of statement) *with* Ex. 10 July 23

Luzadder letter at 1 (not disputing that Fox's "all documents" representation was inaccurate.)
Instead, it argues that the Court's decision had little to do with "the amount of work required to
produce" the season information.  (Ex. 10, July 23 Luzadder letter at 1.)

  That is implausible.  The March 7 order held that the "season" interrogatories were
disproportionate "especially" because of the burden they would impose on Fox.  (ECF 143 at 3.)
And in all events, Fox has now told Plaintiffs that season revenues *are* relevant, because that is
how Fox books its revenues.  Without access to this broader information, Plaintiffs are left to
guess at what criteria Fox used to attribute costs and revenues to the relevant episodes or, to
somewhere elsewhere.  And that question, of course, is a core issue in this case.

### 5.  Fox must produce the *Empire* license agreement.

Plaintiffs asked Fox to produce license agreements that governed Episodes 201 and 202.
Fox refused to produce these documents—even though it appears already to have gathered them
for this case.  (*See* Seal. Ex. 2, "Document date" column.)

Fox objects that the license agreement cannot possibly be relevant. But the license
agreement is likely to define the financial terms under which *Empire*—and thus the two episodes
at issue—is produced and distributed.  Those terms define the allocation of costs and revenues
between different entities, and thus form the foundation for the revenue numbers that Fox has put
forward.  Asking for such a document is an entirely reasonable request when a central question
in the case is which entity made how much money from the exploitation of the media property at
the center of this unjust enrichment dispute.

Fox argues that there are numerous license agreements relating to Episodes 201 and 202,
and claims that what Plaintiffs ask for would impose severe burdens.  But in making this
argument, Fox simply ignores that Plaintiffs offered to ameliorate the resulting burden during the

12

meet-and-confer process. For the most part these peripheral agreements apparently concern various licensees; they are of a second order to core agreements between TCFTV and FBC, which Fox has already gathered. After being told of these burdens, Plaintiffs' counsel told Fox that Plaintiffs have no interest in gathering such peripheral agreements, and to the extent a request called for such painstaking review, it could be modified. Fox's declarations in support of its motion for protective order, however, were written as though these offers had never been made. (*See* ECF 180-1 ¶¶ 4; 7-8 (describing burden of pulling numerous license agreements).)

Once again, Fox's primary discovery maneuver is to object on the basis of a burden that does not exist. Plaintiffs do not seek dozens of peripheral licensing agreements, which Fox asserts would be burdensome to gather. They ***do*** seek the agreement between TCFTV and FBC, and any other core agreements, that set the distribution of revenues and costs among the Fox entities. That request is entirely germane and proportional to this litigation. Fox must respond.

### 6. Fox cannot simply object to Plaintiffs' specific revenue requests.

In their second round of discovery, Plaintiffs also ask Fox to provide certain specific categories of information relating to revenue. FBC Interrogatory No. 4, for example, asked Fox to identify each advertiser who had run ads during the two *Empire* episodes, the number of minutes for each ad, and the amounts paid for each ad. (Ex. 9, FBC Interrog. 4; *see also* Ex. 9, FBC Interrog. 2-6, 8.)

Fox's primary objection to this discovery is that its accounting systems do not record the information Plaintiffs seek in the manner Plaintiffs have requested, meaning that to provide the requested information Fox would have to spend dozens of hours locating primary source documents or performing awkward calculations. That is thrust of the two affidavits that Fox has submitted in support of its motion for protective order. (*See* ECF 180-1 and 180-2.)

13

That position, however, ignores that Plaintiffs have specifically offered to adjust their requests to match Fox's accounting classifications, or otherwise limit their requests. (*See* Ex. 10, Aug. 16 Weil letter at 3 (offering to accept information as it is categorized in Fox's accounting systems, and "if that information is sufficient we may be able to compromise on the requested items that your accounting systems record. Please let me know if this is acceptable.")

The proper course for such requests is for the parties to confer regarding how requests can be ***adjusted***. Plaintiffs don't know how Fox keeps its records—only Fox does. Fox's burden objections are therefore only the first step. The rules then require Fox to work with Plaintiffs to allow the gathering of otherwise appropriate discovery in a manner that does not impose undue burden on it. Fox's refusal to take that next step, despite Plaintiffs' explicit offer, is entirely improper. The Court should reject Fox's objections to this discovery.

### 7. The Court should (again) require 21CF to respond to Interrogatory 9.

21CF Interrogatory No. 9 seeks information about Fox Television Group, a Fox business unit, to determine whether *Empire* was a joint venture between FBC and TCFTV, which would make FBC liable for TCFTV's alleged misconduct at the JTDC.

Fox had objected to responding to this interrogatory on the grounds that it was irrelevant, because "whether [FBC and TCFTV] shared unrelated employees is irrelevant; what is important is that none of the people who were involved with filming at the JTDC worked for any entity other than TCFTV." (*Id*.) (ECF 140 at 12.)

Plaintiffs, however, explained to the Court that they had served the interrogatory to prove up their allegation *Empire* was a joint venture between FBC and TCFTV. Statements by 21CF about Fox Television Group indicated that *Empire* was indeed just such a joint venture. In 2014, 21CF announced that it was "combin[ing] [FBC] and [TCFTV]" into Fox Television Group, which would "operate our creative [TCFTV] and broadcast [FBC] divisions under the leadership

of a single team" for the creation of in-house television shows, like *Empire*. (ECF 138 at 10 (quoting 21CF press release).) Interrogatory No. 9 thus was designed to help Plaintiffs prove "that FBC and TCFTV engaged in a 'joint effort' specifically with respect to the creation of *Empire* through the Fox Television Group. . . . which would make FBC jointly and severally liable for the torts of its joint venturer [TCFTV] with respect to that project," including (but of course not limited to) the filming at JTDC. (ECF 142 at 10.)

The Court granted Plaintiffs' motion to compel, ordering Fox to "produce the responding information to Plaintiffs as relevant to their theory of liability that the Fox Defendants acted jointly." (ECF 143 at 4.) As relevant here, Interrogatory No. 9 asks 21CF to identify the employees of Fox Television Group.[4] Fox never did so. Now, Fox argues that all it had to do was identify the Fox employees who were directly involved in filming at the JTDC, and that no other information is relevant to Plaintiffs' claims. (ECF 180 at 15.) But that is precisely the argument that Fox originally made in objection to Interrogatory No. 9, and it was the argument that the Court rejected upon consideration of Plaintiffs' reasons for seeking a full response to the interrogatory. Fox has simply defied the Court's order. It should be forced to respond.

### 8. Plaintiffs seek profit participation information for legitimate reasons, not "voyeurism."

In its production of cost records, Fox redacted compensation amounts of several actors and *Empire*'s director. Fox objects to producing this information, claiming that Plaintiffs' counsel are seeking these requests out of "voyeuristic curiosity." (ECF 180 at 4.) That is wrong. Plaintiffs seek the information to show that people whose compensation was tied to *Empire*'s

---

[4] Interrogatory No. 9 contains four sub-parts, (a) – (d). 21CF averred that it could not respond to parts (c) and (d) (ECF 150 ¶ 7), but it made no such statement regarding subparts (a) and (b).

profitability, such as the show's director, would have had a financial incentive to choose a bargain venue like the JTDC, which the County rented to Fox for $1,500 per day.

In addition, the compensation Fox paid to famous people is relevant to show the reprehensibility of its conduct: if the amounts paid to *Empire*'s stars are substantial, it goes to show that Fox was willing to pay large amounts for talent, while at the same time it was willing to have hundreds of children placed on lockdown because it was economical to do so. Plaintiffs are surely entitled to present such information at trial, and the time to discover it is now.

Fox has proposed an *in camera* review of this information. (ECF 180 at 7.) Plaintiffs do not object, but don't see the point—the redacted information shows amounts that several Fox contractors are paid. For the reasons set out above, that compensation is relevant regardless of what the actual amount happens to be. Again, Plaintiffs have offered to discuss additional protections that would give Fox a measure of comfort about the confidentiality of this information, but Fox has never accepted the offer.

### 9. Fox has waived attorney-client and work-product privileges by referring to documents in its interrogatory responses.

In Plaintiffs' second round of discovery, TCFTV RFP No. 17 asked Fox to produce the documents it referred to in its interrogatory responses. (*See* Ex. 9.) TCFTV's interrogatory responses *cite* to multiple documents (*see* Seal. Ex. 2, "Document Date" column), but Fox never produced them, objecting instead that they were covered by attorney-client and work-product protections. By citing and relying on these documents, however, Fox has waived those privileges. It should produce the documents called for in TCFTV RFP. No 17.

## VI. CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court grant the relief sought in this memorandum, as described herein.

16

August 27, 2018                                Respectfully Submitted,

                                               /s/ Stephen H. Weil


Stephen H. Weil – steve@weilchardon.com        Adam J. Pessin – apessin@finekaplan.com
Alexis G. Chardon – ali@weilchardon.com        Fine, Kaplan and Black, R.P.C.
Weil & Chardon LLC                             One South Broad Street, Suite 2300
333 S. Wabash Avenue, Suite 2700               Philadelphia, PA 19107
Chicago, IL 60604                              (215) 567-6565
(312) 585-7404

Terrence Garmey – tgarmey@garmeylaw.com
Terry Garmey & Associates
482 Congress Street, Suite 402
Portland, ME 04101
(207) 331-3111

                                               *Attorneys for Named Plaintiffs T.S. and Q.B.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2018, a true and correct copy of the foregoing was filed electronically.  Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

Unredacted copies of the memorandum, and the sealed exhibits, were transmitted to all counsel of record via email.

/s/ Stephen H. Weil