# SEALED EXHIBIT 1

# THIS EXHIBIT FILED UNDER SEAL

PURSUANT TO AGREED CONFIDENTIALITY ORDER AND L.R. 26

# SEALED EXHIBIT 2

# THIS EXHIBIT FILED UNDER SEAL

PURSUANT TO AGREED CONFIDENTIALITY ORDER AND L.R. 26

# EXHIBIT 1

1   **KASOWITZ BENSON TORRES & FRIEDMAN LLP**
2   JOHN V. BERLINSKI (SBN # 208537)
    jberlinski@kasowitz.com
3   MANSI K. SHAH (SBN # 234984)
    mshah@kasowitz.com
4   CANDACE FRAZIER (SBN # 282358)
    cfrazier@kasowitz.com
5   2029 Century Park East, Suite 750
    Los Angeles, CA 90067
6   Telephone: (424) 288-7900
    Facsimile: (424) 288-7901

7   Attorneys for Plaintiffs

**CONFORMED COPY**
**ORIGINAL FILED**
Superior Court of California
County of Los Angeles

NOV 30 2015

Sherri R. Carter, Executive Office/Clerk
By: _____, Deputy
Ishayla Chambers

9         **SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

10                  **COUNTY OF LOS ANGELES**

TEMPERANCE BRENNAN, L.P. f/s/o KATHLEEN REICHS; SNOOKER DOODLE PRODUCTIONS, INC. f/s/o EMILY DESCHANEL; and BERTHA BLUE, INC. f/s/o DAVID BOREANAZ,

        Plaintiffs,

    v.

TWENTY-FIRST CENTURY FOX, INC., a Delaware corporation; FOX ENTERTAINMENT GROUP, INC., a Delaware corporation; TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation; FOX BROADCASTING COMPANY, a Delaware corporation, and DOES 1-20, inclusive,

        Defendants.

Case No.   **BC 602548**

**COMPLAINT FOR:**

**(1) BREACH OF CONTRACT;**
**(2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**
**(3) FRAUDULENT INDUCEMENT;**
**(4) FRAUDULENT CONCEALMENT;**
**(5) INDUCING BREACH OF CONTRACT;**
**(6) INTENTIONAL INTERFERENCE WITH CONTRACT;**
**(7) ACCOUNTING; AND**
**(8) DECLARATORY RELIEF**

**DEMAND FOR TRIAL BY JURY**

Trial Date: None

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

1    Plaintiffs Temperance Brennan, L.P. f/s/o Kathleen Reichs ("Reichs"), Snooker Doodle

2    Productions, Inc. f/s/o Emily Deschanel ("Deschanel"), and Bertha Blue, Inc. f/s/o David

3    Boreanaz ("Boreanaz") (collectively, "Plaintiffs"), for their demand against Defendants Twenty-

4    First Century Fox, Inc. ("21st Fox"), Fox Entertainment Group, Inc. ("FEG"), Twentieth Century

5    Fox Television, a unit of Twentieth Century Fox Film Corporation ("20th TV"), and Fox

6    Broadcasting Company ("FBC") (21st Fox, FEG, 20th TV, and FBC collectively "Fox" or

7    "Defendants"), allege as follows:

8                              I.    **INTRODUCTION**

9         1.    Fox and its predecessors have played a leading role in the well-documented history

10   of Hollywood accounting scandals. In 1979, for example, Fox produced the movie *Alien* that, on

11   information and belief, cost it between $9 and $11 million to make and by spring of 1980 had

12   generated more than $100 million at the box office alone. Yet, when it came time to pay the

13   film's profit participant—the small, independent producer who had contracted for a share of

14   Fox's profits—Fox claimed that the film had somehow *lost* money and that no profits were due.

15   That independent producer sued, and, on information and belief, obtained a favorable settlement.

16   In the years since, Fox has engaged in similar conduct with respect to many of its television

17   series, including mega-hits such as *M\*A\*S\*H*, *The X-Files*, *N.Y.P.D. Blue*, and *Cops*, all of which

18   on information and belief have spawned meritorious lawsuits.

19        2.    The Fox conglomerate's latest episode in this grim series concerns *Bones*, the

20   longest running primetime drama in the history of FBC. *Bones* (the "Series") is a one-hour

21   scripted television series based on the best-selling "Temperance Brennan" fiction novels by

22   plaintiff Kathy Reichs. The Series centers around a forensic anthropologist named Dr.

23   Temperance Brennan, who is played by plaintiff Emily Deschanel, and a Special Agent with the

24   FBI named Seeley Booth, who is played by plaintiff David Boreanaz. Together, these characters

25   solve the most baffling murders by combining Dr. Brennan's expertise in cutting edge forensic

26   science with Agent Booth's classically intuitive detective work. *Bones* premiered on FBC in 2005

27   and was heralded by media outlets as "the best drama of the new network season." Since then the

28   Series has been a constant fixture on FBC's primetime schedule. During Season 10 in 2014,

1   *Bones* celebrated its 200th broadcast episode. Very few dramas on any television network, and

2   only two others in the history of FBC, have ever achieved this honor. Showing no signs of

3   stopping its epic run, *Bones* is currently in its 11th season and is heading toward Season 12.

4           3.      *Bones'* longevity has made it a cash cow for Fox. For example, on information and

5   belief, FBC has earned many hundreds of millions of dollars selling commercial airtime in

6   connection with the Series. The price that advertisers pay for such airtime depends in part on

7   Nielsen audience ratings. In the United States alone, *Bones* averaged 9 million weekly viewers in

8   its most recent season, which made it FBC's second most watched primetime television series.

9   Separate and apart from these advertising revenues, 20th TV—Fox's production and distribution

10  arm—has received hundreds of millions of dollars from the exploitation of the Series in over 150

11  territories throughout the world. According to Gary Newman, Fox Television Group chairman

12  and Chief Executive Officer, the Series has been "incredibly successful internationally, in

13  syndication, on SVOD [subscription video-on-demand] and Netflix." Media outlets have echoed

14  this sentiment, referring to *Bones* as Fox's "golden child."

15          4.      The success of *Bones* has been all the more impressive considering its frequent

16  migration on FBC's primetime schedule. On information and belief, television series achieve

17  better Nielsen audience ratings when they are broadcast on the same day and time each week so

18  that viewers can establish a habit of tuning in for "appointment viewing." Yet in an effort to

19  provide ratings "Band-Aids" for FBC, which in recent history has had fewer than a handful of

20  dramas continue beyond three seasons, FBC has broadcast original *Bones* episodes in seven

21  different time periods spanning five different nights. According to Mr. Newman: "To have a

22  show that resilient is an incredible luxury." Indeed, the value of *Bones* to Fox goes well beyond

23  the revenues that FBC and 20th TV have generated through advertising and licensing the Series.

24          5.      Plaintiff Reichs, a forensic anthropologist, is the inspiration for Temperance

25  Brennan's television persona. In return for her life story rights, the television rights to her novels,

26  and her agreement to render producing services for the Series, 20th TV promised her a 5% share

27  of the Series profits. Plaintiffs Deschanel and Boreanaz, for their leading roles in the Series, are

28

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 3 -

1    each contractually entitled to a 3% share of Series profits. All three Plaintiffs are entitled to

2    periodic accounting statements showing how 20th TV calculates their profits.

3          6.     As the Series became more profitable for Fox over the years, these accounting

4    statements issued by 20th TV counter-intuitively showed Plaintiffs falling farther and farther away

5    from achieving profits. In 2010, for example, not long after FBC aired the finale of the Series'

6    successful fifth broadcast season, plaintiff Reichs received a statement showing that she was

7    nearly $90 million away from receiving profits payments, and plaintiffs' Boreanaz and Deschanel

8    received statements showing they were nearly $100 million away from profits. Knowing of Fox's

9    checkered history in profit participation matters, Plaintiffs noticed an audit of 20th TV's books

10   and records thereafter. During the following years, Plaintiffs' independent auditor set out to

11   uncover the truth but was stymied by 20th TV's refusal to disclose many of the basic documents

12   related to Plaintiffs' profit statements.

13         7.     The documents that 20th TV did provide confirmed Plaintiffs' suspicions and

14   showed that they were being cheated out of more than $100 million in gross revenues and being

15   overcharged many additional millions of dollars in alleged expenses. One of the primary culprits

16   was 20th TV's practice of licensing the Series to Fox affiliates. When "self-dealing" such as this

17   occurs, a temptation exists for the distributor to charge below market rates so that fewer dollars

18   are directed into the "pool" of funds from which profit participants like Plaintiffs share. Many

19   television studios are transparent about this temptation and offer profit participants a "seat at the

20   table" to arrive at what is commonly referred to as an "imputed license fee." 20th TV, however,

21   set its initial network license fees for *Bones* without ever consulting Plaintiffs. And when 20th TV

22   finally did engage with Plaintiffs in the fifth and sixth seasons of the Series, it did so under the

23   threat of cancelling the Series unless Plaintiffs accepted its non-negotiable license fee figure, and

24   then concealed material information about the true value of that figure.

25         8.     Plaintiffs' auditor also uncovered a practice whereby 20th TV "packages" films

26   and television series together in a single license agreement, leveraging the most successful series

27   to force licensing of the entire package. But contrary to logic and well-established California law,

28   when 20th TV accounts to profit participants such as Plaintiffs, it allocates a disproportionately

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 4 -

greater share of the total fees it receives to the less valuable shows. The result is that Fox understates the revenues on its most successful television series—which are necessarily the ones most likely to result in profit participation payments.

9.    In addition to uncovering improper self-dealing and misallocation claims, the auditor's review, albeit truncated by 20th TV's withholding of many key documents, unearthed more than a dozen accounting errors, tricks, and deceitful acts that 20th TV has used to deprive Plaintiffs of their entitlement to profits. In short, the audit revealed that, consistent with past Fox practices, 20th TV has engaged in a systematic and pervasive effort to cheat Plaintiffs out of their entitlement to profits from the longest running drama series ever broadcast on FBC. Plaintiffs bring this action to enforce their rights to these payments that they are rightfully owed, which they estimate to collectively exceed tens of millions of dollars.

## II.    JURISDICTION AND VENUE

10.    The Court has personal jurisdiction over Defendants pursuant to California Code of Civil Procedure 410.10 because the Defendants are domiciled in and/or are doing business in the State of California and some or all of the agreements that are the subject of this dispute were made, entered into, performed, and breached within the State of California. The amount in controversy exceeds the jurisdictional minimum of this Court.

11.    Venue is proper in this County pursuant to California Code of Civil Procedure § 395(a) and § 395.5 because the Defendants, or some of them, have their principal place of business in the County of Los Angeles and because some or all of the agreements that are the subject of this dispute were made, entered into, performed, and/or breached in this County.

12.    Venue is also proper under the parties' agreements. Plaintiff Reichs' agreement, attached hereto as Exhibit A, provides that her entitlement to profits "shall be defined, computed, accounted for and paid according to the [profits definition] customarily used by Fox, and shall be incorporated herein, subject to good faith negotiations within the customary parameters for persons of [her] stature in the television industry . . .." Ex. A, 2004 Reichs Agreement, Purchase Agreement, ¶ 10(c). The profits definition being used by Fox is attached hereto as Exhibit B. It provides that the parties' rights to "maintain or institute *any* action or proceeding shall be *only* as

provided in [the profits definition]," and then defines such an action as "an action at law for recovery of any such monies claimed." Ex B, 2007 Profits Definition, ¶ VII.F. On information and belief, 20[th] TV is using a similar profits definition with an identical dispute resolution provision for Deschanel and Boreanaz.

### III. PARTIES

13.     Plaintiff Temperance Brennan, L.P. is a partnership organized under the laws of the State of Delaware whose principal place of business is located in the County of Los Angeles. At all relevant times, Temperance Brennan, L.P. was and is the loan-out company through which Kathleen Reichs provides her producing services for the Series.

14.     Plaintiff Snooker Doodle Productions, Inc. is a corporation organized under the laws of the State of California, with its principal place of business located in the County of Los Angeles. At all relevant times, Snooker Doodle Productions, Inc. was and is the loan-out company through which Emily Deschanel provides her acting and producing services for the Series.

15.     Plaintiff Bertha Blue, Inc. is a corporation organized under the laws of the State of California, with its principal place of business located in the County of Los Angeles. At all relevant times, Bertha Blue, Inc. was and is the loan-out company through which David Boreanaz provides his acting, directing, and producing services for the Series.

16.     Defendant Twenty-First Century Fox, Inc., on information and belief, is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware doing business throughout the United States, including at its offices in the State of California, County of Los Angeles.

17.     Defendant Fox Entertainment Group, Inc., on information and belief, is, and at all relevant times was, a corporation organized and existing under the laws of the State of Delaware doing business throughout the United States, including at its principal place of business in the State of California, County of Los Angeles. Fox Entertainment Group, Inc. is, on information and belief, a wholly-owned subsidiary of Twenty-First Century Fox, Inc.

1       18.     Defendant Twentieth Century Fox Television, on information and belief, is a unit

2 of Twentieth Century Fox Film Corporation, which, on information and belief, is, and at all

3 relevant times was, a corporation organized and existing under the laws of the State of Delaware

4 doing business throughout the United States, including at its principal place of business in the

5 State of California, County of Los Angeles. Twentieth Century Fox Television, on information

6 and belief, is not a legal entity distinct from Twentieth Century Fox Film Corporation, so

7 Twentieth Century Fox Film Corporation is therefore liable for all acts and omissions made by or

8 on behalf of Twentieth Century Fox Television. Twentieth Century Fox Film Corporation is, on

9 information and belief, a wholly-owned subsidiary of Fox Entertainment Group, Inc. and/or

10 Twenty-First Century Fox, Inc.

11       19.     Defendant Fox Broadcasting Company, on information and belief, is, and at all

12 relevant times was, a corporation organized and existing under the laws of the State of Delaware

13 doing business throughout the United States, including at its principal place of business in the

14 State of California, County of Los Angeles. Fox Broadcasting Company is, on information and

15 belief, a wholly-owned subsidiary of Fox Entertainment Group, Inc. and/or Twenty-First Century

16 Fox, Inc.

17       20.     Defendants, Does 1 through 20, are sued herein by fictitious names for the reason

18 that their true names are unknown to Plaintiff. Plaintiff will seek leave to amend this Complaint to

19 allege the true names and capacities of these Defendants when their identities have been

20 ascertained. Plaintiff is informed and believes and based thereon alleges that these fictitiously

21 named Defendants are responsible in some manner for the actions and damages alleged herein.

22       21.     Plaintiff is further informed and believes and based thereon alleges that

23 Defendants at all times herein alleged were the agents, employees, servants, joint venturers,

24 and/or co-conspirators of each of the other remaining Defendants, and that in doing the things

25 herein alleged were acting in the course and scope of such agency, employment, joint venture,

26 and/or conspiracy.

27

28

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

COMPLAINT

## IV.   FACTUAL BACKGROUND

### A.  Plaintiffs are the Inspiration for and the Faces of *Bones*

22.     *Bones* was inspired by a series of crime novels authored by Reichs, and commonly referred to as the "Temperance Brennan Novels." The first of these novels was released in 1997 and there have been 18 in this series to date. All of the novels feature a protagonist named Dr. Temperance Brennan, a forensic anthropologist whose fictional persona is based on Reichs' real-life experiences, which continue to generate creative material for her novels and the Series.

23.     In *Bones,* Dr. Brennan is played by plaintiff Deschanel, and Special Agent Booth is played by plaintiff Boreanaz. The duo are the backbone of the Series, ensuring that millions of viewers tune in each week not only to see the next murder mystery that their characters are able to solve, but also to see the evolution of their relationship. While Dr. Brennan is ruled by her head, Agent Booth is ruled by his heart. These differing perspectives initially give rise to tension between the characters, but ultimately, as is often the case in classic love stories, opposites attract. Through their skillful acting and long-standing dedication to their characters, plaintiffs Deschanel and Boreanaz continue to make palpable for dedicated viewers the powerful chemistry between Dr. Brennan and Agent Booth.

### B.  The Outsized Success of *Bones*

24.     Premiering September 13, 2005 on FBC, *Bones* immediately garnered positive reviews for its infusion of dark humor and character development into an otherwise saturated primetime schedule of crime procedurals. The Series' premiere obtained nearly 11 million viewers and was FBC's highest-rated primetime Tuesday-night drama since the premiere of the hit series *24* four years earlier. Media outlets soon began describing the show as "the best drama of the new network season." FBC, knowing it had a hit on its hands, on information and belief, ordered a full season of *Bones* after a mere three episodes had aired.

25.     FBC's instincts proved keen, and the Series continued to generate favorable Nielsen ratings for a freshman drama, finishing the year averaging around 9 million weekly viewers. Remarkably, *Bones* continues to maintain these ratings ten years later in an era when overall audiences have declined in part because, according to FX Networks' CEO John Landgraf:

- 8 -

1   "There is simply too much television." It is due to *Bones*' loyal viewership and its ability to

2   perform regardless of when it airs that FBC has had the luxury of scheduling the Series such that

3   at some point in its run, *Bones* has held a timeslot on every weeknight. It is rare for a series to be

4   moved around the primetime schedule as often as FBC has done with *Bones*, and even rarer still

5   for this type of movement to not negatively affect the overall viewership numbers. It is clear that

6   *Bones* is in a class of its own.

7        26.      This durability of the Series often has been touted by Fox. When FBC announced

8   that *Bones* would be renewed for Season 7 in May 2011, its President of Entertainment Kevin

9   Reilly said, "*Bones* is creatively fresh, it's a rock-solid player every time it airs and this season it

10  has helped us win on Thursday nights for the first time in our history." Fox has even used the

11  Series as a lead-in to help improve the viewership of other series aspiring to cultivate the faithful

12  fan base of *Bones*. For example, last month FBC broadcast a cross-over event with *Bones* and

13  *Sleepy Hollow*, beginning a storyline with *Bones* at 8 p.m. and concluding that storyline with

14  *Sleepy Hollow* at 9 p.m. While *Bones* out-performed *Sleepy Hollow*, Fox was able to use the

15  *Bones* viewership to boost *Sleepy Hollow*'s audience by an additional 38% compared to the prior

16  week. It is this type of consistent performance that has allowed *Bones* to earn its accolades as a

17  "golden child" and the longest running drama ever produced and broadcast by Fox.

18        27.      Of course, *Bones* would not have achieved this distinction without the ability to

19  generate consistent profits for Fox. According to 20th TV, the Series has earned over 1.1 ***billion***

20  dollars in revenues on the 20th TV side alone. This revenue is mostly comprised of fees from

21  domestic broadcast licenses and revenues from syndication, from subscription video-on-demand

22  platforms such as Netflix, and from multiple networks and platforms abroad. Separate and apart

23  from these revenues, on information and belief Fox has generated hundreds of millions of

24  additional dollars in advertising revenues in connection with the 220 *Bones* episodes and counting

25  that have aired to date in original runs and in syndication on Fox's owned and operated network

26  of television channels throughout the United States and abroad.

27        28.      *Bones* has also received significant critical acclaim, and the Series and its cast

28  have been recognized by various entertainment industry award nominations. In fact, its cast and

1  crew have been nominated for over 10 different industry awards including the Primetime Emmys

2  and People's Choice Awards.

3  **C.  The Agreements Entitling Reichs to Series Profits**

4      29.    In or about April 2005, Reichs and 20th TV entered into their initial agreements

5  regarding the Series dated as of September 1, 2004. Attached hereto as Exhibit A are true and

6  correct copies of a redacted Purchase Agreement for Purchase of Literary Material and Life Story

7  Rights and a redacted Option Agreement for Purchase of Literary Material and Life Story Rights,

8  along with supporting exhibits, executed by Reichs and 20th TV (the "2004 Reichs Agreement").

9      30.    The 2004 Reichs Agreement entitled Reichs to fixed and contingent compensation

10  in connection with her work on the Series. With respect to the latter, Reichs is entitled to a 5%

11  share of the Series "Modified Adjusted Gross Receipts" ("MAGR"), pursuant to a profits

12  definition that 20th TV promised to supply at a later time. The 2004 Reichs Agreement further

13  provided that after Reichs received the profits definition it would be "subject to good faith

14  negotiations within the customary parameters for persons of [Reichs'] stature in the television

15  industry." Ex. A, 2004 Reichs Agreement, Purchase Agreement, ¶ 10(c).

16      31.    It was not until approximately three years later, in November 2007, that 20th TV

17  provided Reichs with its "standard" MAGR definition (the "2007 Profits Definition"). Attached

18  hereto as Exhibit B is a true and correct copy of the correspondence from 20th TV providing

19  Reichs with this 2007 Profits Definition. Notwithstanding 20th TV's promise to subsequently

20  negotiate this 2007 Profits Definition in "good faith," 20th TV never even commenced such

21  negotiations.

22  **D.  The Agreements Entitling Deschanel and Boreanaz to Series Profits**

23      32.    Plaintiffs Deschanel and Boreanaz became entitled to Series profits when they

24  signed their initial agreements with 20th TV in 2005. Their most recent agreements entitling them

25  to profits, true and correct copies of which are attached hereto with redactions as Exhibits C and

26  D, are dated as of December 24, 2012, and provide for each of them to receive a 3% share of

27  MAGR (the "2012 Actor Agreements"). Similar to the 2004 Reichs Agreement, the 2012 Actor

28  Agreements provide that after Deschanel and Boreanaz receive their MAGR profits definitions,

- 10 -

1    those definitions would be subject to "good faith negotiation within Fox's customary parameters

2    for persons of [Actor's] stature." Exs. C-D, 2012 Actor Agreements, Rider. Unlike with Reichs,

3    however, 20th TV never even sent plaintiffs Deschanel or Boreanaz the profits definition.  On

4    information and belief, the profits definition that 20th TV is using to calculate Deschanel and

5    Boreanaz's profit share is substantially similar to the 2007 Profits Definition and identical with

6    respect to the dispute resolution provisions.

7    **E.**   **Plaintiffs Receive No Profits Payments For 10 Years**

8           33.    In March 2008, during Season 3 of the Series, 20th TV issued Plaintiffs their first

9    profits accounting statements, which reflected deficits of around $70 million that each of them

10    would need to recoup before they would receive any payments. In January 2009, during the

11    Series' fourth season, 20th TV issued its second set of statements to Plaintiffs, showing that their

12    deficit had been ***increased*** to over $80 million. By the next accounting period the deficit had

13    grown even further, and at one point the deficit approached or exceeded $100 million depending

14    on the Plaintiff.

15    **F.**   **The Audit**

16           34.    Unable to reconcile the growing deficit reported on 20th TV's statements with the

17    fact that *Bones* was in the middle of its sixth successful broadcast season, Plaintiffs exercised

18    their contractual audit rights. Toward that end, their representatives engaged Sills & Gentille

19    (now known as Green Hasson & Janks LLP), an independent third party auditing firm

20    specializing in entertainment industry accounting and transactions, to conduct a review of 20th

21    TV's books and records (the "Audit").

22           35.    As explained below, 20th TV withheld from the auditors much of the

23    documentation necessary to conduct this audit and determine the full extent of the underpayments

24    to Plaintiffs. Based on the limited information that 20th TV did provide, however, the auditors

25    uncovered more than twenty accounting violations that they estimated to total well over $100

26    million in underreported receipts and millions of additional dollars in overcharged expenses.

27    Plaintiffs submitted these findings to 20th TV on or around May 14, 2014 (the "Audit Reports").

28           36.    The audit also uncovered the falsity of representations made by 20th TV to

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 11 -

1   Plaintiffs and the concealment of material facts by 20th TV, in connection with discussions

2   between the parties about a potential "release" of claims regarding the license fees that FBC had

3   agreed to pay 20th TV for broadcasting seasons 5 and 6 of the Series (the "2009 Release").

4   **G. The Tolling Agreements**

5          37.     On or about April 25, 2014, 20th TV and Plaintiffs entered into an agreement

6   extending until May 30, 2015 the deadlines under which Plaintiffs could bring the claims set forth

7   in this lawsuit. Attached hereto as Exhibit E is a true and correct copy of this agreement dated

8   April 25, 2014. On May 6, 2015, 20th TV and Plaintiffs agreed to further extend this deadline

9   until November 30, 2015. Attached hereto as Exhibit F is a true and correct copy of this

10  agreement dated May 6, 2015. On November 20, 2015, 20th TV and Plaintiffs agreed to further

11  extend this deadline until May 31, 2016.

12          **V.     DEFENDANTS' BREACHES OF THE AGREEMENTS**

13  **A. Failure to Permit a Full and Complete Audit**

14         38.     The 2007 Profits Definition provides Plaintiffs with the right to audit 20th TV's

15  "books of account which relate to the [Series], in order to verify the accuracy of the transactions

16  or items of information as first reflected in any Negative Cost Summary or any Participation

17  Statement . . ." Ex. B, 2007 Profits Definition, ¶ VI.G. However, when it came time to provide

18  the auditors with the documents necessary to verify the accuracy of these transactions and items,

19  20th TV's responses ranged from no substantive response, to outright denial, to false

20  representations that it had disclosed all relevant documents.

21         39.     One of the most significant revenue streams that television studios like 20th TV

22  typically receive are the fees associated with licensing the rights to broadcast initial runs of a

23  television series on a U.S. network. To arrive at these fees here, on information and belief, 20th

24  TV and FBC negotiated a network license agreement. Notwithstanding repeated requests,

25  however, the auditor was never provided with a complete copy of this network license agreement.

26         40.     Nor did 20th TV provide the auditor with any of the scores of license agreements

27  that it entered into with other affiliated companies concerning *Bones*. These included, but were

28  not limited to, agreements with Fox's home video distribution arm, agreements with the Fox

- 12 -

owned and operated stations that broadcast *Bones* in syndication, and agreements with the many Fox International Channels that broadcast the Series in Europe, Latin America, Africa, and Asia.

41.     In addition to the above, 20th TV failed to provide the auditor with a host of other critical documents including but not limited to:

- Documents enabling the auditor to calculate the Nielsen rankings of the Series to test 20th TV's calculation of cumulative series deficit reimbursement payments;

- Documents reflecting the amount of production costs charged in excess of the budgeted amounts for the Series, and documents reflecting how much, if any, of those excess production costs were reimbursed by FBC and credited to Plaintiffs;

- Documents reflecting the agreements reached, and the revenues received, from licensing the Series on new media platforms such as fox.com and Netflix;

- The agreement with Shaw Television Limited Partnership in connection with the network broadcast of *Bones* in Canada;

- Documents related to determining whether Plaintiffs were credited all revenues 20th TV received from Turner Entertainment Network ("TEN") in connection with TEN's basic cable television license agreement; and

- The detail ledger for foreign home video sales.

42.     Without these and other documents, the auditors could not complete their review or determine the full value of Plaintiffs' claims, though as set forth below, the auditors' findings based on what limited information 20th TV did provide were still significant.

**B.  Improper Self-Dealing**

43.     20th TV has engaged in numerous improper self-dealing license agreements with its affiliated networks and other licensees. Some of the more egregious examples of this misconduct are highlighted below.

**1.     20th TV's "Sweetheart" Network License Agreement with FBC**

44.     The fees received by a distributor for licensing the right to broadcast original runs of a television series to a network are among the most significant revenues included in calculating profits. Recognizing this, and the potential conflict of interest when two arms of the same entity

- 13 -

negotiate with one another, many studios who produce for their sister networks have adopted an "imputed license fee" model. In essence, this model prevents conflicts by directly inserting the profit participant into licensing negotiations. The studio discloses the amounts that it intends to credit to the profit participant in connection with the network license up front, and the profit participant negotiates the figure and ultimately signs off on it. This imputed license fee model has the benefit of transparency and strives to minimize self-dealing claims such as those in this case.

45.     Here, however, Plaintiffs were never given a seat at the table when 20th TV "negotiated" the Series initial network license agreement with its sister network FBC. Not surprisingly, the product of that "negotiation" was a schedule of artificially low license fees that benefitted FBC and its parent, 21st Fox, at the expense of Plaintiffs. Then, beginning in Season 5, FBC and 20th TV added insult to injury by conspiring to amend their network license agreement such that FBC would pay even less to 20th TV—and in turn the Plaintiffs—than what it had initially agreed to pay. Through Season 6 these fees were so low that they resulted in a production deficit—the delta between production costs and network license fees—of around $50 million.

46.     The "sweetheart" deals that created this deficit do not even come close to satisfying 20th TV's contractual obligations to enter into license agreements with its affiliates on terms comparable to the terms on which those affiliates enter into similar agreements with unrelated third parties.[1] For example, media outlets have reported that FBC was willing to pay significantly more to license the television series *House* from unrelated distributor Universal Media Studios than FBC paid to license *Bones* from affiliate 20th TV.

47.     As stated above, 20th TV and FBC also routinely amended the terms of their network license agreement to reduce payment obligations to 20th TV at the expense of Plaintiffs. In addition to the Season 5 example set forth above, the initial 20th TV/FBC network license agreement contained a provision that promised to pay 20th TV "rankings bonuses" depending on how *Bones* compared to certain other primetime television series in terms of Nielsen viewership. Shortly before these bonuses were due, however, FBC and 20th TV conspired to amend this

---

[1] In this lawsuit, plaintiffs' Boreanaz and Deschanel do not contest the license fees that were credited to them in connection with Season 11 of the Series.

1    provision and create a pure "ratings" bonus structure. The result, as these Fox affiliates knew but

2    concealed from Plaintiffs, was a reduction of at least $2.62 million in bonus payments through the

3    Audit Period. Similarly, 20th TV agreed to forego at least $10,375,000 in "deficit recoupment"

4    payments from FBC without any consideration in return. Had FBC licensed the Series from a

5    third party television studio instead of affiliate 20th TV, on information and belief that third party

6    studio would never have agreed to such financially disadvantageous amendments.

7    　　　　2.　　**20th TV's "Sweetheart" Deals with Affiliated Foreign Networks**

8    　　　　48.　　*Bones* has performed well not only in the United States but in many of the more

9    than 70 foreign territories in which 20th TV has licensed it. In certain of these territories, 20th TV

10   licensed runs of the Series in non-exclusive arrangements to both its affiliated networks and to

11   unrelated third party networks. The stark differences between the monetary terms of these deals

12   demonstrate how 20th TV has dramatically underpaid Plaintiffs when licensing to its foreign

13   affiliates. By way of example only, 20th TV licensed Season 1 of the Series in Italy to third party

14   network, RTI SPA, for $3,077 per run while simultaneously licensing Season 1 to its Italian sister

15   network for $200 per run. The value of the Series was therefore more than 15 times what 20th TV,

16   and consequently Plaintiffs, received from this self-dealing transaction. Likewise, 20th TV

17   licensed Season 1 of the Series in Spain to third party Gestora de Inversiones Audiovisuales La

18   Sexta S.A. for $24,667 per run, but when dealing with its Spanish sister network, licensed that

19   season for $300 per run for the same term. In the same territory, 20th TV therefore obtained 82

20   times more fees when licensing the Series to a third party than to its affiliate. Fox has engaged in

21   similar improper self-dealing transactions with numerous other foreign affiliates.

22   　　　　3.　　**Fox's Self-Dealing In New Media Licenses**

23   　　　　49.　　In recent years, the exhibition of television series has evolved beyond traditional

24   linear broadcasts on television screens in the home. These "new media" exhibitions permit

25   viewing of full or partial episodes of television series on platforms including computers, smart

26   phones, and tablets, and allow for downloading and streaming at the convenience of the user.

27   With the emergence of digital subscription video-on-demand options like Hulu and Netflix,

28

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 15 -

COMPLAINT

1    television studios and distributors are now collectively receiving billions of dollars in exchange

2    for licensing their series and related content to these new media outlets.

3         50.    20th TV's licensing of Bones to new media outlets owned in whole or in part by

4    Fox was handled consistent with Fox's overall approach of licensing to related parties at below

5    market rates. One example concerns Hulu, LLC ("Hulu") an entity in which Fox possesses an

6    approximate 33% equity interest according to its SEC 10-K filings. On information and belief,

7    Hulu is available free of charge to viewers and additional premium programming is available at

8    Hulu.com on a monthly subscription basis for $7.99 per month or a commercial free option for

9    $11.99 per month. Press releases in or around March 2008, the date of Hulu's public launch,

10   touted Bones as among the available Hulu programming.

11        51.    On information and belief, the license agreements that 20th TV entered into with

12   related party Hulu for Bones differ markedly from the agreements that Hulu enters into with third

13   party distributors for similar television programming. For one, on information and belief, many

14   third party distributors require fixed cash guarantees to license their series to Hulu, but on

15   information and belief 20th TV is licensing Bones for a speculative percentage of the ad sales and

16   monthly subscriber fees that Hulu pays to 20th TV. This arrangement shifts the risk onto the Profit

17   Participant and can also result in delayed receipt of license fees. Moreover, it means that 20th TV

18   should be allocating an appropriate percentage of the monthly subscriber fees it receives from

19   Hulu to each individual title it has licensed, including Bones. On information and belief, 20th TV

20   has failed to do so, resulting in significant underpayments to Plaintiffs.

21        52.    20th TV has also breached the parties' agreements by licensing the subscription

22   video on demand ("SVOD") rights to current season episodes of Bones to Hulu for below market

23   rates. "Current season" refers to the episodes of a television series that make up the season

24   presently being broadcast in original runs on network television, as opposed to episodes that were

25   broadcast in prior seasons. On information and belief, Fox's financial interest in Hulu has resulted

26   in 20th TV licensing current season episodes of Bones for less than what Hulu would have paid a

27   third party distributor—sometimes even giving away access to clips and series premieres for free.

28   Moreover, this practice of "stacking" current season episodes on multiple platforms such as FBC

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 16 -

1    and Hulu has, on information and belief, resulted in third party SVOD licensees such as Netflix

2    paying less for those episodes—which have been viewed more often and therefore have lost

3    value—than they would otherwise have paid if the current season episodes were kept off of Hulu.

4        **4.    Fox's "Sweetheart" Domestic Syndication Deal**

5        53.    On information and belief, 20th TV licensed certain "re-runs" of the Series in

6    syndication to Fox's owned and operated group of domestic television stations. Where television

7    series are as successful as *Bones*, such syndication agreements typically contain both a fixed cash

8    license fee and a barter component. The barter component gives distributors such as 20th TV the

9    right to sell commercial airtime during the broadcasts of these "re-run" episodes. Here, when

10   dealing with its affiliated stations group, 20th TV obtained no cash license fees, but rather traded

11   *Bones'* valuable syndication rights for only commercial airtime plus 30 additional seconds of

12   billboard announcements. As an initial matter, 20th TV's licensing of these valuable rights

13   without including a cash component breached its contractual obligation to deal with affiliates on

14   monetary terms comparable to the terms on which those affiliates enter into similar agreements

15   with third party distributors. Moreover, 20th TV's failure to credit Plaintiffs with any revenues

16   from the sale of the 30-second billboard announcements it received as consideration constitutes a

17   further breach of its obligations under the parties' agreements.

18       54.    Moreover, 20th TV has rejected lucrative third-party syndication deals opting to

19   instead license basic cable rights to the Series to its affiliates for less than fair market value. In

20   one such example of this self-dealing, on information and belief, 20th TV licensed the Spanish-

21   language rights to the Series to its then sister network MundoFox (now known as MundoMax) for

22   a mere $13,000 per episode. Knowing that this license fee was well below market value of these

23   rights, 20th TV tried to get Plaintiffs to consent to this transaction by representing that it had

24   contacted all potential Spanish-language buyers and they had passed. But when Plaintiffs'

25   representatives sought to verify that claim, they learned that the other major buyers had never

26   been contacted and knew nothing about this potential opportunity. Moreover, Plaintiffs'

27   representatives were told that these buyers would have paid substantially more than the $13,000

28

1    per run that MundoFox offered. Notwithstanding Plaintiffs' objection to this transaction, 20th TV
2    went ahead and licensed the Series to MundoFox.

3    C.  **Additional Accounting Claims**

4        55.    As detailed in the Audit Report, 20th TV has committed well over a dozen
5    breaches of the parties' agreements in addition to the claims mentioned above. A sampling of
6    these additional accounting claims is set forth below.

7        1.    **Improper Allocations**

8        56.    When distributing the Series domestically and internationally, 20th TV frequently
9    "packaged" *Bones* with other Fox-owned television series and films and licensed these collective
10   titles as a group. Large distributors such as 20th TV often engage in this practice of "packaging"
11   in an effort to sell as much of their owned content as possible, using the more popular television
12   series and films as "drivers" in these deals, and refusing to sell those "drivers" a la carte. While
13   this strategy is effective in bringing in more revenue for the corporate entity as a whole—because
14   20th TV can force its less popular content on licensees—it often harms profit participants on
15   successful series like *Bones* whose statement are credited at less than market value.

16       57.    Where a distributor like 20th TV "packages" content together, it has a duty to
17   allocate the total license fees it receives in good faith relative to the actual value of each title in
18   the package. Here, 20th TV blatantly failed to do so. On information and belief, it often employed
19   what is referred to as a "straight-line" allocation methodology and credited all titles in a particular
20   "package" agreement with the same episodic license fees, notwithstanding their different values
21   to the licensee. In other instances, Fox drastically undervalued *Bones* compared to other less
22   successful Fox titles. For example, in one such agreement, Fox allocated only $6,000 per episode
23   to *Bones* but then allocated ***seven times as much,*** $44,000 per episode, to *Boston Public*—a
24   television series that was cancelled after four seasons. 20th TV's misallocation in favor of *Boston*
25   *Public*—a series that, on information and belief, likely will never generate profit participation
26   payments—ensures that its corporate parent 21st Fox will retain more money by having to pay out
27   fewer dollars to Plaintiffs on *Bones.* On information and belief, 20th TV has failed to properly
28   allocate license fees on many other "package agreements," including those with Netflix and Hulu.

- 18 -

**2.   Improperly Charging Production Costs Associated with a Spinoff Pilot**

58.   The 2007 Profits Definition obligated 20th TV to calculate Plaintiffs profits by deducting only those production costs incurred "in connection with the preparation, production, completion and delivery of the completed *Program*," which the 2007 Profits Definition defined as *Bones*. Notwithstanding this clear language, 20th TV breached the parties' agreements by deducting $3.5 million in production costs incurred in connection with a proposed spinoff series called *The Finder* when calculating Plaintiffs' profits.

**3.   Improperly Charging Distribution Fees on EST and VOD Receipts**

59.   With respect to electronic sell-through ("EST") license agreements, 20th TV accounts to Plaintiffs on a 20% royalty basis, meaning that of the nearly $8 million in cash that 20th TV admits it received in connection with digital downloads of the Series (e.g., iTunes downloads), 20th TV credited to Plaintiffs' profits definition just $1.6 million. 20th TV applies the same accounting treatment to video-on-demand ("VOD"), which is when a distributor makes episodes available to consumers on its website or via a set-top box. But 20th TV does not stop there. On top of the 80% of revenues it keeps, 20th TV deducts an additional 30% or 45% distribution fee, thereby effectively reducing the amounts that are used to calculate Plaintiffs' profits to 14% for domestic EST and VOD and 11% for foreign EST and VOD. 20th TV's purported justification for doing so is that EST and VOD are similar to the hard goods manufactured for DVD sales and this type of accounting treatment is fair with respect to such hard goods. But the expenses associated with DVD sales far outweigh the negligible costs associated with EST and VOD. Using this improper accounting treatment has given 20th TV a windfall and caused Plaintiffs to suffer a detriment of at least $4.2 million in Gross Receipts.

**4.   Improper Distribution Charges**

60.   In addition to crediting Plaintiffs with less than 20% of certain revenue streams using a royalty-based accounting methodology, 20th TV has also improperly charged certain expenses against its royalty-based accounting. As stated above, when 20th TV accounts to profit participants using a royalty formula it is already excluding 80% of the revenues received.  It is not therefore permitted to also deduct actual expenses associated with that distribution because the

1   80% it is holding back is designed to account for those expenses. 20th TV, however, has done

2   exactly that with respect to certain home video distribution expenses and music clearance fees

3   that should be part of the home video expenses. This improper accounting has resulted in a

4   detriment to Plaintiffs of over $1.5 million in Gross Receipts.

5          **5.     Improper Overhead and Corporate Charges**

6          61.     In addition to distribution expenses, 20th TV deducts distribution fees from all

7   revenues that it receives in connection with the distribution of the Series. These distribution fees

8   can be as high as 50% of the total revenues received and are designed to compensate 20th TV for

9   internal costs such as corporate overhead. Yet in addition to deducting these significant

10  distribution fees, 20th TV has also deducted general corporate costs including but not limited to

11  those associated with sales conventions, Fox's TV library and digital services, consumer and

12  market research, and Fox's information technology support services. By taking these additional

13  expenses on top of the direct distribution expenses and distribution fees that are already deducted,

14  Plaintiffs' have suffered a detriment of over $1.1 million in Gross Receipts.

15         62.     Moreover, with respect to production costs, 20th TV charges a 15% overhead fee

16  on all of the more than $400 million in production costs that it has incurred to date. These

17  overhead fees are designed to provide 20th TV with compensation for its internal resources that

18  are used in connection with the production of the Series. Notwithstanding that 20th TV has

19  already collected over $60 million in overhead related to the production of the Series, however,

20  20th TV has added to the Series Production Charges certain indirect and overhead costs not

21  directly attributable to the Series including but not limited to computer support, transporentals,

22  restocking fees, and refreshments. It has then charged a 15% overhead fee on the indirect

23  expenses that should have been subsumed in the overhead fee 20th TV was already taking on the

24  direct production charges for the Series. This practice of double-dipping has resulted in a

25  detriment to Plaintiffs of more than $3.1 million in Gross Receipts.

26         **6.     Insufficiently Supported Expenses**

27         63.     20th TV has a legal duty to justify all of the expenses that it deducts when

28  calculating Plaintiffs' profit participation. With respect to over $100,000 in dubbing expenses,

1  however, it indicated during the Audit that it is unable to provide any support or justification. In

2  the absence of any support justifying that these expenses were in fact incurred in connection with

3  the distribution of the Series, Plaintiffs should not have these expenses deducted from Gross

4  Receipts when calculating their profit participation.

5  **7.  Improperly Deducting Foreign Taxes**

6  64.  Through the Audit Period, 20th TV had deducted approximately $1.4 million from

7  Defined Gross Receipts as distribution expenses attributable to foreign taxes. Because Fox is able

8  to take a credit for these taxes on its United State income tax return, these are not moneys that

9  20th TV is ultimately out-of-pocket in connection with the Series, and therefore it should not

10  deduct them when calculating Plaintiffs' profit participation.

11  **8.  Failure to Report Rebates from Media Buys**

12  65.  20th TV charged the Series with nearly $900,000 in advertising, expenses and

13  accruals related to media buys in markets such as cable, interactive and radio but did not report

14  any credits in connection with these media buys. On information and belief, it is customary to

15  receive discounts, rebates and other credits based on volume purchases related to media buys. In

16  fact, 20th TV has reported rebates from vendors related to production costs, so it is even more

17  questionable that none were reported in connection with these large media buys.

18  **9.  Improperly Charging Overhead on Distribution Expenses**

19  66.  20th TV has improperly classified certain distribution expenses as production

20  charges, thereby subjecting them to a 15% overhead fee that would not have been deducted from

21  Plaintiffs' Gross Receipts if these expenses had been properly accounted. For example, 20th TV

22  charged a 15% overhead fee on the $172,205 of AMPTP dues that it paid. The 2007 Profits

23  Definition is clear that AMPTP dues are a distribution expense rather than a production cost, and

24  therefore should not be subject to an overhead fee. Through the Audit Period, Plaintiffs were

25  damaged by at least $25,830 in overcharged expenses as a result of this accounting treatment.

26  **10.  Improperly Accounting for Breakage**

27  67.  20th TV incurred tens of millions of dollars in additional production charges over

28  and above what had been budgeted for each season. During the Audit Period, FBC reimbursed

1    20th TV for some of those production overages, known as "breakage." However, instead of

2    offsetting Production Charges with these reimbursements, 20th TV accounted for these amounts in

3    the manner most favorable to itself and detrimental to Plaintiffs. Specifically, 20th TV included

4    these breakage reimbursements in Production Charges and then charged a 15% overhead fee on

5    them even though 20th TV was not truly out-of-pocket on these expenses. This overhead resulted

6    in a detriment to Plaintiffs to be proven at trial but that Plaintiffs expect to exceed $8 million.

7         **11.**    <u>**Improperly Accounting for Product Placement & Integration Revenues**</u>

8         68.    20th TV accounts for product placement and integration revenues as if they are

9    merchandising receipts so that it can apply a 40% distribution fee to those revenues when

10    calculating Plaintiffs' profits. There is nothing in the 2007 Profits Definition permitting this

11    accounting treatment. Moreover, 20th TV failed to follow through on its promise that it would

12    account for certain product integration revenues it received as an offset to Production Charges,

13    thereby reducing the amount of Production Charges for which the 15% overhead was applied.

14    Fox's improper deduction of a 40% distribution fee coupled with its failure to offset Production

15    Charges as promised resulted in a detriment to Plaintiffs of over $1.8 million in Gross Receipts.

16         **12.**    <u>**Underreported License Fees Due to Misclassification of Episodes**</u>

17         69.    20th TV produced certain episodes during one season but then broadcast those

18    episodes as part of a subsequent season. Although the FBC/20th TV network license agreement

19    provided that episodic license fees must increase for successive seasons of the Series, when 20th

20    TV engaged in this practice of holding episodes until later seasons, it only credited Plaintiffs with

21    the license fees for the season in which the episode was produced. This is despite the fact that

22    when Fox licensed those episodes to third parties, 20th TV demanded from a third party the higher

23    license fee associated with the season in which a particular episode aired. This practice resulted in

24    a detriment to Plaintiffs in an amount to be proven at trial.

25         **13.**    <u>**20th TV's Failure to Negotiate the Profits Definitions in Good Faith**</u>

26         70.    Plaintiffs' agreements entitle each of them to a good faith negotiation of their

27    profits definitions within 20th TV's customary parameters for persons of Plaintiffs' stature. With

28    respect to Reichs, 20th TV did not send its standard Profits Definition until 2007, three years after

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

COMPLAINT

her initial deal had been executed. Upon sending the 2007 Profits Definition, 20th TV did not engage in any negotiation with Reichs whatsoever, let alone a good faith negotiation. With respect to Deschanel and Boreanaz, 20th TV has never even sent them a copy of its standard Profits Definition, and has therefore not negotiated any of its terms at all. Plaintiffs are informed and believe that if 20th TV had engaged in the contractually required good faith negotiation with each Plaintiff, he or she would have received significant improvements to that definition such that his or her eventual profit participation payments would have been dramatically increased.

**14.    Improperly Charged Overhead on Unrecouped Guarantees**

71.    When calculating Reichs' profit participation payments, 20th TV charged a 15% overhead fee on more than $3 million of unrecouped guarantees and overhead because these expenses were included as Production Charges. As stated above, Reichs' 2004 Agreement entitles her to a Profits Definition that is negotiated in good faith. The fact that Plaintiffs Deschanel and Boreanaz, both of whom are also producers on the Series as is Reichs, were not accounted to in this manner is evidence that Reichs was not treated consistent with the terms of her agreements and should not be subject to the 15% overhead fee applied to these $3 million in expenses.

**15.    Failure to Consult Regarding Distribution**

72.    The 2012 Agreements provide that "[20th TV] shall accord good faith (meaningful) consultation to [Deschanel and Boreanaz] with respect to the initial domestic off-network sales plan, subject to the reasonable availability and reasonable response time of [Deschanel and Boreanaz]." 20th TV nevertheless failed to consult with Deschanel and Boreanaz about the initial domestic off-network sales plan, and if it had done so, Deschanel and Boreanaz are informed and believe that the consultation would have resulted in higher license fees to 20th TV, which would have resulted in higher profit participation payments to Deschanel and Boreanaz.

**VI.    DEFENDANTS' FRAUDULENT CONDUCT**

73.    In or around May 2009, 20th TV and FBC approached Plaintiffs and the other profit participants on *Bones* and informed them that unless each and every one of them agreed that FBC could pay 20th TV reduced episodic license fees for Seasons 5 and 6 of *Bones* relative to the amounts that FBC had previously agreed to pay, FBC would not pick up its option on the

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

COMPLAINT

1  Series, thereby preventing them from receiving the additional fixed and contingent compensation

2  that they would earn only if the Series continued. 20th TV then prepared an "Agreement and

3  Release" memorializing this, which contained signature lines for each and every profit participant

4  on the Series. Believing 20th TV's representations to be true at the time they were made, and

5  fearful that Season 5 would not be picked up unless she and all the other profit participants signed

6  this 2009 Release, Reichs executed it. It was not until years later during the Plaintiffs' joint

7  attempts to resolve the Audit Claims with 20th TV that Reichs learned that Deschanel and

8  Boreanaz had in fact not signed the 2009 Release and that 20th TV had falsely represented to

9  Reichs that producing Seasons 5 and 6 of *Bones* had been contingent upon ***all*** *Bones* profit

10  participants agreeing to the reduced license fees in the 2009 Release. Moreover, Deschanel and

11  Boreanaz learned during the Audit that even though they had refused to sign the 2009 Release

12  because the license fees Fox had proposed for Season 5 and 6 were well below fair market value,

13  20th TV still credited them with those same below-market license fees.

14      74.     In addition to these affirmative misrepresentations in connection with the 2009

15  Release, 20th TV took its bad acts one step further and simultaneously concealed additional

16  material information that, if known by Reichs, would have ensured she did not sign the 2009

17  Release. In particular, Fox suppressed the fact that immediately after obtaining Reichs' signature

18  on the 2009 Release, 20th TV intended to ***further*** harm her by amending other terms of the

19  existing FBC/20th TV network license agreement to her detriment.

20      75.     Indeed, as Plaintiffs learned during the Audit, the very same day that 20th TV

21  obtained Reichs' signature on the 2009 Release, it entered into a "sweetheart" deal with FBC to

22  amend the Nielsen ratings bonus provision in their network license agreement for *Bones*. The

23  original formula was based on how Nielsen *ranked* the Series relative to other primetime shows

24  and provided for a minimum of $100,000 per episode for each eligible episode, but the

25  amendment replaced this with a less favorable bonus structure tied purely to the Series' Nielsen

26  *ratings*. The new ratings bonus structure considered only the total number of viewers and did not

27  make any adjustments based on how well *Bones* performed relative to its competition. Under this

28  new structure, instead of owing 20th TV a minimum of $100,000 per eligible episode, FBC did

1  not have to pay any money in connection with the majority of the episodes, and in fact paid only a

2  fraction of what would have been due under the original agreement. Yet even though FBC and

3  20th TV were aware that they were devaluing the network license agreement to the detriment of

4  plaintiff Reichs and the other profit participants on the very same day that they were asking them

5  to accept reduced network license fees, Fox concealed this material fact from Plaintiffs.

6      76.     Moreover, FBC ensured it would be exceedingly difficult for 20th TV and

7  therefore the Plaintiffs to obtain these bonuses under the new structure by subjecting *Bones* to the

8  fate of perpetual migration throughout its primetime schedule. Notably, *Bones* is the only drama

9  in the history of FBC that has migrated to so many different timeslots that it has aired on each

10 weeknight during its 11-year run. Just as the day of the week kept migrating, so did its broadcast

11 time, with FBC sometimes airing it at 8 p.m. and at other times airing it at 9 p.m. In some

12 instances, such as Season 7, the weekly day and time for *Bones* were changed three times during

13 the course of a single broadcast season. This decision by FBC to constantly migrate the Series

14 likely led to it having lower viewership, which ultimately impacted the Nielsen bonuses the show

15 would earn under the new *ratings* bonus structure that FBC and 20th TV conspired to employ and

16 in fact did employ.

17     77.     Then in October 2009, at the start of Season 5 when certain "deficit

18 reimbursement" payments that were part of the original network license agreement between 20th

19 TV and FBC were due to be paid to 20th TV, the sister companies once again amended their

20 agreement, this time by eliminating entirely 20th TV's entitlement to these payments that ranged

21 from $250,000-500,000 per episode for the 84 episodes in Seasons 1 through 4 of the Series.

22 Inexplicably, as the show continued and grew more and more successful, 20th TV negotiated with

23 FBC to *forego* payments to which it was already entitled. And it did so without receiving any

24 consideration in return, resulting in a detriment to Plaintiffs of at least $10.375 million in Gross

25 Receipts, and possibly much more.

26

27

28

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 25 -

COMPLAINT

**FIRST CAUSE OF ACTION**

**<u>Breach of Contract</u>**

**(By All Plaintiffs Against Defendant 20th TV)**

78.     Plaintiffs incorporate by reference and reallege each and every allegation in paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

79.     Plaintiffs have performed all conditions, covenants, and promises required to be performed by them in accordance with the terms of their respective agreements and the 2007 Profits Definition provided by 20th TV to Reichs.

80.     All conditions required for Defendants' performance of the conditions, covenants, and promises required to be performed by them in accordance with the terms of the agreements and the 2007 Profits Definition have occurred.

81.     As detailed above, Defendants have breached the agreements and the 2007 Profits Definition by, among other things, failing to pay monies due to Plaintiffs pursuant to Fox's Television Definition of Defined Modified Adjusted Gross Receipts.

82.     Defendants have further breached the agreements and the 2007 Profits Definition by failing to provide Plaintiffs' auditor with documents necessary to allow the auditor to perform its audit of 20th TV accounts as required by the agreements.

83.     As a direct and proximate result of Defendants' breaches of the agreements and the 2007 Profits Definition, Plaintiffs have suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**<u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>**

**(By All Plaintiffs Against 20th TV)**

84.     Plaintiffs incorporate by reference and reallege each and every allegation in paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

85.     Plaintiffs have performed all conditions, covenants, and promises required to be performed by them in accordance with the terms of their respective agreements and the 2007 Profits Definition.

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

COMPLAINT

86.     All conditions required for Defendants' performance of the conditions, covenants, and promises required to be performed by them in accordance with the terms of the agreements and the 2007 Profits Definition have occurred.

87.     Defendants breached the implied covenant of good faith and fair dealing by unfairly interfering with Plaintiffs' right to receive the benefits of the their respective agreements and the 2007 Profits Definition by, among other things:

- Failing to properly allocate revenues earned from agreements in which *Bones* was licensed in packages with other Fox television series and films;

- Failing to properly allocate to *Bones* revenues earned from new media, including but not limited to those earned from Netflix and Hulu;

- Misclassifying certain revenues and expenses to the detriment of Plaintiffs; and

- Improperly accounting for home video and electronic sell-through receipts to the detriment of Plaintiffs.

88.     As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered monetary damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### Fraudulent Inducement per Cal. Civ. Code § 1572

### (By Plaintiff Reichs Against All Defendants)

89.     Plaintiffs incorporate by reference and reallege each and every allegation in paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

90.     As set forth above, in May 2009, 20th TV and FBC approached Plaintiffs and the other profit participants on *Bones* and informed them that unless each and every one of them agreed that FBC could pay 20th TV significantly reduced episodic license fees for Seasons 5 and 6 of *Bones* relative to the amounts stated in the FBC/20th TV network license agreement, FBC would not pick up its option on the Series, thereby preventing them from receiving the additional fixed and contingent compensation that they would earn only if the Series continued. 20th TV then prepared an "Agreement and Release" memorializing this, which contained signature lines for

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 27 -

COMPLAINT

1    each and every profit participant on the Series. Believing 20th TV's representations to be true at

2    the time they were made, and fearful that Season 5 would not be picked up unless she and all the

3    other profit participants signed this 2009 Release, Reichs executed it. It was not until years later

4    during the Plaintiffs' joint attempts to resolve the Audit Claims with 20th TV that Reichs learned

5    that Deschanel and Boreanaz had in fact not entered into the 2009 Release and 20th TV had

6    falsely represented to Reichs that producing Seasons 5 and 6 of *Bones* had been contingent upon

7    *all Bones* profit participants agreeing to the reduced license fees in the 2009 Release.

8         91.    Defendants knew their representations to Reichs were false at the time they were

9    made, *i.e.* that Defendants would produce and broadcast Season 5 of *Bones* regardless of whether

10   all profit participants signed the 2009 Release, which is in fact what occurred. Defendants

11   intentionally made these false representations to Reichs to induce her to enter into the 2009

12   Release.

13        92.    Plaintiff Reichs actually and justifiably relied on Defendants' false material

14   misrepresentations and, consequently, agreed to enter into the 2009 Release because Fox

15   threatened to cancel *Bones* if she did not acquiesce, thereby stripping her of other fixed and

16   contingent compensation that she would have otherwise been due under the 2004 Reichs

17   Agreement and the 2007 Profits Definition.

18                              **FOURTH CAUSE OF ACTION**

19                    **Fraudulent Concealment per Cal. Civ. Code § 1572**

20                    **(By Plaintiff Reichs Against All Defendants)**

21        93.    Plaintiffs incorporate by reference and reallege each and every allegation in

22   paragraph 1 through 77 and paragraph 90 of this Complaint, inclusive, as though fully set forth

23   herein.

24        94.    At the time Fox entered into the 2009 Release, FBC and 20th TV concealed their

25   intent to further amend the network license agreement between 20th TV and sister-company FBC

26   to the detriment of Plaintiffs. The very same day that 20th TV induced Reichs to enter into the

27   2009 Release, FBC and 20th TV amended their network license agreement to change the Nielsen

28   bonus structure from a rankings structure that was more favorable to profit participants such as

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 28 -

1   Reichs to a ratings structure that was less favorable to Reichs. In addition, Fox concealed the

2   material fact that it would be exceedingly difficult to obtain these Nielsen ratings bonuses under

3   the new structure because it intended to broadcast *Bones* at different time periods on all five

4   weekdays thus making it more difficult for viewers to locate the show and thus to achieve

5   sufficient Nielsen ratings to achieve bonuses.

6       95.     The facts concealed by Defendants were material and Fox concealed such facts

7   with the intent to induce Reichs to enter into the 2009 Release.

8       96.     At the time Fox concealed these material facts, and at the time Reichs took the

9   actions herein alleged, Reichs was ignorant of the facts concealed, and in reasonable reliance on

10  these representations, Reichs was induced to and did enter into the 2009 Release. Had Reichs

11  know the actual facts, and had Defendants not concealed material facts, she would not have taken

12  such actions. Reichs' reliance on Fox's concealment was justified because Reichs could not, in

13  the exercise of reasonable diligence, have discovered the actual facts.

14      97.     As a direct and proximate result of the fraudulent concealment by Fox, Reichs has

15  been damaged in an amount to be proven at trial. When Reichs has ascertained the full value of

16  her damages, she will seek leave of the Court to amend this Complaint accordingly.

17      98.     Reichs is informed and believes and thereon alleges that Defendants, in doing the

18  things alleged herein, acted willfully, maliciously, oppressively and with full knowledge of the

19  adverse effects of their actions on Reichs, and with willful and deliberate disregard to the

20  consequences to Reichs, such as to constitute oppression, fraud, and/or malice. As a direct result

21  of their fraudulent, willful and malicious conduct, Reichs is entitled to exemplary and punitive

22  damages pursuant to Civil Code § 3294 in an amount to be determined by the Court at trial.

23                          **FIFTH CAUSE OF ACTION**

24                          <u>**Inducing Breach of Contract**</u>

25          **(By All Plaintiffs Against 21st Fox, FEG, FBC, and Does 1-20)**

26      99.     Plaintiffs incorporate by reference and reallege each and every allegation in

27  paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

28

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 29 -

COMPLAINT

100.    20th TV and one or more Plaintiffs were parties to the 2004 Reichs Agreement and 2012 Actor Agreements, which are valid and binding contracts.

101.    20th TV and one or more Plaintiffs were parties to the 2007 Profits Definition, portions of which are valid and binding contracts.

102.    At all relevant times, defendants 21st Fox, FEG, FBC, and Does 1-20 were aware of the 2004 Reichs Agreement, the 2007 Profits definition, and the 2012 Actor Agreements and their terms.

103.    As set forth above, 20th TV breached the 2004 Reichs Agreement, the 2012 Actor Agreements, and the binding portions of the 2007 Profits Definition, including their implied covenants of good faith and fair dealing, in various ways.

104.    Defendants 21st Fox, FEG, FBC, and Does 1-20 intended to influence, direct, or cause 20th TV to commit the above-described breaches because these defendants knew they would benefit from such breaches. Among other benefits, Defendants 21st Fox, FEG, FBC, and Does 1-20 benefited by paying lower license fees for the rights to broadcast the Series, thus decreasing costs and increasing profits for FBC and ultimately for 21st Fox as a result of denying Plaintiffs their proper share of revenues from the Series.

105.    Through the conduct described above, Defendants 21st Fox, FEG, FBC, and Does 1-20 caused 20th TV to breach the 2004 Reichs Agreement, the 2012 Actor Agreements, and the binding portions of the 2007 Profits Definition as set forth above. But for the influence or direction of these defendants, 20th TV would have had no incentive, basis, and/or ability to collude with these defendants; rather, absent such collusion, the primary goal of 20th TV would have been to maximize its revenues and profits from the Series and obtain the highest-possible license fees for the Series.

106.    Through their conduct, Defendants 21st Fox, FEG, FBC, and Does 1-20 caused damage to Plaintiffs by inducing acts that reduced 20th TV's Gross Receipts and ultimately Plaintiffs' profit participation in connection with the Series, in an amount to be proven at trial.

107.    The conduct of Defendants 21st Fox, FEG, FBC, and Does 1-20 was a substantial factor in causing Plaintiffs' harm.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
ATTORNEYS AT LAW

- 30 -

1    108.   In engaging in the misconduct alleged herein, Defendants 21ˢᵗ Fox, FEG, FBC, and

2    Does 1-20 have acted with malice, oppression, or fraud, and in willful disregard of Plaintiffs'

3    rights and interests, thus entitling Plaintiffs to an award of punitive damages in an amount

4    appropriate to punish or make an example of Defendants 21ˢᵗ Fox, FEG, FBC, and Does 1-20,

5    pursuant to Civil Code § 3294.

6                              **SIXTH CAUSE OF ACTION**

7                      **Intentional Interference with Contract**

8           **(By All Plaintiffs Against 21ˢᵗ Fox, FEG, FBC, and Does 1-20)**

9    109.   Plaintiffs incorporate by reference and reallege each and every allegation in

10   paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

11   110.   20ᵗʰ TV and one or more Plaintiffs were parties to the 2004 Reichs Agreement and

12   2012 Actor Agreements, which are valid and binding contracts.

13   111.   20ᵗʰ TV and one or more Plaintiffs were parties to the 2007 Profits Definition,

14   portions of which are valid and binding contracts.

15   112.   At all relevant times, defendants 21ˢᵗ Fox, FEG, FBC, and Does 1-20 were aware

16   of the 2004 Reichs Agreement, the 2007 Profits Definition, and the 2012 Actor Agreements and

17   their terms.

18   113.   Defendants 21ˢᵗ Fox, FEG, FBC, and Does 1-20 collaborated and/or participated

19   with 20ᵗʰ TV in the misconduct described above because these defendants knew they would

20   benefit from such misconduct. Among other benefits, Defendants 21ˢᵗ Fox and FBC benefited by

21   paying lower license fees for the rights to broadcast the Series, thus decreasing costs and

22   increasing profits for FBC and ultimately for 21ˢᵗ Fox as a result of denying Plaintiffs their proper

23   share of revenues from the Series.

24   114.   Through the conduct described above, Defendants 21ˢᵗ Fox, FEG, FBC, and Does

25   1-20 intended to disrupt or prevent the performance by 20ᵗʰ TV of the 2004 Reichs Agreement,

26   the 2012 Actor Agreements, and the binding portions of the 2007 Profits Definition as set forth

27   above, and did disrupt or prevent that performance.

28

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

COMPLAINT

115.    Through their conduct, Defendants 21st Fox, FEG, FBC, and Does 1-20 caused damaged to Plaintiffs by collaborating and/or participating in acts that reduced 20th TV's Gross Receipts and ultimately Plaintiffs' profit participation in connection with the Series, in an amount to be proven at trial.

116.    The conduct of Defendants 21st Fox, FEG, FBC, and Does 1-20 was a substantial factor in causing Plaintiffs' harm.

117.    In engaging in the misconduct alleged herein, Defendants 21st Fox, FEG, FBC, and Does 1-20 have acted with malice, oppression, or fraud, and in willful disregard of Plaintiffs' rights and interests, thus entitling Plaintiffs to an award of punitive damages in an amount appropriate to punish or make an example of Defendants 21st Fox, FEG, FBC, and Does 1-20, pursuant to Civil Code § 3294.

### SEVENTH CAUSE OF ACTION

#### Accounting

#### (By All Plaintiffs Against All Defendants)

118.    Plaintiffs incorporate by reference and reallege each and every allegation in paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

119.    A relationship exists between Plaintiffs on the one hand and Defendants on the other hand for which an accounting of Defendants' books and records is appropriate.

120.    Plaintiffs are informed and believe and thereon allege that Fox has derived and received significant income, profit and other benefits from the aforementioned improper and fraudulent accounting practices. Plaintiffs are entitled to a full and accurate accounting of all proceeds generated from, by or in connection with the distribution, licensing and/or other exploitation of the Series and its components as well as the fees and expenses incurred by 20th TV in connection with the production, distribution and exploitation of the Series and its components.

121.    The amount of money due to Plaintiffs is unknown and cannot be reasonably ascertained without a full and complete accounting of Defendants' books and records. Defendants have failed and refused to supply the information and documents necessary to complete that audit. Due to Plaintiffs' exclusion from exercising any control or management over the distribution,

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

1  licensing and other exploitation of the Series and the collection, reporting and accounting of

2  revenues generated from such exploitation and the complex nature of the accounts of such

3  exploitation, it is impractical to ascertain a fixed sum that is currently owed to Plaintiffs.

4  Accordingly, the full amount due and owing to Plaintiffs can only be determined pursuant to a

5  full and accurate accounting of all proceeds and expenses generated in connection with the

6  production, distribution, licensing and other exploitation of the Series that Plaintiffs seek herein.

7        122.    Plaintiffs also pray for the Court to impose a constructive trust on all moneys

8  wrongfully withheld by Defendants, in accordance with common law and California Civil Code

9  §§ 2223-2224, for the benefit of Plaintiffs and Plaintiffs' interests.

10                         **EIGHTH CAUSE OF ACTION**

11                            **<u>Declaratory Relief</u>**

12                     **(By All Plaintiffs Against 20th TV)**

13       123.    Plaintiffs incorporate by reference and reallege each and every allegation in

14  paragraph 1 through 77 of this Complaint, inclusive, as though fully set forth herein.

15       124.    An actual controversy has arisen and now exists between Reichs and 20th TV

16  regarding the enforceability of the 2009 Release. Reichs is informed and believes that 20th TV

17  contends that Reichs is bound by the terms of the 2009 Release, and that Reichs is not entitled to

18  raise claims associated with the improperly reduced network license fees reported to her in

19  connection with Season 5 and 6 of the Series. Reichs, on the other hand, contends that she was

20  fraudulently induced to enter into the 2009 Release, therefore rendering it null, void, and

21  unenforceable. These issues have been raised with 20th TV who disagrees and thus the parties

22  have a dispute concerning their respective rights and obligations, if any, under the 2009 Release.

23       125.    Plaintiffs are further informed and believe that an actual controversy has arisen

24  and now exists between Plaintiffs and 20th TV regarding the allocation of certain license fees that

25  are used to determine Plaintiffs' profit participation under the agreements. Plaintiffs are informed

26  and believe that 20th TV is misallocating and/or underreporting the revenues for the Series in

27  many of self-dealing domestic and international agreements governing the distribution, licensing,

28  or other exploitation of *Bones*. Plaintiffs, on the other hand, contend that pursuant to their

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

COMPLAINT

1    agreements, 20th TV must allocate and report revenues consistent with the monetary terms of the

2    licenses 20th TV enters into with third parties for comparable programs.

3    126.    Plaintiffs are further informed and believe that an actual controversy has arisen

4    and exists between Plaintiffs and 20th TV regarding their respective rights and obligations under

5    the parties' agreements with respect to the interpretation of provisions of the parties' agreement

6    related to the calculation, reporting, and payment of Plaintiffs profit interests in the Series.

7    Plaintiffs are informed and believe that 20th TV contends otherwise.

8    127.    Therefore, Plaintiffs request that this Court make and enter its binding judicial

9    declarations in accordance with Plaintiffs' contentions set forth above. These declarations are

10   both necessary and proper at this time under the circumstances in that, among other things, the

11   interests of judicial economy and substantial justice will be served thereby.

[Remainder of page intentionally left blank]

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 34 -

COMPLAINT

1

**PRAYER FOR RELIEF**

2    WHEREFORE, Plaintiffs pray for judgment against the Defendants and each of them as

3  follows:

4    1.    For monetary damages in an amount to be proven at trial;

5    2.    For a judicial declaration of the parties' contractual rights and duties in connection

6  with *Bones*, their agreements concerning *Bones*, the 2007 Profits Definition, and the 2009 Release

7  alleged herein;

8    3.    For an accounting under Court supervision of the profits of the Series and the

9  amounts due and payable to Plaintiffs in accordance with the agreements alleged herein;

10    4.    For the Court to impose a constructive trust on the moneys wrongfully withheld;

11    5.    For rescission of the 2009 Release;

12    6.    For an award of punitive damages in an amount to be proven at trial;

13    7.    That Plaintiffs be awarded all pre-judgment interest allowable by law;

14    8.    That Plaintiffs be awarded their outside attorneys' fees and costs; and

15    9.    For such further relief as the Court may deem just and proper.

16

17  Los Angeles, California

18  Dated: November 30, 2015                **KASOWITZ, BENSON, TORRES &**
                                            **FRIEDMAN, LLP**
19

20                                          By: _____

21                                          John V. Berlinski, Esq.
                                            Mansi K. Shah, Esq.
22                                          Candace Frazier, Esq.
                                            2029 Century Park East, Suite 750
23                                          Los Angeles, California 90068
                                            Telephone: (424) 288-7900
24
                                            *Attorneys for Plaintiffs*
25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs Temperance Brennan, L.P. f/s/o Kathleen Reichs, Snooker Doodle Productions,

3

Inc. f/s/o Emily Deschanel, and Bertha Blue, Inc. f/s/o David Boreanaz hereby demand a trial by

4

jury in this matter.

5

6

Los Angeles, California

7

Dated: November 30, 2015                      **KASOWITZ, BENSON, TORRES & FRIEDMAN, LLP**

8

9

By: _____

10

John V. Berlinski, Esq.
Mansi K. Shah, Esq.

11

Candace Frazier, Esq.
2029 Century Park East, Suite 750

12

Los Angeles, California 90068
Telephone: (424) 288-7900

13

*Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KASOWITZ, BENSON,
TORRES & FRIEDMAN
LLP
ATTORNEYS AT LAW

- 36 -

COMPLAINT

# EXHIBIT 2

27th Annual Entertainment Law Issue

# LosAngelesLawyer

May 2011 / $4



**EARN MCLE CREDIT**

Inverse Ratio Rule
in Copyright
page 29

**PLUS**

Studio
Self-Dealing
page 36

Net Neutrality
page 9

Joint-Work
Copyrights
page 14

Rights of Publicity
in Video Games
page 17

# STAR POWER

Los Angeles lawyers
Bradford S. Cohen and
Kyle R. Neal offer advice
on structuring charitable
activities by entertainers
page 22

by Roman M. Silberfeld and Bernice Conn



# The RED and the BLACK

## Studios have suffered recent court setbacks in their efforts to defend Hollywood accounting

HOLLYWOOD CONTRACTS ARE complicated and convoluted, especially when it comes to profit participation provisions. Thanks to a trio of recent cases that exposed the arcane world of Hollywood deal making and studio accounting, profit participation provisions are once again in the spotlight's glare. The jury verdicts in *Celador International, Ltd. v. The Walt Disney Company*,[1] *Don Johnson Productions, Inc. v. Rysher Entertainment, Inc.*,[2] and *Alan Ladd, Jr. v. Warner Bros. Entertainment, Inc.*,[3] dealt Hollywood's media conglomerates unanticipated and unwelcome setbacks. In each case, the plaintiff successfully sued to enforce a contractual profit participation right and challenged some of Hollywood's most controversial accounting and financial practices.

It often is the case that the contracts between studios or networks and the parties who provide intellectual property to them, such as producers, writers, directors and actors, include provisions under which the profits derived from distribution of the completed content are to be shared among the parties to the contract. However, as a result of the opaque accounting methods used in Hollywood—often referred to as Hollywood accounting[4]—profit participants typically do not receive any share of the promised profits, even for successful projects. In fact, the accountings generated by studios and networks typically reflect that popular, highly successful films and long-running television series produce financial returns for their owners that would be considered ruinous in any

other industry. Challenges to these improbable accountings, however, have done little to effect any change in the way studios and networks do business.

Hollywood contracts generally are as incoherent as the tax code. Because of the immense inequality in bargaining power that exists between today's media conglomerates (which own the major studios and networks) and talent and small production companies, studios and networks usually dictate contract

**Roman M. Silberfeld and Bernice Conn are partners in the Los Angeles office of Robins, Kaplan, Miller & Ciresi, L.L.P., practicing complex business litigation. They represent Celador International, Ltd., and tried *Celador International, Ltd. v. The Walt Disney Company*.**

KEN CORRAL



terms. As a result, contracts typically are a mélange of vague terms, conflicting references, and provisions that have been copied from other contracts, resulting in documents that are needlessly long, disjointed, and unintelligible, and that require years of costly litigation to interpret. Only experienced lawyers whose clients have tremendous leverage in the entertainment community are able to negotiate provisions that better protect their clients' profit participation rights.

The accountings that studios and networks provide to profit participants often are confusing, vague, and difficult to reconcile. Challenging studio accountings either through audits or litigation is time-consuming and expensive and may be beyond the financial means of the profit participant. On occasion, however, lawsuits are prosecuted by profit participants who have the means and clout to do so.

Typically, these lawsuits include allegations that, to some degree or another, media conglomerates are vertically integrated. Vertical integration allows affiliated entities to participate in self-dealing, which precludes profit participants from sharing in a project's success. Vertical integration is a phenomenon resulting from the 1995 repeal[5] of the Network Financial Interest and Syndication Rules, popularly known as the Fin-Syn rules.[6] The Fin-Syn rules were an attempt to prevent studios and networks from consolidating their control over the ownership, production, broadcast, distribution, syndication, licensing, and merchandising of the properties they acquired.

After the repeal of the Fin-Syn rules, large media conglomerates were formed, through which networks and studios now control the creative process from development through distribution. Vertical integration also allows conglomerates to engage in accounting practices by which a property's revenues may be manipulated to ensure that the property never generates profits that must be shared outside the conglomerate. For example, a studio or network that has contractual profit participation obligations may license a motion picture project or television show to its affiliated cable network at a below-market license fee so that the cable network receives most of the revenue (which it is not required to share with profit participants), thus reducing or eliminating entirely any distribution revenue to be shared by the studio or network with the profit participant.

Historically, Hollywood has chosen to settle profit participation disputes rather than divulge to the public (or, more importantly, to a jury) the inner workings of the conglomerates that control the media.[7] But in *Celador*, *Johnson*, and *Ladd*, the studios and networks abandoned this strategy and instead attempted to justify to the courts and to juries the sweetheart deals and self-dealing that goes on behind the success of popular films and television shows. Their efforts failed.

**Recent Cases**

In 1998, a British company, Celador International, Ltd., developed a unique concept for prime time television: a game show in which the contestants, who played for ever-increasing amounts of money, could ask for help. The show premiered in the United Kingdom and was an overnight sensation. Soon, the show was being licensed worldwide, and ABC aggressively negotiated to obtain the North American rights to what became *Who Wants to Be a Millionaire?*

The contract that Celador signed with ABC and its affiliate Buena Vista Television provided that Celador was entitled to 50 percent of the "defined contingent compensation" derived by ABC and Buena Vista Television from the exploitation of any pilot and series produced under the contract.[8]

*Who Wants to Be a Millionaire?* debuted on ABC in August 1999 and, as in Europe, was a runaway success. The show was credited with taking ABC from fourth to first in network rankings and for reigniting the prime-time game show and reality show genres. Yet, after three years on ABC and years in syndication, and after generating hundreds of millions of dollars in revenue for ABC and Buena Vista Television, the show—according to accountings given to Celador—was running at a loss. At the time of trial, 11 years after the show's debut, Celador had not received any profit participation payments other than the initial, non-recoupable advances against contingent compensation that ABC and Buena Vista Television had agreed to pay when the contract was signed.

Celador sued the Walt Disney Company, ABC, Buena Vista Television, and Valleycrest Productions, Ltd. (collectively Disney) to collect 50 percent of the profits that would have been generated if a fair-market license fee had been paid for the network broadcast of the long-running television game show. Celador also challenged the expense deductions taken against the show's merchandising revenue. On Celador's claims for breach of contract and breach of the implied covenant of good faith and fair dealing, the jury awarded damages of over $269 million.[9] In September 2010, an additional $50 million in prejudgment interest was assessed, for a total judgment of $319 million.

The television series *Nash Bridges* aired on CBS from 1996 through 2001. It was a highly rated series and entered syndication in 1999. Actor Don Johnson co-conceived, starred in, and produced the series pursuant to an agreement with Rysher Entertainment, Inc. Due to the success of his earlier series, *Miami Vice*, Johnson enjoyed tremendous leverage in the entertainment industry at the time he negotiated his contract with Rysher. As a result, he was able to negotiate a deal with Rysher by which his production company would acquire a 50 percent ownership of the series' copyright if it was bought for 66 episodes and became eligible for syndication.

Notwithstanding the success of the series, and after delivering 122 completed episodes of *Nash Bridges* for distribution, Don Johnson Productions had been paid nothing as co-owner of the copyright. Although the network accountings for the series reflected that *Nash Bridges* had generated hundreds of millions in gross revenues, according to the network it allegedly still was running at a deficit of about $150 million in 2009.

Johnson sued to affirm his 50 percent co-ownership of the copyright in the *Nash Bridges* television series and his right to 50 percent of the show's profits.[10] The jury found in his favor and awarded him $23.2 million in damages owed to date. The show continues to run in syndication. In September 2010, the trial judge awarded Johnson an additional $28 million in prejudgment interest, bringing the total judgment to $51.2 million.

In a suit filed against Warner Bros., Alan Ladd Jr. and several production companies challenged the industry's practice of "straight-lining," by which studios license film packages to broadcasters or cable companies, valuing every feature film in the package the same, regardless of the value of the film to the broadcaster or channel.[11] The suit followed an audit that Ladd initiated when he learned that a coinvestor in the film *Blade Runner* was receiving payments from Warner Bros., even though Warner Bros. had told Ladd the movie was unprofitable.

Ladd sued to collect his share of licensing fees that would have been generated if his films had been properly valued. Evidence at trial disclosed that, although Warner Bros. assigned each movie in a licensing package a grade of A, B, or C, the studio allocated the same proportion of the license fee to each title in the package, irrespective of the film's letter grade.[12] The jury found that during the four years preceding the filing of the suit, Warner Bros. had thereby undervalued Ladd's films, which were all rated either A or B. Based on Ladd's contracts, the jury concluded that Ladd should have received an additional $3,190,625 in profit participation payments.

On May 25, 2010, the California Court of Appeal affirmed the jury's verdict.[13] In doing so, the appellate court rejected as meritless the attempts of Warner Bros. to justify straight-lining, which it characterized as "the

buyer made me do it" defense.[14] The court also rejected the argument of Warner Bros. that because straight-lining was a common industry practice, it could not constitute a breach of the implied covenant of good faith and fair dealing. The court held that "even if straight-lining were a common practice, it would not absolve Warner of its duty to Ladd, as a profit participant, to fairly allocate fees derived from licensing packages."[15]

**Contract Language**

The outcome of these disputes was attributable, in part, to the cryptic and confusing language used in studio and network contracts. Indeed, these days, the word "profit" rarely appears in profit participation agreements. Instead, the contracts employ terms such as "contingent compensation," "defined contingent compensation," "adjusted defined receipts," or some other similar phrase.[16] The amounts owed pursuant to these vague terms are calculated by equally obscure accounting methods, with a typical result being that hugely successful shows inexplicably generate large deficits year after year, leaving profit participants with no profits. Vertically integrated media conglomerates own most of the entities involved in the production, distribution, and merchandising of properties, so it is not difficult for them to manipulate the accountings to ensure that no contingent compensation ever will be shared with profit participants.

For example, in the *Celador* trial, an incomplete, two-page exhibit describes "defined contingent compensation" in the contract among Celador, ABC, and Buena Vista Television. The description states, in part:

For purposes of Defined Contingent Compensation, Participant agrees that words and phrases used in connection with Participant's contingent participation, if any, are…not intended to correspond to any conventional understanding or dictionary definition of such words and terms, whether used in the entertainment industry or any other industry or business and are not intended to correspond in any way to generally accepted accounting principles ("GAAP"), or any other mean-



ings thereof, which may be associated with the practices of accounting or auditing.[17]

So, according to the contract, the words used to describe Celador's right to receive "defined contingent compensation" were not to be understood to mean what they generally do mean, either in the ordinary sense or in a financial context. What then was "defined contingent compensation" supposed to mean? According to Disney, it was not supposed to mean profit.

Disney filed a motion in limine to preclude Celador from using the term "profits" at trial and from contending that it was entitled to share in Disney's "profits." Disney argued that "profit" was a financial term that had a specific meaning and that because Disney did not calculate Celador's share of "defined contingent contribution" according to generally accepted accounting principles, Celador's right to share in "defined contingent compensation" could not be referred to as a right to share in profits. Disney also contended that the use of the word "profits" by Celador at trial would be inaccurate, prejudicial, confusing, and misleading to the jury.[18] The motion was denied after Celador presented evidence that Disney's current and former employees, as well as its own expert, com-

monly referred to "defined contingent compensation" as profits.[19]

Understandably, much of the evidence presented at trial was aimed at discerning the intentions of the parties at the time of contracting, understanding what "defined contingent compensation" encompassed, and determining how that compensation was supposed to be calculated. Ultimately, it was left up to the jury to interpret the contract, and the outcome did not favor Disney.[20]

Similarly, in *Johnson,* the contract provided that Don Johnson Productions was entitled to 50 percent of "all gross receipts," which was defined as receipts to Rysher and its affiliates after deductions for distribution fees, distribution costs, direct production costs, and interest "on the net deficited portion of the direct production costs." Johnson alleged that this contract provision was designed to make it impossible for a show ever to turn a net profit.

The confusion created by the use of uncertain terminology and vague definitions in profit participation contracts is compounded by the obscurity of the accounting methods used to calculate what is owed to a profit participant. As one industry insider has stated, Hollywood accounting can generate different results "depending on who's asking," and accounting methods differ depending on the result sought.[21] For example, one method may be used to calculate profits when accounting to profit participants and another when accounting for tax purposes. Not surprisingly, when calculating a project's profits for the purpose of paying profit participants, the goal often is to report reduced profits or no profits whatsoever.[22]

Profit participants also typically allege that in addition to improper accounting methods, the television distribution deals struck by the studios and networks are the result of self-dealing and sweetheart deals between affiliated entities. These deals often involve preferential and greatly diminished license fees being charged for the broadcast and syndication of the acquired properties—thus reducing, if not eliminating altogether, the profits to be shared with profit participants. The deals also may involve redistributing contract rights among affiliated entities,

thus diverting revenue from the profit participation calculations. The evidence presented at the *Celador* trial is illustrative of the type of intracompany dealings that can deprive a profit participant from sharing in a project's success.

In the 1999 contract with Celador, ABC and Buena Vista Television jointly acquired all rights to *Who Wants to Be a Millionaire?* The two acquired the rights to produce, broadcast, and syndicate the show throughout North America. Yet, shortly after the contract was signed, ABC, Buena Vista, and a wholly owned production company called Valleycrest Productions, Ltd., engaged in a series of partially documented, unsigned, or allegedly oral assignments among themselves that were not disclosed to Celador. Through these assignments, ABC and Buena Vista Television supposedly transferred all the contract rights they acquired from Celador to a third-party affiliate, either Valleycrest Productions or another affiliate, Buena Vista Productions.

After that initial transfer, further assignments allegedly occurred among these affiliates, resulting in a perpetual network license being issued back to ABC—even though ABC originally had acquired the right to broadcast the series on the network through its contract with Celador. The network license supposedly issued to ABC by one of these affiliates provided that the fee paid by ABC to Buena Vista Television for the broadcast rights to *Who Wants to Be a Millionaire?* always would be equal to Buena Vista Television's costs of producing the show. Disney also contended that "defined contingent compensation," as used in the contract, only referred to Buena Vista Television's revenues and not ABC's.

All this maneuvering deprived Celador of its share of the immense revenue that the show generated. According to Disney's accountings, although the show has been on the air continuously in the United States since 1999 and has generated hundreds of millions of dollars of revenue for ABC and Buena Vista Television, *Who Wants to Be a Millionaire?* has produced $70 million in losses, continues to go deeper and deeper into the red with each episode and, so far, no "defined contingent compensation" is owed to Celador.[23]

The *Celador* and *Johnson* verdicts make clear that juries find it difficult to believe that long-running, successful television shows generate nothing but losses for their owners. The studios' traditional unwillingness to explain their accounting methods, and the costly, lengthy, difficult, and frustrating process of auditing participation statements, further escalates the general skepticism surrounding studio and network accountings.

Frequently, audits create more questions than they answer.

There are exceptional cases in which lawyers negotiate language that anticipates and protects against these types of studio and network maneuvers. As an example, the contract between Alan Alda and Twentieth Century Fox contained the following provision: "If and to the extent Fox makes agreements in respect of exploitation of [M*A*S*H*] with any affiliated entity which is a so-called 'end user' such as, by way of example only, [Fox Broadcasting Company] or the Fox television stations, the income of such end user shall not be deemed gross receipts hereunder, but Fox shall establish fair, just and equitable market rates, arms-length prices in such dealings, which shall be created on a reasonable and empirically justifiable basis."[24]

In response to the vertical integration claims, some studios and networks include contract provisions that characterize transactions with affiliates as presumptively fair. For example, a Disney provision allows Disney affiliates to self-deal, requires the owner of the property being sold to prove that a specific deal is unfair, and, if the owner succeeds in doing so, limits the owner's damages. The provision further reads:

In addition, Owner acknowledges and agrees that any agreement or other arrangement by ABC/BVT with an Affiliate or Related Party regarding the Exploitation Rights shall be conclusively presumed to be fair, reasonable and unobjectionable unless Owner shall establish that such agreement or other arrangement is on non-unique financial terms which, taken as a whole, are materially less favorable economically to ABC/BVT than the terms of Similar Transactions generally entered into by ABC/BVT with Affiliates and Related Parties....Owner further agrees that if there is a final, non-appealable determination that ABC/BVT has entered into a Less Favorable Arrangement with an Affiliated or Related party, Owner's sole and exclusive remedy shall be the right to receive an adjusted accounting statement, including any additional payments that may be required.[25]

If the verdicts in the recent cases are any gauge of the public's perception of Hollywood deal making, studios should be wary of urging the legitimacy of such contract provisions on courts or juries.

Ultimately, however, while the verdicts in the *Celador, Johnson,* and *Ladd* cases are encouraging indicators that studios are not invulnerable, the unfortunate reality is that it is unlikely that a wave of profit partici-

pation cases will be heading for the courts. In recent years, studios and networks have required arbitration clauses in most of their contracts in recognition of the potential liability to which they are exposed if cases like these do make it to trial. It may be that, as with clauses deeming self-dealing to be presumptively fair, the arbitration clauses in these contracts are susceptible to attack given the disparity in power between the negotiating parties, but only time will tell. Since both the *Celador* and *Johnson* cases appear headed for the appellate courts, today's media conglomerates may find themselves bound in the future by standards of fairness and equity imposed by the courts on the entertainment industry. Perhaps one day, successful films and television shows actually will produce a profit. ■

---

[1] Celador Int'l, Ltd. v. The Walt Disney Co., No. CV04-3541 (Nov. 23, 2004), 347 F. Supp. 2d 846 (C.D. Cal. 2004).

[2] Don Johnson Prods., Inc. v. Rysher Entm't, Inc., No. BC407796 (L.A. Super. Ct. Feb. 17, 2009).

[3] Ladd v. Warner Bros. Entm't, Inc., 184 Cal. App. 4th 1298 (2010).

[4] *See, e.g.,* http://www.en.wikipedia.org/wiki/Hollywood_accounting.

[5] 60 Fed. Reg. 48,907.

[6] 47 C.F.R. §73.658(j) (1970).

[7] *See, e.g.,* Pierce O'Donnell, Fatal Subtraction (1992) (Paramount settled with Art Buchwald for undisclosed terms.).

[8] Celador Int'l, Ltd. v. The Walt Disney Co., No. CV04-3541 (Nov. 23, 2004), Trial Exhibit 1A, ¶3(B)(1).

[9] The jury awarded Celador $260,238,024 on its network license fee claim and $9,193,774 on its merchandising claim.

[10] Paramount took over the management of Rysher Entertainment in 1999.

[11] Ladd v. Warner Bros. Entm't, Inc., 184 Cal. App. 4th 1298, 1302 (2010).

[12] *Id.* at 1307.

[13] *Id.* at 1298.

[14] *Id.* at 1308.

[15] *Id.* Industry custom and practice is one of the primary defenses asserted by studios and networks in profit participation cases. As the *Ladd* court obliquely observed, however, just because studios and networks follow certain practices does not make those practices legal.

[16] *See, e.g.,* Celador Int'l, Ltd. v. The Walt Disney Co., No. CV04-3541 (Nov. 23, 2004), Trial Exhibit 1A; Don Johnson Prods., Inc. v. Rysher Entm't, Inc., No. BC407796 (L.A. Super. Ct. Feb. 17, 2009), Complaint at 8.

[17] Celador Int'l, No. CV04-3541, Trial Exhibit 1A, B at 2.

[18] *Id.,* Docket #366 at 2-3.

[19] *Id.,* Docket #421.

[20] *Id.,* Special Verdict Form No. 2.

[21] Schuyler M. Moore, The Biz: The Basic Business, Legal and Financial Aspects of the Film Industry 123 (3d ed. 2007).

[22] *Id.* at 121, 125.

[23] Celador did receive approximately $5 million in mandated, nonrecoupable advances against contingent compensation that never materialized.

[24] *See* Stanton L. Stein & Marcia J. Harris, *Vertically Challenged,* Los Angeles Lawyer, May 2003, at 30.

[25] Celador Int'l, No. CV04-3541, Trial Exhibit No. 33.

# EXHIBIT 3

Case: 1:16-cv-08303 Document #: 183-1 Filed: 08/27/18 Page 50 of 207 PageID #:2122



## THE Hollywood REPORTER

TV Reviews    Live Feed    Fall TV    Premiere Dates    Scorecard    Emmys 2018



ALL EYES ON EMPIRE

# 'Empire's' "Batshit Crazy" Behind-the-Scenes Drama: On the Set of TV's Hottest Show

by Lacey Rose
September 16, 2015, 7:00am PDT

 



It's TV's soap opera within a soap opera, a show so big even Lucious Lyon couldn't dream it up, with an A-list guest-star roster (Chris Rock as ... a cannibal?), hints of a tour, a spinoff and Lee Daniels' defense of Terrence Howard: "He ain't done nothing different than Marlon Brando or Sean Penn."

*This story first appeared in the Sept. 25 issue of The Hollywood Reporter magazine. To receive the magazine, click here to subscribe.*

A dozen *Empire* writers are perched around a cluttered conference table in Beverly Hills when one of the series' youngest voices clears her throat. "I think I have something," she says, tapping her cotton-candy-pink nails nervously against the table. "It's kinda crazy ... "

"Oh, we *like* crazy," says co-creator **Danny Strong**, coaxing her along.

HOLLYWOOD'S **100** *FAVORITE* TV SHOWS

See who's on the List

Her male hairdresser, she explains, had gone out one evening with his best girl friend and her boyfriend, and at the end of the night the boyfriend took the hairdresser aside and said, "You know, if you wanted to, you could suck my dick. I'm not gay or anything, but you know ... it's cool."

Before she can finish, the room — a mix of black, white, Latino, gay, straight, seasoned, green and the formerly incarcerated — is howling. "I'm scandalized," one of the more established writers shrieks in faux horror, when another cuts him off: "No, this is f—ing good." For the next 15 minutes, they boisterously debate what constitutes cheating and whether this little tidbit is juicy enough to be repurposed as a storyline for season two.



**'Empire': Exclusive Portraits of the Cast (Photos)**

📷 VIEW SLIDESHOW

Welcome to the *Empire* writers room, which is every bit as provocative, unfiltered and refreshingly diverse as the series

itself. When the hip-hop drama starring Oscar nominees
**Terrence Howard** and **Taraji P. Henson** as pigheaded music
mogul Lucious Lyon and his fresh-out-of-prison ex-wife,
Cookie, premiered in January on Fox, it blew up the decades-
old mold of primetime programming — demonstrating that a
show by black people, about black people and for black
people could, in fact, appeal to other people, too. "For so
long, we've had conversations that have ranged from
challenging to unproductive with various creative partners
about the value of having our shows reflect the audience that
watches television," says Fox TV Group chairman **Dana
Walden**. "The result is that you can have a big, fat hit."



*"I'm surprised the show's even on the air right now," says Daniels (center), directing the
season two premiere. "You got me, you got Taraji, and you got Terrence Howard. All
three of us are batshit f—ing crazy."*

But *Empire* — conceived as either a "hip-hop *Lion in Winter*" or
a "black *Dynasty*," depending on whether you ask Strong or
his co-creator **Lee Daniels** — was more than just a hit. It was
a full-blown cultural phenomenon, the likes of which network

Case: 1:16-cv-08303 Document #: 183-5 Filed: 08/27/18 Page 54 of 207 PageID #:2122

television had not produced in years. It became the first
series in more than 20 years to increase its viewership with
each successive episode, quickly earning high-profile fans in
**Oprah Winfrey**, **Jack Nicholson** and **Michelle Obama**. Yes,
black viewers made up 63 percent of the series' nearly 18
million weekly broadcast audience, but it was bigger and
broader than a single demo. Factor in all of the platforms on
which *Empire* has been offered, and more than 26 million
viewers have tuned in for its often-outrageous plot twists and
catchy **Timbaland**-produced soundtrack. More impressive: It
not only drew the youngest audience for a network drama,
with a median age of 43, but also the most social — 2.4
million tweets were fired off during the finale alone. All of
which has the advertising community salivating; Fox's asking
price for a 30-second spot in the Sept. 23 premiere is said to
be a staggering $750,000, and as much as $600,000 — peak
*American Idol* range — for the remainder of the season.

> **READ MORE**
> 'Empire' Showrunner Previews Season 2's "Shifting of
> Alliances" and "Ethical Dilemmas"

With outsized success, however, comes outsized expectations
and no shortage of backstage drama: Howard's personal
travails have turned him into a gossip-world pinata, Daniels
has occasionally flexed his creative authority beyond the
comfort zone of the network, and there are lingering
concerns that too many big-name guest stars (**Chris Rock**,
**Mariah Carey**, **Rosie O'Donnell**, the list goes on) could
overwhelm the second season. But all of this soap opera
within the soap opera ultimately is good for Fox, which needs

Case: 1:16-cv-08303 Document #: 183-1 Filed: 08/27/18 Page 55 of 207 PageID #:2122

as much attention as possible to keep its juggernaut rolling.
Even with *Empire*'s stratospheric viewership, the network
wrapped the 2014-15 season at No. 4, down more than 20
percent from the previous season. "The big question now,"
says **David Campanelli**, director of national TV at media ad-
buying agency Horizon Media, "is whether *Empire* gives Fox a
launching pad to turn the network around."

Walden and her fellow chairman **Gary Newman** have
supersized the episode load, upping the season-two order
from 12 to 18, and now they're prepping possible
companions to join the schedule as early as midseason.
There's chatter about a potential spinoff — "It's coming,"
promises Daniels — and even before the second season kicks
off, Howard has begun dropping hints about a contract
renegotiation, which could come as early as next summer.
The studio already rewarded the stars of *Empire* with Rolex
watches as a wrap gift for season one. "Fox has been really
good to me and to the rest of the cast," says Howard. "And as
the business of the show grows, we should be able to
participate in that growth."

When I ask showrunner **Ilene Chaiken**, who made a name
for herself on Showtime's *The L Word*, how she's coping with
all of it during a rare break from production, she just laughs:
"I'm pretending that it's no different than last season."



Click to enable Adobe Flash Player

*Hollywood*

**. . .**

The idea for *Empire* was hatched when Strong, 41, was driving
around Los Angeles and heard a story about **Sean "P. Diddy"
Combs** on the radio. To the writer of HBO Emmy winners
*Game Change* and *Recount*, the premise — an epic family saga
set in the hip-hop world — suddenly seemed obvious, and he
called Daniels, with whom he'd collaborated on *Lee Daniels'
The Butler*, and pitched it as a movie. Daniels, still stung from
the tortuous path *Butler* had taken to get made, called back
the next day. "Let's do it for TV," he told Strong. "It'd be nice
to make some money."

What Daniels, Strong and executive producer **Brian Grazer**
couldn't have predicted when they sold *Empire* in the summer
of 2013 was the degree to which it would strike a chord. This
was before *Black-ish*, *How to Get Away With Murder* and
*Straight Outta Compton*, when the prevailing wisdom in white-
run Hollywood was to doubt the mainstream appeal of black
subject matter. "The show had a lot of things going against
it," says Grazer. But *Empire*, as they envisioned it, wasn't just
about putting a nonwhite family and the world of hip-hop on
primetime TV; it also would take on topics widely considered
off-limits in the African-American community.

"We'd be cowards if we dealt with something like pop music and pop culture and we didn't deal with the things that are going on in our world today, whether it's mental illness, homophobia, racism, classicism, sexism or police brutality," says **Jussie Smollett**, whose character, Lucious' openly gay son, Jamal, wrapped season one at the helm of the Lyon family record label — with his mother and two brothers looking to stage a hostile takeover and his father in jail for murder. But there were many others, including the series' two leads, who had concerns about how the show would be received. Howard, who has been candid about his own homophobic upbringing, said in an interview with *Vogue*, "From the moment when they had the guys kissing in the first 20 minutes of the pilot, I was like 'You're going to lose everyone. Black people are going to change the channel.' " When I ask now how he feels, knowing how many didn't, he laughs: "Fortunately, I'm not always right."

None of it fazed Daniels, an Oscar-nominated director who seems to be most comfortable when his audience isn't. "You gotta shake 'em up to make 'em think," he says while editing the season-two premiere down the hall from the writers room. Minutes earlier, in a dark edit bay with eight staffers huddled around him, he said he wanted a joke about Ferguson, Mo., edited back in. Though he and his fellow producers won't reveal specific plot points, themes of police brutality and the Black Lives Matter movement will feature more prominently in the upcoming season, which will delve into Lucious' and Cookie's pre-fame-and-fortune backstory. "We don't set out to just do a juicy soap opera," says Strong.

Case: 1:16-cv-08303 Document #: 183-3 Filed: 08/27/18 Page 58 of 207 PageID #:2122

"We set out to do a very truthful drama that's also a soap opera."



Click to enable Adobe Flash Player

Daniels has talked about wanting to dramatize a wider range of the African-American experience in the series' second season, and it was with this in mind that he, Strong and Chaiken brought in more black writers, including Shondaland alum **Ayanna Floyd**, who'd watched as *Empire* caught on with nearly everyone she knew. "There's been an appetite for a long time for network television to do something different," she says. "And black people, in particular, love to see themselves on television because they don't see themselves a lot — and this wasn't about seeing yourself in a way that makes you feel bad about yourself. It's not a slave movie. They're rich, they're glamorous, they're complicated ..."

Though Daniels leaves the writing to Strong and Chaiken, he's been known to pop in periodically to try to stir things up, pushing provocative ideas that are often drawn from his own experiences as a gay, black parent. He tells me about a call he recently got from his partner, who is white, about Daniels' college-age black son, **Liam**. "My partner's crying, and he

Case: 1:16-cv-08303 Document #: 183-5 Filed: 08/27/18 Page 59 of 207 PageID #:2122

goes, 'I'm so worried. They just shot another kid. Is Liam
going to be OK?' I lied to him and said he's going to be OK,
but I'm worried," says Daniels. "And that fear, that's what we
have to write about."

> **READ MORE**
> Watch THR's Full, Uncensored Drama Writers Roundtable
> With Lee Daniels, Damon Lindelof and More

Writers like **Joshua Allen**, who joined the *Empire* room from
CBS' *Hostages*, say they look forward to Daniels' whirlwind
visits. "Whenever he comes in, he's very honest about making
sure that we hit those issues that we need to be hitting," says
Allen. "At the same time, he's Lee, so he's going to give you
those OMG moments. You're going to tweet about anything
Lee Daniels does because he's going to keep it outrageous."

But there are limits to how far even Daniels can push it.
According to multiple insiders, Fox brass shot down an early
idea to have Chris Rock's character, who's in jail with Lucious,
be a cannibal in the first episode of the season. But Daniels,
who directed the season opener, is said to have ignored the
mandate and shot the Rock story as initially envisioned,
including one particularly grotesque scene featuring the actor
with a plate of human body parts before him. Rock agreed to
return to the series' Chicago set for reshoots this summer,
where sources say the cannibal plotline was scaled back to
the point of barely detectable at the network's insistence.

> **READ MORE**
> Faces of Fall TV: Will the Next Cookie Please Stand Up?



## Featured News



### Studios Gamble on James Franco, Casey Affleck Projects Post-#MeToo Claims



### Malibu Murder Mystery: "Everyon Freaking Out" Ove Unsolved Killings, Bodies Dumped, Police Questions



•••

The Chris Rock appearance was, nevertheless, something of a watershed for *Empire*.

Chaiken had been enjoying her three-week reprieve between seasons this spring when she got word Rock was trying to reach her. Her assistant tracked her down in the California desert. "Um, I got a phone call for you," she was told, "and I think it really is Chris Rock." Rock had been trying to put in a good word for a writer, but once he got Chaiken on the phone, he said, "You know, I wouldn't mind being on the show, but I want to do something really kind of cool and twisted." Fielding this type of call was a new experience for Chaiken. "In the first season, you're sort of begging people to come and work with you, and we heard a lot of 'no,' " she says. "Then in season two, there were a lot of people who reached out to us and said, 'Hey, I want to do something.' "

Case: 1:16-cv-08303 Document #: 183-1 Filed: 08/27/18 Page 62 of 207 PageID #:2122



*"So after however many years I've been in this business, I finally have Hollywood's attention," says Taraji P. Henson (who plays Cookie Lyon), photographed along with her castmates Aug. 23 on 'Empire's' soundstage at Cinespace Studios in Chicago.*

> **READ MORE**
> Emmys: Who's Leading the Lead Actress Races?

The *Empire* writers found a way to work Rock in, just as they worked in **Marisa Tomei**, **Lenny Kravitz**, **Ludacris**,

O'Donnell and **Pitbull**, all of whom wanted to be part of the phenomenon. The season opener also features blink-and-you-miss-them cameos from the **Rev. Al Sharpton**, *Vogue*'s **Andre Leon Talley** and CNN's **Don Lemon**. "Now everyone wants to be on the show," says Henson, for whom the parade of guest stars doesn't seem to be sitting particularly well. "I get it. What was that song ["Still Tippin' "]? 'Back then [hoes] didn't want me; now I'm hot, [hoes] all on me?' I guess it's a compliment, but ..."

Chaiken and her employers at Fox are aware that at a certain point, such stunt casting can overwhelm a show; and when I suggest to Daniels that there have been rumblings at the network that perhaps he's overused his impressive Rolodex, his eyes bulge. "You think we wanted the names? No, it was [Fox] that wanted them," he says. "Don't get it twisted." He then admits that when his A-list pals ask to be on the show, he has a hard time saying no and often lets Strong "play the bad guy." Later, I run the scenario by Strong, who laughs, "That is true."

Maintaining the improvisational spirit of *Empire*'s first season will be among the show's toughest challenges as season two gets underway. Already, a star-studded premiere event was staged Sept. 12 at Carnegie Hall, with past and present guest stars, including **Courtney Love**, **Naomi Campbell** and **Mariah Carey**, dangling from Daniels' arms at the afterparty. Gold-plated *Empire* buses have been traveling around the country, brands like Pepsi have signed on as seasonlong sponsors and, soon, the windows of Saks Fifth Avenue will feature an exclusive *Empire*-inspired fashion collection from

designers Cushnie et Ochs and Jimmy Choo. There are more
albums coming — the first debuted at No. 1 on the Billboard
200 chart in March and remained in the top 100 for 19 weeks
— and discussions about a *Glee*-style concert tour with
members of the cast continue.

> **READ MORE**
> ['Empire' Co-Creator Lee Daniels: "There Will Be a Spinoff"](#)

And though there are no deals in place yet, Daniels
announced at a TV conference in early August that "without
question" there would be a spinoff, which he later suggested
would center on a young Cookie. It was the first that Henson
had heard of the plan, and the Fox executives huddled in the
back of the room also were taken by surprise. They all
watched as the news began rocketing around the web; even
Daniels, who has a long history of dropping bombs like this,
was surprised by the frenzy that transpired. "To me, what
that says is 'Lee Daniels, keep your f—ing mouth shut,' " he
jokes, then clarifies: "It ain't coming anytime soon because we
have to make sure this one is on the ground first, but it's
coming."

The first four episodes were delivered to the network by early
September, and if there are any concerns about a sophomore
slump, nobody is letting on. "The audience who loved the
show last year is going to see the same level of storytelling
this year," promises Newman, without giving anything away. I
ask whether it will be enough to continue shattering Nielsen
records, adding viewers for another 18 consecutive weeks.
"We've been pretty vocal with our showrunner, our producers

and, frankly, anyone who will listen that that's not our measure of success," he says. "The only thing that we can control is doing a quality show."



•••

On the Chicago set in late August, Smollett is whizzing around the cavernous halls on a hoverboard — a gift from **Ne-Yo**, who has joined the show as a music producer — while Henson and Howard head to Lucious' living room to rehearse.

Howard needs a couple of minutes to get comfortable with the material, but after a few run-throughs, it's all clicking. The scene — which ends with Cookie slamming the door on her ex-husband — is classic *Empire*, a mix of bawdy theatrics, melodrama and tight, delicious dialogue. ("You ain't a boss, Lucious, you's a busta," Cookie snarls at one point.) And no two actors seem to have more fun with all of it than Henson and Howard, who tease each other mercilessly when the cameras are off.



*"We're playing chess this season. Everybody's storylines involve everybody else's, and we all have agendas," Trai Byers said of season two.*

> **READ MORE**
> Watch THR's Full, Uncensored Drama Actress Roundtable With Viola Davis, Taraji P. Henson and More

But somewhere between take two and take 12, a "Page Six" item suggesting Howard's screen time is being "scaled back because of his recent divorce drama and numerous prior allegations of domestic abuse" begins circulating online. All summer long, the *New York Post* — which, like *Empire*, is a product of **Rupert Murdoch** — kept up a steady drumbeat of items about Howard's bitter battle with his second wife and a reported divorce from his third. When I connect with Walden a few weeks later, she emphatically denies the report. "Taraji and Terrence are the leads of this show, they are at the center of *Empire*, and we would never look to displace Terrence from that position," she says, suggesting that Howard's role is, if anything, greater this season than last

Case: 1:16-cv-08303 Document #: 183-3 Filed: 08/27/18 Page 67 of 807 PageID #:2122

since he's doing significantly more performing and songwriting. "Honestly," she adds, "it was a silly item that will be completely disproved once the show is on the air."

The embattled actor has, however, reduced his press availability, presumably fearing questions will shift toward his offscreen drama as they did in a recent *Rolling Stone* profile. His co-stars have been advised not to comment on the ongoing saga, but Daniels can't help himself. "That poor boy," he says, fiercely protective of his actor. He then alludes to other actors who have been the subject of domestic abuse allegations in the past. "[Terrence] ain't done nothing different than Marlon Brando or Sean Penn, and all of a sudden he's some f—in' demon," says Daniels. "That's a sign of the time, of race, of where we are right now in America."

Fortunately, the media has been far kinder to the rest of *Empire*'s cast, particularly 45-year-old Henson, whose stock has soared since the series premiered. She has graced the covers of *Glamour*, *Allure* and *W* and, earlier this summer, picked up the series' only major Emmy nomination for outstanding actress in a drama series. "Taraji was what I call 'Project Royalty' because in the projects, honey, she is royalty," says Daniels, who courted her for the role. "She was **Meryl Streep** in the streets; it just took a moment for white America to catch on."

> **READ MORE**
> 'Empire' Co-Creator Lee Daniels Responds to Emmys Snub

On the set, Henson has assumed the role of den mother, keeping close tabs on how each of her fictional sons —

Smollett (Jamal), **Trai Byers** (Andre) and **Bryshere "Yazz" Gray** (Hakeem) — is managing his overnight stardom. She is tightest with Smollett, 32, who sought her advice before sitting down with **Ellen DeGeneres** in March to discuss his own sexuality. When I ask him about his now-famous remark to DeGeneres that "there's never been a closet that I've been in," he tells me, "If millions of people are listening to what you're saying, then you should say something worth listening to."

Unlike Jamal, for whom coming out was considered a threat to the family business, Smollett has signed a modeling contract with P. Diddy's clothing line, presented a VMA to **Kanye West** and performed at events including the BET Awards. For 21-year-old Gray, who had never boarded a plane, much less acted professionally, before flying from Philadelphia to Los Angeles for his *Empire* audition in early 2014, the rise has been even more startling. "I make sure he's saving his money and getting a business manager," says Henson. "I want him investing in property and art and not in shoes and cars."

> **READ MORE**
> 'Empire's' Taraji P. Henson Reveals Why She Hid Her Phone on Emmy Nominations Day (Video)

The *Empire* halo has extended well beyond the cast, with both Chaiken and Daniels inking rich overall deals with the show's studio this spring. By August, Daniels already had scored a pilot order for a potential series about a girl group trying to make it in Atlanta without so much as a script to show Fox. That he intends to produce it without his *Empire* counterparts



is said to have ruffled feathers internally, though nobody involved will say so publicly.

As I pack up my things back at *Empire*'s Beverly Hills headquarters, I mention how convinced people seem to be that the series will return even bigger on Sept. 23. Daniels swats his hand dismissively. "I don't buy the hype," he says. "I don't because the hype told me I was getting [an Oscar] nomination for *The Butler*. I bought into it for a second, and then I got my feelings hurt." He pauses. "I know what goes up must come down ... and I'm prepared for the worst."

---

*Main Image: Eric Ray Davidson*



🗨 SHOW COMMENTS ▾

The Hollywood Reporter

© 2018 The Hollywood Reporter
All rights reserved.

Terms of Use | Privacy | Sitemap | About Our Ads

About Us

Daily Edition

Subscribe

Subscriber Services

Back Issues

Advertising

Contact Us

Careers

Industry Jobs

Follow Us On
# TWITTER

Find Us On
# FACEBOOK

Watch Us On
# YOUTUBE

Our affiliate publications

billboard

VIBe

SPIN

STEREOGUM

# EXHIBIT 4

# AdAge

# TV Ad Pricing Chart: 'Sunday Night Football,' 'Empire' Are Broadcast's Most Expensive Ad Buys

**A Scripted Drama Sits Among Top Two for First Time Since 2007-08**

By [Jeanine Poggi](#)
*Published:* September 24, 2015



Fox's 'Empire' is costing advertisers $497,364 on average for 30 seconds, according to Ad Age's annual report on ad prices, making it the second most expensive broadcast show this fall. Credit: Fox

8/18/2018 How Much Does a TV Ad Cost? Networks Charge Big for Broadcast's Most Expensive Ad Buys | Advertising Age

Case: 1:16-cv-08303 Document #: 188-3 Filed: 08/27/18 Page 73 of 207 PageID #:2122

See the full analysis and context below this chart.

## How Much For a 30-Second TV Spot?
## Explore Our Interactive Chart

☑ **All** ☑ **ABC** ☑ **CBS** ☑ **Fox** ☑ **NBC** ☑ **The CW**

☑ **Monday** ☑ **Tuesday** ☑ **Wednesday** ☑ **Thursday** ☑ **Friday** ☑ **Saturday** ☑ **Sunday**

| Type to search |
|---|

| Show/Network ▲ | Day/Time ▼ | 2015 Price ($) ⇕ | 2014 Price ($) ⇕ | % Change ⇕ |
|---|---|---|---|---|
| Sunday Night Football *NBC* | Sunday 8 p.m. | 603,000 | 627,300 | -4% |
| Empire *FOX* | Wednesday 9 p.m. | 497,364 | - | - |
| NFL Thursday Night Football *CBS* | Thursday 8 p.m. | 464,625 | 483,333 | -4% |
| The Big Bang Theory *CBS* | Monday 8 p.m./ Thursday 8 p.m. | 348,300 | 344,827 | 1% |
| How to Get Away with Murder *abc* | Thursday 10 p.m. | 252,934 | 146,113 | 73% |
| The Voice (Monday) *NBC* | Monday 8 p.m. | 240,502 | 274,157 | -12% |
| Modern Family *abc* | Wednesday 9 p.m. | 239,993 | 239,650 | 0% |
| The Voice (Tuesday) *NBC* | Tuesday 8 p.m. | 233,720 | 253,840 | -8% |
| Scandal *abc* | Thursday 9 p.m. | 224,509 | 217,546 | 3% |
| Blindspot *NBC* | Monday 10 p.m. | 209,700 | - | - |
| The Blacklist *NBC* | Thursday 9 p.m. | 193,793 | 282,975 | -32% |
| Life in Pieces *CBS* | Monday 8:30 p.m. | 192,379 | - | - |

| Show/Network | Day/Time | 2015 Price ($) | 2014 Price ($) | % Change |
|---|---|---|---|---|
| The Simpsons FOX | Sunday 8 p.m. | 186,050 | 189,933 | -2% |
| Family Guy FOX | Sunday 9 p.m. | 164,933 | 158,400 | 4% |
| Grey's Anatomy abc | Thursday 8 p.m. | 157,609 | 149,523 | 5% |
| Black-ish abc | Wednesday 9:30 p.m. | 155,990 | 137,807 | 13% |
| Once Upon a Time abc | Sunday 8 p.m. | 155,596 | 136,538 | 14% |
| Gotham FOX | Monday 8 p.m. | 151,080 | 181,575 | -17% |
| NCIS CBS | Tuesday 8 p.m. | 151,738 | 170,948 | -11% |
| Supergirl CBS | Monday 8 p.m. | 147,933 | - | - |
| Scream Queens FOX | Tuesday 9 p.m. | 147,808 | - | - |
| American Idol (Wednesday) FOX | Wednesday | 147,826 | 243,200 | -39% |
| Mom CBS | Thursday 9 p.m. | 144,660 | 141,548 | 2% |
| Scorpion CBS | Monday 9 p.m. | 142,108 | 148,071 | -4% |
| The Middle abc | Wednesday 8 p.m. | 141,874 | 133,425 | 6% |
| The Goldbergs abc | Wednesday 8:30 p.m. | 137,826 | 110,667 | 25% |
| Marvel's Agents of S.H.I.E.L.D. abc | Tuesday 9 p.m. | 134,707 | 157,254 | -14% |
| Criminal Minds CBS | Wednesday 9 p.m. | 133,983 | 135,789 | -2% |
| The Muppets abc | Tuesday 8 p.m. | 131,313 | - | - |
| The Last Man on Earth FOX | Sunday 9:30 p.m. | 131,045 | - | - |

| Show/Network | Day/Time | 2015 Price ($) | 2014 Price ($) | % Change |
|---|---|---|---|---|
| Code Black<br>CBS | Wednesday 10 p.m. | 129,626 | - | - |
| Brooklyn Nine-Nine<br>FOX | Sunday 8:30 p.m. | 129,892 | 150,500 | -14% |
| Angel from Hell<br>CBS | Thursday 9:30 p.m. | 127,550 | - | - |
| Blood and Oil<br>abc | Sunday 9 p.m. | 127,923 | - | - |
| Heroes Reborn<br>NBC | Thursday 8 p.m. | 126,793 | - | - |
| NCIS: New Orleans<br>CBS | Tuesday 9 p.m. | 125,920 | 114,843 | 10% |
| Survivor<br>CBS | Wednesday 8 p.m. | 125,449 | 134,358 | -7% |
| Chicago P.D.<br>NBC | Wednesday 10 p.m. | 121,061 | 122,000 | 4% |
| Minority Report<br>FOX | Monday 9 p.m. | 120,388 | - | - |
| Fresh off the Boat<br>abc | Tuesday 8 p.m.; 8:30p.m. | 120,133 | - | - |
| Chicago Med<br>NBC | Tuesday 9 p.m. | 120,642 | - | - |
| Quantico<br>abc | Sunday 10 p.m. | 120,387 | - | - |
| Dancing with the Stars<br>abc | Monday 8 p.m. | 115,962 | 118,606 | -2% |
| Grandfathered<br>FOX | Tuesday 8 p.m. | 115,136 | - | - |
| Castle<br>abc | Monday 10 p.m. | 113,149 | 141,560 | -20% |
| Limitless<br>CBS | Tuesday 10 p.m. | 113,900 | - | - |
| 60 Minutes<br>CBS | Sunday 7 p.m. | 111,298 | 98,280 | 13% |
| NCIS: Los Angeles<br>CBS | Monday 10 p.m. | 109,940 | 127,932 | -14% |

| Show/Network | Day/Time | 2015 Price ($) | 2014 Price ($) | % Change |
|---|---|---|---|---|
| The Player NBC | Thursday 10 p.m. | 108,082 | - | - |
| Elementary CBS | Thursday 10 p.m. | 106,695 | 125,780 | -15% |
| Best Time Ever with Neil Patrick Harris NBC | Tuesday 10 p.m. | 105,268 | - | - |
| The Grinder FOX | Tuesday 8:30 p.m. | 101,392 | - | - |
| Shark Tank abc | Friday 9 p.m. | 99,631 | 109,878 | -9% |
| Madam Secretary CBS | Sunday 8 p.m. | 99,587 | 73,525 | 35% |
| Sleepy Hollow FOX | Thursday 9 p.m. | 98,253 | 202,500 | -51% |
| The Good Wife CBS | Sunday 9 p.m. | 97,428 | 87,210 | 12% |
| MasterChef Junior FOX | Friday 8 p.m. | 96,300 | 100,400 | -7% |
| Nashville abc | Wednesday 10 p.m. | 95,871 | 97,581 | -2% |
| Bones FOX | Thursday 8 p.m. | 94,681 | 125,200 | -24% |
| Wicked City abc | Tuesday 10 p.m. | 93,039 | - | - |
| Rosewood FOX | Wednesday 8 p.m. | 88,687 | - | - |
| Law & Order: SVU NBC | Wednesday 9 p.m. | 85,230 | 89,700 | -5% |
| CSI: Cyber CBS | Sunday 10 p.m. | 82,055 | 98,138 | -16% |
| Grimm NBC | Friday 9 p.m. | 81,198 | 118,818 | -30% |
| Hawaii Five-0 CBS | Friday 9 p.m. | 77,683 | 72,788 | 7% |
| Blue Bloods CBS | Friday 10 p.m. | 75,965 | 79,370 | -4% |

| Show/Network | Day/Time | 2015 Price ($) | 2014 Price ($) | % Change |
|---|---|---|---|---|
| Bob's Burgers FOX | Sunday 7:30 p.m. | 74,733 | - | - |
| The Flash CW | Tuesday 8 p.m. | 70,687 | 50,775 | 39% |
| The Mysteries of Laura NBC | Wednesday 8 p.m. | 70,423 | 94,750 | -26% |
| The Amazing Race CBS | Friday 8 p.m. | 65,517 | 76,375 | -14% |
| 20/20 abc | Friday 10 p.m. | 65,994 | 62,917 | 5% |
| Last Man Standing abc | Friday 8 p.m. | 64,631 | 66,767 | -3% |
| Dr. Ken abc | Friday 8:30 p.m. | 63,543 | - | - |
| America's Funniest Home Videos abc | Sunday 7 p.m. | 61,567 | 49,839 | 24% |
| Undateable NBC | Friday 8 p.m. | 50,844 | - | - |
| Arrow CW | Wednesday 8 p.m. | 48,056 | 47,040 | 2% |
| Dateline NBC | Friday 10 p.m. | 47,261 | 48,667 | -3% |
| The Vampire Diaries CW | Thursday 8 p.m. | 44,924 | 59,620 | -25% |
| Supernatural CW | Wednesday 9 p.m. | 35,631 | 40,440 | -12% |
| iZombie CW | Tuesday 9 p.m. | 34,674 | - | - |
| 48 Hours CBS | Saturday 10 p.m. | 33,831 | 33,500 | 0% |
| The Originals CW | Thursday 9 p.m. | 32,634 | 32,140 | 2% |
| Jane the Virgin CW | Monday 9 p.m. | 25,034 | 23,400 | 7% |
| Saturday Night Live Encores NBC | Saturday 10 p.m. | 25,242 | - | - |

8/18/2018 6-nv-08303-Document 4, Night dot bthe 30 dot 1 mple / Are Broadcast's Most Expensive Roles - Ad Age...

Case: 1:16-cv-08303 Document #: 138-3 Filed: 08/27/18 Page 78 of 207 PageID #:2122

| Show/Network | Day/Time | 2015 Price ($) | 2014 Price ($) | % Change |
|---|---|---|---|---|
| Crazy Ex-Girlfriend<br>CW | Monday<br>8 p.m. | 23,159 | - | - |
| Reign<br>CW | Friday<br>8 p.m. | 19,327 | 23,100 | -16% |
| Crimetime Saturday<br>CBS | Saturday<br>8 p.m.; 9 p.m. | 18,471 | 22,794 | -19% |
| America's Next Top Model<br>CW | Friday<br>9 p.m. | 17,082 | 23,900 | -29% |

HOW WE GENERATE THE DATA: Ad Age's survey is compiled using data from as many as six agencies. The resulting prices should be viewed as directional indicators and are not the actual price that every advertiser pays for a 30-second spot. The numbers are based on a range of agency estimates that can vary depending on the amount of inventory purchased from a network, the inclusion of any nontraditional advertising such as product placements, and the relationship an advertiser and media-buying agency has with a network. Most TV advertising is typically purchased as part of larger negotiations, not on a one-off basis. These estimates also reflect the prices advertisers and networks agreed on in this year's upfront marketplace. Prices have likely changed for those wishing to buy a spot closer to the air date in the so-called "scatter" market.

*Charts by Chen Wu.*

While football continues to dominate as the most expensive broadcast programming for advertisers, for the first time in many years a scripted show is giving it a run for its money.

Fox's "Empire" is costing advertisers $497,364 on average for a 30-second commercial, according to Ad Age's annual pricing chart, positioning it as the No. 2 most expensive broadcast show this fall.

The last time a broadcast drama fetched such high prices was during the 2007-08 season, when ABC's "Grey's Anatomy" averaged $419,000.

For many years the costliest scripted program has been CBS's "The Big Bang Theory." This year the sitcom comes in at No. 4, averaging $348,300 for a 30-second spot, on par with last year's price. It moves down one notch, from No. 3 last season.

Of course, football still reigns with NBC's "Sunday Night Football" once again the costliest program on broadcast, averaging $603,000 for 30 seconds of commercial time. CBS's "Thursday Night Football" comes in at No. 3, averaging $464,625, down one spot from last year.

ESPN's "Monday Night Football," it should be noted, costs around $400,000 for commercial time.

Ad Age's survey is compiled using data from as many as six media-buying agencies. (See our 2014 TV ad pricing chart.) The resulting prices should be viewed as directional indicators and are not the actual price that every advertiser pays for a 30-second spot. The numbers are based on a range of agency estimates that can vary depending on the amount of inventory purchased from a network, the inclusion of any nontraditional advertising such as product placements, and the relationship an advertiser and media-buying agency has with a network. Most TV advertising is typically purchased as part of larger negotiations, not on a one-off basis.

These estimates also reflect the prices advertisers and networks agreed on in this year's upfront marketplace. Prices have likely changed for those wishing to buy a spot closer to the air date in the so-called "scatter" market.

In addition to ESPN's "Monday Night Football," there are several cable programs that challenge broadcast as the most expensive programs in which to buy commercial time. AMC 's "The Walking Dead" can cost marketers in the high $400,000s to the low $500,000s for a package of spots. In its first season, the prequel, "Fear the Walking Dead," costs about $300,000, and AMC's other new drama, "Better Call Saul," a spin-off of "Breaking Bad," can run advertisers over $200,000.

But it's difficult to compare many cable ad packages to those of broadcast because cable often includes multiple airings and repeats of a show.

## Top 10 Priciest Shows on Broadcast For Advertisers

**1**    NBC
**Sunday Night Football**
**$603,000**

**2**    FOX
**Empire**
**$497,364**

**3**    CBS
**Thursday Night Football**
**$464,625**

**4**    CBS
**The Big Bang Theory**
**$348,300**

**5**    abc
**How to Get Away with Murder**
**$252,934**

Case: 1:16-cv-08303 Document #: 188-1 Filed: 08/27/18 Page 80 of 207 PageID #:2122

| 6 |  |  **NBC**<br>**The Voice (Monday)**<br>**$240,502** |
| 7 |  |  **abc**<br>**Modern Family**<br>**$239,993** |
| 8 |  |  **NBC**<br>**The Voice (Tuesday)**<br>**$233,720** |
| 9 |  |  **abc**<br>**Scandal**<br>**$224,509** |
| 10 |  |  **NBC**<br>**Blindspot**<br>**$209,700** |

ABC's "How to Get Away with Murder" is a newcomer to the top 10, coming in at No. 5 and averaging $252,934. The Shonda Rhimes drama, part of the alphabet network's Thursday night "TGIT" lineup, is also the biggest price gainer of the year, rising 73% from its freshman season.

Other noteworthy gainers include ABC's "The Goldbergs," which increased 25% to $137,826; The CW's "The Flash," up 39% to $70,687 and CBS's "Madam Secretary," which grew 35% to $99,587.

NBC's "The Voice" on Monday nights comes in at No. 6, down one spot from last season, averaging $240,502. The results show on Tuesday night is No. 8, down two spots, and averaging $233,720 for a 30-second spot.

ABC's critically acclaimed "Modern Family" remained steady at No. 7, averaging $239,993, as did "Scandal," which stayed at No. 9 and averages $224,509 for a 30-second spot.

Rounding out the top 10 is NBC's newcomer, "Blindspot," averaging $209,700 for a 30-second spot. This makes it the most expensive new show of the season.

"Blindspot" premiered to 10.6 million viewers earlier in the week, significantly topping the premiere of "State of Affairs," which appeared in the same time slot last year. "State of Affairs" was actually the most expensive new show of last season at $219,188, but it didn't even make it to a second season.

While "Blindspot" joins the top 10 list, NBC's "The Blacklist" falls off after it came in at No. 4 last year. The show is one of the biggest decliners of the season, with the average cost falling 40% to $102,720.

Other notable decliners include Fox's "Sleepy Hollow," which came in the top 10 last year. Its average cost plunged 51% to $98,253. NBC's "The Mysteries of Laura" fell 26% averaging $70,423; Fox's "Gotham" declined 21% to $143,295; and The CW's "The Vampire Diaries" dropped 25% to $44,924.

Among returning broadcast shows, 13 have seen the cost for ad time increase, while another 23 have seen decreases and 22 have remained relatively steady.

## Quick Facts

- **TV's Costliest Show:** NBC's "Sunday Night Football" averages $603,000 for a 30-second spot.

- **Most Expensive Scripted Series:** Fox's "Empire" clocks in at $497,364 for a 30-second spot.

- **Biggest Price Decliner:** Fox's "Sleepy Hollow," which cracked the top 10 last season, halved its price, now averaging $98,681 for a 30-second spot, down from $202,500 last season.

- **Biggest Price Gainer:** ABC's "How to Get Away With Murder," comes in at No. 5 in its sophomore season, surging 73% to average $252,934 for a 30-second spot.

- **Most Expensive New Series:** In its first season, NBC's "Blindspot" averages $209,700.

*Photos courtesy of ABC, CBS, FOX, NBC and The CW.*

Copyright © 1992-2018   <u>Crain Communications</u>   |   <u>Privacy Statement</u>   |   <u>Contact Us</u>

# EXHIBIT 5

FOR YOUR EMMY CONSIDERATION - 4 NOMINATIONS INCLUDING OUTSTANDING COMEDY SERIES

CurbYour Enthusiasm | HBO FYC



HOME > TV > NEWS

SEPTEMBER 29, 2015 8:03AM PT

# TV Ad Prices: Football, 'Empire,' 'Walking Dead,' 'Big Bang Theory' Top The List

By **BRIAN STEINBERG**



CREDIT: COURTESY OF FOX

MORE NEWS FOR YOU:

**LISTEN: 'THE HANDMAID'S TALE'S' YVONNE STRAHOVSKI ON SERENA AS VICTIM OR VILLAIN**

VIEW NEXT ARTICLE ✕

Of TV's three primetime football programs, only one — "Sunday Night Football" — was able to command higher ad prices from sponsors compared with a year ago, according to a *Variety* analysis of primetime ad costs for the 2015-2016 season. And in the case of the increase, the hike was meager: The average price for a 30-second spot in "Sunday Night Football" rose just 2.2%, according to *Variety's* study, which is put together using estimates from as many as six different media-buying agencies as well as other sources. Meantime, the average price of a 30-second ad in ESPN's "Monday Night Football" fell 2.44% and the average price of a 30-second spot in CBS' "Thursday Night Football" dipped 6.1%.

Some of TV's best-watched scripted programs showed more power in the marketplace. Fox's "Empire," which just launched its sophomore season after breaking out as a hit in its freshman run, saw its average ad price soar a whopping 277.6% over last season's according to the *Variety* study. The average price of a package of commercials sold in multiple airings of AMC's "The Walking Dead," meanwhile, rose 21.5%. Last season, the horror serial gave Sunday football a run for the massive ratings it normally generates.

The ad prices are meant to be taken as directional figures, not industry gospel. The cost of a TV ad can vary according to many factors, including the relationship between the advertiser and the network and the amount an advertiser spends overall with a particular outlet. The *Variety* numbers are based on deals made during TV's "upfront" market, when advertiser buy commercial inventory in advance. They may be quite different in TV's "scatter" market, when inventory is purchased much closer to the ads' actual air date.

Below, a list of TV's 25 most expensive programs for advertisers, with year-to-year comparisons:

### TV's Priciest Shows

- **"Sunday Night Football"** (NBC, Sunday): 2015: $637,330 2014: $623,445 **+2.2%**
- **"Empire"** (Fox, Wednesday): 2015: $521,794 2014: $138,200 **+277.6%**
- **"The Walking Dead"*** (AMC, Sunday): 2015: $502,500 $2014: $413,695 **+21.5%**
- **"Thursday Night Football"** (CBS, Thursday): 2015: $462,622 2014: $492,000 **-6.1%**
- **"Fear The Walking Dead"*** (AMC, Sunday) 2015: $395,000 2014: N/A
- **"Monday Night Football"** (ESPN, Monday) 2015: $388,176 2014: $397,898 **-2.44%**
- **"The Big Bang Theory"** (CBS, Monday) 2015: $289,621 2014: $327,885 **-11.7%**
- **"The Big Bang Theory"** (CBS, Thursday) 2015: $266,163 2014: $322,891 **-17.6%**
- **"Modern Family"** (ABC, Wednesday) 2015: 236,296 2014: $229,935 **+4.1%**
- **"The Voice"** (NBC, Monday) 2015: 234,371 2014: $262,041 **-10.6%**
- **"How To Get Away With Murder"** (ABC, Thursday) 2015: $229.794 2015:$164,938 **+39.3%**
- **"The Voice"** (NBC, Tuesday) 2015: $219,461 2014: $254,485 **-13.8%**
- **"Scandal"** (ABC, Thursday) 2015: $207,255 2014: $217,423 **-4.6%**
- **"Better Call Saul"*** (AMC, Monday) 2015: $200,000 2015: N/A
- **"The X-Files"** (Fox, Monday) 2016: $195,893 2015: N/A
- **"Blindspot"** (NBC, Monday) 2015: $190,216 2014: N/A
- **"The Blacklist"** (NBC, Thursday) 2015: $180,618 2014: $200,166 **-9.6%**
- **"The Catch"** (ABC, Thursday) 2016: $167,566 2015: N/A
- **"Life In Pieces"** (CBS, Monday) 2015: $163,377 2014 N/A
- **"Grey's Anatomy"** (ABC, Thursday) 2015: $160,415 2014: $159,411 **+1.27%**
- **"Once Upon A Time"** (ABC, Sunday) 2015: $159,160 2014: $145,582 **+9.33%**
- **"Gotham"** (Fox, Monday) 2015:$158,547 2014: $192,111 **-17.5%**
- **"Supergirl"** (CBS, Monday) 2015: $157,592 2014: N/A
- **"black-ish"** (ABC. Wednesday) 2015:$155,928 2014: $131,160 **+18.9%**
- **"The Simpsons"** (Fox, Sunday) 2015: $155,727 2014: $205,885 **-24.4%**

*Price is for a package of ads that run across multiple airings of an episode

**Source:** *A Variety survey of estimates from as many as six media-buying agencies and other sources*

To be sure, Sunday-night football remains the most-expensive program on TV for advertisers, commanding an average of $637,330 for a 30-second spot. But its ability to gain more from Madison Avenue remains in doubt. Last season, the average price of a 30-second ad in the show fell 0.8% to $623,425. NFL content has long been the TV-industry equivalent of a sure thing: Viewers tune into the games live, and must watch the ads along with the show rather than skipping past them with a DVR. Yet there's only so much anyone can pay for any TV program and CBS' move to bring NFL games to Thursday night last season may have saturated the market. The NFL has also come under more scrutiny, thanks to incidents involving its players behavior and questions about the toll playing the game takes on athletes.

Football, however, will likely remain at the top of the list. The momentum behind scripted fare tends to come and go. The average cost of a 30-second ad in CBS' "Thursday Night Football" came to $462,622, making it the fourth most-expensive program for commercials this season. ESPN's "Monday Night Football" commanded an average of $388,176, giving it the No. 6 spot in *Variety's* rankings. Fox's Sunday-evening post-game program, "The OT" commands an average of $303,200, but it is not counted on the lists because it is not a regularly scheduled primetime program.

All the prices were likely affected by TV's tough advertising market. With Madison Avenue attracted to new venues such as mobile devices and streaming video, TV's ability to command outsize prices has been under duress. The five English-language broadcast secured between $8.02 billion and $8.69 billion for their primetime entertainment schedules in the recently completed "upfront" market, according to *Variety* estimates, compared with between $8.17 billion and $8.94 billion for the 2014-15 season.

Fox's "Empire" mustered the biggest surge among the chart-toppers. The average cost of a 30-second ad in the hip-hop drama is now $521,794, according to *Variety*. It is the first time in many years that a scripted primetime series has bested live sports content and the reality-competition "American Idol" in terms of pricing. In a marked departure from previous years, prices for "Idol" have fallen so much in the last few TV seasons that the program is no longer of TV's most expensive for sponsors (more on that later).

The creatures of "The Walking Dead" continue to feast on ad revenue. The average cost of a package in the drama comes to $502,500 this season, making it the third most-expensive program for advertisers. The cost of a package of ads in the new AMC spin-off series "Fear the Walking Dead," meantime, came to around $395,000. Inclusion of the programs comes with caveats, because it raises an apples-to-oranges comparison: a package of commercials featured in multiple airings on cable to a single 30-second slot on broadcast.

CBS' "The Big Bang Theory" also fetches a nice price, though less of one than it did in the past. The Monday airing of the program, which takes place while CBS broadcasts football on Thursdays, commands an average price of $289,621, an 11.7% decline from last season. The Thursday airing of the comedy commands an average price of $266,163, marking a tumble of 17.6% from the year before.

ABC's "Modern Family" and the Monday broadcast of NBC's "The Voice" round out the list of TV's ten most expensive programs for advertisers. The average price of a 30-second spot on "Modern Family" comes to $236,296, a rise of 4.1% over last season. The Monday "Voice" broadcast commands an average of $234,371 for a 30-second ad, a dip of 17.6% from last season's pricing.

The most expensive freshman program for marketers is Fox's revival of "The X-Files," slated to air in the second half of the season. The average cost of a 30-second ad in the series comes to $195,893. NBC's "Blindspot," which commands an average of $190,216 for a 30-second commercial, is next on the freshman list, followed by "The Catch," an ABC drama supervised by hot producer Shonda Rhimes. That program commands an average of $167,566 for a 30-second ad.

Other shows are showing big pricing gains this season. ABC's Thursday-night drama, "How To Get Away With Murder" this season commands an average of $229,794 for a 30-second ad, a 39.3% hike over last year. And ABC's Wednesday-night comedy, "black-ish," commands an average of $155,928 for a 30-second spot, an 18.9% rise over the price it notched in its freshman outing.

Some programs are losing their marketplace heft. The Blacklist, which last year was one of TV's ten most expensive programs for sponsors, saw its average ad price decline 9.8% this season to $180,618. Fox's "Gotham" last year was the second most-expensive freshman program, behind the now-defunct "State of Affairs." Its average ad price has fallen 17.5% season over season. Some programs, like Fox's "Family Guy" and "Sleepy Hollow," have fallen off the list of top shows entirely, along with ABC's Saturday broadcasts of college football.

And then there's the curious case of "American Idol." The popular competition program enjoyed a long reign as one of TV's most costly programs for sponsors, reflecting its broad appeal and historic place in popular culture. Even in its late-era decline, the show has managed to hold on. Last season, both the Wednesday and Thursday night broadcasts on Fox ranked among TV's ten most expensive programs.

In 2015, however, the show's age is obvious. The Wednesday-night broadcast will command an average of $151,245 for a 30-second spot, a stunning 43% decline from the $266,333 it garnered last season. The Thursday-night broadcast, meanwhile, stands to attract an average of $134,247, representing a drop of around 46%. Fox has already revealed that the show's coming 2016 run will be its last.

Below, a night-by-night rundown of prices for broadcast programs scheduled to air this season in fall or midseason slots:

## SUNDAY

### ABC

7PM: America's Funniest Home Videos **$56,581**
8PM: Once Upon A Time **$159,160**
8PM: Galavant **$112,914** (midseason)
9PM: Blood and Oil **$132,881**
10PM: Quantico **$139,330**
10PM: The Family **$99,217**

### CBS

7P: 60 Minutes **$112,958**
8P: Madam Secretary **$88,737**
9P: The Good Wife **$92,752**
10P: CSI: Cyber **$79,185**

### FOX

7P: The OT **$303,200**
730PM: Bob's Burgers **$66,072**
8PM: The Simpsons **$155,727**
830PM Brooklyn Nine-Nine **$122,008**
9PM: Family Guy **$143,490**
930P: Last Man on Earth **$113,485**
Bordertown: **$85,806** (midseason)

### NBC

8PM: Football Night in America **$135,716**
8:30PM: Sunday Night Football **$637,330**
7PM: Dateline Sunday **$29,000** (midseason)
8PM: NBC Sunday Movie $**19,000** (midseason)
8PM: Celebrity Apprentice $**80,062** (midseason)

## MONDAY

## ABC

8PM: Dancing with the Stars **$121,400**
The Bachelor **$114,000** (midseason)
10PM: Castle **$118,195**

## CBS

8PM: The Big Bang Theory (until November) **$289,621**
830PM: Life in Pieces (until November) **$163,377**
8PM: Supergirl (November) **$157,592**
9PM: Scorpion **$133,791**
10PM: NCIS: Los Angeles **$106,121**

## FOX

8PM: Gotham **$158,547**
9PM: Minority Report **$149,870**
9PM: X Files **$195,893** (midseason)
Lucifer **$87,390** (midseason)

## NBC

8PM: The Voice **$234,371**
8PM: Biggest Loser **$90,000** (midseason)
10PM: Blindspot **$190,216**

## CW

8PM: Crazy Ex-Girlfriend **$24,927**
9PM: Jane the Virgin **$25,871**

# TUESDAY

## ABC

8PM: The Muppets **$131,446**
830PM: Fresh Off The Boat **$122,212**
8:30PM: The Real O'Neals **$80,690** (midseason)
9PM: Marvel's Agents of SHIELD **$132,552**
9PM: Marvel's Agent Carter **$135,093** (midseason)
10PM: TBD
10PM: Wicked City **$107,588** (midseason)

## CBS

8PM: NCIS **$145,083**
9PM: NCIS: New Orleans **$117,752**
10PM: Limitless **$109,434**

## FOX

8PM: Grandfathered **$109,935**
830PM: The Grinder **$107,368**
9PM: Scream Queens **$144,560**
9PM: New Girl **$150,913** (midseason)
930PM: Guide To Surviving Life **$89,355** (midseason)

## NBC

8PM: The Voice **$219,461**
9PM: Heartbreaker **$94,485**
10PM: Best Time Ever **$98,296**
10PM: Chicago Med **$109,846**
10PM: Chicago Fire **$141,925**

## CW

8PM: The Flash **$68,501**
9PM: I Zombie **$34,805**

# WEDNESDAY

## ABC

8PM: The Middle **$134,872**
830PM: The Goldbergs **$135,226**
9PM: Modern Family **$236,296**
930PM: Black-ish **$155,928**
10PM: Nashville **$92,965**
10PM: Secrets and Lies **$101,882** (midseason)

## CBS

8PM: Survivor **$121,952**
9PM: Criminal Minds **$129,945**
10PM: Code Black **$125,715**

## FOX

8PM: Rosewood **$89,835**
9PM: Empire **$521,794**
American Idol **$151,245** (midseason)
Lookinglass **$115,762** (midseason)

## NBC

8PM: Mysteries of Laura **$68,585**
9PM: Law & Order: SVU **$85,553**
10PM: Chicago P.D. **$119,065**

## CW

8PM: Arrow **$53,285**
9PM: Supernatural **$38,293**

# THURSDAY

## ABC

8PM: Grey's Anatomy **$160,415**
9PM: Scandal **$207,355**
10PM: How to Get Away with Murder **$229,794**
The Catch $**167,566** (midseason)

## CBS

8P Thursday Night Football (through November) **$462,622**
8PM: The Big Bang Theory **$266,163**
830PM: Life in Pieces **$142,812**
9PM: Mom **$123,966**
930PM: Angel From Hell **$119,138**
10PM: Elementary **$101,651**

## FOX

8PM: Bones **$92,183**
9PM: Sleepy Hollow **$121,733**
8PM: American Idol **$134,247** (midseason)

## NBC

8PM: Heroes Reborn **$128,321**
8PM: You, Me and the End of the World **$63,000** (midseason)
9PM: The Blacklist **$180,618**
10PM: The Player **$104,305**

## CW

8PM: The Vampire Diaries **$45,019**
9PM: The Originals **$31,492**

# FRIDAY

## ABC

8PM: Last Man Standing **$64,881**
830PM: Dr. Ken **$63,434**
830PM: Uncle Buck **$75,000** (midseason)
9PM: Shark Tank **$102,047**
10PM: 20/20 **$62,565**

## CBS

8PM: The Amazing Race **$66,841**
9PM: Hawaii Five-0 **$75,187**
10PM: Blue Bloods **$72,477**

## FOX

8PM: Masterchef Junior **$97,451**
8PM: Sleepy Hollow **$55,427**
9PM: World's Funniest Fails **$43,587**
9PM: Are You Smarter Than A Fifth Grader **$77,634** (midseason)

## NBC

8PM: Undateable **$47,937**
830PM: Truth Be Told **$83,099**
9PM: Grimm **$100,713**
10PM: Dateline NBC **$48,236**

## CW

8PM: Reign **$19,521**
9PM: America's Next Top Model **$17,267**

## SATURDAY

### ABC

8PM: ABC's Saturday Night College Football **$104,290**
8PM: Saturday Night Movie **$27,500** (midseason)

### CBS

8PM: Crimetime Saturday **$17,241**
9PM: Crimetime Saturday **$18,786**
10PM: 48 Hours **$32,351**

### FOX

8PM: Fox Saturday Night College Football **$84,000**
8PM: Reruns **$15,625**
9PM: Reruns **$15,625**

### NBC

8PM: Repeats **$28,000**
8PM: Saturday Dateline Mysteries **$44,500**
9PM: Repeats **28,000**
10PM: SNL Vintage **$28,673**



**6**   **LEAVE A REPLY**

**BIG BANG THEORY** | **EMPIRE** | **SUNDAY NIGHT FOOTBALL** | **THE WALKING DEAD** | **TV ADVERTISING**

**Want to read more articles like this one?   Subscribe to Variety Today.**

## Popular on Variety



**Laverne Cox: Why 'Our Lives Are on the Line' When It**





# EXHIBIT 6



☰

(https://www.adweek.com/agencyspy/mtv-steps-deeper-into-virtual-reality/118862)
(https://www.adweek.com/agencyspy/we-hear-some-prominent-agencies-opted-out-of-the-mtv-creative-review/118851)

**AD BIZ (/AGENCYSPY/CATEGORY/AD-BIZ)** | **TV (/AGENCYSPY/CATEGORY/TV)**

# A 30-Second Ad on Fox's Empire Would Have Cost You Over $500K Last Year

  

By Erik Oster (https://www.adweek.com/agencyspy/author/erikoster) on Oct. 17, 2016 - 3:29 PM

💬 Comment (https://www.adweek.com/agencyspy/a-30-second-ad-on-foxs-empire-would-have-cost-you-over-500k-last-year/11890



Here's a somewhat interesting piece that has nothing to do with agency press releases: Advertising research, analytics, and planning tool SQAD pushed out an analysis of the average cost of a primetime 30-second spot for the top-rated fall shows of 2015.

Fox's **Empire** easily topped with the list, with its $508,115 average cost for a primetime 30-second spot more than double the runner-up, CBS' **The Big Bang Theory**, which had an average cost of $249,161.

$225,000 for a combined average of around $229,000 per 30-second spot. **Empire** still gave Fox the lead in that category, though. Despite **Family Guy** and **Scream Queens** averaging below $141,000, the combined average for the network's top three programs was a little over $260,000 per 30-second spot.

Among the other findings, **The Voice** was the only reality show to make the list, at an average of $222, 487 for a 30-second spot and CW was the least expensive of the networks, with the youth-oriented network's top offering of **The Flash** averaging $59,028 for a 30-second spot.

The study also found that some of the best values to not make the list included CBS' **Code Black**, which charged an average of $121,223 for a 30-second spot with ratings* of 6.3 (comparable to the 6.2 ratings for NBC's **Blindspot**, which charged an average of $177,044), and CBS' **Limitless**, with a 6.2 rating* and an average cost of just $101,457 for a 30-second spot.

Based on the [first ratings (http://www.adweek.com/news/television/heres-what-we-learned-first-week-new-tv-season-173756)](http://www.adweek.com/news/television/heres-what-we-learned-first-week-new-tv-season-173756) and [social media engagement (http://www.adweek.com/news/television/us-had-most-facebook-and-twitter-activity-any-new-show-fall-174075)](http://www.adweek.com/news/television/us-had-most-facebook-and-twitter-activity-any-new-show-fall-174075) studies from this year's season, it looks like This Is Us could be the next Empire.

Here's the table of each network's 3 priciest programs from last fall:

| Network | Show | Average cost for :30 spot | HH Rating* | HH CPM* |
|---------|------|---------------------------|------------|---------|
| ABC | Scandal | $229,099 | 6.8 | 28.88 |
| | Modern Family | $232,113 | 5.4 | 36.59 |
| | How to Get Away With Murder | $225,985 | 6 | 32.58 |
| CBS | Big Bang Theory | $249,161 | 8 | 26.85 |

| | | | | |
|---|---|---|---|---|
| | Scorpion | $152,400 | 6.6 | 19.86 |
| **CW** | The Flash | $59,028 | 2 | 25.81 |
| | Significant Mother | $44,486 | 0.9 | 41.77 |
| | The Arrow | $42,957 | 1.7 | 21.5 |
| **FOX** | Empire | $508,115 | 8.6 | 50.71 |
| | Family Guy | $140,466 | 2.9 | 41.52 |
| | Scream Queens | $132,542 | 3.8 | 29.95 |
| **NBC** | The Voice | $222,487 | 6.8 | 28.26 |
| | Blindspot | $177,044 | 6.2 | 24.35 |
| | The Blacklist | $142,948 | 5.6 | 21.85 |

**\*Household ratings are based on an aggregate of the guaranteed ratings by networks, not actual Nielsen ratings**

# Comments

**0 Comments**                                    Sort by  Oldest



Add a comment...

Facebook Comments Plugin

< Previous Article (https://www.adweek.com/agencyspy/we-hear-some-prominent-

Next Article > (https://www.adweek.com/a new-york-and-playstation-sink-

Advertisement

[_____ review/118851)                                         _____)

Get AgencySpy delivered straight to your inbox

Email address                                                    Submit

## Send an anonymous tip

Describe your tip

Send

## Subscribe to Adweek

[(http://adweek.com/subscribe-widget)   **Magazine + iPad App**

Subscribe                    Buy Issue
(http://adweek.com/subscribe-  (http://shop.adweek.com)
widget)

## Featured Jobs

**Sales Consultant (https://jobs.adweek.com/job/sales-consultant-golden-colorado-277704)**
HomeAdvisor
Golden, Colorado

**Editorial Producer (Guest Booking) - Cuomo Primetime, C... (https://jobs.adweek.com/job/editorial-producer-guest-booking-cuomo-primetime-cnn-new-york-new-york-277696)**
CNN
New York, New York

**Media Sales Representative (https://jobs.adweek.com/job/media-sales-representative-new-york-city-new-york-277702)**
HomeAdvisor

**Online Sales Consultant (https://jobs.adweek.com/job/online-sales-consultant-indianapolis-indiana-277703)**

HomeAdvisor

Indianapolis, Indiana

---

**National Marketing Manager - Cayman Islands Dept. of To... (https://jobs.adweek.com/job/national-marketing-manager-cayman-islands-dept-of-tourism-new-york-new-york-277697)**

Cayman Islands Dept. of tourism

New York, New York

---

**See More Jobs**

(http://jobs.adweek.com)

---

**Adweek Network** ▾

**About** ▾

**More** ▾

© 2018 Adweek All Rights Reserved



. (https://www.adweek.com/agencyspy/)



(https://www.facebook.com/pages/AgencySpy/212390705446846)



. (http://www.twitter.com/agencyspy)

. (https://www.linkedin.com/company/adweek)

# EXHIBIT 7





# How Many Minutes of Commercials Are Shown in an Average TV Hour? The Number Has Been Steadily Climbing

May 13, 2014   •   Post A Comment

The number of commercials shown in a typical hour of television has increased steadily over the past five years, the Los Angeles Times' Company Town reports, citing a study from Nielsen.

Broadcast networks averaged 13 minutes and 25 seconds of commercial time per hour in 2009, which grew to 14 minutes and 15 seconds in 2013, the story reports.

On cable TV, the growth has been even more significant, the report notes. Last year, the average was 15 minutes and 38 seconds, up from 14 minutes and 27 seconds in 2009, according to the report.

And more commercials are being jammed into that growing ad hole, with the number of 30-second spots decreasing while the number of 15-second ads rises.

"In 2009, 30-second spots accounted for 62% of all ads on television; 15-second spots were just 35%. In 2013, the percentage of 30-second ads fell to 53% and 15-second spots increased to 44%," the story reports. "The increased number of commercials has translated to more money flowing into television. According to Nielsen, advertisers spent $78 billion on TV commercials in 2013, compared to $64 billion in 2009."

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| T.S. *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Twentieth Century Fox Television *et al.*, <br><br> Defendants. | Case No. 1:16-cv-08303 <br><br> Hon. Amy J. St. Eve |

**TWENTY-FIRST CENTURY FOX, INC.'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, by and through its attorneys, Twenty-First Century Fox ("21CF") hereby objects and responds to Plaintiffs' First Set of Interrogatories ("Responses"):

**PRELIMINARY STATEMENT**

All Responses that follow are made subject to this preliminary statement.

1.     The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Interrogatories or Responses; (3) the right to object to the use of information produced in response to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2.     The information and responses supplied herein are for use in this action only, and for no other purpose.

3.      Any statement by 21CF that it is producing or will produce information responsive to any Interrogatory does not mean that it possesses responsive information.  A statement that 21CF is producing or will produce information responsive to any Interrogatory means only that 21CF is conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information at the conclusion of its investigation.  No response or objection made herein, or lack thereof, is an admission by 21CF as to the existence or non-existence of any information.

4.      21CF expressly preserves its objections to these Interrogatories to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery. Inadvertent production of information that 21CF later claims was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege.  Instead, 21CF may request the return of any inadvertently produced information stating the basis for withholding such material.

5.      FBC reserves the right to assert additional objections to these Interrogatories as appropriate, and to amend or supplement these objections and responses based on the results of its continuing investigation.

## OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1:** State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.

**RESPONSE**: Objection.  21CF objects to Interrogatory No. 1 because it is overly broad, unduly burdensome, and not proportional to the needs of the case.  Specifically, Interrogatory No. 1 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to 21CF, if at all, but is available to Plaintiffs and other parties to this action.  Subject to and without waiving the foregoing objections, 21CF states:

1. Named Plaintiffs and persons who, when the Named Plaintiffs were minors, acted as their legal guardians
   Represented by counsel
   Knowledge of facts and circumstances alleged in the complaint.

2. Anna Ashcraft
   Director of Real Estate Management
   County of Cook, Real Estate Management Division
   Represented by counsel
   Knowledge of facts and circumstances alleged in their complaint.

3. Brady Breen
   Location Manager
   To be contacted through undersigned counsel
   Mr. Breen is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, TCFTV's presence at and activities within the JTDC in the summer of 2015, and contacts between TCFTV and JTDC officials before and during filming.

4. Richard Lederer
   Production Manager and Co-Producer
   To be contacted through undersigned counsel
   Mr. Lederer is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, and any payments

made to the County pursuant to the Location Agreement or otherwise relating to TCFTV's presence at the JTDC in the summer of 2015.

5.    Loucas George
Co-Executive Producer/Line Producer
To be contacted through undersigned counsel.
Mr. George is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, TCFTV's presence at and activities within the JTDC in the summer of 2015, and contacts between TCFTV and JTDC officials before and during filming.

6.    Bruce Terris
First Assistant Director
To be contacted through undersigned counsel.
Mr. Terris is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, TCFTV's presence at and activities within the JTDC in the summer of 2015.

7.    Jess Gisin
Extras Coordinator
To be contacted through undersigned counsel
Ms. Gisin is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the hiring of extras during filming at the JTDC.

**INTERROGATORY NO. 2:** State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses. Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 2 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 2 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to 21CF, if at all, but is available to Plaintiffs and other parties to this action. Subject to and without waiving the foregoing objections, 21CF states: None.

4

**INTERROGATORY NO. 3:** List the documents, ESI, tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control.

**RESPONSE**: Objection.  21CF objects to Interrogatory No. 3 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case.  Specifically, Interrogatory No. 3 is

overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests

information regarding "any party's claims or defenses" and such information is not readily

available to 21CF, if at all, but is available to Plaintiffs and other parties to this action.  Subject to

and without waiving the foregoing objections, 21CF refers Plaintiffs to the documents TCFTV is

producing in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century

Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television.


**INTERROGATORY NO. 4** Describe in detail the nature of the search you have performed to discover and/or produce documents in this case. Include in your answer a description of all locations, whether electronic or physical, that have been searched, and all custodians whose documents have been searched. If you have used search terms or other parameters to search ESI, provide those terms and parameters.

**RESPONSE**:  Objection.  21CF objects to Interrogatory No. 4 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case.  Specifically, the information sought in

Interrogatory No. 4 is not relevant to any party's claim or defense and improperly requests 21CF

to undertake a wholly unnecessary task that is inconsistent with the U.S. Court of Appeals for the

Seventh Circuit's approach to "discovery on discovery."  *See, e.g.*, Seventh Cir. Elec. Discovery

Comm., Proposed Standing Order Relating to the Discovery of ESI, Principle 2.04(b).  Subject to

and without waiving the foregoing objections, 21CF states that it has searched for any written

communication between FBC and the County of Cook, Illinois and the Chief Judge of the Circuit Court of Cook County and any other documents discussing or referencing filming of *Empire* at the JTDC.

**INTERROGATORY NO. 5:** Identify each employee or agent of TCFTV, FBC, or 21CF who entered the JTDC for any purpose relating to the filming of *Empire* there. For each such person, identify:

      a.      The person's name;

      b.      The person's last known contact information, including address and phone number;

      c.      The person's employer;

      d.      Each person or entity on whose behalf or at whose direction the person entered the JTDC;

      e.      The person's job title;

      f.      Each date and time that the person entered the JTDC;

      g.      Each place within the JTDC that the person travelled; and

      h.      The nature of the work or tasks the person performed within the JTDC.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 5 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 5 related to each employee who entered the JDTC for any purpose is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 5 that are not relevant to any party's claim or defense. Moreover, Interrogatory No. 5 is directed at 21CF, but requests information related to TCFTV and FBC. Requests for such information are more properly directed at TCFTV and FBC. Subject to and without waiving the foregoing objections, 21CF

refers Plaintiffs to the Call Sheets and Production Reports that TCFTV is producing in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television, Bates numbers TCFTV000654 to TCFTV000986.

**INTERROGATORY NO. 6:** Identify each person who provided services to TCFTV, FBC, or 21CF, directly or indirectly, relating to the filming of *Empire* at the JTDC. For each such person, identify:

    a.      The person's name;

    b.      The person's last known contact information, including address and phone number;

    c.      The person's employer;

    d.      Each person or entity on whose behalf or at whose direction the person provided the service;

    e.      The person's job title;

    f.      Each date and time that the person entered the JTDC if any;

    g.      Each place within the JTDC, if any, that the person travelled; and

    h.      The nature of the services that the person provided.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 6 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 6 related to *each* person who provided services to TCFTV, FBC, or 21CF, *directly or indirectly*, *relating to* the filming of *Empire* at the JTDC is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 6 that are not relevant to any party's claim or defense. Moreover, Interrogatory No. 6 is directed at 21CF, but requests information related to TCFTV and FBC. Requests for such information are more properly directed at TCFTV

and FBC. Subject to and without waiving the foregoing objections, 21CF refers Plaintiffs to the

Call Sheets and Production Reports that TCFTV is producing in response to Plaintiffs' First Set of

Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and

Twentieth Century Fox Television, Bates numbers TCFTV000654 to TCFTV000986.

**INTERROGATORY NO. 7:** Identify all communications to or from any employee or agent of TCFTV, FBC, or 21CF relating to the filming of *Empire* at the JTDC, including but not limited to the effect of the filming on the JTDC's operations and the detainees housed there. For each such communication, identify:

    a.      Each person who participated in the communication;

    b.      The employer of each such person or the entity for whom each such person acted as an agent;

    c.      The time and date of the communication;

    d.      Any documents generated by or relating to the communication; and

    e.      A fair description of the nature and substance of the communication.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 7 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case. Specifically, the information sought in

Interrogatory No. 7 related to *all* communications *relating to* the filming of *Empire* at the JTDC is

overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast

amounts of detailed, narrative information in the subsections of Interrogatory No. 7 that are not

relevant to any party's claim or defense. Moreover, Interrogatory No. 7 is directed at 21CF, but

requests information related to TCFTV and FBC. Requests for such information are more properly

directed at TCFTV and FBC. Subject to and without waiving the foregoing objections, 21CF

refers Plaintiffs to the documents produced in response to Plaintiffs' First Set of Requests for

Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century

Fox Television.

**INTERROGATORY NO. 8:** With respect to income realized by 21CF or any of its subsidiaries in relation to *Empire*, identify with specificity for each such entity:

    a.      The gross revenues, net revenues, and profits that received from Season 1 of *Empire*;

    b.      The gross revenues, net revenues, and profits received from Season 2 of *Empire*;

    c.      For *Empire* Season 2, Episode 1, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost; and

    d.      For *Empire* Season 2 Episode 2, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 8 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 8 (a) and (b) request revenue and profit information for two complete seasons of *Empire*, including revenue and profit information for Season 1, the filming of which concluded before the events giving rise to the current action. This information is not relevant to any party's claim or defense. In addition, Interrogatory No. 8 (c) and (d) request an accounting of all costs and revenue for the first two episodes of *Empire* Season 2, regardless of if the costs or revenue are related to 21CF's alleged involvement in the filming at the JTDC. Finally, at this stage in the pleadings, the information sought in Interrogatory No. 8 is not relevant because 21CF's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of Civil Procedure 23. Therefore discovery of actual damages issues prior to class certification is premature. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

**INTERROGATORY NO. 9:** Identify each employee or agent of 21CF or any of its subsidiaries who were assigned to or worked in or as part of the business unit "Fox Television Group" during the Relevant Period. For each such person, identify:

      a.      The legal entity (e.g., 21CF, FBC, TCFTV, or other) that employed the person;

      b.      The title or role of the person within Fox Television Group;

      c.      Any and all communications that the person had regarding the filming of *Empire* at the JTDC; and

      d.      Any and all documents in the person's possession regarding the filming of *Empire* at the JTDC.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 9 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 9 seeks information that is not relevant to any party's claim or defense, including that identity of alleged employees or agents that had nothing to do with the filming at the JTDC. Moreover, the information sought in Interrogatory No. 9(c) related to *all* communications *regarding* the filming of *Empire* at the JTDC is overly broad and unduly burdensome in that most of the communications and documents sought are not relevant to any party's claims or defense.

**INTERROGATORY NO. 10**: For each of your defenses, state the facts relevant to it and the legal theories upon which it is based.

**RESPONSE**: Objection. 21CF objects to Interrogatory No. 10 because it is unduly burdensome. Specifically, Interrogatory No. 10 is a contention interrogatory that is premature at this stage in the proceeding and places an undue burden on 21CF in purporting to require 21CF to answer this contention interrogatory before discovery is complete in this matter. "The general policy is to defer contention interrogatories until discovery is near an end, in order to promote efficiency and fairness." *Ziemack v. Centel Corp.*, 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995).

Date: December 15, 2017

Respectfully Submitted,

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 15, 2017, a true and correct copy of the foregoing was served to all counsel of record via email.

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| T.S. *et al.,* | Case No. 1:16-cv-08303 |
| Plaintiffs, | Hon. Amy J. St. Eve |
| v. | |
| Twentieth Century Fox Television *et al.,* | |
| Defendants. | |

**FOX BROADCASTING COMPANY'S OBJECTIONS AND RESPONSES TO**

**PLAINTIFFS' FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, by and through its attorneys, Fox Broadcasting Company ("FBC") hereby objects and responds to Plaintiff's First Set of Interrogatories ("Responses"):

**PRELIMINARY STATEMENT**

All Responses that follow are made subject to this preliminary statement.

1.      The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Interrogatories or Responses; (3) the right to object to the use of information produced in response to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2.      The information and responses supplied herein are for use in this action only, and for no other purpose.

3.      Any statement by FBC that it is producing or will produce information responsive to any Interrogatory does not mean that it possesses responsive information.  A statement that FBC is producing or will produce information responsive to any Interrogatory means only that FBC is conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information at the conclusion of its investigation.  No response or objection made herein, or lack thereof, is an admission by FBC as to the existence or non-existence of any information.

4.      FBC expressly preserves its objections to these Interrogatories to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery. Inadvertent production of information that FBC later claims was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege.  Instead, FBC may request the return of any inadvertently produced information stating the basis for withholding such material.

5.      FBC reserves the right to assert additional objections to these Interrogatories as appropriate, and to amend or supplement these objections and responses based on the results of its continuing investigation.

## OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1**: State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 1 because it is overly broad and unduly burdensome. Specifically, Interrogatory No. 1 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to FBC, if at all, but is available to Plaintiffs and other parties to this action. Subject to and without waiving the foregoing objections, FBC states:

1. Named Plaintiffs and persons who, when the Named Plaintiffs were minors, acted as their legal guardians
   Represented by counsel
   Knowledge of facts and circumstances alleged in the complaint.

2. Anna Ashcraft
   Director of Real Estate Management
   County of Cook, Real Estate Management Division
   Represented by counsel
   Knowledge of facts and circumstances alleged in their complaint.

3. Brady Breen
   Location Manager
   To be contacted through undersigned counsel
   Mr. Breen is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, TCFTV's presence at and activities within the JTDC in the summer of 2015, and contacts between TCFTV and JTDC officials before and during filming.

4. Richard Lederer
   Production Manager and Co-Producer
   To be contacted through undersigned counsel
   Mr. Lederer is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, and any payments made to the County pursuant to the Location Agreement or otherwise relating to TCFTV's presence at the JTDC in the summer of 2015.

5.    Loucas George
      Co-Executive Producer/Line Producer
      To be contacted through undersigned counsel.
      Mr. George is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, TCFTV's presence at and activities within the JTDC in the summer of 2015, and contacts between TCFTV and JTDC officials before and during filming.

6.    Bruce Terris
      First Assistant Director
      To be contacted through undersigned counsel.
      Mr. Terris is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, TCFTV's presence at and activities within the JTDC in the summer of 2015.

7.    Jess Gisin
      Extras Coordinator
      To be contacted through undersigned counsel
      Ms. Gisin is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the hiring of extras during filming at the JTDC.

**INTERROGATORY NO. 2**: State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses. Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

**RESPONSE:**  Objection.  FBC objects to Interrogatory No. 2 because it is overly broad, unduly burdensome, and not proportional to the needs of the case.  Specifically, Interrogatory No. 2 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to FBC, if at all, but is available to Plaintiffs and other parties to this action.  Subject to and without waiving the foregoing objections, FBC states:  None.

**INTERROGATORY NO. 3**: List the documents, ESI, tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control.

**RESPONSE:**  Objection.  FBC objects to Interrogatory No. 3 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case.  Specifically, Interrogatory No. 3 is

overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests

information regarding "any party's claims or defenses" and such information is not readily

available to FBC, if at all, but is available to Plaintiffs and other parties to this action.  Subject to

and without waiving the foregoing objections, FBC refers Plaintiffs to the documents TCFTV is

producing in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century

Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television.


**INTERROGATORY NO. 4**: Describe in detail the nature of the search you have performed to discover and/or produce documents in this case. Include in your answer a description of all locations, whether electronic or physical, that have been searched, and all custodians whose documents have been searched. If you have used search terms or other parameters to search ESI, provide those terms and parameters.

**RESPONSE:**  Objection.  FBC objects to Interrogatory No. 4 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case.  Specifically, the information sought in

Interrogatory No. 4 is not relevant to any party's claim or defense and improperly requests FBC to

undertake a wholly unnecessary task that is inconsistent with the U.S. Court of Appeals for the

Seventh Circuit's approach to "discovery on discovery."  *See, e.g.*, Seventh Cir. Elec. Discovery

Comm., Proposed Standing Order Relating to the Discovery of ESI, Principle 2.04(b).  Subject to

and without waiving the foregoing objections, FBC states that it has searched for any written

5

communication between FBC and the County of Cook, Illinois and the Chief Judge of the Circuit Court of Cook County and any other documents discussing or referencing filming of *Empire* at the JTDC.

**INTERROGATORY NO. 5**: Identify each employee or agent of TCFTV, FBC, or 21st Fox who entered the JTDC for any purpose relating to the filming of *Empire* there. For each such person, identify:

    a.    The person's name;

    b.    The person's last known contact information, including address and phone number;

    c.    The person's employer;

    d.    Each person or entity on whose behalf or at whose direction the person entered the JTDC;

    e.    The person's job title;

    f.    Each date and time that the person entered the JTDC;

    g.    Each place within the JTDC that the person travelled; and

    h.    The nature of the work or tasks the person performed within the JTDC.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 5 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 5 related to each employee who entered the JDTC for any purpose is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 5 that are not relevant to any party's claim or defense. Moreover, Interrogatory No. 5 is directed at FBC, but requests information related to TCFTV and 21CF. Requests for such information are more properly directed at TCFTV and 21CF. Subject to and without waiving the foregoing objections,

FBC refers Plaintiffs to the Call Sheets and Production Reports that TCFTV is producing in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television, Bates numbers TCFTV000654 to TCFTV000986.


**INTERROGATORY NO. 6**: Identify each person who provided services to TCFTV, FBC, or 21st Fox, directly or indirectly, relating to the filming of *Empire* at the JTDC. For each such person, identify:

a.    The person's name;

b.    The person's last known contact information, including address and phone number;

c.    The person's employer;

d.    Each person or entity on whose behalf or at whose direction the person provided the service;

e.    The person's job title;

f.    Each date and time that the person entered the JTDC if any;

g.    Each place within the JTDC, if any, that the person travelled; and

h.    The nature of the services that the person provided.

**RESPONSE:**  Objection.  FBC objects to Interrogatory No. 6 because it is overly broad, unduly burdensome, and not proportional to the needs of the case.  Specifically, the information sought in Interrogatory No. 6 related to *each* person who provided services to TCFTV, FBC, or 21CF, *directly or indirectly*, *relating to* the filming of *Empire* at the JTDC is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 6 that are not relevant to any party's claim or defense.  Moreover, Interrogatory No. 6 is directed at FBC, but requests information related to TCFTV and 21CF.  Requests for such information are more properly directed at TCFTV

and 21CF. Subject to and without waiving the foregoing objections, FBC refers Plaintiffs to the Call Sheets and Production Reports that TCFTV is producing in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television, Bates numbers TCFTV000654 to TCFTV000986.

**INTERROGATORY NO. 7**: Identify all communications to or from any employee or agent of TCFTV, FBC, or 21st Fox relating to the filming of *Empire* at the JTDC, including but not limited to the effect of the filming on the JTDC's operations and the detainees housed there. For each such communication, identify:

      a.      Each person who participated in the communication;

      b.      The time and date of the communication;

      c.      Any documents generated by or relating to the communication; and

      d.      A fair description of the nature and substance of the communication.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 7 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 7 related to *all* communications *relating to* the filming of *Empire* at the JTDC is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 7 that are not relevant to any party's claim or defense. Moreover, Interrogatory No. 7 is directed at FBC, but requests information related to TCFTV and 21CF. Requests for such information are more properly directed at TCFTV and 21CF. Subject to and without waiving the foregoing objections, FBC refers Plaintiffs to the documents produced in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television.

**INTERROGATORY NO. 8**: With respect to income realized by FBC in relation to *Empire*, identify with specificity:

   e.   The gross revenues, net revenues, and profits you have received from Season 1 of *Empire*;

   f.   The gross revenues, net revenues, and profits you have received from Season 2 of *Empire*;

   g.   For *Empire* Season 2, Episode 1, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost; and

   h.   For *Empire* Season 2 Episode 2, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost

**RESPONSE:**  Objection.  FBC objects to Interrogatory No. 8 because it is overly broad, unduly burdensome, and not proportional to the needs of the case.  Specifically, Interrogatory No. 8 (a) and (b) request revenue and profit information for two complete seasons of *Empire*, including revenue and profit information for Season 1, the filming of which concluded before the events giving rise to the current action.  This information is not relevant to any party's claim or defense. In addition, Interrogatory No. 8 (c) and (d) request an accounting of all costs and revenue for the first two episodes of *Empire* Season 2, regardless of if the costs or revenue are related to FBC's alleged involvement in the filming at the JTDC.  Finally, at this stage in the pleadings, the information sought in Interrogatory No. 8 is not relevant because FBC's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of Civil Procedure 23.  Therefore discovery of actual damages issues prior to class certification is premature.  See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

**INTERROGATORY NO. 9**: For each of your defenses, state the facts relevant to it and the legal theories upon which it is based.

**RESPONSE:** Objection. FBC objects to Interrogatory No. 9 because it is unduly burdensome. Specifically, Interrogatory No. 9 is a contention interrogatory that is premature at this stage in the proceeding and places an undue burden on FBC in purporting to require FBC to answer this contention interrogatory before discovery is complete in this matter. "The general policy is to defer contention interrogatories until discovery is near an end, in order to promote efficiency and fairness." *Ziemack v. Centel Corp.*, 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995).

Date: December 15, 2017

Respectfully Submitted,

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 15, 2017, a true and correct copy of the foregoing was served to all counsel of record via email.

<u>/s/ Jeffrey S. Jacobson</u>

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| T.S. *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>Twentieth Century Fox Television *et al.*,<br><br>    Defendants. | Case No. 1:16-cv-08303<br><br>Hon. Amy J. St. Eve |

## TWENTY-FIRST CENTURY FOX, INC., FOX BROADCASTING COMPANY, AND TWENTIETH CENTURY FOX TELEVISION OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, by and through their attorneys, Twentieth Century Fox Film Corporation ("TCFTV"); Fox Broadcasting Company ("FBC"); and Twenty-First Century Fox, Inc. ("21CF") (collectively the "Fox Defendants"), hereby object and respond ("Responses") to Plaintiffs' First Set of Requests for Production ("Requests"):

## PRELIMINARY STATEMENT

All Responses that follow are made subject to this preliminary statement.

1.      The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Requests or Responses; (3) the right to object to the use of information produced in response to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2.     The information and responses supplied herein are for use in this action only, and for no other purpose.

3.     Any statement by the Fox Defendants that they are producing or will produce information or documents responsive to any Request does not mean that any of the Fox Defendants, either individually or collectively, possesses responsive information. A statement that the Fox Defendants are producing or will produce information or documents responsive to any Request means only that the Fox Defendants are conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information or documents at the conclusion of its investigation within their respective possession, custody, or control. No response or objection made herein, or lack thereof, is an admission by any of the Fox Defendants as to the existence or non-existence of any information or documents.

4.     The Fox Defendants expressly preserve their objections to these Requests to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery. Inadvertent production of information that the Fox Defendants later claim was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege. Instead, the Fox Defendants may request the return of any inadvertently produced information stating the basis for withholding such material.

5. The Fox Defendants reserve the right to assert additional objections to these Requests as appropriate, and to amend or supplement these objections and responses based on the results of their continuing investigation.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1**: All documents identified in your Initial Disclosures.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of the Fox Defendants 26(a)(1) Initial Disclosures. Subject to and without waiving the foregoing objections, the Fox Defendants will produce the responsive non-privileged documents identified in their Initial Disclosures in their possession, custody, or control.

**REQUEST NO. 2**: All documents that you identified or referred to in response to Plaintiffs' interrogatories.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure but the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce those documents referred to in their respective Responses to Plaintiffs' Interrogatories, if any.

**REQUEST NO. 3**: All documents concerning (in whole or in part) the filming of *Empire* at the JTDC. This includes, but is not limited to, communications with and among the following persons and entities, as well as officers, employees, or agents of same:

    a. Any defendant in this case, including any Fox entity;

    b. Any member of the cast or crew of *Empire*;

    c. Any person or entity contracted or otherwise hired or retained to provide services relating in whole or in part to the filming of *Empire* at the JTDC;

    d. Vendors or service providers at the JTDC, including defense attorneys, court staff, states attorneys, sheriff, police, program providers, volunteers, and contractors;

  e.  Non-profit organizations affiliated with the JTDC, including the JTDC Foundation;

  f.  JTDC personnel;

  g.  Chicago Public Schools;

  h.  The City of Chicago;

  i.  The State of Illinois; and

  j.  The Chicago Film Office, the Illinois Film Office, and/or the City of Chicago Department of Cultural Affairs and Special Events.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" the filming of *Empire* at the JTDC could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. For example, this Request encompasses communications with individuals and third-parties provided services "relating" to the filming of *Empire* at the JTDC that did not have contact with any defendant other than TCFTV or were not present at the JTDC, such as film editors and caterers. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce communications and documents between and among the Fox Defendants, the County, Chief Judge of the Circuit Court of Cook County, Leonard Dixon and JTDC personnel, sufficient to show the cast and crew members present at the JTDC as well as the locations within the JTDC used by TCFTV. The Fox Defendants also will produce the Location Agreement and addenda between TCFTV and the County. No other agreements exist.

**REQUEST NO. 4**: All documents concerning (in whole or in part) the script or similar document calling for the scenes that were eventually filmed at the JTDC.

**RESPONSE**: The Fox Defendants object to this request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" the script or similar document calling for the scenes that were eventually filmed at the JTDC seeks a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, this Request calls for script drafts and the communications related to those edits. Subject to and without waiving the foregoing objections, the Fox Defendants will produce the script(s) used for the scenes filmed at the JTDC and communications, if any, pertaining to edits necessitated by use of the JTDC as a filming location.

**REQUEST NO. 5**: All documents concerning (in whole or in part) the scouting, consideration, and selection of the JTDC as a location for the filming of *Empire*.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, this Request encompasses receipts and other travel documents and communications that are not relevant to the selection of the JTDC as a filming location. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents related to the scouting, consideration, and selection of the JTDC as a location for the filming of *Empire,* and the Location Agreement and addenda between TCFTV and the County for filming within the JTDC.

**REQUEST NO. 6**: All documents concerning (in whole or in part) the scouting and consideration of other locations, settings, or methods for the filming of the *Empire* scenes that were filmed at the JTDC, and any negotiations or agreements regarding same.

5

**RESPONSE**: The Fox Defendants object to this request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, and as with Request No. 5, this Request encompasses receipts and other travel documents and communications that are not relevant to the selection of the JTDC as a filming location. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure but the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, Fox Defendants will produce documents related to the scouting, and consideration of other locations for filming the scenes that were filmed at the JTDC.

**REQUEST NO. 7**: All documents concerning (in whole or in part) any agreements or contracts relating to the filming of *Empire* at the JTDC, including all documents relating to the negotiation of the agreements, and all versions and drafts of the agreements.

**RESPONSE**:  The Fox Defendants object to this request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part) any agreements or contracts relating to the filming" could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, this Request encompasses agreements, contracts, and related communications with individuals and entities that had no part in the selection of the JTDC as a filming location or were not involved in the filming of *Empire* at the JTDC, such as caterers and other service providers. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents related to the

negotiation and execution of the Location Agreement and addenda between TCFTV and the County for filming within the JTDC.

**REQUEST NO. 8**: All documents concerning (in whole or in part) the JTDC's layout, floorplans, and operations.

**RESPONSE**: The Fox Defendants will produce the documents in its possession, if any, that describe the JTDC's layout, floorplans, and operations.

**REQUEST NO. 9**: All documents concerning (in whole or in part) any "prep" for filming at the JTDC, including preparations made by Fox employees or agents at the JTDC in advance of filming there.

**RESPONSE:** The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" any "prep" for filming at the JTDC encompasses a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, this Request encompasses documents related to travel and other logistical considerations for activities that occurred outside of the JTDC. In addition, the Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. Subject to and without waiving the foregoing objections, the Fox Defendants will produce communications and documents between and among the Fox Defendants, the County, Chief Judge of the Circuit Court of Cook County, Leonard Dixon and JTDC personnel, related to the preparation that was done prior to filming at the JTDC.

**REQUEST NO. 10**: All documents concerning (in whole or in part) the terms (or substantially similar terms) of Section 1(D) of the Location Agreement (ECF No. 51-2), including but not limited to any communications relating to the inclusion of such terms.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to

and without waiving the foregoing objections, the Fox Defendants will produce documents and communications between and among the Fox Defendants, the County, Chief Judge of the Circuit Court of Cook County, Leonard Dixon and JTDC personnel, if any, related to Section 1(D) of the Location Agreement.

**REQUEST NO. 11**: In Section 1(D) of the Location Agreement (and all subsequent Location Agreements, *see* ECF Nos. 51-2), TCFTV "acknowledges that the [JTDC] is a functioning Municipal Building, operating as a residential facility for juveniles." Produce all documents TCFTV referred to or relied upon in making this acknowledgement, and all documents upon which this acknowledgement was based.

**RESPONSE:** The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents, if any, related to Section 1(D) of the Location Agreement.

**REQUEST NO. 12**: All documents concerning (in whole or in part) your performance of Section 1(D) of the Location Agreement (and all subsequent Location Agreements, *see* ECF Nos. 51-2) regarding TFTV's use of the JTDC, *i.e.*, "TCFTV will cooperate with the County, JTDC Administration, and Security, the Department of Facilities Management and Staff and the Sheriff so that normal operations of the Building and its occupants, and access by the public, are not disrupted in any manner whatsoever."

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents, if any, related to Section 1(D) of the Location Agreement.

**REQUEST NO. 13**: All documents concerning (in whole or in part) any consideration or discussion by you or any other person of the effect that filming *Empire* at the JTDC would have on the JTDC's normal operations, on the children housed there, and/or on the provision of services to the children housed there.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents and communications between and among the Fox Defendants, the County, Chief Judge of the Circuit Court of Cook County, Leonard Dixon and JTDC personnel, if any, related to the effect that filming *Empire* "would have on the JTDC's normal operations, on the children housed there, and/or on the provision of services to the children housed there."

**REQUEST NO. 14**: All documents concerning (in whole or in part) the areas of the JTDC made available for *Empire*'s crew for filming and/or for support services (*e.g.*, areas for crew, equipment, changing, catering, delivery, lighting, production, etc.), as well as travel between such areas.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents sufficient to show the locations within the JTDC used by TCFTV and any documents that may exists that concern" travel between such areas."

**REQUEST NO. 15**: All documents concerning (in whole or in part) schedules or plans for filming, including crew schedules, filming schedules, schedules for access to the JTDC, times for filming or access to the JTDC or areas within the JTDC, and logistics relating to filming at the JTDC.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, "schedules or plans for filming" encompasses activities that occurred outside of the JTDC. The Fox Defendants further object to this Request to the extent it is duplicative of Plaintiffs' other Requests. Subject to and without waiving the

foregoing objections, the Fox Defendants will produce documents related to schedules or plans for filming at the JTDC.

**REQUEST NO. 16**: All documents concerning (in whole or in part) any alterations to the JTDC physical space made for filming and support services, including but not limited to any painting of the facility.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents, if any, related to any alterations to the JTDC.

**REQUEST NO. 17**: All documents concerning (in whole or in part) any equipment to be brought into the JTDC, including locations of same and schedules for entry and exit of same.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents concerning (in whole or in part)" could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, this Request encompasses contracts for the rental of equipment that is unrelated to the claims in this matter. Subject to and without waiving the foregoing objections, the Fox Defendants will produce correspondence, if any, relating to the entry, exit, and storage of equipment at the JTDC.

**REQUEST NO. 18**: All documents concerning (in whole or in part) any acts to be done (or omitted) by JTDC staff in relation to the filming of *Empire* at the JTDC.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request as unduly burdensome in so far as information regarding the JTDC's operations are within the possession, custody, or control of Cook County. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce communications between the Fox Defendants and JTDC personnel relating to the use of the JTDC.

**REQUEST NO. 19**: All documents concerning (in whole or in part) any alterations or changes to the JTDC's normal operations in connection with to the filming of *Empire* at the JTDC. This includes, but is not limited to, JTDC staff locations, staff duties, resident movement, school, medical, visitation, programming, recreation, court hearings, resident transfers, consolidation of pods, and provision of commissary.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request as unduly burdensome in so far as information regarding the JTDC's operations are within the possession, custody, or control of Cook County. The Fox Defendants further object to this Request to the extent it seeks information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce communications between the Fox Defendants and JTDC personnel relating to the use of the JTDC and documents sufficient to show the locations within the JTDC used by TCFTV.

**REQUEST NO. 20**: All documents concerning the locations of actors, film crews, any Fox employees or agents, JTDC staff, and/or JTDC residents during the Filming Periods.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request as unduly burdensome in so far as information regarding the JTDC's operations are within the possession, custody, or control of Cook County. Subject to and without waiving the foregoing objections, the Fox Defendants will produce communications between the Fox Defendants and JTDC personnel relating to the use of the JTDC and documents sufficient to show the cast and crew members present at the JTDC as well as the locations within the JTDC used by TCFTV.

**REQUEST NO. 21**: All documents related to any compensation paid or given by Fox to Cook County or any other party in exchange for or in relation to use of the JTDC as a set for filming of *Empire*.

**RESPONSE**: The Fox Defendants object to this Request to the extent it is duplicative of Plaintiffs' other Requests. The Fox Defendants further object to this Request to the extent it seeks

information protected from disclosure by the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents sufficient to show all amounts paid by the Fox Defendants for the use of the JTDC as a set for filming of *Empire*.

**REQUEST NO. 22**: All photographs or video of the crew or cast of *Empire* at the JTDC during the Relevant Period, including any metadata.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all photographs or video" of the crew or cast of *Empire* at the JTDC during which the JTDC was used for filming encompasses a large number of documents and information unrelated to any party's claim or defense, and is not proportional to the needs of the case.

**REQUEST NO. 23**: All documents created as posted signs (*e.g.*, a document created to be taped on a wall as a posted sign) relating in any way to the *Empire* filming, as well as any electronic files used to generate such documents, including any metadata.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all documents" created as posted signs seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case.

**REQUEST NO. 24**: All budget binders concerning (in whole or in part) *Empire* Season 2, Episode 1 and Episode 2.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all budget binders concerning (in whole or in part)" *Empire* Season 2, Episode 1 and Episode 2 could conceivably encompass a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. The Fox Defendants further object to this Request as vague in so far as the term "budget binders" is vague and undefined. Subject to and without waiving the foregoing objections, the Fox Defendants will

produce documents sufficient to show all amounts paid by the Fox Defendants for the use of the

JTDC as a set for filming of *Empire*.

**REQUEST NO. 25**: All production schedules concerning (in whole or in part) the scenes for *Empire* that were filmed at the JTDC.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome.

The Fox Defendants further object to this Request as vague in so far as the term "production

schedules" is vague and undefined. Subject to and without waiving the foregoing objections, the

Fox Defendants will produce call sheets and production reports for filming at the JTDC.

**REQUEST NO. 26**: Documents sufficient to identify each Fox employee or agent who entered the JTDC in connection with the filming of *Empire* there (including before and after the dates identified in the Filming Periods), the time(s) each such person entered the JTDC, and the time(s) each such person exited the JTDC.

**RESPONSE:** The Fox Defendants object to this Request as overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, the Fox Defendants will produce

communications between the Fox Defendants and JTDC personnel, documents sufficient to show

the cast and crew members present at the JTDC as well as the locations within the JTDC used by

TCFTV.

**REQUEST NO. 27**: All expense reports concerning (in whole or in part) the scenes for *Empire* that were filmed at the JTDC.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome.

Plaintiffs' request for "all expense reports concerning (in whole or in part)" the scenes for *Empire*

that were filmed at the JTDC encompasses a large number of documents unrelated to any party's

claim or defense, and is also not proportional to the needs of the case. The Fox Defendants further

object to this Request as vague in so far as the term "expense reports" is vague and undefined.

Subject to and without waiving the foregoing objections, the Fox Defendants will produce

documents sufficient to show all amounts paid by the Fox Defendants for the use of the JTDC as a set for filming of *Empire*.

**REQUEST NO. 28**: All profit and loss statements of TCFTV concerning (in whole or in part) all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all profit and loss statements of TCFTV concerning (in whole or in part)" all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2 encompasses a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, Plaintiffs have not disclosed any calculation of their alleged damages which necessitate or relate to any information contained in any portion of any TCFTV profit and loss statement, to the extent such documents exist. Finally, at this stage in the pleadings, the documents sought in this Request are not relevant because TCFTV's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of Civil Procedure 23. Therefore discovery of actual damages issues prior to class certification is premature. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents sufficient to show all amounts paid by the Fox Defendants for the use of the JTDC as a set for filming of *Empire*.

**REQUEST NO. 29**: All profit and loss statements of FBC concerning (in whole or in part) all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all profit and loss statements of FBC concerning (in whole or in part)" all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2 encompasses a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, Plaintiffs' claims do not allege any FBC action or inaction relating

14

to, or knowledge of, the conditions within the JTDC during the filming of *Empire*, nor could they. Finally, at this stage in the pleadings, the documents sought in this Request are not relevant because FBC's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of Civil Procedure 23. Therefore discovery of actual damages issues prior to class certification is premature. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents sufficient to show all amounts paid by the Fox Defendants for the use of the JTDC as a set for filming of *Empire*.

**REQUEST NO. 30**: All profit and loss statements of 21CF concerning (in whole or in part) all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request for "all profit and loss statements of 21CF concerning (in whole or in part)" all revenue and expenses associated with *Empire* Season 2, Episodes 1 and 2 encompasses a large number of documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, Plaintiffs' claims do not allege any 21CF action or inaction relating to, or knowledge of, the conditions within the JTDC during the filming of *Empire*, nor could they. Finally, at this stage in the pleadings, the information sought in this Request are not relevant because 21CF's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of Civil Procedure 23. Therefore discovery of actual damages issues prior to class certification is premature. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Subject to and without waiving the foregoing objections, the Fox Defendants will produce documents sufficient to show all amounts paid by the Fox Defendants for the use of the JTDC as a set for filming of *Empire*.

**REQUEST NO. 31**: Documents sufficient to show the rental cost per day of each other facility rented as a set for purposes of filming for Season 2 of *Empire*.

**RESPONSE**: The Fox Defendants object to this Request as overly broad and unduly burdensome. Plaintiffs' request seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, Plaintiffs have not disclosed any calculation of their alleged damages which necessitate or relate to the rental cost per day of any other facility rented as a set for purposes of filming for Season 2 of *Empire*.

Date: December 15, 2017

Respectfully Submitted,

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 15, 2017, a true and correct copy of the foregoing was served to all counsel of record via email.

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| T.S. *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Twentieth Century Fox Television *et al.*, <br><br> Defendants. | Case No. 1:16-cv-08303 <br><br> Hon. Amy J. St. Eve |

## TWENTIETH CENTURY FOX TELEVISION'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, by and through its attorneys, Twentieth Century Fox Television ("TCFTV") hereby objects and responds to Plaintiff's First Set of Interrogatories ("Responses"):

## PRELIMINARY STATEMENT

All Responses that follow are made subject to this preliminary statement.

1. The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Interrogatories or Responses; (3) the right to object to the use of information produced in response to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2. The information and responses supplied herein are for use in this action only, and for no other purpose.

3.      Any statement by TCFTV that it is producing or will produce information responsive to any Interrogatory does not mean that it possesses responsive information.  A statement that TCFTV is producing or will produce information responsive to any Interrogatory means only that TCFTV is conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information at the conclusion of its investigation.  No response or objection made herein, or lack thereof, is an admission by TCFTV as to the existence or non-existence of any information.

4.      TCFTV expressly preserves its objections to these Interrogatories to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery. Inadvertent production of information that TCFTV later claims was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege.  Instead, TCFTV may request the return of any inadvertently produced information stating the basis for withholding such material.

5.      TCFTV reserves the right to assert additional objections to these Interrogatories as appropriate, and to amend or supplement these objections and responses based on the results of its continuing investigation.

## OBJECTIONS AND RESPONSES

**INTERROGATORY NO. 1**: State the names and, if known, the addresses and telephone numbers of all persons who you believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 1 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 1 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to TCFTV, if at all, but is available to Plaintiffs and other parties to this action. Subject to and without waiving the foregoing objections, TCFTV states:

1. Named Plaintiffs and persons who, when the Named Plaintiffs were minors, acted as their legal guardians
Represented by counsel
Knowledge of facts and circumstances alleged in the complaint.

2. Anna Ashcraft
Director of Real Estate Management
County of Cook, Real Estate Management Division
Represented by counsel
Knowledge of facts and circumstances alleged in their complaint.

3. Brady Breen
Location Manager
To be contacted through undersigned counsel
Mr. Breen is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, TCFTV's presence at and activities within the JTDC in the summer of 2015, and contacts between TCFTV and JTDC officials before and during filming.

4. Richard Lederer
Production Manager and Co-Producer
To be contacted through undersigned counsel
Mr. Lederer is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the execution of TCFTV's Location Agreement with the County, and any payments made to the County pursuant to the Location Agreement or otherwise relating to TCFTV's presence at the JTDC in the summer of 2015.

5.      Loucas George
        Co-Executive Producer/Line Producer
        To be contacted through undersigned counsel.
        Mr. George is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, TCFTV's presence at and activities within the JTDC in the summer of 2015, and contacts between TCFTV and JTDC officials before and during filming.

6.      Bruce Terris
        First Assistant Director
        To be contacted through undersigned counsel.
        Mr. Terris is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, TCFTV's presence at and activities within the JTDC in the summer of 2015.

7.      Jess Gisin
        Extras Coordinator
        To be contacted through undersigned counsel
        Ms. Gisin is likely to have knowledge regarding the facts and circumstances surrounding the events described in the Complaint, including, but not limited to, the hiring of extras during filming at the JTDC.

**INTERROGATORY NO. 2**: State the names and, if known, the addresses and telephone numbers of all persons who you believe have given written or recorded statements relevant to any party's claims or defenses. Unless you assert a privilege or work product protection against disclosure under applicable law, attach a copy of each such statement if it is in your possession, custody, or control. If not in your possession, custody, or control, state the name and, if known, the address and telephone number of each person who you believe has custody of a copy.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 2 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 2 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to TCFTV, if at all, but is available to Plaintiffs and other parties to this action. Subject to and without waiving the foregoing objections, TCFTV states: None.

4

**INTERROGATORY NO. 3**: List the documents, ESI, tangible things, land, or other property known by you to exist, whether or not in your possession, custody or control, that you believe may be relevant to any party's claims or defenses. To the extent the volume of any such materials makes listing them individually impracticable, you may group similar documents or ESI into categories and describe the specific categories with particularity. Include in your response the names and, if known, the addresses and telephone numbers of the custodians of the documents, ESI, or tangible things, land, or other property that are not in your possession, custody, or control.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 3 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 3 is overly broad, unduly burdensome, and not proportional to the needs of the case in that it requests information regarding "any party's claims or defenses" and such information is not readily available to TCFTV, if at all, but is available to Plaintiffs and other parties to this action. Subject to and without waiving the foregoing objections, TCFTV refers Plaintiffs to the documents it is producing in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television.

**INTERROGATORY NO. 4**: Describe in detail the nature of the search you have performed to discover and/or produce documents in this case. Include in your answer a description of all locations, whether electronic or physical, that have been searched, and all custodians whose documents have been searched. If you have used search terms or other parameters to search ESI, provide those terms and parameters.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 4 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 4 is not relevant to any party's claim or defense and improperly requests TCFTV to undertake a wholly unnecessary task that is inconsistent with the U.S. Court of Appeals for the Seventh Circuit's approach to "discovery on discovery." *See, e.g.*, Seventh Cir. Elec. Discovery Comm., Proposed Standing Order Relating to the Discovery of ESI, Principle 2.04(b). Subject to and without waiving the foregoing objections, TCFTV states that it is producing all written

communication between TCFTV and the County of Cook, Illinois and the Chief Judge of the

Circuit Court of Cook County and all written agreements, including any amendments or addenda,

between TCFTV and the County of Cook, Illinois and the Chief Judge of the Circuit Court of Cook

County.

**INTERROGATORY NO. 5**: Identify each employee or agent of TCFTV, FBC, or 21CF who entered the JTDC for any purpose relating to the filming of *Empire* there. For each such person, identify:

    a.      The person's name;

    b.      The person's last known contact information, including address and phone number;

    c.      The person's employer;

    d.      Each person or entity on whose behalf or at whose direction the person entered the JTDC;

    e.      The person's job title;

    f.      Each date and time that the person entered the JTDC;

    g.      Each place within the JTDC that the person travelled; and

    h.      The nature of the work or tasks the person performed within the JTDC.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 5 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case. Specifically, the information sought in

Interrogatory No. 5 related to *each* employee who entered the JDTC *any* purpose is overly broad,

unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of

detailed, narrative information in the subsections of Interrogatory No. 5 that are not relevant to any

party's claim or defense. Moreover, Interrogatory No. 5 is directed at TCFTV, but requests

information related to FBC and 21CF. Requests for such information are more properly directed

at FBC and 21CF. Subject to and without waiving the foregoing objections, TCFTV refers

Plaintiffs to the Call Sheets and Production Reports that TCFTV is producing in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television, Bates numbers TCFTV000654 to TCFTV000986.

**INTERROGATORY NO. 6**: Identify each person who provided services to TCFTV, FBC, or 21CF, directly or indirectly, relating to the filming of *Empire* at the JTDC. For each such person, identify:

     a.     The person's name;

     b.     The person's last known contact information, including address and phone number;

     c.     The person's employer;

     d.     Each person or entity on whose behalf or at whose direction the person provided the service;

     e.     The person's job title;

     f.     Each date and time that the person entered the JTDC if any;

     g.     Each place within the JTDC, if any, that the person travelled; and

     h.     The nature of the services that the person provided.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 6 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, the information sought in Interrogatory No. 6 related to *each* person who provided services to TCFTV, FBC, or 21CF, *directly or indirectly*, *relating to* the filming of *Empire* at the JTDC is overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast amounts of detailed, narrative information in the subsections of Interrogatory No. 6 that are not relevant to any party's claim or defense. Moreover, Interrogatory No. 6 is directed at TCFTV, but requests information related to FBC and 21CF. Requests for such information are more properly directed at FBC and

21CF.  Subject to and without waiving the foregoing objections, TCFTV refers Plaintiffs to the

Call Sheets and Production Reports that TCFTV is producing in response to Plaintiffs' First Set of

Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and

Twentieth Century Fox Television, Bates numbers TCFTV000654 to TCFTV000986.


**INTERROGATORY NO. 7**: Identify all communications to or from any employee or agent of
TCFTV, FBC, or 21CF relating to the filming of *Empire* at the JTDC, including but not limited
to the effect of the filming on the JTDC's operations and the detainees housed there. For each
such communication, identify:

a.   Each person who participated in the communication;

b.   The employer of each such person or the entity for whom each such person acted
as an agent;

c.   The time and date of the communication;

d.   Any documents generated by or relating to the communication; and

e.   A fair description of the nature and substance of the communication.

**RESPONSE:** Objection.  TCFTV objects to Interrogatory No. 7 because it is overly broad, unduly

burdensome, and not proportional to the needs of the case.  Specifically, the information sought in

Interrogatory No. 7 related to *all* communications *relating to* the filming of *Empire* at the JTDC is

overly broad, unduly burdensome, and not proportional to the needs of the case in that it seeks vast

amounts of detailed, narrative information in the subsections of Interrogatory No. 7 that are not

relevant to any party's claim or defense.  Moreover, Interrogatory No. 7 is directed at TCFTV, but

requests information related to FBC and 21CF.  Requests for such information are more properly

directed at FBC and 21CF.  Subject to and without waiving the foregoing objections, TCFTV

refers Plaintiffs to the documents produced in response to Plaintiffs' First Set of Requests for

Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century

Fox Television.

**INTERROGATORY NO. 8**: With respect to Section 1(D) of your Location Agreement with Cook County (ECF No. 51-2), identify:

    a.    All information, including but not limited to documents, relied upon or pursuant to which TCFTV's "acknowledge[d] that the [JTDC] is a functioning Municipal Building, operating as a residential facility for juveniles.";

    b.    Every act that TCFTV and its employees or agents took (or refrained from taking) in performance of Section 1(D); and

    c.    All your communications with any person regarding the inclusion of Section 1(D) in the Location Agreement.

**RESPONSE:** TCFTV refers Plaintiffs the documents produced in response to Plaintiffs' First Set of Requests for Production to Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television.

**INTERROGATORY NO. 9**: With respect to income realized by TCFTV in relation to *Empire*, identify with specificity:

    a.    The gross revenues, net revenues, and profits you have received from Season 1 of *Empire*;

    b.    The gross revenues, net revenues, and profits you have received from Season 2 of *Empire*;

    c.    For *Empire* Season 2, Episode 1, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost; and

    d.    For *Empire* Season 2[,] Episode 2, all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 9 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 9 (a) and (b) request revenue and profit information for two complete seasons of *Empire*, including revenue and profit information for Season 1, the filming of which concluded before the events giving rise to the current action. This information is not relevant to any party's claim or defense.

In addition, Interrogatory No. 9 (c) and (d) request an accounting of all costs and revenue for the first two episodes of *Empire* Season 2, regardless of if the costs or revenue are related to TCFTV's filming at the JTDC. Finally, at this stage in the pleadings, the information sought in Interrogatory No. 9 is not relevant because TCFTV's liability for the alleged conduct has not been established and Plaintiffs have not met the requirements of Federal Rule of Civil Procedure 23. Therefore discovery of actual damages issues prior to class certification is premature. See *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) and *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).

**INTERROGATORY NO. 10**: For each of your defenses, state the facts relevant to it and the legal theories upon which it is based.

**RESPONSE:** Objection. TCFTV objects to Interrogatory No. 10 because it is unduly burdensome. Specifically, Interrogatory No. 10 is a contention interrogatory that is premature at this stage in the proceeding and places an undue burden on TCFTV in purporting to require TCFTV to answer this contention interrogatory before discovery is complete in this matter. "The general policy is to defer contention interrogatories until discovery is near an end, in order to promote efficiency and fairness." *Ziemack v. Centel Corp.*, 1995 WL 729295, at *2 (N.D. Ill. Dec. 7, 1995).

Date: December 15, 2017

Respectfully Submitted,

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 15, 2017, a true and correct copy of the foregoing was served to all counsel of record via email.

<u>/s/ Jeffrey S. Jacobson</u>

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| T.S. *et al.,* | |
| Plaintiffs, | Case No. 1:16-cv-08303 |
| v. | Hon. Rebecca R. Pallmeyer |
| Twentieth Century Fox Television *et al.,* | |
| Defendants. | |

**TWENTIETH CENTURY FOX TELEVISION ANSWERS
TO PLAINTIFF'S SECOND SET OF INTERROGATORIES**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, by and through its attorneys, Twentieth Century Fox Television ("TCFTV") hereby responds to Plaintiffs' Second Set of Interrogatories ("Responses") as follows:

**PRELIMINARY STATEMENT**

All Responses that follow are made subject to this preliminary statement.

1.     The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Interrogatories or Responses; (3) the right to object to the use of information produced in response to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2.     The information and responses supplied herein are for use in this action only, and for no other purpose.

3.      Any statement by TCFTV that it is producing or will produce information responsive to any Interrogatory does not mean that it possesses responsive information.  A statement that TCFTV is producing or will produce information responsive to any Interrogatory means only that TCFTV is conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information at the conclusion of its investigation.  No response or objection made herein, or lack thereof, is an admission by TCFTV as to the existence or non-existence of any information.

4.      TCFTV expressly preserves its objections to these Interrogatories to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery. Inadvertent production of information that TCFTV later claims was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege.  Instead, TCFTV may request the return of any inadvertently produced information stating the basis for withholding such material.

5.      TCFTV reserves the right to assert additional objections to these Interrogatories as appropriate, and to amend or supplement these objections and responses based on the results of its continuing investigation.

## ANSWERS TO INTERROGATORIES

1.      Identify the actual license fees received or receivable by TCFTV from any person for Episodes 201 and 202, including breakage and rerun residual reimbursements, and identify the payor of each such fee.

**ANSWER:** Objection. TCFTV objects to Interrogatory No. 1 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. "Actual license fees received or receivable by TCFTV from any person for Episodes 201 and 202, including breakage and rerun residential reimbursements" are not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the forgoing objections, TCFTV refers Plaintiffs to TCFTV001881 – 1882; TCFTV001883 – 1933; TCFTV001934 – 1940; TCFTV001942 – 2020; TCFTV002021 – 2035; TCFTV002036 – 2114 and TCFTV002115 – 2128.

2.    Describe the basis for the calculation of the "International Free/Pay TV" totals listed on TCFTV001857 by identifying each territory and licensee included, the total per licensee, and the term of each license, and by stating whether the totals include second-cycle sales. If the total does not include second-cycle sales, provide the foregoing information for second-cycle sales.

**ANSWER:** Objection. TCFTV objects to Interrogatory No. 2 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. The information requested about "each territory and license, included, the total per licensee, and the term of each license" is not reasonably calculated to lead to the discovery of admissible evidence. Moreover, such information does not exist in the form requested by the Plaintiffs and would require TCFTV to undertake a complex accounting exercise to include identify "each territory and licensee included, the total per licensee, and the term of each license, and by stating whether the totals include second-cycle sales." Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed

3

relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation.

3.  Describe the basis for the calculation of Domestic Subscription Video on Demand ("SVOD") listed on TCFTV001857 by identifying each licensee, the total revenue per licensee, and the term of each license. State whether projections for Hulu are included in this number, and if so, provide the basis for the number projected.

**ANSWER:** Objection.  TCFTV objects to Interrogatory No. 3 because it is overly broad, unduly burdensome, and not proportional to the needs of the case.  The information requested about "each licensee, the total revenue per licensee, and the term of each license," is not reasonably calculated to lead to the discovery of admissible evidence. Moreover, such information does not exist in the form requested by the Plaintiffs and would require TCFTV to undertake a complex accounting exercise to include identify "each licensee, the total revenue per licensee, and the term of each license."  Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation.

4.  Describe the principal and material bases for the calculation of International Subscription Video on Demand ("Int'l SVOD") listed on TCFTV001857 by identifying each licensee, the total revenue per licensee, and the term of each license.

**ANSWER:** Objection.  TCFTV objects to Interrogatory No. 4 because it is overly broad, unduly burdensome, and not proportional to the needs of the case.  The information requested about "each licensee, the total revenue per licensee, and the term of each license," is not reasonably calculated to lead to the discovery of admissible evidence. Moreover, such information does not exist in the form requested by the Plaintiffs and would require TCFTV to undertake a complex accounting exercise to include identify "each licensee, the total revenue per licensee, and the term of each license."  Should

Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation.

5.     Describe the principal and material bases for the calculation of Domestic Syndication listed on TCFTV001857, including a detailed breakdown of the components used in the calculation.

**ANSWER:** Objection. TCFTV objects to Interrogatory No. 5 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. "A detailed breakdown of the components used" for the calculation of "Domestic Syndication listed on TCFTV001857" is not reasonably calculated to lead to the discovery of admissible evidence. Moreover, Plaintiffs' request for a description of the "principal and material bases for the calculation … including a detailed breakdown of the components used in the calculation" would require TCFTV to conduct a complex accounting exercise that is not proportional to the needs of this case. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation.

6.     Describe the principal and material bases for the calculation of Electronic Sell-Through ("EST") and Other Revenue listed on TCFTV001857, including a detailed breakdown of the components, including license fees, used in the calculation.

**ANSWER:** Objection. TCFTV objects to Interrogatory No. 6 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. "A detailed breakdown of the components used" for the calculation of "Electronic Sell-Through" is not reasonably calculated to lead to the discovery of admissible evidence. Moreover, Plaintiffs' request for a description of the "principal and material bases for the calculation … including a detailed breakdown of the components used in the calculation" would

require TCFTV to conduct a complex accounting exercise that is not proportional to the needs of this case. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation.

7.      Identify all revenue received or receivable by TCFTV from DVD sales of Season Two of *Empire*.

**ANSWER:** Objection. TCFTV objects to Interrogatory No. 7 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. TCFTV refers Plaintiffs to the Court's Order dated March 7, 2018, which states "discovery for full seasons of *Empire* is not proportional to the needs of this case." See ECF No. 143.

8.      Describe the principal and material bases for the calculation of participation costs of Episodes 201 and 202, including but not limited to the identities of the participants, the interests of the participants, and the nature of the interest of the participants.

**ANSWER**:  Objection. TCFTV objects to Interrogatory No. 8 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. Specifically, Interrogatory No. 8 seeks highly confidential, sensitive, and detailed information about non-parties, which is not relevant to any party's claim or defense. Moreover, Plaintiffs' request for a description of the "principal and material bases for the calculation … but not limited to the identities of the participants, the interests of the participants, and the nature of the interest of the participants" would require TCFTV to conduct a complex accounting exercise, detailed research and draft a narrative regarding the "nature of the interest of the participants" that is not proportional to the needs of this case. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation.

Date: June 25, 2018

Respectfully Submitted,

/s/ Jeffrey S. Jacobson
Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the TCFTV*

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2018, a true and correct copy of the foregoing was served to all counsel of record via email.

/s/ Jeffrey S. Jacobson
Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the TCFTV*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| T.S. *et al.,* <br><br>                 Plaintiffs, <br><br>      v. <br><br> Twentieth Century Fox Television *et al.,* <br><br>                 Defendants. | Case No. 1:16-cv-08303 <br><br> Hon. Rebecca R. Pallmeyer |

**TWENTIETH CENTURY FOX TELEVISION RESPONSES TO PLAINTIFFS'
SECOND SET OF REQUESTS FOR PRODUCTION TO
<u>TWENTIETH CENTURY FOX TELEVISION</u>**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, by and through their attorneys, Twentieth Century Fox Television, a division of Twentieth Century Fox Film Corporation ("TCFTV") hereby responds ("Responses") to Plaintiffs' Second Set of Requests for Production to Twentieth Century Fox Television ("Requests").

**<u>PRELIMINARY STATEMENT</u>**

All Responses that follow are made subject to this preliminary statement.

1.    The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Interrogatories or Responses; (3) the right to object to the use of information produced in response

to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2.      The information and responses supplied herein are for use in this action only, and for no other purpose.

3.      Any statement by TCFTV that it is producing or will produce information responsive to any Request does not mean that it possesses responsive information.  A statement that TCFTV is producing or will produce information responsive to any Request means only that TCFTV is conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information at the conclusion of its investigation.  No response or objection made herein, or lack thereof, is an admission by TCFTV as to the existence or non-existence of any information.

4.      TCFTV expressly preserves its objections to these Requests to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery.  Inadvertent production of information that TCFTV later claims was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege.  Instead, TCFTV may request the return of any inadvertently produced information stating the basis for withholding such material.

TCFTV reserves the right to assert additional objections to these Requests as appropriate, and to amend or supplement these objections and responses based on the results of its continuing investigation.

5.      TCFTV reserves the right to assert additional objections to these Requests as appropriate, and to amend or supplement these objections and responses based on the results of their continuing investigation.

## REQUESTS FOR PRODUCTION

1.      Any license agreements between TCFTV and any person relating in whole or in part to Episodes 201 and 202.

**ANSWER:**  TCFTV objects to this Request as overly broad and unduly burdensome.  Plaintiffs' request seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case.  "License agreements between TCFTV and any person relating in whole or in part to Episodes 201 and 202" are not relevant nor reasonably likely to lead to the discovery of admissible evidence.  Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation.

2.      The master license or master series agreement for the *Empire* series. This includes but is not limited to any such agreement between TCFTV and any person, including but not limited to FBC.

**ANSWER:**  TCFTV objects to this Request as overly broad and unduly burdensome.  Plaintiffs' request seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case.  Specifically, a master license or master series agreement for the *Empire* series is not proportional to the needs of the case.  TCFTV refers Plaintiffs to the Court's Order dated March 7, 2018, which stated that "discovery for full seasons of *Empire* is not proportional to the needs of this case."  *See* ECF No. 143.

3. Documents sufficient to show the actual license fees received or receivable by TCFTV, including breakage and return residual reimbursements, for Episodes 201 and 202.

**ANSWER:** TCFTV objects to this Request as overly broad and unduly burdensome. Plaintiffs' request seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Actual license fees received or receivable by TCFTV for Episodes 201 and 202 are not relevant nor reasonably likely to lead to the discovery of admissible evidence Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the forgoing objections, TCFTV refers Plaintiffs to TCFTV001881 – 1882; TCFTV001883 – 1933; TCFTV001934 – 1940; TCFTV001942 – 2020; TCFTV002021 – 2035; TCFTV002036 – 2114; and TCFTV002115 – 2128.

4. Documents sufficient to show the actual license fees received or receivable by TCFTV from FBC, including breakage and rerun residual reimbursements, for Episodes 201 and 202.

**ANSWER:** TCFTV objects to this Request as overly broad and unduly burdensome. Plaintiffs' request seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Actual license fees received or receivable by TCFTV for Episodes 201 and 202 are not relevant nor reasonably likely to lead to the discovery of admissible evidence. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the forgoing objections, TCFTV refers Plaintiffs to TCFTV001881 – 1882; TCFTV001883 – 1933; TCFTV001934 – 1940; TCFTV001942 – 2020; TCFTV002021 – 2035; TCFTV002036 – 2114; and TCFTV002115 – 2128.

5.      All license agreements between TCFTV and any 21CF subsidiary that relate in whole or in part to Episodes 201 and 202.

**ANSWER:**  TCFTV objects to this Request as overly broad and unduly burdensome. Plaintiffs' request seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case.  All license agreements between TCFTV and 21CF that related in whole or in part to Episodes 201 and 202 are not relevant nor reasonably likely to lead to the discovery of admissible evidence.  Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation.

6.      Cost reports for Episode 201, including (a) cover sheets and (b) detailed cost reports.

**ANSWER:**  TCFTV object to this Request as overly broad and unduly burdensome. TCFTV further objects to this Request as vague in so far as the term "cost reports" is vague and undefined.  Cost reports for Episode 201 are not relevant nor reasonably likely to lead to the discovery of admissible evidence.  Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation.  Subject to and without waiving the foregoing objections, TCFTV refers Plaintiffs to TCFTV001883 – 1933 and TCFTV001942 – 2020.

7.      Cost reports for Episode 202, including (a) cover sheets and (b) detailed cost reports.

**ANSWER:**  TCFTV object to this Request as overly broad and unduly burdensome. TCFTV further objects to this Request as vague in so far as the term "cost reports" is vague and undefined.  Cost reports for Episode 202 are not relevant nor reasonably likely to lead to the discovery of admissible evidence.  Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857

contain all the information necessary to perform this calculation. Subject to and without waiving the foregoing objections, TCFTV refers Plaintiffs to TCFTV001934 – 1940 and TCFTV002036 – 2114.

8. All episodic budgets for Episodes 201 and 201, including a detailed episodic budget for each episode.

**ANSWER:** TCFTV object to this Request as overly broad and unduly burdensome. TCFTV further objects to this Request as vague in so far as the term "episodic budgets" is vague and undefined. Episodic Budgets for Episodes 201 and 202 are not relevant nor reasonably likely to lead to the discovery of admissible evidence. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the foregoing objections, TCFTV refers Plaintiffs to TCFTV001881 – 1882; TCFTV001883 – 1933; TCFTV001934 – 1940; TCFTV001942 – 2020; TCFTV002021 – 2035; TCFTV002036 – 2114; and TCFTV002115 – 2128.

9. The pattern budget for Season Two of Empire.

**ANSWER:** TCFTV objects to this Request as overly broad and unduly burdensome. Plaintiffs' request seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. TCFTV refers Plaintiffs to the Court's Order dated March 7, 2018, which stated that "discovery for full seasons of *Empire* is not proportional to the needs of this case." *See* ECF No. 143.

10. All distribution expense estimates for Episodes 201 and 202.

**ANSWER:** TCFTV objects to this Request as overly broad and unduly burdensome. TCFTV further objects to this Request as vague in so far as the term "distribution expense" is vague and undefined. Distribution expense estimates for Episodes 201 and 202 are not relevant nor

reasonably likely to lead to the discovery of admissible evidence. Moreover, such information does not exist on an episode-by-episode basis and would require TCFTV to undertake a complex accounting exercise to separate Episodes 201 and 202 from the entirety of Season 2. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation.

11.     All residual expense estimates for Episodes 201 and 202.

**ANSWER:** TCFTV objects to this Request as overly broad and unduly burdensome. TCFTV further objects to this Request as vague in so far as the term "residual expense" is vague and undefined. All residual expense estimates for Episodes 201 and 202 are not relevant nor reasonably likely to lead to the discovery of admissible evidence. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the forgoing objections, TCFTV refers Plaintiffs to TCFTV001881 – 1882; TCFTV001883 – 1933; TCFTV001934 – 1940; TCFTV001942 – 2020; TCFTV002021 – 2035; TCFTV002036 – 2114; and TCFTV002115 – 2128.

12.     Documents sufficient to show the detail of projected profit participation, by participant, for Episodes 201 and 202, including but not limited to each participant's share of defined profits.

**ANSWER:** TCFTV objects to this Request as overly broad and unduly burdensome. Plaintiffs' request seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. Specifically, Plaintiffs' request is seeking highly confidential, sensitive, and detailed information about nonparties that is unrelated to any party's claims or defenses. Moreover, such information does not exist on an episode-by-episode basis and would require TCFTV to undertake a complex accounting exercise to separate Episodes 201 and 202 from the entirety of

7

Season 2. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation.

13. Documents sufficient to demonstrate the principal and material bases for your calculation of each category of Revenue on TCFT001857.

**ANSWER:** TCFTV objects to this Request as overly broad and unduly burdensome. TCFTV further objects to this request as vague in so far as the phrase "documents sufficient to demonstrate" is vague and undefined. The "principal and material bases" for "each category of Revenue on TCFTV001856" is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the foregoing objections, TCFTV001881 – 1882; TCFTV001883 – 1933; TCFTV001934 – 1940; TCFTV001942 – 2020; TCFTV002021 – 2035; TCFTV002036 – 2114; and TCFTV002115 – 2128.

14. Documents sufficient to demonstrate principal and material bases for your calculation of each category of Costs on TCFTV001857.

**ANSWER:** TCFTV objects to this Request as overly broad and unduly burdensome. TCFTV further objects to this request as vague in so far as the phrase "documents sufficient to demonstrate" is vague and undefined. The "principal and material bases" for "each category of Cost on TCFTV001856" is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the foregoing objections, TCFTV refers Plaintiffs to TCFTV001881 – 1882; TCFTV001883 – 1933;

TCFTV001934 – 1940; TCFTV001942 – 2020; TCFTV002021 – 2035; TCFTV002036 – 2114; and TCFTV002115 – 2128.

15.     Nielsen ratings for Episodes 201 and 202.

**ANSWER**:  TCFTV objects to this Request as it seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case.  "Nielsen rating reports" for all airings of Episodes 201 and 202 are not relevant nor reasonably calculated to lead to the discovery of admissible evidence.  Specifically, the "rating report" of a third-party vendor has no bearing on any potential damages in this matter.  Subject to and without waiving the forgoing objections, TCFTV refers Plaintiffs to TCFTV001941 – 1941.

16.     The air date schedule for Episodes 201 and 202.

**ANSWER:**  TCFTV objects to this Request as it seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case.  "Air dates" are not relevant nor reasonably calculated to lead to the discovery of admissible evidence.  In addition, the term "air date" is vague and ambiguous.  Subject to and without waiving the forgoing objections, TCFTV refers Plaintiffs to TCFTV001941 – 1941.

17.     All documents relied upon or referred to by you in answering Plaintiffs' Second Set of Interrogatories to TCFTV.

**ANSWER**:  TCFTV objects to this Request to the extent it seeks information protected from disclosure but the attorney-client privilege and work-product doctrines.  Subject to and without waiving the foregoing objections, TCFTV refers Plaintiffs to TCFTV001881 – TCFTV002128.

*[Signature Page on Following Page]*

Date: June 25, 2018

Respectfully Submitted,

/s/ Jeffrey S. Jacobson
Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the TCFTV*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 25, 2018, a true and correct copy of the foregoing was served to all counsel of record via email.

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the TCFTV*

11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

T.S. *et al.*,

Plaintiffs,

v.

Twentieth Century Fox Television *et al.*,

Defendants.

Case No. 1:16-cv-08303

Hon. Rebecca R. Pallmeyer

**FOX BROADCASTING COMPANY ANSWERS TO**
**PLAINTIFF'S SECOND SET OF INTERROGATORIES**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, by and through its attorneys, Fox Broadcasting Company ("FBC") hereby responds to Plaintiffs' Second Set of Interrogatories ("Responses"):

**PRELIMINARY STATEMENT**

All Responses that follow are made subject to this preliminary statement.

1.      The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Interrogatories or Responses; (3) the right to object to the use of information produced in response to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2.      The information and responses supplied herein are for use in this action only, and for no other purpose.

3.      Any statement by FBC that it is producing or will produce information responsive to any Interrogatory does not mean that it possesses responsive information.  A statement that FBC is producing or will produce information responsive to any Interrogatory means only that FBC is conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information at the conclusion of its investigation.  No response or objection made herein, or lack thereof, is an admission by FBC as to the existence or non-existence of any information.

4.      FBC expressly preserves its objections to these Interrogatories to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery. Inadvertent production of information that FBC later claims was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege.  Instead, FBC may request the return of any inadvertently produced information stating the basis for withholding such material.

5.      FBC reserves the right to assert additional objections to these Interrogatories as appropriate, and to amend or supplement these objections and responses based on the results of its continuing investigation.

## RESPONSE TO INTERROGATORIES

1.      Identify the actual license fees paid or payable by FBC for Episodes 201 and 202, including breakage and rerun residual reimbursements, and the payee of each such fee.

2

**ANSWER:** Objection. FBC objects to Interrogatory No. 1 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. "Actual license fees paid or payable by FBC for Episodes 201 and 202, including breakage and rerun residential reimbursements, and the payee of each such fee" contains highly confidential and sensitive information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the forgoing objections, FBC refers Plaintiffs to TCFTV001881 – 1882; TCFTV001883 – 1933; TCFTV001934 – 1940; TCFTV001942 – 2020; TCFTV002021 – 2035; TCFTV002036 – 2114; and TCFTV002115 – 2128.

2.      Describe the principal and material bases for the calculation of Linear Ad Sales totals listed on TCFTV001856, including a detailed breakdown of the principal and material components used in the calculation, and a description of how many minutes of advertising the sales numbers represent.

**ANSWER:** Objection. FBC objects to Interrogatory No. 2 because it is overly broad, unduly burdensome, and not proportional to the needs of the case. A detailed breakdown of the principal and material components used in TCFTV001856 contains highly confidential and sensitive information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Moreover, such information does not exist in the form requested by the Plaintiffs and would require FBC to undertake a complex accounting exercise to include a "detailed breakdown of the principal and material components used in the calculation, and a description of how many minutes of advertising the sales numbers represent." In addition, advertising revenues are not a valid

3

a measure of Plaintiffs' alleged damages, even on a theory of "unjust enrichment."

Should Plaintiffs prevail on their claims, and in the event that advertising revenues are

deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain

all the information necessary to perform this calculation.

3.      If the Linear Ad Sales totals listed on TCFTV001856 represent only totals from the first broadcasts, identify the amount of linear ad sales for all rebroadcasts of Episodes 201 and 202, including a detailed breakdown of the components used in the calculation and a description of how many minutes of advertising the sales numbers represent.

**ANSWER:**  Objection.  FBC objects to Interrogatory No. 3 because it is overly broad,

unduly burdensome, not proportional to the needs of the case, and is not relevant nor

reasonably calculated to lead to the discovery of admissible evidence.  Moreover, such

information does not exist in the form requested by the Plaintiffs and would require FBC

to undertake a complex accounting exercise to include a "detailed breakdown of the

components used in the calculation, and a description of how many minutes of

advertising the sales numbers represent."  In addition, advertising revenues are not a valid

a measure of Plaintiffs' alleged damages, even on a theory of "unjust enrichment."

Subject to and without waiving the forgoing objections, FBC states that the amount of

linear advertising sales for the encore broadcasts of Episodes 201 and 202 on Fox's

television network are $693,000 and $477,000, respectively.

4.      For all linear ad sales made for Episodes 201 and 202, identify:
        a.      each advertiser to whom sales were made;
        b.      the total minutes sold to each such advertiser;
        c.      the broadcast for which each such sale was made (first broadcast, second broadcast, etc.); and
        d.      the total dollars paid by each such advertiser.

**ANSWER:**  Objection.  TCFTV objects to Interrogatory No. 4 because it is overly broad,

unduly burdensome, and not proportional to the needs of the case.  The information

requested about "all linear ad sales made for Episodes 201 and 202" including "each

advertiser," "the total minutes sold," "the broadcast for which each such sale was made," and the "total dollars paid by each such advertiser" is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Moreover, such information does not exist in the form requested by the Plaintiffs and would require FBC to undertake a complex accounting exercise to breakdown the linear ad sales in the manner requested by Plaintiffs. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation

5.      If the Linear Ad Sales totals listed on TCFTV001856 do not include advertising revenue from online exploitation of Episodes 201 and 202, provide ad sales calculation for all advertising revenue from online exploitation, including a detailed breakdown of the principal and material components used in the calculation and a description of how many minutes of advertising the sales numbers represent.

**ANSWER:** Objection. FBC objects to Interrogatory No. 5 because it is overly broad, unduly burdensome, not proportional to the needs of the case, and is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Moreover, such information does not exist in the form requested by the Plaintiffs and would require FBC to undertake a complex accounting exercise to include a "detailed breakdown of the principal and material components used in the calculation and a description of how many minutes of advertising the sales numbers represent." In addition, advertising revenues are not a valid a measure of Plaintiffs' alleged damages, even on a theory of "unjust enrichment." Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the forgoing objections, FBC states that the advertising revenue

5

from the online availability of Episodes 201 and 202 is contained in the line of

TCFTV001856 titled, "Non-Linear."

6.     List and describe all income or other consideration received or receivable from product placement for Episodes 201 and 202.

**ANSWER:**  FBC states:  There was no paid product placement during the filming of

*Empire* at the JTDC.


Date: June 25, 2018

Respectfully Submitted,

/s/ Jeffrey S. Jacobson
Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for FBC*

6

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 25, 2018, a true and correct copy of the foregoing was

served to all counsel of record via email.

/s/ Jeffrey S. Jacobson
Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the FBC*

7

4827-6903-2039v.2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| T.S. et al., <br><br> Plaintiffs, <br><br> v. <br><br> Twentieth Century Fox Television et al., <br><br> Defendants. | Case No. 1:16-cv-08303 <br><br> Hon. Rebecca R. Pallmeyer |

**FOX BROADCASTING COMPANY RESPONSES TO PLAINTIFFS' SECOND SET OF
REQUESTS FOR PRODUCTION TO FOX BROADCASTING COMPANY**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, by and through their attorneys, Fox Broadcasting Company ("FBC") hereby responds ("Responses") to Plaintiffs' Second Set of Requests for Production to Fox Broadcasting Company:

## PRELIMINARY STATEMENT

All Responses that follow are made subject to this preliminary statement.

1. The Responses appearing below are made subject to and without waiver of: (1) all questions as to the admissibility, including but not limited to the competency, relevancy, materiality, or privilege, of the Responses made, any documents produced, or the subject matter of such documents; (2) the right to object to other discovery directed to the subject matter of the Interrogatories or Responses; (3) the right to object to the use of information produced in response to the Requests at any hearing, trial, or other point during this action; and (4) the right to make additional objections or seek protective orders.

2. The information and responses supplied herein are for use in this action only, and for no other purpose.

3.     Any statement by FBC that it is producing or will produce information responsive to any Request does not mean that it possesses responsive information.  A statement that FBC is producing or will produce information responsive to any Request means only that FBC is conducting a diligent and reasonable search, and will produce responsive, non-objectionable, non-privileged responsive information at the conclusion of its investigation.  No response or objection made herein, or lack thereof, is an admission by FBC as to the existence or non-existence of any information.

4.     FBC expressly preserves its objections to these Requests to the extent they seek information or admissions concerning matters that are privileged or otherwise protected against discovery pursuant to the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery.  Inadvertent production of information that FBC later claims was an inadvertent disclosure which should have been withheld on grounds of the attorney-client privilege, the work product doctrine, the joint defense privilege, the consulting expert rule, the common interest doctrine, investigative privileges, or any other legally recognized privilege, immunity, or exemption from discovery, will not be deemed to waive such privilege.  Instead, FBC may request the return of any inadvertently produced information stating the basis for withholding such material.

5.     FBC reserves the right to assert additional objections to these Requests as appropriate, and to amend or supplement these objections and responses based on the results of its continuing investigation.

## REQUESTS FOR PRODUCTION

1.      Any license agreements between FBC and any subsidiary of 21CF, including but not limited to TCFTV, relating in whole or in part to Episodes 201 and 202, including but not limited to the license agreement for the *Empire* series.

**ANSWER:** FBC objects to this Request as overly broad and unduly burdensome.  Plaintiffs'

request seeks documents unrelated to any party's claim or defense, and is also not proportional to

the needs of the case.  Specifically, a license agreement for the *Empire* series is not proportional

to the needs of the case.  FBC directs Plaintiffs to the Court's Order dated March 7, 2018, which

stated that "discovery for full seasons of Empire is not proportional to the needs of this case."

*See* ECF No. 143.

2.      The master license or master series agreement for the *Empire* series. This includes but is not limited to any such agreement between FBC and any entity, including but not limited to TCFTV.

**ANSWER:** FBC objects to this Request as overly broad and unduly burdensome. Plaintiffs'

request seeks documents unrelated to any party's claim or defense, and is also not proportional to

the needs of the case.  Specifically, a master license or master series agreement for the *Empire*

series is not proportional to the needs of the case.  FBC refers Plaintiffs to the Court's Order

dated March 7, 2018, which stated that "discovery for full seasons of *Empire* is not proportional

to the needs of this case."  *See* ECF No. 143.

3.      Documents sufficient to show the actual license fees paid or payable by FBC, including but not limited to breakage and rerun residual reimbursements, for Episodes 201 and 202, and the payee or each such fee.

**ANSWER:** FBC objects to this Request as overly broad and unduly burdensome. Plaintiffs'

request seeks documents unrelated to any party's claim or defense, and is also not proportional to

the needs of the case.  "Actual license fees paid or payable by FBC for Episodes 201 and 202,

including breakage and rerun residential reimbursements, and the payee of each such fee"

contains highly confidential and sensitive information that is not relevant nor reasonably

calculated to lead to the discovery of admissible evidence. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the forgoing objections, FBC refers Plaintiffs to TCFTV001881 – 1882; TCFTV001883 – 1933; TCFTV001934 – 1940; TCFTV001942 – 2020; TCFTV002021 – 2035; TCFTV002036 – 2114; and TCFTV002115 – 2128.

4.      All air dates scheduled which include Episodes 201 and 202.

**ANSWER:**  FBC objects to this Request as this request seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. "Air dates" are not relevant nor reasonably calculated to lead to the discovery of admissible evidence. In addition, the term "air date" is vague and ambiguous. Subject to and without waiving the forgoing objections, FBC refers Plaintiffs to TCFTV001941 – 1941.

5.      Nielsen ratings reports for all airings of Episodes 201 and 202.

**ANSWER:**  FBC objects to this Request as this request seeks documents unrelated to any party's claim or defense, and is also not proportional to the needs of the case. "Nielsen rating reports" are not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Specifically, the "rating report" of a third-party vendor has no bearing on any potential damages in this matter. Subject to and without waiving the forgoing objections, FBC refers Plaintiffs to TCFTV001941 – 1941.

6.      Documents sufficient to show all agreements for product placement relating to any product placement revenue received or anticipated from Episodes 201 and 202.

**ANSWER:**  FBC states:  There was no paid product placement during the filming of *Empire* at the JTDC.

7.      Documents sufficient to demonstrate the principal and material bases for your calculation of each category of Revenue on TCFTV001856.

**ANSWER:** FBC objects to this Request as overly broad and unduly burdensome. FBC further objects to this request as vague as far as the phrase "documents sufficient to demonstrate" is vague and undefined. The "principal and material bases" for "each category of Revenue on TCFTV001856" is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the foregoing objections, FBC refers Plaintiffs to TCFTV001881 – 1882; TCFTV001883 – 1933; TCFTV001934 – 1940; TCFTV001942 – 2020; TCFTV002021 – 2035; TCFTV002036 – 2114; and TCFTV002115 – 2128.

8.      Documents sufficient to demonstrate the principal and material bases for your calculation of each category of Costs on TCFTV001856.

**ANSWER:** FBC objects to this Request as overly broad and unduly burdensome. The "principal and material bases" for "each category of Costs on TCFTV001856" is not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Should Plaintiffs prevail on their claims, and in the event that advertising revenues are deemed relevant to any damages calculation, TCFTV00185 and TCFTV001857 contain all the information necessary to perform this calculation. Subject to and without waiving the foregoing objections, FBC refers Plaintiffs to TCFTV001881 – 1882; TCFTV001883 – 1933; TCFTV001934 – 1940; TCFTV001942 – 2020; TCFTV002021 – 2035; TCFTV002036 – 2114; and TCFTV002115 – 2128.

9.      All documents relied upon or referred to by you in answering Plaintiffs' Second Set of Interrogatories to FBC.

**ANSWER:** FBC objects to this Request to the extent it seeks information protected from disclosure but the attorney-client privilege and work-product doctrines. Subject to and without waiving the foregoing objections, FBC refers Plaintiffs to TCFTV001881 – TCFTV002128.

Date: June 25, 2018

Respectfully Submitted,

/s/ Jeffrey S. Jacobson
Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 25, 2018, a true and correct copy of the foregoing was

served to all counsel of record via email.

/s/ Jeffrey S. Jacobson _____

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for the Fox Defendants*

# EXHIBIT 10



333 S. Wabash Avenue, Suite 2700
Chicago, IL 60604

www.weilchardon.com
Phone: (312) 585 - 7404
Fax: (773) 409 - 2745

July 10, 2018

**<u>Via Email</u>**

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178
jjacobson@kelleydrye.com

Re: Fox Defendants' responses to discovery

Dear Jeff,

I am writing on three discovery items. The first two items concern your responses to our original, November 3, 2017 discovery. The final item concerns your responses to our May 10, 2018 discovery.

***First***, the Court's March 7, 2018 order protected Fox from our November 3 discovery about its "seasonal" revenues based the representation in your brief that providing this information would be exceptionally burdensome. The revenue information you have provided subsequent to that ruling, however, suggests that your burden claim was inaccurate—by all appearances your clients keep well-organized records regarding their costs and revenues, making it easy to identify the season-wide information we requested. We therefore ask you to provide this information, which should be easy to do. If you disagree, we would like to meet and confer with you to understand your reasons. ***Second***, your March 29 "production" of TCFTV 1856-57 is inadequate in several respects. ***Finally***, your June 25 response to Plaintiffs' discovery are inadequate in multiple respects, for the reasons described below.

1. **November 3, 2017 Discovery**

    a. **Burden of providing season-wide revenue information**

Our original, November 3 discovery requests sought certain revenue information covering *Empire*'s first and second seasons. To be clear, this discovery did not ask any of the Fox defendants to produce all documents relating to such revenue. Rather, these were interrogatories that asked TCFTV, FBC, and 21CF to "identify" the "gross revenues, net revenues, and profits you have received" from season 1 and 2 of *Empire*.

During our meet-and-confer you objected to this discovery as unduly burdensome, without explanation. When we moved to compel it, you represented to the Court that this

1

discovery would require you to gather "*all* documents pertaining to advertising on *Empire* for all episodes from both of the show's first two seasons," and claimed that "[g]athering the information Plaintiffs have requested will require significant effort" that was unduly burdensome you should therefore not be required to undertake. (ECF No. 140 at 11-12 (emphasis original).) Based on this representation, the Court's March 7 ruling concluded that our "seasonal" discovery placed a "disproportionate burden" on Fox. (ECF No. 143 at 3.)

It now appears that your representations about the burden involved in gathering the "seasonal" information were incorrect. The Court's March 7 Order instructed you to respond to discovery revenue regarding Episodes 201 and 202, and you did so on March 29 in two short pages of "production," *i.e.* TCFTV 1856-57. And now, in your June 25 round of production, you have responded to additional discovery regarding costs and revenues. These discovery responses reveal that your clients keep well-organized records regarding their costs and revenues relating to *Empire*—meaning that, contrary to your prior representations to Judge St. Eve, providing information about season-wide costs and revenues would not require you first to gather "all documents pertaining to advertising." Rather, it is apparent that you can provide responsive information simply by consulting your clients' existing and well-organized financial records.

We therefore ask you to respond to our discovery seeking season-wide revenues for Empire's first two seasons, or explain to us why, notwithstanding the well-organized appearance of the records you have provided so far, responding to our season-wide interrogatories requires you to gather the mass of documents you represented to the Court in ECF No. 140. If you decline to do either we will move the Court to reconsider this aspect of the March 7 discovery ruling.

### b. Inadequate revenue responses in TCFTV 1856-57

There are several problems with the revenue discovery responses you made on March 29 to our RFPs and to our Interrogatories.

***RFPs.*** Our original, November 3 RFPs to the Fox Defendants contained the following requests:

> 28. All profit and loss statements of TCFTV concerning (in whole or in part) all revenue and expenses associated with Empire Season 2, Episodes 1 and 2.

> 29. All profit and loss statements of FBC concerning (in whole or in part) all revenue and expenses associated with Empire Season 2, Episodes 1 and 2.

> 30. All profit and loss statements of 21CF concerning (in whole or in part) all revenue and expenses associated with Empire Season 2, Episodes 1 and 2.

On March 29 you made a "production" in response to these requests, pursuant to the Court's March 7 order. The production did not contain the profit and loss statements that were

requested in RFPs 28-30, however. Rather, it consisted of two pages relating to Fox's costs and revenues, TCFTV 1856-57.

Those two pages are not profit or loss statements. Rather they appear to be documents that were created for this litigation. That information does not respond sufficiently to RFPs 28-30, each of which calls for profit and loss statements concerning Episodes 201 and 202, in whole or in part. Furthermore, RFP No. 30 asked for production of this information from 21CF. TCFTV 1856-57 do not appear to contain that information.

Please provide clarification, or produce the documents called for by RFPs 28-30, as you were ordered to do on March 7.

*Interrogatories*. The November 3 interrogatories asked each of the Fox defendants to identify "all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost" for Episodes 201 and 202. (TCFTV Interrogatory No. 9 (c) & (d); FBC Interrogatory No. 9 (c) & (d); 21CF Interrogatory No. 8 (c)-(d).) Your "production" of TCFTV 1856-57 raises several issues.

First, please confirm that TCFTV 1856-57 constitute your clients' responses to the November 3 revenue interrogatories regarding Episodes 201 and 202. If not please amend the interrogatory responses to provide those responses. Second, your clients must now sign the interrogatory responses pursuant to Rule 33(b)(5). Please provide those signatures. Third, the information contained on TCFTV 1856-57 appears to provide responsive information regarding TCFTV and FBC, but it does not appear to contain responsive information regarding 21CF. If TCFTV 1856-57 (or some other part of your responses) do provide responsive information about 21CF, please identify it. Otherwise, please provide responsive information regarding 21CF.

## 2. May 10, 2018 Discovery

On May 10, Plaintiffs served RFPs and Interrogatories on TCFTV and FBC. Your clients responded on June 25. There are multiple problems with those responses, as set forth below.

### a. Global issues.

#### i. *Redactions* (All discovery.)

Numerous documents in this production contain redactions, however we do not see where you have provided a privilege log, as required by Rule 26(b)(5)(A). Please do so.

To the extent that the redactions were made based on your objection (*e.g.* TCFTV RFP No. 12) that our requests seek "highly confidential" information about financial matters involving stars in the show, that is inappropriate. There is a Confidentiality Order in place that covers such information (ECF No. 125.) If you want additional protections not provided in the Confidentiality Order we are willing to discuss other, reasonable measures. But this is not a basis for refusing to provide responsive, non-privileged information. If this was the basis for

3

your redactions, please provide unredacted versions, which you may designate as confidential per the protective order.

### ii. *Withheld documents* (All discovery.)

Rule 34(b)(2)(C) requires the responding party to state whether documents are being withheld on the basis of any objections. Your RFP responses fail to do this. Please amend them to provide the information required by the rule.

### iii. *"Proportionality" objections based on the Court's March 7 ruling*. (TCFTV RFPs 2, 9; TCFTV Interrogatory 7; FBC RFPs 1, 2.)

You have refused to respond to any discovery going beyond Episodes 201 and 202 by claiming it is "disproportionate." You based this objection solely on the Court's March 7 "proportionality" ruling regarding our earlier set of discovery. (ECF No. 143 at 3.) That is not a sufficient basis for your objection.

Rule 26(b)(1)'s proportionality analysis must be directed to each request at issue. Indeed that was the analysis of the Court's March 7 ruling, where it held that "*this* discovery"—*i.e.*, the requests at issue in that motion—was disproportionate. (ECF No. 143 at 3 (emphasis added).) Specifically, the Court's March 7 ruling did not conclude that the information we sought was irrelevant. Rather it was a proportionality ruling, and it was informed by your representations that our "seasonal" requests would impose a significant burden. (*See* ECF No. 140 at 11-12.)

As I have explained above, we now believe that that ruling was based representations that are factually incorrect. But setting that aside, you have not shown what burden any of the *May 10* requests are likely to impose. And the burdens you asserted in ECF No. 140 simply don't apply here. Several of the May 10 requests ask for license agreements, which should take almost no effort to produce. The well-organized budgets you have produced also suggest that the Season 2 pattern budget is likely to be contained in relatively small number of pages. And your citation to the March 7 "proportionality" ruling does not apply at all to our request for DVD sales figures, since some of the revenue from those sales is attributable to Episodes 201 and 202, and thus is directly responsive to our revenue discovery about those episodes. In short your citation to the Court's March 7 "proportionality" ruling is unsupported and invalid. To the extent that you believe that you have valid proportionality objections to the above requests, please inform us of them. If not, please produce responsive materials.

### iv. *Objections based on provision of TCFTV 1856-57*. (TCFTV RFPs 1, 3-8; 10-14; TCFTV Interrogatories 1-6, 8; FBC RFPs 3, 7, 8; FBC Interrogatories 1, 2, 4, 5.)

As discussed above, after the Court ordered your clients to respond to our revenue discovery, you "produced" a total of two pages – TCFTV 1856-57. Those two pages are not

business records, but rather documents created for the purpose of this litigation. They amount to your clients' *litigation position* regarding their revenues from the episodes.

Now in your current responses, you have used these two pages to resist virtually all further revenue discovery. That is inappropriate. That you have purported to recite the amounts of your clients' costs and revenues does not act as a shield to prevent discovery of business records that may (or may not) substantiate your assertions. Indeed, the additional information we seek now is directed not only at understanding your clients' revenues generally; it is also aimed at understanding the basis for the claims your clients have made in TCFTV 1856-57.

Plaintiffs are entitled to discover information that is reasonably calculated to put those numbers in context, corroborate or contradict them, or point to other evidence that does so. This is particularly so because the figures you have provided don't match industry information about the likely advertising revenues for the two episodes. The discovery we seek is entirely appropriate and is reasonably targeted for discovering relevant information in this case.

### b. Individual Discovery Requests.

***TCFTV RFP No. 1.*** This RFP seeks license agreements relating in whole or in part to Episodes 201 and 202. You assert boilerplate overbreadth, undue burden, relevance, and proportionality objections. These objections are waived; it is the responding party's burden to describe what problems a discovery request imposes and boilerplate objections fail to do that.

In any event, the objections are invalid. Plaintiffs have claimed that TCFTV received revenue from the filming at issue, and the requested license agreements are likely to allow us to understand the financial terms that governed TCFTV's costs and expenses. Furthermore, such agreements are unlikely to require any meaningful effort to produce. Indeed, from the "Document date" column in TCFTV 1881-82, it would appear that you have already gathered at least some of the responsive documents and are simply refusing to produce them.

Finally, for the reasons stated above, your citation to TCFTV 1856-57 is not a valid basis for resisting this discovery. The requested license agreements, among other things, are designed to understand the basis for the claims you make in TCFTV 1856-57.

***TCFTV RFP No. 2.*** This request asks for the master license or master series agreement for *Empire*. You claim that this request is unduly burdensome, but again, it should require little or no effort to produce a contract.

Your overbreadth objection is unexplained but it is invalid in any event. It is likely that the agreement governing *Empire* as a whole governed or at least impacted the financial terms of the production and distribution of Episodes 201 and 202, and thus the agreement relates specifically to those episodes. For this same reason, your reliance on the Court's March 7 "proportionality" ruling, besides being wrong for the reasons described above, is simply inapposite here. This discovery seeks documents that relate directly to Episodes 201 and 202.

***TCFTV RFP No. 5.*** Like TCFTV RFP No. 1, this RFP seeks license agreements relating to Episodes 201 and 202, between TCTFV and any 21CF subsidiary. Your objections, which are composed of boilerplate plus a citation to TCFTV 1856-57, are essentially identical to your objections to TCFTV RFP Nos. 1 and 2 and are invalid for the same reasons.

***TCFTV RFP No. 8.*** This RFP contained a typo, asking for "All episodic budgets for Episodes 201 and 201," when it obviously should have asked for 201 and ***202***. Please inform us whether you responded to this request assuming it referred to episodes 201 and 202, or whether you read it strictly as referring only to 201. If you read it as applying only to 201, we would request that you produce responsive information about Episode 202 as a courtesy. If you decline we will serve an additional RFP asking for it.

***TCFTV RFP No. 9.*** This request seeks the pattern budget for *Empire* Season 2. That budget is calculated to place the amounts paid for Episodes 201 and 202 in context and to help understand Fox's motivation for choosing to film at the JTDC. You have asserted overbreadth, undue burden, and relevance objections, all of which, as boilerplate, are invalid.

Your "proportionality" objection, which relies on Judge St. Eve's March 7 ruling, is invalid as well. Here, your existing production (*e.g.* TCFTV 1942) indicates that the *Empire* pattern budget files are well organized and would be easy to locate and produce. You have provided no reason to think that responding to this discovery would be meaningfully burdensome.

***TCFTV RFP No. 10.*** This RFP asked TCFTV for distribution expense estimates for Episodes 201 and 202. You make boilerplate assertions that the requested information is not relevant to the claims in this case; but plainly expenses associated with Episodes 201 and 202 are relevant, since they impact the episodes' profitability and the ultimate amount Plaintiffs could recover.

You also claim that providing such information would require complex calculations because it does not exist on an episode-by-episode basis, but you do not explain why that would make the calculations difficult. And indeed, you have provided other information that is pro-rated, *see* TCFTV 1881-82. Finally, your citation to TCFTV 1856-57 is invalid, for the reasons described above. We are entitled to understand the information that underlies the representations that you have made in TCFTV 1856-57 regarding the costs and revenues of the episodes.

***TCFTV RFP No. 12.*** This request asked you to identify profit participant expenses. You assert boilerplate objections, but those are invalid. This request is relevant both for understanding the profitability of the two episodes and for answering other questions, including how Fox prioritized spending for the episodes shot at the JTDC.

Otherwise, you state two objections to this request. First, you claim that the requested information is highly confidential. But there is already a confidentiality order in place, and your objection does not explain why the order is insufficient. We are willing to discuss other, reasonable confidentiality measures, but you are not entitled simply to refuse to produce it.

6

Second, you claim that the requested information does not exist on an episode-by-episode basis and would thus require a complex calculation. But at the same time, you claim that TCFTV 1856-57 contain all the information we need to answer this RFP. That means either (1) you have already made the calculation that you now object to performing, or (2) you have not made the calculation, in which case you cannot claim that TCFTV 1856-57 provides the information we need.

**_TCFTV RFP No. 13._** This RFP asked for documents sufficient to demonstrate the basis for your calculations in TCFTV 1857. Our request for "documents sufficient" is a good faith effort to limit production burdens on Fox. The information you have responded with, however, is inadequate. You have provided summary revenue information, (TCTFV 1881-82), but the only obvious connection between those pages and TCFTV 1857 is the $1.851 million "episodic license fee," which presumably corresponds to "Reimbursables/Reruns (A)." Otherwise there does not appear to be any connection with the other revenue categories in TCFTV 1857. Furthermore, even the episodic license fee is not supported by documents, only your line entry in a spreadsheet. Thus the only additional concrete information we have regarding the revenues identified in TCFTV 1857 is that "Reimbursables/Returns (A)" refers to "episodic license fees."

The information you have provided regarding revenues, in short, does not come close to satisfying this request. If you do not provide information that actually responds to our request, we will move to compel that information and to serve additional RFPs for related documents.

**_TCFTV RFP No. 14._** This RFP sought documents sufficient to demonstrate the basis for the cost information identified on TCFTV 1857. We are still reviewing your June 25 production to determine whether it is adequate.

**_TCFTV Interrogatory Nos. 2-6 & 8._** These interrogatories each ask you to describe the principal and material bases for calculations of different components identified in TCFTV 1857. You refuse to respond to these interrogatories, and instead refer us back to the same document.

That is not a sufficient response. TCFTV 1856-57 were created specifically for this litigation. They thus reflect your clients' litigation position about their costs and revenues. We are entitled to understand the basis for that position. That is particularly so where the financial figures in those documents are the product of "a complex accounting exercise," as your response represents. The information we seek, in other words, is reasonably calculated to lead to the discovery of admissible evidence.

**_TCFTV Interrogatory No. 7_.** This interrogatory asked you to identify figures from DVD sales. You object that this discovery is not proportional, citing the Court's March 7 ruling. Your reliance on that ruling is improper, as explained above. Indeed here you do not explain what burden identifying DVD sales would impose. Moreover, the citation to the March 7 ruling is inapposite, since DVD sales would include sales of Episodes 201 and 202.

**_FBC RFP Nos. 1 & 2._** Both these RFPs ask for the production of license agreements. You assert boilerplate objections, which are waived. As to proportionality you rely on the

Court's March 7 ruling without explanation. That is meritless. Producing contracts simply does not impose any meaningful burden, and you do not actually claim otherwise. Meanwhile the license agreements are highly relevant since they presumably governed the allocation of costs and revenues that are important to Plaintiffs' claims against your clients in this case.

*FBC RFP No. 7*. This RFP asked you for information about product placement. You respond that there was no product placement for the scenes filmed at the JTDC. The March 7 order, however, ordered you to respond to our discovery about Episodes 201 and 202, not parts of the episodes. That includes product placement that occurred anywhere in the two episodes. Whether such placements are ultimately relevant to Plaintiffs' claims in this case is a separate question for which there will be time to debate. For the moment they should be produced, especially if, like the other revenue information Fox has identified, there is no meaningful burden to producing them.

*FBC Interrogatory No. 2*. This request asked your client to provide the principal and material basis for the linear ad sales reported on TCFTV 1856. You object that the information we seek is highly confidential. But there is already a confidentiality order in place in this case. We are willing to discuss additional measures to protect confidential information, but ultimately this information is central to our unjust enrichment claim.

Second you object that the information does not exist in the form we have requested—but that is hard to understand, since we requested a breakdown of the components "used in the calculation" of the figures in TCFTV 1856—a calculation that had to be performed in order to create the numbers reflected in TCFTV 1856. The request also asks you to describe "how many minutes of advertising the sales numbers represent." You have not explained why that task is difficult, but to the extent that the sales numbers are explained in some other manner, your answer can say so.

You also object that "advertising revenues are not a valid a measure of Plaintiffs' alleged damages, even on a theory of 'unjust enrichment.'" But you already lost that argument at the motion to dismiss stage, and the Court's March 7 order specifically instructed you to produce advertising revenue over that same objection. Please clarify whether you are refusing to respond to this interrogatory on the basis of this argument.

Finally you say that all the information we require is contained in TCFTV 1856-57. But as I have explained above, we are entitled to discover the basis for the figures identified in this document, which was created for this litigation.

*FBC Interrogatory No. 3*. From your response to this interrogatory it is our understanding that the amounts you identified—$693,000 and $477,000—are in addition to, and were not included in, the Linear Ad Sales totals listed on TCFTV001856. Please correct me if this is understanding is wrong.

*FBC Interrogatory No. 4*. This interrogatory sought details about the information for linear ad sales made for Episodes 201 and 202. You make boilerplate relevance objections to

each of the subcomponents requested, but the amount of linear ad sales go to the defendants' profits from filming, and are thus highly relevant to our unjust enrichment claim.

You also object that responding would require Fox to undertake a complex accounting exercise. There are several problems with this argument. First, you fail to explain how this objection could be applicable to subparts (a) – (c). Whatever Fox's accounting practices, certain ads ran during the episode broadcasts, each of which was connected to a particular advertiser, and each of which ran for a certain number of minutes. It is hard to understand how answering those subparagraphs would require an accounting exercise.

Regarding sub-part (d), again you have not explained what sort of accounting adjustments are required. Moreover we asked you to provide the basis for the linear ad sales in FBC Interrogatory No. 2, but you have refused to answer that question, as well. This gives every appearance of an effort to thwart our discovery into the basis of the revenue claims you made in TCFTV 1856-57. Without a bona fide explanation of the burden involved, this objection is simply invalid.

***FBC Interrogatory No. 6***. This interrogatory asked you to identify revenue from product placement in the two episodes. You respond that there was no product placement for the scenes shot at the JTDC. This response is invalid for the same reason your response to FBC RFP 7 is invalid—the Court's March 7 order instructed Fox to respond to discovery about the episodes as a whole. There will be ample time to determine whether such evidence is ultimately relevant to our claims. Identifying such revenue is appropriate, particularly if the burden for doing so is modest, as it appears to be.

*     *     *

Please respond by July 18, 2018.

Best regards,

Stephen H. Weil

cc via email:

Matthew Luzzader, mluzadder@kelleydrye.com

Catherine James, CJames@kelleydrye.com

**KELLEY DRYE & WARREN LLP**

A LIMITED LIABILITY PARTNERSHIP

**333 WEST WACKER DRIVE**

**SUITE 2600**

**CHICAGO, IL 60606**

(312) 857-7070

NEW YORK, NY
WASHINGTON, DC
LOS ANGELES, CA
HOUSTON, TX
PARSIPPANY, NJ
STAMFORD, CT
BRUSSELS, BELGIUM

AFFILIATE OFFICE
MUMBAI, INDIA

FACSIMILE
(312) 857-7095
www.kelleydrye.com

MATT LUZADDER

DIRECT LINE:(312) 857-2623

EMAIL:mluzadder@kelleydrye.com

July 23, 2018

Stephen H. Weil
Weil & Chardon LLC
333 S. Wabash Ave., Suite 2700
Chicago, IL 60604

> Re: *T.S., et al v. Twentieth Century Fox Television, et al.*
> Court No.: 1:16-cv-08303

Dear Stephen:

This responds to your letter dated July 10, 2018.

As a threshold matter, we think your letter misreads the Court's March 7, 2018 decision (the "Order," Dkt. No. 143) on your prior motion to compel. In ruling that Plaintiffs are not entitled to information about episodes of *Empire* other than the two episodes that were partially filmed at the Cook County Juvenile Temporary Detention Center ("JTDC") on three occasions during the summer of 2015, the Order stated: "Plaintiffs' reasons for why they need this discovery for two full seasons of Empire is not proportional to the needs in this case, especially because their requests place a disproportionate burden on the Fox Defendants to produce information that goes well beyond the scenes shot at the JTDC." The Court does not appear to have reached this decision based solely or even principally on the amount of work required to produce this information; the Court instead simply considered your broad requests to be out-of-bounds.

Your July 10, 2018 Letter provides no new reasons why "all sources of revenue and the amounts of each such source; and all costs and the amounts of each source of cost" for the 30 episodes constituting the entire first two seasons of *Empire* are necessary to Plaintiffs' case. You simply repeat the arguments you made previously to the Court in extensive briefing. The Order rejected those arguments and limited you to discovery about the two episodes specifically. Even that limited discovery was, in our view, overbroad and disproportionate. As you know, the footage shot at the JTDC accounted for less than 13 aired minutes of Episodes 201 and 202, out of the roughly 45-minute length of each episode.

**KELLEY DRYE & WARREN LLP**

Stephen H. Weil
Weil & Chardon LLC
July 23, 2018
Page Two

For these reasons, we do not think you are justified in seeking to revisit the Order. We both briefed and argued the issue, and the Court reached a compromise as between your position and ours. Its Order was clear. Although we disagreed with the Court's ruling, the Fox Defendants complied with it.

Beyond your requests for information the Court explicitly denied you, you have asked for "clarification" regarding TCFTV 1856-57. Those pages reflect the "revenues and profit information for the first two episodes of Empire's second season," that the Order directed the Fox Defendants to produce. Order at 3. As you will note, however, that sentence was the Court's full response to your combined demands for responses to your "Interrogatories Nos. 8 and 9 and Requests for Production Nos. 28, 29 and 30." A plain reading of the Order precludes you from seeking additional responses to those five discovery requests. The Court did not order the Fox Defendants to produce "profit and loss statements," and we fail to understand how a document showing gross revenue and net profits fails to comply fully with both the letter and spirit of the Order.

Second, you are correct that the Fox Defendants created TCFTV 1856-57 to comply with the Order. You are incorrect, however, in your assumption that this information was easy to come by. Simply put, FBC and TCFTV do not generate "revenue and profit information" documents on a per episode basis in the regular course of business. The information you requested exists electronically in accounting systems. Fox employees expended time and effort to extract the relevant information from that system and generate the spreadsheet we produced to you. It contains all the data the Court ordered the Fox Defendants to produce with regard to revenues earned by Twentieth Century Fox Television ("TCFTV") and Fox Broadcasting Company ("FBC") from the two relevant episodes of *Empire*. We will, however, provide verifications to the interrogatory responses to TCFTV No. 9 (c) and (d), and to FBC Interrogatory No. 9 (c) and (d), as those responses have been supplemented by the production of TCFTV 1856-57.

Twenty-First Century Fox ("21CF"), the ultimate parent corporation of TCFTV and FBC, does not possess at its level the information necessary to ascertain "revenues and profit information for the first two episodes of Empire's second season." As the "Affidavit of Completeness of Discovery Searches and Production on Behalf of Defendants Twenty-First Century Fox, Inc., Fox Broadcasting Company, and Twentieth Century Fox Television" stated, "21CF attests that TCFTV maintains separate books and records apart from 21CF, including those books and records related to the filming of *Empire* at the JTDC." (Docket No. 150, at ¶7.) This attestation extends to 21CF's non-possession of "revenues and profit information for the first two episodes of Empire's second season." Accordingly, the response to your document requests directed to 21CF remains accurate.

**KELLEY DRYE & WARREN LLP**

Stephen H. Weil
Weil & Chardon LLC
July 23, 2018
Page Three

In light of the explanations contained in this letter and the Fox Defendants' June 25, 2018 discovery responses, please advise if you believe that other information should have been included in TCFTV 1856-57. You call the information reflected in these documents a "litigation position," but that is not accurate. Our "litigation positions" are that you will not be able to establish any actionable breaches of duty by Cook County officials; that the Fox Defendants certainly did not "knowingly participate in" or "knowingly induce" any such breaches, as the Court held they must have done in order to be liable here; and that even if you could carry your burden (which you cannot), the law is clear that revenues the Fox Defendants took in from advertisers are not recoverable by your clients on an "unjust enrichment" theory. Notwithstanding those positions, however, we have complied fully with the Court's order to give you revenue and profit information from the two episodes of *Empire* that the Fox Defendants partially filmed at the JTDC.

We therefore must respectfully decline your request to revisit this issue. Picking yet more fights over revenue information is nothing more than a needless distraction. Imposing more and more discovery burdens on the Fox Defendants, before you have cleared either of the two hurdles necessary for establishing liability, is unjustified. We have not previously thought it necessary to ask the Court to bifurcate discovery, separating liability and "damages" issues, but if you persist in these sorts of requests, we will take that step.

With regard to the other matters raised in your letter:

**Redactions from June 25 Production**

Please advise us as to how "financial matters involving stars [of *Empire*]" can possibly be relevant to Plaintiffs' lawsuit. As you will note, the documents produced contain the total amounts paid to the "stars," other actors, and everyone else involved in the filming of Episodes 201 and 202 at the JTDC. Other than to satisfy voyeuristic curiosity regarding the compensation of well-known people, we fail to see how this information has any bearing on the two remaining claims against the Fox Defendants or any damages calculations in this case, in the unlikely event that this matter reaches that point. If necessary, we will provide unredacted copies of these documents to the Court for *in camera* review. We can explain our bases for withholding that information, including the highly sensitive nature of the information and the privacy interests involved, and you can attempt to argue that you need it.

**Objections to Requests for Production**

The remainder of your July 10, 2018 letter continues to ignore that the Court addressed and largely rejected your broad requests for "revenue discovery." The Court ruled that you are entitled to receive information about revenues the Fox Defendants received for the first and second

**KELLEY DRYE & WARREN LLP**

Stephen H. Weil
Weil & Chardon LLC
July 23, 2018
Page Four

episodes of the second season, and we produced that information. Simply restating requests for additional documents or revenue information in subsequent discovery requests does not provide grounds to re-litigate the issue and disturb the Court's previous ruling. As the Court stated: "In any event, Plaintiffs' reasons for why they need this discovery [on gross revenues, net revenues and profits] for two full seasons of Empire is not proportional to the needs in this case, especially because their requests place a disproportionate burden on the Fox Defendants to produce information that goes well beyond the scenes shot at the JTDC." (Docket No. 143 at p. 3). This is the law of the case.

If there were any doubt as to Plaintiffs' right to request information beyond the first two episodes of *Empire*'s second season—which there is not—it clearly would be Plaintiffs' burden to show how the information is proportional to the needs of this case. It is not incumbent upon the Fox Defendants to explain how every new discovery request you make for information about episodes *not* filmed at the JTDC is disproportionate. Put another way, there is nothing "invalid" about objecting to requests on the basis that the Court already ruled on them.

For example, your letter asserts, without any basis, that "license agreements" related to the two *Empire* episodes, and the "master series agreement" for *Empire*, are "likely to allow [you] to understand the financial terms that governed TCFTV's costs and expenses." That is not true, but even if it were, the revenues and expenses were what they were, and that is the only information the Court said you were entitled to receive. The documents you requested are among the most confidential in the television industry and you have no possible basis for discovering them here.

The same is true of your request for the "pattern budget." As you know, much of *Empire* is filmed on a Chicago soundstage. Your complaint correctly alleges the reason why the Fox Defendants chose to film at the JTDC: They needed a realistic prison setting to film episodes in which the story had one of the lead characters in the show incarcerated. We long ago produced to you all costs that the Fox Defendants incurred to film at the JTDC, and we since have produced to you all revenues the Fox Defendants received from the two episodes. We thus have fully complied with the Court's instructions.

As to the expense estimates you requested, we objected on the basis of undue burden and explained that objection in sufficient detail. Your assertion that you need this information to "understand the profitability of the two episodes" is so devoid of substance as to make any further response unnecessary.[1]

---

[1] With regard to FBC Interrogatory No. 6 and FBC RFP No. 7, FBC states that there was no paid product placement during any part of Episodes 201 or 202.

**KELLEY DRYE & WARREN LLP**

Stephen H. Weil
Weil & Chardon LLC
July 23, 2018
Page Five

Pursuant to Rule 34(b)(2)(C), the Fox Defendants state that they are withholding responsive documents on the basis of the objections stated, including those objections based on the Court's Order. As should be clear from our objections, we are withholding the raw data from accounting systems, across various Fox divisions, that track revenue generated from DVD sales, music costs, internet streaming agreements, etc., and the agreements themselves, which are not specific to individual episodes. You have cited to TCFTV 1881-82 and noted the date the document was produced. This highlights this point. This document was not "gathered" but specifically generated in a manner similar to that used to generate TCFTV 1856-57. As you will note, it pertains to Episodes 201 and 202 and demonstrates the Fox Defendants' commitment to comply in good faith with Plaintiffs' discovery requests and the letter and spirit of the Order.

Although TCFTV and FBC have generated documents in compliance with the Order, there are limits to the information that the Fox Defendants can produce without substantial burden. For example, TCFTV RFP Nos. 10 and 12 request information that does not exist on an episode-by-episode basis, either for "distribution expense estimates" or "projected profit participation." Your addition of a qualifier to your request—asking merely for "documents sufficient to show"—therefore does nothing to alleviate the burden of this request.

We can confirm that we understood the typo in TCFTV RFP No. 8 to be a typo, as we indicated in the response to that RFP, and produced responsive documents.

**Objections to Interrogatories**

Without repeating the points above pertaining to the Court's Order and the production of TCFTV 1856-57, TCFTV and FBC rely on their previously stated objections with regard to the response to TCFTV Interrogatory 7.

With regard to TCFTV Interrogatory Nos. 2-6 and 8, your request in each of these interrogatories for the basis or bases for the calculation and each component, including in Interrogatory Nos. 2-4 for "each licensee, the total revenue per licensee, and the term of each license" and in Interrogatory No. 8 for the "identities of the participants, the interest of the participants, and the nature of the interest of participants" would require TCFTV to expend numerous hours responding.

Specifically, the numbers contained in TCFTV 1857 each were pulled from different accounting systems that do not include the detail that Plaintiffs have requested. It would be necessary to not only pull the raw numbers, but also to review the contracts or licenses in order to determine the territory and term of each license. This would be a time consuming process that has no bearing on the Plaintiffs' alleged claims or damages and is not proportional to your needs.

**KELLEY DRYE & WARREN LLP**

Stephen H. Weil
Weil & Chardon LLC
July 23, 2018
Page Six

FBC Interrogatories Nos. 2 and 4 suffer from the same burdensomeness issue. Plaintiffs are asking FBC to pull the contracts with each advertiser and detail how many minutes each advertiser received. Given the number of markets where Episodes 201 and 202 were broadcast, including the encore broadcasts, and the number of national and local market advertisers, this is not at all an easy task to complete. Even if the identities of particular advertisers had some tangential relevance, which they do not, such a task is not proportional to the needs in this case. Moreover, because the revenue numbers have already been provided, we fail to see how the exact number of advertising minutes, the names of advertisers, and how much they paid per minute, are relevant to any portion of this case. Finally, advertising contracts are not on a per-episode basis and, in many instances, are part of larger agreements between the network and national advertisers. For this reason, a complex accounting exercise to break down linear advertising sales in the form that Plaintiffs request in Interrogatory 4 would be a burdensome task.

In short, responding to the interrogatories at issue would require nothing less than a full-blown audit of the entire *Empire* series. As the Court already held in its Order, when you previously requested just a fraction of what you are seeking now, your requests are not proportional to the needs of this case. Your attempted "end-run" around the Order is unproductive.

Jeff Jacobson and I would be happy to discuss these responses further with you by telephone tomorrow. Please advise when you are available. If possible, we would prefer to confer about these issues before the upcoming depositions of Brady Breen and Jon Klemke.

Sincerely,

Matthew C. Luzadder



333 S. Wabash Avenue, Suite 2700
Chicago, IL 60604

# Weil & Chardon
### CIVIL LITIGATION ATTORNEYS

www.weilchardon.com
Phone: (312) 585 - 7404
Fax: (773) 409 - 2745

**<u>Via Email</u>**                                             August 16, 2018

Matthew Luzadder
Kelley Drye & Warren
333 W. Wacker Drive, Suite 2600
Chicago, IL 60606
mluzzader@kelleydrye.com

Re: Fox Defendants' responses to discovery

Dear Matthew:

I am writing in reply to your July 23, 2018 letter, which responded to our July 10, 2018 discovery enforcement correspondence.

### 1. Objections based on the Court's March 7 "proportionality" ruling.

You continue to object to responding to any discovery seeking information about revenues—or even documents that are inarguably easy to produce, like contracts—that fall in any manner outside Episodes 201 and 202. The basis of your refusal is the Court's March 7 "proportionality" ruling that I reviewed in Sections 1(a) of my July 10 letter. Proportionality, of course, balances the need for discovery against the burden of providing it. Your letter does not dispute that the "season" burden representations you made in ECF No. 140 were incorrect, but nevertheless you have indicated that your clients are unwilling to revisit the subject, as we requested in our July 10 letter. We are therefore at issue.

Also, as I noted in Section 2(a)(iii) of my letter, you have effectively treated the March 7 proportionality holding as a relevance ruling that any revenue information outside of Episodes 201 and 202 is irrelevant. Your July 23 letter persists in this position, so we are at issue.

### 2. Narrowed reading of March 7 order.

As discussed in Section 1(b) of my July 10 letter, you failed to produce the documents and information responsive to RFP Nos. 28-30 and Interrogatories 8 and 9.[1] In page 2 of your July 23 letter, you respond by claiming that the March 7 order granting our motion to compel this discovery actually *narrowed* the requests and interrogatories. That reading is indefensible, and to the extent you are basing your objections that reading we are at issue.

### 3. 21CF's access to information and documents in its wholly-owned subsidiaries.

You also argue that 21CF has no information to produce, based on the affidavit you had submitted earlier (ECF No. 150). It has already been established, however, that both TCFTV

---

[1]  Thank you for agreeing to provide verifications to these interrogatory responses.

1

and FBC are wholly-owned subsidiaries of 21CF (*see* Fox. Defs. Answer to SAC (ECF No. 121 ¶¶ 4(a)-(c))), and the courts deem parent companies to have control over the books and records of their wholly-owned subsidiaries for purposes of both Rules 33 and 34. *See Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, No. 01-cv-3016, 2002 WL 1835439, at *3 (S.D.N.Y. Aug. 8, 2002) (collecting cases and holding that "when the parent is served with an interrogatory, it is no defense to claim that the information is within the possession of a wholly owned subsidiary, because such a corporation is owned and controlled by such interrogee . . . . [t]he same principle applies to requests for documents pursuant to Rule 34 . . . .").

Indeed the affidavit does not negate such control. That invalidates 21CF's objection to responding to Interrogatory No. 8, as well as 21CF's earlier objections to 21CF Interrogatory No. 9. We therefore renew our request that you respond to that interrogatory as well.

### 4. TCFTV RFP No. 8.

Thank you for the professional courtesy in recognizing the typo in this request and proceeding as though it asked for production about both episodes. In that regard, it appears that you inadvertently duplicated production for Episode 201 (*compare* TCFTV1942-2020 *with* TCFTV2036-2114), and did not produce an equivalent production for Episode 202. We request that you produce the equivalent documents for Episode 202.

### 5. Redactions from the June 25 production.

This redacted information is relevant to our case, both for the motivations of profit participants to choose the JTDC, and for the spending priorities informing Fox's decision to select the JTDC as a location. As I've said before, in addition to the confidentiality order in place we are willing to discuss additional measures to protect this information. Based on your July 23 letter, however, it appears we are at issue.

### 6. Burdensomeness of discovery.

Aside from the objections I have noted above, the remainder of your objections appear to be based on the burden of providing underlying financial or "accounting" information. The problem with this position is that, as I set out in my July 10 letter, our May 10 discovery largely seeks to understand the basis for the revenue figures you identified in TCFTV1856-57, which you created for the purpose of this litigation. Your objections amount to a claim that we must accept TCFTV1856-57 at face value, and have no right to inquire further.

That is simply not a tenable position. The amount by which the Fox Defendants were enriched by the filming of the two episodes at the JTDC is obviously central to Plaintiffs' unjust enrichment claims, which are important claims in this case. As to the burden of responding, the bulk of our requests ask you to show the basis of calculations *that you have already performed* in creating TCFTV1856-57. I will discuss several specific issues you raise below.

      a. ***TCFTV RFP Nos. 10 and 12***. You claim these RFPs ask for information that is not broken out by episode. But you have already pro-rated a number of other financial factors for the episodes. You give no reason why that would be hard to do here.

      b.    ***TCFTV Interrogatory No. 7***.  You refuse to identify Season 2 DVD sales revenue.  But Episodes 201 and 202 are part of Season 2, so profits realized from DVD sales are a component of our claims.  This interrogatory entirely appropriate, so we are at issue.

      c.    ***TCFTV Interrogatory Nos. 2-6 and 8***.  These interrogatories ask your clients to describe the principal and material bases for the cost and revenue information in TCFTV1856 & 1857.  They also list particular components sought.  Your objection essentially appears to be that your clients' accounting systems from which 1856 & 1857 do not store information in this manner.  If that is the case, under Rule 33(b)(3) you are obligated to identify the principal and material bases for the information that your accounting systems *do* reflect, since that should not be unduly burdensome to do.  And, indeed, if that information is sufficient we may be able to compromise on the requested items that your accounting systems record.  Please let me know if this is acceptable.

      d.    ***FBC Interrogatory Nos 2 and 3***.  We do not understand your letter's discussion of these interrogatories.  We are asking for the components *you* used to calculate Linear Ad Sales in TCFTV1856.  Furthermore, your argument that the re-broadcasts of the episodes presents an undue burden is unpersuasive since, according to TCFTV1941, each episode has only been re-broadcast once.  And we fail to understand why you cannot identify the number of minutes the advertising represents, since each episode ran for a fixed amount of time in a one-hour slot.  You have made no valid objection to these interrogatories.  We are at issue.

      e.    ***FBC Interrogatory 4***.  This interrogatory concerns advertising revenue from broadcasting the two episodes.  It is relevant for understanding the advertising revenue that was actually realized from the episodes, and for testing your assertions regarding same.  You identify several complicating factors.  You claim that "encore" make this too burdensome, but TCFTV1941 indicates each episode was only re-broadcast once.  That is a manageable number.  You also say that there are both national and local advertisers.  If that is indeed the case, identifying national advertisers should be straightforward; if there are slots left for local advertisers, you can identify those and we can agree to some form of summary information for the local slots.  As your remaining objections, I fail to see the undue burden.  You claim that the advertising contracts are not per-episode, but in TCFTV1856 you already isolated and attributed advertising revenue for each episode.  Thus your undue burden claim is unsupported.

*    *    *

      I propose we hold a call this Friday to determine if any compromise can be reached.

                         Best regards,

                         Stephen H. Weil

cc: Jeffrey Jacobson, jjacobson@kelleydrye.com



Stephen Weil <steve@weilchardon.com>

## TS v. Fox -- Discovery follow-up
1 message

**Stephen Weil** <steve@weilchardon.com>                                      Mon, Aug 20, 2018 at 11:03 PM
To: "Jacobson, Jeffrey" <jjacobson@kelleydrye.com>, "Luzadder, Matt" <mluzadder@kelleydrye.com>
Cc: Alexis Chardon <ali@weilchardon.com>, Adam Pessin <apessin@finekaplan.com>, Terry Garmey
<tgarmey@garmeylaw.com>

Jeff and Matt,

After further reviewing your discovery responses there are a few additional items need clearing up.  If you'd like to discuss
any of this over the phone please let me know.

The items have to do with **Rule 34(b)(2)(C)** -- the responding party's statement whether documents are being withheld
subject to objections that have been lodged against a request.  Matt's July 23 letter states that documents are being
withheld subject to your objections as a general matter,  but in some cases that appears to be incorrect.  For example
TCFTV RFP No. 15 asks for a Nielsen report on 201/202, and you lodge objections but then provide the report.

In that light there are a handful of specific requests & related objections I'd like to clear up:

- **FBC RFP No. 3**.  ("Documents sufficient to show the actual license fees paid or payable by FBC, including but not
  limited to breakage and rerun residual reimbursements, for Episodes 201 and 202, and the payee or each such
  fee.")  You lodged objections, but then identified several bates ranges your June 25 production.  The only
  responsive figures I can find among those documents are the "Episodic License Fee" and "Episodic Stacking Fee"
  lines in TCFTV 1881.  MY QUESTION IS:  Is this a complete response to the RFP, or are you withholding
  responsive documents pursuant to your objections?  If so I'll proceed on the assumption that your objections are
  the same as the objections to providing further financial information that we have discussed in our M&C to date.
  Please correct me if this is wrong.

- **FBC RFP No. 7**.  ("Documents sufficient to demonstrate the principal and material bases for your calculation of
  each category of Revenue on TCFTV001856.")  After stating objections you identify several bates ranges from
  your June 25 production.  All of these documents, however, concern TCFTV's costs and revenues.  As far as I am
  aware, none of them show the components of FBC's revenues (if I'm wrong about this, please correct me).  Thus
  I'm proceeding on the assumption that you are withholding documents pursuant to the objections you stated in
  your response, as well as the objections to further financial disclosures discussed in our M&C to date.  Please let
  me know if this is wrong.

- **FBC RFP No. 8**.  ("Documents sufficient to demonstrate the principal and material bases for your calculation of
  each category of Costs on TCFTV001856.")  Same issue here as FBC RFP No. 3.  You make objections and then
  identify bates ranges with TCFTV's costs and revenues, not FBC's costs.  The "cost" to FBC identified on 1856 is
  $2.408 million in "programming" for each of the two episodes.  Of course, some of FBC's costs are likely to be
  TCFTV's revenue.  My question, however, is whether the bates ranges you identify are fully responsive to the RFP-
  -do they contain the information sufficient to show the basis for the $2.408 million in programming costs--or are
  you withholding responsive documents pursuant to your objections?

- **TCFTV RFP No. 17**.  This asked you to produce all documents you relied upon in answering interrogatories.  You
  assert attorney-client and work-product objections, and then respond by directing Plaintiffs to TCFTV001881-
  2128.  In TCFTV 1881-82, the "Document Date" column appears to refer to a number of documents.  I believe that
  none of these documents have been produced.

  I am therefore assuming that you are refusing to produce the documents in the "Document Date" column in
  TCFTV 1881-82 on the basis of attorney-client / work-product privilege.  Please let me know if this is wrong,
  otherwise I'll proceed on this assumption.  And if those are your objections they fail, because you have relied on

the documents in the "Document Date" column to make representations about TCFTV's revenues, thereby waiving those privileges.

Please provide any response by this Thursday.  Again I'm happy to talk anytime.

Thanks and best regards,

Steve


Stephen H. Weil
Weil & Chardon LLC
333 S. Wabash Ave., Suite 2700
Chicago, IL 60604
(o) 312-585-7404
(f)  773-409-2745
(c) 267-240-5585
steve@weilchardon.com
www.weilchardon.com