**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| T.S. *et al.,* <br><br> Plaintiffs. <br><br> v . <br><br> Twentieth Century Fox Television, a division of Twentieth Century Fox Film Corporation et al., <br><br> Defendants. | Case No. 1:16-cv-08303 <br><br> Hon. Rebecca R. Pallmeyer |

**FOX DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A
PROTECTIVE ORDER AND IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

Plaintiffs' primary argument in again seeking non-merits discovery into the finances of

Empire—discovery that the prior jurist in this case explicitly *refused* to compel—is that the Fox

Defendants supposedly are misconstruing that judge's clear March 7, 2018 Order (Dkt. No. 143)

and the extensive briefing that preceded it. But the Fox Defendants fully complied with that Order

*months* before Judge St. Eve's elevation to the Seventh Circuit Court of Appeals, giving Plaintiffs

spreadsheets of information taken directly from their accounting systems reflecting revenues and

profits earned from the two relevant episodes of *Empire*. Plaintiffs then tellingly waited to serve

new discovery requests flouting that Order until the very day the United States Senate voted

unanimously to close debate on Judge St. Eve's certain elevation. Plaintiffs hoped a new Court

would reconsider the prior judge's limitations on this non-merits discovery. It should not.

When the prior judge ordered the Fox Defendants to disclose the revenues and profits they

earned from the two *Empire* episodes that partially filmed at the Cook County Juvenile Temporary

Detention Center ("JTDC"), but *rejected* Plaintiffs' demands for document discovery and for

information concerning other episodes of *Empire*, the Court premised that compromise on Rule

1

26(b)(1)'s requirement of proportionality. Plaintiffs' brief neither addresses that requirement nor contests the declarations submitted by Twentieth Century Fox Television ("TCFTV") and Fox Broadcasting Company ("FBC") attesting to the substantial burden that Plaintiffs' requests for this discovery would place on them. Plaintiffs contend that they need this documentary discovery in order to "audit" the revenue and profit information the Fox Defendants gave them in March 2018, but the Fox Defendants have *attested* to the accuracy of this information, and Plaintiffs' only responses to those attestations are unfounded speculation, faulty assumptions, and false innuendo.

Plaintiffs' strategy throughout this two year-old litigation has been to wait until the last possible moment before a status conference to argue a discovery position, usually in a long brief filled with falsehoods, in order to give the Fox Defendants and the government defendants no time to respond. Plaintiffs' Monday-night filing in this case is typical of that sharp practice. With the status conference set for tomorrow, the Fox Defendants cannot effectively respond to all of the false claims in Plaintiffs' brief, but will attempt here to respond concisely to the most egregious.

**Plaintiffs' Brief Misstates Merits Discovery.** The Fox Defendants explicitly *did not* premise their Motion for a Protective Order on the crumbling "merits" of Plaintiffs' made-up claims in this matter. The Fox Defendants, however, cannot leave unanswered Plaintiffs' blatantly false assertion in their brief that the depositions of TCFTV contractors "confirmed that…Fox offered to pay the JTDC's administrators" as an alleged inducement to permit filming at the JTDC. Opp. Br. at 6. The Fox Defendants never offered to pay and never did pay any JTDC administrator, and not a shred of discovery—neither documentary nor testimonial—suggests otherwise. TCFTV requested to film in certain areas of the JTDC; Cook County offered TCFTV a take-it-or-leave-it rental agreement permitting that access under tightly controlled conditions; and TCFTV signed that agreement and paid *Cook County* the rental fees and expense reimbursements required by that agreement. No money was paid to individuals, nor were such payments ever offered.

2

Plaintiffs' brief also lies about the deposition testimony of Plaintiff T.S. Their Second Amended Complaint in this matter centers around a false charge that the Fox Defendants filmed in and therefore closed the JTDC's infirmary—a charge the falsity of which Plaintiffs subsequently admitted to the Court, but only *after* having relied on it to argue against dismissal of the case. Plaintiffs nevertheless clung to a claim that, even though the infirmary remained open, filming in other parts of the facility caused JTDC officials to "ignore" detainees' medical complaints.

In interrogatory responses, Plaintiffs admitted that only T.S. was making such a claim; Q.B. did not request medical treatment. Then, at T.S.'s deposition, T.S. admitted that this claim was nothing more than a joke. Plaintiffs' brief admits that T.S.'s sick call request at issue was a joke, but falsely contends that the joke pertained only to "one of several sick call slips [T.S.] submitted" during filming. Opp. Br. at 6. That is not true. Here, in its entirety, is T.S.'s testimony about the only "medical condition" he claims the JTDC's officials supposedly ignored:

> A. …I needed medical help extremely bad.
> Q. Okay. You didn't want out of your pod?
> A. That too but I really needed medical help.
> Q. All right, let's talk about that medical help. What was your ailment, sir?
> A. Well, I had a problem with my privates.
> Q. With your what?
> A. My privates.
> Q. Your privates?
> A. Yeah?
> Q. ….So what problems did you have with your private parts?
> A. Man, I don't even recall.
> Q. You don't recall?
> A. No.
> Q. Did you put in your request was your issue was?
> A. Yes.
> Q. So you wrote out what the problem was?
> A. Yes.
> Q. Okay. What happened? Did they ever respond?
> A. No, they never responded. I never got treated for that.
> Q. Okay. So the nurse never took you up to her kind of roving cart to give you medicine or anything for that?
> A. No, it wasn't no—you couldn't take no medicine for that problem—my problem.
> Q. You needed surgical help?
> A. Yes.

3

Q.     Okay.  Did you put in a request for surgery?
A.     Yes.
Q.     Okay.  And they never responded?
A.     No.
Q.     Okay.  What surgery request did you make?
A.     I wanted to be circumcised.
Q.     …Did you make any other medical requests while you were in the JTDC that you recall?
A.     I probably made that same sick call multiple times.
Q.     Being the circumcision?
A.     Yes.
Q.     Okay.  Why did you wait until the JTDC to try to get circumcised?
A.     I was having problems.  I was growing too much, and I thought it was going to have to –
Q.     You were growing too much.  Okay.
A.     Yes.
Q.     And you thought that would create an issue.
A.     Yeah, it was getting out of hand.
Q.     All right.  Other than that issue, you don't recall putting in any other requests?
A.     Maybe for like headaches –

The video of T.S.'s deposition shows him laughing uncontrollably while discussing his joke of a "medical issue" (which, contrary to his false testimony at the beginning of this excerpt that he did not recall, he obviously remembered quite clearly).  Later in the deposition, T.S. was *not* laughing when he admitted that he also put in a legitimate sick call request for a toothache while *Empire* was filming, that the JTDC quickly referred him to an outside dentist for treatment, and that he was satisfied with the JTDC's response to this actual request for medical aid.

Plaintiffs' discovery demands are beginning to take on an air of desperation precisely because they no longer can rely on the false allegations of their three complaints in this matter. The medical claims are gone.  The schooling claims are all but gone; Plaintiffs now have admitted that the JTDC's school was on summer break during two of the three filming periods.  Plaintiffs also admitted that they wildly overstated their claims of disrupted family visitations.  What seems to be left, at most, is a claim that detainees received recreation in the JTDC's massive gymnasiums during a few days of filming, rather than outdoors.  That, however, neither amounts to a breach of fiduciary duty by the government nor supports a claim that the Fox Defendants "induced" a breach.

4

**Plaintiffs Cannot Claim Advertising Revenues as "Unjust Enrichment" Damages Even If They Could Prevail In This Case.** Plaintiffs' Monday-night brief was the first time they have even attempted to explain why advertising revenues represent a valid measure of "unjust enrichment" damages in this case if they succeed on the merits. It is beyond debate, however, that JTDC detainees had no claim to receive these revenues had they not been paid to the Fox Defendants. The Fox Defendants' opening brief (at 16-17) cited and discussed five cases, all directly on point, holding that unjust enrichment plaintiffs cannot seek monies that never would have been paid to them. Plaintiffs' opposition (at 7), however, ignored four of them and mischaracterized the only case they chose to address.

The key holding in *Asch v. Teller, Levit & Silvertrust, P.C.*, No. 00-cv-3290, 2003 WL 22232801, at *7 (N.D. Ill. Sept. 26, 2003)—which Plaintiffs failed to quote or address—was that "[t]he parties have pointed to no case, and the court has uncovered no case, in which a court has applied [the] wrongful conduct exception where a plaintiff is attempting to recover money to which it is not entitled…. The court cannot conclude that the Illinois Supreme Court intended to create a claim for unjust enrichment where a plaintiff claims damages that rightly belong to a third party." Plaintiffs here have no claim to advertising revenues under an "unjust enrichment" theory, as *Asch* and the four more recent cases the Fox Defendants cited all state. Plaintiffs thus would have no valid basis to demand this discovery even were it not disproportionate and unduly burdensome.

Unable to find anything in Illinois law suggesting they may claim the Fox Defendants' advertising revenues as a measure of damages, Plaintiffs reach back 80 years to a New York case, *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 51 (2d Cir. 1939), *aff'd*, 309 U.S. 390, 60 S. Ct. 681, 84 L. Ed. 825 (1940), alleging copyright infringement related to the plagiarized 1932 film *Letty Lynton*. There, as Plaintiffs correctly note, the court held that the owner of a stolen movie script could seek disgorgement of a movie studio's "profits attributable to [the] studio's

theft of the script." Opp. Br. at 6. The *Sheldon* copyright case has no bearing here because JTDC detainees cannot monetize their detention as the plaintiff in *Sheldon* could monetize a script.

Plaintiffs' only other response to the Fox Defendants' argument is a false contention that Judge St. Eve "specifically rejected [the unavailability of these damages] as an inappropriate objection to Plaintiffs' revenue discovery." Judge St. Eve, however, did not consider these arguments, much less reject them. Judge St. Eve declined to address the *factual* merits of Plaintiffs' claims in March, before any depositions had occurred, but she did not rule at all on the *legal* question of whether advertising revenues are cognizable "unjust enrichment" damages in this case. The Court ordered the Fox Defendants to produce limited revenue information, and the Fox Defendants complied. To the extent Plaintiffs now are demanding documents and information that is orders of magnitude more burdensome than what the Court previously ordered, the Fox Defendants respectfully submit that the Court should consider this threshold legal question.

**The Court Should Reject Plaintiffs' Unfounded Speculation As a Basis For Ordering An Audit of the Revenue and Profit Information the Fox Defendants Provided.** The Fox Defendants complied with the March 7 Order without resistance and produced spreadsheets with information taken directly from their accounting systems reflecting revenues received from the two *Empire* episodes in question. The Fox Defendants have *attested* to this information. Unsatisfied, Plaintiffs now seek all manner of documents that would allow them to audit the information to which the Fox Defendants have attested, and they support that request by effectively accusing the Fox Defendants of lying in these attestations. Their "evidence" for this charge is (*i*) the allegations in an unverified complaint in a 2015 lawsuit brought by actors in a different program seeking money damages arising from their work on that program (Opp. Br. Ex. 1); (*ii*) a single media report of what "Fox's *asking price* for a 30-second spot" during *Empire*'s second season "is *said to [have] be[en]*" (Opp. Br. Ex. 3, emphasis added); and (*iii*) advertising cost data

reported in other media, footnotes to which say that the numbers "should be viewed as directional indicators and are not the actual price that every advertiser pays for a 30-second spot" (*e.g.*, *id.* Ex. 4). Plaintiffs also accuse the Fox Defendants of "omit[ting]" revenue from the charts pertaining to later airings of the two episodes domestically and internationally, which continue to occur.

Plaintiffs cite the unrelated lawsuit to suggest that the Fox Defendants might have understated TCFTV's profits in order to shift profitability to defendant Fox Broadcasting Company ("FBC"), which owns the Fox television network. The claim is not true, but regardless, the Fox Defendants complied with Judge St. Eve's order to produce financial information from *both* TCFTV and FBC. Plaintiffs have no basis to contend that the Fox Defendants have failed to account for any advertising or other revenues earned by either company.

Plaintiffs cite media reports of the Fox Defendants' 2015 "asking prices" for ad spots during *Empire*'s second season in order to allege "discrepancies" between the Fox Defendants' revenue figures and Plaintiffs' back-of-the-envelope calculation of what the Fox Defendants might have received if (*i*) every advertiser paid the reported asking price, and (*ii*) Fox sold advertising at this rate for every second of available time. In a footnote to their brief, Plaintiffs admit basing their charge of "discrepancies" on an assumption that every second of difference between the running time of Episodes 201 and 202 and the one-hour time slot for *Empire*'s airing represented third-party advertising. *See* Opp. Br. at 3 n.3. Among the many variables this assumption ignores, however, is that local television stations get some of this advertising time, and that FBC devotes a portion of time—particularly during the first episodes of a popular show—promoting its other programming. Thus, the amount of time sold to external advertisers is less than the maximum theoretically available. Because the premise of Plaintiffs' "discrepancy" claim is wrong, the claim holds no water.

Finally, Plaintiffs' assertion that the Fox Defendants omitted revenues from their spreadsheets is misleading.  On a daily basis, episodes from past seasons of *Empire* continue to generate revenue, including through domestic and international television distribution, as well as through streaming services (*e.g.*, Hulu).  The revenue and profit information the Fox Defendants provided five months ago in compliance with the Order reflected a snapshot in time.  The Fox Defendants would have to constantly repeat the burdensome exercise it performed to generate the spreadsheets in order to provide information about later-received revenues.[1]

The Fox Defendants have explained through sworn declarations the enormous burdens that Plaintiffs' demands for more information would impose.  Plaintiffs' brief does not even try to dispute those declarations.  Plaintiffs are attempting to audit the books of a long running, successful television series.  Such an audit takes months or years to complete in the normal course of business.  Plaintiffs have not remotely met their burden to overturn the careful compromise Judge St. Eve ordered in this case, directing disclosure of revenue and profit information but not authorizing a widespread fishing expedition for documents unrelated to the merits of the case.

**The Fox Defendants Correctly Stated the Burdens Plaintiffs' Discovery Requests Would Impose On Them.**  It remains as true today as it did when the Fox Defendants made the point in briefing prior to the Court's March 7 Order that to produce granular information about how much each advertiser paid for each advertisement on the two relevant episodes of *Empire* would require review of "all documents pertaining to advertising of *Empire* for all episodes from both of the show's first two seasons."  Luzadder Decl. Ex. G (Pl. July 10, 2018, letter at 1-2).

---

[1]    Without having raised this issue in any pre-motion discussions, Plaintiffs' brief suddenly and jarringly contends that the Fox Defendants waived their attorney-client privilege by producing the spreadsheet Plaintiffs submitted to the Court as Seal Ex. 2.  That spreadsheet is a business record from TCFTV, not a list of documents TCFTV relied upon in answering Plaintiffs' interrogatories to the company.  *See* Luzadder Decl. Ex. 10 (July 23 letter explaining how TCFTV produced Seal Ex. 2).  Plaintiffs' claim of a waiver is specious.

On July 10, Plaintiffs sent the Fox Defendants a nine-page, disorganized, rambling letter asking the Fox Defendants to "reconsider" their successful opposition to broader discovery on these non-merits issues. On July 23, the Fox Defendants responded in detail, reaffirming their statements to Plaintiffs or the Court about the burdensomeness or disproportionality of Plaintiffs' discovery demands. Plaintiffs point to a single false charge in their nine-page letter that the Fox Defendants did not explicitly rebut and contend this amounted to an admission that the charge was correct. *See* Opp. Br. at 11 (highlighting the Fox Defendants' argument to the Court respecting this information and arguing that the Fox Defendants "did not dispute" their letter's false charge that this representation to the Court was wrong). Not so.

A declination to address in detail every single accusation in a prolix letter is hardly an admission that unaddressed accusations are true. In any event, Plaintiffs' charge is not true. The Fox Defendants' declarations in support of their protective order motion reconfirm and further explain the basis of the Fox Defendants' prior arguments, including with respect to advertising.

**"License Agreements" Relating to *Empire* Have No Bearing on This Case.** The Fox Defendants long ago produced to Plaintiffs all agreements and correspondence related in any way to TCFTV's filming at the JTDC. None of this material supports—indeed, all of it categorically *refutes*—Plaintiffs' claims that the Fox Defendants "induced" a breach of fiduciary duty. Unaided by any relevant documents, Plaintiffs now ask to go fishing through every agreement related to the production of *Empire* based on nothing more than speculation as to what other agreements *might* contain. *See* Opp. Br. at 12. Setting aside the tremendous burden on the Fox Defendants to locate, review, and produce all domestic and international licenses for Empire, these license agreements, are some of the most commercially sensitive documents in the television industry. Even if the Plaintiffs were entitled to these agreements, which they are not, the Fox Defendants would need

9

to spend several weeks complying with confidentiality obligations to third parties prior to producing these documents.

**A List of Business Unit Employees Has No Bearing On This Case.** Nothing in the March 7 Order suggests an intention to direct the Fox Defendants –specifically, the publicly-traded parent company, Twenty-First Century Fox, Inc. ("21CF")—to produce a list of employees who worked for an unincorporated 21CF business unit regardless of whether those persons had anything to do with the filming of *Empire* scenes at the JTDC (or, indeed, with the production of *Empire* at all). When Plaintiffs requested this list of employees, the Court specifically authorized 21CF to respond by averring that it does not possess the information requested, which 21CF did. To the extent Plaintiffs now wish either to seek reconsideration of that prior order or to demand the same information from other 21CF subsidiaries, they offer no valid basis to do so.

Plaintiffs purport to justify their request by stating the rather obvious fact that two 21CF subsidiaries, producer TCFTV and broadcaster FBC, collaborated on programming to be broadcast on the Fox network. *See* Opp. Br. at 14-15. But the Fox Defendants have given Plaintiffs a list of everyone involved with filming at the JTDC and all correspondence pertaining to that filming. A list of employees who were not involved in any respect with the filming is not relevant to this case.

**Fox's Payments To Actors and Executives Certainly Has No Bearing On This Case.** Finally, after predicating this entire case on false and inflammatory charges, Plaintiffs argue that they should be entitled to discover what they call "the compensation Fox paid to famous people"— *Empire*'s actors and executives (Opp. Br. at 16)— *solely* for the purpose of inflaming passions further. The questions in this case are (1) whether any changes to JTDC routines occasioned by TCFTV's filming there amounted to a breach of JTDC officials' fiduciary duties (if any) to JTDC detainees, and (2) if so, whether the Fox Defendants "knowingly induced" or "knowingly

10

participated in" any such breach. "The compensation Fox paid to famous people" is not relevant

to either question and the Court should not authorize discovery on this subject.

## CONCLUSION

For the reasons stated above, the Fox Defendants request that the Court grant their Motion

for a Protective Order and deny the relief sought in Plaintiffs' Motion to Compel.


Date: August 28, 2018                                  Respectfully Submitted,

                                                       /s/Jeffrey S. Jacobson

                                                       Jeffrey S. Jacobson
                                                       Kelley Drye & Warren LLP
                                                       101 Park Ave
                                                       New York, NY 10178
                                                       212-808-5145
                                                       jjacobson@kelleydrye.com

                                                       Matthew C. Luzadder
                                                       Catherine E. James
                                                       Janine Fletcher-Thomas
                                                       Kelley Drye & Warren LLP
                                                       333 West Wacker Drive
                                                       Suite 2600
                                                       Chicago, IL 60606
                                                       (312) 857-7070
                                                       mluzadder@kelleydrye.com
                                                       cjames@kelleydrye.com

                                                       *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing Defendant Twentieth Century Fox Television's **REPLY IN SUPPORT OF MOTION FOR PROTECTIVE ORDER AND OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY FROM FOX DEFENDANTS** were served on all counsel of record pursuant to the Court's ECF system on this 28th day of August, 2018.

/s/ Jeffrey S. Jacobson

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Janine Fletcher-Thomas
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
(312) 857-7070
mluzadder@kelleydrye.com
cjames@kelleydrye.com

*Attorneys for Defendants*