```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION

T.S. a minor, by and through    )
his parent and guardian, S.S,   )
on behalf of themselves and     )
all others similarly situated,  )
                                )  Case No. 16 c 8303
               Plaintiffs,      )
                                )  Chicago, Illinois
   -vs-                         )  August 29, 2018
                                )  9:13 a.m.
Twentieth Century Fox           )
Television, a division of       )
Twentieth Century Fox Film      )
Corporation, et al.,            )
                                )
               Defendants.      )


               TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE REBECCA R. PALLMEYER
APPEARANCES:

For the Plaintiffs:    MR. STEPHEN H. WEIL
                       MS. ALEXIS GARMEY CHARDON
                       Weil & Chardon LLC
                       333 S. Wabash Ave.
                       Suite 2700
                       Chicago, IL 60604
                       (312)585-7404
                       Email: Steve@weilchardon.com
                              Ali@weilchardon.com

For Defendant Fox:     MR. JEFFREY S. JACOBSON
                       Kelley Drye & Warren LLP
                       101 Park Ave
                       New York, NY 10178
                       (212)808-5145
                       Email: Jjacobson@kelleydrye.com

Court Reporter:

           KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                    Official Court Reporter
                  United States District Court
         219 South Dearborn Street, Suite 2524-A
                    Chicago, Illinois  60604
                  Telephone:  (312) 435-5569
              Kathleen_Fennell@ilnd.uscourts.gov
```

| | | |
|---|---|---|
| 1 | APPEARANCES: (Continued) | |
| 2 | For Defendant Cook County: | MS. ALLYSON LYNN WEST |
| 3 | | Cook County State's Attorney's Office |
| | | 500 Richard J. Daley Center |
| 4 | | 5th Floor |
| | | Chicago, IL 60602 |
| 5 | | (312)603-6299 |
| | | Email: Allyson.west@cookcountyil.gov |
| 6 | | |
| 7 | For Defendant Dixon: | MR. LYLE KEVIN HENRETTY |
| | | Cook County State's Attorney 2030 |
| 8 | | 69 West Washington |
| | | 20th Floor |
| 9 | | Chicago, IL 60602 |
| | | (312)603-1426 |
| 10 | | Email: Lyle.henretty@cookcountyil.go |
| 11 | | |
| 12 | For the Defendant, Chief Judge of the Circuit Court of Cook | |
| 13 | County, in his Official capacity: | MR. T. ANDREW HORVAT |
| 14 | | Illinois Attorney General's Office |
| | | General Law Bureau |
| 15 | | 100 West Randolph Street |
| | | 13th Floor |
| 16 | | Chicago, IL 60601 |
| | | (312)814-5484 |
| 17 | | Email: THorvat@atg.state.il.us |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

|  |  |
|---|---|
|  | 1     (Proceedings heard in open court:) |
|  | 2     THE CLERK: 16 C 8303, T.S. versus Twentieth Century |
|  | 3     Fox Television for status and motion. |

      1      (Proceedings heard in open court:)

      2      THE CLERK: 16 C 8303, T.S. versus Twentieth Century

      3  Fox Television for status and motion.

      4      MR. HORVAT: Good morning, your Honor. Andrew Horvat

09:13:38    5  on behalf of the Office of the Chief Judge.

      6      THE COURT: Good morning.

      7      MS. WEST: Good morning, your Honor. Allyson West on

      8  behalf of Cook County.

      9      MR. HENRETTY: Good morning, your Honor. Lyle

09:13:47   10  Henretty on behalf of Superintendent Dixon.

     11      MR. JACOBSON: Good morning, your Honor. Jeffrey

     12  Jacobson on behalf of the Fox defendants.

     13      MR. WEIL: Good morning, Judge. Steve Weil on behalf

     14  of the plaintiffs.

09:13:55   15      MS. CHARDON: Good morning, your Honor. Alexis

     16  Chardon on behalf of the plaintiffs.

     17      THE COURT: Good morning.

     18      Here's -- I've got Defendant Fox's motion for

     19  protective order, and the response that the plaintiff filed

09:14:07   20  includes basically a motion to compel, and then I saw that

     21  there was a final brief that was submitted. I had a chance to

     22  look at that as well.

     23      There seems to be at least a little bit of a factual

     24  dispute about what was produced.

09:14:24   25      What the plaintiff -- I know that Judge St. Eve

1  issued a four-page order months ago in which she directed that
2  certain materials be produced, including information regarding
3  profits that Fox recovered from these two episodes.
4      And in response to that, as I understand it,
5  plaintiff says they gave us nothing more than four pages, and
6  Fox says it took -- these are spreadsheets that required a lot
7  of effort and combing through a lot of documents.
8      I know plaintiff's also suspicious about whether or
9  not Fox's reporting of its actual profits could possibly be
10  accurate in light of what the plaintiff has learned I think
11  from various sources about what kind of ad revenue could be
12  expected from this very popular series.
13      Is there something more that I don't understand?
14      MR. JACOBSON: I would say it this way, your Honor.
15  Judge St. Eve ordered us to produce the revenue and profit
16  information for the two episodes. We did. It took a lot of
17  effort to do it, but we generated those spreadsheets and we
18  produced the information.
19      The numbers are confidential, but your Honor has seen
20  them. They're in plaintiffs' motion -- they're an exhibit to
21  plaintiffs' motion to compel. They're gigantic numbers.
22  They're, I would argue, they're far more than this case is
23  worth on its best day.
24      Plaintiffs don't believe them. We've explained why
25  they're right. We've explained why it would be extremely

burdensome to produce the underlying documents. We've explained why plaintiffs' assumptions about why they're wrong are wrong. They're just multiplying what they read in the paper about what the ad revenue should have been, multiplied it by the total number of minutes between the air time of the episodes and an hour and said, well, if you sold every second of advertising, there should have been more.

We explained in the brief that we filed yesterday that local advertisers get some of that time, and we use some for promotions. The revenues are exactly right. It took us a long time to produce the information to plaintiffs, and we've -- you know, leaving aside that Judge St. Eve expressly didn't give them access to the documents behind it and expressly didn't give them access to full season information, the numbers are massive. They're -- they're -- as I say, this case is not worth what those two revenues combined are put together.

I submit that we ought to be spending the next few months trying to land this ship. I think that we're reasonably close to dispositive motions. There hasn't been a motion for class certification. Until there is, this case is not worth even a fraction of the numbers that we've produced.

And to be having this fight now over an audit of a couple of episodes of *Empire* is just not the right way to be spending our time. We've explained the burdens that would be

imposed on us if the Court orders them to be able to conduct this audit. This isn't the time for it. It's not called for, and Judge St. Eve said no, and here we are doing the same argument again that we had in March.

THE COURT: I'm going to assume for purposes of discussion that we're about to have that plaintiffs are going to win and that they're going to get the class certified and that some members of the class are going to have very, very significant damages for either the denial of education or health care, whatever it might be. I'm just going to make that assumption.

I'm having difficulty with the notion that Fox's revenues/profit is the appropriate measure of damages, and here's why I say that. Let's suppose this show, contrary to everything we know about it, let's presume that the show was a big loser and cost Fox far more than they ever recovered from the advertising revenue. Now, we know that's not true, but let's just assume that.

If some one of these plaintiffs, these juveniles, lost his life or was -- was seriously injured or had some other significant trauma, the fact that Fox had no profits would mean nothing to me about whether or not Fox was responsible for those damages and should pay them. And the reason I say that is that it seems to me that the appropriate measure of damages here is generously construed whatever those

1 kids lost as a result of what happened, and whether or not Fox
2 got rich or took a bath shouldn't make any difference.
3 If they had taken a bath, you wouldn't be saying they
4 owe us nothing. You'd be saying they owe us big time because
5 you would, I think, properly say, correctly say, my clients
6 were injured horribly and the fact that they made a bad
7 business decision doesn't excuse them from the obligation of
8 paying my clients for what they did.
9 What I'm concerned about is if your clients prevail,
10 what are they entitled to? And I'm just not sure why Fox's
11 profits are relevant to that.
12 MR. WEIL: Sure, Judge. I can answer that.
13 So this was all briefed in the motion to dismissal
14 phase, and the answer is simply that we're seeking two
15 alternative remedies. There's a decision by Judge Posner
16 called *Electric Games* saying that when a plaintiff is injured
17 and the defendant profits by that injury, the plaintiff can
18 elect between damages and unjust enrichment. I can go back
19 and just submit that case to you, if you'd like.
20 But we have two alternative remedies. Certainly if
21 we pursued a damages route, what you just said would be
22 absolutely correct. We'd have really no business with Fox
23 beyond -- no business with Fox's profits. Whether they took a
24 bath or whether they made a lot of money and we have a claim
25 that a bunch of kids got hurt or were traumatized by what

1 happened, Fox's profits wouldn't matter.

2 Alternatively, we have a claim for unjust enrichment.
3 And that's saying if I induce someone to do something bad to
4 you and I make money by doing that, I have been unjustly
5 enriched. The principle of unjust enrichment is you should
6 not profit from your own wrong.

7 Now, if Fox took a bath and we had an unjust
8 enrichment claim, it wouldn't be worth pursuing; but if they
9 made a lot of money by doing something bad, they profited from
10 their own wrong, then we do get to go after their profits.

11 I accept this is an unusual claim. It's a very
12 unusual claim, but as we said in our brief, you know, we think
13 there are plenty of circumstances where, in a more
14 conventional sense, a more conventional business sense such as
15 theft of intellectual property, this happens all the time.

16 An intellectual property plaintiff, if Fox would have
17 stolen a script for *Empire* and we were representing the
18 scriptwriter and Fox took a bath, you know, probably wouldn't
19 be worth taking the case but the fact that they made a lot of
20 money is. That is the point of the unjust enrichment claim.

21 It is an unusual claim, Judge. It's certainly not
22 something that's going to come across your desk every day. I
23 mean, you have something that looks like a civil rights case
24 that morphs into an unjust enrichment case, but the law is
25 pretty clear. Our briefing sets it out. We fight about in

1 our briefing, and Judge St. Eve's opinion sets it out, too.
2 And she says, in the discovery order from March, they have
3 made an unjust enrichment claim, and they're entitled to take
4 discovery on it. That's what we're seeking right now.
5 MR. JACOBSON: Your Honor, if I may, first of all,
6 the case that Mr. Weil cited I don't believe I've seen it in
7 any brief. It certainly wasn't in the briefing on this
8 motion, and I don't think it was in the motion to dismiss.
9 We did not have this out at the motion-to-dismiss
10 stage. We certainly argued for dismissal of the unjust
11 enrichment claim. Until discovery, we have not had any
12 argument about what discovery is appropriate on the unjust
13 enrichment claim.
14 Your Honor is exactly correct about the law of unjust
15 enrichment, and this matter has come up in front of other
16 judges. The *Sotelo against Direct Revenue* case that we cited
17 in our brief that plaintiff had no answer to was exactly this.
18 That was someone who claimed that defendant had put spyware on
19 their computer and profited as a result, and they wanted to
20 disgorge the profits. And what that case held was sorry, no,
21 you're not somebody who was going to get the revenues that the
22 defendant got by operation of it. You may have a claim and
23 you may be able to collect your damages, but it's not -- it's
24 not the -- the measure of it is not what the defendant got.
25 We cited five cases in our brief where this has come

1   up, and all five times the judges have ruled exactly as your
2   instincts are guiding you, your Honor, which is that this is
3   just not an appropriate measure of damages.
4       They have a claim.  We're in the middle or toward the
5   end of merits discovery.  We can talk about that.  I think we
6   should talk about that when we move to the status portion of
7   this hearing, but they've got the revenue numbers.  As I say,
8   they're massive.  If the plaintiffs prevail, they're going to
9   get a lot less than the numbers that we've reported.  This
10  audit they want to conduct is not an appropriate use of time,
11  and it's why Judge St. Eve said no to it.
12      MR. WEIL:  Judge, if I may.  Fox brought up all those
13  cases in its motion to dismiss phase, saying that we had no
14  entitlement to an unjust enrichment claim.  Judge St. Eve
15  denied those.  And you can look at the brief.  You don't have
16  to take my word for it.
17      MR. JACOBSON:  And there is an unjust enrichment
18  claim on the books and it's here and it's fine.
19      MR. WEIL:  I'm sorry.
20      And then if you go back to our first motion to compel
21  Fox's revenue, they brought out the exact same cases.  It's
22  very lightly edited as it's from the brief version of what
23  they're saying right now.
24      Judge St. Eve specifically said they have survived
25  this claim.  They have survived your motion to dismiss the

1 unjust enrichment claim. I have allowed it to go forward and
2 now we can take discovery.
3     MR. JACOBSON: And she said --
4     MR. WEIL: Fox -- Fox has its position which she said
5 is best for summary judgment. This is our opportunity to get
6 discovery on a claim that we survived.
7     MR. JACOBSON: And she said give them revenue and
8 profits information, which we did. We should be moving on.
9 There should not be an audit of these numbers at this stage.
10     MR. WEIL: And I'm happy to talk about that part,
11 Judge, but in terms of the claim that we have, it's a live
12 claim. It's been briefed thoroughly, and we're in the
13 discovery phase on that claim.
14     THE COURT: I -- I don't think it makes any sense,
15 from a proportionality standpoint, to devote more time to this
16 effort. Fox has already identified its lost profits from
17 these episodes. Even if they're, you know, low-balling their
18 profits, it's a very large amount of money, and I have grave
19 concerns about whether or not the plaintiffs have any claim to
20 lost profits here.
21     In the intellectual property context, the individual
22 whose creative expression has been stolen from him can make
23 the plausible argument those profits should be mine, and in
24 most unjust enrichment claims, the unjust enrichment again is
25 you took something that should be mine that should belong to

me to which I am entitled.

The plaintiffs in this case can't make that argument because under no circumstances were these plaintiffs going to be able to make their own television show, market it, and get rich. That wasn't -- that's not your theory. Your theory is that they were injured gravely by the fact that they were deprived of various circumstances they were entitled to because somebody wanted to make money. That's your theory.

I think it's a very plausible theory. I think you might very well win. I just think if you win, the measure of damages has to be harm to your clients, not unjust enrichment to -- to defendant in ways that the plaintiffs themselves never would have prevailed.

If I'm wrong about that, and I might be, I nevertheless do not think additional discovery on this claim makes sense at this stage of what I think is already a very expensive piece of litigation. We need to move on.

MR. WEIL: Sure, Judge, and I'll say just a couple things about that.

This is a distraction for us as well. We want to deal with the merits. We want some straight answers. We see information in there that looks like it's way off. We have a representation from them that they omitted rerun revenue, and it's, like, well, where was that? That was either a considered choice or an omission. So we don't think the

numbers are right.

We don't really have a problem with addressing this later, but we don't want to have a 10-month fight, which we've been having, about giving the right numbers.

I want to return briefly to the merits, Judge.

THE COURT: Okay.

MR. WEIL: Again, this is an unusual claim, but what was taken away from these kids was the use of all these facilities that they're entitled to.

THE COURT: Exactly.

MR. WEIL: Fox took that and made money off that. There are cases, and, again, unjust enrichment is not a common, you know, law that's brought, but there are cases where a doctor takes a patient's blood draw and the doctor sees that the blood's unusual and sells it for a massive amount of money.

Now, the only tort that that doctor committed was not asking permission from the plaintiff. The plaintiff couldn't have sold that blood for all kinds of money. No access to it, no ability to sell it. It was just lack of permission. And by that wrong, the doctor was unjustly enriched, and that money had to go to the plaintiff.

Again, we can brief this all out, and we have briefed it. We can brief it again. It's a novel theory, but it works here, Judge, and I think that's where we land.

I do think, though, that at a minimum, we cannot close discovery on this in terms of -- we want to get to the merits. We want to deal with the merits. This was a massive waste of time from plaintiffs' perspective to brief all this, but we can't close out discovery on the unjust enrichment entirely.

MR. JACOBSON: I'm happy to say, your Honor, that if this case moves forward, he gets a class certified, I'm not going to raise the closure of discovery as a reason not to revisit this if your Honor chooses to at that time, but there's no reason to revisit it now as you said.

I apologize. I have a cold. My voice usually is big and booming. It is not today.

THE COURT: I could comment on -- on the blood draw situation, but, again, I in my mind keep returning to the notion that if Fox had zero profits and took a big, big loss, they, under no circumstances, could come in here and say we don't owe them anything. We didn't make any money off this deal. Nobody would make that argument with a straight face, or at least no judge would listen to it.

I really think the measure of damages is something different, but I don't think I need to make that decision now, and I'll certainly look over the cases that you've cited, as well as what Judge St. Eve has already done. The only decision I'm making right now is I don't want to spend any

more of your time or defendants' time on discovery on this issue.

You've already got some information. It may not be as comprehensive or complete as you need on these two episodes, but we shouldn't spend any more time on it at this point. You do have enough evidence that they were -- that they collected a huge amount of money that would no doubt make your clients happy, and we can talk about whether it really should be larger and whether they've been fully forthcoming if we need to at some later stage.

MR. WEIL: Yes, Judge.

THE COURT: What's our status otherwise?

MR. WEIL: Judge, we've been -- so we have some merits left. You recall last time you ordered the Chief Judge's Office to produce documents.

THE COURT: Right.

MR. WEIL: I believe, and Mr. Horvat can speak to it, that they're gathering and reviewing and they're almost done. That's my understanding.

Then we have a couple of discovery items that we can discuss that are a bit miscellaneous there that are outstanding. I think the big takeaway for us is just that we need to review whatever Mr. Horvat gets -- gives us before we can really take productive depositions. We've taken a couple and, frankly, the lack of documents was a hindrance there.

1 And so we have right now a deadline of October 31st
2 to complete depositions, and I don't think that that's going
3 to be possible.
4 THE COURT: How many are left?
5 MR. WEIL: How many depositions, Judge?
6 THE COURT: Yeah.
7 MR. WEIL: That's going to be determined by a
8 production. I can ballpark, but I'm not positive. It's going
9 to depend on who said what, and we're waiting for those
10 documents.
11 MR. JACOBSON: The only defense depositions, your
12 Honor, have been of my two people. They haven't taken any
13 depositions of any of the government people.
14 MR. WEIL: That's correct, Judge. We haven't because
15 we don't have the government's communications. We're
16 comfortable that Fox has produced everything they have in
17 terms of the merits.
18 MR. HORVAT: Judge, I can speak to those emails if
19 you wish.
20 THE COURT: Sure.
21 MR. HORVAT: I've gone through all of them
22 individually, and it took some time, so I should be able to --
23 they're being collected now so they can be produced in a
24 format requested by plaintiffs. We're looking at about 2,000
25 emails. I'll inform them for the first time right now that

1 they're almost 100 percent duplicative of what they already
2 have.
3 There are a few other requests, most of which I don't
4 have possession or control of. There was kind of a
5 last-second third or fourth request for production that is
6 due, I believe, the close of discovery, the 31st. I should
7 have that information. In fact, what's requested is sitting
8 on a disk in the Chief Judge's Office right now. I need to go
9 pick it up.
10 So as far as any delay in getting Mr. Weil and
11 Ms. Chardon what they've requested, I don't see it. I should
12 have it in the next couple of days in the format they've
13 requested.
14 THE COURT: Well, what I'm going to suggest is we set
15 a status early in October, and if you -- at that point, you
16 can present to me a schedule, and if that schedule bleeds past
17 October 31st for legitimate reasons, I'll certainly entertain
18 it. But what I'd like to see is your proposed scheduled dates
19 for depositions and any further -- further follow-up document
20 discovery and the like.
21 MR. WEIL: That shouldn't be a problem, Judge. Thank
22 you.
23 THE COURT: All right. So how about a status on
24 October 3rd. That's a Wednesday.
25 MR. HORVAT: Your Honor, I apologize, I'm out of the

1  state that week.  Can we go to the next week, would that be
2  okay?
3        THE COURT:  Sure.  October 10th at 9:00?
4        MR. HORVAT:  That's fine with the State.
5        MR. WEIL:  Fine by plaintiffs, Judge.
6        THE COURT:  All right.  October 10th, 9:00 for a
7  status.
8        MR. HORVAT:  Thank you, Judge.
9        THE COURT:  All right.  Thank you.
10     (Which were all the proceedings heard.)
11                        CERTIFICATE
12    I certify that the foregoing is a correct transcript from
13  the record of proceedings in the above-entitled matter.
14  */s/Kathleen M. Fennell*          *September 17, 2018*
15  _____      _____
    Kathleen M. Fennell                  Date
16  Official Court Reporter

09:31:38 (line 5)