# Exhibit 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| T.S. et al., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16-cv-08303 |
| | ) | |
| vs. | ) | Hon. Amy J. St. Eve |
| | ) | |
| | ) | |
| Twentieth Century Fox Television et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT COOK COUNTY'S RESPONSE TO PLAINTIFFS' THIRD REQUESTS FOR PRODUCTION

Now comes Defendant, COOK COUNTY, by its attorney KIMBERLY M. FOXX, State's Attorney of Cook County, through her Assistant State's Attorney, Allyson L. West, and responds to Plaintiff's Third Requests for Production as follows:

## DOCUMENT REQUESTS

1.      All documents identified, relied upon, or referenced by you in response to any of Plaintiff's Interrogatories served on you in this matter.

**RESPONSE**: Defendant objects to Request No. 1 as vague.  However without waiver of said objections Defendant refers Plaintiff to those documents previously produced to Plaintiff in response to Defendant Cook County's Answers to Plaintiff's First Set of Interrogatories tendered on January 31, 2018, which included Bates stamped CCSAO T.S. v. 20th Century 10770-10838.

2.      All reports or other documents synthesizing or analyzing health care data from JTDC from the Relevant Period.

**RESPONSE**: Defendant objection to Request No. 2 as vague as to the terms "synthesizing" and "analyzing."  Additionally, Defendant objects to the Relevant Time period as defined by Plaintiff as irrelevant to the extent it seeks documentation outside of the filming period. However, without waiver of said objections, Defendants refer Plaintiffs to the sick call logs previously produced, Bates Stamped, CCSAO T.S. v. 20th Century 003561-3583.

3.      Documents relating or pertaining to resident screening and classification conducted during the Relevant Period, including *but not limited to*:

a. Committee Meeting Minutes of the Housing Classification and Assignment Committee (*see* Policy 6.09.03 "Housing Classification");

b. Housing Classification and Assignment Forms (*see* Policy 6.09.03 "Housing Classification");

c. Transfer Lists;

d. Monthly Reports relating to inmate screening and classification (*see* Policy 6.09.03 "Housing Classification");

e. Admissions Checklists (*see* Policy 4.07.06 "Health Screenings");

f. Nursing Admissions Screenings (*see* Policy 4.07.04, "Suicide Self Prevention");

g. MAYSI Reports (see Policy 4.07.04, "Suicide Self Prevention"; Policy 5.10.03, "Reception and Orientation");

h. Other documents related to or created pursuant to procedures referenced in Policy 6.09.03 ("Housing Classification");

i. Other documents related to or created pursuant to procedures referenced Policy 4.07.04 ("Suicide Self Prevention");

j. Other documents related to or created pursuant to procedures referenced Policy 4.07.06 ("Health Screenings").

**RESPONSE**: Defendant objects to Request No. 3, subparagraphs a) through e) and g) through h) as they as such documentation is not in the custody or control of this Defendant. Additionally, Defendant objects to the Relevant Time period as defined by Plaintiff as irrelevant to the extent it seeks documentation outside of the filming period. Defendant further objects to Request No. 3, subparagraph f), i) and j) insofaras it requests medical information of individuals that are protected under HIPPA, and therefore cannot be disseminated without individual wavier. Defendant also objects as no class has been defined or certified at this time, only mere class allegations therefore, such request is vague and overly broad.

4. Documents summarizing, analyzing, or consolidating information regarding the classification and screening process during the Relevant Period.

**RESPONSE**: Defendant objects to Request No. 4 as it is vague and not properly directed toward this Defendant and such documentation is not in the custody or control of this Defendant. Additionally, Defendant objects to the Relevant Time period as defined by Plaintiff as irrelevant to the extent it seeks documentation outside of the filming period.

5. All policies and procedures related to resident health care at JTDC, including those authored by or in the possession of Cermak Health Services, and any other policy in effect during the Relevant Period which has not already been produced in this litigation.

**RESPONSE**: Defendant objects to Request No. 5, as irrelevant regarding "any" policy, overly board and unduly burdensome. Additionally, Defendant objects to the Relevant Time period as defined by Plaintiff as irrelevant to the extent it seeks documentation outside of the filming period. However, without wavier of said objects, Defendant refers Plaintiff to the attached 2015 Policy Table of Contents, in attempts to narrow Request No. 5.

6.      All schedules, timetables, logs, policies, procedures, or other documents reflecting the schedules for the following during the Relevant Period:

a.      The delivery of medication to the residents of the JTDC;

b.      The collection of sick call slips or mental health slips at the JTDC;

c.      The provision of medical care to residents at the JTDC in light of requests made on sick call and mental health slips.

**RESPONSE**: Defendant objects to Request No. 6, subparagraph a) through c) insofaras it requests medical information of individuals that are protected under HIPPA, and therefore cannot be disseminated without individual wavier. Defendant also objects as no class has been defined or certified at this time, only mere class allegations therefore, such request is vague and overly broad. Additionally, Defendant objects to the Relevant Time period as defined by Plaintiff as irrelevant to the extent it seeks documentation outside of the filming period. With regard to subparagraph b) and c) Defendant refers Plaintiffs to sick call logs previously produced, Bates Stamped, CCSAO T.S. v. 20th Century 003561-3583.

7.      Documents reflecting the actual times that:

a.      Medication was delivered to the residents of the JTDC during the Relevant Period;

b.      Sick call slips and mental health slips were collected during the Relevant Period;

c.      Medical care was provided in response to requests made on sick call and mental health slips during the Relevant Period.

**RESPONSE**: Defendant objects to Request No. 7, subparagraph a) through c) insofaras it requests medical information of individuals that are protected under HIPPA, and therefore cannot be disseminated without individual wavier. Defendant also objects as no class has been defined or certified at this time, only mere class allegations therefore, such request is vague and overly broad. Additionally, Defendant objects to the Relevant Time period as defined by Plaintiff as irrelevant to the extent it seeks documentation outside of the filming period.

8.     Documents analyzing, consolidating, logging, or in any way reflecting the actual length of time between when sick call requests and/or mental health requests were authored and/or collected and when medical care was provided response to the requests during the Relevant Period.

**RESPONSE**: Defendant objects to Request No. 8, insofaras it requests medical information of individuals that are protected under HIPPA, and therefore cannot be disseminated without individual wavier. Defendant also objects as no class has been defined or certified at this time, only mere class allegations therefore, such request is vague and overly broad. Additionally, Defendant objects to the Relevant Time period as defined by Plaintiff as irrelevant to the extent it seeks documentation outside of the filming period. With regard to logging Defendant refers Plaintiffs to sick call logs previously produced, Bates Stamped, CCSAO T.S. v. 20th Century 003561-3583.

9.     Documents reflecting, summarizing, analyzing, or consolidating information about medication distribution/administration and responses to resident health care and mental health care requests or needs for the Relevant Period.

**RESPONSE**: Defendant objects to Request No. 8, insofaras it requests medical information of individuals that are protected under HIPPA, and therefore cannot be disseminated without individual wavier. Such documentation is kept in each individual's protected medical record file. Defendant also objects as no class has been defined or certified at this time, only mere class allegations therefore, such request is vague and overly broad. Additionally, Defendant objects to the Relevant Time period as defined by Plaintiff as irrelevant to the extent it seeks documentation outside of the filming period.

10.     Documents regarding the provision of medical services during the Filming Periods and any disruptions or changes to normal processes, schedules, and procedures for the same.

**RESPONSE**: Defendant objects to Request No. 10, insofaras it requests medical information of individuals that are protected under HIPPA, and therefore cannot be disseminated without individual wavier. Defendant also objects as no class has been defined or certified at this time, only mere class allegations therefore, such request is vague and overly broad. Additionally, Defendant objects to the Relevant Time period as defined by Plaintiff as irrelevant to the extent it seeks documentation outside of the filming period. With regard to logging Defendant refers Plaintiffs to sick call logs previously produced, Bates Stamped, CCSAO T.S. v. 20th Century 003561-3583.

Respectfully Submitted,

Kimberly M. Foxx
State's Attorney of Cook County

By:    /s/ *Anthony E. Zecchin*
        Anthony E. Zecchin
        Assistant State's Attorney
        Richard J. Daley Center
        50 West Washington, Suite 500
        Chicago, Illinois 60602
        (312) 603-3373

By:    /s/ *Allyson L. West*
        Allyson L. West
        Assistant State's Attorney
        Richard J. Daley Center
        50 West Washington, Suite 500
        Chicago, Illinois 60602
        (312) 603-6299

**CERTIFICATION**

PLEASE TAKE NOTICE that I, Allyson L. West, Assistant State's Attorney, hereby certify that I sent a copy of Defendant Cook County's Answers to Plaintiffs' Third Requests for Production to all counsel of record via electronic mail on June 25, 2018.


By:     */s/ Allyson L. West*
          Allyson L. West

# Exhibit 2



## RE: Discovery follow-up
1 message

**DANIELLE MIKHAIL (States Attorney)** <DANIELLE.MIKHAIL@cookcountyil.gov>        Mon, Sep 24, 2018 at 12:19 PM
To: Stephen Weil <steve@weilchardon.com>, "ANTHONY ZECCHIN (States Attorney)"
<anthony.zecchin@cookcountyil.gov>, "Allyson West (States Attorney)" <Allyson.West@cookcountyil.gov>
Cc: Alexis Chardon <ali@weilchardon.com>

Steve,

Sorry for the delayed response, I was out of the office Thursday and Friday of last week. Please see County's responses in red below.

- The County does not have objections (including scope / burden / etc.) objections to our outstanding discovery, as narrowed in our Sept, 10 phone call and as recited in my Sept 10 email (in this thread).

- County does not have a problem with the scope of discovery on this request extending to the June, July, and August filming days, as well as the "sample" time period of July 27- August 7.

- The County's objection is limited to a threshold "medical confidentiality" objection arising from HIPAA and state privileges discussed in the <u>Shull v. Ellis</u> decision. The County's position is that notwithstanding the protective order currently in place in this case, an individual waiver is required from each detainee in order to produce responsive documents that identify them.

- County will not disclose any document considered to be a medical record of any patient without a properly executed HIPPA release from that patient or a court order. The protective order on file does not address HIPPA or cover HIPPA privilege and therefore is not adequate to protect my client. County referred to *Shull v. Ellis* in response to Plaintiff relying on *Shull* on this matter.

- Based on this objection you are refusing to respond to the two RFP groups [RFPs 2,6,7,8,9, and 10] and [RFP 3] as described in my Sept 10 email.

- Correct on RFP 3. County objects to this request as it will reveal confidential medical information on individuals whom we do not have HIPPA waivers. See also the third bullet point below.

- As for RFP 2, 6, 7, 8, 9, and 10, I am still waiting to receive those logs to see exactly what information they reveal. If they do contain medical information, County would maintain the same medical privilege objection to this request. If Plaintiff is willing to accept a redacted version of this log so as to protect specific patients names and medical information but reveal the number of patients scheduled for certain days for medical and dental referrals, County would be fine turning that redacted version over.

- **Please note County also objects to both RFP groups,** [RFPs 2,6,7,8,9, and 10] and [RFP 3], **as irrelevant**. Plaintiffs' allegations regarding any medical inquiry is limited to the timeliness of responding to sick requests. The nature and details of any medical visit by each patient is therefore irrelevant. Also, for RFP 3, Plaintiff's Second Amended Complaint does not allege inadequate mental health, therefore further information regarding the MAYSI requests is irrelevant.

- Your "medical confidentiality" objection does not impact RFP 5, and the County will produce documents responsive to that RFP, as limited in my Sept. 10 email. Thus we are not at issue as to RFP 5.

- Correct. County is working to gather and produce the requested page ranges in the prior referenced email by Plaintiff.

Feel free to call and discuss further if you want. I will be at a settlement conference at 1:30 other than that I will be in my office.



**Danielle A. Mikhail**

Assistant State's Attorney

Civil Actions Bureau – Civil Rights/Torts Litigation

Cook County State's Attorney's Office

500 Richard J. Daley Center

Chicago, IL 60602

P: 312.603.3368    E: danielle.mikhail@cookcountyil.gov

This communication is private and confidential and may be subject to attorney-client and/or work product privileges.  If you have received this message in error, please notify the sender and remove it from your system.

**From:** Stephen Weil [mailto:steve@weilchardon.com]
**Sent:** Wednesday, September 19, 2018 3:49 PM
**To:** DANIELLE MIKHAIL (States Attorney); ANTHONY ZECCHIN (States Attorney); Allyson West (States Attorney)
**Cc:** Alexis Chardon
**Subject:** Re: Discovery follow-up

Danielle,

Following up on our call last Friday 9/14 I want to make sure we're clear on the scope of our discovery dispute.  Here is my understanding of the dispute:

- The County does not have objections (including scope / burden / etc.) objections to our outstanding discovery, as narrowed in our Sept, 10 phone call and as recited in my Sept 10 email (in this thread).

- The County's objection is limited to a threshold "medical confidentiality" objection arising from HIPAA and state privileges discussed in the Shull v. Ellis decision.  The County's position is that notwithstanding the protective order currently in place in this case, an individual waiver is required from each detainee in order to produce responsive documents that identify them.

- Based on this objection you are refusing to respond to the two RFP groups [RFPs 2,6,7,8,9, and 10] and [RFP 3] as described in my Sept 10 email.

 - Your "medical confidentiality" objection does not impact RFP 5, and the County will produce documents responsive to that RFP, as limited in my Sept. 10 email.  Thus we are not at issue as to RFP 5.

Please confirm that I have correctly described the scope of our dispute.

Many thanks,

Steve


Stephen H. Weil

Weil & Chardon LLC

333 S. Wabash Ave., Suite 2700

Chicago, IL 60604

(o) 312-585-7404

(f)  773-409-2745

(c) 267-240-5585

steve@weilchardon.com

www.weilchardon.com


On Thu, Sep 13, 2018 at 9:49 AM, Stephen Weil <steve@weilchardon.com> wrote:

Danielle I have our call down for 3 today.  Does that work?

Steve


Stephen H. Weil

Weil & Chardon LLC

333 S. Wabash Ave., Suite 2700

Chicago, IL 60604

(o) 312-585-7404

(f)  773-409-2745

(c) 267-240-5585

steve@weilchardon.com

www.weilchardon.com


On Mon, Sep 10, 2018 at 5:41 PM, Stephen Weil <steve@weilchardon.com> wrote:

Hello Danielle,


To follow up on our call.  As we discussed:


- You are reviewing the County's threshold "HIPAA"-type objections, and we will discuss Thursday.


- As to the substance of our requests, we are offering to narrow them significantly as described below; you are going to get back to us on Thursday about whether (assuming the threshold HIPAA objections are resolved) these requests would be acceptable from a burden / over-breadth standpoint.


We are offering to limit RFPs 2,6,7,8,9, and 10, to the following:


    - Sick call slip logs (like those reflected in CCSAO 3561-83) for all three filming periods, not just the August filming period.


    - Sick call slip logs (like those reflected in CCSAO 3561-83) for a "comparator" period of July 27 to August 7.  This narrows our "Relevant Period" request significantly.


    - For each sick call slip log entry during the "filming" and narrowed "relevant" periods that has a check mark for "CLINIC REFERRAL," "DENTAL REFERRAL," or "MH REFERRAL," we are requesting documents sufficient to show the date that the kid was seen (at the clinic, dental, and/or mental health) for said referral.  As I said we are happy to log-style information that shows this; if that is not available we would need to discuss a more involved process how to gather this information.  I'll note that the spreadsheet you produced this afternoon seems to log information on these same categories.


    - If we can get these documents we should be able to forego requests for the sick call slips themselves as well as the medical records on the "referral" side.


We are offering to limit RFP 3 as follows:


    - We are offering to limit our request to 3(g) only, the MAYSI request.  For this request, we are further willing to limit it to the following:


    - During the filming periods, we are seeking documents sufficient to show the names of all kids who were admitted, and all kids who took the MAYSI test.  The purpose of this request is to flesh out the information set out in the attached email, which compares admissions vs. MAYSI tests.  To the extent you have it, we are also asking for documents sufficient to show which pod each such kid was assigned during filming.

- During the "relevant" period, we are asking for documents sufficient to show (1) how many kids were admitted and (2) how many kids took the MAYSI test.  This information can be anonymized (we don't need the kids' names).  If this information is easy to gather (and the attached email suggests that it is) we requesting for the entire relevant period as defined in the requests (~May to September), but excluding the filming periods.  If the information is hard to gather we would ask for only the July 27 to August 7 comparator period (though we would want an explanation about why the information is hard to gather).

RFP 5 (manual)

We are narrowing our request to the following page ranges.  Alternatively we are requesting a chance to inspect the manual and then copy from it.

12-14

70-74

152-55

164-93

226-315

332-417

433-39

466-76

As noted, we'll follow up on all this Thursday.

Thanks and best regards,

Steve

Stephen H. Weil

Weil & Chardon LLC

333 S. Wabash Ave., Suite 2700

Chicago, IL 60604

(o) 312-585-7404

(f)  773-409-2745

(c) 267-240-5585

steve@weilchardon.com

www.weilchardon.com

# Exhibit 3

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

Marc Shull,                               )
                                          )
            Plaintiff,                    )
                                          )   No. 15 L 9759
     v.                                   )   and all consolidated
                                          )   cases
Eric Ellis,                               )
                                          )
            Defendant.                    )

## MEMORANDUM OPINION AND ORDER

This court has been tasked with reconciling a circuit court
order with a state statute. The court order at issue is the Health
Insurance Portability and Accountability Act (HIPAA) qualified
protective order (QPO) currently entered routinely by judges in the
Circuit Court of Cook County. That order authorizes the
disclosure of a litigant's protected health information (PHI) to,
among others, the defendants' insurers exclusively for use in the
captioned litigation and requires all entities to return or destroy a
litigant's PHI at the lawsuit's conclusion. The statute in question
is the Illinois Insurance Code (IIC). That statute, along with its
extensive regulations, requires property and casualty insurers to
retain for seven years nearly every type of document in their
possession for various state and industry purposes.

In attempting to reconcile the order and the statute, this
court recognizes that it must also consider HIPAA's privacy and
security rules as well as the Illinois constitution. The latter
document explicitly guarantees a right to personal privacy that the
Illinois Supreme Court has held extends to personal medical
information. This court has concluded that the Circuit Court's

current HIPAA QPO conflicts with both federal and state law and the Illinois constitution by authorizing:

(1)  the disclosure of a plaintiff's PHI to property and casualty insurers despite their exemption from HIPAA;

(2)  the disclosure of a plaintiff's PHI to property and casualty insurers without the plaintiff's explicit and knowing waiver of her or his constitutional right to privacy; and

(3)  property and casualty insurers to retain PHI only until the end of litigation although the IIC requires them to retain PHI for at least seven years.

This court further concludes that these conflicts arise from the same focal problem – the current HIPAA QPO fails to inform a plaintiff who is disclosing PHI of the competing constitutional, statutory, and administrative interests in her or his PHI. To remedy this problem, this court has drafted a new HIPAA QPO and attached it as an exhibit. This court believes that the proposed QPO is a narrowly tailored solution to this multi-faceted problem because it informs a plaintiff how her or his PHI may be received, retained, used, and disposed of. With this information, a plaintiff may make an explicit and knowing waiver of her or his constitutional rights.

## Facts

On September 12, 2012, Judge William D. Maddux, then presiding judge of the Circuit Court's Law Division, entered an order authorizing the use of a standardized QPO compliant with HIPAA and its regulations. *See* Circuit Ct. Cook Cty. Gen'l Admin. Order 12-1, attached as Ex. A.[1] The court's purpose in approving the QPO was to avoid the voluminous and repetitive motion practice that would otherwise be required in individual lawsuits to authorize the limited use of a litigant's PHI. Since the

---

[1] Illinois Supreme Court Rule 201(c)(1) authorizes the entry of protective orders.

entry of General Administrative Order 12-1, Circuit Court judges in the Law Division have entered the HIPAA QPO in tens of thousands of lawsuits on a routine basis. The same HIPAA QPO is also used in other circuit court divisions.

The QPO explicitly provides for the disclosure, receipt, retention, and disposal of PHI by "current parties (and their attorneys) and any future parties (and their attorneys). . . ." Ex. A, ¶ 1. To that end, litigants and their attorneys are expressly permitted to use PHI:

> *in any manner reasonably connected with the . . . litigation.* This includes . . . disclosure to the parties, the attorneys' firm (*i.e.*, attorneys, support staff, agents and consultants), *the parties' insurers*, experts, consultants, court personnel, court reporters, copy services, trial consultants, jurors, venire members and other entities *involved in the litigation process. . . .*

*Id.* (emphasis added), ¶ 4. The QPO also requires that at the end of all litigation, including any appeals:

> any person or entity in possession of "PHI" . . . shall destroy any and all copies of "PHI" pertaining to _____, **except**:
> (a) the defendant that is no longer in the litigation may retain "PHI" generated by him/her/it; and
> (b) the remaining defendants in the litigation, and persons or entities receiving "PHI" from those defendants . . . may retain "PHI" in their possession . . . .

*Id.* (emphasis in original), ¶ 5. Finally, the QPO provides that parties must comply with state statutes governing mental health and AIDS records as well as state and federal laws governing drug and alcohol records. *Id.* at ¶ 8.

3

On April 19, 2016, State Farm Mutual Automobile Insurance
Company (State Farm) filed in a now-related proceeding,[2] a
motion to compel the plaintiff to execute HIPAA authorizations for
the release of her PHI or for a court order requiring their release.
Soon thereafter, State Farm and other property and casualty
insurers began filing similar motions in other cases.[3] These
motions came to the attention of the current Law Division
Presiding Judge, James P. Flannery. On July 13, 2016, Judge
Flannery, on the court's own motion, entered an order based on
the following finding:

> Motion Section Judges are being presented with a large
> number of motions challenging the language of the
> standard Law Division HIPAA order, on the basis that
> [its] terms, which require the return or destruction of
> . . . protected health information ("PHI"), conflict with
> an insurer's federal and state statutory obligation to
> "maintain a complete record of all books, records and
> accounts." 215 Ill. Comp. Stat. Ann. 5/133.

Ex. B. Judge Flannery concluded that, in the interest of judicial
economy, the identified issue should be consolidated before this
court for adjudication.[4]

In subsequent case management conferences, this court
extended an invitation to members of both the plaintiffs' and
defendants' bars to participate in the resolution of the issue
identified by Judge Flannery. Several law firms have been
involved in subsequent discussions, and this court wishes to
acknowledge especially the work of Daniel S. Kirschner of Corboy
& Demetrio, counsel for Shull, and Glen E. Amundsen of
SmithAmundsen, LLC, counsel for State Farm. Kirschner and

---

[2] *Spielberger v. Herman*, 15 L 9935.

[3] State Farm was originally a non-party to these lawsuits, but filed motions to
intervene as required by the Code of Civil Procedure. *See* 735 ILCS 5/2-408.

[4] Judge Flannery issued his order in *Franklin v. Pace Sub. Bus Div., Reg'l
Transp. Auth.*, 14 M1 302527. That case settled, and on March 27, 2017,
Judge Flannery entered an order transferring the issue to this case. Ex. C.

Amundsen have indicated in correspondence with this court that, despite their concerted and cordial efforts to agree on a draft replacement HIPPA QPO, they have been unable to do so. To that end, State Farm submitted to this court a proposed replacement HIPAA QPO while Shull submitted a proposed subparagraph to be added to the existing HIPAA QPO.[5]

State Farm's proposed QPO retains much of the existing HIPAA QPO but would order that PHI be maintained "in a confidential manner" and "shall be destroyed at the conclusion of this litigation" with three exceptions. First, absent a court order, "[c]onfidential medical records retained by defense counsel shall be destroyed in accordance with defense counsel's regular business practices. . . ." Second, "'PHI' provided to the Defendant(s) [sic] property and casualty insurer(s) shall be destroyed at the earliest date that permits the insurer to comply with its retention obligations under applicable insurance regulations. . . ." Third, "[w]hile Plaintiff(s) [sic] confidential medical records/'PHI' are in the custody or possession of defense counsel or Defendant(s) [sic] property and casualty insurer(s) . . . such records shall not be disclosed to any third person. . . ."

For his part, Shull suggested the following language be added to paragraph five of the existing HIPAA QPO:

> Nothing in this section is intended to limited [sic] or expand the duties or obligations of the parties' insurers to retain, protect or destroy PHI pursuant to any federal code, state law, administrative regulation, or other court order. A parties' [sic] insurer may retain PHI upon the conclusion of this litigation, but such retention shall be subject to the privacy and use requirements set forth in existing federal code, state law, administrative regulation, or other court order

---

[5] Given the significance of the issues presented, this court thought it prudent to receive from the parties their input on how best to resolve the identified problems as well as to create as complete a record as possible.

regarding the retention, protection or destruction of
those records.

Shull further rejects State Farm's reasons to exclude property and
casualty insurers from the record destruction requirements of the
current HIPAA QPO.

## Analysis

The issue before this court lies at the intersection of three
distinct bodies of substantive law. Before addressing the
confluence of that intersection, it is necessary first to understand
the purpose and effect of each.

I.   Applicable Law

A.   Health Insurance Portability and Accountability Act

The United States Congress passed HIPAA in August 1996
in response to the rapid evolution of health information systems
and the electronic transfer of such information. *See South
Carolina Med. Ass'n v. Thompson*, 327 F.3d 346, 348 (4th Cir.
2003). One of HIPAA's central goals is to protect individually
identifiable health information, defined as information relating to
the physical or mental health or condition of an individual, or the
provision of health care to an individual, that identifies that
person. *See* 42 U.S.C. § 1320d-6; 45 C.F.R. § 160.103. Individually
identifiable health information is more commonly called "protected
health information," or "PHI." *See* 45 C.F.R. § 160.103.

HIPAA directs the Secretary of Health and Human Services
to promulgate regulations to protect PHI from improper
disclosure, a goal achieved, in part, through what is known as the
privacy rule. *See* 45 C.F.R. parts 160 & 164, subparts A & E. To
that end, HIPAA establishes a "mandatory floor" of privacy
protections, 65 Fed. Reg. 82,465-71 (Dec. 28, 2000), that "shall not
supersede a contrary provision of State law, if . . . [it] imposes
requirements, standards or implementation specifications that are

6

more stringent than . . . [those] imposed under the regulation." 45 C.F.R. § 160.203(b). A state standard is more stringent if it "provides greater privacy protection for the individual who is the subject of the individually identifiable health information." 45 C.F.R. § 160.202(6); *see also Northwestern Mem. Hosp. v. Ashcroft*, 362 F.3d 923, 924 (7th Cir. 2004).

HIPAA regulations apply generally to "covered entities" and "business associates." A covered entity is defined as a: (1) "health plan," an individual or group plan that provides or pays the cost of medical care; (2) "healthcare clearinghouse," such as a billing service or health system management company; or (3) "healthcare provider," considered to be a person or entity that furnishes, bills, or is paid for health care in the normal course of business. *See* 45 C.F.R. § 160.103. A business associate is defined as a person or entity that performs certain functions or activities involving the use or disclosure of PHI on behalf of, or provides services to, a covered entity. *See id*. Business associate functions and activities include, for example, claims processing or administration, data analysis, quality assurance, and billing. *See id*.

Covered entities and business associates are not permitted to use or disclose a person's PHI, *see* 45 C.F.R. § 164.502(a)(1)(i-ii), subject to 12 exceptions, including one for judicial and administrative proceedings, *see* 45 C.F.R. § 164.512(e). The judicial exception authorizes covered entities and business associates to disclose PHI in various ways, three of which are the most common. First, PHI may be disclosed pursuant to a court-entered QPO, *see* 45 C.F.R. § 164.512(e)(1)(ii), (iv), (v), provided that the covered entity or business associate discloses "only the [PHI] expressly authorized by such order. . . ." 45 C.F.R. § 164.512(e)(1)(i) & (f)(1)(ii). The type of order envisioned by HIPAA is a QPO that, at a minimum:

> (A) prohibits the parties from using or disclosing the [PHI] for any purpose *other than the litigation or proceeding for which it was requested*; and

7

> (B) requires the return of the [PHI] to the covered entity
> or the destruction of the information *at the end of the*
> *litigation or proceeding.*

45 C.F.R. § 164.512(e)(1)(v)(A) & (B) (emphasis added). Second, a
party seeking disclosure may send the covered entity a valid
subpoena. *See* 45 C.F.R. § 164.512(e)(1)(ii). The covered entity
may disclose PHI if the subpoena is accompanied by a written
statement from the party issuing the subpoena that: (1) the issuer
made reasonable good-faith efforts to notify the patient in writing
of the subpoena, *see* 45 C.F.R. § 164.512(e)(1)(ii)(A); (2) the issuer
made reasonable efforts to secure a QPO, *see* 45 C.F.R. §
164.512(e)(1)(ii)(B); (3) the notice included sufficient detail to
permit the patient to object to the subpoena in court, 45 C.F.R. §
164.512(e)(1)(iii)(A) & (B); and (4) the time for the patient to object
to the subpoena lapsed absent any objections or the court
overruling any objections, *see* 45 C.F.R. § 164.512(e)(1)(iii)(C)(1) &
(2). Third, a party seeking disclosure may provide the covered
entity with the patient's valid authorization containing the
required elements and statements. *See* 45 C.F.R. § 164.508(b)(1)(i)
& (ii).

    This brief summary of HIPAA and its scope is useful if only
to emphasize that HIPAA does *not* apply to insurers that write
non-health insurance lines of business. This is evident if only from
the statute's name, the *Health Insurance* Portability and
Accountability Act, as opposed to, say, property, casualty, workers'
compensation, or any other insurance line. The reason insurers
that write non-health insurance lines of business are exempt from
HIPAA is that they are not: (1) health plans, since they are not
individual or group plans providing or paying the cost of medical
care, *see* 42 U.S.C. 300gg-91(a)(2); (2) health care clearinghouses,
such as billing services or re-pricing companies; or (3) health care
providers that provide medical or health services. *See* 42 U.S.C.
1395x(s) & (u). The Department of Health and Human Services
subsequently clarified HIPAA's scope when it explained that:

> With regard to life and casualty insurers, we understand
> that such benefit providers may use and disclose
> individually identifiable health information. However,
> Congress did not include life insurers and casualty
> insurance carriers as "health plans" for the purposes of
> this rule and therefore they are not covered entities.

Standards for Privacy of Individually Identifiable Health
Information. Final Privacy Rule Preamble . . . Covered Entity,
Ass't Sec'y for Planning & Eval., U.S. Dep't of Heath & Human
Srvcs., Dec. 28, 2000.

Although HIPAA does not apply to property and casualty
insurers, those insurers receive enormous amounts of what would
otherwise be considered PHI. In other words, HIPAA creates a
legal fiction because the same information, considered PHI while
in the possession of a covered entity or business associate, is *not*
considered PHI while in the possession of property and casualty
insurers. Regardless of the moniker, information that would
otherwise be considered PHI under HIPAA is essential for
property and casualty insurers to function both in response to and
apart from litigation. As one industry representative explained
the paradox:

> Property and casualty insurance differs from health and
> other types of insurance. The policyholder is typically not
> the party claiming benefits but rather is a party *against*
> *whom a third party is asserting legal rights* and to whom
> the insurer owes a contractual duty to defend and
> indemnify. The information a property and casualty
> insurer needs in evaluating and settling claims is not
> information in its possession but is information in the
> hands of the claimant-third party. It is critical for
> property and casualty insurers, most critically, workers'
> compensation insurers, to have unimpeded and timely
> access to medically related information to meet their
> obligations to their policyholders and under law. If not
> carefully crafted, medical privacy rules could give adverse

9

> third-party claimants the ability to circumscribe a
> carrier's need to share information with innumerable
> parties that are inherently part of claims evaluation and
> disability management.

Bruce C. Wood, "Statement of the American Ins. Ass'n," Nov. 18,
2011 (emphasis in original); available at: www.ncvhs.hhs.gov/wp-
content/uploads/2014/05/111118p7.pdf.

In addition to its privacy rule, HIPAA contains a security
rule that, in part, governs the disposal of PHI. *See generally* 45
C.F.R. Parts 160 & 164, subparts A & C; 45 C.F.R. §§ 164.306,
164.308, 164.310 & 164.312. HIPAA requires that covered entities
and business associates implement policies and procedures to
address the disposal of PHI, *see* 45 C.F.R. §164.530(c), including
electronically stored information. *See* 45 CFR § 164.310(d)(2)(i).
Yet neither HIPAA nor its regulations identify the means for
disposal. Acceptable methods do, however, include shredding,
pulverizing, melting, incinerating, and degaussing. *See*
https://www.hhs.gov/hipaa/for-professionals/faq/575/what-does-
hipaa-require-of-covered-entities-when-they-dispose-information/.
As with the privacy rule explained above, insurance companies
that sell non-health insurance lines of business are not subject to
the security rule since, once again, those carriers are not covered
entities or business associates. *See* 45 C.F.R. parts 160 & 164,
subparts A & C.

B.     Illinois Insurance Code

The IIC, 215 ILCS 5/1 – 1516, and the accompanying
administrative code, 50 Ill. Admin. Code 101 – 9500, regulate the
business of insurance in Illinois. Although records that would be
considered PHI under HIPAA are exempt from HIPAA regulation
while in the possession of property and casualty insurers, those
same records are still subject to state regulation. Article XL of the
IIC is devoted explicitly to insurance information and privacy
protection. *See* 215 ILCS 5/1001 – 1024. As provided, the purpose
of article XL is to:

10

establish standards for the collection, use and disclosure of information gathered in connection with insurance transactions by insurance institutions, agents or insurance-support organizations; to maintain a balance between the need for information by those conducting the business of insurance and the public's need for fairness in insurance information practices, including the need to minimize intrusiveness; to establish a regulatory mechanism to enable natural persons to ascertain what information is being or has been collated about them in connection with insurance transactions and to have access to such information for the purpose of verifying or disputing its accuracy; to limit the disclosure of information collected in connection with insurance transactions; and to enable insurance applicants and policyholders to obtain the reasons for any adverse underwriting decision.

215 ILCS 5/1002.

In the case of property and casualty insurance, the protections provided by article XL extend to persons "who are subject of information collected, received or maintained in connection with insurance transactions involving policies, contracts or certificates of insurance delivered, issued for delivery or renewed in this State. . . ." 215 ILCS 5/1002(B)(2)(a). The IIC goes on to regulate the need for and contents of notices to policyholders and applicants, including in instances of re-disclosure of information by insurance companies. *See, e.g.*, 215 ILCS 5/2-1005 – 1008 & 1014. To implement the statute's privacy protections effectively, the Department of Insurance has promulgated regulations governing financial as well as personal privacy information. *See* 50 Ill. Admin. Code 4001.10 – 4001.50 & 4002.10 – 4002.240.

Since property and casualty insurers are exempt from HIPAA regulation, they are also exempt from HIPAA's civil and

11

criminal penalties for unauthorized disclosures. At the same time, these insurers have every incentive to comply fully with the privacy provisions of the IIC and the administrative code. Article XL includes a provision outlining a range of penalties for insurers that violate the IIC, starting with hearings and cease-and-desist orders and escalating to monetary fines, suspensions, and license revocations. *See* 215 ILCS 5/1020.

In addition to regulating insurers' use of records, Illinois also regulates their disposal and destruction. Regardless of the type of record or the line of insurance, an insurer is authorized to:

> dispose of or destroy records in its custody that are not needed:
> a)   in the transaction of current business;
> b)   for the final settlement or disposition of any claim arising out of a policy of insurance issued by the company; or
> c)   to determine the financial condition of the company for the period since the date of the last examination report of the company officially filed with the Department of Insurance, except that these records must be maintained for at least 7 years.

50 Ill. Adm. Code 901.20, amended in, 40 Ill. Reg. 7895, eff. May 23, 2016. As the citation indicates, the Department of Insurance recently amended this regulation. The Department justified increasing the retention period from five to seven years because it: "recognized that the process outlined by this rule was outdated, unnecessary, and not in line with other states' requirements."[6] This statement makes no sense.

Despite this bare bones explanation, the seven-year-retention rule reveals three facts relevant to this court's analysis. First, the IIC does not distinguish between records disclosed

---

[6] The department had implemented the five-year requirement in 1968. *See* 7 Ill. Reg. 4213 (Nov. 25, 1968).

before or after the filing of a lawsuit; they are all treated the same. Second, the disposal of documents is predicated on a needs-based trigger, meaning that documents may be retained for more than seven years. In normal business practice, insurers typically begin the running of the retention period after the close of a transaction – a settlement or judgment – and the expiration of any appeals period. In some insurance lines, therefore, such as workers' compensation, carriers might be required to retain records for decades given work-related injuries and subsequent coverage claims. Third, there is no requirement that insurers return documents to the claimant, litigant, or provider instead of disposing of them; rather, insurance companies may dispose of records as they see fit.

This state's particular regulatory scheme serves various and vital purposes. It is plain that what would otherwise be considered PHI under HIPAA constitute fundamental information needed by the state to support its regulatory responsibility of auditing insurers to ensure the fair and efficient business of insurance for consumers. The same records constitute fundamental information needed by insurers to evaluate and pay claims. The records are also necessary for internal audits and regulatory disclosures required, for example, by Medicare and Medicaid. These records further ensure a carrier's solvency by providing a basis for sufficient reserves to avoid the liquidation of assets to pay claims or to avoid artificially high premiums to cover projected claims. The records also form the basis for insurance accreditation, ratings, and reviews by independent and trade organizations. Finally, the records may prove to be key evidence used to defend the carrier against bad-faith claims brought by a particular plaintiff or a class of consumers. In short, the use of records is vital to the insurance industry and the state's regulation of it.

C.     Illinois Constitution

13

Illinois is one of only ten states governed by a constitution expressly guaranteeing a right to privacy.[7] As provided, in part:

> The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, *invasions of privacy* or interceptions of communications by eavesdropping devices or other means.

Ill. Const., art. I, § 6 (emphasis added). Our Supreme Court has recognized as a general matter that the Illinois constitution, "goes beyond federal constitutional guarantees by expressly recognizing a zone of personal privacy, and that the protection of that privacy is stated broadly and without restrictions." *Kunkel v. Walton,* 179 Ill. 2d 519, 537 (1997), *citing In re Will Cty. Grand Jury,* 152 Ill. 2d 381, 391 (1992). The court further found that "[t]he confidentiality of personal medical information is, without question, at the core of what society regards as a fundamental component of individual privacy." *Kunkel,* 179 Ill. 2d at 537. This public policy is ultimately grounded on the sanctity of the physician-patient relationship. *See Petrillo v. Syntex Labs., Inc.,* 148 Ill. App. 3d 581, 587-88 (1st Dist. 1986). At the same time, "[r]easonableness is the touchstone of the privacy clause" and article I, section 6 "does not accord absolute protection against invasions of privacy. Rather, it is unreasonable invasions of privacy that are forbidden." *Hope Clinic for Women, Ltd. v. Flores,* 2013 IL 112673, ¶¶ 64, 65, *quoting Kunkel,* 179 Ill. 2d at 538.

This state's constitutional privacy protections for health information are reflected in a wide variety of statutes and regulations governing the creation, disclosure, maintenance, and use of that information. *See, e.g.,*

- Abortion Law of 1975, 720 ILCS 510/10

---

[7] *See also* Alaska Const. art. I, § 22; Ariz. Const. art. II, § 8; Calif. Const. art. I, § 1; Fla. Const. art. I, § 23; Haw. Const. art. I, §§ 6 & 7; La. Const. art. I, § 5; Mont. Const. art. II, § 10; S.C. Const. art. I, § 10; & Wash. Const. art. I, § 7.

14

- AIDS Confidentiality Act, 410 ILCS 305/6 & 9
- Alcoholism and Other Drug Abuse and Dependency Act, 20 ILCS 301/30-5(b) & (bb)
- Child Care Act of 1969, 225 ILCS 10/15
- Community Integrated Living Arrangements Code, 59 Ill. Admin. Code 115.250
- Community Living Facilities Code, 77 Ill. Admin. Code 370.1230
- Community Services Act Code, 59 Ill. Admin. Code 132.20
- Dental Care Patient Protection Act, 215 ILCS 109/5(b)(4)
- DNA Indexing Act, 730 ILCS 5/5-4-3(f)
- Early Intervention Services System Act, 325 ILCS 20/12(b) & 89 Ill. Admin. Code 500.155
- Freedom of Information Act, 5 ILCS 140/7
- Genetic Information Privacy Act, 410 ILCS 513/15
- Hospital Licensing Act, 210 ILCS 85/6.17(d) & 77 Ill. Admin. Code 250.1510
- Illinois Public Aid Act, 305 ILCS 5/11-9
- Illinois Veterans' Homes Code, 77 Ill. Admin. Code 340.1800 & 340.1840
- Intermediate Care for the Developmentally Disabled Facilities Code, 77 Ill. Admin. Code 350.1610 & 350.1630
- Long-Term Care for Under Age 22 Facilities Code, 77 Ill. Admin. Code 390.1610, 390.1630 & 390.3320
- Managed Care Reform and Illinois Patient Rights Act, 215 ILCS 134/5(a)(4)
- Medical Patient Rights Act, 410 ILCS 50/3(d)
- Medical Practice Act, 735 ILCS 5/8-802
- Medical Studies Act, 735 ILCS 5/8-2101
- Mental Health and Developmental Disabilities Confidentiality Act, 740 ILCS 110/1 – 17
- Nursing Home Care Act, 210 ILCS 45/2-101, 2-105 & 77 Ill. Admin. Code 300.1810, 300.1820, 300.1840 & 300.3320
- Parental Notice of Abortion Act of 1995, 750 ILCS 70/25 & 70/35
- Respite Program Act Code, 89 Ill. Admin. Code 220.100
- Sheltered Care Facilities Code, 77 Ill. Admin. Code 330.1710 & 330.4320.

15

The same privacy right has been extended through the common law to include medical information exchanged pursuant to the Workers' Compensation Act. *See* 820 ILCS 305/1 – 30; *see also Hydraulics, Inc. v. Industrial Comm'n*, 329 Ill. App. 3d 166, 171-72 (2d Dist. 2002), *citing Petrillo*, 148 Ill. App. 3d at 591.

As is also evident from the discussion above, the right to privacy is also reflected in the IIC and its regulations. *See* 215 ILCS 5/1 – 1516; 50 Ill. Admin. Code 101 – 9500. Whether any of the permitted uses of what would otherwise be considered PHI possessed by insurers constitute an unreasonable infringement of the constitutional right to privacy is unknown. This court is unaware of any challenge to the constitutionality of this state's statutory and administrative regulation of information received, used, maintained, and disposed of by insurers.

II.    HIPAA QPO

The convergence of these three bodies of substantive law brings into relief this court's twin goals. This court must remove property and casualty insurers from the untenable position of complying with a QPO that is inapplicable to their line of business and conflicts with the IIC and its regulations. This court must also ensure that any redrafting of the current HIPAA QPO protects Illinois residents' constitutional rights to privacy over the disclosure of their PHI.

A point of clarification at this juncture would be beneficial. The conundrum this court seeks to resolve concerns only PHI disclosed subject to the HIPAA QPO, in other words, *after* the filing of a lawsuit. This court does not address the scenario in which a person at the pre-suit stage voluntarily discloses the same information to an insurer in hopes of settling a claim. Given a plaintiff's voluntary disclosure, an insurer may receive, use, retain, and dispose of what would otherwise be considered PHI in compliance with the IIC and its regulations. This distinction is important as a legal matter, but likely has little import as a

16

practical matter since insurers do not segregate information based on whether it is received before or during a lawsuit.

The problems identified above have a common source – the current HIPAA QPO. The QPO fails to account for both a plaintiff's right to privacy and an insurer's legal duty to comply with the state's statutory and regulatory insurance framework. The former is a question of constitutional law; the latter is a question of statutory law. These issues are addressed below.

It is evident that the current HIPAA QPO is subject to a facial constitutional challenge. Although most such challenges concern statutes, court orders, too, may be found to be constitutionally flawed. *See, e.g., McDunn v. Williams*, 156 Ill. 2d 288, 394 (1993) (appellate court decision unconstitutional). A facial challenge imposes far more stringent standards than an "as-applied" challenge because a challenged statute or order is facially invalid "only if no set of circumstances exists under which it would be valid." *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 305-06 (2008); *In re M.T.*, 221 Ill. 2d 517, 536 (2006) ("Successfully making a facial challenge to a statute's constitutionality is extremely difficult, requiring a showing that the statute would be invalid under *any* imaginable set of circumstances." (Emphasis in original)). A finding of facial invalidity voids the document for all parties; consequently such a decision is "manifestly, strong medicine that has been employed by the court sparingly and only as a last resort." *Pooh-Bah Enters., Inc. v. Cook County*, 232 Ill. 2d 463, 473 (2009), *quoting National Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (internal quotation marks omitted). In this instance, the medicine proposed by this court is far more palatable.

As noted above, HIPAA creates a floor of privacy protections that yields to any state law (or constitution) that imposes "requirements, standards or . . . specifications that are more stringent than . . . [those] imposed under the regulation." 45 C.F.R. § 160.203(b). The right to personal privacy guaranteed by article I, section 6 is unquestionably more stringent than HIPAA

17

because the constitution expresses this state's public policy that "the individual's privacy interest in his *physical person* . . . must be protected." *Will Cty. Grand Jury*, 152 Ill. 2d at 391-92 (emphasis added) (addressing search and seizure violations). Such protection encompasses the disclosure of a person's PHI, which is the focus of HIPAA and *Kunkel*. *See* 179 Ill.2d at 537. The guarantees of article I, section 6 must also extend, however, to informing a plaintiff of the likely uses an insurer may subsequently make of her or his PHI.

That conclusion does not end this court's analysis because Illinois' constitutional right to privacy is not limitless. The Supreme Court has recognized that article I, section 6 prohibits only "unreasonable invasions of privacy." *Hope Clinic*, 2013 IL 112673, ¶¶ 64-65. To determine what is unreasonable, the court has followed a two-step analysis based on "the extent of one's expectation of privacy under the circumstances presented, as well as the degree of intrusiveness of the invasion of privacy." *In re Lakisha M.*, 227 Ill. 2d 259, 279 (2008), *citing People v. Caballes*, 221 Ill. 2d 282, 231 (2006), and *People v. Cornelius*, 213 Ill. 2d 178, 193-94 (2004). Employing that analysis, the court in *Kunkel*, held unconstitutional a Code of Civil Procedure section because there existed both: (1) an expectation of privacy over medical records; and (2) statutory overreach because a trial court could order the disclosure of medical information against the patient's wishes or dismiss the lawsuit for failure to comply. *See* 179 Ill. 2d at 539 (addressing 735 ILCS 5/2-1003(a)). In contrast, the court in *Lakisha M.* found that the constitution generally protected the disclosure of DNA information, but that the DNA Indexing Act, *see* 730 ILCS 5/5-4-3, was narrowly tailored and, hence, constitutional. *See* 227 Ill. 2d at 280. Similarly, in *Hope Clinic*, the court upheld the Parental Notice of Abortion Act of 1995, 750 ILCS 70/1 – 70/99, because a minor has a right to privacy in choosing an abortion, but the statute's notification options were narrowly tailored based on the perceived need to treat minors differently than adults. *See Hope Clinic*, 2013 IL 112673, ¶ 64.

In this case, the two-step analysis establishes that the HIPAA QPO is unconstitutional. First, *Kunkel* makes it plain that all persons, including litigants, have an expectation of privacy over their personal medical information. *See* 179 Ill. 2d at 537. Second, the degree of intrusiveness imposed by the HIPAA QPO is substantial because it orders a plaintiff to disclose PHI without informing the plaintiff that the information will be used outside the scope of the litigation. Although the QPO explains that PHI may be disclosed to "the parties' insurers," it incorrectly characterizes the disclosure as one "reasonably connected with the . . . litigation. . . ." If that were true, a plaintiff could believe that her or his PHI was going to be used by an insurer to evaluate and settle the claim at issue in the litigation. In fact, the IIC and its regulations mandate insurers use health information in a wide variety of ways outside the litigation. Again, the issue here is not that the uses of what would otherwise be considered PHI outside of litigation fail to satisfy a compelling state interest. Rather, the issue is that the current HIPAA QPO fails to inform a litigant that the disclosure of her or his PHI will not be considered PHI after it has been disclosed to insurers and will be used by them.

This court is unaware of any Illinois decision addressing the constitutional, statutory, and regulatory issues arising from the conflicts created by the current HIPAA QPO. This court has, however, identified one highly pertinent decision from another jurisdiction that has addressed these issues. In *Cohan v. Ayabe*, 132 Haw. 408 (2014), the State of Hawaiʻi Supreme Court considered Cohan's petition for mandamus against Ayabe, an arbitration judge, who had affirmed an arbitrator's decision ordering Cohan to sign broad authorizations for the disclosure of his medical records. *Id.* at 410. Cohan had previously objected to the entry of the HIPAA stipulated qualified protective order (SQPO) used in most Hawaiʻi circuit court litigation (and then available on the Hawaiʻi Bar Association's website). *Id.* at 411. (A copy of the bar association's HIPAA SQPO addressed in *Cohan* is attached as Exhibit D.)

19

The Hawaiʻi constitution's right to privacy is contained in two sections. As provided:

> The right of the people to privacy is recognized and shall not be infringed without the showing of a compelling state interest. The legislature shall take affirmative steps to implement this right.

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated. . . .

Haw. Const., art. I, §§ 6 & 7. Writing for the court, Justice Richard Pollack considered five provisions of the HIPAA SQPO and found that each violated the Hawaiʻi constitution's right to personal privacy. The first subparagraph considered by the court permitted the disclosure use of Cohan's health information for the defendant's insurer's internal reviews, claims auditing, loss experience, premium setting, reserve calculations, and procurement of additional coverage. *See* 132 Haw. at 419. The court concluded that even if Cohan could not show any harm from such uses, the disclosure leads to uses that "are outside the underlying litigation. Accordingly, the language of SQPO paragraph 1(b)(2) exceeds the scope allowed by the State Constitution." *Id.*

The court reached the identical conclusion regarding another subparagraph that permitted the use of health information for "external review and/or auditing, such as by reinsurers, the Insurance Commissioner, or external auditors. . . ." *Id.* at 420 (addressing subparagraph 1(b)(3)). The court recognized that HIPAA explicitly permits the use of health care information for external review and audits conducted by a variety of entities. *See id.* at 420, n. 19, *citing* 45 C.F.R. § 164.501(4). Yet the subparagraph authorized an insurer to share a plaintiff's health information with business associates, including reinsurers, a disclosure that goes beyond the scope of the litigation. *See id.* The

20

court concluded that without comprehensive limitations in the SQPO, the provision violated the right to privacy. *See id.*

The court invalidated a third subparagraph permitting the use of de-identified information "for statistical or analytical purposes. . . ." *Id.* at 420-21 (addressing subparagraph 1(b)(7)). The court reasoned that:

> This provision does not explain what type of analysis will be conducted, who will compile the statistics, and whether the results will be made available to entities outside the litigation. Presumably, there is no need to strip the health information of identifiers if it remains inside the litigation. Because de-identified information is for use outside of the present litigation, the provision is not in accord with the Hawai'i constitutional protection for health information.

*Id.* at 421.

The court invalidated a fourth subparagraph for two reasons. First, it permitted insurers to maintain health information for "any record keeping requirements or obligations relating to any of the forgoing, and pertaining to the Subject Accident." *Id.* at 421 (addressing subparagraph 1(b)(8)). Since the provision provided "no ostensible limitation to allowing use of Cohan's information outside the subject litigation," it violated the constitution's privacy guarantee. *Id.* Second, the provision permitted the defendant's insurers to request "additional permissible categories of uses, disclosures, or maintenance be added" to the SQPO, and prohibited Cohan from "unreasonably withhold[ing] consent. . . ." *Id.* For these very reasons the court also found that the subparagraph violated the constitution's privacy protections. *Id.*

Finally, the court addressed a paragraph requiring the defendant, within 90 days of the end of litigation, either to "return to Plaintiff's counsel or destroy the Health Information." *Id.* at 422 (addressing paragraph 5). The court reasoned that a 90-day,

21

post-litigation grace period permitted insurers to use information outside the litigation and that article I, section 6, "by inference, require[d] parties to return records immediately after the litigation concludes." *Id.*

This court finds the Hawai'i Supreme Court's reasoning in *Cohan* highly persuasive for two significant reasons. First, the two constitutions are quite similar as written and applied. The privacy rights guaranteed in article I, section 6 of the Illinois constitution and article I, section 7 of the Hawai'i constitution are nearly word for word identical. In both states, this right extends to personal medical information. *See Kunkel*, 179 Ill. 2d at 537; *Brende v. Hara*, 113 Haw. 424, 426 (2007) (per curiam). Further, the compelling-state-interest provision expressly provided in article I, section 6 of the Hawai'i constitution corresponds with the reasonable-invasion exception recognized in Illinois common law interpreting the constitution. *See Hope Clinic*, 2013 IL 112673, ¶¶ 64-65 (prohibiting only unreasonable invasions of privacy).

Second, this Circuit Court's current HIPAA QPO contains many of the same constitutional deficiencies as did the SQPO at issue in *Cohan*. At a minimum, the HIPAA QPO does not explain that a plaintiff's PHI will no longer be considered PHI once disclosed to an insurer. The current HIPAA QPO permits the disclosure of PHI for subsequent uses that are unexplained. While some or all of those uses may fulfill the compelling state interest of regulating insurance, the document gives no explanation of those uses or the need for them. The order also fails to inform a plaintiff that her or his PHI may be re-disclosed to others outside of litigation, including reinsurers. Finally, the QPO misinforms a plaintiff that her or his PHI will be returned or destroyed at the end of litigation, although state law requires that such information be retained for a minimum of seven years.

One could argue, as did the defendant in *Cohan*, that a plaintiff would be hard pressed to prove any particular harm arising from the use of what would otherwise be considered PHI outside of litigation. That argument only supports the

22

unsupportable proposition that the violation of a constitutional right exists only if it leads to a monetarily compensable injury. The fact remains that the current HIPAA QPO fails in many ways to inform a plaintiff of the consequences of disclosing her or his PHI. That the current HIPAA QPO applies equally to each plaintiff who executes a release of her or his PHI leads to the inexorable conclusion that the current HIPAA QPO authorized by Circuit Court General Order 12-1 violates the right to personal privacy guaranteed by article I, section 6 of the Illinois constitution.

Since the HIPAA QPO violates the Illinois constitution's personal privacy guarantee, this court must determine if there exists a narrowly tailored solution. That solution must necessarily focus on the previously identified problem – the failure of the HIPAA QPO to inform a plaintiff that the disclosure of her or his PHI will allow a defendant's insurer to use and retain the information after the litigation ends. This court has concluded that a simple but comprehensive remedy comes in the form of a re-drafted HIPAA QPO containing an explicit waiver executed by the person whose PHI will be disclosed.

It is well established that Illinois law recognizes a person's ability to waive any and all rights, including constitutional guarantees. *See, e.g., Birkett v. Dockery*, 235 Ill. 2d 73, 78 (2009) (waiver of jury trial); *Cook Cty. College Teachers Union v. Board of Trustees*, 134 Ill. App. 3d 489, 481 (1st Dist. 1985) (waiver of privacy right over outside employment information); *Suburban Downs, Inc. v. Illinois Racing Bd.*, 316 Ill. App. 3d 404, 414 (1st Dist. 2000) (waiver of due process). To waive a constitutional right, however, there must be "an intentional relinquishment or abandonment of a known right. . . ." *Smith v. Freeman*, 232 Ill. 2d 218, 228 (2009), *quoting People v. McClanahan*, 191 Ill. 2d 127, 137 (2000). A waiver "must [constitute] 'knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *Id., quoting McClanahan*, 191 Ill. 2d at 137, *citing cases*. In short, a waiver is an absolute necessity lest a plaintiff unknowingly forfeit her or his constitutional right to

23

privacy. *See People v. Blair*, 215 Ill. 2d 443-44 & n.2, *quoting United States v. Olano*, 507 U.S. 725, 733 (1993) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of the right, waiver is the 'intentional relinquishment or abandonment of a known right.'").

This court believes that its proposed HIPAA QPO to replace the current one authorized by General Order 12-1 strikes the necessary balance between guaranteeing a litigant's right to personal privacy and an insurer's needs to retain, use, and dispose of what would otherwise be considered PHI as required by the IIC and its regulations. *See* Ex. E. The proposed HIPAA QPO informs the litigant that by waiving the right to privacy, her or his PHI may be lawfully used by insurers. Further, the proposed HIPAA QPO lists those uses and indicates that they will continue for at least seven years. Finally, the proposed HIPAA QPO includes explicit statements that the litigant understands the contents of the order and the consequences of executing the waiver.[8]

In response to this court's most recent interlocutory memorandum opinion and order and proposed HIPAA QPO, State Farm submitted a brief explaining its objections. State Farm's overarching argument is that there exist "compelling [ ] state interests" requiring insurance carriers to receive, use, and retain a litigant's health information. State Farm Br. at 4. State Farm even quotes this court's interlocutory opinion and order in support of that proposition. Of greater insight is the affidavit State Farm provided of Robert E. Wagner, who has an extensive career in the insurance industry and the legal profession. Wagner avers in considerable detail the statutorily required uses of what would

---

[8] This court would be remiss if it did not warn litigants that would seek to use subpoenas or patient authorizations to circumvent any perceived shortcomings in the proposed HIPAA QPO. Subpoenas or patient authorizations that fail to include an explicit waiver of the right to privacy run the same risk of violating the constitutional guarantees of article I, section 6.

otherwise be considered PHI by the insurance industry. None of that is in dispute.

State Farm's focus on the insurance industry's statutorily compelled requirements is, ultimately, misdirected. The critical predicate fact is that the current HIPAA QPO permits the disclosure of a plaintiff's PHI without an explicit assurance that the plaintiff understands what the IIC requires and permits and consents to it. State Farm is unquestionably correct that there exists a compelling state interest for insurers to receive, use, and retain a plaintiff's PHI. There exists, however, no compelling state interest for a plaintiff to waive her or his right to privacy by disclosing PHI absent knowledge of its future use. Put another way, but for a plaintiff voluntarily filing a lawsuit and placing her or his medical condition at issue, the state's interest in or ability to obtain a plaintiff's PHI is nearly completely circumscribed. In short, the state's compelling interest arises only *after* a litigant has disclosed her or his PHI to an insurer.

State Farm's argument that the Illinois and Hawai'i constitutions have different constitutional standards for PHI disclosure is unavailing. The argument comes down to switching one set of nouns and adjectives – "compelling state interest" – for another – "reasonable invasion of privacy." State Farm argues there exists a difference between prohibiting an unreasonable invasion of privacy in Illinois, and permitting an invasion of privacy based on a compelling state interest in Hawai'i. Yet a compelling state interest must also be reasonable because the only invasion of personal privacy other than a reasonable one is an unreasonable one. And it is simply illogical and legally unsupportable to suggest that Hawai'i's constitution permits an unreasonable invasion of privacy that serves a compelling state interest.

The cases on which State Farm relies do not lead to a different result. In *Lakisha M.*, for example, the court addressed the scope of the search-and-seizure clause of article I, section 6, not its privacy clause, when it addressed a challenge to the state's

25

compelled collection of the defendant's saliva. *See* 227 Ill. 2d at 263. One critical distinction is that the saliva was for later use by the state, not a corporation. State Farm concedes as much when it writes that the court in *Lakisha M.* "held that *after* a properly compelled disclosure, the Government's subsequent *retention* and *use* of the DNA, did not give rise to any new or 'additional invasion of the respondent's privacy interest. . . .'" State Farm Br. at 8, n.4 (italics in original). The word State Farm fails to italicize for emphasis is the most important – "Government[ ]." The DNA database is exclusively for use by the state, not private companies. Two other cases on which State Farm relies are also off point because they do not address the constitution's privacy clause. *See People v. Caballes*, 221 Ill. 2d 282 (2006) (search-and-seizure challenge based on canine-sniff searches for illegal drugs); *In re M.A.*, 2014 IL App (1st) 132540 (challenging compelled registration under the Illinois Murderer and Violent Offender Against Youth Registration Act).

*Hope Clinic* is also substantially different. There, the court addressed, in part, a privacy challenge to the Parental Notice of Abortion Act provision requiring a minor seeking an abortion to notify an adult family member or obtain a judicial waiver of the notice. *See* 2013 IL 112673, ¶ 63. The court upheld the statute because it was narrowly drawn; notification needed to be given to one family member only. *See id. Hope Clinic* is distinct because the statute explicitly informed the minor of the reason for the disclosure. 750 ILCS 70/5 ("The General Assembly finds that notification of a family member . . . is in the best interest of an unemancipated minor" because "[t]he medical, emotional, and psychological consequences of abortion are sometimes serious and long-lasting, and immature minors often lack the ability to make fully informed choices"). In contrast, the current HIPAA QPO does not give the plaintiff any information to justify the disclosure of her or his PHI to the defendant's insurer.

State Farm's reliance on *Kunkel* is also unhelpful. *Kunkel* held unconstitutional a Code of Civil Procedure provision requiring unlimited disclosure of a plaintiff's health information

during discovery. *See* 179 Ill. 2d 519 (1997). State Farm apparently believes that *Kunkel* is persuasive because it concerns the disclosure of health information during discovery, but that is where any similarity to this court's inquiry ends. *Kunkel* has nothing to do with the disclosure of PHI *to insurers* during litigation, their use of that information, and its potential re-disclosure to third persons such as reinsurers. It is also plain that the *Kunkel* court did not have the benefit of HIPAA, its supporting regulations, and the now large body of federal and state case law extending personal privacy statutory rights to the disclosure of PHI.

*Burger v. Lutheran General Hospital* does not further State Farm's argument.[9] *See* 198 Ill. 2d 21 (2001). *Burger* stands for the proposition that it is reasonable for a patient to expect that healthcare providers would share the patient's health information "within the hospital setting." *Id.* at 53. The patient would, however, have a "justifiable expectation of privacy with respect to the release of medical information to third parties," consequently the Hospital Licensing Act makes such a disclosure a misdemeanor. *Id.*, *citing* 210 ILCS 85/6.17(i). Thus, the lesson from *Burger* is that the reasonably expected use of a plaintiff's PHI *in* litigation is not reasonably expected *outside* of litigation.

## Conclusion

The complex legal issues presented above are reconcilable through a plaintiff's explicit waiver of a right to privacy. Such a waiver will inform a plaintiff of the waiver's consequences. At the same time, the waiver will assure that property and casualty insurers may use what would otherwise be considered PHI as mandated by state law. For the reasons presented above, it is ordered that:

---

[9] It should be noted that State Farm initially quotes *Burger* from the section of the opinion addressing constitutional separation of powers, not the subsequent section addressing constitutional privacy concerns. State Farm Br. at 12.

27

1. This order shall apply to all cases listed on Exhibit F;
2. State Farm is granted leave to intervene in all other cases subject to Judge James Flannery's July 13, 2016 sweep order in which State Farm is a defendant's insurer;
3. In each case in which State Farm is granted leave to intervene, the record will reflect that State Farm raised the same objections that it raised in this lawsuit as if those objections had been filed in each lawsuit;
4. State Farm's motion to compel the plaintiff to execute HIPAA authorizations for the release of her medical information or for a court order requiring its release is denied;
5. This order shall apply to all active cases in which a HIPAA QPO has been entered and shall apply to all future filed cases in which a HIPAA QPO will be entered;
6. The August 8, 2017 case management conference at 11:00 a.m. shall stand; and
7. A copy of this memorandum opinion and order including all exhibits will be provided as of this date to Presiding Judge James Flannery for consideration as a replacement to the HIPAA QPO authorized in General Order 12-1.


John H. Ehrlich, Circuit Court Judge

Judge John H. Ehrlich

JUL 25 2017

Circuit Court 2075

28