**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

T.S. *et al.*,

          Plaintiffs,

    v.

Twentieth Century Fox Television *et al.*,

          Defendants.

Case No. 1:16-cv-08303

Hon. Rebecca R. Pallmeyer

**NAMED PLAINTIFFS' MOTION TO COMPEL
<u>DISCOVERY FROM THE FOX DEFENDANTS AND WITNESS BRADY BREEN</u>**

Pursuant to Federal Rules of Civil Procedure 33, 34, 37,[1] and 45, Plaintiffs move the Court to compel discovery responses from defendants Twenty-First Century Fox, Inc., Twentieth Century Fox Television, and Fox Broadcasting Company (collectively "Fox Defendants" or "Fox"), as well as from a third-party witness, Brady Breen.[2]  In support Plaintiffs state:

A.    **Discovery of evidence indicating Fox knew the filming would be disruptive.**

   1.    ***Discovery showing that it was Fox's common experience that people who lived near filming sets were adversely impacted by filming.***
      (Interrogatory No. 3)

This discovery asks Fox to identify "neighbor" payments it made in Seasons 1 and 2 of *Empire*.  Plaintiffs seek this information to discover evidence showing that Fox was well aware that the *Empire* filming commonly impacted people near its filming locations.

Fox has produced budget documents for the filming of *Empire* Episodes 201 and 202.  As an example, the "approved" budget for Episode 201 is attached as **Exhibit 4** (filed under seal).  Among the standardized listed expenses is a line-item for payments to "neighbors."  (*See* Ex. 4 at TCFTV002102, -03, -04, -05.)   *Empire*'s location manager, Brady Breen, testified that this line item refers to payments that are commonly made to people who live near a filming location and are impacted or inconvenienced by the filming.  (Breen Dep. Tr. at 169.)

There are no "neighbors" budget entries for the scenes shot at the JTDC (*see* Ex. 4 at TCFTV002102), but budget entries for other locations where Episode 201 was filmed indicate

---

[1]    ***Local Rule 37.2 Statement***.  Pursuant to Local Rule 37.2, Counsel attempted to resolve this discovery dispute through an informal meet-and-confer process in which they exchange of correspondence on September 25, October 3, October 11, and October 12, and a phone call between Stephen Weil and Jeffrey Jacobson on October 12.  They were able to resolve some disputes but are otherwise at issue.  The parties' discovery enforcement correspondence is attached as **Exhibit 1**.

[2]    The discovery request to Fox that is at issue, along with Fox's responses thereto, is attached hereto as **Exhibit 2**.  Mr. Breen's deposition notice *duces tecum* is attached hereto as **Exhibit 3**.

that Fox anticipated significant "neighbor" payments as part of filming at those locations. (*Id.* at TCFTV002103-05.) And indeed, Fox's witnesses have testified that neighbor payments were common, because even though a property owner might be eager to rent a location, people who lived nearby (often, in the same building) often were adversely impacted by the filming. (Breen Dep. Tr. at 56, 169; Klemke Dep. Tr. at 15.)

Plaintiffs now seek to corroborate this evidence by identifying the neighbor payments during *Empire*'s first two seasons. This discovery is designed to show that "neighbor" payments were not infrequent or sporadic, but were an ordinary feature of filming *Empire*. This evidence will demonstrate Fox's knowledge—based on its own experience and accepted industry practice—that the filming of *Empire* can and frequently does disrupt the lives of people who live near a location. Moreover, the evidence will show that Fox, in the ordinary course of business, compensates inconvenienced parties with monetary payments. Finally, this evidence also gives lie to Fox's argument that the hundreds of children who were locked down so that *Empire* could film at the JTDC are not entitled to compensation. This discovery is highly relevant to Plaintiffs' claims.

The burden of providing this information, on the other hand, is minimal. The budget documents that Fox produced for Episodes 201 and 202 indicate that Fox's budget data includes, as a line-item, a coded spending entry for payments to "neighbors" as part of the costs for each filming location. (*See* Ex. 4 at TCFTV002102-05 (coding the "neighbors" entry under expense item 150-50, "Site Rentals").) Fox thus can locate the responsive information simply by referring to the budget entries for the twenty-eight other episodes in the show's first two seasons (there were total of thirty episodes in *Empire*'s first two seasons, including Episodes 201 and 202, the two filmed at the JTDC), where the "neighbor" payments have already been recorded

and will be easy to identify.  This discovery seeks information that is relevant to Plaintiffs'

claims in this case, and it does not impose a substantial burden on Fox to answer.

*      *      *

*Fox's "out-of-bounds" objection*.  Fox does not seriously object to this discovery on

grounds of relevance or burden.  Instead, it contends Judge St. Eve's March 7 discovery order

(ECF 143) flatly banned Plaintiffs from seeking any discovery that touches on any episode other

than Episodes 201 and 202.  As Fox bluntly put it in meet-and-confer, "Fox need not provide any

information regarding *Empire* episodes other than 201 and 202."[3]  (Ex. 1 at 8.)

Fox flogged this argument vigorously in its August motion for a protective order,

claiming repeatedly that the March 7 ruling had placed "out of bounds" discovery going outside

Episodes 201 and 202 in any way.  (*See* ECF 180 at 3, 5.)  But the argument is built on air.

In their first round of discovery, Plaintiffs sought advertising revenue information

covering *Empire*'s first and second seasons.  In opposing this request, Fox told Judge St. Eve that

responding would force it to gather "*all* documents pertaining to advertising on

*Empire* for all episodes from both of the show's first two seasons."  (*See* ECF 143 at 11

(emphasis original).)  Informed by this representation, the Judge St. Eve held that the burden

imposed by the season-wide revenue discovery was disproportionate:

> Plaintiffs' reasons for why they need this [revenue] discovery for two full seasons
> of Empire is not proportional to the needs in this case, especially because their
> requests place a disproportionate burden on the Fox Defendants to produce
> information that goes well beyond the scenes shot at the JTDC.

(ECF 143 at 3.)

As Plaintiffs have pointed out (*see* ECF 183 at 11-12), Fox's burden representations

informing this holding were factually incorrect.  But setting that problem aside, Judge St. Eve's

---

[3] As noted herein, Fox reasserts this objection to many of Plaintiffs' discovery requests.

ruling offers no support to Fox's argument that she categorically banned all discovery touching on any other episodes. Rule 26(b)(1) distinguishes between discovery of evidence that is "relevant" on the one hand, and discovery that is "proportional" on the other. Judge St. Eve could have ruled that any information outside of Episodes 201 and 202 was irrelevant, but she did not; rather she held that the particular discovery request before her was disproportionately burdensome. Indeed if nothing beyond the two episodes was relevant, Fox's burden would not have mattered—but in assessing the proportionality of the "season" revenue discovery, Judge St. Eve gave "especial[]" consideration to the burden Fox had claimed.

And why would Judge St. Eve rule otherwise? She had no reason to bar discovery requests she had not yet seen; and if she did mean to issue such a sweeping decision, one would expect her to provide a thorough explanation for doing so. The March 7 Order has none of this. Rather, it reflects the Court following Rule 26(b)(1)'s proportionality considerations: balancing the purported burden of a discovery request against its likely evidentiary value, and making a decision. The blanket ban that Fox reads into the March 7 order simply does not exist.

Turning to *this* discovery, Plaintiffs have described why the "neighbor" evidence is relevant, and they have explained that the burden of responding to this discovery is minimal. To oppose relevant discovery as disproportionate, Fox bears the burden of identifying specific facts that would make the production of this information unduly burdensome. Yet Fox has articulated no facts at all. The Court should order Fox to respond.

2. ***Third-Party subpoena to witness Brady Breen for Directors' Guild Code of Conduct.*** (Breen subpoena *duces tecum*)

Plaintiffs' Deposition *Duces Tecum* commanded Mr. Breen to bring to his deposition:

Any documents reflecting policies, protocols, standards, guidelines, or codes of conduct that were promulgated, enforced, or suggested by TCFTV or any

5

affiliated entity, applying to the witness or any other member of the location team working on the *Empire* episodes filmed at the JTDC.

(*See* **Exhibit 3**.)  At his deposition, Mr. Breen testified that the codes of conduct he was expected to abide by during the filming included the rules and guidelines of the Directors' Guild of America ("DGA").  (Breen Dep. Tr. at 11-12; 31.)  Mr. Breen had not brought the DGA guidelines with him to the deposition, but testified that he had access to them and could produce them to his counsel.[4]  (*Id*. at 11-12.)  Since then, however, Mr. Breen's counsel has refused to produce the guidelines, and has represented that Mr. Breen did not retrieve them.

Plaintiffs' request for the DGA guidelines seeks information that is relevant to the claims in this case.  The guidelines for film crews that have been produced so far speak specifically to the impact filming has on persons who live near filming locations, and they make it the duty of film crews to take specific, affirmative steps to minimize the impact on people living nearby.  Fox's own "Filmmaker's Code of Professional Responsibility," for instance, notes the impact filming can have on third parties and states, "We should not expect everyone in the surrounding environment to alter their lives just to accommodate the needs of film production."

Mr. Breen testified that the DGA guidelines have substantially similar provisions; if that is true, they are additional evidence that it was the common experience of people in the business of location filming that the activities of film crews had significant impacts on persons near the filming locations.  The DGA guidelines are thus relevant to Plaintiffs' claims in this case, which involve Fox's knowledge of the impact of its filming at the JTDC.

If Mr. Breen indeed did not retrieve the DGA guidelines and does not have them, Plaintiffs respectfully request leave from the Court to subpoena the DGA for their production.

---

[4] Mr. Breen is represented by counsel of record for the Fox Defendants.

**B.**     **Discovery about Fox's motivation to film at the JTDC.**

Plaintiffs seek two items of discovery to show that Fox had a powerful motive to film at the JTDC specifically. ***First***, Plaintiffs seek discovery to show that the JTDC was a windfall for Fox, because the County charged very little to rent out the facility, whereas owners of private film locations would have charged much more. ***Second***, Plaintiffs seek discovery that will shed light on the costs of another alternative: building a "prison" set on a local sound stage. Evidence adduced so far indicates that building such a set would have been vastly more expensive than renting the JTDC.

This discovery is designed to show that Fox had powerful motivations to film at the JTDC in particular, making it more likely that Fox would have been willing to overlook the impact that filming at the facility would have on the children housed there.

      **1.**     ***Discovery to show that the JTDC was a bargain compared with private alternatives.*** (RFP Nos. 1 & 2)

Fox was able to rent out much of the JTDC—a building occupying much of a city block—for $1,500 per day.[5] In addition, the budget Fox created in advance of filming shows that it anticipated spending an additional ███████ over five days of filming (or approximately ███████ per day) to defray JTDC staff expenses, for a total "rental" cost of approximately ███████ per day. (*See* Ex. 4 at TCFTV002102.) It appears that these anticipated[6] costs were dramatically lower than renting out a private venue. For example, the same budget document shows that at

---

    [5]  One entry lists the price at $2,500 (*see* Ex. 4 at TCFTV002102), but that was an entry error; the contract price in the JTDC rental agreement, which was signed before the date of the approved budget, lists the price as $1,500 per day. In all events Mr. Bren testified that such a difference would have been immaterial. (Breen Dep. Tr. at 173.)

    [6]  Discovery indicates that Fox ended up paying more than it anticipated to rent out the JTDC, but that it was not aware of the additional costs until after it had completed much of the filming there.

two separate film locations, Fox anticipated paying ███ per day to rent out a ***single***

***apartment***.  (*See id*. at TCFTV002009-10.)  This is evidence that for Fox, the prospect of renting

out a functioning building the size of the JTDC for approximately $7,500 per day was a windfall.

      Plaintiffs seek to bolster this evidence by examining budgets from the other episodes in

*Empire*'s first two seasons.  Plaintiffs anticipate this evidence will shed light on the market that

Fox faced for renting *Empire* filming locations.  If Fox would have had to pay much more for a

facility comparable to the JTDC, that would indicate that Fox was powerfully motivated to use

the JTDC—making it more likely that Fox would have been willing to rent the facility even

though doing so would impact the children housed there.[7]

      Once more, the burden of producing responsive documents is minimal.  From its existing

production it appears that Fox keeps organized budget documents each *Empire* episode, making

responsive documents for the other 28 episodes in Empire's first two seasons easy to produce.

Indeed Fox does not object that this discovery is burdensome, but rather claims that the Court's

March 7 order flatly bans Plaintiffs from discovering any information outside Episodes 201 and

202.  (*See* Ex. 1 at 8.)  That argument is based on Fox's misreading of Judge St. Eve's March 7

decision, as explained above.  The Court should order Fox to respond to RFPs 1 and 2.

    **2.**    ***Discovery to show that building a "prison" soundstage would have been
far more expensive than filming at the JTDC.***  (RFP No. 17)

      Discovery so far indicates that Fox shot some *Empire* scenes at locations in and around

Chicago, while it shot other scenes on a sound stage called Cinespace, on Chicago's southwest

side.  During his deposition, Mr. Breen testified that Fox had constructed a "prison" set at

---

[7]  RFPs 1 and 2 additionally show Fox's ***planned*** "neighbor" payments.  (*See* Ex. 4 at
TCFTV002102, -03, -04, -05.)  They are thus relevant for identifying relevant information about
Fox's payments to neighbors for the reasons described regarding Interrogatory 3 above—which
seeks information about ***actual*** neighbor payments.

Cinespace to shoot scenes for *Empire*'s fourth season. In light of that testimony, Plaintiffs requested documents showing the cost of this set. Fox objects that this discovery is irrelevant: the stage was built during another season, and it was built for season-long film plot rather than two episodes, like the scenes shot at JTDC. (*See* Ex. 2 at 10-11.)

These facts are precisely what make the costs associated with the sound-stage "prison" relevant, because at the time Fox chose the JTDC, it had run out of other outside "prison" locations to film. In their deposition testimony, Mr. Breen and *Empire*'s scout, Jonathan Klemke, testified Fox had been considering three specific locations for the "prison" scenes in Episodes 201 and 202: (1) the Cook County Jail; (2) an abandoned IDOC prison in Joliet, Illinois; and (3) the JTDC. And Mr. Breen and Mr. Klemke further testified that in the days before it chose the JTDC, Fox had determined that neither Cook County Jail nor Joliet were viable options. Fox had filmed scenes at the Cook County Jail in *Empire*'s first season, but after an incident there the Sheriff's Office told Fox it could not come back. (*See* Breen Dep. Tr. 65-68; Klemke Dep. Tr. 50-53.) And Fox had scouted the Joliet facility, but found that it had fallen into disrepair and therefore was not viable. (*See* Breen Dep. Tr. At 83.) It thus appears that the options left for Fox were to film at the JTDC—or build out "prison" set instead.

The expenses that Fox actually incurred in building a prison set are circumstantial evidence of the expenses Fox likely would have been contemplating if it were forced to build a prison set rather than film at the JTDC. If the expenses of building out a set are significantly more than the cost of renting out the JTDC, that will be evidence tending to show that Fox had a particular motive to film at the JTDC. The expenses Fox did incur in building out an *Empire* prison set are therefore highly relevant to understanding the degree to which Fox was motivated to film at the JTDC in particular.

9

Such motivation, again, makes it more likely that Fox would have been willing to film at the JTDC notwithstanding the impact that the filming would have on the children housed there. As such, the fact that these expenses occurred during a different season, or that the set was built for a season-wide story arc, do not counsel against discovery. So far, the evidence in the case indicates that Fox had run out of other locations at which to film the "prison" locations, meaning that if it was unable to use the JTDC, it would have to incur the expense of building a set.

There is no reason to believe that this discovery will be burdensome. The episode budgets that Fox has produced so far indicate that it kept meticulous and well-organized records that categorized the costs of filming in detail, including construction costs. (*See* Ex. 4 at TCFTV002064-66 (breakdown and coding of costs for "set construction").) There is every reason to think that Fox was equally meticulous in recording costs in *Empire*'s fourth season. Such documents therefore should not be difficult for Fox to obtain and produce.

**C.** **Discovery relating to punitive damages.** (RFP Nos. 3 and 4)

Plaintiffs have asked the Fox Defendants to provide evidence about their net worth (RFP 3) and their recent revenues (RFP 4). Plaintiffs seek this evidence to prove up the Fox Defendants' financial condition, which is a relevant consideration for punitive damages under Illinois law. *See Black v. Iovino*, 580 N.E.2d 139, 150 (Ill. Ct. App. 1991) ("Because punishment and deterrence is the only justification for punitive damages, it follows that the defendant's financial situation is relevant. An amount sufficient to punish or to deter one individual may be trivial to another. As a result, if one's financial status is not considered the very reason for the imposition of punitive damages could be subverted.").

Fox's objection to this discovery is grounded on language in *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499 (7th Cir. 1992) expressing skepticism about assessing punitive damages on

10

corporations because such entities are "abstractions." 979 F.2d at 508. (*See* Ex. 1 at 8 (objecting based on *Zazu*).) In a long line of decisions, however, this Court has repeatedly held that *Zazu*'s comments are *dicta* and are not controlling; and that punitive damages **can** appropriately be assessed against corporations. *See, e.g.*, *JCW Invs., Inc. v. Novelty, Inc.*, 2003 WL 742184, at *3 n.3 (N.D. Ill. Mar. 4, 2003) (*Zazu*'s comments about corporate liability for punitive damages were *dicta* and need not be followed); *Jones v. Sci. Colors, Inc.*, 2001 WL 902778 (N.D. Ill. July 3, 2001) (same); *EEOC v. Staffing Network, LLC*, 2002 WL 31473840 (N.D. Ill. Nov. 4, 2002) (same); *Isbell v. John Crane, Inc.*, 74 F. Supp. 3d 893, 898-99 & n.4 (N.D. Ill. 2014) (same). *See also Donald v. Wexford Health Sources, Inc.*, 266 F. Supp. 3d 1097, 1099 (C.D. Ill. 2017) (same, collecting cases).[8] Plaintiffs state a viable punitive damage claim against Fox and should be allowed to discover evidence that supports it.

### D.  Tabled discovery.

Plaintiffs here make a record of two items of discovery they seek to table for the present time:

#### 1.  Unjust enrichment discovery.

Plaintiffs' August 1 discovery sought to close out a variety of facts relating to Plaintiffs' unjust enrichment claims against Fox. (*See* Interrogatory Nos. 4 and 5; RFP Nos. 6-10, 12 (to the extent it relates to advertisements), and 13.) The Court's August 29 ruling, however, denied without prejudice Plaintiffs' motion to compel unjust enrichment discovery against Fox, based on the Court's expressed uncertainty about Plaintiffs' unjust enrichment theory.

In light of the Court's August 29 ruling, the parties have agreed to "table" this August 1

---

[8]  There are other problems too. The *Zazu dicta* concerned federal law, whereas Fox's punitive damages liability arises in state law. And its *dictum* is contradicted both by Supreme Court precedent and by subsequent Seventh Circuit decisions. *See Isbell*, 74 F. Supp. 3d at 899.

unjust enrichment discovery, to be revisited if and when the Court decides that Plaintiffs may pursue an unjust enrichment claim. Plaintiffs include this agreement here to ensure that the record regarding the status of these discovery requests is clear.

        **2.**        **Discovery of compensation of *Empire* decision-makers.** (RFP No. 11)

This discovery seeks employment / engagement contracts from four persons who appear to have been involved in the decision to film at the JTDC, and who also scouted or toured the JTDC in advance of filming. These persons are Lee Daniels, Loucas George, Sanaa Hamri, and Chase Harlan. Plaintiffs will revisit this discovery if and when they seek to depose any of these persons.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the Court grant the relief sought in this memorandum, as described herein.

October 12, 2018                                    Respectfully Submitted,

                                              /s/ Stephen H. Weil

Stephen H. Weil – steve@weilchardon.com      Adam J. Pessin – apessin@finekaplan.com
Alexis G. Chardon – ali@weilchardon.com       Fine, Kaplan and Black, R.P.C.
Weil & Chardon LLC                         One South Broad Street, Suite 2300
333 S. Wabash Avenue, Suite 2700          Philadelphia, PA 19107
Chicago, IL 60604                          (215) 567-6565
(312) 585-7404

Terrence Garmey – tgarmey@garmeylaw.com
Terry Garmey & Associates
482 Congress Street, Suite 402
Portland, ME 04101
(207) 331-3111

                                         *Attorneys for Named Plaintiffs T.S. and Q.B.*

12

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on October 12, 2018, a true and correct copy of the foregoing was filed electronically.  Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

      Unredacted copies of the memorandum, and the sealed exhibits, were transmitted to all counsel of record via email.

<u>/s/ Stephen H. Weil</u>