IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| T.S. *et al.*,  Plaintiffs,  v.  Twentieth Century Fox Television *et al.*,  Defendants. | Case No. 1:16-cv-08303  Hon. Rebecca R. Pallmeyer |

**PLAINTIFFS' MOTION TO STRIKE OR TO HOLD IN ABEYANCE
DEFENDANTS' MOTION TO DENY CLASS CERTIFICATION,
AND TO SET A CLASS CERTIFICATION BRIEFING SCHEDULE**

Pursuant to Federal Rules of Civil Procedure 12 and 23, Plaintiffs move the Court to strike, or in the alternative hold in abeyance, Defendants' Motion to Deny Class Certification (ECF 201-1). Plaintiffs also propose a briefing schedule for Plaintiffs' Rule 23 motion. In support of their motion, Plaintiffs state:

**INTRODUCTION**

After complaining repeatedly that Plaintiffs were engaged in "sandbagging" and "sharp tactics" by filing routine discovery motions in the days before the status hearings, the Defendants have filed an enormous brief—the longest any of them has submitted in this case—less than 72 hours before the Court's scheduled status hearing to discuss the remaining discovery in this case.

The timing of this filing—which Defendants have evidently been working on for weeks—appears calculated to ensure that there is only enough time for the Court to hear the Defendants' own spin on the facts and the law in this case, while depriving Plaintiffs of enough time to correct the record. That one-sided presentation, in turn, is designed to set up a status conference at which the Defendants will ask the Court to cut off the meat of Plaintiffs' class

1

discovery—just days after the Defendants have finally begun to produce the class-focused documents that Plaintiffs have been requesting for months.

This is a cynical manipulation of the Federal Rules of Civil Procedure, and the Court should not permit it. Rule 23(c)(1)(A) provides that the Court should determine whether to certify a class "at an early practicable time." The overwhelming weight of authority, however, makes clear that Defendants' peremptory motion is premature. Given the current state of discovery—and Defendants' dilatory and incomplete responses to Plaintiffs' discovery requests—now is certainly "early" but is **not** a "practicable" time to conduct the "rigorous" analysis required by Rule 23. *See, e.g., Muir v. Nature's Bounty (DE), Inc.*, No. 15-cv-9835, 2018 WL 3647115, at *9 (N.D. Ill. Aug. 1, 2018) (Pallmeyer, J.) (recognizing "rigorous standard" of Rule 23 and "postpon[ing]" certification to permit Plaintiffs the "opportunity to take discovery" that would allow for a "clearer factual record").

Because discovery is not yet sufficiently complete to entertain Defendants' motion on a fully developed record, the motion must be considered for what it is: a motion to strike Plaintiffs' class allegations under Rule 12. Defendants failed to raise this challenge in their multiple Rule 12 motions, however, so they have waived this argument. *See* Fed. R. Civ. P. 12(g)(2) ("a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion"). In any event, Plaintiffs' class allegations are not facially invalid. Accordingly, Defendants' motion should be stricken, or in the alternative, held in abeyance until such time that there is a "clearer factual record" that a full Rule 23 analysis requires. In this light, Plaintiffs further propose that the Court set a schedule for the orderly briefing and disposition of Plaintiffs' motion to certify a class pursuant to Rule 23.

**BACKGROUND**

The essence of Plaintiffs' claim is that the Defendants placed the entire JTDC on lockdown not for any legitimate governmental purpose, but rather to provide Fox with a realistic venue to film scenes for *Empire*.

### 1. The standard applicable to the Defendants' misconduct.

Plaintiffs will discuss the impact of the *Empire* lockdowns herein. It is worth pausing, however, to note that after more than a year of discovery, the Defendants make no attempt to suggest that the lockdowns did not occur, or to claim that they served any legitimate governmental purpose.[1] That is critical, because it puts the Defendants' misconduct on exceptionally unforgiving footing. Indeed, Judge St. Eve held that the *Empire* lockdowns did ***not*** serve any legitimate purpose, and rejected the Defendants' effort to dismiss the resulting restrictions as "short-term inconveniences" that did not rise to the level of a violation:

> "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees."

(Mem. Op. and Order (ECF 73) at 4 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979)).)

In their current motion, however, Defendants flip this ruling on its head. They compare the restrictions imposed in this case to those that were imposed in *Bell*, which the Court held did not violate due process. (*See* ECF 201-1 at 16 (citing *Bell*).) Then throughout their brief, they frame the impact of the *Empire* lockdowns in a similar light, citing similar cases. (*Id.* at 19-30.)

This is a deception. The restrictions imposed in *Bell*—and those imposed in the other cases the Defendants cite—***were*** imposed for a legitimate governmental purpose. As such they were entitled to vastly more deferential analysis. *See Bell*, 441 U.S. at 540. Indeed, *Bell*

---

[1] For good reason: ample discovery thus far indicates that *Empire* was allowed to film at the JTDC because Superintendent Dixon was eager to meet and socialize with the show's stars.

3

*contrasted* restrictions imposed pursuant to a legitimate purpose with ones that were "arbitrary or purposeless," *id.*, which is precisely what Judge St. Eve held was at issue in this case. It was under *Bell's* "arbitrary and purposeless" standard that Judge St. Eve assessed Plaintiffs' claims, and it was under *that* standard she held the Defendants' conduct should be analyzed.

The Defendants' motion, in other words, depends on undoing Judge St. Eve's ruling and on holding themselves to an entirely different and vastly more deferential standard. The Defendants would never have tried this stunt before Judge St. Eve, but they evidently hope to take advantage of the transfer of this litigation to undo her rulings. The Court should not permit that to occur.

### 2. The effect of the lockdowns.

Plaintiffs allege that in order to facilitate Fox's filming of *Empire* at the JTDC, the facility was thrown into disarray, with the impact falling on the children housed there—including the Named Plaintiffs. In summary:

**Children were idled and confined to pods**. As Plaintiffs explained in their complaint, during the times that children at the JTDC are confined to their pods, they are essentially immobilized for hours on end. This is both psychologically damaging and it is dangerous, as it can lead detainees to act out and attack each other. (*See* Second Amended Complaint ("SAC") (ECF 88) ¶¶ 18-19; 24-28.) As Plaintiffs further explained, during normal operation the JTDC expends substantial resources to get children off these pods so that they can participate in other activities. In a typical day at the JTDC, children spend much of their waking hours off the pod. When school is in session, the children are taken off the pod for most of the day for classes, an hour of outdoor recreation and/or recreation in the facility's gymnasiums, and after-school activities. (*Id.* ¶¶ 20-28.) When school is on break, the JTDC arranges for additional programs,

4

tournaments, and multiple hours of recreation per day—all with the goal of providing detainees with activities that keep them off the pods. During the *Empire* filming, however, children spent nearly the entire day on the pod, across the board. The evidence shows:

- ***School.*** management-level emails show that during the July filming when school was in session, the children were not allowed to leave the pods but instead were "taught" there.
- ***Break activities***. Management-level emails also confirm that tournaments and other activities that normally be scheduled to "allow[] them [the detainees] to burn off some of their energy," were never provided—the children were confined to their pods instead.
- ***Outdoor recreation***. Even though the JTDC's policies specifically require "regular access to outdoor recreation," outdoor activities were eliminated entirely so that *Empire* could film on the yard. As one email euphemistically put it, during *Empire* filming JTDC staff had to "coordinate pod activities instead of yard."
- ***Other recreation.*** Discovery indicates that during the filming some children were able to use the indoor gymnasiums in the facility's basement—but apparently because there were simply not enough spaces with the yards being closed, many children were given "large muscle activity" on their pods instead. Under normal operations this "pod rec" is only imposed to **punish detainees for bad behavior**.
- ***Programming***. Emails indicate that many programs that had been scheduled throughout the summer were cancelled in order to accommodate *Empire*. For example, one program coordinator repeatedly informed program providers that "They are filming the show *Empire* and all the programming has been cut."

As Plaintiffs explained in their complaint, it is commonly accepted that "[t]he amount and quality of structured daily programming in juvenile facilities has a significant impact on the rate

of violent and antisocial incidents." (ECF 88 ¶ 19.) The restrictions imposed to accommodate Fox imposed severe restrictions for hundreds of children for days on end, which is psychologically damaging and placed every child in the facility at increased danger of violence.

*Visitation was degraded*. Private visitation with family is a vital lifeline for children at the JTDC. To accommodate the filming, however, visitation was moved from the JTDC's purpose-built visitation facilities to a small room with 1/3 fewer visiting tables. The evidence so far indicates that (1) some visitors were turned away for want of tables and (2) the cramped quarters in the smaller room eliminated privacy for all the visits that did occur.

*Filming impaired residents' access to healthcare*. T.S. and Q.B. consistently testified that during normal operation, they received medical attention shortly after nurses picked up sick call slips—but during filming residents had to wait much longer for their appointments.

*Children were put at risk*. Combined with idling hundreds of detainees on their pods, other steps to accommodate the filming dramatically increased the danger to residents:

- *Dangerous transfers and overcrowding*. Fox wanted to use two pods for filming. To accommodate this request, JTDC staff (1) dispersed dozens of detainees to other pods throughout the facility, and (2) increased the head counts on those other pods to levels that the JTDC's own operating policies state is dangerous.

- *Failure to conduct MAYSI screenings*. Because of the chaos caused by Fox's use of the pods, the JTDC failed to conduct "MAYSI" mental health screenings of well over 100 inmates—then dispersed them throughout the pods, endangering everyone in the facility.

- *Destruction of "token" economy*. The JDTC had a carefully constructed "token" economy that incentivized good behavior with numerous rewards. The restrictions

6

imposed by the filming effectively undid these incentives, endangering everyone in the building.

### 3. Named Plaintiffs' depositions.

The Defendants crow about the testimony they extracted from T.S. and Q.B. and argue that notwithstanding the impact of the *Empire* lockdowns, T.S. and Q.B. cannot represent the other children at the JTDC. Defendants are wrong, and grossly misrepresent the record.

- *Medical claims*. When Defendants deposed T.S., the Defendants themselves had only produced sick call logs for the period covering the August filming, and thus were only able to question him about a single request—plus a joke request apparently made in frustration at the lockdowns. T.S., however, was detained during all three filming periods, and said he filed multiple requests during the filming. His deposition testimony does not touch on the requests for the June or July filming.

- *Recreation*. The Defendants claim that T.S. and Q.B.'s recreation schedules show they always received recreation in the gymnasium. They base this claim on "LME logs," which are created electronically by a staff member after the fact. The boys' "pod logs," however, which are created contemporaneously by hand, and are essentially impossible to falsify, show that in fact much of the activity in question occurred on the pods, not in the gymnasium.

- *Visitation*. The Defendants claim that T.S. and Q.B.'s testimony about visitation is somehow disqualifying. But the fact that T.S. lost all privacy with his mother in the smaller room is uncontradicted, and the testimony by Q.B. and his grandmother that she was turned away is not consistent with any disciplinary issue, but rather with an overcrowded facility that was unable to accommodate enough visitors.

7

Nothing in T.S. and Q.B.'s depositions, in short, indicates that they would not be adequate class representatives to represent the hundreds of children impacted by the *Empire* lockdowns.

## **STATUS OF DISCOVERY**

The evidence Plaintiffs have gathered strongly indicates that each of the restrictions above occurred, and was implemented ***throughout*** the facility, thereby impacting every child in the JTDC. Indeed while the Defendants have complained about one-off evidence in the past, the bulk of these "anecdotes" consist of management-level employees communicating with each other about what the facility would do in order to accommodate the filming.

But of course, Plaintiffs have not stopped at these communications. Since the outset of discovery Plaintiffs have sought out facility-wide operational data and other information that will show that the restrictions discussed in the various management-level communications actually occurred. Defendants have either resisted this discovery or dragged their feet in responding to it, and indeed much of the responsive information Plaintiffs seek has only been produced in the last week, or is still the subject of ongoing enforcement efforts by Plaintiffs. By and large, though, Plaintiffs' discovery efforts have been successful, and setting aside a few enforcement matters, Plaintiffs believe their document discovery is largely complete. To summarize:

*School*. In this case, Plaintiffs believe that existing emails, along with confirming corporate depositions, will confirm that school was moved to the pods to accommodate *Empire*. There are multiple management-level emails saying exactly this, and supervisory logs for each pod confirm that these restrictions were in place.

*Recreation*. Plaintiffs have gathered ample evidence demonstrating the restrictions that were placed on recreation in order to accommodate *Empire*. On the one hand, the JTDC maintained existing recreation calendars to show what ***should*** have happened. Notably, the bulk

of recreation was scheduled to occur on the third-floor courtyard, no recreation was scheduled to occur on pods. On the other hand, Plaintiffs also have multiple records to show what *actually* happened. The JTDC maintained a computerized "movement" log that reflects all detainee movement, computerized "supervisory" reports record recreation, and hand-written pod logs show if and where recreation occurred. These sources confirm that no pods received recreation outside during filming, and that many of them were provided "pod rec"—effectively no recreation—instead.

*Programming*. Ample communications during the filming report that numerous programs—including facility-wide tournaments that should have been held during the June and August school breaks—were cancelled because of *Empire*. Defendants have represented that the JTDC kept imperfect records regarding programming, however, so to establish the level of programming that children *should* have received, Plaintiffs have improvised to gather relevant evidence. Among other things, Plaintiffs have requested—and received just last week—JTDC movement logs from the "comparator" break periods in 2014 and 2016, which will show the frequency of movement from pods to common programming or commissary rooms during normal, break periods.

*Medical care*. Defendants have repeatedly insisted that there were no delays in responding to sick calls, but the documents that might show this have never been produced. After reverse-engineering the JTDC's procedures, Plaintiffs sought documents that will allow them to compare sick call response times during normal operation and during filming. They have now moved to compel that production. (*See* ECF 195.)

*Visitation*. Management communications confirm that during filming visitation occurred in a smaller room with fewer visiting tables—meaning that there was less privacy, and making it

9

more likely that many visitors, like Q.B.'s grandmother, would be turned away for lack of room. And uncontradicted testimony by T.S. and his mother confirms that this proximity destroyed their privacy, a condition that would obtain for any other visit during filming. Additionally, Plaintiffs have sought production of visitation logs during normal operations to determine whether there was a drop in the number of visits during filming, which would indicate that the reduced number of tables caused visitors to be turned away. Those documents should have been—but were not—produced by the Office of the Chief Judge last week.

***Needless transfers and over-population***. In order to allow Fox to use pods 3A and 3B during filming, the children that would normally be housed in those pods were dispersed throughout the facility, and head counts on the other pods increased to levels that the JTDC's own operating manual deems unsafe. Plaintiffs have sought data to determine where these children were transferred, in order to determine which pods were placed at risk. This information should have been produced last week—but was not—by the Office of the Chief Judge.

***Failure to conduct MAYSI tests***. "MAYSI" is a behavioral screening tool that the JTDC normally administers to every single detainee on intake to determine whether they suffer from mental illnesses that pose a risk to themselves or to others. During the filming, only 14 of the 182 children who entered the JTDC received the MAYSI test—and it appears many of these unscreened children were then dispersed to pods around the facility. Plaintiffs have served discovery to determine where these children were sent—and thus who was placed at risk—and to determine what percentage of children were tested during normal operation.

\* \* \*

Plaintiffs, in short, have been able to gather a raft of discovery in this case pointing to the class-wide impact that accommodating Fox imposed on the children at the JTDC. Fox's claim

10

that "Plaintiffs propose to litigate this case by anecdote" (ECF 201-1 at 17) simply ignores the broad nature of the data that Plaintiffs have been able to gather. At the same time, this discovery is incomplete, for three basic reasons:

*Foot-dragging*. The Defendants have dragged their feet in responding to much of this discovery. Much of the information relevant for proving class-wide impact was delivered by the Office of the Chief Judge just last week, even though Plaintiffs were seeking it since early this summer. Plaintiffs hope that the information they actually sought is in this production, but they have not had time to review it as of the time of this filing. For similar reasons, Plaintiffs have had to move to compel some of the class-impact information, including the current motion to compel sick-call response documents from Cook County. (*See* ECF 195.)

*Need for depositions*. While Plaintiffs believe they have much of the class-wide information they require, they inevitably need depositions—particularly Rule 30(b)(6) depositions—to fill in the spaces in this information, particularly to confirm Plaintiffs' understanding of the data and to steer Plaintiffs clear of misunderstandings. There are also multiple depositions of decision-makers that must be taken, to confirm that the restrictions they said they were planning to impose were actually carried out. Among these deponents William Steward, who Defendants rely on to aver facts in support of the Denial Motion.

## PRACTICABLE TIME FOR CERTIFICATION

Defendants' motion is premature and their effort to preclude Plaintiffs from seeking to certify a class should be denied. "The serious allegations in this case warrant a complete and fulsome class certification analysis, which cannot be made based on the record and arguments before the Court." *Van v. Ford Motor Co.*, No. 14-CV-8708, 2018 WL 4635649, at *13 (N.D. Ill. Sept. 27, 2018). "The parties have not yet *completed* discovery, and the class allegations are

11

not facially deficient." *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 739 (N.D. Ill. 2014) (St. Eve, J.) (emphasis added). Thus, the outstanding discovery should be completed before entertaining a Rule 23 motion in this case. *See Pruitt v. Pers. Staffing Grp., LLC*, No. 16 C 5079, 2016 WL 6995566, at *6 (N.D. Ill. Nov. 30, 2016) (rejecting "drastic measure" of striking class allegations and finding "no justification for denying Plaintiffs the opportunity to conduct some class discovery and for the court to resolve the class certification issue on the merits in an orderly fashion").

The cases cited by Defendants are notable for how different they are than this case. For example, in *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557 (7th Cir. 2011)—which Defendants invoke for the proposition that "a court may deny class certification even before the plaintiff files a motion requesting certification," *id.* at 563—involved a plaintiff whose case was dismissed for "want of prosecution." *Id.* at 559. The Seventh Circuit reversed the dismissal and, in *dicta*, suggested that the trial court's frustration with the plaintiff's delayed class certification motion might better have been dealt with by issuing a ruling, *sua sponte*, under Rule 23. *Id.* at 563. Even so, the Seventh Circuit reinstated the case, **declined** to strike the class allegations and on remand directed that the plaintiff should be allowed to conduct class discovery so that the "district court [would] be in a better position to make an appropriate ruling." *Id.* Here, unlike *Kasalo*, Plaintiffs have in no way sat on their claims, but have pressed Defendants repeatedly to comply with their discovery obligations.

In *Cook County Teachers Univ. Local 1600, AFT v. Byrd*, 456 F.2d 882, 884 (7th Cir. 1972) the Seventh Circuit upheld the dismissal of class claims that a union had attempted to bring on behalf of its members. The trial court issued its Rule 23 order **after** summary judgment motions had been fully briefed and **after** a four and a half day hearing on the merits. *Id.*

12

In *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 545 (7th Cir. 2016) the Seventh Circuit upheld the decertification of a class (that had previously been certified on the plaintiffs' motion) long *after* discovery was complete. Similarly, in *Alpha Tech Pet Inc. v. Lagasse, LLC*, Nos. 16 C 513 & 16 C 4321, 2017 WL 5069946, at *1 (N.D. Ill. Nov. 3, 2017), discovery had been closed "for a number of months" before the court undertook a Rule 23 analysis.

Defendants offer no valid reason to diverge from the ordinary and customary practice of evaluating class certification pursuant to **Plaintiffs'** motion. It is, as Defendants acknowledge, Plaintiffs' burden to establish that certification is appropriate under Rule 23. To the extent that Defendants desire to speed the case toward resolution—as Plaintiffs surely desire—then Defendants need only abandon their obstructionist discovery tactics.

Plaintiffs propose a schedule for the briefing of their Rule 23 motion that is tied to the completion of discovery. The table below proposes adjustments to the dates in the scheduling order entered by Judge St. Eve (ECF 149) to account for the three-month delay caused by Defendants and also incorporates dates for Rule 23 and Rule 56 motions.

| Event | Minute Entry 149 Date | Proposed New Date |
|---|---|---|
| Written fact discovery completion | 8/31/2018[2] | open enforcement |
| Oral fact discovery completion | 10/31/2018[3] | 1/31/2019 |
| Burden of proof expert disclosures | 11/30/2018 | 2/28/2019 |
| Plaintiffs' Rule 23 motion | *** | 2/28/2019 |

---

[2] Plaintiffs completed all responses to Defendants' written discovery by this deadline. In contrast, no Defendant complied with this deadline and discovery productions and disputes remain outstanding with all Defendants.

[3] Both Named Plaintiffs and their family members already have been deposed by Defendants. Because of delays in Defendants' production of documents, only two Fox witnesses have been deposed by Plaintiffs and no government witnesses have been deposed by Plaintiffs.

| | | |
|---|---|---|
| Rebuttal expert disclosures | 1/15/2019 | 4/15/2019 |
| Defendants' Rule 23 opposition | *** | 4/15/2019 |
| Reply expert reports | 3/19/2019 | 6/14/2019 |
| Plaintiffs' Rule 23 Reply | *** | 6/14/2019 |
| All expert discovery completed | 4/1/2019 | 7/1/2019 |
| Service of Requests for Admission and Contention Interrogatories | 4/8/2019 | 7/8/2019 |
| Rule 56 motions | *** | 9/30/2019 |
| Opposition to Rule 56 motions | *** | 11/15/2019 |
| Rule 56 replies | *** | 12/13/2019 |

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court strike or hold in abeyance the Defendants Motion to Deny Class Certification, and enter an Order adopting the schedule proposed by Plaintiffs.

October 16, 2018                                                  Respectfully Submitted,

/s/ Stephen H. Weil

Stephen H. Weil – steve@weilchardon.com
Alexis G. Chardon – ali@weilchardon.com
Weil & Chardon LLC
333 S. Wabash Avenue, Suite 2700
Chicago, IL 60604
(312) 585-7404

Adam J. Pessin – apessin@finekaplan.com
Fine, Kaplan and Black, R.P.C.
One South Broad Street, Suite 2300
Philadelphia, PA 19107
(215) 567-6565

Terrence Garmey – tgarmey@garmeylaw.com
Terry Garmey & Associates
482 Congress Street, Suite 402
Portland, ME 04101
(207) 331-3111

*Attorneys for Named Plaintiffs T.S. and Q.B.*

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 16, 2018, a true and correct copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

                                                /s/ Stephen H. Weil