**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| T.S. *et al.,* <br><br> Plaintiffs. <br><br> v . <br><br> Twentieth Century Fox Television, a division of Twentieth Century Fox Film Corporation et al., <br><br> Defendants. | Case No. 1:16-cv-08303 <br><br> Honorable Judge Rebecca Pallmeyer |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DENY CLASS CERTIFICATION**

# Table of Contents

Page

1.  INTRODUCTION ........................................................................................................... 1

2.  LEGAL STANDARD..................................................................................................... 4

3.  FACTS .......................................................................................................................... 7

4.  PLAINTIFFS' PUTATIVE CLASS CLAIMS ............................................................. 15

5.  ARGUMENT ............................................................................................................... 16

    (a)  Plaintiffs Cannot Satisfy Rule 23(a)'s Typicality Requirement ......................... 17

    (i)  Plaintiff T.S. Presents Unique Medical Claims; Q.B. Has None......................... 18

    (ii)  Plaintiffs' Recreation Claims Require Detainee-Specific Inquiries ................... 21

    (iii)  Plaintiffs' Visitation Claims Do Not Satisfy Rule 23(a) .................................... 23

    (iv)  Plaintiffs' Claims Related to Education and Voluntary Programs Require
          Detainee-Specific Inquiries................................................................................. 24

    (b)  Plaintiffs Cannot Satisfy Rule 23(b)(3)'s Predominance Requirement .............. 25

    (c)  Plaintiffs Cannot Satisfy Rule 23(b)(1)(B) ........................................................ 29

CONCLUSION................................................................................................................. 30

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Alpha Tech Pet Inc. v. Lagasse, LLC*,
    Nos. 16 C 513 & 16 C 4321, 2017 WL 5069946 (N.D. Ill. Nov. 3, 2017)..............................5

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) ...........................5

*Antonelli v. Sheehan*, 81 F.3d 1422 (7th Cir. 1996) ...................................................21

*Bailey v. Clark Cty., Nev.*, No. 2:12-CV-1954 JCM CWH,
    2013 WL 3155331 (D. Nev. June 18, 2013).....................................................18

*Barndt v. Wenerowicz*, 698 Fed. App'x 673 (3d Cir. 2017) .........................................22

*Bell v. Wolfish*, 441 U.S. 520 (1979) .............................................................. 15-16

*Brislane v. Brown*,
    No. CV 16-6002-JFW (EX), 2017 WL 3579698 (C.D. Cal. Apr. 11, 2017)..........................18

*CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011).......................25

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ...............................................................5

*Cook County Teachers Univ. Local 1600, AFT v. Byrd*,
    456 F.2d 882 (7th Cir. 1972) ...................................................................5

*Dobbey v. Mitchell-Lawshea*, 806 F.3d 938 (7th Cir. 2015) .....................................16, 19

*Dochak v. Polskie Linie Lotnicze Lot S.A.*,
    No. 15 C 4344, 2017 WL 2362570 (N.D. Ill. May 30, 2017) ..................................5

*Doll v. Cooper*,
    No. 96 C 2395, 1997 WL 94723 (N.D. Ill. Mar. 3, 1997) ......................................21

*Estelle v. Gamble*, 429 U.S. 97 (1976) ...................................................16, 26

*Foreman v. PRA III*,
    LLC, No. 05 C 3372, 2007 WL 704478 (N.D. Ill. Mar. 5, 2007)...........................18

*French v. Owens*, 777 F.2d 1250 (7th Cir. 1985) .......................................................21

*Gallagher v. City of Winlock, Wash.*,
    287 Fed. Appx. 568 (9th Cir. 2008)..................................................................19

*Hall v. County of Milwaukee,*
No. 17-C-379, 2018 WL 2376512 (E.D. Wisc. May 23, 2018)............................................29

*Harper v. Sheriff of Cook County*, 581 F.3d 511 (7th Cir. 2009) .............................................7, 28

*Harris v. Fleming*, 839 F.2d 1232 (7th Cir. 1988)..........................................................................21

*Holmes v. Sheahan*, 930 F.2d 1196 (7th Cir. 1991)......................................................................20

*In re IKO Roofing Shingle Prods. Liab. Litig.,*
757 F.3d 599 (7th Cir. 2014) ..........................................................................................26

*Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557 (7th Cir. 2011)................................................4-5

*Knight v. Armontrout*, 878 F.2d 1093 (8th Cir. 1989) ................................................................22

*Lee v. Children's Place Rental Stores, Inc.,*
No. 14 C 3258, 2014 WL 5100608 (N.D. Ill. Oct. 8, 2014) .....................................................5

*May v. Baldwin*, 109 F.3d 557 (9th Cir. 1997) ............................................................................23

*McCasker v. Darden Restaurants, Inc.*, 845 F.3d 794 (7th Cir. 2017)........................................26

*Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974) .............................................................................26

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ......................................................................6, 31

*Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575 (N.D. Ill. 2005) ...........................................29

*Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006) ........................................................18, 29

*Parko v. Shell Oil Co.*, 739 F.3d 1083 (7th Cir. 2014) .............................................................6, 16

*Pavone v. Meyerkord & Meyerkord, LLC*, 321 F.R.D. 314 (N.D. Ill. 2017)......................6, 18, 26

*Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002) .........................................................5, 20

*Pearson v. Ramos*, 237 F.3d 881 (7th Cir. 2001) .........................................................................21

*Phillips v. Sheriff of Cook County*, 828 F.3d 541 (7th Cir. 2016) ............ 2, 3, 7, 16, 19-20, 26, 28

*Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.,*
254 F. Supp. 3d 1007 (N.D. Ill. 2017) ....................................................................................25

*Portis v. City of Chicago, Ill.*, 613 F.3d 702 (7th Cir. 2010).................................................28, 30

*Ruiz v. Stewart Assocs., Inc*, 167 F.R.D. 402 (N.D. Ill. 1996)......................................................18

*Savino v. Computer Credit, Inc.*, 164 F.3d 81 (2d Cir. 1998).......................................................25

*Shannon v. S.C. Dep't of Corr.*,
No. CA 6:12-2938-JFA-KFM, 2014 WL 1232893 (D.S.C. Mar. 25, 2014) ..........................18

*Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso*,
No. CIV.A. 02CV00651RPM, 2006 WL 1801379 (D. Colo. June 28, 2006),
*aff'd*, 543 F.3d 597 (10th Cir. 2008)......................................................................................18

*Smith v. Dart*, 803 F.3d 304 (7th Cir. 2015) .........................................................................15, 22

*Smith v. Sheriff of Cook* County*, et al.*, Case No. 07 CV 3659,
2008 WL 4866071 at *3 (N.D. Ill. July 16, 2008)................................................. 20, 26, 28-29

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) .......................................................................5, 20

*Stile v. Cumberland County Jail*,
No. 2:12-cv-260-JAW, 2013 WL 1881300 (D. Me. Mar. 26, 2013).......................................21

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014).................................................20, 26

*Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017) .....................................................6

*Turner v. Grant Cty. Det. Ctr.*,
No. CIV.A. 05-148-DLB, 2008 WL 821895 (E.D. Ky. Mar. 26, 2008) .................................18

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................................5, 17, 26

*Wellman v. Faulkner*, 715 F.3d 269 (7th Cir. 1983).....................................................................20

*Williams v. Ford Motor Co.*, 192 F.R.D. 580 (N.D. Ill. 2000) ....................................................18

*Wilson v. Warren Cnty., Ill.*, 830 F.3d 464 (7th Cir. 2016) .........................................................15

*Wrightsell v. Sheriff of Cook County*,
No. 08 CV 5451, 2009 WL 482370 (N.D. Ill. Feb. 19, 2009).........................................16, 29

## Statutes

42 U.S.C. § 1983...........................................................................................................................15

T.S. *et al.*,

               Plaintiffs.

      v.

Twentieth Century Fox Television, a division of
Twentieth Century Fox Film Corporation et al.,

               Defendants.

Case No. 1:16-cv-08303

Honorable Judge
Rebecca Pallmeyer

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DENY CLASS CERTIFICATION

Defendants in this matter—Cook County, the Chief Judge of the Circuit Court of Cook County, Superintendent Leonard Dixon of the Cook County Juvenile Temporary Detention Center (the "JTDC"), and the Fox Defendants (Twentieth Century Fox Television, or "TCFTV"; Fox Broadcasting Company and Twenty-First Century Fox, Inc.), hereby move pursuant to Fed. R. Civ. P. 23(c) and (d)(1)(D) for an order holding that plaintiffs T.S. and Q.B. ("Plaintiffs") cannot satisfy the requirements of Fed R. Civ. P. 23(a)(3), 23(a)(4), 23(b)(1)(B) and 23(b)(3).  In support of their Motion, Defendants rely upon the following Memorandum of Law.

## 1.      INTRODUCTION

This case arises from Cook County's decision in June 2015 to allow TCFTV access to the JTDC for the purpose of filming scenes for the television show *Empire*.  No JTDC detainees were filmed, but Plaintiffs, who were detained at the JTDC during some or all of the 13 days that this filming occurred, claim that TCFTV's presence at the facility changed operations in ways that violated their civil rights.  Plaintiffs primarily seek money damages in this case, not

1

injunctive relief; the filming was a one-off occurrence that has not been repeated. But Plaintiffs also conceded long ago that they have no actual damages in the case and are instead only seeking exemplary or "unjust enrichment" damages on behalf of themselves and other former detainees.

Plaintiffs cannot satisfy their burden under Fed. R. Civ. P. 23(b)(3) to certify a damages class. The Seventh Circuit, in *Phillips v. Sheriff of Cook County*, 828 F.3d 541 (7th Cir. 2016), set forth clear standards for class certification in conditions-of-detention cases that plaintiffs do not satisfy. To the contrary, Plaintiffs trivialize the concept of civil rights violations. Their Second Amended Complaint ("SAC") stated a host of inflammatory factual allegations, but Plaintiffs have since *admitted* that all of the most serious allegations were false. Because these also were the allegations that Plaintiffs ostensibly posited to satisfy *Phillips,* what remains of this case after their admissions of falsity is simply not a viable class action. Plaintiffs' deposition testimony showed their remaining complaints to be anecdotal, individualized, and not capable of being generalized to all JTDC detainees. Further, contemporaneous JTDC records *contradict* at least most of Plaintiff's complaints, meaning a fact-finder would have to determine whether an alleged "deprivation" actually occurred and then, if so, whether *Empire* filming was the cause. Under the controlling doctrine of *Phillips*, therefore, this Court thus may conclude, here and now, that Plaintiffs' claims cannot satisfy Rule 23's typicality or predominance requirements.

By far the most serious charge in Plaintiffs' SAC—the charge on which the prior judge in this matter (St. Eve, J.) focused in denying Defendants' motions to dismiss (Dkt. No. 73)—was that JTDC officials allowed TCFTV to film scenes from *Empire* in the JTDC's infirmary and closed the infirmary to facilitate this. Plaintiffs now admit this claim was false. Plaintiffs refused to amend their complaint on the asserted basis that filming *elsewhere* caused medical needs to be ignored or short-changed, but their depositions showed that claim to be false, too.

One of the two Plaintiffs, Q.B., never sought medical care during *Empire* filming. The other, T.S., admitted that the JTDC responded appropriately to his *actual* medical needs. The only medical "problem" he claims the JTDC "ignored" was a request for surgical circumcision that he submitted as an obvious (if distasteful) joke about the size of his penis. Neither could name a single detainee whose serious *actual* medical need went unmet. It is clear, therefore, that Plaintiffs cannot meet the high *Phillips* standard of establishing "systemic deficiencies" that "rendered the medical treatment constitutionally inadequate for all [detainees]." *Phillips*, 828 F.3d at 554.

At Defendants' earliest opportunity, they will seek summary judgment as to Plaintiffs' remaining claims. None of them amount to civil rights violations. What is clear here and now, however—and what the Court can and should decide without need of further discovery—is that Plaintiffs cannot remotely satisfy the *Phillips* standard necessary to obtain class certification.

Plaintiffs' next-most serious charge, after the bogus medical claims, is that they were deprived of exercise. Detention case law, however, requires such a prolonged deprivation that detainee health and safety was jeopardized. Although Plaintiffs' SAC claimed that the JTDC deprived all detainees of recreation for extended periods due to *Empire* filming, they retreated from this charge at their depositions. They claimed, instead, that on just two or three days, they and their residential "pods" of detainees received recreation on their pods rather than in the JTDC's gymnasiums or outside. The JTDC's contemporaneous records, however, say otherwise, showing that T.S.'s pod had recreation off-pod on every day Empire filmed. Although Q.B.'s pod may have had on-pod recreation on one or two days, Q.B. was in court or confined to his room for disciplinary reasons on these days. Because these claims are anecdotal and subject to individual fact finding, they cannot support class certification.

The same is true of Plaintiffs' claims regarding visitation, which also are individualized and not reflective of what they falsely alleged in the SAC. Q.B. contends his grandmother was not allowed to visit him on a single occasion, but this apparently was a disciplinary matter specific to Q.B., rather than a consequence of *Empire* filming. T.S.'s mother's testimony was that she had to wait 40 minutes on one occasion, rather than what she said was the usual 20, before T.S. was brought to the visitation room. Even if Plaintiffs can prove that these one-off claims are true and related to *Empire* filming, which Defendants would dispute, neither claim suggests a widespread problem sufficient to justify class certification.

Finally, Plaintiffs' claims of missed schooling and other programs cannot proceed on a class basis, either. The JTDC's Nancy B. Jefferson ("NBJ") School—which runs on the same schedule as other public schools in Chicago—*was not in session* during most of the days *Empire* filmed at the JTDC. Even assuming that cancellation of other voluntary (non-school) programs could give rise to a claim, Q.B. and other detainees with disciplinary issues could not sign up for such programs. Whether any particular detainee would have signed up for a program canceled as a result of *Empire* filming, and suffered harm as a result, would require individual inquiries.

The extreme divergence between Plaintiffs' SAC and their testimony precludes Plaintiffs from demonstrating that they assert claims typical of those they seek to assert on behalf of a class and also divests Plaintiffs of standing to maintain those claims. Further discovery would not and cannot cure any of these fatal deficiencies, and Seventh Circuit precedent indisputably allows defendants in putative class actions to initiate the Rule 23 inquiry at any appropriate time. Accordingly, this Court should issue an order denying class certification.

2.     **LEGAL STANDARD**

"[A] court may deny class certification even before the plaintiff files a motion requesting certification." *Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011). A party

"opposing a class action may move for an order determining that the action may not be maintained as a class suit." *Cook County Teachers Univ. Local 1600, AFT v. Byrd*, 456 F.2d 882, 885 (7th Cir. 1972), *quoting* 3B J. Moore, Fed. Practice ¶ 23.50, at 23-1102 (2d ed. 1969). *See also Alpha Tech Pet Inc. v. Lagasse, LLC*, Nos. 16 C 513 & 16 C 4321, 2017 WL 5069946, at *2 (N.D. Ill. Nov. 3, 2017) ("[U]nder Fed. R. Civ. P. 23(c)(1), either party may ask the court to determine whether class certification is appropriate."). Here the discovery record has advanced well beyond the point that the Court may rule on class certification.

Regardless of who initiates the Rule 23 inquiry, "[p]laintiffs still bear the burden of demonstrating that class certification is appropriate." *Dochak v. Polskie Linie Lotnicze Lot S.A.*, No. 15 C 4344, 2017 WL 2362570, at *3 (N.D. Ill. May 30, 2017), *citing Lee v. Children's Place Retail Stores, Inc.*, No. 14 C 3258, 2014 WL 5100608, at *2 (N.D. Ill. Oct. 8, 2014). *See also Alpha Tech Pet*, 2017 WL 5069946, at *2. Rule 23 "does not set forth a mere pleading standard"; rather, the plaintiff must satisfy Rule 23 "through evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim,'" *id.* at 33-34, *quoting Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Merits issues may be considered if relevant to determining whether the Rule 23 prerequisites for class certification are satisfied. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). A court "need not delay a ruling on certification if it thinks that additional discovery would not be useful…" *Kasalo*, 656 F.3d at 563.

As a threshold matter, plaintiffs who seek to represent a class must *themselves* have suffered injuries that confer standing to sue. They cannot predicate standing on an injury suffered only by absent members of a putative class. *See, e.g., Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 N.6 (2016); *Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir. 2002). As the

Supreme Court stated most recently in *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017), "standing is not dispensed in gross"; a plaintiff must personally "demonstrate standing for each claim he seeks to press and for each form of relief that is sought."

Plaintiffs who seek to certify a case for class treatment must begin by satisfying the "numerosity," "commonality," "typicality," and "adequacy" requirements of Federal Rule of Civil Procedure 23(a), and then also satisfy at least one requirement of Rule 23(b).

As to Rule 23(b), Plaintiffs hypothesize they may be able to satisfy Rule 23(b)(3) and/or Rule 23(b)(1)(B). *See* SAC ¶ 71. To pursue a class under Rule 23(b)(3), a plaintiff must establish the *predominance* of questions common to the entire putative class. The Court must inquire "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues," and "a plaintiff does not satisfy [this] requirement if individual questions overwhelm questions that are common to the class." *Pavone v. Meyerkord & Meyerkord, LLC*, 321 F.R.D. 314, 320 (N.D. Ill. 2017) (internal citations omitted); *see also Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014).

Rule 23(b)(1)(B) provides that a class may be certified where "prosecuting separate actions by...individual class members would create a risk of...adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B). Rule 23(b)(1)(B) applies where "the shared character of rights claimed or relief awarded entails that any individual adjudication by a class member disposes of, or substantially affects, the interests of absent class members." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999).

*Phillips*, the Seventh Circuit's most recent and authoritative opinion on class certification in the detention context, explained that "the constitutionality of a wait for medical treatment will depend on a variety of individual circumstances" that "can only be answered by looking at the unique facts of each detainee's case." *Phillips*, 828 F.3d at 555-556. *Harper v. Sheriff of Cook County*, 581 F.3d 511, 515 (7th Cir. 2009), cited approvingly in *Phillips*, likewise held that the "constitutionality of [any] detention depends on whether the length of the delay…was reasonable in any given case." These cases illustrate that when a proposed conditions-of-detention claim requires "[a] consideration of each of the detainees' proposed [circumstances]," Rule 23 poses a "hurdle that cannot be overcome." *Phillips*, 828 F.3d at 556.

**3.    FACTS**

### *TCFTV Filmed* **Empire** *at the JTDC by Agreement with Cook County*

TCFTV produces *Empire* and films it in Chicago, although the fictional show is set in New York. The first season of *Empire*, which now is in its fifth season, appeared on the Fox broadcast television network beginning in 2014. The first season ended with a male lead character incarcerated pre-trial, and as TCFTV prepared to film the second season in spring 2015, it needed a realistic location, ideally including a prison "yard," in which to film scenes of this character's detention. Cook County presented, and TCFTV signed, a Location Agreement requiring TCFTV to pay $1,500 per day plus reimbursement of personnel costs and out-of-pocket expenses associated with TCFTV's access to the facility. *See* Ex. A. Cook County ultimately gave TCFTV leased access to the JTDC from June 21-26, July 13-16, and August 23-26, 2015. The original agreement contemplated only the June 2015 filming period, but TCFTV subsequently requested access for a few more days in July and again in August to shoot additional footage, and Cook County offered and TCFTV executed addenda to the lease agreement with the same financial terms. *See* Group Ex. B.

### *Normal JTDC Operations*

Upon being taken into the JTDC, each male detainee is assigned to one of three "Centers" based on, among other things, assessed risk of disciplinary issues. (A fourth Center, "Wings," houses female detainees, but the SAC contains no allegations related to Wings or any female detainees). The Centers are further divided into "pods"— groups of 12 to 15 detainees. The pods are kept separate from each other and residents from one pod generally cannot see the residents of other pods. *See* Ex. C, 86:17-87:3. Movement and activities at the JTDC, including recreation and schooling, are conducted by pod, although different detainees within a pod may be subject to different treatment for disciplinary reasons or individual needs. *See* Ex. D, Steward Decl. ¶ 14. Each pod has individual cells for detainees, bathroom and shower facilities, with cells opening out to a common area with seating and a separate television area with seating. *See Id.* ¶ 6.

Each detainee is assigned a number designation from Level 1 to Level 4. Level 4 detainees have the most privileges, including the ability to sign-up for voluntary classes and first pick of those classes. Level 3 detainees also have the ability to sign up for classes but only after all Level 4 detainees have done so. At the other end of the spectrum are Level 1 detainees, who have had disciplinary issues and, therefore, are given the fewest privileges. Level 1 detainees are excluded from voluntary classes, and on days when school is not session, they frequently spend all but one hour of the day confined to their pods. *See* Ex. D, Steward Decl. ¶¶ 8 -11.

Plaintiff Q.B. was a Level 1 detainee both in June and August 2015. *See* Ex. C, 56:9-17. Because Q.B. was assigned to the disciplinary Center, all detainees on his pod were Level 1 detainees, too. Plaintiff T.S. was detained at the JTDC throughout the summer of 2015. He was

a Level 4 detainee during some of his time at the JTDC but occasionally was demoted to Level 1 for disciplinary violations. *See* Ex. E, 23:21-24:4.

When the JTDC's NBJ School is in session, detainees have breakfast on their pods after waking, go through daily hygiene, and then are brought down by pod to the school area. They have lunch in the school area and are brought back to their pods after school. Detainees remain on their pods from the end of school until the time they are confined to their cells for lights out, except for an hour of off-pod recreation and occasional special activities for which only some detainees were eligible. On non-school days, by contrast, including weekends and school vacation periods, detainees wake later but spend substantially all day on their pods, except again for one-hour of off-pod recreation. *See* Ex. C, 37:7-46:22.

Although movement to common activities, such as schooling and recreation, occurred by pod, individual detainees did not always travel with their pods. For example, on June 24, 2015 (a day *Empire* was filming), JTDC officials confined Q.B. to his cell for 24 hours after Q.B. repeatedly struck another detainee. *See* Ex. C, 90:19-93:9. As another example, T.S. contends that JTDC officials prevented him, for unknown reasons, from going with his pod to meet an *Empire* cast member. *See* Ex. E, 84:7-23. Both of T.S. and Q.B. also were taken outside the JTDC for one full day during filming (T.S. on July 14, Q.B. on June 24) so that they could appear in court. *See* Group Ex. F and Group Ex. G.[1]

### *How Empire Filming Impacted the JTDC*

During each of the three filming periods, the first and last days were used, respectively, to prepare for filming and to remove equipment. Actual filming occurred only on the middle days of each period (*i.e.*, June 22-25, July 14-15 and August 24-25). On various days, TCFTV filmed

---

[1]     Here, and throughout the exhibits associated with this motion, relevant portions of the exhibit are highlighted or marked with the respective Plaintiff's initials.

in (1) an unoccupied pod, (2) the JTDC's regular visitation area, (3) a storage area, (4) the garage/sally port; (5) one section of the outdoor recreation area; and (6) during the August filming, in a hallway between two pods. TCFTV personnel also used at least several of the NBJ School classrooms as staging areas and a large common area used as a chapel on the weekends as a lunchroom. *See* Group Ex. H.

### Schooling

The NBJ School was on summer break during the June and August filming periods. *See, e.g., See* Ex. I, at Answer 15 and Ex. E, 124:1-125:15. Summer school was in session only during July, when Q.B. was not detained at the JTDC. T.S. was detained at the JTDC during July 2015 but he had a court appearance on one of the filming days. He testified that schooling occurred in his pod's common area during one or two filming days and that he and other detainees were more distracted than they would have been had schooling occurred in classrooms. *See* Ex. E, 34:14-35:6. It appears that some classes were indeed held on the pods during the July filming period, but information about which classes were and were not held on the pods, and the extent (if any) to which some teachers may not have come to a pod to teach, is not reflected in any written records. *See* Ex. J.

### Visitation

Detainees within each Center were allowed visitation windows on two specific days per week. The JTDC's records reflect that visitation occurred on each and every day *Empire* filmed. On the few days when TCFTV filmed in the JTDC's regular visitation area, visitation was moved to a classroom. Q.B. recalls one visit with his grandmother having been held in that area. T.S. similarly recalls one visit in this alternative area. Q.B. and T.S. testified that they felt this room offered less privacy to speak with their visitors. *See* Ex. E, 43:14-44:5 and Ex. C, 64:8-20.

Q.B. also testified that his grandmother was individually turned away from visitation on one occasion because of an issue affecting Q.B. specifically. According to Q.B., a guard told him that his specific visit had been canceled, not that *all* visitation had been canceled. *See* Ex. C, 60:17-66:3. Q.B.'s grandmother confirmed that she was turned away from one visit after identifying herself, but she did not see any signs of *Empire* being filmed and no one told her why she was not allowed to visit Q.B. on that single occasion. *See* Ex. K, 10:22-13:17.

T.S. and his mother asserted at their depositions that on June 25, 2015, T.S.'s mother waited about 40 minutes for T.S. to be brought to the visitation room. *See* Ex. L, 14:17-15:15. She said that this was about double the normal 20 minutes she usually waited. *See* Ex. L, 19:11-27:6. The JTDC's records confirm this 40 minute waiting time, but also reflect that other visitors sometimes had to wait over 40 minutes to visit their loved ones on days when TCFTV was not on the premises. *See e.g. Ex.* M. The records also reflect that T.S. spent nearly an hour with his mother after he arrived at the visitation room. *See* Ex. N. All of this refutes the SAC's allegation that T.S.'s mother waited for two hours to visit and that visit was substantially shortened as a result. *See* SAC ¶ 47(d).

**Recreation**

In the ordinary course, the JTDC has multiple areas available for detainee recreation. These include three outdoor concrete courts, two large indoor gymnasiums, and a game room with game tables and video game equipment. *See* Ex. D*, Steward Decl. ¶ 13. JTDC officials schedule different pods to have access to different recreation areas at different times. *See id.* According to Q.B., disciplinary issues sometimes would cause JTDC officials to cancel off-pod recreation for his pod of Level 1 (disciplinary problem) detainees. According to T.S., who occupied a different pod comprised mostly of Level 4 detainees, his pod often could decide by

majority vote whether to have recreation outside or in one of the gymnasiums. *See* Ex. E, 138:7-139:4. Q.B. testified that in the summer, weather permitting, his pod would have outdoor recreation only about twice a week. *See* Ex. C, 45:17-46:6. There is no indication that JTDC officials allowed his disciplinary pod to vote on where to have recreation.

Although *Empire* filming occupied only one of the three sections of the outdoor recreation area, and only on some of the filming days, JTDC officials decided not to hold any outdoor recreation while *Empire* was filming. During the July filming dates, the JTDC conducted window cleaning, which required closing one of the yards. *See Ex. O.*[2] According to the JTDC's records, despite the closing of the outdoor recreation area, each of Q.B.'s and T.S.'s pods nevertheless had recreation on all days that *Empire* filmed. Q.B.'s pod had off-pod recreation nearly every filming day. T.S.'s pod had recreation in the gymnasiums on all but one filming day. On that remaining day, T.S.'s pod had recreation in a game room equipped with video game equipment and ping-pong tables. *See* Ex. E, 71:16-73:22.

T.S. disputes the accuracy of the JTDC's contemporaneous records. He contends that on at least one day, he did not receive recreation off his pod. He could not state which day or during which filming period this allegedly occurred and he could not say that any particular JTDC record was wrong. *See* Ex. E, 139:10-14. Importantly, that T.S.'s and Q.B.'s pods received off-pod recreation on most filming days is confirmed in at least two *different* sets of JTDC records: contemporaneous daily handwritten logs about all happenings on the Pod, referred to as Pod Logbooks, and DC5 Logs, showing number of residents moved from specific locations to specific destinations, and which JTDC employee was responsible for the residents' movements.

---

[2] This internal JTDC email exchange reflects the resolution of a grievance filed by a resident of a different pod than those occupied by Q.B. and T.S. The exchange suggests that residents of this pod received on-pod recreation during the July filming days at least in part because the JTDC's North Yard was "closed due to maintenance issues."

There also are Large Muscle Activity Reports showing exactly what kind of recreation each pod received and each detainee's individual level of participation. *See, e.g.* Group Ex. P.

**Medical Treatment**

Plaintiffs' SAC (at ¶¶ 36, 43) claimed that the "[t]he *Empire* film crew used the JTDC's infirmary to shoot scenes for the show." More recently, however, Plaintiffs admitted that this was not true. *See* Dkt. No. 142, pg. 1 ("Fox...argue[s]...that it did not film in the JTDC's infirmary. This appears to be correct.") (internal citation omitted).

JTDC detainees request medical care by filling out forms available in their pods. The medical slip seeks information about the detainee's medical complaint, level of pain, and next court date. Detainees would complete those slips and place them in a box in their pod areas. Nurses would regularly collect slips from each box, review them, and determine the treatment to be provided. *See* Exs. C, 72:7-73:2 and E, 76:22-77:24; 78:11-81:12.

As Q.B. confirmed at his deposition, he never sought medical care on any filming day. *See* Ex. C, 72:24-73:2 and Ex. Q, Answer 3. T.S. complained of a toothache during an *Empire* filming period. *See* Ex. R. The JTDC medical staff promptly referred him to the dental clinic for treatment, and T.S. testified at his deposition that he was satisfied with the JTDC's response to his toothache. *See* Ex. E, 149:22-150:14. T.S. recalled that he also may have requested treatment for a headache during filming and that the JTDC responded appropriately to that request, too. *See* Ex. E, 107:22-108:14. Finally, T.S. alleges that he requested mental health treatment five or six times. *See* Ex. E, 176:14-177:12. He states that he spoke to a mental health specialist, but he does not recall when this occurred. *See* Ex. E, 182:8-14.

Asked at his deposition to explain what "medical issue" he had to which medical staff did not appropriately respond during *Empire* filming, here, in full, was the exchange:

| | |
|---|---|
| A. | …I needed medical help extremely bad. |
| Q. | Okay. You didn't want out of your pod? |
| A. | That too but I really needed medical help. |
| Q. | All right, let's talk about that medical help. What was your ailment, sir? |
| A. | Well, I had a problem with my privates. |
| Q. | With your what? |
| A. | My privates. |
| Q. | Your privates? |
| A. | Yeah? |
| Q. | ….So what problems did you have with your private parts? |
| A. | Man, I don't even recall. |
| Q. | You don't recall? |
| A. | No. |
| Q. | Did you put in your request what your issue was? |
| A. | Yes. |
| Q. | So you wrote out what the problem was? |
| A. | Yes. |
| Q. | Okay. What happened? Did they ever respond? |
| A. | No, they never responded. I never got treated for that. |
| Q. | Okay. So the nurse never took you up to her kind of roving cart to give you medicine or anything for that? |
| A. | No, it wasn't no—you couldn't take no medicine for that problem—my problem. |
| Q. | You needed surgical help? |
| A. | Yes. |
| Q. | Okay. Did you put in a request for surgery? |
| A. | Yes. |
| Q. | Okay. And they never responded? |
| A. | No. |
| Q. | Okay. What surgery request did you make? |
| A. | I wanted to be circumcised. |
| Q. | …Did you make any other medical requests while you were in the JTDC that you recall? |
| A. | I probably made that same sick call multiple times. |
| Q. | Being the circumcision? |
| A. | Yes. |
| Q. | Okay. Why did you wait until the JTDC to try to get circumcised? |
| A. | I was having problems. I was growing too much, and I thought it was going to have to – |
| Q. | You were growing too much. Okay. |
| A. | Yes. |
| Q. | And you thought that would create an issue. |
| A. | Yeah, it was getting out of hand. |

*See* Ex. E, 105:8-107:21. T.S., in other words, had no real medical problem. As a poor attempt

at humor, T.S. filled out multiple medical slips complaining that his penis was growing too large.

He did not contend at his deposition that the JTDC should have taken this seriously. Other than complaining of a toothache and headaches, for which he received treatment, T.S. testified he made no other medical requests during his stay at the JTDC, including when *Empire* filmed at the JTDC. *See* Ex. D 107:5-108:17.

### 4.    PLAINTIFFS' PUTATIVE CLASS CLAIMS

Plaintiffs' SAC says they "seek to represent a class consisting of all children housed at the JTDC…during the filming of *Empire* in the summer of 2015." SAC ¶ 72. Against the governmental defendants, Plaintiffs seek on behalf of this putative class to litigate civil rights claims under 42 U.S.C. § 1983 and a claim that these defendants breached their fiduciary duties to detainees. Against the Fox Defendants, Plaintiffs seek to litigate a claim that these defendants tortiously induced a breach of fiduciary duty and a separate claim for "unjust enrichment."

"To succeed on their § 1983 claims, Plaintiffs must show: '(1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under color of state law.'" Order on Motion to Dismiss (Dkt. No. 73) at 6, *quoting Wilson v. Warren Cnty., Illinois*, 830 F.3d 464, 468 (7th Cir. 2016). Plaintiffs must show not only that the JTDC imposed restrictions that were not related to a legitimate governmental objective, but that these restrictions rose to the level of "punishment" and therefore constituted a violation of the Plaintiffs' due process rights. *See* Order on Motion to Dismiss (Dkt. No. 73) at 7, *quoting Bell v. Wolfish*, 441 U.S. 520, 538 (1979). Plaintiff's alleged deprivations must be viewed holistically to determine if they "in cumulative effect violate the Eighth Amendment."[3] Dkt. No. 73 at 9. Notably, the court in *Bell* specifically addressed the housing of detainees in common living

---

[3]    "[T]here is little practical difference, if any, between the standards applicable to pretrial detainees and convicted inmates when it comes to conditions of confinement claims…. [S]uch claims…are appropriately analyzed under the Eighth Amendment test." Dkt. No. 73 at 7, *quoting Smith v. Dart*, 803 F.3d 304, 310 (7th Cir. 2015).

quarters in circumstances more restrictive than those alleged in the instant case. In *Bell*, detainees were "double-bunked" in rooms where they were confined for seven or eight hours, but were otherwise free to move between their rooms and the common area. This did not violate the Constitution. *Bell*, 441 U.S. at 543.

Plaintiffs' claims regarding medical treatment—by far their most serious charges—must be examined in detail. *See Parko*, 739 F.3d at 1085. Denial of medical care is an oft-pleaded claim in prison cases. To succeed on such a claim, detainees must establish "'deliberate indifference' to [their] serious medical needs." *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015), *quoting Estelle v. Gamble,* 429 U.S. 97, 101 (1976). "Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm to the prisoner exists, but intentionally or recklessly 'disregards that risk.'" *Phillips*, 828 F.3d at 554.

Plaintiffs' burden with respect to the Fox Defendants is higher. With respect to any particular deprivation Plaintiffs may contend also amounted to a breach of fiduciary duty, they can prevail on those claims against the Fox Defendants only by proving that the Fox Defendants "knowingly induced" or "knowingly participated in" the act(s) alleged to constitute the breach. October 30, 2017, Order Granting Fox Defendants' Motion for Clarification (Dkt. No. 117), p. 3.

## 5. ARGUMENT

Like the failed class claims in *Phillips*, Plaintiffs' allegations are too individualized to satisfy Rule 23. To win money damages arising from conditions of detention, a detainee first must show that he had an objectively serious need that resulted in significant harm or injury by inattention. The detainee then must separately "show that the inattention was a result of a sufficiently culpable state of mind so as to constitute deliberate indifference, a subjective inquiry." *Wrightsell v. Sheriff of Cook County*, No. 08 CV 5451, 2009 WL 482370, at *2 (N.D. Ill. Feb. 19, 2009). Only where both facets of this test—objective seriousness of the need and

subjective culpability—can be proved through common, class-wide evidence, does such a claim support Rule 23(b)(3) class certification. Here, however, neither Plaintiff showed inattention to an objectively serious need. Just as importantly under *Phillips*, Plaintiffs cannot posit any class-wide basis to determine whether all deprivations (if any even occurred) happened for common and culpable reasons.

At best, Plaintiffs propose to litigate this case by anecdote: one missed visitation between Q.B. and his grandmother; one 20-minute increased wait time for T.S.'s mother to visit him and a different shortened visit; two or three days of ineffective classes attended by T.S. on his pod; and a few days of recreation held indoors rather than outside. Even if these events could allow Plaintiffs to pursue money damages, their claims are too individualized to support class certification. Litigating whether Q.B.'s grandmother was or was not turned away from a visit on a single occasion, for example, and if so why, will not demonstrate that any other detainee at the JTDC has or lacks a valid claim. Litigating whether or not a class was missed by T.S.'s pod will not advance the case of detainees in any other pod. For all these reasons, and others, Plaintiffs cannot satisfy the Rule 23(a)(3) and (b)(3) requirements of typicality and predominance.

**(a)**      <u>**Plaintiffs Cannot Satisfy Rule 23(a)'s Typicality Requirement**</u>

Defendants do not challenge Plaintiffs' ability to satisfy Rule 23(a)(1)'s numerosity requirement or Rule 23(a)(2)'s commonality requirement. "[A]ny competently crafted class complaint literally raises common questions." *Phillips,* 828 F.3d at 550, *citing Dukes*, 564 U.S. at 349. Defendants do not dispute that the presence of *Empire*'s cast and crew on those few days in June, July, and August 2015 had some impact on the JTDC's normal operations, or that two particular impacts were common: First, on the few days when *Empire* filmed in the JTDC's visitation area, JTDC officials shifted visitation to an alternate area. Second, JTDC officials closed the outdoor recreation yard during filming, but detainees received their allotted recreation

in the indoor areas. Plaintiffs' SAC, however, does not posit an entitlement to damages or to class certification based on either of these facts. Plaintiffs instead base their complaint for damages on different and more serious alleged claims of which—even if they occurred (which Defendants can prove they did not)—Plaintiffs' own admitted experiences are not typical.

To satisfy Rule 23(a)'s typicality requirement, the class representative's claim must arise "from the same event or practice or course of conduct that gives rise to the claims of other class members." *Foreman v. PRA III*, LLC, No. 05 C 3372, 2007 WL 704478, at *8 (N.D. Ill. Mar. 5, 2007). The requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large. *See Oshana v. Coca-Cola Co*., 472 F.3d 506, 514 (7th Cir. 2006) (internal citations omitted); *see also Pavone*, 321 F.R.D. at 323. "If proof of plaintiff's claims would not necessarily prove all of the proposed class members' claims, he fails the typicality prong of Rule 23(a)." *Williams v. Ford Motor Co.*, 192 F.R.D. 580, 586 (N.D. Ill. 2000) citing *Ruiz v. Stewart Assocs., Inc*., 167 F.R.D. 402, 405 (N.D. Ill. 1996). Courts routinely deny class certification in conditions-of-detention cases on typicality grounds where claims are individualized rather than systemic.[4]

### (i)    Plaintiff T.S. Presents Unique Medical Claims; Q.B. Has None.

Detainees at the JTDC had a wide range of medical complaints, ranging from runny noses and tattoo removal to vomiting *and* chest pain. *See, e.g.* Ex. S.[5] Understandably, the

---

[4]    *See, e.g.*, *Shook v. Bd. of Cty. Comm'rs of Cty. of El Paso*, No. CIV.A. 02CV00651RPM, 2006 WL 1801379, at *10 (D. Colo. June 28, 2006), *aff'd*, 543 F.3d 597 (10th Cir. 2008) (no class where denial of mental health treatment not based on single course of conduct by jail); *Brislane v. Brown*, No. CV 16-6002-JFW (EX), 2017 WL 3579698, at *4–5 (C.D. Cal. Apr. 11, 2017) (no class where complaints of lack of bedding differed); *Shannon v. S.C. Dep't of Corr.*, No. CA 6:12-2938-JFA-KFM, 2014 WL 1232893, at *3 (D.S.C. Mar. 25, 2014) (no class where individual evaluations of claims would be necessary); *Bailey v. Clark Cty., Nev.*, No. 2:12-CV-1954 JCM CWH, 2013 WL 3155331, at *1 (D. Nev. June 18, 2013) (same); *Turner v. Grant Cty. Det. Ctr.*, No. CIV.A. 05-148-DLB, 2008 WL 821895, at *14 (E.D. Ky. Mar. 26, 2008) (same).

[5]    See the complaint column on Exhibit S for the relevant portion of this exhibit.

urgency of treatment differed as widely as the complaints. Some detainees were treated immediately when a nurse visited the pod. Other detainees were treated at the JTDC's infirmary. Others were referred to separate clinics, including dental and metal health referrals. *Id*. Some complaints were treated with a combination of these. *Id*.

At the motion to dismiss stage, Judge St. Eve held that "Plaintiffs' allegations regarding the denial of access to the infirmary and the rejected sick-call requests—alone—state an actionable claim." The two cases cited for this were *Dobbey*, 806 F.3d at 940, where prison officials *knowingly* allowed a prisoner's abscessed tooth to go untreated for weeks, leaving that prisoner in distress and in danger of serious complications and even death, and *Gallagher v. City of Winlock, Wash.*, 287 Fed. Appx. 568, 576 (9th Cir. 2008), where police allegedly refused to allow an epileptic to take her anti-seizure medication, leading to a seizure. Judge St. Eve thus plainly assumed, as she had to at the dismissal stage, the truth of Plaintiffs' at-least-implied claims that the JTDC failed to treat *life-threatening* medical conditions during *Empire* filming. At the class certification stage, however, this Court must instead examine the discovery record showing that the JTDC "ignored" only T.S.'s poor attempt at bathroom humor.

To satisfy typicality, Plaintiffs must posit that litigating the JTDC's supposed denial of medical treatment requested by T.S. should bind all other JTDC detainees regarding whatever medical claims they may have. That means a jury in this case will see the video of T.S., laughing hysterically, testifying to his "growing out of control" penis as the basis for his claim that the JTDC ignored his "needs." *See* Ex. E, 104:1-107:21; 177:20-24. Needless to say, neither T.S.'s claim nor his assertion of the JTDC's allegedly culpable indifference to it is typical of the claim T.S. seeks to pursue on behalf of all detainees at the JTDC.

In *Phillips*, those plaintiffs' claims did not support class certification even where some detainees waited months for treatment and endured severe pain as a result. That was because they could not "present classwide evidence that a prison is engaging in a policy or practice which rises to the level of a systemic indifference." *Phillips*, 828 F.3d at 557, *quoting Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). *Phillips* hypothesized that it would take "a consistent pattern of egregious delays in medical treatment" to support class certification. *Id.*; *see, also, e.g., Smith v. Sheriff of Cook* County, *et al.*, Case No. 07 CV 3659, 2008 WL 4866071 at *3 (N.D. Ill. July 16, 2008) (denying motion to reconsider denial of class certification based on delay in receiving dental treatment). In *Wellman v. Faulkner*, 715 F.3d 269 (7th Cir. 1983), for example, the Seventh Circuit "found systemic deficiencies…where two out of three physicians could not communicate effectively with patients because of a language barrier...prisoners had been denied vital surgeries for two to five years, and medical supplies were being reused because they had not been restocked." *Phillips*, 828 F.3d at 557, *citing Wellman*, 715 F.3d at 272-74. "In contrast, the plaintiff in *Holmes v. Sheahan*, 930 F.2d 1196 (7th Cir. 1991)…only presented evidence about the medical care he himself received," and therefore did not "provide evidence of a widespread practice" sufficient to support class certification. *Phillips*, 828 F.3d at 557. Here, by contrast, Plaintiffs have not even alleged one-off claims such as those in *Holmes*.

Plaintiffs' claims must *themselves* be typical of claims they seek to litigate on behalf of a class. The Supreme Court has stated repeatedly, including in *Spokeo,* 136 S. Ct. at 1547 n.6, that the named plaintiffs in a putative class action "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." The Seventh Circuit, too, has stated that a putative named plaintiff "cannot

predicate standing on injury which he does not share," and that "[s]tanding cannot be acquired through the back door of a class action." *Payton*, 308 F.3d at 682. In detention cases, this means that a named plaintiff "cannot use [a class action] lawsuit to right the wrongs, real or imagined, experienced by other prisoners when he himself has not" suffered those alleged wrongs. *Stile v. Cumberland County Jail*, No. 2:12-cv-260-JAW, 2013 WL 1881300, at *4 (D. Me. Mar. 26, 2013). *Cf. Doll v. Cooper*, No. 96 C 2395, 1997 WL 94723 (N.D. Ill. Mar. 3, 1997) (dismissing class action where inmate alleged no cognizable harm to himself). Plaintiffs therefore cannot predicate entitlement to class certification on the asserted experiences of others, even had they been able to identify someone who had a serious medical need unmet during *Empire* filming.

### (ii)    Plaintiffs' Recreation Claims Require Detainee-Specific Inquiries

Plaintiffs' claims regarding recreation are held to essentially the same standard as their claims regarding medical care. Judge St. Eve's dismissal opinion (ECF No. 73 at 9) cited to *Smith* and noted that "lack of exercise can rise to a constitutional violation 'where movement is denied and muscles are allowed to atrophy and the health of the individual is threatened.'" *Smith*, 803 F.3d at 313, *quoting French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985). *See also Antonelli v. Sheehan*, 81 F.3d 1422, 1432 (7th Cir. 1996) ("Lack of exercise may rise to a constitutional violation in *extreme and prolonged* situations where movement is denied to the point *that the inmate's health is threatened*.") (emphasis added).

It is equally clear, however, that temporary deprivations of recreation, or provision of recreation indoors rather than outdoors, do not give rise to a claim. The Seventh Circuit, in *French*, expressly refused to say that "hav[ing] exercise in cramped quarters" amounted to a constitutional violation. *French*, 777 F.2d at 1256. The Court in *Pearson v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001), held that denial of yard privileges for 90 days did not give rise to a claim. In *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988), the Seventh Circuit found that

a month in administrative segregation, during which time a detainee had no recreation time outside his cell, did not state a claim. "Lack of exercise is easily distinguishable from deliberate denial of medical care," and "[u]nless extreme and prolonged,…is not equivalent to a medically threatening situation." *Id. See also, e.g., Barndt v. Wenerowicz*, 698 Fed. App'x 673, 677 (3d Cir. 2017) (denial of out-of-cell exercise for 28 days did not amount to a deprivation of rights); *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) ("temporary denial of outdoor exercise with no medical effects is not a substantial deprivation"); *Knight v. Armontrout*, 878 F.2d 1093, 1096 (8th Cir. 1989) (denial of outdoor recreation for 13 days was not a constitutional violation).

Even granting that juvenile detainees have a greater need for regular recreation than adult detainees, Plaintiffs cannot obtain class certification without demonstrating through common proof that *all* detainees had such a prolonged deprivation of exercise that their health was put in jeopardy. Here, neither T.S. nor Q.B. claims anything like a sustained deprivation of exercise even in his own, personal case. Thus, to the extent Plaintiffs seek to claim that detainees lacked opportunities to exercise over a sustained period, their personal allegations are not typical of this.

At Q.B.'s deposition, Defendants confronted him with records showing that he received off-pod recreation on each day of filming. Q.B. admitted those records likely were accurate and that he probably did receive off-pod recreation. *See* Ex. C, 89:15-90:16; 96:2-97:5. He continued to assert that he lacked off-pod recreation on at least some of the *June* filming dates, but the JTDC's records contradict this, too, showing that Q.B.'s pod received off-pod recreation. Q.B.'s pod had recreation in the South Gym on June 21, 22, and 26, 2015; in Classroom 311 for Commissary on June 23, 2015; and played cards and watched television on June 24 and 25, 2015. *See* Exs. T and C, 29:23-30:2; 32:3-32:19. Q.B. himself did not receive recreation on June 24 or 25, but this was for reasons specific to him. He was off-premises, in court, on June 24. The

next day, June 25, Q.B. was confined to his cell until approximately 8:30 p.m. for fighting and did not partake in recreation with the rest of his pod. *See* Ex. C, 92:11-93:4; 96:7-20. Q.B.'s claims thus demonstrate that whether any detainee had recreation is an individual inquiry that requires a review of DC5 Logs and Pod Logbooks, court dates, and disciplinary restrictions.

T.S., who was detained at the JTDC during all three filming periods, no longer disputes that he received off-pod recreation on at least most filming days. He still contends that, on perhaps one or two days, he and his pod received only on-pod recreation. When shown documents stating that his pod had off-pod recreation on every filming day, however, T.S. could not say that any particular record was inaccurate. The best he could muster was that it was "most likely" he received recreation or a repeated response of "I don't recall." *Compare* SAC ¶ 47(c) with Ex. C, 56:12-76:8. Again, this is not typical of any allegedly widespread deprivation.

### (iii)    <u>Plaintiffs' Visitation Claims Do Not Satisfy Rule 23(a)</u>

There is a similar lack of typicality in Plaintiffs' claims regarding visitation. Rather than showing widespread and systematic problems with visitation during *Empire* filming, T.S. and Q.B. each claim a delay or cancellation with only a single visit. T.S. claims a separate visit was shortened, although this too is contradicted by the records. The issues each Plaintiff claims, moreover, differed from each other, and both appear to have been personal to them.

Plaintiffs' SAC included the false claim that "parents, who normally waited just a few minutes to visit with their children for an hour or more, [were] forced to sit in waiting rooms for hours on end" when *Empire* was filming. SAC ¶ 42. T.S.'s personal claim supposedly was typical of this assertion. But the SAC alleges an account of a visit between T.S. and his mother that T.S.'s mother admitted was fiction. The false claim was that "[a]fter around two hours had passed, [T.S.'s mother] saw a large group of what appeared to be *Empire*'s cast or crew leave the building. … Instead of being allowed to visit for an hour, their visit was shortened significantly,"

SAC ¶ 47(e).  According to T.S.'s mother, however, the alleged "two-hour delay" did not happen, her visit with T.S. lasted the usual hour, and she never saw anyone involved with *Empire*.  *See* Ex. L, 15:3-8; 17:21-18:2; 30:24-31:24 .

While T.S. claims a single *delayed* visit, Q.B. claims a single *canceled* visit.  On the day of a scheduled visit with his grandmother, she was individually turned away.  At least 38 other detainees had visitation that day, so this certainly was not a generalized issue.  *See* Ex. U.[6] Q.B.'s grandmother testified that she arrived toward the end of the visiting window, was not told why she was being turned away, and saw no signs of *Empire* cast or crew being present.  *See* Ex. K, 10:22-13:17.

### (iv)    Plaintiffs' Claims Related to Education and Voluntary Programs Require Detainee-Specific Inquiries

Alleged deprivations of schooling featured prominently in Plaintiffs' SAC:  "When Empire arrived at the JTDC to film, the lockdown began with school."  *See* SAC ¶ 39.  Plaintiffs knew before suing, however, that the NBJ School was *out of session* when TCFTV "arrived at the JTDC [in June 2015] to film."  The same was true in August.  Plaintiff Q.B. thus was not detained at the JTDC on any day of *Empire* filming when school was in session.  Q.B.'s allegations about seeing detainees in his pod being "required to sit in one place, and could only move, one at a time" are pure fabrication.  *Compare* SAC ¶ 48(b) with Ex. C, 82:16-83:7.

T.S. was detained at the JTDC during July 2015, when the NBJ School was in summer session.  He was not present on July 14, however, because of a court date.  *See* Ex. E, 136:1-24. This leaves July 13, 15, and 16, as days when T.S. was present for school and TCFTV was on the premises.  T.S. said that he recalled school being held in his pod on some or all of these days and that some classes were not held at all because individual teachers decided not to teach.  *See* Ex.

---

[6]    This exhibit shows visitation records from June 23, 2015.

E, 28:10-18; 30:5-19. He also believes that he and the other detainees on his pod were not going to listen to teachers regardless. *See* Ex. E, 34:14-35:3. T.S. was not in a position to describe teaching or learning conditions in any other pod and no JTDC records reflect classes not being held. *See* Ex. D, Steward Decl. ¶¶ 3 -5.

Plaintiffs separately suggest that the cancellation of voluntary programming due to *Empire* filming at the JTDC may give rise to a claim. Neither Q.B. nor any other Level 1 detainee, however, was eligible to participate in voluntary programming. *See* Ex. C, 53:9-54:2; 56:9-57:10; 101:18-24. T.S. signed up for two voluntary programs during his stay at the JTDC: a fatherhood program and a writing program. *See* Ex. E, 109:12-117:4. He recalled little about them. He said the writing program was offered on Saturdays, *id.*, but TCFTV was not present on any Saturday. He only attended the fatherhood program once and he did not know if was offered during the filming of *Empire* or why it was discontinued. *See* Ex. E, 114:12-116:24. Even to the extent the use of classroom space by TCFTV necessitated the moving of some programs and the postponement or cancellation of others, therefore, neither T.S. nor Q.B., can claim to have been affected by these issues. Their claims are not typical.[7]

### (b)    Plaintiffs Cannot Satisfy Rule 23(b)(3)'s Predominance Requirement

Plaintiffs' claims look even worse through the lens of Rule 23(b)(3)'s requirement that issues common to the putative class must "predominate" over issues specific to each class

---

[7]    Although Plaintiffs' atypicality suffices to bar class certification, Defendants also would challenge both Plaintiffs' and their counsel's ability to satisfy Rule 23(a)(4)'s adequacy requirement. The vast gulf between Plaintiffs' allegations and their deposition testimony, contradictions in their testimony, and their refusals to withdraw false allegations, raise credibility issues sufficient to preclude an adequacy finding. *See, e.g., CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011), *citing Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (plaintiff could not adequately represent class where credibility undermined by contradictory pleadings and testimony); *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 254 F. Supp. 3d 1007, 1022 (N.D. Ill. 2017), *reconsideration denied*, No. 12 C 3233, 2017 WL 4682734 (N.D. Ill. Oct. 18, 2017) (plaintiff could not adequately represent class where credibility undermined by false interrogatory answers). Plaintiffs' counsel filed multiple complaints in this matter with false claims that an adequate investigation would have disproved.

members. Rule 23(b)(3) builds upon Rule 23(a)'s requirements, but "the predominance criterion is far more demanding." *Pavone*, 321 F.R.D. at 320, *quoting McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 800 (7th Cir. 2017). Beyond Rule 23(a)(2)'s commonality requirement— which *Dukes*, 564 U.S. at 349-50, holds "requires the plaintiff to demonstrate that the class members 'have suffered the same injury'"—predominance requires Plaintiffs to show that "the same conduct or practice by the same defendant gives rise to the *same kind of claims from all class members*." *Suchanek*, 764 F.3d at 756 (emphasis added). "The critical point is 'the need for *conduct* common to members of the class.' " *Id.*, *quoting In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014) (emphasis in original). Class members' claims must turn on issues that are "capable of classwide resolution." *Dukes*, 564 U.S. at 350.

In denying dismissal of Plaintiffs' claims, Judge St. Eve relied upon *Nelson v. Heyne*, 491 F.2d 352, 360 (7th Cir. 1974), which held that fiduciaries for minors must provide care akin to what parents would provide. *See* Dkt. No. 73 at 9. *Phillips* precludes class certification unless the alleged breach affected *all* detainees in a manner capable of common proof, and *Nelson* crystallized why claims like Plaintiffs' would be nearly impossible to pursue on a class basis: "In our view the 'right to treatment' includes the right to minimum acceptable standards of care and treatment for juveniles and the right to individualized care and treatment. Because children differ in their need for rehabilitation, individual need for treatment will differ." *Nelson*, 491 F.2d at 360. As the court then reasoned in *Smith v. Sheriff*, 2008 WL 4866071 at *2,

> The Court doubts that it could find the current staffing inadequate without some showing that the care of inmates has been harmfully delayed. The necessity of considering the impact upon Plaintiffs then leads back to the individualized and divergent facts which the Court originally found to make class certification inappropriate. In short, it would be difficult, if not impossible, to separate these individualized facts from resolution of the claim common to all class members, thus making Plaintiffs' proposed separation of issues [addressing only systematic inadequacy of dental services] unworkable in practice.

Plaintiffs' claims against the Fox Defendants complicate the predominance inquiry even further. For any action by JTDC officials deemed to constitute a breach of fiduciary duty, the fact finder would need to determine whether or not any Fox Defendant "knowingly induced" or "knowingly participated in" that specific action. Each act would require separate fact-finding.

With regard to the medical claims in this case, even had Plaintiffs' testimony not rendered them void, the fact finder would have to assess individually whether the JTDC provided appropriate medical treatment to any complaining detainee. If not, the fact finder then must determine separately whether the Fox Defendants knowingly induced JTDC officials to fall short of their obligations. (Plaintiffs do not and cannot claim that the Fox Defendants knowingly *participated* in any aspect of detainee treatment.) With regard to recreation, similarly, Plaintiffs are pitting their admittedly uncertain recollections against multiple contemporaneous records showing that they received off-pod recreation on every day that *Empire* filmed. The fact finder would have to engage in one-at-a-time credibility determinations with respect to any record that a detainee claims is wrong, then make separate findings as to each Fox Defendant.

Claims regarding visitation are equally individualized. In most cases, the JTDC has (1) sign-in records showing when each visitor arrived on the premises, (2) movement logs showing when each detainee was brought to the visitation area, (3) logs showing when a visit began and ended and when the visitor left the premises, and (4) movement logs showing when the detainee was removed from the visitation area. The JTDC's records reflect that all of Plaintiffs' visits lasted approximately an hour. To the extent that the fact finder would need to determine whether any particular record was wrong, or whether any detainee had a visit shortened, this would require individual inquiries into credibility and the circumstances of any allegedly shortened visit. With respect to Q.B.'s allegedly canceled visit with his grandmother, the fact finder must

determine whether *Empire* filming caused the cancellation and, if so, whether any Fox Defendant knowingly induced it. The outcome of this inquiry would not impact any other detainee's claim.

Claims regarding schooling and other programming raise additional individual questions. To what disciplinary level was the detainee assigned, and was he eligible for programs at all? Which programs were canceled (rather than postponed), and was that cancellation caused by the filming of *Empire*, as opposed, for example, to the program leader's unavailability? Had detainees already signed up for any canceled programs, or would the fact finder have to determine which detainees would have been eligible to sign up for them and which detainees would have done so? Which teachers allegedly did not conduct summer classes on days in July 2015 that *Empire* was filming, and why did they not teach? In any class that occurred on a pod during *Empire*'s filming, was teaching disrupted, and if so, can the fact finder conclude that schooling would have been more effective had it occurred in a classroom rather than the pod's common area? And for any act deemed wrongful, did the Fox Defendants knowingly induce it?

In *Harper*, the Seventh Circuit addressed predominance in the context of allegedly unconstitutional detention after bond had been posted. It found that individual liability issues, such as how long each detainee was held and what justifications there might been for that particular detainee, would predominate. *Accord Portis v. City of Chicago, Ill.*, 613 F.3d 702, 705 (7th Cir. 2010) ("[B]ecause one detainee's circumstances differ from another's, common questions do not predominate and class certification is inappropriate."). All of this is consistent with *Phillips*, where the Seventh Circuit reaffirmed the heavy burden a conditions-of-detention plaintiff must meet in seeking class certification.

In *Smith v. Sheriff*, similarly, the court found that the issue of the jail's reduction of dental staff would not satisfy the predominance requirement. Resolution of any common issue would

not "lead to noticeable gains in efficiency, given the likely need to revisit the facts surrounding the system-wide reduction in staff in making individualized determinations of causation." *Smith v. Sheriff*, 2008 WL 4866071 at *2. The court reached the same result in *Wrightsell*, 2009 WL 482370 at *4, where plaintiffs sought a more limited class than in *Smith*. Finding that individual questions predominated over questions of alleged systematic inadequacy of dental care, the court held the claims at issue would "require[] a case-by-case analysis and factual determination as to the degree of seriousness of dental impairment of each detainee versus the time within which treatment was provided." *Id.* at *3.

As another example, in *Hall v. County of Milwaukee*, No. 17-C-379, 2018 WL 2376512 (E.D. Wisc. May 23, 2018), a sheriff admitted a policy to shackle pregnant inmates who were hospitalized for childbirth. The court nevertheless denied class certification because whether the restraints were necessary in any particular case required individual inquiry. *Id.* at *4.

**(c)**      **Plaintiffs Cannot Satisfy Rule 23(b)(1)(B)**

Neither T.S. nor Q.B. alleges any actual damages in this case. Nor do they allege that the governmental defendants and the Fox Defendants lack monetary resources. Plaintiffs' citation to Rule 23(b)(1)(B) as an alternative method of class certification, therefore, is curious and wrong. Because members of a class certified under Rule 23(b)(1)(B) are not provided notice or an opportunity to exclude themselves from class membership, the rule must be narrowly interpreted. *Ortiz*, 527 U.S. at 833 n. 13, 842. The "paradigm case" for Rule 23(b)(1)(B) certification is one involving a limited and identifiable pool of funds, which this case does not involve. *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 584 (N.D. Ill. 2005), *aff'd sub nom. Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006). The Advisory Committee Notes to Rule 23(b)(1)(B) discuss situations such as actions by shareholders to compel the declaration of a dividend, or

when claims are made by numerous persons against a limited fund that could not satisfy all claims. None of those circumstances apply here.

## CONCLUSION

For the above reasons, Defendants respectfully request that the Court grant their Motion to Deny Class Certification.

Date: October 18, 2018                    Respectfully Submitted,


By: */s/ Danielle A. Mikhail*
    Danielle Mikhail
    Anthony E. Zecchin
    Allyson Lynn West
    Cook County State's Attorney's Office
    500 Daley Center
    50 West Washington
    Chicago, IL 60602
    312-603-3368
    anthony.zecchin@cookcountyil.gov
    danielle.mikhail@cookcountyil.gov
    allyson.west@cookcountyil.gov

    *Attorneys for Defendant the County of Cook, Illinois*

By: */s/Joi Kamper*                        
    Joi Kamper
    Lyle Kevin Henretty
    Cook County State's Attorney
    69 W Washington, Suite 2030
    Chicago, IL 60602
    312-603-1434
    joi.kamper@cookcountyil.gov
    lyle.henretty@cookcountyil.gov

    ***Attorneys for Defendant Leonard Dixon***


By: /s/ *T. Andrew Horvat*                    
    T. Andrew Horvat
    Illinois Attorney General's Office
    General Law Bureau
    100 West Randolph Street
    13th Floor
    Chicago, IL 60601
    312-814-5484
    THorvat@atg.state.il.us

    ***Attorney for The Chief Judge of the Circuit Court of Cook County in his official capacity***

By: /s/ *Jeffrey S. Jacobson*

Jeffrey S. Jacobson
Kelley Drye & Warren LLP
101 Park Ave
New York, NY 10178
212-808-5145
jjacobson@kelleydrye.com

Matthew C. Luzadder
Catherine E. James
Janine N. Fletcher-Thomas
Kelley Drye & Warren LLP
333 West Wacker Drive
Suite 2600
Chicago, IL 60606
312-857-7070
mluzadder@kelleydrye.com

***Attorneys for the Fox Defendants***