**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| T.S. *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:16-cv-08303 |
| | ) | |
| v. | ) | Hon. Rebecca R. Pallmeyer |
| | ) | |
| Twentieth Century Fox Television *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DENY CLASS
CERTIFICATION AND CROSS-MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND .............................................................................. 6

    A.   Fox occupies large parts of the JTDC facility ............................................ 6

    B.   The JTDC "restructures" its operations to accommodate Fox ................... 8

        1.   Additional confinement on pods .......................................................... 8

        2.   Disruption of the "Alpha" intake center and over-population of pods ........ 12

        3.   Degrading of visitation ...................................................................... 14

        4.   Delay in response to sick call slip requests ....................................... 15

        5.   Disruption of the JTDC's behavior economy ..................................... 16

III. ARGUMENT ..................................................................................................... 16

    A.   Rule 23(a) considerations ......................................................................... 17

        1.   Defendants concede numerosity and commonality ........................... 17

        2.   Typicality – Named Plaintiffs were impacted when the JTDC restructured its normal operations to accommodate Fox ................................................ 17

            a)   Increased pod confinement ..................................................... 18

            b)   Disruption of Alpha ................................................................ 21

            c)   Visitation ................................................................................ 21

            d)   Sick call slips ......................................................................... 22

            e)   Behavior economy .................................................................. 23

        3.   Adequacy ........................................................................................... 24

Page(s)

B. The class satisfies Rule 23(b) .................................................................. 25

    1. Rule 23(b)(3) – Common issues predominate ........................................... 26

        a) Government defendants ........................................................ 26

            (1) Fourteenth Amendment – Due Process Clause ...................... 26

            (2) Breach of Fiduciary Duty ..................................................... 35

            (3) Intentional Infliction of Emotional Distress.......................... 35

        b) Fox defendants........................................................................ 36

            (1) Inducement of breach of fiduciary duty ................................ 37

            (2) Unjust enrichment ................................................................. 38

    2. Rule 23(b)(1)(B) – Recovery from an unjust enrichment pool remedy.... 40

IV. CONCLUSION ............................................................................................ 41

## TABLE OF AUTHORITIES

**Cases**                                                                               **Pages**

*Bakalis v. Golembesi,* 35 F.3d 318 (7th Cir. 1994) ....................................................................... 24

*Bell v. Wolfish*, 441 U.S. 520 (1979) ............................................................................. 4, 5, 27-29

*Brieger v. Tellabs, Inc.*, 245 F.R.D. 345 (N.D. Ill. 2007) ....................................................... 17, 18

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ..................................................... 31

*Costello v. BeavEx, Inc.*, 810 F.3d 1045 (7th Cir. 2016) ............................................................. 17

*Davis v. Wessel*, 792 F.3d 793 (7th Cir. 2015) .......................................................................... 29

*Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) ....................................................................... 29

*Hall v. County of Milwaukee*, No. 17-cv-379, 2018 WL 2376512 (E.D. Wis. May 23, 2018) .... 30

*Harper v. Sheriff of Cook County*, 581 F.3d 511 (7th Cir. 2009) ........................................... 29, 30

*In re Delta/AirTran Baggage Fee Antitrust Litigation*, 317 F.R.D. 675 (N.D. Ga. 2016) ........... 32

*Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) ............................................................... 27, 28-29

*Messner v. Northshore University HealthSystem*, 669 F.3d 802 (7th Cir. 2012) .. 26, 31, 35, 38-39

*Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018) ...................................................... 27-28

*Mulvania v. Sheriff of Rock Island County*, 850 F.3d 849 (7th Cir. 2017) .......................... 4, 28-31

*Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974) ........................................................................ 35

*People ex rel. Daley v. Warren Motors, Inc.*, 500 N.E.2d 22 (Ill. 1986) ................................. 38-39

*Phillips v. Sheriff of Cook County*, 828 F.3d 541 (7th Cir. 2016) ................................ 5, 26-28, 30

*Potts v. Manos*, No. 11-cv-3952, 2017 WL 4340157 (N.D. Ill. Sept. 29, 2017) ........................... 4

*Robles v. Prince George's County*, 302 F.3d 262 (4th Cir. 2002) ................................................ 29

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) ................................................................. 17

*Wagner v. County of Maricopa*, 706 F.3d 942 (9th Cir.) ............................................................ 29

**Federal Rules of Civil Procedure**

Rule 23(a)................................................................................................ 16-17, 24

Rule 23(b)(1)(B) ........................................................................................ 25, 40

Rule 23(b)(3)............................................................................................. 25-26

**Additional Authority**

Restatement of Restitution § 174 (Am. Law. Inst. 1937) ........................................... 38

**INDEX OF EXHIBITS**

**Ex.**   **Document**

1   Expert Report of Earl Dunlap

2   Expert Report of Dr. Louis Kraus

3   2018.10.18 Hearing Transcript

4   Aerial Photograph of the JTDC

5   JTDC Floorplan

6   Deposition of Leonard Dixon [excerpt]

7   Deposition of Jonathan Klemke [excerpt]

8   2015.06.12 Email from Z. Alonzo to L. Lechowicz [filed under seal]

9   2015.06.02 Email from J. Klemke to L. Dixon

10   2015.07.31 Email from G. Robinson to S. Grant [filed under seal]

11   2015.06.19 Email re: FOX TV Request

12   2015.07.13 Email from A. Buckingham to M. de Dios

13   Deposition of Gene Robinson [excerpt]

14   2015.06.19 Email B. Breen - G. Robinson [filed under seal]

15   Deposition of William Steward [excerpt]

16   2015.06.22 Email from Y. Akins to B. Breen [filed under seal]

17   2015.06.22 Email from Y. Akins to B. Breen [filed under seal]

18   2015.06.19 Email from G. Robinson re: Empire Final Draft

19   Declaration of Kenya Taylor [filed partially under seal]

20   2015.06.19 Email from McCoy to various [filed under seal]

21   2015.06.18 Email re: Fox TV Request

22   Summer 2015 Nancy B. Jefferson Schedule [excerpt]

23   JTDC Policy No. V3C05P03 (Program and Service Areas)

24   2015.07.08 Empire Work Plan

25   Phoenix Center Recreation Calendar, Summer 2015

26   2015.07.16 Center Shift Report Renaissance [filed under seal]

27   2015.07.14 Center Shift Report Omega [filed under seal]

**28**  2015.07.15 Center Shift Report Justice [filed under seal]

**29**  June 2015 Resident Grievance

**30**  2015.06.30 Memorandum from W. Kern to M. McCoy

**31**  JTDC Policy No. V6C12P09 (Resident Self Improvement Activities)

**32**  2015.08.17 Email from S. Hatcher to A. Buckingham et al.

**33**  2015.06.22 Email from A. Buckingham to C. Probst

**34**  2015.06.23 Email from C. Clarahan to S. Ambrose

**35**  2015.07.10 Email from A. Buckingham to C. Thomas

**36**  2015.08.21 Email from A. Buckingham to various

**37**  Deposition of Free Write (Ryan Keesling) [excerpt]

**38**  Deposition of Anna Buckingham [excerpt]

**39**  JTDC Policy No. V6C09P03, housing classification and assignment

**40**  2015.07.10 Email from W. Steward re: Pod Transfer [filed under seal]

**41**  2017.05.05 Email from Q. Young to S. King

**42**  2015.06.20 Center Shift Report Alpha [filed under seal]

**43**  2015.06.21 Center Shift Report Renaissance [filed under seal]

**44**  Deposition of Q.B. [excerpt]

**45**  Deposition of T.S. [excerpt]

**46**  Q.B. Interrogatory Responses [excerpt]

**47**  T.S. Interrogatory Responses [excerpt]

**48**  JTDC Policy No. V6C12P06 (Resident Incentive Reward System)

**49**  2015.06.24 5G Pod Log [excerpt]

**50**  2015.06.24 DC5 Movement Log

**51**  2015.06.24 Pod 5G Large Muscle Exercise Log

**52**  2015.06.24 LME Log Metadata

**53**  Deposition of V.P. [excerpt]

**54**  JTDC Policy No. V6C12P17 (The Token Economy)

**55**  JTDC Resident Roster [excerpt]

**56**  2015.06.23 *Empire* production report [filed under seal]

**57**   2015.06.15 Email from B. Breen to Y. Akins [filed under seal]

**58**   Deposition of Brady Breen [excerpt]

**59**   TCFTV - Filmmaker's Code of Professional Responsibility [filed under seal]

**60**   *Empire* Budget Episode 201 [excerpt] [filed under seal]

**61**   JTDC MIS Department Update Memo

**62**   JTDC Policy No. V2C05P03 (Facility Size and Rated Capacity)

Plaintiffs T.S. and Q.B. submit this memorandum in opposition to Defendants' motion to deny class certification, ECF 212 ("Denial Motion"), and in support of Plaintiffs' cross-motion to certify this case as a class action under Fed. R. Civ. Proc. 23(b)(3) and (b)(1)(B).

## I.    INTRODUCTION

In the summer of 2015, Defendants restructured the operations of the Cook County Juvenile Temporary Detention Center ("JTDC")—one of the largest juvenile detention centers in the country—so that the facility could be repurposed as a film set for *Empire,* a Fox television drama.  This restructuring was accomplished by imposing a number of restrictions and deprivations on all of the young people detained at the JTDC.

Two of those young people, Plaintiffs T.S. and Q.B., now move, pursuant to Rule 23, to represent a class of all of the youth who were detained at the JTDC during the *Empire* filming. The crux of the Court's inquiry under that rule is whether the evidence that will be relied upon by T.S. and Q.B. to prove their own injuries also will show that all or nearly all of the JTDC's detainee population were similarly impacted by the same conduct.  As Plaintiffs demonstrate herein, any trial on the claims of any detainee relating to the deprivations caused by the *Empire* lockdowns will involve the same common evidence that will be presented by T.S. and Q.B. to prove their own claims.  Moreover, common evidence will establish that all detainees suffered the same types of injuries from the *Empire* lockdowns as T.S. and Q.B.

Discovery has confirmed that the JTDC was locked down because of *Empire,* and that these lockdowns impacted the entire JTDC population, including Named Plaintiffs:

- Common evidence shows that to facilitate the *Empire* filming, Defendants subjected the entirety of the JTDC's population—including Named Plaintiffs—to additional confinement on their pods by eliminating outdoor recreation, confining detainees to their pods for school, and eliminating off-pod programs.  Defendants quibble with some details of this

1

additional confinement (arguments that Plaintiffs address below), but there is no disputing that the JTDC's entire population was subjected to additional pod confinement for no other reason than to accommodate the filming of *Empire*.

- Discovery has revealed that in order to accommodate *Empire*'s desire to shoot scenes in a pod, Defendants disbanded two pods of the JTDC's "Alpha" intake center. To do so, Defendants (1) reassigned Alpha pod detainees to other pods, thereby overpopulating pods throughout the JTDC beyond their safe functional operating capacity; (2) engaged in bulk transfers of intake detainees to pods throughout the building, in contravention of safety protocols; and (3) stopped administering a computerized psychological screening test, called "MAYSI," which is designed to identify detainees who are a risk to themselves or others. This endangered all of the JTDC's residents.

- Common evidence shows that in order to facilitate the filming, Defendants moved visitation to a smaller room for visits. The smaller space reduced or eliminated privacy for all detainees with visits.

- Common evidence suggests that medical attention for JTDC detainees was delayed during the *Empire* filming. T.S. and Q.B., although housed on different pods, have each offered evidence that responses to sick call slips were delayed during *Empire*.

- Common evidence shows that Fox knew that filming at the JTDC would disrupt the JTDC's operations and impact all detainees by, for example, eliminating detainee access to the outdoor yards. In written communications, Fox's experienced locations experts recognized that a film crew of even 30 people at the JTDC would be disruptive. But to film in the way it wanted, Fox opted to bring crews of 200 or more into the JTDC for the filming.

2

• Common evidence shows that the *Empire* filming was not rationally related to a legitimate governmental objective and in all events was excessive in relation to any notional benefits to any detainee. For example, expert testimony establishes that (1) increased pod restriction is harmful for all youth; (2) lack of access to the outdoors is harmful for all youth; and (3) pod overpopulation, the elimination of computerized intake psychological screening, and bulk population transfers create risks for all detainees at the JTDC.

In short, the allegations set forth in the Second Amended Complaint ("SAC") have largely been confirmed through the ongoing discovery in this case. In addition, Plaintiffs will offer the opinions of two expert witnesses who have spent their careers focused on juvenile detention and who also have specific expertise and knowledge relating to the JTDC. Earl Dunlap, whose report is attached as Exhibit 1, was appointed by this Court as the Transitional Administrator of the JTDC in conjunction with *Doe v. Cook County*, No. 99-C-3945 (N.D. Ill.) ("*Doe* litigation"). Mr. Dunlap ran the JTDC from 2007 through May 2015, during which time he implemented policies and procedures (most of which, ostensibly, remain in force today) to bring the JTDC into compliance with Constitutional standards. Dr. Louis Kraus, whose report is attached as Exhibit 2, is a juvenile psychiatrist who focuses on juvenile justice and conditions of detention. He served as an expert in the *Doe* litigation. Mr. Dunlap and Dr. Kraus opine that the JTDC's accommodation of Fox's filming of *Empire* was a wholesale departure from appropriate juvenile detention administration, and that the resulting restrictions and deprivations at the JTDC were injurious to all JTDC detainees.

\*       \*       \*

What makes this case particularly appropriate for class certification is the legal standard by which these deprivations are judged. The Court already has held that "that there was no legitimate governmental purpose" for locking down the JTDC to "provide[] the Fox Defendants

3

with a realistic prison facility to use as a set for two *Empire* episodes," (ECF 73 at 10), and in more than two years of litigation Defendants have never offered a plausible justification for what they did. As such, Defendants face an overpowering problem: imposing deprivations that are not related to a legitimate government purpose creates an "infer[ence] that the purpose of the governmental action is punishment that may not constitutionally be inflicted on [pre-trial] detainees" like the youth detained at the JTDC. *Bell v. Wolfish*, 441 U.S. 520, 539 (1979).

That standard, which the Court quoted in denying Defendants' motion to dismiss (*see* ECF 73 at 10), prescribes an unforgiving lens through which to view the lockdowns imposed in this case. As Judge Alonso recently observed in rejecting a defense claim that an arbitrary use of force against a jail inmate was *de minimis*,

> under the Fourteenth Amendment, the proper inquiry is not the seriousness of plaintiff's injury or whether [the defendant's] conduct rises to the level of offensiveness, but whether objective evidence establishes that [the defendant's] conduct was not "rationally related to a legitimate governmental objective or that it was excessive in relation to that purpose."

*Potts v. Manos*, No. 11-cv-3952, 2017 WL 4340157, at *2 (N.D. Ill. Sept. 29, 2017). Indeed in observing that Defendants lacked a legitimate governmental interest for the lockdowns, this Court (*see* ECF 73 at 10) cited a Seventh Circuit decision that analyzed under *Bell* a jail policy requiring all female inmates to wear white underwear, that put the inquiry in even starker terms:

> [A] reasonable trier of fact could find that the white underwear policy is not rationally related to a legitimate governmental objective, or is at least excessive in relation to such a purpose. This conclusion, ***without more***, supports an inference that the policy punishes pretrial detainees in violation of the Fourteenth Amendment.

*Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 857-58 (7th Cir. 2017) (emphasis added).

Plaintiffs by no means suggest that the deprivations at issue here are *de minimis*. While Defendants dismiss as inconsequential the denial of access to the outdoors and the punitive increase in pod confinement, these restrictions worsen incarceration's negative impact on young

4

people.  What is especially galling—and legally determinative here—is that these heightened

restrictions at the JTDC entirely lacked justification.  Imposing deprivations on kids to film a

television drama is not a legitimate exercise of government power.  The law on this point is

clear.  *Bell* and its progeny thus present Defendants with wholesale liability.

In their Denial Motion, therefore, Defendants pretend that an entirely different legal

standard applies.  First, Defendants claim that only "egregious" or "extreme and prolonged"

deprivations could ever rise to the level of a due process violation.  (*See* ECF 212 at 16, 20, 21.)

Citing cases in which severe, months-long deprivations were deemed permissible, Defendants

attempt to remove from consideration the very deprivations that they must *concede* are common

among the class members.  (*See, e.g.*, ECF 212 at 17-18 (conceding "common" impacts of

closing visitation and the outdoor yard, but then claiming—entirely incorrectly—that "Plaintiffs .

. . do[] not posit an entitlement to . . . class certification based on either of these facts.").)  In the

same vein, Defendants wrongly claim that the Court would have to determine whether each

deprivation imposed on each detainee was "reasonable," "justif[ied]," or "necessary," and would

further have to determine as to each one whether Defendants had a "subjective[ly]" "culpable

state of mind."  (*Id.* at 7, 16, 28, 29.)  Doing so, they argue, would require individualized fact-

finding, making certification inappropriate.  (*Id.*)

One problem with Defendants' argument is that it relies on bad case law.  The standard

set out in *Phillips v. Sheriff of Cook County*, 828 F.3d 541 (7th Cir. 2016)—the decision on

which Defendants premise their entire argument—has been overruled by the Seventh Circuit.  A

second and even more significant flaw in Defendants' argument is that the conditions-of-

confinement decisions on which they rely are exclusively cases in which there *was* a legitimate

governmental interest for the restriction at issue.  In each of those cases, the court was required

to weigh the impact of a given deprivation against the government's legitimate imperatives. In this case, where the purpose of Defendants' lockdowns was entirely illegitimate, their imposition of the deprivations, ***without more***, establishes a due process violation for all detainees.

The theme of Defendants' Denial Motion, repeated in their brief and in open court, is that suing over the *Empire* lockdowns "trivialize[s] the concept of civil rights violations." (ECF 212 at 2; Oct. 18, 2018 Hr'g Tr. 15:13-14. (Ex. 3).) It is more accurate, and legally relevant, to say that Defendants treated the government's coercive power as a triviality that could be arrogated for their own private ends. As this Court already recognized in denying Defendants' motion to dismiss, the Due Process Clause protects citizens from such abuses of power. Every detainee at the JTDC during the *Empire* filming—including T.S. and Q.B.—was subjected to deprivations that had no legitimate government purpose. Thus every member of the proposed class has a viable due process claim, and those claims will be proved at trial with common evidence. Class certification of these claims is entirely appropriate.

## II.  FACTUAL BACKGROUND

### A.  Fox occupies large parts of the JTDC facility.

The JTDC, which housed more than 300 detainees during the *Empire* filming, is a five-story, rectangular building. As an aerial photograph (Ex. 4) and the building's floorplan (Ex. 5) show, the JTDC's third, fourth, and fifth floors, where all its detainees are housed, are arranged as an atrium, in which residential "pods" surround the open-air recreation yard on the building's third floor. "Pod" is the name for a cell-block living unit at the JTDC, in which residents' individual cells open onto an enclosed common area. (Ex. 6 at 36:24-37:18.) Services for the children housed at the JTDC, including recreation, education, enrichment programs, and the like, are offered on the building's lower floors: primarily the third-floor courtyard and the second floor, which houses school classrooms, visiting facilities, a chapel, a library and media lab, and

6

similar service areas; plus two gymnasiums on the first floor.  (Ex. 5.)  This layout drives the JTDC's operations, and it is central to the events in this case. (Ex. 6 at 131:7-8.)

On May 20, 2015, after years of federal receivership by this District Court arising from the *Doe* lawsuit, the JTDC was turned over to control of defendant Office of the Chief Judge, and defendant Leonard Dixon was appointed superintendent.  (*See* ECF 88 ¶¶ 62-67 (describing transition).)  The events in this case began one approximately one week later, on May 28, 2015, when a Fox location scout called the JTDC to ask if Fox could scout the facility as a filming location for *Empire*.  (Ex. 7 at 23:8-24:3.) Dixon welcomed Fox and, not long after, approved *Empire*'s filming there.  (*Id.*; Ex. 8.)

Fox wanted to film multiple areas of the JTDC, which would "require extensive use of several parts of the facility" during filming.  (Ex. 9.)  The film crew that would descend on the JTDC was indeed enormous, running at times to over 200 people (Ex. 10), along with props and enough filming equipment to fill a semi-trailer to the roof.  (Ex. 11.)  The size of the film crew, Fox's filming needs, and the JTDC's layout presented particular problems for the facility:

- Fox wanted to film in the JTDC's yard.  The yard is divided into three sections— called South, Middle, and North, and Fox planned only to use one of them, the North yard, for filming.  Nevertheless, it was determined that during the filming, no detainees should be allowed in any section of the yard.  (*See, e.g.*, Ex. 18.)

- Fox wanted to film scenes in one of the JTDC's pods, and also needed a place to store its equipment.  It was decided that Fox would be provided with Pods 3A and 3B, adjacent to the North Yard.  (Ex. 13 at 60:4-61:2; Ex. 14.)  Pods 3A and 3B were two of the JTDC's three "Alpha" intake pods, where newly-arrived residents are screened and assessed upon admission. (Ex. 13 at 41:11-16; Ex. 15 at 264:3-18.)

7

- Fox wanted to use large parts of the second floor for staging and filming. The JTDC's chapel and the surrounding hallways would be used as a crew break and staging area. Fox would film in the visitation room, also on the JTDC's second floor. At Mr. Dixon's urging, *Empire*'s actors were given a break room next to his office, on another side of the second floor. (Ex. 16; Ex. 17.) And Fox used several school classrooms as staging areas. (ECF 212 at 10.) Fox's crew would need to be escorted between these locations, and the locations on the third floor, throughout each filming day. (Ex. 18 at CCSAO 7787.)

**B.      The JTDC "restructures" its operations to accommodate Fox.**

**1.      Additional confinement on pods.**

Because of if its atrium plan, JTDC's upper residential floors are taken up entirely by the living pods. Thus, all JTDC residents must be transported to its lower floors, often multiple times a day, for the services that provide them with education, rehabilitation, recreation, and the programs needed to mitigate incarceration's harmful impact on children and teenagers.

Transporting hundreds of detainees to and from their pods to these various activities requires considerable resources, even a including a supervisor who, like an air traffic controller, coordinates in real time the movement of different groups of detainees throughout the building. (Ex. 6 at 132:2-133:3, Ex. 13 at 21:13-22:15.) Indeed ensuring detainees are able to get off their pods is so important to the JTDC's mission that if it ever finds itself short-staffed, pods are re-arranged and combined to make sure that there are enough employees to escort the detainees off their pods every day. (Ex. 13 at 17:20-18:2.)

The JTDC devotes such resources to moving detainees off their pods because, as Plaintiffs' experts explain, the restrictive conditions of pod confinement compound the negative impact of incarceration on the JTDC's young detainees. The pods resemble adult prison facilities, and the more time that is spent in their restrictive and monotonous conditions, the

worse the negative psychological impact of incarceration and the higher the risk of violence among detainees. (Ex. 1 ¶ 65; Ex. 2 ¶¶ 8, 30.)

The JTDC's procedures for ensuring regular time off the pods could not survive Fox's filming needs, however. Once Fox explained which areas of the facility it wanted to use, JTDC management set about "modif[ying]" programs "to use available space." (Ex. 20.) Bearing in mind that movement of residents to the second and third floors would need to be restricted, in practice this meant one thing: the "available space" for the youth at the JTDC was largely limited to the pods. As the JTDC's recreation supervisor bluntly put it, "I will coordinate pod activities instead of yard movement." (Ex. 21.) This restructuring had the following impacts on the children detained at the JTDC:

*Denial of all opportunity to go outdoors for all detainees*. The yards were the only place where youth could go outside while they were detained at the JTDC. (Ex. 19 ¶ 17; Ex. 13 at 80:2-14.) As Defendants concede, outdoor recreation and programs were eliminated—for all JTDC residents—so that Fox could use the yards for filming. (ECF 212 at 17; Ex. 13 at 75:1-9; 80:15-21; 130:22-131:1.)

*Confinement on pods for school for all detainees*. The JTDC's Nancy B. Jefferson ("NBJ") school operates year-round, with short breaks in June and August. (Ex. 6 at 71:8-10; Ex. 22.) The NBJ's classrooms are located on the JTDC's second floor, and by written policy, instruction is to occur there. (Ex. 23.) On normal school days, the youth detained at the JTDC are programmed to be transported off their pods and to the NBJ's classrooms. (Ex. 22*;* Ex. 13 at 84:5-8.) During the July filming, school was in session, and in order to accommodate Fox's use of the second floor, no detainee was permitted to leave their pods for school. Instead they were confined to the pods, and teachers were told to give instruction there. (Ex. 24; Ex. 13 at 130:6-

16; Ex. 15 at 244:18-22.)  (For the other two filming periods in June and August, the NBJ School was on break.  (*See* Ex. 8 at 70:11-17.).)

***Pod confinement for recreation for all detainees***.  At least one hour of large muscle exercise ("LME") recreation must be provided to children at the JTDC every day.  Pursuant to written JTDC policies, all such recreation is to occur off-pod—either in one of the three open-air yards or in one of the JTDC's two gymnasiums.  (*See, e.g.*, Ex. 25; Ex. 23.)  Normally, no such recreation is scheduled for the JTDC's pods. (Ex. 23; Ex. 19 ¶13(c)(i).)  By placing the yards off-limits, however, Defendants reduced the number of recreation spaces from five (the three outdoor yards plus two indoor gyms) to the two indoor gyms only.  (Ex. 19 ¶¶ 18, 32.)  For safety, each recreation space can be used only by one pod at a time.  (Ex. 6 at 132:5-10.) With this limitation, there were simply not enough off-pod spaces and time slots for every pod to use. (Ex. 19 ¶ 18.)  The result was inevitable.  As one manager summarized, "Recreation was limited to the gyms and to the sections [*i.e.*, the pods]," instead of the yards.   (Ex. 10.)

And indeed, there are numerous contemporaneous records noting specifically that because of the filming residents across the facility confined to their pods for recreation.  (*See, e.g.*, Ex. 26 ("4A/R1 given large muscle recreation on living pod 4A due to yards being closed from "Empire" filming"); Ex. 27 ("The beginning count was 16 AT's. Residents were on the pod due to filming in the facility."); Ex. 28 ("The residents participated in Pod Rec due to the yards being closed for the taping of the Empire."); Ex. 29 (resident grievance stating, "WE NEED RECK[.] we haven't had reck in day's[.]  Fuck the empire just cause there here doesn't mean we don't gotta have reck").  *See also* Ex. 19 ¶¶ 14-23, 30-32.)  In order to accommodate *Empire* all detainees were given less off pod recreation than they normally would have received.

The confinement to the pods for recreation was compounded during the June and August filming periods.  In those periods NBJ was on one of its short "breaks," meaning detainees were not able to leave the pods for school.  Under normal operation the JTDC makes up for this loss by providing additional recreation off the pods, either in the existing recreation spaces or on the second floor, often through tournaments among pods.  (*See, e.g.*, Ex. 25, June 22-26).  With the *Empire* restrictions, however, these opportunities were eliminated—a fact that was noted by a JTDC manager as one of the impacts of filming.  (*See* Ex. 30 ("I do have several concerns [about the June *Empire* filming].  One of which is the timing. This was the first week our residents were on summer break. It is during this time that the use of the school area and yards is helpful in allowing them to burn off some of their energy.").)

***Elimination of off-pod programs.***  Pursuant to written policy, the JTDC provides "a comprehensive and varied system of structured program activities designed to develop pro-social thinking and behavior patterns."  (Ex. 31.) These programs are important to detainee well-being and thus are offered both during school and after school, both when school is in session and when it is on break.  These programs range from courses on nutrition, to writing and self expression, to programs to combat sexual exploitation, to which JTDC detainees are particularly vulnerable.  (Ex. 2 ¶ 29.)  The programs also draw detainees off pods, typically to facilities such as the library, the media room, and different classrooms on the building's second floor (though some, like "Karma Garden," are offered on the outdoor yard).  (Ex. 32.)

In order to accommodate Fox's filming needs, off-pod enrichment and rehabilitation programs were eliminated.  (*See, e.g.*, Ex. 33 (email informing Chicago Alliance Against Sexual Exploitation that its program had been cancelled: "They are filming the show Empire and all of the programming has been cut"); Ex. 34 (email regarding cancellation of the University of

Illinois nutrition education program, noting that "[u]nfortunately they have cancelled all programming this week," and later, "we had to cancel last week" because of "filming the TV show Empire");  Ex. 35 (explaining to volunteer that the following week was not available because "[t]he building is shut down next week (again) due to Empire filming their show here.");  Ex. 12 ("And just a reminder that there is no Free Write this week, due to Empire.");  Ex. 36 ("Empire will be back and filming at the JTDC. We will not have any programming next week.")  Where programs were cancelled, substitute programming was not arranged and missed session of the cancelled programs were never made up.  (Ex. 37 at 52:3-6; Ex. 38 at 52:3-6 & 64:22-65:15.)

*Elimination of Commissary*.  The JTDC has designated, repurposed classrooms on its second floor where detainees are given periodic breaks to purchase items from commissary or to engage in activities like ping pong and video games.  (Ex. 1 ¶¶ 67, 76.)  These activities are in addition to, and separate from, the daily recreation on the outdoor yard and gymnasiums. (Ex. 19 ¶ 31, Ex. 25.)  "Commissary" time is a fundamental part of the Behavior Economy, a points-based behavior reinforcement system—so much so that it is built into the policies of JTDC. (*See* § II(B)(5) *infra*.)  Because Fox was using much of the second floor, however, many commissary and game sessions were eliminated.  (*See* Ex. 24 at OAG7030 (reflecting "no commissary" for certain centers because area closed for *Empire*).)  The youth were confined to the pods instead.

## 2. Disruption of the "Alpha" intake center and over-population of pods.

The JTDC's procedures for ensuring safety begin when a new detainee arrives at the facility.  When detainees enter the JTDC, they are not immediately assigned to a residential pod.  Instead they are held in an intake center, called "Alpha," which normally consists of three pods, including Pods 3A and 3B.  (Ex. 1 ¶ 47; Ex. 13 at 133:24-134:6.)  Disbanding those two intake pods so that Fox could use them instead had effects felt throughout the JTDC:

12

***Elimination of computerized psychological risk screening.*** When detainees first enter the JTDC they receive a psychological evaluation, which by written policy is built around the "MAYSI" test, a computerized psychological analysis program that assesses residents for the risk of harm to themselves or others. (Ex. 1 ¶ 48; Ex. 39; Ex. 15 at 266:3-270:7.) The MAYSI test is administered at a computer workstation that is located in pod 3A or 3B, but because the children who would have been assigned to Alpha were removed from those two pods to make way for Fox (Ex. 61), the MAYSI tests were abandoned for virtually all boys[1] during filming:

| 2015 DATES | Admissions | MAYSI completed |
|---|---|---|
| June 21-26 | 88 | 8 |
| July 13-16 | 43 | 4 |
| August 23-26 | 51 | 2 |
| Total | 182 | 14 |

Not sure if this is useful, but all but one of the MAYSI completed during this period above are female residents. Attached is the spreadsheet breakdown.

(Ex. 41.) Per the JTDC's standard practices, many of these unscreened intake detainees were subsequently transferred to residential pods throughout the facility. (Ex. 1 ¶ 52; Ex. 2 ¶ 37.)

***Bulk dispersal of Alpha residents.*** In addition to psychological screening, while detainees are on Alpha, JTDC staff determine where in the facility they should be assigned. This is a painstaking process. Because of risk levels, interpersonal conflicts, and real or perceived gang membership, every transfer carries risk, so multiple staff from different disciplines meet and work together to identify a pod best able to provide a safe environment. (Ex. 1 ¶ 49.) Under normal operation a resident is transferred out of Alpha if and when an appropriate pod has been identified—and only then. (Ex. 1 ¶ 50.)

---

[1] Intake screening for girls occurs in a pod called WINGS, that was not occupied by Fox. The JTDC thus appears to have administered MAYSI testing for girls during the *Empire* filming.

In order to close pods 3A and 3B, however, JTDC staff were forced to transfer Alpha residents wholesale—on a timetable driven not by safety, but by Fox's filming schedule.  As the manager in charge of Alpha explained, in order to accommodate *Empire*, "[w]e need to transfer *At Least* 14 residents (allowing us to close 3A) throughout the facility." (Ex. 40 (emphasis original).  Transfers of this nature, driven by Fox's needs instead of the JTDC's normal screening process, endangered detainees and staff alike.  (Ex. 1 ¶ 52.)

***Overpopulation throughout the JTDC***.  The closure of pods 3A and 3B also resulted in unsafe overpopulation of the pods throughout the JTDC.  The JTDC's pods were built as 18- or 16-bed units, depending on their location in the facility.  (Ex. 5.)  However, the JTDC's written policies provide that in order to ensure safety, the *functional* operating capacity of the pods is 14 or 12 residents, respectively.  (Ex. 62; Ex. 1 ¶¶ 53-54.)  Closing 3A and 3B eliminated dozens of beds.  To make up the lost space, the JTDC had to "fill up" the other pods in the facility "with 15 and 16 residents each."  (Ex. 42 ("Filming for a television show begins next week. As a result, the capacity on the pods throughout the facility will go up  . . . ."); Ex. 43 ("[L]et the Staff know that the population caps for all of the pods are raised to 16.").  And indeed, numerous pods were overpopulated.  *See, e.g.*, Ex. 28 (showing pods with 15 or 16 residents each); Ex. 27 (reflecting 16 residents "on the pod due to filming in the facility.").)  Overpopulated pods compromised the safety of the entire JTDC facility and negatively impacted all the youth detained there.  (Ex. 1 ¶¶ 53-54, 60; Ex. 2 ¶ 38.)

### 3.    Degrading of visitation.

Pursuant to written policies, the JTDC "provides adequate and appropriate areas for resident visitation" on the second floor of the JTDC. (Ex. 23.)  The JTDC's dedicated visiting room is outfitted with twelve tables, which are spaced far enough apart to ensure that twelve different detainees can simultaneously visit their families in privacy.  Privacy in these sessions is

14

critical to their value in mitigating the psychological impact of incarceration because a parent may be the only person who a teen can confide in during their detention.  (Ex. 2 ¶ 30(e).)

Detainees have two one-hour visiting slots per week.  The visiting slots are organized by center, and each pod has set times when visits to children housed on that center are allowed. (Ex. 44 at 56:16-59:7.)  In order to prevent the mixing of children from different centers in the (which could lead to conflict), once the visiting hour for a given center is over, the detainee is not able to receive visits until the next scheduled visiting slot.  (*Id.* at 56:16-59:7.)

To accommodate Fox's desire to film in the visitation facility, however, visitation was moved to a smaller classroom.  This had two impacts.  ***First***, while the JTDC's visitation facility had seating for twelve simultaneous visits, the classroom only had enough space for eight visits. This meant that each visiting hour permitted only eight visits instead of the normal twelve. (Ex. 24.)  ***Second***, the tighter quarters reduced privacy between detainees and their visitors, who were usually family members.  (Ex. 45 at 43:14-44:5; Ex. 44 at 64:8-14.)

### 4.    Delay in response to sick call slip requests.

On every pod of the JTDC, detainees can submit sick call slips, which are picked up twice daily by nurses and then triaged, with some detainees receiving attention by the nurse and others being sent to the infirmary, located in a repurposed pod on the third floor.

Both Named Plaintiffs, who were on different pods and on different floors during filming, assert that while sick call slips were picked up by the nurses in the normal fashion, responses to detainees who would normally receive attention in the infirmary were delayed during the filming.  (Ex. 46 at 5-6; Ex. 47 at 5-6.)  That is consistent with the restriction of off-pod movement that Defendants imposed in order to facilitate the filming of *Empire*.

### 5.    Disruption of the JTDC's behavior economy.

To further reduce the negative impact of incarceration and improve the safety at the facility, the JTDC operates a behavior "economy."  The behavior economy, which is formalized in JTDC policies (Ex. 48; Ex. 54), awards points to residents for good behavior, and allows residents to advance to higher "levels" for sustained good behavior.  Points allow detainees to "purchase" consumer goods at commissary, while higher "levels" allow detainees to participate in a variety of activities off the pod, like commissary, programs, and tournaments.  Conversely, residents may be punished—either with lower privilege levels or loss of points—for bad behavior, which reduces their eligibility for earned time off of the pods.  (Ex. 2 ¶ 30(d); ECF 212 exhibit D.)

Consistently linking behavior to material consequences is important for promoting safety; it also ameliorates the negative impact of incarceration by providing detainees at every behavior level a sense that they are being treated fairly, and that pro-social behavior is recognized and reinforced.  (*See* Ex. 1¶¶ 74-77; Ex. 2 ¶ 30(d); Ex. 48.)  The *Empire* restrictions, however, effectively eliminated rewards for good behavior across the board.  (Ex. 1 ¶ 78; Ex. 2 ¶ 39.)  This both eliminated incentives for good behavior and eliminated the perception of fairness that the behavior economy was designed to generate.  (*Id*.) That in turn increased the risk of disorder and violence among all detainees (*id*.), and the destruction of a perception of fairness increased the negative psychological impact of incarceration on all detainees. (*Id*.)

## III.    ARGUMENT

Aside from focusing on Plaintiffs' claims regarding sick call slips, Defendants do not seriously contest Plaintiffs' account of the restrictions that were imposed on the detainees in order to accommodate Fox's filming.  Rather they raise red-herring "individual" issues that are

irrelevant to Rule 23's certification criteria. As set out below, Plaintiffs' class claims satisfy Rule 23(a), and they are certifiable under both Rule 23(b)(3) and Rule 23(b)(1)(B).

### A.      Rule 23(a) considerations.

"To be certified as a class action, the putative class must first meet the four requirements of [Rule] 23(a): numerosity, typicality, commonality, and adequacy." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016). The proposed class satisfies each requirement.

### 1.      Defendants concede numerosity and commonality.

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable," and Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Defendants concede that the proposed class satisfies both these requirements. (ECF 212 at 17.) Indeed, this case concerns a common set of lockdowns, and during all three filming sessions there were more than 300 detainees at the JTDC. (Ex. 1 ¶ 60.)

### 2.      Typicality—Named Plaintiffs were impacted when the JTDC restructured its normal operations to accommodate Fox.

Defendants focus their arguments on Rule 23(a)(3)'s typicality requirement. "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "[T]ypical does not mean identical, and the typicality requirement is liberally construed." *Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 350 (N.D. Ill. 2007) (quotation omitted). Rather, "courts focus on the conduct of the defendant and determine whether the putative class representative and the members of the putative class claim similar injuries due to the defendant's alleged actions." *Id.* (citing *Rosario*).

Plaintiffs T.S. and Q.B. were impacted by Defendants' conduct described in section II(B) *supra*, making their claims typical of the class they seek to represent. Defendants' protestations

17

to the contrary are grounded either in mischaracterizations of the record or have been disproven by discovery since their Denial Motion was filed.

a)      **Increased pod confinement.**

As Plaintiffs explained in opposing Defendants' motion to dismiss, "the gravamen" of their claim in this case is that they—and the hundreds of other detainees at the JTDC—were subject to increased confinement on their pods so that Fox could film on the JTDC's second and third floors.  (ECF 58 at 4.)  Defendants accomplished this additional pod confinement by eliminating a variety of different opportunities to leave the pods.  (*See* § II(B)(1) *supra*.)  T.S. and Q.B. were subject to these deprivations in multiple ways—any one of which would be sufficient to satisfy the typicality requirement.  *See Brieger*, *supra*, 245 F.R.D. at 350.

***Elimination of opportunity to go outside.***  Defendants do not dispute that T.S. and Q.B. were both deprived of any opportunity to go outside during the *Empire* filming.  As Defendants note, Q.B. testified that during the summer his pod was normally allowed on the yard at least twice a week (ECF 212 at 12).  Recreation schedules show that T.S.'s pod was scheduled for outdoor recreation multiple days during filming, but because of *Empire* it never occurred.  (Ex. 25.)  Their claims are typical of the class.

***School on pods***.  T.S. was confined to his pod for schooling instead of going down to NBJ's classrooms on the second floor (ECF 88 ¶ 47(b)), and Defendants concede as much. (ECF 212 at 24-25.)  Defendants focus on the possibility that the ersatz educational experience of the detainees on T.S.'s pod might have been different from that on other pods (*id.* at 25, 28), but Plaintiffs charge that increased pod confinement itself was harmful.  (*See* § II(B)(1) *supra*; Ex. 2 ¶¶ 35-36.)  T.S.'s claims are therefore typical of the class.

18

***Elimination of off-pod recreation***.  Reliable, contemporaneous records show that both

T.S. and Q.B. were denied off-pod exercise recreation during filming, despite Defendants'

considerable efforts to obfuscate this fact.

Q.B. did not receive off-pod recreation on at least June 23, because of the *Empire*

filming.  (Ex. 19 ¶ 32.)  In fact, recreation did not occur that day for his pod at all.  (Ex. 19 ¶¶ 30-

32.)  The pod logs show that Q.B.'s pod was taken to commissary that night (Ex. 19 ¶ 31), but as

a guard on pod duty that night explains, provision of commissary is different from and not a

substitute for exercise or recreation.  (Ex. 19 ¶ 32.)  But for the *Empire* filming, Q.B. would have

received more off pod recreation than he did.

T.S., meanwhile, was denied off-pod recreation on at least June 24.  The pod log for that

day shows that recreation was offered at 9:50 a.m. that day on the pod, and that "2 out of 13

residents participated."  (Ex. 49).  The "DC5" movement log confirms that T.S.'s pod—5G—had

no movement from the pod anywhere near that time.  (Ex. 50.)  Defendants nevertheless claim

that T.S. had recreation off the pod that day.  They rely on a different record, a large muscle

exercise ("LME") log from June 24, 2015 to that effect.  (*See* ECF 212, at 23; see Ex. 51.)  The

LME log, however, is demonstrably inaccurate.  It shows full (level "4") participation in the

gym, by 14 out of 14 residents.  (*Id*.)  Besides contradicting both the DC5 log and the pod log's

observation that only "2 out of 13 residents" participated, the LME log cannot possibly be

correct: the pod log records that at 7:55 that morning, one Pod 5G resident was escorted to court,

leaving only 13 residents on the pod through the early afternoon (see Ex. 49) and making the

LME log's 14-out-of-14 participation notation impossible.[2]

---

[2]  The June 24 LME log is likely inaccurate because it was created the next day and was
thus the product of a faulty memory.  (*See* Ex. 52 (showing file was created on June 25, 2015).)

Defendants, no doubt aware that the June 24 LME log is contradicted by two different contemporaneous records,[3] do not directly assert that T.S. *actually* received off-pod recreation on June 24. Instead, at T.S.'s deposition they tried to manufacture uncertainty in his memory. At the deposition Defendants showed T.S. each day's LME log entry one by one, and for each log, asked T.S. whether he had any reason to disagree with it. (Ex. 45 at 139:10-147:2.) T.S. has been consistent that he received off-pod recreation on some days and was denied it on others. Unsurprisingly, though, he could not recall which specific days he was allowed off or confined to the pod, and thus could not identify which LME logs were inaccurate. Defendants now point to that testimony to suggest that there is no proof T.S. was ever confined to the pod for recreation. (ECF 212 at 12, 23.) Maneuvers like this do not make facts, however. Despite Defendants' efforts, T.S.'s memory is corroborated by two sets of contemporaneous records.

Additionally, both T.S. and Q.B. were denied extra off-pod recreation that is provided to JTDC residents when NBJ was on break, during the June and August filmings. As noted above (*see* § II(B)(1), *supra*), when NBJ is on break the detainees are provided with extra recreation to mitigate the harmful impact of the additional pod confinement. But logs from the filming periods—pod logs, the DC5 log, and the LME logs—all show that T.S. and Q.B. did not receive such additional recreation. (*See, e.g.,* Ex. 50; Ex. 19 at "exhibit 2".) Instead, like every other detainee, they were confined to their pods more than they would have been absent the *Empire* filming. Their claims are typical of the class.

***Elimination of structured programs***. The Denial Motion argues that neither Named Plaintiff "can claim to be affected" by cancellations of structured programs. (ECF 212 at 25.)

_____

Pod logs and DC5 logs, by contrast, are made contemporaneously with the events they record. (*See* Ex. 19 ¶ 10; Ex. 13 at 21:13-22:15.)

[3] Elsewhere Defendants cite the pod and DC5 logs as authoritative. (ECF 212 at 12.)

After Defendants filed the Denial Motion, however, Plaintiffs deposed one of the program providers, Free Write. At the deposition Free Write's witness testified, consistent with contemporaneous emails, that T.S. was scheduled to participate in Free Write's programming during the filming periods, but that Free Write was cancelled in order to accommodate the filming. (Ex. 37 at 52:3-6; 59:3-7; Ex. 12.) Like numerous other detainees, (*see* § II(B)(1) *supra*), T.S. was denied structured programs, and instead held on his pod, in order to accommodate *Empire*. His claims are typical of the class.

### b) Disruption of Alpha.

T.S. and Q.B. were impacted by Defendants' action in closing Alpha Pods 3A and 3B. As with numerous pods throughout the JTDC, during filming Q.B.'s pod became overpopulated beyond its safe functional operating capacity. This was harmful to Q.B. (Ex. 1 ¶¶ 53-60, Ex. 2 ¶ 38.) In addition, this led to a fight between Q.B. and the new detainee. Fights of this nature among children are dangerous and psychologically damaging to all their participants. (Ex. 2 ¶ 38.) The impact on Q.B.'s pod flowed directly out of Defendants' decision to close down Pods 3A and 3B in order to accommodate Fox's filming needs.

Both Q.B. and T.S. were also subjected to heightened risks by the closure of pods 3A and 3B, which caused overpopulation throughout the JTDC, the suspension of MAYSI screenings for the majority of new detainees and the bulk transfers of detainees through the facility. By compromising the safety protocols at the JTDC to accommodate Empire, T.S. and Q.B.—along with every other detainee—were subjected to risks and injuries that they would not otherwise have suffered. (Ex. 1 ¶¶ 53-60, Ex. 2 ¶ 38.)

### c) Visitation.

Both T.S. and Q.B. were impacted by the movement of visitation to a smaller room. T.S. and Q.B. testified that the smaller room, with its closer tables, reduced privacy for their visit (Ex.

21

45 at 43:14-44:5; Ex. 44 at 64:8-14), which would have affected every detainee who had a visitor during the filming. Q.B.'s grandmother, meanwhile, was turned away when she attempted to visit during filming. (Ex. 53 at 12:4-14:19.) (In their introductory argument Defendants suggest that Q.B. was "apparently" denied the visit because of a "disciplinary matter," (ECF 212 at 4), but there is no evidence to support this; and indeed Defendants point to none. (*See id.* at 4, 24.) This is consistent with the number of tables and thus available visitation slots being reduced from twelve to eight, which would have resulted in cancelled visits throughout the filming.

### d) Sick call slips.

T.S. recalls that the response to sick call requests was delayed on his pod, impacting him and other detainees. (Ex. 47.) Q.B. corroborated that detainees on his pods also received delayed attention to sick calls, though he does not recall having submitted sick call slips himself. (Ex. 46; *see also* § III(A)(3) *infra*.)

Defendants devote considerable space in their brief to one sick call slip that T.S., evidently frustrated with the *Empire* lockdown, submitted as an off-color joke. (*See* ECF 212 at 3, 13-15, 19.) But T.S. also testified, without contradiction, that he submitted multiple legitimate sick call slips during filming, and Defendants' focus on a teenage joke does little but distract from the actual impact T.S. suffered as a result of the filming.

T.S. explained that he submitted multiple other sick call requests during this time, which included sick call slips for a toothache, headaches, and psychological distress. (Ex. 45 at 149:22-150:14; 107:22-108:14; 176:14-177:12.) And earlier, in response to Defendants' interrogatories, he explained that the problem he and others encountered was one of delay:

> T.S. recalls that under normal operation, when he or other children on his pod put in sick call requests, they were usually attended to by the next day. T.S. recalls that during the *Empire* filming periods, however, sick call requests, including his, were not attended to until the next week, or not all.

22

(Ex. 47 at 6.)  With this interrogatory response in hand, Defendants could have probed the basis for this recollection at T.S.'s deposition.  Instead they did the opposite: they pointedly *avoided* asking T.S. whether the responses to his requests were delayed.  For example, during the filming T.S. submitted a sick call request for a toothache and eventually received medical attention for it. Defense counsel began asking T.S. if the appointment was delayed, but then changed course mid-sentence to avoid that question, and ask a different one instead.  (*See* Ex. 45 at 150:7-14: "Q. Did it strike you that it [the wait to receive dental care] was too long?  Was it about—were you satisfied—let me ask it this way.  Were you satisfied with the treatment you received?").) Likewise T.S. recalled that during filming he submitting sick call slips for a headache.  Instead of asking T.S. to substantiate his claim that the response took longer than usual, Defense counsel repeatedly confined themselves to a different question: whether he received care for the headache at all.  (Ex. 45 at 107:22-108:14).  Similarly T.S. recalled submitting mental health slips during the filming for which "I never got none of that help."  (Ex. 45 at 178:16-17.) Defense counsel pressed T.S. about whether he spoke with a mental health specialist about the problem at some point, but again, never asked T.S. whether this care was delayed. (Ex. 45 at 182:8-14.)

It would have been simple enough to ask T.S. about the delay claim, but defense counsel appears to have made a considered choice not to do so.  That is Defendants' prerogative, but they cannot use questions that *avoided* the issue to claim now that no delay occurred.  T.S. asserts that responses to his sick call requests were delayed, and nothing in his deposition contradicts that claim.  T.S. satisfies Rule 23(a)(3)'s typicality requirement as to the sick call claim.

### e)    Behavior economy.

As Mr. Dunlap and Dr. Kraus explain, the various restrictions imposed by the *Empire* lockdowns would have effectively eliminated incentives for good behavior and destroyed all

detainees' perception of fairness—both increasing the risk for violence and worsening the psychological impact of incarceration at the facility. (Ex. 1 ¶ 78; Ex. 2 ¶ 39.) That impact flowed to every detainee, regardless of their "level" at the time of filming (*id.*) and thus impacted both T.S. and Q.B., along with all other detainees in the facility.

### 3. Adequacy.

Plaintiffs respectfully submit that under Rule 23(a)(4), T.S. and Q.B., and their counsel, are adequate representatives for the class. T.S. and Q.B. understand their obligations as class representatives and have willingly submitted to discovery and depositions propounded by Defendants. Class counsel have extensive experience in complex litigation, class action prosecution, civil rights litigation, and trial practice.[4]

Defendants do not appear to contest class counsel's qualifications. Instead, in a footnote, Defendants use "adequacy" as an opportunity to malign both Plaintiffs and class counsel as dishonest and unethical. Because these arguments are made in a footnote, Plaintiffs understand them as intended to demean, not to persuade. *See Bakalis v. Golembeski*, 35 F.3d 318, 326 n.8 (7th Cir. 1994) (deeming argument made only in footnote in opening brief waived). Defendants accuse Plaintiffs' counsel of "fil[ing] multiple complaints in this matter with false claims that an adequate investigation would have disproved." (ECF 212 at 25 n.7.) The record, however, speaks for itself. As this memorandum endeavors to make clear, while the parties vigorously dispute how to interpret what occurred at the JTDC during the *Empire* filming, discovery has confirmed the accuracy of the bulk of Plaintiffs' allegations.

---

[4] *See* counsel experience summaries: Alexis Chardon: www.weilchardon.com/chardon; Terry Garmey: https://garmeylaw.com/terry-garmey/; Adam Pessin: www.finekaplan.com/attorneys/apessin.asp; Stephen Weil: www.weilchardon.com/weil.

Defendants' *ad hominem* attacks on counsel are simply unprofessional; their attacks on the two troubled teens who were willing to bring this case are far worse than that. Defendants malign the character of T.S. and Q.B., claiming there is a "vast gulf between [their] allegations and their deposition testimony" that disqualifies them. (ECF 212 at 25 n.7.) The Court would do well not take this accusation at face value. Defendants say, for example, that despite alleging that sick call requests were ignored, "[n]either [T.S. nor Q.B.] could name a single detainee whose serious *actual* medical need went unmet." (ECF 212 at 3 (emphasis original).) As to Q.B., what Defendants appear to mean is that he **literally did not know the names** of detainees with ignored requests:

> Q. Do you know of any residents or kids on your pod, can you give me examples of anybody who put in a sick pod request and it didn't get handled within one or two days?
> A. [Q.B.] One kid, he had a—he had a blood clot in his eye. He put in sick call. He ain't get seen until the next week.
> Q. Blood clot in his eye?
> A. Yes.
> Q. What do you mean, his eyeball was actually red?
> A. Yes.
> Q. Do you know who h[e] was?
> A. I don't remember his name. I remember he was in there for a while. . . . [H]e had Thug Life [tattooed] on his stomach so we called him Thug Life.

(Ex. 44 at 106:8-107:4.) T.S., meanwhile, was able to list, by name, four detainees with delayed sick call responses, but he did not know what conditions they had sought to address.[5] (Ex. 45 147:3 and 149:10.) Defendants' entire line of argument is poisonous, and meritless. Plaintiffs and counsel satisfy the adequacy requirement.

---

[5] Defendants also attack T.S.'s mother for what they claim are her false memories (*see* ECF 212 at 11, 23-24), but she is not proposed as a class representative. And they suggest that they caught Q.B. lying in his deposition about experiencing NBJ schooling on the pod (*id.* at 24), but Q.B. had already explained in his interrogatory responses that he did recall being at the JTDC when school was in session. (Ex. 46 at 15, Ex. 44 at 9-10; 103:22-104:24.)

### B.     The class satisfies Rule 23(b).

Besides satisfying Rule 23(a), a proposed class must satisfy one of the alternative criteria of Rule 23(b).  Plaintiffs seek certification under the familiar Rule 23(b)(3), as well as Rule 23(b)(1)(B), which addresses the management of a pool remedy created by an unjust enrichment award.  Certification is appropriate under both categories.

### 1.     Rule 23(b)(3)—Common issues predominate.

Rule 23(b)(3) permits class certification if the questions of law or fact common to class members "predominate" over questions that are proprietary to individual class members.  This requirement is satisfied when "common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication."  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (quotation, brackets, and ellipses omitted).  That occurs when "the legal or factual questions" arising from common conduct like the lockdowns at issue here "qualify each class member's case as a genuine controversy," *Messner*, 669 F.3d at 814.  The test is as follows:

> If, to make a *prima facie* showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question.  If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question.

*Id.* at 815 (quotation omitted).  The predominance inquiry is therefore guided by "the elements of the underlying cause of action."  *Id.* (quotation omitted).[6]  Plaintiffs first assess their claims against the government defendants, and then assess the claims against the Fox defendants.

---

[6]  Of course "[i]ndividual questions need not be absent. . . .  [R]ule [23(b)(3)] requires only that those questions not predominate over the common questions affecting the class as a whole."  *Messner*, 669 F.3d at 815.

a)    **Government defendants.**

(1)    **Fourteenth Amendment—Due Process Clause.**

Count I of the complaint charges that Defendants violated the due process rights of the detainees at the JTDC by imposing deprivations on them in order to facilitate Fox's filming of *Empire*.  (ECF 88 ¶¶ 79-85.)  Defendants do not meaningfully dispute that these claims arise from conduct common to the class.  Instead they focus on the legal standard governing the claims—but they articulate one that is entirely incorrect.  Relying on *Phillips v. Sheriff of Cook County*, 828 F.3d 541 (7th Cir. 2016) and related authorities, Defendants argue that Plaintiffs' due process claims must be "analyzed under the Eighth Amendment test" (ECF 212 at 15 n.7), which is only violated "when a defendant realizes that a substantial risk of serious harm to the prisoner exists, but intentionally or recklessly 'disregards that risk,'" (*id.* at 16 (quoting *Phillips*)), which, under the Eighth Amendment, is a "subjective inquiry."  (*Id.*)  From there, Defendants argue that deprivations cannot be due process claims unless they are "extreme and prolonged," so that, for example, deprivation of exercise cannot be the basis for a claim unless it is so severe that "muscles are allowed to atrophy and the health of the individual is threatened." (*Id.* at 21 (quotations omitted).)  Common issues do not predominate, Defendants say, because the Court would have to conduct "a case-by-case analysis and factual determination as to the degree of seriousness" of each deprivation suffered by each member of the class to determine whether it passes the threshold set out in the Eighth Amendment.  (*Id.* (quotation omitted).)

The Seventh Circuit has directly overruled this line of reasoning.  In *Bell v. Wolfish*, the Supreme Court held that unlike prisoners who may not be subjected to cruel and unusual punishment, pretrial detainees may not be punished ***at all***.  441 U.S. at 538.  *Bell* was decided in 1979, and afterward, courts, including the Seventh Circuit, "typically . . . . grafted the Eighth Amendment's [standards] onto the pretrial detainee situation."  *Miranda v. Cty. of Lake*, 900

27

F.3d 335, 350 (7th Cir. 2018). In 2015, however, the Supreme Court decided *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). *Kingsley* "disapproved the uncritical extension of Eighth Amendment jurisprudence to the pretrial setting . . . ." *Miranda*, 900 F.3d at 351 (discussing *Kingsley*). Instead *Kingsley* clarified that under *Bell*,

> a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.

*Kingsley*, 135 S. Ct. at 2473-74.

*Kingsley* involved an excessive force claim, and initially some Seventh Circuit panels, out of uncertainty, did not apply the *Kingsley* inquiry to certain other types of due process claims arising from pretrial detention. That included *Phillips*, where the Court of Appeals continued to apply the Eighth Amendment to pretrial medical care claims, while acknowledging *Kingsley* as possibly contrary authority. *See Phillips*, 828 F.3d at 554 n.31. In *Miranda*, however, the Court of Appeals changed course, explicitly abandoning *Phillips* in the process. *See Miranda*, 900 F.3d at 352 (discussing *Phillips*). As *Miranda* put it, *Kingsley*'s reasoning rejected the "dissection of the different types of claims [by pretrial detainees] that arise under the Fourteenth Amendment's Due Process Clause." *Id.* Rather, *Miranda* held, *all* due process claims brought by pretrial detainees "are subject only to the objective unreasonableness inquiry identified in *Kingsley*." *Id.* Thus after *Miranda*, the Eighth Amendment standard that *Phillips* sets out—and upon which Defendants' Denial Motion relies—is simply inapplicable. The relevant standard, rather, is the one set out in *Kingsley*: to prevail a plaintiff need "only" present evidence that the "challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley*, 135 S. Ct. at 2473-74.

Even before *Miranda*, moreover, the Seventh Circuit, like other courts, understood both *Bell* and *Kingsley* to impose a flat bar on pretrial restrictions or deprivations that are unrelated to

28

a legitimate governmental purpose, even if those deprivations might not otherwise rise to an

Eighth Amendment violation. Plaintiffs have already mentioned *Mulvania*, which cited both

*Kingsley* and *Bell* in holding that because a reasonable trier of fact could find that a Sheriff's

"white underwear" policy was unrelated to, or excessive in relation to, a legitimate governmental

purpose, "th[at] conclusion, without more, supports an inference that the policy punishes pretrial

detainees in violation of the Fourteenth Amendment." 850 F.3d at 858 (citing *Kingsley* and

*Bell*). The Seventh Circuit took the same approach in *Davis v. Wessel*, 792 F.3d 793 (7th Cir.

2015), where it held, also relying on *Kingsley* and *Bell*, that leaving a detainee handcuffed while

he tried to urinate during a break in a court hearing "constitutes punishment in the constitutional

sense if the[] use [of the handcuffs] is not rationally related to a legitimate nonpunitive

government purpose or [] appear[s] excessive in relation to the purpose." 792 F.3d at 800.[7]

Plaintiffs pointed out this line of case law at the motion to dismiss stage (*see* ECF 58 at 8-11),

and indeed the Court denied Defendants' motions to dismiss specifically because Plaintiffs had

---

[7] Other Circuits have reached the same conclusion. In *Robles v. Prince George's County*, 302 F.3d 262 (4th Cir. 2002), officers who had arrested the plaintiff handcuffed him to a light pole in an empty parking lot and left him there for 10 minutes. 302 F.3d at 266. Noting that "[t]he police behavior here was not reasonably related—indeed it was entirely unrelated—to any legitimate law enforcement purpose," the court held that "[e]ven a so-called prank that fails to serve any 'legitimate governmental objective' can constitute a due process infraction." *Id.* at 269-70 (quoting *Bell*, 441 U.S. at 539). *Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) involved the sheriff's placement of webcams in the jail that transmitted a public video feed of the detainees to the public over the internet. The court held that because the webcams served no legitimate governmental purpose, imposing discomfort on inmates in the form of unnecessary public exposure violated due process. 378 F.3d at 1033 (relying on *Bell*). Likewise in *Wagner v. County of Maricopa*, 706 F.3d 942 (9th Cir.) *amended and superseded on denial of reh'g on other grounds*, 747 F.3d 1048 (2013), an inmate challenged the jail's policy of issuing detainees pink underwear on the grounds that, "given the cultural context," the color was chosen "to shame and stigmatize the male prisoners as feminine." 706 F.3d at 948. Relying on *Bell*'s rule that conditions of pretrial detention not related to a legitimate governmental purpose are violative of due process, the court observed that "[u]nexplained and undefended, the dress-out in pink appears to be punishment without legal justification." *Id.*

plausibly alleged that the restrictions at issue lacked a legitimate governmental purpose. (*See* ECF 73 at 10 (quoting *Bell* and *Mulvania*).)

Now two years later, Defendants still do not have a good response. Instead, they rely on class action denials in which there ***was*** a plausible legitimate governmental purpose for imposing the restriction or condition at issue, and thus reasonableness had to be examined case by case.[8] But this entire line of cases is simply inapposite. There is no question that the government may impose substantial and even severe restrictions on pretrial detainees—if the restriction is reasonably related to a legitimate governmental purpose. Here, by contrast, Plaintiffs can show that the *Empire* lockdowns were not imposed for such a purpose—so ***none*** of the deprivations imposed were reasonably related to a legitimate governmental purpose.

As such, the proper class action analysis for this case is set out not in *Phillips*, but in *Mulvania*, the white-underwear decision. As Plaintiffs have explained, *Mulvania* addressed a jail policy of requiring female detainees to wear white underwear. The court observed that "a reasonable trier of fact could find that the white underwear policy is not rationally related to a legitimate governmental objective, or is at least excessive in relation to such a purpose" and held that "[t]his conclusion, without more," supported an inference that the white-underwear policy was a due process violation. 850 F.3d at 857-58. From there, *Mulvania* went on to assess whether the claim should be certified as a class action. Pointedly, the court determined that the

---

[8] *See, e.g.*, *Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 515 (7th Cir. 2009) (*cited in* ECF 212 at 7) (certification of post-bond over-detention class inappropriate because court would have to determine whether the delay "was reasonable in any given case," which would "depend on how long each detainee was held after bond was posted and what justifications there might be for the delay"); *Phillips*, 828 F.3d at 555 (*cited in* ECF 212 at 7) (quoting *Harper*'s "was reasonable in any given case" language to deny class certification); *Hall v. Cty. of Milwaukee*, No. 17-cv-379, 2018 WL 2376512 (E.D. Wis. May 23, 2018) (*cited in* ECF 212 at 29) (class certification denied for sheriff's policy of shackling pregnant inmates during childbirth "because whether the restraints were necessary in any particular case required individual inquiry." (quotation is Defendants' summary)).

putative class satisfied Rule 23(b)(3).  The defense contended that claims would "vary for individual class members based on factors such as how long a detainee was deprived of her underwear, whether she was on her menstrual cycle or pregnant, and other considerations," *id.* at 859, but the court rejected this argument.  That the white-underwear policy lacked a legitimate governmental purpose meant that liability was common; therefore, the individual factors cited by defendants were a matter of damages, which could be addressed via case-management protocols. *Id*.  The claim thus satisfied Rule 23(b)(3).  *Id.*  (The court ultimately did not certify the class, but that was because its 29 members failed numerosity, *id.* at 860, which is not an issue here.)

This case is on all fours with *Mulvania*.  The record permits the inference that the deprivations at issue were imposed in order to facilitate the filming of a television drama, which the Court has already held is not a legitimate governmental purpose.  (ECF 73 at 10.)  That "conclusion, without more, supports an inference" that the restrictions imposed at the JTDC violated the due process rights of all JTDC detainees.  *Mulvania*, 850 F.3d at 858.  Moreover, the evidence that the lockdowns did not serve a legitimate governmental purpose—which is the "same evidence" for every class member—"will," as it did under *Mulvania*, "suffice for each member to make a *prima facie* showing" that their due process rights were violated.  *Messner*, 669 F.3d at 815.  As such, under *Messner* common issues predominate with respect to Plaintiffs' due process claims.  *Id.*  "There is a single, central, common issue of liability: whether" the deprivations imposed on the hundreds of detainees at the JTDC were done for a legitimate governmental purpose.  *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).  A fact-finder can determine in one stroke that they were not, which would establish liability against the government Defendants for each and every detainee.

Defendants' objections, reviewed below, do not change this basic fact.

31

***Elimination of outdoor recreation***.  Defendants acknowledge that outdoor recreation was eliminated in order to accommodate *Empire*.  (ECF 212 at 17.)  Thus the overriding question about the closure of this space has already been established.  Defendants' only actual challenge to this common issue is to claim that some detainees may have been denied outdoor recreation because the North Yard, where Fox filmed, was closed for window cleaning.  (ECF 212 at 12 & n.2.)  That does not defeat predominance.  It is based on a single email by a single pod employee (not a JTDC maintenance person) about why the yards were closed during filming (*id.*), and it is contradicted by Gene Robinson, who was responsible for coordinating Fox's use in the North Yard and testified that window maintenance had been completed before filming began.  (Ex. 13 at 165-24-166:20.)  In all events the question can be resolved on a class-wide basis—it is not an individual issue that would overwhelm the common questions in this case.

***Confinement to school on the pods***. Defendants claim that there are a host of individualized issues, such as whether schooling in each pod was more or less effective than it would have been in the NBJ classrooms.  (ECF 212 at 28.)  But the issue is whether the detainees endured additional confinement on the pods.  Thus the ***relevant*** questions are the same:  whether the children were confined to their pods instead of being allowed off for school, as they normally would have been, and whether this restriction was imposed pursuant to a legitimate governmental purpose.  Those questions can and will be answered with common evidence.

***Confinement to pods for recreation***.  Defendants eliminated off-pod recreation in order to accommodate Fox's use of the JTDC.  (*See* § II(B)(1) *supra*.)  Identifying which pods were impacted by these eliminations, and when, is straightforward:  pod recreation schedules, showing

where detainees *should* have gone, can be compared to contemporaneous records that show what actually happened, including the DC-5 movement log, pod logs, LME logs, and CSR reports.[9]

***Elimination of off-pod programs***.  As Plaintiffs have already explained (*see supra* § III(A)(2)(a)), Defendants' efforts to raise individual issues regarding cancellation of off-pod programming cannot be squared with the discovery record that has emerged since Defendants filed their Denial Motion.  Defendants also object that it will have to be determined which programs were cancelled instead of postponed (ECF 212 at 28), but Anna Buckingham, who was responsible for coordinating virtually all such programs, testified that they were cancelled.  (*See* Ex. 38 at 48:6-48:15; 55:19-56:4.)  That was confirmed by Free Write's witness, who testified that his organization's programs were cancelled, not postponed.  (*See* § III(A)(2)(a) *supra*.).  Moreover, even if programming were postponed until another day, detainees still would have spent more time on their pods on those days as a result.

Defendants also question whether detainees that were eligible for off-pod programs can be identified and whether they had signed up for programs in advance.  (ECF 212 at 28.)  The record developed since Defendants filed the Denial Motion makes clear that they can.  William Steward testified that a detainee's disciplinary level is recorded, that detainees signed up for programs in advance, and that program schedules were recorded in advance.  (Ex. 15 at 162:11-165:23.)  That is consistent with JTDC policy (Ex. 54), and it was confirmed by Ryan Keesling, the director for the Free Write program, who not only testified that detainees signed up in

---

[9]   In the limited circumstances where these records disagree, as they did for T.S.'s recreation, they can be resolved by considering the manner in which the records were created. (*See* § III(A)(2)(a), *supra*.)  There is no reason to think disagreement would be common, though; as Defendants note, the records generally are in agreement.  (ECF 212 at 12.)  Furthermore, "that some review of files and submissions will be required does not defeat certification; otherwise, Defendants . . . could escape class-wide review due solely to the . . . manner in which their business records were maintained." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 693 (N.D. Ga. 2016).

advance, but also produced specific lists of detainees who had signed up for Free Write in the summer of 2015. (*See* § III(A)(2)(a) *supra*.)

*Impact of "Alpha" closure*. The impact of the Alpha closures is easily demonstrated with common evidence. Every pod at the JTDC keeps a population count, showing which pods were overpopulated; the impact of closing 3A and 3B is thus demonstrable throughout the facility. The JTDC's resident rosters are also recorded daily, and thus show where detainees from Pods 3A and 3B were transferred. The same goes for the impact of shutting down the MAYSI psychological screen test; Defendants have already produced the names of every detainee who did not receive the test (Ex. 41), and the JTDC's rosters show exactly where those detainees were eventually housed, and with whom. (Ex. 55.) Moreover, the impact of the closure of the Alpha Pods created risks throughout the facility, for *all* detainees at the JTDC, so the impact was common to all class members. (Ex. 1 ¶¶ 45-60.)

*Visitation*. T.S. and his mother both testified that the closeness of the tables in the alternate visitation room meant that they lost their privacy, which as Dr. Kraus explains, is psychologically detrimental in a detention setting. (Ex. 2 ¶¶ 30(e), 40.) The closer tables in the smaller room was common to all detainees that had visitation during the *Empire* filming; and the identities of those detainees can readily be identified from visitation rosters. It is simply undisputed that detainees and their families were relegated to inferior visitation facilities in order to accommodate the *Empire* filming. (*See* § II(B)(3) *supra*.)

*Sick call slips*. Cook County keeps appointment rosters showing when detainees submitted sick call slips and when they received an appointment, allowing normal operations to be compared with operations impacted by the filming periods. (*See* ECF 195.)

***Disruption of behavior economy***.  Mr. Dunlap and Dr. Kraus explain that the disruption of the behavior economy created risk and had a negative psychological impact on all detainees in the facility, regardless of point level.  (*See* § II(B)(5) *supra*.)  This is common evidence, as is the evidence that the behavior economy was disrupted in order to accommodate *Empire*.  (*Id.*)

*     *     *

Plaintiffs can point to evidence showing that the core question for due process liability—whether the deprivations at issue were imposed pursuant to a legitimate governmental purpose—can be proven with common evidence.  Meanwhile, the common impact of those deprivations can be proven through Defendants' own records, which show both what should have happened, and what actually did happen.  Plaintiffs' due process claim satisfies Rule 23(b)(3).

### (2)     Breach of Fiduciary Duty.

Plaintiffs assert a breach of fiduciary duty claim against Dixon.  (ECF 88, Count VII.) The Court has already held—over Dixon's objection—that he was the guardian of the detainees at the JTDC and thus had fiduciary duties towards them.  (*See* ECF 73 at 23 ("A 'fiduciary' is a person, having a duty, created by his undertaking, to act primarily for another's benefit in matters connected with such an undertaking, and it includes relationships such as a guardian." (quotation omitted).)  Plaintiffs can show that Dixon approved the alleged lockdowns not for the benefit of the detainees at the JTDC, but rather so that Fox could film *Empire* there.  As with Plaintiffs' due process claims, that evidence is common to all the detainees at the JTDC.

Defendants object that each juvenile is likely to have different needs (ECF 212 "'Because children differ in their need for rehabilitation, individual need for treatment will differ.'" (*quoting Nelson v. Heyne*, 491 F.2d 352, 360 (7th Cir. 1974).)  *Nelson*, however, was a *certified class action* in which the court determined on a class wide basis that the defendants were required to provide individualized rehabilitative treatment to juvenile detainees—and that *no*

individual detainee could be "warehoused" and deprived of such treatment. *Nelson*, 491 F.2d at 360. Plaintiffs here accuse Dixon of cancelling and degrading the precisely such detainee treatment and programs so that Fox could use the facility for filming. That detainees may have been injured to a greater or lesser degree by this misconduct would be a matter of varying damages, which does not defeat class certification. *See e.g.*, *Messner*, 669 F.3d at 819 (holding that "common proof of damages for class members . . . is not required" to satisfy Rule 23(b)(3)). This claim satisfies Rule 23(b)(3).

**(3)    Intentional Infliction of Emotional Distress.**

Count IX of Plaintiffs' complaint asserts an Intentional Infliction of Emotional Distress ("IIED") claim. The Denial Motion does not address this claim. The IIED claim arises from Defendants' imposition of the deprivations at issue in this case in order to accommodate the *Empire* filming—a common issue. Dr. Kraus will offer common evidence that such deprivations are psychologically harmful. (Ex. 2 ¶¶ 32-40.) The IIED claim satisfies Rule 23(b)(3).

**b)    Fox defendants.**

Plaintiffs charge the Fox Defendants in two separate counts: inducement of breach of fiduciary duty (Count VIII) and unjust enrichment or accounting (Count XII). (*See* ECF 88.) These two counts are based on distinct theories of liability.

The evidence uncovered in discovery to date substantiates Plaintiffs' charge that Fox both knew, and that it should have known, that the JTDC's normal operations were restructured to the detriment of the children housed there, in order to accommodate its filming needs. Fox's scout and location manager recognized that filming even by a crew of 30 persons would disrupt the JTDC's operations. (Ex. 9.) Fox's film crew, however, was a multiple of this number, sometimes climbing to more than 200 people. (Ex. 10.) Fox's location scout conceded that he knew there was no other place but the yards for children to go outside at the JTDC—and that he

36

never once saw a child present on the yards during the shooting days, which lasted more than 12 hours.  (Ex. 7 at 45:2-14; 110:5-14; *see, e.g.,* Ex. 56.)  And Fox, which was given extensive tours of the JTDC in advance of filming—including the upper residential floors—and thus became familiar with the building's layout, had to know that its film crews were occupying the bulk of the areas within the building where children could go to get off their pods.  (Ex. 13 at 34:2-36:9; Ex. 7 at 45:15-46:9; Ex. 57.)

At their depositions, Fox's location employees claimed that even if they might have believed they were disrupting the lives of the children detained at the JTDC, they entrusted that issue to the JTDC's managers.  (Ex. 7 at 49:7-14; Ex. 58 at 79:6-81:3.)  That is damning if true, and it is directly at odds with Fox's own code of conduct, which recognizes that filming often disrupts people nearby, states that "[w]e should not expect everyone in the surrounding environment to alter their lives just to accommodate the needs of film production," and prescribes a variety of affirmative steps that Fox film crews should take to minimize the negative impact of filming on people who live near a set.  (Ex. 59.)  Indeed when Fox anticipates that its film production will impact the lives of persons near a film set, it budgets for "neighbor" payments—an expense so common that it is a standard line-item on Fox's film-budget sheets. (*see* Ex. 60.)  As Fox's witnesses testified, this often includes payments to neighbors who live within the same building where filming is occurring.  (Ex. 58 at 55:11-56:19; 169:8-20; Ex. 7 at 15:4-12.) Fox's advance "neighbor payments" budgets for filming at the JTDC, by contrast, were zero, even though it knew JTDC was an active detention facility with hundreds of young detainees. (Ex. 60.)  With this background, Plaintiffs turn to their legal theories against Fox.

### (1)    Inducement of breach of fiduciary duty.

Plaintiffs' first claim against Fox is for inducement of breach of fiduciary duty.  (SAC Count VIII.)  An inducement claim requires Fox to have "knowingly induced the JTDC officials

37

to breach their fiduciary duty" to the children at the JTDC. (ECF 117 at 3.) The remedy for an inducement claim is damages, or an accounting. (*See* ECF 88 ¶¶ 122-123.)

Fox focuses on this element, arguing that to be liable it would have to know about every single act that the JTDC undertook to provide it with filming space, and further would have to know how that act impacted each young person in the facility—an inquiry in which individual issues would predominate. (ECF 212 at 27.) What this Court already has held, however, is that it would be sufficient for Plaintiffs to show that it was obvious to Fox that the children at the JTDC had to be placed on lockdown in order to accommodate the filming (ECF 117 at 2-3), from which an inference of Fox's actual knowledge can be drawn. And indeed as Plaintiffs explain above, discovery has revealed that Fox was given extensive, repeated tours of the facility, making it obvious to Fox that in order for it to occupy the bulk of the second and third floors and the outdoor yard the children would need to be deprived access to all these areas—which would substantially limit them to their pods. Furthermore, while a factfinder might have to infer this knowledge about Fox's occupation of the second floor, Fox's witnesses testified that they *knew* no children were being allowed out on the outdoor yards, and that the children had nowhere else to go outside while Fox was filming (Ex. 7 at 44:22- 45:14; 110:5-14), from which an inference of its knowledge can be drawn. These issues are common, and they make out the "*prima facie* showing" that *Messner* requires at the class certification stage to satisfy Rule 23(b)(3).

### (2)    Unjust enrichment.

Plaintiffs' second claim is for unjust enrichment, or accounting. (SAC Count XIII.) Whereas Plaintiffs' inducement claim (Count VIII) requires actual knowledge of the breach of fiduciary duty, Plaintiffs' unjust enrichment claim applies both when a party knows it is benefitting from a fiduciary's misconduct, and when it ***should have known***. *See People ex rel. Daley v. Warren Motors, Inc.*, 500 N.E.2d 22, 28-29 (Ill. 1986) (third-party beneficiary of a

breach of fiduciary duty liable in unjust enrichment because he "knew or should have known" that the benefits he received from the fiduciary were improper, since "'[a] person has notice of facts giving rise to a constructive trust not only when he knows them, but also when he should know them; that is when he knows facts which would lead a reasonably intelligent and diligent person to inquire whether there are circumstances which would give rise to a constructive trust . . . .'" (quoting Restatement of Restitution § 174, cmt. a (Am. Law. Inst. 1937)).

Fox was so accustomed to impacting people in the areas surrounding its film sets that it developed an entire code of conduct acknowledging those impacts, ***and*** had a standard line item in its film budgets for compensating neighbors who were impacted by filming. Whether it *should have known* that taking over the two floors of the JTDC that had facilities for recreation and education would impose deprivations on the youth detained there is a common question that can be answered with common evidence for the class as a whole. Plaintiffs have certainly made the *prima facie* showing required by *Messner* to satisfy Rule 23(b)(3).

That should be the end of the matter. Since the Court's motion to dismiss decision, however, Fox has effectively pretended that Count XIII no longer exists. Instead it has repeated, over and over again, that the Court's motion to dismiss opinion held that Count XIII can only be satisfied via a showing of actual knowledge. (*See, e.g.*, ECF 180; ECF 188; ECF 204.) That is simply not so. The parties litigated Count XIII vigorously in their motion to dismiss briefing— particularly the constructive notice standard set out in *Warren Motors*.[10] Ultimately, however, the Court declined to decide the question. After noting that courts had seemed to go both ways on the question of whether Illinois recognized a cause of action for unjust enrichment, the Court concluded that

---

[10]   (*See* ECF 91 at 11-13 (Fox MTD); ECF 97 at 7-15 (Plf. Resp.); ECF 103 at 7-10 (Fox Reply); ECF 107 *passim* (Plf. Sur-Reply).)

39

> [a]t this stage of the proceedings, whether a claim for unjust enrichment can stand alone as an independent claim or must have a predicate cause of action involving improper conduct does not make or break Plaintiffs' unjust enrichment claim. More specifically, as addressed above, Plaintiffs have plausibly alleged the Fox Defendants' conduct was improper, namely, that they tortiously induced the County Defendants to breach their fiduciary duties . . . . As such, the Court denies the Fox Defendants' motion to dismiss Count XIII.

(ECF 110 at 13-14.) In other words, because it had already held that Plaintiffs had sufficiently pled Fox's actual knowledge required for Count VIII, ***and*** because Count VIII provided the same accounting remedy as Count XIII, the Court did not need to reach the question of whether Illinois recognizes Count XIII's unjust enrichment claim and its constructive knowledge standard. (*See* ECF 110 at 14.) Count XIII sets a lower scienter bar, so Fox's desire to see it disappear is understandable. But the Court simply did not reach the question of whether Plaintiffs can proceed on constructive notice alone, since it had already held that Plaintiffs had adequately pled actual notice and inducement, which would also permit the same remedy.

Plaintiffs do not seek to relitigate the viability of Count XIII here; that is for briefing at the summary judgement stage. This is the proper time, however, to decide whether Count XIII's constructive notice standard satisfies Rule 23(b)(3). And as Plaintiffs explain above, whether Fox should have known that its filming at the JTDC would result in restrictions to the residents there presents a common question that can be resolved as to all detainees at once.

### 2. Rule 23(b)(1)(B)—Recovery from an unjust enrichment pool remedy.

Plaintiffs additionally seek certification under Rule 23(b)(1)(B), for the unjust enrichment remedy sought in this case, which would establish a trust. The drafters of Rule 23(b)(1)(B) intended this class device for precisely such a purpose. *See* Fed. R. Civ. P. 23(b)(1)(B) advisory committee's note to 1966 amendment (explaining that Rule 23(b)(1)(B) "applies to an action which charges a breach of trust . . . affecting the members of a large class of . . . beneficiaries,

and which requires an accounting or like measures . . . .").  Plaintiffs seek an unjust enrichment remedy, in Counts VIII and XIII.  If the remedy creates such a pool, an award from the pool to one class member would affect the amount available for all the others.  Certification under Rule 23(b)(1)(B) is thus appropriate as to Plaintiffs' unjust enrichment remedy.

## IV.     CONCLUSION

The Court should reject Defendants' Denial Motion and certify the proposed class pursuant to Rule 23(b)(3) and Rule 23(b)(1)(B).

April 12, 2019                                                  Respectfully Submitted,

                                                                            /s/ Stephen H. Weil

Stephen H. Weil – steve@weilchardon.com          Adam J. Pessin – apessin@finekaplan.com
Alexis G. Chardon – ali@weilchardon.com          Fine, Kaplan and Black, R.P.C.
Weil & Chardon LLC                                          One South Broad Street, Suite 2300
333 S. Wabash Avenue, Suite 2700                   Philadelphia, PA 19107
Chicago, IL 60604                                             (215) 567-6565
(312) 585-7404

Terrence Garmey – tgarmey@garmeylaw.com
Terry Garmey & Associates
482 Congress Street, Suite 402
Portland, ME 04101
(207) 331-3111

                                                                            *Attorneys for Named Plaintiffs T.S. and Q.B.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2019, a true and correct copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

Sealed exhibits referred to herein were transmitted to all counsel of record via email.

/s/ Stephen H. Weil