## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| T.S. *et al.*, | Case No. 1:16-cv-08303 |
| Plaintiffs, | |
| | Honorable Chief Judge |
| v. | Rebecca Pallmeyer |
| Twentieth Century Fox Television, a division of Twentieth Century Fox Film Corporation et al., | |
| Defendants. | |

## GOVERNMENT DEFENDANTS' MEMORANDUM OF LAW
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
## AND REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DENY CLASS CERTIFICATION

## TABLE OF CONTENTS

**Page**

1.  PRELIMINARY STATEMENT ....................................................................... 1

2.  FACTS ............................................................................................................. 8

3.  LEGAL STANDARD...................................................................................... 23

4.  ARGUMENT ................................................................................................... 26

    (a)  Plaintiffs Cannot Satisfy Rule 23(a)'s Typicality Requirement ......................... 28

    (b)  Plaintiffs Cannot Satisfy Rule 23(b)(3)'s Predominance Requirement .............. 32

    (c)  Plaintiffs Cannot Satisfy Rule 23(b)(1)(B) ......................................................... 38

CONCLUSION.................................................................................................... 39

i

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)..................................................................................................23

*Bell v. Wolfish*,
441 U.S. 520 (1979)......................................................................................4, 25, 26

*Brieger v. Tellabs, Inc.*,
245 F.R.D. 345 (N.D. Ill. 2007)...............................................................................29

*Butler v. Sears, Roebuck & Co.*,
727 F.3d 796 (7th Cir. 2013) ...................................................................................35

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................................................................................................23

*In re: Delta/AirTran Baggage Fee Antitrust Litig.*,
317 F.R.D. 675 (N.D. Ill. 2016)...............................................................................34

*Dobbey v. Mitchell-Lawshea*,
806 F.3d 938 (7th Cir. 2015) ...................................................................................29

*Dochak v. Polskie Linie Lotnicze Lot S.A.*,
No. 15 C 4344, 2017 WL 2362570 (N.D. Ill. May 30, 2017) .................................23

*French v. Owens*,
777 F.3d 1250 (7th Cir. 1985) .................................................................................31

*Gallagher v. City of Winlock, Wash.*,
287 Fed. Appx. 568 (9th Cir. 2008).........................................................................29

*Harper v. Sheriff of Cook County*,
581 F.3d 511 (7th Cir. 2009) .............................................................................24, 38

*Kaplan v. Pomerantz*,
132 F.R.D. 504 (N.D. Ill. 1990)...............................................................................32

*King v. Berks Cnty. Jail Sys. Supervisor Officials*,
No. 19cv0389, 2019 WL 2123575 (E.D. Pa. May 14, 2019) ..................................30

*Kingsley v. Hendrickson*,
135 S. Ct. 2466 (2015)...........................................................................................6, 26

*Messner v. Northshore Univ. Healthsystem*,
669 F.3d 802 (7th Cir. 2012) .........................................................................34, 35

*Miranda v. County of Lake*,
900 F.3d 335 (7th Cir. 2018) ..........................................................................5, 6, 26

*Mulvania v. Sheriff of Rock Island County*,
850 F.3d 849 (7th Cir. 2017) .........................................................................5, 25, 34

*Neil v. Zell*,
275 F.R.D. 256 (N.D. Ill. 2011).......................................................................38

*Nistra v. Reliance Trust Co.*,
No. 16 C 4773, 2018 WL 835431 (N.D. Ill. Feb. 13, 2018)..................................38

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)........................................................................................24, 38

*Oshana v. Coca-Cola Bottling Co.*,
225 F.R.D. 575 (N.D. Ill. 2005), *aff'd sub nom. Oshana v. Coca-Cola Co.*,
472 F.3d 506 (7th Cir. 2006) ...........................................................................39

*Parko v. Shell Oil Co.*,
739 F.3d 1083 (7th Cir. 2014) .........................................................................24

*Pavone v. Meyerkord & Meyerkord, LLC*,
321 F.R.D. 314 (N.D. Ill. 2017)........................................................................24

*Payton v. County of Kane*,
308 F.3d 673 (7th Cir. 2002) ...........................................................................23

*Penna. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*,
286 F.R.D. 355 (N.D. Ill. 2012)........................................................................29

*Phillips v. Sheriff of Cook County*,
828 F.3d 541 (7th Cir. 2016) ...................................................................... *passim*

*Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*,
254 F. Supp. 3d 1007 (N.D. Ill. 2017), *reconsideration denied*, No. 12cv3233,
2017 WL 4682734 (N.D. Ill. Oct. 18, 2017)........................................................32

*Portis v. City of Chicago, Ill.*,
613 F.3d 702 (7th Cir. 2010) ...........................................................................38

*Potts v. Manos*,
No. 11 C 3952, 2017 WL 4340157 (N.D. Ill. Sept. 29, 2017)................................28

*Red Barn Motors, Inc. v. Next Gear Capital, Inc.*,
    915 F.3d 1098 (7th Cir. 2019) ..............................................................................23

*Reed v. Bowen*,
    __ Fed. Appx. __, 2019 WL 1873026 (7th Cir. Apr. 26, 2019) ........................................27, 31

*Romero-Arrizabal v. Ramos*,
    No. 16-cv-5967, 2019 WL 1281968 (N.D. Ill. Mar. 20, 2019) ...............................26, 27, 29

*Rowell v. Voortman Cookies, Ltd.*,
    No. 02cv0681, 2005 WL 1026715 (N.D. Ill. Apr. 27, 2005) .................................................28

*Smith v. Dart*,
    803 F.3d 304 (7th Cir. 2015) .........................................................................30, 31

*Spano v. The Boeing Co.*,
    633 F.3d 574 (7th Cir. 2011) ..............................................................................38

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ................................................................................23, 30

*Stile v. Cumberland County Jail*,
    No. 2:12-cv-260-JAW, 2013 WL 1881300 (D. Me. Mar. 26, 2013) .....................................23

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ..............................................................................30

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .........................................................................................23

*Young v. Blozinski*,
    __ Fed. Appx. __, 2019 WL 2084441 (7th Cir. May 13, 2019) ...........................................30

## STATUTES, RULES & REGULATIONS

Fed. R. Civ. P. 23 ................................................................................................... *passim*

## OTHER AUTHORITIES

Fourteenth Amendment ..............................................................................................5

On October 17, 2018, the "Government Defendants" in this matter—Cook County, the Chief Judge of Cook County Circuit Court, and Superintendent Leonard Dixon of the Cook County Juvenile Temporary Detention Center (the "JTDC"); and the "Fox Defendants" (Twentieth Century Fox Television, or "TCFTV"; Fox Broadcasting Company; and Twenty-First Century Fox, Inc. n/k/a TFCF Corporation), moved pursuant to Fed. R. Civ. P. 23(c) and (d)(1)(D) for an order that plaintiffs T.S. and Q.B. ("Plaintiffs") cannot satisfy Rule 23. *See* Dkt. No. 212 ("Denial Mem."). On April 12, 2019, Plaintiffs filed a motion seeking to certify a class pursuant to Rules 23(b)(1)(B) and (b)(3). *See* Dkt. No. 235 ("Pl. Mem."). This memorandum is the Government Defendants' reply in support of their motion and their opposition to Plaintiffs' motion.

## 1. PRELIMINARY STATEMENT

Q.B.'s and T.S.'s actual complaints about the conditions of their detention when TCFTV filmed scenes from *Empire* at the JTDC in the summer of 2015 are far different from what they falsely alleged in their Second Amended Complaint ("SAC"). For purposes of the instant motions for and against class certification, what matters most is that their actual claims are too individualized and atypical to satisfy Rule 23 and therefore cannot proceed on behalf of a putative class. It must be said, however, that T.S.'s and Q.B.'s *actual* claims, accurately pleaded, never would have survived pleading-stage motions to dismiss and will not survive summary judgment.

Q.B.'s and T.S.'s individual claims differ considerably, which is not surprising given their different statuses within the JTDC. Q.B.'s propensity for fights and poor behavior designated him a "Level 1" detainee with few privileges, and he resided within the "Center" at the JTDC reserved for serious disciplinary cases. Q.B.'s only two complaints about the supposed impact of *Empire* filming both arose on one day: June 23, 2015. He claims that the residents of his "pod" of detainees did not receive their usual hour of off-pod recreation that afternoon, and that when his grandmother arrived to visit with him that evening, JTDC staff turned her away. But Q.B. was on a "behavior

plan" that day and committed a rules infraction that morning which had led to additional discipline. Other residents on his pod who were not on behavior plans had normal visitations that day. If Q.B. still wants to argue that *Empire* filming, rather than his own actions, caused either of his alleged deprivations on June 23, proving or disproving those claims would entail purely individual inquiries that would not advance the claims of any other detainee at the JTDC.

T.S. resided in a different Center than Q.B.'s, and his mostly good behavior while detained earned him fairly consistent "Level 4" status, with the most privileges. He had an atypically long stay at the JTDC and was present for all 14 of the days that TCFTV filmed across June, July, and August 2015. He asserts five personal claims. First, he contends that his pod missed one day of off-pod recreation, although JTDC records from that day show otherwise. Second, one evening visit with his mother lasted 41 minutes rather than 45 minutes, although nothing in the record suggests that this had anything to do with *Empire*. Third, on one day when TCFTV was filming in the JTDC's 1302-square-foot visitation area, T.S.'s visit with his mother occurred in a 1148-square-foot classroom instead. Fourth, on one or two days, T.S. had summer school classes on his pod rather than in a classroom, and he contends that these classes were less effective. Fifth, he claims that a "Free Write" class, which he might have attended on one afternoon, was canceled for lack of a classroom, but JTDC staff testified his attendance at "Free Write" classes was sporadic.

These claims by T.S. and Q.B. are individual and minor, not systemic and severe, and therefore do not measure up to the high bar that the Seventh Circuit set for class certification in *Phillips v. Sheriff of Cook County*, 828 F.3d 541 (7th Cir. 2016). *Phillips* involved claims of inadequate medical care at a detention facility, including episodic failures to treat serious illnesses. Even so, the Seventh Circuit held that class certification was inappropriate in *Phillips* because the plaintiffs had not established "systemic deficiencies" that "rendered the medical treatment constitutionally inadequate for all [detainees]." *Id.* at 554.

Medical care had featured prominently in T.S. and Q.B.'s SAC. Indeed, the SAC survived dismissal only because they alleged that TCFTV filmed in the JTDC's medical area and thereby "depriv[ed] the juvenile detainees [of] access to the infirmary" and caused "the denial of sick-call requests." Dkt. No. 73 at 9. T.S. and Q.B. have admitted, however, that this central allegation was false. *See* Dkt. No. 142, pg. 1 (conceding no filming occurred in the medical area). Nurses made rounds every day during filming, as normal. Even the movement logs Plaintiffs submitted (*e.g.*, Pl. Ex. 19) show detainees from Q.B.'s pod being escorted normally to and from the medical area on these days. In other words, Plaintiffs cannot even approach the type of claims that *failed* to win class certification in *Phillips*. And with the medical claims no longer operative, their individual stories about other aspects of their detention show neither "systemic deficiencies" nor any actionable deprivations at all. For this reason, their motion could not and did not cite a single case, pre- or post-*Phillips*, in which any court certified a damages class for claims like theirs.

Because Plaintiffs cannot satisfy the *Phillips* standard, their motion throws up a dense fog of distortions. They wrongly portray *Phillips* as "bad law," misstate the discovery record, and urge the Court to see this case as they wish it to be rather than what it actually is. Their motion begins with the false premise that this Court "*already has held* 'that there was no legitimate governmental purpose'" for Cook County's decision to permit filming. Pl. Mem.at 3 (emphasis added). Not so. Judge St. Eve, in ruling on Defendants' motion to dismiss, held only that Plaintiffs' unproved complaint "*adequately alleged* that there was no legitimate governmental purpose." Dkt. No. 73 at 10 (emphasis added). This Court has made no findings with respect to the legitimacy of the government's objectives, and in discovery, JTDC officials, led by Superintendent Leonard Dixon, articulated numerous beneficial purposes that they both intended to achieve and did achieve by permitting TCFTV to enter.

3

Just as importantly, Plaintiffs' motion rips the term "legitimate governmental objective" from its context. In *Bell v. Wolfish*, 441 U.S. 520, 539 (1979), the Supreme Court wrote that "if a restriction or condition [of pretrial detention] is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly *may* infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* (emphasis added). That emphasized "may" is critical: The question relevant to class certification here is whether Plaintiffs, in the course of trying to prove that restrictions imposed on them were "arbitrary," "purposeless," and "[un]related to a legitimate goal," and which therefore *may* lead to an inference of an intent to "punish," will do so through evidence applicable commonly to all putative members of their class. The facts as borne out through discovery, summarized below, show conclusively that the answer to this question is a resounding "no."

- In June 2015, Cook County and TCFTV executed an agreement permitting TCFTV to enter the JTDC to film scenes for *Empire* but requiring TCFTV to defer at all times to the JTDC's operational priorities. Cook County granted TCFTV access to the JTDC on June 21–26, July 13–16, and August 23–26, 2015.

- Medical care, including nurses' daily visits to detainees' pods and detainees' access to the JTDC's medical facilities, were uninterrupted and normal on all these days.

- Intake procedures, including detailed mental health screening for new detainees, also proceeded normally while TCFTV was at the JTDC. Although the JTDC allowed TCFTV to film inside empty pods usually occupied by new arrivals, the JTDC made two other pods available for new arrivals' residency.

- TCFTV filmed on some days in one section of the JTDC's three-section outdoor yard. On those days, the JTDC elected to close either two or all three sections of the yard and to conduct recreation indoors for those pods that had been scheduled for outdoor activity in the closed areas. Some pods already were scheduled for indoor recreation on those days and therefore were not affected.

- On four days, TCFTV filmed in the JTDC's regular visitation area. The JTDC moved scheduled visitation to a slightly smaller classroom. This affected only detainees whose scheduled visitation fell on those days and who had visitors.

- The JTDC gave TCFTV use of some of the building's classrooms to use on filming days. School was not in session during the June or August filming periods. Summer school was held on the three days in July, and the JTDC arranged for

classes to be held in detainees' pods for those days. The JTDC also cancelled or rescheduled some nonschool programs that would have been held in the classrooms, which affected only those detainees who were eligible to sign up for such programs and who would have signed up and been chosen for them.

- None of these changes were discussed between the JTDC and TCFTV.

- Dixon—whom the federal government has recognized as an expert in juvenile corrections—had prior experience with allowing a studio to film at a detention facility. Based on this experience, he believed that allowing TCFTV to film at the JTDC would provide a positive experience for detainees and staff, and he sought to maximize those benefits. For example, he arranged for detainees on good behavior to meet privately with actor Chris Rock, who starred in the *Empire* episodes. Terrence Howard, who plays *Empire*'s male lead, has since returned to the JTDC to meet with detainees and hold programming.

The need for individual inquiries into what actually happened to T.S. and Q.B., and to balance the benefits that each detainee received against the alleged impacts on him in particular, is why Plaintiffs' brief could not cite analogous cases in which classes were certified. In discussing the "punishment" standard applicable to their claims, Plaintiffs cited only *nonclass* cases involving abhorrent actions taken against individuals in those other cases, such as when a detainee was "handcuffed while [trying] to urinate," or "handcuffed…to a light pole in an empty parking lot" and left alone as a "prank." Pl. Mem. at 29. Nothing even remotely like that occurred here.

Assuming for purposes of this motion that T.S. or Q.B. still has a claim, all the key liability questions, as in *Phillips*, "can only be answered by looking at the unique facts of each detainee's case," and therefore "are incapable of being solved on a classwide basis." *Phillips*, 828 F.3d at 556. Plaintiffs' brief (at 30) falsely contends that *Mulvania v. Sheriff of Rock Island County*, 850 F.3d 849 (7th Cir. 2017), overruled *Phillips* by setting forth a different standard for class certification. The reality, though, is that *Mulvania* made no mention at all of *Phillips*, and *Phillips* continues to control how this Court must analyze Plaintiffs' motion for class certification.[1]

---

[1] Plaintiffs appear to have based their "bad case law" assertion (Pl. Mem. at 2) on the Seventh Circuit's statement in *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) that "medical care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the

Because granular examination of T.S.'s and Q.B.'s actual experiences is fatal to Plaintiffs' attempt to certify a class, Plaintiffs' brief argues a set of facts very different from the discovery record. They pretend, for example, that they still have a medical claim to assert. Even if they do, however, it is not one that satisfies *Phillips*. Plaintiffs said in interrogatory responses that T.S. had an unmet medical need, but T.S.'s deposition revealed that to be a farce: His "unmet need" was a prurient joke about the size of his penis. T.S. admitted that when he made *real* complaints during filming, about headaches and a toothache, JTDC staff responded appropriately, with pain relievers for the former and a prompt dentist visit for the latter. Plaintiffs' brief thus now tries a new tack based on testimony from Q.B. about having seen an unnamed other detainee with an untreated bloodshot eye during filming. *See* Pl. Mem. at 25. JTDC officials have examined the chart of the person whom they think Q.B. had in mind and found no such complaint, but even if Q.B.'s recollection is correct, this is not evidence that filming affected any, much less all, medical treatment at the JTDC. *See Phillips*, 828 F.3d at 554 (denying class certification absent "systemic deficiencies" that "rendered the medical treatment constitutionally inadequate for all [detainees]").

Discovery having disproved Plaintiffs' claim that detainees were widely denied medical care, they now stress a new claim, not pleaded in their SAC. They contend that TCFTV's presence caused the JTDC to alter its intake procedures by curtailing administration of a computerized psychological screening test, placing new detainees directly into the JTDC's general population without evaluation, and "overpopulat[ing]" the JTDC. Pl. Mem. at 12–14. This claim, however, holds no more water than Plaintiffs' false claim that the medical center was "closed." The documents Plaintiffs submitted with their motion (*e.g.*, Pl. Exs. 18 & 24) show that the intake

---

objective unreasonableness inquiry identified in *Kingsley* [*v. Hendrickson*, 135 S. Ct. 2466 (2015),]" and not a standard of "deliberate indifference." *See* Pl. Mem. at 28 (discussing *Miranda*). As will be explained in this memorandum, however, Plaintiffs no longer have any actionable "medical care claims." More importantly, *Miranda* was not a class action, and nothing in it calls into question the soundness of the class certification analysis in *Phillips*.

process continued normally on days *Empire* filmed. Newly arrived detainees (which T.S. and Q.B. were not) received comprehensive psychological screening before being placed in one of the residential Centers. The records of detainees taken in during filming confirm this. The computer test indeed was not given to all new arrivals, but this was not because of filming: a terminal was down, and a since-terminated employee was derelict in not administering the test on numerous occasions both during and after the filming period. As for supposed "overpopulation," each pod's occupancy goes up and down on a daily basis, no pod ever had more detainees than it had one-bed secure rooms to hold them, and the total population never exceeded the JTDC's recommended capacity. Indeed, Plaintiffs concede in their brief that having pods "rearranged and combined" is a standard practice at the JTDC. Pl. Mem. at 8. Again, there is nothing here that amounts to "punishment" or that satisfies the *Phillips* standards for class certification.

Plaintiffs separately claim that Dixon breached a fiduciary duty to them. This claim requires them to show that Dixon put them at substantial risk of harm. But just as Plaintiffs' civil rights claim will turn on highly individualized facts about whether the specific restrictions they allege were imposed on them both amounted to "punishment" and were caused by the filming, the same is true of claims that Dixon ignored a substantial risk of harm (which he did not).[2]

Plaintiffs are not seeking an injunctive class, nor would a Rule 23(b)(2) class be possible here because no additional filming is contemplated by TCFTV or by anyone else. This is a proposed *damages* class, and there is no precedent for certifying such a class in circumstances such as Plantiffs'. This should not be the first.

---

[2] Plaintiffs' also claim intentional infliction of emotional distress. To prevail, they must show that JTDC officials *intentionally* inflicted harm on them in order to bring about emotional distress. Superintendent Dixon's undisputed testimony that he thought the filming would result in benefits to detainees should put this claim to rest, but in any event, the evidence of whether any detainee suffered emotional distress and whether JTDC officials had the intent to create that detainee's distress are questions that would be individual to each detainee.

2.      **FACTS**

*TCFTV Filmed Empire at the JTDC by Agreement with Cook County*

TCFTV produces *Empire* and films it in Chicago.  The show's first season ended with a male lead character incarcerated pretrial, and as TCFTV prepared to film the second season in spring 2015, it sought a filming location, ideally one including a prison "yard," in which to create scenes of this character's detention.  A location scout for TCFTV, Jonathan Klemke, saw pictures of the JTDC, contacted Dixon, and asked if he "would be interested in potentially exploring letting [TCFTV] use" the JTDC for filming.  *See* Ex. A, 23:8–20; *see also* Ex. B, 63:9–64:6.

When Dixon worked at a detention facility in Miami in the 1980s, a movie studio filmed in both the juvenile and adult wings of that facility.  *See* Ex. B, 105:18–107:23.  Dixon believed that detainees had a positive experience during that filming, and he was receptive to TCFTV's request.  *See id.*  In particular, he thought detainees at the JTDC would benefit from meeting some of the stars of *Empire*.  *Empire* features "African-American actors, and [the JTDC] is basically African-Americans," so Dixon (who is African-American himself) "wanted [detainees] to be exposed to the actors so they could talk to them."  *See* Ex. B, 110:3–7.  He asked TCFTV about actors' willingness to do this, and received positive indications from TCFTV, before he decided to allow filming.  *See* Ex. B, 109:9–110:12.

Dixon knew that if he allowed TCFTV to film at the JTDC, the JTDC's operational needs would take precedence over filming logistics.  *See* Ex B. 68:15–22.  TCFTV's Location Manager, Brady Breen, who handled most discussions with Dixon, "understood that there had to be some regulations to how we conducted our business in order for those kids to maintain their time there. It was important to us."  *See* Ex. C, 108:12–21.  *See also id.* 111:9–21 ("[T]hat is exactly why there were meetings sitting in a conference room making sure that we could find a way to work and maintain the kids' time in that facility…[t]here was a lot of conversation about how we can

accomplish the work that we want to accomplish and be respectful of what's going on in the building, and those guidelines were set very clearly by the team that works at the [JTDC].").  On this basis, Dixon approved TCFTV's request to film inside the JTDC.  *See Ex. B,* 88:14–22.

Cook County presented, and Breen signed without alterations, a Location Agreement requiring TCFTV to pay $1,500 per day plus reimbursement of certain costs associated with TCFTV's access to the facility.  *See* Dkt. No. 212, Ex. A.  It stated, "TCFTV acknowledges that the [JTDC] is a functioning municipal building operating as a residential facility for juveniles…[and] will cooperate… so that normal operations of the building and its occupants and access by the public are not disrupted in any manner whatsoever."  *See* Ex. C, 101:13–21; Dkt. No. 212, Ex. A.  ¶ 1(d).  The agreement covered only the June filming period, but TCFTV subsequently requested access for a few more days in July and then again in August to shoot additional footage.  *See* Dkt 212, Ex. B.  TCFTV received access to the JTDC from June 21–26, July 13–16, and August 23–26, 2015, all on the same "no disruptions" terms.

Breen had a clear recollection of being told at one point during filming that the TCFTV crew had to move away from a location that they had been occupying because JTDC officials needed to move detainees through that area.  *See* Ex. C, 136:5–13.  He remembered "many times" when crew movements were restricted because JTDC operations and "protect[ing] the kids" took precedence.  *See* Ex. C, 148:12–20.  Location scout Klemke, who also was on-site during filming, similarly recalled, "occasions when our crew members would have to wait to use elevators and doorways so that juveniles could be taken to their scheduled activities."  *See* Ex. A, 26:6–10.

### *Normal JTDC Operations*

Each new male detainee at the JTDC is initially housed in an intake or "Alpha" pod, is assessed over the first 24–72 hours of his detention and then, if he is still detained—some detentions last less than 48 hours—he is assigned to one of several residential Centers based on,

9

among other things, his prior history of disciplinary issues.  *See* Ex. D, 70:8–13.  One Center, "Wings," houses female detainees, but neither the SAC nor Plaintiffs' motion discusses the experience of female detainees, who go through a different intake process and have a separate program.  *See id.* 80:12–21.  The male Centers are divided into residential "pods," with each Center typically having three pods assigned to it.  Residents of different Centers are kept separate from each other.  Activities, including recreation and schooling, are conducted by Center or pod, but detainees within a pod may be subject to different treatment for disciplinary or other reasons.  *See* Dkt. No. 212 Ex. D, ¶ 14.  Pods have individual secured rooms for each detainee, and these open out to a common area with seating and a separate television area with seating.  *See id.* ¶ 6.

Once assigned to a Center, detainees have a behavior-driven designation from Level 1 to 4.  Detainees attain higher levels by earning "points" through good behavior and participation in Center programs.  *See* Ex. D,  93:16–95:15.  Detainees lacking enough points may not be able to elect certain activities.  *See id.*  Level 4 detainees have the most privileges, including the ability to sign-up for voluntary classes and first pick of those classes.  *See* Ex. E*,* 26:16–27:13.  Level 3 detainees also can sign up for classes but only after all Level 4 detainees have done so.  *See id.*; Ex. F, 118:13–119:9.  At the other end of the spectrum are Level 1 detainees,such as Q.B., with more serious behavior issues and the fewest privileges.  *See* Dkt. No. 212, Ex. D, ¶¶ 8–11.

When the JTDC's Nancy B. Jefferson ("NBJ") School is in session, detainees have breakfast on their pods, go through hygiene, and then are brought down by pod to the school area. Each Center has its own classrooms, although two Centers may share.  *See* Ex. F, 76:12–19, 77:8–13.  Newly --arrived detainees in the Alpha Center always receive schooling on their pods rather than being taken to the NBJ School.  *See* Ex. F, 129:11–22.  Detainees who are in the medical unit or are confined to their rooms for disciplinary violations do not attend school.  *See id.*  Sometimes, when staff believe it would be more appropriate for detainees not to travel from their pods to the

NBJ School area on the second floor of the JTDC, "the staff could make a decision and speak to management and say I think there are some concerns. We will stay upstairs today" rather than going down to the school. See Ex. F, 129:21–130:15; *see also* Ex. D, 27:4–10.

T.S. resided at the JTDC twice. On Aug. 5, 2014, he stayed for just one day. *See* Ex. G, 17:22–18:7. He then was remanded to the JTDC on Dec. 3, 2014, went through the normal intake process, and remained there until Sept. 24, 2015. *Id*. at 18:21–19:7, 86:11–16.

Between March and May 2015, Q.B. was in and out of the JTDC. Each stay lasted between two and three weeks. *See* Ex. H, 14:20–16:12. He then spent six weeks at the JTDC from early June through mid-July 2015, but was released prior to the time *Empire* filmed in July. *See id.* 16:13–20. He returned in August and remained until January 2016. *See id.* 16:24–17:9.

T.S. described a normal (school) day for him at the JTDC as involving classes from 8:15 a.m. to 2:45 p.m., followed by a recreation period. He then would shower and remain in his pod's common area until bedtime. *See* Ex. G, 22:8–23:15. On a normal weekend day, T.S. said he usually would have recreation in the morning, and possibly time in the JTDC's "game room" or a visit to his Center's "Commissary" later in the day to spend his earned points on snacks, but otherwise would be in his pod's common area. *See id.* at 24:24–25:17.

Q.B. "had a fight on intake" and therefore was in the "Legacy" Center, which was reserved for detainees with disciplinary problems. He had "Level 1" status during all times *Empire* filmed. *See* Ex. H, 84:18–85:22, 94:4–19. Q.B. frequently engaged in fights and described his days very differently from the way T.S. (who most often was a "Level 4") described his. Q.B. had a much earlier lights-out time than other detainees had, he could not participate in most voluntary activities, and he did not usually have Commissary privileges. On typical nonschool days— unrelated to *Empire* filming—Q.B. said he spent all but an hour of his day on his pod. *See* Ex. H, 23:21–24:4, 37:7–43:20, 84:18–85:22, 94:4–19. *See also* Dkt. No. 212, Ex. D, ¶¶ 8–11.

### *How Empire Filming Impacted the JTDC*

TCFTV's "call sheets" for the cast and crew reflect that TCFTV filmed in or used one section of the outside yard on at least parts of June 22–23, July 13 and 15, and Aug. 23–24. TCFTV filmed in an unoccupied pod on at least parts of June 22–24, July 13 and 15, and Aug. 23–24. It filmed in the JTDC's visiting area on June 24–25 and July 13–14. These all were weekdays. *See* Dkt. No. 212, Exs. A and B.

Dixon told Klemke, "activities had been scheduled in a manner that they wouldn't impact our filming and that our filming wouldn't impact them." *See* Ex. A, 26:11–27:1. Breen had no contact with detainees because officials "were pretty careful about isolating [the cast and crew] from children that were in there." *See* Ex. C, 88:10–18; *see also* Ex. A, 50:5–6 ("The facility went out of their way to keep us separated from kids."). Klemke recalls only "occasionally" seeing detainees "in the halls in transit" during filming. *See* Ex. A, 42:16–19.

### <u>Medical Treatment</u>

At the heart of Plaintiffs' SAC was their false claim (at ¶¶ 36, 43) that the "[t]he *Empire* film crew used the JTDC's medical area to shoot scenes for the show." Plaintiffs have admitted that this was not true. *See* Dkt. No. 142, pg. 1 ("Fox … argue[s] … that it did not film in the JTDC's infirmary. This appears to be correct."). TCFTV *asked* to film in the JTDC's medical area, but Dixon made clear that neither he nor his staff ever would have allowed that: "There was no way they were going to film in the infirmary." *See* Ex. B, 99:7–19.

The JTDC's records confirm that the medical area remained open and unimpeded at all times. *See* ECF No. 212 Ex. S. Nurses made their twice-daily rounds to all pods—meeting with detainees, dispensing medications, and collecting detainees' Health Service Requests—without interruption. *See* Ex. I, ¶¶ 10–14. Sometimes it is necessary for detainees to visit the medical unit, and Pl. Ex. 19 is a filming-day movement log showing multiple detainees doing so. It is undisputed

that no medical emergencies occurred during filming, and the JTDC's records reflect that *Empire* filming had no impact on health care delivery. *See* Ex. I, ¶ 16. Put simply, "[n]o medical care was interrupted during the *Empire* filming dates." *Id.* ¶ 4.

T.S. agreed that nurses visited his pod twice every day, including during filming, and read all detainees' "sick call" slips. If a detainee said, for example, "you had a headache," the nurse will call the detainee to the cart for a pain reliever. If the issue was "serious, she'll call you, ask about it, put it in a book, and they call you down [to the medical area] later." *See* Ex. G, 78:2– 79:21. The supposedly untreated medical issue that T.S. referenced in his interrogatory responses, which he said he put in "six or seven" sick call slips, was his "problem with my privates," which he meant to be a joke. *Id.* 104:14–105:18. He also "maybe" put in other requests "for like headaches," but he received medicine when he did so. *Id.* 107:22–108:15. He did not recall any other medical requests. *Id.* 107:15–17. When prompted, he also remembered that he had a toothache when *Empire* filmed, but he said that he was satisfied with his treatment, which included a prompt dentist visit and a filling. *See id.* 149:22–150:14; *see also* Dkt. No. 215*,* Ex. R.

Q.B. said he never sought medical care on any filming day. *See* Ex. H, 72:24–73:2. (This appears not to be true, however, because Pl. Ex. 19 shows that on June 25, while Q.B. was in the middle of a 24-hour confinement for fighting, he complained of chest pains and was attended to by a nurse.) Q.B. testified at his deposition, "one kid" on his pod "had a blood clot in his eye. He put in sick call. He ain't get seen until the next week." Q.B. could not identify this person except that he had a "Thug Life" tattoo on his stomach. *See* Ex. H, 106:8–107:10. That description sufficed for Cermak Health Services to identify the person whom Q.B. likely had in mind, and the responsible manager inspected this detainee's chart. *See* Ex. J, ¶¶ 6–9. The detainee never sought eye care during the times *Empire* filmed, and he was seen regularly by nursing and medical staff on days before, during, and after filming. *See id.* ¶¶ 9(a)–(b).

13

**Intake Process**

Plaintiffs' memorandum correctly states (at 12), "[w]hen detainees enter the JTDC, they are not immediately assigned to a [permanent] residential pod." Under normal procedures, a newly --arrived male detainee spends at least his first one to three days in an Alpha pod, during which he undergoes various evaluations and JTDC officials decide which of the Centers should house him. T.S. and Q.B. both went through this process. *See* Ex. G, 86:11–16; *see also* Ex H, 85:7–22, 94:4–19. Plaintiffs posit that because *Empire* filmed in what is normally an Alpha pod, this must mean that the JTDC did not put new arrivals through the usual Alpha process. This is not true, however, and Plaintiffs notably did not ask the multiple JTDC executives whom they deposed about it. They relied on their Ex. 40, but this was an employee's thoughts on how Pods 3A and 3B *could* be freed for filming, not a record of what actually happened.

On the days when TCFTV filmed in Pods 3A and 3B, the JTDC used two other pods, 3F and 5B, for Alpha activities. *See* Pl Exs. 18 & 24, *See* Ex. K, 76:9–13, 77:6–12. Other logs show that detainees who arrived during *Empire* filming spent one to three days in the Alpha Center, exactly as they would have under any other circumstances. *See* Pl. Exs. 18 & 24, *See* Ex. K, 76:9–13, 77:6–12. Contrary to the statement in Plaintiffs' brief (at 14), every detainee who arrived during filming and who stayed more than a day received a panoply of tests called for by the JTDC's "Mental Health Intake Screening and Initial Treatment Plan," ("MHI"), including face-to-face exams conducted by trained medical professionals. *See* Ex. L, ¶¶ 9(b), 15. This has been confirmed by multiple officials reviewing multiple contemporaneous records. *See id.* ¶ 15, Ex. J, ¶¶ 5(a)–(b). *No detainee* was transferred out of Alpha and into a different Center at the JTDC

without having been carefully screened by medical staff for mental and physical health issues or without a normal meeting of the JTDC's "transfer team." *See* Ex. M. ¶¶ 5–6.

It is true, as Plaintiffs claim, that most male detainees who arrived during *Empire* filming did not also take a computerized mental health screening test known as the "MAYSI-2." *See* Pl. Mem. at 13; Pl. Ex. 41. The likely causes of this inconsistent use of MAYSI were one or more case workers who "consistently failed to administer the MAYSI test" (one of whom was dismissed as a result) and "technical difficulties" when one of the MAYSI machines was moved." *See* Ex. S, ¶¶ 4–5. The MAYSI, however, was only one component of the JTDC's overall screening of new detainees (*See* Ex. M)—arguably the least important and least reliable because it is self-administered by detainees rather than reflecting an examination by professionals—and "is not a necessary tool" in the context of the JTDC's other screening steps. *See* Ex. L, ¶¶ 9(d)–11.

### Schooling

The NBJ School was on breaks during the June and August filming periods. *See, e.g.,* Ex G, 124:1–125:15; Pl. Mem. at 9–10. When TCFTV filmed on four days in July, summer school was in session, but Q.B. was not detained on those days. *See* Ex. H, 101:18–24; Dkt. No. at 9. T.S. had a court appearance on July 14 and was confined to his room for a disciplinary violation on July 15. *See* Ex. G., 136:4–24 & Pl. Ex. 28. Plaintiffs' only evidence about how classes were taught on pods during *Empire* filming in July 2015 thus comes from T.S. based on (at most) his one or two days of experience on July 13 and/or 16. T.S. said he thought the periods were shorter because teachers had to move between pods (Ex. G, 30:20–31:5) and that detainees "continued to play cards and watch TV" during classes (Ex. G, 32:24–33:4). He said he recalled that his math teacher never came to his pod. *See* Ex. G, 31:16–21. T.S. could not speak to the experience of detainees in other pods, however, and Plaintiffs' motion does not and cannot contend that records exist pertaining to classes held or not held in particular pods on these days.

**Visitation**

Detainees within each Center were allowed visitation on two specific days per week. *See* Pl. Mem. at 15. The JTDC's records reflect that visitation occurred on every day *Empire* filmed. *See* Ex. N, ¶¶ 5–7; Pl. Ex. 10 ("Visitation was not canceled."). According to Earl Dunlap, a compensated witness for Plaintiffs who was the JTDC's administrator before Dixon, only about 50%–60% of JTDC detainees have regular visitors. *See* Ex. D, 173:23–174:8.

On four days when TCFTV filmed in the JTDC's regular visitation area, JTDC officials moved visitation from the regular 1302-square-foot room to a classroom. Then–JTDC Supervisor-in-Charge Gene Robinson "personally oversaw the setup of the alternate, 1148-square-foot classroom used for visitation … [and] personally designed the table arrangement … to ensure that visitors had space and privacy consistent with [that] … in the regular visitation room." See Ex. N, ¶ 6. T.S. and his mother each recalled one visit in this alternate area. *See* Ex. G, 128:4–129:7, see also Ex. O, 27:14–21. Q.B. recalls one or two visits in the alternate area, but these were with his court-appointed "mentor," not with his family. *See* Ex. H, 65:13–66:3.

Plaintiffs opine that the alternate room had too-few tables (*see* Pl. Mem. at 15), but the Government Defendants dispute this, and in any event, no testimony suggests that any detainee or visitor had to wait for an available table. Neither T.S.'s mother nor Q.B.'s grandmother noticed anything different outside the JTDC on days when *Empire* was filming, and neither had any trouble parking in their normal places to visit T.S. and Q.B. during filming. *See* Ex. O, 15:11–16:2; *see also* Ex. P, 11:15–21.

T.S.'s mother visited T.S. on three days when TCFTV was present at the JTDC. JTDC records, including visitor logs signed by T.S.'s mother and movement logs for T.S.'s pod, show that T.S. visited with his mother for 41 minutes during her visit on June 25 and for an hour during her visits on filming days in July and August. *See* Dkt. No. 214, Ex. N; *see also* Ex. Q. Plaintiffs'

SAC falsely alleged that T.S.'s mother waited for two hours to visit on one occasion and that the visit was substantially shortened as a result. *See* SAC ¶ 47(d). With respect to that June 25 visit, T.S.'s mother testified, and the JTDC's records confirm, that after arriving at the JTDC's visitor center at 6:35 p.m., she waited a not-atypical 44 minutes before entering the visiting room, where T.S. had arrived seven minutes earlier. *See also* Ex. Q. Seven other detainees had visits at the same time, and they all ended at 8:00 p.m. Plaintiffs' motion does not explain how a four-minute reduction in the usual 45-minute visitation period could have been a function of *Empire* filming, which was over for the day. Both JTDC records and T.S.'s mother contradict T.S.'s testimony that "all [his] visitations" during *Empire* filming were cut from the usual length down to 15 minutes. *Compare* Ex. G, 42:6–19 *with* Ex, O, 19:11–27:8.

Q.B.'s grandmother, V.P., visited Q.B. "once a week or every other week" when he was detained. *See* Ex. P, 8:13–17. She said, on a normal day, she would wait "20 minutes, half an hour" after arriving to meet with Q.B. *Id.* 10:1–4. On June 23, 2015, V.P. said the cutoff for visitation was 7:15 p.m., and she arrived at the JTDC "between 6:00 and 6:30." *See id.* 10:22–11:11. When she told the security guard she was there to visit Q.B., "they said no and I [was] turned away." *Id.* 12:7–10. She did not see anyone else being turned away. *See id.* 13:18–20.

Q.B. had multiple disciplinary violations on June 23, as the log Plaintiffs submitted as Pl. Ex. 19 reflects. *See* Ex. N ¶¶ 10–13. He already was on a "behavior plan" for past fighting, which meant any further infractions would lead to additional consequences. *Id.* ¶ 12. Q.B. received individual discipline for ignoring a guard's instruction in the morning of June 23 and then, at 2:00 p.m. that day, *all* residents of Q.B.'s pod were put on room confinement for an hour. *See id.* ¶¶ 13–14. The log shows that multiple detainees in Q.B.'s pod were escorted to the visitation area for normal visitation, that one detainee still on confinement was allowed to go to visitation only because the visitor was his attorney, and that another detainee on a behavior plan had regular

17

visitation that evening. *Id.* ¶ 15. The log does not indicate Q.B.'s whereabouts when his grandmother arrived or why he was denied visitation. *See id.* ¶¶ 16-17. Q.B. testified that after his grandmother left, the guards "called upstairs and like, [Q.B.'s last name], your visit just got canceled." He said he later spoke to V.P. and she told him "they turned me around." *See* Ex. H, 60:17–62:15. V.P. said Q.B. told her about *Empire* filming at the JTDC, but he did not say, and she does not know, whether this was the reason she was not able to visit him. *See id.* 14:2–15:17. No one told her why she was not allowed to visit Q.B. on that single occasion. *See* Ex. P, 10:22–13:17. The conduct of normal family visitation for the rest of Q.B.'s pod on June 23 disproves that *Empire* filming caused any disruption of visitation. *See* Ex. N. ¶ 15.

### Recreation

Detainees usually receive an hour of recreation per day. *See* Pl. Mem at 9. The JTDC has multiple areas available for detainee recreation, including an outdoor concrete court divided by walls into three sections (closed in winter but otherwise open when weather and circumstances permit), two large gyms, and a game room. *See* Dkt. No. 212, Ex. D, ¶ 13. Because JTDC officials want to keep pods separated and prevent too many detainees from occupying the same area at once, they schedule pods for different recreation areas at different times. *See id.*; *see also* Ex. D, 35:12–20. JTDC Deputy Executive Director William Steward recalled that the outside yards had to be closed in July for the installation of new lights and for maintenance. *See* Ex. F, 260:24–262:8. The yards thus may not have been usable on July 13–15 even had *Empire* not filmed in one section on those days.[3] It is undisputed, however, that (1) TCFTV's use of one part of the yard on

---

[3] Plaintiffs' brief quotes from the deposition of JTDC employee Gene Robinson, who they say testified that "window maintenance had been completed before filming began." Pl. Mem. at 32. What Mr. Robinson actually said, in response to the question "[d]o you know when the window replacement project was done?," was "you can't quote me exactly, not an exact date, no, but I know at that time [of filming] we were doing window replacements…. I don't believe it was

two days in June, two in July, and two in August 2015 put that section out of use for detainees; and (2) JTDC officials decided, without discussion with TCFTV, to close one or both of the other outdoor sections on those days and to shift pods that had been scheduled for outside recreation at those times to indoor activities. *See, e.g.,* Ex. K, 66:1–68:1; Dkt No. 214, Ex. O.

T.S. said that in a usual summer week, he would receive outside recreation "two, three times" per week. T.S. 138:7–10. Multiple contemporaneous JTDC records show his pod received recreation in the gym—or, on one day, in the game room—on every day *Empire* filmed. These records include Pod Logbooks (daily handwritten logs about all happenings on the pod), and DC5 Logs showing the details of detainees' movement. There also are Large Muscle Activity Reports showing exactly what kind of recreation each pod received and each detainee's individual level of participation. *See, e.g.* Dkt No. 214, Ex. P. T.S. disputed the accuracy of these records but nevertheless retracted his main contention about recreation as pleaded in the SAC. Instead of saying there were "four or five" days when he missed off-pod recreation, he claims now there was only *one* such day: June 24. *See* Ex. G 139:10–140:5; Pl. Mem. at 19.

Q.B. likewise said he normally went outside only two days per week. *See* Ex. H, 34:13–16, 45:17–46:6. According to Steward, for Level 1 detainees in the Legacy Center—the JTDC Center for detainees with severe disciplinary problems—exercise activity "is done on pod quite often." *See* Ex. F, 233:19–234:1. Q.B. testified that *all* of his recreation was on-pod when *Empire* was filming, but the JTDC's records show otherwise, and Plaintiffs' brief argues only that Q.B. did not receive off-pod recreation on June 23. June 23, however, as reflected above, was the day on which Q.B. received multiple disciplinary violations and his entire pod were confined to their rooms for part of the afternoon. Plaintiffs only speculate that it was *Empire* filming that caused

---

simultaneous. I believe it was done a week or two prior to, I believe." *See* Ex. K, 166:12–20. *See also* Ex. N, ¶ 8.

Q.B.'s pod not to receive off-pod recreation that day, rather than these other issues, just as they only speculate about why Q.B.'s grandmother could not visit with Q.B. that same evening.

### Nonschool Programming

From time to time, the JTDC offers nonschool classes to select detainees. In general, these classes were open only to Level 4 detainees and, if spaces remained available, Level 3s. The JTDC's Director of Gender Services, Anna Buckingham, testified that "[t]he majority of programming did not" include overlapping Centers. *See* Ex. E, 1:12–15. "Some programs were open to any and all residents that were currently maintaining safety with their behaviors…. Other programs were open only to residents on a specific behavior level." *Id.* 26:13–21. "Center management determines what residents would be able to participate based on behavior." *Id.* 29:5–11. In 2015, Ms. Buckingham coordinated a writing program called "Free Write," a movement and dance program called "Kuumba Lynx," a "Karma Garden" mural project she started in July 2015, "Storycatchers," "the Chicago Community Trust Creative Career Day," and the University of Illinois extension school cooking program. *See* Ex. E, 13:4–14:3, 14:17–22, 15:21–16:10.

Because of filming on Tuesday–Thursday, June 23–25, 2015, Ms. Buckingham's records reflect that she notified a program put on by the Chicago Alliance Against Sexual Exploitation ("CAASE"), and the University of Illinois cooking program, that those programs could not be held on those days. *See* Ex. E, 50:15–56:4. The CAASE program was only offered to select detainees within a single Center who could participate for four consecutive days. *See* Ex. E, 83:4–84:13. The cooking class was rescheduled to the next week. *See* Pl. Ex. 34. "Free Write" activities were canceled on those days. A program involving the Boys & Girls Club went forward for girls, but not for boys. Ex. E, 65:16–22. Ms. Buckingham believes that this resulted from a lack of volunteers, not because of *Empire*. *See* Ex. E, 75:1–8; Pl. Ex. 36. Plaintiffs' statement that all programs were canceled, rather than simply postponed (Pl. Mem. at 33) is wrong: The Kuumba

Lynx program had not started yet; *Empire* filming caused its start date to be delayed a week, but no classes were canceled. *See id.* 64:1–8, 109:15–23. In addition, Pl. Ex. 35 shows that when Buckingham postponed Kuumba Lynx, its manager had not yet transmitted information she needed to start the program. As for the mural program, Buckingham was able to meet with participants during filming, but they could not paint outdoors on those days. *See id.* 64:9–21, 77:8–12.

Q.B., as a Level 1 detainee, could not participate in these programs. As for T.S., the only nonschool programs that interested him were "Free Write" and a parenting class. *See* Ex. G, 35:18–24. 110:5–8. Free Write occurred "twice a month" for "an hour." *Id.* 111:5–15. T.S. did not attend every month and did not recall how often he went. *See id.* 111:16–112:3. He said that he only attended the parenting class once. *See id.* 114:8–19. Buckingham did not recall a parenting program in 2015, so T.S. may have been mistaken on the timing. *See* Ex. E, 14:23–15:5. Buckingham said, too, that programs are canceled for many reasons. *See id.* 107:1–3.

**Benefits the JTDC Received from TCFTV's Presence**

Dixon recalls talking to detainees and staff about the filming and receiving only positive feedback. *See* Ex. B, 174:10–177:2, 209:22–24. 213:12–216:10. He arranged for actor Chris Rock, who guest-starred in the *Empire* episodes filmed at the JTDC, to meet with a number of the Level 3 and 4 detainees. (T.S. said he was set to attend but "but as soon as it was time to go, they just,… no, something happened. You can't go no more." *See* Ex. G, 84:5–17. He said "two, three others" on his pod also were not allowed to go. *Id.* 119:14–20.) Dixon said that detainees who met Mr. Rock "were in awe. They were excited. They were just happy. You know, they said they can get a chance to meet someone that they never would get a chance to meet." *See* Ex. B, 208:13–20.

While the *Empire* cast was at the JTDC, Dixon took the opportunity to speak to other actors about meeting and working with detainees. *Empire*'s lead actor Terrence Howard has since

returned to meet with JTDC detainees, and he and his wife continue to work with the JTDC to develop programming for detainees. *See* Ex. B. 205:19–206:18; *see also* Ex. K, 47:1–15. Dixon focused, too, on detainees being able to watch the filming: "[T]hey were excited because— especially on the third … and fourth floor … they could look over and see the filming…. And they would ask me, hey, will we get a chance to meet these people and those kind of things." *Id.* 175:16–22. Dixon made his decisions as someone who has been recognized as an expert in juvenile corrections. *See* Ex. B., 11:15, 14:11, 16:15, 16:22, 51:12–21, 201:15, 204:17. Earl Dunlap, Dixon's predecessor and now a compensated witness for Plaintiffs, admitted that he would change his opinion about the benefits of filming based on the number of detainees who were able to meet *Empire* cast members. *See* Ex. D, 189:3–15; *see also id.* 56:1–5 (admission by Dunlap that he did not know Dixon's motives and would need to understand them to better opine).

Steward agreed, "when they announced that *Empire* was coming, the residents were excited about it. They got to speak to some of the … cast. They were happy about that. The staff morale went up tremendously. So it was a good—and I believe you should have documentation of it that even incident reports went down during this time frame that they were there." *See* Ex. F, 175:22– 176:11. The observations in a memorandum from JTDC executive Bill Kern to Millicent McCoy (Pl. Ex. 30), included "excited-happy-enthusiastic staff," an "elevated energy level," only "minor interruptions/distractions to daily functions/task routine," and "an operation [that] seemed to run smooth." Kern also noted "positive and motivating" impact that mentors had on his development and stated, "celebrities can have a positive impact on a youth's life path if the opportunity was presented to them to meet/talk to them." That opportunity *was* presented to them by Dixon's decision to permit filming at the JTDC.

### 3. LEGAL STANDARD

Oddly, Plaintiffs' brief nowhere defines the class that they seek to certify. Plaintiffs' SAC says they "seek to represent a class consisting of all children housed at the JTDC … during the filming of *Empire* in the summer of 2015." SAC ¶ 72.

Whatever the proposed class may be, Plaintiffs "bear the burden of demonstrating that class certification is appropriate." *Dochak v. Polskie Linie Lotnicze Lot S.A.*, No. 15 C 4344, 2017 WL 2362570, at *3 (N.D. Ill. May 30, 2017) (citation omitted). *See also Alpha Tech Pet*, 2017 WL 5069946, at *2. "A decision to grant or deny class certification can have a considerable impact on the playing field of litigation and requires a rigorous analysis." *Red Barn Motors, Inc. v. Next Gear Capital, Inc.*, 915 F.3d 1098, 1101 (7th Cir. 2019). "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'" *Id.* at 33–34, *quoting Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). *See also Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). Rule 23 "does not set forth a mere pleading standard"; rather, Plaintiffs must carry their burden "through evidentiary proof" presented in the motion itself. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

Plaintiffs must *themselves* have suffered injuries that confer standing and cannot predicate standing on an injury suffered only by other, absent members of a putative class. *See, e.g., Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 N.6 (2016); *Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) ("Standing cannot be acquired through the back door of a class action."). *See also, e.g., Stile v. Cumberland County Jail*, No. 2:12-cv-260-JAW, 2013 WL 1881300, at *4 (D. Me. Mar. 26, 2013) (named plaintiff "cannot use [a class action] lawsuit to right the wrongs, real or imagined, experienced by other prisoners when he himself has not" suffered those alleged wrongs).

Proposed class representatives must begin by satisfying the "numerosity," "commonality," "typicality," and "adequacy" requirements of Rule 23(a) and then also must satisfy at least one

requirement of Rule 23(b).  As to Rule 23(b), Plaintiffs seek certification under Rule 23(b)(3) and/or Rule 23(b)(1)(B).  *See* SAC ¶ 71; Pl. Mem. at 1.  To pursue a class under Rule 23(b)(3), a plaintiff must establish the *predominance* of questions common to the entire class.  The Court must inquire "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues," and "a plaintiff does not satisfy [this] requirement if individual questions overwhelm questions that are common to the class." *Pavone v. Meyerkord & Meyerkord, LLC*, 321 F.R.D. 314, 320 (N.D. Ill. 2017) (internal citations omitted); *see also Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085 (7th Cir. 2014).

Rule 23(b)(1)(B) provides that a class may be certified where "prosecuting separate actions by … individual class members would create a risk of … adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."  Fed. R. Civ. P. 23(b)(1)(B).  It applies where "the shared character of rights claimed or relief awarded entails that any individual adjudication by a class member disposes of, or substantially affects, the interests of absent class members."  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999).  Yet although Plaintiffs seek certification under Rule 23(b)(1)(B) as an alternative to Rule 23(b)(3), their discussion of Rule 23(b)(1)(B) is cursory, consumes less than half a page of their brief (at 40–41), and cites no cases.

*Phillips*, the Seventh Circuit's most recent and authoritative opinion on class certification in the detention context, explained, "the constitutionality of a wait for medical treatment will depend on a variety of individual circumstances" that "can only be answered by looking at the unique facts of each detainee's case."  *Phillips*, 828 F.3d at 555–556.  Another case cited approvingly in *Phillips—Harper v. Sheriff of Cook County*, 581 F.3d 511, 515 (7th Cir. 2009)— likewise held that the "constitutionality of [any] detention depends on whether the length of the

24

delay…was reasonable in any given case." These cases illustrate that whenever a proposed conditions-of-detention claim requires "[a] consideration of each of the detainees' proposed [circumstances]," Rule 23 poses a "hurdle that cannot be overcome." *Phillips*, 828 F.3d at 556.

Plaintiffs' brief argues that *Mulvania*, rather than *Phillips*, serves as the closer analog to this case. Nothing in *Mulvania*, however, comes close to the facts or claims in this matter. In *Mulvania*, 850 F.3d at 855, a sheriff had a policy of requiring female pretrial detainees to "wear white underwear or no underwear at all," meaning they had to purchase white underwear from the jail's commissary if they wished to wear underwear. "Some plaintiffs allege[d] that corrections officers watched as they removed their underwear and changed into jail uniforms." *Id.* The only rationale the sheriff could muster for this policy was that detainees might be able to extract ink from colored underwear and "use that ink to make tattoos." *Id.* But the sheriff could not "identify any instances of this occurring." *Id.* Further, the sheriff "often did not enforce the policy." *Id.* at 857. For these reasons, the Court reversed summary judgment because "a reasonable trier of fact could find that the white underwear policy … punishes pretrial detainees." *Id.* at 857–58. The Court also said that a need for individual *damages* calculations alone would not have precluded class certification, but the Court nevertheless upheld the denial of class certification because too few women actually had been subject to the policy. *See id.* at 859–60.

Plaintiffs here long ago conceded that they do not have actual damages. Defendants therefore do not oppose certification based solely on the need for individualized damages determinations. Rather, the crux of Defendants' argument is that the Court cannot certify a class because T.S. and Q.B. do not assert claims typical of the class that they seek to represent and because whether T.S., Q.B., or any other JTDC detainee was "punished" (in the parlance of *Bell v. Wolfish*) through missed outdoor recreation, etc., cannot—as in *Phillips*—be determined without individual inquiry.

25

**4.** **ARGUMENT**

Plaintiffs' motion posits, wrongly, that they and a putative class can win money solely by showing that filming had even a *de minimis* impact on at least most detainees. As Plaintiffs put it, if *any* "deprivations" resulted from filming, then the "imposition of the[se] deprivations, ***without more***, establishes a due process violation." Pl. Mem. at 6 (emphasis in original). This is not remotely the law, however, and Plaintiffs do not—because they cannot—offer any support for their sweeping statement. The correct liability standard, which Plaintiffs must show is amenable to common proof across the entire class of detainees, requires T.S. and Q.B. first to establish that the government lacked a sufficiently legitimate purpose to impose any particular restriction on them, and then to show that the restrictions on them collectively rose to the level of "punishment." Dkt. No. 73 at 7, *quoting Bell*, 441 U.S. at 538.[4]

A recent decision from this District confirms as much. In *Romero-Arrizabal v. Ramos*, No. 16-cv-5967, 2019 WL 1281968, at *4–*5 (N.D. Ill. Mar. 20, 2019), Judge Tharp held that post-*Miranda*, "the conditions-of-confinement inquiry remains a two part test," with pretrial detainees needing to prove not only "that [the] defendant's conduct was objectively unreasonable," but also "that the conditions of confinement were sufficiently serious … which is to say that they must deny the detainee the minimal civilized measure of life's necessities" (internal citation and quotation omitted). In that *nonclass* case, an immigration detainee's claim of being "left shackled

---

[4] Plaintiffs cite *Kingsley*, a 5–4 Supreme Court decision holding that the question in prison use-of-force cases should be whether that force was "objectively unreasonable," not whether officers were subjectively aware that it was unreasonable. The dissenting justices opined that the officers' subjective intent should have controlled. "It is illogical … automatically to infer punitive intent from the fact that a prison guard used more force against a pretrial detainee than was necessary. That could easily have been the result of a misjudgment about the degree of force required … rather than the product of an intent to punish." *Kingsley*, 135 S. Ct. at 2478. In this case, which is not about the use of force but rather about the intent of JTDC officials to bring *benefits* to detainees, it would be highly incongruous not to consider that intent, *Miranda* notwithstanding.

26

in a hot, unventilated van for approximately 40 minutes" *did not* satisfy this standard. *Id.* at *5. Then, in another nonclass case, the Seventh Circuit held that a pretrial detainee had pleaded sufficient "punishment" by alleging that officials kept three people in a cell designed for two over a long period of time (with one detainee sleeping on a mattress on the floor that "covered the entire floor, eliminating all free space"), did not clean the cells or provide adequate ability for the plaintiff to wash himself, ignored the rash he developed as a result, and consistently fed him unhealthy food. *See Reed v. Bowen*, __ Fed. Appx. __, 2019 WL 1873026, at *2 (7th Cir. Apr. 26, 2019).

These demanding standards of what any detainee must prove to have a claim in his individual circumstances, and the controlling *Phillips* case, are the lenses through which this Court must examine Plaintiffs' attempt to certify a class. Each detainee in the putative class would have to do what the *Romero-Arrizabal* single plaintiff could not do: meet both halves of the two-part liability test. They cannot do so because the Government Defendants have advanced multiple legitimate reasons for permitting TCFTV to film at the JTDC, including the positive impacts they expected TCFTV's presence would have on detainees and staff. Looking just at T.S.'s and Q.B.'s individual allegations, therefore, the fact-finder will have to examine the restrictions that each of T.S. and Q.B. say were imposed on him, determine whether those restrictions resulted from the filming, and if so, decide whether those restrictions—in light of the benefits JTDC officials expected to result—were "sufficiently serious" as to amount to unlawful "punishment." Those questions all will turn on evidence that is purely individual to T.S. and Q.B.

The problems compound even more with respect to Plaintiffs' claim against Superintendent Dixon for breach of fiduciary duty. As Judge St. Eve noted in ruling on Defendants' motions to dismiss, the standard applicable to this claim is whether Dixon breached a duty "similar to that of [a] guardian's fiduciary duty to its wards" to protect their "safety and well-being." Dkt. No. 73 at 24. The questions of whether any combination of restrictions allegedly resulting from TCFTV's

presence impacted a detainee's *safety* will be as individualized as questions regarding whether those conditions amounted to "punishment" are, but with each detainee having to meet an even higher standard of proof. *See, e.g., Potts v. Manos*, No. 11 C 3952, 2017 WL 4340157, at *3 (N.D. Ill. Sept. 29, 2017) (denying summary judgment in "failure to protect" claim where defendant "was aware of the habitual use of [pepper] spray against plaintiff—but he took no action.")

As for Plaintiffs' claim for intentional infliction of emotional distress, Plaintiffs' motion tellingly does not cite any class action cases. The standard for this claim, as Judge St. Eve noted, is whether a defendant's conduct was "extreme and outrageous" and whether that defendant "intended that his conduct inflict severe emotional distress." Dkt. No. 73 at 26–29. The fact-finder, in other words, would need to go beyond whether a combination of restrictions amounted to "punishment" or a threat to safety, and determine both whether restrictions were "extreme and outrageous" and whether Dixon *intended* them to cause a claimant emotional distress. Those are not questions that can be answered on a class basis because they would "require highly individualized inquir[ies]." *Rowell v. Voortman Cookies, Ltd.*, No. 02cv0681, 2005 WL 1026715, at *2 (N.D. Ill. Apr. 27, 2005) (refusing to certify intentional infliction of emotional distress class based on failure to establish typicality).

### (a)    Plaintiffs Cannot Satisfy Rule 23(a)'s Typicality Requirement

Defendants' Denial Mem. (at 18 & n.4) cited numerous conditions-of-detention cases where courts denied class certification on typicality grounds because claims were individualized rather than systemic. Plaintiffs' motion ignored all of these cases. Neither T.S. nor Q.B. asserts facts remotely similar even to any *nonclass* conditions-of-detention case that survived dismissal, much less facts that would allow them to represent a putative class of persons who claim damages from conditions of detention that supposedly amounted to unlawful "punishment." Their brief does not even attempt to show that their personally alleged experiences typify a class of people

28

who supposedly were denied "the minimal civilized measure of life's necessities." *Romero-Arrizabal*, 2019 WL 1281968, at *5. Their claims thus fail to satisfy Rule 23(a)(3).[5]

T.S.'s claim, exposed in discovery, is that one visit with his mother consumed only 41 rather than 45 minutes (for reasons that may have had nothing to do with *Empire*), one visit occurred in a classroom that is 10 percent smaller than the normal visitation area, he missed one day of off-pod recreation (which records dispute), he perhaps missed one "Free Write" class (which he admitted attending only sporadically), and one or two days of summer school classes that were held on his pod were less effective (which the Government Defendants dispute).[6] Q.B.'s claim is that he missed a single visit with his grandmother and a single day of off-pod recreation, both on the same day he broke JTDC rules while he already was on a behavior modification plan.

Previously, Plaintiffs had sought to demonstrate typicality through sick call claims. Their radical refashioning of those claims leaves them far from the mark. As Defendants demonstrated in their Denial Mem., Judge St. Eve had to assume at the dismissal stage the truth of Plaintiffs' at-least-implied claims that the JTDC failed to treat *life-threatening* medical conditions during *Empire* filming. *See* Dkt. No. 73 at 9, *citing Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015) (prison officials knowingly allowed a prisoner's abscessed tooth to go untreated for weeks) and *Gallagher v. City of Winlock, Wash.*, 287 Fed. Appx. 568, 576 (9th Cir. 2008) (police allegedly refused to allow an epileptic to take her antiseizure medication, leading to a seizure). Neither of those was a class action, and both involved claims much more severe than the minor (at

---

[5] Plaintiffs' typicality argument relies on *Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 350 (N.D. Ill. 2007), which Plaintiffs contend holds that the typicality standard is not demanding. *See* Pl. Mem. at 17. *Brieger*, however, was an ERISA case brought effectively on a derivative rather than a class capacity. A later case, *Penna. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 286 F.R.D. 355, 376 (N.D. Ill. 2012), distinguished *Brieger* and denied class certification because—as here— "[e]ach class member complains about separate alleged misconduct."

[6] Any alleged deprivations also need to be put in the context of a particular detainee's stay at the JTDC. According to Plaintiffs, the average JTDC stay is 10 days. *See* Ex. D, 44:9–11; 75:18. Both T.S. and Q.B. therefore are highly atypical in having had much longer stays.

best) claims that Plaintiffs now advance after retreating from the claims in their SAC. *See, e.g.,*
*Young v. Blozinski*, __ Fed. Appx. __, 2019 WL 2084441 (7th Cir. May 13, 2019) (affirming
dismissal of a pretrial detainee's claim that a nurse showed deliberate indifference to his sexually
transmitted disease; his "non-emergent" medical request, treated within "two or three days," did
not rise to the level of "deliberate indifference" or treatment that was "objectively unreasonable").

In *Phillips*, the Seventh Circuit held that detainees' claims of denied medical care did not
support class certification even where some detainees waited months for treatment and endured
severe pain as a result. That was because they could not "present classwide evidence that a prison
is engaging in a policy or practice which rises to the level of a systemic indifference." *Phillips*,
828 F.3d at 557, *quoting Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). *See*
*generally* Denial Mem. at 20 (collecting cases). The same is true here. Plaintiffs' brief dances
around the undisputed facts that neither T.S. nor Q.B. had a real untreated medical problem during
filming, nurses' rounds occurred normally, and detainees were brought regularly to the medical
unit. Plaintiffs' suggestion that they can litigate claims of "other detainees" (Pl. Mem. at 22) fails
the *Spokeo* test requiring them to prove their own standing to sue. *See King v. Berks Cnty. Jail*
*Sys. Supervisor Officials*, No. 19cv0389, 2019 WL 2123575, at *5 (E.D. Pa. May 14, 2019)
(holding that plaintiff inmate could not serve as a representative for a proposed class of other
inmates where "it is not clear whether [the plaintiff] was exposed to all of the conditions in
question"). In any event, detainees' medical records do not suggest that *anyone* detained at the
JTDC has a valid claim. The records appear to disprove Q.B.'s hearsay claim of a detainee with
an untreated bloodshot eye, which is the only medical claim that Plaintiffs currently assert.

Plaintiffs' brief similarly ignored the standard of proof that they must meet with respect to
their claims regarding off-pod recreation. Judge St. Eve's dismissal opinion (ECF No. 73 at 9)
cited to *Smith v. Dart*, 803 F.3d 304, 313 (7th Cir. 2015), and noted that "lack of exercise can rise

to a constitutional violation 'where movement is denied and muscles are allowed to atrophy and the health of the individual is threatened.'"  As Defendants demonstrated in their Denial Mem. (at 21–22)—through other cases that Plaintiffs' brief failed to cite or distinguish—mere temporary deprivations of recreation, or providing it indoors rather than outdoors, do not give rise to a claim. In *French v. Owens*, 777 F.3d 1250, 1256 (7th Cir. 1985), a case *Smith* relied upon, the Seventh Circuit expressly refused to say that "hav[ing] exercise in cramped quarters" amounted to a constitutional violation.  Plaintiffs' claims here, which are nothing more than T.S.'s allegedly having receiving on-pod recreation vs. off-pod recreation on one day and Q.B.'s allegedly missing recreation for one day, are not typical of a putative class of persons who had such a prolonged deprivation of exercise that their health was put in jeopardy.  *See Reed*, 2019 WL 1873026, at *1 (distinguishing *French* because three detainees were confined to a cell designed for two and had no free space at all when a mattress was placed on the floor).

With respect to visitation, neither Plaintiff has a claim typical of the fiction alleged in the SAC about "parents, who normally waited just a few minutes to visit with their children for an hour or more, [being] forced to sit in waiting rooms for hours on end" when *Empire* was filming. SAC ¶ 42.  Both T.S.'s mother and Q.B.'s grandmother said that this did not happen.  Equally contrived were the claims that Q.B. saw detainees on his pod, while school was being held on the pod, being "required to sit in one place, and could only move, one at a time."  *He was not detained when* Empire *was filmed on school days.  Compare* SAC ¶ 48(b) with Ex. C, 82:16–83:7.

Recognizing that their SAC alleges deprivations that simply never happened, Plaintiffs' motion contends that T.S. and Q.B. can clear the "typicality" hurdle by broadly contending that they and other detainees spent more time on their pods, rather than elsewhere at the JTDC, as a

result of filming.  *See* Pl. Mem. at 18.  They cite no cases in support of this alleged standard, and the cases cited above show it has no support at all.[7]

### (b)  Plaintiffs Cannot Satisfy Rule 23(b)(3)'s Predominance Requirement

Plaintiffs' problems satisfying the typicality threshold—the failure of which dooms class certification no matter which Rule 23(b) prerequisite they try to satisfy—are as nothing compared to their problems satisfying the predominance standard of Rule 23(b)(3).  Defendants' Denial Mem. (at 17) correctly characterized Plaintiffs' case as "litigation by anecdote," and Plaintiffs' motion embraced that fatal charge by focusing on *disputed* elements of Plaintiffs' personal claims. These include whether, if Q.B. missed a day of recreation, the cause was *Empire* filming or something unrelated to *Empire* (*i.e.*, his being disciplined), and whether T.S. actually missed any recreation at all.  *See* Pl. Mem. at 18.  Plaintiffs also highlight Q.B.'s single missed visit with his grandmother, but offer no evidence that filming caused this missed visit and wrongly argue that it is Defendants' burden to prove a lack of causation.  *See* Pl. Mem. at 22.

Detainees were in and out of the JTDC on a daily basis.  Assuming an average 10-day stay, most putative class members only experienced one of the three filming periods.  Each of the nine Centers within the JTDC ran its own program.  Some detainees may not have missed any scheduled

---

[7] Beyond Plaintiffs' Rule 23(a)(3) problems, Defendants do not, as Plaintiffs' motion claims, concede that Plaintiffs or their counsel satisfy the adequacy requirement of Rule 23(a)(4).  Both Defendants' Denial Mem. and this brief show numerous instances, in the SAC and in Plaintiffs' depositions, where Plaintiffs clearly lied.  The Court could deny certification on that basis alone: "A plaintiff's honesty and integrity are important considerations in allowing him to represent a class" and "credibility problems" not only impact the adequacy requirement, but also "interfere with [a] plaintiff's satisfaction of the typicality requirement."  *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990).  Plaintiffs' counsel have not addressed how they pleaded so many demonstrably false allegations, and they also have not shown any prior experience litigating class actions.  That, too, justifies denying certification.  *See Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 254 F. Supp. 3d 1007, 1024 (N.D. Ill. 2017), *reconsideration denied*, No. 12cv3233, 2017 WL 4682734 (N.D. Ill. Oct. 18, 2017) (reasoning that plaintiff's counsel's conclusory assertions of their adequacy, along with their conduct, justified denying certification). The Court, however, should deny certification for the other reasons explained above and below, which cannot be cured through the substitution of different named plaintiffs or counsel.

outdoor recreation, while others may have missed one day of it during a relatively short stay. Some had no visits at all during filming; others had no visits on days the room for visitation was changed. Many detainees were not eligible for non-school classes; others would not have chosen them even if eligible. Whether any combination of these circumstances amounted to "punishment" in any particular detainee's case thus clearly would require individualized scrutiny.

Plaintiffs' arguments with respect to the predominance requirement acknowledge that when the government has "a plausible legitimate governmental purpose for imposing the restriction or condition at issue," then "reasonableness [must] be examined case by case" and Rule 23(b)(3) bars class certification. Pl. Mem. at 30. Plaintiffs seek to avoid that conclusion by stating, falsely, that Defendants have not advanced a legitimate objective for allowing the filming. In fact, the opposite is true. Dixon wanted to bring energy and excitement into an atmosphere that too often lacks both, and to give as many detainees as possible the chance to meet actors such as Chris Rock and Terrence Howard, which he accomplished. Because the government *did* have multiple legitimate reasons to permit the filming, T.S. and Q.B. have the additional burden of demonstrating that any restrictions actually imposed on them as a result of TCFTV's access to the JTDC were "sufficiently serious" when viewed through the lens of the government's objectives. Each other detainee would have to clear the same bar based on his own set of individualized facts. Other residents of T.S.'s pod, for example, had the chance to meet with Chris Rock, while T.S. himself, for unknown reasons, was sent back to his room just before that meeting.

Level 1 detainees such as Q.B. and Level 2 detainees could not have attended nonschool classes and thus were unaffected by the cancellation or postponement of a few classes. Many Level 3 and 4 detainees would not have signed up for the canceled or postponed classes, and there is no way to judge this in hindsight. Disproving T.S.'s and Q.B.'s claims about visitation required examination of multiple different paper records of their and their family members' movements;

this same examination would be required for any other detainee raising similar claims.[8]  The same is true with respect to Plaintiffs' claims about recreational opportunities:  Plaintiffs reviewed tens of thousands of pages of paper records from the JTDC and only found three reflecting on-pod recreation because of filming, all from July 14 or 15, and all affecting just one Center.  *See* Pl. Exs. 26–28.  One of those, Pl. Ex. 26, showed that only one of three pods in the Center had on-pod recreation, on a day that all three pods enjoyed a "Movie Night."  As for T.S.'s claim that he did not have a math class on his pod, there are no records at all to support this claim, meaning that the fact-finder must judge T.S.'s testimony as a matter of credibility, weighing this testimony against numerous other instances in which T.S. did not tell the truth during the course of this case.

Plaintiffs' motion cannot reasonably be analogized to *Mulvania*, "the white-underwear decision."  Pl. Mem. at 30.  The indefensible "ink extraction for tattoos" argument the Sheriff advanced in that case, the permanence of the policy, and the personal dignity arguments associated with enforcing an underwear policy in a women's prison, make *Mulvania* unique and distinguishable.  Here, the questions are whether T.S. and Q.B. were "punished" through alleged "deprivations"—missed recreation, etc.—not offset by Dixon's beneficial objectives in permitting the filming.  Each of them was subject to a different set of alleged "deprivations" and will need to prove on an individual basis which of those actually resulted from filming.  *Mulvania* did not involve the same kinds of individual inquiries and therefore does not support Plaintiffs' motion.

Another case on which Plaintiffs rely for their predominance argument is the antitrust case of *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802 (7th Cir. 2012).  The question in

---

[8] In a footnote (Pl. Mem. at 33 n.9), Plaintiffs cite *In re: Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 693 (N.D. Ill. 2016), and contend that a need to review records should not bar class certification.  In *Delta*, there was no dispute about the number of first-bag fees the defendants had collected, and records existed showing who paid them.  The court therefore held the class to be ascertainable.  The question in this case, by contrast, is not one of ascertainability, but instead whether plaintiffs can prove without individual inquiry what did and did not happen to each resident of multiple JTDC "Centers" on multiple days and in multiple aspects of detention.

*Messner* was whether those plaintiffs could show the class-wide price impact of a proposed merger of two hospitals through "the same economic and statistical methods used by the Federal Trade Commission … to analyze antitrust impact in the merger litigation before the FTC." *Id.* at 808. After reiterating that "a court may not simply assume the truth of … matters as asserted by the plaintiff" at the class certification stage, but must instead "receive evidence and resolve the disputes before deciding whether to certify the class," *id.* at 811 (citations omitted), and also reiterating that "[a]nalysis of predominance … begins, of course, with the elements of the underlying cause of action," *id.* at 815 (quotation and citation omitted), the Seventh Circuit said that it was the plaintiffs' burden "to show that it was possible to use common evidence to prove that Northshore's merger injured the members of the proposed class." *Id.* at 816. The Seventh Circuit held, "[t]he district court misapplied [the] predominance standard when it made uniformity of nominal price increases a condition for class certification." *Id.* at 818. The antitrust context of *Messner* and the conditions-of-detention context here could not be more different.

Plaintiffs also cite *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013)—a case about an alleged design defect in a washing machine. But this is a conditions-of-detention case, and it must be analyzed under the *Phillips* standard, which Plaintiffs' brief admits they cannot meet. Put another way, even if the single question of whether Dixon's reasons for permitting the filming were "legitimate" can be considered "common," *see* Pl. Mem. at 31, whether the resulting experience of any detainee rose to the level of "punishment" cannot.

It does not suffice, in other words, for Plaintiffs to show that the reason the JTDC shifted recreation indoors was filming rather than window cleaning. *See* Pl. Mem. at 32. They must instead show both that recreation was moved indoors because of filming and that this happened often enough to each of them, in combination with other restrictions, as to constitute "punishment" in his individual case, out of proportion to the government's goals. Even Plaintiffs' compensated

witness, psychiatrist Dr. Louis Kraus, admitted that this will require individual scrutiny and cannot be determined in bulk.

Dr. Kraus did not examine, meet, or speak with T.S., Q.B., or with any other person who was detained at the JTDC during filming. *See* Ex. R, 7:8–14. Plaintiffs' counsel told him to assume certain facts—most of which, as described above, are demonstrably untrue—and he rendered his opinions based solely on those assumptions. *See id.* 20:3–7, 20:17–21:4, 51:1–23. For example, Dr. Kraus wrote his report in this case believing that the JTDC had conducted on-pod schooling over multiple *weeks* of classes. When told that schooling was conducted on pods just for (at most) four days of summer school in July, even Dr. Kraus could not say that this would have had a meaningful impact on any detainee's schooling. He said that if "you miss a week of school here or there, that by itself is not going to have a long-term impact on your general educational needs," and that a few days of classes being taught on pods "may not impact the general education, but it may impact the youth for other reasons" which he agreed would require a person-by-person determination. *See* Ex. R, 58:13–60:6.

Indeed, Dr. Kraus conceded on multiple occasions during his deposition that the impact (if any) of the issues about which Plaintiffs complain will turn on factors individual to each detainee. Dr. Kraus's report introduced the concept of an "offset" between the benefits recognized from filming and the alleged "harms of increased pod time, deprivation of outdoor time, and the other harmful changes [he has] identified." *See* Pl.'s Ex. 2, ¶ 41. At his deposition, however, he conceded that he "had not really thought about" the question of "what would be an appropriate offset." *See* Ex. R, 72:10–73:10. If a detainee met Chris Rock, but had recreation indoors rather than outdoors, that "becomes, you know, a question mark" for Dr. Kraus. *Id.* 73:11–23. *See also id.* 75:18–76:6 (admitting impact of missed recreation would turn on how many recreation periods were missed and the length of the detainee's stay at the JTDC). Dr. Kraus also had no knowledge

of what nonschool programs were canceled, and he said, when asked about the impact of program cancellation, that he could not opine without more information.  *Id.* 80:18–81:3 ("There are sort of specifics that perhaps if I had the actual info, I could respond easier.").[9]

Ignoring their burden to *prove* entitlement to class certification through evidence submitted with their motion, Plaintiffs breezily assert their belief that "records" they have not put before the Court might possibly allow them to meet their burden later.  Pl. Mem. at 35.  This was the time for T.S. and Q.B. to make their case, however, and as their own experiences show, written records disprove their claims.  Other detainees' claims would require entirely separate records reviews.

Records contradict T.S.'s claim about not receiving off-pod recreation.  The handwritten log for Q.B.'s pod on the day he did not receive recreation does not say why this happened; it shows only that all pod residents received confinement that day.  Proving what happened would require weighing contradictory evidence specific to T.S. and then different evidence specific to Q.B.  Then, even if a record shows that T.S. was a participant in the "Free Write" program, T.S. admitted he did not attend that program regularly, and there is no way to know if he would have attended the single session that was canceled during filming.  This is another individual inquiry.  Visitation sign-in logs and movement logs disprove T.S.'s and Q.B.'s visitation claims, and if T.S. and Q.B. wish to press those claims anyway, comparing their claims to the records and weighing their credibility would involve yet more purely individual questions.  These same kinds of inquiries would have to be conducted all over again for any other detainee claiming that his personal conditions were impacted by filming.

---

[9] Dr. Kraus also had no idea, for example, of the sizes of the JTDC's regular visitation area or the classroom used as an alternative.  *See* Ex. R, 83:22–84:19.  He certainly did not know any details of detainee intake during filming or whether any detainee failed to receive a sufficient mental health screening.  *See id.* 49:14–21, 64:12–17.  He admitted he was not familiar with the panoply of ways the JTDC conducts mental health screening on intake and that he had not seen documents the JTDC used for this purpose both regularly and during filming.  *See id.* 45:12–23.

Defendants' motion to deny class certification discussed in detail cases such as *Harper*, where the Seventh Circuit addressed predominance in the context of allegedly unconstitutional detention after bond had been posted and held that individual questions predominated, and *Portis v. City of Chicago, Ill.*, 613 F.3d 702, 705 (7th Cir. 2010), where the Court similarly held that "because one detainee's circumstances differ from another's, common questions do not predominate and class certification is inappropriate." Plaintiffs' brief ignored *Portis*, and their only answer to *Harper* was to return to their standard crutch of wrongly asserting that the government had no legitimate purpose for allowing filming in this case. *See* Pl. Mem. at 30 & n.8. This puts Plaintiffs' case on all fours with *Phillips*, where the Seventh Circuit reaffirmed the heavy burden that a conditions-of-detention plaintiff must meet in seeking class certification. Plaintiffs here cannot meet that burden.

### (c)     Plaintiffs Cannot Satisfy Rule 23(b)(1)(B)

"In *Ortiz*, the Supreme Court cautioned strongly against overuse of (b)(1) classes." *Spano v. The Boeing Co.*, 633 F.3d 574, 587 (7th Cir. 2011), *citing Ortiz*, 527 U.S. at 841–48. Where a plaintiff premises a proposed Rule 23(b)(1)(B) non-opt-out class on "actions charging a breach of trust by a fiduciary," the breach *must* have "similarly affect[ed] the members of a large class of beneficiaries," such that "an individual adjudication by [any] class member" must effectively resolve the claim for all. *Nistra v. Reliance Trust Co.*, No. 16 C 4773, 2018 WL 835431, at *3 (N.D. Ill. Feb. 13, 2018); *see also Neil v. Zell*, 275 F.R.D. 256, 268 (N.D. Ill. 2011) (Pallmeyer, J.) ("a victory on these claims by one plan member would necessarily be a victory for all plan members"). Here, as shown above, adjudication of T.S.'s claim will not even affect the outcome of Q.B.'s claim, must less that of any other detainee.

Neither T.S. nor Q.B. alleges any actual damages in this case. Nor do they allege that Defendants lack monetary resources. Plaintiffs' citation to Rule 23(b)(1)(B) as an alternative

method of class certification, therefore, is curious and wrong. The "paradigm case" for Rule 23(b)(1)(B) certification is one involving a limited and identifiable pool of funds, which this case does not involve. *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 584 (N.D. Ill. 2005), *aff'd sub nom. Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006). The Advisory Committee Notes to Rule 23(b)(1)(B) discuss situations such as actions by shareholders to compel the declaration of a dividend, or when claims are made by numerous persons against a limited fund that could not satisfy all claims. None of those circumstances apply here.

## CONCLUSION

For the above reasons, Defendants respectfully request that the Court grant their Motion to Deny Class Certification.

Date: June 18, 2019                    Respectfully Submitted,


By: */s/ Danielle A. Mikhail*
　　　Francis J. Catania
　　　Danielle Mikhail
　　　Cook County State's Attorney's Office
　　　500 Daley Center
　　　50 West Washington
　　　Chicago, IL  60602
　　　312-603-3373
　　　francis.catania@cookcountyil.gov
　　　danielle.mikhail@cookcountyil.gov

　　　***Attorneys for Defendant the County of Cook, Illinois***

By: */s/Joi Kamper*
　　　Joi Kamper
　　　Lyle Kevin Henretty
　　　Cook County State's Attorney
　　　69 W Washington, Suite 2030
　　　Chicago, IL  60602
　　　312-603-1434
　　　joi.kamper@cookcountyil.gov
　　　lyle.henretty@cookcountyil.gov

　　　***Attorneys for Defendant Leonard Dixon***

By: /s/ *Michael Dierkes*                         
Michael Dierkes
Illinois Attorney General's Office
General Law Bureau
100 West Randolph Street
13th Floor
Chicago, IL  60601
312.814.3672
mdierkes@atg.state.il.us
***Attorney for The Chief Judge of the Circuit Court of Cook County in his official capacity***

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that the foregoing Government Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification and Reply Memorandum in Support of Defendants' Motion to Deny Class Certification was served on all counsel of record pursuant to the Court's ECF system on this 18th day of June, 2019.


By: /s/ *Danielle A. Mikhail*_____