# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF ILLINOIS
 3                        EASTERN DIVISION
 4
 5   T.S., et al.,                )
 6              Plaintiffs,       )
 7         vs.                    ) No. 1:16-cv-08303
 8   TWENTIETH CENTURY FOX        ) Hon. Pallmeyer
 9   TELEVISION, et al.,          )
10              Defendants.       )
11
12              The videotaped deposition of JONATHAN
13   KLEMKE, called as a witness for examination, taken
14   pursuant to the Federal Rules of Civil Procedure of
15   the United States District Courts pertaining to the
16   taking of depositions, taken before VICTORIA C.
17   CHRISTIANSEN, a Certified Shorthand Reporter of the
18   State of Illinois, CSR No. 84-3192, at Suite 500,
19   20 North Clark Street, Chicago, Illinois, on the
20   27th day of July, A.D. 2018, at 12:59 p.m.
21
22
23
24
```



```
 1      Q.    When did that conversation take place?
 2      A.    During my initial scout.
 3      Q.    Did Superintendent Dixon personally
 4   accompany you on that -- on that initial scout?
 5      A.    Yes.
 6      Q.    The entire scout?
 7      A.    I don't recall.
 8      Q.    Okay.  So can you reconstruct for us to
 9   the best of your ability your first phone
10   conversation with Superintendent Dixon?
11      A.    I told him that Twentieth Century Fox
12   Television working on a show called Empire was
13   looking for a location that we might be able to use
14   as a prison and I was curious if the juvenile
15   detention facility would be interested in
16   potentially exploring letting us use them as that
17   location.
18      Q.    And what did he say?
19      A.    He said that he was interested in
20   pursuing that.
21      Q.    And what was the next contact after that
22   phone conversation with Superintendent Dixon or the
23   institution?
24      A.    That same day I drove over to his
```



```
 1   about in the hallways?
 2        A.   No.
 3        Q.   During the actual shooting, did you ever
 4   see that?
 5        A.   Yes.
 6        Q.   On what occasions?
 7        A.   On occasions when our crew members would
 8   have to wait to use elevators and doorways so that
 9   juveniles could be taken to their scheduled
10   activities.
11        Q.   All right.  Was it your understanding
12   that scheduled activities were never interrupted
13   during your shoot?
14        MR. JACOBSON:  Objection to form.
15   BY THE WITNESS:
16        A.   It was my understanding that activities
17   had been scheduled in a manner that they wouldn't
18   impact our filming and that our filming wouldn't
19   impact them.
20   BY MR. GARMEY:
21        Q.   And was that important to you?
22        A.   Yes.
23        Q.   Who -- who informed you that your
24   filming would not impact the kids?
```



```
 1        A.    That was Superintendent Dixon.
 2        Q.    Can you best express to me the language
 3  he used when he expressed that sentiment to you?
 4        A.    I don't know if I recall.
 5        Q.    All right.
 6               (WHEREUPON, discussion was had
 7                between counsel off the record.)
 8  BY MR. GARMEY:
 9        Q.    I'll show you what's been marked as
10  Exhibit 18 to the previous deposition.  I'm going
11  to ask you if those are the photos you took.
12               (WHEREUPON, there was a short
13                interruption.)
14  BY THE WITNESS:
15        A.    I believe these to be the photos that I
16  took.
17  BY MR. GARMEY:
18        Q.    What time of day do those photos -- do
19  you remember taking those photos?
20        A.    I don't recall exactly.
21        Q.    Can you give me a -- your best estimate?
22        A.    Early afternoon.
23        Q.    How long did your tour take that day?
24        A.    I don't recall exactly.
```



```
 1        A.    That is my recollection.
 2        Q.    All right.  Do you remember how people
 3   got from the chapel to wherever they had to go to
 4   film?
 5        A.    They were escorted by guards.
 6        Q.    All right.  And did they walk, most of
 7   them, as opposed to waiting a turn in an elevator?
 8        A.    Most people waited their turn at the
 9   elevator.
10        Q.    All right.  So the people that were
11   escorted by guards, did they -- were you ever one
12   of those people?
13        A.    Escorted by guards?
14        Q.    Yes, sir.
15        A.    Yes.
16        Q.    All right.  When you were escorted by
17   guards from the staging area to Pods 3A and 3B,
18   where, if at all, did you see juveniles?
19        A.    Occasionally in the halls in transit.
20        Q.    And what spaces were you passing as you
21   transitioned from the chapel to 3A and 3B?  Do you
22   remember the -- the rooms you were passing or the
23   spaces you were passing?
24        A.    The only rooms I remember -- let me
```



```
 1  filmings, which were days each, you never saw a kid
 2  in the yard, correct?
 3       MR. JACOBSON:  Objection to form.
 4  BY THE WITNESS:
 5       A.   The facility went out of their way to
 6  keep us separated from kids, making sure that kids
 7  moved past us to the spaces that they were supposed
 8  to be in.
 9            Once we finished our work up in the
10  yard, I had no reason to be up there, and it was
11  our understanding that once we had cleared out of
12  the yard, it would be made available to kids again,
13  and so thus I would have been prevented from being
14  up there for disturbing the rights of the kids.
15  BY MR. GARMEY:
16       Q.   And that's not something you wanted to
17  do, which was disturb of the rights of the kids,
18  correct?
19       A.   That is correct.
20       Q.   Now, in this letter, you say, "Right now
21  we're still deciding between a number of different
22  options."
23            What -- what were those options at that
24  time?
```



```
 1       Q.   All right.  At some point in time did
 2   Mr. Breen tell you that Cook County did not want
 3   you to film in their institution?
 4       A.   Yes.
 5       Q.   At some point.
 6            When?
 7       A.   I was aware that Cook County
 8   correctional facility was not willing to have us
 9   prior to looking for this, which is what prompted
10   looking for another location; however, Brady wanted
11   to reach out to them to see if there was a way that
12   we could still make it work.
13       Q.   So did that call take place, to your
14   knowledge?  Were you -- did Mr. Breen report to you
15   that specifically for this episode he reached out
16   to Cook County to see if it could work out?
17       MR. JACOBSON:  Objection to form.
18   BY THE WITNESS:
19       A.   I recall him talking about making a
20   call.  As to whether or not he ever did, I wouldn't
21   know.
22   BY MR. GARMEY:
23       Q.   All right.  Well, tell me about the
24   conversation you recollect with Mr. Breen about
```

