# EXHIBIT R

1            IN THE UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4

5    T.S., et al.,                  )

6              Plaintiffs,          )

7         vs.                       ) No. 1:16-cv-08303

8    TWENTIETH CENTURY FOX          )

9    TELEVISION, et al.,            ) Hon. Rebecca

10             Defendants.          ) Pallmeyer

11

12           The deposition of LOUIS J. KRAUS, M.D.,

13   called for examination, taken pursuant to the

14   Federal Rules of Civil Procedure of the United

15   States District Courts pertaining to the taking of

16   depositions, taken before KRISTIN C. BRAJKOVICH, a

17   Certified Shorthand Reporter, CSR. No. 84-3810, of

18   said state, at Suite 2600, 333 West Wacker Drive,

19   Chicago, Illinois, on the 24th day of May, A.D.

20   2019, at 10:00 a.m.

21

22

23

24



1  and Q.B.?

2       A.    I have not.

3       Q.    Have you ever spoken with them?

4       A.    Prior to this?

5       Q.    At all.  Have you ever spoken with T.S.

6  or Q.B.?

7       A.    Wait.  I'm sorry.

8       Q.    The plaintiffs in this case are two now,

9  I guess, 19- or 20-year-olds.  They go by their

10  initials, T.S. and Q.B.  So my question is, have

11  you ever met them?

12       A.    I have not.

13       Q.    And have you ever spoken with them?

14       A.    I have not.

15       Q.    Am I correct that you were the treating

16  psychiatrist at the Illinois maximum security youth

17  center in Joliet from 1990 to 1999?

18       A.    Correct.

19       Q.    And that facility no longer exists.

20  It's now a facility for mentally ill adult

21  detainees; is that correct?

22       A.    Correct.

23       Q.    When the Joliet facility was in

24  operation as a youth facility, did it have an



1    I wanted, as is typical for an expert, as many

2    pieces of factual information as possible.

3              What they said to me was they were going

4    to and did give me a series of assumptions, and

5    they wanted me to base my opinion on those

6    assumptions.  They minimized the factual component

7    focused on these assumptions.

8         Q.    And did they communicate those

9    assumptions to you orally, in writing, or both?

10        A.    Both.

11        Q.    So what did they communicate to you

12   orally that they asked you to assume?

13        A.    This is in my report, so if I miss

14   something, it's there and can be summarized in

15   there.

16        Q.    Okay.

17        A.    They wanted me to assume that there were

18   changes in the intake process for the youth, that

19   the youth were restricted to their pods, that the

20   youth were not going to school but, rather, the

21   education process was occurring in the pods.

22             They wanted me to assume that outdoor

23   recreation during these periods were not occurring.

24   Other general limitations, staying on the pods, not



 1 | going to medical instead of having the nurses come
 2 | to them.  There could be something else in my
 3 | report, but those seem to be the crux of the
 4 | limitations -- the assumptions.
 5 |      Q.    And then at some point did they
 6 | communicate the same assumptions in writing?
 7 |      A.    I believe so.
 8 |      Q.    So I think the best way to do this is
 9 | you can turn in the exhibit that I handed you most
10 | recently, 6, to the pages that are Bates numbered
11 | 73 and 74.  So the first non-blacked out words here
12 | are, Plaintiffs' counsel has made the following
13 | representations to me regarding the impact of
14 | Empire's filming at the JTDC.  Are you the "me" in
15 | that sentence?
16 |      A.    Give me one moment.
17 |      Q.    Of course.
18 |      A.    Yes.
19 |      Q.    All of the blacked out material in this
20 | document, starting on Kraus 65, do you happen to
21 | know if this is a draft of Earl Dunlap's
22 | declaration in this case?
23 |      A.    Wow, good question.
24 |      Q.    Only if you remember.



1      A.    I'm familiar with questionnaires that

2   are used to assess detainees' mental health.   I

3   can't tell you which ones they use there beyond the

4   MAYSI, which I'm --

5      Q.    I'm going to show you a couple and see

6   if you have seen them before.   You either have or

7   you haven't.

8                  (WHEREUPON, a certain document was

9                  marked Kraus Deposition Exhibit

10                 No. 8, for identification.)

11  BY MR. JACOBSON:

12     Q.    Have you ever seen the document that the

13  court reporter just handed you as Kraus 8 before?

14     A.    No.

15     MR. JACOBSON:   Then let's do the clinical.

16                 (WHEREUPON, a certain document was

17                 marked Kraus Deposition Exhibit

18                 No. 9, for identification.)

19  BY MR. JACOBSON:

20     Q.    Have you ever seen the document that the

21  court reporter just marked as Exhibit Kraus 9

22  before?

23     A.    I have not.

24     Q.    And you mentioned a screening tool



LOUIS J. KRAUS, M.D.                                    May 24, 2019
T.S. vs TWENTIETH CENTURY FOX TELEVISION                        49

 1                    (WHEREUPON, a certain document was

 2                    marked Kraus Deposition Exhibit

 3                    No. 10, for identification.)

 4   BY THE WITNESS:

 5        A.    It was 52.

 6   BY MR. JACOBSON:

 7        Q.    It's not a memory test and

 8   nevertheless -- so is this a document that you are

 9   familiar with, Dr. Kraus?

10        A.    It is.

11        Q.    So is it fair to describe the MAYSI as a

12   yes or no situation?

13        A.    Yes.

14        Q.    Do you know for a fact that any

15   detainees did not take the MAYSI during Empire

16   filming, or is that something that was communicated

17   to you and you believe it to be true?

18        MR. WEIL:   Object to form, vague.

19   BY THE WITNESS:

20        A.    I don't know factually who took the

21   MAYSI or didn't.

22                    (WHEREUPON, a certain document was

23                    marked Kraus Deposition Exhibit

24                    No. 11, for identification.)



LOUIS J. KRAUS, M.D.                                    May 24, 2019
T.S. vs TWENTIETH CENTURY FOX TELEVISION                        51

1        Q.    And do you have any personal knowledge

2    that any of these things actually occurred, or you

3    are just relying on the assumptions that were

4    communicated to you?

5        A.    I neither know what occurred or what

6    didn't.  It's basically, Here are the assumptions

7    of what occurred.  What are your opinions based on

8    those assumptions?

9        Q.    I asked you earlier whether you have met

10   either of the two plaintiffs in this case.  Let me

11   now broaden that out.

12             Have you examined any person who was

13   detained at the JTDC during the filming of Empire?

14        MR. WEIL:  Object to form, calls for

15   speculation.

16   BY THE WITNESS:

17        A.    I have not.

18   BY MR. JACOBSON:

19        Q.    Have you spoken with any person who was

20   detained at the JTDC during the filming of Empire?

21        MR. WEIL:  Same objection.

22   BY THE WITNESS:

23        A.    I have not.

24



1    impact on a youth's general education needs?

2         A.    It would depend on the situation.

3         Q.    What do you mean by that?

4         A.    Well, what do I mean by that?  I think

5    for youth, if they are sitting there thinking that

6    they are not able to go to school and are having a

7    teacher come in to try to teach them for a

8    nonelective -- for an elective reason versus

9    perhaps a shutdown, maybe a medical issue or

10   something that is beyond their control, the

11   reaction could be different and how it impacts the

12   youth.

13            I think that, you know -- in general,

14   you know, you miss a week of school here or there,

15   that by itself is likely not going to have a

16   long-term impact on your general educational needs,

17   but, you know, if you are in the public school

18   system and you are not going to school, you need to

19   have a good excuse.  I'm not sure if this is a good

20   excuse.

21        Q.    What I intend to ask is, what if it was

22   one or two days of classes being taught on the pods

23   instead of in a classroom, would that, in your

24   view, cause an impact on a detainee's general



LOUIS J. KRAUS, M.D.                                    May 24, 2019
T.S. vs TWENTIETH CENTURY FOX TELEVISION                          59

 1   educational needs?

 2       A.    One or two days may not impact the

 3   general education, but it may impact the youth for

 4   other reasons.

 5       Q.    Would that be a youth-by-youth

 6   determination?

 7       A.    I think generally speaking, yeah, you

 8   look at these youth and you would see them as high

 9   risk.  These are kids that have a significant

10   history of mental health issues, alcohol and

11   substance abuse issues, and other risks beyond just

12   their risk of mental health issues that simply

13   place them in general as a more reactive group.

14       Q.    I understand that answer, but I'm going

15   to press my question anyway.

16       A.    Understood.

17       Q.    Would the degree to which a day or two

18   of classes being taught on pods versus in

19   classrooms and the impact of that be a

20   youth-by-youth determination?

21       MR. WEIL:  Object to form.  You can answer.

22   BY THE WITNESS:

23       A.    Sure.  As specific as I can, trying to

24   be not vague and avoidant, I think the answer is



1  both.  I think that certainly every youth may

2  respond and react differently, but in general you

3  can look at these youth and say there are some

4  general constructs that these group of youths are

5  going to be at much higher risk for from doing

6  that.

7  BY MR. JACOBSON:

8      Q.    Would the impact also depend on the

9  quality of the teacher in any particular

10  circumstance?

11      MR. WEIL:  Object to form.  You can answer.

12  BY THE WITNESS:

13      A.    You know, of course the quality of the

14  teacher is important.  I'm not sure how it might

15  impact this or not.  More so than why aren't I

16  going to school.

17  BY MR. JACOBSON:

18      Q.    That is what I'm asking.  Are some

19  teachers going to be better able to adapt to

20  teaching on a pod than in a classroom?

21      A.    I'm sure some teachers might be better

22  at adapting than others.  I think the concept of

23  getting off the pod is the issue that I'm focused

24  on and being in an educational program as opposed



```
 1   screening process.
 2   BY MR. JACOBSON:
 3       Q.    What did you mean by "where the
 4   screening occurs"?
 5       A.    My understanding, and I think I have
 6   already commented, was that there was a -- these
 7   alpha pods, these two alpha pods that were moved,
 8   so the screening was occurring in two different --
 9   in a different place than they typically do it, and
10   I don't know how that may or may not impact or did
11   or did not impact screening.
12       Q.    Let me unpack that a little bit.  First
13   of all, other than what plaintiffs' counsel
14   communicated to you, do you have any knowledge as
15   to whether alpha pods were or weren't impacted by
16   the filming of Empire?
17       A.    No.
18       Q.    And so, to your knowledge, are new
19   arrivals at the JTDC asked any screening
20   questions -- let me back up.  Let me strike that.
21           Are you familiar with the sally port at
22   the JTDC, the place where the detainees arrive?
23       A.    Vaguely, yes.
24       Q.    To your knowledge, are new arrivals
```



1    potential concerns, based on the hypotheticals that

2    have been presented to me, it's my opinion that

3    this interaction would not outweigh the detrimental

4    impact of the filming on the youth, and nothing

5    more than that.

6          And I put "highly likely" because I

7    can't say 100 percent.  I wasn't there, but it just

8    doesn't seem like it would have.

9    BY MR. JACOBSON:

10     Q.    Would the likelihood of an offset, in

11   your view, depend on the extent to which a

12   particular detainee actually missed an outdoor

13   recreation period or had an activity cancelled?

14     MR. WEIL:  Object to form, vague, foundation.

15   BY THE WITNESS:

16     A.    I think the concept of what would be an

17   appropriate offset is a great question.  I had not

18   really thought about it yet.  Is the -- you know,

19   what do the kids get out of this versus what

20   limitations were electively placed on them that may

21   have caused some amount of suffering?  And that is

22   really what it comes down to.

23          I'm not clear of much of an offset of

24   what has occurred that would have allowed a

1   justification for this elective process for the

2   kids to have offset the things that we have talked

3   about.

4   BY MR. JACOBSON:

5       Q.   First of all, was "offset" your word or

6   plaintiffs' counsel's word?

7       A.   I can't tell you that with 100 percent

8   surety.  I know the balance concept was my concept.

9   I can't remember that word, per se, whether I used

10  that from them or whether that was mine, my word.

11      Q.   So if I showed you a detainee who met

12  Chris Rock and the only cost was one missed outdoor

13  recreation, would that -- what would your opinion

14  be of the cost versus benefits to that particular

15  detainee?

16      A.   Well, I'm going to answer it, but first

17  I need to just preface it by saying, look, I'm

18  commenting about general concepts of what I think,

19  what was an impact of the group as a whole.  You

20  know, it becomes, you know, a question mark in

21  regards to an isolated youth that had the pleasure

22  over the three times that they were there to have

23  met Chris Rock and been excited about that.

24               So with that said, with exactly as you



```
 1   described it, it sounds that that youth had a

 2   really exciting moment meeting Chris Rock.

 3        Q.    I meant to ask this before.  Earlier in

 4   your report in paragraph 20, you talk about on

 5   occasion the JTDC houses some preteens.  Do you

 6   know whether on the days that Empire was filmed

 7   there were any preteens housed at the JTDC?

 8        A.    I can't answer that for sure.

 9        Q.    Do you know the ages of detainees who

10   were housed at the JTDC while Empire was being

11   filmed?

12        A.    I can't tell you the age range while it

13   was being filmed.

14        Q.    Does the age range impact your

15   conclusions in any way -- strike that.

16             Would knowing the actual ages of the

17   detainees impact your conclusions in any way?

18        A.    So if assuming the rules changed, when

19   I -- years ago, they had older kids that could be

20   there.  Now it's up to, I think, just 18 and down

21   to, I want to say, 12, maybe 11.  I actually had a

22   couple very young kids years ago that I assessed

23   that were part of the process here that were 11 and

24   12.
```



1          And I don't think it would make any

2     significant difference of whether we were looking

3     at a group of kids that were 12 to 17 versus 14 to

4     18.  I think that the concepts of what I'm

5     describing here would be similar.

6          Q.    So you made a comment a few questions

7     ago with respect to -- I think you hypothesized

8     someone who was staying at the JTDC across the

9     three periods that we filmed.  By the way, do you

10    know the dates on which we filmed, as you sit here

11    today?

12         A.    I can't tell you them from memory.

13         Q.    Do you know the distance between -- the

14    time lag between the filming periods?

15         A.    Other than there was a time lag, I can't

16    tell you whether it was six weeks or eight weeks or

17    three months.

18         Q.    So it comes back to the average length

19    of stay being ten days.  Let's say a detainee was

20    housed at the JTDC for three months and was there

21    for all of the filming periods.  If that detainee

22    missed one outdoor rec period because of Empire

23    filming, to what degree in the detainee's overall

24    three-month stay would you say that that impacted



1  that person who was there across all three filming

2  periods?

3      MR. WEIL:  Object to form, vague.

4  BY THE WITNESS:

5      A.    Missing one rec time in three months,

6  probably less than perhaps others.

7  BY MR. JACOBSON:

8      Q.    And then let me take it in the other

9  direction.  Somebody who was there for only three

10  days and missed one outdoor rec by virtue of Empire

11  filming, what would that impact be on somebody who

12  was only there for less than the average time of,

13  say, three days?

14      MR. WEIL:  Same objection, vague.

15  BY THE WITNESS:

16      A.    So, you know, again, it's important to

17  understand the kids that we are dealing with.  It

18  could be that a kid misses their rec time and

19  nothing happens and he comes back and he's a little

20  annoyed.  It could be that that same kid turns

21  around and belts a wall and breaks his hand or

22  belts another kid's jaw because he's so enraged and

23  infuriated about what is going on.

24          It could then impact the other 12 kids



LOUIS J. KRAUS, M.D.                                    May 24, 2019
T.S. vs TWENTIETH CENTURY FOX TELEVISION                        80

1    were affected by this?

2         A.    I can't tell you that.

3         Q.    Or on how many days it happened?

4         A.    Correct.

5         Q.    And is it fair to say that that is the

6    same -- I could ask you those questions about all

7    of the other assumptions as well and you would not

8    know how many people it affected and how many days?

9         A.    The assumptions were given to me.  Based

10   on the assumptions, I drew my opinions.

11        Q.    Then I do want to ask you specifically,

12   in 32(e), you say, Numerous programs which were

13   scheduled to occur off the pods were cancelled.  Do

14   you have any knowledge about which programs those

15   were?

16        A.    I can't tell you which programs were

17   cancelled or not.

18        Q.    And would it matter to you if a program

19   was cancelled versus postponed?

20        MR. WEIL:  Object to form, foundation.

21   BY THE WITNESS:

22        A.    Yeah, I -- so it may matter, it may not.

23   If it gets postponed but the youth is discharged,

24   does it matter that it's just postponed?  So I



 1  don't know.  There are sort of specifics that

 2  perhaps if I had the actual info, I could respond

 3  easier.

 4  BY MR. JACOBSON:

 5      Q.    In (f)(ii), you say that one of the

 6  assumptions was that population caps on pods

 7  throughout the facility were raised past their safe

 8  functional operating capacity and numerous pods

 9  were, in fact, overpopulated.

10          What is your understanding of the term

11  "functional operating capacity"?

12      A.    So this paragraph I -- I clarified after

13  reading Mr. Dunlap's report.  Mr. Dunlap talks

14  about two sizes of pods when he came onboard, one

15  that housed 18 youth and one that I believe housed

16  16 youth.  He felt that -- based on national

17  criteria, that those numbers should be less, and he

18  reduced them to, I think, 14 and 12.  And so this

19  is what I was referring to in regards to what he

20  felt was a safe functional number.

21          By the way, that is not just necessarily

22  related to size.  It also has to do with ratios of

23  security and people to watch the kids.

24      Q.    So in your opinion only, if a pod has 16



1    beds and 13 detainees in it, is that unsafe?

2         MR. WEIL:  Object to form, vague.

3    BY THE WITNESS:

4         A.    I can't really give you a definitive

5    opinion of whether it's safe or unsafe.  I took

6    that information from what I read.

7    BY MR. JACOBSON:

8         Q.    In Mr. Dunlap's report?

9         A.    Correct.  There were concerns in regards

10   to the potential of intake units being shut down

11   and the additional youth having to be placed in

12   other pods, concerns of potential overcrowding.

13   That information I had before the Dunlap report.

14   The Dunlap report helped clarify the specifics with

15   it.  That is where that paragraph came from.

16        Q.    Then in iii, you refer to the MAYSI as

17   the JTDC's primary psychological screening tool.

18   On what basis did you refer to the MAYSI as the

19   primary psychological screening tool?

20        A.    In my opinion, it's the most important

21   initial screening tool.  It's the most used in

22   facilities across the country and has been -- has

23   just a significant level of validation.  Again, as

24   I described, although it can be used to look at



 1   other mental health sequelae, most importantly it

 2   looks at that risk for suicide, which is so

 3   crucially important, so that is what I mean by

 4   that.  I think the most important certainly.

 5          So I'm saying this because there are

 6   going to be other -- you showed me some screening

 7   forms that they have, and there might even be other

 8   ones that they fill out that could be more

 9   comprehensive than the MAYSI, but the MAYSI

10   initially is an extremely important one.

11       Q.    When we talked earlier about the intake

12   process, I believe you mentioned the mental health

13   interview that was conducted by a mental health

14   clinician or professional.  Am I accurately

15   restating what you said earlier?

16       A.    Yeah, that was reasonable.

17       Q.    What is the relationship between the

18   MAYSI and that interview?

19       A.    The MAYSI is not to be used in

20   isolation.  It's to be used in association with a

21   reasonable assessment.

22       Q.    And then paragraph 32(g) you say,

23   Visitation was moved from the JTDC's purpose-built

24   visitation facility to a smaller room with fewer,



 1  closer tables that afforded less privacy.

 2          Do you have any knowledge as to which

 3  room visitation was moved to?

 4      A.   I don't.

 5      Q.   And do you have any knowledge, as you

 6  sit here, about the relationship in size between

 7  the regular visitation area and the alternative

 8  room?

 9      A.   No.  You know, from what I remember from

10  Mr. Dunlap's report, I think it was -- it took care

11  of eight families instead of 12, and it was a

12  little more crowded so there was a little less

13  privacy for the family communication.

14      Q.   So for this conclusion you were relying

15  on Mr. Dunlap's report; is that correct?

16      MR. WEIL:  Object to form.

17  BY THE WITNESS:

18      A.   To the best of my memory, that is where

19  I got that information from.

20  BY MR. JACOBSON:

21      Q.   Do you have any personal knowledge as to

22  detainee visitation schedules at the JTDC, how

23  often detainees get visitation and when?

24      A.   Again, I think in the Dunlap report they

