**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| T.S. *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:16-cv-08303 |
| | ) | |
| v. | ) | Hon. Rebecca R. Pallmeyer |
| | ) | |
| Twentieth Century Fox Television *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF
<u>CROSS-MOTION FOR CLASS CERTIFICATION</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  **The merits of this case will be decided using evidence
    that is common to the class.** ............................................................. 3

    a.  Common evidence establishes that the defendants increased pod confinement and
    eliminated outdoor recreation to the detriment of all class members in order to
    accommodate Fox's filming needs. ...................................................... 3

    b.  Common evidence establishes that to accommodate *Empire* the defendants
    overpopulated pods throughout the JTDC. ........................................... 7

    c.  Common evidence will show that to facilitate *Empire* the defendants
    disrupted the JTDC's behavior economy to the detriment of all detainees. ........... 9

    d.  Common evidence will decide whether defendants eliminated MAYSI
    Testing in order to provide *Empire* with empty pods to use in
    conjunction with the filming. ........................................................ 9

    e.  Common evidence will decide whether the intake assignment process
    Was disrupted in order to accommodate *Empire*. .................................. 10

    f.  Common evidence will show whether visitation was degraded in order to
    accommodate Fox's needs. ........................................................... 11

    g.  Common evidence will show whether sick call responses were delayed. ............ 11

    h.  Common evidence will show whether the deprivations imposed to
    facilitate the *Empire* filming was reasonably related to a legitimate
    governmental interest. ................................................................. 12

    i.  Whether Fox had sufficient knowledge about the impact of the
    lockdowns will be answered with common evidence. ............................... 14

II. **The Named Plaintiffs suffered injuries typical of the class.** ...................... 15

    a.  Named Plaintiffs were subject to increased pod confinement and were
    denied access to the outdoor yards. ................................................. 15

    b.  The Named Plaintiffs were harmed by the disruption of Alpha
    and closure of Pods 3A and 3B. ..................................................... 17

    c.  Named Plaintiffs were impacted by the disruption of the behavior economy. ...... 17

      d.   Named Plaintiffs were impacted by the degrading of visitation. ......................... 18

      e.   T.S.'s sick call claim is typical. ........................................................... 18

**III.**    **Named Plaintiffs and their counsel are adequate representatives.** ........................... 19

**IV.**    **Common issues in this case predominate over individualized ones.** ......................... 22

      a.   The defendants continue to mis-apply the *Phillips* decision. ............................. 22

      b.   Liability for the injuries to the class is a common question. ............................... 25

**V.**    **A Rule 23(b)(1)(B) class is appropriate for Plaintiffs' unjust enrichment remedy.** ........................................................................................... 28

**VI.**    **Conclusion.** ............................................................................................... 30

**Table of Authorities**

**Cases**                                                                         **Page(s)**

*A.J. v. Kierst*, 56 F.3d 849 (8th Cir. 1995)......................................................................... 27

*Adair v. Town of Cicero*, No. 18 C 3526,
    2019 WL 2866708  (N.D. Ill. July 3, 2019) ................................................. 11, 15, 24

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013)............................... 54

*Bell v. Wolfish*, 441 U.S. 520 (1979) ................................................................. 25, 26, 27

*Bergren v. City of Milwaukee*, 811 F.2d 1139 (7th Cir. 1987) ...................................... 28

*Davis v. Wessel*, 792 F.3d 793 (7th Cir. 2015) ....................................................... 26, 27

*Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004)........................................................ 27

*Doe v. Cook Cty.*, No. 99-cv-3945, 1999 WL 1069244 (N.D. Ill. Nov. 22, 1999)...................... 27

*Godschall v. The Franklin Mint*, No. 01-cv-6539,
    2004 WL 2745890 (E.D. Pa. Dec.1, 2004)................................................................. 29

*Hill v. Watson*, No. 19-cv-00160, 2019 WL 2206526 (S.D. Ill. May 22, 2019) ..................... 26

*Kingsley v. Hendrickson*, 576 U.S. __, 135 S. Ct. 2466 (2015) ................................ 12, 25, 26, 27

*Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145 (S.D.N.Y. 2017).......................... 28

*Miranda c. Cty. of Lake*, 900 F.3d 335 (7th Cir. 2018) ............................................... 25

*Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849 (7th Cir. 2017)................. 6, 12. 14, 24, 26

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) .................................................... 28, 29

*Phillips v. Cook County,* 828 F.3d 541 (7th Cir. 2016) ........................................... 2, 22-24

*Reed v. Bowen*, 769 F. App'x 365 (7th Cir. Apr. 26, 2019) ........................................ 25, 26

*Rhodes v. Chapman*, 452 U.S. 337 (1981)............................................................. 25, 26

*Robles v. Prince George's County*, 302 F.3d 262 (4th Cir. 2002)................................... 27

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016) ......................................... 15

*Wagner v. County of Maricopa*, 706 F.3d 942 (9th Cir. 2013) .................................................... 27

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................. 22

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 23 ................................................................................................................ 2

Fed. R. Civ. P. 23(a)(4) ..................................................................................................... 21

Fed. R. Civ. P. 23(b)(1)(B) ............................................................................................... 28, 29

Fed. R. Civ. P. 23(b)(3) ................................................................................................... *passim*

**Additional Authorities**

7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
§ 1772 (3d ed. April 2019 update) ...................................................................... 29

## INDEX OF EXHIBITS

(exhibit numbering continued from ECF 236 at v-vii)

| Ex. | Document |
|-----|----------|
| **63** | 2018.10.18 Hearing Transcript [excerpt] |
| **64** | Deposition of Dr. Brian Conant [excerpt] |
| **65** | NCCHC Standards for Health Services in Juvenile Detention and Confinement Facilities, Standard Y-F-03 |
| **66** | Deposition of Earl Dunlap [excerpt] |
| **67** | JTDC Policy No. V5C10P03 |
| **68** | Deposition of Leonard Dixon [excerpt] |
| **69** | 2015.06.22 email correspondence between B. Breen and Y. Akins [filed under seal] |
| **70** | 2015.06.22 email correspondence between B. Breen and Y. Akins [filed under seal] |
| **71** | Deposition of Yvonne Akins [excerpt] |
| **72** | 2015.08.21 email correspondence between B. Breen and Y. Akins [filed under seal] |
| **73** | 2015.08.24 Leonard Dixon Calendar [filed under seal] |
| **74** | 2015.08.21 email correspondence between Y. Akins, M. McCoy, and D. McGhee |
| **75** | 2015.07.24 correspondence between L. Dixon and T. Geraghty |
| **76** | Deposition of Ryan Keesling [excerpt] |
| **77** | 2015.06.30 email correspondence between Z. Alonzo and B. Breen |

Plaintiffs T.S. and Q.B., former residents of the Cook County Juvenile Detention Center ("JTDC"), allege that the defendants wrongly imposed deprivations on them for the purpose of allowing Fox to film scenes for *Empire* at JTDC during the summer of 2015. They seek to represent a class of all youth who were detained at JTDC during the *Empire* lockdowns.

Although this Court is now called to decide the question of class certification only, the defendants argue at length that this case is really about trifling inconveniences which could never make out a claim. These arguments are wrong, and Defendants badly distort the record to make them. But as the Court has already observed, they are essentially irrelevant at this juncture. The decision to certify a class turns not on whether Plaintiffs' claims will ultimately prevail, but rather on whether the conduct that Plaintiffs claim to be illegal occurred on a classwide basis:

> The question on class certification is not the question about whether people can prevail and what their injuries are and what their damages are and exactly what happened. It's a question of whether the conduct of the defendants apply to the plaintiffs as a whole.

(Ex. 63.) Here, it plainly did. The injuries Plaintiffs allege in their complaint all flow from a single decision: to permit the filming of *Empire* at the JTDC and to modify the JTDC's operations—to the detriment of the youth housed there—to facilitate that filming. Plaintiffs charge that this decision, and the deprivations that flowed from it, were not reasonably related to a legitimate governmental purpose, and as such violated the rights of the JTDC's residents.

The defendants, of course, disagree; they now claim that the *Empire* deprivations *were* related to a legitimate governmental interest, and as such all the class member's claims fail. (ECF 248 at 21-22.) That claim is a transparent attempt to rationalize the defendants' own misconduct after the fact, and it is belied by what they actually said and did during the filming. But ultimately it is not a question to be answered at the class certification stage. What matters now is that the resolution of that dispute will resolve the claims of all the members of the

1

proposed class, in one stroke. All the detainees at the JTDC were subject to deprivations resulting from the *Empire* filming, and those deprivations were imposed on them for the same purpose: to facilitate the filming. As such, whether or not the deprivations were lawful can be answered all at once, for all detainees who were subject to them.

The defendants' misplaced focus appears to flow from their misreading of the case law. Specifically, the defendants still rely on *Phillips v. Cook County*, 828 F.3d 541 (7th Cir. 2016), but they still misunderstand that decision. They now argue that under *Phillips*, jail conditions cases essentially operate under special class action rules, under which a class cannot be certified unless the plaintiffs have identified a broad-based pattern of "systemic and severe" misconduct. (ECF 248 at 2.) *Phillips*, however, makes clear that jail conditions cases—like all other class actions—turn not on the severity of the alleged harm, but rather on whether the class claims turn on a common allegedly illegal policy or action. ***One*** way to identify such a common policy is indeed to identify broad systemic deficiencies, but as *Phillips* makes clear, that systemic analysis is an alternative means of identifying a common question. In the first instance, an allegation that a "specific policy" unlawfully caused classwide injuries is certifiable. 828 F.3d at 558. Here, there is such a specific policy decision: the decision to permit the filming of Empire at the JTDC, and to alter the facility's operations to accommodate that filming. Whether that decision was lawful, or not, will resolve the claims of the entire class. That is the efficiency that Rule 23 is designed to achieve, and certification will accomplish it here.

I.    **The merits of this case will be decided using evidence that is common to the class.**

   a.    **Common evidence establishes that the defendants increased pod confinement and eliminated outdoor recreation to the detriment of all class members in order to accommodate Fox's filming needs.**

The core of this case is straightforward.  Incarceration of children and adolescents may at times be necessary, but it is psychologically harmful to them.  (*See* ECF 236-1 Ex. 1 ("Dunlap Rpt.") ¶ 28; ECF 236-1 Ex. 2 ("Kraus Rpt.") ¶¶ 21, 30.)  Confinement to more restrictive spaces with fewer activities—particularly "day rooms" like the JTDC's pods—magnifies that psychological harm.  (Kraus Rpt. ¶ 6.)   In contrast, more time off the pods and more activities—especially access to outdoor recreation—mitigates the psychological harm that incarceration imposes on young people.  (*Id.* ¶ 9.)  This has been Plaintiffs' basic claim since the outset of this case.  (*See, e.g.*, ECF 1 ¶ 17 (alleging that youth who are "warehoused in cells or pods with nothing to occupy the hours, aggravates the psychological and emotional traumas suffered by this already vulnerable population")·)  And in support of their motion for class certification, Plaintiffs pointed to evidence showing that in order to facilitate *Empire*'s filming on the JTDC's second and third floors, the defendants reduced or eliminated the presence of adolescents on those floors by purposefully subjecting the hundreds of youth detained at the JTDC to increased confinement on their pods—including by eliminating outdoor recreation and off-pod schooling completely.  (*See* ECF 236 at 8-12.)  That evidence showed that that this additional pod confinement was centrally directed by the JTDC's management, and that it all was undertaken for a single purpose: to facilitate Fox's filming of *Empire*.  (*Id.*)

The defendants do not meaningfully contest that this additional pod confinement occurred, nor do they contest that it was done for the purpose of facilitating the *Empire* filming.  They concede, for example, that all detainees were confined on their pods instead of being

3

allowed to leave them for school (ECF 212 at 10), and they concede that the outdoor recreation yards were closed to all detainees during filming. (*Id.* at 17.) The defendants nowhere contest that off-pod commissary was cancelled, and they concede that after-school programming that would have taken detainees off their pods was cancelled as well. (ECF 248 at 5.) As such the defendants' actual arguments against this claim are remarkably circumscribed. And they are unavailing. Plaintiffs can prove their claim of increased confinement with common evidence.

*First*, the defendants pretend that the additional-confinement claim does not exist, framing it instead as various distinct claims. Thus they analyze pod confinement for school separately from pod confinement for recreation and separately from pod confinement for programming. (*See* ECF 248 at 15, 18-21, 33-34.) As Plaintiffs have explained, however, these are all versions of the same deprivation, done for the same purpose, with the same impact of increasing the restrictiveness of incarceration and thus the negative psychological impact that incarceration had on the detainees housed there. The increased pod confinement is, in short, a common injury, inflicted for the same purpose, which affected the entire proposed class.

*Second*, when the defendants do finally acknowledge Plaintiffs' increased confinement claim in a few lines at the end of their brief (*see* ECF 248 at 31-32), they argue that it cannot be the basis for class certification because it is not a cognizable harm. (*Id.* at 32.) This, of course, is a question of law that is identical for every member of the class, and as such its resolution is appropriate at summary judgment, not class certification. *See, e.g., Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." (emphasis original)). Here, Plaintiffs' legal theory—that the increased

confinement harmed the detainees and violated their legal rights—is common to every class member.  Whether the theory will ultimately prevail on the merits is a question for another day.

That legal theory, moreover, will be decided with common evidence.  Plaintiffs have offered evidence, for example, that the outdoor yards at the JTDC were closed for a single reason—to film *Empire*—which precluded all detainees from obtaining access to the outdoors, and that the defendants prohibited access to the Nancy B. Jefferson school facilities for all detainees in order to accommodate *Empire*.  (*See* ECF 236 at 32-34.)  Proving at individual trials whether and why the yards and the school facilities were closed would require the absent class members to present the same evidence.

In the same manner, common evidence will show that subjecting children and adolescents to additional pod confinement is harmful to them.  Plaintiffs have put forward two expert witnesses who will testify that the increased confinement imposed on the detainees was harmful.  Dr. Louis Kraus, who was appointed by this Court as a psychiatric expert in the *Doe* litigation, has offered the opinion that:

> More time spent restricted to the pods means more negative impact on detainees and more psychological harm from incarceration. This is true for every juvenile; more restriction equals more harm.  For this reason, numerous JTDC programs—school, enrichment activities, exercise, recreation, commissary, etc.—are purposefully scheduled to take place off the pod.

(Kraus Rpt. ¶ 30(a).)  Earl Dunlap, who as the *Doe* District Court's appointed Transitional Administrator is perhaps the person most qualified to opine on appropriate treatment of young people at the JTDC, likewise is of the opinion that:

> [A]ll youth at the JTDC during the *Empire* filming appear to have endured increased pod confinement, reduced opportunities for structured programming, and the total elimination of access to outdoor space and fresh air.  These types of restrictions are harmful to youth and increase the harms to juveniles that are caused by detention.

(Dunlap Rpt. ¶ 9.)  Indeed, the defendants' own witness, Dr. Brian Conant, a clinical psychologist and the JTDC's current Mental Health Director, agreed that getting time off of the pod—particularly outdoor time—is beneficial "for psychological reasons, yes, because a change of scenery is good sometimes, so going to school is good, going to the gym is good, getting fresh air [is] important" for adolescent detainees.  (Ex. 64 at 177:23-178:5.)  Dr. Conant also explained that the JTDC's mental health unit relies on the National Commission on Correctional Healthcare for appropriate treatment standards.  (*See id. at* 56:3-57:21.)  And those standards, which are included among Dr. Conant's reliance materials, require, as a matter of detainee *healthcare*, "[d]aily outdoor exercise" "whenever possible" in order to help control "anxiety, nervousness, manic episodes, and depression" among adolescent detainees.  (Ex. 65.)

All this evidence is common to each class member.  While the defendants' position appears to be that, for example, missing one outdoor recreation session is less harmful than missing five, or that a short speech from one of the show's stars mitigated the damages of the handful of detainees who heard it (*see, e.g.*, ECF 248 at 36), that does not defeat class certification.  *See, e.g.*, *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017) (noting that "[c]ourts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations" (quotation and brackets omitted)).  Class members rarely suffer identical injuries.  The relevant inquiry is whether class members were injured by common conduct such that liability can be demonstrated with common proof.  That is the case here.

**Third,** the defendants argue that Plaintiffs have only pointed to a few instances where operating reports state explicitly that an activity is being cancelled because of *Empire*.  (ECF 248 at 34.)  This is hardly surprising:  the *Empire* cancellations were a facility-wide phenomenon of

which everyone was aware. While a few employees might have noted "*Empire*" specifically in their logs, there was no particular need to do so. There are few log notations, for example, stating that school was being held on the pods because of *Empire* or that a particular recreation session would not be held outdoors because of *Empire*—yet it is undisputed that the *Empire* filming caused both these things to occur across the JTDC. Using the JTDC's scheduling records and logs to compare what *should* have happened with that *did* happen, as Plaintiffs will do (*see* ECF 236 at 32-33), is common evidence that can be applied across the class as a whole.

*Fourth* and finally, citing two witnesses, the defendants claim that the outdoor yards may already have been closed for maintenance during the July filming period. (*See* ECF 248 at 18 & n.3.) This is a bald mischaracterization of the record: one of those witnesses recalled that such maintenance occurred before the filming (*see* ECF 236 at 32), while the other did not recall when it occurred at all (*see* ECF 248-6 at 260:24-262:8). That is to say nothing of the JTDC's *Empire* planning documents, which reflect the yards closing for *Empire* and reopening upon *Empire*'s departure, all with no reference to maintenance of any kind. (*See* ECF 236-2, Ex. 24.) But in any case, whether or not the yards were already (or ever) closed for maintenance is a question common to all detainees, and its answer will apply to all detainees as well.

### b. Common evidence establishes that to accommodate *Empire* the defendants overpopulated pods throughout the JTDC.

In support of their motion for class certification, Plaintiffs pointed to evidence showing that in order to accommodate Fox's desire to use residential pods for filming, the defendants closed pods 3A and 3B, and then dealt with the reduced capacity by over-populating other pods throughout the facility past their functional operating capacities. (ECF 236 at 14.) Plaintiffs' experts explain that pod functional operating capacities are set out in JTDC's own regulations to ensure detainee safety, and that overpopulating the pods as the defendants did was dangerous for

7

the youth in the JTDC. (Dunlap Rpt. ¶ 53 ("[T]he evidence indicates that in order to accommodate the Empire filming many pods exceeded their Functional Operating Capacities. This compromised the safety of the entire JTDC and all youth who were detained during the periods of overcrowding."); Kraus Rpt. ¶ 38 ("Overcrowding tends to exacerbate the impact of detention on juveniles because it creates increased risk of violence and fights among youth[.]").)

The defendants do not dispute that they caused pods to exceed functional operating capacity in order to accommodate *Empire*. (*See* ECF 248 at 7.) Instead they claim that overpopulation of the pods is insignificant because pod populations go up and down, because the number of detainees never exceeded the number of beds on each pod, and because the JTDC's overall population never exceeded its functional operating capacity. (*Id.*)

None of these arguments counsel against class certification. Plaintiffs have identified emails showing JTDC managers planning to overpopulate the pods specifically to accommodate *Empire*. (*See* ECF 236 at 14.) While the defendants claim that pod populations fluctuate, nowhere do they claim that they are pushed past their functional operating capacity during normal operation—and indeed, the JTDC's regulations require instituting emergency protocols if they do. (*See* ECF 236-2 Ex. 62 at 3.) The functional operating capacity regulations do indeed require fewer detainees than the bed space that is physically available—because filling the pods to their physical capacity threatens the "safety/security for residents and staff." (*Id*. Ex. 62 at 2; Dunlap Rpt. ¶ 54.) And as Mr. Dunlap explained, the JTDC's overall functional operating capacity is a function of the capacities of its different pods (Ex. 66 at 61:19-23), meaning that to accommodate *Empire* the defendants effectively over-populated the entire facility.

Most importantly, these are all common issues. It is Plaintiffs' legal theory, and the opinion of Plaintiffs' experts, that needlessly overpopulating the pods was both dangerous and

8

harmful to the JTDC's detainees. (*See* ECF 236 at 14.) That theory presents a question common to the class, and Plaintiffs will prove it with common evidence.

### c. Common evidence will show that to facilitate *Empire* the defendants disrupted the JTDC's behavior economy to the detriment of all detainees.

Plaintiffs had explained that the JTDC normally maintains a comprehensive behavior "economy" that provides consistent, immediate consequences—both positive and negative—in response to detainees' behavior, and that consistently maintaining this system is important both for the safety of all detainees in the building and for instituting a sense of fairness that facilitates the detainees' rehabilitation. (ECF 236 at 16.) Indeed, Dr. Conant, the defendants' own witness and head of Mental Health at the JTDC, agrees that the behavior economy

> can be beneficial to detainees because it gives them an opportunity to be agents in their own—let me rephrase this. It gives them the opportunity to take responsibility and to enjoy the benefits of being responsible. It gives them the opportunity to feel some sense of control, and generally speaking it promotes good behavior because when you behave well, you get good things, and that's good not only for the youth but also for the facility.

(Ex. 64 at 187:8-17.) Mr. Dunlap and Dr. Kraus both opined that the *Empire* deprivations disrupted this economy, creating safety risks for all the detainees at the JTDC and increasing the negative psychological impact of their incarceration. (ECF 236 at 16.) This evidence is common to all detainees, meaning Plaintiffs' claim can be decided on a class-wide basis.

### d. Common evidence will decide whether defendants eliminated MAYSI testing in order to provide *Empire* with empty pods to use in conjunction with the filming.

In their certification motion, Plaintiffs offered evidence that in order to accommodate *Empire*'s use of Pods 3A and 3B, the defendants failed to administer MAYSI psychological screening, which is a tool used to assess, among other things, the suicidality of detainees. (ECF 236 at 13-14.) Plaintiffs charge that the failure to administer MAYSI created risks for detainees throughout the facility. (*Id*.) In their response, the defendants suggest that the failure to

administer the MAYSI was not due to the filming, but instead was due to a wayward employee who was later fired; and, they add, the MAYSI test was unimportant. (*See* ECF 248 at 15; 248-12 Ex. L (Decl. of Brian Conant) and 248-19 Ex. S (Decl. of Zenaida Alonzo).)

This is an astonishing defense. The MAYSI is a screening tool mandated by JTDC policy. (*See* Ex. 67 at 4.) Here the JTDC admits that it failed to administer the MAYSI—as Plaintiffs assert—but claims it this was because of a ***different*** systemic failure. Thus the claimed injury—failure to administer the MAYSI—is common, and not in dispute. Whether this injury is actionable is a common question of law, and whether it was caused by *Empire*, or something else, is a common question of fact that will be proven with common evidence. Again defendants raise summary judgment arguments under the specter of class certification. The MAYSI test is centrally administered in the Alpha unit, so whatever caused the failure is common to the class.

### e. Common evidence will decide whether the intake assignment process was disrupted in order to accommodate *Empire*.

Plaintiffs charge that in order to accommodate *Empire*'s use of Pods 3A and 3B, the defendants made bulk transfers of detainees on a timetable driven by Fox's filming needs rather than the pod assignment procedures that the JTDC normally employs (*see* ECF 236 at 14), which compromised the facility and endangered the JTDC's residents. (*Id.*) In response, the defendants assert that all assignment screenings were completed properly. (*See* ECF 248 at 14.)

As with the MAYSI test, what impact *Empire* had on the assignment process is a question can be answered for the class as a whole. The assignment process is a centralized function that occurs in the Alpha unit. (*See* ECF 236 at 12-14.) Whether that process was degraded in order to accommodate the filming, as the defendants' contemporaneous emails indicate (*see id*. at 14), or whether it was not, as the defendants now claim (*see* ECF 248 at 21), is a common question that can be resolved all at once—indeed, the defendants do not assert otherwise.

10

**f.  Common evidence will show whether visitation was degraded in order to accommodate Fox's needs.**

Plaintiffs charge (*see* ECF 236 at 14-15), and the defendants admit (*see* ECF 248 at 16), that in order to accommodate *Empire* the defendants (1) moved visitation to a smaller room that was not designed for visits and (2) reduced the number of visiting tables from 12 to 8.  (*See* ECF 236 at 14-15; ECF 248 at 16.)  Plaintiffs claim that this had two effects:  first, the tables in the alternate room were closer together, eliminating privacy, and second, fewer tables meant fewer visiting slots, resulting in some visitors—like Q.B.'s grandmother—being turned away.  (ECF 236 at 15.)  The defendants dispute the factual basis for these claims.  They claim the tables in the replacement visitation room were set up with enough distance to ensure privacy (*see* ECF 248 at 16), and they dispute that the reduced number of tables was "too few."  (*Id.*)

These factual disputes are common to the class, because deciding them will resolve them for everyone.  *Cf. Adair v. Town of Cicero*, No. 18-cv-3526, 2019 WL 2866708, at *2 (N.D. Ill. July 3, 2019) (Kennelly, J.) (certifying Rule 23(b)(3) jail conditions class alleging configuration of jail's intake facilities allowed male guards to see female detainees' genitalia when they used the restroom, because questions about the jail's physical layout were common to the class).  Since they can be resolved with common evidence, they are appropriate for class-wide treatment.

**g.  Common evidence will show whether sick call responses were delayed.**

Plaintiffs charge, based on the recollections of different detainees in different parts of the facility, that responses to sick call slips were delayed during the filming, which flows logically from the restrictions on detainee movement to the second and third floors that were imposed to facilitate the filming.  (ECF 236 at 15.)  In response, the defendants have submitted voluminous affidavits in which they claim that detainees received medical care in response to sick call slips submitted during the filming.  (ECF 248 at 12-13 (collecting affidavits).)  Evidence that medical

care was provided is not inconsistent with evidence that it was delayed, however. And Plaintiffs'
charge of delayed response to sick call slips presents a common question under the Fourteenth
Amendment: is it reasonable to delay responses to detainee sick call slips in order to facilitate
the filming of a television drama in a juvenile detention facility? That question can be answered
on the merits for the entire class at once.

### h. Common evidence will show whether the deprivations imposed to facilitate the *Empire* filming were reasonably related to a legitimate governmental interest.

Defendants now argue that the *Empire* lockdowns served a legitimate governmental
purpose, claiming the filming was intended to benefit the youth housed at the JTDC, and to
improve staff morale. (*See* ECF 248 at 21-22.) This, too, presents a common question. The
relevant issue at the class certification stage is whether there is common evidence that a fact-
finder can use to decide whether the deprivations imposed to facilitate the *Empire* filming were
"'rationally related to a legitimate governmental objective, or [whether they were] excessive in
relation to such a purpose.'" *Mulvania*, 850 F.3d at 857-58 (quoting *Kingsley v. Hendrickson*,
576 U.S. ___, 135 S. Ct. 2446, 2473-74 (2015)). Plainly, there is.

The record puts the governmental interest that the defendants now purport to identify in
sharp relief: their claim amounts to an assertion that more than 300 detainees were placed on
lockdown for nearly two weeks in order to allow a handful of them to hear a movie star give a
short presentation. That is simply implausible; indeed, Mr. Dunlap has opined that the "benefits"
the defendants claim to have identified could never have justified the lockdowns. (*See* ECF 236-
1 Ex. 1 ¶ 87.) Placing hundreds of detainees on lockdown for nearly two weeks, furthermore, is
not a legitimate means to get JTDC staff excited about their jobs.

The "purpose" now identified by the defendants, moreover, is based largely on Dixon's
after-the-fact testimony in this litigation, whereas the record shows that at the time, Dixon's

energies and efforts were devoted almost entirely to creating opportunities for mingling with the *Empire* celebrities.  For example, Dixon brought his wife to the filming (Ex. 68 at 151:24-152:8) and then directed his administrative assistant to ask *Empire*'s location manager to bring all the stars to his office before filming began.  (Ex. 69.)  Minutes after the location manager demurred to this request, Dixon instructed his administrative assistant to insist—over the location manager's protests that it would be inconvenient—that any break room for *Empire*'s stars would be in his own office. (Ex. 70.)  This was justified on "privacy" grounds, but those were revealed to be entirely pretextual.  (Ex. 71 at 38:9-41:9; 51:17-53:3.)  Dixon also repeatedly asked for an embossed "*Empire* director's chair"—a demand that the defendants now try to pass off as a joke, but which was serious enough at the time for Fox's location manager to have one procured especially for him.  (Ex. 72.)  Dixon cleared out his calendar on days that *Empire* came to film (*see* Ex. 73.), and he and senior JTDC managers spent much of their time working out plans to meet with the show's actors and take photos with them. (*See* Ex. 74.)  Indeed, Dixon admitted that "as best I could," he had made sure to get photographs with every celebrity who came to the set.  (Ex. 68 at 314:22-315:5.)

It appears, moreover, that Dixon knew at the time that the conditions imposed to facilitate the filming were unjustifiable.  The defendants concede, for example, that multiple after-school programs were cancelled in order to accommodate the *Empire* filming.  (*See* ECF 248 at 20.) That indicates that when Dixon assured Northwestern University Law School Prof. Thomas Geraghty, *Doe*'s court-appointed next friend of the detainees, that "[t]he Empire filming had no impact on regular programming for our kids," (Ex. 75.), he was purposefully misleading the professor about the impact of the filming on the JTDC's detainees.

In all events, the purpose of the *Empire* deprivations presents a common question, which will be resolved for every class member in one stroke. The decision to permit the *Empire* filming was made by the superintendent, and the resulting restrictions were centrally planned and directed in order to facilitate that filming. (ECF 236 at 6-16.) As such, whether or not the deprivations imposed to facilitate the *Empire* filming were "rationally related to a legitimate governmental objective, or [whether they were] excessive in relation to such a purpose," *Mulvania*, 850 F.3d at 857-58, can be decided for all detainees at once.

### i. Whether Fox had sufficient knowledge about the impact of the lockdowns will be answered with common evidence.

Fox filed a separate brief in which it argues that a Rule 23(b)(3) class cannot be certified against it in particular. (ECF 249.) But Fox's arguments all apply to the class as a whole— showing that class certification is indeed appropriate on Plaintiffs' claims against it.

Plaintiffs base their two claims against Fox—Count VIII and Count XIII, both of which survived motion to dismiss[1]—on the allegation that before filming, Fox was confronted with the fact that the only place for the youth detained at the JTDC to get off their pods was the second and third floors that Fox wanted to use to film. (*See* ECF 88 ¶¶ 29-30.) Discovery confirmed that to be true. After touring the JTDC, for example, Fox's scout sent an email acknowledging that while *Empire* usually brought crews of 80 to a film set, a smaller crew of 30 would be necessary to prevent disruption; yet Fox brought crews that dwarfed that number, sometimes totaling over 200. (*See* ECF 236 at 36.) Fox claims that "nothing in the discovery record shows that the Fox Defendants had any reason to know or believe that their presence . . . could have

---

[1] Fox continues to assert that Plaintiffs' Count XIII against it has effectively been dismissed, and that all claims against can only be satisfied pursuant to Count VIII, with proof that Fox had actual knowledge of the lockdowns. (ECF 249 at 1-2.) As Plaintiffs have explained, that is wrong. (*See* ECF 236 at 39-40.) And it is an issue for summary judgment, not certification. (*Id.*)

detrimentally impacted JTDC detainees."  (ECF 249 at 4.)  But that argument simply ignores the contemporaneous record in favor of the self-serving deposition testimony of its employees.

Fox's argument, moreover, does not militate against class certification at all.  Fox contends that that it categorically did not know or have any reason to know about any of the restrictions imposed on any of the JTDC's detainees.  That argument is one to address at summary judgment.  As Judge Kennelly recently explained in certifying a Rule 23(b)(3) jail conditions class action over the defendants' objection that the case was entirely meritless:

> [W]hen "the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification."

*Adair*, 2019 WL 2866708, at *1 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016) (brackets omitted)).  What Fox knew, or didn't know, would be proven with the exact same evidence in any trial brought by any individual detainee.  Fox's knowledge, or lack thereof, is thus a quintessentially common issue.

## II.    The Named Plaintiffs suffered injuries typical of the class.

Named Plaintiffs suffered the same injuries as the absent class members.  The defendants expend considerable space disputing this fact (*see* ECF 248 at 12-21), but their arguments boil down either to ignoring the record as it stands, or to making legal arguments about the deprivations that are irrelevant to class certification.  Neither is a basis for denying certification.

### a.  Named Plaintiffs were subject to increased pod confinement and were denied access to the outdoor yards.

Both named Plaintiffs were subject to additional pod confinement in order to accommodate *Empire*.  Plaintiffs pointed out that T.S. was subject to additional pod confinement for school (*see* ECF 236 at 18), and the defendants concede as much.  (ECF 212 at 24-25.)  T.S.

15

thus suffered the same injury (increased confinement to his pod) for the same reason (the defendants' exclusion of detainees from the JTDC's second and third floors in order to accommodate *Empire*) as the absent class members. That fact, alone, thus satisfies the typicality requirement as to Plaintiffs' claim of increased pod confinement.

The record also shows that in order to accommodate the filming both T.S. and Q.B. were denied the opportunity to go outside (*see* ECF 236 at 18). It further shows that during the June and August filming periods, T.S. and Q.B. were both denied the extra off-pod recreation that is provided during school breaks, which is designed to mitigate the increased pod confinement that otherwise occurs when detainees are unable to leave their pods for school. (*Id.* at 20.) The defendants do not dispute this fact, or even acknowledge it.

Plaintiffs further offered evidence that on certain days both T.S. and Q.B. were denied all off pod recreation whatsoever. (*Id.* at 19-20.) The defendants dispute that this is so (ECF 248 at 19-20), but they never explain why Plaintiffs' analysis of T.S.'s pod records are wrong, and while they speculate that Q.B.'s pod may have been subject to some drastic discipline that was never mentioned in its logs (*id.* at 19), the guard who was actually responsible for Q.B.'s pod at the relevant time has averred that there were no disciplinary issues that would have prevented him from leaving his pod for recreation. (ECF 236-1 Ex. 19 ¶¶ 24-33.) T.S. and Q.B. were thus deprived even of minimal off-pod time in order to facilitate *Empire*.

Plaintiffs have also offered evidence showing that T.S. had been participating in the Free Write program off the pod, which was cancelled to accommodate *Empire*. (*See* ECF 236 at 21.) The defendants claim that T.S. attended this program "sporadically," but they cite no evidence for that claim. (*See* ECF 248 at 2, 29.) And indeed, not only was T.S. on the Free Write roster at the time of the filming (*see* ECF 236 at 21), Free Write's director testified that T.S.'s attendance

16

was consistent (Ex. 76 at 67:23-68:3.), and specifically recalled discussing with T.S. the missed programming caused by the *Empire* filming. (*Id.* at 66:16-67:4.)

In short, Plaintiffs have put forward evidence that the defendants subjected Named Plaintiffs to additional pod confinement in order to accommodate the *Empire* filming. The defendants did so in multiple ways, any one of which would satisfy the typicality requirement for their additional-confinement claim. Ultimately the defendants do not dispute this evidence. Having lost on the facts they instead argue the law, contending that as a legal matter additional pod confinement is not a cognizable claim (ECF 248 at 30-32.) Even this, however, is a defense common to all the class members. Named Plaintiffs' confinement claim is typical of the class.

**b. The Named Plaintiffs were harmed by the disruption of Alpha and closure of Pods 3A and 3B.**

Plaintiffs have explained that both Named Plaintiffs were impacted by the closure of Pods 3A and 3B to accommodate *Empire*. Q.B.'s pod was overpopulated past its safe functional operating capacity; and as Plaintiffs have explained, bulk transfers and the elimination of MAYSI impacted the entire facility. (ECF 236 at 21.) The defendants do not dispute that Q.B. was on an overpopulated pod. They argue that MAYSI was superfluous and that over-populating the pods didn't matter (*see* ECF 248 at 6, 15), but they do not seriously contend that the Named Plaintiffs' claims arising from this alleged misconduct are atypical of the class.

**c. Named Plaintiffs were impacted by the disruption of the behavior economy.**

Plaintiffs explained that disrupting the JTDC's behavior economy placed everyone in the facility at risk of increased violence, and that it worsened the detention conditions of all detainees at the JTDC. (ECF 236 at 16.) That, of course, includes the Named Plaintiffs, for whom the behavior economy was disrupted along with all the other detainees in the facility. (*Id.*) The defendants do not address this point anywhere in their response, essentially conceding it.

17

**d. Named Plaintiffs were impacted by the degrading of visitation.**

T.S. and Q.B. were impacted by the degrading of visitation. Plaintiffs allege that the privacy of visits for T.S. and Q.B. was eliminated in the smaller visitation room. (ECF 236 at 21-22), and they charge that by reducing the number of visitation tables the defendants effectively eliminated multiple visitation slots during each pod's visiting hour—causing the otherwise inexplicable cancellation of Q.B.'s visit with his grandmother. (ECF 236 at 22.)

The defendants' only contention regarding the loss of privacy is to argue that the claim is false, because the tables were far enough apart (ECF 248 at 16-17), but as Plaintiffs have already noted that is a merits issue, not one for class certification. (*See supra* 11-12.) Regarding the cancellation of Q.B.'s visit, the defendants say that "the conduct of normal family visitation for the rest of Q.B.'s pod . . . disproves that *Empire* filming cause any disruption of visitation," (*see* ECF 248 at 18), but that is also consistent with Plaintiffs' theory of the otherwise inexplicable cancellation of the visit by Q.B.'s grandmother: with fewer tables the visiting slots filled up faster, resulting in cancellations for additional visits—including Q.B.'s grandmother. (*See* ECF 236 at 22.) All detainees with visits during the filming were subject to these impositions.

**e. T.S.'s sick call claim is typical.**

Plaintiffs have explained that T.S.'s claim regarding sick call slips is that responses were delayed during the filming (*see* ECF 236 at 22-23), and they pointed out that the defendants pointedly avoided taking discovery to determine whether the care was actually delayed. (*Id.* at 23.) In response the defendants repeat that the responses to T.S.'s medical claims were "prompt," (*see* ECF 248 at 13), but they offer no more support for that contention than they did in their initial brief (*see* ECF 236 at 22-23 (describing defendants' lack of evidence)), and in any event such evidence would amount to a factual dispute that must be decided on the merits.

18

### III. Named Plaintiffs and their counsel are adequate representatives.

The defendants continue to claim that class counsel and Named Plaintiffs are inadequate. (*See* ECF 248 at 32 n.7.) Made again via footnote, the argument appears to have little purpose other to distract from the real issues in this case. All the same, it compels a response.

The defendants now assert that class counsel "have not shown any prior experience litigating class actions." (*Id.*) This is demonstrably false. Counsel of record have decades of experience in complex litigation, including large class cases, and including as lead counsel in this very court. For example, Fine, Kaplan & Black R.P.C., the firm of which Mr. Pessin is a partner, was appointed as co-lead counsel by Judge Gettleman in *In re Aftermarket Filters Antitrust Litigation*, MDL No. 157 (N.D. Ill.) (resolved by settlements totaling approximately $20 million) and as co-lead counsel by Judge Zagel in *In re Standard Iron Works v. ArcelorMittal, et al.*, No. 08-cv-5214 (N.D. Ill.) (resolved by settlements totaling approximately $194 million). Mr. Garmey, meanwhile, is an accomplished trial attorney, and was one of three lawyers selected by Maine's attorney general to represent that state in its lawsuit against the tobacco industry, eventually securing $1.5 billion for the state as part of the Master Settlement Agreement reached between the industry and numerous states and territories. And Mr. Weil and Ms. Chardon have more than a decade of experience litigating class actions with national defense practices, and Mr. Weil additionally has experience litigating jail conditions class actions through the MacArthur Justice Center at Northwestern University School of Law.[2]

The defendants also say that Plaintiffs' counsel has not explained "how they pleaded so many demonstrably false allegations." (*Id.*) The one incorrect allegation they actually point to is

---

[2] Plaintiffs would be pleased to submit additional materials substantiating their adequacy as class counsel, should the Court request it. Counsel for Plaintiffs' web biographies provide additional information on their experience and qualifications. (*See* ECF 236 at 24 n. 4.)

Plaintiffs' initial claim that filming occurred in the infirmary. (*Id.* at 12.) But the defendants well know the basis for this claim: while the defendants now say that "neither [Dixon] nor his staff ever would have allowed" filming in the infirmary, (ECF 248 at 12) the publicly available location agreement *recited in writing* that Fox would film there (*see* ECF 212-1 Ex. A ¶ 1(A)), and the infirmary was on the itinerary Fox circulated at the outset of filming. (*See, e.g.*, ECF 249-4 at PageID #:4476). It was only through document discovery that Plaintiffs learned it was later cancelled, over Fox's objection. (Ex. 77.)

T.S. and Q.B., meanwhile, might seem easy to paint as dishonest because of their backgrounds, and perhaps that is why the defendants have been so eager to do so. But their aspersions are baseless and irresponsible. Consider:

- In their opening brief the defendants effectively accused T.S. and Q.B. of lying, claiming that neither detainee could "name" a single detainee whose serious medical needs went unmet. (ECF 212 at 3.) But the defendants well knew that T.S. and Q.B. *had* identified such detainees at their depositions. (*See* ECF 236 at 25.) It was only after Plaintiffs pointed this out that (*id.*) the defendants bothered looking into that testimony (*see* ECF 248 at 13). That *confirmed* Q.B.'s testimony that a detainee nicknamed "Thug Life" was on Q.B.'s pod and had submitted sick call requests during filming. (*See id.*) The defendants still appear to insist that Q.B. was lying, perhaps because he diagnosed "Thug Life's" illness incorrectly. (*Id.*) The defendants have nothing to say, meanwhile, about the multiple detainees whom T.S. identified by name. (*See* ECF 236 at 25.) It is simply unconscionable for sophisticated defense counsel, with plenary access to detainee medical files, to accuse T.S. and Q.B. of dishonesty so carelessly.

- Regarding Q.B., the defendants say: "Equally contrived were the claims that Q.B. saw detainees on his pod, while school was being held on the pod," since Q.B. was not detained

at the JTDC during the July filming when school was in session.  (ECF 248 at 31.)  But the part of Q.B.'s "allegation" which the defendants claim is dishonest was invented by the defendants themselves.  Q.B. never alleged that he "saw" the impact of the July filming—that "allegation" is the defendants' own fabrication.  (*See* ECF 88 ¶ 48(d).)  As Plaintiffs have already noted, Q.B. noted in response to an interrogatory that he did not recall being at the JTDC when school was in session (*see* ECF 236 at 25 n.5), and he readily explained at his deposition that in SAC ¶ 48(d) he was relating what other detainees on his pod had told him about their experiences during the July filming.  (*See* ECF 236-2 Ex. 44 at 103:22-104:10.)

     •     The defendants portray T.S. as an apathetic who attended the Free Write program only "sporadically" and thus was untruthful when he claimed to have missed it because of the filming (ECF 248 at 2, 29).  But the defendants know full well that Free Write's director testified both that T.S.'s attendance was consistent, and that he and T.S. specifically discussed missing the program after it was cancelled because of *Empire*.  (*See supra* 17.)

     •     The defendants repeatedly emphasize that both Named Plaintiffs recall missing more off-pod recreation than is supported by the record.  But the record broadly establishes that both detainees were subject to pod confinement well over and above what they normally would have experienced—spending hours on the pod when they normally would have been off for school, additional off-pod recreation and tournaments during school breaks, and non-school programming.  Both Named Plaintiffs were indeed denied all recreation on some days, and neither one was ever allowed outdoors, amplifying their recollection of confinement.  All of this implies at most imperfect memories, not the dishonesty defendants are so eager to find.

     Named Plaintiffs and class counsel are adequate under Rule 23(a)(4).

IV.    **Common issues in this case predominate over individualized ones.**

   a.  **The defendants continue to mis-apply the *Phillips* decision.**

   The defendants continue to rely on *Phillips v. Cook County,* 828 F.3d 541 (7th Cir. 2016) as the lynchpin of their class certification argument,[3] but in doing so they continue to misconstrue the decision.  The *Phillips* class analysis did not turn on the **severity** of the deprivations at issue, as the defendants claim.  (*See* ECF 248 at 2.)  Rather, it turned on the **source** of the putative class claims—specifically, whether or not the "class members are as one in their exposure to a particular and sufficiently well-defined . . . allegedly illegal polic[y]," *Phillips*, 828 F.3d. at 553, such that the

> claims [of the class] "depend upon a common contention of such a nature that it is
> capable of classwide resolution—which means that determination of its truth or
> falsity will resolve an issue that is central to the validity of each one of the claims
> in one stroke."

*Phillips*, 828 F.3d at 550 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (ellipses omitted)).  In this case, of course, there is such an allegedly illegal, centralized act upon which Plaintiffs assert their claims:  the alteration of the JTDC's operations for the purpose of facilitating the filming of *Empire*, which imposed deprivations on the detainees.  Plaintiffs claim that this act was illegal because it was not reasonably related to a legitimate governmental purpose.  An answer to that question—whether or not the *Empire* deprivations were indeed reasonably related to a legitimate governmental purpose—"will," to quote *Wal-Mart*, "resolve an issue that is central to the validity" of each class member's claims.

---

   [3]  The defendants originally argued that *Phillips* made class certification impossible because it incorporated the Eighth Amendment's subjective deliberate indifference standard.  (*See, e.g.*, ECF 212 at 16-17.)  As Plaintiffs pointed out, however, the Seventh Circuit has since disavowed the use of that standard in the pretrial detention setting.  (*See* ECF 236 at 28.)

*Phillips* was a long-running Rule 23(b)(3) class action over delayed dental care at a jail. When the action was initially filed the jail employed too few dental staff, which the plaintiffs alleged was the cause of the delayed care. 828 F.3d at 544. While the case was pending an appropriate number of staff were hired, *id.* at 545, but plaintiffs alleged that dental care was still delayed. *Id.* at 545-46. The district court certified a Rule 23(b)(3) class covering the period that the jail employed too few dental staff, since "the class members shared a common question" based on the allegedly inadequate number of staff, *id.* at 544, but it declined to certify a class for the period when there were sufficient staff, since the plaintiffs could not identify another common cause for the continuing delays. *Id.* at 548. Plaintiffs appealed this second ruling.

That appeal—the *Phillips* decision—actually consists of two separate class certification analyses. First, the court assessed whether the plaintiffs could identify a specific and common reason of the alleged delays. The court held that plaintiffs had not, since the delays identified by the plaintiffs each "concerned a different alleged deficiency in the treatment process," and thus did not have an identifiable common cause. *Id.* at 555. The court held that without identifying a common, allegedly unlawful cause of the delays, the plaintiffs could not present a question whose answer would resolve claims for the entire class, and there was therefore no way to determine in a "classwide manner" whether the delays were unlawful. *Id.* at 556.

That was *Phillips*' primary analysis. Having concluded that the plaintiffs could not identify a specific policy that caused the alleged delays, the court then proceeded to a "second category" of analysis: whether plaintiffs had identified "systematic deficiencies" in healthcare. *Id.* at 557. This type of claim is one where "a prison ha[s] such a consistent pattern of egregious delays in medical treatment that a trier of fact might infer a systemic unconstitutional practice," since a "pattern of unconstitutional conduct can indicate an entrenched practice that has the

effective force of a formal policy" whose existence "would lead to a finding that all detainees are effectively denied treatment" as a result of that policy. *Id.* (quotation omitted). *Phillips* held that because the plaintiffs did "not present a pattern of egregious delays across the entire class," they had not identified such a policy, and therefore the class could not be certified under this systemic theory of liability, either. *Id.* at 558.

The defendants in this case argue that *Phillips* holds that all class actions concerning conditions of confinement must identify a pattern of egregious systemic deficiencies in order to proceed as a class. (*See* ECF 248 at 2-3, 6.). That is simply not so. *Phillips* specifically treated its "systemic" analysis as an alternative means to identify—or as *Phillips* put it, to "infer," *id.* at 557—the existence of a policy applicable to the class, where a single, specific policy could not otherwise be identified. But *Phillips* makes plain that in the first instance, it is sufficient for a plaintiff to identify "a particular and sufficiently well-defined" policy, the alleged illegality of which presents a question whose resolution, up or down, will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 550.

That single, identifiable policy or act may be allegedly insufficient dental staffing, like the Rule 23(b)(3) class that the *Phillips* district court did certify. *See id.* at 548. It may be the physical configuration of a lock-up facility that allegedly forced all female detainees to use the bathroom in view of male guards, like the Rule 23(b)(3) class certified by Judge Kennelly. *See Adair*, 2019 WL 2866708, at *2. It may be a sheriff's requirement that all female detainees wear white underwear, as in *Mulvania*. Or, as here, it may be a superintendent's decision to permit the filming of a commercial television drama at the JTDC and to do so by altering alter the facility's operations, to the detriment of its detainees. To the extent *Phillips* applies to this case, it counsels in favor of certification, not against it.

24

**b. Liability for the injuries to the class is a common question.**

The defendants also argue that class certification is inappropriate because for each deprivation imposed on each detainee, the Court will have to decide whether each injury is sufficiently serious, because in order to constitute an actionable due process claim the deprivation "must deny the detainee the minimal civilized measure of life's necessities." (ECF 248 at 26.) That standard would graft the Eighth Amendment's criteria for cruel and unusual punishment onto the Fourteenth Amendment's prohibition against punishment of any kind. *Kingsley* made clear, however, that the Eight Amendment does not apply to pretrial detainees. And as Plaintiffs have noted (*see* ECF 236 at 27-28), the Seventh Circuit, in light of *Kingsley*, has specifically disavowed "graft[ing] the Eighth Amendment's [standards] onto the pretrial detainee situation." *Miranda v. Cty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). Indeed in *Reed v. Bowen*, 769 F. App'x 365 (7th Cir. Apr. 26, 2019), the Seventh Circuit recently distinguished between the rule prescribed by *Kingsley* and the "minimal civilized measure of life's necessities" rule that the defendants ask the Court to apply here:

> A *detainee's* claim differs from a *prisoner's* because "pretrial detainees (unlike convicted prisoners) cannot be punished at all." *Kingsley*, 135 S. Ct. at 2475. In bringing a conditions-of-confinement claim, a pretrial detainee "can . . . prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.' " *Kingsley*, 135 S. Ct. at 2473 quoting *Bell v. Wolfish*, 441 U.S. 520, 561 (1979)*. The Eighth Amendment is more permissive*; it requires only that conditions not cause an "unquestioned and serious deprivation of basic human needs . . . [or] *deprive inmates of the minimal civilized measure of life's necessities*." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

*Reed*, 769 F. App'x at 369 (ellipses and brackets original; italics emphasis original; bold emphasis added). *Reed* could hardly be more conclusive: the standard that the defendants ask the Court to follow here is *not* the standard of the Fourteenth Amendment, which prohibits all punishment of detainees (like Plaintiffs); but rather the "more permissive" Eighth Amendment

25

standard that applies to convicted prisoners and prohibits only punishment that is cruel and

unusual. *Cf. Hill v. Watson*, No. 19-cv-00160, 2019 WL 2206526, at \*2 (S.D. Ill. May 22, 2019)

("The Fourteenth Amendment prohibits all forms of punishment of pretrial detainees, and the

Eighth Amendment prohibits cruel and unusual punishment of convicted persons." (citing *Reed*

and *Kingsley*)). As *Reed* makes plain, the standard applicable in this case is not *Rhodes v.*

*Chapman*'s "minimal civilized measure of life's necessities" that the defendants invite the Court

apply, but rather the objective unreasonableness criteria set out in *Kingsley* and *Bell*.

      As Plaintiffs pointed out in their certification memorandum, moreover, the courts are

consistent in holding that even relatively minor impositions violate due process when they have

no reasonable relationship to a legitimate governmental purpose. (*See* ECF 236 at 29 & n. 7.)

*Mulvania* is one example; the defendants try to distinguish the facts in that case as more serious

than this one (*see* ECF 248 at 25), but while *Mulvania* noted that *some* detainees were watched

as they dressed into the underwear and *some* had to purchase the underwear, *all* the female

detainees were appropriate class members, based on the white underwear policy alone. *See* 850

F.3d at 855. The defendants also suggest that *Mulvania* turned on detainee dignity, (ECF 236 at

34), but *Mulvania*'s "dignity" language was distinctly an alternative, "[e]ven if" analysis, to be

performed in the event that the white underwear policy "might ultimately be found to be

rationally related to a legitimate governmental objective" by the fact-finder on remand. 850 F.3d

at 858. On the other hand, if the fact-finder at trial concluded that the policy was not reasonably

related to a legitimate governmental purpose or was excessive in relation thereto, that

"conclusion, ***without more***," would establish a due process violation. *Id.* (emphasis added).

      Plaintiffs pointed out other such cases in their class certification memorandum. (*See* ECF

236 at 29 & n.7.) The defendants try to distinguish two of the cases, *Davis v. Wessel*, 792 F.3d

793 (7th Cir. 2015) and *Robles v. Prince George's County*, 302 F.3d 262 (4th Cir. 2002), because the act at issue involved handcuffing detainees in a manner that was deemed inappropriate (though not physically injurious). (*See* ECF 248 at 5.) But handcuffing itself is hardly an uncommon experience for pretrial detainees. Rather, *Davis* and *Robles* held that the handcuffing at issue violated due process under the objective analysis of *Bell* and *Kingsley* because it was not done for a purpose reasonably related to a legitimate governmental interest. The defendants never address the other decisions Plaintiffs cited: *Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) held that placing webcams in adult jails that transmitted a public video feed violated due process because it was not rationally related to a legitimate governmental purpose, while *Wagner v. County of Maricopa*, 706 F.3d 942 (9th Cir. 2013) held that requiring male inmates to dress in pink underwear was also punishment, as it was not reasonably related to a legitimate governmental interest. None of these deprivations approached a denial of the "the minimal civilized measure of life's necessities," yet because the deprivations at issue imposed on pretrial detainees and were not reasonably related to a legitimate governmental purpose, the courts in those cases all held that they violated the detainees' Fourteenth Amendment rights.

The deprivations alleged in this case sit easily on par with these decisions, and indeed they exceed them. The putative class members here are all children or adolescents. As the court observed in *Doe*, about this same JTDC population, "the 14th amendment due process standard should, as a general matter, be more liberally construed when applied to juvenile pretrial detainees." *Doe v. Cook Cty.*, No. 99-cv-3945, 1999 WL 1069244, at *4 (N.D. Ill. Nov. 22, 1999) (citing *A.J. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995)). *Kierst* explains in more detail:

> In applying the due process standard to juveniles, we cannot ignore the reality that assessments of juvenile conditions of confinement are necessarily different from those relevant to assessments of adult conditions of confinement . . . . the due

process standard applied to juvenile pretrial detainees should be more liberally
construed than that applied to adult detainees.

56 F.3d at 854. The Seventh Circuit has been equally emphatic:

> For the juvenile, the experience of incarceration may have a far more long-lasting
> psychological effect. . . . [M]inority is a time and condition of life when a person
> may be most susceptible to influence and to psychological damage. The
> possibility of such serious injury at the hands of the state to a presumptively
> innocent minor must be taken into consideration when assessing the conditions of
> confinement.

*Bergren v. City of Milwaukee*, 811 F.2d 1139, 1143-44 (7th Cir. 1987). Plaintiffs will offer the

testimony of two highly qualified experts who explain that, in their opinions, the deprivations

that the defendants imposed in order to facilitate *Empire*'s filming at the JTDC were both

injurious and dangerous to all of the youth housed there. Plaintiffs have put forward common

evidence to show that the deprivations imposed on hundreds of detainees in order to facilitate

*Empire*'s filming were real, and they have put forward common evidence to show that the

deprivations were not reasonably related to a legitimate governmental purpose. These claims can

and will be proved with that common evidence.

**V.    A Rule 23(b)(1)(B) class is appropriate for Plaintiffs' unjust enrichment remedy.**

Plaintiffs move for a Rule 23(b)(1)(B) class to the extent that they seek an unjust

enrichment remedy. Fox objects that certification under Rule 23(b)(1)(B) is inappropriate

because "[t]he 'paradigm case' for Rule 23(b)(1)B) certification is one involving a limited and

identifiable pool of funds," which does not apply here because Fox is solvent. (ECF 248 at 39.)

That argument misunderstands Plaintiffs' grounds for a Rule 23(b)(1)(B) class. Limited

fund cases may be the "paradigm" Rule 23(b)(1)(B) class, but "limited fund cases—which

involve situations in which a fund's assets are insufficient to satisfy all claims—are just one of

the 'traditional varieties of representative suit encompassed by Rule 23(b)(1)(B).'" *Leber v.*

28

*Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 165 (S.D.N.Y. 2017) (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834-35 (1999)).

Rule 23(b)(1)(B) "authorizes the use of the class-action device when necessary to prevent possible adverse effects . . . on absent class members[] that might result if separate actions had to be brought," which "can [be] determine[d] . . . simply by looking at the nature of the relief . . . that might be sought . . . if class treatment is denied."  7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1772 (3d ed. April 2019 update).  Here, Plaintiffs' unjust enrichment remedy seeks disgorgement of profits that were illegally obtained, and would, as Plaintiffs explained, operate to create a trust.  (ECF 236 at 41.)  This is distinct from a tort remedy which turns on the magnitude of each putative class member's injuries; instead, the size of the trust will be limited to Fox's allegedly illegal profits.  If class treatment is denied in favor of individual actions, the first successful plaintiff (or the first fifty) can be expected to seek the largest payouts possible; that would put subsequent plaintiffs at a disadvantage, since Fox would be able to assert that it has already disgorged its unjust profits, to the plaintiffs who came before.

Unless Fox were to waive such a defense, the prosecution of the first individual actions will, "as a practical matter," either "be dispositive of the interests of the other members" to obtain their own unjust enrichment remedies, or "would substantially impair or impede their ability" to do so.  Fed. R. Civ. P. 23(b)(1)(B).  That is why "[w]hen a breach of fiduciary duty is at issue, any individual adjudication regarding the breach would necessarily affect the interests of others" and "[t]herefore it is appropriate to certify the class pursuant to Rule 23(b)(1)(B)." *Godschall v. The Franklin Mint*, No. 01-cv-6539, 2004 WL 2745890, *3 (E.D. Pa. Dec.1, 2004). Certification under Rule 23(b)(1)(B) is appropriate for the unjust enrichment remedy.

## VI.    Conclusion.

For the reasons set forth herein and in Plaintiffs' memorandum supporting class

certification (ECF 236) the Court should certify the proposed class.


July 31, 2019                                           Respectfully Submitted,

                                                        /s/ Stephen H. Weil

Stephen H. Weil – steve@weilchardon.com          Adam J. Pessin – apessin@finekaplan.com
Alexis G. Chardon – ali@weilchardon.com          Fine, Kaplan and Black, R.P.C.
Weil & Chardon LLC                               One South Broad Street, Suite 2300
333 S. Wabash Avenue, Suite 2700                 Philadelphia, PA 19107
Chicago, IL 60604                                (215) 567-6565
(312) 585-7404

Terrence Garmey – tgarmey@garmeylaw.com
Terry Garmey & Associates
482 Congress Street, Suite 402
Portland, ME 04101
(207) 331-3111

                                                        *Attorneys for Named Plaintiffs T.S. and Q.B.*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 31, 2019, a true and correct copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

Sealed filings will be transmitted to counsel separately via email.

<u>/s/ Stephen H. Weil</u>