UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

T.S. and Q.B., individually and on behalf of all )
others similarly situated, )
)
Plaintiffs, )
)
v. )
)
TWENTIETH CENTURY FOX TELEVISION, FOX )    No.  16 cv 08303
BROADCASTING COMPANY, TWENTY-FIRST )
CENTURY FOX, INC., FOX ENTERTAINMENT )    Judge Rebecca R. Pallmeyer
GROUP, LLC, FOX NETWORKS GROUP, INC., )
FOX TELEVISION GROUP, THE COUNTY OF )
COOK, ILLINOIS, LEONARD DIXON, JOHN )
DOES 1 THROUGH 20, and THE CHIEF JUDGE )
OF THE CIRCUIT COURT OF COOK COUNTY, )
)
Defendants. )

## MEMORANDUM ORDER AND OPINION

During the summer of 2015, Plaintiffs T.S. and Q.B. were pretrial detainees at the Cook

County Juvenile Temporary Detention Center ("JTDC").  On several days during that summer,

Defendant Twentieth Century Fox and other Fox entities (collectively, "Fox Defendants") filmed

scenes for the television show *Empire* at the JTDC.  Plaintiffs allege that *Empire* filming altered

the normal operations of the JTDC in ways that harmed them and other juvenile detainees.  In

this proposed class action, they assert claims under 42 U.S.C. § 1983 and various supplemental

state law theories.  *See* 28 U.S.C. §§ 1331, 1367(a).  Plaintiffs bring constitutional claims against

Defendants Cook County, Illinois; Leonard Dixon, the Superintendent of the JTDC; the Chief

Judge of the Circuit Court of Cook County in his official capacity; and Defendant Does

(collectively, "County Defendants").  Plaintiffs assert supplemental state law claims against the

County and Fox Defendants.  The parties' cross-motions on the issue of class certification[1] are

---

[1]    The County Defendants and the Fox Defendants submitted a combined motion to
deny class certification.  References to this brief [212] therefore reflect the arguments of all
Defendants.  The County and Fox Defendants then submitted separate briefs in reply to Plaintiffs'
motion for class certification.

now before the court.  As explained here, while some of Plaintiffs' claims may be amenable to class treatment, the class as currently defined—"all youths who were detained at the JTDC during the *Empire* filming"—is overbroad.  Plaintiffs' motion for class certification [235] and Defendants' motion to strike class allegations [212] are both denied without prejudice.

## BACKGROUND

During three brief periods in the summer of 2015 (June 21–26, July 13–16, and August 23–26), the Fox Defendants filmed scenes for the television show *Empire* at the JTDC.  (Mot. to Deny Class Cert. ("Mot. to Deny") [212] at 7.)  Between 250 and 400 detainees under the age of 18 are held at the JTDC at any given time while they await trial or other court proceedings, remaining there, on average, for less than a month.[2]  (Kraus Report ¶ 20, Ex. 2 to Mot. for Class Cert. [236]; Dunlap Dep. 93:8–11, Ex. D to Gov't Reply Mem. [248]; Dunlap Report ¶ 27, Ex. 1 to Mot. for Class Cert.)  The JTDC is a five-story building with residential areas on floors three through five, and other facilities for the detainees on the lower floors such as the Nancy B. Jefferson School's classrooms, recreation areas, a visiting room, and a chapel.  (Mot. for Class Cert. at 6.)  Detainees at the JTDC are housed in residential "pods"—living units of generally fewer than 15 detainees, in which individual cells open onto a shared common area.  (*Id.* at 6, 14.)  The detainees' activities at the JTDC occur with the other residents of their pods, and pods generally remain separate from each other.  (Mot. to Deny at 8.)

The JTDC is under the authority of the Office of the Chief Judge of the Circuit Court of Cook County, and Defendant Leonard Dixon is the JTDC's Superintendent.  (Mot. for Class Cert. at 7.)  In May 2015, JTDC officials, including Dixon, were contacted by a Fox location scout and ultimately agreed to allow the show *Empire* to film at the facility.  (*Id.*)  At times during filming, Plaintiffs allege, there were more than 200 of *Empire*'s cast and crew members at the JTDC.  (*Id.*)

---

[2]      Dr. Kraus's expert report said that detainees spend, on average, less than ten days at the JTDC, whereas Mr. Dunlap, an expert for Plaintiffs and former Transitional Administrator of the JTDC, said in his deposition that the average stay was under twenty-five days. (Kraus Report ¶ 20; Dunlap Dep. 93:8–11.)

Superintendent Dixon permitted the Fox Defendants access to several areas of the JTDC, including the northern part of the outdoor recreation area, pods 3A and 3B (normally two of JTDC's intake pods for male detainees), the chapel, the visitation room, several classrooms, and the hallways surrounding these areas. (*Id.* at 7–8.)

Plaintiffs allege that the decision to allow filming at the JTDC caused numerous disruptions to the facility's normal operations. (*See id.* at 8–16.) According to Plaintiffs, these disruptions included additional confinement of detainees to their pods, the elimination of outdoor recreation, July classes being conducted on the pods rather than in the Nancy B. Jefferson School classrooms,[3] reduced opportunities for off-pod recreation and programming, disruption to intake procedures, overpopulation of the pods, confinement of visitation to an unusually small space, and delayed response to requests for medical attention. (*Id.*) The Plaintiffs also allege that filming disrupted the JTDC behavior economy, which uses points to reward detainees for good behavior. (*Id.* at 16.) Specifically, as detainees earn points, they advance to higher "levels" (starting at level one and moving to level four) and enjoy greater privileges, such as increased access to the commissary, voluntary programs, and tournaments. (*Id.*; Steward Dep. at 163:8–10, Ex. 15 to Mot. for Class Cert.; Steward Decl. ¶¶ 8–11, Ex. D to Mot. to Deny.)

As noted, most JTDC residents stay, on average, for periods shorter than one month, but Plaintiff T.S. was a JTDC resident during all three of *Empire*'s filming periods. T.S. claims that he was required to spend more time on his pod during filming. In July, the residents of T.S.'s pod did not go to the classrooms for school, but instead received instruction from teachers who came to the pod. (Mot. for Class Cert. at 9, 18.) T.S. was assigned to level four at the time of filming and was eligible to participate in the JTDC's voluntary programs. (T.S. Dep. 114:12–116:24, Ex. E to Mot. to Deny.) T.S. claims that he signed up for a writing program and a parenting class that

---

[3] School was not in session during the June and August filming periods. (*See* Dixon Dep. at 71:2–10, Ex. 6 to Mot. for Class Cert.; Steward Decl. ¶¶ 3–5.)

were canceled during *Empire* filming.[4]  (*Id.*; Exs. 12, 33–36 to Mot. for Class Cert.)  T.S. asserts, further, that he was denied access to the outdoor recreation yard during *Empire* filming and that his pod had no off-pod recreation on at least June 24, 2015.  (Mot. for Class Cert. at 19.)  During *Empire* filming, T.S. submitted requests for medical attention for a toothache, headaches, and psychological distress, and he believes that the response time was greater than usual.  (*Id.* at 22.)  T.S. claims, in addition, that he had less privacy during family visits in the alternative visitation room during filming.  (*Id.*)

Plaintiff Q.B. was detained at the JTDC during parts of the summer of 2015, but was not detained at the JTDC on any day when school was in session in July.  (Mot. to Deny at 24.)  Q.B. was assigned to level one and was not eligible to participate in the JTDC's voluntary programs.  (Q.B. Dep. 53:9–54:2, 56:9–57:10, Ex. C to Mot. to Deny.)  Q.B. does not recall submitting a request for medical attention while *Empire* was filming at the JTDC.  (Mot. for Class Cert. at 22.)  Q.B. states that on June 23, 2015, recreation time scheduled for his pod occurred in the pod's common area rather than outdoors or in one of the designated areas on the lower floors of the facility.  (*Id.* at 19.)  Q.B. also claims that a visit with his grandmother was canceled on June 23, 2015 when *Empire* was filming at the JTDC, and that he had less privacy during his visits in the alternative visitation room with his court-appointed mentor.  (*Id.* at 22.)

Plaintiffs seek to certify a class of all youth detained at the JTDC during *Empire* filming. They seek money damages from the County Defendants for the alleged violation of their due process rights pursuant to 42 U.S.C. § 1983 (Counts I, II, and VI).  They also seek damages under state law theories: intentional infliction of emotional distress against the County Defendants (Count IX) and breach of fiduciary duty against Defendant Dixon and Defendant Does (Count VII).

---

[4]     Anna Buckingham, the JTDC Director of Gender Services who coordinated these programs, did not recall offering a parenting class in 2015, but did not dispute that some programs were rescheduled or canceled during *Empire* filming.  (Buckingham Dep. 14:23–15:5, 50:15–56:4, 65:16–22, 83:4–84:13, Ex. E to Gov't Reply Mem.)

Against the Fox Defendants, Plaintiffs assert state law claims of inducement of a breach of fiduciary duty (Count VII), civil conspiracy (Count X) and unjust enrichment (Count XII).[5]

## DISCUSSION

Any proposed class must meet four requirements under Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. FED. R. CIV. P. 23(a). The class then must satisfy the requirements of one of the three types of classes listed in Rule 23(b). *See Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012). For all of their claims, Plaintiffs seek certification under Rule 23(b)(3), which requires a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). In the alternative, Plaintiffs ask the court to certify a class for their claims against the Fox Defendants under Rule 23(b)(1)(B), appropriate if "adjudications with respect to individual class members . . . would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." FED. R. CIV. P. 23(b)(1)(B).

A "party seeking class certification must affirmatively demonstrate his compliance with the rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Plaintiffs bear the burden of showing that Rule 23's requirements are met by a preponderance of the evidence. *Messner*, 669 F.3d at 811. A court may look beyond the pleadings to determine whether class certification is appropriate, because "[o]n issues affecting class certification, [ ] a

---

[5]     Although labelled as Counts in the Complaint, Counts III, XI, and XII are not mentioned in the certification motion and do not set forth independent claims. They instead allege theories on which the government-entity Defendants may be held liable for the acts of various agents. *See* Count III (seeking to impose municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), against the County Defendants); Count XI (alleging that Cook County and the Chief Judge's Office have *respondeat superior* liability for state law claims); and Count XII (asserting that Cook County must indemnify its agents under state law).

court may not simply assume the truth of the matters as asserted by the plaintiff." *Id.* If there are factual disputes, "the court must receive evidence and resolve the disputes before deciding whether to certify the class." *Id.* (internal quotation omitted). This inquiry may involve "some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart*, 564 U.S. at 351, but class certification is not a "dress rehearsal for a trial on the merits," *Messner*, 669 F.3d at 811.

## I. Rule 23(a) Requirements

### A. Class Overbreadth

Although Rule 23 does not explicitly address the issue, courts have recognized that a proposed class must be ascertainable, meaning that it is "defined clearly and based on objective criteria." *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659 (7th Cir. 2015). If "a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by a defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Messner*, 669 F.3d at 824. Class overbreadth is not a merits question. That is, if "a proposed class consists largely . . . of members who are ultimately shown to have suffered no harm, that may not mean that the class was improperly certified but only that the class failed to meet its burden of proof on the merits." *Id.*

A class definition is not infirm merely because it may include a small percentage of persons who were not harmed. *Messner*, 669 F.3d at 825–26 (reversing denial of class certification where defendant admitted that only about 2.4 percent of the putative class members could not have been harmed by alleged anticompetitive practices). Still, a class definition that sweeps in a large proportion of persons who could not have been injured is overbroad. See *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (affirming district court's refusal to certify a proposed class that included millions of people who could not have been injured by defendant's failure to disclose ingredients in diet fountain drinks).

In the case before this court, Plaintiffs' proposed class, defined as all youth detained at the JTDC during *Empire* filming, may indeed include some individuals who could not have been

harmed. William Steward, a Deputy Executive Director of the JTDC, testified in his deposition that many detainees arrive at the JTDC and are released shortly thereafter, without ever having left the intake unit. (Steward Dep. 266:3–21.) This could happen, for example, if a detainee is not ultimately charged, or the court does not order the individual to be confined at the JTDC. (*Id.*) As Plaintiffs have not specifically stated what it means to be "detained" for purposed of the class definition, some detainees who never leave the intake unit are currently included in the class definition. (*See* Gov't Sur-Reply [278] at 1.) Plaintiffs defend this, noting that these individuals were nevertheless affected by *Empire* filming because when scenes were filmed at the entrance of the JTDC, new detainees were required to be shackled as they entered the facility.[6] (Pls.' Sur-Reply [279] at 7.) As Defendants observe, however, individuals who were never assigned to a pod could not have experienced the alleged alterations to the normal operations of the pods. Moreover, the injury that this group is alleged to have experienced—shackling—has not been raised as a class claim. That said, the court is uncertain how many putative class members fall within the group of individuals who were never transferred from the intake area to a residential pod, and believes that the inclusion of some number of individuals who were not ultimately confined at the JTDC is not, by itself, a basis to deny class certification in this case. Instead, this concern must be addressed by means of a narrower class definition.

## B. Numerosity

To be certified, the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Seventh Circuit, a class as small as forty members may suffice. *See Neil v. Zell*, 275 F.R.D. 256, 260 (N.D. Ill. 2011). Based upon the report of their expert that the JTDC was operating near its Functional Operating Capacity of 382 detainees

---

[6] The parties do not explain whether new arrivals were shackled when they entered the JTDC at other times when *Empire* was not filming. Plaintiffs cite "OAG 5300" to support their statement that "guards were instructed to make sure that detainees entering the facility were 'handcuffed and shackled.'" (Pls.' Sur-Reply at 7.) OAG 5300 likely refers to the page number of an exhibit, but Plaintiffs did not attach this exhibit to their response to Defendants' Sur-Reply [279], nor was the court able to find it elsewhere in the record.

during the period of *Empire* filming (Dunlap Report ¶ 60), Plaintiffs estimate that there are at least 300 potential class members. (Mot. for Class Cert. at 17.) Defendants do not challenge Plaintiffs' ability to meet the requirements of Rule 23(a)(1).

## C. Commonality

To satisfy the commonality requirement, Plaintiffs must show that there are "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(1). Even one common question may suffice. *See Phillips v. Sheriff of Cook Cty.*, 828 F.3d 542, 550 (7th Cir. 2016) (quoting *Wal-Mart*, 564 U.S. at 359). A superficial common question, such as whether class members "have all suffered a violation of the same provision of law," *McCaster v. Darden Rests.*, 845 F.3d 794, 800 (7th Cir. 2017) (quoting *Wal-Mart*, 564 U.S. at 350), is not sufficient for class treatment, however. *See Van v. Ford Motor Co.*, 332 F.R.D. 249, 273 (N.D. Ill. 2019). Rather, a prospective class must show that "determination of [the] truth or falsity [of a common contention] will resolve an issue that is central to the validity of each one of the claims in one stroke." *Phillips*, 828 F.3d at 550 (quoting *Wal-Mart*, 564 U.S. at 340). "The critical point is 'the need for conduct common to members of the class.'" *Phillips*, 828 F.3d at 553 (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)). "[S]upplemental proceedings can [ ] take place if, for example, the common question relates to liability of the defendant to a class and separate hearings are needed to resolve the payments due to each member." *Spano v. The Boeing Co.*, 633 F.3d 574, 585 (7th Cir. 2011).

Defendants' motion to deny class certification does not challenge Plaintiffs' ability to meet the commonality requirement, conceding that "the presence of *Empire*'s cast and crew on those few days in June, July, and August 2015 had some impact on the JTDC's normal operations." (Mot. to Deny at 17.) The court finds that Plaintiffs have identified at least one question that is common to the class—whether *Empire* filming disturbed operations at the JTDC in ways that violated class members' constitutional rights. Accordingly, Plaintiffs have satisfied Rule 23(a)'s commonality requirement.

Plaintiffs assert that the County Defendants violated their due process rights by altering the JTDC's normal operations to facilitate *Empire* filming. To pursue such a claim under 42 U.S.C. § 1983, Plaintiffs must allege "(1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under color of state law." *Wilson v. Warren Cty., Ill.*, 830 F.3d 464, 468 (7th Cir. 2016). After the close of briefing, the Seventh Circuit clarified the correct standard to apply to unlawful conditions of confinement claims brought by pretrial detainees. *See Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019). It is the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment's prohibition of cruel and unusual punishment, that governs challenges to a pretrial detainee's conditions of confinement. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). This is because pretrial detainees, unlike convicted prisoners, may not be punished. *Hardeman*, 933 F.3d at 821; *see also Schall v. Martin*, 467 U.S. 253, 269 (1984). For some time, courts in this Circuit have recognized "little practical difference, if any, between the standards applicable to pretrial detainees and convicted inmates when it comes to conditions of confinement claims," and have therefore analyzed such claims under the Eighth Amendment test. *Smith v. Dart*, 803 F.3d 304, 310 (7th Cir. 2015). More recently, the Supreme Court has clarified that "the interests of pretrial detainees and prisoners derive from separate sources and must be assessed differently." *Hardeman*, 933 F.3d at 822 (citing *Kingsley*, 135 S. Ct. at 2473). Accordingly, in *Hardeman*, the Seventh Circuit held that "*Kingsley*'s objective inquiry applies to all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees."[7] 933 F.3d at 823.

As explained in Judge Sykes's concurring opinion, to succeed on a conditions-of-confinement claim, a pretrial detainee must prove that

---

[7]     As explained in *Hardeman*, 933 F.3d at 824, the Eighth Amendment's deliberate indifference standard that governs conditions claims brought by convicted prisoners is "more demanding" than "the objective inquiry" that governs this one. Accordingly, the deliberate-indifference standard described in *Phillips v. Sheriff of Cook County* does not control the outcome of Plaintiffs' claims.

> (1) the conditions in question are or were objectively serious (or if the claim is for inadequate medical care, his medical condition is or was objectively serious); (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable—that is, 'not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose.'

*Hardeman*, 933 F.3d at 827 (Sykes, J., concurring) (quoting *Kingsley*, 135 S. Ct. at 2473–74). A court should consider the severity and duration of the conditions experienced by pretrial detainees because there is "a *de minimis* level of imposition with which the Constitution is not concerned." *Bell v. Wolfish*, 441 U.S. 520, 539 n.21 (1979) (quoting *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)); *see also Hardeman*, 933 F.3d at 824 (majority). A combination of conditions of confinement that are "not individually serious enough to work constitutional violations, may violate the Constitution . . . when they have 'a mutually enforcing effect that produces the deprivation of a single, identifiable human need'" such as food or exercise. *Budd v. Motley*, 711 F.3d 840, 842–43 (7th Cir. 2013) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). The second element, requiring purposeful, knowing, or reckless conduct, reflects that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Kingsley*, 135 S. Ct. at 2472; *see also Miranda v. Cty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018) ("[N]egligent conduct does not offend the Due Process Clause.").

The third element of a conditions-of-confinement claim incorporates the reasoning of *Bell v. Wolfish*. In *Bell*, the Supreme Court explained that, when assessing whether "particular restrictions and conditions accompanying pretrial detention amount to punishment," the court "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." 441 U.S. at 538. "In the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Kingsley*, 135 S. Ct. at 2473 (quoting *Bell*, 441 U.S. at 561).

The primary common question that Plaintiffs have identified is whether "the deprivations imposed on the hundreds of detainees at the JTDC were done for a legitimate governmental purpose."[8] (Mot. for Class Cert. at 31.) As so stated, that question appears to assume one element that Plaintiffs need to prove—that the alterations to the normal operations of the JTDC experienced by each detainee were serious enough to be considered "a problem of constitutional magnitude." *Hardeman*, 933 F.3d at 824. The core issue that Plaintiffs raise, however, is whether allowing *Empire* to film at the JTDC is a legitimate justification for altering the normal operations of the facility.[9] This is an issue that is common to all proposed class members. As Plaintiffs have not alleged that the County Defendants intended to punish them, their due process claim requires a showing either that the County Defendants' actions were "not rationally related to a legitimate governmental objective," or that their actions were "excessive" in relation to a legitimate governmental objective. *Kingsley*, 135 S. Ct. at 2473. Whether filming serves a legitimate government purpose may not be dispositive of the County Defendants' liability (*cf.* Mot. for Class Cert. at 31), but that question is one that is common to every member of the putative class. Accordingly, Plaintiffs have satisfied Rule 23(a)'s commonality requirement.

---

[8] Plaintiffs identify several other questions that they claim are common to the class, but because Plaintiffs need only identify one common question, the court will not individually address the additional proposed questions:

(1) Whether the outdoor recreation yard was closed due to filming, maintenance, or some other reason. (Pls.' Reply Mem. [270] at 7.)

(2) Whether *Empire* filming, or instead a delinquent employee or technical difficulties, disrupted psychological intake screenings during filming. (*Id.* at 10.)

(3) Whether additional pod confinement is harmful to detainees. (*Id.* at 5, 28.)

(4) Whether fewer tables in the visiting room ever led to canceled visits. (*Id.* at 11.)

(5) Whether holding visits in a smaller room reduced the distance between tables and led to decreased privacy for detainees during visits. (*Id.*)

(6) Whether the response to requests for medical care was delayed during filming. (*Id.*)

[9] Plaintiffs suggest that the court has already concluded that altering the JTDC's operations to facilitate filming is "not a legitimate governmental purpose." (Mot. for Class Cert. at 31.) The court has not made such a finding; when denying the Defendants' motion to dismiss, the court observed that Plaintiffs had "adequately *alleged* that there was no legitimate governmental purpose for the lockdowns." (Order on Mot. to Dismiss [73] at 10, emphasis added.)

### D. Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). The typicality requirement is "liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). The claims of the representatives need not be identical to those of the class members, but they should have the "same essential characteristics as the claims of the class at large." *Oshana*, 472 F.3d at 514; *Van*, 332 F.R.D. at 280. The representatives' injuries must "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members" and must be "based on the same legal theory." *Oshana*, 472 F.3d at 514 (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)). Overall, "there must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano*, 633 F.3d at 586. As an initial point, because the parties only briefed the due process standard applicable to conditions-of-confinement claims by pre-trial detainees (rather than the Eighth Amendment standard that applies to convicted persons), the class definition should be limited to individuals who have not been convicted of a crime.

Some of the conduct giving rise to Q.B. and T.S.'s claims appear to be typical of the class, but other alleged deprivations that they experienced appear to be unique. The primary issues of typicality relate to Plaintiffs' claims arising out of the altered school schedule, voluntary programming, and medical care. The current class definition includes detainees who were not at the JTDC while school was in session, detainees who were not eligible to participate in voluntary programming, and detainees with varying medical needs. The class could be redefined to include only the alleged deprivations that are common to every class member; to the extent this would risk prejudicing class members with stronger claims by grouping them with weaker claims, *see Van*, 332 F.R.D. at 282, the court would entertain proposed subclasses.

*Schooling.* The Nancy B. Jefferson School at the JTDC was on break in late June and August; thus, the only sessions interrupted by *Empire* filming days were in July. (*See* Dixon Dep. at 71:2–10, Ex. 6 to Mot. for Class Cert.; Steward Decl. ¶¶ 3–5.) T.S., but not Q.B., was detained at the JTDC in July when classes were conducted in the pods rather than in the classrooms. As currently defined, the class is overbroad with respect to this claim. The court recognizes, further, that because the average stay at the JTDC may be as short as ten days, many of the proposed class members likely never experienced schooling on the pods.

*Voluntary Programming.* Similarly, T.S.'s claim arising out of canceled voluntary programming is not typical of all members of the proposed class. The JTDC offered structured programming in addition to recreation and schooling that some detainees could participate in. Many of these programs were canceled on the days that *Empire* filmed at the JTDC. (*See* Exs. 12, 33–36 to Mot. for Class Cert.; Keesling Dep. 52:3–6, Ex. 37 to Mot. for Class Cert.) Not all detainees were eligible for these programs, however: each detainee was assigned a level from one to four based on his "individual needs and disciplinary record," with level one detainees having the fewest privileges, and level four having the most. (Steward Decl. ¶ 7.) Only level four and level three detainees were eligible to participate in voluntary programming, and level three detainees could enroll only after all interested level four detainees had signed up. (*Id.* at ¶¶ 3–4.) Q.B., a level one detainee, was not eligible. (Q.B. Dep. 53:9–54:2, 56:9–57:10.) T.S., who was at level four, was enrolled in a program called Free Write for detainees interested in music or poetry and a fatherhood class. (T.S. Dep. 114:12–116:24; Mot. for Class Cert. at 21.) Free Write was canceled on days *Empire* was filmed. Additionally, during the school's summer break in June and August, the JTDC arranged for residents to have additional off-pod recreation such as tournaments among pods. (Mot. for Class Cert. at 11, 20.) Participation in these activities, as well, was based on the detainee's level; it appears that level one and two detainees were not eligible to participate in sports tournaments during summer break from school. (Steward Decl.

¶ 8.)  A class challenging the denial of non-school programming must be narrowed to those detainees who were in fact eligible for such programming during the relevant time period.

*Female Detainees.*  The proposed class representatives, Q.B. and T.S., are both male, but the proposed class includes female detainees as well.  Without more information about which claims, if any, female detainees assert, the court is unable to determine whether Q.B. and T.S. have claims that are typical of those detainees.  The record at least suggests that female and male detainees were not equally affected by the decision to allow *Empire* filming at the JTDC. Boys and girls are housed separately at the JTDC.  (Dunlap Dep. 80:12–21.)  Intake procedures for female detainees take place in a separate unit called WINGS, while intake for male detainees occurs in a unit known as Alpha which consists of several pods.  (Mot. for Class Cert. at 13.) When detainees enter the JTDC, they ordinarily undergo a psychological health screening called the Massachusetts Youth Screening Instrument ("MAYSI").  (*Id.*)  Boys took the MAYSI test in pod 3A or pod 3B within the Alpha unit.  Fox used these pods for filming, which Plaintiffs claim disrupted MAYSI screening.[10]  (*Id.*)  Fox did not film in the WINGS unit, and it appears that MAYSI screening for girls was not disrupted to the same extent as MAYSI screening for boys during filming.  (*Id.*; Steward Dep. 103:20–24.)  Additionally, Plaintiffs assert that the closure of pods 3A and 3B during filming led to overpopulation in the other male pods.  Because boys and girls were housed separately, any alleged overpopulation stemming from a disruption to Alpha's intake procedures would not affect female detainees.  It appears that male and female detainees used the same school and recreation facilities, but none of Plaintiffs' claims with regard to schooling or recreation mentions female detainees.  The deposition testimony of Anna Buckingham, the JTDC employee who coordinated the programming aside from school and recreation, suggests that the

---

[10]    Defendants propose an alternative explanation.  Zenaida Alonzo, General Counsel at the JTDC, stated in a declaration that one of the machines used to administer the MAYSI test was moved, causing technical difficulties, and that a caseworker responsible for administering the screenings was derelict in their duties and did not do so.  (Alonzo Decl. ¶ 4, Ex. S to Gov't Reply Mem. [248].)

girls' voluntary programs were not canceled or postponed, unlike the voluntary programming for boys.  (*See* Buckingham Dep. 65:18–24.)

While female detainees may have been affected by *Empire* filming, Plaintiffs have not described the conditions experienced by female detainees or whether those conditions give rise to similar legal claims.  Plaintiffs' claims may be typical of those of female class members, but the court does not yet have adequate information to so conclude.  *Cf. Van*, 332 F.R.D. at 281 ("[W]ith no named Plaintiffs from the MP & L department at the Assembly Plant, it is not clear to the Court why any named Plaintiff would have the incentive to establish the extent to which improper conduct was occurring in that department."); *see also Wal-Mart*, 564 U.S. at 350.

*Off-Pod Recreation.*  Defendants contest whether named Plaintiffs were denied off-pod recreation while *Empire* filmed at the JTDC, but they do not deny that JTDC officials closed the outdoor recreation yard during filming.  (Mot. to Deny at 17.)  Superintendent Dixon testified in his deposition that detainees are supposed to have one hour of "large muscle exercise," that is recreation, per day.  (Dixon Dep. 36:10–14.)  Q.B. claims that he had no off-pod recreation on June 23, 2015,[11] and T.S. states that he had no off-pod recreation on at least June 24, 2015.  The parties have submitted conflicting records relating to Q.B. and T.S.'s access to recreation on those days (*compare* Ex. T to Mot. to Deny *with* Ex. 49 to Mot. for Class Cert.; *see also* Exs. 50–51 to Mot. for Class Cert.), but there appears to be sufficient evidence that Q.B. and T.S.'s claimed losses of off-pod recreation on June 23 and June 24, respectively, are typical of the proposed class because the other residents on their pods were affected in the same way on those days.

*Medical Treatment.*  Plaintiffs' initial claim based on medical treatment was that JTDC detainees were denied access to the facility's infirmary and that certain sick call requests were denied during *Empire* filming.  (*See* Second Am. Compl. ¶ 43.)  Discovery has revealed, however,

---

[11]     Q.B. also claims that he was denied recreation on June 24 and 25, but Defendants contend that Q.B.'s June 24 and 25 recreation claims are not typical of the class because he was in court on June 24, 2015 and confined to his cell for fighting on June 25, 2015.  That assertion is supported by the record and uncontested by Plaintiffs.  (*See* Mot. to Deny at 22–23.)

that the infirmary was in fact open during filming.  (Mot. to Deny at 13; Pls.' Reply Mem. [270] at 20).  As they now present this claim, Plaintiffs allege that they suffered delays in response to requests for medical care.  (Mot. for Class Cert. at 22.)  Q.B. does not recall submitting any request for medical attention while *Empire* was filming at the JTDC, but T.S. submitted requests for medical attention for a toothache, headaches, and mental health treatment.  (*Id.*)  During discovery, T.S. recalled that during *Empire* filming, his sick call requests were not responded to for several days, rather than in one day as during normal operations at the JTDC.  (*Id.*)  The only evidence of a request by T.S. for medical treatment that was denied was apparently submitted as an off-color joke.  (*See* Mot. for Class Cert. at 22; T.S. Dep. 104:1–107:21.)  Q.B. recalled that a resident of his pod with an eye injury requested medical care during filming and allegedly was not treated for one week.[12]  (*See* Q.B. Dep. 106:8–107:10.)  T.S. recalled four other detainees who submitted sick call requests but could not recall their ailments or how long they waited for treatment.  (T.S. Dep. 147:3–149:10.)

Plaintiffs claim that the delay in treatment presents a common claim that satisfies the typicality requirement.  In opposition, Defendants argue that detainees had a wide range of medical complaints during *Empire* filming that each required a different urgency of response.  (Mot. to Deny at 18–19.)  Absent evidence that detainees were denied medical treatment altogether during filming, the court agrees.  As in *McFields v. Sheriff of Cook County*, each request for medical attention described by Plaintiffs involves "a different situation," different medical issues, "different delays," and "different treatments."  No. 17 C 7424, 2019 WL 4645443, at *5 (N.D. Ill. Sept. 24, 2019).  In *McFields*, the named plaintiffs complained that they did not receive face-to-face assessments by a registered nurse or other practitioner after submitting requests for

---

[12] Defendants dispute that this request for medical treatment was made.  (*See* Kampe Decl. ¶¶ 6–9, Ex. J to Gov't Reply Mem. [248].)  Specifically, Linda Kampe, the Director of Health Information Management for Cermak Health Services of Cook County, found no record of a request for eye care by the individual identified by Q.B., although that individual was seen by Cermak medical staff on several days when *Empire* filmed at the JTDC.  (*Id.*)

dental treatment.  Id. at *2.  The named plaintiffs experienced different dental issues, different wait times, and different courses of treatment.  In this case, consideration of whether medical treatment was delayed in violation of detainees' constitutional rights similarly involves individualized inquiries such that "no case is typical."  *Id.*; *see also Phillips*, 828 F.3d at 555 ("[T]he length of the delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.").  With respect to delays in medical treatment, Plaintiffs here have not shown they have claims that are typical of those of a class.

*Visitation.*  Defendants argue that Plaintiffs' claims of disruption to visitation are also not typical of the proposed class.  Q.B. claims that a visit with his grandmother was canceled on June 23, 2015 while *Empire* was filming at the JTDC.  (Mot. for Class Cert. at 22.)  The visitation records for that day show, however, that Q.B.'s canceled visit is not typical of the proposed class because many other detainees had visits that day, including residents of Q.B.'s pod.  (*See* Ex. U to Mot. to Deny.)  T.S. initially claimed that a visit with his mother on June 25, 2015 was delayed and shortened after she was made to wait for two hours in the waiting room prior to the visit.  (Second Am. Compl. ¶ 47(e).)  Plaintiffs do not reassert this claim in their motion for class certification, and T.S.'s mother's deposition testimony shows that she actually waited about 45 minutes on that day. (Mot. for Class Cert. at 21–22; Ex. L to Mot. to Deny.)  Defendants do, however, concede that visitation occurred in a different room while *Empire* filmed in the normal visitation room. (Mot. to Deny at 17.)  Plaintiffs' claim of loss of privacy due to the smaller visiting room is the only visit-related claim that may be typical of the class.

*Disruption of Alpha.*  Named Plaintiffs T.S. and Q.B. do not have standing to the extent that they seek to challenge the alleged suspension of MAYSI screening for newly admitted residents during *Empire* filming.  (Mot. for Class Cert. at 21.)  Mr. Dunlap's expert report reflects that 168 of 182 admitted male residents did not receive MAYSI screening (as noted, for reasons disputed by the parties), but T.S. and Q.B. were not scheduled to receive MAYSI screening during the relevant time period because they had already gone through the intake process.  "[E]ven

named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 n.6 (2016) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)).

T.S. and Q.B. also, however, allege that the pods became overpopulated because pods 3A and 3B in the Alpha unit were closed during filming, and the residents of those pods were assigned to other locations.[13]  The court is not aware of any residents moved from 3A or 3B to T.S.'s pod during filming; but one new resident did move to Q.B.'s pod, and Q.B. became involved in a physical fight with this new resident on June 24, 2015, a day when the population of his pod exceeded its functional capacity by one resident.  (Mot. for Class Cert. at 21; Pod Capacity Log at PageID #: 5032, Ex. U to Gov't Sur-Reply.)  Plaintiffs allege that overcrowding creates safety risks and can be psychologically harmful to detainees.  (Mot. for Class Cert. at 21.)  Plaintiffs make no mention of other altercations involving residents transferred from pods 3A or 3B during filming, so the fight Q.B. describes may not have been a typical event, but pod capacity records reflect that several pods had populations that exceeded their functional capacity on the same day. (*See* Pod Capacity Log at PageID #: 5032.)

*Behavior Economy.*  Plaintiffs last argue that *Empire* filming disrupted the behavior economy at the JTDC by diminishing the incentives for good behavior.  (Mot. for Class Cert. at 23–24.)  Plaintiffs' experts contend that an elimination of incentives for good behavior creates a sense of unfairness that increases "the risk for violence and worsen[s] the psychological impact of incarceration at the facility."  (*Id.* at 24; *see also* Pls.' Reply Mem. at 17.)  This alleged disruption presents a problem of standing rather than typicality; neither T.S. nor Q.B. has identified any concrete injury he suffered as a result of the alleged alteration of the behavior economy.  Standing

---

[13]     The Defendants dispute that Alpha was closed during filming, contending instead that Alpha intake activities were moved to other pods.  (*See* Gov't Reply Mem. at 14.)

cannot be conferred by potential injuries, nor by injuries suffered by other members of the proposed class.  *See Spokeo*, 136 S. Ct. at 1547 n.6.

In sum, some, but not all, of T.S. and Q.B.'s claims are typical of a class of detainees at the JTDC.  The proposed class definition is, however overbroad:  it includes both male and female detainees, detainees from all behavioral levels, detainees with varying medical needs, and detainees who were not at the JTDC while school sessions were allegedly disrupted.  Though it appears class treatment may be appropriate for some claims, Plaintiffs must redefine the class or propose appropriate subclasses in a renewed motion for class certification.

## E.    Adequacy of Representation

Rule 23(a)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" implicates both the named representatives and the proposed class counsel.  FED. R. CIV. P. 23(a)(4).  Specifically, the "claims and interests of the named Plaintiffs must not conflict with those of the class, the class representatives must have sufficient interest in the outcome of the case, and class counsel must be experienced and competent."  *Van*, 332 F.R.D. at 282 (citing *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993)).  The experience and competence of class counsel includes "counsel's work on the case to date, counsel's class action experience, counsel's knowledge of the applicable law, and the resources counsel will commit to the case."  *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 n.7 (7th Cir. 2013).  A court may consider whether class counsel has "demonstrated a lack of integrity," including through misconduct or an ethical breach, if the lack of integrity "jeopardizes the court's ability to reach a just and proper outcome in the case."  *Id.* at 498–99.  The credibility of the class representatives is also relevant as "[o]ne who intentionally does not tell the truth about the case cannot be an effective class representative."  *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*  254 F. Supp. 3d 1007, 1024 (N.D. Ill. 2017) (citing *Eubank v. Pella Corp.*, 753 F.3d 718, 724 (7th Cir. 2014)).

Defendants' challenge to the adequacy of Plaintiffs as class representatives and of class counsel appears only in a footnote in which Defendants mention "contradictions in their testimony, and [ ] refusals to withdraw false allegations." (Mot. to Deny at 25 n.7; *see also* Gov't Reply Mem. at 32 n.7.) "For an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 728 (7th Cir. 2011). Defendants have not met this burden. Their footnote does not identify the specific testimony or allegations they consider to be false nor which evidence would severely undermine Plaintiffs' credibility, instead stating merely that they have established this elsewhere in the briefs. *See Evergreen Square of Cudahy v. Wis. Hous. & Econ. Dev. Auth.*, 848 F.3d 822, 829 (7th Cir. 2017) ("A party may waive an argument by presenting it only in an undeveloped footnote.").

Defendants further question Plaintiffs' counsel's integrity, arguing that counsel "filed multiple complaints in this matter with false claims that an adequate investigation would have disproved." (Mot. to Deny at 25 n.7.) Plaintiffs' counsel do have an obligation under Federal Rule of Civil Procedure 11 to ensure, to the best of their knowledge and after a reasonable inquiry, that the factual contentions in the complaint had evidentiary support or likely would have evidentiary support. But Defendants do not specify which claims were false, so the court does not have sufficient information to find that a serious ethical violation warranting denial of class certification. *Compare Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) (reversing certification where proposed class counsel obtained evidence using false promises and made misleading representations to named plaintiffs); *see also, e.g., Van*, 332 F.R.D. at 287 (finding to be inadequate proposed class counsel who altered a document potentially demonstrating an intra-class conflict and who, in prior class action litigation, had been sanctioned).

The County Defendants also briefly challenge the adequacy of the proposed class counsel's prior experience litigating class actions. (Gov't Reply Mem. at 32 n.7.) Mr. Stephen Weil and Ms. Alexis Chardon claim to have more than a decade of experience litigating class actions. (Pls.' Reply Mem. at 19.) Brief review of this court's docket records does not confirm this; those records show that Mr. Weil and Ms. Chardon have filed appearances in several cases in this court, including a number of prison conditions cases, but none appears to be a class action. Those records do not account for counsel's activities in other jurisdictions. In any event, the court is not troubled by the purported absence of prior class action experience; any experienced class action litigator got his or her start somewhere, and Mr. Weil and Mrs. Chardon have been effective and well-prepared in their appearances in this case. The court notes, further, that since the close of briefing, Mr. Weil has joined the firm Loevy & Loevy, a firm whose class-action litigation experience is well-recognized. In a renewed or refined motion for class certification, Plaintiffs are invited to provide updated biographies for Mr. Weil and Ms. Chardon and address how, if at all, the addition of counsel from Loevy & Loevy will affect class representation in this case.

## II.     Rule 23(b) Requirements

Plaintiffs seek certification as a Rule 23(b)(3) class, and in the alternative on the counts alleged against the Fox Defendants, as a Rule 23(b)(1)(B) class. Although the Plaintiffs have not yet met the elements of Rule 23(a), the court believes they may be able to do so and will therefore address the Rule 23(b) requirements.

### A.     Rule 23(b)(3)

To certify a class under Rule 23(b)(3), the court must find that common questions predominate over individual ones and that a class action is "superior to other available methods of adjudicating the controversy." FED. R. CIV. P. 23(b)(3). "The decision whether to certify a class is one that depends on a careful assessment of the facts, of potential differences among class members, of management challenges, and of the overall importance of the common issues of law or fact to the ultimate outcome." *Riffey v. Rauner*, 910 F.3d 314, 318 (7th Cir. 2018). The

predominance requirement is "far more demanding" than the commonality requirement, and tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997).

The Rule 23(b)(3) analysis begins with the "elements of the underlying cause of action." *Messner*, 669 F.3d at 815. "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." *Id.* (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). "If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Id.* Rule 23(b)(3) does not require "that each element of [a] claim is susceptible to classwide proof." *Alicea v. Cty. of Cook*, No. 18 C 5381, 2019 WL 3318140, at *3 (N.D. Ill. July 24, 2019) (quoting *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 381 (7th Cir. 2015)). But the "common questions must be a significant aspect of a case." *Messner*, 669 F.3d at 815 (citation and internal quotation marks omitted); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses.") (citation omitted).

Plaintiffs recognized that Rule 23(b)(3)'s predominance inquiry focuses on the elements of each cause of action, but only discussed the elements of their Section 1983 conditions-of-confinement claim. Since the close of briefing, the Seventh Circuit clarified the standard for a due process conditions-of-confinement cause of action, so the predominance briefing on that claim is incomplete. Application of *Kingsley*'s objective due process standard, rather than the Eighth Amendment's deliberate indifference standard, may ultimately make it easier for Plaintiffs to show that class treatment is appropriate. In a renewed motion for class certification, Plaintiffs should connect the common evidence they propose to use to the elements required to make a *prima facie* showing for each cause of action. *See Van v. Ford Motor Co.*, No. 14-CV-8708, 2018 WL

4635649, at *7 (N.D. Ill. Sept. 27, 2018); *Messner*, 669 F.3d at 815.  The parties should also address the extent to which a class action is, or is not, superior to other methods available to adjudicate Plaintiffs' claims.  FED. R. CIV. P. 23(b)(3).

### 1. Fourteenth Amendment Due Process Violation

To establish a due process claim, Plaintiffs will need to show that the conditions of confinement during the few days of filming were objectively serious, that the County Defendants acted at least recklessly with regard to the consequences of allowing the Fox Defendants to film at the JTDC, and that the County Defendants' actions were "not rationally related to a legitimate governmental objective," or were "excessive in relation to that purpose."  *Kingsley*, 135 S. Ct. at 2473–74; *Hardeman*, 933 F.3d at 927 (Sykes, J., concurring).

The court recognizes that the conditions experienced by each JTDC detainee vary, so it may be difficult to assess whether the conditions support a class-wide claim.  In some cases, "an illegal policy might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class."  *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 498 (7th Cir. 2012).  In *Mulvania*, for example, all of the female prisoners were subjected to a prison's policy requiring women to wear white underwear or no underwear at all.  *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 855 (7th Cir. 2017); *see also Flood v. Dominguez*, No. 2:08 CV 153 PPS PRC, 2011 WL 238265, at *5 (N.D. Ind. Jan. 21, 2011) (certifying class of inmates in county jail, all of whom suffered common conditions: "no bedding, cold temperatures, lack of hygiene, lack of exercise, small meal portions"); *Adair v. Town of Cicero*, No. 18 C 3526, 2019 WL 2866708, at *1–2 (N.D. Ill. July 3, 2019) (certifying a Fourth Amendment claim for a class of female detainees who alleged that "the configuration of the lock-up facility required them to use the bathroom (and thereby expose their genitals) in full view of male lock-up employees and male detainees").  In this case, in contrast, although Plaintiffs challenge a single decision regarding use of the JTDC facility, the putative class members (at least as the class is currently defined) were not all exposed to the same set of conditions.

23

This variance in complained-of conditions also affects the determination of whether the challenged conditions are excessive in relation to a legitimate governmental purpose. *See Kingsley*, 135 S. Ct. at 2473. *Kingsley*'s objective inquiry essentially assesses whether the challenged "conditions of confinement [ ] were objectively unreasonable." *Hardeman*, 933 F.3d at 824. As Defendants note, pointing to cases where courts declined to certify classes alleging other constitutional violations, "reasonableness is a standard that must be considered individually." *Perez v. City of Chicago*, No. 13-CV-4351, 2019 WL 7290848, at *10 (N.D. Ill. Dec. 27, 2019) (addressing challenge to police officers' delay in publicizing the fact of plaintiffs' arrests) (quoting *Portis v. City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010) (challenge to length of detention of persons arrested for offenses punishable by fine)); *see also Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 515 (7th Cir. 2009) (challenge to practice of requiring detainees to undergo certain jail intake procedures before being released on bond). That is not to say that a class of juveniles adversely affected by filming could never be certified, *see, e.g., Driver v. Marion Cty. Sheriff*, 859 F.3d 489, 491–94 (7th Cir. 2017) (appropriate to certify subclass of individuals who were held after legal authority for detention ceased, and subclass of persons "whose excessive detention resulted from the [jail's] inadequate computer system"). As the class is currently defined, however, individual inquiries would be a significant aspect of the litigation of Plaintiffs' claims.

Whether *Empire* filming caused class members' injuries may also require individualized determinations. *Cf. Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (affirming certification of classes of purchasers of windows that suffered from design defects while acknowledging that "[p]roximate cause [ ] is necessarily an individual issue"). For example, Q.B.'s missed visit with his grandmother may not have resulted from *Empire* filming; other residents of his pod were allowed visits on the same day. Additionally, detainees did not have outdoor recreation every day—residents of Q.B.'s pod, for example, normally went outside two times per week (Q.B. Dep. 45:17–22)—so whether any particular detainee's injuries were caused by filming

in the outdoor recreation area would depend on his pod's weekly schedule. "[T]he need for individual proof alone does not necessarily preclude class certification," but if individual issues predominate, class treatment is not appropriate. *Cf. Pella*, 606 F.3d at 394.

### 2.     Breach of Fiduciary Duty

Plaintiffs claim that Defendant Dixon breached a fiduciary duty to the JTDC detainees by allowing *Empire* to film at the facility. To succeed on a claim for breach of fiduciary duty under Illinois law, Plaintiffs must show that "(1) a fiduciary duty existed, (2) that duty was breached, and (3) the breach of the duty proximately caused damages." *Chicago Title Ins. Co. v. Sinikovic*, 125 F. Supp. 3d 769, 777 (N.D. Ill. 2015) (citing *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010)). A fiduciary duty may arise "(1) automatically pursuant to specific legal relationships, . . . or (2) by virtue of circumstances unique to the parties' relationship, where one party places trust in another so that the latter gains superiority and influence over the former." *Landale Signs & Neon, Ltd. v. Runnion Equip. Co.*, No. 16-CV-7619, 2016 WL 7409916, at *4 (N.D. Ill. Dec. 22, 2016). A guardian owes fiduciary duties to his ward, *see Estate of Osborn*, 128 Ill. App. 3d 453, 455, 470 N.E. 2d 1114, 1117 (5th Dist. 1984), and an individual may assume the role of guardian "even though he was not given that title by a court." *Clayton v. Millers First Ins. Cos.*, 384 Ill. App. 3d 429, 436, 892 N.E.2d 976, 982 (5th Dist. 2008) (citing *Parks v. Kownacki*, 193 Ill. 2d 164, 169, 737 N.E.2d 287, 290 (Ill. 2000)). One fiduciary duty that a guardian owes to his ward is the duty of care. *See Parks v. Kownacki*, 305 Ill. App. 3d 449, 461, 711 N.E.2d 1208, 1216 (5th Dist. 1999), *rev'd on other grounds*, 193 Ill. 2d 164, 737 N.E.2d 287 (Ill. 2000).

Plaintiffs claim that Defendant Dixon owed a fiduciary duty to JTDC detainees,[14] and Defendants do not appear to challenge this assertion. Rather, they contend that proving a breach

---

[14]     Judge St. Eve recognized in her ruling on Defendants' motion to dismiss [73] that Plaintiffs' allegations "rais[ed] a reasonable inference that Superintendent Dixon and the Doe Defendants are liable for breaching their fiduciary duty." (Order on Mot. to Dismiss at 25.) The court also explained that the state has a duty, under clearly established principles of constitutional and tort law, "to assume some responsibility" for the "safety and general well-being" of detainees.

of a fiduciary duty requires Plaintiffs to show that Dixon put the detainees "at substantial risk of harm"—an inquiry they claim to be highly individualized.[15] (Gov't Reply Mem. at 7.) Plaintiffs argue that they will use common evidence to show that "Dixon approved the alleged lockdowns not for the benefit of the detainees at the JTDC, but rather so that Fox could film *Empire* there." (Mot. for Class Cert. at 35.) But to establish that Dixon's decision amounted to a breach of fiduciary duty, Plaintiffs need to show that this decision had a class-wide effect on the detainees' safety or well-being. Additionally, while Plaintiffs are correct that the need for individualized inquiries into damages does not defeat class certification (*id.* at 36), proving that the proposed class was harmed at all is part of a *prima facie* showing of breach of fiduciary duty.[16] *See Sinikovic*, 125 F. Supp. 3d at 777; *Messner*, 669 F.3d at 815 ("If, to make a *prima facie* showing on a given question, the members of a proposed class will need to prevent evidence that varies from member to member, then it is an individual question."). Plaintiffs must address this issue, too, to establish that common questions predominate for purposes of a renewed motion for class certification.

### 3. Intentional Infliction of Emotional Distress

Plaintiffs devote just one paragraph to their state law claim against the County Defendants for intentional infliction of emotional distress, and have not made the case that common questions predominate. To succeed on such a claim, Plaintiffs would have to prove: "(1) that the conduct

---

(*See id.* at 24 (citing *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989); *Nelson v. Heyne*, 491 F.2d 352, 360 (7th Cir. 1974))); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (explaining that the Eighth Amendment imposes duties on prison officials to "take reasonable measures to guarantee the safety of the inmates").

[15] Defendants cite no authority for this proposition, except for a case describing the showing required for a failure to protect claim, rather than a claim of a breach of fiduciary duty. *See Potts v. Manos*, No. 11 C 3952, 2017 WL 4340157, at *3 (N.D. Ill. Sept. 29, 2017) ("For a failure to protect claim, as plaintiff asserts here, he must show that he was incarcerated under conditions posing a substantial risk of harm.") (internal citation omitted).

[16] Plaintiffs need not prove that the *extent* of their damages is the same, but must be able to show with common evidence that members of the class were harmed in some way.

was extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and, (3) that the conduct in fact caused severe emotional distress." *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015). Whether conduct is extreme and outrageous may, in some cases, depend on the plaintiff; for example, if "the defendant's improper use of a position of power [ ] gives him the ability to adversely affect the plaintiff's interests," *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010), or if "the defendant knew the plaintiff was particularly susceptible to emotional distress and acted inappropriately despite that knowledge." *Cairel v. Alderden*, 821 F.3d 823, 836 (7th Cir. 2016). The "intensity and duration of the distress" are important to assessing its severity. *McGrath v. Fahey*, 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809 (Ill. 1988).

Plaintiffs assert as a common issue that Defendants "imposed the deprivations at issue in this case in order to accommodate the *Empire* filming," but do not connect this allegation to any element of the claim. Plaintiffs also expect their expert, Dr. Kraus, to offer "common evidence that [the alleged] deprivations are psychologically harmful." (Mot. for Class Cert. at 36.) The court recognizes that, as a general matter, restrictive conditions of confinement may be harmful to detained youth. (Kraus Report ¶ 30.) But Plaintiffs must show that Defendants' conduct *in fact* caused them severe emotional distress, *Bailey*, 779 F.3d at 696, using evidence of, for example, physical symptoms or a resulting need for medical treatment. *Honaker v. Smith*, 256 F.3d 477, 495 (7th Cir. 2001); *see also Rowell v. Voortman Cookies, Ltd.*, No. 02 C 0681, 2005 WL 1026715, at *2 (N.D. Ill. Apr. 27, 2005) ("Plaintiffs' intentional infliction of emotional distress claim would [ ] require the highly individualized inquiry of whether the Defendants' conduct caused severe emotional distress in numerous individuals.") As noted, Plaintiffs have not alleged that the County Defendants intended to punish them; instead, Plaintiffs' position appears to be that Defendant Dixon was motivated by a desire to spend time with celebrities—potentially common evidence, but not tending to show that Plaintiffs' emotional distress was the intended or highly probable

result of Dixon's conduct.  (*See* Pls.' Reply Mem. at 13.)  In sum, Plaintiffs have not satisfied the predominance requirement for their claim of intentional infliction of emotional distress claim.

### 4.    Tortious Inducement of Breach of Fiduciary Duty

To succeed on a claim for tortious inducement of a breach of fiduciary duty, Plaintiffs must show that the Fox Defendants "(1) colluded with a fiduciary in committing a breach; (2) knowingly participated in or induced the breach of duty; and (3) knowingly accepted the benefits resulting from that breach."  *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007) (citing *Regnery v. Meyers*, 287 Ill. App. 3d 354, 364, 679 N.E.2d 74, 80 (1st Dist. 1997)).  Liability requires a showing of some "active misbehavior on the part of [the Fox Defendants]."  *Borsellino*, 477 F.3d at 509; *see also Lansing v. Carroll*, 71 F. Supp. 3d 765, 770 n.7 (N.D. Ill. 2014) (quoting *In re Pritzker*, No. 02 CH 21426, 2004 WL 414313, at *7 (Ill. Cir. Ct. Mar. 5, 2004) ("[T]he parties [must know] or [have] reason to believe at the time of their alleged participation that the acts were wrongful.")).  The requisite active misbehavior has been found in cases of bribery, *see, e.g., People ex rel. Daley v. Warren Motors*, 114 Ill. 2d 305, 500 N.E.2d 22 (Ill. 1986); *Chicago Park Dist. v. Kenroy*, 89 Ill. App. 3d 450, 411 N.E.2d 1067 (1st Dist. 1980), misuse of confidential information, *Conant v. Karris*, 165 Ill. App. 3d 783, 520 N.E.2d 757 (1st Dist. 1987), and other types of wrongful conduct, *see, e.g., Regnery*, 287 Ill. App. 3d at 363–64, 679 N.E.2d at 80 (finding the brother of a majority shareholder liable because he initiated the idea that a voting trust should authorize a "sale of stock to his brother and himself at a price far below market value," and "fully participated in all steps of the transaction").  Merely "accepting a deposit," on the other hand, was not sufficient to hold a bank liable for participating in an alleged breach of fiduciary duty.  *Chabraja v. Martwick*, 248 Ill. App. 3d 995, 999, 618 N.E.2d 800, 803 (1st Dist. 1993).

The Fox Defendants argue that establishing that they induced a breach of fiduciary duty will require individualized inquiries into whether "each Fox Defendant 'knew or was substantially certain' that specific changes by the JTDC to [each detainee's] daily routine would put his safety and well-being at risk."  (Fox Reply Mem. [249] at 2, 5; Mot. to Deny at 27.)  Plaintiffs appear to

argue more generally, however, that the decision to alter normal JTDC operations to facilitate filming constituted a single breach of fiduciary duty that affected all class members—a common inquiry. Plaintiffs explain that they would draw on the common evidence of Fox's code of conduct acknowledging the disruptive impacts of filming, and Fox's general practice of making payments to compensate neighbors who were impacted by filming. (Mot for Class Cert. at 39.) As the court explained in an earlier order, Plaintiffs' allegations—that the Fox Defendants offered to pay rent at the JTDC, that they offered to pay wages and overtime for JTDC staff "on the condition that the JTDC's administrators would change the facility's normal operations to make the second and third floors of the JTDC available for filming," and that the Fox Defendants continued filming despite the alleged obviousness that the JTDC "had been placed on lockdown"—all tend to show knowing inducement or participation as needed for the second element of the tortious inducement cause of action. (Order Mot. for Recons. [117] at 2–3.) Proving such allegations would not require individualized inquiries.

Whether the Fox Defendants knew that filming would result in a breach of fiduciary duty can therefore be assessed on a class-wide basis.[17] It will not be sufficient for Plaintiffs to show that "it was obvious to Fox that the children at the JTDC had to be placed on lockdown in order to accommodate the filming" (*cf.* Mot. for Class Cert. at 38); they will also have to prove that the Fox Defendants knew or had reason to know that their acts could be harmful. *See Chabraja*, 248 Ill. App. 3d at 999, 618 N.E.2d at 803. But whether the Fox Defendants did knowingly induce or participate in, and accept the benefits of, a breach of fiduciary duty raises questions of fact that are common to the class.

---

[17]    Plaintiffs propose the following as common questions: Did the Fox Defendants' tours of the JTDC make it obvious to them that to "occupy the bulk of the second and third floors and the outdoor yard the children would need to be deprived access to all these areas" in a way that "would substantially limit them to their pods"? (Mot. for Class Cert. at 38.) Did the Fox Defendants know that "no children were being allowed out on the outdoor yards, and that the children had nowhere else to go outside while Fox was filming"? (*Id.*) Were the Fox Defendants on notice that "taking over the two floors of the JTDC that had facilities for recreation and education would impose deprivations on the youth detained there"? (*Id.* at 39.)

### 5.    Unjust Enrichment

Plaintiffs last argue that the Fox Defendants were unjustly enriched by the profits from the two episodes of *Empire* filmed at the JTDC.  To succeed on an unjust enrichment claim, a plaintiff must show that the defendant "unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of that benefit violates the fundamental principles of justice, equity, and good conscience."  *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 561 (7th Cir. 2011) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (Ill. 1989)).  While "a plaintiff need not show loss or damages, he must show a detriment, and significantly, a connection between the detriment and the defendant's retention of the benefit."  *Cleary*, 656 F.3d at 518–19.  This is because "[u]njust enrichment is not a mode of imposing punitive damages; it is a means of recovering something that the defendant is not entitled to but is unfairly possessing to the plaintiff's detriment."  *Id.* at 520.

The court need not decide at the class certification stage which remedy may be appropriate should Plaintiffs succeed on the merits of their claims, but will clarify two points raised during briefing.  First, in its earlier order on Defendants' motion to dismiss, the court acknowledged some debate as to "whether Illinois law recognizes an independent cause of action for unjust enrichment, or whether unjust enrichment must always be tied to another underlying claim found in tort, contract, or statute."  *Id.* at 516.  Since that order, the Seventh Circuit has concluded that "[u]nder Illinois law, there is no stand-alone claim for unjust enrichment."  *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019).  Plaintiffs' "request for relief based on unjust enrichment is therefore 'tied to the fate of the[ir] claim'" against the Fox Defendants for inducing a breach of Defendant Dixon's fiduciary duty.  *Id.* (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 740 (7th Cir. 2019)).  Second, Plaintiffs devote the unjust enrichment section of their brief to discussing the Fox Defendants' requisite state of mind rather than the elements of unjust enrichment described above.  (Mot. for Class Cert. at 38–40.)  In this regard, the court notes that the choice of remedy does not change the state of mind Plaintiffs must prove to succeed

on their underlying tort claim against the Fox Defendants. *See Hoagland ex rel. Midwest Transit, Inc. v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 744 (7th Cir. 2004) ("The fact that restitution was sought instead of conventional damages [ ] does not alter the nature of the suit.").

### B.    Rule 23(b)(1)(B)

The court may certify a class under Rule 23(b)(1)(B) if "prosecuting separate actions . . . would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." FED. R. CIV. P. 23(b)(1)(B).  Plaintiffs argue, in the alternative to certification under Rule 23(b)(3), that Rule 23(b)(1)(B) certification is appropriate for their claims against the Fox Defendants (Count VIII for tortious inducement of a breach of fiduciary duty and Count XIII for unjust enrichment). The court will defer resolution of whether the putative class could be certified under Rule 23(b)(1)(B) to a subsequent motion based on a more narrowly-defined class, but notes a few points for further briefing.

Plaintiffs suggest that, if a class is not certified, the first individual plaintiff with a successful claim will seek the "largest payout[ ] possible," which would "put subsequent plaintiffs at a disadvantage, since Fox would be able to assert that it has already disgorged its unjust profits [from the two episodes of *Empire* filmed at the JTDC] to the plaintiffs who came before."  (Pls.' Reply Mem. at 29.)  This appears to be, essentially, a limited fund rationale, and the Fox Defendants respond that certification under Rule 23(b)(1)(B) is not appropriate because Fox has adequate financial resources to pay individual damages awards.  (Mot. to Deny at 29; *see also Ortiz v. Fibreborad Corp.*, 527 U.S. 815 (1999).)  Given that the Fox Defendants appear to have sufficient funds to satisfy the claims of each putative class member and that restitution based on unjust enrichment may not be a fitting remedy in this context, Plaintiffs have not shown that certification of a class under Rule 23(b)(1)(B) is warranted based on a limited fund theory.  *See Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 583–84 (N.D. Ill. 2005), *aff'd*, 472 F.3d 506

(7th Cir. 2006) (rejecting a nearly identical argument by a plaintiff seeking class certification on a claim of deceptive marketing against Coca-Cola in light of the need to interpret Rule 23(b)(1)(b) narrowly because class members cannot opt out, and Coca-Cola's clear ability to pay the claims of all putative class members).[18]

## CONCLUSION

Plaintiffs have not yet met the requirements of Rule 23(a) and (b) and the court, therefore, declines to certify their proposed class at this time. Plaintiffs' motion for class certification [235] is denied without prejudice to renewal within 21 days of this order. Defendants may then respond to the renewed motion for class certification or seek a determination on the merits. The court notes, further, that although it appears Plaintiffs' claims present common questions, it may well be that some residents of the JTDC were affected by the *Empire* filming only briefly or in relatively insignificant ways. Moreover, as time passes, it likely will become increasingly difficult to locate and provide meaningful relief to a class of persons who were juveniles at the time of the relevant events but may well now be moving toward adulthood. For all of these reasons, the court encourages the parties to explore the possibility of settlement before incurring the expense of another round of briefing.

ENTER:

Date:   January 16, 2020

REBECCA R. PALLMEYER
United States District Judge

---

[18]     Plaintiffs also suggest that certification under Rule 23(b)(1)(B) is appropriate because "when a breach of fiduciary duty is at issue, any individual adjudication regarding the breach would necessarily affect the interests of others." (Pls.' Reply Mem. at 29 (quoting *Godshall v. The Franklin Mint*, No. 01 CV 6539, 2004 WL 2745890, at *3 (E.D. Pa. Dec. 1, 2004).) But absent a common showing that the class was harmed by the alleged breach of fiduciary duty, *see Sinikovic*, 125 F. Supp. 3d at 777, it is not clear that one class member's success on that claim would "necessarily settle the issue for all other prospective plaintiffs." *Neil*, 275 F.R.D. at 267.