**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

T.S. *et al.,*

              Plaintiffs,

    v.

Twentieth Century Fox Television *et al.,*

              Defendants.

Case No. 1:16-cv-08303

Hon. Rebecca R. Pallmeyer

## PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTS ........................................................................................................................4

CLASS PROPOSAL ...................................................................................................6

ARGUMENT ..............................................................................................................7

    I.       Ascertainability ..................................................................................8

    II.      Numerosity ........................................................................................8

    III.    Commonality......................................................................................10

    IV.    Typicality ..........................................................................................12

            a.  Class 1 satisfies the typicality requirement..................................12

            b.  The Class 1 subclasses satisfy the typicality requirement ..................14

            c.  Class 2 satisfies the typicality requirement..................................14

            d.  Class 3 satisfies the typicality requirement..................................15

    V.      Adequacy ..........................................................................................15

    VI.    Rule 23(b)(3) Predominance .............................................................17

            a.  Fourteenth Amendment due process..........................................18

                i.  Conduct that is purposeful, knowing, or reckless....................18

                ii.  Objective reasonableness .......................................................19

                iii.  A deprivation of "constitutional magnitude"...........................21

            b.  Breach of Fiduciary Duty ........................................................28

                i.  Breach of fiduciary duty – for damages ..................................28

                ii.  Breach of fiduciary duty – for restitution ................................30

            c.  Inducement of breach of fiduciary duty ...................................33

            d.  Count XII ................................................................................34

    VII.   Rule 23(b)(3) Superiority .................................................................34

    VIII.  Rule 23(b)(1) Unjust enrichment pool .............................................35

CONCLUSION      .......................................................................................36

i

## <u>TABLE OF AUTHORITIES</u>

*A.J. v. Kierst*, 56 F.3d 849 (8th Cir. 1995) ...................................................................23

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) ....................................4, 17

*Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408 (N.D. Ill. 2012) ......................... 11

*Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322 (N.D. Ill. 1995) ............................9

*Cf. Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000)............................................26

*Chi. Teachers Union v. Bd. of Educ. of City of Chi.*, 797 F.3d 426 (7th Cir. 2015).....................35

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ...............................................................................4

*Davis v. Wessel*, 792 F.3d 793 (7th Cir. 2015) .....................................................................22, 26

*De La Fuente v. Stokely-Van Camp*, 713 F.2d 225 (7th Cir. 1983) ....................................... 11-14

*Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) .................................................................22, 26

*Doe v. Cook Cty.*, No. 99-cv-3945 (N.D. Ill. Nov. 22, 1999) ............................................... 23-25

 *Driver v. Marion Cty. Sheriff*, 859 F.3d 489 (7th Cir. 2017) .................................................20-21

*Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019) .............................................................18, 21

*Harper v. Sheriff of Cook Cty.*, 581 F.3d 511 (7th Cir. 2009) ......................................................20

*Hudson v. Preckwinkle*, No. 13-cv-8752 (N.D. Ill.). ....................................................................16

*Jimenez v. GLK Foods, LLC* (E.D. Wis. June 4, 2014) ...................................................................9

*Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016) .............................................17

*Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 643 N.E.2d 734 (1994)..............................30

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ............................8, 17

*Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974) ...........................................................................23

*New Hampshire v. Hess*, No. 03-c-550 (Sup. Ct. Merrimack Cty.)...............................................16

*Olson v. Brown*, 284 F.R.D. 398 (N.D. Ind. 2012) .......................................................................9

*Perez v. City of Chicago*, No. 13-cv-4351 (N.D. Ill. Dec. 27, 2019).............................................20

*Ploss et al. v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003 (N.D. Ill. 2020) .............................18

*Portis v. City of Chicago*, 613 F.3d 702 (7th Cir. 2010)................................................................20

*Pro-Pac Inc. v. WOW Logistics Co.*, 721 F.3d 781 (7th Cir. 2013) ..............................................30

*Pruitt v. City of Chicago*, 472 F.3d 925 (7th Cir. 2006) .................................................................8

*Robles v. Prince George's County*, 302 F.3d 262 (4th Cir. 2002).........................................22, 26

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) ....................................................................11

*Toney v. Quality Resources, Inc.*, 323 F.R.D. 567 (N.D. Ill. 2018)................................................8

*Tussey v. ABB*, No. 06-cv-04305 (W.D. Mo.) ..............................................................................16

*Wagner v. County of Maricopa*, 706 F.3d 942 (9th Cir.) .......................................................22, 26

*Young v. County of Cook*, No. 1:06-cv-00552 (N.D. Ill.)..............................................................17

Pursuant to the Court's order in its January 16, 2020 Opinion (ECF 319), Plaintiffs respectfully submit their renewed motion for class certification.

## INTRODUCTION

This litigation—and the claims of every class member—redound to the question: were they were injured by the exact same course of action (the alteration of the JTDC's operations to facilitate the filming of *Empire*) in the exact same place at the exact same times by the exact same decision makers? This common core of facts will be the central evidence for the claims of every single class member.

The putative class members here run well past 300. It would be absurd to hold 300-plus trials at which the common evidence about *Empire*'s filming and the centrally-planned alterations to accommodate it were tried and retried over and over. There was one, central decision that caused the deprivations that Plaintiffs have alleged in this case: the decision to permit the filming of *Empire* at the JTDC, and to do so by restructuring the JTDC's operations so that they would suit Fox's needs, to the detriment of the children housed there. Plaintiffs have offered evidence to show that ultimately, hundreds of youth at the JTDC were subject to deprivations because Leonard Dixon wanted to mingle with movie stars and Fox thought the JTDC was an artistically appealing film set.

Plaintiffs charge that this one decision was not made to further a legitimate governmental interest—rather, it was a raw abuse of power by a government official, done to suit his own ends. That is the core element of liability in both the federal and state claims in this case. It, too, will be decided with common evidence. If there are separate trials, every class member will offer the same evidence about why the decision to invite Fox was made—the same, central question would be litigated hundreds of times. As Plaintiffs understand it, this is why the Court's January

16 Opinion observed that certification of a class in this case was likely. Indeed the class action device is designed for cases like this one, where a single decision, undertaken for the same reason, impacts hundreds of persons in similar ways.

Plaintiffs originally proposed to represent a class of all youth detained at the JTDC. The Court denied certification out of concern that so defined, the class presented manageability problems. Plaintiffs respectfully submit that they have addressed those concerns with their revised class definitions:

- The Court noted that a class of "all detainees" included detainees with different kinds of injuries—like increased pod confinement versus loss of visitation privacy—that would be hard to try together. Plaintiffs have addressed this concern by proposing three classes that satisfy the typicality requirement: (1) detainees subject to additional confinement; (2) detainees who experienced degraded visitation; and (3) detainees subject to overcrowding. These three classes ensure that the claims typical of each other are grouped together.

- The Court noted that a class defined as "all detainees" was overbroad because it could capture a handful of detainees who were at the JTDC for such a short period of time that they would not have been affected. Plaintiffs have adjusted the class definition to include only detainees who were at the JTDC for at least 24 hours. As Plaintiffs explain herein, all such detainees, even those on "intake," would have been impacted by the filming.

- The Court asked Plaintiffs to describe how they would prove their injuries with common evidence. As Plaintiffs explain herein, they introduced the reports of two eminent expert witnesses, Earl Dunlap and Dr. Louis Kraus. These experts, both of whom are well qualified to offer opinions on the effects that the *Empire* deprivations would have had on the children housed at the JTDC, offer the opinion that youth in each of the subclasses was injured,

and was placed in significant danger, by the alterations that the Defendants made to facilitate Fox's filming at the facility. This is evidence that each class member would use to prove that he or she was injured by the *Empire* deprivations, and it is evidence from which a reasonable fact finder could conclude it is more likely than not that each such class member *was* injured. Without certification his same expert testimony would be at issue in hundreds of separate trials.

- Finally, the Court observed that some deprivations may have placed detainees in danger, but did not cause concrete injuries. Plaintiffs clarify here that their claim for restitution requires them to show that a fiduciary (or third party with notice) profited from the breach of fiduciary duty, but it does not require that the fiduciary duty have caused a concrete injury. Thus a fiduciary like Dixon or third party with notice, like Fox, who profited from the endangering of the youth at the JTDC has been unjustly enriched, and is liable in restitution. Each class member would offer the same evidence—drawn in substantial part from the expert opinions of Mr. Dunlap and Dr. Kraus—to show that the that the Defendants endangered him or her at the JTDC. And common evidence would show that they profited from doing so.

*    *    *

Ultimately, a jury might disbelieve this common evidence. Or it might disagree with the conclusions of Mr. Dunlap and Dr. Kraus that that the *Empire* lockdowns did in fact injure the children housed at the JTDC. But those are questions that should be resolved at the merits, not here. What matters at class certification is that Plaintiffs will prove their claims with common evidence, evidence that each class member in this case would use to prove their own claims. The class action device is designed precisely for such situations. Class certification is appropriate.

**FACTS**

The Supreme Court has directed courts making decisions about class certification to do so with the relevant evidence in mind. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) (discussing the difference between a showing that questions of liability are common to the class, which is required, and a showing that the answer to those questions will be in the class's favor, which is not required). Plaintiffs have established an extensive factual record in the first round of class certification briefing, and those records will assist the Court in assessing Plaintiffs' renewed motion. (*See* ECF 236 and exhibits; ECF 270 and exhibits; ECF 279; ECF 284-1.) The January 16 Opinion, however, raised several factual issues that require clarification:

***Additional off-pod time for "low-level" detainees during breaks***. School was on break during the June and August filming periods. During these breaks the JTDC normally schedules additional off-pod recreation and activities for detainees. (*See* Dunlap Expert Rpt., ECF 236-1 ¶ 70.) The Court, relying on the affidavit of William Steward, stated it appeared as though lower-level detainees would not be eligible for these activities. (*See* ECF 319 at 13). In fact, as Earl Dunlap testified at his deposition, additional off-pod recreation and activities are scheduled for entire pods, and all "levels" of detainees participate in the activities, including in tournaments. (*See* Supplemental Expert Report of Earl Dunlap ("Dunlap Supp. Rpt.") ¶ 5 attached hereto as Ex. 1.) Indeed, it was the ***official policy of the JTDC*** that during breaks, all detainees would be scheduled for additional off-pod recreation and activity in addition to the minimal one hour of off-pod Large Muscle Exercise. (*Id.*) The amount of that additional recreation, moreover, was substantial. Mr. Dunlap has attached two shift reports from Spring Break, April 2015, showing that youth were provided with tournaments and programming for much of the day. (*See id.* ¶ 5.)

***Female detainees***.  The Court requested clarification on the routines of female detainees. (ECF 319 at 15.)  As the Court notes, female detainees have a separate intake, and therefore were not affected by the abandonment of the MAYSI machine, or by the overcrowding caused by the closure of the Alpha pods.  (ECF 319 at 14.)  Otherwise, though, the female detainees operated in much the same way as the other detainees in the building.  The pods of female detainees were segregated from the other pods in the facility—but that does not distinguish them from male detainees, whose pods were segregated from each other.  Female detainees, exactly like male detainees, attended school during normal operations on the JTDC's second floor, and they, exactly like male detainees, received off-pod recreation during normal operations in the facility's gyms and outdoor yards.  (Dunlap Supp. Rpt. ¶ 6.)  Thus, female detainees were subject to the very same increased confinement resulting from the very same causes (*i.e.*, the closure of school and the elimination of off-pod activity venues) as were the male detainees in the facility.

***Recreation on Intake ("Alpha") Pods***.  The intake pods, referred to in the briefing as the "Alpha" pods, are the pods where male youth detained at the JTDC are first brought after processing.  Typically, youth brought into intake stay there one to two days while they undergo screening and the staff locate a residential pod for them to stay in.  In discussing ascertainability, the January 16 Opinion stated that "[a]s Defendants observe, however, individuals who were never assigned to a [residential] pod could not have experienced the alleged alterations to the normal operations of the pods."  (ECF 219 at 7.)  This is inaccurate as a factual matter.  Youth housed on Alpha do not attend school, but under normal operations they would have received off-pod recreation and structured program activities during school breaks.  (*See* Dunlap Supp. Rpt. ¶ 4.)  Thus, youth detained on the Alpha pods suffered more restrictive conditions of confinement because of the filming.

**CLASS PROPOSAL**

In light of the January 16 Opinion, Plaintiffs propose three classes.

**Class 1—Increased confinement class:** All youth detained at the JTDC for at least 24 consecutive hours during the *Empire* filming periods. Each member of this proposed class was confined to their pods more than they otherwise would been because of the filming of Empire in the JTDC facility.

In the alternative, Plaintiffs have divided Class 1 into multiple subclasses. Plaintiffs submit that these subclasses are unnecessary because Class 1 satisfies Rule 23(a)(3)'s typicality requirement, as explained herein.

*Subclass 1(a)—LME sub-class*—All youth detained at the JTDC for at least 24 consecutive hours during the *Empire* filming periods who did not receive at least one hour of Large Muscle Exercise ("LME") recreation off-pod during any day of the filming periods.

*Subclass 1(b)—Outdoor recreation sub-class—*All youth detained at the JTDC for at least 24 consecutive hours during the *Empire* filming periods who did not receive scheduled outdoor recreation during the filming periods or whose outdoor recreation was not scheduled because of the filming of *Empire* in the JTDC facility.

*Subclass 1(c)—School break recreation sub-class*—All youth detained at the JTDC for at least 24 consecutive hours during the *Empire* filming periods who did not receive off-pod recreation or programming in addition to one hour of LME during each day of the June and August filming periods because of the filming of *Empire* in the JTDC facility.

*Subclass 1(d)—School sub-class*—All youth detained at the JTDC for at least 24 consecutive hours during the *Empire* filming periods who were detained on residential pods

during the July filming period who did not travel to the Nancy B. Jefferson school each day for class.

     ***Subclass 1(e)—Program class***—All youth detained at the JTDC for at least 24 consecutive hours during the *Empire* filming periods who were scheduled to participate in off-pod programs like Free Write, Karma Garden, or off-pod activities like commissary or game room but who did not do so because of the *Empire* filming.

     ***Subclass 1(f)—severe confinement class***—All youth detained at the JTDC who did not leave their pods for at least 24 consecutive hours because of schedule disruptions caused by the filming of Empire. For this subclass, Plaintiffs propose a new class representative, H.C.[1] H.C. was housed in Pod 3J during all three filming periods.

     **Class 2**. All youth detained at the JTDC for at least 24 consecutive hours who had family visitation during the June and July filming periods.

     **Class 3**. All youth detained at the JTDC for at least 24 consecutive hours during the *Empire* filming periods who were detained at the JTDC during the filming periods on pods with populations that exceeded safe functional operating capacity.

## ARGUMENT

     To obtain class certification, Plaintiffs must demonstrate that the proposed classes satisfy the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). "Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements, but they need not make that showing to a degree of absolute certainty. It is sufficient if each

---

[1] Pursuant to existing confidentiality orders in this case the names of youth detained at the JTDC have been treated as confidential. Plaintiffs will provide H.C.'s full name to Defendants.

disputed requirement has been proven by a preponderance of evidence." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012) (citations omitted).

The January 16 Opinion asked Plaintiffs to provide new class definitions to address several certifiability concerns.  Plaintiffs submit that the proposed class definitions address the matters raised in the January 16 Opinion, and that certification is appropriate.

## I.  Ascertainability.

The January 16 Opinion observed expressed concern that Plaintiffs' original class definition presented an ascertainability problem because it would include youth who had never left the JTDC's "Alpha" intake units and been transferred to a residential pod.  (ECF 319 at 7.)  To address this concern, Plaintiffs have adjusted their class definition to include only detainees who were at the JTDC for at least 24 consecutive hours or more during the filming periods.  As a matter of JTDC policy, detainees in custody for this amount of time or longer would have received off-pod recreation, among other things. As Plaintiffs have explained above, "Alpha" intake detainees are under normal conditions provided with daily off-pod recreation, including extra school break tournament recreation. (*See* Dunlap Supp. Rpt. ¶ 4.)   As such, boys on the Alpha pods were directly impacted by the filming and deprived of off-pod recreation like the other proposed class members.

## II.  Numerosity.

A class may be certified only if it is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although there is no magic number, courts have found classes of forty or more to be sufficiently large to satisfy Rule 23(a)(1). *See Pruitt v. City of Chicago*, 472 F.3d 925, 926-27 (7th Cir. 2006); *Toney v. Quality Resources, Inc.*, 323 F.R.D. 567, 583 (N.D. Ill. 2018). Other practical considerations, including the economy gained from

avoiding multiple actions, ease of identifying class members, and financial resources of class members (among others), may be relevant to the Court's decision. *Jimenez v. GLK Foods, LLC*, 2014 WL 2515398, at *5 (E.D. Wis. June 4, 2014); *Olson v. Brown*, 284 F.R.D. 398, 407 (N.D. Ind. 2012). Additionally, "although the one who asserts the class must show some evidence or reasonable estimate of the number of class members, if a plaintiff cannot provide precise numbers, a good faith estimate is sufficient to satisfy the numerosity requirement where it is difficult to assess the exact class membership." *Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 329 (N.D. Ill. 1995) (quotation and brackets omitted).

There were more than 300 youth at the JTDC during each of the filming sessions. Defendants did not challenge numerosity, and the Court held that Plaintiffs' originally proposed class was sufficiently numerous. (ECF 319 at 7-8.) Since Plaintiffs have proposed new class definitions, they revisit the requirement.

***Increased confinement class***. This proposed class consists of all youth who were detained at the JTDC for more than 24 hours during the filming periods who would normally have been allowed off the pods for one or more activities. It will include virtually all youth detained at the JTDC, aside from a handful—if any exist—who were detained at the JTDC for less than 24 hours. Class 1 satisfies the numerosity requirement.

***Alternative Subclass 1(a)***. This alternative subclass would consist of youth detained at the JTDC for at least 24 hours during the filming periods whose pods lost off-pod recreation during the filming periods. Plaintiffs do not attempt to quantify the entire subclass here, direct the Court to those youth who were held on their pods for 24 hours, and would therefore have missed off-pod recreation, number well over 100 on multiple days. *See* Exhibit A to the

Declaration of Stephen Weil (Ex. 2.)  This alternative subclass is sufficiently numerous to satisfy the numerosity requirement.

    ***Alternative Subclass 1(b)***.  This subclass would consist of all youth who did not receive scheduled recreation outdoors during filming.  This class is numerous.  Exhibit B to the Declaration of Stephen Weil is the recreation schedule from just one of the JTDC's centers, and it shows multiple pods scheduled for outdoor recreation every day.  (*See* Weil Decl., Ex. 2.)

    ***Subclass 1(c)***.  This subclass consists of youth who did not receive extra off-pod programming during the school breaks in June and August.  Earl Dunlap's Supplemental Expert Report explains that all youth at the JTDC were expected to receive time off the pod in addition to LME.  This group satisfies the numerosity requirement.  Plaintiffs do not attempt to quantify this entire class here, but direct the Court to Exhibit A of Mr. Weil's declaration.  All youth counted in that exhibit, which number well over 100, would be part of this subclass.

    ***Subclass 1(d)***—This subclass consists of all youth who were detained during the July filming and therefore did not go to school.  This subclass would consist of nearly the entire JDTC population in July (except intake), and is therefore sufficiently numerous.

    ***Subclass 1(e)***—program class.  This class consists of detainees who lost programming because of the *Empire* filming.  This class is sufficiently numerous.  The cancellation of Free Write in June alone caused 41 youth to lose programming.  (*See* Weil Decl.)  Multiple other programs were cancelled as well.  (*See* ECF 236 at 33.)  Numerosity is satisfied.

    ***Subclass 1(f)***—this is the severe confinement class.  It consists of well over 100 members.  (*See* Weil Decl. Ex. A.)  Numerosity is satisfied.

    ***Class 2***.  This class consists of all youth who had family visitation during the June and July filming periods, when the JTDC's visiting room was being used by Fox and family visits

were shunted to an alternative location. Every day dozens of youth receive family visits, (*see* ECF 214), and this class would include all visits during two entire filming periods. This proposed class satisfies the numerosity requirement.

*Class 3*. Records indicate that dozens of youth were housed in overpopulated pods subject to overcrowding on multiple pods as a result of the closures of Pods 3A and 3B. (*See* ECF 236-2 Ex. 28.) This class satisfies the numerosity requirement.

## III. Commonality.

The January 16 Opinion held that Plaintiffs had satisfied the commonality requirement. The Court found "that Plaintiffs have identified at least one question that is common to the class—whether *Empire* filming disturbed operations at the JTDC in ways that violated class members' constitutional rights," (ECF 319 at 9), and more specifically, whether "allowing *Empire* to film at the JTDC is a legitimate justification for altering the normal operations of the facility," which is "common to every member of the putative class." (*Id*. at 11.)

The Court's finding remains true of each of the different classes Plaintiffs have proposed, and of each legal theory on which Plaintiffs assert. Each of the classes that Plaintiffs propose is grounded in the claim that deprivations—be they additional confinement on the pods, denial of access to the outdoors, or loss of privacy in visitation—were imposed on the class members so that the JTDC could alter its operations in order to facilitate Fox's filming at the facility. That is a central claim component of Plaintiffs' due process claim, as well as its breach of fiduciary duty claim, inducement of breach, and "unjust enrichment." The resolution of all these claims will be driven by whether the *Empire* deprivations were imposed for a legitimate governmental purpose.

## IV.    Typicality.

To meet the typicality requirement set out in Rule 23(a)(3), the claims of the named plaintiffs must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This means that the named Plaintiffs' claims must (1) "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members," and (2) "[be] based on the same legal theory." *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 412 (N.D. Ill. 2012) (citing *De La Fuente v. Stokely-Van Camp*, 713 F.2d 225, 232 (7th Cir. 1983)).

Rule 23(a)(3), however, does not "require all class members suffer the same injury as the named class representative." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Rather, "[t]he typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus, similarity of legal theory may control even in the face of differences of fact." *De La Fuente*, 713 F.2d at 232.

In its January 16 Opinion the Court observed that "some, but not all, of T.S. and Q.B.'s claims are typical of a class of detainees at the JTDC," and instructed that as such "[t]hough it appears class treatment may be appropriate for some claims, Plaintiffs must redefine the class or propose appropriate subclasses in a renewed motion for class certification." (ECF 319 at 19.) Pursuant to the Court's instructions Plaintiffs have modified their proposed class definition. Plaintiffs submit that as modified, Plaintiffs' class proposal satisfies the typicality requirement.

### a.    Class 1—the increased confinement class—satisfies the typicality requirement.

Proposed Class 1 includes all youth who were subject to increased confinement— whether that increased confinement resulted from confinement to the pod in lieu of school, confinement to the pod in lieu of large muscle activity, or confinement to the pod in lieu of programming, or confinement from the outdoors. This class satisfies the typicality requirement.

12

*First*, the increased confinement—whether imposed in lieu of off-pod school, or off-pod recreation, or off-pod programming—"arises from the same event or practice or course of conduct that gives rise to the claims of other class members . . . ." *De La Fuente*, 713 F.2d at 232. As Plaintiffs set out at length in their class certification briefing, youth detained at the JTDC had to travel to the facility's lower floors and yard for recreation, schooling, and programming. (ECF 236 at 6-7.) Indeed Earl Dunlap explains that given the realities of operating the JTDC, "all youth at the JTDC during the *Empire* filming appear to have endured increased pod confinement, reduced opportunities for structured programming, and the total elimination of access to outdoor spaces and fresh air." (Dunlap Rpt., ECF 236-1 Ex. 1 ¶ 9.)

The increased confinement—whether it resulted from confinement in lieu of off-pod school, recreation, or programming—resulted from "the same . . . practice or course of conduct," *De La Fuente*, 713 F.2d at 232, by the Defendants: it was imposed on the youth at the JTDC in order to facilitate Fox's use of the facility for filming. This satisfies the first component of the typicality requirement articulated by the Seventh Circuit in *De La Fuente* and subsequent decisions. (*See* ECF 319 at 12 (collecting cases).)

*Second*, Plaintiffs' "claims [arising from the additional confinement] are based on the same legal theory." *De La Fuente*, 713 F.2d at 232. That is, Plaintiffs claim that additional confinement—pod confinement in lieu of off-pod school, pod confinement in lieu of off-pod recreation, confinement from the outdoors, etc.,—was both imposed for an improper purpose, and that it injured them in the same manner. For example, Dr. Kraus explains that in order to "minimize the negative impacts of detention on the juveniles it houses," the JTDC has developed "numerous activities designed to get youth off the 'pods' where they are confined, including school, recreation, outdoor time, programs, commissary, and physical activities." (Kraus Rpt.,

13

ECF 236-1 Ex. 2 ¶ 22.)  Having been asked to assume that youth detained at the JTDC were

subject to additional confinement to their pods to facilitate the filming of Empire as set out

below, Dr. Kraus opined:

> To accommodate *Empire*, youth detained at the JTDC spent more time on
> their pods than they otherwise would have, as set forth above. These
> changes resulted in increased confinement to the pods for the youth
> detained at the JTDC.

> Youth were kept in an enclosed environment, with their normal activities
> restricted or eliminated, for longer than would have been the case if
> *Empire* were not present. Because any increased restrictions on juveniles
> are psychologically harmful, any youth detained at the JTDC who spent
> more time on the pod than he or she otherwise would have was harmed.

(Kraus Rpt., ECF 236-1 Ex. 2 ¶¶ 34-35.)  Likewise, Dr. Kraus explains,

> Detention of juveniles at facilities like the JTDC is sometimes necessary
> to protect the juvenile or the community, but it tends to be psychologically
> harmful to the juvenile, and tends to increase chances of recidivism. The
> fewer the services and the more restrictive the incarceration, the more
> harmful the detention will be for the young person.

(Kraus Rpt. ¶ 6.)

Each and every proposed class member seeks to hold Defendants liable for the harm of

increased confinement—whether in lieu of off-pod school, off-pod recreation, or off-pod

programming, or outdoor recreation—which the Defendants imposed for no legitimate purpose.

Each and every class members' claims rise and fall together on this theory of liability.  As *De La*

*Fuente* put it, "[t]he typicality requirement may be satisfied even if there are factual distinctions

between the claims of the named plaintiffs and those of other class members. Thus, similarity of

legal theory may control even in the face of differences of fact."  713 F.2d at 232.

Class 1 thus satisfies the typicality requirement.  The injury at issue **(1)** was caused by the

same course of conduct (*i.e.*, increasing confinement in order to make the JTDC's second and

third floors available for Fox to use) and **(2)** Plaintiffs' claims arising from the injury are based

14

on the same theory: the increased restrictiveness of confinement is psychologically harmful to young people. Under *De La Fuente* and its progeny, this satisfies the typicality requirement.

### a. The Class 1 subclasses satisfy the typicality requirement.

Because Class 1 satisfies the typicality requirement, Plaintiffs submit that the Class 1 subclasses are unnecessary. Subclasses 1(a)-(f) distinguish the immediate reason that a youth was subject to additional confinement (*e.g.*, because they were confined to the pod for school, or confined to the pod for LME), but the ultimate effect and alleged injury—increased confinement—is identical in every instance.[2] Moreover, causation in each subclass (whether the closure of the school, the yards or cancellation of structured programming) also is identical: the alteration of the JTDC's operations in order to accommodate the *Empire* filming. Nevertheless, if the Court determines that subclasses are necessary under Rule 23, Subclasses 1(a)-(f) are divided among the reasons for the additionally restrictive confinement and therefore would satisfy the typicality requirement as well.

### b. Class 2 satisfies the typicality requirement.

Class 2 consists of detainees who had visits with family during the June and July filming periods, when Fox used the JTDC's visitation facilities and visitation was moved to a different room with less space between tables, and thus less privacy for visits. (ECF 236 at 21-22.) This happened to T.S. (*see id.*), and as Plaintiffs explained in their class certification motion, T.S.'s injury is the same as all other youth who had visits during the same period. "The closer tables in the smaller room was common to all detainees that had visitation during the Empire filming . . .

---

[2] In their original discussion of the typicality requirement Plaintiffs described how T.S. and Q.B. had suffered all the injuries for which they sought certification. (*See* ECF 236 at 17-24.) That is true of the narrower classes that Plaintiffs propose, with the possible exception of Subclass 1(f), the severe confinement class. For that subclass Plaintiffs have proposed a representative, H.C., who was housed on Pod 3J during the filming periods.

." (*Id.* at 34.)  The members of this class suffered the same injury—loss of privacy—that T.S. suffered, and their injury occurred for the same reason, to provide Fox with a filming location. T.S.'s claims are typical of the class.

### c.  Class 3 satisfies the typicality requirement.

Class 3 consists of all detainees who, like Q.B., were placed in pods that were populated past their safe functional operating capacity during the filming periods.  As Plaintiffs explained in their original class certification briefing, there is substantial evidence that in order to make Pods 3A and 3B available for Fox's use, the Defendants purposefully overpopulated multiple pods throughout the JTDC past their safe functional operating capacities.  (ECF 236 at 14.)  The over-population, in other words, resulted from the same course of conduct.

Additionally, it is Plaintiffs' theory that exceeding the pods' safe functional operating capacity endangered the youth housed in those pods.  As Mr. Dunlap and Dr. Krause explain, overpopulating the pods both endangered the youth housed in those pods and would been psychologically damaging to them.  (*See, e.g.*, Dunlap Rpt. ¶¶ 53-54; Kraus Rpt. ¶ 38.)  Plaintiffs have the same theories of liability for each of the youth detained in these overpopulated pods.

## V.  Adequacy.

The Court asked Plaintiffs to describe the backgrounds of Ms. Chardon and Mr. Weil, and to describe the role that Loevy & Loevy will play in this case.  (ECF 319 at 21)

Ms. Chardon received her undergraduate and law degrees from Northwestern University. Following a clerkship with Judge Kermit Lipez of the U.S. Court of Appeals for the First Circuit, she practiced complex commercial litigation with Eimer Stahl LLP.  In that role she defended multiple nationwide class actions including cases involving long term care insurance and environmental torts. She managed summary judgment briefing on behalf of a joint defense group

consisting of more than 100 insurers in a nationwide class action involving antitrust and RICO claims. She now represents plaintiffs in personal injury, civil rights, and products liability cases.

Mr. Weil received his law degree from the University of Pennsylvania. He clerked for Judge Robert E. Payne of the U.S. District Court for the Eastern District of Virginia and then joined the firm of O'Melveny & Myers LLP in Washington D.C. While at O'Melveny Mr. Weil represented Fannie Mae in an MDL arising from an earnings restatement, where he prepared accounting witnesses in deposition, managed class document production, and was involved in motions practice. He was also part of a trial team representing Fidelity Investments in *Tussey v. ABB*, No. 06-cv-04305 (W.D. Mo.), in a month-long ERISA class action bench trial. Mr. Weil was involved in motions practice and in preparing senior executives for examination. Mr. Weil then practiced at Eimer Stahl LLP, where he was involved for years in *New Hampshire v. Hess*, No. 03-c-550 (Sup. Ct. Merrimack Cty.), reputed to be the largest case in New Hampshire state court history. *Hess* was a *parens patriae* action that shares many of the complexities of class action litigation, and Mr. Weil was one of the principle drafters of briefs addressing the aggregating factors in that case. With the MacArthur Justice Center at Northwestern University Law School, Mr. Weil also represented a class of detainees at the Cook County Jail suing over the conditions of their confinement, in *Hudson v. Preckwinkle*, No. 13-cv-8752 (N.D. Ill.). In that role he was involved in gathering class evidence and examining witnesses at the class preliminary injunction hearing. These are examples of Mr. Weil's class action experience.

Mr. Weil has joined Loevy & Loevy as an attorney at the firm. Loevy attorneys including Jon Loevy, Michael Kanovitz, and Sarah Grady have appeared in the case. The firm is taking on this case as one of its own, under the supervision of partners Mr. Kanovitz and Mr. Loevy. The firm is devoting resources to the case through all phases of the litigation, including

certification, the remaining motions practice, taking the case to trial and appeal, negotiating any settlement or alternative resolution, and overseeing notice and distribution to class members.

The firm's extensive class action experience includes representing incarcerated people. *Young v. County of Cook*, No. 1:06-cv-00552 (N.D. Ill.), for example, a class action over strip searches at Cook County Jail, resulted in a settlement of $60 million. Additional information about the firm's class action background is available at https://loevy.com/blog/category/class-action/. Mr. Kanovitz, Mr. Loevy, and Ms. Grady are pleased to supply the Court with any additional information it desires regarding their class action litigation experience.

## VI.    Rule 23(b)(3) - Predominance.

The focus of Rule 23(b)(3) is to ensure that courts "select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc.*, 568 U.S. at 460 (internal quotation marks and brackets omitted). Plaintiffs seek certification of their damage claims under Rule 23(b)(3), which is appropriate when common questions of law or fact predominate over individualized ones and a class action is superior to other methods of adjudication.

 "Predominance is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 925 (7th Cir. 2016). Courts look to the "elements of the underlying cause of action." *Messner*, 669 F.3d at 815. A plaintiff can meet the predominance requirement by showing that common evidence will be used to prove the elements of each class members' claims, but a plaintiff "need not, at [the class certification] threshold, prove that the predominating question will be answered in their favor." *Ploss et al. v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003, 1013 (N.D. Ill. 2020) (quotation omitted). The Court directed Plaintiffs to

"connect the common evidence they propose to use to the elements required to make a *prima facie* showing for each cause of action." (ECF 319 at 22.) Plaintiffs do so here.

### a. Fourteenth Amendment due process.

The January 16 Opinion looked to *Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019) for Seventh Circuit's analysis of due process claims by pretrial detainees (ECF 319 at 9), and treated as instructive the elements set out in a concurrence to that decision:

> "(1) the conditions in question are or were objectively serious (or if the claim is for inadequate medical care, his medical condition is or was objectively serious); (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable—that is, "'not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose.'"

(ECF 319 at 10 (quoting *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring) (quoting *Kingsley*)).) Each class member in this case would offer the same evidence to prove each of these elements. Plaintiffs describe that evidence here:

### i. Conduct that is purposeful, knowing, or reckless.

As *Kingsley* explained, this element distinguishes injuries that result from the "deliberate decisions of government officials" from those that result from accident. *Kingsley* gives the example of "an officer [who] unintentionally trips and falls on a detainee," *see* 135 S. Ct. at 2472. Plaintiffs have marshalled voluminous evidence showing that the *Empire* alterations were centrally planned and deliberately imposed by the JTDC's administrators for the purpose of facilitating Fox's filming at the facility. (*See* ECF 236 at 7-16; ECF 270 at 32-24.) This evidence includes contemporaneous emails from JTDC managers, correspondence by JTDC managers after the fact, and deposition testimony by multiple witnesses, all of which show that the *Empire* restructuring was purposeful and centrally planned by the JTDC's management. (*Id.*)

Indeed many of the alterations were set out in an "Empire Work Plan" that was distributed among JTDC managers in advance of each filming session. (*See* ECF 236-2 Ex. 24.)

This is common evidence. Every member of the class would use this same evidence to show that the deprivations the Defendants imposed on the youth at the JTDC were not caused by an accident, but rather were purposefully and deliberately undertaken to accommodate Fox. This first element satisfies the predominance requirement.

### ii. Objective reasonableness.

Every class member would also use the same evidence to show that the deprivations imposed to facilitate the Fox filming were "not rationally related to a legitimate governmental purpose," *Kingsley*, 135 S. Ct. at 2473-74.

That proof begins with the common evidence that the *Empire* deprivations were imposed purposefully, as explained above. That evidence of purposefulness establishes not just that the *Empire* deprivations were imposed deliberately; it also establishes, with common evidence, *why* the JTDC's managers imposed those deprivations. That is, the evidence Plaintiffs will use to show that the *Empire* deprivations were purposeful is *also* evidence that their purpose was to enable Fox's filming in the facility. That, in turn, is common evidence that every class member would use to show that the deprivations were not rationally related to a legitimate governmental purpose, but instead were undertaken for a purpose that was not legitimate.

\*   \*   \*

January 16 Opinion notes that multiple courts have declined to certify conditions-of-confinement class actions where objective reasonableness "must be considered individually." (ECF 319 at 24 (quotation omitted) (citing *Perez v. City of Chicago*, No. 13-cv-4351, 2019 WL 7290848 (N.D. Ill. Dec. 27, 2019); *Portis v. City of Chicago*, 613 F.3d 702 (7th Cir. 2010); and *Harper v. Sheriff of Cook Cty.*, 581 F.3d 511 (7th Cir. 2009)), while objective reasonableness in

other conditions-of-confinement class actions can be assessed on a class-wide basis. (*Id.* (citing *Driver v. Marion Cty. Sheriff*, 859 F.3d 489, 491–94 (7th Cir. 2017).) The Court's discussion was directed at Plaintiffs' original class definition (*see, e.g.*, ECF 319 at 24-25 (discussing problems with Q.B.'s visitation claim), which Plaintiffs have since narrowed. All the same, an analysis of the competing decisions reviewed by the Court is useful for assessing the Plaintiffs' class-wide "objective reasonableness" proof now.

As the January 16 Opinion suggests, the key distinction between *Perez*, *Portis*, and *Harper* on the one hand, and *Driver* on the other, is whether the reasonableness of the challenged deprivation can be proved with common evidence. *Perez*, *Portis*, and *Harper* all involved claims over different species of delay in incarceration and processing. In each of those cases, though, determining whether or not each class member's delay was reasonable depended on the particular circumstances that caused the delay, and whether those specific circumstances were unreasonable. Thus, as *Perez* explained, common issues did not predominate because "each allegedly unreasonable detention must be evaluated in light of the specifics of what happened and the officer's justification for delay." *Perez*, 2019 WL 7290848, at *10.

In *Driver*, by contrast, the plaintiffs claimed that all putative class members had experienced delayed releases from custody for the same reason: the Sheriff used a defective computer system, which the plaintiffs charged was objectively unreasonable. *Driver*, 859 F.3d at 494. The *Driver* plaintiffs, in other words, had offered evidence that all the delays at issue were attributable to the same unreasonable policy—use of a defective computer system—rather than to "individual factors" that would be unique to each class member's particular circumstances. *Id.* at 494-95. Because each class member would rely on the same evidence—*i.e.*, the defective computer system—to show that their delay was unreasonable, common issues predominated. *Id.*

21

Here, like in *Driver*, the deprivations that Plaintiffs have alleged all flow from a single, unreasonable policy: the Defendants' decision to alter the JTDC's operations in order to accommodate Fox's filming needs. Each class member would offer the same evidence to prove that their particular deprivation—be it increased pod confinement, loss of visitation, or something else—was not imposed on them to further a legitimate governmental purpose, but rather to accommodate Fox's filming needs. The evidence needed to assess whether *any* of the deprivations at issue in this case was reasonably related to a legitimate governmental purpose, in other words, is the same. Each class member here, like each class member in *Driver*, would cite the same "policy" as the source of their deprivation, and each would offer the same evidence to prove that that policy was not reasonably related to a legitimate governmental interest. Common issues, rather than individualized issues, thus predominate with respect to evidence supporting the "objective unreasonableness" element of Plaintiffs' Fourteenth Amendment claim.

### iii. A deprivation of "constitutional magnitude."

The third element is whether the deprivation is objectively serious, or as the *Hardeman* majority put it, whether the deprivation is "'a problem of constitutional magnitude.'" (ECF 319 at 11 (quoting *Hardeman*, 933 F.3d at 824 (maj. op.).) Every class member would also use common evidence to prove that the deprivation that they suffered was one of "constitutional magnitude" and thus satisfy this element.

**Legal background.** Plaintiffs briefly review the legal background of the "constitutional magnitude" element before turning to the evidence they will use to prove it.

To determine whether the *Empire* deprivations are ones of "constitutional magnitude," the Court should look to other circumstances in which the courts have analyzed deprivations that resulted from an abuse of power by the government—*i.e.*, deprivations that were unrelated to a

legitimate governmental purpose. In these circumstances the Seventh Circuit, and other courts of

appeal, have set a low bar for violation of the Due Process Clause:

- In *Davis v. Wessel*, 792 F.3d 793 (7th Cir. 2015) guards unnecessarily left a detainee handcuffed when he went to use the bathroom during a court appearance. Relying on *Kingsley*, the court held that this "constitutes punishment *in the constitutional sense* if the[] use [of the handcuffs] is not rationally related to a legitimate nonpunitive government purpose or [] appear[s] excessive in relation to the purpose." 792 F.3d at 800 (emphasis added).

- The Court is familiar with *Mulvania v. Sheriff of Rock Island County*, 850 F.3d 849 (7th Cir. 2017), in which a sheriff had a policy that all female jail detainees must wear white underwear. The court held that if such a policy did not have a legitimate governmental purpose, it would violate the women's rights Fourteenth Amendment. 850 F.3d at 858.

The approach of other circuits is similar:

- In *Robles v. Prince George's County*, 302 F.3d 262 (4th Cir. 2002), officers who had arrested the plaintiff handcuffed him to a light pole in an empty parking lot and left him there for 10 minutes. 302 F.3d at 266. Noting that "[t]he police behavior here was not reasonably related—indeed it was entirely unrelated—to any legitimate law enforcement purpose," the court held that "[e]ven a so-called prank that fails to serve any 'legitimate governmental objective' can constitute a due process infraction." *Id*. at 269-70 (quoting *Bell*, 441 U.S. at 539).

- *Wagner v. County of Maricopa*, 706 F.3d 942 (9th Cir.) amended and superseded on denial of reh'g on other grounds, 747 F.3d 1048 (2013), an inmate challenged the jail's policy of issuing detainees pink underwear on the grounds that, "given the cultural context," the color was chosen "to shame and stigmatize the male prisoners as feminine." 706 F.3d at 948. Relying on *Bell's* rule that conditions of pretrial detention not related to a legitimate governmental purpose are violative of due process, the court observed that "[u]nexplained and undefended, the dress-out in pink appears to be punishment without legal justification." *Id*.

- *Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) involved the sheriff's placement of webcams in the jail that transmitted video of the detainees over the internet. The court held that the webcams served no legitimate governmental purpose, and thus imposing discomfort on inmates in the form of public exposure violated due process. 378 F.3d at 1033 (relying on *Bell*).

These decisions all teach that the Seventh Circuit, along with other courts of appeal, considers

even a relatively mild or short-lived deprivation to be "a problem of constitutional magnitude"

when a is imposed for no legitimate governmental purpose.

In addition to that body of authority, courts construe the Due Process Clause even more liberally when the challenged action involves deprivations imposed on minors. *See Doe v. Cook Cty.*, No. 99-cv-3945, 1999 WL 1069244, at \*4 (N.D. Ill. Nov. 22, 1999) (discussing analysis of alleged constitutional violations against detainees at the JTDC: "[T]he 14th amendment due process standard should, as a general matter, be more liberally construed when applied to juvenile pretrial detainees."); *A.J. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995) (same). Under the Due Process Clause detained youth also have an affirmative right to receive rehabilitation treatment. *Nelson v. Heyne*, 491 F.2d 352, 358-59 (7th Cir. 1974).

*    *    *

**Proof at trial.** As set out above, Plaintiffs will use common evidence to show that they were injured by these deprivations. That evidence would allow a reasonable fact finder to believe that it is more likely than not that each class member suffered a substantial injury that, in these circumstances, the constitution does not permit.

***Class 1-increased confinement class***. Mr. Dunlap and Dr. Kraus offer substantial evidence that the *Empire* deprivations would have been psychologically harmful to detained minors, and would have placed those minors in danger.[3] Every class member would use this same evidence to prove that they were injured by the deprivations that the Defendants imposed on them in order to facilitate the *Empire* filming.

Earl Dunlap offers the opinion that:

> [A]ll youth at the JTDC during the *Empire* filming appear to have endured increased pod confinement, reduced opportunities for structured programming, and the total elimination of access to outdoor space and

---

[3] That evidence is bolstered by Dr. Brian Conant, the JTDC's own Mental Health Director (*see* ECF 270 at 6), and the standards relied upon by the JTDC's mental health unit, all of which support Plaintiffs' claim that the deprivations imposed to facilitate *Empire* were psychologically harmful. (*Id.*)

24

fresh air. These types of restrictions are harmful to youth and increase the harms to juveniles that are caused by detention.

. . . .

Pod confinement at the JTDC most resembles the conditions of adult incarceration, and is most negatively impactful on young detainees.

Indoor and outdoor structured programs are an important outlet for youth, particularly when they find themselves in an enclosed, secure and locked detention facility like the JTDC.

During the Empire filming, some indoor recreation areas and all of the outdoor recreation areas were closed to youth at the JTDC. This means that youth had fewer opportunities for off-pod recreation—and no opportunities whatsoever for outdoor recreation— while Empire was at the JTDC. Taking recreation opportunities away from youth in a detention facility, and outdoor opportunities in particular, is harmful to youth. It is noteworthy that the weeks scheduled for the filming were in the summer when the weather, for the most part, is ideal for outdoor recreation and activities.

Imagine being restricted to a space not much larger than a two-car garage for most of your waking hours with as many as sixteen people, many of whom have mental health issues, and surrounding the garage are neighbors banging on the exterior walls. The conditions of confinement at the JTDC caused by the *Empire* filming were harmful to all JTDC youth.

(Dunlap Rpt. ¶¶ 9, 65, 70, 71, 72-73.)

Mr. Dunlap among the country's leading experts on the appropriate operation of juvenile detention facilities. This Court, in the *Doe* litigation, appointed him to reform the JTDC to protect the constitutional rights of the youth housed there. Each class member would use Mr. Dunalp's testimony to prove that he or she was injured.

Each class member would also use the opinions of Dr. Kraus. Dr. Kraus was appointed by this Court as a psychiatric expert for the JTDC's detainees in the *Doe* litigation. He has offered the opinion, among other things, that:

Placing youth in a restricted environment like the JTDC may be necessary, but it is also harmful. In order to minimize the harm to children in detention, the JTDC implemented numerous interventions designed to get the children off of their pods.

. . . .

Regular outdoor recreation helps mitigate the impact of incarceration on youth by allowing team play, fresh air and large muscle exercise. Less outdoor exposure increases the negative psychological impact of detention.

. . . .

Detention of juveniles at facilities like the JTDC is sometimes necessary to protect the juvenile or the community, but it tends to be psychologically harmful to the juvenile, and tends to increase chances of recidivism. The fewer the services and the more restrictive the incarceration, the more harmful the detention will be for the young person.

. . . .

[M]ore restrictive environments in a juvenile detention setting diminish the amount and the effectiveness of programming such as education, exercise, recreation and enrichment that is necessary and appropriate for juveniles, and thereby degrade the efficacy of rehabilitative efforts undertaken on a youth's behalf

More time spent restricted to the pods means more negative impact on detainees and more psychological harm from incarceration. This is true for every juvenile; more restriction equals more harm. For this reason, numerous JTDC programs—school, enrichment activities, exercise, recreation, commissary, etc.—are purposefully scheduled to take place off the pod.

. . . .

Because any increased restrictions on juveniles are psychologically harmful, any youth detained at the JTDC who spent more time on the pod than he or she otherwise would have was harmed.

(Kraus Rpt. ¶¶ 6(c), 21, 30(a), 35.)

Mr. Dunlap's and Dr. Kraus's opinions are common evidence. Each class member would use them to prove that they were injured by the increased restrictions and pod confinement imposed on him or her in order to facilitate *Empire*'s filming.

This evidence, moreover, makes out a *prima facie* showing that the injury suffered by each class member is one of constitutional magnitude. *Cf. Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 152 (2000) (reversing lower court's ruling on *prima facie* showing because "[t]he court . . . failed to draw all reasonable inferences in favor of petitioner."). Giving each

class member the benefit of all factual inferences, a reasonable fact finder could conclude that Mr. Dunlap and Dr. Kraus show that a government official who subjects kids to restrictive confinement in order to pursue his own personal ends is "a problem of constitutional magnitude" that is comparable to or greater than the injury imposed by the white underwear policy in *Mulvania*, the unnecessary handcuffing in *Davis*, the "prank" in *Robles*, the use of webcams in *Demery*, or the pink dress code in *Wagner*. Common issues in Class 1 predominate, and certification of the Class 1 due process claim is appropriate.

**Subclasses 1(a)-(e)**—these subclasses separate the increased confinement injuries imposed on the members of Class 1 into the various reasons for increased restrictive conditions (*e.g.*, pod confinement in lieu of school, pod confinement in lieu of off-pod recreation, etc.). For the reasons set out Plaintiffs' discussion of typicality, above, these classes are unnecessary. In all events though, each of the subclasses involves the imposition of increased, more restrictive confinement on youth in order to facilitate Fox's filming. Each member of each of these subclasses, therefore, would use the common expert evidence from Mr. Dunlap and Dr. Kraus to prove that he or she was injured by these restrictions. Such evidence is common.

**Subclass 1(f)—severe confinement class**. The members of Subclass 1(f) were confined to their pods in lieu of programming for at least 24 hours. Class 1 satisfies Rule 23(b)(3)'s predominance requirement, and Subclass 1(f) is unnecessary. In the event the Court concludes that Class 1 cannot use common evidence to prove that their additional pod confinement was "a problem of constitutional magnitude," Plaintiffs offer Subclass 1(f). The members of this class were subject to at least 24 hours of continuous confinement without programs or activities, and thus have a larger minimum injury. Their claims are otherwise provable with the same common evidence as Class 1. Subclass 1(f) satisfies the predominance requirement as well.

*Class 2—visitation class.* Class 2 consists of all detainees who had family visits during the June and July filming periods, when the JTDC's purpose-built visitation facility was given over to Fox and families were obligated to conduct their visits in a room with less privacy.

Each of these detainees would prove that they were injured by using common evidence. Mr. Dunlap offers the opinion that:

> [Family] visits are important, particularly because youth detained at the JTDC may have few if any people to confide in while they are detained.
> . . . .
> Youth in detention facilities have a real sense of isolation when incarcerated and while it is important for them to recognize and confront the consequences of their actions, it is also important to recognize the significance and value of family engagement.
> . . . .
> [The elimination of privacy] would disrupt one of the key benefits of visitation, as detained youth have nobody but their parents to confide in during their incarceration.

(Dunlap Rpt. ¶¶ 30(e), 80, 82.)  Dr. Kraus, meanwhile, offers the opinion that

> Loss of privacy in visitation . . . would degrade contact with family and degrade the opportunity for the detainee to confide in family members during a visit. Such losses would further increase the negative psychological impact of incarceration on the detainee.

(Kraus Rpt. ¶ 40.)  Each member of Class 2 would use this common evidence to establish that he or she had had suffered an injury of constitutional magnitude when the Defendants deprived them of privacy so that Fox could film scenes in the JTDC's purpose-built visitation facility.

*Class 3—overcrowding class.* This class was subject to overcrowding past the pods' safe functional operating capacity in order to make Pods 3A and 3B available to Fox.  Mr. Dunlap has explained that keeping pod populations within their safe functional operating capacities was "essential [for] youth in custody [to feel] safe and [to be] safe."  (Dunlap Rpt. ¶ 57.) Overcrowding on the pods, Mr. Dunlap explains, increase the stress of being on pods in the first place.  (*Id.* ¶ 73.)  Dr. Kraus, likewise, is of the opinion that this sort of overcrowding is

psychologically harmful.  (*See* Kraus Rpt. 37.)  Every member of Class 3 would use this expert

evidence to prove that they were injured by the Defendants' overpopulation of the pods to

accommodate Fox's needs.  This, too, is common evidence.

### b.  Breach of Fiduciary Duty

Plaintiffs have asserted a claim of breach of fiduciary duty.  They seek two distinct

remedies from this claim—**(1)** damages, and **(2)** restitution.  (*See* ECF 88 ¶¶ 115-16.)  The

elements satisfying those two different remedies are distinct, as Plaintiffs explain below.

Plaintiffs have gathered common evidence to prove up both remedies, and as set out below that

common evidence predominates over any individual issues.

### i.  Breach of fiduciary duty—for damages

As the January 16 Opinion explains, "[t]o succeed on a claim for breach of fiduciary duty

under Illinois law, Plaintiffs must show that (1) a fiduciary duty existed, (2) that duty was

breached, and (3) the breach of the duty proximately caused damages."  (ECF 319 at 25

(quotation omitted).)

***Existence of a fiduciary duty***.  In its January 16 Opinion the Court held that the first

element, the existence of a fiduciary duty, had been satisfied by operation of law, since

Defendant Dixon had assumed the position of guardian of the JTDC's young detainees, as wards.

(*See* ECF 319 at 25.) The first element is therefore satisfied with common evidence.

***Breach of duty***.  The Court further explained that as guardian, Dixon had a fiduciary duty

to ensure the "safety and general well-being" of his wards.  (ECF 319 at 25 n. 14.)  Plaintiffs

have offered substantial, common evidence to show that the normal operations of the JTDC—

such as off-pod activities, visitation rooms that permitted privacy, functional population caps

within the facility, and the behavior economy—were all designed to ensure the safety and well-

being of the youth detained there. This is common evidence that all the class members would use to show that these various provisions were designed for their safety and well-being.

Common evidence would also be used to show that Dixon breached his fiduciary duty by eliminating or degrading these various services in order to benefit himself and Fox, at the expense of the youth detained at the JTDC. That evidence is essentially identical to the common evidence that each class member would use to prove the "objective unreasonableness" element of their Fourteenth Amendment claim. *See* VI(a)(ii) *supra*. As Plaintiffs explained in discussing that element, each class member would use this same evidence to prove that the restrictions that Dixon breached his fiduciary duty to him or her. This evidence thus is common to all class members, and common issues therefore predominate as to that element.

***Breach proximate caused injury***. Common evidence will also be used to prove that the breach proximately caused injuries to the class. This evidence would be substantially similar to the common evidence used to establish that the Defendants' violation of Plaintiffs' Fourteenth Amendment rights injured them, as set forth above. *See* VI(a)(iii) *supra*. As Plaintiffs explained, common evidence, particularly the expert opinions of Mr. Dunlap and Dr. Kraus, establishes that additional pod confinement, loss of privacy in visitation, and the like are psychologically harmful to incarcerated youth. *See* VI(a)(iii) *supra*. Every class member would use this same common evidence to prove that Dixon's breach of fiduciary duty injured them. Such evidence would therefore make out a *prima facie* case for each class discussed above.

### ii. Breach of fiduciary duty—for restitution.

Plaintiffs also assert a claim for restitution arising from the alleged breach of fiduciary duty. (*See, e.g.*, ECF 88 ¶ 116.) The elements of a claim for restitution arising from a breach of fiduciary duty are distinct from the elements of a claim for damages. While the plaintiff must

still prove the existence of a fiduciary duty and a breach of that duty, instead of providing that the breach proximately injured the plaintiff, the plaintiff must instead prove that the breach benefitted the fiduciary (or a third party with notice). The Seventh Circuit set out the elements of this claim in *Pro-Pac Inc. v. WOW Logistics Co.*, 721 F.3d 781 (7th Cir. 2013), they are:

> A person who obtains a benefit
>
> (a) in breach of a fiduciary duty,
>
> (b) in breach of an equivalent duty imposed by a relation of trust and confidence, or
>
> (c) in consequence of another's breach of such a duty,
>
> is liable in restitution to the person to whom the duty is owed.

721 F.3d at 787 (quoting § 43 Restatement (Third) of Restitution & Unjust Enrichment (Am Law Inst. 2011) (hereinafter "Section 43").) [4]

*Existence of fiduciary duty*. Plaintiffs will prove the existence of Dixon's fiduciary duty with the same evidence as the fiduciary duty (damages) claim set out above.

*Breach of fiduciary duty*. Plaintiffs will prove that Dixon breached his fiduciary duty with the evidence set out in the fiduciary duty (damages) claim set out above. In addition to this evidence, Plaintiffs will also offer common evidence to show that Dixon breached his fiduciary duty by *endangering* them and thus breaching his fiduciary duty to protect their wellbeing, even if such endangerment did not ultimately cause a "concrete" injury. Specifically, both Mr. Dunlap and Dr. Kraus offer the opinion that in addition to injuring the youth at the JTDC, the alterations made to accommodate Fox endangered the youth as well. (*See* Dunlap Rpt. ¶¶ 8, 44, 52, 53, 64, 78; Kraus Rpt. ¶¶ 6, 6(a), 6(b), 30(c), 30(d), 38.)

---

[4] *Pro-Pac* construes Wisconsin law, but Illinois law is the same. *See Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 55, 643 N.E.2d 734, 745 (1994) ("The Restatement of Restitution also specifies that a constructive trust is imposed to recover any illegal benefit a breach of fiduciary duty may have given the fiduciary.")

This is all common evidence of breach. Each class member who was subject to increased risk of harm from overcrowding, or increased pod confinement, or loss of activities, would use the opinions of Mr. Dunlap and Dr. Kraus in order to prove that to accomplish the filming they were endangered, which violated the fiduciary duties owed to them.

*Benefits attributable to the breach*. The third element—benefits realized from the breach—will be proved with evidence common to each class member as well. In addition to the frisson of mingling with movie stars, Leonard Dixon received certain quantifiable benefits, including autographed photographs with movie stars and a director's chair, while Fox realized profits from filming *Empire* at the JTDC. (*See* ECF 270 at 13.)

### c. Inducement of breach of fiduciary duty

The January 16 Opinion held that Plaintiffs had satisfied their burden to show that their inducement of breach claim against Fox was entitled to class treatment, because "[p]roving [the] allegations [necessary to establish the elements of tortious inducement] would not require individualized inquiries," and that "[w]hether the Fox Defendants knew that filming would result in a breach of fiduciary duty can therefore be assessed on a class-wide basis." (ECF 319 at 29.) This claim is therefore certifiable under Rule 23(b)(3).

### d. Count XIII

In Count XIII Plaintiffs brought a claim styled "unjust enrichment." The January 16 Opinion concluded that it did not need to address Count XIII as a certification matter, and thus discussed it only in *dicta*. (ECF 319 at 30-31.) In light of the Court's assessment of the claim, Plaintiffs will address their entitlement to a restitution remedy from Fox at the merits stage.

## VII.    Rule 23(b)(3) – Superiority

Rule 23(b)(3)'s "superiority" requirement asks the Court to determine whether the "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," and directs the court to look to several distinct factors, which are reviewed herein.

Two of the superiority considerations are straightforward.  This Court is the only and primary forum for the claims at issue in this case, which all arise from an event that occurred in this district.  The Rule 23(b)(3)(C) factor thus favors concentrating litigation in this forum. Additionally, Plaintiffs are unaware of any other collateral litigation involving the controversy at issue in this case, meaning that the Rule 23(b)(3)(B) factor favors certification as well.

Plaintiffs submit that the factor set out in Rule 23(b)(3)(A), which asks the Court to consider "the class members' interests in individually controlling the prosecution or defense of separate actions," also favors class treatment.  This case, in the aggregate, involves a serious abuse of power:  the Defendants imposed deprivations on hundreds of vulnerable young people who were under their care—not for the benefit of those young people, but rather to make it easier for a private corporation use the children's recreation, programming, and educational facilities to stage and shoot scenes for a commercial television show.  At the same time, however, the claims of any one of the young people who was impacted by this misconduct is likely to be small.  "The purpose of class action litigation is to avoid repeated litigation of the same issue and to facilitate prosecution of claims that any one individual might not otherwise bring on her own."  *Chi. Teachers Union v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015).  That purpose is served here; if a class is not certified these claims would involve hundreds of cases repeating litigation of the same, small matters with the same evidence.

Management of this class action, likewise, should not be difficult. This case involves a discrete series of events, committed by the same defendants, in a single location, against a similarly situated group of people who were affected in similar ways. While the Court has held that some of the injuries suffered by the class members are sufficiently distinct that subclasses are appropriate, those subclasses have been proposed and their claims can be proved with evidence common to each class. The Rule 23(b)(3)(D) consideration thus favors certification.

## VIII.    Rule 23(b)(1) Unjust enrichment pool.

Plaintiffs sought certification under Rule 23(b)(1)(B) for the unjust enrichment remedy sought in this case. The Court denied this request, construing Plaintiffs' Rule 23(b)(1)(B) request as an alternative grounds for certification, and concluding that such a class was unnecessary because Fox inarguably has sufficient funds to satisfy an unjust enrichment award. (ECF 319 at 31-32.)

Plaintiffs write here to clarify that they do not seek the Rule 23(b)(1)(B) class in the alternative—rather they respectfully submit that for the management of an unjust enrichment award, a Rule 23(b)(1) class is preferable to a Rule 23(b)(3) class. That is so because an unjust enrichment pool will create a temptation for individual Rule 23(b)(3) class members to opt out, race to court, and recover as much of the unjust enrichment pool as they can for themselves, before the remainder of the class members get to judgment.

That would deplete the pool—not because Fox would become insolvent, but because Fox was enriched from the *Empire* filming only by a certain amount, and no more. Once Fox has disgorged that certain amount to early opt-out class members, the pool will be empty, and other class members who arrive later will have nothing to recover. A Rule 23(b)(1)(B) class protects

against that problem, for the reasons Plaintiffs explained in their original class certification briefing. (*See* ECF 236 at 40-41; ECF 270 at 28-30.)

## CONCLUSION

The Court should certify the proposed classes pursuant to Rule 23(b)(3) and Rule 23(b)(1)(B).


June 15, 2020                              Respectfully Submitted,

                                          /s/ Stephen H. Weil

                                          Stephen H. Weil – weil@loevy.com
                                          Michael I. Kanovitz – mike@loevy.com
                                          Jonathan I. Loevy – jon@loevy.com
                                          Sarah C. Grady – sarah@loevy.com
                                          Loevy & Loevy
                                          311 N. Aberdeen Street, 3rd Floor
                                          Chicago, IL 60607
                                          312.243.5900

                                          *Attorneys for Named Plaintiffs T.S. and Q.B.*

## CERTIFICATE OF SERVICE

  I hereby certify that on June 15, 2020, a true and correct copy of the foregoing was filed electronically.  Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

             /s/ Stephen H. Weil