**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| T.S. and Q.B., individually and on behalf of all others similarly situated, ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Case No. 16 C 8303 |
| TWENTIETH CENTURY FOX TELEVISION, FOX BROADCASTING COMPANY, TWENTY-FIRST CENTURY FOX, INC., FOX ENTERTAINMENT GROUP, LLC, FOX NETWORKS GROUP, INC., FOX TELEVISION GROUP, THE COUNTY OF COOK, ILLINOIS, LEONARD DIXON, JOHN DOES 1 THROUGH 20, and THE CHIEF JUDGE OF THE CIRCUIT COURT OF COOK COUNTY, ) ) ) ) ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

During the summer of 2015, Plaintiffs T.S. and Q.B. were pretrial detainees at the Cook County Juvenile Temporary Detention Center ("JTDC"). During three short intervals that summer, Defendant Twentieth Century Fox and the other Fox Defendants filmed scenes for the television show *Empire* at the JTDC. Plaintiffs allege that the *Empire* filming disrupted the normal operations at the facility in ways that harmed them and other juvenile detainees. In this putative class action, they assert claims under 42 U.S.C. § 1983 and supplemental state law theories. Plaintiffs' claims and allegations are recounted thoroughly in an earlier opinion and will not be repeated extensively here. *See T.S. v. Twentieth Century Fox Television*, 334 F.R.D. 518 (N.D. Ill. 2020) (denying Defendants' motion to strike class allegations and denying without prejudice Plaintiffs' motion for class certification).

Pending before the court now is a question of law involving the potential liability of the Chief Judge of the Circuit Court of Cook County (the "Chief Judge"). Plaintiffs have asserted constitutional claims against the Chief Judge in his official capacity, in addition to claims against

Defendants Cook County, Illinois; Leonard Dixon, the Superintendent of the JTDC; and Defendant Does. Plaintiffs seek partial summary judgment that (1) the Chief Judge is not entitled to immunity under the Eleventh Amendment of the U.S. Constitution and (2) Defendant Dixon was the Chief Judge's final decisionmaker concerning the *Empire* filming. (Pls.' Mot. for Partial Summ. J. ("Pls.' Mot.") [310].) The Chief Judge has filed a cross-motion for summary judgment, in which he argues that (1) he is not a person subject to suit under Section 1983 and (2) all claims against him are barred by the Eleventh Amendment. (Chief Judge's Mot. for Summ. J. [323].) As explained here, the court grants the Chief Judge's motion for summary judgment, holding that the Eleventh Amendment bars the claims against him. Plaintiffs' motion for summary judgment on this issue is denied, but the court concludes that Plaintiffs are entitled to summary judgment on their claim that Dixon was the Chief Judge's final decisionmaker on relevant issues.

## FACTUAL BACKGROUND

Dixon was the Superintendent of the JTDC during the *Empire* filming. (*See* Defendant Chief Judge's L.R. 56.1 Stat. of Facts ("Chief Judge L.R. 56.1 Stat.") [325] ¶ 8.)[1] In the months and years preceding the filming, operational and administrative control of the JTDC had undergone a significant transition. The event that triggered the shift was a federal civil rights lawsuit filed in 1999 by detainees at the JTDC against Cook County and JTDC's then-Superintendent. (*Id.* ¶ 1 (citing *Doe v. Cook Cnty.*, No. 99-cv-3945 (N.D. Ill.)).) At the time the lawsuit was filed, the Cook County Board exercised control over the JTDC. (Chief Judge L.R. 56.1 Stat. ¶ 1).[2] The 1999 lawsuit resulted in a settlement agreement that required Cook County to "improve conditions" at the facility. (*Id.* ¶ 2.) Several years later, in August 2007, the district

---

[1] Plaintiffs do not dispute the Chief Judge's Local Rule 56.1 Statement of Facts. (*See* Pls.' Reply in Support of Pls.' Mot. for Partial Summ. J. and Response in Opp. to Def. Chief Judge's Cross-Mot. for Summ. J. ("Pls.' Reply & Resp.") [332] at 1.) The Chief Judge does not dispute Plaintiffs' Local Rule 56.1 Statement of Facts. (*See* Def. Chief Judge's Combined Resp. to Pls.' Mot. for Partial Summ. J. and Cross-Mot. for Summ. J. ("Chief Judge's Br.") [322] at 2.)

[2] The parties do not specify the source of law that originally delegated authority to the Cook County Board.

court in *Doe* determined that the County was not complying with the terms of the settlement agreement. (*See id.*) The court appointed a transitional administrator of the JTDC (Earl Dunlap) "to bring the facility into compliance." (*Id.*)

At the time of the appointment of the transitional administrator, "the Illinois General Assembly was considering legislation that would transfer control of the JTDC" from the Cook County Board to the Office of the Chief Judge of the Circuit Court of Cook County ("OCJ"). (*Id.* ¶ 3.) The bill sponsor was concerned that "the county board president's office wasn't necessarily handling the juvenile detention center in the proper way." (*Id.* (quoting 95th General Assembly, 32nd Legislative Day, March 28, 2007 House Transcript ("Mar. 2007 House Tr.") at 48, *available at https://www.ilga.gov/house/transcripts/htrans95/09500032.pdf* (last visited Nov. 23, 2020)).) As the bill sponsor noted, in "all the other counties in the state," the chief judge's office (rather than the county) administers juvenile detention centers. (Mar. 2007 House Tr. at 48.) In its order appointing Dunlap as the transitional administrator of the JTDC, the district court "referenced this pending legislation" and ordered Dunlap to "prepare the JTDC for the transition of administrative authority over its operations to the [OCJ]." (Chief Judge L.R. 56.1 Stat. ¶ 4 (internal quotation marks omitted).)

The Illinois General Assembly ultimately did transfer "operational and administrative authority over the JTDC to the OCJ, effective January 1, 2008." (*Id.* ¶ 5.) It did so by amending the County Shelter Care and Detention Home Act ("Detention Home Act"), 55 ILCS 75/1 *et seq.*, which allows counties in Illinois to create and maintain juvenile detention facilities. (*Id.*) Despite the amendment's effective date, the JTDC remained under Dunlap's control until May 20, 2015. (Chief Judge L.R. 56.1 Stat. ¶ 6.) In a case brought by JTDC employees who challenged employment actions taken by the Transitional Administrator, the Seventh Circuit explained:

> The word "Transitional" in the Administrator's title comes from the fact that Illinois amended its law in 2007 to move management of the Center from the domain of the County's political branches to the domain of the Circuit Court of Cook County, in whose Chief Judge state law now vests authority. . . . The Administrator was supposed to produce an orderly transition from the old regime to the new one.

3

That took a good deal longer than expected.

*Doe v. Cook Cnty., Ill.*, 798 F.3d 558, 560 (7th Cir. 2015) (citing 55 ILCS 75/3(b)).

On May 20, 2015, the district court in *Doe* "terminated [Dunlap's] appointment as transitional administrator." (Chief Judge L.R. 56.1 Stat. ¶ 6.) As of that date, "the OCJ had operational and administrative control over the JTDC" pursuant to the authority granted in the Detention Home Act. (*Id.* ¶ 7; *see* Pls.' L.R. 56.1 Stat. of Undisputed Material Facts ("Pls.' L.R. 56.1 Stat.") [310] ¶ 1.) Pursuant to the Act, the Chief Judge appointed Dixon as the JTDC's Superintendent. (Chief Judge L.R. 56.1 Stat. ¶ 7.) Plaintiffs and the Chief Judge have stipulated that Dixon "was the final decision-maker for the [OCJ] regarding whether to permit the staging and filming of scenes for *Empire* at the [JTCD]" and "whether and how the JTDC's operations would be altered in order to accommodate the *Empire* filming." (Stip., Ex. 2 to Pls.' Mot. [310-2]); Pls.' L.R. 56.1 Stat. ¶ 2; Chief Judge L.R. 56.1 Stat. ¶ 8.) Further, the parties agree that "[f]or purposes of governmental entity liability in this case," the OCJ "is not different from the Chief Judge . . . in his official capacity." (Pls.' L.R. 56.1 Stat. ¶ 3.) This stipulation and agreement confirm that Plaintiffs are entitled to summary judgment that Dixon is the Chief Judge's final decisionmaker with respect to the *Empire* filming.

## PROCEDURAL HISTORY

In 2017, Defendants filed several motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). Relevant here, the Chief Judge asserted Eleventh Amendment immunity as an affirmative defense. *See T.S. v. Twentieth Century Fox Television*, No. 16 C 8303, 2017 WL 1425596, at *7 (N.D. Ill. Apr. 20, 2017) ("MTD Order"). The Chief Judge maintained that his function under the Detention Home Act is limited: he has power only to appoint an administrator to work as the JTDC's Superintendent, appoint other necessary personnel, and control the JTDC's budget. *Id.* at *8. Accordingly, the Chief Judge argued, he is entitled to immunity because "even if administration under the Detention Home Act is a county function[,]" Dixon "is the individual with administrative authority over the JTDC pursuant to the Act." *Id.* Judge St. Eve, who was presiding

4

over this case at the time, determined that the record was unclear regarding "which final policy decision-maker allowed the Fox Defendants to film *Empire* at the JTDC." *Id.* She concluded that "[u]ntil the parties take discovery" to clarify that issue, "the Chief Judge's Office remains a Defendant to this lawsuit." *Id.*

As reflected in the parties' stipulation that Dixon was the final decision-maker "for the OCJ" regarding the *Empire* filming, the Chief Judge has abandoned his argument that he is entitled to immunity on the ground that the Chief Judge lacks operational or administrative control over JTDC. (*See* Chief Judge L.R. 56.1 Stat. ¶ 8; Pls.' Reply & Resp. at 7 n.3 (maintaining that the Chief Judge has abandoned that argument); *see generally* Chief Judge Reply in Supp. of Cross-Mot. for Summ. J. [340] (offering no rebuttal on that point).) What remains is the argument that the Chief Judge is entitled to Eleventh Amendment immunity because he is acting on behalf of the State of Illinois, rather than the County of Cook, in his administrative role with respect to JTDC.

## **DISCUSSION**

Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute exists, and summary judgment is precluded, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the initial burden of showing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On cross-motions for summary judgment, a court examines the record and makes "all reasonable inferences in the light most favorable to the party against whom the motion was filed." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019).

The Eleventh Amendment bars lawsuits for damages against the states. U.S. CONST. amend. XI. It does not "extend to counties and similar municipal corporations," however. *DeGenova v. Sheriff of DuPage Cnty.*, 209 F.3d 973, 975 (7th Cir 2000) (quoting *Franklin v. Zaruba*, 150 F.3d 682, 684 n.2 (7th Cir. 1998)). The Chief Judge argues that he is a state officer

when he administers the JTDC, and that he is therefore entitled to immunity under the Eleventh Amendment. Plaintiffs contend that the Chief Judge is a county officer when he occupies this role, not shielded by the Eleventh Amendment, and that this lawsuit against him can therefore proceed.

The Supreme Court's decision in *McMillian v. Monroe County, Alabama*, 520 U.S. 781 (1997), supplies the framework for determining whether the Chief Judge acts as an arm of the state or county when he administers the JTDC. In *McMillian*, the Court held that "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties." *Id.* at 793. It observed, first, that "the question is not whether" a government official—in *McMillian*, the defendant-sheriff—acts for the state or county "in some categorical, 'all or nothing' manner." *Id.* at 785. Rather, a court must ask whether state law provides that the official is a final policymaker in the "particular area" or on the "particular issue" in dispute. *Id.*; *see also, e.g.*, *DeGenova*, 209 F.3d at 975-76; *Scott v. O'Grady*, 975 F.2d 366, 371 (7th Cir. 1992) ("The fact that [the defendants] normally act as county officials does not mean that they can *never* act as an arm of the state."). Next, a court must determine whether the government official is a final policymaker for the state or a local entity on the relevant issue. *See McMillian*, 520 U.S. at 786. This, too, is a question of state law. *See id.*; *see also, e.g.*; *DeGenova*, 209 F.3d at 976. State law cannot provide the answer by "simply labeling" the official as a state or county actor. *See McMillian*, 520 U.S. at 786. Instead, what matters is how state law defines the official's "actual function" in the "particular area." *Id.*

The Seventh Circuit has applied the *McMillian* framework in determining that "Illinois sheriffs are county officers when they manage [a] jail." *DeGenova*, 209 F.3d at 977.[3] In *DeGenova*, the court first explained that the relevant Illinois statutes—and the ways in which the

---

[3] As the Court in *McMillian* stated, because "the role of sheriffs and the importance of counties vary from State to State, there is no inconsistency created by court decisions that declare sheriffs to be county officers in one State, and not in another." 520 U.S. at 795.

6

Illinois Supreme Court and the Seventh Circuit have interpreted them—show that "Illinois sheriffs have final policymaking authority over jail operations." *Id.* at 976. Next, the court determined that state law indicates that Illinois sheriffs are policymakers for a local entity when they manage a jail. *See id.* The court observed that the Illinois Constitution "designates the Sheriff as a county officer" and stated that although "[t]his strongly indicates that the Sheriff is an agent for the county," it does not end the inquiry. *Id.* More conclusive, the court explained, are state laws providing that "the county maintains and furnishes the jail"; the county "bears all of the costs to maintain prisoners"; the "county board builds the jail and provides for the Sheriff's reasonable and necessary expenses"; and "the Sheriff, as warden of the jail, must notify the county board if he decides that the jail is insufficient to secure prisoners." *Id.* (citations omitted). Maintaining that he acted as a state agent in managing the jail, the sheriff in *DeGenova* emphasized that Illinois law "require[s] sheriffs to participate in annual training programs that a State board has approved"; "authorize[s] the State Department of Corrections to inspect the jails at least once a year"; and "permit[s] the governor to remove sheriffs who fail to protect prisoners from a lynch mob." *Id.* The court concluded that these provisions did not change the result because they "merely authorize the State to regulate sheriffs in a very tenuous and indirect manner" and "do not outweigh" the other features of Illinois law that the court discussed. *Id.*

In this case, the parties have stipulated that Dixon was the final policymaker for the OCJ in the areas relevant to this lawsuit: (1) whether to allow the Fox Defendants to film *Empire* at the JTDC and (2) whether and how to alter the JTDC's operations to accommodate the filming. Accordingly, the parties' dispute centers on whether, under Illinois law, the Chief Judge is acting as an officer of the State of Illinois or of Cook County on those issues. To resolve the dispute, the court first consults the Illinois Constitution.

Article VI, Section 1 of the Illinois Constitution vests "judicial power" in the State's Supreme, Appellate, and Circuit Courts. ILL. CONST. art. VI, § 1. Article VI, Section 7 provides that, "[s]ubject to the authority of the Supreme Court," the chief judge of each circuit "shall have

7

general administrative authority over his court . . . ." ILL. CONST. art. VI, § 7(c). Article VI indicates that a circuit's chief judge acts as an arm of Illinois when he or she exercises judicial power. *See, e.g.*, *Drury v. Cnty. of McLean*, 89 Ill. 2d 417, 424, 433 N.E.2d 666, 669, 60 Ill. Dec. 624, 627 (1982) (holding that the clerk of a circuit court "must be a member of State government" because if it were otherwise, a county government could exercise control over the administration of justice—something Article VI neither contemplates nor authorizes). As Plaintiffs correctly state, however, the Chief Judge's final policymaking authority concerning the JTDC does not stem from Article VI. Indeed, the Chief Judge does not exercise judicial power or "administrative authority over his court," ILL. CONST. art. VI, § 7(c), when he operates and administers the JTDC. His policymaking authority in that realm instead arises from the Detention Home Act. Accordingly, Article VI's indication that the Chief Judge acts as an Illinois official when exercising judicial power carries little weight in the court's analysis. Further, neither side identifies a constitutional provision that labels the Chief Judge as an Illinois or county actor in connection with the JTDC. Even if there were such a provision, "simply labeling" an official as one who makes state or county policy does not resolve whether that official is a county policymaker in a specific situation. *McMillian*, 520 U.S. at 786. Therefore, the court next examines how the Detention Home Act defines the Chief Judge's functions in operating and administering the JTDC.

Under the Detention Home Act, the chief judge of a circuit court "shall . . . appoint[ ]" the "administrator and all other necessary personnel of" a juvenile detention home in the county. 55 ILCS 75/3(a); *see also id.* § 75/3(b) (stating that within 180 days after the effective date of the 2007 amendment to the Act, the Chief Judge of the Circuit Court of Cook County "shall appoint an administrator to serve as the Superintendent of the" JTDC, as well as "all other necessary personnel"). In every county, the appointed personnel "serve at the pleasure of" the chief judge. *Id.* § 75/3(a), (b). The Chief Judge of the Circuit Court of Cook County "shall have administrative control over the budget of" the JTDC and any other juvenile detention home in Cook County, "subject to the approval of the Cook County Board . . . ." *Id.* § 75/3(c). This budgetary provision

appears to be unique to Cook County. *See id.*

A county's powers under the Detention Home Act are also relevant to the court's analysis. Any county in Illinois may purchase, build, lease, support, and maintain a shelter home to temporarily care for minors who are delinquent. *Id.* § 75/1(a). It may "levy and collect a tax to pay" for establishing and maintaining the home. *Id.* If a county board determines that the detention home is obsolete, it can, by a majority vote of the board, rebuild or relocate the home. *Id.* § 75/1(b). A county board fixes the monthly salary of a detention facility's superintendent and other necessary personnel. *Id.* § 75/3(a). In addition, upon a superintendent's request, a county board furnishes the "supplies or repairs necessary" to maintain and operate the detention home. *Id.* § 75/3(a), (d). A county board audits and pays the resulting bills in the manner it would for other county institutions. *Id.* "[A]t any time," a county board can require a superintendent to provide any information it desires "concerning the conduct, maintenance or residents of the home." *Id.* § 75/4. Finally, a county's electors can vote to repeal the Detention Home Act in the county. *Id.* § 75/7.

Plaintiffs argue that a county's weighty responsibilities under the Detention Home Act show that Illinois allocated the operation and administration of juvenile detention homes to the counties, not to the state. Plaintiffs emphasize that a county is responsible for purchasing, building, and maintaining juvenile detention homes; must furnish supplies to maintain and repair the homes; can demand relevant reporting from a superintendent; can transfer juvenile detainees to other counties; and can "eliminate [a] juvenile detention center entirely" through its electorate. (Pls.' Mot. at 6.) According to Plaintiffs, these features of the Detention Home Act are similar to features of Illinois law that the Seventh Circuit found dispositive in *DeGenova*, where it held that Illinois sheriffs act as policymakers for the county when they manage jails. (*See id.*; *DeGenova*, 209 F.3d at 976 (noting that counties build and maintain jails, pay all costs of maintaining prisoners, provide for sheriffs' reasonable and necessary expenses, and require sheriffs to notify the county board if they believe that jails cannot sufficiently secure prisoners).)

9

The court is not persuaded that Cook County's role in establishing and financing the JTDC disposes of the question of whether the Chief Judge acts for the County in operating and administering it. A significant consideration under the *McMillian* framework is whether the state or local government directly controls how the official fulfills his duties in the relevant area. *See McMillian*, 520 U.S. at 791. If control over finances does not dictate or significantly influence how an official performs those duties, then having that control does not determine whether the official acts as an arm of the county or the state. *See, e.g.*, *id.* at 791-92 (although a county may deny certain funds for a sheriff in his exercise of law enforcement duties, "this discretion would" "at most" allow the county "to exert an attenuated and indirect influence over the sheriff's operations," and therefore does not transform the sheriff into a county actor); *Drury*, 89 Ill. 2d at 424-25, 433 N.E.2d at 669, 60 Ill. Dec. at 627 ("The fact that counties pay the salaries and expenses of circuit court clerks" (and "fix" the salaries "within statutory limits") "does not make the office of circuit court clerk a county office"). Similarly, a county or state's discretion to exercise oversight over the official's relevant functions does not necessarily mean that it can meaningfully control how an officer performs them. *See DeGenova*, 209 F.3d at 976 (where state-law provisions—including that the state may inspect a jail at least once a year—"merely authorize the State to regulate sheriffs in a very tenuous and indirect manner," they do not show that a sheriff acts for the state when he manages a jail). Like financial control, therefore, oversight authority is not necessarily dispositive under the *McMillian* framework.

The question here is whether the Chief Judge acts as an agent of Cook County when operating and administering the JTDC. The parties agree that operating and administering the JTDC included making decisions about the *Empire* filming. There is no evidence that the County's financial authority or its ability to demand reports from the Superintendent about the JTDC allow it to dictate how the Chief Judge operates and administers the facility. To the contrary, as the Chief Judge emphasizes, the Illinois General Assembly amended the Detention Home Act to prevent the County from controlling the day-to-day administration of the JTDC. (*See, e.g.*, Chief

10

Judge L.R. 56.1 Stat. ¶ 3; Mar. 2007 House Tr. at 48 (bill sponsor arguing that administrative control over the JTDC should be stripped from the county because it was not properly operating the facility); *Doe*, 798 F.3d at 560 (stating that in 2017, the Illinois General Assembly amended the Detention Home Act "to move management of the Center from the domain of the County's political branches to the domain of the Circuit Court of Cook County, in whose Chief Judge state law now vests authority").) The amendment also weakened the County's financial control over the JTDC by giving the Chief Judge administrative control over the budget. *See* 55 ILCS 75/3(c). True, the Chief Judge's budgetary control is subject to the County's approval. *See id.* But in light of the purpose of the amendment to the Detention Home Act, the Illinois General Assembly could not have intended for the County to use its remaining financial and oversight functions as an end-run around the decision to vest operational and administrative control in the Chief Judge. Overall, the amendment to the Detention Home Act and its legislative history weigh heavily against a conclusion that operating and administering the JTDC is a county function. Cook County's authority to replace the JTDC does not tip the balance in the other direction because it is unclear how exercising that option would give the County any control over the current or any new facility's day-to-day operations. Likewise, the voters' authority to eliminate the JTDC by repealing the Detention Home Act does not give the County control over day-to-day operations so long as the JTDC exists.

     Another important consideration is that counties in Illinois have not historically had operational and administrative control over juvenile detention centers. Before the Illinois General Assembly amended the Detention Home Act in 2007, the chief judge's office in every county (other than Cook) administered juvenile detention centers. (*See* Mar. 2007 House Tr. at 48.) The 2007 amendment brought Cook County into line with this practice. Further, there is no evidence that in operating and administering the JTDC, the Chief Judge acts as a policymaker for a quasi-independent Cook County department or office.. *Cf. Franklin*, 150 F.3d at 685 (although sheriffs are not agents of the county for purposes of *respondeat superior*, they are not state agents by

11

default because there is a "third possibility"—"that the sheriff is an agent of the county sheriff's department, an independently-elected office that is not subject to the control of the county in most respects"). Based on the Detention Home Act's descriptions of the Chief Judge's functions, the 2007 amendment to the Act, the amendment's legislative history, and Illinois' history of vesting administrative control of juvenile detention centers in chief judge's offices rather than in counties, the court concludes that the Chief Judge acts as an arm of Illinois when he operates and administers the JTDC.[4]

In *Mathlock v. Fleming*, No. 18 CV 6406, 2019 WL 2866726 (N.D. Ill. July 3, 2019), a court in this district reached a similar conclusion. The issue in *Mathlock* was whether Superintendent Dixon and the OCJ "acted on behalf of the state when hiring, training, and supervising [JTDC] employees to prevent excessive force." *Id.* at *3. Applying the *McMillian* framework, the court observed that the Detention Home Act gives Cook County the power to create, fund, and replace the JTDC, while it gives the Chief Judge the power to "control[ ] its budget and the day-to-day conduct of its officials." *Id.* The court determined that the "county's role in approving the center's budget and setting the salaries of its officials does not outweigh the chief judge's more direct

---

[4] The Chief Judge argues that *Burger v. County of Macon*, 942 F.3d 372 (7th Cir. 2019) compels this conclusion. The plaintiff in *Burger* asserted a Section 1983 claim against the county after she was fired from the State's Attorney's Office for the county. *See id.* at 373-74. The court observed that Illinois law designates State's Attorneys as state officers, but explained that "even decisions by a state officer may constitute county policy . . . when the county can and does delegate county policymaking authority to the state officer." *Id.* at 375. According to the court, this did not occur because an Illinois statute gave "exclusive control over" personnel decisions to the State's Attorney's Office. *Id.* Thus, the county could not have delegated the relevant authority; the State's Attorney's Office did not engage in local policymaking when it terminated the plaintiff's employment; and the plaintiff lacked a viable claim against the county. *Id.* at 375-76. Citing *Burger*, the Chief Judge argues that due to the amendment to the Detention Home Act, Cook County has "no policymaking authority [on the relevant issue] to delegate," and the Chief Judge therefore must act as a policymaker for Illinois when he administers the JTDC. (Chief Judge Br. at 11-12.) The court agrees that the amendment to the Detention Home Act removed Cook County's ability to delegate policymaking authority in the relevant area, and that this factor supports the conclusion that the Chief Judge acts as an arm of Illinois when he administers the JTDC. The court, however, does not interpret *Burger* as indicating that a state officer can act as an arm of the county *only* when the county delegates final policymaking authority to him or her. Therefore, the court does not agree with the Chief Judge that *Burger* dictates the result here.

control" over the functions at issue and was therefore not dispositive under *McMillian*. *Id.* In addition, the court considered the history of juvenile detention facilities in Illinois and of the JTDC specifically. *See id.* It noted that chief judge's offices, rather than counties, historically have administered juvenile detention facilities in the state. *See id.* In addition, it observed that the purpose of the 2007 amendment to the Detention Home Act was "to take control away from the county board and give it to the chief judge." *Id.* The court concluded that Dixon and the OCJ act as agents of the state when they hire, train, and supervise JTDC employees, and that the Eleventh Amendment therefore barred the plaintiffs' claims against them. *Id.* at *4. *Mathlock* is not binding authority, but the court finds its reasoning persuasive.

Plaintiffs argue that the court in *Mathlock* did not properly apply the *McMillian* framework. Specifically, they contend that the court erroneously relied on Article VI's indication that a chief judge is a state actor, and then determined that because the relevant JTDC functions are administered by the Chief Judge, the Chief Judge must be acting on behalf of Illinois when fulfilling them. (*See* Pls.' Mot. 9-10; Pls.' Reply & Resp. at 5-6.) The court disagrees. In *Mathlock*, the court indeed stated that "[i]n Illinois, the Office of the Chief Judge is a state entity." 2019 WL 2866726, at *2 (citing *Drury*, 89 Ill. 2d at 427, 433 N.E.2d at 670, 60 Il. Dec. at 628). But it did not rely on that label. Instead, it correctly recognized that the question "is not whether [the Chief Judge] is a state official 'in some categorial 'all or nothing' manner,'" but instead "whether he is a final policymaker for Illinois or Cook County on the particular issue of hiring, training, and supervising" JTDC employees. *Mathlock*, 2019 WL 2866726, at *2 (quoting *McMillian*, 520 U.S. at 785). The court then examined the Detention Home Act and its history, and explained why both indicate that the Chief Judge acts as an arm of Illinois in the relevant functions. *See Mathlock*, 2019 WL 2866726, at *2-4. The analysis in *Mathlock* is sound.

Nor is this court's ruling (or that in *Mathlock*) inconsistent with Judge St. Eve's analysis at the 12(b)(6) stage. Plaintiffs maintain that Judge St. Eve "rejected" the Chief Judge's argument that he is a state actor for purposes of this case. (Pls.' Mot. at 3; *see also id.* at 4 (suggesting that

13

Judge St. Eve determined that the Chief Judge exercises "county administrative authority" when he operates the JTDC).) This argument is misleading. Judge St. Eve recognized that the Chief Judge's administrative authority over the JTDC arises from the Detention Home Act. MTD Order, 2017 WL 1425596, at *7. She also observed that a court must look to the Act to determine whether the Chief Judge acts as a policymaker for the state or the county in the area at issue. *See id.* at *8. But Judge St. Eve never answered that question. Rather, she concluded that it would not be appropriate to do so without further discovery. *See id.* It was on that basis that she refused to dismiss the claims against the Chief Judge. *See id.*

Plaintiffs also urge the court to follow *McKinney v. Franklin County, Illinois*, 417 F. Supp. 3d 1125 (S.D. Ill. 2019). There, a district court determined that the director of court services for the Second Judicial Circuit—to whom the chief judge of that circuit had delegated responsibility for managing Franklin County's juvenile detention facility—acted as an agent of Franklin County in that role. *See id.* at 1131, 1138. As here, the court observed that the official's relevant functions arose from the Detention Home Act, not Article VI of the Illinois Constitution. *See id.* at 1138. Relatedly, the court declined to rely on Article VI's suggestion that a chief judge is a state actor. *See id.* But the court took a different view of how the county's financial and oversight responsibilities under the Detention Home Act affect the *McMillian* analysis. According to the court in *McMillian*, those responsibilities show that the director of court services acts as a policymaker for the county when administering a juvenile detention facility. *See id.* (concluding that the director of court services "functioned as [a] county employee[ ] relative to" the juvenile detention center because the county "is solely responsible for" the center's "budget and finances", "maintains and furnishes" the center, "bears most of the costs to maintain detainees", and requires the director of court services to "notify and confer with the County Board regarding the operation of the Center and any issues arising at the Center").

The court, respectfully, finds *McKinney* unpersuasive in the present circumstances. Because *McKinney* concerned Franklin County, the court understandably did not discuss the

14

2007 amendment to the Detention Home Act, which affected only Cook County. As discussed above, the amendment and its legislative history are strong indicators that operating and administering the JTDC are state functions. So, too, is the fact that Illinois' chief judges, rather than its counties, historically have administered juvenile detention facilities. The court in *McKinney* did not consider this factor. Additionally, for the reasons explained above, Cook County's financial control over JTDC and its ability to demand reporting from the Superintendent do not "translate into control" over the Chief Judge's exercise of his administrative functions. *McMillian*, 520 U.S. at 791. Nor does the county's authority to replace the JTDC or the voters' power to eliminate it by repealing the Detention Home Act. Finally, as noted, the Detention Home Act gives the Chief Judge administrative control over the JTDC's budget. *See* 55 ILCS 75/3(c). The Act does not do the same for chief judges in other counties. *See id.*; *see also McKinney*, 417 F. Supp. 3d at 1138 ("Franklin County . . . is solely responsible for [the center's] budget and finances."). Franklin County, therefore, presumably has greater ability than Cook County to directly control how the chief judge's office operates and administers its juvenile detention center. This factor sets *McKinney* apart from the instant case and from *Mathlock*.

The court concludes that the Chief Judge acts an arm of the State of Illinois when he operates and administers the JTDC. Accordingly, the court grants the Chief Judge's motion for summary judgment that the Eleventh Amendment bars Plaintiffs' claims against him and denies Plaintiffs' motion for summary judgment seeking the opposite result. Given this result, the court need not consider whether the Chief Judge is a person subject to suit under Section 1983.

## **CONCLUSION**

For the foregoing reasons, the court grants the Chief Judge's Motion for Summary Judgment that all claims against him are barred by the Eleventh Amendment [323] and denies Plaintiffs' Motion for Partial Summary Judgment that the Chief Judge is not entitled to Eleventh Amendment immunity [310]. The court grants Plaintiffs' Motion for Partial Summary Judgment that Dixon was the Chief Judge's final decision-maker regarding (1) whether to permit the *Empire*

filming at the JTDC and (2) whether and how to alter the JTDC's operations to accommodate the filming [310].

                                        ENTER:

Dated: November 23, 2020

                                        _____
                                        REBECCA R. PALLMEYER
                                        United States District Judge