# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| T.S. *et al.*,<br><br>               Plaintiffs,<br><br>       v .<br><br>Twentieth Century Fox Television, a division of<br>Twentieth Century Fox Film Corporation et al.,<br><br>           Defendants. | Case No. 1:16-cv-08303<br><br>Honorable Chief Judge<br>Rebecca Pallmeyer |

## MEMORANDUM OF LAW OF THE COUNTY OF COOK, ILLINOIS, AND LEONARD DIXON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 4

    Cook County Executed Dixon's Instruction to Provide Access to 20th TV..................... 5

    JTDC Staff Prepare for 20th TV's Arrival in June 2015 .................................................. 6

    JTDC Staff Prepare for 20th TV's Return In July 2015 ................................................... 7

    JTDC Staff Prepare for 20th TV's Final Visit in August 2015 ....................................... 8

    Impacts of Filming on T.S., Q.B., and H.C. ................................................................... 10

    Impact of Filming on Schooling at the JTDC ................................................................ 11

    Impact of Filming on Non-School Programming ........................................................... 12

    Impact of Filming on Recreation at the JTDC ............................................................... 12

    Impact of Filming on Family Visitation ......................................................................... 13

    Impact of Filming on Pod Population ............................................................................. 14

LEGAL STANDARD................................................................................................... 15

ARGUMENT ............................................................................................................... 16

I.     Plaintiffs' Claims Against All Defendants Fail Because The Conditions At Issue Were Not "Objectively Serious" Deprivations of "Life's Necessities ........................... 16

II.    Plaintiffs' Claims Against Cook County Fail Because Cook County Had No Control Over Their Conditions of Detention ................................................................. 19

III.   The Claims Against Dixon are Barred by Eleventh Amendment and Sovereign Immunity, and the Evidentiary Record Supports No State Law Claim By Plaintiffs Against Dixon ............................................................................................................... 22

CONCLUSION............................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andersen v. Village of Glenview*,
 821 F. App'x 625 (7th Cir. 2020) ...........................................................21

*Antonelli v. Sheahan*,
 81 F.3d 1422 (7th Cir. 1996) .................................................................26

*Bell v. Wolfish*,
 441 U.S. 520 (1979)..........................................................................1, 25

*Bernard v. Scott*,
 No. 3:15-cv-50277, 2020 WL 6825696 (N.D. Ill. Nov. 20, 2020) .........................17

*Blow v. Bijora, Inc.*,
 855 F.3d 793 (7th Cir. 2017) .................................................................16

*Boston v. Dart*,
 No. 14 CV 8680, 2016 WL 5373083 (N.D. Ill. Sept. 26, 2016)............................17

*Bristow v. Drake Street, Inc.*,
 41 F.3d 345 (7th Cir. 1994) ...................................................................30

*Brooks v. Ross*,
 578 F.3d 574 (7th Cir. 2009) .................................................................24

*Burton v. Downey*,
 805 F.3d 776 (7th Cir. 2015) .................................................................17

*Cairel v. Alderden*,
 821 F.3d 823 (7th Cir. 2016) .................................................................21

*Calderone v. City of Chicago*,
 979 F.3d 1156 (7th Cir. 2020) ................................................................25

*Colbruno v. Kessler*,
 928 F.3d 1155 (10th Cir. 2019) ...............................................................18

*Day v. Jeffreys*,
 No. 19-CV-945, 2019 WL 6701671 (S.D. Ill. Dec. 9, 2019) ...............................27

*DeShaney v. Winnebago County Dep't of Social Services*,
 489 U.S. 189 (1989)......................................................................3, 27, 28

*Feltmeier v. Feltmeier,*
  798 N.E.2d 75 (Ill. 2003) .................................................................................4

*French v. Owens,*
  777 F.2d 1250 (7th Cir. 1985) ........................................................................26

*Gerber v. Elkhart County Correctional,*
  No. 3:18-CV-864-RLM-MGG, 2020 WL 2526492 (N.D. Ind. May 18, 2020) ....................18

*Graham v. Commonwealth Edison Co.,*
  742 N.E.2d 858 (Ill. Ct. App. 2000) .........................................................29, 30

*Hardeman v. Curran,*
  933 F.3d 816 (7th Cir. 2019) .........................................................1, 2, 17, 18

*Healy v. Vaupel,*
  548 N.E.2d 1240 (Ill. 1990) ...........................................................................23

*Hernandez v. Cate,*
  No. EDCV 11-00627 R AJW, 2014 WL 6473769 (C.D. Cal. Oct. 16, 2014) .................28

*Hickman v. St. Clair County Jail,*
  No. 20-cv-266-JPG, 2020 WL 3489239 (S.D. Ill. June 26, 2020) ...........................18

*Honaker v. Smith,*
  256 F.3d 477 (7th Cir. 2001) .........................................................................21

*Jackson v. Elrod,*
  881 F.2d 441 (7th Cir. 1989) .........................................................................25

*James v. Hale,*
  959 F.3d 307 (7th Cir. 2020) .........................................................................16

*Jett v. Brookhart,*
  No. 3:17-cv-517-MAB, 2020 WL 5602822 (S.D. Ill. Sept. 18, 2020) ....................26

*Johnson v. Winters,*
  No. 10 C 5480, 2013 WL 4029114 (N.D. Ill. Aug. 8, 2013) .................................24

*Lawlor v. N. Am. Corp. of Ill.,*
  983 N.E.2d 414 (Ill. 2012) .............................................................................28

*Mathlock v. Fleming,*
  No. 18 CV 6406, 2019 WL 2866726 (N.D. Ill. July 3, 2019) ...........................22, 23

*Mays v. Emanuele,*
  No. 18-cv-1057-pp, 2020 WL 4934612 (E.D. Wis. Aug. 24, 2020) ......................18

*Mulvania v. Sheriff of Rock Island County*,
    850 F.3d 849 (7th Cir. 2017) ........................................................................18

*Orenic v. Illinois State Labor Relations Bd.*,
    537 N.E.2d 784 (Ill. 1989) ...........................................................................23

*Payne v. County of Cook*,
    No. 15 C 3154, 2016 WL 1086527 (N.D. Ill. Mar. 21, 2016) ................................23

*Pearson v. Ramos*,
    237 F.3d 881 (7th Cir. 2001) .........................................................................26

*Richman v. Sheahan*,
    270 F.3d 430 (7th Cir. 2001) .....................................................................23, 24

*Rua v. Glodis*,
    52 F. Supp. 3d 84 (D. Mass. 2014) ..................................................................28

*Smith v. Dart*,
    803 F.3d 304 (7th Cir. 2015) .........................................................................26

*Sperry v. Corizon Health, Inc.*,
    No. 18-3119-SAC, 2020 WL 905745 (D. Kan. Feb. 25, 2020)...............................28

*Surratt v. McClaran*,
    234 F. Supp. 3d 815 (E.D. Tex. 2016), *aff'd sub nom. Surratt v. McClarin*,
    851 F.3d 389 (5th Cir. 2017) .........................................................................28

*T.S. v. Twentieth Century Fox Television*,
    2017 WL 1425596 (N.D. Ill. Apr. 20, 2017) ......................................18, 20, 21, 29

*T.S. v. Twentieth Century Fox Television*,
    2020 WL 5868944 (N.D. Ill. Aug. 31, 2020) .....................................................26

*T.S. v. Twentieth Century Fox Television*,
    2020 WL 6870809 (N.D. Ill. Nov. 23, 2020) ............................................... *passim*

*T.S. v. Twentieth Century Fox Television*,
    334 F.R.D. 518 (N.D. Ill. 2020).................................................................8, 16, 27

*Thomas v. Martija*,
    No. 16 C 8718, 2020 WL 3192856 (N.D. Ill. June 15, 2020) ................................15

*Turner v. City of Champaign*,
    979 F.3d 563 (7th Cir. 2020) .........................................................................15

*Williams v. Collins*,
    No. 14 C 5275, 2015 WL 4572311 (N.D. Ill. July 29, 2015) ................................17

*Williams v. Edwards,*
    No. 10 C 1051, 2012 WL 983788 (N.D. Ill. Mar. 22, 2012) ...................................................20

**Statutes**

725 ILCS 205/8 .................................................................................................................27

42 U.S.C. § 1983 ................................................................................... *passim*

Ill. Comp. Stat. 505/8(d) (2012) .................................................................................23

Local Government and Governmental Employees Tort Immunity Act, 745 ILCS
    10/9-102 .................................................................................................................20

**Other Authorities**

Eleventh Amendment ....................................................................................................1, 22

Rule 12(b)(6) ................................................................................................................10

## PRELIMINARY STATEMENT

Discovery conclusively disproved the claims made by Plaintiffs T.S., Q.B., and H.C.,[1] that "the severity and duration of the conditions [they] allegedly experienced" while detained at the Cook County Juvenile Temporary Detention Center (the "JTDC"), "were so significant that . . . they violated the Constitution." *Hardeman v. Curran*, 933 F.3d 816, 823-24 (7th Cir. 2019). In the seminal case of *Bell v. Wolfish*, 441 U.S. 520, 542 (1979), the Supreme Court held that detainees can prevail in a Due Process claim only if they have "endure[d] genuine privations and hardship over an extended period of time," enough to constitute "punishment." A claim of "punishment," according to the Seventh Circuit, requires, at a minimum, conditions that go "far beyond inconvenience." *Hardeman*, 933 F.3d at 824. Plaintiffs have not cleared this high bar. The Court therefore should grant summary judgment in favor of Cook County and JTDC Superintendent Leonard Dixon (together, the "Government Defendants").[2]

Plaintiffs are adults now, but in the summer of 2015 they were minors detained at the JTDC. That summer, JTDC officials gave Twentieth Century Fox Television ("20th TV") permission for the cast and crew of the fictional television show *Empire* to enter the facility in order to film scenes for the program. This occurred on five consecutive days in June 2015, four days in July, and three days in August. The filming yielded benefits for JTDC detainees, including the opportunity to watch some of the filming and to meet *Empire* cast members. At the same time, accommodating

---

[1] On July 1, 2020, Plaintiffs sought leave to file a Third Amended Complaint ("TAC") adding H.C. as a plaintiff. *See* Dkt. No. 365. Although the Court has not yet ruled on H.C.'s ability to join the case, this motion addresses H.C.'s allegations.

[2] Plaintiffs also sued the Office of the Chief Judge of Cook County Circuit Court (the "Chief Judge"). On November 23, 2020, the Court held that the Chief Judge has Eleventh Amendment immunity from Plaintiffs' claims and dismissed him from the case. *See* Dkt. No. 405; *T.S. v. Twentieth Century Fox Television*, 2020 WL 6870809 (N.D. Ill. Nov. 23, 2020). Although the Chief Judge, having been dismissed, is not a party to this motion, the Government Defendants' arguments would be equally applicable to the Chief Judge.

the filming also involved temporary and minor changes to routines at the JTDC. The principal changes were the closing of at least two of three sections of the facility's outdoor yard for several days, shifting family visitation for four days (two in June, two in July) from one room to another, conducting three days of July summer school classes in detainees' living quarters rather than school classrooms, and cancelling or postponing some voluntary after-school meetings. JTDC officials decided that the benefits of filming outweighed these minor inconveniences.

T.S. and Q.B. appear to have missed **one day** of recreation outside of their living quarters, out of 12 filming days, perhaps because of the filming; H.C. appears to have missed two days of off-pod recreation. **One** of T.S.'s family visits occurred in a room other than the dedicated visiting area, and he contends (without evidence beyond his say-so) that the tables were set more closely together than the typical arrangement and that he perceived less privacy as a result. Q.B. had **one** family visit canceled, but because all other residents in Q.B.'s "pod" of detainees had normal visits that day, Q.B. has no basis to contend that filming had anything to do with the decision of JTDC staff to deny him that single visit. T.S. experienced **one day** of summer school classes in his living quarters and contends (again, without evidence beyond his say-so) that school was less effective than it would have been in a classroom. T.S. and H.C. missed **one** session of a twice-monthly "Free Write" after-school class that they attended with some regularity.

Plaintiffs cannot cite a case from any jurisdiction in which a court held temporary and minor inconveniences like those at issue here sufficient to state a constitutional claim under 42 U.S.C. § 1983. In response to this motion, therefore, Plaintiffs are likely to argue—as they did in support of their pending motion for class certification—that if they can successfully challenge Dixon's *motive* for allowing filming at the JTDC, they can sue even for minor issues. *See* Dkt. No. 351 at 22-23. They are wrong, for at least two reasons. First, the *Hardeman* "far beyond

inconvenience" standard bars Plaintiffs' claims irrespective of Dixon's motive. Second, the evidence demonstrates that Dixon's motive, if relevant, was entirely legitimate.

Before authorizing the filming, Dixon talked to 20th TV personnel about setting up opportunities for detainees to meet *Empire*'s African-American stars, and received positive indications that this could happen (as, indeed, it did). Dixon is a highly experienced juvenile detention administrator, and precedent requires courts to defer to detention administrators' judgment in matters where detainees ask courts to second-guess those decisions.

Plaintiffs contend that Dixon authorized the filming for self-interested reasons, so that he personally could meet the *Empire* stars. Not a single witness, however, contradicted Dixon's testimony that he believed allowing the filming was in the best interests of detainees at the JTDC.

The Court already has ruled that the Chief Judge of Cook County Circuit Court, who oversees the JTDC by operation of Illinois state law, performs a *state* function when doing so, not a Cook County function. *T.S.*, 2020 WL 6870809, at *5-*8. Dixon works for the Chief Judge in carrying out this function, and the parties have stipulated that the Chief Judge delegated the relevant decision-making authority to Dixon. *See* Dkt. No. 293-2 ("Dixon had final decision-making authority for the [Chief Judge] to decide" whether to permit 20th TV to film and how to accommodate the filming.) Dixon, therefore, is entitled to the same immunity as the Chief Judge.

Plaintiffs' claims against Dixon, for breach of fiduciary duty and for intentional infliction of emotional distress ("IIED") also fail for reasons apart from Dixon's immunity. Any fiduciary duty Dixon had to protect the "safety and general well-being" of JTDC detainees, as set forth in *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 200 (1989), has the same contours as the same constitutional duty enforceable against him through Section 1983. Plaintiffs' inability to demonstrate more than minor inconveniences is equally fatal to their fiduciary breach

claim. Plaintiffs have barely mentioned their IIED claim since the pleading stage and cannot establish that the inconveniences they experienced rose to the level of "extreme and outrageous." None of the three Plaintiffs sought medical care for emotional distress or produced any evidence suggesting they suffered any. The psychiatrist whose opinion Plaintiffs submitted in connection with Plaintiffs' class certification motion did not examine any of the three Plaintiffs. Plaintiffs thus cannot establish that the conduct they challenge caused them "*severe* emotional distress." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003)(citation omitted).

As for Cook County, all that the County did in this case was draft a contract, at Dixon's direction, specifying where and when 20th TV could film at the JTDC, and memorializing that 20th TV had to defer to directions given it by JTDC officials and could not interfere at any time with facility operations. Plaintiffs adduced no basis to argue that Andrew Kruzel, the Cook County real estate official who drafted the contract, had reason to believe that detainees would be negatively impacted by the filming. Kruzel certainly had no meeting of the minds with Dixon intending to deprive detainees of any rights, and no other County employee's conduct is at issue. Plaintiffs' claims against Cook County—under Section 1983, for conspiracy, for IIED, and based on theories of *respondeat superior* and indemnity, therefore fail.

The Court should grant summary judgment in the Government Defendants' favor on all remaining counts of Plaintiffs' TAC and bring this litigation to a close.

## FACTUAL AND PROCEDURAL BACKGROUND

T.S. was detained at the JTDC from December 3, 2014, until September 24, 2015. SUMF ¶ 36. Q.B. spent six weeks at the JTDC from June until mid-July 2015, was not detained during the July filming period, but returned to the JTDC from August 2015 through January 2016. SUMF ¶ 37. H.C. arrived at the JTDC in May 2015 and remained in detention until June 2016.

SUMF ¶ 38.  T.S. and H.C. thus were detained during all three periods in June, July, and August 2015, when 20th TV filmed at the JTDC.  SUMF ¶ 2.  Q.B. was detained only for the June and August filming periods.  *Id.*  All three were 17 at the time.

The Fox Defendants' Motion for Summary Judgment explains how 20th TV approached Dixon with a request to film at the JTDC, Dixon's approval of that request, and Cook County's entry into a "Location Agreement" with 20th TV to permit the filming.  The Government Defendants adopt and incorporate by reference the Fox Defendants' Factual Background discussion.  Below, the Government Defendants will address subjects to which the Fox Defendants were not privy, including the JTDC's internal planning for 20th TV's presence and the impacts on filming on the three Plaintiffs.

### Cook County Executed Dixon's Instruction to Provide Access to 20th TV

When Dixon worked at a detention facility in Miami in the 1980s, a movie studio filmed in its juvenile wing, and Dixon recalled those detainees having enjoyed the experience. SUMF ¶ 25.  That personal history formed part of Dixon's basis for being receptive to 20th TV's request to film at the JTDC, as he believed it would have a positive effect on the staff and the JTDC residents.  SUMF ¶ 26. Dixon also thought that detainees would benefit from meeting some of the stars of *Empire*, and he did not agree to allow the filming until 20th TV confirmed to him that actors potentially would be willing to meet with detainees.  SUMF ¶ 27.  *Empire* featured "African-American actors, and [the JTDC] is basically African-Americans," so Dixon "wanted [detainees] to be exposed to the actors so they could talk to them."  *Id.*

After Dixon decided that he wanted to give 20th TV access to the facility, he directed the JTDC's in-house general counsel, Zenaida Alonzo, to work with Cook County and the Office of the Chief Judge to determine if the JTDC could accommodate 20th TV's request.  SUMF ¶ 28.

Alonzo contacted Kruzel, the Cook County real estate official, and Kruzel drafted an agreement for 20th TV to execute. SUMF ¶¶ 11, 23-24. Kruzel began with a standard form that Cook County uses for similar types of access requests and modified it to address the unique needs of the JTDC. SUMF ¶ 12. In particular, Kruzel added a provision requiring 20th TV to "cooperate with . . . JTDC administration . . . so that normal operations of the [JTDC] and its occupants, and access by the public, are not disrupted in any manner whatsoever." SUMF ¶ 14. Kruzel dealt directly with 20th TV regarding the Location Agreement, and 20th TV requested only minor changes to the draft—*not* to the "normal operations" provision—to which Kruzel agreed. *See* Ex. 11 49:20-52:19 & Ex. 15; SUMF ¶ 15. Cook County and 20th TV executed addenda to the original agreement when 20th TV requested, and Dixon agreed, to allow additional filming on dates in July and August 2015. SUMF ¶ 33, 35; Ex. 5 299:2-13.

### *JTDC Staff Prepare for 20th TV's Arrival in June 2015*

According to JTDC Deputy Executive Director William Steward, when JTDC detainees heard that *Empire* was coming to film, detainees were "excited about it." SUMF ¶ 36; Ex. 17 176:2-11. "[S]taff morale went up tremendously," too. *Id.* Similar to situations in which JTDC detainees were able to meet U.S. Representatives John Lewis and Maxine Waters, "it's beneficial"; "there is an energy that's created." SUMF ¶ 36; Ex. 17 309:5-310:3.

From the perspective of JTDC's executive staff, having filming occur inside the facility was unusual, but hosting a large number of visitors was not. Just prior to Steward's deposition, Steward had coordinated an event inside the JTDC attended by 225 visitors. SUMF ¶ 31. To plan for the first (and, at that time, only) contemplated filming period, JTDC executive Gene Robinson prepared a work plan that involved keeping Pods 3A and 3B vacant, and therefore using other pods to house detainees during their first 24-72 hours of detention. SUMF ¶ 29-30. He also planned to

shift family visits for two days to a classroom. *Id.*; Ex. 27. The purpose of Robinson's plan 'was to make sure . . . that all services were rendered during the time of the filming, . . . that no services [were] halted." SUMF ¶ 29. Dixon approved Robinson's plan. *See* Ex. 5 91:7-9. On one of the June days that the *Empire* cast filmed at the JTDC, Dixon and some of his staff members posed for pictures with them. Dixon currently displays those pictures in and around his office at the JTDC. *See* Ex. 5 150:16-151:15.

### JTDC Staff Prepare for 20th TV's Return In July 2015

After the June filming dates, JTDC executive Bill Kern wrote an after-action memo stating that it was "great to see excitement around the building for a change," and that filming yielded only "minor interruptions/distractions to daily functions/tasks/routine although the whole operation seemed to run smooth." SUMF ¶ 32. Kern questioned whether detainees' inability to use the outdoor yard affected their ability to "burn off energy" during summer break." *Id.* "Overall," however, he "thought that Empire had a positive impact on the JTDC and brought good energy into the center and community." *Id.* Kern thought the experience could have been enhanced for detainees if they could meet the *Empire* actors, and this occurred during the subsequent filming periods. *Id.*

On July 24, 2015, Dixon wrote to one of the outside experts who had been involved in the *Doe* litigation that "[t]he Empire filming had no impact on regular programming for our kids other than changing the locations of some programs and visits." Ex. 43. He stated that "JTDC residents were never placed on lockdown due to Empire filming," that "[a]ll visits from social workers and others from private agencies were conducted in alternative locations within the JTDC, and that he "ensure[d] that the kids received the highest quality of care and were not negatively impacted by the 'Empire' filming." *Id.* Dixon believed that the outside expert had a profit motive in seeking

to raise concerns about the filming, and in an email to his wife after he responded to the expert, Dixon said the filming "is a once in a lifetime event for these kids an[d] staff. I will not[] back off for what's best for the facility and the kids." Ex. 44.

Based upon what he considered to be a successful experience in June, Dixon approved 20th TV's request to return to the facility in July for reshoots. SUMF ¶ 33. 20th TV pushed to be able to film in the JTDC's medical treatment area during the July filming, but Dixon refused that request. SUMF ¶ 73. Although Plaintiffs' Second Amended Complaint ("SAC," Dkt. No. 88) and TAC allege that responses to medical complaints might have been slowed, none of the three Plaintiffs has a personal complaint in that regard. *See T.S. v. Twentieth Century Fox Television*, 334 F.R.D. 518, 532-33 (N.D. Ill. 2020). The JTDC's records reflect that medical treatment proceeded normally during filming.[3] SUMF ¶¶ 74-75. Robinson's work plan for the July filming period included shifting family visits to a classroom again for two days, shifting school classes to detainees' pods on July 14-16, and once again relocating intake activities to pods other than 3A and 3B. SUMF ¶ 34.

### *JTDC Staff Prepare for 20th TV's Final Visit in August 2015*

20th TV requested, and Dixon approved, a third and final filming session in August 2015. Ex. 5 299:2-13. In exchanging emails with 20th TV personnel, Dixon's assistant Yvonne Akins requested that 20th TV provide Dixon with a "director's chair," but never stated this as a precondition for 20th TV's return, and Dixon authorized 20th TV's return without any promise of receiving a director's chair. Ex. 48. Dixon acknowledged having asked for the chair. Ex. 5

---

[3]    Brian Conant, director of health services, testified that he "went back and looked at our productivity statistics during those [filming] time periods and found no decrease in our number of [medical] referrals, no decrease in the number of—really, any of our statistics." SUMF ¶ 60; Ex. 38 125:24-126:9. For the provision of mental health services, as well, it was "business as usual." SUMF ¶ 60; Ex. 38 131:18-132:2, 139:6-19.

284:10-286:3. 20th TV ultimately provided a chair to Dixon with the *Empire* logo, incurring a cost of approximately fifty dollars to do so. *See* Ex. 4 118:22-119:4. Akins testified that Dixon was "excited" when he learned that 20th TV would bring him a director's chair. Ex. 12 56:9-57:1. As Robinson had done before, he prepared a schedule and work plan. SUMF ¶ 35. The schedule included closing the outdoor yards from August 23-26 and once again relocating intake activities out of Pods 3A and 3B, but "visitation will continue as normal." *Id.*

\* \* \*

Plaintiffs deposed numerous JTDC officials and employees. The testimony was consistent: filming had no significant impact on facility operations. The lone JTDC official who mentioned anything negative was JTDC Director of Gender Services Anna Buckingham. Ms. Buckingham testified to having heard "vague discomfort about restricted movement" and answered yes to Plaintiffs' question "[w]ere you frustrated that you could not provide programming that you had planned to the residents." Ex. 31 89:6-90:4. Ms. Buckingham said that "the residents that I interacted with did not seem pleased about the filming" because "[t]hey had complaints about the restricted movement" and "[t]hey had complaints about a television show depicting prison life while they were detained." Ex. 31 91:6-18; SUMF ¶ 32.

Plaintiffs also deposed Ryan Keesling, who ran the outside "Free Write" program. He testified that "[b]ased on conversations with [detainees] after the filming was over," including T.S. and H.C., he heard that detainees "were not allowed to leave their living units." Ex. 49 65:9-17. He had no first-hand knowledge of any such restrictions, and as the record makes clear, it simply was not true that detainees "were not allowed to leave their living units" during filming. Keesling also noted that Free Write never operates in August (*id.* 48:18-49:6), and that the program typically is canceled "a couple times a year" by the JTDC for various reasons (*id.* 63:5-24).

### *Impacts of Filming on T.S., Q.B., and H.C.*

Plaintiffs filled their Complaint (Dkt. No. 1), First Amended Complaint (Dkt. No. 23), and SAC, with false allegations that Plaintiffs disavowed when questioned under oath. The JTDC's infirmary was **not** "used as a film set" (SAC ¶ 36), and **no** "sick call requests were ignored" as a result (*id.* ¶ 43). SUMF ¶¶ 73-75. Plaintiffs withdrew those claims from the TAC, but the damage already had been done. When the Court denied the Government Defendants' Rule 12(b)(6) Motion to Dismiss, it did so on the basis that "Plaintiffs' allegations regarding the denial of access to the infirmary and the rejected sick-call requests—alone—state[d] an actionable claim." Dkt. No. 73 (Order dated April 20, 2017), at 9.

Where Plaintiffs did not invent their allegations from whole cloth, they exaggerated them. Plaintiffs claimed in the SAC that "[d]uring *Empire* filming, [detainees] did not leave [their living areas] for recreation." SAC ¶ 47(c). They alleged that Q.B. "never received recreation during *Empire*'s filming." *Id.* ¶ 48(d). None of this was true. On days *Empire* filmed in one section of the JTDC's outdoor yard, recreation still occurred normally in the JTDC's two large gymnasiums. SUMF ¶¶ 54-55. Those gyms have enough capacity to accommodate all detainees for their scheduled hour of recreation, as occurs all winter at the JTDC when the outdoor yard is entirely closed. SUMF ¶ 53. Although each Plaintiff missed one day of off-pod recreation, it is far from clear that this happened because of the filming. Plaintiffs also claimed that "visits with families were effectively eliminated during *Empire* filming." SAC ¶ 42. That, too, was false. The JTDC held family visits every day that 20th TV was at the facility. SUMF ¶ 70. The SAC alleged that T.S.'s mother waited "two hours" for a visit with T.S., until "she saw a large cast of what appeared to be *Empire*'s cast or crew leave the building," after which she had a "significantly" curtailed visit with T.S. SAC ¶ 48(e). As illustrated in T.S.'s mother's deposition, none of this actually

happened.  SUMF ¶ 68. At most, T.S.'s mother waited for 45 minutes on one visitation day before T.S. arrived.  *Id.*; Exs. 51 & 52.  There is no evidence that *Empire* filming caused this wait time. SUMF ¶¶ 68-70.

All of H.C., T.S., and Q.B. testified that on non-school days, they typically spent the entire day in their pod living areas, except for an hour of off-pod recreation.  SUMF ¶ 40. Plaintiffs' allegation that "under normal operation [detainees] spend relatively little time on their pods and cells in the JTDC's upper floors (SAC ¶ 24), therefore, was not true, either.  Nor was it true that rules regarding detainee movements were any different when they were in classrooms than when they were in the common areas of their living quarters.  *See id.* ¶ 26.  Q.B. testified that the same restrictions—*i.e.*, detainees having to raise their hands to move from one place to another—applied equally in classrooms as in the pods' common areas. Ex. 21 26:12-27:1.

**Impact of Filming on Schooling at the JTDC**

The JTDC's in-house Nancy B. Jefferson School (the "School"), like all Chicago public schools, was on summer break during the June and August days when 20th TV filmed at the JTDC. SUMF ¶ 42.  In July, the School was open for summer classes.  SUMF ¶ 41.  For three days, July 14-16, the JTDC moved the location of those classes from School classrooms to the common areas of detainees' pods.  SUMF ¶ 43.

Q.B. was not detained at the JTDC on these dates.  SUMF ¶¶ 38, 45 .  H.C. was in court on one of the three days that schooling occurred on his pod.  SUMF ¶ 46.  Although H.C. recalled school having been held on his pod on at least one day he was present for it, he had no memory of what happened or of any problems with schooling.  *Id.*  T.S. also was in court on one of the three days (July 14) and was confined to his individual cell for a disciplinary violation on July 15. SUMF ¶ 47.  T.S. thus only could have attended classes on his pod on July 16. *Id.* T.S. testified

that his class periods seemed shorter that day because teachers had to move between pods, that he did not recall having had math class on that day, and that detainees "continued to play cards and watch TV" during classes. *Id.* Plaintiffs did not adduce any evidence beyond T.S.'s testimony to support his claim that his math class did not occur or that instruction on his pod was any less effective than it would have been in a classroom.

Plaintiffs did not depose any School teachers or officials, or any non-Plaintiff detainees. Although Plaintiffs' psychiatric expert witness opined that interruptions to school could have harmed Plaintiffs, he based that opinion on an incorrect belief, represented to him by Plaintiffs' counsel, that the JTDC had conducted school on detainees' pods over multiple *weeks*. When he learned that schooling was conducted on detainees' pods for only three days, he could not say that this had a meaningful impact on Plaintiffs' schooling. SUMF ¶ 48.

**Impact of Filming on Non-School Programming**

Q.B.'s behavioral status precluded him from participating in after-school programming at the JTDC. SUMF ¶ 44. T.S. testified that he participated in an after-school parenting class, but the JTDC has no records of a parenting class having been scheduled during the months that *Empire* filmed. *Id.* Both T.S. and H.C. undisputedly participated in the "Free Write" writing program, which occurred "twice a month" for "an hour." Ex. 22 111:5-15. Filming caused the cancellation of one Free Write class that T.S. and H.C. would have been able to attend. SUMF ¶ 44. T.S. and H.C. did not participate in any other non-school programming at the JTDC.

**Impact of Filming on Recreation at the JTDC**

Customarily, detainees receive one hour of "large muscle exercise" per day. *See* Dkt. No. 237 at 10. The JTDC has multiple areas for detainee recreation, including an outdoor concrete court divided by walls into three sections (closed in winter but otherwise open when weather and

circumstances permit), two large indoor gyms, and a game room. SUMF ¶¶ 51-53. Large muscle exercise also can occur in detainees' pod common areas, and "is done on pod quite a bit." SUMF ¶ 56. The JTDC's records for June 2014, August 2014, and April 2015—months, obviously, unaffected by filming—all showed multiple examples of detainees having their exercise on their pods rather than outside or in the gyms. *Id.*

T.S. contends he had recreation in his pod common area on June 24, 2015. SUMF ¶ 58, Dkt. No. 237 at 19. Q.B. contends he had recreation in his pod common area on June 23. *Id.* H.C. contends he had on-pod recreation on two days in July 2015. Should Plaintiffs' claims proceed to trial, the Government Defendants would dispute that T.S. had on-pod recreation on any filming day or that filming was the cause of Q.B. or H.C. having exercise on their pods rather than in a gymnasium on the days in question. For purposes of this motion only, however, the Court may assume that T.S. and Q.B. missed one day of off-pod recreation, that H.C. missed two days of off-pod recreation, and that filming caused these changes.[4]

**Impact of Filming on Family Visitation**

As referenced above, most of what T.S. alleged in the SAC regarding visitation was false, and Plaintiffs removed those claims from the TAC. *Compare* SAC ¶ 47(d)-(e) *with* TAC ¶ 47(d)-(e). The most T.S. can claim, based on the discovery record, is that one visit with his mother occurred in a classroom rather than in the normal visitation area. The classroom has ten percent

---

[4]     Plaintiffs' motion for class certification posited that the JTDC might have offered "extra" recreation but for the filming. As the Government Defendants demonstrated in opposition to Plaintiffs' motion, this is pure speculation on Plaintiffs' part. During some other school breaks, the JTDC offered "tournaments" in which a fraction of detainees participated. During other school breaks, however, the JTDC did not offer extra recreation beyond detainees' normal hour. *See* Dkt. No. 397 at 35-36. Even if Plaintiffs could show that the JTDC would have offered extra recreation on days that 20th TV filmed at the facility, Plaintiffs cannot show either that they would have participated in it or that the cancellation of "extra" recreation is actionable as a violation of their constitutional rights.

less square footage than the visitation area (SUMF ¶ 66), and Plaintiffs contend—but no record evidence supports—that the tables in the classroom were set up closer together than the tables in the visitation area.  Q.B. and H.C. did not have any family visits in the alternate area.

The SAC also claimed that when Q.B.'s grandmother arrived to visit him on one evening after filming had concluded, "she was told that visits in that time [slot] had been canceled." SAC ¶ 48(e).  That was not true, either.  Q.B.'s grandmother did not say "she was told that visits in that time had been canceled," but only that she herself would not be able to visit with Q.B. that evening. SUMF ¶ 69.  Every other detainee in Q.B.'s pod who had a visitor during that designated time slot saw that visitor as usual.  *Id.* ("Visitation was not canceled."); SUMF ¶ 70.  Although JTDC staff did not allow Q.B.—but only Q.B.—to have a family visit that evening after Q.B. had been disciplined earlier in the day, no evidence suggests that *Empire* filming earlier in the day had anything to do with this.  SUMF ¶ 69.

### Impact of Filming on Pod Population

The JTDC's written policies recommend that residential pods be filled with fewer detainees than the number of individual rooms in the pod can accommodate.  SUMF ¶ 71.  In other words, if a pod has 16 beds, the JTDC's written policies might set the "functional operating capacity" of that pod at 14.  *Id.*  This was only an aspirational goal, however, and the JTDC rarely attained it. SUMF ¶ 72.  On every day in June and July 2015—not just the days that *Empire* filmed at the Facility—some pods at the JTDC exceeded their functional operating capacity, some pods had fewer detainees than their functional operating capacity, and at least one pod was closed.  *Id.*

In June 2015, neither H.C.'s pod (3J) nor T.S.'s pod (5G) ever exceeded its functional operating capacity.  SUMF ¶ 72; Ex. 37.  Q.B.'s pod (4G) had one more resident than its functional operating capacity on 11 out of 30 days, including three days (June 22, 24, and 25) on which

filming occurred.  *Id.*  In July 2015, Q.B. was not detained, and Pod 4G never exceeded its functional operating capacity.  *Id.*  H.C.'s pod had one more detainee than its functional operating capacity on four days in July 2015, including two filming days (July 15 and 16).  *Id.*  T.S.'s pod had one more detainee than its functional operating capacity on nine days in July 2015, including two filming days (July 15 and 16).  *Id.*  No pod ever had more detainees than it had individual single-bed rooms to accommodate them.

* * *

To summarize:  T.S. and Q.B. missed one day of off-pod recreation; H.C. missed two days.  H.C. may have spent a 24-hour day without traveling elsewhere in the JTDC beyond his pod common area.  T.S. had one visit with his mother during which he contends he had less privacy.  Q.B. had one visit with his grandmother canceled for unknown reasons.  H.C. had no issues with visitation.  Q.B. and H.C. had no issues with their schooling.  T.S. contends that he had one day of classes held on his pod and that classes were less effective than they would have been in classrooms.  T.S. and H.C. missed one session of the Free Write program; Q.B. was not eligible for programming.  The population of Plaintiffs' pods was not materially different on days that filming occurred than it was on every other day in June and July 2015.

## LEGAL STANDARD

On a motion for summary judgment, the Court must "view the evidence in the light most favorable to . . . the non-moving party, giving [them] the benefit of reasonable inferences that can be drawn in [their] favor."  *Turner v. City of Champaign*, 979 F.3d 563, 565 (7th Cir. 2020).  "Once the party moving for summary judgment demonstrates the absence of a disputed issue of material fact, the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute."  *Thomas v. Martija*, No. 16 C 8718, 2020 WL 3192856, at *1 (N.D. Ill. June 15,

2020) (Pallmeyer, J.) (citation and internal quotation marks omitted). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, summary judgment must be granted." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017), quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The principal function of summary judgment is to prevent unnecessary trials by screening out factually unsupported claims." *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020). In a case involving conditions of civil detention, "[t]he plaintiff bears the burden to demonstrate objective unreasonableness" of those conditions, "and he must make a twofold showing." *Id.* at 318. "First, he must show that the defendant[s] acted purposefully, knowingly, or even recklessly when considering the consequences" of their actions. *Id.* "Second, the plaintiff must show that the challenged conduct was objectively unreasonable in light of the totality of the relevant facts and circumstances." *Id.* Where a plaintiff "has not presented sufficient evidence for a reasonable jury to find in his favor on either element of the claim," summary judgment is appropriate. *Id.*

## ARGUMENT

## I.     Plaintiffs' Claims Against All Defendants Fail Because The Conditions At Issue Were Not "Objectively Serious" Deprivations of "Life's Necessities."

Juvenile detainees, like adult pretrial detainees, cannot be "punished." Plaintiffs here never have "alleged that the [Government] Defendants intended to punish them." *T.S.*, 334 F.R.D. at 530. Because Plaintiffs do not allege intent, they must establish that (1) the conditions [they challenge] are or were objectively serious . . .; (2) the [Government Defendants] acted purposefully, knowingly, or recklessly with respect to the consequences of [their] actions; and (3) the [Government Defendants'] actions were objectively unreasonable—that is, not rationally related to a legitimate government objective or excessive in relation to that purpose." *Id.* at 529,

quoting *Hardeman*, 933 F.3d at 827 (Sykes, J. concurring) (internal quotation marks and alterations omitted). Critically, Plaintiffs must establish all three of these elements. If the conditions they challenge were not "objectively serious," their claim fails without regard to the Government Defendants' motive or state of mind.

The Seventh Circuit has held repeatedly that for conditions to be so "objectively serious" as to have constitutional magnitude, they must amount to "deprivations of life's necessities." *See, e.g., Burton v. Downey*, 805 F.3d 776, 786 (7th Cir. 2015) (to meet the test, detainees must be deprived of "*essential* food, medical care, or sanitation")(citation and internal quotation marks omitted). That formulation has been repeated in this District as recently as November 20. *See Bernard v. Scott*, No. 3:15-cv-50277, 2020 WL 6825696, at *10 (N.D. Ill. Nov. 20, 2020) ("Nothing in the record manifests an intent to punish or a deprivation of life's necessities."). *See also, e.g., Boston v. Dart*, No. 14 CV 8680, 2016 WL 5373083, at *8 (N.D. Ill. Sept. 26, 2016) (alleged refusals to accommodate pretrial detainee's disability did not amount to "deprivation of life's necessities"); *Williams v. Collins*, No. 14 C 5275, 2015 WL 4572311, at *3-*4 (N.D. Ill. July 29, 2015) (pretrial detainee's lack of running water in his cell not a "deprivation of life's necessities" if he receives drinking water or if the lack of drinking water is "so temporary that it constitutes only a *de minimis* imposition unworthy of Section 1983 relief"; plaintiff stated a claim only because he alleged that he was without adequate drinking water for over two weeks). *Hardeman*, to cite another example, involved claims that detainees had no running water, no flushable toilets, and insufficient drinking water for "approximately three days in 2017." *Hardeman*, 933 F.3d at 819.

The Seventh Circuit has allowed claims to proceed where detention officials failed to provide critical-needs medical treatment, deprived detainees of essential food, water, or sanitation,

or subjected detainees to unnecessary humiliation. The first two of those categories are not at issue in this case. The only relevant example of the third that Plaintiffs have cited is *Mulvania v. Sheriff of Rock Island County*, 850 F.3d 849, 858 (7th Cir. 2017), where a policy preventing women from wearing underwear unless they purchased white underwear from the jail's commissary forced some detainees to "attend[] . . . court hearings without underwear," including one detainee who had to do so "during her menstrual cycle." In *Hardeman*, 933 F.3d at 823, the Seventh Circuit also approvingly cited *Colbruno v. Kessler*, 928 F.3d 1155, 1161-63 (10th Cir. 2019), where officers "unnecessarily walked a pretrial detainee nude through the public halls of a hospital." Plaintiffs here do not allege bodily humiliation akin to that in *Mulvania* or *Colbruno*.

No court, anywhere, has found minor issues like those alleged by Plaintiffs to be actionable. Where detainees allege only "temporary inconveniences and discomforts," courts reject their constitutional claims. *Mays v. Emanuele*, No. 18-cv-1057-pp, 2020 WL 4934612, at *5 (E.D. Wis. Aug. 24, 2020), quoting *Adams v. Pate*, 445 F.2d 105, 108 (7th Cir. 1971). *See also, e.g., Hickman v. St. Clair County Jail*, No. 20-cv-266-JPG, 2020 WL 3489239, at *2 (S.D. Ill. June 26, 2020) ("Conditions that cause inconvenience or discomfort do not rise to the level of a constitutional violation."); *Gerber v. Elkhart County Correctional*, No. 3:18-CV-864-RLM-MGG, 2020 WL 2526492, at *1 (N.D. Ind. May 18, 2020) ("brief denial" of "access to a shower or exercise" was not "irrational or excessive" and therefore failed to state a claim).

It should not matter whether the Court considers the deprivations at issue in this case individually or collectively. *See* Dkt. No. 73, *T.S. v. Twentieth Century Fox Television*, 2017 WL 1425596, at *4 (N.D. Ill. Apr. 20, 2017) (noting that one deprivation "in isolation" may not amount to punishment, but that multiple deprivations may do so "in cumulative effect" (citation and internal quotation marks omitted)). Examining T.S.'s claims, for example, the evidence

establishes—at most—that he missed one off-pod recreation period, had one family visit conducted in a smaller space, had one day of less-effective schooling, and had one "Free Write" session canceled. Aggregating those claims does not get T.S. any closer to supporting a claim that this amounted to unlawful "punishment" sufficient to give him a damages claim. The most that H.C can establish is that he spent 24 hours without leaving his pod's common area (which included a television viewing area and tables for card games and other entertainment) and missed one "Free Write" session. Q.B. missed one session of off-pod recreation and, although the JTDC deprived him of one visit with his grandmother, no evidence suggests this had anything to do with filming. SUMF ¶ 69. Just as T.S.'s aggregate complaints do not amount to "punishment," H.C.'s and Q.B.'s complaints do not, either.

Plaintiffs' inability to establish that the JTDC subjected them to objectively serious deprivations of life's necessities requires the Court to grant summary judgment in favor of the Government Defendants on all of Plaintiffs' remaining claims.

## II.     Plaintiffs' Claims Against Cook County Fail Because Cook County Had No Control Over Their Conditions of Detention.

Separate from Plaintiffs' lack of support for any claim against any Government Defendant, Plaintiffs have no possible claim against Cook County. Plaintiffs sued Cook County based on their assumption that the JTDC, overseen by the Chief Judge of Cook County Circuit Court, was operated under the County's direction rather than that of the State of Illinois. The TAC alleges claims against Cook County under Section 1983, for *Monell* liability or as a matter of *respondeat superior* or indemnification (but only if the Chief Judge was performing a County rather than a state function), for conspiracy, and for IIED. As the Court held, "the Illinois General Assembly amended the Detention Home Act to prevent the County from controlling the day-to-day administration of the JTDC." *T.S.*, 2020 WL 6870809, at *5. The Court concluded "that the Chief

Judge acts as an arm of Illinois when he operates and administers the JTDC." *Id.* at *6. Following that ruling, Plaintiffs no longer can maintain a claim against Cook County under *Monell* or for *respondeat superior* or indemnification. The only County employee who had any involvement in admitting 20th TV to the JTDC was County real estate employee Andrew Kruzel.[5] His role was limited to preparing the "Location Agreement" with 20th TV, and the parameters of that agreement—including the requirement that 20th TV must not interfere at all with facility operations—were set by Dixon on authority from the Chief Judge. SUMF ¶ 5.

For Cook County to be liable to Plaintiffs on a federal conspiracy theory, Plaintiffs must have adduced evidence sufficient to establish that Kruzel "(1) reached an agreement to deprive a plaintiff of his constitutional rights, and (2) overt acts [by Kruzel] in furtherance of the agreement [that] actually deprived the plaintiff of those constitutional rights." *T.S.*, 2017 WL 1425596, at *7, citing *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). The Court dismissed the Fox Defendants from Plaintiffs' conspiracy claims because Plaintiffs had not sufficiently alleged "facts raising a reasonable inference that Defendants' agreement concerned depriving the juvenile detainees' constitutional rights." *Id.*, citing *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 398 (7th Cir. 2015). After full discovery, Plaintiffs can put forward no evidence suggesting that Kruzel or any Cook County employee reached any agreement with Dixon to deprive Plaintiffs of their rights.

For Cook County to be liable on a state law conspiracy theory, Plaintiffs must have adduced evidence sufficient to establish that Kruzel had a "purpose of accomplishing by concerted action

---

[5]   The plaintiffs failed to adduce any evidence at all of involvement by a County employee in setting the conditions of their detention during filming. Therefore, they did not establish employee liability necessary for an indemnification claim against the County under the Illinois Local Government and Governmental Employees Tort Immunity Act, 745 ILCS 10/9-102. No employee of the County was shown to have exercised any control over the relevant policies of the JTDC. *See Williams v. Edwards*, No. 10 C 1051, 2012 WL 983788, at *15 (N.D. Ill. Mar. 22, 2012) (Pallmeyer, J.) (dismissing indemnification claim where "Plaintiff has not established liability against any of the City's employees").

either an unlawful purpose of a lawful purpose by unlawful means." *T.S.*, 2017 WL 1425596 at

*12, quoting *Independent Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 938 (7th Cir.

2012). Plaintiffs also must be able to establish that Kruzel entered into such an unlawful agreement

and "a tortious act committed in furtherance of that agreement" by a conspirator. *Id.*, quoting

*McClure v. Owens Corning Fiberglass Corp.*, 720 N.E.2d 242, 241 (Ill. 1999). Kruzel committed

no tortious act; Plaintiffs cannot contend otherwise. As explained below, Dixon committed no

tortious act, either. Further, as the Court held with respect to the Fox Defendants in its April 2017

opinion, Plaintiffs cannot establish that Kruzel had any unlawful agreement with Dixon to harm

the interests of detainees. *See id.* Kruzel drafted a contract, to Dixon's specifications, explicitly

providing that 20th TV's filming activities could *not* impact facility operations.

Plaintiffs' IIED claims fail against all Defendants, certainly including Cook County. "The

bar is high—the conduct must be 'truly extreme and outrageous.'" *Andersen v. Village of

Glenview*, 821 F. App'x 625, 629 (7th Cir. 2020), quoting *Feltmeier*, 798 N.E.2d at 80. "[T]he

tort does not extend to . . . trivialities"; "[i]nstead, the conduct must go beyond all bounds of

decency and be considered intolerable in a civilized community." *Honaker v. Smith*, 256 F.3d

477, 490 (7th Cir. 2001) (citations omitted). "An average member of the community would not

exclaim 'Outrageous' upon learning of defendants' actions in this case." *Cairel v. Alderden*, 821

F.3d 823, 836 (7th Cir. 2016) (citation and internal quotation marks omitted). Further, "the actor

must either intend that his conduct inflict severe emotional distress, or know that there is at least a

high probability that his conduct will cause severe emotional distress," and "the conduct must in

fact cause severe emotional distress." *Id.* at 835 (citation and internal quotation marks omitted).

Plaintiffs here have provided no evidence that they suffered emotional distress, no evidence that

they sought treatment for such distress, and no evidence that Mr. Kruzel, the only Cook County

employee involved in the logistics of permitting a film crew to enter the JTDC, intended to inflict distress on detainees or knew that the limited access permitted by the Location Agreement conceivably could have caused severe distress.

### III. The Claims Against Dixon are Barred by Eleventh Amendment and Sovereign Immunity, and the Evidentiary Record Supports No State Law Claim By Plaintiffs Against Dixon.

"In this case, the parties have stipulated that Dixon was the final policymaker for the [Office of the Chief Judge of Cook County Circuit Court] in the areas relevant to this lawsuit." *T.S.*, 2020 WL 6870809, at *4; SUMF ¶ 5. The relevant areas in which Dixon served as the "final policymaker" included "(1) whether to allow the Fox Defendants to film *Empire* at the JTDC and (2) whether and how to alter the JTDC's operations to accommodate the filming." *Id.* The Court concluded that the Chief Judge's authority, under which Dixon served as the "final policymaker," was the authority of the State. *See id.* at *7-8. In the same ruling, the Court granted summary judgment "that Dixon was the *Chief Judge's* final decision-maker" on the relevant subjects. *Id.* at *8 (emphasis added). Like the Chief Judge himself, therefore, Dixon was exercising State rather than County authority, and is entitled to Eleventh Amendment immunity from Plaintiffs' suit in this Court. *See Mathlock v. Fleming*, No. 18 CV 6406, 2019 WL 2866726 at *4 (N.D. Ill. July 3, 2019) ("Dixon and the Office of the Chief Judge acted [as] arms of the state.")

In *Mathlock*, a JTDC detainee brought an excessive force claim against the Chief Judge and Dixon pursuant to Section 1983. *Id.* at *1 (plaintiff claimed that two JTDC employees "aggressively handcuffed him, breaking his arm and causing other injuries"). In finding, as this Court did, that the Chief Judge's administration of the JTDC was a state function, the *Mathlock* court held that Dixon was also entitled to Eleventh Amendment immunity because he "exercised the [chief] judge's control, not the county's fiscal authority," when he supervised JTDC

employees. *Id.* at \*3*; see also Orenic v. Illinois State Labor Relations Bd.*, 537 N.E.2d 784, 795 (Ill. 1989) (in Illinois "the State, not a county, is the sole employer of all court employees."); s*ee also Payne v. County of Cook*, No. 15 C 3154, 2016 WL 1086527, at \*11 (N.D. Ill. Mar. 21, 2016) (probation officers appointed under the control of the Chief Judge were state officials and therefore entitled to sovereign immunity on plaintiff's claims brought pursuant to § 1983).

Dixon also has immunity to the extent Plaintiffs' state law claims are brought against him in his individual capacity. Under Illinois law, the Court of Claims has exclusive jurisdiction over all claims against the State of Illinois sounding in tort. *Healy v. Vaupel*, 548 N.E.2d 1240, 1246 (Ill. 1990), citing 705 Ill. Comp. Stat. 505/8(d) (2012). It is well-established under Illinois case law that "a claim against individual officers will be considered a claim against the state, even when, as here, the officials are sued in their individual capacities, if 'judgment for the plaintiff could operate to control the actions of the State or subject it to liability.'" *Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001), quoting *Currie v. Lao*, 592 N.E.2d 977, 980 (Ill. 1992). A claim against state officials will be attributed to the state for purposes of sovereign immunity when "'(1) [there are] no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3)…the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State.'" *Richman*, 270 F.3d at 441, quoting *Healy*, 549 N.E.2d at 1247.

In *Richman*, the plaintiff brought claims in federal court against Cook County Sheriff deputies in their individual capacities pursuant to § 1983 and the Illinois Wrongful Death Act, alleging that the deputies caused the death of her son by acting willfully and wantonly while trying to restrain him during a court hearing. *Id.* at 433-434. The Seventh Circuit determined the deputies

were entitled to sovereign immunity with respect to Plaintiff's state law claims because they were "agents of the state" during the alleged incident, as they were acting on orders given by the circuit court, a state official, and because their alleged wrongful conduct did not exceed the scope of authority they were granted. *See id.* at 442-443. Dixon, similarly, exercised the discretion given him by the Chief Judge to allow and coordinate the filming of *Empire* at the JTDC. Even if Plaintiffs had a shred of evidence that Dixon acted willfully and wantonly, which they do not, Dixon still would be entitled to immunity because there is insufficient evidence showing his conduct exceeded the scope of his authority. *See Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (citing *Richman* and holding that defendants were entitled to immunity on the plaintiff's malicious prosecution claim because "there [were] no allegations that the defendant[s] [were] acting for a purpose unrelated to [their] employment."); *Johnson v. Winters*, No. 10 C 5480, 2013 WL 4029114, at *53-54 (N.D. Ill. Aug. 8, 2013) (Pallmeyer, J.) (citing *Richman* and holding that inmate's claims for battery and IIED were barred by sovereign immunity because the defendants' alleged wrongful actions fell within the "normal and official functions" of prison guards and they did not engage in any conduct that exceeded their authority as state employees (citation and internal quotation marks omitted)).

The novelty of Plaintiffs' claims also raises the issue of qualified immunity. At the pleading stage, the Court declined to apply qualified immunity based on the facts as Plaintiffs falsely pleaded them. *See* Dkt. No. 73 at 20-21. The Court should not find that any of the minor inconveniences Plaintiffs *actually* experienced rise to a constitutional dimension, but even if they could, Plaintiffs had no "clearly established" constitutional right to family visitation in a room of a particular size, to a recreation hour outside of their living quarters every day, to have every school class conducted in a classroom rather than in their living quarters, or never to have an after-school

activity postponed or canceled. *See, e.g., Calderone v. City of Chicago*, 979 F.3d 1156, 1162 (7th Cir. 2020) ("[A] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (citation and internal quotation marks omitted). No court has ever held that any of the of the minor issues Plaintiffs raise amounts to a Due Process violation, and no court ever has held that a juvenile facility superintendent violated detainees' rights by authorizing a film crew to access the facility. *See Bell*, 441 U.S. at 548 ("[J]udicial deference is accorded [to prison administrators] not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."); *see also Jackson v. Elrod*, 881 F.2d 441, 445 (7th Cir. 1989) (reasoning that "[c]orrectional officers controlling pretrial detainees are afforded broad deference" and "[a]bsent substantial evidence indicating officers have erred, courts defer to their expertise."). Looking at the facts as the discovery record established them, and not the false version pleaded in Plaintiffs' various complaints, Dixon may rely on the defense of qualified immunity.

Even setting these immunities aside, Plaintiffs' claims against Dixon fail in any event for the same reason their claims fail against the other defendants: None of the conditions they challenge are "objectively serious" deprivations of life's necessities. Unable to clear that hurdle, Plaintiffs try to pretend it does not exist. Plaintiffs have posited that if they can show Dixon lacked a "legitimate governmental purpose" in permitting 20th TV to enter the JTDC, courts "have set a low bar for violation of the Due Process Clause" in such circumstances. Dkt. No. 351 at 22-23. Plaintiffs, however, are wrong both in their premise and in their conclusion.

Dixon and his subordinates testified to the legitimate purpose they hoped to achieve by exposing detainees to the television production process and *Empire* cast members. Plaintiffs' innuendo that Dixon authorized the filming so that he personally could meet the *Empire* cast members does not suffice to create a genuine issue as to motive. *See, e.g., Jett v. Brookhart*, No. 3:17-cv-517-MAB, 2020 WL 5602822, at *11 (S.D. Ill. Sept. 18, 2020) ("Plaintiff offered only his own conjecture to . . . show it was wholly impossible for [the challenged] actions to relate to legitimate government objective, which is, of course, insufficient to survive summary judgment."). Further, even were Dixon's motive a matter in genuine dispute, which it is not, it is neither the law generally, nor the law of this case, that Plaintiffs can sue over trivial inconveniences if the government lacked a legitimate basis for imposing them. As this Court has held, regardless of motive, each Plaintiff "still must prove that the filming injured him to a constitutionally significant degree." *See* Dkt. No. 397; *T.S. v. Twentieth Century Fox Television*, 2020 WL 5868944 (N.D. Ill. Aug. 31, 2020) (citing *T.S.*, 334 F.R.D. at 530). Plaintiffs have not done so.

Plaintiffs' claims regarding recreation—one or two sessions conducted on their pods and the shifting of other recreation periods from the outside concrete court to the indoor gyms—do not give rise to a claim. In *Smith v. Dart*, 803 F.3d 304, 313 (7th Cir. 2015), the Seventh Circuit held that "lack of exercise can rise to a constitutional violation [only] where movement is denied and muscles are allowed to atrophy and the health of the individual is threatened." (citation omitted) The Seventh Circuit rejected claims regarding "exercise in cramped quarters" in *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985), and denial of yard privileges for three months in *Pearson v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001). In the only case *permitting* recreation claims, *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996), the plaintiff missed "seven weeks" of recreation and never had more than "one hour of exercise every two weeks." Plaintiffs here had exercise

every day that filming occurred, on all but one or two of those days in a spacious gymnasium.

Plaintiffs' other claims—one allegedly cramped-quarters family visit in T.S.'s case, a cancellation of one visit with Q.B. under disputed circumstances, one day of allegedly less-productive school as claimed by T.S., and H.C. and T.S. missing one "Free Write" class each—are even less serious than their recreation claims. In more than four years of litigation, Plaintiffs have never cited a single case in which detainees even attempted to bring a constitutional claim over these kinds of minor matters. Nor have the Government Defendants located any.

Plaintiffs' state law claim against Dixon for breach of fiduciary duty then also fails for the separate reason that Dixon did not owe Plaintiffs a fiduciary duty with respect to the matters at issue. This Court has held, and the Government Defendants do not contest, that detention center officials "assume some responsibility for the safety and general well-being" of detainees. *See T.S.*, 334 F.R.D. at 538 n.14, quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989) (internal quotation marks omitted). This duty includes providing for basic human needs, such as "food, clothing, shelter, medical care, and reasonable safety." *DeShaney*, 289 U.S. at 200. Illinois courts have *not* held, however, that this duty is fiduciary in nature. *See, e.g.*, *Day v. Jeffreys*, No. 19-CV-945, 2019 WL 6701671, at *4 (S.D. Ill. Dec. 9, 2019) ("[i]t is unclear whether a breach of fiduciary duty in this statutory context [between a prison director and a prisoner under 725 ILCS 205/8] is cognizable under Illinois law"). When this Court found that Dixon *potentially* owed a fiduciary duty to Plaintiffs similar to that of a guardian and ward, it did so in the context of Plaintiffs' debunked medical claims. *See* Dkt. No. 73 at 24-25. Plaintiffs cannot cite to any Illinois authority to support that detention officials owe a fiduciary duty with respect to recreation or visitation.

Numerous courts outside of Illinois agree. These courts have either held that (1) there is no fiduciary relationship between prison officials and detainees or (2) that the fiduciary relationship is limited to physicians and detainee patients or with respect to the handling of detainees' funds. *See, e.g., Sperry v. Corizon Health, Inc.*, No. 18-3119-SAC, 2020 WL 905745, at *3 (D. Kan. Feb. 25, 2020) ("Kansas courts have not recognized an action for breach of fiduciary duty in the prison context…"); *Hernandez v. Cate*, No. EDCV 11-00627 R AJW, 2014 WL 6473769, at *3 (C.D. Cal. Oct. 16, 2014) (although a fiduciary relationship may exist between a prison physician and his patient or with respect to an inmate's funds, there is no authority to support that there is a fiduciary relationship with respect to a prisoner's conditions of confinement); *Rua v. Glodis*, 52 F. Supp. 3d 84, 100 (D. Mass. 2014) (jail supervisor did not owe fiduciary duties to pretrial detainees; relationship did not fall within the "many familiar and well recognized forms of fiduciary relationships" (citation and internal quotation marks omitted)); *Surratt v. McClaran*, 234 F. Supp. 3d 815, 833 (E.D. Tex. 2016), *aff'd sub nom. Surratt v. McClarin*, 851 F.3d 389 (5th Cir. 2017) ("no basis for recognizing Plaintiff's novel conception of a fiduciary relationship" between arrestee and arresting police officers).

Assuming Dixon's duty was fiduciary in nature, Plaintiffs must prove that he breached it and that the breached "proximately caused the injury of which [Plaintiffs] complain[]." *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 433 (Ill. 2012), citing *Neade v. Portes*, 739 N.E.2d 496 (Ill. 2000). The "safety and general well-being" this Court cited in framing Dixon's duty came from the Supreme Court's decision in *DeShaney* that the Constitution precludes government from "so restrain[ing] an individual's liberty that it renders him unable to care for himself, and at the same time fail[ing] to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *DeShaney*, 489 U.S. at 200. "The affirmative duty to protect arises . . . from

the limitation which [the State] has imposed on his freedom to act on his own behalf." *Id.* *DeShaney* thus confirms that the duty owed by detention officials to detainees is that imposed by the Constitution—nothing more and nothing less. Because Plaintiffs have not established that Dixon violated their constitutional rights, they have no fiduciary breach claim against him, either.

Even if the Court were to conclude that the standard for breach of fiduciary duty is different from and arguably lower than under Section 1983, none of the actions Dixon took put detainees' "safety and well-being" at risk. Dixon testified that he permitted 20th TV to film at the JTDC with detainees' well-being specifically in mind, hoping to give them opportunities they would not have had otherwise to view the filming and meet prominent African-American actors. SUMF ¶¶ 25-27. Absolutely nothing in the record contradicts Dixon's testimony in that regard. Nor did any of the minor changes that Dixon authorized to accommodate the filming compromise detainees "safety." This claim survived Dixon's initial motion to dismiss because of Plaintiffs' false and later-withdrawn claims about filming having closed off access to the JTDC's medical treatment area.

Finally, Dixon is entitled to summary judgment on Plaintiffs' claim against him for IIED. The Court warned Plaintiffs at the outset of their case when it denied dismissal of the IIED claim that they will need to establish that "Defendants' conduct went beyond all possible bounds of decency and is regarded as intolerable in a civilized community." *T.S.*, 2017 WL 1425596, at *11. They have not done so with respect to Dixon. At the pleading stage, Plaintiffs cited *Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858 (Ill. Ct. App. 2000), as support for their claim. In *Graham*, after a subordinate employee at a nuclear power plant lodged a workplace safety complaint, his supervisor "pursued a five-month-long sham investigation of" the complainant. *Id.* at 868. During this sham investigation, the employer made knowingly false defamatory statements about the complainant to "over 100 employees," including that he "planted radioactive material"

and "was a leader of a gang." *Id.* The plaintiff also pleaded that he "suffered severe emotional and mental distress as a result," and that the defendant "knew of his distress." *Id.* at 868-69. All of that—the knowingly outrageous conduct, actual emotional distress, and knowledge of that distress, is missing from these Plaintiffs' case.

In IIED cases, "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Bristow v. Drake Street, Inc.*, 41 F.3d 345, 349 (7th Cir. 1994) (citation omitted). The plaintiff in *Bristow* experienced stomach pains and vomiting, hives, and "cried all the time." *Id.* "[T]he weaker the evidence of distress," the *Bristow* court held, "more evidence of outrageousness" is required. *Id.* at 350. Plaintiffs here have presented no evidence of distress at all, nor have they alleged outrageous conduct by Dixon.

## CONCLUSION

For the above reasons, the Government Defendants respectfully request that the Court grant their Motion for Summary Judgment.

Date: December 16, 2020       Respectfully Submitted,

By: */s/ Francis J. Catania* _____
    Francis J. Catania
    Danielle Mikhail
    Cook County State's Attorney's Office
    50 West Washington, Room 500
    Chicago, IL 60602
    312-603-3373
    francis.catania@cookcountyil.gov
    danielle.mikhail@cookcountyil.gov
    ***Attorneys for Defendant the County of Cook, Illinois***

By: */s/ Lyle K. Henretty* _____
    Lyle K. Henretty
    Patrick D. Morris
    Cook County State's Attorney
    69 W Washington, Suite 2030
    Chicago, IL  60602
    312-603-1434
    patrick.morris@cookcountyil.gov

lyle.henretty@cookcountyil.gov
***Attorneys for Defendant Leonard Dixon***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing was served on all counsel of record pursuant to the Court's ECF system on this 16th day of December, 2020.

/s/ Francis J. Catania