## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

T.S. *et al.*,                                          )
                                                        )
        Plaintiffs,                             )          Case No. 1:16-cv-08303
                                                        )
  v.                                              )          Hon. Rebecca R. Pallmeyer
                                                        )
Twentieth Century Fox Television *et al.,*              )
                                                        )
        Defendants.                             )
                                                        )

## PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Factual Background ....................................................................................................5

I.    The operation of JTDC ....................................................................................5

II.   Fox comes to the JTDC.....................................................................................8

III.  Impacts on TS/QB/HC .....................................................................................22

IV.  Dixon's purpose in imposing the *Empire* lockdowns ......................................22

Legal Standard ........................................................................................................29

Discussion ..............................................................................................................30

I.    The lockdowns violated Plaintiffs' due process rights because they
were imposed for no legitimate governmental purpose ...................................31

II.   Dixon breached his fiduciary duties to the Plaintiffs .......................................39

      a.    Dixon had a fiduciary relationship with the Plaintiffs.........................39

      b.    Dixon breached his fiduciary duties to Plaintiffs.................................42

      c.    Dixon's breach of fiduciary duty gives rise to both
damages and restitution .......................................................................44

III.  A reasonable jury could conclude that Dixon's abuse of his
power over hundreds of children constituted an intentional infliction of
emotional distress ...........................................................................................45

IV.  Dixon has no immunity from suit ...................................................................46

      a.    Eleventh Amendment Immunity .........................................................46

      b.    Qualified Immunity .............................................................................47

      c.    State-officer "sovereign" immunity .....................................................49

V.    Cook County must indemnify Dixon ...............................................................51

VI.  Fox is liable to the Plaintiffs both for inducement and in unjust enrichment ...................52

i

a.   Fox is subject to liability in restitution if it engaged in
     "active misbehavior" or if it merely accepted benefits from
     the breach with notice ........................................................................ 53

b.   Fox is subject to liability if it knew about the breach or if it should have known
     about the breach ................................................................................ 58

c.   Fox engaged in active misbehavior, and it accepted the benefits of filming even
     though it was on notice that they were being provided in breach of Plaintiffs'
     rights ................................................................................................. 60

d.   Fox cannot escape liability through the lease agreement ....................................... 65

Conclusion ............................................................................................................ 66

## TABLE OF AUTHORITIES

*A.J. v. Kierst*, 56 F.3d 849 (8th Cir. 1995)....................................................................36

*Accord Mashburn v. Yamhill Cty.*, 698 F. Supp. 2d 1233 (D. Or. 2010) ......................41

*Accord Robles v. Prince George's County*, 302 F.3d 262 ..............................................49

*Accord See Pro-Pac Inc. v. WOW Logistics Co.*, 721 F.3d 781 (7th Cir. 2013) ...........45

*Anderson v. Creighton*, 483 U.S. 635 (1987) ................................................................48

*Ayeni v. CBS Inc.*, 848 F. Supp. 362 (E.D.N.Y. 1994) ..................................................40

*Ayeni v. Mottola*, 35 F.3d 680 (2d Cir. 1994) ...............................................................40

*Barrett v. Outlet Broad.*, Inc., 22 F. Supp. 2d 726 (S.D. Ohio 1997)............................39

*Bell & Beckwith*, 838 F.2d 844 (6th Cir. 1988) ............................................................60

*Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639 (7th Cir. 2019)..................... 56-57

*Bergren v. City of Milwaukee*, 811 F.2d 1139 (7th Cir. 1987) ......................................36

*Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001)....................66

*Bristow v. Drake St. Inc.*, 41 F.3d 345 (7th Cir. 1994)..................................................45

*Buchanan v. Pfister*, No. 17-cv-8075 (N.D. Ill. Oct. 1, 2018) ......................................47

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................29

*Chabraja v. Martwick*, 618 N.E.2d 800 (Ill. Ct. App. 1993) ........................................56

*Chicago Park Dist. v. Kenroy, Inc.*, 402 N.E.2d 181 (Ill. 1980) ...................................54

*Conant v. Karris*, 520 N.E.2d 757 (Ill. Ct. App. 1987) .......................................... 55-56

*Conley v. Birch*, 796 F.3d 742 (7th Cir. 2015) .............................................................29

*Conradt v. NBC Universal, Inc.*, 536 F. Supp. 2d 380 (S.D.N.Y. 2008)......................39

iii

*Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) ........................................................49

*DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989) ........ 41-42

*Digiore v. State of Ill.*, 962 F. Supp. 1064 (N.D. Ill. 1997) .............................................47

*Doe v. Cook County*, No. 99-cv-3945 (N.D. Ill. May 15, 2015). ...............................8, 27

*Doe v. Cook Cty.*, No. 99-cv-3945 (N.D. Ill. Nov. 22, 1999) ......................................36

*Estate of Swiecicki*, 477 N.E.2d 488 (Ill. 1985) .......................................................42

*Farmer v. Brennan*, 511 U.S. 825 (1994) ..........................................................30, 34

*Feltmeier v. Feltmeier*, 798 N.E.2d 75 (Ill. 2003) ....................................................45

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) .....................................................50

*Frederick v. Biography Channel*, 683 F. Supp. 2d 798 (N.D. Ill. 2010) ......................39

*Fritz v. Johnston*, 209 Ill. 2d 302 (2004) ...............................................................50

*Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858 (Ill. 2000) ...........................46

*Hansen v. Fincantieri Marine Grp.*, LLC, 763 F.3d 832 (7th Cir. 2014)......................29

*Happy R Sec., LLC v. Agri-Sources, LLC*, 988 N.E.2d 972 (Ill. Ct. App. 2013) ...................45, 54

*Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019)................................................34

*Healy v. Vaupel*, 133 Ill. 2d 295 (1990)................................................................51

*Honaker v. Smith*, 256 F.3d 477 (7th Cir. 2001)....................................................46

*Hope v. Pelzer*, 536 U.S. 730 (2002) ...................................................................48

*J.H. v. Mercer Cty. Youth Det. Ctr.*, 930 A.2d 1223 (N.J. App. Div. 2007) ...............41

*Kentucky v. Graham*, 473 U.S. 159 (1985)............................................................47

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015)............................................32-34, 48-49

*Kingsley v. Hendrickson*. 900 F.3d 335 (7th Cir. 2018) ...............................32-34, 48-49

iv

*Lawrence v. Clepper*, 865 P.2d 1150 (Mont. 1993) ........................................................60

*Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734 (Ill. 1994) ................................45

*Mathlock v. Fleming*, 2019 WL 2866726 (N.D. Ill. July 3, 2019) ................................47

*Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020) ................................................................33

*Miller v. Gonzalez,* 761 F.3d 822 (7th Cir. 2014) ........................................................29

*Mulvania v. Sheriff of Rock Island County*, 850 F.3d 849 (7th Cir. 2017)............................ 33-35

*N.G. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004) ........................................................41

*Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974) .....................................................36, 42

*Parks v. Kownacki*, 737 N.E.2d 287 (Ill. 2000)...................................................... 40-41

*Parks v. Kownacki*, 711 N.E.2d 1208 (Ill. App. Ct. 1999) ...................................... 40-41

*People ex rel. Daley v. Warren Motors, Inc.*, 500 N.E.2d 22 (Ill. 1986)................................54, 58

*Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016) ............................................................29

*Pippion v. Hedden*, No. 3:19-CV-3010 (C.D. Ill. Apr. 5, 2019) ..................................50

*Reed v. Bowen*, 769 F. App'x 365 (7th Cir. 2019)........................................................32

*Richman v. Sheahan*, 270 F.3d 430 (7th Cir. 2001)......................................................50

*Robinson v. Sappington*, 351 F.3d 317 (7th Cir. 2003) ................................................51

*Rodriguez v. Cook County*, 664 F.3d 627 (7th Cir. 2011) ............................................50

*Schall v. Martin*, 467 U.S. 253 (1984) ........................................................................36

*Scott v. O'Grady*, 975 F.3d 366 (7th Cir. 1992) ..........................................................47

*Smart v. City of Miami*, 107 F. Supp. 3d 1271 (S.D. Fla. 2015)...................................39

*Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731 (7th Cir. 2006)................................52

*TCF Mortg. Corp. v. Gelber Holding Co.*, No. 91-cv-2125 (N.D. Ill. July 3, 1991) ...................57

*Tiwari v. NBC Universal, Inc.*, No. 08-cv-3988 (N.D. Cal. Oct. 25, 2011) ..................................39

*United States v. Lanier*, 520 U.S. 259 (1997) ..............................................................................48

*Vill. of Wheeling v. Stavros*, 411 N.E.2d 1067 (Ill. Ct. App. 1980) ...............................................53

*Wickersham v. City of Columbia*, 481 F.3d 591 (8th Cir. 2007) ....................................................66

*Williams v. City of Chicago*, 733 F.3d 749 (7th Cir. 2013) ...........................................................29

*Williams v. Collins*, No. 14-cv-5275 (N.D. Ill. July 29, 2015) .......................................................32

*Wms. Elecs. Games, Inc. v. Garrity*, 366 F.3d 569 (7th Cir. 2004) ...............................................57

**INTRODUCTION**

In the summer of 2015 Leonard Dixon, the superintendent of the Cook County Juvenile Temporary Detention Center ("JTDC"), was entrusted with the safekeeping and rehabilitation of more than 300 minors housed at the facility. There is ample evidence, however, that in order to facilitate Fox's use of the JTDC to film scenes for *Empire*, he imposed lockdowns on the children housed there that were harmful and dangerous to them. The Defendants try to portray these lockdowns as being done for the benefit of the children housed there, but the evidence shows that the repurposing of the JTDC was, at all times, intended to serve a purpose other than legitimate detention administration. In order to fulfill Dixon's desire to mingle with *Empire*'s stars and Fox's desire to film in a realistic "prison setting," the Defendants largely shut down the two floors within the JTDC that were the primary venues for providing off pod recreation and programming to the children housed there, as well as the only place where any child could go outside.

Dixon knew that what he was doing was unlawful. When Professor Thomas Geraghty— who had been appointed by Judge Holderman to act as the "next friend" of the youth detained in the JTDC during the *Doe* litigation—wrote Dixon in July 2015 to express concern that the filming might have restricted movement of residents within the facility, Dixon responded with a letter that was both false baldly misleading, falsely assuring Geraghty that *Empire* had been brought in for the residents' benefit, and that no restrictions on movement had occurred. Dixon then sought to manipulate the timing of the next filming session so that it would be hidden from Geraghty and the *Doe* monitors who had been appointed by Judge Holderman to help him ensure that the JTDC was not violating the constitutional rights of the minors housed there. Dixon knew that if the monitors observed the filming, they would have seen widespread restrictions on

the hundreds of young people housed at the JTDC, while Fox presented the JTDC's administrators with gifts and granted them photo privileges with *Empire*'s stars.

For its part, Fox had every reason to believe that Dixon was imposing widespread deprivations on the hundreds of minors housed at the JTDC in order to facilitate the company's filming there. Today, Fox insists that it had no idea whether the filming would create impositions for the kids at the JTDC, and instead left that question entirely to the JTDC's administrators. But in the days before the filming Fox, after conducting an extensive tour of the JTDC, concluded in a written assessment that even if *Empire* filmed there for a mere two days, the JTDC's operations would be substantially disrupted if the film crew grew to more than 30 persons. Despite this knowledge, Fox (having run out of other locations to film the "prison" scenes it needed) convinced the star-struck Dixon to allow film crews as large as 200 to enter the building for more than two work-weeks of filming. All the while, Fox gave Dixon repeat audiences with movie stars and provided him with souvenirs from the show. It was these things—not benefits for the minors housed at the JTDC—that Dixon demanded repeatedly during the course of filming.

The evidence of this misconduct is amply supported by the record in this case. Nevertheless, the Defendants claim that none of the minors who they placed on lockdown—not the Plaintiffs or anyone else—can make any claim against them. The Defendants claim that Plaintiffs cannot state a due process claim because their injuries are *de minimis*. But the Defendants' arguments ignore the law and the evidence in this case, including the opinions of two experts, both of whom worked with youth at the JTDC for years, and who are eminently qualified to offer opinions about the harm caused by the increased confinement that the Defendants imposed on hundreds of children at the facility. Both experts have explained that the

additional pod confinement at issue here would worsen the psychological impact of incarceration on a minor, and that the arbitrary imposition of such confinement, which is typically used as a negative consequence youth at the JTDC to deter bad behavior, would impede the JTDC's rehabilitation efforts by effectively punishing the minors for no legitimate reason. That is an injury of constitutional magnitude, particularly where, as here, the deprivations were imposed not for a legitimate governmental purpose but for the Defendants' own personal interests.

The Defendants also argue that Plaintiffs cannot state a claim against Dixon for breach of fiduciary duty. This argument, however, requires them to contend that the laws of Illinois have somehow been eliminated—an argument they invent out of whole cloth. Fiduciary duty, as Judge St. Eve made clear in this case, is a creature of state law. And contrary to the Defendants' claims, it is well established in the juvenile detention context in Illinois. And Illinois law permits a jury to reasonably conclude that Dixon breached his fiduciary duty by taking advantage of his authority over the detainees to promote his own interests at their expense, rendering him liable. That is so both to the extent Dixon actually injured the JTDC's detainees, and to the extent he breached his fiduciary duty simply by endangering them in pursuit of his own interests.

In light of the Court's Eleventh Amendment ruling regarding the Chief Judge's office, the Defendants make a variety of arguments attempting to insulate Dixon and Cook County from liability. Plaintiffs agree that Cook County is not liable pursuant to a *Monell* theory. But the remainder of the Defendants' arguments against liability for Dixon and Cook County fail.

Fox, meanwhile, argues that is not liable either for inducement of breach of fiduciary duty or for unjust enrichment because it did not know exactly what deprivations the minors at the JTDC were being subjected to in order to facilitate its filming. But Fox was on ample notice that its filming would impose massive disruptions to a facility filled with hundreds of young people,

3

to their detriment. Even so, it went ahead with filming and plied the JTDC's administrators with attention from *Empire*'s stars, all so that it could maximize its profits from filming at the JTDC. Under the laws of inducement and of unjust enrichment, those facts permit a factfinder to find Fox liable.

The Defendants repeatedly argue that imposing liability in a case like this is unprecedented. That argument does not mean what they seem to think it does. Thankfully, it is rare that officials engage in wholesale departures from their duties and impose deprivations on minors entrusted to their care for entirely illegitimate purposes—much less their own benefit. But when such abuses of power occur the law provides remedies to the victims of such mistreatment. Plaintiffs seek to vindicate their rights under those laws, and they have amassed the evidence to so do. The Court should permit them to present their claims to a jury.

## FACTUAL BACKGROUND

### I.  The operation of JTDC

The JTDC is a large, five-story, rectangular building. During the *Empire* filming at issue in this case, it housed more than 300 children, nearly all between 12 and 18 years of age. PSOAF ¶ 2 The JTDC is set up in an atrium plan: the children are housed on pods arranged in an open ring on the building's third, fourth, and fifth floors. PSOAF ¶ 1. A "pod" is the name for a living unit at the JTDC. It contains rooms for individual residents, which open to an enclosed common area. *Id.* The common area is somewhat larger than a two-car garage and features several bolted-down tables as well as a guard's desk. PL Ex. 4 ¶ 73. Between each pod and the atrium area is a corridor that is used for communication between the pod and the rest of the JTDC. PSOAF ¶ 1.

4

Aside from an infirmary, the interiors of the JTDC's third, fourth, and fifth floors are strictly for confinement—there is only room for the pod and the narrow atrium hallway, PSOAF ¶ 2; PL Ex 2, and services and programming are not offered there. PSOAF ¶ 3. Instead, services for the youth—recreation, schooling, programming, library, and visitation—are offered on the building's lower floors. PSOAF ¶ 3. There is a large, open-air courtyard on the building's third floor, which is the only venue for outdoor recreation. PSOAF ¶ 4. And the second floor houses a number of classrooms, game rooms, a media lab, a chapel venue, and a library, where the bulk of services are offered, including educational services for the children, commissary and "game" rooms, library access, media labs, visitation, and enrichment programs such as "Free Write." PSOAF ¶ 5. The second floor is the only location for these indoor education and programming spaces. *Id*. The first floor has two auxiliary gymnasiums; otherwise it consists of public areas that are off-limits to the JTDC's residents. PSOAF ¶ 6.

Because of the JTDC's multi-story layout, the hundreds of children housed there are transported multiple times each day from their pods down to the service venues on the building's lower floors. PSOAF ¶ 7. This requires considerable resources, including a supervisor who coordinates the movement of different groups of residents throughout the building in real time. *Id*. Ensuring that residents can leave their small rooms is so important to the JTDC's mission that it has a contingency plan to ensure that the children are permitted to attend out-of-pod activities even if the JTDC finds itself short-staffed. *Id*.

The JTDC devotes these resources to ensuring children are permitted time out of their pods because, as Plaintiffs' experts explain, the restrictive conditions of pod confinement compound the negative impact of incarceration on the children housed at the JTDC. The physical layout of each pod resembles the layout of a typical adult prison housing unit, and

consequently the more time that is spent in these restrictive and monotonous conditions, the worse the negative psychological impact of incarceration, and the higher the risk of violence among residents.  PSOAF ¶ 8.  Dr. Brian Conant, a clinical psychologist and the JTDC's current Mental Health Director, has explained that getting time off of the pod is beneficial to residents "for psychological reasons, yes, because a change of scenery is good sometimes, so going to school is good, going to the gym is good, getting fresh air [is] important" for children. PSOAF ¶ 9.  Indeed the JTDC relies upon the standards of the National Commission on Correctional Healthcare for guidance, and those standards require, as a matter of healthcare, "[d]aily outdoor exercise" "whenever possible" in order to help control "anxiety, nervousness, manic episodes, and depression" among facility residents. PSOAF ¶ 9.

The JTDC has purposely attempted to minimize the amount of time youth spend on the pods.  It has done this in several ways:

- Every day, the youth on the JTDC are provided a minimum of one hour of off-pod physical recreation.  This recreation is provided outside in spaces on the third floor courtyard and in the two auxiliary gymnasiums.  Because there are not enough time slots in the two gymnasiums to provide recreation to all youth in the facility, during events like inclement weather the JTDC also uses large rooms on the JTDC's second floor, including its chapel, to provide recreation space. PSOAF ¶ 35.

- During the school year, the youth at the JTDC are transported from their pods to school on the JTDC's second floor.  They spend several hours there, taking classes and eating lunch.  PSOAF ¶ 33.

- During school breaks, the JTDC provides extra off-pod recreation programming to the youth detained there.  The off-pod recreation is designed to provide a minimum of one hour extra recreation for all detainees, regardless of behavior level.  PSOAF ¶ 34.

- The JTDC offers non-school programming, including a "Free-Write" program, for eligible detainees who sign up. PSOAF ¶ 37

- The JTDC offered after-school "commissary" and "game room" programming, where youth would leave the pod and "buy" snacks and play games in designated rooms on the JTDC's second floor.  PSOAF ¶ 37

6

The JTDC also offered scheduled visitation for all detained children with their families. Each "Center" within the JTDC had a visitation time slot; during that time parents and guardians could visit with their children. Visitation occurred in a room on the JTDC's second floor that contained 12 tables, spaced far enough apart to provide privacy for each child who was visiting with his or her family members. PSOAF ¶ 11.

## II.     Fox comes to the JTDC.

On May 20, 2015, after years of federal receivership by this District Court arising from the *Doe v. Cook County* civil rights litigation overseen by Judge James F. Holderman, the JTDC was turned over to the Chief Judge of the Circuit Court of Cook County, who appointed Leonard Dixon as Superintendent. (*See* ECF 88 ¶¶ 62-67 (describing transition).) The events in this case began approximately one week later, on May 28, 2015. On that day, a Fox location scout named Jonathan Klemke called the JTDC to ask if Fox could scout the facility as a filming location for *Empire*. PSOAF ¶ 12.

Klemke called because Fox, which filmed the *Empire* series in the Chicagoland area, wanted a realistic prison setting in which to film certain scenes for its upcoming season. ECF 410 at 1. Fox's options were limited. In the previous season of *Empire*, Fox had filmed scenes for Empire at the Cook County Jail, but officials changed their policies. When *Empire*'s location manager called about filming for the second season, the Jail explained it had decided only to allow in film crews that advanced the Jail's operations—not commercial filming like Fox's. PSOAF ¶ 14. Upon hearing of the changed policy, Fox abandoned the possibility of filming at the Jail. *Id*. There were some deactivated correctional facilities available in Joliet, which would have been the "runner-up" to the JTDC, but those facilities had fallen into disrepair, and on a tour Fox determined that they had effectively been "destroyed" by vandalism, and were

"dangerous." PSOAF ¶ 15. Fox also shot *Empire* scenes on a soundstage in Chicago, but its practice was not to build such sets unless they were to be used on a regular, recurring basis, whereas the "prison" scenes that Fox ultimately filmed at the JTDC were set to appear only in two episodes. PSOAF ¶ 16. The JTDC was also a desirable location because it was conveniently located close to Fox's soundstage, which was nearby. PSOAF ¶ 16. Fox became even more attracted to the JTDC as a filming location after touring because it fit aesthetically with *Empire*'s cinematic needs. PSOAF ¶ 16. Additionally, filming in county buildings like the JTDC was vastly cheaper than other locations—the County's rate for using the JTDC (and its other buildings) was $1,500 per day; by way of comparison, renting out a single private condominium for filming cost Fox upwards of $8,000 per day for the rental alone. PSOAF ¶ 17.

In late May 2015, Klemke, Fox's location scout, viewed a Google Maps image of the JTDC and saw that it had an open exercise yard, which was called for in the *Empire* "prison" episodes that were to be filmed. PSOAF ¶ 12. On Thursday, May 28, Klemke called the JTDC, explained that he wanted to scout the JTDC as a film location, and was put through directly with Superintendent Leonard Dixon. PSOAF ¶ 12, 18. After Klemke explained his purpose, Dixon invited Klemke to scout the JTDC that same day, and when Klemke arrived at the JTDC early that afternoon, Dixon personally gave him a tour of the facility. PSOAF ¶ 18.

Klemke toured the facility extensively. He toured the JTDC's second floor and became familiar with its layout. He also toured the JTDC's upper "Pod" floors, taking photographs both of pods and elevated photographs of the JTDC's open courtyard and the "ring" atrium structure of the pods on the upper floors. PSOAF ¶¶ 18-19. He also toured and photographed the JTDC's infirmary, as that was another area where Fox sought to film. PSOAF ¶¶ 18-19.

When Klemke toured the second floor, he saw detainees being transported between activities. PSOAF ¶ 18.  He conceded at his deposition that it was evident to him during the tour that the second floor was lined with classrooms and that he expected the JTDC's school to be in session. PSOAF ¶ 19.  Klemke then claimed that he had asked Dixon about schooling, and Dixon had assured him that school was out all summer, *id.*, but Dixon denied ever telling Klemke anything of the sort.  *Id*.  Klemke also conceded that he expected the yards to be closed to detained youth during the filming, and that he knew there was no other place for the kids at the JTDC to go outside. *Id*.  Klemke, in short, toured the upper floors, where he would have seen that there was only space for pod confinement, and the JTDC's second floor, where he would have seen the only location for classrooms and activity facilities in the building.  PSOAF ¶¶ 18-19.  That tour exposed Klemke to the problems with repurposing the JTDC's second and third floors for filming—doing so would sharply curtail the only places where the youth housed on the facility's upper floors could go.

It was Fox's experience that people near film shoots would be impacted by them.  Fox had developed a code of conduct for filmmaking, which admonished that "we should not expect everyone in the surrounding environment to alter their lives just to accommodate the needs of film production." PSOAF ¶ 20.  The City of Chicago's own regulations, of which Fox was aware, had similar admonishments.  *Id.*  The experience was so common that Fox's film budgets contained a standard line-item for "neighbor payments," which could run up to $10,000 per day in affluent areas like a condominium building in the South Loop.  *Id.*

Klemke would claim at his deposition that he didn't consider it his job to determine the impact of filming on the JTDC's operations, and made no attempt to do so, leaving that question to the JTDC's administrators.  PL Ex. 14 at 68; *see also* ECF 410 at 13.  On June 2, 2015,

however, Klemke, whom Fox regarded as a highly capable location scout, PSOAF ¶ 13, followed up his scouting tour with an email to Dixon.  PSOAF ¶ 21. That email is the only contemporaneous written assessment by Fox of the likely impact that a film crew would have on the JTDC's operations.  In the email, Klemke noted that he hoped Fox would not interfere with the JTDC's operations "too badly," but that nevertheless Fox would need to use several parts of the building.  *Id.*  That might be feasible, Klemke suggested, because Fox would only film for "two days or so," which Klemke suggested could lessen the impact.  *Id.*  Even so, having viewed the JTDC's operations, Klemke recognized that a film crew of any meaningful size would disrupt the facility's operations.  *Id.*  Specifically, Klemke explained that film crews usually numbered around 80 people, but, he proposed that most of those crew members could be kept outside of the facility, in order to "limit" the persons going inside to only the most essential personnel.  *Id.*  Imposing those limitations, Klemke said, could drop the number of extra people in the building to around "30 people total."  *Id.*

On June 5, Klemke forwarded his June 2 email to Brady Breen, Fox's location manager for Empire.  PSOAF ¶ 21.  By this time, the *Empire* film directors had reviewed Klemke's photographs of the JTDC and decided that it was an aesthetically attractive location.  PSOAF ¶ 16.  An arrangement was made for Breen and *Empire*'s director, Leonard Daniels, to tour the facility on June 11.  The areas Daniels and Breen wanted to use were expansive:  they included the JTDC's outdoor yard, its infirmary, a living pod, visitation, as well as an area of the second floor hallway where staff clocked in and out.  PSOAF ¶¶ 22, 23.  And instead of keeping the bulk of the film crew outside, as Klemke recognized would likely be necessary, Fox also secured agreement to use the large chapel room on the building's second floor as a "lunch and holding location," as well as the JTDC's library.  PSOAF ¶ 23; D-SUMF ¶¶ 21-22.  The number of days

10

for filming had expanded to occupy nearly an entire week in June, plus several more days for the return filming session in July. PSOAF ¶¶ 22, 23. And the size of the crew had ballooned. Whereas Klemke had recognized that the JTDC's operations could not handle much more than a crew of 30 for two days, PSOAF ¶¶ 22, 23, Fox's technical scouting crew alone was nearly that large, PSOAF ¶¶ 22, 23, the film crew itself would number in the hundreds, PSOAF ¶¶ 22, 23; and Fox brought in and transported through the facility's hallways a semi-trailer worth of equipment, which resulted in additional restrictions on the movement of staff and detainees. PSOAF ¶¶ 24.

Fox could have filmed at night. That is what it did when filming scenes at the Cook County Administration building downtown, in order to avoid disturbing office workers, PSOAF ¶ 22, and in the Cook County Courthouse at 26th and California, in order to avoid disturbing the court's operations there. PL. Ex. 104. But even though Klemke had recognized that the large crew was likely impose significant disruption on the JTDC's operations, Fox never offered to film at night at all. **Dixon Dep** 69. Fox also asserts that it "readily could have made alternate arrangements" to taking over the second floor and the JTDC's intake pods for its crews and equipment, "such as by using trailers outside." ECF 410 at 18. Yet it did not do so, even though that is precisely what Klemke, Fox's experienced location scout, assessed was necessary to avoid disrupting of the JTDC's operations "too badly." **Breen Dep Ex.** 6.

Nevertheless, Dixon approved Fox's use of the facility. After he did so, he directed his subordinates to deal with the paperwork. While the Office of the Chief Judge operated the building, the real estate itself is owned by Cook County. Therefore, after Dixon approved the filming, Zenaida Alonzo, the JTDC's in-house counsel, communicated the agreement to an employee in the Cook County real estate office named Andrew Kruzel. PR-SUMF ¶ 11. It was

11

the County's practice to not even send its standardized lease agreement until use of the use of the facility had already been agreed to. PSOAF ¶ 25. Alonzo told Kruzel which areas of the JTDC Fox and Dixon had agreed that Fox would lease, and Kruzel then plugged those areas into a standardized lease contract that the County maintained for such leases. PR-SUMF ¶ 12. *That* was the customized portion of the operative lease agreement in this case, along with a provision regarding what could be photographed, and another relating to intellectual property. By contrast, paragraph 1(D) of the lease, the "no-disruption" clause cited by the Defendants, was a boilerplate term that was standard in County leases. PSOAF ¶ 25. (compare PL Ex. 30 with Def. Ex. 1). Kruzel left in the boilerplate "no-disruption" term, modified to describe the building where the filming was to occur, without prompting or consultation with the JTDC's administrators. Def. Ex. 1. Neither Dixon nor anyone else who exercised operational control of the JTDC signed the lease agreement (rather, it was signed by a real estate manager employed by Cook County, *see* PR-SUMF ¶ 11), and Dixon regarded the lease agreement as a "technical" matter of little consequence, PSOAF ¶ 26. Meanwhile Daniels, who directed the scenes filmed at the JTDC had decided where in the JTDC the show would be filmed, had no knowledge of the clause or whether there was an agreement at all that the filming would not disrupt the JTDC's operations. PSOAF ¶ 26.

Indeed, the alterations needed to accommodate Fox's filming needs required "restructuring" of the facility's operations. PSOAF ¶ 27. The film crew that would descend on the JTDC was enormous, running at times to over 200 people *see* PL Ex. 102, along with props and enough filming equipment to fill a semi-trailer to the roof. PSOAF ¶ 27. The size of the film crew, Fox's filming needs, and the JTDC's layout required a total transformation of the facility:

12

*The outdoor recreation yard*. Fox would use the JTDC's yard. The yard is divided into three portions. Fox filmed in one but it desired quiet on the set—while *Empire*'s director would later claim that noise created by the JTDC's detainees would not have bothered him, both Fox's location scout and its location manager, who were responsible for securing the yard as a location and ensuring that it met Fox's sound requirements, testified that quiet on sets like the yard was critically important, PSOAF ¶ 28. And Gene Robinson, the JTDC's point person for accommodating Fox's filming needs, testified that several Fox employees had told him he needed to keep the detained youth quiet for the filming. PSOAF ¶ 28. Additionally, as Dixon explained to Fox, there was a concern that one of the youth might choose to climb over the partitions that separated the three yard sections. PSOAF ¶ 28. And Fox allowed debris to remain that were cleared at the end of filming. PSOAF ¶ 28**.** For all these reasons, and as reflected in the lease agreement, Fox leased the entire yard for the entire time it filmed at the JTDC. Def. Ex. 1 ¶ (A), and detainees were not allowed into any section of the yard. PL Ex. 48.

*Use of Alpha pods*. Fox filmed in one of the JTDC's pods, and was given another pod to store its equipment. It was decided that Fox would be provided with Pods 3A and 3B. (PL Ex. 43 at 60:4-61:2; PL Ex. 44.) Pods 3A and 3B were two of the JTDC's three "Alpha'' intake pods, where newly-arrived residents are screened and assessed upon admission. (PL Ex. 43 at 41:11-16; Ex. 15 at 264:3-18.) In order to accommodate Fox those pods had to be closed. *Id.*

*Use of second floor*. Fox needed large parts of the second floor for staging and filming. The JTDC's chapel, the largest room on the second floor, was chosen as a staging, break, and lunch area for *Empire*'s film crew and the large number of extras. PSOAF ¶ 30. The JTDC's library—the second-largest venue in the building, *see* PL Ex. 2—was repurposed as another *Empire* break room. PSOAF ¶ 30; ECF 415 pp 21-22. And Fox repurposed several classrooms

13

for its own use.  *Id*.  The chapel and the library were on the opposite side of the second floor

from the JTDC's entrance, and it was planned that Fox personnel would be walking in and out of

the JTDC all day.  PL Ex. 48 at 7787.  Fox additionally had set aside the JTDC's specialized

visitation room on the second floor as well.  PSOAF ¶ 30.

*       *       *

To accommodate Fox's needs, JTDC management set about "modif[ying]" programs "to

use available space." PSOAF ¶ 31.  Bearing in mind that movement of residents to the second

and third floors would need to be restricted, in practice this meant one thing: the "available

space" for the youth at the JTDC was largely limited to the pods.  As the JTDC's recreation

supervisor put it, "I will coordinate pod activities instead of yard movement." PSOAF ¶ 31.

These moves, which amounted to "restructuring" the JTDC's operations, PSOAF ¶ 31, had the

following relevant impacts on the children detained at the JTDC:

**Denial of all opportunity to go outdoors**. The yard was the only place where youth could

go outside while they were detained at the JTDC. PSOAF ¶ 32.  As Defendants have conceded,

outdoor recreation and programs were eliminated for all JTDC residents so that Fox could use

the yards for filming. ECF 212 at 17; PSOAF ¶ 32.

**Confinement on pods for school**. The JTDC's Nancy B. Jefferson ("NBJ") school

operates year-round, with short breaks in June and August. PSOAF ¶ 34. The NBJ's classrooms

are located on the JTDC's second floor, and by written policy, instruction is to occur there.

PSOAF ¶ 34. On normal school days, the youth detained at the JTDC are transported off their

pods and to the NBJ's classrooms. PSOAF ¶ 34. During the July filming, school was in session,

and in order to accommodate Fox's use of the facility, no detainee was permitted to leave their

pods for school. Instead they were confined to the pods, and teachers were told to give

14

instruction there. PSOAF ¶ 34 (For the other two filming periods in June and August, the NBJ

School was on break. PSOAF ¶ 34

   ***Confinement to pods instead of extra "school break" recreation***.  The confinement to

the pods for recreation was compounded during the June and August filming periods. In those

periods NBJ was on one of its short school "breaks," meaning detainees were not able to leave

the pods for school.  Under normal operation the JTDC made up for this loss by providing

additional recreation off the pods, either in the existing recreation spaces or on the second floor,

often through tournaments among pods.  PSOAF ¶ 34.  Notably, this extra school-break

recreation was intended for all the detainees in the JTDC, not just those with good behavior

records.  PSOAF ¶ 34.  With the *Empire* restrictions, however, these opportunities were

eliminated—a fact that was noted by a JTDC manager, Bill Kern, as one of the impacts of

filming. (PSOAF ¶ 34 ("I do have several concerns [about the June *Empire* filming]. One of

which is the timing.  This was the first week our residents were on summer [*i.e.*, school] break. It

is during this time that the use of the school area and yards is helpful in allowing them to burn

off some of their energy.").)[1]

   ***Elimination of minimal off-pod LME recreation***.  At least one hour of large muscle

exercise ("LME") recreation must be provided to children at the JTDC every day.  Pursuant to

written JTDC policies, all such recreation is to occur off-pod—either in one of the three open-air

yards or in one of the JTDC's two gymnasiums. PSOAF ¶ 35.  Absent exigent circumstances, no

_____

   [1]  Despite Mr. Kern's contemporaneous observations and Mr. Dunlap's expert report, Defendants
claim these extra breaks never happened.  ECF 414 at 13 n.4.  For support they cite their class
certification opposition brief.  *See id.* (citing ECF 397 at 35-36).  Plaintiffs responded to
those contentions in their class certification reply, and showed that they were meritless.  *See* ECF 400 at
17-18.  A fact-finder could reasonably credit Mr. Dunlap and Mr. Kern, and disbelieve the
Defendants' conjecture to the contrary.

such recreation is scheduled for the JTDC's pods. PSOAF ¶ 35. By placing the yards off limits, however, Defendants reduced the number of recreation spaces from five (the three outdoor yards plus two indoor gyms) to the two indoor gyms only. *Id.* For safety, each recreation space can be used only by one pod at a time. PSOAF ¶ 35. With this limitation, there were simply not enough off-pod spaces and time slots for every pod to use. PSOAF ¶ 35. The result was inevitable. As one manager summarized, "Recreation was limited to the gyms and to the sections [*i.e.*, the pods]," instead of the yards. PSOAF ¶ 35.

And indeed, there are numerous contemporaneous records noting specifically that because of the filming residents across the facility, the young detainees were confined to their pods for recreation. (*See, e.g.*, PSOAF ¶ 35 ("4A/R1 given large muscle recreation on living pod 4A due to yards being closed from "Empire" filming"); ("The beginning count was 16 AT's. Residents were on the pod due to filming in the facility."); ("The residents participated in Pod Rec due to the yards being closed for the taping of the Empire."); (resident grievance stating, "WE NEED RECK[.] we haven't had reck in day's[.] Fuck the empire just cause there here doesn't mean we don't gotta have reck"). *See also* PL Ex. 49 ¶¶ 14-23, 30-32.) In order to accommodate *Empire* residents were given less off-pod recreation than they normally would have received.

***Elimination of off-pod programs***. Pursuant to written policy, the JTDC provides "a comprehensive and varied system of structured program activities designed to develop pro-social thinking and behavior patterns." PSOAF ¶ 37. These programs are important to the residents' well-being and thus are offered both during school and after school, both when school is in session and when it is on break. These programs range from courses on nutrition, to writing and self-expression, to programs to combat sexual exploitation. PSOAF ¶ 37. The programs also

16

draw detainees off the pods, typically to facilities such as the library, the media room, and different classrooms on the building's second floor (though some, like "Karma Garden," are offered on the outdoor yard). PSOAF ¶ 37.

In order to accommodate Fox's filming needs, off-pod enrichment and rehabilitation programs were eliminated. (*See, e.g.*, PSOAF ¶ 38 (email informing Chicago Alliance Against Sexual Exploitation that its program had been cancelled: "They are filming the show Empire and all of the programming has been cut"); (email regarding cancellation of the University of Illinois nutrition education program, noting that "[u]nfortunately they cancelled all programming this week," and later, "we had to cancel last week" because of "filming the TV show Empire"); (explaining to volunteer that the following week was not available because "[t]he building is shut down next week (again) due to Empire filming their show here."); PSOAF ¶ 37 ("And just a reminder that there is no Free Write this week, due to Empire."); PSOAF ¶ 37 ("Empire will be back and filming at the JTDC. We will not have any programming next week.") Where programs were cancelled, substitute programming was not arranged and missed sessions of the cancelled programs were never made up. PSOAF ¶ 38.

***Elimination of Commissary***. The JTDC has designated, repurposed classrooms on its second floor where detainees are given periodic breaks to purchase items from the commissary or to engage in activities like ping pong and video games. PSOAF ¶ 39 These activities are in addition to, and separate from, the daily recreation on the outdoor yard and gymnasiums. PSOAF ¶ 39.  Because Fox was using much of the second floor, however, many commissary and game sessions were eliminated. (*See id.* (reflecting "no commissary" for certain centers because the area closed for *Empire*).) The youth were confined to the pods instead.

*Overpopulation throughout the JTDC.* In order to close Pods 3A and 3B for Fox's use. PSOAF ¶ 40., JTDC staff were forced to transfer Alpha residents wholesale. As the manager in charge of Alpha explained, in order to accommodate *Empire*, "[w]e need to transfer *At Least* 14 residents (allowing us to close 3A) throughout the facility." PSOAF ¶ 40 (emphasis original). This, in turn, caused numerous pods in the JTDC to become overpopulated past their safe functional operating capacities.  The JTDC's pods were built as 18- or 16-bed units, depending on their location in the facility. *Id.* However, the JTDC's written policies provide that in order to ensure safety, the *functional* operating capacity of the pods is 14 or 12 residents, respectively. *Id.* Closing 3A and 3B eliminated dozens of beds. To make up the lost space, the JTDC had to "fill up" the other pods in the facility "with 15 and 16 residents each." *PSOAF* ¶ 41.  *See id.* ("Filming for a television show begins next week. As a result, the capacity on the pods throughout the facility will go up . . . ."); ("[L]et the Staff know that the population caps for all of the pods are raised to 16."), numerous pods were overpopulated.  *See, e.g.*, PSOAF ¶ 41 (showing pods with 15 or 16 residents each); *id.* (reflecting 16 residents "on the pod due to filming in the facility.").)  Overpopulated pods compromised the safety of the entire JTDC facility and negatively impacted all the youth detained there. PSOAF ¶ 41.

Plaintiffs' experts explain that pod functional operating capacities are set out in JTDC's own regulations to ensure detainee safety, and that overpopulating the pods as the Defendants did was dangerous for the youth in the JTDC. PL Ex. 4 ¶ 53 ("[T]he evidence indicates that in order to accommodate the Empire filming many pods exceeded their Functional Operating Capacities. This compromised the safety of the entire JTDC and all youth who were detained during the periods of overcrowding."); PL Ex. 10  ¶ 38 ("Overcrowding tends to exacerbate the

impact of detention on juveniles because it creates increased risk of violence and fights among youth[.]").)

The Defendants note that pod populations occasionally exceeded the functional operating capacity on other occasions, ECF 414 at 14, but contemporaneous communications show the JTDC managers planning to overpopulate the pods specifically to accommodate *Empire*, (*see* ECF 236 at 14), and the very pod population records that the Defendants cite show a dramatic increase in overpopulation when Pods 3A and 3B were closed for *Empire*. *See* PR-SUMF ¶ 72.

***Degrading of visitation***. Pursuant to written policies, the JTDC "provides adequate and appropriate areas for resident visitation" on the second floor of the JTDC. PL Ex. 10. The JTDC's dedicated visiting room is outfitted with twelve tables, which are spaced far enough apart to ensure that twelve different detainees can simultaneously visit their families in privacy. Privacy in these sessions is critical to their value in mitigating the psychological impact of incarceration because a parent may be the only person who a teen can confide in during their detention. PL Ex. 10 ¶ 30(e). Detainees have two one-hour visiting slots per week. The visiting slots are organized by center, and each pod has set times when visits to children housed on that center are allowed. PSOAF ¶ 42.

To accommodate Fox's desire to film in the visitation facility, however, visitation was moved to a different room. This had two impacts. *First*, while the JTDC's visitation facility had seating for twelve simultaneous visits, the classroom only had enough space for eight visits. This meant that each visiting hour permitted only eight visits instead of the normal twelve. PL Ex. 4. *Second*, privacy between detainees and their visitors was reduced. *Id.*

***Disruption of behavior economy***. The deprivations described above disrupted the JTDC's "behavior economy," in which good behavior is rewarded with, among other things,

more opportunities to leave the pods. The behavior economy, which is formalized in JTDC policies (ECF 236-2 Ex. 48; Ex. 54), awards points to residents for good behavior, and allows residents to advance to higher "levels" for sustained good behavior. Consistently linking behavior to material consequences ameliorates the negative impact of incarceration by providing detainees at every behavior level a sense that they are being treated fairly, and that pro-social behavior is recognized and reinforced. PSOAF ¶ 44. It also is important for safety, as the pro-social reinforcement reduces the risk of violence among detainees. *Id.*

The *Empire* restrictions, however, effectively eliminated rewards for good behavior across the board, which eliminated incentives for good behavior and also eliminated the perception of fairness that the behavior economy was designed to generate. PSOAF ¶ 44. That increased the risk of disorder and violence among all detainees, and the destruction of a perception of fairness increased the negative psychological impact of incarceration on the JTDC's detainees. *Id*.

## III. IMPACTS ON T.S., Q.B., and H.C.

**T.S.**

- T.S. was confined to his pod for school for at least one day.
- T.S. was confined to his pod for LME at least one day.
- T.S. was confined to his pod missing Free Write at least one day.
- T.S. had visitation with his mother in a setting that afforded less privacy.
- T.S. lost "break rec" on all school-break days in June and August.

Q.B.

- Q.B. lost visitation with his grandmother one day.
- Q.B. was confined to his pod for recreation at least one day.
- He lost "break rec" on all school-break days in June and August.

H.C.

- H.C. was confined to his pod for at least 24 hours because of filming.
- H.C. was confined to his pod for school at least one day.

- H.C. was confined to his pod missing Free Write at least one day.
- H.C. was confined to his pod for LME at least one day.
- H.C. lost "break rec" on all school-break days in June and August.

*See* PSOAF ¶¶ 10; 34.

## IV.    Dixon's purpose in imposing the *Empire* lockdowns.

When Dixon was contacted by Klemke on May 28, he had been the JTDC's superintendent for approximately one week.  The Defendants suggest that Dixon was interested in having the filming because "[w]hen Dixon worked at a detention facility in Miami in the 1980s, a movie studio filmed in its juvenile wing, and Dixon recalled those detainees having enjoyed the experience," and that "[t]hat personal history formed part of Dixon's basis" for being receptive to the Fox filming. ECF 414 at 5.  This claim, however, is an invention of counsel. Dixon testified that when he worked in Miami, he recalled that a movie filmed at a detention center there.  But Dixon did not work at the detention center; he worked at a halfway house and only went to the detention center to pick up residents.  He did not testify he knew anything about the filming inside the facility, and he offered no testimony that any of the minors who had been at the facility reported having positive experiences.  *See* PR-SUMF ¶ 25.

After the tour, Klemke sent Dixon the June 2 email proposing that Fox's normal film crew could be cut back to a skeleton crew of 30 in order to prevent the filming from disrupting the JTDC's operations "too badly." PSOAF ¶ 21.  Thereafter a meeting was arranged with *Empire*'s location manager, Brady Breen, and its director, Lee Daniels.  At the meeting, which occurred on June 11, it became clear that while the *Empire* filming would take over large parts of the facility, there was no assurance any benefits would be provided to the children housed there. Dixon claims that at this meeting Daniels agreed that *Empire*'s stars would meet with the detainees.  *See* PSOAF ¶ 46. Daniels, however, said he would never have agreed to such a

21

condition. PSOAF ¶ 46. Dixon therefore was left to ask the stars on his own, and that resulted

in exactly two interactions: for a few minutes during one day of the June filming, one actor,

Chris Rock, spoke in a room for a few minutes to approximately 24 detainees, PSOAF ¶ 46; PL

Ex. 76. The many of the detainees were unhappy with this event, and reported that he seemed

disinterested and made jokes insulting them. PSOAF ¶ 47. and a second actor, Terrence

Howard, came back on a single occasion after the filming for a similar meeting. PSOAF ¶ 47.

There were no other interactions. PSOAF ¶ 47. And there were no interactions between any of

*Empire*'s cast or crew and any detainees during either the July or the August filming periods.

*See* PSOAF ¶ 47. For those two brief interactions with two stars, for two weeks more than 300

minors were subject to additional pod confinement, loss of programming, loss of all opportunity

to go outside, and unsafe overcrowding.

There was no need to have a filming company take over large parts of the JTDC to secure

an audience with a famous or inspiring person. Prominent people regularly come to the JTDC to

meet with the children there. These have included members of the Chicago Bulls and Chicago

Bears, Congressman John Lewis, Congresswoman Maxine Waters, Cook County Board

President Toni Preckwinkle, and numerous other luminaries, including prominent writers and

artists, all of whom have visited the JTDC to meet and talk with the young people housed there.

PSOAF ¶ 48. Notably, while these persons were prominent, they did not arrive at the JTDC with

large entourages that would upend the JTDC's operations. PSOAF ¶ 48.

In sharp contrast with the paltry interactions that Dixon secured for the facility's

detainees, the record shows that at the time, the energies of Dixon and the JTDC's other

administrators were devoted to creating opportunities for mingling with the *Empire* celebrities

and obtaining mementos for themselves of the event. Dixon brought his wife to the filming

PSOAF ¶ 49. and then directed his administrative assistant to ask *Empire*'s location manager to bring all the stars to his office before filming began. PSOAF ¶ 49. Minutes after the location manager demurred to this request, Dixon instructed his administrative assistant to insist—over the location manager's protests that it would be inconvenient—that any break room for *Empire*'s stars would be in his own office suite, PSOAF ¶ 49. This was justified on "privacy" grounds, but those were revealed to be entirely pretextual—there were numerous other areas of the facility that, while far away from Dixon's office, had already been blocked off for filming that could have been used instead. PSOAF ¶ 49. And indeed, after the stars entered Dixon's office, he and other staff came there to get pictures with them. PL Ex. 5.

Dixon cleared out his calendar on days that *Empire* came to film PSOAF ¶ 51, and he repeatedly demanded opportunities to meet with both *Empire*'s cast and its director, a demand he was able to make over and over again; Breen testified that Dixon made these demands to an amount that was unusual, and he was able to do so because the show required so many permissions to access different parts of the building. PSOAF ¶ 51. Other senior staff also went to great lengths to lobby for their own opportunities to meet with stars, with Dixon "working" various opportunities to get audiences with them. PSOAF ¶ 51Fox willingly acquiesced to these requests, arranging a large meet-and-greet between senior JTDC administrators and the show's stars in the JTDC's library. PL Ex. 32.

None of this energy was directed at securing benefits for the hundreds of youth who had been placed on lockdown for Fox's convenience, however. Though Dixon testified that he met and got photos with all of *Empire*'s stars, *see* PSOAF ¶ 52; PL Ex. 83, he conceded that he did not ask them to meet with the youth detained at the facility. PSOAF ¶ 52. When asked why he never asked Chris Rock to meet with more of the youth outside the one event in June, Dixon

claimed that he never saw Rock again, Dixon 221-22. But he took photographs with Rock during the August filming. PL Ex. 84, apparently without asking the star for another audience with any detainees.

Indeed when Fox contacted Dixon to ask permission to come back for an unplanned film shoot in August, Dixon did not demand that Fox provide some benefit to the residents in exchange. Instead he demanded a director's chair for himself, and then began "working" Fox toe create photo opportunities for senior JTDC administrators. PSOAF ¶ 53. Dixon passed off this demands for a chair as a joke. PL Ex. 21 at 284-86. But after the request was made, one of Dixon's subordinates emailed another privately, "Tell Brady Breen [Fox's location manager], if Dixon approved this he will need to get Dixon a directors chair," to which the other responded, "10-4." PSOAF ¶ 53. The email is a matter-of-fact exchange rather than a humorous one. Thereafter, Breen took the chair request seriously, and had a director's chair custom made for Dixon. ECF 410 at 21.

The Defendants also claim that the filming was good for staff morale, ECF 414 at 6. But Dixon only invited select staff to meet the stars. PSOAF ¶ 54 Gene Robinson, who coordinated the filming for the facility, explains why the JTDC's line staff was excited: they were interested in the filming "not to meet" the stars, but to get overtime pay. "They were asking for overtime because they wanted more money. . . . The whole entire building signed up for overtime." PSOAF ¶ 54 . That is confirmed by contemporaneous communications that noted the "enormous outcry of staff asking for overtime" in advance of the filming. PSOAF ¶ 54 . Providing staff with overtime pay is not a legitimate justification for subjecting hundreds of children to more restrictive conditions of confinement.

24

Defendants claim that the young people at the JTDC were uniformly elated about the filming in the facility. ECF 414 at 6. That self-serving assessment is contradicted by people who actually worked with the minors detained at the facility. Kenya Taylor, who supervised youth on one of the pods, reported that during the Empire filming there was "more tension, stress and anxiety on the pods where I worked." PSOAF ¶ 54 . Taylor attributed this to the fact that "[t]he children were unable to move as much," that they had lost their routines, and that "[i]t felt like everyone was 'cooped up.'" *Id.* Anna Buckingham, who oversaw programming within the JTDC, testified that the JTDC's residents she interacted with were upset about the filming, particularly the lack of movement that had been imposed on them, and reported that based on what she had observed that because of the lockdowns and cancellation of programs she had come to the conclusion that the filming had a negative impact on the youth at the facility. PSOAF ¶ 54 . Likewise Ryan Keesling, who ran the Free Write program within the JTDC, reported that his students, who numbered in the dozens, feeling both locked in and troubled that as incarcerated young people, they were confined to their pods for the filming of a movie. PSOAF ¶ 54

***Dixon hides filming conditions from Judge Holderman*.** During the summer of 2015 the JTDC was transitioning from federal receivership in the *Doe* civil rights litigation, and it was under three months of monitoring by Judge Holderman to ensure that the conditions of confinement under Dixon's administration were constitutionally adequate. *See Doe v. Cook County*, No. 99-cv-3945, Dkt. No. 786, (N.D. Ill. May 15, 2015). Among these monitors was Professor Thomas Geraghty, Director of the Bluhm Legal Clinic at Northwestern University Law School, as "next friend" of the detainees, to speak on their behalf. *See id.* Dkt. No. 8, (N.D. Ill. Aug. 4. 1999). In July 2015, Geraghty contacted Dixon, saying he had heard about the filming and expressing concern that the detainees' movement was being restricted to make it possible.

25

PSOAF ¶ 56. Dixon responded several days later with a letter assuring Geraghty the filming had had "no effect" on the JTDC's programs other than "change the location" where programming was provided. *Id.* Dixon assured Geraghty that the detainees had received "regular" programming and schooling, and listed two programs that had not been cancelled for the filming. *Id.*

The letter was equal parts misleading and outright false. It carefully deceived Geraghty about his major concern that there was lack of movement, assuring Geraghty that the "locations" of some programs had changed, while omitting that often the new "location" was often the detainees' pods—the very concern with which Geraghty had contacted him. And contrary to what the letter said, multiple programs had in fact been cancelled outright, including courses like Free Write and the sexual exploitation course, as well as the hours of extra "school break" recreation that was normally provided to all the detainees in the facility. PSOAF ¶ 34.

Dixon testified at his deposition that he would never have criticized Geraghty for inquiring into the filming; he noted that he had been a monitor himself, and only cared about making things better for kids in detention. PSOAF ¶ 56. But Dixon forwarded the Geraghty letter to one of his family members mocking Geraghty, *see* PL Ex. 90 (Dixon claimed implausibly that the only word in this email—"Dying"—was a typo, *see* PL Ex. 90 at 248-249), and he forwarded the letter to another relative claiming that Geraghty was trying to "squeeze [money] out of the county" with more litigation in the *Doe* case. PL Ex. 91. Dixon explained that what he meant was that he was concerned the litigants in *Doe* might reopen the litigation if the learned about the *Empire* filming. PL Ex. 90 at 250-56. That is another way of saying, of course, that Dixon did not Judge Holderman to learn about what Dixon had done to facilitate the filming, because if Judge Holderman did learn the truth from the litigants in the *Doe* case, the

evidence would cause him to place the JTDC back under receivership. Dixon's misleading letter, however, worked. Shortly after receiving it Geraghty wrote back to Dixon, "Thanks for your response. I'm very glad to hear that the filming of Empire has been a positive experience for the kids at the Detention Center." PSOAF ¶ 57.

All the same, Dixon was determined to prevent Judge Holderman from learning about the reality of the *Empire* filming. There was a meeting of the *Doe* parties on August 20, 2015 to conclude Judge Holderman's monitoring of the JTDC in the *Doe* litigation. PL Ex. 93. On August 7, Breen wrote to Dixon explaining that Fox needed to re-shoot several scenes, and proposed that Fox would come back to the JTDC on August 12. *Id.* Dixon forwarded the request to Alonzo, the JTDC's in-house counsel, asking what she thought. *Id.* Alonzo answered, "I don't advise having them come back before the *Doe* party meeting on 8/20," to which Dixon responded, "Agreed." *Id.* Alonzo claimed that she gave this advice because the *Doe* meeting was a lot of work. Dixon, however, did not remember that preparing for the *Doe* meeting involved any particularly burdensome work at all—in terms of work, "it was just a general meeting." PL Ex. 21 at 278:6-12. August 20, 2015 was of enormous significance in the Doe litigation, however: that was the date Judge Holderman's active monitoring of the facility terminated. PL Ex. 4 ¶ 22; PL Ex. 90. The final *Empire* filming ultimately took place a few days later, after the *Doe* monitoring had ended. ECF 415 para 35.

## LEGAL STANDARD

On summary judgment, the moving party bears the initial burden of showing no genuine dispute of material facts as to each claim on which it seeks judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, resolving all evidentiary

conflicts in their favor. *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015); *Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013) (credibility issues must be given to a jury to decide). The non-moving party is entitled to every reasonable inference. *Hansen v. Fincantieri Marine Grp.*, LLC, 763 F.3d 832, 836 (7th Cir. 2014); *see also Miller v. Gonzalez,* 761 F.3d 822, 828 (7th Cir. 2014) ("Deciding which inference to draw from [a] conversation is the task of a fact finder."). Furthermore, circumstantial evidence is entitled to equal weight, *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), including circumstantial evidence of knowledge and state of mind. *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

### DISCUSSION

This case involves claims brought under both federal and state law, and it involves claims abounding both in damages and in unjust enrichment. Plaintiffs assert the following claims.

- *Pretrial punishment*. Plaintiffs charge that by imposing the lockdowns on the youth at the JTDC the government defendants effectively imposed punishment on them, along with the hundreds of other detainees, in violation of their rights as pretrial detainees under the due process clause.

- *Breach of fiduciary duty*. Plaintiffs charge that Dixon breached his fiduciary duty by subjecting them to the lockdowns in order to advance his own interests and those of Fox, in association with the *Empire* filming. As a result, Plaintiffs charge Dixon both (1) worsened the psychological impact of youth incarceration, and (2) placed them at increased risk of physical injury from violence from other detainees in the JTDC. And Fox accepted the benefits of these lockdowns with notice of the breach.

- *Intentional infliction of emotional distress*.  Plaintiffs charge that Dixon engaged in an extreme abuse of authority that he knew would inflict emotional distress on hundreds of children, including Plaintiffs.

- *Inducement of breach of fiduciary duty*.  Plaintiffs charge that Fox induced Dixon to make filming space available for *Empire* with notice that Dixon would subject hundreds of detainees at the JTDC to deprivations in order to do so, which resulted in injuries to the detainees and enrichment to Fox.

- *Unjust enrichment*.  Plaintiffs charge that Fox was aware of sufficient facts that it knew or should have known that Dixon was providing it with filming space by subjecting the youth at the JTDC to deprivations and placing them at risk, yet Fox accepted the benefits of the filming space and profited from them.

- *Indemnification*.  Plaintiffs seek indemnification from Cook County.

## I. The lockdowns violated Plaintiffs' due process rights because they were imposed for no legitimate governmental purpose.

Plaintiffs have charged that the deprivations that the Defendants subjected them to were not imposed for any legitimate governmental purpose, and as such violated their rights to be free from punishment under the due process clause.  The Defendants argue that Plaintiffs cannot state a due process claim, *see* ECF 414 at 16-19, but they have not sought summary judgment on the question of whether the lockdowns were reasonably related to a legitimate governmental interest. Instead, they contend only that Plaintiffs cannot show that the deprivations were an "objectively serious" deprivation of "life's necessities."  ECF 414 at 16-17, 25-26.  This claim both misunderstands the law and ignores the evidence in this case.

**First,** the Defendants argue that the *Empire* deprivations could not violate due process because they did not rise to a serious "deprivation of life's necessities" such as "*essential* food,

medical care, or sanitation." ECF 414 at 16-17 (emphasis original). These, however, is drawn

from *Rhodes v. Chapman*, 452 U.S. 337 (1981), and it is the test for determining whether an

imposition amounts to punishment that is *cruel and unusual*, under the Eighth Amendment.[2] It

is not the standard for determining whether there has been a violation of the Fourteenth

Amendment, which prohibits the imposition of any punishment at all. The Seventh Circuit noted

this distinction in *Miranda v. County of Lake*, where it observed that the Supreme Court had

"disapproved" of such "uncritical extension[s] of Eighth Amendment jurisprudence to the

pretrial setting in *Kingsley v. Hendrickson*." 900 F.3d 335, 351 (7th Cir. 2018) (citing *Kingsley*

*v. Hendrickson*, 576 U.S. 389 (2015)).

      The Seventh Circuit elaborated on *Miranda* in *Reed v. Bowen*, 769 F. App'x 365 (7th Cir.

2019), explaining that "[a] detainee's claim differs from a prisoner's because 'pretrial detainees

(unlike convicted prisoners) cannot be punished at all.'" *Reed*, 769 F. App'x at 369 (quoting

*Kingsley*, 576 U.S. at 400-01). *Reed* then distinguished the two standards, noting that whereas a

pretrial detainee "can . . . prevail by showing that the actions are not 'rationally related to a

legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to

that purpose[,]'" a convicted prisoner must show that the conditions caused an "unquestioned

and serious deprivation of basic human needs . . . [or] deprive[d the convicted prisoner] of the

minimal civilized measure of life's necessities." *Reed*, 769 F. App'x at 369. Indeed, *Reed*

---

[2] The decisions that the Defendants cite, *see* ECF 414 at 17, repeatedly draw the "deprivation of life's necessities" from the articulation of the Eighth Amendment standard for cruel and unusual punishment in *Rhodes*. *See Bernard v. Scott*, No. 3:15-cv-50277, 2020 WL 6825696, at *10 (N.D. Ill. Nov. 20, 2020) (drawing "deprivation of life's necessities" from *Rhodes*); *Boston v. Dart*, No. 14-cv-8680, 2016 WL 5373083, at *8 (N.D. Ill. Sept. 26, 2016) (drawing "deprivation" standard from *Strominger v. Brock*, 592 F. App'x 508, 511 (7th Cir. 2014) and *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013), each of which draws the standard from *Rhodes*); *Williams v. Collins*, No. 14-cv-5275, 2015 WL 4572311, at *3 (N.D. Ill. July 29, 2015) (drawing "deprivation" standard from *Budd*, which draws said standard from *Rhodes*).

reversed the district court specifically because it had applied the Eighth Amendment standard set out in *Rhodes*, rather than the due process standard set out in *Kingsley*. *Id.* The Defendants' proposed standard for assessing the "constitutional magnitude" of the injuries in this case invites this Court to commit precisely the same error.

**Second**, the Defendants analyze the seriousness "element" of Plaintiffs' due process claim in isolation, without reference to the governmental purpose of the deprivations that they imposed, and they further claim that only certain "categories" of conditions can implicate a detainee's constitutional rights. *See* ECF 414 at 17-18. *Kingsley* forbids that. *Kingsley* held that a pretrial detainee "can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." 576 U.S. at 398. In articulating this "objective reasonableness" standard, *Kingsley* cautioned that "[a] court (judge or jury) cannot apply this standard mechanically. Rather, objective reasonableness turns on the facts and circumstances of each particular case." *Id.* at 397. Applying this admonition, the Court of Appeals has instructed that "when evaluating whether challenged conduct is objectively unreasonable [under *Kingsley*], courts must focus on the totality of facts and circumstances" in the case before it. *Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020).

In *Mulvania v. Sheriff of Rock Island County*, 850 F.3d 849 (7th Cir. 2017), the Seventh Circuit applied this analytical frame. To ensure that it was appropriately assessing the totality of the circumstances, *Mulvania* conducted two alternative analyses of the "white underwear" policy, assuming it existed in two different factual scenarios. In the first scenario, *Mulvania* assumed that the trier of fact would conclude that the white underwear policy was unrelated to a legitimate governmental interest. *Id.* at 858. In that scenario, "[t]his conclusion, without more,

31

supports an inference that" the policy was unconstitutional punishment. *Id.* at 858-59 (citing *Kingsley*). In the second scenario, *Mulvania* assumed that the white underwear policy "might ultimately be found to be rationally related to a legitimate governmental objective" by the fact-finder on remand. *Id.* at 858. It was in this second scenario that *Mulvania* assessed whether the detainees had "allege[d] a credible dignitary harm," and it was in that portion of the court's analysis that it weighed the alleged deprivations that the Defendants cite in their brief. *Compare* ECF 414 at 18 (describing conditions involving humiliation) *with* 850 F.3d at 858 (same).

*Mulvania* illustrates the need for a fulsome examination of the circumstances of the alleged due process violation, examining both the governmental actions and its penological justification. In *Mulvania*, conditions that serve no legitimate governmental interest can violate the Fourteenth Amendment even if the same conditions might not violate the Fourteenth Amendment if a legitimate governmental interest is present. And after *Kingsley*, *Mulvania* makes clear that while humiliation is certainly *one* means by which a detainee's due process rights can be violated, in circumstances where a deprivation is unrelated to a legitimate governmental interest, that fact, "without more," amounted to a due process violation under *Kingsley*. In short, the "categories" of injuries listed by the Defendants, *see* ECF 414 at 17-18, are entirely invented, and *Kingsley* says as much. The Defendants' insistence on analyzing the injuries in this case without considering the surrounding circumstances, *id.* at 18-19, is a method of analysis that *Kingsley* forbids.[3]

---

[3] This rule is not inconsistent with Judge Sykes' concurrence in *Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019). Judge Sykes drew her concurring rule from *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), which involved prison conditions and thus the Eighth Amendment's "more permissive" standard for assessing whether punishment is cruel and unusual, as opposed to the Fourteenth Amendment's concern with whether it is punishment in the first instance. *Compare Hardeman*, 933 F.3d at 827 (Sykes, J. concurring (quoting *Farmer*)) *with Reed*, 769 F. App'x at 369 (noting Eighth Amendment's "more permissive" standard). *Hardeman*, however, involved deprivations flowing from a jail's repairs to its water supply, a task that, while perhaps improperly executed, was

Judge St. Eve said as much in her Rule 12 decision, ECF 73. The Defendants claim that the decision is irrelevant because it was decided in light of the incorrect[4] allegation that Fox filmed in the JTDC's infirmary.[5] ECF 410 at 15-16; ECF 414 at 29. But the Defendants' argument misreads the opinion. The Rule 12 decision noted that a delay in medical care alone would be sufficient to state a due process violation by itself, ECF 73 at 9, but nowhere did it suggest that Plaintiffs' other claims were insufficient to state a violation. Then as now, Plaintiffs' claims centered not on medical issues but on the restrictive pod confinement caused by the closure of the outdoor yard and Fox's use of the second floor, *see* ECF 88 ¶¶ 12-28, 38-41, 44. Those deprivations were distinct in origin and in nature from delayed sick call responses, and had Judge St. Eve believed that they did not amount to a due process violation it would have been easy and appropriate to separate them from the sick call claims and dismiss them from the case. She did not do so. To the contrary, after rejecting Defendants' characterization of the deprivations as "inconveniences" because of the obligation to draw inferences in Plaintiffs' favor, ECF 73 at 9-10, Judge St. Eve, citing *Mulvania*, remarked that Plaintiffs had "[a]dditionally" sufficiently alleged that the deprivations were unrelated to any legitimate

---

indisputably legitimate. *Hardeman*, 933 F.3d at 819. Under the totality of circumstances in those conditions, Judge Sykes's articulation of some minimal imposition requirement is consistent with *Mulvania*'s second scenario, in which the court assumed that the white underwear policy was instituted pursuant to a legitimate governmental purpose. *See Mulvania*, 850 F.3d at 858.

[4] Plaintiffs had good reason to make the allegation. The Defendants now say Dixon refused Fox's request to film in the infirmary, but he actually approved it, as memorialized in the lease. PSOAF ¶ 63. The filming appears to have been cancelled only after the head of the infirmary was notified at the last minute and raised a strong objection. PSOAF ¶ 63

[5] Defendants also get their facts wrong. Plaintiffs alleged that Fox filmed in the infirmary, as reflected in the lease agreement itself. *See* ECF 88 ¶ 43; Breen Dep Ex. 9 ¶ 1(A). But they never alleged that the infirmary was shut down; instead they allege that sick call requests were delayed. Only T.S. claimed to have submitted such a request, but all three named plaintiffs—T.S., Q.B., and H.C.—have testified that the responses to their sick call requests were indeed delayed during the filming. PSOAF ¶ 64.

governmental interest, permitting the inference that they amounted to punishment in violation of due process. ECF 73 at 10. The Rule 12 opinion accordingly does not undermine Plaintiffs' arguments in any way. To the contrary, it supports Plaintiffs' contention, well-founded in the caselaw reviewed above, that deprivations which might be permissible in other circumstances amount to punishment when they are imposed for an illegitimate purpose.

This case, moreover, involves deprivations imposed on youth, whose due process rights implicate more sensitive interests than those of adults. The "impressionability of juveniles" tends to "make the experience of incarceration more injurious to them than to adults," *Schall v. Martin*, 467 U.S. 253, 291 (1984) (Marshall, J. dissenting) (cited with approval in *Bergren v. City of Milwaukee*, 811 F.2d 1139, 1144 n.4 (7th Cir. 1987). Indeed, youth "is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Bergren*, 811 F.2d at 1143 (quotation omitted). For this reason, "assessments of juvenile conditions of confinement are necessarily different from those relevant to assessments of adult conditions of confinement," *A.J. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995) (cited with approval in *Doe v. Cook Cty.*, No. 99-cv-3945, 1999 WL 1069244, at *4 (N.D. Ill. Nov. 22, 1999)), and, unlike adult detainees, the conditions of confinement of youth must be affirmatively rehabilitative. *Nelson v. Heyne*, 491 F.2d 352, 358 (7th Cir. 1974).

Here, Plaintiffs have offered competent evidence that the conditions imposed on the youth at the JTDC to facilitate the filming both injured them and degraded the rehabilitative custodial care they should have been provided. Plaintiffs have provided the opinions of two highly qualified experts who explain that while restrictive incarceration of children and adolescents may at times be necessary, it is psychologically harmful to them.P Dr. Louis Kraus, who served as a psychiatric expert in the *Doe* litigation, has opined that confinement to more

34

restrictive spaces with fewer activities—particularly confinement that is restricted to "day rooms" like the JTDC's pods—magnifies that psychological harm. PSOAF ¶ 8; PL Ex. 10 ¶ 30. In contrast, more time off the pods and more activities—especially access to outdoor recreation—mitigates the psychological harm that incarceration imposes on young people. PSOAF ¶ 8; PL Ex. 10 ¶ 30. Earl Dunlap, who as the court-appointed Transitional Administrator of the JTDC in *Doe* is perhaps the person most qualified to opine on appropriate treatment of young people at the JTDC, likewise is of the opinion that "increased pod confinement, reduced opportunities for structured programming, and the total elimination of access to outdoor space and fresh air . . . are harmful to youth and increase the harms to juveniles that are caused by detention." PSOAF ¶ 61. To highlight the need for time off pod, Mr. Dunlap described the conditions of pod confinement as follows:

> Imagine being restricted to a space not much larger than a two-car garage for most of your waking hours with as many as sixteen people, many of whom have mental health issues, and surrounding the garage are neighbors banging on the exterior walls.

PL Ex. 4 ¶ 73. The JTDC's current director of mental health, Dr. Brian Conant, agreed with these experts, and explained that getting time out of the pod is necessary "for psychological reasons, yes, because a change of scenery is good sometimes, so going to school is good, going to the gym is good, getting fresh air [is] important" for adolescent detainees. PSOAF ¶ 9. Dr. Conant also explained that the JTDC's mental health unit relies on the National Commission on Correctional Healthcare for appropriate treatment standards. PSOAF ¶ 9. And those standards, which are included among Dr. Conant's reliance materials, require, as a matter of detainee healthcare, "[d]aily outdoor exercise" "whenever possible" in order to help control "anxiety, nervousness, manic episodes, and depression" among adolescent detainees. PSOAF ¶ 9. Pod confinement is so immiserating to young people that it is the normal practice of guards at the

JTDC to use restrictive pod confinement, such as the cancellation of off-pod recreation, as *punishment* designed to deter misconduct by detainees and maintain order and safety on the pods. PSOAF ¶ 62.

Mr. Dunlap and Dr. Kraus both opined that the *Empire* deprivations disrupted this behavior economy, creating safety risks for all the detainees at the JTDC and increasing the negative psychological impact of their incarceration. PSOAF ¶ 61 \. Dr. Conant agreed, explaining that the behavior economy promotes rehabilitation because it gives youth detained at the facility "the opportunity to take responsibility and to enjoy the benefits of being responsible. It gives them the opportunity to feel some sense of control, and generally speaking it promotes good behavior because when you behave well, you get good things, and that's good not only for the youth but also for the facility."  PSOAF ¶ 44.  Plaintiffs' experts have explained that eliminating the behavior economy degraded this feeling of agency for the detainees in the facility, impeding the rehabilitation that is at the heart of the JTDC's purpose and that is guaranteed by the due process clause.  PSOAF ¶ 44.

Plaintiffs' experts have explained that regular visits from family are critical for maintaining the well-being of detainees, and it is important that these visits be private, as many detainees have nobody to confide in while they are incarcerated.  (**ECF 236-1** Ex. 2 ¶ 30(e).) Eliminating visits for some detainees (like Q.B.) and reducing the privacy of those detainees who had visits (like T.S.) was psychologically harmful to them.

Accordingly, even if this Court holds that a Fourteenth Amendment due process claim regarding conditions of confinement requires some threshold showing that the conditions are sufficiently serious, which it does not, Plaintiff's evidence would permit a factfinder to reach precisely this conclusion.  Defendants do not acknowledge any of Plaintiff's expert evidence in

their motion.[6]  Instead, they present a variety of cases in which serious impositions were held not

to violate due process because they *were* imposed pursuant to legitimate governmental

imperatives.  ECF 414 at 18-19; 25-26.

Those cases do not govern the outcome here, however, because the frame of analysis that

Defendants propose ignores the totality of the circumstances in this case.  There is ample and

compelling evidence that Dixon went forward with the *Empire* lockdowns for Fox's benefit and

for his own personal benefit, without any legitimate governmental interest or any concern

whatsoever about the minors housed at the JTDC.  A reasonable jury could conclude that had

Dixon actually believed that the filming was beneficial to the JTDC's detainees, he would have

so informed Judge Holderman and the *Doe* monitors.  But Dixon did the opposite—concealing

the filming—permitting a jury to conclude that Dixon the lockdowns he was imposing were both

unrelated to a legitimate governmental interest and causing young detainees in his care to suffer

harm.  And indeed, the evidence in this case would permit a reasonable factfinder to conclude

that Fox was allowed to enter the JTDC not for the benefit of the minors housed there, but

because Dixon was starstruck and wanted to be part of the excitement of filmmaking.  That is an

unfortunate conclusion to draw from the evidence, but it is an entirely reasonable one.[7]

---

[6]  The only time that the Defendants acknowledge either of these expert opinions is to take out of
context one of Dr. Kraus's response to a question and claim that his answer was "represented to him
by Plaintiffs' counsel."  *See* ECF 414 at 12.  Plaintiffs encourage the Court to read the deposition
passage that the Defendants cite in support of this claim, *see* ECF 412-53.  In it Dr. Kraus responds
to a hypothetical question and with a hypothetical answer—all about quality of schooling, which he
explains is not the concern of his report.  And there is no suggestion anywhere that Dr. Kraus's own
hypothetical came from a representation by Plaintiffs' counsel.

[7] District courts have previously permitted claims that state actors were motivated to violate the
constitutional rights of those in their custody for media attention to proceed.  *See, e.g.*, *Conradt v.
NBC Universal, Inc.*, 536 F. Supp. 2d 380 (S.D.N.Y. 2008) (where the manner in which officers
conducted an arrest was motivated at least in part by the goal of creating footage for a television
show, the officers' actions had no legitimate governmental purpose and the plaintiff's rights were
therefore violated); *Frederick v. Biography Channel*, 683 F. Supp. 2d 798 (N.D. Ill. 2010) (same;
police officer "exacerbat[ed]" arrest to provide dramatic footage for a television crew); *Tiwari v.

II.     **Dixon breached his fiduciary duties to the Plaintiffs.**

As Plaintiffs set out below, the evidence in this case permits the inference that Dixon,

who had been entrusted with instrumentalities designed for the care, safety, and rehabilitation of

the hundreds of minors at the JTDC, misdirected those resources for his own benefit and that of

Fox, to the detriment of the youth who had been placed in his care.  Construing this evidence in

Plaintiff's favor, a factfinder could accordingly find Dixon liable for breaching his fiduciary duty

to Plaintiffs.

a.   **Dixon had a fiduciary relationship with Plaintiffs.**

Under Illinois law, Dixon had control over the care of Plaintiffs at the JTDC, and he

accordingly assumed a fiduciary duty to them as their guardian. *Parks v. Kownacki*, 193 Ill. 2d

164, 169 (2000) ("When [the defendant] accepted the responsibility of plaintiff's care and

education, he took on the role of her guardian, even though he was not given that title by a

court."); *see also Parks v. Kownacki*, 711 N.E.2d 1208, 1216 (Ill. App. Ct. 1999), *overruled on

other grounds by Parks*, 193 Ill. 2d 164 ("A fiduciary duty exists between a guardian and a ward.

This Court has previously recognized Dixon's fiduciary duty to Plaintiffs. ECF 73 at 24-25; ECF

319 at 25 n.14.

The Defendants state that they do not contest this Court's prior holdings regarding

Dixon's fiduciary duty, but appear to argue that such a duty is limited to medical care. ECF 414

at 27. The Defendants offer no support in Illinois statutory or common law for their argument.

Instead, the Defendants cite to federal district court opinions addressing torts arising under other

---

*NBC Universal, Inc.*, No. 08-cv-3988, 2011 WL 5079505 (N.D. Cal. Oct. 25, 2011) (same); *Smart v. City of Miami*, 107 F. Supp. 3d 1271 (S.D. Fla. 2015) (same); *Barrett v. Outlet Broad.*, Inc., 22 F. Supp. 2d 726 (S.D. Ohio 1997) (police violated plaintiff's rights where they altered manner of search to provide footage for media company); *Ayeni v. CBS Inc.*, 848 F. Supp. 362 (E.D.N.Y. 1994), aff'd sub nom. *Ayeni v. Mottola*, 35 F.3d 680 (2d Cir. 1994) (same).

state laws. Those cases find that there is no fiduciary duty owed to adult prisoners. But none of those cases address *Illinois*'s law regarding the fiduciary duty owed to a *minor* who is entrusted to another's care. Plaintiffs have previously identified numerous cases in which courts found the existence of a guardian-ward relationship in the juvenile context. *See* ECF 58 at 15 (quoting *N.G. v. Connecticut*, 382 F.3d 225, 232 (2d Cir. 2004) ("Where the state is exercising some legitimate custodial authority over children, its responsibility to act in the place of parents (in loco parentis) obliges it to take special care to protect those in its charge"); *J.H. v. Mercer Cty. Youth Det. Ctr.*, 930 A.2d 1223, 1230 (N.J. App. Div. 2007) (concluding that as in loco parentis, a juvenile detention center "operates in the traditional role of a guardian toward its ward.")). *Accord Mashburn v. Yamhill Cty.*, 698 F. Supp. 2d 1233, 1238-39 (D. Or. 2010) ("[D]efendants act as guardians to the children in the detention facility. This guardianship status gives rise to special responsibilities and obligations to care for and protect detained children.").

As noted above, Judge St. Eve previously held that Dixon owed a fiduciary duty to the youths at the JTDC to protect their "safety and well-being[.]" ECF 73 at 25. In reaching this conclusion, Judge St. Eve relied on Illinois law, including the Illinois Supreme Court's decision in *Parks*. *Id.* at 24. Nothing about Judge St. Eve's decision turned on medical care, and the decision itself makes clear that no such distinction exists. *Id.* at 25 (noting that Plaintiffs' allegations sufficiently alleged a breach of the fiduciary duty "by subjecting the juveniles to *numerous restrictions* that were detrimental to their health and safety" (emphasis added)). The Defendants have offered no legitimate justification for determining that Illinois law restricts the fiduciary duty that a guardian owes to its minor wards solely to issues regarding medical care. This Court should accordingly reject any such argument.

Next the Defendants seize on Judge St. Eve's citation to *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989) to argue that *DeShaney*'s Eighth Amendment threshold for generic prisoner cases should supplant the state-law claim that Plaintiffs have actually asserted. *See* ECF 410 at 25-26; ECF 414 at 27; *DeShaney*, 489 U.S. at 197-98. Defendants ask this Court to find that any fiduciary duty Dixon might is equivalent to the Eighth Amendment's bar on cruel and unusual punishment: "nothing more and nothing less[,]" thereby effectively federalizing (with a more stringent standard of liability than Plaintiffs' constitutional claims) Plaintiffs' state-law claim ECF 410 at 29.

This would turn *DeShaney* on its head. In that case the Court took pains to point out that while the plaintiff did not have a constitutional due process claim, he would have a claim sounding in state tort law. 489 U.S. at 202 (recognizing the availability of remedies under state tort law, but finding that the Due Process Clause does not "transform every tort committed by a state actor into a constitutional violation"). The Defendants effectively ask this Court to do precisely what the Supreme Court in *DeShaney* rejected: to find that action by a state actor must be governed by constitutional principles, rather than those arising under state law. In other words, the Defendants would have this Court deprive Plaintiffs of their state law remedy based on an assertion that the conduct at issue does not also amount to a constitutional violation. That is the precise outcome that *DeShaney* disavowed.[8]

---

[8] Moreover, in promoting *DeShaney* the Defendants studiously ignore the due process standard for *juvenile* detention set out in *Nelson v. Heyne*, 491 F.2d 352 (7th Cir. 1974), that "[w]hen a state assumes the place of a juvenile's parents, it assumes as well the parental duties, and its treatment of its juveniles should, so far as can be reasonably required, be what proper parental care would provide." ECF 73 at 24 (quoting *Nelson*). If the Court does adopt a federal standard, which it should not, *Nelson*, which involved children, provides the relevant one.

**b. Dixon breached his fiduciary duties to Plaintiffs.**

Fiduciary duty "prohibits a guardian from dealing with a ward's property for the guardian's own benefit." *In re Estate of Swiecicki*, 477 N.E.2d 488, 490 (Ill. 1985). Here, that duty forbade Dixon from using the instrumentalities with which he was entrusted to rehabilitate Plaintiffs and to protect their safety and wellbeing—here the JTDC's physical plant—to benefit himself or a third party instead. Plaintiffs have offered substantial evidence to show that the normal operations of the JTDC—such as off-pod activities and outdoor recreation, visitation rooms that permitted privacy, functional population caps within the facility, and the behavior economy—were all designed to ensure the safety and well-being of the youth detained there, to reduce the psychological damage that incarceration has on children like Plaintiffs, and to improve the detainees' chances of rehabilitation. This evidence, reflected principally in the opinions of Mr. Dunlap and Dr. Kraus, is the same for T.S., Q.B., and H.C.

Plaintiffs have also pointed to extensive evidence that Dixon upended these operations in order to benefit himself and Fox, at the expense of the youth detained at the JTDC. *See supra* at 13. And they have offered evidence that Dixon's degradation and elimination of these programs and services was both psychologically harmful to the young detainees at the JTDC, and placed them in physical danger. PSOF ¶ 63. The Defendants dispute this evidence, *see* ECF 414 at 29, but such a dispute is for the factfinder—not this Court. Plaintiffs' claims are supported by the expert opinions of both Mr. Dunlap and Dr. Kraus, which establish that additional pod confinement, loss of privacy in visitation, and the like are psychologically harmful to incarcerated youth and increase the risk of physical violence. PSOF ¶¶ 8, 57-61. These opinions apply to T.S., Q.B., and H.C. alike. See PSOF 68. This is evidence from which a reasonable

41

fact-finder could conclude that Dixon breached his fiduciary duty to the Plaintiffs, and that Plaintiffs were harmed as a proximate result.

In addition to this evidence, Plaintiffs will also show that Dixon breached his fiduciary duty by *endangering* them and thus breaching his fiduciary duty to protect their safety and wellbeing. Specifically, both Mr. Dunlap and Dr. Kraus offer the opinion that in addition to injuring the youth at the JTDC in the manner described above, the *Empire* lockdowns, particularly additional pod confinement and overpopulation, endangered the safety of the JTDC's detainees by making physical violence among them more likely. PSOAF ¶ 65. That is competent evidence from which a reasonable factfinder could conclude that Dixon breached his fiduciary duty to the Plaintiffs to provide for their safekeeping.

### c. Dixon's breach of fiduciary duty gives rise to both damages and restitution.

As Plaintiffs explained in their renewed motion for class certification, they seek two distinct remedies for their breach of fiduciary duty claim: (1) damages and (2) restitution. *See* ECF 351 at 29-32. The elements satisfying those two different remedies are distinct, and thus Plaintiffs address them separately.

***Breach of fiduciary duty—damages***. As the January 16 Opinion explains, "[t]o succeed on a claim for breach of fiduciary duty under Illinois law, Plaintiffs must show that (1) a fiduciary duty existed, (2) that duty was breached, and (3) the breach of the duty proximately caused damages." ECF 319 at 25 (quotation omitted). The *Empire* lockdowns that Dixon imposed in breach of his fiduciary duties proximately caused the injuries to Plaintiffs discussed above, including increased pod confinement, deprivation from the outdoors, and loss of privacy in visitation, which are described in detail by Mr. Dunlap and Dr. Kraus, *supra* pp. 36-37.

42

*Breach of fiduciary duty—restitution*.  Plaintiffs also assert a claim for restitution

resulting from a breach of fiduciary duty.  *See* ECF 88 ¶ 116.  These elements are distinct.  While

the plaintiff must still prove the existence of a fiduciary duty and a breach, instead of providing

that the breach proximately *injured* the plaintiff, the plaintiff must instead prove that the breach

benefitted the fiduciary (or a third party with notice).  *See Martin v. Heinold Commodities, Inc.*,

643 N.E.2d 734, 745 (Ill. 1994) ("The Restatement of Restitution also specifies that a

constructive trust is imposed to recover any illegal benefit a breach of fiduciary duty may have

given the fiduciary.").  "[I]t is gain to the agent from the abuse of the relationship that triggers

the right to recover, rather than loss to the principal." *Martin*, 163 Ill. 2d at 57 (quotation

omitted).  *Accord See Pro-Pac Inc. v. WOW Logistics Co.*, 721 F.3d 781 (7th Cir. 2013) (a

person who obtains a benefit in breach of fiduciary duty or in consequence of another's breach

"is liable in restitution to the person to whom the duty is owed" (quoting § 43 Restatement

(Third) of Restitution & Unjust Enrichment (Am Law Inst. 2011) (hereinafter "Restatement

(Third) § 43") (construing Wisconsin law).[9]  The parties are not in dispute that Fox obtained

revenue from the filming, *see, e.g.*, ECF 180, and Plaintiffs will put forth proof of that revenue's

attribution to the breach.

## III.    A reasonable jury could conclude that Dixon's abuse of his power over hundreds of children constituted an intentional infliction of emotional distress.

To make out a claim for intentional infliction of emotional distress ("IIED"), a plaintiff

must allege that the defendant's conduct was "extreme and outrageous," that the defendant knew

there was a high probability that its conduct would cause severe emotional distress, and that the

---

[9] Illinois courts also look to the Restatement (Third) § 43 for guidance regarding restitution in the context of breaches of fiduciary duty, *see Happy R Sec., LLC v. Agri-Sources, LLC*, 988 N.E.2d 972, 982 (Ill. Ct. App. 2013) (citing Section 43 for discussion of restitution in the context of a breach of fiduciary duty).

conduct caused such distress. *See Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003). As to the emotional distress suffered by the Plaintiffs, Illinois courts "tend to merge the issue of the outrageousness of the defendant's conduct with the issue of the severity of the plaintiff's emotional distress," *Bristow v. Drake St. Inc*., 41 F.3d 345, 350 (7th Cir. 1994), such that "'the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.'" *Id*. (quoting Restatement (Second) of Torts § 46 cmt. J). As a result, "the very nature of the conduct involved may [itself] be evidence of its [emotional] impact on the victim." *Honaker v. Smith*, 256 F.3d 477, 496 (7th Cir. 2001). In turn, the more power and control that a defendant has over a plaintiff, the more likely defendant's conduct will be deemed outrageous. *See Graham v. Commonwealth Edison Co*., 742 N.E.2d 858 (Ill. 2000). This is especially true if, as here, the defendant knew that the plaintiff is particularly susceptible to emotional distress. *Id.*

In this case, the victims of Dixon's scheme were hundreds of children. They had been removed from the care of their parents and were instead entrusted to Dixon's care, under his complete control. Dixon knew these children were exceptionally vulnerable, calling juvenile detention the "emergency room of the juvenile justice system." PL Ex. 21 at 49. Despite knowing all this Dixon put hundreds of children on the lockdowns described herein so that Fox could film a commercial television show at the facility and he could mingle with the show's stars—worsening the psychological impact of incarceration on those same children. That is an outrageous abuse of power, and its predicate facts satisfy the elements of IIED.

## IV. Dixon has no immunity from suit.

The Defendants assert that even if Dixon violated one or more of Plaintiffs' rights, he enjoys several immunities that protect him from liability. Defendants are wrong. None apply.

a.     **Eleventh Amendment Immunity**

Defendants claim Dixon is entitled to Eleventh Amendment immunity because (1) the Court determined the Office of the Chief Judge ("OCJ") is a state entity, and (2) Dixon is the "final decisionmaker" for the OCJ.  ECF 414 at 22-23. This argument, however, misunderstands Eleventh Amendment immunity entirely.  Dixon is being sued in his individual capacity, not his official capacity.  The Supreme Court has long held that suits against state officials in their personal capacity are not barred by the Eleventh Amendment. *See Scott v. O'Grady*, 975 F.3d 366, 369 (7th Cir. 1992) (citing *Kentucky v. Graham*, 473 U.S. 159, 167 (1985)).  The distinction does not change, furthermore, when a defendant sued in his individual capacity has supervisory or decision-making authority (final or otherwise).  Heads of agencies are routinely sued in their individual capacities for policymaking decisions they take which are alleged to have caused a plaintiff's injuries.  *See, e.g.*, *Digiore v. State of Ill.*, 962 F. Supp. 1064, 1070 (N.D. Ill. 1997) (upholding individual capacity suit against Illinois Secretary of State and Director of Police against Eleventh Amendment challenge); *Buchanan v. Pfister*, No. 17-cv-8075, 2018 WL 4699778, at *6 (N.D. Ill. Oct. 1, 2018) (upholding individual capacity suit against IDOC Warden against Eleventh Amendment challenge).  Defendants cite *Mathlock v. Fleming*, 2019 WL 2866726 (N.D. Ill. July 3, 2019), but the case is inapposite.  In *Mathlock* the plaintiff sued Dixon in his *official* capacity, *see id*. at *2, not in his individual capacity, as Plaintiffs have here.  Dixon is not entitled to Eleventh Amendment immunity.

b.     **Qualified immunity.**

Dixon asserts he is entitled to qualified immunity, claiming broadly that the due process violations Plaintiffs experienced in lockdown did not rise to the level of a clearly established constitutional right.  *See* ECF 414, 24-25.  Dixon, however, limits his focus to the discrete acts of

deprivation that Plaintiffs experienced, rather that the constitutional right at issue. Dixon thus

has it backward: the relevant question for qualified immunity is whether the right to be free from

conditions imposed on them for no legitimate reason was clearly established. Plainly it was.

In *Bell v. Wolfish*, the Supreme Court held that the Fourteenth Amendment's Due Process

Clause prohibits holding pretrial detainees in conditions that "amount to punishment," and

further holding that a condition amounts to punishment if it is "imposed for the purpose of

punishment" or it "is not reasonably related to a legitimate goal". 441 U.S. 520, 535, 538-39

(1979). Thus at the time of the lockdowns it was clearly established that a detainee's due process

rights are violated if they can show "objective evidence that the challenged governmental action

is not rationally related to a legitimate governmental objective or that it is excessive in relation to

that purpose." *Kingsley,* 576 U.S. at 399. These are general statements of law in the sense that

they do not concern a specific type of deprivation, but "general statements of the law are not

inherently incapable of giving fair and clear warning" that an official's actions are unlawful.

*United States v. Lanier*, 520 U.S. 259, 271 (1997), and Supreme Court has made it clear that

there need not be a case with "materially" or "fundamentally" similar facts in order for a

reasonable person to know that his or her conduct would violate the constitution. *Hope v. Pelzer*,

536 U.S. 730, 741 (2002). Rather, the ultimate question is whether, "in the light of pre-existing

law[,] the unlawfulness [is] apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The facts in this case, taken in the light most favorable to Plaintiffs as the non-moving

parties, establish that Dixon enacted the lockdown policy in issue in order to facilitate the filming

of *Empire* at the JTDC. That resulted in deprivations on hundreds of children that were not

related to a legitimate governmental purpose, or at best were wildly excessive in relation to any

legitimate interest. The lockdowns were not enacted in order to carry out a legitimate penological

46

objective at the JTDC—unlike, for example, the practice of double-bunking detainees the Supreme Court described in *Bell*, 441 U.S. at 525-26—nor were they imposed to safeguard the safety and security of the detainees at the JTDC. They were entirely illegitimate.

A Ninth Circuit case, *Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) is instructive. In *Arpaio* the sheriff installed webcams in one of the county's jails, and livestreamed the video-feed on the internet. 378 F.3d at 1024. The Sheriff did so in order to deter crime, and to allow family and friends of incarcerated detainees the ability to view them. *Id*. The Ninth Circuit held that this practice was unconstitutional, however, because the practice did not serve any non-punitive governmental objects, such as improving the safety and security in the jail, and must accordingly be considered punishment under the Fourteenth Amendment. *Id*. at 1030-31, 33. Even though the deprivation in *Arpaio* was not "independently cognizable as a separate constitutional violation," because it did not serve a legitimate penological purpose, it was prescribed by the Fourteenth Amendment. *Id*. *Accord Robles v. Prince George's County*, 302 F.3d 262, 269-70 (4th Cir. 2003) ("Even a so-called prank that fails to serve any 'legitimate governmental objective' can constitute a due process infraction.")

The same can be said of the facts at issue here. Taken in the light most favorable to the Plaintiffs, the deprivations that Dixon imposed to facilitate the filming were entirely illegitimate—they were arbitrary and purposeless. As Judge St. Eve held at the Rule 12 stage, Dixon cannot prevail on qualified immunity if he imposed the deprivations at issue for entirely illegitimate reasons. *See* ECF 73, 20-21 *citing Kingsley*. In light of *Kingsley*'s admonition that a deprivation that is imposed for no legitimate purpose violates due process, it should have been apparent to Dixon that imposing deprivations on hundreds of children for the purpose of securing

47

commercial filming space violated their due process rights. Dixon's invocation of qualified immunity should accordingly be rejected.

### c.     State-officer "sovereign" immunity.

Dixon argues that he is a state employee, and as such he is immune from all of Plaintiffs' state-law claims against them. ECF 414 at 23. Plaintiffs do not concede that Dixon is a state employee, but even if he were his argument is incorrect. Dixon's argument is grounded in the Illinois Court of Claims Act, 705 ILCS 505/8, which confers exclusive jurisdiction on claims against the state in the Illinois Court of Claims. *See, e.g.*, *Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001). His contention is not that Plaintiffs cannot sue him for state law torts, but that they can only do so in the Court of Claims. In *Rodriguez v. Cook County*, 664 F.3d 627 (7th Cir. 2011), however, the Seventh Circuit unequivocally rejected this precise argument, stating that even "if Illinois had purported to insist that all civil litigation against [state officials] occur in state courts, that could not curtail federal jurisdiction. Congress, not the states, determines the jurisdictional authority of the federal courts." 664 F.3d at 632.

In other words, "states cannot insist that any particular category of litigation be conducted only in state court." *Id*. The Court of Appeals reaffirmed *Rodriguez* in *Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012), holding that "a state employee's sovereign- immunity defense does not impact a federal court's jurisdiction over a case." 672 F.3d at 518. Dixon's "sovereign immunity" argument is thus doomed at the outset. *See, e.g.*, *Pippion v. Hedden*, No. 3:19-CV-3010, 2019 WL 1507428, at *2 (C.D. Ill. Apr. 5, 2019) ("[T]he Seventh Circuit has held that 'a state employee's sovereign immunity defense does not impact a federal court's jurisdiction over a case.'" (quoting *Fields*, 672 F.3d 518, and citing *Rodriguez*)).

Even if *Rodriguez* and *Fields* had never been decided, moreover, the Illinois Supreme Court has made clear that "[w]henever a state employee performs illegally, unconstitutionally, or without authority, a suit may still be maintained against the employee in his individual capacity and does not constitute an action against the State of Illinois." *Fritz v. Johnston*, 209 Ill. 2d 302, 313 (2004). In other words, "[s]overeign immunity affords no protection . . . when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority, and in those instances an action may be brought in circuit court [instead of the Court of Claims]." *Healy v. Vaupel*, 133 Ill. 2d 295, 308 (1990). In this case, Plaintiffs have asserted that Dixon's misconduct violated their constitutional rights. And Plaintiffs' state law claims are predicated on the same acts. Sovereign immunity does not apply.

V. **Cook County must indemnify Dixon**.

The Defendants argue that because the Court held that the office of the Chief Judge's office is a state entity for purposes of Eleventh Amendment immunity, and because Dixon is an employee of the Chief Judge's office, Dixon is a state employee and the County is not obligated to indemnify him. ECF 414 at 19-20. In Illinois, however, counties have a duty to indemnify claims brought against State officials where the county funds the office of that state official. *Robinson v. Sappington*, 351 F.3d 317, 339 (7th Cir. 2003) ("The responsibility for maintaining and funding the Macon County Circuit Court lies with Macon County. Under Illinois law, it is responsible for the payment of expenses and judgments emanating from the workings of that court. The fact that some of the parties involved are state officials, as opposed to employees of Macon County, does not alter that fiscal responsibility."). Nothing in the 2007 amendments to the Detention Home Act that transferred operational control of the JTDC from Cook County to the Chief Judge's office altered the County's obligation to fund the JTDC. To the contrary, the

49

JTDC's funding still comes from the County.  *See* 55 ILCS 75/1(a).  The County is therefore

obligated to indemnify Dixon and dismissal of Plaintiffs' claim against the County for

indemnification is improper.[10]

## VI.    Fox is liable to the Plaintiffs both for inducement and in unjust enrichment.

Plaintiffs have asserted two claims against Fox:  Count VIII (inducement of breach of

fiduciary duty) and Count XIII (unjust enrichment or accounting).  Fox makes two principal

arguments in support of summary judgment, neither of which has merit.[11]

First, Fox argues that it cannot be liable to Plaintiffs under either of Plaintiffs' claims

unless it engaged in "active misbehavior," meaning it induced or participated in Dixon's breach

of fiduciary duty.  This is wrong.  Plaintiffs' inducement claim (Count VIII) does require a

showing of "active misbehavior."  But Plaintiffs' unjust enrichment claim (Count XIII) does

not—it merely requires that Fox have accepted the benefits of Dixon's breach with notice of the

---

[10] Cook County also seeks dismissal of the *Monell* claim against it.  *See* ECF 414 at 19-20.
Plaintiffs do not object.  Plaintiffs asserted the *Monell* claim against Cook County when the
amendments to the Illinois County Shelter Care and Detention Home Act left uncertain which entity
controlled the facility.  Indeed, at the outset of this case the Defendants contended that the County,
not the Chief Judge's office, exercised control over the JTDC, *see, e.g.* ECF 59 at 2-3, and the Court
noted at the Rule 12 phase that this question of law was uncertain.  *See* ECF 73 at 19.  The
Defendants have since abandoned that position, and the parties are now in agreement that it is the
Chief Judge's office that exercises operational and administrative control over the JTDC.  *Compare*
ECF 310 ¶ 1 (Plaintiffs) *with* ECF 310 ¶ 7 (Chief Judge's office).  Thus Plaintiffs do not object to the
dismissal of the *Monell* claim against Cook County.

[11] In previous briefing Fox has also argued that even if it were otherwise liable in restitution,
Plaintiffs have no "entitlement" to the benefits it realized Dixon's unlawful conduct.  *See, e.g.*, ECF
180.  But Fox does not make those arguments in support of its summary judgment motion, so they
are waived.  *See, e.g.*, *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("[I]f the
moving party does not raise an issue in support of its motion for summary judgment, the nonmoving
party is not required to present evidence on that point, and the district court should not rely on that
ground in its decision.").  In all events they are wrong; Plaintiffs' evidence satisfies the elements
required for restitution, as set out herein.

breach. And, contrary to Fox's arguments, a reasonable factfinder could find that Plaintiffs have established their unjust enrichment claim under Illinois law.

Second, Fox argues that to be held liable Plaintiffs must prove that Fox *actually* knew that Dixon was violating the rights of the JTDC's residents. This is not true. The standard is constructive notice: Fox is liable if it knew, or should have known, that Dixon was violating the rights of the detainees in order for Fox to film its show.

From the outset, Fox has itself recognized that a film crew of the size and duration it used would badly disrupt the JTDC's operations. Rather than take any action in response to that recognition, it instead lavished attention on Dixon— providing him with repeat audiences with the show's stars, and even custom-ordering him an embossed *Empire* "directors" chair when he demanded it as a condition of coming back to film for the third session. As such, Fox (1) engaged in active misbehavior, and (2) it accepted a benefit from Dixon that it knew or should have known was acquired by violating the rights of Plaintiffs and the hundreds of other children at the JTDC. *Either* ground is sufficient to impose liability on Fox in this case.

### a. Fox is subject to liability in restitution if it engaged in "active misbehavior," <u>or</u> if it merely accepted benefits from the breach with notice.

Fox argues that it cannot be liable in restitution without "'a showing of some active misbehavior'" by Fox itself, a rule Fox draws from the Court's *dicta* in its January 16 class certification decision. ECF 410 at 27 (quoting ECF 319 at 28)). Fox did engage in "active" misbehavior, as Plaintiffs explain below, but no such showing is required.

"Active misbehavior" is certainly required for Plaintiffs' inducement claim (Count VIII), and it is *a* ground for creating liability in restitution. But under Illinois law, "active misbehavior" is not necessary to create liability in restation asserted in Count XIII. In Illinois, rather, "[a] third party who induces a breach of a trustee's duty of loyalty, or participates in such

51

a breach, or *knowingly accepts any benefit* from such a breach, becomes directly liable to the

aggrieved party." *Vill. of Wheeling v. Stavros*, 411 N.E.2d 1067, 1070 (Ill. Ct. App. 1980)

(emphasis added). *Accord* ECF 117 at 3 (quoting *Stavros*). *Stavros* is articulated as a disjunctive

rule, setting out that a party is liable in restitution either if it induces or participates in a breach,

*or* if it "knowingly accepts any benefit from such a breach." The disjunctive articulation of this

rule was not grammatical happenstance, but rather is well-settled law. *See, e.g., Chicago Park*

*Dist. v. Kenroy, Inc.*, 402 N.E.2d 181, 186 (Ill. 1980) ("[C]onstructive trusts on benefits obtained

by third persons through their knowledge of or involvement in a public official's breach of

fiduciary duty."); *People ex rel. Daley v. Warren Motors, Inc.*,500 N.E.2d 22, 28 (Ill. 1986)

(same, quoting *Kenroy*).

Restatement (Third) § 43, which both draws on Illinois law and is relied upon by Illinois

courts for guidance regarding liability for restitution, *see Happy R Sec.*, 988 N.E.2d at 982,

makes the distinction explicit. In Comment g to Restatement (Third) § 43, which concerns

"[c]laims against third parties" explains:

> Once property has been transferred in breach of the transferor's fiduciary duty,
> the beneficiary may obtain restitution from any subsequent transferee who does
> not qualify as a bona fide purchaser. Benefits derived from a fiduciary's breach of
> duty may therefore be recovered from third parties, not themselves under any
> special duty to the claimant, who acquire such benefits with notice of the breach.
> *See* Illustrations 31-32. *A fortiori*, one who actively participates in another's
> breach of fiduciary duty will be liable to disgorge the profits realized thereby. *See*
> Illustration 33.

Restatement (Third) § 43 cmt. g. (citation omitted). Comment g provides for recovery from third

parties "who acquire such benefits with notice of the breach," irrespective of their participation

or inducement of the breach. Indeed, this includes "subsequent transferees" of the acquired

benefit who have notice of the breach—a group that by definition could not have participated in

or induced the breach. *Id.* And Comment g specifically distinguishes cases of active

misconduct, noting that "*A fortiori*, one who actively participates in another's breach of fiduciary duty will be liable to disgorge the profits realized thereby," and provides the example of a person benefiting by paying the fiduciary a bribe. *Id.* & Illus. 33.

Thus while "active" misconduct certainly *may* generate liability, it is not necessary. Rather, it the elements of the tort are satisfied if the third party acquires the benefit "with notice of the breach." *Id.* To explain *that* principle, Comment g provides Illustration 32, which is drawn from *Conant v. Karris*, 520 N.E.2d 757 (Ill. Ct. App. 1987). In *Conant*, the plaintiff-investor, Conant, created a proprietary business plan for buying a property and hired a broker, Ernest, to represent him in the transaction. Ernest communicated the plan to his brother, Nicholas, who knew that Ernest was acting as Conant's agent. After Nicholas used the information from Ernest to underbid Conant for the property, Conant sued Nicholas for an accounting. 520 N.E.2d at 786. The court held that even though Nicholas was a third party, he was liable in unjust enrichment. Specifically, the Illinois appellate court held that it was "not necessary to have a fiduciary relationship between plaintiff and the buyer" in order to maintain a claim for breach of fiduciary duty. Instead, a "third party who . . . knowingly accepts any benefit from [] a breach [of fiduciary duty] becomes directly liable to the aggrieved party." *Id.* at 790-91.

No active participation was necessary in *Conant* because Nicholas accepted the beneficial information with notice of the breach. *Id.* Indeed Comment g pairs *Conant v. Karris* with Illustration 31, which makes the same point even more clearly:

> Guardian pledges bonds held for Ward as security for a new loan by Bank to Guardian personally. Facts known to Bank are sufficient to afford notice that the pledge is a violation of Guardian's fiduciary duty. Although Bank gives value when it takes the bonds as security, Bank's notice of Guardian's breach of duty forecloses a defense of bona fide purchase. Ward has a claim in restitution against Bank to recover the Bonds or their proceeds.

Restatement (Third) § 43, Illus. 31 (citations omitted).  The bank could not be said to have

engaged in active misbehavior, as its only "act" was to accept the guardian's security pledge.

But because the bank accepted the pledge knowing sufficient facts "afford notice that the pledge

is a violation of Guardian's fiduciary duty," it was subject to a claim for restitution. *Id.* Thus

"knowingly accept[ing] any benefit from [] a breach" of fiduciary duty is sufficient to render a

third party liable in restitution.  *Conant*, 520 N.E.2d at 790-91.  In this case, as set out below,

Fox had every reason to know that its filming at the JTDC would disrupt its operations, and that

Dixon was offering the JTDC as a venue in violation of Plaintiffs' rights.  Yet it accepted the

benefits from the filming anyway.  Under *Conant* a factfinder could find that Fox is liable to

Plaintiffs.

Fox cites *Chabraja v. Martwick*, 618 N.E.2d 800, 802 (Ill. Ct. App. 1993) for the

proposition that active participation is always necessary to generate unjust enrichment liability.

*See* ECF 410 at 27.  In that case, however, the plaintiff charged *only* "participation" liability,

which the plaintiff *defined* as accepting the deposit.  *See Chabraja*, 618 N.E.2d at 802.  In doing

so, the plaintiff in *Chabraja* made no allegations about what the bank knew or should have

known about the allegedly unlawful deposits it was accepting, so *Chabraja* had no cause to reach

the question of whether accepting a benefit with notice of a breach generates liability in

restitution.  Nothing in *Chabraja* is inconsistent with the rule in *Conant* that a third party who

has notice of a breach and yet accepts benefits from it takes those benefits subject to a

constructive trust, and liable in restitution.

That a third party can be liable in disgorgement without engaging in "active" misconduct

is also consistent with *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th

Cir. 2019), which Fox additionally cites for the proposition that it can only be held liable in

unjust enrichment if it "actively" participated in or induced Dixon's breach.  ECF 410 at 4.  In

*Benson*, the plaintiffs alleged that a commercial practice was fraudulent and consequently pled a

consumer fraud statute claim and an unjust enrichment claim.  The court held that the consumer

fraud claim was invalid, leaving unjust enrichment as the only claim in the case.  944 F.3d at

648.  The court held that the unjust enrichment claim had to be dismissed, because "in Illinois

there is no stand-alone claim for unjust enrichment."  *Id.*  "Instead, . . . Illinois courts describe

[unjust enrichment] as a condition that may be brought about by unlawful or improper conduct as

defined by law," such that it must be tethered to an unlawful act.  *Id.* (quotation omitted).

Plaintiffs charge that Fox's unjust enrichment *was* "brought about" by unlawful conduct.

In Count VIII Plaintiffs charge that the unjust enrichment was brought about by Fox's

inducement and participation in Dixon's breach of fiduciary duty as well as his violation of the

due process rights of the JTDC's detainees.  And in Count XIII, Plaintiffs charge that Fox's

unjust enrichment was brought about by Dixon's breach of fiduciary duty and his violation of the

detainees' due process rights,[12] from which Fox accepted benefits with notice of Dixon's

---

[12]  Unjust enrichment liability is not confined to a third party's enrichment of breaches of fiduciary duty; it applies to third parties who benefit with notice from wrongs other than breaches of fiduciary duty as well. That principle is set out in the Restatement (Third) of Restitution and Unjust Enrichment § 44(1), which tracks the language of Restatement (Third) § 43 in providing that "[a] person who obtains a benefit by conscious interference with a claimant's legally protected interests (or in consequence of such interference by another) is liable in restitution as necessary to prevent unjust enrichment." *Id*. (emphasis added).  That is consistent with *Benson*'s formulation that unjust enrichment may be "brought about" by unlawful conduct generally.  And it is recognized in other Illinois decisions as well.  *See Wms. Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) (restitution is available for unlawful conduct "whether or not the tort involved a breach of fiduciary duty"); *TCF Mortg. Corp. v. Gelber Holding Co.*, No. 91-cv-2125, 1991 WL 127587, at *3 (N.D. Ill. July 3, 1991) (plaintiff stated an unjust enrichment claim against second defendant for profiting from first defendant's misconduct, even though first defendant was not a fiduciary of plaintiff).  Plaintiffs' Count XIII asserts restitutionary liability against Fox for accepting benefits with notice of Dixon's breach of his fiduciary duty to the Plaintiffs and his violation of Plaintiffs' due process rights.  *See* ECF 88 ¶ 144.  Fox does not discuss this claim in its motion, but Fox remains liable to Plaintiffs on these grounds as well.

unlawful conduct.  In both cases, the unjust enrichment was tethered to unlawful conduct—in Count VIII to Fox's own unlawful conduct, and in Count XIII to Dixon's unlawful conduct of which Fox had notice.  Accordingly, unlike in *Benson*, where the dismissal of the consumer fraud claim left the unjust enrichment claim without any underlying misconduct, in this case Fox's unjust enrichment is a condition that was "brought about" by Dixon's unlawful acts.  Fox is thus the "third party who . . . knowingly accepts any benefit from [] a breach [of fiduciary duty] becomes directly liable to the aggrieved party," making it liable under Illinois law. *Conant*, 520 N.E.2d at 790.  If it "accepted [the] benefits from" filming at the JTDC with notice that they were brought about by Dixon's unlawful conduct, it is liable to the Plaintiffs for unjust enrichment.  *Conant*, 520 N.E.2d at 790.

### b. Fox is subject to liability if it knew about the breach, <u>or</u> if it should have known about the breach.

Fox claims that notice of the breach, as required to establish liability on an unjust enrichment claim, requires proof that Fox *actually knew* that a breach had occurred. But Illinois courts have repeatedly held that constructive notice—which would indicate to a reasonably intelligent person (or corporation) that an investigation into the lawfulness of the conduct was necessary—is sufficient.

Fox argues that it cannot be held liable for unjust enrichment because it did not *actually know* that Dixon was breaching his fiduciary duties to the children in the facility, and thus did not actually know that the children at the facility suffered any meaningful impact from the filming.  *See, e.g.*, ECF 410 at 17.  But the relevant question under Illinois law is whether Fox was aware of circumstances that should have caused a reasonable person to investigate if Dixon was violating the detainees' rights to provide Fox with the filming venue.

That rule set out plainly in *People ex rel. Daley v. Warren Motors, Inc.*, 500 N.E.2d 22 (Ill. 1986). *Warren Motors* arose out of a corrupt practice in which several current and former employees of the Cook County Assessor's Office would hold themselves out to property owners as tax consultants who could reduce the owner's property tax assessments in exchange for a portion of the savings. *Warren Motors*, 500 N.E.2d at 23-24. When a property owner retained the "consultant" to get a tax reduction, the corrupt employees would prepare and file a tax complaint on the owner's behalf, and would then enter the Assessor's Office after hours and enter a lower valuation in the Assessor's files. *Id.* When the county sued one of these property owners (an auto dealer) to recover the resulting tax benefits on a theory of unjust enrichment, the dealer argued that he was not liable because his only "wrong" was "a failure to inquire into the circumstances of the tax-assessment reductions," which "is insufficient evidence for the imposition of a constructive trust." *Id.* at 28. The court disagreed, explaining that "[a] person has notice of facts giving rise to a constructive trust not only when he knows them, but also when he should know them." *Id.* at 28 (quoting Restatement of Restitution § 174, comment a, at 707–08 (1937)). A person has such notice, the court held,

> "[W]hen he knows facts which would lead a reasonably intelligent and diligent person to inquire whether there are circumstances which would give rise to a constructive trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know of such circumstances."

*Id.* (quoting Restatement of Restitution § 174). Having set out the rule, the court noted that multiple circumstances should have alerted the dealer that the reductions were being achieved by some improper means: (1) the dealer had normally retained a lawyer to "handle the legal affairs of the dealership," but the "consultant" was not a lawyer; (2) the dealer did not have to provide the "consultant" with documents or evidence supporting the reduction, just the index numbers of

the properties for which he wanted reductions; and (3) when the dealer learned that a reduction

had been rescinded, he contacted the "consultant" who said he would "take care of it," and the

reduction was restored.

*Id.* This evidence, the court held, supported an inference that the dealer "knew or should have

known" of "circumstances" suggesting that "illegal means were used to obtain his tax-

assessment reductions are supported by the evidence." *Id.* at 28-29. Other courts have analyzed

the notice required for imposition of a constructive trust in the same way. *See, e.g.*, *In re Bell &*

*Beckwith*, 838 F.2d 844, 849 (6th Cir. 1988) (upholding imposition of a constructive trust against

a third-party beneficiary and explaining that "[i]f the totality of the circumstances surrounding

the conveyance of the assets given to [the third party beneficiary] aroused suspicion, [said

beneficiary] should have inquired as to the source of the property he received," and that

"anything which naturally arouses suspicion as to the invasion of the rights of another should

cause inquiry so as to charge the party with notice of the facts which a proper inquiry would

disclose." (applying Ohio law)); *Lawrence v. Clepper*, 865 P.2d 1150, 1157 (Mont. 1993) (citing

Restatement of Restitution § 174 to hold that "if [the third party beneficiaries] were aware of

facts which should have caused further investigation, and if that investigation would have led to

knowledge of [another's inappropriate] conduct [that benefitted the third party], then they [the

third parties] are charged with notice."). Despite Fox's arguments to the contrary, Illinois law

(supported by cases throughout the country) recognizes that a third party may be liable for unjust

enrichment pursuant to constructive notice—*i.e.*, lead a reasonably intelligent and diligent person

to inquire whether there are circumstances which would give rise to a constructive trust—even if

the person was not given actual notice by being *told* about a breach.[13]

---

[13]  During Rule 12 briefing, Fox suggested that *Warren Motors* was a case about *actual*
knowledge, *see* ECF 103 at 9, but in making this argument Fox added a fact to the case, asserting that

### c. Fox engaged in active misbehavior, and it accepted the benefits of filming even though it was on notice that they were being provided in breach of Plaintiffs' rights.

In this case, a factfinder could reasonably conclude that the circumstances should have prompted a reasonably intelligent and diligent entity to inquire into whether Dixon was mistreating the children in the JTDC in order to provide Fox with a place to film. Fox knew that filming impacts persons nearby the filming, something so common that Fox typically set aside money to pay people near the filming for the inconvenience. PSOAF ¶ 22. Additionally Fox had filmed at night in both Cook County's downtown administration building and its courthouse at 26th and California so that it would not disturb the governmental work being done in those locations. *Id.* Facts like these all tend to show Fox's knowledge that filming would be impactful to all the detainees in the JTDC, as this Court has previously recognized. ECF 319 at 29.

The evidence does not stop there. Fox claims that Klemke never "learned details" about the JTDC's operations. But as Plaintiffs noted, Klemke did know that there was a school in the building, and his claim that Dixon assured him school would be on break is contradicted by Dixon himself. PSOAF ¶ 19. Moreover, Klemke, a highly-regarded scout, toured the JTDC on an early weekday afternoon while it was in operation, and he got an expansive view of the facility and how it worked—the facility's upper floors where the pods are located, and its second and third floors where services and programs are provided to the facility's detainees. PSOAF ¶¶ 18-19. A reasonable factfinder could infer that the problem of the JTDC's layout would have been obvious to him: in an enormous facility with three full floors of confinement pods, the

---

the consultant had "told" the dealer that he was entering the assessor's office after hours to alter the property valuations. *Id.* That fact does not exist, however. *See* ECF 107 *passim* (explaining Fox's addition of facts in *Warren Motors*). *Warren Motors* is about what circumstances should alert a third-party beneficiary to the possibility of misconduct.

second floor was where services were provided to the detainees, and a single place for them to go outside.

Klemke's awareness of these facts is made manifest by Klemke's June 2 email to Dixon, in which he proposed that Fox could depart from its normal filming procedures and film with only a skeleton crew of 30 people to "limit" the number of people who had to be inside the building. PSOAF ¶ 21. And this was Klemke's proposal for mitigating *Empire*'s impact for only two days of filming. *Id.* Klemke now takes the position that he was agnostic as to how many people should be in the building, and was merely providing Dixon with an option so that Dixon could use his professional judgment. PL Ex. 14 at 67-68. But even accepting that as true, Klemke was an experienced location scout who would understand the effects film crews have on the operation of a working building. The fact that he felt it necessary to propose a substantial downward departure from Fox's normal filming procedures, even for a short film session, can fairly be read as his assessment that in order to avoid disrupting the JTDC's operations "too badly[,]" it would be necessary to cut back dramatically even on a normal-size film crew. Klemke's June 2 proposal to use a skeleton film crew makes little sense unless Klemke saw how the JTDC operated and recognized that even a normal film crew, even on a short film shoot, would disrupt those operations considerably.

On June 5, Klemke forwarded his June 2 assessment to Breen. PSOAF ¶ 21Breen knew that the JTDC provided spaces for the children to read and use computers PSOAF ¶ 22, but Fox would take over that area—the media center and library on the second floor—for use by its stars. PSOAF ¶ 19. Breen acknowledged that Fox would take over pods 3A and 3B, but he did not know where the children in those pods were placed during filming. PSOAF ¶ 19. Even though he was never told the exact recreation schedule for the yards, Breen understood that

60

they were set aside for youth to play there.  PSOAF ¶ 19.  Yet Fox took those over as well.  PSOAF ¶¶ 28-31.

Breen and Daniels toured the JTDC on June 11 and met with Dixon to discuss the proposed filming.  PSOAF ¶ 22.  Given Klemke's assessment of the likely impact of filming on the JTDC's operations, what emerged from the June 11 meeting was extraordinary.  It was not two days of filming, but two different filming sessions covering nearly two entire work weeks.[14]  Breen Ex. 7.  And instead of a skeleton crew of 30, Fox brought in crews routinely numbering more than 150 and sometimes more than 200.  PSOAF ¶ 23.  Fox leased all the outdoor yards for all the time it was filming, PSOAF ¶ 28, demanded quiet from the detainees, *id.*, had two pods on the third floor repurposed for its own use, PSOAF ¶ 29, and took over the largest rooms on the JTDC's second floor—its chapel and its library, along with some nearby classrooms—with its large crew being ferried back and forth from these locations to the other parts of the JTDC throughout the day. PSOAF ¶ 30.  All the while Dixon kept the JTDC's residents out of sight, which is to say, out of Fox's way.  PSOAF ¶ 47.  Klemke claims that he sometimes had to wait for a resident to be moved from one location to another, but such events would have been rare; the JTDC had "minimized" movement for both residents and staff on both the second and third floors PSOAF ¶ 24.  The broad occupation of two floors of the JTDC was a departure by orders of magnitude beyond what Klemke assessed on June 2 would impede the JTDC's operations.

During his deposition Daniels testified that he "absolutely" "would [have] want[ed] to know" that the JTDC's residents could not access their classrooms during filming, PSOAF ¶ 66, that it would have mattered to him if the children at the JTDC could not go outside because of the filming, *id*., that he would have wanted to know that kids could not get off their pods for

---

[14]  The need for the third session, in August, would emerge later. PSOAF ¶ 53.

exercise, *id.*, that it would have mattered "[d]eeply" to him that enrichment programming was cancelled for the filming, *id.* Those concerns, which imply a recognition that any such deprivations would be harmful and unacceptable, are aligned with the opinions of Plaintiffs' experts, who have explained that the deprivation of these things was harmful to the young people housed at the JTDC. Yet Fox actually knew about many of these things, and at minimum, a reasonable factfinder could determine that Fox did or should have strongly suspected them.

Despite its actual or constructive knowledge about the harmful impact its filming was having on the youth housed at the JTDC, Fox was confronted in Dixon with an administrator who was willing to upend the JTDC's operations, for no apparent reason other than an obvious desire to be around the action of filming of famous people by a famous director employed by a major film studio. The occasional gestures Dixon made towards getting something out of the filming for the hundreds of children housed at the facility only highlighted how little his invitation to Fox had to do with the welfare of the children housed there. At his meeting with Breen and Daniels on June 11, Dixon either did not ask about having the show's actors meet with the residents in exchange for using the facility, or he asked and was rebuffed. PSOAF ¶ 46. Yet with nothing in hand, Dixon invited Fox to film anyway. *Id.* For this, hundreds of youth in an enormous facility were subject to what Fox knew, or should have suspected, were substantial disruptions of their normal programming, and specifically the restriction of their ability to leave their pods to use the facilities on the JTDC's second and third floors. Dixon demanded nothing more.

By contrast, to get benefits for himself, his family, and his senior staff, Dixon was indefatigable. Plaintiffs have described above the lengths Dixon went to in order to secure photo opportunities and other audiences with the show's stars. It is notable, once again, that aside from

Rock and Howard, Dixon took photos with all of the show's stars but asked none of them to talk with the kids in the detention center. Indeed Breen testified that unlike the occupants of other settings Fox used, Dixon remained in the picture and continued to demand access. And when Fox asked to come back to film in August, Dixon's assistant conveyed a concrete *quid pro quo*: "Tell Brady Breen [Fox's location manager], if Dixon approved this he will need to get Dixon a directors['] chair." PSOAF ¶ 53. As Plaintiffs have explained above, Fox lavished Dixon with attention. It provided multiple audiences for him, his wife, and his senior staff to meet repeatedly with the show's stars. And when Dixon demanded a "director's chair" as a condition for allowing Fox to come back for the third filming session, Fox delivered. Fox provided special favors to Dixon in order to gain access to the facility, all while it either knew or should have known that Dixon was breaching his duties to the youth at the JTDC in order to provide Fox with a filming venue. Under Illinois law, a reasonable factfinder could find Fox liable under both Counts VIII for inducement, and Count XIII for restitution.

### d. Fox cannot escape liability through the lease agreement.

Fox advances one final argument: the Lease Agreement contained a "no-disturbance" provision, so Fox could not have known or had reason to know that the filming was disrupting the lives of the children at the facility. The "no-disturbance" clause, however, is not entitled to the considerable weight Fox gives it. For one thing, as Plaintiffs have explained, *see supra* at 12-13, the Lease Agreement played no role in the discussions between Dixon and Fox about where Fox could film and what Fox could do. It came after those discussions, in boilerplate language sent from a Cook County administrator whom Fox had dealt with for renting other county facilities separate and apart from the JTDC. PSOAF ¶ 25. Thus as a practical matter there is no reason to think it impacted the filming.

63

Moreover, courts have repeatedly rejected invocations of provisions in contracts like this, explaining that if such "formalism were the *sine qua non*" of liability in such cases, liability would be erased "owing to the east and inevitability of its evasion" through formal agreements like the "no-disturbance" clause in the Lease Agreement. *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 301 (2001). For that reason, the "underlying reality of private entity's relationship to the state often trumps legal formalities erected in attempt to thwart" liability in such circumstances. *Wickersham v. City of Columbia*, 481 F.3d 591, 599 (8th Cir. 2007). That should be the rule here. Fox had numerous reasons to believe Dixon had imposed considerable restrictions on the residents of the JTDC in order to facilitate Fox's filming there, yet Fox went ahead and filmed anyway. Given those facts, Fox cannot erase its liability by signing the lease agreement.

## CONCLUSION

For the reasons set out above the Court should deny the Defendants' motions for summary judgment.

February 9, 2020

Respectfully Submitted,

/s/ Stephen H. Weil

Stephen H. Weil – weil@loevy.com
Jonathan I. Loevy – jon@loevy.com
Michael I. Kanovitz – mike@loevy.com
Sarah C. Grady – sarah@loevy.com
Loevy & Loevy
311 N. Aberdeen Street
3rd Floor
Chicago, IL 60607
312.243.5900

*Attorneys for Named Plaintiffs T.S. and Q.B.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2021, a true and correct copy of the foregoing was

filed electronically.  Notice of this filing was sent by operation of the Court's ECF electronic

filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing

through the Court's electronic filing system.

<u>/s/ Stephen H. Weil</u>