## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## ILLINOIS EASTERN DIVISION

| | |
|---|---|
| T.S. *et al.*,<br><br>                    Plaintiffs.<br><br>          v.<br><br>Twentieth Century Fox Television, a division of<br>Twentieth Century Fox Film Corporation et al.,<br><br>                    Defendants. | Case No. 1:16-cv-08303<br><br>Honorable Chief Judge<br>Rebecca Pallmeyer |

## PLAINTIFFS' RESPONSES TO DEFENDANTS' CONSOLIDATED LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Northern District of Illinois Local Rule 56.1(a), Plaintiffs T.S., Q.B., and H.C., by and through their undersigned attorneys, hereby submit the following responses to the Defendants' Consolidated Local Rule 56.1 Statement of Undisputed Material Facts, ECF 415.

### THE PARTIES, JURISDICTION AND VENUE

1.      Plaintiffs T.S., Q.B., and H.C.[2] ("Plaintiffs") are former residents of the Juvenile Temporary Detention Center ("JTDC") in Cook County, Illinois. *See* Plaintiffs' Third Amended Complaint ("TAC"), ¶¶ 2-4.

**Plaintiffs' Response**:  undisputed.

2.      Each Plaintiff was detained at the JTDC on at least some of the days in June, July, and August 2015, when 20th TV filmed scenes from the scripted fictional television series *Empire. See id.*

1

**Plaintiffs' Response**:  undisputed that each Plaintiff was detained at the JTDC on at least some of the days in June, July, and August 2015 when the *Empire* filming occurred.  Object that the evidence cited does not support the claim that the entity which came to film was "20th TV."  The entity that came to film is not identified.

3.      20th TV is a division of Twentieth Century Fox Film Corporation. Twentieth Century Fox Film Corporation operates as a subsidiary of Twenty-First Century Fox, Inc. Fox Broadcasting Company operates the Fox television network that broadcast new episodes of *Empire* during that show's five-season run that concluded in 2020. TAC, ¶¶ 5(a)-(c).

**Plaintiffs' Response**:  First sentence undisputed.  Second sentence undisputed.  Third sentence, undisputed that Fox Broadcasting Company operates the Fox television network that broadcast new episodes of *Empire*; objection that evidence cited does not support that *Empire* had a five-season run that concluded in 2020.

4.      Defendant Leonard Dixon is the superintendent of the JTDC. Dixon oversaw the JTDC's daily operations during the summer of 2015. *See* TAC, ¶ 7.

**Plaintiffs' Response**:  undisputed.

5.      "[T]he parties have stipulated that Dixon was the final policymaker for the [Office of the Chief Judge of Cook County Circuit Court] in the areas relevant to this lawsuit." *See* Dkt. No. 405 at 7.

**Plaintiffs' Response**:  undisputed; Plaintiffs' understanding is that the relevant entity is named the Office of the Chief Judge of the Circuit Court of Cook County.

6.      Defendant The County of Cook, Illinois ("Cook County") is a county in Illinois.

*See* TAC, ¶ 8.

**Plaintiffs' Response**:  undisputed.

7.    This Court has jurisdiction for purposes of Defendants' Motions for Summary Judgment pursuant to 28 U.S.C. §§ 1331 and 1343 and jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a). *See* TAC, ¶ 11.

**Plaintiffs' Response**:  undisputed.

8.    Venue is proper in this District for purposes of the Fox Defendants' Motion for Summary Judgment pursuant to 28 U.S.C. § 1391(b). *See* TAC, ¶ 12.

**Plaintiffs' Response**:  undisputed.

9.    In the summer of 2015, Cook County and 20th TV entered into a "Location Agreement" allowing 20th TV to film scenes for *Empire* at the JTDC. *See* Ex. 1, ¶ 1(a); Exs. 13- 14.

**Plaintiffs' Response**: undisputed.

10.    20th TV accessed the JTDC pursuant to the Location Agreement and two addenda for five days in June 2015, four days in July 2015, and three days in August 2015. *See id.*

**Plaintiffs' Response**:  undisputed that Fox signed a location agreement prior to each filming session at the JTDC, and undisputed that Def. Exs. 1, 13, and 14 are copies of the location agreements and addenda entered into by Fox prior to each filming session at the JTDC.  Object that "pursuant to" is a legal conclusion that is unsupported by the evidence cited, to the extent "pursuant to" is meant to imply that Fox entered and used the JTDC strictly "pursuant to" the language in lease agreements.  By way of example, Fox used the JTDC's chapel as cast and crew staging are, *see* PSOAF ¶ 23, but those are not reflected in the lease agreements.

11.    Andrew Kruzel, a Cook County real estate official, signed the Location

3

Agreement and the two addenda on behalf of Cook County. *See id.*

> **Plaintiffs' response:** disputed. None of the cited lease agreements are signed by Andrew
>
> Kruzel. *See* Def. Exs. 1, 13, and 14.

12.     The Location Agreement was a standard Cook County form that Cook County modified to fit the particulars of 20th TV's request. Ex. 11 33:3-34:15, 47:3-7.

> **Plaintiffs' response:** object that the term "modified" is vague with respect to the evidence
>
> cited. The evidence cited reflects that some terms were modified, but that many other terms in
>
> the Location Agreement were standardized, and were not modified to fit any particulars
>
> relating to the filming at the JTDC.

13.     The Location Agreement gave 20th TV "the right to enter upon, use[,] . . . photograph, . . . and sound record . . . the [JTDC's] visitation room, exercise yard, medical office, living pod, and common hallways and lobby areas located in the residents section." Ex. 1, ¶ 1(a).

> **Plaintiffs' response:** undisputed.

14.     The Location Agreement expressly conditioned this access on 20th TV's agreement to "cooperate with the County, JTDC Administration, and Security . . . so that normal operations of the Building and its occupants, and access by the public, are not disrupted in any manner whatsoever." Ex. 1, ¶ 1(d).

> **Plaintiffs' response:** undisputed.

15.     20th TV accepted this provision without requesting changes to it. Ex. 11 52:17-19.

> **Plaintiffs' response:** undisputed.

16.     The Location Agreement contemplated access between June 22-26, 2015. Ex. 1 ¶ 2.

4

**Plaintiffs' response:** undisputed.

17.     20th TV requested to return twice more for additional filming, and 20th TV and Cook County executed two addenda to the Location Agreement, both of which left the financial and other terms, including the "no disruptions" provision, unchanged. Ex. 11 53:2-7, 54:15-18; Exs. 13-14.

**Plaintiffs' response:** undisputed.

18.     The first addendum, dated July 7, 2015, allowed access from July 13-16, 2015. Ex. 13, ¶ 3.

**Plaintiffs' response:** undisputed.

19.     The second addendum, dated August 18, 2015, allowed access from August 23-25, 2015. Ex. 14, ¶ 3.

**Plaintiffs' response:** undisputed.

20.     The Location Agreement and its addenda were the only agreements between Cook County and 20th TV pertaining to filming. *See* Ex. 11 51:15-54:18; Ex. 15.

**Plaintiffs' response:** undisputed.

21.     In addition to the areas specified in the Location Agreement where 20th TV had the right to "enter upon" for the purposes of filming, the JTDC gave 20th TV access to additional areas of the facility for crew rest and storage. Ex. 20.

**Plaintiffs' response**: undisputed that Fox was given access to additional areas of the JTDC besides those specified in the Location Agreement for crew rest and storage. Object that the evidence cited does not support the fact proposed to the extent that "the JTDC" is not an entity or person cable of action.

22.     These areas included several classrooms of the Nancy B. Jefferson School (the

"School") inside the JTDC, the JTDC's library area, and a large meeting room that the JTDC used as a chapel on weekends. *Id.*

   **Plaintiffs' response:** undisputed.

23.    There were no negotiations over the price for access specified in the Location Agreement—Cook County asked for $1,500 per day, plus reimbursement of certain expenses, and Fox agreed to those amounts. *See* Ex. 1, ¶ 3; Ex. 11 15:5-16:19.

   **Plaintiffs' response:** undisputed.

24.    Andrew Kruzel testified that these fees were standard and "were set a long time ago by the policymakers, that this was how much we were going to charge, you know, for events such as this." Ex. 11 15:5-23.

   **Plaintiffs' response:** undisputed.

25.    When Dixon worked at a detention facility in Miami in the 1980s, a movie studio filmed in its juvenile wing, and Dixon recalled those detainees having enjoyed the experience.  *See* Ex. 5 105:18-107:23.

   **Plaintiffs' response:**  object that the evidence does not support the fact proposed.  In the evidence cited, Dixon testified that he lived and worked in Miami when there was a filming in a juvenile detention facility.  But Dixon testified that he did not work at the juvenile detention facility; he worked at a halfway house, "and we would take kids back and forth from the detention center to the halfway house." Def. Ex. 5 at 107:11-13.  Dixon offered no testimony about whether or not he recalled the detainees enjoyed the experience.

26.    That personal history formed part of Dixon's basis for being receptive to 20th TV's request to film at the JTDC. Dixon testified that he believed filming "would be good for

the staff. I thought it would be good for the kids. It would create a certain energy in the facility. People were excited. It gave folks an opportunity to see what happens when you do filming, you get a chance to see the actors, you get a chance to see all of those things that people never see in their lifetime." Ex. 5 112:1-8.

> **Plaintiffs' response:** first sentence:  object that "[t]hat personal history" is vague.  To the extent "[t]hat personal history" refers to Dixon's "Miami" experience asserted to in SUMF ¶ 25, those assertions are unsupported.  Remainder of statement:  undisputed that Dixon made these claims at his deposition; disputed that these were the actual reasons that Dixon invited Fox to film, as demonstrated by his actions during filming. *See* PSOAF ¶¶ 49-53.

27.     Dixon also thought that detainees would benefit from meeting some of the stars of *Empire*, and he did not agree to allow the filming until 20th TV confirmed to him that actors potentially would be willing to meet with detainees. Ex. 5 109:6-110:12. *Empire* featured "African-American actors, and [the JTDC] is basically African-Americans," so Dixon "wanted [detainees] to be exposed to the actors so they could talk to them." *Id.* 109:6-110:12.

> **Plaintiffs' response:**  disputed that Dixon "did not agree to allow the filming until 20th TV confirmed to him . . . ."  Asked whether Dixon talked with Lee Daniels about kids meeting actors "before you had agreed to allow the filming?" Dixon answered: "I don't recall when it was."  Def. Ex. 5 at 110:18-23.  Object that the evidence cited reflects that Dixon "talk[ed] about" kids meeting actors with Lee Daniels, Def. Ex. 5 at 109-10, but does not support the proposition that Dixon received a "confirmation" of any sort, either before or after he allowed the filming.  Daniels did not recall Dixon asking about stars meeting with kids at all, and testified that he would have objected if

meeting actors were a condition for being allowed to film. PSOAF ¶ 46. Undisputed that Dixon testified he "wanted [detainees] to be exposed to the actors so they could talk to them."

28. Accordingly, Dixon directed his in-house general counsel, Zenaida Alonzo, to work with Cook County and the Office of the Chief Judge to determine if the JTDC could accommodate 20th TV's request to film at the JTDC. Ex. 42 12:13-13:23, 27:17-29:21.

**Plaintiffs' response:** object that "accordingly," in referring to the previous statement, refers to facts that are unsupported. Undisputed as to remainder.

29. In preparation for 20th TV's arrival, JTDC executive Gene Robinson prepared a work plan, the purpose of which was "to make sure . . . that all services were rendered during the time of the filming, . . . that no services [were] halted." *See* Ex. 9 53:1-22, Ex. 27.

Plaintiffs' response: undisputed that Robinson prepared a workplan. Undisputed that Robinson made the quoted statement. Disputed that the work plan was actually created for this purpose. As the work plan itself reflects, to accommodate the filming the work plan called for the cancellation of all visits between children and their parents. Def. Ex. 27 at PageID #:7710 ("The caseworkers from these two centers need to notify the Parents that the Visitation will be closed . . . ."); the work plan contemplated increasing the pod populations above their functional operating capacities. *Id.* The outdoor yards were closed to the kids at the facility. *Id.* The library / media center and the chapel were "closed for the week of production." *Id.* at PageID #:7711. Different North/South halves of the second floor school area were closed for the week of production. *Id.* Parts of the third floor around the infirmary were closed. *Id.* Residents were barred from the second floor. *Id.* ("Two staff – one on each end will secure the

perimeter to ensure no unauthorized personnel or residents are allowed."). The JTDC's operations were "restructured" to accommodate Fox, with the result that no recreation occurred outside, numerous LME recreations occurred on the pods, there was no school break "extra" recreation, kids were confined on their pods for school, and programming was cancelled. PSOAF ¶¶ 33-39.

30. In order to accommodate the June 22-26 filming, the JTDC made certain changes to its operations, which included closing at least two of three sections of the facility's outdoor yard for several days, shifting family visitation for two days from one room to another, cancelling or postponing a handful of voluntary after-school meetings, and relocating the intake pods. *See* Ex. 27.

**Plaintiffs' response**:  undisputed that the changes made to accommodate the *Empire* filming included these changes.

31. The JTDC anticipated approximately 200 Fox TV employees to be onsite during filming days, and the JTDC had coordinated events with more than 200 visitors before. *See* Ex. 17 184:13-185:1.

**Plaintiffs' response**:  undisputed that the JTDC had coordinated events with 200 visitors before.  Disputed that they resembled the *Empire* filming.  Robinson, who prepared the work plan in Def. Ex. 27, was selected to prepare the *Empire* workplans because he had recently been trained by FEMA in disaster preparedness.  While the JTDC occasionally hosted large groups, this occurred for a few hours, never for multiple days. PSOAF ¶ 48.

32. Following the June filming, JTDC executive Bill Kern wrote a memo recognizing that the June filming produced "minor interruptions/distractions to daily

functions/tasks/routine although the whole operation seemed to run smooth." Ex. 28.

> **Plaintiffs' response**: undisputed that Kern's memo contained the quoted passage.
> The same memo also stated that the operation may have run smoothly for the adults
> operating the JTDC, its "timing" was negative for the children housed there because
> "This was the first week our residents were on summer break. It is during this time that
> the use of the school area and yards is helpful in allowing them to burn off some of
> their energy." Def. Ex. 28.

33.     Dixon approved 20th TV's request to return to the facility from July 13-16 for reshoots. *See* Ex. 5 172:14-22.

> **Plaintiffs' response**: undisputed.

34.     Once again, Gene Robinson prepared a work plan to facilitate the July filming, which included shifting family visits to a classroom again for two days, shifting School classes to detainees' pods on July 14-16, and once again relocating intake activities from Pods 3A and 3B to other pods. *See* Ex. 29.

> **Plaintiffs' response**: undisputed that Robinson prepared the July work plan, and that
> the July work plan included the changes described, among other things.

35.     For the final August 23-26 filming, Gene Robinson prepared another work plan, which included closing the outdoor yards for four days and once again relocating intake activities out of Pods 3A and 3B, but asserting that "visitation will continue as normal." *See* Ex. 30.

> **Plaintiffs' response**: undisputed that Robinson prepared the August work plan, and
> that the August work plan included the changes described, among other things.

36.     While multiple JTDC officials testified to the positive benefits of filming,

including the "excitement in the building," the "positive energy," and the emotional benefit
that was provided to detainees (*see* Ex. 5 174:6-16, 208:11-20; Ex. 17 176:2-11, 309:5-310:3,
312:12- 313:9), other testimony suggested that residents had complaints about "restricted
movement" and "a television show depicting prison life while they were detained." Ex. 31
91:6-18.

> **Plaintiffs' response**: undisputed that the deposition testimony cited contains the
> quotes repeated in this paragraph. Object as unsupported to the extent this paragraph
> purports to quote all staff testimony regarding the impact of filming on the JTDC.

### *Plaintiffs Time as Residents at the JTDC*

37.　T.S. was detained at the JTDC from December 3, 2014, until September 24,
2015.

*See* Ex. 22 18:21-19:7, 86:11-16.

> **Plaintiffs' response**: undisputed.

38.　Q.B. spent six weeks at the JTDC from June until mid-July 2015, was not
detained during the July filming period, but returned to the JTDC from August 2015 through
January 2016. *See* Ex. 21 14:20-17:9; 16:13-17:3.

> **Plaintiffs' response**: undisputed.

39.　H.C. arrived at the JTDC in May 2015 and remained in detention until June
2016.

*See* Ex. 41 29:9-17.

> **Plaintiffs' response**: undisputed.

40.　All of H.C., T.S., and Q.B. testified that on non-school days, they typically
spent the entire day in their pod living areas, except for an hour of off-pod recreation. *See* Ex.
41 41:5- 45:13, Ex. 21 23:21-24:4, 37:7-43:20, 84:18-85:22, 94:4-19; Ex. 22 24:24-25:17.

**Plaintiffs' response:** object that "typically" is vague in the context of this case; object further that "non-school days" is ambiguous in that it does not specify school break or weekend time. Otherwise not disputed T.S., Q.B., and H.C. offered the specific testimony in each of the deposition transcripts cited.

41.     The School held classes during the three days in July 2015 that 20th TV returned to film. *See* Ex. 5 237:5-18; Ex. 33 ¶ 4.

**Plaintiffs' response**: undisputed.

42.     The School was on summer break during the June and August filming periods. *See*

Ex. 5 70:3-17; *id*. 113:1-114:5; Ex. 33 ¶¶ 3, 5.

**Plaintiffs' response**: undisputed.

43.     For three days, July 14-16, the JTDC moved the location of the classes from School classrooms to detainees' pod common areas. *See* Ex. 29.

**Plaintiffs' response**: undisputed.

44.     Additionally, a number of voluntary after-school activities were postponed or cancelled due to the filming. *See* Ex. 32. However, Q.B.'s behavioral status precluded him from participating in after-school programing, Ex. 33 ¶¶ 8-11, and there is no evidence to support T.S.'s claim that he participated in an after-school parenting class. *See* Ex. 31 14:23-15:5.

**Plaintiffs' response**: First sentence: undisputed. Second sentence as to Q.B.: undisputed. Second sentence as to T.S.: objection. The evidence cited does not support the factual proposition; Ms. Buckingham testified that she did not remember whether or not she coordinated a parenting class in 2015. Def. Ex. 31 at 15:5.

45.     Q.B. was not detained at the JTDC when the School was open for summer

classes.

Ex. 21 16:13-17:3.

> **Plaintiffs' response**: object that "summer classes" is vague and has no obvious
>
> meaning in the context of this litigation. To the extent "summer classes" refers to NBJ
>
> classes taught during July 13-16 at the JTDC, undisputed.

> 46. H.C. was in court on one of the three days that schooling occurred on his pod.
> Ex.

41 88:6-17. Although H.C. recalled school having been held on his pod on at least one day he

was present for it, he had no memory of what happened or of any problems with schooling. *See*

Ex. 41 88:6-17; 96:21-102:19.

> **Plaintiffs' response**: First sentence: undisputed. Second sentence: object that "H.C.
>
> recalled school having been held on his pod on at least one day he was present for it" is
>
> confusing as written. The deposition transcript reflects that H.C. was asked what he
>
> remembered about schooling on certain dates, e.g., July 14, and though H.C. stated he
>
> could remember events he could not identify the calendar date on which they occurred.
>
> Object that "problems with schooling" is vague in the context of the transcript cited.
>
> H.C. was never asked to identify problems, but did testify that "school" on the pod was
>
> different than school in the classroom. Def. Ex. 41 96:21-102:19.

> 47. T.S. also was in court on one of the three days (July 14) and was confined to
> his individual cell for a disciplinary violation on July 15. Ex. 22 136:4-24.

> **Plaintiffs' response**: undisputed that T.S. had court on July 14. Object that the
>
> evidence cited does not support that T.S. was confined to his cell for a disciplinary
>
> violation on July 15. In the evidence cited there is no discussion of a disciplinary
>
> violation or any events on July15.

48.     T.S. testified that his class periods seemed shorter that day because teachers had to move between pods (Ex. 22 30:20-31:5), that he did not recall having had math class on that day (*id.* 31:16-21), and that detainees "continued to play cards and watch TV" during classes (*id.* 32:24- 33:4). When Plaintiffs' psychiatric expert witness learned that schooling was conducted on detainees' pods for only three days, he could not say that this had a meaningful impact on Plaintiffs' schooling. *See* Ex. 53 58:13-60:6.

**Plaintiffs' response**:  First sentence:  undisputed.  Second sentence: object that the evidence does not support the factual proposition sought to be advanced.  Instead, this is what the deposition transcript says:

> 2   A.  It would depend on the situation.
> 3   Q.  What do you mean by that?
> 4   A.  Well, what do I mean by that? I think
> 5 for youth, if they are sitting there thinking that
> 6 they are not able to go to school and are having a
> 7 teacher come in to try to teach them for a
> 8 nonelective -- for an elective reason versus
> 9 perhaps a shutdown, maybe a medical issue or
> 10 something that is beyond their control, the
> 11 reaction could be different and how it impacts the
> 12 youth.
> 13     I think that, you know -- in general,
> 14 you know, you miss a week of school here or there,
> 15 that by itself is likely not going to have a
> 16 long-term impact on your general educational needs,
> 17 but, you know, if you are in the public school
> 18 system and you are not going to school, you need to
> 19 have a good excuse. I'm not sure if this is a good
> 20 excuse.
> 21   Q.  What I intend to ask is, what if it was
> 22 one or two days of classes being taught on the pods
> 23 instead of in a classroom, would that, in your
> 24 view, cause an impact on a detainee's general
> 1 educational needs?
> 2   A.  One or two days may not impact the
> 3 general education, but it may impact the youth for
> 4 other reasons.

The transcript does not support the proposition that Dr. Kraus mistakenly believed that school had occurred on the pods for weeks, or that he "learned" at the deposition that school had been conducted on the pods for several days. (In the transcript Dr. Kraus also says that missing "a week or two of school here or there" is also "likely not going to have a long-term impact" on a child's education.)

49.     There is no evidence that 20th TV knew summer school was in session during the July 2015 filming period or that 20th TV knew that the JTDC moved summer school classes to the residential pods on those days.

**Plaintiffs' response**: disputed. See PSOAF ¶¶ 18-24.

50.     In addition, 20th TV personnel did not learn from JTDC personnel that the JTDC used the School's classrooms for some non-school activities when school was not in session. Ex. 3 43:24-44:21, 69:17-70:22; Ex. 5 83:4-84:2; Ex. 2 97:12-98:9; 101:21-102:8.

**Plaintiffs' response**: disputed. See ***PSOAF ¶¶ 18-24***.

51.     The JTDC has multiple areas for detainee recreation, including an outdoor concrete court divided into three sections by tall, opaque fences, commonly referred to as the North Yard, the Middle Yard, and the South Yard. Exs. 23 and 24.

**Plaintiffs' response**: undisputed.

52.     The JTDC also has two large indoor gyms and a game room. Ex. 33 ¶ 13.

**Plaintiffs' response**: undisputed.

53.     The JTDC's outdoor yards are closed in winter but otherwise open when weather and circumstances permit. *Id*.

**Plaintiffs' response**: object that this SOF is vague as to time. Assuming that the SOF refers to the time period of the 2015 filming, object that the evidence cited does not

support the proposition that the JTDC's outdoor yards were closed during winter, as the affidavit does not say such. Disputed was not open in the winter; children were gotten outside whenever possible, and the JTDC offered coats to give children the opportunity to go outside in inclement weather, with the goal of getting them outside whenever possible. PSOAF ¶ 35. Otherwise undisputed.

54.     20th TV filmed in or used one section of the outside yard for parts of the day on June 22-23, July 13 and 15, and August 23-24, 2015. *See* Exs. 1, 13-14.

**Plaintiffs' response**: Plaintiffs' response. Undisputed that Fox filmed in one section of the yard on the days noted. Object that "used" is vague in the context of this case. Disputed that Fox only "used" one section of the yard on the days noted. Fox also reserved the right of entry to the entire yard for the duration of each of its filming sessions, Def. Ex. 1, it left debris in the yard to be cleaned up later, PSOAF ¶ 28, and it had children excluded from the entire yard for noise and security purposes. *See* PSOAF ¶ 28.

55.     JTDC officials decided to close one or both of the other outdoor sections on those days, and to shift pods that had been scheduled for outside recreation at those times to indoor recreation and activities. *See, e.g.,* Ex. 9 66:1–68:1; Ex. 25; Ex. 34.

**Plaintiffs' response:** Object that "officials decided" is vague in this context; Fox had leased out the entire yards for the entire time it filmed at the JTDC, had requested silence for filming, used yards on days when it was not filming, and left items in the yards after filming to be cleaned up later. PSOAF ¶¶ 28. Object that "indoor recreation" is vague in the context of this case; many children were confined to their pods instead of being allowed to leave for recreation. *See, e.g.,* Def. Ex. 34 at PageID

16

#:7757 (reporting grievance that "Well we haven't had Rec in a week. They was shooting a movie, but they is gone now. In sell know REC. We need to get off the POD." And, "We need to get off the pod. We need your REC.")

56.　　Large muscle exercise also can occur in detainees' pod common areas, and "is done on pod quite a bit." Ex. 17 233:14-234:1. The JTDC's records for June 2014, August 2014, and April 2015—months, obviously, unaffected by filming—all showed multiple examples of detainees having their exercise on their pods rather than outside or in the gyms. Ex. 56.

> **Plaintiffs' response**: Undisputed that Wm. Steward testified that LME occurred on the pods quite a bit. Disputed that this was true; JTDC's regulations prohibited the scheduling of LME on pods and no LME was scheduled for pods. PSOAF ¶ 35. While it was possible for off-pod recreation to be cancelled because of short staffing, off-pod recreation was so important that on days when short staffing occurred pod populations would be shifted for the purpose of gathering groups to go off-pod for recreation. PSOAF ¶ 7. Denial of off-pod recreation sometimes did occur as a form of punishment for misbehavior, PSOAF ¶ 62; Def Ex. 33 ¶ 13 (noting that availability of off-pod recreation "may depend on . . . disciplinary measures specific to the pod."). To the extent Def. Ex 56 is cited for the proposition that confinement to pods for recreation is common, disputed; the exhibit shows that confinement to pods for recreation is the exception and is exceedingly rare.

57.　　In weeks unaffected by filming, T.S. said he usually would receive outside recreation just "two, three times" per week. Ex. 22 138:7-10. Q.B. also said he normally went outside just two days per week while detained. *See* Ex. 21 34:13-16, 45:17-46:6.

**Plaintiffs' response**: undisputed that T.S. and Q.B. made these statements at their depositions.

58.     T.S. contends he had recreation in his pod common area on June 24, 2015. *See* Ex. 22 139:10-140:5, Dkt. No. 237 at 19. Q.B. contends he had recreation in his pod common area on June 23. Ex. 21: 89:9-14.

**Plaintiffs' response**: **Plaintiffs' response**: First sentence: disputed. T.S. contends that he had no off-pod recreation on June 24. *See, e.g.*, Dkt. No. 237 at 19 (noting that LME instructor came to pod for LME and that only "2 out of 13 residents participated"). Plaitniffs assume this is a typographical error. Additionally in order to accommodate Empire all detainees were denied the extra off-pod recreation that is normally provided during breaks. PSOAF ¶ 34. Second sentence: object that the evidence cited does not support the proposition that Q.B. contended "he had recreation in his pod" on June 23. In the passage cited Q.B. states he did not have recreation that day. Def. Ex. 21: 89:9-14. In fact the evidence cited indicates that Q.B.'s pod received no recreation on June 23. *See* PL Ex 43 ¶¶ 30-32.

59.     20th TV was aware that detainees could not use the single section of the JTDC's outdoor yard that 20th TV was using during the times that 20th TV was using it, and 20th TV may have been aware that detainees could not use the Middle Yard during those times, either. *See* Ex. 3 49:24-50:19, 83:5-9, 110:20-111:13; Ex. 4 75:17-76:4.

**Plaintiffs' response**: undisputed that Fox had the awareness cited, at a minimum.

60.     20th TV personnel believed detainees would still be able to use the third section of the yard at all times, and would be able to use the whole yard whenever 20th TV was not filming. Ex. 3 49:24-50:19, 83:5-9, 101:21-102:5, 103:23-104:10, 109:1-12, 110:5-111:13; Ex.

18

2 92:22- 93:3, *id*. 96:23-97:7.

> **Plaintiffs' response**: regarding "use section of yard at all times," object that the evidence cited does not support the factual proposition. For would be able to use the whole yard whenever 20th TV was not filming example, in Def. Ex. 3 at 83:5-9, Klemke testified he knew that full closure of the yards had been "imposed" for the filming. Klemke also conceded that he did not believe that any kids would be allowed to play in any of the yards while Fox was filming. Def. Ex. 3 at 110:5-111:13. Additionally disputed. *See* PSOAF ¶ 28. Regarding "would be able to use the whole yard whenever 20th TV was not filming," disputed. *See* PSOAF ¶ 28.

61.     20th TV did not know that JTDC officials had made the decision to close off at least two sections of the yard (the North Yard, where 20th TV filmed, and the Middle Yard) for detainee use during all days that 20th TV was filming at the JTDC, even when 20th TV was not actively filming in the yard. *See* Ex. 9 65:11-67:21, Ex. 25; Ex. 3 49:24-50:19, 83:5-84:6, 110:20- 111:13; Ex. 4 75:17-76:4; Ex. 2 96:23-97:7, 100:3-25.

> **Plaintiffs' response**: disputed. *See* response to SUMF ¶ 60; PSOAF ¶ 28.

62.     There is no evidence that 20th TV knew its use of the yard section was impacting detainee recreation options, beyond knowing that detainees could not occupy the single section of the yard that 20th TV was using at the same time 20th TV was using it.

> **Plaintiffs' response**: object that this SOF fails to comply with Local Rule 56.1(a)(3) in that it is unsupported by evidence. Responding further, because the contention in this SOF is that there is "no evidence," to dispute it Plaintiffs need only provide some evidence, not all evidence in their possession. Responding further, disputed. For example, Klemke testified to his awareness that closure of all the yards had been

"imposed" during Fox's filming.  Def. Ex. 3 at 83:5-9.  In that same portion of the deposition, Klemke was asked, "could the film crew tolerate the noise of kids and basketballs?" he answered, "No," and explained that the *Empire* crew "couldn't tolerate that noise."  Def. Ex. 3 at 83:10-24.  Fox thus could not tolerate the presence of kids on the yard during filming.  Responding further, see PSOAF ¶¶ 18-21; 28.

63.     The JTDC's visitation area was another location within the facility where 20th TV sought and received permission to film. *See* Ex. 1.

**Plaintiffs' response**:  undisputed.

64.     Dixon told Jonathan Klemke, a 20th TV location scout, that "visitation occurred only on certain days and that [20th TV] would be able to use the room on off-days." Ex. 3 100:24- 101:9.

**Plaintiffs' response**:  undisputed.

65.     In actuality, the JTDC shifted visitation to one of two large classrooms on the days in June and July 2015 that 20th TV filmed in the visitation area. Exs. 25-26.

Plaintiffs' response:  undisputed that visitation was shifted to classrooms.  Object that the evidence cited does not support the proposition that the classrooms were of any particular size.

66.     The alternative classroom has ten percent less square footage than the visitation area. Ex. 35 ¶¶ 4, 6.

**Plaintiffs' response**:  undisputed.

67.     There is no evidence that 20th TV knew or had reason to know that the JTDC had moved visitation to a classroom as an alternate area, the dimensions or layout of that alternative area, or the impact that the shift may have had on detainees or their visitors, if any.

**Plaintiffs' response:** undisputed.

68. No evidence exists that 20th TV's filming caused T.S.'s mother visit to be significantly delayed or otherwise affected on the single occasion that T.S. alleges it occurred. *See* Ex. 50 20:1-21:21; 23:1-24; 26:15-27:6.

**Plaintiffs' response**: undisputed.

69. No evidence exists that 20th TV's filming was the cause, directly or indirectly, of Q.B.'s grandmother being turned away from visitation during one of the filming days. Q.B.'s grandmother testified only that she herself would not be able to visit with Q.B. on the evening of one of the days of filing. Ex. 54 12:4-24. Every other detainee in Q.B.'s pod who had a visitor during that designated time slot saw that visitor as usual. *See* Ex. 35; Ex. 55.

> Plaintiffs' response: First sentence: disputed. The alternate visitation area was both smaller and used different tables, such that only 8 tables could be used in the visiting area instead of 12 in the normal visitation room. PSOAF ¶ 43. Thus there were fewer slots for visitors during the hour that Q.B.'s pod was scheduled to have visits, which may have caused her to miss the visit. Second sentence: undisputed. Third sentence: object that the evidence cited does not support the proposition advanced. The fact that some detainees on Q.B.'s pod is consistent with the proposition that the 8 available tables filled up, making it impossible for Q.B. to visit with his grandmother.

70. Visitation occurred on every day 20th TV was present. Ex. 9 149:17-21; Ex. 35 ¶ 7;

Ex. 55.

**Plaintiffs' response**: undisputed.

71. The JTDC has written policies recommending that residential pods be filled with fewer detainees than the number of individual rooms in the pod can accommodate. *See*

Ex. 36.

> **Plaintiffs' response**: object that the evidence cited does not support the proposition that the JTDC's written policies "recommend[]" population caps. The written policies provide that in order to ensure safety of the detainees, the functional operating capacity "shall" not be exceeded for each pod, and that if the functional operating capacity is exceeded emergency measures should be put in place. *See* Def. Ex. 36.

72.     The JTDC rarely attained this goal. On every day in June and July 2015—not just the nine days that *Empire* filmed in June and July—some pods at the JTDC exceeded their functional operating capacity, some pods had fewer detainees than their functional operating capacity, and at least one pod was closed. *See* Ex. 37.

> **Plaintiffs' response**: disputed. The evidence cited shows relatively few pods past functional operating capacity before filming, followed by a dramatic increase when the facility began to prepare for the filming. For example, compare Def. Ex. 37 at PageID #:7787 (June 20) with *id.* at PageID #:7788-93 (June 21-26). Indeed the cited document indicates that Pod 3A, which was closed for the *Empire* filming, was not able to re-open until July 1, reducing the JTDC's overall functional capacity. *Id.* at PageID #:7794-97. The document cited shows another increase in pods over functional operating capacity during the July filming after Pods 3A and 3B were closed again on July 11, *compare id.* at PageID #:7806 (July 10) *with* PageID #:7807-12 (July 11-16).

73.     20th TV did initially ask to film in the medical area, but the JTDC denied 20th TV's request, and 20th TV never filmed in the JTDC's medical area. *See* Ex. 5 99:1-19; Ex. 3 84:20- 85:8, 85:13-86:12, 102:6-18; Ex. 42 43:5-11; Ex. 45; Ex. 46.

> **Plaintiffs' response**: undisputed that Fox never filmed in the infirmary. Disputed that Fox initially requested but was denied by the JTDC. Dixon agreed to filming in the

infirmary; permission was only rescinded a few days before filming when infirmary personnel were told about the filming and to "plan accordingly," *see* PSOAF ¶ 63.

74.     The medical area was open and operating during the entire time that *Empire* was filming at the JTDC. *Id.*; Dkt. No. 319 at 15-16; Ex. 18, Ex. 19.

**Plaintiffs' response**:  object that "open and operating" is vague in the context of this case.  Plaintiffs do not dispute that the infirmary was not closed, but it was seeing residents at a reduced rate.  *See* PSOAF ¶ 64.

75.     JTDC officials testified unequivocally that "[n]o medical care was interrupted during the *Empire* filming dates." Ex. 19 ¶ 4; Ex. 38 125:24-126:9, 131:18-132:2, 139:6-19.

**Plaintiffs' response**:  undisputed that JTDC officials testified as quoted.  Responding further, see PSOAF ¶ 64.

76.     To the extent that there were any medical treatment issues during filming, there is no evidence that 20th TV knew or had reason to know that there were such issues or that filming could have caused them.

**Plaintiffs' response**:  disputed.  *See* PSOAF ¶ 24.

77.     On the days when 20th TV filmed in Pod 3A and stored equipment in Pod 3B— pods that had been used for Alpha Center intake activities—the JTDC instead used Pods 3F and 5B as Alpha pods. *See* Ex. 39; Ex. 9 76:9–13, 77:6–12.

**Plaintiffs' response**:  undisputed.

78.     During filming days, detainees spent 24-72 hour on intake, as usual, and staff did not transfer any detainees out of the intake unit until detainees had been carefully screened for mental and physical health issues and after the JTDC's "transfer team" had determined the best Center assignment for the detainee. *See* Ex. 57 ¶¶ 4-6.

**Plaintiffs' response**: object that the evidence cited does not support a proposition about the amount of time detainees were on intake. Object that "as usual" is vague in the context of this case. Object that transfer decisions were driven by the best Center assignment of the detainee during filming. Contemporary emails indicate that the timing of many transfers was being driven by the *Empire* filming, *see* PSOAF ¶ 40.

79. While detainees did not take a computerized psychological exam called the "MAYSI" during filming, detainees had not regularly been taking the MAYSI for "many years" prior to filming, and the MAYSI was only one aspect of the overall mental health screening. *See, e.g.,* Ex. 40; Ex. 42 155:5-156:20, Ex. 38 143:19-144:4, 152:19-158:24, 189:12-190:8, 209:17- 210:9; Ex. 57.

**Plaintiffs' response**: object that the cited evidence does not support the proposition being advanced. Plaintiffs cannot find the words "many years" in the evidence cited. Responding further, disputed. Plaintiffs assume that Defendant are referring to an investigation that occurred in 2017, when it was discovered that an employee had been taking MAYSI tests for children on intake, thus falsely making it appear that the children had taken the test when in fact they had not. Def Ex. 40.

80. No records or testimony suggests that the JTDC ever notified 20th TV that it was in violation of the Location Agreement or that it was causing any disruptions to the detainees' routines. *See* Ex. 6 82:19-23, 86:12-15; Ex. 5 96:21-97:18, 97:19-98:7.

**Plaintiffs' response**: object that "notified" is vague in the context of this case, notification can refer to actual notice or constructive notice. Plaintiffs further object that "in violation" is vague in that the contractual term refers to both cooperation and disruption, and does not specify an obvious means for breach even if disruption in fact

24

occurred. Subject to that objection, disputed. *See* PSOAF ¶¶ 18-24.

81.     No records or testimony suggest that any JTDC official—or anyone—told 20th TV that the presence of the *Empire* cast and crew actually was having any detrimental impact on detainees or any detrimental negative impacts on facility operations.

> **Plaintiffs' response**: object that "told" is vague in this context in that does not specify whether it refers to being told information from which it could be inferred that the *Empire* cast and crew actually was having any detrimental impact on detainees or any detrimental negative impacts on facility operations. Subject to that objection, disputed. *See* PSOAF ¶¶ 18-24.

82.     No records or testimony suggest that any JTDC official—or anyone—told 20th TV that the presence of the *Empire* cast and crew had the potential to have, or was having, an impact on detainees' safety and well-being.

> **Plaintiffs' response**: object that "told" is vague in this context in that does not specify whether it refers to being told information from which it could be inferred that the presence of the *Empire* cast and crew had the potential to have, or was having, an impact on detainees' safety and well-being. Subject to that objection, disputed. *See* PSOAF ¶¶ 18-24.

83.     Additionally, there is no evidence that JTDC personnel informed 20th TV personnel regarding details of the facility's operations or of detainees' schedules or movements.

> **Plaintiffs' response**: disputed. *See* PSOAF ¶¶ 18-24.

84.     Although 20th TV film scout Jonathan Klemke ("Klemke"), recognized that filming would require "extensive use of several parts of the facility over the course of two days

or so," Klemke's understanding was that activities were scheduled in a manner where 20th TV's filming would not impact them. *See* Ex. 16; Ex. 3 26:11-27:4, 34:24-35:13.

> **Plaintiffs' response**: disputed. *See* PSOAF ¶¶ 18-24.

85. Although Klemke understood that a film crew at the JTDC would not be normal, he believed it need not be disruptive. *See id*. 36:8-38:1, 66:24-67:16; Ex. 16.

> **Plaintiffs' response**: disputed. *See* PSOAF ¶¶ 18-24.

86. During filming, there were numerous situations where JTDC personnel told 20th TV to stop filming, or to move from one area to another, in order to promote facility operations and 20th TV trusted that it would be informed if filming disrupted JTDC operations. *See* Ex. 4 79:6-80:8, 146:12-147:9, 148:12-20; Ex. 3 26:6-10, 37:13-38:1, 49:7-17, 67:18-68:7, 65:13-66:3; Ex. 5 96:21-97:18.

> **Plaintiffs' response**: object that none of the evidence cited supports the proposition that Fox was ever told to stop filming to promote facility operations. Answering further, disputed. When Breen (testimony in Def. Ex. 4) was asked about what he saw or heard during the filming, he testified he was not at the JTDC for the filming, rather he handles location negotiations on the "front end," and then he "moves on" to the next episode. PL Ex. 15 at 81. The proposition that Fox personnel frequently had to wait for movement of residents is implausible for the reasons set out in PSOAF ¶¶ 24, 27, 30, 31, 33, 34, 35, 36, 37, 38, 39.

87. Brady Breen ("Breen"), who was 20th TV's liaison to the JTDC during filming, also "understood that staff had made accommodations to make sure that normal operations [of the JTDC] should continue." Ex. 4 112:2-13, 150:17-151:2, 156:5-14.

> **Plaintiffs' response**: undisputed that Breen so testified; disputed that Breen had that

understanding.  *See* PSOAF ¶¶ 18-24.

88.     Breen stated that although 20th TV had a "significant presence there," 20th TV wanted to be "respectful of what [was] going on in this building" and that the "guidelines were set very clearly by the team that work[ed] at—at the juvenile detention facility." *Id*. 74:7-75:15, 108:5-21, 110:18-22; 110:23-111:21, 143:13-17.

**Plaintiffs' response**:  undisputed that Breen made these statements at his deposition.

89.     Breen did not remember interacting with any detainees because officials "were pretty careful about isolating [the cast and crew] from children that were in there." *Id*. 88:10-18.

**Plaintiffs' response:**  undisputed that Breen did not remember interacting with any detainees.

90.     There is no evidence that JTDC personnel had any discussions with 20th TV about whether detainees would have to spend more time on their residential pods for any reason because of filming activities. *See id*. 112:15-113:1.

**Plaintiffs' response:**  object that "discussions . . . about" is vague in the context of this case, in the sense that it can refer to discussions had concerning the operation of the JTDC can concern whether detainees would have to spend more time on their pods. Subject to that objection, disputed.  *See* PSOAF ¶¶ 18-24.

91.     Lee Daniels, a creator of *Empire* who directed one of the two episodes with scenes filmed at the JTDC, also testified that he was never told by anyone that 20th TV's presence at the JTDC had or had the potential to have a negative impact on the detainees. *See* Ex. 2 95:8-96:22, 127:12-20.

**Plaintiffs' response**:  undisputed that Daniels directed one of the two episodes with

scenes filmed at the JTDC. Undisputed that Daniels testified that he was never told by anyone that 20th TV's presence at the JTDC had or had the potential to have a negative impact on the detainees.

92.     Daniels also did not know of any negative impacts from 20th TV's presence at the JTDC. *Id.*

**Plaintiffs' response**:  object that "did not know" is vague in the context of this case, which involves constructive notice.  Subject to that objection, disputed.  *See* PSOAF ¶¶ 18-24.

February 9, 2020

Respectfully Submitted,
/s/ Stephen H. Weil

Stephen H. Weil – weil@loevy.com
Jonathan I. Loevy – jon@loevy.com
Michael I. Kanovitz – mike@loevy.com
Sarah C. Grady – sarah@loevy.com
Loevy & Loevy
311 N. Aberdeen Street
3rd Floor
Chicago, IL 60607
312.243.5900

*Attorneys for Named Plaintiffs T.S. and Q.B.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2021, a true and correct copy of the foregoing was filed electronically.  Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

/s/ Stephen H. Weil