IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| T.S. et al., | ) |
|     Plaintiffs, | ) |
| v. | ) 1:16-cv-08303 |
| TWENTIETH CENTURY FOX, et al., | ) Hon. Rebecca Pallmeyer |
|     Defendants. | ) |

## **PLAINTIFFS' STATEMENTS OF ADDITIONAL FACTS**

1. The JTDC is a large, five-story, rectangular building. It is set up in an atrium plan with children are housed on pods in the building's third, fourth, and fifth floors. Exhibit 1; Exhibit 2. Pods contain rooms for individual residents, which open to an enclosed common area somewhat larger than a two-car garage and features several bolted-down tables as well as a guard's desk. Exhibit 1; Exhibit 3 at 36-37; Exhibit 5. Between each pod and the atrium area is a corridor that is used for communication between the pod and the rest of the JTDC. Exhibit 4.

2. During the *Empire* filming at issue in this case, it housed more than 300 children, nearly all between 12 and 18 years of age. Exhibit 6; Exhibit 4 ¶ 27.

3. The interiors of the JTDC's third, fourth, and fifth floors are strictly for confinement, Exhibit 1, and recreation and education are not offered there. Exhibit 4 ¶¶ 64-67, 69-70. Instead, services for the youth are offered on the building's lower floors. Exhibit 4; Exhibit 1; Exhibit 7 at 38-40.

4. There is a large, open-air courtyard on the building's third floor that is divided into three portions and is the only venue for outdoor recreation. Exhibit 2; Exhibit 1.

5. The second floor houses a number of classrooms, game rooms, a media lab, a chapel venue, and a library. This is where the bulk of services are offered, including educational services for the children, commissary and "game" rooms, library access, media labs, visitation, and enrichment programs such as "Free Write." Exhibit 8 at 51-53, 55-64, Exhibit 2; Exhibit 7 at 38-40; Exhibit 4 ¶¶ 64-67, 69-70.

6. The first floor has two auxiliary gymnasiums. Otherwise, it consists of public areas that are off-limits to the JTDC's residents. Exhibit 2; Exhibit 8 at 72-74.

7. Because of the JTDC's layout, the children are transported each day from their pods to the service venues on the building's lower floors, requiring considerable resources. Exhibit 4 ¶¶ 64-67; Exhibit 21 at 132-33; Exhibit 9 at 21-22. Ensuring that residents can leave their small rooms is so important to the JTDC's mission that it has a contingency plan to ensure that the children are permitted to attend out-of-pod activities even if the JTDC finds itself short-staffed. Exhibit 9 at 17-18.

8. The restrictive conditions of pod confinement compound the negative impact of incarceration on the children incarcerated in the JTDC. The physical layout of each pod most closely resembles the layout of a typical adult prison housing unit, and consequently the more time that is spent in these restrictive and monotonous conditions, the worse the negative psychological impact of incarceration and the higher the risk of violence among residents. Exhibit 4 ¶ 65; Exhibit 10 ¶¶ 8, 30.

9. Getting time off of the pod is beneficial to residents for psychological reasons, including a change of scenery, going to school, going to the gym, getting fresh air. Exhibit 11 at 177-78. Daily outdoor exercise also helps control anxiety, nervousness, manic episodes, and depression among facility residents. *See id. at* 56-57; Exhibit 12.

10.

    a.    T.S. was confined to his pod for school for at least one day. PL Ex. 106 ¶ 15. T.S. was confined to his pod for LME at least one day. PL Ex. 106 ¶¶ 13, 14. T.S. was confined to his pod missing Free Write at least one day. PL Ex. 106 T.S. had visitation with his mother in a setting that afforded less privacy. PL Ex. 106 ¶ 16. T.S. lost "break rec" on all school-break days in June and August. *See* PL Ex. 101.

    b.    Q.B. lost visitation with his grandmother one day, when she came to visit but there were fewer available tables. *See* PSOF ¶ 43; PL Ex. 105 ¶ 13. Q.B. was confined to his pod for recreation at least one day. PL Ex. 105 ¶¶ 13, 14. He lost "break rec" on all school-break days in June and August. *See* PL Ex. 101.

    c.    H.C. was confined to his pod for at least 24 hours because of filming. PL Ex. 107 ¶ 10. H.C. was confined to his pod for school at least one day. PL Ex. 107. H.C. was confined to his pod missing Free Write at least one day. PL Ex. 107. H.C. lost "break rec" on all school-break days in June and August. *See* PL Ex. 101.

    11.    The JTDC offers scheduled visitation for all detained children with their families. Each "Center" within the JTDC had a visitation time slot; during that time parents and guardians could visit with their children. Visitation occurred in a room on the JTDC's second floor that contained 12 tables, spaced far enough apart to provide privacy for each child who was visiting with his or her family members. Exhibit 4 ¶¶ 81-83; Exhibit 10 ¶ 30(e).

    12.    On May 28, 2015, a Fox location scout named Jonathan Klemke called the JTDC to ask if Fox could scout the facility as a filming location for *Empire*. Exhibit 13 at 23-24; Exhibit 14 at 22-23. Klemke the JTDC called because Fox wanted a realistic prison setting in which to film certain scenes for its upcoming season of *Empire*. Exhibit 24 at 1. Klemke had

3

seen a satellite image of the JTDC and saw that it had an open exercise yard, which was called for in the *Empire* "prison" episodes that were to be filmed. Exhibit 14 at 19, 24.

13. Klemke was a highly capable location scout, and Fox regarded him as such. Exhibit 15 at 70.

14. In the previous season of *Empire*, Fox had filmed scenes for Empire at the Cook County Jail, but officials changed their policies. When *Empire*'s location manager called about filming for the second season, the Jail explained it had decided only to allow in film crews that advanced the Jail's operations—not commercial filming. Exhibit 15 at 69, 82-83. Upon hearing of the changed policy, Fox abandoned the possibility of filming at the Jail. *Id.* at 69.

15. There were some deactivated correctional facilities available in Joliet, which would have been the "runner-up" to the JTDC, Exhibit 15 at 72, but those facilities had fallen into disrepair, on a tour Fox determined that they had effectively been "destroyed" by vandalism, and were "dangerous." *Id.* at 83.

16. Fox also shot *Empire* scenes on a soundstage in Chicago, but its practice was not to build such sets unless they were to be used on a regular, recurring basis, whereas the "prison" scenes that Fox ultimately filmed at the JTDC were set to appear only in two episodes. Exhibit 15 at 48. The JTDC was also a desirable location because it was conveniently located close to Fox's soundstage, which was nearby. Exhibit 16. Fox became even more attracted to the JTDC as a filming location after touring because it fit aesthetically with *Empire*'s cinematic needs. *Id.*

17. Filming in county buildings like the JTDC was vastly cheaper than other locations—the County's rate for using the JTDC (and its other buildings) was $1,500 per day, Exhibit 15 at 172; Exhibit 17 at 8179, by way of comparison, renting out a single private condominium for filming cost Fox upwards of $8,000 per day for the rental alone. Exhibit 18.

4

18. Dixon invited Klemke to scout the JTDC that same day, and when Klemke arrived at the JTDC early that afternoon, Dixon personally gave him a tour of the facility. Exhibit 14 at 23, 27. When Klemke arrive on May 28, he toured the facility extensively. He toured the JTDC's second floor and became familiar with its layout. He also toured the JTDC's upper "Pod" floors, taking photographs both of pods and elevated photographs of the JTDC's open courtyard and the "ring" atrium structure of the pods on the upper floors. Exhibit 14 at 46; Exhibit 19; Exhibit 20. Klemke toured the second floor and saw detainees being transported between activities. Exhibit 14 at 25.

19. It was evident to Klemke during the tour that the second floor was lined with classrooms and that he expected the JTDC's school to be in session. Exhibit 14 at 69-70. Contrary to claims by Klemke, *id.*, Dixon never told Klemke that school was out in the summer. Exhibit 21 at 71. Klemke also expected the yards to be closed to detained youth during the filming, and that he knew there was no other place for the kids at the JTDC to go outside. Exhibit 21 at 110.

20. Fox had developed a code of conduct for filmmaking, which admonished that "we should not expect everyone in the surrounding environment to alter their lives just to accommodate the needs of film production." Exhibit 22 at 2182. The City of Chicago's own regulations, of which Fox was aware, had similar admonishments. *Id*. In addition, Fox film budgets contain a standard line-item for "neighbor payments" for people affected by the filming, which can run up to $10,000 per day in affluent areas like a condominium building in the South Loop. Exhibit 15 at 55-56, 169; Exhibit 18.

21. On June 2, 2015, Klemke followed up his scouting tour with an email to Dixon, which he forwarded to Breen on June 5. Exhibit 16. Klemke's June 2 email is the only

contemporaneous written assessment by Fox of the likely impact that a film crew would have on the JTDC's operations. In the email Klemke noted that he hoped Fox would not interfere with the JTDC's operations "too badly," which might be feasible because Fox would only film for "two days or so." *Id.* Even so while film crews usually numbered around 80 people, Klemke proposed that most of those people could be kept outside of the facility in order to "limit" the persons going inside to around "30 people total." *Id.*

22. Leonard Daniels (Empire's director) and Brady Breen (Empire's location manager) toured the facility on June 11 and met with Dixon. Exhibit 25. Breen knew that the JTDC provided spaces for the children to read and use computers on the second floor. Exhibit 15 at 63-64. Breen acknowledged that Fox would take over pods 3A and 3B, but he did not know where the children in those pods were placed during filming. *Id.* at 65. Even though he was never told the exact recreation schedule for the yards, Breen understood that they were set aside for youth to play there. *Id.* at 64-65.

23. After the June 11 tour, Fox secured agreement to use the large chapel room on the building's second floor as a "lunch and holding location," as well as the JTDC's library. Exhibit 19. The number of days for filming had expanded to occupy nearly an entire week in June, plus several more days for the return filming session in July. Exhibit 25. Fox's film crew was in the hundreds, requiring restructuring of the facility's operations. Exhibit 27.

24. Fox brought in and spread through the facility a semi-trailer worth of equipment, Exhibit 31, which resulted in additional restrictions on the movement of staff and detainees. Exhibit 7 at 57-60. the JTDC had "minimized" movement for both residents and staff on both the second and third floors to keep them out of Fox's way. Exhibit 7 at 56-57.

6

25. After Dixon approved Fox's use of the he directed his subordinates to deal with the paperwork. Exhibit 29 at 15, 19. It was the County's practice not to send its standardized lease agreement until use of the use of the facility had already been agreed to; Alonzo told Kruzel which areas of the JTDC Fox and Dixon had agreed that Fox would lease, and Kruzel then plugged in those areas and the times and dates into a standardized lease contract that the County maintained for such leases. By contrast, paragraph 1(D) of the lease, the "no-disruption" clause, was a boilerplate term that was standard in County leases. Exhibit 29 at 34-35; compare Exhibit 30 ¶ 1(D); Exhibit 100 ¶ 1(D).

26. Neither Dixon nor anyone else who exercised operational control of the JTDC signed the lease agreement, and Dixon regarded the lease agreement as a "technical" matter of little consequence. Exhibit 25. While Lee Daniels, who directed the scenes filmed at the JTDC had decided where in the JTDC the show would be filmed, had no knowledge of the clause or whether there was an agreement at all that the filming would not disrupt the JTDC's operations. Exhibit 103 at 95.

27. The alterations needed to accommodate Fox's filming needs required a "restructuring" of the facility's operations, Exhibit 27, along with props and enough filming equipment to fill a semi-trailer to the roof. Exhibit 31.

28. Pursuant to the Lease Agreement, Fox took over the entire yard for the entire filming period, even though it filmed only in one part of the yard. There was a concern about youth jumping over the partitions. Exhibit 14 at 55. Fox required total silence to film, and kids on the yard would disrupt the silence. *Id.* at 83-84; Exhibit 15 at 91. Fox employees had JTDC a JTDC employee he needed to keep the detained youth quiet for the filming. Exhibit 33 at

7

159:18-161:17. Fox also allowed debris to remain in the yard after filming was over, indeed it was the last portion of the JTDC to be cleared. Exhibit 34; Exhibit 39; Exhibit 36.

29. Fox filmed in one of the JTDC's pods, and was given another pod to store its equipment. Exhibit 33 at 60:4-61:2; Exhibit 37. These were two of the JTDC's three "Alpha'' intake pods, where newly-arrived residents are screened and assessed upon admission. Exhibit 33 at 41:11-16; Exhibit 38 at 264:3-18. In order to accommodate Fox those pods had to be closed. *Id.*

30. Fox needed large parts of the second floor for staging and filming. It used JTDC's as a staging, break, and lunch area for *Empire*'s film crew and the large number of extras. The JTDC's library was repurposed as another *Empire* break room. Exhibit 94 pp 21-22. And Fox repurposed several classrooms for its own use. *Id*. The chapel and the library were on the opposite side of the second floor from the JTDC's entrance, and it was planned that Fox personnel would be walking in and out of the JTDC throughout the day. Exhibit 39 at CCSAO 7787. Fox additionally had set aside the JTDC's specialized visitation room on the second floor as well. Exhibit 27.

31. To accommodate Fox's needs, JTDC management set about "modif[ying]" programs "to use available space." Exhibit 40. As the JTDC's recreation supervisor put it, "I will coordinate pod activities instead of yard movement." (Exhibit 41.) These moves, which amounted to "restructuring" the JTDC's operations. Exhibit 42.

32. The yard was the only place where youth could go outside while they were detained at the JTDC. Exhibit 43 ¶ 17; Exhibit 33 at 80:2-14. As Defendants have conceded, outdoor recreation and programs were eliminated for all JTDC residents so that Fox could use the yards for filming. Exhibit 44 at 17; Exhibit 33 at 75:1-9; 80:15-21; 130:22-131:1.

8

33. The JTDC's Nancy B. Jefferson ("NBJ") school operates year-round, with short breaks in June and August. Exhibit 21 at 71:8-10; Exhibit 45. The NBJ's classrooms are located on the JTDC's second floor, and by written policy, instruction is to occur there. Exhibit 46; Exhibit 45; Exhibit 33 at 84:5-8. During the July filming, school was in session, and to accommodate Fox's use of the facility, no detainee was permitted to leave their pods for school. Exhibit 47; Exhibit 33 at 130:6- 16; Exhibit 38 at 244:18-22.

34. During the June and August filming periods when school was on break. *See* Exhibit 48. The JTDC would normally provide additional recreation off the pods, either in the existing recreation spaces or on the second floor, often through tournaments among pods. *See, e.g.*, Exhibit 49. This extra school-break recreation was intended for all the detainees in the JTDC, not just those with good behavior records. Exhibit 50 ¶ 5. With the *Empire* restrictions, however, these opportunities were eliminated. *See* Exhibit 51 ("I do have several concerns [about the June *Empire* filming]. One of which is the timing. This was the first week our residents were on summer [*i.e.*, school] break. It is during this time that the use of the school area and yards is helpful in allowing them to burn off some of their energy.")

35. Pursuant to written JTDC policies at least one hour of large muscle exercise ("LME") recreation must be provided to children at the JTDC every day, off the pod. *See, e.g.*, Exhibit 49; Exhibit 46. Absent exigent circumstances, no such recreation is scheduled for the JTDC's pods. Exhibit 46; Exhibit 43 ¶13(c)(i). By placing the yards off limits, however, Defendants reduced the number of recreation spaces from five (the three outdoor yards plus two indoor gyms) to the two indoor gyms only. Exhibit 43 ¶¶ 18, 32. For safety, each recreation space can be used only by one pod at a time. Exhibit 21 at 132:5-10. With this limitation, there were simply not enough off-pod spaces and time slots for every pod to use. Exhibit 43 ¶ 18. The

9

result was inevitable. As one manager summarized, "Recreation was limited to the gyms and to the sections [*i.e.*, the pods]," instead of the yards. Exhibit 27.

36. Detainees were kept on their pods for the *Empire* filming. *See, e.g.*, Exhibit 54 ("4A/R1 given large muscle recreation on living pod 4A due to yards being closed from "Empire" filming"); Exhibit 55 ("The beginning count was 16 AT's. Residents were on the pod due to filming in the facility."); Exhibit 56 ("The residents participated in Pod Rec due to the yards being closed for the taping of the Empire."); Exhibit 57 (resident grievance stating, "WE NEED RECK[.] we haven't had reck in day's[.] Fuck the empire just cause there here doesn't mean we don't gotta have reck"). *See also* Exhibit 43 ¶¶ 14-23, 30-32.

37. Pursuant to written policy, the JTDC provides "a comprehensive and varied system of structured program activities designed to develop pro-social thinking and behavior patterns." (Exhibit 53.) These programs range from courses on nutrition, to writing and self-expression, to programs to combat sexual exploitation. Exhibit 10 ¶ 29. The programs also draw detainees off the pods, typically to facilities such as the library, the media room, and different classrooms on the building's second floor (though some, like "Karma Garden," are offered on the outdoor yard). Exhibit 58.

38. In order to accommodate Fox's filming needs, off-pod enrichment and rehabilitation programs were eliminated. *See, e.g.*, Exhibit 59 (email informing Chicago Alliance Against Sexual Exploitation that its program had been cancelled: "They are filming the show Empire and all of the programming has been cut"); Exhibit 60 (email regarding cancellation of the University of Illinois nutrition education program, noting that "[u]nfortunately they cancelled all programming this week," and later, "we had to cancel last week" because of "filming the TV show Empire"); Exhibit 61 (explaining to volunteer that the following week was not available

10

because "[t]he building is shut down next week (again) due to Empire filming their show here."); Exhibit 62 ("And just a reminder that there is no Free Write this week, due to Empire."); Exhibit 63 ("Empire will be back and filming at the JTDC. We will not have any programming next week.") Where programs were cancelled, substitute programming was not arranged and missed sessions of the cancelled programs were never made up. Exhibit 88 at 52; Exhibit 7 at 52, 64-65.

39. The JTDC has designated, repurposed classrooms on its second floor where detainees are given periodic breaks to purchase items from the commissary or to engage in activities like ping pong and video games. Exhibit 4 ¶¶ 67, 76. These activities are in addition to, and separate from, LME. Exhibit 43 ¶ 31, Exhibit 49. Because Fox was using much of the second floor, however, many commissary and game sessions were eliminated. *See* Exhibit 47 at OAG7030 (reflecting "no commissary" for certain centers because the area closed for *Empire*).

40. To close Pods 3A and 3B for Fox's use, Exhibit 66; Exhibit 2, JTDC staff transferred Alpha around the facility. Exhibit 66 ("[w]e need to transfer *At Least* 14 residents (allowing us to close 3A) throughout the facility." (emphasis in original)). This caused numerous pods in the JTDC to become overpopulated. The JTDC's pods were built as 18- or 16-bed units, depending on their location in the facility. Ex. 5. However, the JTDC's written policies provide that in order to ensure safety, the functional operating capacity of the pods is 14 or 12 residents, respectively. Exhibit 67; Exhibit 4 ¶¶ 53-54.

41. To make up space for Fox, the JTDC had to "fill up" the other pods in the facility "with 15 and 16 residents each." Exhibit 68 ("Filming for a television show begins next week. As a result, the capacity on the pods throughout the facility will go up . . . ."); Exhibit 54 ("[L]et the Staff know that the population caps for all of the pods are raised to 16."). Numerous pods

11

were overpopulated. *See, e.g.*, Exhibit 56 (showing pods with 15 or 16 residents each); Exhibit 55 (reflecting 16 residents "on the pod due to filming in the facility."). Overpopulated pods compromised the safety of the entire JTDC facility. Exhibit 4 ¶¶ 53-54, Exhibit 60; Exhibit 10 ¶ 38.

42. The JTDC's dedicated visiting room has twelve tables, which are spaced far enough apart to ensure that twelve different detainees can simultaneously visit their families in privacy, which is critical to their value in mitigating the psychological impact of incarceration because a parent may be the only person who a teen can confide in during their detention. Exhibit 46; Exhibit 10 ¶ 30(e). Detainees have two one-hour visiting slots per week. The visiting slots are organized by center, and each pod has set times when visits to children housed on that center are allowed. Exhibit 72 at 56-59.

43. To accommodate Fox's desire to film in the visitation facility, visitation was moved to a different room. The classroom only had enough space for eight visits, meaning only eight visit slots per hour instead of twelve in the visiting room. This meant that each visiting hour permitted only eight visits instead of the normal twelve. Exhibit 47. And privacy between detainees and their visitors was reduced. Exhibit 73 at 43-44; Exhibit 72 at 64.

44. The JTDC has a behavior economy, Exhibit 74; Ex. 54, which awards points to residents for good behavior, and allows residents to advance to higher "levels" for sustained good behavior. This gives detainees a sense that they are being treated fairly, and that pro-social behavior is recognized and reinforced. See Exhibit 4 ¶¶ 74-77; ECF 236-1 Exhibit 10 ¶ 30(d); Exhibit 74. It also is important for safety, as the pro-social reinforcement reduces the risk of violence among detainees. Exhibit 4¶¶ 74-78; Exhibit 10 ¶ 30(d); Exhibit 75 at 187.

45.     The *Empire* restrictions effectively eliminated rewards for good behavior, which eliminated incentives for good behavior and eliminated the perception of fairness that the behavior economy was designed to generate. Exhibit 4 ¶ 78; Exhibit 10 ¶ 39. The destruction of a perception of fairness increased the negative psychological impact of incarceration on the JTDC's detainees. *Id.*

46.     Lee Daniels would not have agreed that kids could meet stars as a condition of filming. Exhibit 103 at 77-78.

47.     The only interactions between *Empire* stars and detainees to result from the filming were: (1) Chris Rock spoke to a group of approximately 24 youth in a single session for approximately 30 minutes during the June filming, and (2) Terrence Howard held a single session similar to the Rock session after the filming. Exhibit 79 at 221; Exhibit 76. Many detainees were unhappy with the Rock event. Exhibit 7 at 94; Exhibit 77 at 79-82. Terrence Howard came back on a single occasion after the filming, for a similar meeting. Exhibit 79 at 205-06; Exhibit 9 at 47. Aside from Rock and Howard, there were no interactions between any of *Empire*'s cast or crew and any detainees at the JTDC. *See* Exhibit 79 at 176, 208-09, 216-17, 221.

48.     Prominent people regularly meet with children at the JTDC. These have included members of the Chicago Bulls and Chicago Bears, Congressman John Lewis, Congresswoman Maxine Waters, Cook County Board President Toni Preckwinkle, and numerous other luminaries, including prominent writers and artists, all of whom have visited the JTDC to meet and talk with the young people housed there. Exhibit 9 at 44-45; Exhibit 101 at 57-58; Exhibit 78 at 6. These persons did not arrive at the JTDC with large entourages that would upend the JTDC's operations. Exhibit 101 at 57; Exhibit 9 at 45.

49. Dixon brought his wife to the filming, Exhibit 79 at 151-52, and then directed his administrative assistant to ask *Empire*'s location manager to bring all the stars to his office before filming began. Exhibit 80.

50. Dixon instructed his administrative assistant to add that any break room for *Empire*'s stars would be in his own office suite. Exhibit 80. This was justified on privacy grounds, but there were numerous other areas of the facility that, while far away from Dixon's office, had already been blocked off for filming that could have been used instead. Exhibit 81 at 38-41; 51-53. After the stars entered Dixon's office, he and other staff came there to get pictures with them. Exhibit 5.

51. Dixon cleared out his calendar on days that *Empire* came to film. Exhibit 82. Dixon secured unusually frequent opportunities to interact with the show's stars, which he was able to do because the show required so many permissions to access different parts of the building. Exhibit 15 at 116-17. Other senior staff also sought for their own opportunities to meet with stars, with Dixon "working" opportunities to get audiences with them. Exhibit 85. Fox acquiesced to these requests, arranging a large meet-and-greet between senior JTDC administrators and the show's stars in the JTDC's library. Exhibit 32.

52. Dixon got photos with all of *Empire*'s stars, *see* Exhibit 79 at 314-15; Exhibit 83, but besides Rock and Howard he did not ask any of them to meet with the youth detained at the facility. Exhibit 79 at 119. Dixon said he did not ask Chris Rock to speak with kids after the June filming because he did not see him again, Exhibit 79 at 221-22. But Dixon took photographs with Rock during the August filming. Exhibit 84.

53. When Fox contacted Dixon to ask permission to come back for an unplanned film shoot in August, Dixon demanded a director's chair for himself. Exhibit 98; Exhibit 85. After

14

the request was made, one of Dixon's subordinates emailed another privately, "Tell Brady Breen [Fox's location manager], if Dixon approved this [the August filming] he will need to get Dixon a directors chair," to which the other responded, "10-4." Exhibit 86. Thereafter, Breen took the chair request seriously, and had a director's chair custom made for Dixon. Exhibit 87 at 21.

54. Dixon only invited select staff to meet the stars. Exhibit 79 at 209. Other staff was excited about the filming because of overtime pay. Nearly everyone at the JTDC signed up for overtime during the filming. Exhibit 33 at 118-19.

55. The filming had a negative impact on the youth at the facility. Exhibit 7 at 91, 96-100. During the *Empire* filming there was more tension, stress and anxiety on the JTDC's residential pods. Exhibit 43 ¶¶22. This was because the children were unable to move as much, had lost their routines, and felt cooped up. *Id.* Numerous youth were upset about the filming, particularly the lack of movement that had been imposed on them. Exhibit 7 at 91, 96-100. Others felt both locked in and troubled that as incarcerated young people, they were confined to their pods to facilitate the filming of a movie. Exhibit 88 at 65-69.

56. In July 2015, Professor Thomas Geraghty contacted Dixon, saying he had heard about the filming and expressing concern that the detainees' movement was being restricted to make it possible. Exhibit 89. Dixon responded several days later with a letter assuring Geraghty the filming had had "no effect" on the JTDC's programs other than "change the location" where programming was provided. *Id.* Dixon assured Geraghty that the detainees had received "regular" programming and schooling, and listed two programs that had not been cancelled for the filming. *Id.*

57. After sending the letter Dixon, to Gergahty, Dixon mocked Geraghty in an email to one of his family members, Exhibit 90; Exhibit 79 at 248-49, and told another relative that

Geraghty was trying to "squeeze [money] out of the county" with more litigation in the *Doe* case. Exhibit 91. Shortly after receiving it Geraghty wrote back to Dixon, "Thanks for your response. I'm very glad to hear that the filming of Empire has been a positive experience for the kids at the Detention Center." Exhibit 92.

58. On August 7, Breen wrote to Dixon explaining that Fox needed to re-shoot several scenes, and proposed that Fox would come back to the JTDC on August 12. Exhibit 93. Dixon forwarded the request to Alonzo, the JTDC's in-house counsel, asking what she thought. *Id.* Alonzo answered, "I don't advise having them come back before the *Doe* party meeting on 8/20," to which Dixon responded, "Agreed." *Id.* Alonzo said she gave this advice because the *Doe* meeting was a lot of work. But Dixon did not remember that preparing for the *Doe* meeting involved a lot of work. Exhibit 79 at 278:6-12. Notably, August 20, 2015 was the date that Judge Holderman's active monitoring of the facility terminated. Exhibit 4 ¶ 22; Exhibit 99.

59. Restrictive incarceration of children and adolescents may at times be necessary, but it is psychologically harmful to them. *See* Exhibit 4 ¶ 28; Exhibit 10 ¶¶ 21, 30. Confinement to more restrictive spaces with fewer activities—particularly "day rooms" like the JTDC's pods—magnifies that psychological harm. Exhibit 10 ¶ 6. In contrast, more time off the pods and more activities—especially access to outdoor recreation—mitigates the psychological harm that incarceration imposes on young people. *Id.* ¶ 9.

60. More time spent restricted to the pods means more negative impact on detainees and more psychological harm from incarceration. This is true for every juvenile; more restriction equals more harm. For this reason, numerous JTDC programs— school, enrichment activities, exercise, recreation, commissary, etc.—are purposefully scheduled to take place off the pod. Exhibit 10. ¶ 30(a).

61. Increased pod confinement, reduced opportunities for structured programming, and the total elimination of access to outdoor space and fresh air are harmful to youth and increase the harms to juveniles that are caused by detention. Exhibit 4 ¶ 9.

62. It is the practice of guards to use additional pod confinement, such as the cancellation of off-pod recreation, as punishment designed to deter misconduct by detainees and maintain order and safety on the pods. Exhibit 43 at ¶ 13.

63. Dixon refused Fox's request to film in the infirmary. *See, e.g.*, Exhibit 96; ECF 88 ¶ 43; Exhibit 100 ¶ 1(A). The infirmary filming was cancelled when, a few days before filming there, the infirmary filming plan was sent to Josie Mabale, the head of the infirmary, who was told to "plan accordingly." Exhibit 97. The infirmary filming thereafter was cancelled that same day, upon which Mabale expressed thanks for the cancellation. *Id.*

64. T.S., Q.B., and H.C. have testified that in their perception the responses to sick call requests were indeed delayed during the filming. Exhibit 73; Exhibit 72 at 106-07; Exhibit 77 at 125-28.

65. The *Empire* lockdowns, particularly additional pod confinement and overpopulation, endangered the safety of the JTDC's detainees by making physical violence among them more likely. *See* Exhibit 4 ¶¶ 8, 44, 52, 53, 64, 78; Exhibit 10 ¶¶ 6, 30(c)-(d), 38.

66. Daniels testified that he "absolutely" "would [have] want[ed] to know" that the JTDC's residents could not access their classrooms during filming, Exhibit 103 at 97, 101, that it would have mattered to him if the children at the JTDC could not go outside because of the filming, Exhibit 103 at 100, that he would have wanted to know that kids could not get off their pods for exercise, Exhibit 103 at 100, and that it would have mattered "[d]eeply" to him that enrichment programming was cancelled for the filming, Exhibit 103 at 101-02.

17

67. A person in the yard could not see through the glass into the pods, so he was left only with a "feeling" that residents were allowed to watch. Exhibit 103 at 99.

February 9, 2020

Respectfully Submitted,

/s/ Stephen H. Weil

Stephen H. Weil – weil@loevy.com
Jonathan I. Loevy – jon@loevy.com
Michael I. Kanovitz – mike@loevy.com
Sarah C. Grady – sarah@loevy.com
Loevy & Loevy
311 N. Aberdeen Street
3rd Floor
Chicago, IL 60607
312.243.5900

*Attorneys for Named Plaintiffs T.S. and Q.B.*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on February 9, 2021, a true and correct copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

                                                /s/ Stephen H. Weil