# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

T.S. *et al.,*

        Plaintiffs,

  v.

Twentieth Century Fox Television *et al.,*

        Defendants.

Case No. 1:16-cv-08303

Hon. Rebecca R. Pallmeyer

## EXPERT REPORT OF EARL L. DUNLAP

## I.      INTRODUCTION

1.      My name is Earl L. Dunlap.  I reside in Effingham, Illinois.

2.      I have 50 years of experience in the profession of juvenile justice and specifically in the area of juvenile detention.  From August 2007 until May 2015, I served under my appointment by the United States District Court for the Northern District of Illinois as the Transitional Administrator of the Cook County, Illinois Juvenile Temporary Detention Center ("JTDC").  My Curriculum Vitae is attached to this report as Exhibit A.

3.      I have been retained by counsel for the Plaintiffs to prepare a report and render my opinion in the matter of *T.S. et al. v. Twentieth Century Fox Television et al.*, No. 1:16-cv-8303 (N.D. Ill.) (Case No. 1:16-cv-08303).

4.      I am being compensated at the rate of $175.00 per hour for these services.  I have no financial interest in the outcome of this litigation and my compensation is not contingent on the litigation's outcome.

5.      I have been made aware of and signed the Protective Order in this matter.

6.      My opinions in this report are based on my knowledge and experience as well as materials that have been produced by the Parties in this litigation. I may revise or supplement this report, or testify concerning other issues, in the event that additional information is made available to me or in order to respond to issues raised by the Defendants. The materials I have reviewed and considered in connection with this report are identified in Exhibit B.

## II.      SUMMARY OF OPINIONS

7.      It is my opinion that all youth in custody at the JTDC were harmed by the filming of *Empire*.

8.      To accommodate *Empire*, various JTDC policies and nationally recognized minimum standards of practice were disregarded.  As a result, the safety of the entire JTDC facility was compromised and all youth in custody were placed at increased risk of harm.

9.      In addition, all youth at the JTDC during the *Empire* filming appear to have endured increased pod confinement, reduced opportunities for structured programming, and the total elimination of access to outdoor space and fresh air. These types of restrictions are harmful to youth and increase the harms to juveniles that are caused by detention.

10.      I am unable to see any genuine benefit to the youth at the JTDC from the *Empire* filming.  Certainly, the benefits, if any, were limited to very few youths and even for them the benefits would have been outweighed by the harms caused by the filming.

11.      There was no legitimate government purpose for *Empire* to be filmed at the JTDC.

1

## III.     QUALIFICATIONS & BACKGROUND

12.     I have spent my career working in juvenile justice and detention. As described below, my work in this field has included an appointment by the U.S. President to a juvenile justice advisory board and the founding of an academic department focused on juvenile justice. I have supervised and directed multiple juvenile detention facilities, and have been appointed by federal courts multiple times to monitor or administer juvenile detention facilities, including the JTDC.

13.     I began my career in 1968 as a probation officer in a rural Michigan county. Shortly thereafter I served as the Director of a forty-eight bed (48) youth detention and long-term treatment facility.

14.     In 1980, pursuant to a national search, I was named Director of Youth Detention Services and Child Protection Services in Louisville/Jefferson County, Kentucky, a jurisdiction that was in litigation for inadequate conditions of confinement and crowding.

15.     Under my direction and supervision, between 1980 and 1984 the Jefferson County Youth Center ("JCYC" - 64 beds) became the very first dually accredited facility in the nation by the American Correctional Association and the National Commission on Correctional Health Care. In addition, the JCYC was named the first National Resource Center by the U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention. In the area of child protection and victimization, between 1981 and 1987 the Louisville-Jefferson County Missing and Exploited Child Unit was the first such organized effort to focus on child abduction and non-familial sexual exploitation. It later became the model for the National Center for Missing and Exploited Children.

16.     In 1989 I was appointed to the U.S. Advisory Board on Child Abuse and Neglect by President George H. W. Bush. In addition, I served on several national advisory boards that included the development of Juvenile Detention Standards by the American Correctional Association, the National Commission on Correctional Health Care, and the National Prison Rape Elimination Commission. I also served on the Office of Juvenile Justice and Delinquency Prevention Advisory Board for the "Study of Conditions of Confinement."

17.     In 1991 I created the Office of Juvenile Justice and Detention Services at Eastern Kentucky University and served as the Executive Director of the National Juvenile Detention Association.

18.     In 2001 I co-founded the National Partnership for Juvenile Services and served as the Chief Executive Officer until 2008.

19.     From 1995 to 2000 I served as the Federal Monitor for the Kentucky Consent Decree, *United States of America v. Commonwealth of Kentucky et al.*, Civil Action No 3:95-CV-757 (W.D. Ky.), which related to inadequate "conditions of confinement" in twelve (12) juvenile residential treatment facilities.

20.     I have served in a "coaching" capacity for several jurisdictions' juvenile detention facilities including the Washington, D.C. Youth Services Center (88 beds), which at the time was operating under a Consent Decree.

21.     In 2007 I was appointed by this Court to serve as the Transitional Administrator for the Cook County JTDC pursuant to *Doe v. Cook County*, No. 99-C-3945 (N.D. Ill.) and the August 14, 2007 Agreed Order Appointing a Transitional Administrator.  I served in that role until May 20, 2015.

22.     The JTDC was turned back over to local control on May 20, 2015.  From that date until August 20, 2015, I served as the Federal Court's expert to monitor the transition.

23.     My Curriculum Vitae is attached to this report as Exhibit A.

## IV.    MATERIALS REVIEWED

24.     As part of my assignment, I have reviewed the pleadings, as well as a number of background documents provided by counsel. A complete list of the documents provided to me is shown in Exhibit B.

25.     In addition to my review of these materials, Plaintiffs' counsel has made the following representations to me regarding the impact of *Empire*'s filming at the JTDC:

    a.   When school was in session, youth detained at the JTDC were not allowed to leave their pods to attend school in the designated educational area of the facility. Instead, school was conducted on the pods where the youth were confined;

    b.   Outdoor recreation was eliminated for youth detained at the JTDC;

    c.   In numerous instances, youth detained at the JTDC were not allowed to leave their pods for areas designated and equipped for indoor and outdoor recreation;

    d.   Off-pod programs and recreation that were normally provided to youth when school is out of session were eliminated;

    e.   Numerous programs, which were scheduled to occur off of the pods, were cancelled;

    f.   Two pods of the JTDC's "Alpha" Center were closed off in order to accommodate the *Empire* film crew's use resulting in the following consequences:

        i.   "Alpha" residents were transferred throughout the facility on a schedule dictated by the *Empire* filming, instead of the JTDC's screening, assessment, classification, medical and security policy and protocols;

        ii.   To accommodate the surge in population from the closed "Alpha" pods, population caps on pods throughout the facility were raised past their safe

functional operating capacity, and numerous pods were in fact overpopulated;

    iii.   The JTDC's primary psychological screening tool, called MAYSI, was abandoned for all but a handful of children who entered the JTDC during *Empire* activity and filming;

   g.  Visitation was moved to accommodate *Empire* activity and filming, from the JTDC's purpose-built visitation area to a smaller room with fewer, closer tables that afforded less privacy.

26.    The materials I have reviewed appear to substantiate these representations.

## V.   JTDC BACKGROUND

27.    JTDC houses youth between the ages of twelve and eighteen years old. At any given time, the JTDC population ranges between approximately 250 and 400 youth.

28.    Secure juvenile detention may be necessary to ensure the safety of some youth as well as the safety of the community. However, recent studies and litigation have established that these environments tend to have a negative psychological impact on detained youth, particularly when state and federal regulation and nationally recognized standards of practice are not adequately applied.

29.    Juvenile detention, in order to minimize harm and reduce the negative impact of incarceration, should be organized in a manner that addresses the fundamental civil rights elements of "CHAPTERS"— Classification, Health care, Access, Programs, Training, Environment, Restraints, Safety. Furthermore, a comprehensive policy and procedure manual should, at a minimum, incorporate juvenile detention standards specifically promulgated by:

- American Correctional Association
- National Commission on Correctional Health Care,
- Prison Rape Elimination Act
- Juvenile Detention Alternatives Initiative
- Illinois Juvenile Detention Standards

30.    Pursuant to *Doe v. Cook County*, No. 99-C-3945 (N.D. Ill.) and my appointment as Transitional Administrator in August 2007, the JTDC implemented a number of policies and procedures to minimize the negative impact of incarceration, improve the conditions of confinement, and provide youth with a safe, secure and helpful environment, thereby improving their chances of rehabilitation.

4

## VI.  *DOE* LITIGATION, TRANSITIONAL ADMINISTRATION, AND OVERSIGHT OF THE JTDC

31.     The *Doe* litigation was initiated by the American Civil Liberties Union ("ACLU") in 1999 and was brought to challenge inadequate and unconstitutional conditions of confinement that were extremely harmful to youth incarcerated at the JTDC.

32.     The parties eventually entered into five agreed upon orders that set forth the requirements to improve the harmful conditions of confinement at the JTDC:

- Memorandum of Agreement, December 30, 2002 ("MOA")
- Agreed Supplemental Order, May 18, 2006 ("ASO")
- Modified Implementation Plan, January 3, 2007 ("MIP")
- Order Appointing a Transitional Administrator, August 14, 2007
- Memorandum Opinion and Order, June 23, 2010 ("Staffing Plan")

33.     Between 1999 and 2007, Cook County and the JTDC were unable to satisfactorily improve the conditions of confinement and reduce harm to youth at the JTDC.

34.     The MOA and MIP were specifically designed to improve conditions of confinement, reduce harm to youth, comply with nationally recognized minimum standards of practice, and implement best practices programs and services.

35.     Because Cook County was unable to bring the JTDC into compliance, the Court appointed me as a Transitional Administrator on August 14, 2007.

36.     The Court specifically charged me with the development of comprehensive policies and procedures that complied with all provisions set forth in the MOA, ASO and MIP.  I also was directed to take immediate steps to reduce harm to youth and eliminate civil rights violations of detained youth.

37.     My appointment was to remain in effect until such time as the Court was satisfied that the JTDC was in compliance with the provisions set forth in its orders.

38.     On May 15, 2015, the Court was satisfied that the JTDC had been brought into compliance with the MOA, ASO and MIP and returned the JTDC to local control effective May 20, 2015, at which time the Chief Judge of the Cook County Circuit Court assumed administrative control of the facility.  The Chief Judge appointed Leonard Dixon as the Superintendent of the JTDC shortly thereafter.

39.     As part of the agreement to return the JTDC to local control, all parties agreed that I would remain as the Court's expert for a period of ninety days (through August 20, 2015) to monitor the transition process.  During this ninety-day period I was tasked with identifying any material deviations from the MOA or the MIP that threatened the health and safety of the juvenile population and staff of the JTDC.

40.     I understand that sometime after the JTDC returned to local control that Superintendent Dixon agreed with Fox to allow the JTDC to be used as a filming location for the *Empire* television program.  It seems that an agreement was reached, and filming dates were arranged for June 21-25, July 13-16 and August 23-26 of 2015.  I find these dates to be rather conspicuous as I was asked, as the Court-appointed expert, to schedule my site visits to the JTDC for June 15-18, July 20-23 and August 17-20 of 2015.  In all events, I did not witness any of the *Empire*-related activities during my visits to the JTDC during the summer of 2015.

41.     During the summer of 2015, I was indirectly made aware that filming of some kind was occurring on the JTDC premises.  But at no time was I ever advised of the nature of the production, the impact the production would have on the procedures for maintaining security and control, the adverse impact on daily youth programming, etc.  Furthermore, the Parties to the *Doe* litigation met at the JTDC in August 2015 for the "close out" meeting and Superintendent Dixon never raised the subject of the *Empire* filming, much less the impact it had on the operation of the JTDC and the youth in custody.

42.     Had I been informed of the nature of the *Empire* production and the changes to JTDC operations that were necessary to accommodate *Empire*, I would have objected, attempted to stop it, and if necessary, brought it to the attention of the Court.  That is because, as described below, the conditions put in place at the JTDC to accommodate *Empire* were harmful to the youth and served no legitimate purpose.

## VII.    JTDC RESIDENTS WERE HARMED BY THE FILMING OF *EMPIRE*

43.     Many of the policies and procedures that my administration put in place at the JTDC in order to bring it in compliance with the Court's orders from the *Doe* litigation appear to have been disregarded and violated during the filming of *Empire*.  The primary purpose of these policies and procedure was to minimize harm to youth at the JTDC caused by incarceration.  The policies and procedures are consistent with widely accepted industry standards of care for juvenile conditions of confinement.  All residents of the JTDC were likely harmed by the JTDC's violation of these policies and industry standards.

### a.    THE *EMPIRE* FILMING PLACED THE JTDC AND ALL OF ITS RESIDENTS AT HEIGHTENED RISK OF VIOLENCE AND HARM

44.     Many of the policies and procedures at the JTDC are designed to minimize the risk of violence.  A number of these policies appear to have been disregarded to accommodate *Empire*, which heightened the risk of violence throughout the JTDC.

#### *i.*    The Suspension of Industry Standard Intake Screening Procedures during the *Empire* Filming Created Unacceptable Risks for All JTDC Residents

45.     There may be no single area of conditions of confinement that has a greater potential for adverse impact on the safety and well-being of a youth taken into custody and ordered to be held at the JTDC than to fail to conduct an adequate Classification and Assignment

process upon intake.  Furthermore, not only does such a failure adversely impact the individual youth, it may well extend to the entire youth population in the JTDC at the time.

46.     Screening youth upon intake to a juvenile detention facility and assigning them to an appropriate housing unit are of critical importance.  Numerous industry standards require prompt and thorough Classification and Assignment procedures.  Standard of Care: ACA Standards 3-JDF_2B-08, 3-JDF_5A-02; JDAI Standard 1E.1 thru 1E.6; MOA #56, IDJS 702.70; PREA 115..315, 115.342.

47.     As relevant to this case, the JTDC was reorganized into nine independent residential centers, each of which had multiple pods.  For reference, the residential centers were given names like Renaissance, Legacy, Omega, Phoenix, Houston, etc.  There are a total of nine (9) of these centers.  The center known as "Alpha" center, is focused specifically on resident admissions, screening, assessment and orientation.

48.     A youth's admission to detention is often referred to in the profession as the "critical hours."  When a resident first enters Alpha they are given a psychological screen.  One of the critical testing instruments to be administered to all residents upon admission is the "Massachusetts Youth Screening Instrument-Second Version (MAYSI-2), a 52 item, self-administered questionnaire developed to identify the following behaviors: alcohol/drug use; angry-irritable; depressed-anxious; somatic complaints; suicide ideation; thought disturbance; and traumatic experiences.  The MAYSI-2 is administered via computer at a workstation within the Alpha pods; the computer administration is critical because it allows the MAYSI-2 software program to assess and score the test results, which helps the staff identify psychological problems and risks.  After reviewing the MAYSI-2 test results, Mental Health Services determine whether there is a need for additional testing.

49.     Essential to a successful outcome for a resident Classification system is the work of the Housing Classification and Assignment Committee.  This Committee is made up of a multi-disciplinary team (JTDC Caseworker, Health/Mental Health, Chicago Public School, ALPHA/WINGS Rep.).  The Committee is supposed to meet daily to review new resident admissions, history, relevant data and determine what "Center with a Center" would be most appropriate for the resident.  Because of residents' membership (or perceived membership) in gangs, interpersonal disputes, or psychological issues, a placement on any number of pods can be dangerous either for the new resident, for an existing resident on one of the pods, or both.  The decision to transfer any resident is therefore a painstaking, high risk process.

50.     Critically, the movement a resident out of Alpha and onto a pod should only be done if and when an appropriate housing location has been identified and all screening is complete—no other consideration should impact or drive the timing of a resident's transfer to another center.  The beginning of detention can be a very traumatic time for a young person.  It is a time when it is extremely important to "get it right" and at a minimum "DO NO HARM."

51.     The decisions made in the ALPHA Center can and will impact the safety and well-being of every single resident and staff in the facility.  While JTDC Policy V6C09P03 very clearly sets forth fifteen essential factors that must be considered when making housing decisions, among the most important are: (1.) Suicide and Self-Harm risk assessment; (2.)

Violence or Victimization potential; (3.) Special Consideration/Special Needs, *e.g.*, gang affiliation, known or potential conflicts with other residents/staff; and (4.) Medical/mental health issues.

52. Based on my review of the information and data available it is clear that on the dates in June, July and August 2015 of the filming of *Empire* at the JTDC, the vast majority of boys admitted—168 out of 182—did not receive a Classification (screening, assessment, orientation) in accordance with the aforementioned Standards of Care. This created a risk of harm for the unscreened youth, as well as the other residents and staff at the JTDC. It was highly risky for everyone at the JTDC to disperse throughout the facility, without adequate psychological screening, dozens of youths that might be suicidal, depressed, have violent tendencies, gang affiliations, or have other mental health conditions.

### *ii.* Overcrowding on Pods Caused by the *Empire* Filming Created Unacceptable Risks for All JTDC Residents

53. As described below, the Functional Operating Capacity of the JTDC is 382 beds, and pod capacities are limited to either 14 or 12 beds depending on their layout. Overcrowding is a serious problem with severe consequences for youth at the JTDC and the facility as a whole. The Functional Operating Capacity limits determined during my tenure as the Transitional Administrator were sufficiently important that the Chief Judge of Cook County and Superintendent Dixon both affirmed in writing their commitment to follow the policy after I left. However, the evidence indicates that in order to accommodate the *Empire* filming many pods exceeded their Functional Operating Capacities. This compromised the safety of the entire JTDC and all youth who were detained during the periods of overcrowding.

54. The "Rated Capacity" of each pod is based on the number of individual cells, and thus beds, on each pod; depending on their location within the building, pods have a Rated Capacity of 16 or 18 detainees. During my administration it was determined that this number was unsafe for both detainees and staff. To bring the JTDC into compliance with nationally recognized minimum standards of practice, on May 28, 2013, as Transitional Administrator, I issued a "Functional Operating Capacity" policy that established the functional operating capacity of each pod. All pods with a rated capacity of 18 beds would be reduced to no more than 14 beds, and all pods with a rated capacity of 16 beds would be reduced to no more than 12 beds. These lowered capacities were designed to improve the safety of detainees and staff on each pod and to meet nationally recognized minimum standards of practice as it relates to resident to staff ratio for direct/continuous supervision.

55. Given the number of pods in the facility, this meant that the JTDC's total Functional Operating Capacity was 382 detainees.

56. The Functional Operating Capacity Policy that I implemented at the JTDC complied with well-accepted industry standards of care: ACA Standards 3-JDF_2B-02, 3-JDF_2B-02-1, 3-JDF_2B-06, PREA Standard-Staff to Resident Ratio.

8

57.     During my administration of the JTDC from 2007-2015 my Executive Team and I were charged with the mission and responsibility to take the steps necessary, through the implantation of the MOA, ASO, MIP, nationally recognized minimum standards of practice and evidenced based practices, to promote a safe, secure, humane and helpful environment for youth at the JTDC.  It was absolutely essential that youth in custody felt safe and were safe.  The same was essential for the staff responsible for the care and supervision of these youth.

58.     The "Functional Operating Capacity" Policy was a major contributor to achieving the mission.  Not surprisingly, it therefore became a major factor in the discussions leading up to transition of the JTDC from my supervision to that of the Office of the Chief Judge of the Cook County Circuit Court in May 2015.  The Functional Operating Capacity Policy was so important that the Chief Judge provided my Office with a letter on May 14, 2015 citing his commitment to abide by it.

59.     Superintendent Leonard Dixon, in a letter on August 14, 2015 to the *Doe* Parties, reiterated his on-going commitment to the "FOC" (*i.e.*, Functional Operating Capacity) Policy, and to the totality of the Policy and Procedure Manual.  Mr. Dixon made no mention of the *Empire* filming, which had taken place in June, July and August of 2015 and very clearly had an adverse impact on "FOC" as well as many of the other JTDC operating Policies.

60.     During the *Empire* filming, the JTDC youth population appears to have been very near the Functional Operating Capacity (382) for the facility—it was averaging at least 379 youth during one of the weeks and 376 during another. Closing the Alpha pods for *Empire* forced more youth into a small living space with little to no capacity.

### *iii.*      Allowing the Cast and Crew into the JTDC to Film *Empire* Created Unnecessary Risks for Detainees

61.     The JTDC is a secure facility.  It is designed and operated to provide a safe, secure, humane and helpful environment for youth.  As a secure facility, it is not open to the public. Entry and movement within the JTDC are heavily restricted and monitored in order to protect the youth and the staff in the facility.

62.     It appears that more than 200 people—actors, crew and other personnel and all of their gear—came into the JTDC to film *Empire*.  I am unaware of any other time when such a large group of outsiders was provided access to the JTDC, particularly for such an extended period.

63.     I understand that additional security measures were undertaken because of *Empire*.  However, whatever measures were taken, it was still riskier to have those 200 people in the facility than to not have them in the facility.  So many people all at once that had no legitimate purpose of being in the JTDC created significant security risks and compromised the safety of the entire facility and the youth housed there.  Furthermore, such security measures could only have the effect of reducing or eliminating movement of youth to programs and services that were designed to benefit them.

**b.      THE *EMPIRE* FILMING HARMED ALL JTDC RESIDENTS BECAUSE THEY WERE CONFINED TO THEIR PODS FOR EXCESSIVE AMOUNTS OF TIME**

64.      The summer months for youth in custody at the JTDC are by no means vacation or down time.  In as much as the population is a "captive audience," it is critical to ensure that there are structured program activities for up to fourteen hours a day.  To do less ignores the Orders of the Court (MOA, ASO, MIP) and nationally recognized minimum standards of practice.  In addition, it leaves a population of at-risk and troubled youth to their own devices and places extraordinary pressure on the staff responsible for direct and continuous supervision. To the maximum extent practicable, those programs and activities should occur off of the detainees' pods.

65.      During the *Empire* filming, the youth housed at the JTDC were excessively restricted to the smallest spaces (pod dayrooms) within the facility.  All youth sleeping rooms are directly connected to this dayroom space, as is an even smaller TV room space as well as the toilet and showers area.  So in addition to restrictions on movement, confinement to pods does not allow for anyone to have a single moment of privacy.  Pod confinement at the JTDC most resembles the conditions of adult incarceration, and is most negatively impactful on young detainees.

66.      All youth at the JTDC appear to have spent more time on the pods than they would have if *Empire* had not been there.  Pods were never intended to be occupied for most waking hours and for several days at a time, and indeed the JTDC's policies are designed to minimize time on the pods, to the extent practicable.  Certainly such restrictions to accommodate the filming of a television drama are not justified.

67.      Under ordinary circumstances at the JTDC, facility administrators and Center Team Leaders attempt to minimize the time that youth spend on their pods. Structured programming for youth relies heavily on the movement of youth through the facility and many of the JTDC spaces are used for dual purposes.  For example, the Nancy B. Jefferson ("NBJ") School provides classroom space for all youth but also serves as a commissary, a movie area, a recreational activity space, and houses programs provided by community agencies and volunteers, etc.  Whether or not school is in session, youth at the JTDC frequent the NBJ School space for structured programming.

68.      During the *Empire* filming, much of the NBJ space appears to have been closed and unavailable to JTDC youth.  This meant that school, when it was in session, had to take place on the pods.  And activities that normally would have been at the NBJ facility were cancelled or took place on pods.  This meant more pod time for youth at the JTDC.

69.      Based on my experience as Transitional Administrator I am doubtful that it was feasible to provide equivalent educational services on the pods, where there is traffic moving in and out of the area and doors are clanging and phones are ringing.  Of course, the chances are great that some youth may be confined to their sleeping room and banging on the door, yelling, and generally being disruptive, etc.  School on the pods is not as good as school in the NBJ

facility. And school in and of itself is designed to get detainees off their pods for much of the day.

70.     Just as structured programming needs space for education and other activities, under ordinary operations at the JTDC there are designated spaces for indoor and outdoor physical education, recreation and some activities. Indoor and outdoor structured programs are an important outlet for youth, particularly when they find themselves in an enclosed, secure and locked detention facility like the JTDC. Among other things, when school is out on break, the JTDC provides additional recreation hours to detainees, again to minimize the time they spend on their pods.

71.     During the *Empire* filming, some indoor recreation areas and all of the outdoor recreation areas were closed to youth at the JTDC. This means that youth had fewer opportunities for off-pod recreation—and no opportunities whatsoever for outdoor recreation— while *Empire* was at the JTDC. Taking recreation opportunities away from youth in a detention facility, and outdoor opportunities in particular, is harmful to youth. It is noteworthy that the weeks scheduled for the filming were in the summer when the weather, for the most part, is ideal for outdoor recreation and activities.

72.     Contrary to Superintendent Dixon's statements in his deposition, daily large muscle activity ("LME") is required by the Court's Orders, by existing JTDC Policy, and under industry standards of care. LME cannot be achieved by walking up and down a hall, as Mr. Dixon suggested. Mr. Dixon's testimony that "fresh air" simply means stepping outside of the sleeping room and into any indoor space, including a pod, goes against both standard juvenile detention practices and the JTDC's own policies. "Fresh air" means access to the outdoors.

73.     The impact of the reduction of indoor and outdoor opportunities for recreation was compounded by the fact that the youth at the JTDC were restricted to their pods for several days with few outlets. This was further compounded by the fact that many pods were overcrowded beyond the Functional Operating Capacity, as discussed above. Imagine being restricted to a space not much larger than a two-car garage for most of your waking hours with as many as sixteen people, many of whom have mental health issues, and surrounding the garage are neighbors banging on the exterior walls. The conditions of confinement at the JTDC caused by the *Empire* filming were harmful to all JTDC youth.

## c.     THE SUSPENSION OF BEHAVIOR INCENTIVES (TOKEN ECONOMY) DURING THE *EMPIRE* FILMING WAS HARMFUL TO YOUTH AT THE JTDC

74.     The JTDC has implemented a structured behavior and incentive program ("token economy"). Youth are able to earn points for good behavior and involvement in planned programs and activities.

75.     Youth are able to earn points from various endeavors, such as good behavior; participation in educational programming; work activity such as maintaining one's sleeping and small living and recreation area, showers, restrooms, as well as other areas of the facility;

participation in structured recreation, community and volunteer sponsored programming; etc. The better the youth's behavior and participation the more points they earn.

76.     Points accumulated by youth provides them with the spending power to purchase items from the commissary or to buy the right to perform certain activities, including additional telephone privileges, special visitation, later bedtime, access to electronic games, etc.

77.     It is important to note that this is just a brief summary of a comprehensive program that is designed to provide incentives to engage in appropriate behavior. The token economy is a key feature of daily operations at the JTDC. The program also provides a quick and transparent system of rewards and punishments, which provides youth with a sense of order and fairness.

78.     Effectively suspending the token economy during the *Empire* filming—by eliminating privileges that detainees had earned—likely created a sense of unfairness and arbitrariness for the youth at the JTDC. This would both eliminate incentives for good behavior and increase the negative psychological impact of incarceration at the JTDC.

> **d.     VISITATION DURING THE *EMPIRE* FILMING WAS COMPROMISED**

79.     Visitation is a fundamental right of juveniles housed in pre-trial detention.

80.     Youth in detention facilities have a real sense of isolation when incarcerated and while it is important for them to recognize and confront the consequences of their actions, it is also important to recognize the significance and value of family engagement.

81.     It appears that some youth had to either forgo or adjust opportunities for private visitation because of the *Empire* filming. To accommodate *Empire*, visitation was moved to a smaller area that afforded fewer spaces for visitors and less privacy.

82.     It appears that parents and others who had set their schedules in a way where they could visit now had to make adjustments and for no other reason than to accommodate a movie production. Furthermore, T.S. and his mother indicate that privacy was eliminated. This would disrupt one of the key benefits of visitation, as detained youth have nobody but their parents to confide in during their incarceration.

83.     With the limits on space at the JTDC, *Empire* simply could not be accommodated without taking things away from the youth at the JTDC, including opportunities for private visitation. This becomes one more reason for youth to view the system as failing them, or it is used as an excuse to act out in the facility.

> **VIII.   THERE WAS NO LEGITIMATE GOVERNMENTAL PURPOSE FOR FILMING *EMPIRE* AT THE JTDC**

84.     In my career I have served as the administrator of several juvenile detention facilities and as Transitional Administrator to the JTDC. I served as the Chief Executive Officer of the National Partnership for Juvenile Services (NPJS), which is the umbrella organization for

the National Juvenile Detention Association (NJDA), the National Association of Juvenile Corrections Administrators (NAJCA), the Juvenile Justice Trainers Association (JJTA), and the Council for Education of At-Risk and Delinquent Youth (CEARDY). I have worked with the U.S. Department of Justice and conducted investigations, internal reviews and assessments of dozens of juvenile detention facilities. I have been honored to serve on working committees that developed and promulgated national standards for juvenile detention facilities by the American Correctional Association (ACA), National Commission for Correctional Health Care (NCCHC) and the Prison Rape Elimination Act (PREA). Based on all of this experience, it is absolutely clear to me that there was no legitimate government purpose for filming *Empire* at the JTDC.

85.     The JTDC, like any secure juvenile detention facility, has a singular mission: to provide a safe, secure, humane and helpful environment for the youth in custody. The safety, security, and rehabilitation of some of society's most vulnerable youth and the safety of the broader community are the goals of the JTDC. Using the JTDC to film a television drama does not advance those goals. As I discuss throughout this report, if anything, the *Empire* filming appears to have undermined those goals.

86.     The JTDC is a juvenile detention center, not a film set. I cannot come up with any reason that would justify using the JTDC as a film set, especially in light of the many harms that doing so inflicted on the youth at the JTDC.

87.     I am very doubtful that any of the youth in custody at the JTDC benefited from the *Empire* filming. I am aware that a very small number of youth received a speech from one of the *Empire* actors and that some youth may have incidentally caught glimpses of the filming from a window in their pods. The small and superficial benefits, if any, of these interactions are outweighed by all of the harms caused by the *Empire* filming throughout the JTDC facility.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on 10 of April, 2019.

Earl L. Dunlap

# DUNLAP EXPERT REPORT

# Exhibit A:

## Curriculum Vitae

# EARL L. DUNLAP

15650 N. Blue Point Trail, Effingham, Illinois 62401
Home: (217) 868-5997 ◆ Cell: (317) 691-9678 ◆ Email: NJDAED2@aol.com

---

## CURRENT ACTIVITY

Cook County, Illinois Juvenile Temporary Detention Center ...................................................... **2007 – 2015**
U.S. Department of Justice/Office of Juvenile Justice Delinquency Prevention ................. **1991 – Present**

**United States District Court for the Northern District of Illinois Eastern Division**
***Doe v. Cook County,*** 99 C 3945

Cook County, Illinois: Appointed Transitional Administrator of the Cook County Juvenile Temporary Detention Center by the United States District Court. A (498) bed juvenile detention facilities for juvenile offenders and adult transfers. The facility is now in substantial compliance with a series of Court Orders related to inadequate conditions of confinement and was transitioned May, 2015 to the local governing authority of the Office of the Chief Judge of the Cook County Circuit Court.

**ELD, Inc. / Comprehensive Systems Solutions**

Since 1985 has provided consulting services, including training and technical assistance, in all facets of juvenile justice with specific emphasis in the following areas:

- Planning of juvenile justice and detention services systems
- Youth Violence Strategies
- Programming related to architectural planning and design of juvenile facilities
- Management/Leadership
- Staffing Analysis
- Policy/Procedure Development
- Training
- Fiscal Planning
- Leadership/Coaching of Systems/ Facilities in Crisis or Litigation

## EDUCATION

**Siena Heights College**
*Adrian, Michigan*
B.A. Degrees
Major: Social Sciences, Minor: Education

Advanced Study:

- Michigan Supreme Court, Court Administrators Program
- Michigan Judicial Institute
- American Correctional Association
- National Juvenile Detention Association
- Institute for Court Management
- National Council of Juvenile and Family Court Judges
- Correctional Education Association

*Earl L. Dunlap – continued*

## EMPLOYMENT HISTORY

**Chief Executive Officer, National Partnership for Juvenile Services**..............................................2002 – 2010

NPJS is a non-profit collaborative consisting of four (4) nationally recognized organizations; **Juvenile Justice Trainers Association, National Association of Juvenile Corrections Agencies, National Juvenile Detention Association and the Council for the Education of At-Risk and Delinquent Youth.** The Partnership advocates for youth, families and communities and promotes "best practice" and professional development of practitioners serving at-risk and delinquent youth.

**Executive Director, National Juvenile Detention Association**.........................................................1985 – 2002

NJDA is a non-profit membership organization made up of professions dedicated to promoting excellence in juvenile detention services. NJDA, founded in 1968, publishes quarterly newsletters, a bi-annual *Journal for Juvenile Justice and Detention Services*; annually presents the Joint Conference on Juvenile Detention and Corrections and the National Juvenile Services Training Institute; administers several federally funded projects focusing on issues impacting juvenile justice, detention and corrections.

**Director of Juvenile Justice and Detention Services, Eastern Kentucky University**......................1991 – 2009

Responsibilities: Directed grants/contracts in numerous states to develop "Juvenile Detention Services Plan's" that include:

- Implementation of a "State Juvenile Detention and Placement Plan".
- Development of a course of education and training for juvenile detention services personnel.
- Technical assistance to jurisdictions with or developing juvenile detention services systems.
- Monitoring of regulatory requirements.

**Director of Youth Placement Services, Jefferson County Government** ................................... **1/1980 – 3/1991**
*Louisville, Kentucky 40202*

Responsibilities: In this capacity, responsibility for a pre-adjudicative juvenile detention services continuum of care and a post-dispositional community residential care program. In 1979, the pre-adjudicative secure facility was fraught with corruption and under grand jury investigation. A series of pro-active initiatives began in 1980 which included:

**1980**: A reduction in the secure custody population from an average daily population of ninety (90) to twenty-five (25) through the development of a Pre-Custodial release criteria and a continuum of alternative programs. Programs included staff intensive group home(s) and home supervision / home detention.

**1981:** Transition to a new fifty-six (56) bed secure facility, staffed to serve forty (40) beds and maintained an A.D.P. of twenty-five (25) to thirty-seven (37).

**1983:** Facility, (Jefferson County Youth Center), accredited by the Commission on Accreditation for Corrections and the National Commission on Correctional Health Care and in all subsequent years to 1991.

**1985**: Facility, (Jefferson County Youth Center), named a National Resource Center by the Office of Juvenile Justice and Delinquency Prevention and American Correctional Association.

**1985**: Four (4) community residential group homes accredited by the Commission on Accreditation for Corrections and in all subsequent years to 1991.

The operating budget for all programs and services approximated $4.5 million and personnel approximated one hundred and fifty (150) individuals.

2

*Earl L. Dunlap – continued*

**Administrator, Louisville and Jefferson County Exploited and Missing Child Unit** .............. **8/1982 – 7/1987**
**(Task Force on Child Victimization)**
*Louisville, Kentucky 40202*

Responsibilities:  In this capacity, responsibility for the administration and management of all law enforcement and social services activity relating to the criminal investigation of child sexual exploitation and search for missing children.  The Unit consists of one (1) law enforcement Lieutenant and five (5) police / social work teams, as well as one (1) full-time person assigned to outreach and education.  The operating budget is approximately three hundred fifty thousand dollars ($350,000) annually.  The Unit has received national recognition for its pro-active approach to the victimization of children by combining the activity of law enforcement and social services in a single operating Unit serving a city and county of eight hundred thousand (800,000) people. The Unit played an integral role in the development of the National Center for Missing and Exploited Children.

**Director, Youth Protection, Jefferson County Government**...................................................... **8/1982 – 2/1985**
*Louisville, Kentucky 40202*

Responsibilities:  Inclusive of the two (2) areas listed above, in addition to the administration of all Child Protective Services (dependent, neglect, abuse) programs within Jefferson County Government.  The program employed over eighty (80) personnel inclusive of three (3) program directors, ten(10) to twelve(12) supervisors, forty-five(45) to fifty(50) social work staff, and support personnel.  The operating budget exceeded two million dollars (2,000,000).  The program served some nine hundred (900) active cases within the community and the responsibility for the development and supervision of all short-term foster care.

**Director, Monroe County Youth Center**........................................................................................ **9/1976 – 1/1980**
*Monroe, Michigan 48161*

Responsibilities:  The Monroe County Youth Center did not open its doors until November 1977.  Prior to that, it was the responsibility of the Director to work with government officials, architects, a general contractor, and various sub-contractors in the development of an adequate structure to house juvenile offenders.  Also, it was essential that programs be developed prior to construction so that the structure could adequately meet the program needs.  Programs were developed in the areas of Reality Therapy and Token Economy, and to date are the major substance of programming.  Approximately sixty-five percent (65%) of the staffing pattern had to be hired and trained.  Grants were written and money obtained through the Office of Criminal Justice Programs for the purpose of staff training and development.

The Monroe County Youth Center was a forty-five (45) bed facility serving the Court.  Of these beds eighteen (18) were designated as short-term reception/detention, and twenty-seven (27) were designated as long-term residential/treatment.  The programs are physically separated within the structure.  The staffing pattern consisted of forty-three (43) full-time personnel, inclusive of those with master's degrees in social work and other related fields, certified instructors of the emotionally impaired, and support personnel in the areas of food services and building services.

The Director of the Youth Center was responsible for the administration of the facility's operation in all of the following areas:  development of all Center policy and procedure; development of programs in the area of intake, reception/detention, residential/treatment, education, food services, building services, in-service, and after-care; development of the business management;  preparation of budgets ($700,000); coordinating programs with other local agencies;  public relations; and working with various elected officials.

*Earl L. Dunlap – continued*

**Division Chairman (Part-time), Bedford Public Schools** ......................................................... **9/1976 – 6/1977**
*Temperance, Michigan 48182*

Responsibilities: As division chairman, developed and coordinated all senior citizen programming in the area of social sciences. This was inclusive of the supervision of six (6) certified teachers, curriculum development, related field trips, and implementation of a student government.

The entire program concept was virtually new in the state of Michigan. It has since grown to become a model program throughout the country.

**Teacher (Part-Time), Monroe Public Schools** .......................................................................... **1/1975 – 6/1976**
*Monroe, Michigan 48161*

Responsibilities: Worked in the psychology and sociology department in the adult education program. This was done on a part-time basis. In addition to this program also serviced the educational program for Monroe, Michigan senior citizens in the area of social studies. This involved the daily teaching of social studies and the coordinating of related trips.

**Treatment Director, Monroe County Shelter Home** ................................................................ **1/1974 – 9/1976**
*Monroe, Michigan 48161*

Responsibilities: At the administrative level throughout the court: Administrator of all staff at the juvenile home, both at an administrative or line staff level; development and administration of a Token Economy behavioral program in the facility; development of all treatment services available to youth in the home, budgeting of the home's annual operation; functioning as the court's coordinator for public mental health services; overseeing all college student field training programs; and consultant to the court for the purpose of building a juvenile detention treatment center.

**Counselor, Lenawee County Juvenile Home (Maurice Spear Campus)** ................................... **8/1971 – 1/1974**
*Adrian, Michigan 49221*

Responsibilities: Entailed a vast job description: Administration of all child care staff in the open program; evaluating youth in the detention program for future court hearings and placements; establishing treatment programs for each youth in the open program; leading group and family therapy sessions; staff training programs; and working with the juvenile homes' board of directors in the area of public relations.

While working at the Lenawee County Juvenile Home implemented a Positive Peer Culture Program. The facility serviced sixty-five (65) delinquent boys and girls.

Also, during the time period of 1971 to 1974, acted as a consultant to the Muskegon, Michigan Public Schools in implementing a behavioral group program for pre-delinquent youth in the local school. A similar consultant service was provided to the Monroe County Juvenile Court and Monroe Public Schools, Monroe, Michigan in 1973.

**Probation Officer, Lenawee County Juvenile Court** ................................................................ **6/1969 - 8/1971**
*Adrian, Michigan 49221*

Responsibilities: Worked with delinquent boys, both in the county and at the Lenawee County juvenile Home. During that time carried a case load of thirty-five (35) to forty-five (45) boys. The job involved completing social histories and making recommendations to the juvenile court on each boy; working with county area schools that each boy was attending; establishing treatment programs for all assigned boys in the juvenile home; and placement and supervision of boys in foster care.

*Earl L. Dunlap – continued*

## RELATED EXPERIENCE (CONSULTANT/FACULTY)

**Consultant, American Correctional Association**................................................................**1986**
Assignment:   Technical assistance to Wayne County Youth Home - Detroit, Michigan

**Consultant, Community Research Associates for the Office of Juvenile Justice and
Delinquency Prevention**................................................................................ **1985 -1996**
Assignments:  Evaluation of Marion County Youth Home
*Indianapolis, Indiana*

Evaluation of Southern Idaho Youth Detention Facility
*Jerome, Idaho*

Jail Removal Planning
*Jerome, Idaho*

Jail Removal Planning
*New Hampshire*

Jail Removal Planning
*Clark County, Indiana*

Architectural Design
*Ocean County, New Jersey*

Review of North Carolina Detention System
*North Carolina*

Architectural Design and Operational Transition
*Caddo Parish, Louisiana*

Systems Planning
*Kane County, Illinois*

Review of Detention System
*DuPage County, Illinois*

Systems Planning
*Florida Parishes, Louisiana*

Systems Planning
*Delaware County, Indiana*

Operational Planning/Staffing of South Carolina Department for Youth Services Juvenile
Detention facility
*South Carolina*

Planning for regional juvenile detention system
*Horry and Beaufort Counties, South Carolina*

Juvenile Detention Assessment
*Lake County, Illinois*

Juvenile Detention Planning
*Davidson County, Tennessee*

Juvenile Detention Planning
*Douglas County, Lancaster County, Northeast Region – Nebraska*

Conditions of Confinement Training
*Arizona*

*Earl L. Dunlap – continued*

       Transition Activation Planning
       *Hudson County, New Jersey*

       Evaluation of and planning for juvenile detention facility
       *Kane County, Illinois*

       Assessment of Juvenile Detention Services System
       *Franklin County, Ohio*

**Faculty, National Council of Juvenile and Family Court Judges**
Assignment:   Training on Detention Management

**Faculty, Institute for Court Management**
Assignment:   Training in Detention Management

**Faculty, American Correctional Association**
Assignments:  Developing a National Resource Center

       Detention and the Status Offender

       Construction of a Juvenile Detention Facility - Is There a Model?

**Consultant, Earl L. Dunlap, Inc. / Commissioner for Social Services, Washington, D.C.** .............. **1985 - 1986**
Assignment:   Evaluation of Youth Services Administration

**Consultant, Earl L. Dunlap, Inc. / Rosser Fabrap International, Atlanta, Georgia** ........................ **1985 - 1998**
Assignments:  Architectural planning and design of juvenile detention facilities

       Architectural Planning / Design
       *Marion County, Indiana*

       Feasibility Study
       *San Bernadino County, California*

**Consultant, Earl L. Dunlap, Inc. / Gus Harrison and Associates, Lansing, Michigan** .................... **1984 - 1986**
Assignment:   Physical Plant evaluation of Ingham County Youth Home

**Consultant, Earl L. Dunlap, Inc. / Sedgwick County District Attorney's Office, Wichita, Kansas** ........... **1986**
Assignment:  Organizational development and training of law enforcement and social workers to pro-actively
        attack the problem of child victimization at the local level.

**Consultant, Earl L. Dunlap, Inc. / Franklin County Children's Services, Columbus, Ohio** ...................... **1986**
Assignment:  Organizational development and training of law enforcement and social workers to pro-actively
        attack the problem and child victimization at the local level.

**Consultant, Earl L. Dunlap, Inc. / State of Colorado, Department of Public Safety** ................................. **1986**
Assignment:   Evaluation of High Plains Youth Training and Detention Center
        *Brush, Colorado*

**Consultant, Earl L. Dunlap, Inc. / United States Attorney, Central District of California** ...................... **1987**
Assignment:   Review of depositions versus the Department of Immigration and Naturalization

*Earl L. Dunlap – continued*

**Consultant, Earl L. Dunlap, Inc. / King County, Washington**.................................................. **1987 - 1988**
Assignment:  Development of a Comprehensive Detention Services Program

**Consultant/Trainer, Earl L. Dunlap, Inc. / Eastern Kentucky University, Richmond, Kentucky**.............**1988**
Assignment:  Development of curriculum and delivery of forty(40) hour training for Deputy Jailers staffing
juvenile section of jail

**Consultant/Trainer, Earl L. Dunlap, Inc. / Jefferson County, (Birmingham) Alabama** ...........................**1988**
Assignment:  Training and technical assistance to Jefferson County Youth Center

**Consultant, Earl L. Dunlap, Inc. / OJJDP - American Correctional Association** ....................................**1988**
Assignment:  Technical assistance to Clallam County Youth Services
*Washington*

**Consultant/Trainer, Earl L. Dunlap, Inc. / Caddo Parish, Louisiana**......................................................**1988**
Assignment:  Review of architectural planning / design of new facility
*Caddo Parish, Louisiana*

**Trainer, Earl L. Dunlap, Inc. / Illinois** ...........................................................................................**1988**
Assignment:  Delivery of training for the Illinois Juvenile Detention Symposium, Sangamon State University

**Consultant, Earl L. Dunlap, Inc. / OJJDP - American Correctional Association** ....................................**1989**
Assignment:  Technical assistance to Ada County Juvenile Court - Idaho, relating to juvenile detention standards
and development of policies / procedures.

**Consultant, Earl L. Dunlap, Inc. / Clark County, Indiana** ...........................................................**1989**
Assignment:  Development of a conceptual design for a planned juvenile detention facility.

**Consultant, Earl L. Dunlap, Inc. / Bernalillo County, New Mexico**.................................................. **1989 - 1990**
Assignment:  Evaluation / monitoring of Bernalillo County Juvenile Detention Center.

**Consultant, Earl L. Dunlap, Inc. / Illinois**......................................................................................**1989**
Assignment:  Training of Illinois detention administrators on "Conditions of Confinement."

**Consultant, Earl L. Dunlap, Inc. / Sedgwick County, Kansas** ....................................................... **1990 - 1991**
Assignment:  Needs Assessment for Detention Services.

**Consultant, Earl L. Dunlap, Inc. / Midland County, Michigan**.......................................................**1991**
Assignment:  Detention Services and Systems Analysis
*Midland County, Michigan*

**Consultant, Earl L. Dunlap, Inc. / Carter - Goble Associates**........................................................**1991**
Assignment:  Analysis and Design of Alternative Programming
*Dallas County, Texas*

**Consultant, Earl L. Dunlap, Inc. / Indiana Department of Corrections**.........................................**1991**
Assignment:  Detention Services Needs Assessment
*Marshall County, Indiana*

**Consultant, Earl L. Dunlap, Inc. / Slack-Alost Architects-Shreveport, Louisiana**......................**1991**
Assignment:  Assessment of new constructed physical plant and operations
*Caddo Parish, Louisiana*

*Earl L. Dunlap – continued*

**Consultant, Earl L. Dunlap, Inc. / Indiana Department of Corrections**............................................................**1991**
Assignment:  Assessment of existing jail as to conformance to federal regulations for sight-sound separation of
juveniles
*Lawrence County, Indiana*

**Consultant, Earl L. Dunlap, Inc. / Indiana Department of Corrections**............................................................**1991**
Assignment:  Assessment of existing jail as to conformance to federal regulations for sight-sound separations of
juveniles
*Dubois County, Indiana*

**Consultant, Earl L. Dunlap, Inc. / Vermilion County, Illinois**............................................................**1991**
Assignment:  Planning for a multi-county/multi-state regional detention facility

**Consultant, Earl L. Dunlap, Inc. / Indiana Department of Corrections**............................................................**1991**
Assignment:  Assessment to renovate a closed jail for juvenile detention placement
*Warrick County, Indiana*

**Consultant, Earl L. Dunlap, Inc. / Indiana Department of Corrections**............................................................**1991**
Assignment:  Assessment of existing jail as to conformance to federal regulations for sight-sound separation of
juveniles
*Huntington County, Indiana*

**Consultant, Earl L. Dunlap, Inc. / Indiana Department of Corrections**............................................................**1992**
Assignment:  Assessment of existing physical plant and provide operational and staffing plan for juvenile
detention facility
*Vanderburgh County, Indiana*

**Consultant, Earl L. Dunlap, Inc. / Indiana Department of Corrections**............................................................**1992**
Assignment:  Assessment of existing jail as to conformance to federal regulations for sight-sound separation of
juveniles
*Boone County, Indiana*

**Consultant, Earl L. Dunlap, Inc. / Indiana Department of Corrections**............................................................**1992**
Assignment:  Assessment of existing physical plant and operational planning for juvenile detention facility
*Bartholomew County, Indiana*

**Consultant, Earl L. Dunlap, Inc. / Cain Associates/Architects**............................................................**1992**
Assignment:  Assessment of a closed college campus physical plant and Operational Planning for a Juvenile
Justice Continuum of Care
*Kalamazoo County, Michigan*

**Consultant, Earl L. Dunlap, Inc. / Indiana Department of Corrections**............................................................**1992**
Assignment:  Development of an operational plan and staffing for a new constructed juvenile detention facility
*Henry County, Indiana*

**Consultant, Earl L. Dunlap, Inc. / Carter-Goble Associates**............................................................**1992**
Assignment:  Needs Assessment and analysis for a juvenile "High Risk Management" facility
*Forsyth County (Winston-Salem), NC*

**Consultant, Earl L. Dunlap, Inc. / Bobbie Huskey & Associates**............................................................**1992**
Assignment:  Juvenile Justice Needs Assessment
*Winnebago County (Rockford), IL*

*Earl L. Dunlap – continued*

**Consultant, Earl L. Dunlap, Inc. / Arizona Admin. Office of the Supreme Court** ....................................**1993**
Assignment:  Evaluation of Conditions of Confinement
               *Cochise County, AZ*

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership** ........................................................**1993/1994**
Assignment:  Juvenile Justice Systems Planning
               *Oneida, Racine, Washington Counties, Wisconsin*

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership** .............................................................**1993**
Assignment:  Juvenile Detention Services Master Plan
               *Horry County, South Carolina*

**Consultant, Earl L. Dunlap, Inc. / Illinois Juvenile Justice Commission** ...........................**1993/1994**
Assignment:  Juvenile Detention Services Master Plan - 18th Judicial Circuit
               *DuPage County, Illinois*

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership** .............................................................**1994**
Assignment:  Juvenile Detention Services Master Plan
               *Ingham County, Michigan*

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership** .............................................................**1994**
Assignment:  Juvenile Detention Services Master Plan
               *Cuyahoga County, Ohio*

**Consultant, Earl L. Dunlap, Inc. / Correctional Partners, Inc.** ..............................................................**1994**
Assignment:  Facility Planning
               *Davidson County, Tennessee*

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership** .............................................................**1994**
Assignment:  Juvenile Justice System Planning
               *Outagamie, Wisconsin*

**Consultant, Earl L. Dunlap, Inc. / RNL Architects** ..................................................................**1994/1995**
Assignment:  Facility Planning/Prototype, Colorado Department of Youth Services

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership/RNL Architects** ...........................**1994/1995**
Assignment:  Youthful Offender Facility (300 beds) Planning, Colorado Department of Correction

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership/Krhounek & Provandra Architects** ......**1995**
Assignment:  Youthful Offender Facility (75-150 beds) Planning, Nebraska Office of Juvenile Services

**Consultant, Earl L. Dunlap, Inc. / Tower, Pinkster & Titus Architects** .......................................**1995**
Assignment:  Facility Planning (300 beds), Michigan Department for Social Services

**Consultant, Earl L. Dunlap, Inc. / U. S. Corrections Corporation** ..........................................**1995**
Assignment:  Juvenile Justice Privatization Planning

**Consultant, Earl L. Dunlap, Inc. / Illinois Juvenile Justice Commission** ...........................**1995/1996**
Assignment:  Juvenile Detention Services Master Plan, 7th Judicial Circuit
               *Illinois*

*Earl L. Dunlap – continued*

**Consultant, Earl L. Dunlap, Inc. / National Council on Crime & Delinquency**................................**1995/1996**
Assignment:  Statewide Juvenile Detention Services Planning
*Nebraska*

**Consultant, Earl L. Dunlap, Inc. / Illinois Juvenile Justice Commission** .......................................**1995**
Assignment:  Juvenile Detention Services Master Plan, 19th Judicial Circuit
*McHenry County, Illinois*

**Consultant, Earl L. Dunlap, Inc. / Clark County, Nevada** .............................................................**1996**
Assignment:  Assessment and Planning of a Juvenile Detention System and Facility

**Consultant, Earl L. Dunlap, Inc. / Illinois Juvenile Justice Commission** .................................**1996/1997**
Assignment:  Juvenile Detention Services Master Plan, 14th Judicial Circuit
*Illinois*

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership**.....................................................**1996**
Assignment:  Juvenile Justice Master Plan
*Winnebago County, Wisconsin*

**Consultant, Earl L. Dunlap, Inc. / Illinois Juvenile Justice Commission** ...........................**1997/1998**
Assignment:  Operational Assessment of Cook County (Chicago), Illinois Juvenile Detention Center

**Consultant, Earl L. Dunlap, Inc. / Beaver County, Pennsylvania** ...............................................**1997**
Assignment:  Operational Assessment of Juvenile Detention Center
*Beaver County, Pennsylvania*

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership** ...................................................**1997**
Assignment:  Facility Planning
*Baltimore County, Maryland*

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership** ...................................................**1997**
Assignment:  Juvenile Justice Master Plan
*Maricoupa County (Phoenix), Arizona*

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership**.............................................**1997/1998**
Assignment:  Juvenile Justice Master Plan
*Lancaster County (Lincoln), Nebraska*

**Consultant, Earl L. Dunlap, Inc. / Chinn Planning Partnership**.......................................**1997/1998**
Assignment:  Juvenile Corrections Master Plan, Idaho Department of Corrections

**Consultant, Earl L. Dunlap, Inc. / Puerto Rico** ...............................................................**1997/1998**
Assignment:  Reviewer of juvenile detention/corrections privatization Proposal(s) and contract negotiations

**Consultant, Comprehensive Systems Solutions/Monroe County Michigan** .....................................**2003 - 2008**
Assignment:  Administrative oversight, facility and systems planning for Monroe County, Michigan-Monroe
County Youth Center

**Consultant, District of Columbia**…………………………………….................... ………………...**2005 - 2008**
Assignment:  Department of Youth Rehabilitative Services; Administrative "coaching" of an (80) bed secure
detention facility for pre-adjudicated youth.

*Earl L. Dunlap – continued*

## GRANTS/CONTRACTS

**Indiana Criminal Justice Institute**.................................................................................... **1992 - 2006**
Technical Assistance to Indiana Counties developing and/or operating juvenile detention services system.

**Kentucky Justice Cabinet** ............................................................................................... **1991 - 1995**
Technical Assistance in the development of a statewide juvenile detention services plan. Included design, build and operational planning of facilities.

**Kentucky Cabinet for Human Resources** ........................................................................ **1994 - 1996**
Technical Assistance to the Division for Community Residential Services.

## EXPERT WITNESS

**Suicide** ......................................................................................................................................**1989**
Firm - Harlan, Parker, Rudloff
*Sutton v. USA, et al*, Kentucky

**Use of Physical Restraints** ....................................................................................................**1990**
*Hollingsworth v. Orange County*, Orange County, California

**Conditions of Confinement**....................................................................................................**1991**
*T.I. v. Delia*, King County, Washington

**Conditions of Confinement**....................................................................................................**1994**
*Law, et al v. Britt, et al,* North Carolina

## FEDERAL COURT APPOINTMENT(S)

**U.S. Federal Court Monitor, Consent Decree** ................................................................**1995 – 2000**
*United States of America v. Commonwealth of Kentucky, et al,* Civil Action No. 3:95-CV-757
Kentucky

**U.S. Federal Court Transitional Administrator, Cook County Juvenile Temporary Detention Center** ........................................................................................................**2007 – 2015**
*Doe v. Cook County,* No. 99 C 3945
*Cook County, Illinois*

## INTERIM ADMINISTRATION AND COACHING *(Jurisdictions with Troubled Facilities in Crisis or Litigation)*

**Henry County Youth Center**................................................................................................ **1999-2007**
(50) Bed Secure/Staff Secure/Residential Treatment
*Henry County, Indiana*

**Department for Youth and Rehabilitative Services, Youth Services Center** ..................... **2005-2008**
(80) Bed Secure Detention Facility
*Washington, D.C.*

**Indiana Superior Court, Marion County Juvenile Detention Center** .........................................**2007**
(144) Bed Secure Detention Facility
*Marion County, Indiana*

*Earl L. Dunlap – continued*

## PUBLICATIONS

**Juvenile Detention as Process and Place**..............................................................................**1995**
Juvenile and Family Court Journal, 3-16, Spring 1995

## APPEARANCES

Testified before **U.S. Senate Sub-Committee on Youth Violence** ...............................**1997**
*Reauthorization of Juvenile Justice and Delinquency Prevention Act*

Appearances on *CNN Talk Back Live*.............................................................................**1997**
*Youth Violence in America*

Testified before the **U.S. Prison Rape Elimination Commission** ..................................**2006**

## OFFICES / BOARDS/ COMMITTEES

American Correctional Association, Board of Governors .................................. **1986 - 1988**

OJJDP / American Correctional Association Grant, Advisory Board ................... **1988 - 1995**

U.S. Advisory Board on Child Abuse and Neglect................................................ **1989 - 1992**

OJJDP / Abt, "Study of Conditions of Confinement", Advisory Board ................ **1990 - 1992**

National Institute for Citizens Education and the Law, Advisory Board............... **1990 - 1993**

National Commission on Correctional Health Care, Advisory Board .................. **1990 - 1995**

National Academy for Corrections / National Needs Assessment Forum ...........................**1991**

Office of Juvenile Justice and Delinquency Prevention/National Academy of Corrections Juvenile Training Advisory Committee................................................................... **1991 - 1995**

Office of Juvenile Justice and Delinquency Prevention/National Academy of Corrections Executive Assembly ..................................................................................... **1992**

National Council on Crime & Delinquency-National Juvenile Detention Reporting Program .........................**1995**

National Academy of Corrections/Design Committee for Planning of New Institutions....................................**1997**

American Bar Association-A Juvenile Detention Training and Resource Guide for Defenders........................**2003**

National Council of Juvenile and Family Court Judges-Juvenile Delinquency Guidelines ..............................**2003**

## ORGANIZATIONS / MEMBERSHIPS

Kentucky Crime Commission, Chairperson, Sub-Committee on Development of Regulations for Juvenile Detention Facilities

Kentucky Crime Commission, Sub-Committee on Development of Statewide Regional Detention and Alternative to Detention Plan

Board of Directors, Kentucky Juvenile Detention Services Association................................. **1984 - 1987**

President, Michigan Juvenile Detention Association ........................................................ **1979 - 1980**

Vice President, Michigan Juvenile Detention Association.................................................**1977 – 1979**

*Earl L. Dunlap – continued*

## PROFESSIONAL HONORS / AWARDS

Accreditation, Commission on Accreditation for Corrections, to the Jefferson County Youth Center .. **1983 - 1991**

Accreditation, National Commission on Correctional Health Care, to the Jefferson County Youth Center, KY ..............................................................................................................................**1983 – 1991**

National Juvenile Detention Resource Center, OJJDP - ACA, to the Jefferson County Youth Center .. **1984 - 1991**

National Association of Counties, to the Jefferson County Youth Center ................................... **1986 - 1987 - 1989**

National Child Safety Council Award, to the Louisville and Jefferson County Exploited and Missing Child Unit.......................................................................................................................................**1986**

Accreditation, National Commission on Correctional Health Care, to Cook County, Illinois ..........................**2012**

## PERSONAL HONORS

Outstanding Young Man of America ...........................................................................................**1983**

Juvenile Justice Award......................................................................................................................**1987**
*Kentucky Council on Crime and Delinquency*

College of Law Enforcement - Eastern Kentucky University.........................................................**1989**

Distinguished Service Award.......................................................................................................**1993/2010**
*National Juvenile Detention Association - Donald R. Hammergren*

Award of Excellence .........................................................................................................................**1993**
*National Juvenile Justice Trainers Association*

C. A. Zott Distinguished Service Award.............................................................................................**2000**
*Michigan Juvenile Detention Association*

Justice for Children Award ...............................................................................................................**2000**
*U. S Department of Justice: Office of Juvenile Justice and Delinquency Prevention*

James Gould Vision and Leadership Award ......................................................................................**2005**
*National Partnership for Juvenile Services*

Bernard P. Harrison Award of Merit.................................................................................................**2012**
*National Commission on Correctional Health Care*

# DUNLAP EXPERT REPORT

# Exhibit B:

## MATERIALS REVIEWED

- Deposition of Q.B.
- Deposition of T.S.
- Deposition of William Steward
- Deposition of Gene Robinson
- Deposition of Leonard Dixon
- Document production of Chief Judge (through OAG 9472)
- Document Production of County Defendants  (through CCSAO 11137)
- Document Production of Dixon (through DIXON 1349)
- Document Production of Fox Defendants (through TCFTV 2358)
- Document Production of Plaintiffs (through TS v. Fox Plaintiffs Production 281)
- Subpoena Responses of: Board of Education, G4S, University of Illinois, CAASE, and Illinois Film Office
- All written discovery disclosures, discovery requests and discovery responses through November 2, 2018