# EXHIBIT 7

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF ILLINOIS
 3                        EASTERN DIVISION
 4
 5   T.S., et al.,                  )
 6             Plaintiffs,          )
 7        vs.                       ) No. 1:16-cv-08303
 8   TWENTIETH CENTURY FOX          )
 9   TELEVISION, et al.,            ) Hon. Rebecca
10             Defendants.          ) Pallmeyer
11
12             The deposition of ANNA BUCKINGHAM,
13   called for examination, taken pursuant to the
14   Federal Rules of Civil Procedure of the United
15   States District Courts pertaining to the taking of
16   depositions, taken before KRISTIN C. BRAJKOVICH, a
17   Certified Shorthand Reporter, CSR. No. 84-3810, of
18   said state, at Suite 500, 20 North Clark Street,
19   Chicago, Illinois, on the 7th day of March, A.D.
20   2019, at 10:30 a.m.
21
22
23
24
```



```
 1   day, not Empire day, who would you tell me to go
 2   talk to to get the answer to my question?
 3          A.   I would provide you with what
 4   information I had and ask that you confirm that
 5   information with the center team leaders.
 6          Q.   Because the center team leaders would
 7   know?
 8          A.   Yes.
 9          Q.   If their -- if a pod on their center has
10   programming scheduled that day, the center team
11   leader is going to know about it?
12          A.   They should.
13          Q.   Because you can't just have residents
14   taking -- getting whisked off for programming where
15   people don't know where they are going, right?
16          A.   All residents need to be accounted for
17   at all times.
18          Q.   And planning and scheduling is -- you
19   cannot just -- when a pod needs to -- first of all,
20   let's go back.  The programming that you
21   coordinated, where did it take place?
22          A.   The majority of programming that takes
23   place at the JTDC happens on the second floor in
24   the Nancy B. Jefferson School area.
```



```
 1        Q.    Was that the case in the summer of 2015?
 2        A.    For all of the programs with the
 3   exception of the Karma Garden and the Karma Garden
 4   mural, which took place in the center yard on the
 5   third floor.
 6        Q.    Did any of the programming that you
 7   coordinated happen on pods or centers -- excuse
 8   me -- on pods?
 9        A.    Programming typically does not happen on
10   the pods with the exception of faith-based
11   programs.
12        Q.    Could you give me an example of
13   faith-based programming, if you have one?
14        A.    We have individuals from two
15   organizations that offer prayer to the residents,
16   and that is done on the living units.
17        Q.    What organizations?
18        A.    One is Good News Ministry.
19        Q.    And who comes from Good News Ministry?
20   Are there lots of people or a particular person?
21        A.    There are a large amount of volunteers
22   with Good News.
23        Q.    And what is the other one?
24        A.    That is Precious Blood Ministry of
```



```
 1   Reconciliation, and their -- so Precious Blood is
 2   the name of the overall organization, but the
 3   branch that comes into the JTDC is Kolbe House,
 4   K-o-l-b-e.
 5        Q.   Is that -- are you familiar with the
 6   name Fr. Kelly?
 7        A.   Yes.
 8        Q.   Does he come up to the -- is he one of
 9   the people that you said offers faith-based
10   programming on pods?
11        A.   At that time.
12        Q.   Does he still, if you know?
13        A.   He is a point of contact, but I have not
14   seen him on-site recently.
15        Q.   Okay.  Other than those -- the
16   faith-based program that you mentioned, none of
17   the -- earlier you gave me a list of programming
18   and types of programming that was going on in 2015,
19   the summer, that included the arts programming and
20   social emotional and the gender-based.
21             All of that would have occurred either
22   in the Nancy B. Jefferson School or on the yard; is
23   that right?
24        A.   Yes.
```



```
 1   amount of minimized movement that was available for
 2   programs and residents.
 3        Q.   How did you learn that there was
 4   minimized movement for programs and residents?
 5        A.   Are you asking for the specifics of who
 6   told it to me or --
 7        Q.   I'm asking for everything that you can
 8   remember.  If you can remember who told you, yes.
 9        A.   I don't remember specifically who told
10   me.  I remember the physical barriers that were in
11   place that prevented movement.
12        Q.   Where were those physical barriers?
13        A.   There was restricted movement on the
14   third floor.
15        Q.   What did the barriers look like?
16        A.   Staff informing us that we were not
17   permitted to cross or enter certain areas as well
18   as on the third floor, there was filming equipment
19   and cables in the hallways that for safety reasons
20   they did not permit us to be near those items.
21        Q.   You also said that the residents --
22   there was limited movement for residents?
23        A.   Yes.
24        Q.   What did you observe with respect to
```



1  that?
2      A.   If residents were engaging in particular
3  programs that were cancelled, they did not have
4  that engagement.
5      Q.   Were the residents entitled to go to the
6  places that you were blocked off from by those
7  barriers?
8      MR. MORRIS:  Objection, calls for speculation.
9  You can answer.
10 BY THE WITNESS:
11     A.   I don't believe so.
12     MS. KAMPER:  Sorry.  I just wanted to know if
13 we can take a break.  We have been going over an
14 hour.
15     MS. CHARDON:  Sure.
16           (WHEREUPON, a recess was had.)
17     MS. CHARDON:  Let's go back on the record.
18 BY MS. CHARDON:
19     Q.   Before the break, we were talking
20 about -- I think, to use your words, you described
21 limited movement in the facility during the Empire
22 filming, and you were describing that you observed
23 barriers set up to prevent you from moving into
24 certain areas of the building; is that right?



```
 1         A.    That's correct.
 2         Q.    And the barriers were usually staff.
 3   Was it security staff?  That was a bad question.
 4   It was actually two questions.
 5               I think you said the barriers were -- I
 6   asked what the barriers were made of, and I think
 7   you answered they were staff people that were
 8   directing you where you could not go; is that
 9   correct?
10         A.    Correct.
11         Q.    Was it security staff, to your
12   knowledge?
13         A.    I believe it was JTDC staff.
14         Q.    Okay.
15         A.    Our security staff.
16         Q.    Okay.  And that prevented you from -- do
17   you recollect what areas you were prevented from
18   going into?
19         A.    The chapel area was closed off, which is
20   on the second floor in the school area.  I believe
21   it was being used as a refreshment area for the
22   cast and crew of Empire, so there was staff on
23   either side of the chapel redirecting us.
24         Q.    What about, was there ever any times
```



```
 1   when -- where is your office?  Excuse me.  Do you
 2   have an office?
 3          A.    I do have an office.
 4          Q.    Okay.
 5          A.    It's located on the concourse level.
 6          Q.    And was it in 2015?
 7          A.    Yes.
 8          Q.    Other than the chapel area, are there
 9   any other areas that you recall being unable to go
10   to during Empire filming in the summer of 2015?
11          A.    I believe that the yard, when they were
12   filming, was off limits for us and certain areas of
13   the third floor, due to the cables that I described
14   earlier.
15          Q.    And the programming that you coordinated
16   was cancelled when Empire was in the building in
17   2015?
18          A.    Some of it was, yes.
19          Q.    And that was because you mentioned --
20   well, in the e-mail we were just looking at --
21          A.    Which one was it?
22          Q.    Can I just look back at 6, please?  As
23   you describe it to the Boys & Girls Clubs person,
24   everything was pretty much on lockdown from your
```



```
 1        MR. MORRIS:  Object to vague.
 2        MR. DIERKES:  Join.
 3   BY THE WITNESS:
 4        A.   I don't remember.
 5   BY MS. CHARDON:
 6        Q.   How would you describe the mood of those
 7   residents who had a lot of questions about it?
 8        MR. MORRIS:  Object to form, vague.
 9   BY THE WITNESS:
10        A.   The residents that I interacted with did
11   not seem pleased about the filming.
12   BY MS. CHARDON:
13        Q.   What made you think they were not
14   pleased specifically?
15        A.   They had complaints about the restricted
16   movement.  They had complaints about a television
17   show depicting prison life while they were
18   detained.
19        Q.   And during the summer of 2015, do you
20   remember anybody -- anybody from JTDC coming to you
21   and asking you whether you -- asking you about
22   those conversations that you had with residents?
23        A.   I don't recall.
24        Q.   Did you ever talk to Leonard Dixon in
```



```
 1   you see that?
 2        A.    I do.
 3        Q.    Would you agree that the experience of
 4   the Empire filming for kids and staff was
 5   outstanding?
 6        MR. MORRIS:  Object to form, foundation.
 7        MS. KAMPER:  Join.
 8        MR. JACOBSON:  Join.
 9   BY MS. CHARDON:
10        Q.    Would you agree, in your opinion?
11        A.    No.
12        Q.    Why not?
13        A.    Because of my previous statements
14   regarding what the residents reported to me.
15        Q.    Okay.  Let's turn the page to the one
16   that is marked 0039 at the bottom.  If you flip the
17   page, you can see this is a letter signed by
18   Leonard Dixon.  Do you see that?
19        A.    Yes.
20        Q.    If we go to the first paragraph, I'm
21   going to read beginning physically on the third
22   line.  Our kids are not inmates and are entitled to
23   opportunities that broaden their perspective and
24   expose them to positive experiences.  Do you see
```



```
 1   that?
 2        A.    I do.
 3        Q.    And would you agree with that?
 4        A.    Yes.
 5        MR. MORRIS:  Objection to foundation.
 6   BY MS. CHARDON:
 7        Q.    I believe that the Fox Empire filming
 8   was a positive experience for residents and staff
 9   at JTDC.  Do you see that?
10        A.    I do.
11        Q.    And I think we just discussed that you
12   don't agree with that sentence?
13        MR. MORRIS:  Object to foundation.
14   BY THE WITNESS:
15        A.    I do not.
16   BY MS. CHARDON:
17        Q.    The next sentence, The Empire filming
18   had no impact on regular programming for our kids
19   other than changing the locations of some programs
20   and visits.  Do you see that?
21        A.    I do.
22        Q.    Do you agree with that?
23        A.    No.
24        Q.    In fact, programming was cancelled when
```



```
 1   Empire came in, wasn't it?
 2        A.   Yes.
 3        Q.   At the end of that paragraph it says,
 4   Each day I spent 12 to 14 hours walking around and
 5   talking to residents to ensure that the kids
 6   received the highest quality of care and were not
 7   negatively impacted by the Empire filming, right?
 8        A.   I see that.
 9        Q.   Did you see Dixon ever walking around to
10   interact with kids?
11        A.   I didn't.
12        Q.   Did you ever overhear conversations
13   where he was asking kids about the Empire filming?
14        A.   I did not.
15        Q.   Did any kid report to you that Leonard
16   Dixon asked them how they felt about the Empire
17   filming?
18        A.   I don't recall.
19        Q.   He references at the bottom of the next
20   paragraph, Additionally, in my observations and
21   conversations with residents, I only heard positive
22   feedback and excitement about the opportunity to
23   watch the filming of Empire.  Do you see that?
24        A.   I do.
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1      Q.   You heard things other than positive
 2  feedback and excitement about Empire from
 3  students -- from kids, right?
 4      A.   Yes.
 5      Q.   Overall, Empire filming at JTDC was a
 6  positive experience that boosted staff morale and
 7  inspired residents.  Do you see that?
 8      A.   I do.
 9      Q.   Do you think that it boosted staff
10  morale?
11      MR. MORRIS:  Object to foundation.
12      MS. KAMPER:  I'm going to join.
13  BY THE WITNESS:
14      A.   It depends on the staff.
15  BY MS. CHARDON:
16      Q.   Did it boost your morale?
17      A.   No.
18      Q.   Do you know other staff whose morale it
19  negatively affected?
20      MR. MORRIS:  Object to foundation,
21  speculation.
22      MS. KAMPER:  Join.
23  BY THE WITNESS:
24      A.   I'm not sure.
```



```
 1   BY MS. CHARDON:
 2        Q.    Did you have conversations with -- did
 3   you observe a boost in staff morale during the
 4   Empire filming?
 5        MR. MORRIS:  Object to form.
 6        MS. KAMPER:  Join.
 7   BY THE WITNESS:
 8        A.    It depended on the staff.
 9   BY MS. CHARDON:
10        Q.    And did you observe that the Empire
11   filming inspired residents?
12        MR. MORRIS:  Object to form.
13        MS. KAMPER:  Join.
14   BY THE WITNESS:
15        A.    No.
16   BY MS. CHARDON:
17        Q.    Again, to your recollection, in advance
18   of July 24, 2015, no one asked you what the
19   impact -- excuse me -- Leonard Dixon did not ask
20   you what the impact had been on the programming --
21        MS. KAMPER:  Objection.
22        MR. MORRIS:  Objection.
23   BY MS. CHARDON:
24        Q.    -- that you offered?
```



```
 1  STATE OF ILLINOIS )
 2                    ) SS:
 3  COUNTY OF C O O K )
 4              I, KRISTIN C. BRAJKOVICH, a Certified
 5  Shorthand Reporter of said state, do hereby
 6  certify:
 7              That previous to the commencement of the
 8  examination of the witness, the witness was duly
 9  sworn to testify the whole truth concerning the
10  matters herein;
11              That the foregoing deposition transcript
12  was reported stenographically by me,
13  was thereafter reduced to typewriting under my
14  personal direction and constitutes a true record
15  of the testimony given and the proceedings had;
16              That the said deposition was taken
17  before me at the time and place specified;
18              That I am not a relative or employee
19  or attorney or counsel, nor a relative or
20  employee of such attorney or counsel for any of
21  the parties hereto, nor interested directly or
22  indirectly in the outcome of this action.
23              IN WITNESS WHEREOF, I do hereunto set my
24  hand and affix my seal of office at Chicago,
```



1  Illinois, this 26th day of March 2019.
2
3
4
5
6
7  C.S.R. Certificate No. 84-3810.

