# Exhibit 11

J. BRIAN CONANT, PSY.D.
T.S. vs TWENTIETH CENTURY FOX

July 03, 2019
1–4

**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF ILLINOIS
3                    EASTERN DIVISION
4    T.S., et al,                )
5               Plaintiffs,      )
6        -vs-                    ) No. 16-CV-08303
7    TWENTIETH CENTURY FOX        )
8    TELEVISION, et al.,          )
9               Defendants.      )
10       The videotaped deposition of J. BRIAN CONANT,
11   Psy.D., called for examination, taken pursuant to
12   the Federal Rules of Civil Procedure of the United
13   States District Courts pertaining to the taking of
14   depositions, taken before GAIL LIVIGNI, CSR No.
15   84-1965, a Notary Public within and for the County
16   of Will, State of Illinois, and a Certified
17   Shorthand Reporter of said state, at Suite 500, 20
18   North Clark Street, Chicago, Illinois, on the 3rd
19   day of July, A.D. 2019, commencing at 10:00 o'clock
20   a.m.
21
22
23
24
```

**Page 2**

```
1    PRESENT:
2        WEIL & CHARDON, LLC,
3        (333 South Wabash Avenue, Suite 2700,
4        Chicago, Illinois 60604,
5        (312) 585-7404), by:
6        MS. ALEXIS G. CHARDON, ESQ.,
7        MR. STEPHEN H. WEIL,
8            and
9        FINE, KAPLAN & BLACK, R.P.C.,
10       (Via telephone),
11       (One South Broad Street, 23rd Floor,
12       Philadelphia, Pennsylvania 19107,
13       (215) 567-6565), by:
14       MR. ADAM J. PESSIN,
15           appeared on behalf of the Plaintiffs,
16           T.S. and Q.B.;
17   OFFICE OF THE COOK COUNTY STATE'S ATTORNEY,
18       (500 Richard J. Daley Center,
19       Chicago, Illinois 60602,
20       (312) 603-3373), by:
21   MR. FRANCIS J. CATANIA,
22   MS. DANIELLE A. MIKHAIL,
23           appeared on behalf of the Defendant,
24           Cook County and the Deponent;
```

**Page 3**

```
1    PRESENT:
2        OFFICE OF THE ATTORNEY GENERAL,
3        (100 West Randolph Street, 13th Floor,
4        Chicago, Illinois 60601,
5        (312) 814-3684), by:
6        MR. MICHAEL T. DIERKES,
7            appeared on behalf of the Defendant,
8            Chief Judge;
9        OFFICE OF THE COOK COUNTY STATE'S ATTORNEY,
10       (500 Richard J. Daley Center,
11       Chicago, Illinois 60602,
12       (312) 603-3373), by:
13   MS. JOI KAMPER,
14           appeared on behalf of Defendant, Leonard
15           Dixon;
16   DRINKER, BIDDLE & REATH, LLP,
17       (191 North Wacker Drive, Suite 3700,
18       Chicago, Illinois 60606,
19       (312) 569-1000), by:
20   MR. JUSTIN KAY,
21           appeared on behalf of the Fox
22           Defendants.
23   ALSO PRESENT:
24       MR. GABRIEL MARTIN, Videographer.
```

**Page 4**

```
1    THE VIDEOGRAPHER:  We are now on the record.
2    This is Tape No. 1 to the videotaped deposition of
3    Brian Conant in the matter of T.S., et al versus
4    Twentieth Century Fox Television, et al. Being
5    heard before the United States District Court for
6    the Northern District of Illinois, Eastern
7    Division, case number 1:16-CV-08303.
8         This deposition is being held at 20
9    North Clark Street, Chicago, Illinois on July 3rd,
10   2019, and the time is now 10:07 a.m.  My name is
11   Gabriel Martin, and I'm the Videographer.  The
12   Court Reporter is Gail Livigni, both with Esquire
13   Deposition Solutions.
14        Now, for the record, will Counsel please
15   introduce yourself and who you represent?
16   MS. CHARDON:  Good morning, Alexis Chardon on
17   behalf of Plaintiffs.
18   MR. WEIL:  Steven Weil for the Plaintiffs.
19   MR. KAY:  Justin Kay on behalf of the Fox
20   Defendants.
21   MS. KAMPER:  Joi Kamper on behalf of
22   Defendant, Leonard Dixon.
23   MR. DIERKES:  Michael Dierkes on behalf of
24   Chief Judge Evans.
```



J. BRIAN CONANT, PSY.D.
T.S. vs TWENTIETH CENTURY FOX

July 03, 2019
53–56

Page 53

1     A.   Right.
2     Q.   And I want to asked what you mean by the
3   MAYSI people?
4     A.   Thomas Grisso and the people who
5   developed and own the MAYSI.  And just so you know,
6   I was not personally a part of any of that kind of
7   decision-making back in -- it might have been 2007
8   or '06, whenever they brought the MAYSI onboard.
9   It would have been Earl Dunlap, Brenda Welch, you
10  know, people from Cook County Health and Hospital
11  Systems, but they had essentially -- and my
12  predecessor, Ted Garlewski, had discussed this in
13  some detail and made the decision that they didn't
14  want it in the medical record.
15    Q.   Okay.  So I wanted to understand if the
16  MAYSI people were like a third party external to
17  the Cermak Isaac Ray Center, JTDC, but it sounds
18  like when you were referring to those people who
19  didn't want to see the MAYSI in the health record,
20  it included both the people who developed and owned
21  the MAYSI, which is a third party, and Ted
22  Garlewski from Isaac Ray Center?
23    A.   So let me clarify that.  I don't know.
24  What I was told was that it was primarily the

Page 54

1   people who developed the MAYSI who did not want it
2   in our medical record, but I don't know who all
3   supported that or didn't support that.  This is all
4   secondhand information.  This is part of the
5   history that was told to me.  But I think we always
6   felt like it ought to be in the medical record but
7   were told that it couldn't be.
8     Q.   Okay.
9     A.   "We" being the behavioral health folks.
10    Q.   And why was that that you wanted it in
11  the medical record?
12    A.   Well, because it's relevant to
13  the -- well, it's part of screening and it's
14  relevant to mental health needs, and we feel like
15  that those things ought to be in the medical
16  record.
17    Q.   So the MAYSI screens for suicidality
18  among other things, correct?
19    A.   Correct.
20    Q.   What else does it screen for?
21    A.   Lewd issues, some anger irritability,
22  depression, anxiety, somatic complaints, drugs and
23  alcohol, thought disturbance, and traumatic
24  experiences.

Page 55

1     Q.   When is the MAYSI -- as of 2015 -- back
2   up.
3          There is a policy number HS-505 and
4   HS-505.1 are attached to your declaration, right?
5     A.   Yes.
6     Q.   And those are Cermak Health Services
7   policies, right?
8     A.   Correct.
9     Q.   Did you have -- oh, and you testified
10  earlier that you did not have anything to do with
11  the authorship of 505 but you did author 595.1, is
12  that right?
13    A.   Correct.
14    Q.   And were they authored at the same time,
15  if you know?
16    A.   They were both effective, according to
17  what we're looking at here, September 6, 2012 and
18  then the annual review December 31, 2015.
19    Q.   And tell me about these Cermak Health
20  Services policies?  In general, what are
21  the -- what is the purpose of the -- first of all,
22  are there more policies than the two that we're
23  looking at here?
24    A.   Yes.

Page 56

1     Q.   There are many policies?
2     A.   Many.
3     Q.   Generally speaking, what are the
4   purposes of those policies?
5     A.   The purposes of those policies are to
6   establish the practice parameters for medical
7   health and behavioral health, and they cover
8   a -- the policies cover a wide range of topics, but
9   the point of the policies is to create a
10  comprehensive set of rules and procedures that
11  govern how we operate medical and behavioral
12  services at the facility.
13    Q.   Okay.  So the policies provide
14  consistent written set of standards that apply to
15  the operation of medical services at the facility?
16    MR. CATANIA:  Objection, form of the question.
17  BY THE WITNESS:
18    A.   They provide not standards necessarily.
19  They're based upon standards.  Those standards are
20  published by The National Commission on
21  Correctional Health Care.
22  BY MS. CHARDON:
23    Q.   So are the Cermak standards modeled
24  after the National Commission on Correctional



J. BRIAN CONANT, PSY.D.
T.S. vs TWENTIETH CENTURY FOX

July 03, 2019
57—60

Page 57

1 Health Care?
2    A.   Yes.
3    Q.   The National Commission on Correctional
4 Health Care does that reflect best practices for
5 juvenile correctional health care?
6    A.   Yes.
7    Q.   Do the Cermak policies apply to all
8 detainees at JTDC?
9    A.   Yes.
10    Q.   And are they intended to be consistently
11 implemented by all health care professionals
12 working at JTDC?
13    MR. CATANIA:  Objection, form.
14 BY THE WITNESS:
15    A.   Can you ask that question again?
16    MS. CHARDON:  Sure.  Can you re-read my last
17 question?
18        (WHEREUPON, the record was read
19         as requested.)
20 BY THE WITNESS:
21    A.   Yes.
22 BY MS. CHARDON:
23    Q.   Does the -- so the one or the two that
24 we are looking at pertain to -- and by that, I'm

Page 58

1 referring to Exhibit B, your declaration HS-505 and
2 505.1, they both -- 505 is entitled, "Mental Health
3 Screening and Evaluation," right?
4    A.   Yes.
5    Q.   And then the one you wrote as
6 "Procedures Mental Health Department, Mental Health
7 Screening and Evaluation:  Right?
8    A.   Yes.
9    Q.   Can you describe for me the relationship
10 between these two policies?
11    A.   Yes.  HS-505 is the general policy.
12 HS-505.1 are the procedures that are in place to
13 enforce the policy.
14    Q.   So you wrote those procedures to enforce
15 the 505 policy, is that right?
16    A.   That's correct.
17    Q.   Both of these policies reference the
18 MAYSI-2, is that right?
19    A.   Yes.
20    Q.   In 505, is there a time period provided
21 for the administration of the MAYSI-2; in other
22 words, is there a -- yes, a time period with which
23 the MAYSI-2 is supposed to be administered?
24    A.   In 505, it states that it's supposed to

Page 59

1 be administered within four hours of admission by
2 case workers.
3    Q.   Was policy 505 in effect in the summer
4 of 2015?
5    A.   Yes.
6    Q.   Is policy 505 in effect today?
7    A.   Not in its current -- well, let me say,
8 yes, policy HS-505 is in effect.  This version of
9 policy HS-505 may not be in effect.
10    Q.   Okay.  What is different in the current
11 version -- well, first of all, do you know if there
12 is a new version?
13    A.   I'd have to be honest with you, I'd have
14 to look at today's version of HS-505 to tell you if
15 they are different.  I can tell you that HS-505.1
16 is different today than it was in 2015.  I don't
17 know about HS-505 without looking at it.
18    Q.   Okay.  What way is HS-505.1
19 different -- first of all, when was HS-505.1
20 changed?
21    A.   I don't have an exact date for you.  We
22 review and modify policy annually.  It happens at
23 generally the same time ever year, but it isn't
24 always exactly the same time.  I want to say that

Page 60

1 we revised policies last in last December, but, you
2 know, I don't honestly remember.  But HS-505.1 is
3 different in that we are doing different screenings
4 than we were then.  The form has changed
5 considerably, some of the procedures have changed,
6 et cetera.
7    Q.   Did anything -- so do you still
8 administer the MAYSI-2?
9    A.   By "we," who do you mean?
10    Q.   Well, is the MAYSI-2 -- first of all,
11 has anything changed in 505.1 with respect to the
12 MAYSI-2 in the most recent version?
13    A.   Yes.
14    Q.   Okay.  What has changed?
15    A.   That nursing staff administer the
16 MAYSI-2 within four hours of admission.  I couldn't
17 tell you what other elements have changed.  I do
18 know that that has changed.
19    Q.   Okay.  So whereas before I see that 505
20 in paragraph III-A(d) -- I think I read that
21 correctly -- it says case workers will administer
22 the MAYSI-2 within four hours of admission.
23    A.   Yes.
24    Q.   That was the procedure as of the summer



J. BRIAN CONANT, PSY.D.
T.S. vs TWENTIETH CENTURY FOX

July 03, 2019
177—180

Page 177

1    If we're talking about like physical
2 training and that sort of thing, I mean then the
3 pod would be fine.  It just kind of depends.  It
4 depends on what we're talking about.
5 BY MS. CHARDON:
6    Q.    So are there any benefits to getting off
7 the pod for physical recreation or large muscle
8 exercise?
9    MR. CATANIA:  Objection, form.
10    MS. KAMPER:  Join.
11    MR. DIERKES:  Join.
12 BY THE WITNESS:
13    A.    Benefits for large --
14 BY MS. CHARDON:
15    Q.    And the benefits from a mental health
16 perspective, as a professional in mental health,
17 are there any benefits to getting residents off
18 their pod for large muscle exercise or other
19 physical recreation?
20    MR. CATANIA:  Objection, form.
21 BY THE WITNESS:
22    A.    I would say for physical exercise, not
23 necessarily; but to get off the pod periodically
24 for psychological reasons, yes, because a change of

Page 178

1 scenery is good sometimes, so going to school is
2 good, going to the gym is good, getting fresh air
3 important periodically.  It's hard to do in the
4 winter, but I think these are things that are good
5 for anybody, so I will agree to that.  But for
6 large muscle exercise, I mean I think it could be
7 done on a pod as well as anywhere else probably.
8    Q.    Well, would it be appropriate for JTDC
9 to close down the gyms?
10    MR. CATANIA:  Objection, form.
11 BY MS. CHARDON:
12    Q.    In your opinion.
13    MS. KAMPER:  Join.
14    MR. DIERKES:  Join.
15 BY MS. CHARDON:
16    Q.    From a mental health perspective.
17    MR. CATANIA:  Same objection.
18    MS. KAMPER:  Join.
19 BY THE WITNESS:
20    A.    It depends on the reason.
21 BY MS. CHARDON:
22    Q.    I'm asking permanently.
23    A.    Oh, permanently.
24    Q.    Permanently.

Page 179

1    A.    Would it be appropriate for them to
2 permanently close the gyms or the rec yard?  No, I
3 don't think that would be appropriate.
4    Q.    Why not?
5    A.    Because it's good to I think be able to
6 play basketball periodically if you can, football,
7 different types of recreation.  Why would they do
8 that?  That doesn't make any sense.  So having
9 options is great.
10    Q.    Earlier you mentioned fresh air.  What
11 did you mean by that?
12    A.    Being able to be outside when the
13 weather permits.  Of course during the winter, they
14 can't really get out at all.  But if the weather
15 permits and they can get outside, you know, that's
16 I think good.
17    Q.    And specifically there are other
18 benefits from a mental health perspective?
19    A.    Yeah, I think that that can be helpful.
20 You know, it's funny, we had our level 4 -- we have
21 periodic events at the facility, so not all the
22 kids in the facility can go out for the events, so
23 they'll take over the rec yard for the 5K event
24 that we recently had, so the kids weren't able to

Page 180

1 go to gym outside.  They weren't really able to go
2 to rec outside that day because we had an event out
3 there.
4    But, you know, as I think about it, I'm
5 like, well, it benefited a group of kids, you know,
6 but it didn't benefit everybody because not
7 everybody could go out for rec that day.  So
8 sometimes I think that they have to use the space
9 for things that are important for -- to bring in
10 these external programs like we were talking about.
11 But, yes, to answer anticipates your question, I
12 think that like fresh air is good for people
13 periodically.
14    Q.    It was recently school break at JTDC,
15 I'm guessing, June?
16    A.    Yes.
17    Q.    Was the 5K event during school break?
18    A.    It was a few weeks ago.  I'm not sure if
19 it was during school break or not.  You know, I
20 don't recall what the date was, but it was recent,
21 last few weeks.  There was an article about it in
22 one of the running magazines.
23    Q.    Like a national -- what magazine?
24    A.    I want to say it was a national running



J. BRIAN CONANT, PSY.D.
T.S. vs TWENTIETH CENTURY FOX

July 03, 2019
185–188

Page 185
1  Fort Lauderdale at the conference.
2       But that's today's BIMA program.  There
3  in the past have been different types of behavioral
4  modification programs including one called CBT
5  which used certain elements of cognitive behavioral
6  theory and social skills development.  So I'm not
7  sure if you're asking me what they were doing in
8  '15 or what we're doing today.
9       Q.   Yeah, well let's -- I didn't ask that,
10  but that's my next question.
11      A.    There you go.
12      Q.    In 2015, had the token economy been
13  implemented at JTDC?
14      A.    Yes, we have always had some kind of
15  behavior modification system.  I don't know that
16  we -- I believe, if I'm not mistaken in 2015, we
17  had token economy running and we may have still had
18  CBT running on certain centers.
19      Q.    Okay.  Do you agree that the token
20  economy is beneficial to detainees?
21      MR. CATANIA:  Objection, form.
22  BY THE WITNESS:
23      A.    I think that a -- I don't want to
24  comment on -- all right, let me say generally

Page 186
1  speaking having some kind of behavior modification
2  system is beneficial.  I can't comment on the
3  strengths or weaknesses of token economy
4  specifically as it was implemented in '15, but I'll
5  say, in general, yes, behavioral modification
6  systems that leverage rewards, consequences that
7  sort of thing, are beneficial.
8  BY MS. CHARDON:
9       Q.   And they can promote a sense of order or
10  structure?
11      MR. CATANIA:  Objection, form.
12  BY THE WITNESS:
13      A.    Yeah, I mean yes -- I'd say yes.
14  BY MS. CHARDON:
15      Q.    They promote a sense of fairness?
16      MR. CATANIA:  Objection, form.
17  BY THE WITNESS:
18      A.    Well, not always.  You know, I think
19  that fairness gets interpreted by the residents a
20  number of different ways, particularly as it
21  pertains to the level system.  You know, there is
22  always youth who feel like they were entitled to
23  being promoted to another level, and then, oh, the
24  staff favors this one over me, so there is always

Page 187
1  drama around fairness at the facility, particularly
2  around behavior modification systems, but yes.
3  BY MS. CHARDON:
4       Q.   Okay.  So rather than me put words in
5  your mouth, why don't you tell me why you think a
6  behavior modification system like token economy can
7  be beneficial to detainees?
8       A.   I think it can be beneficial to
9  detainees because it gives them an opportunity to
10  be agents in their own -- let me rephrase this.  It
11  gives them the opportunity to take responsibility
12  and to enjoy the benefits of being responsible.  It
13  gives them the opportunity to feel some sense of
14  control, and generally speaking it promotes good
15  behavior because when you behave well, you get good
16  things, and that's good not only for the youth but
17  also for the facility.
18      MS. CHARDON:  Well, thank you for your time.
19  I think I'm done unless your Counsel may have some
20  more questions or other attorneys and then maybe
21  I'll have a couple more.
22      MR. CATANIA:  Yes, I do have some questions.
23
24          CROSS EXAMINATION

Page 188
1  BY MR. CATANIA:
2       Q.   If you could, take a look at your
3  declaration which it might be No. 1.
4       A.   Okay.
5       Q.   The first several pages, that's your
6  declaration in this case, is that right?
7       A.   Yes.
8       Q.   You're a licensed clinical psychologist,
9  correct?
10      A.    Correct.
11      Q.    And you've already described your
12  background.  You've talked about your job title at
13  the institution.  What is your current job title?
14      A.    Juvenile Justice Behavioral Health
15  Director.
16      Q.    In that capacity, you are familiar with
17  the mental health programs screening and
18  assessments for the institution, is that right?
19      A.    Yes.
20      Q.    You're familiar, based on your
21  education, training and experience, with the types
22  of screenings that are done for residents in a
23  juvenile detention center, is that right?
24      A.    Yes.

