IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

T.S. et al.

　　Plaintiffs,

　　　v.

TWENTIETH CENTURY FOX, et al.,

　　Defendants.

1:16-cv-08303

Hon. Rebecca Pallmeyer

## DEFENDANTS' CONSOLIDATED RESPONSE TO PLAINTIFFS' STATEMENTS OF ADDITIONAL FACTS

1.　　The JTDC is a large, five-story, rectangular building. It is set up in an atrium plan with children are housed on pods in the building's third, fourth, and fifth floors. Exhibit 1; Exhibit 2. Pods contain rooms for individual residents, which open to an enclosed common area somewhat larger than a two-car garage and features several bolted-down tables as well as a guard's desk. Exhibit 1; Exhibit 3 at 36-37; Exhibit 5. Between each pod and the atrium area is a corridor that is used for communication between the pod and the rest of the JTDC. Exhibit 4.

**RESPONSE: The first sentence is undisputed. With respect to the second sentence, it is undisputed that pods contain rooms for individual residents, and those pods open up onto two separate common areas. The size of the pods, however, is not in dispute and need not be stated in a disputable and disputed manner such as "somewhat larger than a two-car garage." The floor plan of the JTDC is in the record at Pls.' Ex. 2 and similarly speaks for itself.**

2.　　During the Empire filming at issue in this case, it housed more than 300 children, nearly all between 12 and 18 years of age. Exhibit 6; Exhibit 4 ¶ 27.

**RESPONSE: It is undisputed that the JTDC housed more than 300 children during at least most of the filming days. The majority of detainees housed at the JTDC during filming were sixteen or seventeen years old, and some were adults. Defs.' Ex. 3 21:23-22:24. Although it is possible for the JTDC to house detainees as young as twelve, there is no evidence in the record that any detainees that young were present at the JTDC on any of the dates at issue in this case.**

3.      The interiors of the JTDC's third, fourth, and fifth floors are strictly for confinement, Exhibit 1, and recreation and education are not offered there. Exhibit 4 ¶¶ 64-67, 69-70. Instead, services for the youth are offered on the building's lower floors. Exhibit 4; Exhibit 1; Exhibit 7 at 38-40.

**RESPONSE: Disputed. The third, fourth, and fifth floors of the JTDC are not strictly for confinement, and recreation and education are offered in many places, including the pods on those floors. Defs.' Updated Ex. 5 37:19-39:5; SUMF ¶ 56.**

4.      There is a large, open-air courtyard on the building's third floor that is divided into three portions and is the only venue for outdoor recreation. Exhibit 2; Exhibit 1.

**RESPONSE: Undisputed.**

5.      The second floor houses a number of classrooms, game rooms, a media lab, a chapel venue, and a library. This is where the bulk of services are offered, including educational services for the children, commissary and "game" rooms, library access, media labs, visitation, and enrichment programs such as "Free Write." Exhibit 8 at 51-53, 55-64, Exhibit 2; Exhibit 7 at 38-40; Exhibit 4 ¶¶ 64-67, 69-70.

**RESPONSE: Undisputed.**

6.      The first floor has two auxiliary gymnasiums. Otherwise, it consists of public areas that are off-limits to the JTDC's residents. Exhibit 2; Exhibit 8 at 72-74.

**RESPONSE: Undisputed, except for the characterization of the gyms as "auxiliary." The word "auxiliary" (or any similar characterization) does not appear in the floorplan cited by Plaintiffs nor in the testimony of Mr. Steward cited by Plaintiffs. *See* Ex. 2; Ex. 8 at 72-74.**

7.      Because of the JTDC's layout, the children are transported each day from their pods to the service venues on the building's lower floors, requiring considerable resources. Exhibit 4 ¶¶ 64-67; Exhibit 21 at 132-33; Exhibit 9 at 21-22. Ensuring that residents can leave their small rooms is so important to the JTDC's mission that it has a contingency plan to ensure that the children are permitted to attend out-of-pod activities even if the JTDC finds itself short-staffed. Exhibit 9 at 17-18.

**RESPONSE: Undisputed that under ordinary circumstances, individual detainees, small groups of detainees, and sometimes entire pods of detainees, frequently are in motion between their residential pods and other areas of the facility, and that such movements require escorts by JTDC staff as well as coordination. It also is undisputed that normal operations of the JTDC contemplate such movement. The second sentence is disputed because "contingency plan" and "short-staffed" are undefined, but it is undisputed that JTDC staff will adjust as needed to facilitate detainee movement.**

8.      The restrictive conditions of pod confinement compound the negative impact of incarceration on the children incarcerated in the JTDC. The physical layout of each pod most

closely resembles the layout of a typical adult prison housing unit, and consequently the more time that is spent in these restrictive and monotonous conditions, the worse the negative psychological impact of incarceration and the higher the risk of violence among residents. Exhibit 4 ¶ 65; Exhibit 10 ¶¶ 8, 30.

**RESPONSE: The first sentence is disputed. The terms "restrictive conditions" and "pod confinement" are not defined, and Defendants contest that Plaintiffs were subjected to "restrictive conditions" or "pod confinement" (except, in the case of T.S., when he was given a 24-hour room confinement for disciplinary reasons on one of the dates in question). The second sentence is disputed because no evidence in the record supports what a "typical adult prison housing unit" is or why a JTDC pod supposedly "resembles" it. Defendants also dispute that any of the conditions alleged in this case increased the "psychological impact of incarceration" or the "risk of violence among residents." Plaintiffs have purported to support these contentions only with the unfounded opinions of Earl Dunlap and Louis Kraus, both of whom based those opinions solely on false assumptions about what detainees experienced, rather than the actual facts as adduced in discovery.**

9.     Getting time off of the pod is beneficial to residents for psychological reasons, including a change of scenery, going to school, going to the gym, getting fresh air. Exhibit 11 at 177-78. Daily outdoor exercise also helps control anxiety, nervousness, manic episodes, and depression among facility residents. See id. at 56-57; Exhibit 12.

**RESPONSE: Undisputed that normal operations at the JTDC include at least an hour of large muscle exercise, that such exercise is important, and that JTDC detainees most often receive their hour of large muscle exercise in the outside yard or in one of the two large**

4

gyms, rather than in their pod common areas. The JTDC does not, however, distinguish between indoor and outdoor large muscle exercise. Although, during the warmer months, the JTDC will rotate pod exercise routines so that detainees receive a mix of indoor and outdoor exercise, it is not unusual for some pods to have more outdoor time than others, and for some pods to receive indoor exercise much more frequently than outdoor exercise (or vice versa). SUMF ¶¶ 51-53, 57; *see also* Pls.' Ex. 46 ("Outdoor *and covered/enclosed* exercise areas for general population residents are provided in sufficient number to ensure that each resident is offered at least one hour of access daily.") (emphasis added); *see also See* Defs.' Ex. 58 78:16-86:15 (acknowledging that in June and August 2014, certain pods only went outside a few days each month); Dunlap Supp. Exs. 9-10.

10.    a.    T.S. was confined to his pod for school for at least one day. PL Ex. 106 ¶ 15. T.S. was confined to his pod for LME at least one day. PL Ex. 106 ¶¶ 13, 14. T.S. was confined to his pod missing Free Write at least one day. PL Ex. 106 T.S. had visitation with his mother in a setting that afforded less privacy. PL Ex. 106 ¶ 16. T.S. lost "break rec" on all school-break days in June and August. See PL Ex. 101.

RESPONSE: Undisputed that T.S. had school on his pod for one day. Disputed that he had large muscle exercise on his pod for one day; the evidentiary record is inconclusive on this issue. Undisputed that one session of Free Write that T.S. would have been eligible to attend was canceled, but it is disputed that he was "confined" during that period instead; no facts in the record support the latter assertion.

Disputed that T.S. had a visit with his mother in a setting that afforded less privacy. Undisputed that, on four days (two in June 2015 and two in July 2015), the JTDC offered family visitation in a classroom rather than in the usual visitation area. Undisputed that

the classrooms had approximately ten percent less square footage than the usual visitation areas. **SUMF ¶ 66. No photographs exist of the classrooms as set up for visitation on those days, but computer-aided design printouts in evidence suggest that the classrooms were set up with eight tables for visitation, in contrast to the usual visitation area, which has 12 tables. Photographs of the usual visitation area exist and are in the record; those photographs do not demonstrate any significant degree of 'privacy," and Defendants dispute that the classroom offered less privacy for family visits.**

**Disputed that T.S. would have had any additional recreation had the outdoor recreation area not been used for filming on the days at issue. Exhibit 101 cited by Plaintiffs does not support that assertion.**

b. Q.B. lost visitation with his grandmother one day, when she came to visit but there were fewer available tables. See PSOF ¶ 43; PL Ex. 105 ¶ 13. Q.B. was confined to his pod for recreation at least one day. PL Ex. 105 ¶¶ 13, 14. He lost "break rec" on all school-break days in June and August. See PL Ex. 101.

**RESPONSE: Undisputed that Q.B.'s grandmother was not permitted to visit Q.B. on one day, but the cause is disputed, and there is no evidence in the record that this had anything to do with the number of tables available. SUMF ¶ 69; *see also* Fox Defs.' Opening Br. at 20-21. Undisputed that Q.B. had one day of recreation on his pod. Disputed that Q.B. would have had any additional recreation had the outdoor recreation area not been used for filming on the days at issue. Exhibit 101 cited by Plaintiffs does not support that assertion.**

c. H.C. was confined to his pod for at least 24 hours because of filming. PL Ex. 107 ¶ 10. H.C. was confined to his pod for school at least one day. PL Ex. 107. H.C. was

confined to his pod missing Free Write at least one day. PL Ex. 107. H.C. lost "break rec" on all school-break days in June and August. See PL Ex. 101.

**RESPONSE: Undisputed that H.C. did not leave his pod for one 24-hour period, but it is disputed that he was "confined" to his pod or that H.C.'s being on his pod for 24 hours occurred because several areas of the JTDC were being used by a film crew on that day. Other members of H.C.'s pod attended off-pod activities that day and evening. Undisputed that one session of Free Write that H.C. would have been eligible to attend was canceled, but it is disputed that he was "confined" during that period instead. Disputed that H.C. would have had any additional recreation had the outdoor recreation area not been used for filming on the days at issue. Exhibit 101 cited by Plaintiffs does not support that assertion.**

11.     The JTDC offers scheduled visitation for all detained children with their families. Each "Center" within the JTDC had a visitation time slot; during that time parents and guardians could visit with their children. Visitation occurred in a room on the JTDC's second floor that contained 12 tables, spaced far enough apart to provide privacy for each child who was visiting with his or her family members. Exhibit 4 ¶¶ 81-83; Exhibit 10 ¶ 30(e).

**RESPONSE: The first sentence is undisputed. In the second sentence, it is undisputed that visitation typically occurs in a room on the JTDC's second floor that contains 12 tables. Photographs of this room exist and are in the record; the spacing of tables is a measurable distance that is not subject to dispute and need not be characterized.**

12.     On May 28, 2015, a Fox location scout named Jonathan Klemke called the JTDC to ask if Fox could scout the facility as a filming location for Empire. Exhibit 13 at 23-24;

Exhibit 14 at 22-23. Klemke called the JTDC because Fox wanted a realistic prison setting in which to film certain scenes for its upcoming season of Empire. Exhibit 24 at 1. Klemke had seen a satellite image of the JTDC and saw that it had an open exercise yard, which was called for in the Empire "prison" episodes that were to be filmed. Exhibit 14 at 19, 24.

**RESPONSE: The term "Fox" is undefined. Jonathan Klemke was a contractor working as a location scout for Twentieth Century Fox Television ("20th TV") when he contacted the JTDC on May 28, 2015. Otherwise undisputed.**

13.    Klemke was a highly capable location scout, and Fox regarded him as such. Exhibit 15 at 70.

**RESPONSE: See response to #12 regarding Klemke's relationship with 20th TV. Undisputed that Klemke's supervisor, Location Manager Brady Breen, testified that he regarded Klemke highly.**

14.    In the previous season of Empire, Fox had filmed scenes for Empire at the Cook County Jail, but officials changed their policies. When Empire's location manager called about filming for the second season, the Jail explained it had decided only to allow in film crews that advanced the Jail's operations—not commercial filming. Exhibit 15 at 69, 82-83. Upon hearing of the changed policy, Fox abandoned the possibility of filming at the Jail. Id. at 69.

**RESPONSE: Undisputed, except that "Fox" is undefined. The paragraph should refer to 20th TV.**

15.    There were some deactivated correctional facilities available in Joliet, which would have been the "runner-up" to the JTDC, Exhibit 15 at 72, but those facilities had fallen

into disrepair, on a tour Fox determined that they had effectively been "destroyed" by vandalism, and were "dangerous." Id. at 83.

**RESPONSE: Undisputed, except that "Fox" is undefined. The paragraph should refer to 20th TV.**

16.     Fox also shot Empire scenes on a soundstage in Chicago, but its practice was not to build such sets unless they were to be used on a regular, recurring basis, whereas the "prison" scenes that Fox ultimately filmed at the JTDC were set to appear only in two episodes. Exhibit 15 at 48. The JTDC was also a desirable location because it was conveniently located close to Fox's soundstage, which was nearby. Exhibit 16. Fox became even more attracted to the JTDC as a filming location after touring because it fit aesthetically with Empire's cinematic needs. Id.

**RESPONSE: Undisputed, except that "Fox" is undefined. The paragraph should refer to 20th TV.**

17.     Filming in county buildings like the JTDC was vastly cheaper than other locations—the County's rate for using the JTDC (and its other buildings) was $1,500 per day, Exhibit 15 at 172; Exhibit 17 at 8179, by way of comparison, renting out a single private condominium for filming cost Fox upwards of $8,000 per day for the rental alone. Exhibit 18.

**RESPONSE: Disputed. The Cook County Real Estate Office proposed a daily access fee of $1,500 for the JTDC and 20th TV agreed to pay that amount. SUMF ¶¶ 23-24. There were no negotiations over this aspect of the fee. *Id.* Separately, 20th TV agreed to reimburse expenses and pay overtime charges. *Id.***

18.     Dixon invited Klemke to scout the JTDC that same day, and when Klemke arrived at the JTDC early that afternoon, Dixon personally gave him a tour of the facility. Exhibit 14 at 23, 27. When Klemke arrive on May 28, he toured the facility extensively. He toured the JTDC's second floor and became familiar with its layout. He also toured the JTDC's upper "Pod" floors, taking photographs both of pods and elevated photographs of the JTDC's open courtyard and the "ring" atrium structure of the pods on the upper floors. Exhibit 14 at 46; Exhibit 19; Exhibit 20. Klemke toured the second floor and saw detainees being transported between activities. Exhibit 14 at 25.

**RESPONSE:  Undisputed that Klemke arrived for a tour on the same day he first called and that he met Dixon.  Klemke testified that Dixon took him on a tour, but Dixon's memory differs.  Defs.' Ex. 3 81:19-82:12; *see also* Fox Defs.' Opening Br. at 9.  Plaintiffs' characterization that Klemke "toured the facility extensively" and that he "became familiar" with the facility are hyperbolic and disputed.  Klemke took photos of the areas he scouted and two of those photos are included as Pls.' Exs.  19-20.  Plaintiffs received the full set of photos in discovery.  Undisputed that Klemke saw some detainees in transit in the hallway during his visit, Defs.' Ex. 3 25:11-19, but disputed that Klemke knew or could have known whether the detainees were being "transported between activities" when he saw them in the hallway.**

19.     It was evident to Klemke during the tour that the second floor was lined with classrooms and that he expected the JTDC's school to be in session. Exhibit 14 at 69-70. Contrary to claims by Klemke, id., Dixon never told Klemke that school was out in the summer. Exhibit 21 at 71. Klemke also expected the yards to be closed to detained youth during the

filming, and that he knew there was no other place for the kids at the JTDC to go outside. Exhibit 21 at 110.

**RESPONSE: Disputed. Undisputed that Klemke knew the JTDC had classrooms, but he was told that school would not be in session during the June filming days, which were the only filming days contemplated by 20th TV and the JTDC during this scouting trip. SUMF ¶ 49; Defs.' Ex. 3 69:17-70:22. Undisputed that Klemke knew detainees would not be able to use any section of the yard that 20th TV was occupying during the times that 20th TV was occupying it, but he testified that Dixon told him filming could be scheduled around the detainees' use of the yards. SUMF ¶¶ 59-62.**

20. Fox had developed a code of conduct for filmmaking, which admonished that "we should not expect everyone in the surrounding environment to alter their lives just to accommodate the needs of film production." Exhibit 22 at 2182. The City of Chicago's own regulations, of which Fox was aware, had similar admonishments. Id. In addition, Fox film budgets contain a standard line-item for "neighbor payments" for people affected by the filming, which can run up to $10,000 per day in affluent areas like a condominium building in the South Loop. Exhibit 15 at 55-56, 169; Exhibit 18.

**RESPONSE: Undisputed that 20th TV had a code of conduct, and that Chicago had regulations addressing filming, which speak for themselves. Undisputed that 20th TV's budgets for *Empire* filming occasionally had line items for "neighbor payments," but disputed as to what this means. Neighbor payments were not for "people affected by the filming," but were instead payments (a) for encroachment rights onto private property, or (b) to compensate property owners for making aesthetic changes to their private property**

11

in order to enhance filming visuals. *See* **Pls.' Corrected Ex. 15 55:21-56:19 (discussing that "neighbor payments" are for things like putting "a light on that person's front yard" or "chang[ing] the drapes.").**

21.     On June 2, 2015, Klemke followed up his scouting tour with an email to Dixon, which he forwarded to Breen on June 5. Exhibit 16. Klemke's June 2 email is the only contemporaneous written assessment by Fox of the likely impact that a film crew would have on the JTDC's operations. In the email Klemke noted that he hoped Fox would not interfere with the JTDC's operations "too badly," which might be feasible because Fox would only film for "two days or so." Id. Even so while film crews usually numbered around 80 people, Klemke proposed that most of those people could be kept outside of the facility in order to "limit" the persons going inside to around "30 people total." Id.

**RESPONSE:  Undisputed that Klemke sent an email on June 2, 2015, which is in the record and speaks for itself.  *See* Pls.' Ex. 16.  Plaintiffs' characterizations of the email are disputed.**

22.     Leonard Daniels (Empire's director) and Brady Breen (Empire's location manager) toured the facility on June 11 and met with Dixon. Exhibit 25. Breen knew that the JTDC provided spaces for the children to read and use computers on the second floor. Exhibit 15 at 63-64. Breen acknowledged that Fox would take over pods 3A and 3B, but he did not know where the children in those pods were placed during filming. Id. at 65. Even though he was never told the exact recreation schedule for the yards, Breen understood that they were set aside for youth to play there. Id. at 64-65.

12

**RESPONSE: Undisputed that Lee Daniels (who directed one of the two episodes for which scenes were shot at the JTDC), Brady Breen, and others, toured the JTDC on June 11 and met with Dixon. Undisputed that Breen saw some of the spaces that were used by detainees, knew 20th TV would be filming and storing equipment in 3A and 3B, and knew that the outdoor yard was a space used by detainees for recreation. Disputed that Breen knew whether Pods 3A and 3B otherwise would have been occupied or had any knowledge of JTDC operations. Breen's testimony does not support the conclusion that he had any such knowledge.**

23.     After the June 11 tour, Fox secured agreement to use the large chapel room on the building's second floor as a "lunch and holding location," as well as the JTDC's library. Exhibit 19. The number of days for filming had expanded to occupy nearly an entire week in June, plus several more days for the return filming session in July. Exhibit 25. Fox's film crew was in the hundreds, requiring restructuring of the facility's operations. Exhibit 27.

**RESPONSE: Disputed. 20th TV did not "secure[] agreement" to use those additional spaces; the JTDC offered them for 20th TV's use. SUMF ¶¶ 21-22. Undisputed that the parties later agreed to an addendum to the Location Agreement that permitted a return in July, but this was not done until after the June filming. SUMF ¶¶ 16-19. Disputed that the "crew was in the hundreds" at any one time, although the total number of people assigned badges across all filming days was over 200. Pls.' Ex. 27. Disputed that 20th TV's presence "required restructuring of the facility's operations." SUMF ¶ 30.**

24.     Fox brought in and spread through the facility a semi-trailer worth of equipment, Exhibit 31, which resulted in additional restrictions on the movement of staff and detainees.

Exhibit 7 at 57-60. the JTDC had "minimized" movement for both residents and staff on both the second and third floors to keep them out of Fox's way. Exhibit 7 at 56-57.

**RESPONSE: Undisputed that one deponent characterized the volume of equipment 20th TV brought into the facility as approximately that which would fit in a semi-trailer. Disputed that the equipment resulted in "additional restrictions" or that the JTDC "minimized" movement. The cited testimony does not support those assertions.**

25.     After Dixon approved Fox's use of the JTDC directed his subordinates to deal with the paperwork. Exhibit 29 at 15, 19. It was the County's practice not to send its standardized lease agreement until use of the use of the facility had already been agreed to; Alonzo told Kruzel which areas of the JTDC Fox and Dixon had agreed that Fox would lease, and Kruzel then plugged in those areas and the times and dates into a standardized lease contract that the County maintained for such leases. By contrast, paragraph 1(D) of the lease, the "no-disruption" clause, was a boilerplate term that was standard in County leases. Exhibit 29 at 34-35; compare Exhibit 30 ¶ 1(D); Exhibit 100 ¶ 1(D).

**RESPONSE: The first sentence is disputed.  Although Dixon did not involve himself in the wording of the Location Agreement between Cook County and 20th TV, he remained involved in all decisions respecting 20th TV's access to the JTDC.  Exhibit 29 cited by Plaintiffs does not support the assertion that Dixon "directed his subordinates to deal with the paperwork."  The second sentence is disputed.  Zenaida Alonzo provided Andrew Kruzel with a list of areas that 20th TV intended to access, but all decisions regarding 20th TV's actual ability to access any areas remained subject to the JTDC's operational needs. Defs.' Updated Ex. 42 13:13-23.  Further, although Kruzel had a standard form used for**

14

access to County buildings, the form required customization for 20th TV's proposed access to the JTDC. **Pls.' Corrected Ex. 29 15:8-16:4. The third sentence is disputed. Kruzel testified that Paragraph 1(D) of the Location Agreement was <u>not</u> boilerplate; he inserted it into the Location Agreement for the JTDC's purposes because of the building's particular use and needs.** *See* **Pls.' Corrected Ex. 29 34:1-7.**

26.     Neither Dixon nor anyone else who exercised operational control of the JTDC signed the lease agreement, and Dixon regarded the lease agreement as a "technical" matter of little consequence. Exhibit 25. While Lee Daniels, who directed the scenes filmed at the JTDC had decided where in the JTDC the show would be filmed, had no knowledge of the clause or whether there was an agreement at all that the filming would not disrupt the JTDC's operations. Exhibit 103 at 95.

**RESPONSE:  Defendants dispute the characterizations in these statements, but do not dispute that Dixon and Daniels were unaware of the specific terms of the Location Agreement.  Dixon, however, knew that 20th TV's access to areas of the JTDC was subject to the JTDC's operational needs as determined by Dixon and his staff.  Defs.' Updated Ex. 5 97:5-9.**

27.     The alterations needed to accommodate Fox's filming needs required a "restructuring" of the facility's operations, Exhibit 27, along with props and enough filming equipment to fill a semi-trailer to the roof. Exhibit 31.

**RESPONSE:  Undisputed that one deponent characterized the volume of equipment 20th TV brought into the facility as approximately that which would fit in a semi-trailer. Disputed that the JTDC restructured operations.**

28.    Pursuant to the Lease Agreement, Fox took over the entire yard for the entire filming period, even though it filmed only in one part of the yard. There was a concern about youth jumping over the partitions. Exhibit 14 at 55. Fox required total silence to film, and kids on the yard would disrupt the silence. Id. at 83-84; Exhibit 15 at 91. Fox employees had JTDC a JTDC employee he needed to keep the detained youth quiet for the filming. Exhibit 33 at 159:18-161:17. Fox also allowed debris to remain in the yard after filming was over, indeed it was the last portion of the JTDC to be cleared. Exhibit 34; Exhibit 39; Exhibit 36.

**RESPONSE:  Disputed that 20th TV "took over the entire yard for the entire filming period."  20th TV used only one section of the yard for filming.  JTDC officials decided to close one or both of the other outdoor sections on those days, and to shift pods that had been scheduled for outside recreation at those times to indoor recreation and activities. SUMF ¶¶ 54-55.  Disputed that "Fox required total silence to film" or that Fox told the JTDC "to keep the detained youth quiet for filming."  Klemke only speculated during his deposition that the creative team would have preferred not to hear noise from adjoining sections of the yard, but Klemke was not in a position then to know what the episodes' directors would want.  Lee Daniels, in fact, said he would have welcomed the sound of playing in the other sections.  Defs.' Ex. 2 109:25-110:9.  Further, as JTDC executive staff member Gene Robinson testified, the JTDC took no steps to reduce noise during filming. Pls.' Ex. Corrected 33 at 159:22-160:22.  Disputed that 20th TV "also allowed debris to remain in the yard after filming was over."  Exhibits 24, 36, and 39 cited by Plaintiffs do not support that assertion.**

29.    Fox filmed in one of the JTDC's pods, and was given another pod to store its equipment. Exhibit 33 at 60:4-61:2; Exhibit 37. These were two of the JTDC's three "Alpha"

intake pods, where newly-arrived residents are screened and assessed upon admission. Exhibit 33 at 41:11-16; Exhibit 38 at 264:3-18. In order to accommodate Fox those pods had to be closed. Id.

**RESPONSE: Disputed to the extent this paragraph suggests that 20th TV had knowledge that the pods were "Alpha" pods or that they "had to be closed." 20th TV had no such knowledge and no evidence suggests otherwise. Undisputed that Pods 3A and 3B had been used for intake (*i.e.*, "Alpha") activities in the days prior to and after filming, and that the JTDC used other pods for Alpha activities on the days that 20th TV used Pods 3A and 3B.**

30.    Fox needed large parts of the second floor for staging and filming. It used JTDC's as a staging, break, and lunch area for Empire's film crew and the large number of extras. The JTDC's library was repurposed as another Empire break room. Exhibit 94 pp 21-22. And Fox repurposed several classrooms for its own use. Id. The chapel and the library were on the opposite side of the second floor from the JTDC's entrance, and it was planned that Fox personnel would be walking in and out of the JTDC throughout the day. Exhibit 39 at CCSAO 7787. Fox additionally had set aside the JTDC's specialized visitation room on the second floor as well. Exhibit 27.

**RESPONSE: Undisputed that on at least some of the days during with 20th TV was present at the JTDC, the JTDC gave 20th TV personnel access to the JTDC's library, to a conference room that sometimes is used as a chapel, and to several classrooms. Disputed that 20th TV "needed" this access or demanded it. SUMF ¶¶ 21-22. The JTDC's physical layout is undisputed and need not be characterized. Disputed that it "was planned that [20th TV] personnel would be walking in and out of the JTDC throughout the day." In**

fact, Dixon's office was used as a rest area to give the actors privacy and to avoid more movement in and out of the facility than necessary. *See* Defs.' Ex. 59. Undisputed that 20th TV filmed in the JTDC's visitation area on two days in June and two days in July. Pls. Ex. 16.

31.     To accommodate Fox's needs, JTDC management set about "modif[ying]" programs "to use available space." Exhibit 40. As the JTDC's recreation supervisor put it, "I will coordinate pod activities instead of yard movement." (Exhibit 41.) These moves, which amounted to "restructuring" the JTDC's operations. Exhibit 42.

**RESPONSE: Disputed. Exhibit 41 is an email sent prior to filming, which speaks for itself, and Defendants' do not agree that the message reflects what actually happened during filming. Additionally, the email chain in Exhibit 42 has no reference to "restructuring" JTDC's operations.**

32.     The yard was the only place where youth could go outside while they were detained at the JTDC. Exhibit 43 ¶ 17; Exhibit 33 at 80:2-14. As Defendants have conceded, outdoor recreation and programs were eliminated for all JTDC residents so that Fox could use the yards for filming. Exhibit 44 at 17; Exhibit 33 at 75:1-9; 80:15-21; 130:22-131:1.

**RESPONSE: Undisputed that the yard was the only place where detainees could go outside <u>for recreation</u> while they were detained. Detainees might be transferred outside the facility for other reasons. Disputed that outdoor recreation and programs were "eliminated." The record is inconclusive regarding whether one section of the yard remained open for outdoor recreation during at least some of the times that 20th TV was using another section**

of the yard. It is clear, moreover, that some outdoor programming, such as a "Karma Garden" movie, occurred in the evenings of days that filming occurred. **Pls.' Ex. 58.**

33.     The JTDC's Nancy B. Jefferson ("NBJ") school operates year-round, with short breaks in June and August. Exhibit 21 at 71:8-10; Exhibit 45. The NBJ's classrooms are located on the JTDC's second floor, and by written policy, instruction is to occur there. Exhibit 46; Exhibit 45; Exhibit 33 at 84:5-8. During the July filming, school was in session, and to accommodate Fox's use of the facility, no detainee was permitted to leave their pods for school. Exhibit 47; Exhibit 33 at 130:6- 16; Exhibit 38 at 244:18-22.

**RESPONSE: Disputed that school breaks were "short." The school schedule speaks for itself on the length of breaks. Disputed that the policy requires instruction to occur in the classrooms, and testimony indicates that on-pod instruction happens whenever JTDC officials determine it to be necessary.** *See* **Dkt No. 248 at 10-11;** *see also* **Defs.' Ex. 60 27:4-10; Defs.' Updated Ex. 17 129:21-130:15.**

34.     During the June and August filming periods when school was on break. See Exhibit 48. The JTDC would normally provide additional recreation off the pods, either in the existing recreation spaces or on the second floor, often through tournaments among pods. See, e.g., Exhibit 49. This extra school-break recreation was intended for all the detainees in the JTDC, not just those with good behavior records. Exhibit 50 ¶ 5. With the Empire restrictions, however, these opportunities were eliminated. See Exhibit 51 ("I do have several concerns [about the June Empire filming]. One of which is the timing. This was the first week our residents were on summer [i.e., school] break. It is during this time that the use of the school area and yards is helpful in allowing them to burn off some of their energy.")

**RESPONSE: Disputed. There is no evidence other than the above-cited memorandum that there might have been extra recreation but for filming. Offering extra break-recreation or "tournaments" was not a regular occurrence at the JTDC during school breaks even during Earl Dunlap's tenure as administrator of the JTDC. *See* Defs.' Ex. 58 78:16-86:15 (acknowledging that in June and August 2014, certain pods only went outside a few days each month); Dunlap Supp. Exs. 9-10. Even on those past occasions when the JTDC offered "tournaments" during school breaks, only some detainees participated in them. Defs.' Ex. 58 62:16-63:4.**

35.     Pursuant to written JTDC policies at least one hour of large muscle exercise ("LME") recreation must be provided to children at the JTDC every day, off the pod. See, e.g., Exhibit 49; Exhibit 46. Absent exigent circumstances, no such recreation is scheduled for the JTDC's pods. Exhibit 46; Exhibit 43 ¶13(c)(i). By placing the yards off limits, however, Defendants reduced the number of recreation spaces from five (the three outdoor yards plus two indoor gyms) to the two indoor gyms only. Exhibit 43 ¶¶ 18, 32. For safety, each recreation space can be used only by one pod at a time. Exhibit 21 at 132:5-10. With this limitation, there were simply not enough off-pod spaces and time slots for every pod to use. Exhibit 43 ¶ 18. The result was inevitable. As one manager summarized, "Recreation was limited to the gyms and to the sections [i.e., the pods]," instead of the yards. Exhibit 27.

**RESPONSE: Disputed that large muscle exercise "must" be provided every day or that it "must" be provided in areas other than the JTDC's residential pods. SUMF ¶ 56. Undisputed that the JTDC's written policies call for detainees to receive one hour of large muscle exercise daily and that this exercise occurs most often in the outdoor yard (except in the colder months) or in the gymnasiums. Large muscle exercise occasionally happens on**

the pods, however, and the record demonstrates that this occurred on multiple occasions during Earl Dunlap's tenure. *See* Defs.' Ex. 58 78:16-86:15 (acknowledging that in June and August 2014, certain pods only went outside a few days each month); Dunlap Supp. Exs. 9-10. Disputed that that there is not enough space for recreation when the yards are closed. The yards are closed all winter and during other inclement weather. During these times, the gyms and the JTDC's game room have sufficient capacity for all JTDC detainees to conduct large muscle exercise. SUMF ¶ 53.

36. Detainees were kept on their pods for the Empire filming. See, e.g., Exhibit 54 ("4A/R1 given large muscle recreation on living pod 4A due to yards being closed from "Empire" filming"); Exhibit 55 ("The beginning count was 16 AT's. Residents were on the pod due to filming in the facility."); Exhibit 56 ("The residents participated in Pod Rec due to the yards being closed for the taping of the Empire."); Exhibit 57 (resident grievance stating, "WE NEED RECK[.] we haven't had reck in day's[.] Fuck the empire just cause there here doesn't mean we don't gotta have reck"). See also Exhibit 43 ¶¶ 14-23, 30-32.

RESPONSE: The documents Plaintiffs cite above speak for themselves, but Defendants dispute their contents. With respect to documents written by JTDC staff, Defendants dispute that the staff member authors necessarily were in a position to know or to accurately describe the reason why (*i.e.*,) recreation was conducted in a pod residential area. With respect to the detainee grievance form, Defendants dispute the accuracy of the complaint. Undisputed that some pods had isolated instances of on-pod recreation during filming, but disputed that filming was the sole cause of on-pod recreation. In at least some instances, detainees appear to have been kept in their pods for other reasons, such as

disturbances.  **Most pods had large muscle exercise off their pods on all filming days, primarily in the gyms.**  *See* **Fox Defs.' Opening Br. at 31.**

37.      Pursuant to written policy, the JTDC provides "a comprehensive and varied system of structured program activities designed to develop pro-social thinking and behavior patterns." (Exhibit 53.) These programs range from courses on nutrition, to writing and self-expression, to programs to combat sexual exploitation. Exhibit 10 ¶ 29. The programs also draw detainees off the pods, typically to facilities such as the library, the media room, and different classrooms on the building's second floor (though some, like "Karma Garden," are offered on the outdoor yard). Exhibit 58.

**RESPONSE:  Undisputed that the JTDC offered programming and typically did so in the facilities listed above, but disputed that all of the types of programming listed above were offered in the summer of 2015.  The exhibits cited by Plaintiffs do not state that all of the above-mentioned programming was available in the summer of 2015.**

38.      In order to accommodate Fox's filming needs, off-pod enrichment and rehabilitation programs were eliminated. See, e.g., Exhibit 59 (email informing Chicago Alliance Against Sexual Exploitation that its program had been cancelled: "They are filming the show Empire and all of the programming has been cut"); Exhibit 60 (email regarding cancellation of the University of Illinois nutrition education program, noting that "[u]nfortunately they cancelled all programming this week," and later, "we had to cancel last week" because of "filming the TV show Empire"); Exhibit 61 (explaining to volunteer that the following week was not available because "[t]he building is shut down next week (again) due to Empire filming their show here."); Exhibit 62 ("And just a reminder that there is no Free Write this week, due to Empire."); Exhibit

63 ("Empire will be back and filming at the JTDC. We will not have any programming next week.") Where programs were cancelled, substitute programming was not arranged and missed sessions of the cancelled programs were never made up. Exhibit 88 at 52; Exhibit 7 at 52, 64-65.

**RESPONSE: Disputed. Although it is undisputed that certain programs were postponed and/or cancelled on several days, programming was not "eliminated." Plaintiffs elicited testimony and received documents showing which programs were postponed or canceled and the reasons for any alterations. Some programs were postponed or canceled for reasons other than filming, for example because an outside facilitator did not yet have the necessary staff or had not yet received the necessary permissions to enter the JTDC. *See* Dkt. No. 248 at 20-21; *see also* Defs.' Ex. 37 64:9-21, 75:1-8, 77:8-12; Defs.' Ex. 61.**

39.     The JTDC has designated, repurposed classrooms on its second floor where detainees are given periodic breaks to purchase items from the commissary or to engage in activities like ping pong and video games. Exhibit 4 ¶¶ 67, 76. These activities are in addition to, and separate from, LME. Exhibit 43 ¶ 31, Exhibit 49. Because Fox was using much of the second floor, however, many commissary and game sessions were eliminated. See Exhibit 47 at OAG7030 (reflecting "no commissary" for certain centers because the area closed for Empire).

**RESPONSE: Undisputed that certain JTDC classrooms are, outside school hours, repurposed as a "commissary" for detainees. Undisputed that at least some commissary trips likely were postponed because of filming. Other pods, however, including Q.B.'s pod, appear to have received a commissary visit when one otherwise would not have occurred. *See* Defs.' Ex. 62 (June 23, 2015 log entry stating: "[E]scorted 12 residents to classroom 314 for Commissary.").**

40.     To close Pods 3A and 3B for Fox's use, Exhibit 66; Exhibit 2, JTDC staff transferred Alpha around the facility. Exhibit 66 ("[w]e need to transfer At Least 14 residents (allowing us to close 3A) throughout the facility." (emphasis in original)). This caused numerous pods in the JTDC to become overpopulated. The JTDC's pods were built as 18- or 16-bed units, depending on their location in the facility. Ex. 5. However, the JTDC's written policies provide that in order to ensure safety, the functional operating capacity of the pods is 14 or 12 residents, respectively. Exhibit 67; Exhibit 4 ¶¶ 53-54.

**RESPONSE:  Disputed.  Typically, a newly-arrived detainee will remain in an Alpha pod for the first two to three days after arrival and go through a comprehensive intake process. The site of Alpha activities shifted when the JTDC gave 20th TV access to Pods 3A and 3B, but Alpha activities themselves did not change.  SUMF ¶ 77.  No detainee was transferred out of Alpha to a long-term pod without a full evaluation.  SUMF ¶¶ 78-79.  The pod population records are in evidence and need not be characterized.  Defs.' Ex. 37.**

41.     To make up space for Fox, the JTDC had to "fill up" the other pods in the facility "with 15 and 16 residents each." Exhibit 68 ("Filming for a television show begins next week. As a result, the capacity on the pods throughout the facility will go up . . . ."); Exhibit 54 ("[L]et the Staff know that the population caps for all of the pods are raised to 16."). Numerous pods were overpopulated. See, e.g., Exhibit 56 (showing pods with 15 or 16 residents each); Exhibit 55 (reflecting 16 residents "on the pod due to filming in the facility."). Overpopulated pods compromised the safety of the entire JTDC facility. Exhibit 4 ¶¶ 53-54, Exhibit 60; Exhibit 10 ¶ 38.

**RESPONSE: The pod population records are in evidence and need not be characterized. Defs.' Ex. 37. Defendants dispute the characterizations in this statement, such as "overpopulated." No pod housed more detainees than the number of individual, single-bed rooms in the pod. *See id.* Defendants dispute that safety was compromised. Having pods exceed their "functional operating capacity"—an artificial ceiling on pod capacity below its actual capacity—happens frequently at the JTDC for any number of reasons. *See id.***

42. The JTDC's dedicated visiting room has twelve tables, which are spaced far enough apart to ensure that twelve different detainees can simultaneously visit their families in privacy, which is critical to their value in mitigating the psychological impact of incarceration because a parent may be the only person who a teen can confide in during their detention. Exhibit 46; Exhibit 10 ¶ 30(e). Detainees have two one-hour visiting slots per week. The visiting slots are organized by center, and each pod has set times when visits to children housed on that center are allowed. Exhibit 72 at 56-59.

**RESPONSE: Undisputed that the JTDC's visitation area has 12 tables. Photographs of the room are in evidence. The spacing of the tables is not in dispute and need not be characterized. To the extent the purpose of this statement is to imply that detainees had less "privacy" when visiting with family members in the classrooms used as visitation areas on two days in June 2015 and two days in July 2015, disputed. No evidence exists that detainees had less privacy in the classrooms. The second and third sentences are undisputed.**

43. To accommodate Fox's desire to film in the visitation facility, visitation was moved to a different room. The classroom only had enough space for eight visits, meaning only

eight visit slots per hour instead of twelve in the visiting room. This meant that each visiting hour permitted only eight visits instead of the normal twelve. Exhibit 47. And privacy between detainees and their visitors was reduced. Exhibit 73 at 43-44; Exhibit 72 at 64.

**RESPONSE: Defendants incorporate their response to paragraph 10a and 11, *supra*. The first sentence is undisputed. The second sentence is disputed. Although a computer-aided design printout is in evidence suggesting that the classrooms were set up with eight tables, there are no photographs of the room as actually set up for visitation. If it is true that the rooms had eight tables, Defendants do not dispute that only eight detainees at a time could have had visits. Defendants dispute, however, that this resulted in any detainees not having a visit or having a visit delayed or shortened. No such evidence exists. The fourth sentence is disputed. Defendants dispute that the classroom offered less "privacy" for visits that the regular visitation area. Again, no evidence exists that detainees had less privacy in the classrooms.**

44.     The JTDC has a behavior economy, Exhibit 74; Ex. 54, which awards points to residents for good behavior, and allows residents to advance to higher "levels" for sustained good behavior. This gives detainees a sense that they are being treated fairly, and that pro-social behavior is recognized and reinforced. See Exhibit 4 ¶¶ 74-77; ECF 236-1 Exhibit 10 ¶ 30(d); Exhibit 74. It also is important for safety, as the pro-social reinforcement reduces the risk of violence among detainees. Exhibit 4¶¶ 74-78; Exhibit 10 ¶ 30(d); Exhibit 75 at 187.

**RESPONSE: The first sentence is undisputed. The second and third sentences are assertions from Plaintiffs' purported experts. Although Defendants do not dispute that one**

purpose of the "behavior economy" is to promote appropriate social behavior, Defendants do not necessarily adopt all of the above assertions.

45.     Empire restrictions effectively eliminated rewards for good behavior, which eliminated incentives for good behavior and eliminated the perception of fairness that the behavior economy was designed to generate. Exhibit 4 ¶ 78; Exhibit 10 ¶ 39. The destruction of a perception of fairness increased the negative psychological impact of incarceration on the JTDC's detainees. Id.

**RESPONSE: Disputed. The only "behavior economy" elements impacted by filming were the postponement of perhaps one commissary visit by each "good behavior" detainee, and the postponement or cancellation of a handful of classes that would have been attended by some "good behavior" detainees. This did not amount to "effectively eliminat[ing] rewards for good behavior." To the contrary, only "good behavior" detainees had the opportunity to meet *Empire* guest actor Chris Rock. *See* Defs.' Updated Ex. 5 175:15-177:2.**

46.     Lee Daniels would not have agreed that kids could meet stars as a condition of filming. Exhibit 103 at 77-78.

**RESPONSE: Undisputed.**

47.     The only interactions between Empire stars and detainees to result from the filming were: (1) Chris Rock spoke to a group of approximately 24 youth in a single session for approximately 30 minutes during the June filming, and (2) Terrence Howard held a single session similar to the Rock session after the filming. Exhibit 79 at 221; Exhibit 76. Many detainees were unhappy with the Rock event. Exhibit 7 at 94; Exhibit 77 at 79-82. Terrence

Howard came back on a single occasion after the filming, for a similar meeting. Exhibit 79 at 205-06; Exhibit 9 at 47. Aside from Rock and Howard, there were no interactions between any of Empire's cast or crew and any detainees at the JTDC. See Exhibit 79 at 176, 208-09, 216-17, 221.

**RESPONSE: Disputed as to Terrence Howard's activities (and those of his wife), which are more extensive than described above and are ongoing. Also disputed as to how "many" detainees were unhappy with having met Chris Rock. Undisputed that the only scheduled interaction between detainees and *Empire* cast members during the filming dates themselves was the single meeting with Chris Rock.**

48.     Prominent people regularly meet with children at the JTDC. These have included members of the Chicago Bulls and Chicago Bears, Congressman John Lewis, Congresswoman Maxine Waters, Cook County Board President Toni Preckwinkle, and numerous other luminaries, including prominent writers and artists, all of whom have visited the JTDC to meet and talk with the young people housed there. Exhibit 9 at 44-45; Exhibit 101 at 57-58; Exhibit 78 at 6. These persons did not arrive at the JTDC with large entourages that would upend the JTDC's operations. Exhibit 101 at 57; Exhibit 9 at 45.

**RESPONSE: The record reflects visits to the JTDC by United States Representatives John Lewis and Maxine Waters. There is no evidence in the record as to these visitors' "entourages." Robinson testified that he did not know how big John Lewis's "entourage" was. Pls.' Corrected Ex. 9 45:5-10. The record contains no evidence, either, of the "entourages" or logistics associated with visits by sports professionals or any "other luminaries."**

49.    Dixon brought his wife to the filming, Exhibit 79 at 151-52, and then directed his administrative assistant to ask Empire's location manager to bring all the stars to his office before filming began. Exhibit 80.

**RESPONSE:  Undisputed.**

50.    Dixon instructed his administrative assistant to add that any break room for Empire's stars would be in his own office suite. Exhibit 80. This was justified on privacy grounds, but there were numerous other areas of the facility that, while far away from Dixon's office, had already been blocked off for filming that could have been used instead. Exhibit 81 at 38-41; 51-53. After the stars entered Dixon's office, he and other staff came there to get pictures with them. Exhibit 5.

**RESPONSE:  Undisputed that Dixon suggested his office as a rest area for the principal cast.  Dixon testified that he believed this was the most appropriate area for it.  Defs.' Updated Ex. 5 144:21-146:24.  Disputed that other areas of the facility would have been more appropriate for use as a rest area by the principal cast members or that the principal cast members were disturbed during any times they were meant to be undisturbed. Yvonne Akins testified that Dixon's office was used because it was "the best private place." Pls.' Ex. 81 39:13-40:2.**

51.    Dixon cleared out his calendar on days that Empire came to film. Exhibit 82. Dixon secured unusually frequent opportunities to interact with the show's stars, which he was able to do because the show required so many permissions to access different parts of the building. Exhibit 15 at 116-17. Other senior staff also sought for their own opportunities to meet with stars, with Dixon "working" opportunities to get audiences with them. Exhibit 85. Fox

acquiesced to these requests, arranging a large meet-and-greet between senior JTDC administrators and the show's stars in the JTDC's library. Exhibit 32.

**RESPONSE: Disputed. Exhibit 32 contains photographs of the cast and crew with JTDC staff and those photos speak for themselves. Defendants' disagree with Plaintiffs' characterizations that Dixon "secured unusually frequent opportunities to interact with the show's stars" or of an arrangement for a "large meet-and-greet." Dixon's calendar speaks for itself. Dixon testified that he remained working during all hours that 20th TV was present at the facility and spent most of that time walking the halls of the facility. Defs.' Updated Ex. 5 242:22-243:3.**

52.     Dixon got photos with all of Empire's stars, see Exhibit 79 at 314-15; Exhibit 83, but besides Rock and Howard he did not ask any of them to meet with the youth detained at the facility. Exhibit 79 at 119. Dixon said he did not ask Chris Rock to speak with kids after the June filming because he did not see him again, Exhibit 79 at 221-22. But Dixon took photographs with Rock during the August filming. Exhibit 84.

**RESPONSE: Undisputed that Dixon took photos with many of the stars. The photos are in evidence and speak for themselves. Defendants' dispute Plaintiffs' characterization that Dixon did not "ask any of [the stars]" to meet with the detainees. Dixon testified that while he only spoke directly with Rock and Howard, he spoke with Lee Daniels and "Ms. Bigsby" about having other stars meet with detainees because he felt it would be a good opportunity for the majority-African American detainees to meet the African American actors. Defs.' Updated Ex. 5 108:23-111:8.**

53.     When Fox contacted Dixon to ask permission to come back for an unplanned film shoot in August, Dixon demanded a director's chair for himself. Exhibit 98; Exhibit 85. After the request was made, one of Dixon's subordinates emailed another privately, "Tell Brady Breen [Fox's location manager], if Dixon approved this [the August filming] he will need to get Dixon a directors chair," to which the other responded, "10-4." Exhibit 86. Thereafter, Breen took the chair request seriously, and had a director's chair custom made for Dixon. Exhibit 87 at 21.

**RESPONSE:  Undisputed that Dixon received a director's chair that Brady Breen had made for Dixon, but Defendants' dispute Plaintiffs' characterization that this was a "demand."  Yvonne Akins placed the request for Dixon to receive the director's chair.  Pls.' Ex. 86.**

54.     Dixon only invited select staff to meet the stars. Exhibit 79 at 209. Other staff was excited about the filming because of overtime pay. Nearly everyone at the JTDC signed up for overtime during the filming. Exhibit 33 at 118-19.

**RESPONSE:  Disputed.  Dixon did not testify that he invited only select staff to meet the stars.  He stated only that not all staff had the opportunity to meet the cast.  Defs.' Updated Ex. 5 209:16-20.**

55.     The filming had a negative impact on the youth at the facility. Exhibit 7 at 91, 96-100. During the Empire filming there was more tension, stress and anxiety on the JTDC's residential pods. Exhibit 43 ¶¶22. This was because the children were unable to move as much, had lost their routines, and felt cooped up. Id. Numerous youth were upset about the filming, particularly the lack of movement that had been imposed on them. Exhibit 7 at 91, 96-100.

Others felt both locked in and troubled that as incarcerated young people, they were confined to their pods to facilitate the filming of a movie. Exhibit 88 at 65-69.

**RESPONSE: Disputed. Defendants' disagree with Plaintiffs' characterizations that filming had any of the above-mentioned general negative impacts on detainees.**

56. In July 2015, Professor Thomas Geraghty contacted Dixon, saying he had heard about the filming and expressing concern that the detainees' movement was being restricted to make it possible. Exhibit 89. Dixon responded several days later with a letter assuring Geraghty the filming had had "no effect" on the JTDC's programs other than "change the location" where programming was provided. Id. Dixon assured Geraghty that the detainees had received "regular" programming and schooling, and listed two programs that had not been cancelled for the filming. Id.

**RESPONSE: Disputed. The Geraghty emails and Dixon's response letter are in the record at Pls.' Ex. 90 and speak for themselves.**

57. After sending the letter Dixon, to Gergahty, Dixon mocked Geraghty in an email to one of his family members, Exhibit 90; Exhibit 79 at 248-49, and told another relative that Geraghty was trying to "squeeze [money] out of the county" with more litigation in the Doe case. Exhibit 91. Shortly after receiving it Geraghty wrote back to Dixon, "Thanks for your response. I'm very glad to hear that the filming of Empire has been a positive experience for the kids at the Detention Center." Exhibit 92.

**RESPONSE: Disputed. The Geraghty emails and Dixon's response letter are in the record at Pls.' Ex. 90 and speak for themselves. In his testimony, Dixon denied intentionally mocking Professor Geraghty. Pls.' Corrected Ex. 79 248:15-249:14.**

58.     On August 7, Breen wrote to Dixon explaining that Fox needed to re-shoot several scenes, and proposed that Fox would come back to the JTDC on August 12. Exhibit 93. Dixon forwarded the request to Alonzo, the JTDC's in-house counsel, asking what she thought. Id. Alonzo answered, "I don't advise having them come back before the Doe party meeting on 8/20," to which Dixon responded, "Agreed." Id. Alonzo said she gave this advice because the Doe meeting was a lot of work. But Dixon did not remember that preparing for the Doe meeting involved a lot of work. Exhibit 79 at 278:6-12. Notably, August 20, 2015 was the date that Judge Holderman's active monitoring of the facility terminated. Exhibit 4 ¶ 22; Exhibit 99.

**RESPONSE: Undisputed, but the referenced emails are in the record and speak for themselves. Additionally, Zenaida Alonzo testified that splitting time between filming and the Doe meeting would have been "burdensome" because of the "time, effort, preparation for Doe meeting and then just having a lot of people on site." *See* Defs.' Updated Ex. 42 91:12-93:6.**

59.     Restrictive incarceration of children and adolescents may at times be necessary, but it is psychologically harmful to them. See Exhibit 4 ¶ 28; Exhibit 10 ¶¶ 21, 30. Confinement to more restrictive spaces with fewer activities—particularly "day rooms" like the JTDC's pods—magnifies that psychological harm. Exhibit 10 ¶ 6. In contrast, more time off the pods and more activities—especially access to outdoor recreation—mitigates the psychological harm that incarceration imposes on young people. Id. ¶ 9.

**RESPONSE: Undisputed as a general matter that restrictive incarceration is not beneficial to children's psychological well-being, but that it is at times necessary. Disputed that JTDC detainees' time spent in their pod common areas, or receipt of recreation indoors vs. outdoors (as occurs during the entirety of the colder months) inflicted psychological harm on Plaintiffs or other detainees. Plaintiffs have purported to support these contentions only with the unfounded opinions of Earl Dunlap and Louis Kraus, both of whom based those opinions solely on false assumptions about what detainees experienced, rather than the actual facts as adduced in discovery.**

60.     More time spent restricted to the pods means more negative impact on detainees and more psychological harm from incarceration. This is true for every juvenile; more restriction equals more harm. For this reason, numerous JTDC programs— school, enrichment activities, exercise, recreation, commissary, etc.—are purposefully scheduled to take place off the pod. Exhibit 10. ¶ 30(a).

**RESPONSE: Undisputed that the JTDC typically conducts school, non-school programming, exercise, recreation, and commissary, in areas other than the residential pods. The rest of the statement is disputed. Plaintiffs have purported to support these contentions only with the unfounded opinions of Earl Dunlap and Louis Kraus, both of whom based those opinions solely on false assumptions about what detainees experienced, rather than the actual facts as adduced in discovery.**

61.     Increased pod confinement, reduced opportunities for structured programming, and the total elimination of access to outdoor space and fresh air are harmful to youth and increase the harms to juveniles that are caused by detention. Exhibit 4 ¶ 9.

**RESPONSE: Whether or not Defendants would dispute that confinement to pod common areas and "the total elimination of access to outdoor space" would be appropriate detention conditions for juveniles, those are not the facts of this case, as discussed above and below.**

62.     It is the practice of guards to use additional pod confinement, such as the cancellation of off-pod recreation, as punishment designed to deter misconduct by detainees and maintain order and safety on the pods. Exhibit 43 at ¶ 13.

**RESPONSE: Disputed that it is the "practice of guards" to use pod confinement as "punishment."  The Kenya Taylor declaration, which Plaintiffs cite as purported evidence for this statement, does not support that characterization.  Pls.' Ex. 43 ¶ 13(iv) ("When I worked at JTDC, we would sometimes prohibit residents from participating in off-pod exercise as a punishment.  I also recall at least once when we would not allow residents to participate in off-pod exercise because there was a staff shortage and it would not have been safe to move about the facility.").**

63.     Dixon refused Fox's request to film in the infirmary. See, e.g., Exhibit 96; ECF 88 ¶ 43; Exhibit 100 ¶ 1(A). The infirmary filming was cancelled when, a few days before filming there, the infirmary filming plan was sent to Josie Mabale, the head of the infirmary, who was told to "plan accordingly." Exhibit 97. The infirmary filming thereafter was cancelled that same day, upon which Mabale expressed thanks for the cancellation. Id.

**RESPONSE: Disputed.  Although the Location Agreement listed the JTDC's medical area as one of the locations to which 20th TV would have access, Dixon testified that he never approved filming in the medical area and never would have approved it.  Defs.' Updated**

**Ex. 5 99:7-19. The undisputed reality, which Plaintiffs have conceded, is that 20th TV never filmed in the infirmary.**

64.    T.S., Q.B., and H.C. have testified that in their perception the responses to sick call requests were indeed delayed during the filming. Exhibit 73; Exhibit 72 at 106-07; Exhibit 77 at 125-28.

**RESPONSE: Defendants are not in a position to dispute, or to elect not to dispute, the truth or falsity of Plaintiffs' "perception." The reality, however, as reflected in the evidentiary record, is that on all days that 20th TV was present at the JTDC, no medical rounds to the residents pods were canceled or delayed, detainee transport to and from the medical area continued, no medical emergencies occurred, and none of the Plaintiffs had any medical needs that went unmet or experienced any delays in receiving treatment. Nor is there any evidence in the record that <u>anyone's</u> medical treatment was delayed.**

65.    The Empire lockdowns, particularly additional pod confinement and overpopulation, endangered the safety of the JTDC's detainees by making physical violence among them more likely. See Exhibit 4 ¶¶ 8, 44, 52, 53, 64, 78; Exhibit 10 ¶¶ 6, 30(c)-(d), 38.

**RESPONSE: Disputed. The term "lockdown" is undefined in the statement above but has a particular meaning in the detention context. No "lockdown" within the term's usual meaning occurred in this case. Defendants dispute that any of the issues Plaintiffs raise in this case endangered their safety or made physical violence more likely. The record does not reflect any increase in incidents on days that 20th TV filmed at the JTDC, and multiple JTDC staff members testified that incidents <u>decreased</u> during filming.**

66.     Daniels testified that he "absolutely" "would [have] want[ed] to know" that the JTDC's residents could not access their classrooms during filming, Exhibit 103 at 97, 101, that it would have mattered to him if the children at the JTDC could not go outside because of the filming, Exhibit 103 at 100, that he would have wanted to know that kids could not get off their pods for exercise, Exhibit 103 at 100, and that it would have mattered "[d]eeply" to him that enrichment programming was cancelled for the filming, Exhibit 103 at 101-02.

**RESPONSE:  Undisputed that Lee Daniels testified in the manner quoted.**

67.     A person in the yard could not see through the glass into the pods, so he was left only with a "feeling" that residents were allowed to watch. Exhibit 103 at 99.

**RESPONSE:  Disputed.  There is visibility between the yards and pods.  The layout of the JTDC is not subject to dispute and the floor plan is in the record at Pls.' Ex. 2.**

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

Dated: March 11, 2021                    Respectfully Submitted,

By: */s/ Francis J. Catania*
      Francis J. Catania
      Danielle Mikhail
      Cook County State's Attorney's Office
      50 West Washington, Room 500
      Chicago, IL 60602
      312-603-3373
      francis.catania@cookcountyil.gov
      danielle.mikhail@cookcountyil.gov

      ***Attorneys for Defendant the County of Cook, Illinois***

By: */s/ Lyle K. Henretty*
      Lyle K. Henretty
      Patrick D. Morris
      Cook County State's Attorney
      69 W Washington, Suite 2030
      Chicago, IL 60602
      312-603-1434
      patrick.morris@cookcountyil.gov
      lyle.henretty@cookcountyil.gov

      ***Attorneys for Defendant Leonard Dixon***

By: */s/ Jeffrey S. Jacobson*
      Jeffrey S. Jacobson
      Faegre Drinker Biddle & Reath LLP
      1177 Avenue of the Americas, 41st Floor
      New York, NY 10036-2714
      212-248-3191
      jeffrey.jacobson@faegredrinker.com
      Justin O. Kay
      Faegre Drinker Biddle & Reath LLP
      191 N. Wacker Dr. Suite 3700
      Chicago, IL 60606
      312-569-1000
      justin.kay@faegredrinker.com

      ***Attorneys for the Fox Defendants***